Mr. Fields had ghillied his rifle. Id. at 2384-85. However, he has now explained that it was common for hunters in the area to use ghillie suits and to ghillie their weapons – questions he was never asked by trial defense counsel:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go to any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself.
>
> * * *
>
> Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't because it wasn't unusual.

Declaration of Daniel Presley ("Presley Dec."), A – 20, ¶¶ 4, 5.

111.    Mr. Presley also would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles. He states, "You an either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's." Presley Dec., ¶ 5. Moreover, Mr. Presley would have testified that Mr. Fields

61

attached the scope to his rifle at least a year before the homicides. Id.

112. Mr. Presley also could have rebutted the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides, if only trial counsel had inquired into the matter. The Government first called Mr. Presley to testify that on the evening of July 10, 2003 he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." TR, 2382. The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2005 and told her he had plans with his Mr. Presley for that evening. Ms. Tipton testified:

> Those plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work. He was a very timed person and he got home at exactly the same time every night and he knew – at this time I was not working, so, he knew that I would worry. So, he wanted me to know that him and Danny would be out fishing and that he wouldn't be right home.

TR, 2558-59.

113. From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts. TR, 3412-13.

114. However, Mr. Presley would have testified on cross-examination that Mr. Fields came over to his house after work that day and **asked him to go snake-**

62

**hunting that night**. Presley Dec., ¶ 3. Mr. Presley declined to go hunting because he had plans to go to the casino with sister, id., but the fact that Mr. Fields suggested that the two of them go snake-hunting that evening shows that, as he indicated to Ms. Tipton, he **did** hope to do something with Mr. Presley that evening. As Mr. Presley observes:

> When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m. – or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

Id.

115. Although trial counsel did not question Mr. Presley about this information on cross-examination, they had been alerted to its existence. In Mr. Presley's statement to the FBI, he mentioned that, just hours before the offense,[18] Mr. Fields asked him if he "wanted to do something." FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview") A – 21, at 3. Mr. Presley's statement was produced to the defense in discovery. Yet trial counsel never followed

---

[18]Mr. Presley told the FBI that Mr. Fields came over to his house sometime after 4:00 p.m. Presley Interview at 3. In his testimony at the sentencing hearing he said he "thought it was around 4:00" that he last saw Mr. Fields that day, but he had "heard since that it was later than that." *TR*, 2382. His wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven, I believe." *TR*, 2462.

up with Mr. Presley – either through investigation or cross-examination – to find what it was that Mr. Fields "wanted to do." Had trial counsel followed up on this remark during their investigation, they would have learned that Mr. Fields wanted to go snake hunting the night of the offense, not shoot the Chicks, and could have presented that information to the jury to contradict and challenge the substantial planning and premeditation aggravating factor.

116. Trial counsel never asked Mr. Presley these matters. See Presley Dec., ¶ 3.

### 2. Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.

117. As further proof that Mr. Fields had a premeditated plan to shoot the Chicks, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned several hours later to stage a robbery. This claim was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal. The Government argued:

> To [Agent Dalley] this was not a true burglary or robbery. This was staged.
>
> So you have to ask yourself why would he do this. Why would he come back some hours later to commit this crime. Don't know. But one thing I throw out to you is this. The evidence suggests that he knew he may

have been caught by those people coming in. These people may have recognized his truck and when he had completed his plan, when he had killed the Chicks, when he had finally murdered his prey, when he had graduated from squirrels to humans, he left the area.

* * *

So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery and if anyone says anything I can say, well, I was – they were – I was there using the bathroom. They were already dead.

TR, 3421, 3422; see also TR, 2019 (Government explains relevance of staged robbery theory to statutory aggravating factor).

118.    To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma. Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. TR, 2099. According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried:

65

A:   In addition to the blood that is in the runners of the foot well and on top of the sandals, I also note that there are these small, shiny fragments here which are pieces of broken glass.

Q:   And did you find those pieces of broken glass significant?

A:   Yes, sir.

Q:   And how did you find them significant?

A:   In two ways.  One, they were consistent with being from the driver's window, which I found had been broken, such that there was an impact to the window from the driver's side towards the passenger's side.
The other thing that I noted was there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood.

*TR*, 2098-99.

119.   In addition, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot. *TR*, 2026-32, 2111-15.

120.   If trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator – they would have learned that the evidence supporting the Government's "staged robbery" theory could have been soundly impeached.

66

121. Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. Referring to a photograph marked Government's Exhibit 43, Agent Dalley testified "there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood." *TR*, 2099. Agent Dalley did not explain on direct examination how she arrived at this conclusion, nor did trial counsel ask this question on cross-examination.

122. In the report Agent Dalley prepared almost two weeks after the homicides, however, she recorded no observations about these glass fragments and failed to mention whether she examined the fragments at the scene or collected them for later examination.[19]  Trial counsel never cross-examined her about the fact that

---

[19]Agent Dalley reported about these objects as follows:

DALLEY opened the front passenger door. Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep. Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep. *Fragments of broken glass were on top of the sandals and blood in the doorstep.* DALLEY collected the three sandals and the tissue-like fragment.

her report is utterly silent as to whether the glass fragments had any blood on them. If these fragments were such important pieces of evidence, as the Government argued, Agent Dalley's failure to note their significance in a report written two weeks after the crime raises serious questions about whether she did in fact examine them to determine whether they were free of blood – particularly since she neglected to collect and preserve the fragments as evidence. Her testimony could have been severely impeached on this fact alone.

123.   Moreover, while Government's Exhibit 43 does not show any blood visible on the glass fragments, another crime scene photograph taken by Agent Dalley – a close-up of the area depicted in Government's Exhibit 43 – reveals that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), $A – 23$, ¶ 8. This fact contradicts Agent Dalley's testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Mrs. Chick's blood while the blood was still viscous. Id., ¶ 9. If even one glass fragment landed on Mrs. Chick's blood while it was still viscous, the driver's side window must have been broken before the blood had time to dry. Thus, the Government's theory is deeply flawed and was eminently impeachable.

---

OSBI Crime Scene Investigation Report dated August 1, 2003, $A – 22$, at 3.

68

124.    Even if other glass fragments had no blood on them, trial counsel could have offered a reasonable explanation for this fact during Agent Dalley's cross-examination.  Agent Dalley testified that the front passenger door was closed when she arrived on the scene and that she had to open it in order to view the interior of the van. TR, 2098.  It is likely that Agent Dalley disturbed a number of glass fragments when she opened the door, causing them to fall onto the dried blood at that time.  This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door.  Tressel Dec., ¶ 12.  Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so.  Id.

125.    Trial counsel also could have attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot.  Government's Exhibit 51 is a photograph depicting Mr. Chick's right hand.  It shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist.  Mr. Chick's right hand must have

69

been exposed to this debris while he was being moved from the picnic table to the ground. Tressel Dec., ¶ 16. If Mr. Chick had been moved many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground, and pine needles and other ground debris would not have become attached to the dried blood. Id. Thus, Mr. Chick's body likely was moved within an hour after he was shot,[20] not more than six hours later, as the Government argued. Id.

126.    In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. Tressel Dec., ¶ 17. The air temperature on the evening of July 10, 2003 was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot. Id., ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot, not more than six hours later as the Government argued.

127.    The Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body. Lividity is a

---

[20] Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. *TR*, 2099-2100. The blood on Mr. Chick's right hand appears to be considerable less thick than the blood found in the van, and thus would have dried in less time.

discoloration of the skin caused by the settling of blood in the capillaries due to gravity. Tressel Dec., ¶ 18. It does not occur in areas of the body that are in contact with the ground or another object. Id. Although lividity can become become "fixed," or unchangeable in less than four to six hours after death, although lividity can be fixed is less time in colder temperatures. Id. Dr. DiStephano and Agent Dalley testified that livor patterns on Mr. Chick's body were consistent with lividity having become fixed while Mr. Chick was seated at the picnic table. See, e.g., *TR*, 2031-32 (testimony of Dr. DiStephano), 2177 (testimony of Agent Dalley).

128. Trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body **also** were consistent with lividity having become fixed while Mr. Chick was lying where he was found. Mr. Chick was discovered face down beside the picnic table with his left arm extended across his chest, his right foot bare, and the top of his right foot pressed against the ground. Tressel Dec., ¶¶ 19-20. Mr. Chick's body shows lividity on his left side, right abdomen, top thigh and right bottom toes, which is consistent with the position in which he was found and inconsistent with being seated at the picnic table. Id. These livor patterns could not have occurred if lividity had been fixed before Mr. Chick's body was moved. Id.

129. Some livor patterns on Mr. Chick's body are inconsistent with the

71

position in which he was found. These patterns include areas of discoloration on the backs of Mr. Chick's thighs. Trial counsel nevertheless could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

### B. Evidence Rebutting the Mental Anguish Aggravating Factor.

130. In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor:

> [Mr. Chick's] wife Shirley sitting right in front of him face to face in the darkness sharing moments of the beautiful scenery and the vista. What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his [sic] face. What was the horror, the shock, the sheer oh, my God, the terror that went through her mind at that instant?

*TR*, 3415-16.

131. As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. *TR*, 2088-91. She

also testified that high velocity spatter can travel up to two feet and still remain visible on an object. *TR*, 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face:

> Well, if I can explain just a bit. Since it appears to be from a gunshot wound, then I look for any other gunshot wound in the scene that would be in a position that could cause that staining on her face. And subsequent to the autopsy and getting that information, I could exclude the wounds to her head as producing these stains down on her – especially down on her cheek. I could exclude the wound to her foot. That leaves Mr. Chick having two wounds. And one of those wounds then would be consistent with the staining on her face.

*TR*, 2090. Agent Dalley never explained why she could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point, although trial counsel did establish that the blood spatter on Mrs. Chick's face was never tested to determine the source.[21] *TR*, 2213.

132. Had trial counsel consulted a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and

---

[21]Agent Dalley also did not test high velocity blood spatter that she observed on Mrs. Chick's hands. *TR*, 2213. She attributed this spatter to Mrs. Chick's head wound, claiming it could be accounted for if her hands had been in a defensive position. *TR*, 2180-81.

a nearby exit wound. Tressel Dec., ¶ 26. According to Mr. Tressel, either of these wounds could have created high velocity blood spatter[22] and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

### C.    Trial Counsel's Ineffective Assistance.

133.   Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing.

134.   Trial counsel were deficient for failing to adequately challenge the aggravating factors. The Government's evidence of substantial planning and mental anguish effectively went unrebutted even though trial counsel had readily available information that could have undermined that evidence or placed it in its proper context. Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting and that Mr. Fields wanted to go snake hunting with him on the night of the offense. Presley Dec., ¶¶ 3-5. A crime scene investigator or other

---

[22]Indeed, Agent Dalley conceded this fact when she attributed the high velocity blood spatter on Mrs. Chick's hands to her head wound.

74

appropriate expert could have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. Tressel Dec., ¶¶ 8, 9, 12, 16-17, 19-20, 26. At the very least, trial counsel could have consulted with such an expert to assist in cross-examining the Government's witnesses. Trial counsel concedes that she did not even consider retaining a crime scene investigator or pathologist and that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses." O'Connell Dec., ¶ 22. Trial counsel not only failed to consult with appropriate experts and attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors, but in closing argument she failed to utter a single word about these aggravating factors.

135.  Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims. O'Connell Dec., ¶ 22. Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr.

75

Fields eligible for the death penalty, and trial counsel had every reason to rebut the aggravating factors to convince the jury that mitigating factors outweighed aggravating factors.

136.   Mr. Fields was prejudiced by trial counsel's deficient performance. The Government vigorously argued that its evidence supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456.  That evidence went unchallenged.  Trial counsel could have injected reasonable doubt into the jury's deliberations by cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt.  There is a reasonable likelihood that, had trial counsel vigorously attacked the Government's evidence in these ways, the verdict would have been different.

### D.    The Government's Due Process Violations.

137.   The Government presented false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

1. **False and Misleading Testimony and Argument About a Purportedly Staged Robbery.**

138. As discussed above, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill. *TR*, 3421, 3422. This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Field eligible for the death penalty and was weighed by the jury. See, e.g., *TR*, 2019 (explaining relevance of staged robbery theory to statutory aggravating factor).

139. The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried. Id. at 2098-99.

140. Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation

77

report, and (2) photographs she took at the crime scene.

141.  In a report she prepared approximately two weeks after the homicides, the only observation Agent Dalley made about the glass fragments was that "[f]ragments of broken glass were on top of the sandals and blood in the doorstep." OSBI Crime Scene Investigation Report dated August 1, 2003, 3. Agent Dalley mentioned nothing more about the glass fragments, nor did she include those fragments in the list of evidence she collected at the scene. Id. at 7-9.

142.  Although Agent Dalley testified that the glass fragments were "significant" because they were not stained by blood, TR, 2098-99, her report fails to mention any characteristic that made them significant, indicating that either she did not physically inspect the fragments at the scene or she inspected them but did not observe anything significant about them. Because the glass fragments were not collected as evidence, she could not have examined them at a later time. Thus, her testimony that the fragments were "significant" because they were not stained with blood could not have been based upon her physical examination of those fragments.

143.  Nor could Agent Dalley's claim that the glass fragments were "significant" have been based on her examination of photographs. The bottom surface of these glass fragments is not visible in any photograph. More importantly, one of the photographs taken by Agent Dalley shows that at least one glass fragment

78

resting on the dried pool of Ms. Chick's blood *does* have a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* – 24.[23] This photograph – which the Government never asked Agent Dalley about – contradicts her testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Ms. Chick's blood while the blood was still viscous. If even one glass fragment landed on Ms. Chick's blood while the blood was still viscous, the driver's side window must have been broken before the blood had time to dry.

144.    The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not solicit Agent Dalley's false and misleading testimony, they had a duty to correct it.

145.    Despite the fact that the prosecutors knew or should have known that Agent Dalley's testimony was false and misleading, they nevertheless argued in closing that her testimony supported the substantial planning aggravating

---

[23]The photograph included in the Appendix is not a clear copy and is included for identification purposes only.

circumstance. *TR*, 3456 (prosecutor argues that glass fragments proved that Mr. Fields staged a robbery).

### 2.    Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi."

146.    As discussed above, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offense. This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton. The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382. The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR*, 2558-59.

147.    Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day. **He had already set up us [sic] alibi**. If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him. **He's**

80

**already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth.**

TR, 3412-13.

148.    The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury. In August 2003, Mr. Presley told the FBI that, on the day of the offense, Mr. Fields came to his house sometime after 4:00 p.m.[24] and asked him if he "wanted to do something." Presley Interview at 3. Mr. Presley replied that he had "plans to play the casino in Fort Smith." Id. This statement was memorialized in a FBI 302 Report and provided to the prosecutors. Id. During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening. The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

149.    It was clear from Mr. Presley's complete statement to the FBI that Mr.

_____

[24]At the sentencing hearing, Mr. Presley testified that it may have been later than 4:00. *TR*, 2382. His wife Marilyn testified that it was between 6:30 and 6:45 p.m. *TR*, 2462.

Fields **did** intend – or at least wanted – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence shows that he had no plan to shoot the Chicks at the time at the time he made this statement to Ms. Tipton. It also shows that he had no intention of shooting the Chicks when he suggested to Mr. Presley that they go snake hunting, which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

**3.    The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.**

150.    There is a reasonable likelihood that the judgment of the jury could have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The

82

Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigators. Moreover, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

151. The defense's presentation of Mr. Fields' social history evidence was disjointed, incomplete and unpersuasive. A handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family. Yet, as trial counsel were well aware, the defense's mitigation specialist had collected compelling evidence that, contrary to the

83

impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. This information would have been mitigating in its own right, and also would have helped a mental health expert explain his mental state at the time of the offense. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life. Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

### A. Evidence of Family Dysfunction that the Jury Never Heard.

152. Mr. Fields was raised in a severely dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. Ms. Shettles was retained by trial counsel in August 2003. Shettles Dec., ¶¶

2-3.[25] She spent the next several months interviewing persons who knew about Mr. Fields' family and background and collecting relevant documents, including his medical, mental health and school records. Id., ¶ 3. She provided trial counsel with the results of her investigation and advised them about mitigation themes. Id., ¶ 3-5.

153.   According to Ms. Shettles, Mr. Fields' family history "was marked by notable dysfunction." Shettles Dec., ¶ 5. Both of his parents came from family backgrounds where sexual abuse and violence were prevalent. Id. His father spent part of his youth in a foster home. Preliminary Assessment, dated September 11, 2003 ("Shettles Memo") A – 25, at 4. Three of his father's sisters experienced sexual abuse and rape, one was disabled from polio, and another was disfigured in an automobile accident. Id. at 4-5. In his mother's family, sexual abuse, gambling and drinking took place. Id. at 7.

154.   Mr. Fields' mother, Margaret Fields, suffered from depression her entire life and "placed her own emotional needs above those of her family ...." Shettles Dec., ¶ 5. His father was largely absent from his upbringing, and his mother "jealously

---

[25]As is typical in such cases, Glori J. Shettles is a well-credentialed (masters level educated) and vastly experienced mitigation specialist. As her declaration reveals, she has law enforcement experience, and for approximately the last 17 years she has been involved as a mitigation specialist in over 70 capital cases. Shettles Dec., ¶ 2. Counsel hired the right person, but failed to effectively use the mitigating evidence she unearthed.

guarded her relationship with her husband" by keeping him from their children. Id., ¶ 6. As Cherie Fields, Mr. Fields' sister, explains, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father." Declaration of Cherie Fields ("Fields Dec."), ¶ 3, A – 26. She recalls that her parents never hugged her or Mr. Fields or told them they were loved. Id., ¶ 5.

155. Cherie Fields also recalls that her mother "took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security." Fields Dec., ¶ 5. As a result, Mr. Fields received love from no one in the family. According to Ms. Shettles, "the relationship between the parents and Mr. Fields and his sister ... was distant, cold and unemotional." Shettles Dec., ¶ 6. Mr. Fields' apparent inability to express emotions may have its roots in the lack of appropriate parenting he received as a child. Id., ¶ 9.

156. The problem was compounded by the family's transient lifestyle. Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, TR, 2674-76, the jury never learned the significance of the family's nomadic life: that Mr. Fields had a difficult time forming and keeping friendships, which increased his sense of

isolation at a time when he already felt emotionally cut off from his parents.

157.  Mr. Fields and his sister were the recipients of "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." Shettles Dec., ¶ 6.  Cherie Fields describes this discipline:

> I recall my father being provoked by our mother to have us whip each other with belts – our Dad would be the one to say if we were doing it hard enough.  If we weren't, then he would take a lick.
>
> * * *
>
> When we got a whipping, we'd have to take our pants off and lie on the bed. Dad would whip us with a belt until we'd cry and scream.  It didn't matter what time of day or night it was.  If Mom ordered him to give us a whipping he'd do it.  It was all very bizarre and Eddie really got the worse of it.

Fields Dec., ¶ 6.

158.  For most of his life, Mr. Fields suffered from chronic depression. Shettles Dec., ¶ 8.  He appeared "unhappy," "moody" and "strange," lacked motivation and moved from one activity or relationship to the next without any obvious reason. Id., ¶ 8.  As a result, he was frequently and inaccurately dismissed by those who knew him as "lazy."  Id., ¶ 10.  To Cherie Fields, her brother's depression made him act "weird."  She states that, when she was growing up with her brother, "there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird." Fields Dec., ¶ 9.

87

By the time the family was preparing to move to Virginia, she recalls, "my brother was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

159. In addition, intergenerational mental health and neurological issues plagued Mr. Fields' family, particularly on his mother's side. Shettles Dec., ¶ 8. Cherie Fields explains that Mr. Fields' mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill. Fields Dec., ¶ 8. Mr. Fields' mother reported having brain lesions. Shettles Memo at 2. On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor. Id. at 3-4.

160. The jury never learned about Mr. Fields' severely dysfunctional family. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields. During her direct examination, trial counsel focused on a handful of non-controversial subjects – the impact of the deaths of her father and grandfather and her mother's physical ailments, for instance[26] – which gave the

---

[26]On direct examination, Cherie Fields testified about: the places her family lived, *TR*, 2674-76; fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not

misleading impression that the Fields were a more or less typical family. Trial counsel never inquired into subjects that would have revealed Ms. Fields' own tortured upbringing, significant family dysfunction, including the kind of parenting she and Mr. Fields received, how they were disciplined, the struggles of Mr. Fields and his mother with depression and other mental health issues, or inter-generational mental illness.

161. One of the reasons Cherie Fields' testimony failed to reveal the degree of family dysfunction was that trial counsel never explained to her why it was important for the jury to learn about such matters. Fields Dec, ¶ 12. She states, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

162. As a result, the defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. As Ms. Shettles, who attended the entire sentencing hearing, describes it:

[W]hile some isolated social history facts were provided to the jury,

---

spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offense, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687.

89

there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

163.  Trial counsel also never asked the defense's testifying mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction.

164.  Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

165.  Not only was this social history information never presented to the jury, but much of it was not even presented to Dr. Grinage and Dr. Woods to use in evaluating Mr. Fields. Trial counsel provided Dr. Grinage only with the Shettles Memo, a "preliminary" document that Ms. Shettles had prepared in the very early stages of her investigation. Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005 at $A - 28$ at 2; Shettles Memo at 2. Similarly, the only information about family dysfunction that trial counsel provided Dr. Woods, the other defense psychiatrist, was "family historical records" which

90

included the medical records of his parents and maternal grandmother. Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005 *A – 28* at 1.

### B.    Trial Counsel's Ineffective Assistance.

166.    Trial counsel were ineffective for failing to present Mr. Fields' complete social history – including family dysfunction and other mitigating evidence – through the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert such as Dr. Woods or Dr. Grinage. Trial counsel also were ineffective for failing to argue that Mr. Fields' social history was a mitigating factor and to provide this evidence to the defense's mental health experts to help evaluate his mental state at the time of the offense.

167.    Trial counsel performed deficiently when they failed to present a complete social history and argue that social history as a mitigating factor. Ms. Shettles had collected valuable information about Mr. Fields' background that the jury never heard. Either she or a mental health expert such as Dr. Woods or Dr. Grinage could have developed this information into compelling mitigation themes of parental abandonment, emotional and physical abuse, family dysfunction, and mental illness. All three individuals were available to testify on this subject. Dr. Woods and Dr. Grinage actually did testify at the sentencing hearing (although they were not asked about Mr. Fields' social history), and Ms. Shettles, while not called as a

witness, attended the entire sentencing hearing and could have testified anytime. Shettles Dec., ¶ 13.

168. Had trial counsel asked Ms. Shettles, Dr. Woods or Dr. Grinage to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields. The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records. All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life. See, e.g., Shettles Dec., ¶ 11.

169. From a mitigation and mental health standpoint, this information would have been compelling evidence for the jury to consider. Dr. Grinage explains:

> I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did

we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented.

Grinage Dec., ¶ 10.

170. Moreover, Dr. Woods and Dr. Grinage should have been asked about how this information affected their opinions of Mr. Fields' state of mind at the time of the offense. Dr. Grinage notes, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10.

171. Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and ultimately presented a smidgen of this evidence, e.g., through the testimony of Cherie Fields. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to

93

accomplish that result.

172.    Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented and argued a number of relatively minor biographical facts as mitigators – for instance, that he served in the Navy, worked as a prison guard and performed well at his job at Kenco Plastics. *TR*, 3400-01. However, trial counsel never presented or argued the far more powerful mitigation that was at their fingertips: family dysfunction and the long-term effects of that dysfunction on Mr. Fields' personality and behavior. As Ms. Shettles observes, "counsel were not seeing the forest for the trees as a result of their [own] dysfunctional relationship." Shettles Dec., ¶ 16. Prejudice is well-established:

> In my view, based on over twenty years working in the criminal justice system and with significant experience in capital sentencing, **I am shocked that the jury failed to find a single mental health-related mitigating factor in this case,** when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.

Shettles Dec, ¶ 15. Had the jury heard evidence of Mr. Fields' dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death.

94

## GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

173. The Government's closing arguments were rife with misrepresentations of law and fact, impermissible witness bolstering, *ad hominem* attacks, and speculation intended to inflame the passions of the jury. As a result, Mr. Fields was deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence. These comments violated his due process right to a fundamentally fair trial. Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal.

### A.    Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence.

174. The Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase Mr. Fields' burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns. These instances of prosecutorial misconduct had

95

a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited discretion to extend mercy based on the evidence presented.

175.    The Government twice told the jury that the mitigating factors had to outweigh aggravating factors in order to justify a sentence less than death:

> The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie.  The mitigating factors – (Interrupted)
>
> MR. DERRYBERRY:  Objection to that based on the law.
>
> THE COURT:  Overruled.
>
> MR. SPERLING:  The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

*TR*, 3463-64.  This argument incorrectly stated the law, which requires that the aggravating factors must "sufficiently outweigh" the mitigating factors in order for the jury to impose a sentence of death.  18 U.S.C.A. § 3593(e). Trial counsel appropriately objected to this argument. This Court erred in overruling the objection. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

176.   The improper comments were made worse when this Court overruled the objection in front of the jury, thus suggesting that the Government's incorrect statements were in fact correct.  The official imprimatur thereby placed upon the

prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury.

177.   The Government also urged to the jury to reject mercy based on the evidence as a basis for a sentence less than death:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

*TR*, 3430. To the contrary, mercy is one of the most central and important factors to guide the jury's sentencing discretion.

178.   Despite Mr. Fields' unquestioned statutory and constitutional right to have a penalty hearing before the jury, the Government told the jurors that the entire proceeding was unjust:

> **The Defendant wants to choose a sentence**. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

*TR*, 3457.

> Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.

97

*TR*, 3459. The Government's comments invited the jurors to sentence Mr. Fields to death merely for exercising his Eighth Amendment right to individualized sentencing. This also violated Mr. Fields' Sixth Amendment right to a trial on these sentencing facts the jury was required to consider.

179.    The Government improperly invoked societal concerns about lenient sentences and recidivism as a basis for rejecting a sentence less than death:

> You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence.  I can't believe they gave probation to a child molester. You know [sic] longer have that luxury.

*TR*, 3431.  These sentiments were echoed in later comments, invoking popular opinion that prison was too easy on criminals:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment.  If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation.  Don't let this Defendant be a hero to his incarcerated criminal inmates.

*TR*, 3457.[27]    The Government's comments were an invitation to reject the individualized sentencing determination required by the Eighth Amendment, and a

_____

[27] The Government's argument was based upon facts not in evidence.  The only testimony about so-called jailhouse perks was elicited from Daniel Presley, who testified about the policies at the minimum security Oklahoma state prison where he was employed.  *TR*, 2408-09. Mr. Presley had no knowledge of the conditions of confinement on the Special Confinement Unit of the Federal Death Row at the United States Penitentiary at Terre Haute, Indiana.

naked appeal to vengeance designed to inflame the passions of the jury.

180. Individually and collectively, these improper arguments denied Mr. Fields his right to a jury that would consider and give effect to the mitigating evidence presented and to an individualized determination of the appropriate sentence in his case.

### B. Improper Arguments Denying the Right to a Fair Trial.

181. The Government's closing argument contained numerous statements misrepresenting the record and contained comments designed to inflame the passions of the jury, thus inviting the jury to decide Mr. Fields' punishment on factors other than the evidence properly presented at trial. The Government also improperly embellished and bolstered the testimony of its witnesses throughout its closing.

182. Given the nature of the mitigating evidence of Effexor-induced "manic flip" presented by trial counsel, the credibility of the mental health experts presented by both Mr. Fields and the Government was a critical aspect of the trial. The Government engaged in a series of attempts to improperly bolster and vouch for the credibility of its experts. Referring to Dr. Price, the Government stated:

> He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns.

*TR*, 3429.  The Government continued: "Dr. Mitchell – and he may be the best one of all ... Dr. Mitchell who has no axe to grind here, ladies and gentlemen." TR, 3429-30.[28]

183.   The Government echoed the earlier bolstering of Drs. Price and Mitchell, personally vouching for their credibility by stating, "I respectfully submit, thought [sic], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns." *TR*, 3452.  At the same time, both attorneys for the Government denigrated Mr. Fields' expert witnesses as "high dollar shrinks," id.; "hired guns," *TR*, 3429, from the "left coast," id., who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion." *TR*, 3429.

184.   This improper bolstering of the Government's experts was paired with the Government's gross misrepresentation of the testimony of Drs. Grinage and Woods about a significant factual issue raised by the Government in support of the aggravating factors – whether Mr. Fields' prior use of the ghillie suit to sneak up on other people undermined Mr. Fields' contention that he killed the Chicks in an

---

[28]Contrary to the Government's "left coast – hired gun" attack, Dr. Grinage is from Topeka, Kansas.  *TR*, 2768.  Like the Government's expert Dr. Mitchell, Dr. Grinage had never before testified in a capital case.  Grinage Dec., ¶ 2; see also *TR*, 3429-30 ("Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case.").  Thus, Dr. Grinage was neither a hired gun, nor from the "left coast."

Effexor-induced manic state. The Government argued:

> On cross examination, the doctors we asked about the Ghilley suit. Well, I didn't know he had the Ghilley suit and had snuck up on people beforehand. I didn't know that at all.

TR, 3427. The Government's statements are false. Dr. Woods testified, "I was aware that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit and observed someone...." TR, 3024. Dr. Grinage was **never asked** if he was aware that Mr. Fields put on the ghillie suit and observed people.

185. In addition to improperly bolstering its own expert witnesses and denigrating those of Mr. Fields, the Government launched a series of *ad hominem* attacks on Mr. Fields:

- "But it was he who chose to turn his back on his family five years ago. It was he who chose to be abusive. It was he who chose to ignore his kids and not even pay child support. ... he's already turned his back on his family..." TR, 3431.

- "He abandoned them though. He abandoned them." TR, 3458.

- "The Defendant used and discarded people." TR, 3449.

- "He lied. He was trying – manipulative, a con artist." TR, 3450.

- "And was financially irresponsible, parasitic and promiscuous." TR, 3450.

- "The Defendant is unalterably and fundamentally different from most human beings." TR, 3455.

- "Selfish. Selfish. Narcissistic. It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his widowed mother move halfway across the country." *TR*, 3459.

- "He's the one who put all of us here. What a sense of power he may feel. The narcissistic kind of selfish collections of reality that he has become." *TR*, 3460.

- "He had talked often enough about committing suicide in a transparent ploy to gain sympathy and money from his marks." *TR*, 3464.

- "The fight and Terry Hanna. That was illustrative, wasn't it? That tells you who the Defendant will choose to be near. A child abuser." *TR*, 3465.

These arguments were designed to inflame the passions of the jury, inviting the jurors to sentence Mr. Fields to death, not because any of the aggravating factors that were offered or proven, but because Mr. Fields was a fundamentally bad person, the kind of man who pals around with child abusers and who did not support his family.

186.    Without factual basis in the record, the Government attempted to elicit fear of Mr. Fields – and bolster its claim that Mr. Fields posed a future danger – by arguing that he had been diagnosed as a sociopath.[29]  The Government told the jury:

---

[29] The Government repeatedly sought without success to have some witness tar Mr. Fields with the label of sociopath.  Neither of the Government's mental health experts diagnosed Mr. Fields as a sociopath. At most, Mr. Sperling was able to elicit from Dr. Price a diagnosis of personality disorder not other specified with antisocial, psychopathic and narcissistic features and traits.  *TR*, 3148.  Dr. Price did not diagnose Mr. Fields as antisocial, psychopathic, sociopathic or narcissistic. *TR*, 3215-

"His own doctors are saying, yeah, he has the traits of a sociopath...." *TR*, 3428; "He's a sociopath." *TR*, 3449. To the contrary, neither Dr. Grinage nor Dr. Woods testified that Mr. Fields was a "sociopath" or even had sociopathic traits. Mr. Sperling had attempted to elicit such evidence from Dr. Grinage, whom he questioned extensively about whether Mr. Fields exhibited any of the traits of a sociopath. See TR, 2841-46. Dr. Grinage, however, denied that Mr. Fields exhibited any such traits, as this Court itself noted. TR, 2849 ("I think Mr. Sperling is simply asking the doctor if he noticed these characteristics or traits in the Defendant. I don't think he's asking to give that. And, of course, I know the doctor didn't and I think he said he didn't."). Dr. Woods was never questioned regarding a diagnosis of sociopathy.[30]

_____

17. The Government then tried to adduce evidence that Mr. Fields' experts had diagnosed him as having sociopathic "tendencies" by calling a lay witness, Marilyn Presley, to testify that Mr. Fields "stated that they were – had said that he had some sociopathic tendencies, I believe, and wanted me to look it up on the computer for him." *TR*, 3086. Although the Government's theory was that the "they" who purportedly told Mr. Fields he had "sociopathic tendencies" referred to mental health experts retained by the defense, see *TR*, 3428, Mrs. Presley testified that Mr. Fields never told her who "they" were and in fact conceded it was a "good possibility" that the comment had been communicated to Mr. Fields by trial counsel who were merely reporting what other attorneys had said about him. *TR*, 3086, 3090. Thus, there was no evidence that Mr. Fields' experts had diagnosed him as having "the traits of a sociopath," contrary to Mr. Fries' assertion during closing argument. The reports of the defense trial experts confirm that neither diagnosed Mr. Fields as a sociopath nor observed in him any psychopathic traits.

[30] Trial counsel appropriately objected to the Government's statement that Mr. Fields' "own doctors are saying, yeah, he has a traits [sic] of a sociopath." *TR*, 3428-

6:03-cr-00073-RAW    Document 286-3    Filed in ED/OK on 04/06/10    Page 44 of 67

187.   In addition to arguing that Mr. Fields was a sociopath, the Government made a number of other improper arguments without factual basis in the record in order to bolster its case in support of the aggravating factor of substantial planning and deliberation.  The Government argued that Mr. Fields planned for many months to commit this crime, contending that his hobby of squirrel hunting – and his construction of the ghillie suit for that hobby – was really a prelude to murder:

> Didn't start on July 10, 2003, started long before that.  It started about a year before that when, as you heard, the Defendant was with Penny to help create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.

> \* \* \*

> Look at the painstaking manner that must have been done in order to complete this Ghilley suit.  This is not the act of a man who's frenzied or has flights of thoughts.  It's the actions of a man who is methodically thinking out what he wants to do.  His plan down the road is to become a predator, a sniper.  This is the first step in that action.

> \* \* \*

This is when the plan really began to take form.  Plan was not to kill

---

39. However, this Court overruled the objection. *TR*, 3429.  The Court did so despite previously sustaining an objection to the question asked to Marilyn Presley: "Did he explicitly identify the doctors who had made that finding?" *TR*, 3086.  The Court erred in overruling the objection to the statement made in the Government's closing argument, as there was no factual basis in the record for the Government's assertion that Mr. Fields' doctors said that he had the traits of a sociopath.  Appellate counsel was ineffective for failing to raise this issue on direct appeal.

104

Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

* * *

At this time the Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper.

*TR*, 3406, 3408-9. The Government continued: "He had mastered his craft. He had practiced with squirrels and now he was moving to humans." *TR*, 3414; "in the days, weeks and months before the killing ... the killing germ began to take root in his mind ...." *TR*, 3454.

188. However, there was nothing in the record to support the inference that Mr. Fields constructed the Ghillie suit with the idea of shooting a human being, or that he hunted squirrels for reasons other than to enjoy a hobby with his friend. Indeed, the evidence adduced at trial actually contradicted such an inference. The undisputed evidence at trial established that Mr. Fields' purpose in making the Ghillie suit was to use it for hunting squirrels, and nothing more. See *TR*, 2378-79 (Mr. Presley testified that he went hunting several times with Mr. Fields, who wore the Ghillie suit to shoot squirrels); *TR*, 2458 (Mrs. Presley testified, "It's just a Ghilley suit that people go hunting in."); *TR*, 3121 (Dr. Price testified, "And [Mr. Fields] preferred to use this Ghilley suit that he had constructed and hide and let the squirrels

105

come close to him."); *TR*, 2487 (David Love testified, "He told me that he had basically made it to hunt squirrels with."). Additionally, Jovanna Fields testified Mr. Fields was prepared to abandon the ghillie suit weeks before the Chicks were killed. *TR*, 2656-57.

189.   The Government further misrepresented and twisted the testimony of Daniel Presley in order to bolster its argument that Mr. Fields' hobby of squirrel hunting – and use of the ghillie suit for that hobby – was part of a greater plan to murder the Chicks.  The Government told the jury that Mr. Presley – Mr. Fields' hunting partner – testified that Mr. Fields "[d]idn't need to have a ghilley suit to go squirrel hunting" and that "there's no need to have a scope like this on this kind of gun, a .22," and contended that Mr. Presley called it a "sniper's rifle."  *TR*, 3407-8. Mr. Presley provided no such testimony, and disavows any suggestion that the Government's arguments correctly interpreted his testimony.[31] See *TR*, 2370-2410; Presley Dec., ¶¶ 4-5.

190.   Additionally, the Government misrepresented the testimony of Daniel Love. Mr. Love testified that during the spring of 2003 Mr. Fields said he had snuck

_____

[31]The Government also contended that Mr. Presley testified about an incident when Mr. Fields scared Mr. Presley while the two were hunting and Mr. Fields was wearing the Ghillie suit. *TR*, 3408-9. Mr. Presley never testified about this incident – the story was recounted in the testimony of Dr. Price. *TR*, 3122. The Government never attempted to elicit this story from Mr. Presley. See *TR*, 2370-97; 2408-10.

up on a couple on Talimena Drive while dressed in the Ghillie suit. *TR*, 2487. Mr. Love further testified that he told Mr. Fields to stop doing that or he would "get his ass shot off." Id. The Government contended that "the Defendant just kind of laughed at [Mr. Love]," *TR*, 3408, which was untrue. Mr. Love testified was that Mr. Fields was "[k]ind of aggravated a little bit. He took [the Ghillie suit] back out to the truck." *TR*, 2487. Mr. Love's actual testimony suggests that Mr. Fields was upset by Mr. Love's comments, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. TR, 3409.

191. The Government also contended that Mr. Fields used the campground to scout out potential victims:

> So he begins to look for victims. What is the testimony? He's hanging out at the Winding Stair Campgrounds. He's up in the Talimena Drive. He's going snake hunting. He's doing all these things, but he's also searching for a victim. Not a particular individual, but an individual or individuals who unfortunately have put themselves in a position of danger. He's at the Winding Stair Campgrounds and he's there several times a week. He's taking a shower, he's going to the bathroom. He's using it because his girlfriend won't let him live in their house anymore, but he's also using it as a place to search for a victim. He keeps track of when people are there, who's staying there, when they're staying there, what the habits are.

*TR*, 3410. Contrary to the Government's assertion, there was absolutely no testimony that Mr. Fields used to campground to identify a victim, much less any evidence that

107

he "ke[pt] track of when people are there, who's staying there, when they're staying there, what the habits are." Id. At most, the evidence indicated that Mr. Fields was aware the Chicks were staying at the campground. The Government's argument impermissibly exaggerated the trial evidence in a manner designed to mislead and inflame the jury.

192.   In support of the mental anguish aggravating factor, the Government argued that the jury could reasonably infer that Shirley Chick's death was not silent:

> He likely heard whatever cries or moans or expressions of fear from at least one of his human prey. He killed from a short distance....
>
> And by the way, may I suggest one area in which the evidence establishes really our witness's credibility? Special Agent Gary Graff didn't pump things up. He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me. But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

TR, 3462; see also TR, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life."). There was no evidence that Mrs. Chick cried out when she was shot. This argument was pure speculation and was calculated to elicit an emotional reaction from the jury. It is also another example of the Government's improper witness bolstering.

193.   The Government concluded its closing argument with an extended and

108

wholly improper recitation of scripture to support its position that Mr. Fields was worthy of death. The Government related to the jury the well-known "writing on the wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my Government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

*TR*, 3466-67; <u>compare</u> Daniel 5:1-31. The Government then argued that Mr. Fields should be weighed in the balance and found wanting. TR, 3467. The Government's

109

invocation of biblical support for its position invited the jurors to decide the question of Mr. Fields' punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance. Bible references as a basis for a death sentence are anathema to the Eighth Amendment.

194. Individually and in combination, the improper statements by the Government had a substantially prejudicial effect on Mr. Fields' rights under the Sixth and Eighth Amendment, and rendered his trial fundamentally unfair. These comments exaggerated and improperly bolstered the evidence in support of the Government's position while denigrating the mitigating evidence presented by Mr. Fields, and invited the jury to decide the question of Mr. Fields' punishment in a manner other than set out by statute and the Constitution. It is the prosecutor's job to seek justice, not victory. Here, the Government crossed that line, using a pattern of attacks, misrepresentations and improper appeals to passion, vengeance and fear to seek victory in the form of a death sentence.

C.    **Trial Counsel's Ineffectiveness.**

195. Other than in the two instances noted above, trial counsel failed to object to any of the Government's improper statements throughout its closing arguments. Trial counsel's failure to object to these blatantly improper comments was deficient

performance, and trial counsel could have had no strategic reason for their failure to do so. O'Connell Dec., ¶ 23 ("Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issue for appellate review.").

196. Mr. Fields suffered prejudice from trial counsel's failure to make meritorious objections to the Government's improper closing arguments. As a result, the jury was encouraged to ignore the substantial mental health evidence presented by Mr. Fields, which it did in refusing to find that Mr. Fields committed the offenses under severe mental or emotional disturbance. *TR*, 3481. Based upon the Government's improper embellishment of its evidence, the jury also found that Mr. Fields committed the offenses after substantial planning and premeditation, and that Mr. Fields inflicted mental anguish upon Mrs. Chick. *TR*, 3479-80. If trial counsel had objected to the Government's misrepresentations of the law and the evidence, its *ad hominem* attacks on Mr. Fields, and its appeals to passion and vengeance, there is a reasonable likelihood that the verdict would have been different.

197. Appellate counsel rendered deficient performance by failing to raise these repeated instances of prosecutorial misconduct on direct appeal. Had appellate

111

counsel raised these, there is a reasonable likelihood that Mr. Fields' sentence would

have been vacated and the matter remanded for resentencing. Appellate counsel can

have no reason for failing to raise meritorious claims on direct appeal, particularly in

a capital case.

## GROUND SIX

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

198.    Although Mr. Fields pled guilty to two counts of first degree murder, the

jury sentenced him to a general verdict of death, not separate sentences on each count.

In doing so, the jury was allowed to consider all seven of the aggravating factors

argued by the Government – including five factors that applied to only one of the two

counts.  This unified weighing process skewed the balancing of aggravating and

mitigating factors in favor of death.  Trial counsel not only failed to object to this

unconstitutional weighing process and general verdict, but they requested instructions

and a jury verdict form that were, in the words of the Court of Appeals, "functionally

the same" as the improper instructions and verdict form approved by the Court.

United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009).  Accordingly, trial counsel

rendered ineffective assistance in violation of the Sixth Amendment to the United

States Constitution.

## A.    The Unified Weighing Process and General Death Verdict.

199.    Mr. Fields pled guilty to two counts of first degree murder: Count 1 (the murder of Mrs. Chick) and Count 3 (the murder of Mr. Chick).  The Government sought the death penalty for Counts 1 and 3 based on seven aggravating factors, including three factors that exclusively applied to Count 1 (murdering Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and inflicting mental anguish on Mrs. Chick) and two factors that exclusively applied to Count 3 (murdering Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick).[32]  *TR,* 3396-99.

200.    Although Mr. Fields pled guilty to two separate murder counts, the Court never instructed the jury that it had to determine the penalty for **each** murder count individually and that it could consider only those aggravating factors applicable to a particular count in determining the sentence for that count.  See generally *TR*, 3393-3304; see also *TR*, 3478-83 (Special Findings Form).  Instead, the Court's instructions and the Special Findings Form required the jury to vote on a single verdict of life or death.  *TR*, 3404 (instructions), 3484 (Special Findings Form).  Moreover, although

---

[32]The other aggravators argued by the Government were: (1) killing more than one person in a single episode; and (2) future dangerousness. *TR*, 3396-99.

113

the Court instructed the jury to decide each aggravating factor separately, *TR*, 3403-04; see also *TR*, 3396, 3399 (Special Findings Form), **the jury was permitted to consider all seven aggravators in deciding whether Mr. Fields should live or die.**[33] *TR*, 3403-04; see also *TR*, 3483-84 (Special Findings Form).

201. Consistent with the Court's instructions, the jury "f[ou]nd by unanimous vote that *a* sentence of death shall be imposed on the Defendant." *TR*, 3484-85 (Special Findings Form). The jury rendered no verdict distinguishing between each murder count,[34] nor did the jury apply specific aggravating factors to particular murder counts. See id.

202. The jury's general verdict of death denied Mr. Fields his right under the

---

[33] The Special Findings Form instructed:

The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death .... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer "yes" below [and] record your verdict on [the general verdict form for death] .... If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations [and] sign [the general verdict form for life imprisonment].

*TR*, 3483-84.

[34] The Court's poll of the jury after the verdict also failed to distinguish between each count. *TR*, 3485-87.

Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. In imposing the sentence, the jury had no mechanism for separating out the two counts. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on the other count. Such a verdict was not merely a theoretical possibility. The mental anguish aggravating factor applied only to Mrs. Chick, *TR*, 3399, arguably making her death more egregious in the eyes of the jury. The unitary weighing process used here, however, did not give the jury the option of returning a verdict of death for the murder of Mrs. Chick but life without the possibility of release for the murder of Mr. Chick. Instead, the jury faced an "all or nothing" proposition as its sole sentencing option.

203. More importantly, the unitary weighing process approved by the Court skewed the weighing of aggravating and mitigating factors, denying Mr. Fields his right to reliable sentencing guaranteed by the Eighth Amendment. The Court instructed the jury to consider the substantial planning aggravating factor separately for each of the Chicks. *TR*, 3396; see also id. at 3478 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been

able to consider two plans to kill the Chicks when deliberating about the verdict for each murder count. Under a unitary weighing process, however, the substantial planning aggravating circumstance or instruction skewed the weighing of aggravating and mitigating factors because it allowed the jury to double-count the substantial planning circumstance. The instruction had the effect of allowing the jury to consider two separate plans to kill each of the Chicks even though the Government argued only that Mr. Fields had one plan to kill both of the Chicks in a single criminal episode.

204. The Court also instructed the jury to consider the victim impact aggravating factor separately with regard to each of the Chicks. *TR*, 3398-99; <u>see</u> <u>also</u> *TR*, 3479-80 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been able to consider any victim impact related to the death of Mr. Chick when deliberating about the verdict for killing Mrs. Chick, nor would it have been permitted to consider any victim impact related to the death of Mrs. Chick when deliberating about the verdict for killing Mr. Chick. Under a unitary weighing process, however, the Court's instruction on applying the victim impact aggravating factor skewed the weighing of aggravating and mitigating factors

116

because it added an aggravating factor that would not have been present had the jury separately considered each murder count. The jury was permitted to weigh victim impact related to the deaths of **both** of the Chicks in deciding whether the aggravators outweighed the mitigators.

### B.    Trial Counsel's Ineffective Assistance.

205.    This ground was raised as court error on direct appeal. The Court of Appeals for the Tenth Circuit stated:

> Fields argues that it was error to allow the jury to consider a general death sentence in a multi-count case, based on a weighing process incorporating a set of aggravators that combined, and consequently exceeded, those it found applicable to the individual counts for which the death penalty was sought. Fields, however, did not object to the collective weighing process and general verdict below. Indeed, as the government emphasizes, the instructions and verdict form tendered by the defense were functionally the same as those ultimately used by the court. Therefore, because Fields invited any error of which he now complains, we decline to review it.

Fields, 516 F.3d at 939.

206.    While the invited-error doctrine relied upon by the Court of Appeals in denying relief may be an appropriate analysis for a direct appeal (where claims of ineffectiveness of counsel may not be raised or decided), it leaves open the question of whether trial counsel were ineffective for failing to object and in requesting the objectionable unified weighing process. The answer to that question is rather

117

obvious.

207. Trial counsel were ineffective for failing to object to the unified weighing process and general death verdict that denied Mr. Fields his rights under the Sixth and Eighth Amendments. For the reasons discussed above, the instructions and verdict form deprived Mr. Fields of his right to reliable sentencing and a unanimous sentencing verdict on each count to which he pled guilty. Not only did trial counsel fail to object to these unconstitutional instructions and verdict form, but, as the Court of Appeals noted, they proffered their own instructions and verdict form that were "functionally the same as those ultimately used by the court." Fields, 516 F.3d at 939; see also Defendant's Tendered Penalty Phase Instructions. Counsel could have had no reasonable tactic or strategy to fail to object to this clearly disadvantageous weighing scheme. O'Connell Dec., ¶ 23.

208. Mr. Fields was prejudiced by trial counsel's deficient performance. Because the jury was allowed to consider all of the aggravating factors in the aggregate in rendering a general verdict, its weighing of aggravating and mitigating factors was skewed in favor of death. The jury was allowed to double-count the substantial planning aggravating factor and to consider an additional victim impact aggravating factor, neither of which would have been possible if the jury had been required to render a verdict separately on each murder count. Accordingly, there is

118

a reasonable likelihood that, had the jury been required to deliberate individually on each murder count, the verdict of the jury would have been different.

## GROUND SEVEN

**THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

209.   The Government withheld exculpatory, material evidence that it had an obligation to disclose to the defense, including but not limited to evidence that would have corroborated the defense's argument that Mr. Fields had taken an increased dose of Effexor before the offense, emails and other documents on Mr. Fields' computers supporting the fact that he was mentally ill, and witness statements containing favorable information. To the extent the Government did not have an obligation to disclose this evidence, or the information was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Accordingly, Mr. Fields was denied his rights to due process and the effective assistance of counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

### A.    The Undisclosed Exculpatory Evidence.

210.   The Government had a duty to disclose exculpatory evidence to the

119

defense that included but was not limited to the following.

### 1.    Bottle of 150 mg Effexor Capsules.

211.    In a report dated July 18, 2003, Agent Iris Dalley of the Oklahoma State Bureau of Investigation ("OSBI") stated that, during a search of Mr. Fields' truck, she observed two prescription pill bottles. *A – 29.* OSBI Report of Iris Dalley dated July 18, 2003 at 1. Later in her report she noted that she observed a "pharmacy sack label" dated July 9, 2003 for "30 Effexor 150 mg capsules for EDWARD FIELDS" and a bottle of pills with the same label. Id. at 3.

212.    Five days later, Special Agent James Alford of the United States Forest Service prepared an inventory of items found in Mr. Fields' truck, including an item described as "'Effexor XR 3.75mg/75mg' blister pack containing three pills" but **not** the pharmacy sack label or the bottle of Effexor 150 mg capsules observed by Agent Dalley during her search of the truck. Inventory of Items in 1989 Chevrolet Truck dated July 23, 2003, *A – 30*, at 2.

213.    The FBI subsequently turned over to Mr. Fields' mother the items found in his truck. The defense's investigator prepared an inventory of these, including "July 9, 2003 - Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg" and "14-day sample packet of Effexor XR. Three (3) capsules remain in the package." Memorandum from Glori J. Shettles dated January 1, 2004,

*A* – 31 at 1, 4. The bottle of 150 mg Effexor that Agent Dalley observed in July 2003 was not returned. See id.

214. Law enforcement officials seized the bottle of 150 mg Effexor and are charged with the knowledge of what was in the bottle. The Government elicited agreement from defense expert Dr. Woods that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage? [i.e., the 150 mg dosage of Effexor]" *TR*, 3029-30. The Government also implied that Mr. Fields took a 37.5 mg dose of Effexor from the fourteen-day blister pack, not the 150 mg dose from the thirty day prescription bottle. *TR*, 3030.

215. The Government elicited this testimony from Dr. Woods while being in sole possession of the 150 mg bottle and knowing or being able to determine the contents of it. Thus, the 150 mg Effexor bottle contains exculpatory evidence relating to the quantity of Effexor capsules Mr. Fields ingested prior to the offense. The Government failed to disclose this exculpatory evidence to the defense. See O'Connell Dec., ¶ 20.

121

## 2. Emails and Documents from Mr. Fields' Computers.

216. On August 28, 2003, Patrick Kennedy of the OSBI imaged the hard drive of a computer used by Mr. Fields. OSBI Report of Patrick Kennedy dated November 20, 2003 at 3. This hard drive contained 7,904 documents and 544 email messages. Id. at 4. On September 4, 2003, Mr. Kennedy imaged the hard drive of a second computer used by Mr. Fields. Id. at 3. This hard drive contained 8,095 documents and 6,418 email messages. Id. at 4. According to Mr. Kennedy's report, these drives were "searched for images, documents and web pages relevant to camouflage clothing and particularly Ghillie Suits; snipers; and homicide; in a variety of manners." Id. at 4-5.

217. The hard drives of these two computers contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails. The Government failed to produce this exculpatory evidence to the defense.[35]

---

[35]In response to written requests from undersigned counsel, the Government permitted inspection of the computers seized from Mr. Fields. Counsel appeared at the FBI office to inspect the computers and following that inspection the Government shipped three such computers to the defense for forensic analysis. Upon such analysis, counsel were told that the computers they were permitted to inspect, and which ultimately were shipped to them, are **not** the computers or hard drives references by Agent Kennedy. Those have not been provided by the Government, and counsel will soon include a request for those in a to-be-filed discovery request.

### 3.    FBI Forms 302 and Reports of the OSBI.

218.    On information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information.  The Government failed to produce this exculpatory evidence to the defense.[36]

### B.    The Undisclosed Exculpatory Evidence Was Material.

219.    The exculpatory evidence withheld by the Government was material, both considered separately and because of their cumulative impact.  See, e.g., O'Connell Dec., ¶ 20 (discussing importance of Effexor pills).  There is a reasonable likelihood that, had this evidence been disclosed to the defense, the result of Mr. Fields' sentencing hearing would have been different. Also, when considered along with the due process violations set forth in Ground Three, above, materiality is established.

### C.    Trial Counsel's Ineffective Assistance.

220.    To the extent the Government did not have an obligation to disclose this evidence or it was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence.  Trial counsel rendered

---

[36]Counsel will soon file a discovery motion seeking all of these materials as well as others.

deficient performance by failing to discover exculpatory evidence that could have been used to prove the defense's case-in-chief and to impeach the Government's witnesses. There was no reasonable basis for failing to investigate, discover and present this evidence. See, e.g., O'Connell Dec., ¶ 20 (discussing lack of strategy or tactics regarding discovery of Effexor pills). Mr. Fields was prejudiced by trial counsel's deficient performance because, had the jury learned of this exculpatory evidence, there is a reasonable likelihood that the verdict would have been different.

## GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.

221.  Each of the grounds presented in this *Motion* individually entitles Mr. Fields to relief from his death sentence. However, even if this Court finds that Mr. Fields is not entitled to relief based on any particular ground, the cumulative effect of these errors described herein, have denied him due process and a reliable sentencing hearing as guaranteed by the Fifth and Eighth Amendments to the United States Constitution. Moreover, counsel's cumulative errors and omissions individually and cumulatively entitle Mr. Fields to relief for violations of the Fifth, Sixth and Eighth Amendments to the United States Constitution,

124

## GROUND NINE

### THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.

222.   The manner of Mr. Fields' execution, if carried out under current Bureau of Prison lethal injection protocols, would violate the Eighth Amendment to the United States Constitution.  The protocols governing his execution, including the combination of drugs that would be used to accomplish his death, the use of untrained non-medical and unqualified personnel to carry out his execution, the physical space in which his execution would take place, and other factors which are currently not within counsel's knowledge, would result in the infliction of unnecessary pain and suffering.

223.   While the manner of Mr. Fields' execution would be unconstitutional, this claim is not ripe for review at this time.  Mr. Fields is not at imminent risk of execution, and this claim may be moot if this Court grants him the relief he seeks pursuant to other claims in the Petition.  Mr. Fields asserts this claim only to preserve it against a later challenge by the Government based on waiver or other defenses.  Mr. Fields will amend this claim if the Court deems it appropriate to address it in connection with these proceedings.

Respectfully Submitted,

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Dated:      Philadelphia, PA
            April 5, 2010

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on the 6th day of April, 2010 I caused a copy of the foregoing to be served on the following by hand delivery:

Honorable Sheldon J. Sperling
United States Attorney
Eastern District of Oklahoma
1200 W. Okmulgee
Suite 201
Muskogee, Oklahoma 74401-6848

Michael Wiseman