No. _____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____


IN RE EDWARD LEON FIELDS, JR.,

Movant.

_____

CAPITAL CASE

**EXHIBITS FOR
MOTION FOR LEAVE TO FILE
A SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255**

_____


HUNTER LABOVITZ
Pa. Bar. No. 204760
KATHERINE ENSLER
Pa. Bar No. 319029
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut St., Ste. 545W
Philadelphia, PA 19106
Telephone: (215) 928-0520

May 25, 2020                    *Attorneys for Movant*

## INDEX TO EXHIBITS

A    PROPOSED SUCCESSIVE MOTION TO VACATE CONVICTIONS AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

B    INITIAL MOTION TO VACATE CONVICTIONS AND SENTENCE PURSUANT TO 28 U.S.C. § 2255 (FILED APRIL 6, 2010)

C    AMENDED (INITIAL) MOTION TO VACATE CONVICTIONS AND SENTENCE PURSUANT TO 28 U.S.C. § 2255 (FILED OCTOBER 13, 2015)

D    DISTRICT COURT § 2255 OPINION AND ORDER (DECEMBER 15, 2016)

E    DISTRICT COURT § 2255 JUDGMENT (DECEMBER 15, 2016)

F    TENTH CIRCUIT § 2255 OPINION (DECEMBER 30, 2019)

# EXHIBIT A

PROPOSED SUCCESSIVE MOTION TO VACATE CONVICTIONS AND
SENTENCE PURSUANT TO 28 U.S.C. § 2255

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIV-10-115-RAW |
| Respondent, | : | |
| | : | CAPITAL 2255 PROCEEDINGS |
| v. | : | |
| | : | HONORABLE RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| | : | |
| Petitioner. | : | |

## CONSOLIDATED MOTION AND BRIEF[1] TO VACATE CONVICTIONS AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

HUNTER LABOVITZ
Pa. Bar. No. 204760
KATHERINE ENSLER
Pa. Bar No. 31902
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut St., Ste. 545W
Philadelphia, PA 19106
Telephone: (215) 928-0520

Date:   May 25, 2020                    *Attorneys for Movant*

---

[1] Pursuant to Local Civil Rule 7.1(b), Mr. Fields files a combined motion and brief.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

PROCEDURAL HISTORY................................................................................................ 3

ARGUMENT ................................................................................................................. 4

I.    In light of *United States v. Davis*, this Court should vacate Mr. Fields's § 924(c) convictions because the predicate crimes do not satisfy § 924(c)(3)(A)'s elements clause......................................................................................................... 4

    A.    A predicate crime must categorically satisfy the elements clause to be a "crime of violence." ...................................................................................... 4

    B.    First-degree murder under § 1111 does not qualify as a crime of violence under the elements clause of § 924(c)(3)(A). ........................................... 5

        1.    Federal first-degree murder does not categorically require the level of intent necessary of a crime of violence. ......................................6

        2.    Federal murder does not categorically require the level of force necessary of a crime of violence. ...................................................11

II.    Mr. Fields's plea was not knowing, intelligent, and voluntary where he did not understand the nature of each charge and he was innocent of the § 924(c) charges. ............................................................................................................... 14

III.    Mr. Fields's successive motion satisfies the requirements of 28 U.S.C. § 2255(h)(2) because *Davis* announced a previously unavailable, new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court. ............................................................................................................... 17

    A.    *Davis* announced a previously unavailable new rule of constitutional law. ............................................................................................................... 17

    B.    This motion is timely under 28 U.S.C. § 2255(f)(3)................................. 18

RELIEF REQUESTED..................................................................................................... 18

## TABLE OF AUTHORITIES

**Federal Cases**

*Bailey v. United States*, 516 U.S. 137 (1995) ................................................................. 15

*Borden v. United States*, 140 S. Ct. 1262 ................................................................... 11, 18

*Boykin v. Alabama*, 395 U.S. 238, 243 (1969) .............................................................14, 15

*Bousley v. United States*, 523 U.S. 614 (1998) ...................................................... 2, 15, 16

*Brady v. United States*, 397 U.S. 742 (1970) ................................................................. 15

*Chubbuck v. United States*, No. 01-CR-00289-JAP, 2018 WL 2113236 (D.N.M. May 8, 2018) ...................................................................................................................... 7, 13

*Dukes v. Warden*, 406 U.S. 250 (1972) ........................................................................ 14

*Dean v. United States*, 556 U.S. 568 (2009) ............................................................. 6, 12

*Descamps v. United States*, 570 U.S. 254 (2013) ........................................................... 5

*Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006) ......................................... 8

*Fields v. United States*, 129 S. Ct. 1905 (2009) ............................................................ 3

*Fields v. United States*, No. 10-CIV-115-RAW, 2016 WL 7264579 (E.D. Okla. Dec. 15, 2016)  3

*Garcia v. Gonzales*, 455 F.3d 465 (4th Cir. 2006) ........................................................ 8

*United States v. Harris*, 844 F.3d 1260 (10th Cir. 2017).............................................. 5, 7

*In re Mullins*, 942 F.3d 975 (10th Cir. 2019) ............................................................ 3, 17

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ....................................................... 1, 2

*(Curtis) Johnson v. United States*, 559 U.S. 133 (2010) ...................................... 5, 12, 13

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ................................................................. 5, 7, 13

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) .................................................................. 7

*Montoya v. U.S. Parole Comm'n*, 908 F.2d 635 (10th Cir. 1990) ................................... 6

*Parke v. Raley*, 506 U.S. 20 (1992) ...........................................................................14

*Popal v. Gonzales*, 416 F.3d 249 (3d Cir. 2005) ........................................................... 8

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ................................................................. 2

*Smith v. O'Grady*, 312 U.S. 329 (1941) ...................................................................... 15

*Stokeling v. United States*, 139 S. Ct. 544 (2019) ....................................................... 4, 5

*United States v. Bailey*, 444 U.S. 394 (1980) ............................................................... 7

*United States v. Begay*, 934 F.3d 1033 (9th Cir. 2019) ................................................. 7

*United States v. Boose*, 739 F.3d 1185 (8th Cir. 2014) ................................................. 8

ii

*United States v. Bowen*, 936 F.3d 1091 (10th Cir. 2019) ..................................................... 2, 5, 7

*United States v. Castleman*, 572 U.S. 157 (2014) .................................................... 9, 14

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) .................................................. 5, 6

*United States v. Davis*, 139 S. Ct. 2319 (2019) ...................................................... *passim*

*United States v. Dixon*, 805 F.3d 1193 (9th Cir. 2015) ........................................................... 5

*United States v. Duran*, 696 F.3d 1089 (10th Cir. 2012) ..................................................... 8, 9

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008) ................................................. 3

*United States v. Fields*, 949 F.3d 1240 (10th Cir. 2019) ................................................ 4

*United States v. Garcia*, No. 17-3266, 2020 WL 1952489 (10th Cir. Apr. 23, 2020) ............... 13

*United States v. Gray*, 535 F.3d 128 (2d Cir. 2008) .................................................... 11

*United States v. Hall*, No. CR-06-0155-HE (01), 2008 WL 11463660 (W.D. Okla. Aug. 22, 2008) ...................................................................................................................... 16

*United States v. Hammons*, 862 F.3d 1052 (10th Cir. 2017) ...................................................... 10

*United States v. Hopper*, 723 F. App'x 645 (10th Cir. 2018) ...................................................... 13

*United States v. Lockhart*, 947 F.3d 187 (4th Cir. 2020) (en banc) ............................................. 16

*United States v. Mann*, 899 F.3d 898 (10th Cir. 2018) ...................................................... 10

*United States v. McMurray*, 653 F.3d 367 (6th Cir. 2011) .............................................. 8

*United States v. Melgar-Cabrera*, 892 F.3d 1053 (10th Cir. 2018) ..................................... 12, 13

*United States v. Moore*, No. 17-1224, 2020 WL 564713 (10th Cir. Feb. 5, 2020) .................... 16

*United States v. Moreno*, 821 F.3d 223 (2d Cir. 2016) ................................................... 8

*United States v. Moyer*, 282 F.3d 1311 (10th Cir. 2002) ............................................... 16, 17

*United States v. Muller*, No. CR-06-0155-HE (09), 2008 WL 11463661 (W.D. Okla. Aug. 25, 2008) ..................................................................................................................... 16

*United States v. Murphy*, 887 F.3d 1064 (10th Cir. 2018) ..................................................... 17

*United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999) .......................................................... 6

*United States v. Ontiveros*, 875 F.3d 533 (10th Cir. 2017) ...................................................... 13, 14

*United States v. Orona*, 923 F.3d 1197 (9th Cir.) ......................................................... 11

*United States v. Palomino Garcia*, 606 F.3d 1317 (11th Cir. 2010) ............................................ 8

*United States v. Pam*, 867 F.3d 1191 (10th Cir. 2017) ................................................... 10

*United States v. (Eric) Pearson,* 203 F.3d 1243 (10th Cir. 2000) ............................................6, 10

*United States v. (Dominic) Pearson*, 159 F.3d 480 (10th Cir. 1998) ............................................6

*United States v. Powell*, 159 F.3d 500 (10th Cir. 1998) ....................................................... 15

iii

*United States v. Rutherford*, 54 F.3d 370 (7th Cir.) ........................................................ 8

*United States v. Salas*, 889 F.3d 681 (10th Cir. 2018) ................................................... 12

*United States v. Sanford*, 779 F. App'x 568 (10th Cir. 2019) ..................................... 13

*United States v. Simmons*, 782 F.3d 510 (9th Cir. 2015) ............................................. 8

*United States v. Vargas-Duran*, 356 F.3d 598 (5th Cir.) ............................................. 8

*United States v. Zuniga-Soto*, 527 F.3d 1110 (10th Cir. 2008) ................................. 8, 9

*Voisine v. United States*, 136 S. Ct. 2272 (2016) .......................................................... 9

*Welch v. United States*, 136 S. Ct. 1257 (2016) ........................................................... 2

**Federal Statutes**

18 U.S.C. § 7.3 ............................................................................................................... 3

18 U.S.C. § 81 ................................................................................................................ 12

18 U.S.C. § 751 ........................................................................................................... 7, 13

18 U.S.C. §§ 792-99 ......................................................................................................13

18 U.S.C. § 921............................................................................................................... 9

18 U.S.C. § 922 .............................................................................................................. 9

18 U.S.C. § 924 ..................................................................................................... *passim*

18 U.S.C. § 1111 ................................................................................................... *passim*

18 U.S.C. § 1201(a) ....................................................................................................... 13

18 U.S.C. § 2154 ........................................................................................................... 13

18 U.S.C. § 2381 ........................................................................................................... 13

28 U.S.C. § 2255 ............................................................................................. 1, 3, 17, 18

**Other**

Fed. R. Crim. P. Rule 11(b)(1)(G) ............................................................................... 15

Edward Fields, a prisoner in the custody of the United States sentenced to death and housed at the United States Penitentiary, Terre Haute, Indiana, respectfully moves this Court to vacate his convictions and sentences pursuant to 28 U.S.C. § 2255.

## INTRODUCTION

Mr. Fields pled guilty to, inter alia, two violations of 18 U.S.C. § 924(c) in the United States District Court for the Eastern District of Oklahoma in 2005. Section 924(c) proscribes using a firearm in connection with a predicate "crime of violence." The underlying "crime of violence" for the § 924(c) charges was first-degree murder. After a contested penalty phase before a jury regarding the first-degree murder convictions, the jury returned a sentence of death. Mr. Fields received 405 months on each of his § 924(c) convictions.

Section 924(c) defines the term "crime of violence" in two subparts – the first known as the elements clause, and the second, the residual clause. Accordingly, a "crime of violence" is any felony offense that:

> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 924(c)(3).

In 2015, the Supreme Court held in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the residual clause of the Armed Career Criminal Act of 1984 ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii) – which is similar to the residual clause of § 924(c) – and the "ordinary case" (or categorical) analysis it required courts to undertake, were unconstitutionally void for vagueness. *Id.* at 2557. Specifically, the Court concluded that "the indeterminacy of the wide-

1

ranging inquiry required by the residual clause both denies fair notice and invites arbitrary enforcement by judges," and "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Id.*

Several years later, on June 24, 2019, the Court decided *United States v. Davis*, 139 S. Ct. 2319 (2019), holding that § 924(c)'s residual clause, which must also be interpreted categorically, is likewise unconstitutionally vague for the same reasons that the ACCA's residual clause was deemed unconstitutional in *Johnson*.[2] *Id.* at 2325-32. The Tenth Circuit has held that the Supreme Court's ruling in *Davis* "is a new constitutional rule that is retroactive on collateral review." *United States v. Bowen*, 936 F.3d 1091, 1097-98 (10th Cir. 2019).

Consequently, Mr. Fields's § 924(c) convictions remain valid only if they rest on predicate offenses that satisfy the elements clause of § 924(c). In other words, the predicate offense must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." Mr. Fields's predicate offense does not. Federal first-degree murder, under 18 U.S.C. § 1111(a), fails to qualify as a "crime of violence" because § 1111(a) does not categorically require the *intentional* use of force or the use of *violent physical* force.

Because Mr. Fields is innocent of the § 924(c) offenses, his plea, which necessarily included those offenses, was not knowing, voluntary, and intelligent. *See Bousley v. United States*, 523 U.S. 614, 618-19 (1998). Mr. Fields has not previously had an opportunity to

---

[2] In the interim, the Court also decided *Welch v. United States*, 136 S. Ct. 1257 (2016) (holding *Johnson* retroactive), and *Sessions v. Dimaya*, 138 S. Ct. 1204, 1217 (2018) (plurality op.) (striking down the residual clause in 18 U.S.C. § 16(b), also interpreted with the categorical approach, which many federal criminal provisions use to define a crime of violence).

challenge his § 924(c) convictions based on the new rule announced in *Davis*. *See In re Mullins*, 942 F.3d 975, 979 (10th Cir. 2019). Pursuant to 28 U.S.C. § 2255(f) and (h), this motion is timely filed within one year of the *Davis* decision.

## PROCEDURAL HISTORY

On June 30, 2005, Mr. Fields pled guilty to two counts of using a firearm in relation to a "crime of violence," in violation of 18 U.S.C. § 924(c)(1)(A)(j) and (d) (Counts 2 and 4); two counts of first-degree murder (Counts 1 and 3); one count of an assimilative crime, robbery in violation of 18 U.S.C. § 7.3 and 13 (Count 5); and one count of an assimilative crime, burglary of an automobile in violation of 18 U.S.C. § 7.3 and 13 (Count 6). The underlying "crime of violence" for the § 924(c) charges was first-degree murder. *See* Indictment at 2-3 (ECF No. 16); Tr. at 20 (Plea Colloquy, June 30, 2005) (ECF No. 297).

After a penalty phase before a jury, the jury returned a verdict of death for Mr. Fields. Mr. Fields was sentenced to death for the first-degree murder convictions, 405 months for each of the § 924(c) convictions, 405 months for the assimilative crime of robbery, and 84 months for the assimilative crime of burglary of an automobile. Tr. at 3502 (Nov. 8, 2005) (ECF No. 257).

The Tenth Circuit affirmed Mr. Fields's convictions and sentences on direct appeal. *United States v. Fields*, 516 F.3d 923, 928 (10th Cir. 2008). The Supreme Court denied review. *Fields v. United States*, 129 S. Ct. 1905 (2009).

Mr. Fields filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 with this Court, which was denied. *Fields v. United States*, No. 10-CIV-115-RAW, 2016 WL 7264579, at *26 (E.D. Okla. Dec. 15, 2016). On appeal, the denial of Mr. Fields's § 2255 motion was affirmed in part, reversed in part, and remanded for an evidentiary hearing regarding trial

counsel's ineffectiveness at sentencing. *United States v. Fields*, 949 F.3d 1240, 1243, 1273 (10th

Cir. 2019).[3] On February 21, 2020, the Tenth Circuit issued its mandate to the district court.

**ARGUMENT**

    **I.**        **In light of *United States v. Davis*, this Court should vacate Mr. Fields's § 924(c) convictions because the predicate crimes do not satisfy § 924(c)(3)(A)'s elements clause.**

        **A.**        **A predicate crime must categorically satisfy the elements clause to be a "crime of violence."**

Section 924(c) defines "crime of violence" as any felony offense that:

    (A)  has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

    (B)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 924(c)(3). The Supreme Court in *Davis* held that the residual clause (subsection (B)) is

unconstitutionally vague. Accordingly, after *Davis*, a crime only qualifies as a § 924(c) predicate

if it satisfies the elements clause (subsection (A)). *See id*. Any such question can only be

answered using a categorical analysis, examining whether the offense has "as an element the use,

attempted use, or threatened use of physical force against the person or property of another." *Id.*;

*see Davis*, 139 S. Ct. at 2339 (Kavanaugh, J., dissenting, joined by Thomas, J., Alito, J., and

Roberts, C.J.) (recognizing a categorical approach is used to interpret "whether the underlying

crime *categorically* fits within § 924(c) because of the elements of the crime" (emphasis in

original)); *Stokeling v. United States*, 139 S. Ct. 544, 554-55 (2019) (applying categorical

---

    [3] Mr. Fields plans to file a petition for a writ of certiorari in the Supreme Court, which is due May 28, 2020.

approach to ACCA's elements clause). "Physical force," in turn, has two requirements. First, "physical force" must involve violent force – that is, "strong physical force" "capable of causing physical pain or injury to another person." *(Curtis) Johnson v. United States*, 559 U.S. 133, 140 (2010). Second, the use of such force "must be intentional, not just reckless or negligent." *United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015); *see also Leocal v. Ashcroft*, 543 U.S. 1, 12-13 (2004).

The categorical approach requires courts to "look only to the statutory definitions – *i.e.*, the elements – of a defendant's [offense], and *not* to the particular facts underlying [the offense]" in determining whether the offense qualifies as a crime of violence. *Descamps v. United States*, 570 U.S. 254, 260-61 (2013) (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)) (internal quotations omitted). As the Tenth Circuit outlined in *Bowen*, "in conducting the categorical analysis, we must 'identify the *minimum* force' required for [the offense], and 'determine if *that* force' qualifies as violent force." 936 F.3d at 1103 (quoting *United States v. Harris*, 844 F.3d 1260, 1264 (10th Cir. 2017)).

### B.  First-degree murder under § 1111 does not qualify as a crime of violence under the elements clause of § 924(c)(3)(A).

The federal first-degree murder statute has two elements: (1) the unlawful killing of a human being, and (2) with malice aforethought. *See* 18 U.S.C. § 1111(a); *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000). Murder under 18 U.S.C. § 1111(a) is not categorically a "crime of violence" under the definition of the elements clause of § 924(c)(3)(A). Although such a result may seem counterintuitive, this result is in fact consistent with the broad conduct covered by the federal murder statute. Federal murder is not a crime of violence for at

least two reasons: (1) the statute does not categorically require the *intentional* use of force, and

(2) the statute does not require the use of *violent physical* force.

### 1. Federal first-degree murder does not categorically require the level of intent necessary of a crime of violence.

The required mens rea for federal murder is "malice aforethought." § 1111(a). However,

for first-degree felony murder, which is encompassed by § 1111(a), "to prove the malice

aforethought element[,] the prosecution only need show commission of the specified

felony." *United States v. (Dominic) Pearson*, 159 F.3d 480, 485 (10th Cir. 1998); *see also United

States v. (Eric) Pearson,* 203 F.3d 1243, 1271 (10th Cir. 2000); *Montoya v. U.S. Parole Comm'n*,

908 F.2d 635, 638-39 (10th Cir. 1990) (acknowledging § 1111 "allow[s] conviction for a death

that was unintended and unforeseen"). "Because malice aforethought is proved by commission

of the felony, there is no actual intent requirement with respect to the homicide." *Chanthadara*,

230 F.3d at 1258; *id.* at 1259 (noting "[t]he defendant's state of mind with respect to the death is

irrelevant."); *United States v. Nichols*, 169 F.3d 1255, 1272 (10th Cir. 1999) (noting the felony

murder doctrine "circumvents the normal *mens rea* requirements of first-degree murder").

Felony murder under § 1111 is "in essence a strict liability crime, allowing conviction for a death

that was unintended and unforeseen." *Montoya*, 908 F.2d at 638-39; *see Dean v. United States*,

556 U.S. 568, 575 (2009) ("[I]t is not unusual to punish individuals for the unintended

consequences of their unlawful acts," and "[t]he felony-murder rule is a familiar example: If a

defendant commits an unintended homicide while committing another felony, the defendant can

be convicted of murder." (citing 18 U.S.C. § 1111)). Under the categorical approach, the absence

of a mens rea requirement as to the homicide effectively means the requirements of

§ 924(c)(3)(A) can only be satisfied if the underlying enumerated offenses in § 1111 *all* have "as

6

an element the use, attempted use, or threatened use of physical force against the person or property of another. *See Leocal*, 543 U.S. at 9-11 (requiring a "higher degree of intent than negligent or merely accidental conduct" to use, attempt to use, or threaten to use physical force); *United States v. Begay*, 934 F.3d 1033, 1039 (9th Cir. 2019), *reh'g held in abeyance*, No. 14-10080, 2019 WL 7900329 (9th Cir. Dec. 5, 2019) ("A 'crime of violence' requires intentional conduct." (citing *Leocal*, *supra*)). If even one underlying felony cannot satisfy the elements clause – in this case as to intentionality with respect to the use of violent force – § 1111 cannot categorically satisfy the elements clause. *See Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) (noting that under the categorical approach, a court must "presume that the conviction rested upon [nothing] more than the least of th[e] acts criminalized" (alteration in original) (internal quotations and citations omitted)); *Harris*, 844 F.3d at 1264 (a court must "construe the minimum culpable conduct" under the categorical approach).

As discussed below, several of the underlying enumerated felonies, by their plain terms, do not "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another." *See, e.g.*, 18 U.S.C. § 751(a)[4]; *Chubbuck v. United States*, No. 01-CR-00289-JAP, 2018 WL 2113236, at *2 (D.N.M. May 8, 2018) (finding the predicate crime of escape only qualified as a "crime of violence" under

---

[4] *See also United States v. Bailey*, 444 U.S. 394, 407 (1980) ("As for the element of 'escape,' we need not decide whether a person could be convicted on evidence of recklessness or negligence with respect to the limits on his freedom. A court may someday confront a case where an escapee did not know, but should have known, that he was exceeding the bounds of his confinement or that he was leaving without permission.").

§ 924(c)'s residual clause); *cf. United States v. Simmons*, 782 F.3d 510, 518 (9th Cir. 2015) ("The [state] offense of escape from custody does not have as an element the use, attempted use, or threatened use of force."). Therefore, since there is no additional mens rea requirement for §1111(a) felony murder and the underlying offenses do not necessarily contain the requisite mens rea *as to* "use of force" – for example, escape does not have as an element the use, attempted use, or threatened use of physical force – a conviction under § 1111(a) is not categorically a crime of violence under § 924(c)'s elements clause.

Moreover, even assuming the federal murder statute categorically requires at least a recklessness mens rea for the use of physical force, that should not satisfy § 924(c)(3)(A). The Tenth Circuit and its sister circuits have held that "recklessness falls into the category of accidental conduct that the [Supreme Court in *Leocal*] described as failing to satisfy the use of physical force requirement" often present in similar statutory definitions of "crime of violence." *See United States v. Zuniga-Soto*, 527 F.3d 1110, 1124 (10th Cir. 2008) (holding "a *mens rea* of recklessness does not satisfy use of physical force requirement under § 2L1.2's definition of 'crime of violence'"); *United States v. Duran*, 696 F.3d 1089, 1095 (10th Cir. 2012) (construing similar U.S.S.G. § 4B1.2(a)); *see, e.g.*, *United States v. Moreno*, 821 F.3d 223, 228 (2d Cir. 2016); *Popal v. Gonzales*, 416 F.3d 249, 254 (3d Cir. 2005); *Garcia v. Gonzales*, 455 F.3d 465, 469 (4th Cir. 2006); *United States v. Vargas-Duran*, 356 F.3d 598, 603 (5th Cir.) (en banc), *cert. denied*, 543 U.S. 995 (2004); *United States v. McMurray*, 653 F.3d 367, 374-75 (6th Cir. 2011); *United States v. Rutherford*, 54 F.3d 370, 374 (7th Cir.), *cert. denied*, 516 U.S. 924 (1995); *United States v. Boose*, 739 F.3d 1185, 1187 (8th Cir. 2014); *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1130 (9th Cir. 2006) (en banc); *United States v. Palomino Garcia*, 606 F.3d 1317, 1336 (11th Cir. 2010). Similarly, the Supreme Court has noted that "the merely reckless

8

causation of bodily injury . . . may not be a 'use' of force." *United States v. Castleman*, 572 U.S. 157, 169 (2014). The Court remarked in *Castleman* that it "held in *Leocal* that "'use' requires active employment," rather "than negligent or merely accidental conduct," but "*Leocal* reserved the question of whether a reckless application of force could constitute a 'use' of force." *Castleman*, 572 U.S. at 169 n.8 (quoting *Leocal*, 543 U.S. at 9, 13). The Court went on to recognize that "the Courts of Appeals have almost uniformly held that recklessness is not sufficient." *Castleman*, 572 U.S. at 169 n.8 (citing, inter alia, *Zuniga-Soto*, *supra*); *see also Duran*, *supra*.

The Supreme Court's 2016 decision in *Voisine v. United States*, 136 S. Ct. 2272 (2016), disrupted that consensus. The *Voisine* Court held that a reckless mens rea was sufficient to violate 18 U.S.C. § 922(g)(9), which bars individuals convicted of misdemeanor crimes of domestic violence, which are defined in part as offenses that have "as an element, the use or attempted use of physical force," 18 U.S.C. § 921(a)(33)(A)(ii), from possessing firearms. *Id.* at 2282. In interpreting that provision, the Court reasoned that the "word ['use'] is indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct," and that it "does not exclude . . . an act of force carried out in conscious disregard of its substantial risk of causing harm." *Id.* at 2279. However, the Court expressly reserved judgment on whether recklessness is sufficient for "violent felonies" under the ACCA, § 16 (the provision in *Leocal* with an elements clause materially identical to the ACCA's), and a related class of statutes. *Id*. at 2280 n.4. The Court observed that courts have "sometimes given [the *Voisine* and *Leocal*] statutory definitions divergent readings in light of differences in their contexts and purposes," and it "d[id] not foreclose that possibility" as to the "required mental states" for the statutes' predicate offenses. *Id*.

9

Nevertheless, the Tenth Circuit and some of its sister circuits have broadly applied *Voisine*. *See, e.g.*, *United States v. Mann*, 899 F.3d 898, 905 (10th Cir. 2018) ("We hold today that *Voisine*'s reasoning extends to § 924(c)(3)(A) as well: reckless conduct is no less 'the [volitional] use . . . of physical force against the person or property of another,' for purposes of 18 U.S.C. § 924(c)(3)(A)."); *United States v. Pam*, 867 F.3d 1191, 1207-08 (10th Cir. 2017) (ACCA); *United States v. Hammons*, 862 F.3d 1052, 1055-56 (10th Cir. 2017) (ACCA). In *Mann*, the Tenth Circuit's finding that a reckless mens rea satisfies § 924(c)(3)(A) relied on the predicate offense in the case "requir[ing] that the actor's use of force be directed at the person of another." 899 F.3d at 906. There is no such requirement that the use of force be directed at the person of another for felony murder. *See infra* (discussing examples of predicate felonies underlying felony murder, that by their plain terms, do not "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another").

Recently, in *United States v. Begay*, the Ninth Circuit held that a federal second-degree murder offense[5] does not require the use of physical force and thus is not categorically a crime of violence under § 924(c)'s elements clause "because it can be committed recklessly." *Id.* at 1038; *see also United States v. Orona*, 923 F.3d 1197, 1203 (9th Cir.), *reh'g en banc granted*, 942 F.3d 1159 (9th Cir. 2019) (declining to apply *Voisine*'s reasoning to § 16(a)). While § 924(c) "requires intentional conduct[,] . . . second-degree murder may be committed recklessly – with a

---

[5] Federal second-degree murder is any unlawful killing of a person with malice aforethought that does not qualify as first-degree murder. § 1111(a). The malice aforethought element for second-degree murder can be satisfied by proving: "(1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under . . . first degree murder." *(Eric) Pearson*, 203 F.3d at 1271.

10

depraved heart mental state – and need not be committed willfully or intentionally." *Id.* at 1039-40. "It is of no consequence," the court emphasized, "that the recklessness required for second-degree murder must be 'extreme' and goes beyond ordinary recklessness. . . . Reckless conduct, no matter how extreme, is not intentional." *Id.* at 1040; *see also United States v. Gray*, 535 F.3d 128, 131-32 (2d Cir. 2008) (New York statute criminalizing "reckless conduct occurring under 'circumstances evincing a depraved indifference to human life, . . . which creates a grave risk of death to another person'" not a crime of violence because it "does not criminalize purposeful or deliberate conduct").

This year, the Supreme Court granted certiorari in *Borden v. United States*, 140 S. Ct. 1262, to resolve the circuit split on the question of whether the "use of force" clause in the ACCA encompasses crimes with a mens rea of recklessness. The Court's grant of review further calls into question the Tenth Circuit's decision in *Mann* – which relies on Supreme Court precedent that will likely be addressed by the Court in *Borden* – and its applicability to this case. The outcome of *Borden* can only provide further support for Mr. Fields's argument since § 1111 requires no mens rea and can turn on a finding that the defendant caused a person's death through negligence or accident. However, in the event that this Court determines that § 1111(a) categorically requires at least a recklessness mens rea, this Court should hold this case in abeyance pending the Supreme Court's decision in *Borden*.

### 2. Federal murder does not categorically require the level of force necessary of a crime of violence.

First-degree murder under 18 U.S.C. § 1111 also fails to qualify as a crime of violence because it does not categorically require the use of violent physical force. The "physical force" required for a crime of violence is "*violent* force – that is, force capable of causing physical pain

or injury to another person." *(Curtis) Johnson*, 559 U.S. at 140 (emphasis in original) (interpreting similar § 924(e)(2)(B)(i)); *United States v. Melgar-Cabrera*, 892 F.3d 1053, 1064 (10th Cir. 2018) (applying *Johnson* and holding "force," as used in § 924(c)(3)(A), means "violent force").

Felony murder under 18 U.S.C. § 1111(a) is again instructive. The statute dictates that "[*e*]*very* murder . . . committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery" is first-degree murder. As detailed above, this covers even accidental killings during the course of these felonies. *See Dean*, 556 U.S at 575.

Several of these underlying predicate felonies, by their plain terms, do not "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A). Arson does not require the element of using force against the "person or property of *another*" because it may be accomplished by setting fire to one's own property, or simply conspiring to commit an arson prior to the use of any force at all. *See* 18 U.S.C. § 81; *see United States v. Salas*, 889 F.3d 681, 684 (10th Cir. 2018) (construing similar 18 U.S.C. § 844(i)). A person is guilty of federal arson if, within the jurisdiction of the United States, he or she "willfully and maliciously sets fire to or burns *any* building, structure or vessel, [or] *any* machinery or building materials or supplies" or "attempts or *conspires* to do such an act." 18 U.S.C. § 81 (emphases added); *see Salas*, *supra*.

The crime of escape certainly does not have force as an element. The statute merely states that "[w]hoever escapes or attempts to escape from the custody" of a long list of various federal custody arrangements is guilty of escape. *See* 18 U.S.C. § 751(a); *see also Chubbuck v. United States*, No. 01-CR-00289-JAP, 2018 WL 2113236, at *2 (D.N.M. May 8, 2018) (finding the

12

predicate crime of escape only qualified as a "crime of violence" under § 924(c)'s residual clause). Kidnapping under 18 U.S.C. § 1201(a), "does not fit within the elements clause because it can be committed by 'inveigling,' which does not involve force." *United States v. Hopper*, 723 F. App'x 645, 646 (10th Cir. 2018) (unpublished) (citing Tenth Circuit Criminal Pattern Jury Instructions § 2.55); *United States v. Sanford*, 779 F. App'x 568, 570 (10th Cir. 2019) (similar). Similarly, treason and the several federal espionage statutes do not require force as an element of the offense. *See* 18 U.S.C. §§ 792-99, 2381. The crime of sabotage is accomplished, inter alia, when a defendant simply makes defective war material to obstruct the United States in preparing for war. *See* 18 U.S.C. § 2154.

*Every* accidental death occurring during the perpetration of all of these felonies is first-degree murder. Thus, first degree murder arising out of these felonies does not categorically require force at all, much less the "violent force – that is, force capable of causing physical pain or injury to another person," *(Curtis) Johnson*, 559 U.S. at 140, mandated by the Supreme Court. *See also Melgar-Cabrera*, 892 F.3d at 1064. Any such accidental death occurring during the perpetration of such a felony, many of which do not require the use of force at all, qualifies as first-degree murder. *See Leocal*, 543 U.S. at 10 ("[W]e would not ordinarily say a person uses physical force against another by stumbling and falling into him.") (citations and quotations omitted).

This argument should not be confused with the "definitively rejected argument that poisoning [or a similar indirect force] does not require the use of violent physical force." *United States v. Garcia*, No. 17-3266, 2020 WL 1952489, at *3-4 (10th Cir. Apr. 23, 2020) (unpublished) (citing *United States v. Ontiveros*, 875 F.3d 533, 536-38 (10th Cir. 2017), and *Castleman*, *supra*). These cases do not address the arguments Mr. Fields raises before this Court,

13

but rather address only whether the use of indirect force – with knowledge or intent – is sufficient to establish the force necessary to qualify a predicate crime as crime of violence. *Ontiveros*, 875 F.3d at 538 ("the element of conviction in [*Castleman*] was '*intentionally* or *knowingly* caus[ing] bodily injury to' another, the same as in [*Ontiveros*]" (quoting *Castleman*, 134 S. Ct. at 1414)) (emphasis added); *see also Castleman*, 572 U.S. at 167 (refusing to reach the question of whether the causation of bodily injury necessarily entails violent force, absent offensive touching or the like); *id.* at 170-71 (emphasizing "the knowing or intentional application of force is a 'use' of force," in explaining the "use" of force in the poison example "is the act of *employing poison knowingly as a device to cause physical harm*").

Because neither (1) the intentional use of force nor (2) the actual use of any violent physical force is categorically required for first-degree murder pursuant to § 1111, federal murder is not a crime of violence under the force clause of § 924(c)(3)(A).

**II.    Mr. Fields's plea was not knowing, intelligent, and voluntary where he did not understand the nature of each charge and he was innocent of the § 924(c) charges.**

A guilty plea – which has been described as "perhaps the most devastating waiver possible under our Constitution," *Dukes v. Warden*, 406 U.S. 250, 258 (1972) (Stewart, J., concurring) – represents a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. *Parke v. Raley*, 506 U.S. 20, 29 (1992) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)). As such, a plea must be knowing, intelligent, and voluntary. *Bousley v. United States*, 523 U.S. 614, 618 (1998); *Brady v. United States*, 397 U.S. 742, 748 (1970). As the Court in *Boykin* emphasized: "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he had a full understanding of

what the plea connoted and of its consequences." 395 U.S. at 243. A plea is not intelligent "unless a criminal defendant first receives real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Bousley*, 523 U.S. at 618. To this end, Rule 11(b)(1)(G) of the Federal Rules of Criminal Procedure requires that a defendant be adequately informed of and understand "the nature of each charge to which the defendant is pleading."

In *Bousley*, the petitioner challenged his plea of guilty to "using" a firearm in violation of § 924(c)(1). He argued that because the district court failed to inform him at the time of his plea that the statute required "active employment of the firearm" – as the Supreme Court later clarified in *Bailey v. United States*, 516 U.S. 137, 144 (1995)) – his plea was not knowing or intelligent. 523 U.S. at 617-18. The Supreme Court agreed that a plea to counts arising under a statute later found not to reach the defendant's conduct would be constitutionally invalid. *Id.* at 618-19; *see United States v. Powell*, 159 F.3d 500, 502 (10th Cir. 1998) ("*Bousley* recognized that a guilty plea to a § 924(c) charge may be constitutionally invalid as not knowing and voluntary where the defendant is misinformed by the court of the elements of a § 924(c) offense, as most defendants had been prior to *Bailey*." (internal citation omitted)); *see also Smith v. O'Grady*, 312 U.S. 329, 334 (1941)) (allowing collateral challenge where defendant pleaded guilty to violating a statute that was subsequently interpreted narrowly by the Supreme Court, such that the defendant allegedly "[mis]understood the essential elements of the crime with which he was charged" when he pleaded guilty). Where a record reveals that neither a petitioner, his counsel, nor the court "correctly understood the essential elements of the crime with which he was charged[, the] petitioner's plea [is] constitutionally invalid." *Bousley*, 523 U.S. at 618-19.

15

While "the circumstances under which a guilty plea may be attacked on collateral review" are strictly limited, "it would be inconsistent with the doctrinal underpinnings of habeas review to preclude [a] petitioner from relying on [a new rule of constitutional law] in support of his claim that his guilty plea was unconstitutionally invalid." *Id.* at 621.

In line with these principles, Mr. Fields's guilty plea, based in part on two invalid § 924(c) counts, does not preclude a collateral attack pursuant to *Davis*. Mr. Fields cannot be said to have knowingly and voluntarily entered a plea "where [he] and all other participants in the process were operating under a misunderstanding of the applicable law." *United States v. Muller*, No. CR-06-0155-HE (09), 2008 WL 11463661, at *4 (W.D. Okla. Aug. 25, 2008) (citing, inter alia, *Bousley*, 523 at 618-19); *United States v. Hall*, No. CR-06-0155-HE (01), 2008 WL 11463660, at *4 (W.D. Okla. Aug. 22, 2008) (same).

Mr. Fields is entitled to have his entire plea vacated because it was "unintelligent and constitutionally invalid." *See United States v. Moore*, No. 17-1224, 2020 WL 564713, at *3 (10th Cir. Feb. 5, 2020) (Hartz, J., concurring) (citing *Bousley*, 523 U.S. at 618-19); *see, e.g.*, *United States v. Lockhart*, 947 F.3d 187, 196-97 (4th Cir. 2020) (en banc) (vacating defendant's guilty plea and conviction, in part, because a Supreme Court's intervening decision – *Rehaif v. United States*, 139 S. Ct. 2191 (2019) – evidenced the "wholesale misunderstanding of the law at the time of his plea"); *cf. United States v. Moyer*, 282 F.3d 1311, 1319 (10th Cir. 2002) ("Because Moyer was never made fully aware of the genuine consequences of his guilty plea, he must be given the opportunity to withdraw the plea on remand." (citing *United States v. McCann,* 940 F.2d 1352, 1358 (10th Cir. 1991)). Mr. Fields's requested relief would return him to the position he would have been in had he not had to defend himself against charges under a statute with an unconstitutional provision.

16

III.    **Mr. Fields's successive motion satisfies the requirements of 28 U.S.C. §
2255(h)(2) because *Davis* announced a previously unavailable, new rule of
constitutional law made retroactive to cases on collateral review by the
Supreme Court.**

Mr. Fields files this successive motion pursuant to 28 U.S.C. § 2255(h)(2) after receiving

authorization from the Tenth Circuit. The gatekeeping provision of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA") allows a federal prisoner to file a successive

§ 2255 motion if it "contain[s] . . . a new rule of constitutional law, made retroactive to cases on

collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C.

§ 2255(h)(2). To receive authorization to file a successive motion in the district court, a movant

must make a "prima facie showing to the court of appeals that the motion satisfies the

requirements of § 2255(h), defined as 'a sufficient showing of possible merit to warrant a fuller

exploration by the district court.'" *United States v. Murphy*, 887 F.3d 1064, 1068 (10th Cir.

2018) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)).

In authorizing this motion, the Tenth Circuit thus concluded that Mr. Fields made a prima

facie showing that he satisfies those criteria. Mr. Fields now demonstrates that, beyond a prima

facie showing, he in fact fully satisfies the requirements of § 2255(h)(2).

A.    *Davis* **announced a previously unavailable new rule of constitutional law.**

As the Tenth Circuit has explicitly held: "the Supreme Court's ruling in *Davis* that

§ 924(c)(3)'s residual clause is void for vagueness is a new constitutional rule that is retroactive

on collateral review." *Bowen*, 936 F.3d at 1097-98. Accordingly, Mr. Fields has not previously

had an opportunity to challenge his § 924(c) convictions based on the new rule announced

in *Davis* that the residual clause in § 924(c)(3)(B) is void for vagueness. *See In re Mullins*, 942

F.3d at 979.

17

**B.** **This motion is timely under 28 U.S.C. § 2255(f)(3).**

This motion is timely under § 2255(f)(3), which provides for a one-year limitations period to run from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *Id.* The Supreme Court decided *Davis* on June 24, 2019, and Mr. Fields has filed his claim within a year of that date.

**RELIEF REQUESTED**

Wherefore, based on the foregoing, Mr. Fields respectfully requests that the Court grant him the following relief:

i.  hold this case in abeyance pending the Supreme Court's resolution of *Borden v. United States*, 140 S. Ct. 1262 (2020), if the Court determines that § 1111(a) categorically requires at least a recklessness mens rea;

ii.  leave to amend this motion; and

iii.  a writ of habeas corpus to vacate Mr. Fields's convictions and sentences.

Respectfully submitted,

/s/ Katherine Ensler

HUNTER LABOVITZ
Pa. Bar. No. 204760
KATHERINE ENSLER
Pa. Bar No. 31902
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut St., Ste. 545W
Philadelphia, PA 19106
Telephone: (215) 928-0520

Date:  May 25, 2020

*Attorneys for Movant*

# EXHIBIT B

INITIAL MOTION TO VACATE CONVICTIONS AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255 (FILED APRIL 6, 2010)

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

**CIV 10 - 1 15 - RA W**

| United States District Court | District   Eastern District of Oklahoma |
|---|---|
| Name (under which you were convicted):<br>Edward Leon Fields, Jr. | Docket or Case No.:<br>No. 03-CR-73  -RAW |
| Place of Confinement:<br>U.S.P. Terre Haute, Indiana | Prisoner No.:<br>04136063 |
| UNITED STATES OF AMERICA<br><br>v. | Movant (include name under which you were convicted)<br><br>Edward Leon Fields, Jr. |

### MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

United States District Court, Eastern District of Oklahoma, Muskogee Division

**FILED**
**APR 06 2010**
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By
Deputy Clerk

(b) Criminal docket or case number (if you know):  No. 03-CR-73

2.  (a) Date of the judgment of conviction (if you know):  11/8/2005

(b) Date of sentencing:  11/8/2005

3.  Length of sentence:  Death on counts 1, 3; 1299 months imprisonment  on all other counts.

4.  Nature of crime (all counts):

The indictment, filed 8/1/2003, charged the defendant with two counts of first degree murder under 18 U.S.C Section 111 (Counts 1, 3); two counts of using a firearm in a crime of violence under 18 U.S.C. Section 924 (Counts 2, 4); one count of robbery with a firearm under 18 U.S.C. Section 7 (Count 5); and one count of burglary of an automobile under 18 U.S.C. Section 7 (Count 6).

5.  (a) What was your plea? (Check one)

(1)   Not guilty ☐            (2)   Guilty ☑            (3)   Nolo contendere (no contest) ☐

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)      Jury ☑      Judge only ☐

Page 3

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?  Yes ❑  No ☑

8.  Did you appeal from the judgment of conviction?  Yes ☑  No ❑

9.  If you did appeal, answer the following:

(a) Name of court:  United States Court of Appeals for the Tenth Circuit

(b) Docket or case number (if you know):  No. 05-7128

(c) Result:  Judgment of District Court affirmed

(d) Date of result (if you know):  3/24/2008

(e) Citation to the case (if you know):  516 F.3d 923

(f) Grounds raised:

1.  The federal government lacked subject-matter jurisdiction to prosecute Fields for crimes committed in the Ouachita National Forest.
2.  The district court committed Sixth Amendment reversible error in striking vernireman Fenderson, even though he assured the court he could follow the law and put aside his opposition to the death penalty.
3. The two substantial-planning aggravators were duplicative because the murders of multiple victims occurred in a single episode, as charged in a third aggravator, and skewed the weighing process. (See following attached page for additional grounds raised)

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes ☑  No ❑

If "Yes," answer the following:

(1) Docket or case number (if you know):  No. 08-6504

(2) Result:

Certiorari denied

(3) Date of result (if you know):  4/6/2009

(4) Citation to the case (if you know):  129 S.Ct. 1905

(5) Grounds raised:

1  In passing the Weeks Act, 16 U.S.C. § 480, did Congress intend to prohibit the federal government from acquiring and exercising either exclusive or concurrent jurisdiction in national forest lands, so that such lands are not within the "special maritime and territorial jurisdiction of the United States" for purposes of federal prosecution and adjudication of the murder charges in this case?
2.  With regard to the impact of the murders, does the Federal Death Penalty Act limit non-statutory aggravators, and evidence in support thereof, to the impact of the crimes on the victim's family alone, so as not to include the impact on close friends?

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ❑  No ☑

11.  If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

9(f) (cont'd)

4. The single verdict of death on two counts of murder deprived Fields of a unanimous verdict on each count.

5. Despite the undisputed lag time between the murders and the robbery, the evidence was insufficient to prove the substantial planning and premeditation statutory aggravating factors, because the evidence showed Fields originally planned to rob, not murder, the Chicks.

6. The future-danger non-statutory aggravating factor is unconstitutionally vague and overbroad, should have been limited to future danger in the prison setting, and is not supported by the evidence.

7. Defects in the instructions and Special Findings Form permitted the jury to find the future-danger aggravating factor without constitutionally-required unanimity.

8. Because it does not contain a scienter requirement, the mental-anguish non-statutory aggravating factor is also vague; in addition, it has been pre-empted by Congress in the "heinous-and-cruel" statutory aggravating factor.

9. The court violated the FDPA in failing to limit the victim-impact nonstatutory aggravating factors to the victims and the victims' families, and instead allowed non-family witnesses to testify about the impact of the murders on themselves and others.

10. Based upon undisputed evidence of depression, psychosis and a series of stressors in Fields life, at least one juror should have found, by a preponderance, the severe mental or emotional disturbance statutory mitigating factor.

11. The court erred in refusing to instruct the jury that it had to find, beyond a reasonable doubt, the FDPA's standard that the aggravating factors "sufficiently outweigh" the mitigating factors before a death sentence can be imposed.

12. The court's decision to allow the "guilley suit" in the jury room during deliberations rendered the penalty phase unfair.

13. Cumulative error requires reversal.

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:   Yes ❑   No ❑

(2)  Second petition:   Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Fields raised ten grounds for relief. They are set forth in the pages attached to the back of this form. To aid the Court, Mr. Fields includes an Index to Grounds which is at the beginning of the attachment.

With respect to each of the ten grounds raised, none were raised on direct appeal or in any other post-conviction proceeding.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 33 of 429

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 33    Restricted

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

**(b) Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❏    No ❏

(2) If you did not raise this issue in your direct appeal, explain why:

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❏    No ❏

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❏    No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❏    No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏    No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

Page 8

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❏   No ❏

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❏   No ❏

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Page 9

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR**:

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

6:03-cr-00073-RAW   Document 3051   Filed in ED/OK on 05/26/20   Page 37 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 37   Restricted

Page 10

(b) **Direct Appeal of Ground Four:**

   (1) If you appealed from the judgment of conviction, did you raise this issue?

   Yes ❑  No ❑

   (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

   (1) Did you raise this issue in any post-conviction motion, petition, or application?

   Yes ❑  No ❑

   (2) If your answer to Question (c)(1) is "Yes," state:

   Type of motion or petition:

   Name and location of the court where the motion or petition was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

   (3) Did you receive a hearing on your motion, petition, or application?

   Yes ❑   No ❑

   (4) Did you appeal from the denial of your motion, petition, or application?

   Yes ❑   No ❑

   (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

   Yes ❑   No ❑

   (6) If your answer to Question (c)(4) is "Yes," state:

   Name and location of the court where the appeal was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

Page 11

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

None of the grounds raised by Mr. Fields have been presented to any federal court. Mr. Fields has not had any post-conviction proceedings. The grounds were not raised on direct appeal for one of the following reasons: 1) grounds allege ineffective assistance of counsel which cannot be raised on direct appeal; 2) ground is based on information not available at the time of direct appeal; 3) failure to raise ground is attributable to the ineffective assistance of trial and/or appellate counsel.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?    Yes ❑    No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

Julia L. O'Connell/Barry L. Derryberry, Federal Public Defender, Tulsa, OK

(b) At arraignment and plea:

Same as (a)

(c) At trial:

Same as (a); Isaiah S. Gant, Federal Public Defender, Nashville, TN

(d) At sentencing:

Same as (c)

(e) On appeal:

Vicki Mandell-King, Federal Public Defender, Denver, CO; James L. Hankins, Oklahoma City, OK

(f) In any post-conviction proceeding:

Michael Wiseman & Crisi Charpentier, CHU, Federal Community Defender Office, [cont]

(g) On appeal from any ruling against you in a post-conviction proceeding:

Eastern District, PA, Suite 545 West, The Curtis Center, Phila., PA 19106, 215-928-0520

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

Page 13

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.\*

This Motion is timely filed.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 41    Restricted

Page 14

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_Michael Wiseman_

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

(month, date, year).

Executed (signed) on _April 5 2010_____ (date).

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 42 Restricted

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.03-cr-73-WH |
| Respondent, | : | CAPITAL 2255 PROCEEDINGS |
| -v- | : | HON. RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| Petitioner. | : | |

## GROUNDS IN SUPPORT OF MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields

Dated:     Philadelphia, PA
           April 5, 2010

## INDEX TO GROUNDS

### GROUND ONE

THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating. The Jury's Failure to Find any of this Uncontested Mitigating Evidence Violated the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1. Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 14

C. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage . . . . . . . . . 16

    1. The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence . . . . . . . . . . . . . . . . . . . . . . . . 17

    2. The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price . . . . . . . 24

    3. Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 26

D.   Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    1.   The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    2.   Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 37

E.   Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price . . . . . . . . . . 39

    1.   The Direct and Cross-Examination Testimony of Dr. Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    2.   Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 42

F.   Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    1.   Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    2.   Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 52

G.   Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified . . . . . . . . 53

**GROUND TWO**

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION . . . . . . . . . . . . 54

6:03-cr-00073-RAW Document 305-12 Filed in ED/OK on 05/26/20 Page 45 of 429
6:10-cv-00113-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 4 of 67

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 45 Restricted

## GROUND THREE

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS . . . . . . . . . . . . . 56

A.    Evidence Rebutting the Substantial Planning Aggravating
Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    1.    Evidence that Mr. Fields Did Not Shoot the
Chicks After Substantial Planning . . . . . . . . . . . . . . . . . . . . . 59

    2.    Evidence that Mr. Fields Did Not Stage a
Robbery Many Hours After the Shootings . . . . . . . . . . . . . . 64

B.    Evidence Rebutting the Mental Anguish Aggravating
Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

C.    Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . 74

D.    The Government's Due Process Violations . . . . . . . . . . . . . . . . . . 76

    1.    False and Misleading Testimony and
Argument About a Purportedly Staged
Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    2.    Misleading Testimony and False and
Misleading Argument About Mr. Fields'
Purported "Alibi" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    3.    The False and Misleading Testimony and
Argument Could Have Affected the Judgment
of the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 46 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 5 of 67
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 46 Restricted

## GROUND FOUR

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR.
FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION
SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL
HISTORY AS A MITIGATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

A.      Evidence of Family Dysfunction that the Jury Never Heard . . . . . . 84

B.      Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . . . 91

## GROUND FIVE

MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING,
DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF
COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH
IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY
TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE
ON DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.      Improper Arguments Denying the Right to Jury
        Consideration of All Relevant Mitigating Evidence . . . . . . . . . . . . 95

B.      Improper Arguments Denying the Right to a Fair Trial . . . . . . . . . 99

C.      Trial Counsel's Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## GROUND SIX

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO
INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO
APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED
WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE
MURDER COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

A.      The Unified Weighing Process and General Death Verdict . . . . . 113
B.      Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . 117

6:03-cr-00073-RAW Document 305-12 Filed in ED/OK on 05/26/20 Page 47 of 429
6:10-cv-00113-RAW Document 51-2 Filed in ED/OK on 04/06/10 Page 6 of 67
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 47 Restricted

## GROUND SEVEN

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE
FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL
COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND
PRESENT EXCULPATORY EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

A. The Undisclosed Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . 119

    1. Bottle of 150 mg Effexor Capsules . . . . . . . . . . . . . . . . . . . 120
    2. Emails and Documents from Mr. Fields'
       Computers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    3. FBI Forms 302 and Reports of the OSBI . . . . . . . . . . . . . . 123

B. The Undisclosed Exculpatory Evidence Was Material . . . . . . . . . 123

C. Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . 123

## GROUND EIGHT

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS
DUE PROCESS AND A RELIABLE SENTENCING HEARING . . . . . . . . . . . . . . 124

## GROUND NINE

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD
VIOLATE THE EIGHTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

## STATEMENT REGARDING CITATIONS AND APPENDIX

The transcript of the trial proceedings are sequentially numbered and will be cited as "*TR*" followed by a page citation. Other proceedings will be cited as *TR* followed by the date of the proceeding and page number. Mr. Fields cites a number of documents that are not currently of record. Those documents are included in the accompanying *Appendix*, which will be cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix*, but will be cited. Defendant, Edward Leon Fields, the movant herein, will be referred to as Mr. Fields. The United States of America will be referred to as the Government. All other citations are either self-explanatory or will be explained.

All emphasis is supplied unless otherwise indicated.

## GROUND ONE

**THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS.**

### A.    Introduction.

1.    While there was significant debate at trial regarding whether the offenses to which Mr. Fields pled guilty could be mitigated by the occurrence of what the defense termed a "manic flip," there was no serious controversy that Edward Leon Fields has had a lifetime of mental illness.  There was no dispute between the parties that he suffered from chronic depression, nor was there any serious dispute that he experienced auditory hallucinations before and after the offenses.  Yet, counsel never presented these significant mitigating facts to the jury as possessing mitigating value independent of the "manic flip."  Although the presence of these facts were largely conceded by the Government, the jury did not find depression or auditory hallucinations to be mitigating factors.   The failure of counsel to present them as such violated the Sixth Amendment, and the jury's failure to find and give effect to these uncontested mitigating factors violated the Eighth Amendment.

1

6:03-cr-00073-RAW Document 305-12 Filed in ED/OK on 05/26/20 Page 50 of 429
6:10-cv-00113-RAW Document 1-12 Filed in ED/OK on 04/06/10 Page 9 of 67
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 50 Restricted

2. Counsel's closing argument was confusing, but to the extent it can be read as asking the jury to find some of the uncontested mental health-related mitigating facts, it was deficient in suggesting to the jury that they could be given mitigating effect only through one of three available statutory mitigating factors.

3. Mr. Fields suffers from a progressive neurological disease (discussed in detail below), and at the time of trial this disease had already caused him organic brain damage localized in his frontal lobes. However, this extant mitigating factor was not presented at all to the jury, and accordingly the jury never found his organic brain damage as a mitigating factor. This evidence was not presented despite the fact that counsel had an expert ready to testify to the presence of this damage, and relied upon this factor in arguing to the Department of Justice not to authorize this case as a capital prosecution.

4. These were not counsel's only failures. They failed to call available witnesses who would have testified – contrary to the Government's position – that Mr. Fields was not malingering his illness. These witnesses include those who treated Mr. Fields in the community before the offenses and during his pre-trial incarceration at the Muskogee and Tulsa County Jails. Counsel also ineffectively opened the door to damaging testimony by a Government expert. Counsel ineffectively failed to investigate, marshal and present available evidence showing

that one of the drugs that Mr. Fields had been prescribed in the weeks before the offenses was associated with causing aggressive and violent behavior. And, counsel ineffectively prepared the mental health experts that she did call to testify.

5. Trial counsel rendered ineffective assistance in investigating, presenting and arguing nearly every aspect of Mr. Fields' mental health mitigation defense. These failures – and all of the failures set forth elsewhere in this *Motion* – were due to the dysfunction of the defense team. Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer. In this capital case, Ms. O'Connell alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument. Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful.

6. Ms. O'Connell initially anticipated that Mr. Gant would share the work of preparing and trying this case. Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A* – 1, ¶¶ 2-3. To Ms. O'Connell's dismay and Mr. Fields' significant detriment, however, Mr. Gant made no meaningful contribution to the defense effort. He punted the critical Department of Justice authorization meeting to Ms. O'Connell at the last minute, ignored pleas for assistance in drafting jury instructions, gave

contradictory and unfocused advice about whether Mr. Fields should plead guilty, and, other than fumbling through a portion of the voir dire,[1] played no role at the sentencing hearing. Id., ¶¶ 4, 6-10. By the time trial began, Mr. Gant had ceased to play any meaningful role in assisting the defense.

7.     Because Ms. O'Connell shouldered nearly all the burdens of preparing and trying this complex case, she became overwhelmed. The defense team repeatedly made important decisions without giving them appropriate consideration. Witness preparation was either poorly done or in some cases, non-existent – some witnesses the defense intended to call were not called at all. Ms. O'Connell acknowledges, "There is no question in my mind that the bulk of the ... errors [in this case] were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case." O'Connell Dec., ¶ 24.

8.     The defense team's dysfunction not only adversely affected the performance of Mr. Fields' lead lawyer, but also the performance of the mental health experts who were the anchors of his mitigation defense. Dr. George Woods, a

---

[1]See e.g. TR, 340 (The Court: "Now, we've got to work on the opening and closing argument way of questioning jurors, because I don't like it. Mr. Gant, are you listening. Okay, I really don't. And I may just cut off questioning completely by counsel if we don't restrain ourselves."); TR, 373 (The Court: "We've hoed this road [sic] before. We've hoed this road before. I'm going to start putting a limit on counsel of five minutes each. You're [Mr. Gant] done, okay.").

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 53 of 429
6:10-cv-00115-RAW   Document 1-2   Filed in ED/OK on 04/06/10   Page 52 of 67
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 53   Restricted

psychiatrist who testified for the defense, recalls:

> Even though Ms. O'Connell was the engaged member of the team, I never believed that she gave the presentation I ultimately made the proper time and attention that it required. I had the definite sense that Ms. O'Connell was in over her head. To be clear, I do not mean that she was not capable of handling a complex set of issues, such as those presented by Mr. Fields' case. Instead, I believed that she was being required to handle too much work to be able to responsibly and competently make the required presentation. From my perspective, it was rather obvious that her inability to pay the required attention to the preparation and presentation of my testimony was traceable to Mr. Gant's failure to carry his share of the work.

Declaration of George W. Woods, M.D. ("Woods Dec."), $A-2$, ¶ 4. Another defense psychiatrist, Dr. Bradley Grinage, states that he was contacted "rather close in time to the trial," his preparation time was "short ... and only right before [he] testified" and trial counsel "appeared to be overextended." Declaration of Bradley D. Grinage, M.D. ("Grinage Dec."), $A-3$, ¶ 5.

9.      The mitigation specialist retained by the defense, Glori J. Shettles, also recounts that Ms. O'Connell was effectively alone in her work:

> Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. . . . It was quite clear that Ms. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

> I was in close contact with Ms. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial - a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation

that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of the defense. Ms. O'Connell examined every witness in the case. This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation. During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day.  Evenings seemed to him to be more in the nature of a social event than a serious endeavor. I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court.  Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden. I recall her finally giving up on trying to get him to perform a meaningful role.

Declaration of Glori J. Shettles ("Shettles Dec."), $A - 4$, ¶¶ 12-13.  She observed

the damage caused by the dysfunctional team:

> In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.  I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Ms. O'Connell being effectively on her own.

Id., at ¶ 15.

10.     While the defense team's dysfunction caused problems that permeated

the entire sentencing hearing, it had an especially acute impact on Mr. Fields' mental

6

health mitigation case for the reasons discussed below.[2]  Accordingly, trial counsel's

performances were ineffective in violation of the Sixth Amendment to the United

States Constitution.

**B.     Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating. The Jury's Failure to Find any of this Uncontested Mitigating Evidence Violated the Eighth Amendment.**

11.     Although the defense presented mitigating facts related to Mr. Fields'

mental health – including his pre-offense history of chronic depression and auditory

hallucinations – trial counsel ineffectively failed to argue that this evidence had

---

[2]As Ms. O'Connell notes, this dysfunction did not effect just her performance with regard to the mental health evidence discussed in this Ground.  It had an impact on virtually ever significant decision and action that she took.  After recounting many of her trial shortcomings, her Declaration concludes that they are all traceable to her status as sole counsel:

> I am an experienced, dedicated and conscientious criminal defense attorney. I am disturbed by many of the events that I have discussed In this statement. As the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, I accept full responsibility for my acts or omissions described above. Although Mr. Gant failed to perform his role, I should have either forced the issue with him, or brought it to the attention of the Court. **There is no question in my mind that the bulk of the above-described errors were a result of my being overburdened by essentially functioning without cocounsel in this complex and difficult case.**

O'Connell Dec., ¶ 24.  Accordingly, rather than repeat the allegations regarding the team dysfunction in each succeeding ground for relief, counsel will refer back to this section outlining the relevant events.

mitigating weight independent of the "manic flip" opinion presented by Dr. Woods and Dr. Grinage. This evidence could have been presented as free-standing mitigating evidence under 18 U.S.C. § 3592(a)(1) (significantly impaired capacity), (a)(6) (severe mental or emotional disturbance), or (a)(8) (other factors).[3] Even when counsel mentioned depression and hallucinations separately from the theory of manic flip, counsel never told the jury it could give these facts mitigating effect through anything but the (a)(1) circumstance. This, too, was ineffective.

12.    The defense presented two psychiatrists, Dr. Bradley Grinage and Dr.

---

[3]These three mitigating factors state in full:

(a) Mitigating factors – In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1)    Impaired capacity – The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(6)    Disturbance – The defendant committed the offense under severe mental or emotional disturbance.

(8)    Other factors –  Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

18 U.S.C. § 3592 (a).

8

George Woods, to establish that Mr. Fields suffered from bipolar disorder at the time of the offenses. *TR*, 2775 (Dr. Grinage); *TR*, 2973 (Dr. Woods). Both doctors also testified that the administration of Effexor to Mr. Fields caused him to endure a manic flip. *TR*, 2812 (Dr. Grinage: "[S]pecific to patients with bipolar disorder is you may treat the depressions with an antidepressant, but, there's a risk when treating someone with bipolar disorder that you might actually not only go past treating depression, but, put them into a manic episode or give them symptoms of mania.... the term that is described in the literature is called switching."); *TR*, 2989 ("[I]t's the medication and the blood level. In the same way that some people have unusual responses to penicillin or unusual responses to other types of medicine, there are people who have unusual responses to antidepressants as well. And one of the unusual responses for someone that is bipolar is to switch into mania."). Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of depression as early as age sixteen and, in the months before the offenses, suffered from sleeplessness, command auditory hallucinations and dramatic weight loss. *TR*, 2778, 2800 (Dr. Grinage); *TR*, 2974, 2981 (Dr. Woods). Dr. Grinage and Dr. Woods also testified that for many years prior to the offenses Mr. Fields had been treated with a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor. *TR*, 2745, 2804 (Dr. Grinage); *TR*, 2974, 2987 (Dr. Woods).

13.     While contesting the core of each expert's opinion, the Government

conceded much of the mental health evidence presented by the defense.  Dr. Jeffrey

Mitchell, a psychiatrist who testified for the Government on rebuttal, agreed that Mr.

Fields suffered from severe depression.  See, e.g., *TR*, 3263-64 (Dr. Mitchell testifies,

"I think Dr. Kemp gave – diagnosed depression which I think was a correct

diagnosis.").  Dr. Randall Price, the Government's rebuttal psychologist, also noted

that Mr. Fields suffered from depression which improved with treatment.  *TR*, 3220.

In closing argument, the Government did not dispute depression.  *TR*, 3425

(Government telling the jury: "Was the Defendant depressed during this time period?

**Absolutely.**"); *TR*, 3428 (Government arguing that Mr. Fields was depressed and not

bipolar). In addition, Dr. Mitchell testified that Mr. Fields' history of hearing voices

was "credible," *TR*, 3284, and that he did not "doubt that [Mr. Fields] heard voices

...."[4]  *TR*, 3315.

14.     Trial counsel requested that the Court instruct the jury on twenty-two

---

[4]Dr. Price did not endorse auditory hallucinations and believed Mr. Fields was malingering in this respect.  But he was the only doctor at trial who did not believe that the hallucinations were genuine.  As indicated in other portions of this *Motion*, every doctor who has ever treated Mr. Fields for a mental health-related symptom or illness, or administered mental health-related testing, has found his reports of symptoms and his testing credible.  **None have found him to be a malingerer – Dr. Price stands alone in this regard.**  And, in any event, Dr. Price agreed he could not rule out that the hallucinations were genuine.  *TR*, 3221, 3228.

10

mitigating factors that they contended were present in the case. The Court charged

the jury in accordance with trial counsel's request, i.e., the Court did not refuse to

charge on any mitigating facts or factors requested by the defense.[5] In closing, trial

counsel argued these factors more or less as the Court charged them. Despite the

exquisitely detailed list of mitigating factors given by the Court and argued by

counsel (e.g. Mr. Fields was a good cook), nowhere was the jury told by the Court or

---

[5]The Court charged the jury that the defense had offered as mitigating factors the following factors: (1) the Defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge; (2) the Defendant did not have a significant prior history of other criminal conduct; (3) the Defendant committed the offenses under severe mental or emotional disturbance; (4) the Defendant served in the Navy and was honorably discharged; (5) the Defendant worked as a prison guard for the Oklahoma Department of Corrections; (6) the Defendant has special talents in cooking, art, and computers; (7) the Defendant excelled in his manufacturing job at Kenco Plastics; (8) the Defendant is a loved father; (9) the Defendant is a loved brother; (10) the Defendant is a loved son; (11) the Defendant is a valued friend; (12) the Defendant endured the death of his father months before the offenses; (13) the Defendant's mother moved away weeks before the offenses; (14) the Defendant's ex-wife and children moved away months before the offenses; (15) the mother of the Defendant's children, Teresa Fields, has recently had cancer which may or may not be in remission; (16) the Defendant's death will impact his children, family and friends; (17) the Defendant cooperated with authorities after his arrest; (18) the Defendant confessed to the crimes; (19) the Defendant pled guilty to the crimes; (20) the Defendant has expressed remorse for the crimes; (21) the Defendant sought treatment for his mental illness; (22) the Defendant will not present a future danger to society by being imprisoned for life without possibility of release. *TR*, 3400-01. The Court also instructed the jury that "any other relevant mitigating information presented in this proceeding" could be considered as a mitigating factor. *TR*, 3402.

11

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 60 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 9 of 67
Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 60    Restricted

by counsel that it could:

- consider whether manic flip was a mitigating factor under (a)(6)[6] or (8); the (a)(1) mitigating factor was the sole basis offered to the jury for finding and giving effect to manic flip;

- find or give mitigating effect to Mr. Fields' uncontested depression under (a)(1), (6) or (8);

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under (a)(1), (6) or (8);

- find mental health mitigation (depression and hallucinations) under (a)(1), (6) or (8), even if it did not accept the manic flip theory.

Thus, caught up in presenting and arguing Dr. Woods' and Dr. Grinage's opinions regarding manic flip, counsel made these critical errors which unconstitutionally cramped the jury's ability to find and give mitigating effect to mitigating facts, including those that were uncontested. Simply put, the jury was left without an option by which to give mitigating effect to any of the mental health evidence except under (a)(1), and was given no means of finding and giving effect to depression and hallucinations at all.

15.    The jury rejected trial counsel's presentation of manic flip under the

_____

[6]While trial counsel did offer the (a)(6) severe disturbance mitigating factor, they argued that it was proven, not by mental health evidence, but by the facts that Mr. Fields was in rocky relationships, he was apart from his family, his father had recently died, his mother was ill and he was living out of his truck. *TR*, 3440.

12

(a)(1) mitigating factor. *TR*, 3480-81. Yet, there are two other ways that the jury could have found and given effect to manic flip. If the jury believed that Mr. Fields experienced a manic flip, and that it impaired him but did not "significantly" impair him – in the words of the statute – the jury could have found it under the (a)(8) catch-all factor. Counsel never argued that, nor did they ask the Court to so instruct. Similarly, the jury may have accepted that Mr. Fields underwent a manic flip, and that this constituted a "severe mental disturbance" – to quote the statute – even if it did not "significantly impair" his capacity. Had the jury believed this, it could have found manic flip under the (a)(6) factor. Again, counsel never argued that and did not ask the Court to so instruct. And, the jury may have believed he was bipolar, but did not experience a manic flip. In that case, it may have wanted to give effect to this finding under any of the three discussed mitigating factors. But, again, counsel failed to ask for such an instruction, or provide the jury with this choice. Because of counsel's failure to provide the jury with these alternative means of finding and giving effect to the manic flip, the jury was left with no other way to give expression to the mitigating value of that evidence.

16. In similar fashion, counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations.

13

17. The jury found no mental health related mitigation, and voted for death. *TR*, 3484-85. Although the jury rejected the manic flip-based impaired capacity mitigating factor, this did not mean it must have rejected evidence that Mr. Fields suffered from mental illness. One of the seventeen mitigating factors the jury did find was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482. Concluding that seeking treatment for mental illness is mitigating assumes the existence of mental illness. It is likely, then, that the jury was persuaded that Mr. Fields suffered from mental illness. The jury, however, lacked a means for giving effect to these uncontested mitigating facts. When a capital jury is not given the means by which to give effect to existing mitigating facts, the Eighth Amendment is violated.

### 1. Trial Counsel's Ineffective Assistance.

18. Trial counsel rendered deficient performance by failing to argue that Mr. Fields' mental health impairments were mitigating independent of the manic flip theory and the (a)(1) mitigating factor. Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations. Mental illnesses such as these are plainly mitigating even if they do not rise to the level of significantly impaired capacity, yet trial counsel argued the mitigating value of this evidence only through the impaired capacity mitigating factor. Trial counsel acknowledges, "I should have told the jury that they could find these facts as mitigating and ask the

14

Court to charge them on those facts as separate mitigating factors." O'Connell Dec., ¶ 18.

19.    Trial counsel concedes that she had no tactical or strategic reason for proceeding in this way. O'Connell Dec., ¶ 18. Nor could there be any reasonable tactic or strategy for doing so. By proceeding in this manner, counsel made it far less likely that the jury would find the defense's mental health evidence to be mitigating, which is the opposite of what reasonable counsel would have intended.

20.    Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented significant evidence of his history of mental illness and current diagnoses. Some of this evidence was accepted by the Government's own rebuttal mental health experts. Both Government experts conceded that Mr. Fields suffered from depression, and one even agreed that he experienced command auditory hallucinations. See, e.g., TR, 3263-64, 3220, 3284, 3315. Given that Mr. Fields' history of depression was undisputed, and that the jurors apparently believed at least some evidence of mental illness was credible, the jury likely would have found this evidence to be mitigating had it been given a way to express such a finding. As a result, there is a reasonable likelihood that, had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the statutory impaired capacity mitigator, the verdict would have been different.

15

21.    Mr. Fields submits that, when a jury fails to find uncontested mitigation, the Eighth Amendment is violated. In addition, when counsel fails to take advantage of a prosecutor's concession that mitigating facts exist, and the jury does not find those mitigating facts, Sixth Amendment prejudice is established.

**C.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage.**

22.    At the time of the offenses, Mr. Fields suffered from organic brain damage.[7] Trial counsel failed to discover the full extent of his brain damage because they arranged for Mr. Fields to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing.

23.    Nonetheless, the testing done by the defense neuropsychologist showed that Mr. Fields' frontal lobes were impaired. These impairments affected his executive functioning in areas such as judgment and impulse control. Evidence of this damage would have been mitigating in its own right and also would have bolstered the defense that Mr. Fields experienced a manic flip at the time of the offenses. Because trial counsel did not fully investigate and discover this brain

---

[7]As discussed in more detail below, Mr. Fields' brain damage is progressive and he is now even more severely impaired than he was at the time of the offenses.

16

damage, the jury never heard this crucial mitigating mental health evidence.

### 1. The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence.

24. Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage, should have sought appropriate evaluation and should have presented such evidence to the jury.

25. When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). Because this condition can cut off oxygen to the brain for periods of time, it creates a serious risk of brain damage. Trial counsel anecdotally learned that Mr. Fields suffered from something described to them as "hollow membrane" – a non-existent medical condition – but they failed to obtain legible medical records that would have identified hyaline membrane as the actual diagnosis and documented the resulting respiratory distress. Shettles Dec., ¶ 4. Mr. Fields' current counsel obtained a legible copy of these records which clearly describe his actual condition. They demonstrate that Baby Boy Fields was in dire condition, unable to breathe and near death. Counsel's failure to obtain a legible set of these crucial records was ineffective.

26. The legible records recount that Baby Boy Fields had Hyaline Membrane Disease – an illness in newborns which is associated with twenty to thirty percent of

17

all neonatal deaths. The records show that the "baby sox" (which measured the level of oxygen saturation) was thirty percent when he was taken away from his mother to a specialized hospital. The records also note Baby Boy Fields had "mucous in the lung [that] was so thick" the medical staff was unable to siphon it out. The records show that Baby Boy Fields had "very labored breathing," and "appear[ed] in distress." Radiographs showed "diffuse pulmonary infiltrates, " and that "prognosis [was] guarded." At the time he was removed from his mother, he was administered emergency baptismal rites and transferred in "isolette by ambulance." Subsequent tests showed that "in comparison to earlier films [there was] persistent increase in the markings of the right lung. Persistent inadequate pneumonization of the right lung [was] indicated." See Records of Hillcrest Osteopathic Hospital, A–5, at pp. 1, 3, 4, 7, 10, 14, and 16.

27. In addition, Mr. Fields experienced a number of head injuries and losses of consciousness before the age of twenty. When he was thirteen he had a sleigh-riding accident in which he crashed and lost consciousness for several minutes. Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), A – 6, at 2. At the age of sixteen he rolled a truck down a hill, flipping it over four times. Id. Two days later he became unconscious while riding a dirt bike and required four days of hospitalization. Id. He also experienced an

18

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 67 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 26 of 67
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 67 Restricted

episode of syncope at boot camp after he enrolled in the U.S. Navy. Id.

28. Thus, for good reason, trial counsel arranged for Mr. Fields to receive neuropsychological testing. On August 11, 2004, Dr. Michael Gelbort, a neuropsychologist, conducted an evaluation of Mr. Fields on behalf of the defense. Dr. Gelbort's testing battery included the Wechsler Adult Intelligence Scale-III, portions of Weschsler Memory Scale-III, Wide Range Achievement Test-III, Category Test, Trail Making Test, Lateral Dominance Test, Strength of Grip Test, a partial Sensory Perceptual Examination, Aphasia Screening, and items from the Luria Nebraska. Gelbort Report at 3.

29. This testing showed, among other things: "mild suppressions in working verbal and visual memory"; short-term memory for meaningful information "vacillat[ing] with the overall level of functioning in the borderline defective range of functioning"; verbally mediated tasks "mildly slowed to mildly impaired"; higher-level reasoning tasks demonstrating "mild impairment"; and "[i]mpulsivity of mild proportions." Gelbort Report at 3-4. Dr. Gelbort noted that "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance." Id. at 4. In short, he found that Mr. Fields suffered from organic brain impairments.

30. Most significantly, based on his testing, Dr. Gelbort concluded that Mr.

Fields likely suffered from frontal lobe damage that required further evaluation:

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. **He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted**. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

Gelbort Report at 3.

31. Although Dr. Gelbort recommended further testing, his August 2004 evaluation was the only neuropsychological examination ever conducted for the defense. Nonetheless, there is no question that, based on Mr. Fields' birth history, the other red flags in his background and on Dr. Gelbort's testing, defense counsel knew that Mr. Fields suffered from neuropsychological impairments.

32. That the defense knew Mr. Fields' suffered from impairments is shown by several facts. In the late summer and fall of 2004, the defense filed a number of pleadings with the Court indicating that it intended to conduct further neuropsychological testing and present neuropsychological testimony at trial. Shortly after Dr. Gelbort's testing showed the presence of neuropsychological deficits with frontal lobe involvement, on August 27, 2004, the defense notified the Court "that

20

defendant's neuropsychological test results indicate the presents [sic] of frontal lobe impairment in his brain functioning." Defendant's Ex Parte Supplement to Motion for Extension of Time at 1. On September 17, 2004, the defense notified the Court that they had:

> [C]onferred with the neuropsychologist, and was informed that testing indicated the presence of frontal lobe impairment. This information was then shared with the neuropsychiatrist, who determined that additional medical testing is mandated to confirm the existence, nature and extent of Fields' brain damage. The doctor arranged to return to Tulsa at the end of September to conduct a neurological examination. Thereafter, additional time is necessary for the doctors to analyze testing results, determine if any further testing is indicated, formulate opinions and confer with counsel.

Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice at 6. This filing included an affidavit from an attorney stating that "[a] neurologist is often necessary as well when any brain damage, disease, or dysfunction is suspected" and that "[n]eurologists are usually best equipped to interpret the array of data gathered from the client's history, neuropsychological tests, measures of brain structure and functioning (CT and MRI scans, EEG's, PET scans), and additional tests ...." Id., Exh. B at 7. On November 1, 2004, the defense gave notice that its experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist. Defendant's Notice of Intent to Present Expert Testimony (Rule 12.2 Notice).

21

33.     On December 1, 2004, the defense met with the Government to discuss the results of their mental health investigation in hope of settling the case for a sentence of life imprisonment without parole.  United States Attorney Sheldon Sperling memorialized this meeting in a letter sent the next day.  He wrote, among other things:

> Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. . . . no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case.  You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004, $A-7$, at pp. 1, 2, 4.

34.     Whatever doubts may have remained regarding Mr. Fields' organic impairments after Dr. Gelbort's testing were resolved in June 2005, when Dr. Jack Randall Price conducted a neuropsychological evaluation of Mr. Fields on behalf of the Government.  On July 1, 2005, Dr. Price reported impaired performance on a number of significant neuropsychological tests, including the Trail Making Test, Part A (27th percentile), Trail Making Test, Part B (7th percentile), Digit Vigilance Time (9th percentile), Selective visual attention (variable), COWA (7th percentile) and RFFT (1st percentile).  Report of Neuropsychological Evaluation dated July 1, 2005 ("Price

Report"), *A – 8*, at 21-25.  On the Frontal Systems Behavior Scale Subscales of

Apathy, Disinhibition, and Executive Dysfunction, Dr. Price found that Mr. Fields

ranged from 83rd percentile to above 99th percentile.  Id. at 25.  He noted no evidence

of malingering on the neuropsychological testing portion of the evaluation.  Id. at 21.[8]

35.    Ms. O'Connell provided Dr. Price's report to Dr. Gelbort, who told her

that Dr. Price's data was consistent with his, even though Dr. Price's conclusions

understated the significance of the data and Mr. Fields' impairments.  O'Connell

Dec., ¶ 16 ("I provided this report to Dr. Gelbort, who told me that Dr. Price's data

was consistent with his own – that Mr. Fields was brain damaged and neurologically

impaired.").  Ms. O'Connell confirmed that Dr. Gelbort would testify.  Id.

36.    On July 3, 2005 – just before the start of jury selection – trial counsel

sent Dr. Gelbort a contract to cover his anticipated testimony at the sentencing

hearing.  Trial counsel informed him that he would be needed to testify around July

18, 2003, and also would be needed to consult about the cross-examination of Dr.

Price.  O'Connell Dec., ¶¶ 10,  15 ("Through the months leading up to the trial, I

stayed in contact with Dr. Gelbort about conducting further testing and his ability to

---

[8]Despite these impairments, Dr. Price concluded, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27. However, as noted by Dr. Daniel Martell and discussed below, Dr. Price misrepresented the significance of his findings.

testify.... Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage.").

37.     Mr. Fields never received further neuropsychological testing as recommended by Dr. Gelbort, nor did Dr. Gelbort ever testify at Mr. Fields' sentencing hearing. O'Connell Dec., ¶¶ 10, 17 ("I never had him perform the additional testing.... I had no strategy or tactic for abandoning the specific factor of organic brain damage.").

> 2.     **The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price.**

38.     At the request of current counsel, Mr. Fields has been evaluated by neuropsychologist Dr. Daniel A. Martell.[9]  Dr. Martell was asked to assess Mr. Fields' current neuropsychological state and functioning, and to assess the accuracy of Dr. Price's opinions and testimony.  His conclusions are stunning and compelling.

———————————————

[9]Dr. Martell is a member of *Park Dietz and Associates*.  He is routinely retained by and testifies on behalf of the Government and state prosecutors in both capital and non-capital cases. See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Coe v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes.

Dr. Martell finds that Dr. Price's testimony did not accurately reflect the significance

of his data. Dr. Martell's current testing shows that Mr. Fields has experienced a

"catastrophic decline in functioning over the five years since he was seen by Dr.

Price" and that "some of his test performances were among the worst I have seen")

Report of Daniel A. Martell, Ph.D., ("Martell Report"), $A - 9$, at p. 10.[10]

39. On Dr. Martell's testing, Mr. Fields scored in the severely impaired

range on the gold-standard of neuropsychological tests, the Halstead-Reitan battery.

Martell Report at 10. Mr. Fields' executive functioning – a function controlled by the

frontal lobes – was "among the most profoundly impaired area tests." Id. Based on

his review of the data provided by Dr. Gelbort and Dr. Price, Dr. Martell is easily able

to opine that the progressive disease process observed on his testing had its origins

prior to the time of the offenses. Id. at 16.

40. Dr. Martell finds that Dr. Price inaccurately portrayed his

neuropsychological data. Dr. Price also gave a false impression that Mr. Fields

malingered, when his own testing – and the testing of every doctor who has ever

---

[10]Dr. Martell cannot yet be certain of the causes of this progressive decline. He believes it may be related to a tumor or another process involving stroke. He recommends further imaging to determine the cause. Martell Report at 17. Counsel will shortly move for an order to have Mr. Fields transported to an appropriate imaging facility.

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 74 of 429
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 74 Restricted

6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 33 of 67

evaluated Mr. Fields – shows that he has never malingered. Dr. Martell himself administered multiple, objective, and scientifically sound and accepted tests for malingering, which show conclusively that Mr. Fields did not malinger on his most recent testing. Martell Report at 9.

41. Dr. Martell also finds that Dr. Price employed a "faulty basis" for concluding that Mr. Fields' reports of auditory hallucinations were false, i.e. that they were malingered. Martell Report at 13-14. Dr. Price's faulty conclusions were not challenged by the defense as they could have been.

42. Dr. Martell finds that Dr. Price testified outside of his area of expertise when he opined on the impact of several of the psychotropic medications administered to Mr. Fields. Martell Report at 14. This testimony violated the standards articulated by the American Psychological Association's *Ethical Principles of Psychologists and Code of Conduct* and that group's *Specialty Guidelines for Forensic Psychologists*. Id. at 14-15.

### 3. Trial Counsel's Ineffective Assistance.

43. Trial counsel were ineffective for failing to fully develop and present evidence of Mr. Fields' organic brain damage and to present this evidence to the jury. Trial counsel also were ineffective for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological

impairments.

44.    Almost a year before Mr. Fields' sentencing hearing, Dr. Gelbort informed trial counsel that he suspected frontal lobe dysfunction and recommended further testing. Gelbort Report at 3. Trial counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG. Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing. O'Connell Dec., ¶ 15.

45.    Presentation of evidence that Mr. Fields' frontal lobes were damaged would have been highly mitigating. Woods Dec., ¶ 7 ("People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. Such people act out without making the types of judgments that intact people can make. By itself, this type of impairment is a highly mitigating factor."); Grinage Dec., ¶ 12 ("If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his 'cognition' ... I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.").

46.    Furthermore, organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offense. As Dr.

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 76    Restricted

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 76 of 429
6:10-cv-00115-RAW   Document 1-2   Filed in ED/OK on 04/06/19   Page 35 of 67

Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." Woods Dec., ¶ 7. Dr. Grinage agrees that "the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers."[11] Grinage Dec., ¶ 12. Trial counsel never considered organic brain damage to be inconsistent with a manic flip defense and agreed that "[p]resentation of brain impairments would have been an important part of our mitigation presentation." O'Connell Dec., ¶¶ 15, 17.

47. There was no reasonable basis for trial counsel's failure to fully develop and present this evidence. Trial counsel concedes she had no strategic or tactical reason for failing to arrange for additional testing to be done. O'Connell Dec., ¶ 17.

48. Trial counsel were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments which showed frontal lobe dysfunction. Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so. O'Connell Dec., ¶ 15. As late as the start of jury selection, it was still trial counsel's intention to call Dr.

---

[11]Dr. Grinage notes that the previously undiscovered legible records of Mr. Fields' birth also strengthens this opinion. Grinage Dec., ¶ 12.

28

Gelbort as a witness. O'Connell Dec., ¶ 15. Dr. Gelbort's testimony would have been highly mitigating by itself and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12.

49.    In addition, Dr. Gelbort's testimony was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who told the jury that Mr. Fields did not suffer from brain dysfunction even though his own testing showed significant impairment. See TR, 3154; Price Report, at 21-25; see also Martell Report, pp. 12-13. (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist).

50.    Trial counsel fell below a reasonable objective professional standard when they failed to present this known and available mitigating evidence and failed to rebut Dr. Price's conclusions. According to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem. O'Connell Dec., ¶ 17. Trial counsel concedes she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Id. Nor could she have had a sound strategy. One of counsel's most fundamental duties is to present her client's case. It is therefore incumbent upon trial counsel to invoke the

court's processes, if needed, to insure the attendance of a witness, or else to seek a continuance until the witness is available.

51.     Mr. Fields was prejudiced by trial counsel's deficient performance in failing to investigate and present evidence of organic brain damage. Evidence of frontal lobe damage would have been highly mitigating, especially when considered in combination with Mr. Fields' other diagnosed mental illnesses and his use of the antidepressant Effexor. Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Had the jury known that Mr. Fields suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different.

52.     Mr. Fields also was prejudiced by trial counsel's failure to rebut Dr. Price's testimony. That testimony was devastating, but trial counsel failed to challenge his conclusions in any meaningful way, and actually elicited more harmful testimony on cross-examination.[12] Not only did the jury never learn that Mr. Fields was brain-damaged, but it was affirmatively led to believe he was **not** brain-damaged by Dr. Price's misleading testimony. Had the jury known that Mr. Fields suffered from significant neuropsychological impairments consistent with frontal lobe dysfunction, there is a reasonable likelihood that the jury's verdict of death would

_____

[12]Mr. Fields also alleges that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price. See Part E, below.

30

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 79 of 429
6:10-cv-00135-RAW Document 1-2 Filed in ED/OK on 04/06/18 Page 38 of 67

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 79    Restricted

have been different.

> **D.** **Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered.**

53.     The Government contended that Mr. Fields was malingering when he reported experiencing auditory hallucinations, and also attacked the diagnosis of manic flip presented by Dr. Woods and Dr. Grinage as the opinions of "left coast ... hired guns." *TR*, 3429. Trial counsel could have rebutted these contentions by calling the medical professionals who treated him before and immediately after the offenses. The testimony of local medical professionals, who treated Mr. Fields would have silenced the Government's "left coast ... hired guns" argument. Moreover, as treating providers, these witnesses had a unique opportunity to see and evaluate Mr. Fields' condition, and to offer persuasive testimony about it. Trial counsel neither investigated these medical professionals nor called them to testify. Their unpresented opinions would have carried great weight.

1.   **The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges**

54.    Dr. Randall Price, a psychologist called as a rebuttal witness for the Government, testified that Mr. Fields was malingering when he reported hearing voices:

Q:    In your report what did you say you concluded about auditory hallucinations?

A:    That the way he described them to me was consistent with exaggerated or malingered auditory hallucinations that were inconsistent with genuine auditory hallucinations experienced by psychotic individuals.

Q:    What about the description is inconsistent with the voices described by other psychotic individuals?

A:    Having identified the – a single voice and referring to that voice as a little friend that tells you what to do and that being the only kind of content to the voice, to a single voice.  Not having any strategies to be able to deal with those voices except to obey them and those voices being talked about without an associated delusional system.  Those things are inconsistent with psychotic individuals.

Q:    All right.  The fact that he said it was just a lone voice, you say that's not consistent with – that's not credible?

A:    That's correct.

*TR*, 3221-22.

32

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 81 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 40 of 67
Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 81    Restricted

55.    The Government also suggested in closing argument that Mr. Fields'
suicide attempt was not a real one, but simply a means of gaining attention and
sympathy. *TR*, 3464 (Government arguing that suicide attempt was a "transparent
ploy" to gain sympathy and imploring the jury not to be "fooled" by it).

56.    Ostensibly to address the charge that Mr. Fields was malingering his
auditory hallucinations, trial counsel questioned Dr. Woods about whether Mr.
Fields' treating doctors believed he heard voices. All Dr. Woods could say was that
Mr. Fields' treating doctors (i.e., those who treated him before and after the offenses)
did not make any notes in their files indicating a belief he was malingering and that
they continued to prescribe medication. *TR*, 2979-80. But trial counsel never
presented the available source evidence – evidence that would not have been
vulnerable to the Government's "left coast – hired guns" argument. Nor did counsel
present any evidence showing that Mr. Fields' suicide attempt while incarcerated at
the Muskogee jail was an earnest and serious attempt to take his life.

57.    In closing argument, the Government repeated its claim that Mr. Fields
was a malingerer. His report of auditory hallucinations was vigorously attacked:

> Not at the confession, not in that conversation [with Michelle Tipton].
> Voices, she says, are real and influential? Not his. The voices like the
> robbery and burglary were a convenient afterthought. Remember the
> voice made him falsely claim that cannot be measured. This alleged
> voice that the Defendant claims in this case at about the time he chose

33

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 82 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 82   Restricted
6:10-cv-00115-RAW   Document 1-2   Filed in ED/OK on 04/06/10   Page 41 of 67

to activate his long though out plan to become a double murderer is just not real.  When had the Defendant had any of these voices or had previously heard voices beside the issue here? ... These voices are suspiciously fabricated consistent with exaggeration or malingering, inconsistent with genuine auditory hallucinations described by psychotics.  A little friend that tells him what to do?  Heard by a person with no strategies to deal with the voice but obey?  Unaccompanied by a delusional system, the doctors say, Dr. Price, not credible.

*TR*, 3450-51.

58.    The Government also hammered its "left coast – hired guns" mantra in attacking the credibility of the defense experts:

We didn't have to go out to the left coast to find somebody who testified for the defense every time. **We got people in our own back yard who were credible**, who would give an honest opinion who were not hired guns.

*TR*, 3429.

59.    **The Government was correct**. There were credible local providers "in our own back yard" – to quote the Government – who could have provided extremely helpful testimony.  Such testimony would have rebutted the claim that Mr. Fields was a malingerer, supported the manic flip defense, showed that his suicide attempt was genuine, and demonstrated that, on the whole, Mr. Fields was a truly sick individual.  Counsel did not call any of these medical professionals at trial, each of whom examined Mr. Fields before or immediately after the offense.  They are each local practitioners, which would have given them far greater credibility with the jury than

34

the defense's out-of-state mental health experts who were vulnerable to the Government's charge of being "left coast ... hired guns." *TR*, 3429.

60.     Dr. Louise Bumgardner is a life-time resident of Oklahoma. She is a psychiatrist who treated Mr. Fields at the Muskogee Jail after the homicides. Dr. Bumgardner states that Mr. Fields reported "that he was suffering from auditory hallucinations (hearing voices) and was feeling 'very suicidal.' He reported to me that he was depressed throughout his life." Declaration of Dr. Joyce Louise Bumgardner ("Bumgardner Dec."), *A* – 10, ¶ 3. She further states:

> Based upon my review of my records and my recollection of this patient, I believe that his suicide attempt was a genuine effort to take his life. I also believed that he was suffering from actual psychiatric symptoms and was not malingering them. I have treated many prisoners presenting with psychiatric complaints, many of whom were malingering for secondary gain. When I believed that prisoners were malingering I would not hesitate to place that conclusion in my notes. The absence of that notation, my actual notes and my recollection of Mr. Fields, show that I believed he was genuinely mentally ill.

Id., ¶ 4.

61.     In addition, Dr. Bumgardner agreed with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offense:

> Based on his history, the materials I have reviewed, and my own impressions at the time I treated him, I believe that Mr. Fields presented a classic case of the adverse impact that can occur when anti-depressive medications are given to a person with bi-polar disorder. Providing anti-depressive medications alone (that is, without appropriate additional

35

medications), to a person in Mr. Fields' condition can cause an explosion of extant smoldering manic symptoms, with devastating effects. I have seen such a reaction in other patients I have treated, and I have read about this phenomena in the literature. I also believed that he was a mentally ill individual and was not malingering.

Bumgardner Dec., ¶ 5.

62.    When Mr. Fields was transferred to the Tulsa County Jail, he was treated by Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections. Like Dr. Bumgardner, Dr. Trombka believed that Mr. Fields was hearing voices:

I diagnosed schizoaffective because of Mr. Fields' complaints of auditory hallucinations which were reported concurrent with his mood symptoms. Although reasonable mental health professionals could disagree with regard to the most appropriate diagnosis for Mr. Fields' (whether depression with psychotic features or bi-polar illness with psychotic feature), it was clear to me that he was ill. There was no indication in the jail records upon which to conclude that he was faking his illness, or that his complaints were not genuine .... My notes of February 2, 2004 indicates that he told me that he was feeling better than he had in years. I also noted observations by correctional personnel, which caused me to believe that Mr. Fields was genuinely ill.

Declaration of Larry Trombka, M.D., *A* – 11, ¶ 2.

63.    Other medical professionals who treated Mr. Fields in the years before the homicides confirm that he presented no signs of malingering in describing his symptoms. Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000, states that "he

36

presented with chronic depression which I treated in a standard manner. There is no indication in either my records or my memory that I believed Mr. Fields was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression." Declaration of R.L. Winters, M.D., $A - 12$, ¶ 4.

64.    In 1999, Dean Anderson, a physician's assistant at the Heavener Clinic, also treated Mr. Fields for depression. Mr. Anderson states that "I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different")." Declaration of Dean Anderson, $A - 13$, ¶ 11.

65.    Although they were each available and willing to testify at trial, none were called. Bumgardner Dec., ¶ 6; Trombka Dec., ¶ 4; Anderson Dec., ¶ 12.

### 2.    Trial Counsel's Ineffective Assistance.

66.    Trial counsel were ineffective for failing to call the medical professionals who treated Mr. Fields to testify that they did not believe he malingered his complaints of auditory hallucinations or suicide attempt, and to bolster the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip.

67.    Trial counsel admits that she had no tactic or strategy for not

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 86 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 86   Restricted

6:10-cv-00115-RAW   Document 1-2   Filed in ED/OK on 04/06/19   Page 45 of 67

investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. Mr. Fields'

reports of auditory hallucinations were important to the defense's claim of manic flip,

as well as to establishing other mental health mitigating factors. After the

Government called Dr. Price to rebut this evidence, the defense needed to counter this

charge of malingering. The views of local medical professionals who worked in local

jails and treated Mr. Fields, would have assumed far greater weight and would have

been greeted as more credible by the jury. Yet trial counsel failed to call them,

relying instead on nothing more than the speculative inferences that Dr. Woods was

able to draw from Mr. Fields' medical records. Trial counsel also failed to call Dr.

Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even

though those opinions went to the heart of Mr. Fields' mitigation defense. There was

no reasonable basis for trial counsel's failure to present this evidence when it was

readily available and vital to Mr. Fields' defense.

68.   Mr. Fields was prejudiced by trial counsel's failure to call the medical

professionals who treated him to rebut the Government's allegations that he was

malingering. In closing, the Government argued these allegations at length. This

argument not only undermined the defense's claim that Mr. Fields suffered from

impaired capacity at the time he shot the Chicks, but it also suggested that he was

fabricating an excuse for his behavior, and thus was a powerful indication of

38

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 87 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/18 Page 46 of 74
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 87 Restricted

consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). There is a reasonable likelihood that, had trial counsel called these witnesses to rebut allegations of malingering, the verdict would have been different.

### E. Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price.

69. The defense team's dysfunction and ineffective handling of the neuropsychological evidence was reflected in trial counsel's cross-examination of Dr. Price. Although trial counsel previously sought to limit the testimony of Dr. Price to exclude discussion of organic brain damage, trial counsel elicited the very conclusions they argued were outside the scope of Dr. Price's rebuttal testimony. Furthermore, these conclusions were elicited without meaningful challenge by the defense team, even though the defense team possessed significant information to impeach the testimony of Dr. Price.

### 1. The Direct and Cross-Examination Testimony of Dr. Price.

70. As set forth above, trial counsel ineffectively failed to present evidence of Mr. Fields' organic brain damage during the course of trial. This error was compounded by trial counsel's elicitation from rebuttal witness Dr. Price of testimony that Mr. Fields had no significant brain impairment. Counsel's combined failures left

Mr. Fields with the worst of both worlds.

71.    Trial counsel initially sought to limit the scope of Dr. Price's direct testimony regarding organic brain damage:

> MS. O'CONNELL:  What I was getting ready to tell the Court is that that brings to mind for me the fact that a great deal of what Dr. Price did was testing in relation to brain injury.  And during the course of our case we presented no information, no evidence, no testimony of brain injury.
>
> THE COURT: Meaning that would not be proper rebuttal?
>
> MS. O'CONNELL: Yes.

*TR,* 3080. The Court declined to rule in a vacuum and stated that it would address the matter through any specific objections raised during the course of testimony.  *TR,* 3083-84.

72.    Despite bringing the issue to the attention of the Court, trial counsel failed to object when the Government brought out harmful, but limited, testimony from Dr. Price regarding brain damage.  See, e.g., *TR,* 3106 (observing that Mr. Fields' "cognitive processes ... were intact"); *TR,* 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16).   Notably, trial counsel did not object when Dr. Price suggested that his evaluation did not detect any organic brain damage. *TR,* 3154 ("But I thought there was probably going to be some brain dysfunction, something there to have people

40

evaluating him for this.").

73.     Although the bulk of Dr. Price's neuropsychological opinions were not presented in his direct examination, counsel elicited them on cross-examination. She inexplicably elicited from Dr. Price the opinion that he hinted at in his direct testimony, and the opinion trial counsel initially sought to exclude:

Q:     Yesterday you said that you didn't see at least much impairment in Mr. Fields, is that right, when you testified at the jail? When you saw him at the jail you did not see much impairment?

A:     I did not see much neuropsychological impairment, not significant neuropsychological impairment, that's correct.

Q:     Not much neuropsychological impairment?

A:     Right.

Q:     The kind of impairment that comes from damage to the cells in the brain?

A:     Primarily, yes.

TR, 3204-5.[13] After eliciting this testimony, trial counsel moved on to another subject and did not return to the issue of organic brain damage, leaving Dr. Price's opinion as the final – and as it is now known, inaccurate – word on the issue of organic brain

_____

[13] Trial counsel could not have been surprised by this testimony, as Dr. Price's report states, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder."  Price Report at 27; see also O'Connell Dec., ¶ 16.

41

damage.

## 2. Trial Counsel's Ineffective Assistance.

74. Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to use readily available information to impeach his testimony.

75. Trial counsel could have presented Dr. Gelbort in anticipation of or in rebuttal of Dr. Price's testimony. Trial counsel were aware of the mitigating significance of the evidence of Mr. Fields' organic brain damage. O'Connell Dec., ¶ 17. Trial counsel also were aware that Dr. Price's opinion regarding organic brain damage was vulnerable to impeachment:

> About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell. I saw that Dr. Price opined that Mr. Fields did not have significant brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered. I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own – that Mr. Fields was brain damaged and neurologically impaired. Dr. Gelbort again confirmed that he was available to testify.

O'Connell Dec., ¶ 16. In fact, trial counsel cross-examined Dr. Price regarding the testing areas where Mr. Fields demonstrated impairment. See TR, 3195-96 (e.g., testimony that Mr. Fields performed at 7th percentile on Trail Making Test and Verbal Fluency, 17th percentile on Stroop Test).

76.     Despite this, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neurobehavioral impairments and over-reported Mr. Fields' actual level of functioning.  See Martell Report, pp. 12-13.   While trial counsel questioned Dr. Price regarding individual tests on which Mr. Fields scored poorly, they failed to demonstrate to the jury the combined significance of those results.  Trial counsel failed to pull together the isolated testing results to show that "there was a pattern of impairments suggestive of brain damage."  Martell Report at 12-13.   This could have been accomplished through cross-examination or by presenting the testimony of Dr. Gelbort, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4.

77.     Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the practice effect in neuropsychological testing.  Martell Report at 13.  The practice effect occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the practice effect).

43

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 92 of 429
6:10-cv-00135-RAW   Document 1-2   Filed in ED/OK on 04/06/10   Page 91 of 67

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 92    Restricted

Dr. Price's opinion was vulnerable to impeachment on this front, as he repeated many of the tests that Dr. Gelbort administered ten months earlier. Id.

78. Trial counsel failed to object to Dr. Price's testimony regarding the effects on Mr. Fields of the administration of Effexor. TR, 3129-30.[14] As Dr. Martell points out, Dr. Price is a psychologist and is not expert in the effects of such medications. Indeed, Dr. Price acknowledged as much when he refused to answer a question on cross-examination about the effects of the medication, because of his lack

---

[14]On direct examination, Dr. Price gave the following testimony:

Q:   By the way, Doctor, do you know what happens if you were–let's say you were prescribed 150 milligrams of Effexor and instead of taking one, you took four. You took 600 milligrams. What would happen?

A:   Well, I think you would– that you would feel bad. That you would get– I mean, that you might get sick. It might cause you to be sick to your stomach.

Q:   Would it screw up behavior?

A:   **No.** I know on Effexor that if you stopped taking it abruptly that you could get dizzy. But taking extra. **I don't think immediately, antidepressants don't have an effect on behavior immediately.**

TR, 3129.

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 93 of 429
6:10-cv-00115-RAW Document 1-2 Filed in ED/OK on 04/06/10 Page 52 of 67

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 93    Restricted

of expertise in this area. *TR*, 3206.[15] Counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

79. Trial counsel had no strategic reason for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Trial counsel originally sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence (filed March 31, 2005). Furthermore, just before Dr. Price's direct testimony was presented, trial counsel sought to **prevent** Dr. Price from testifying about organic brain damage, on the basis that it was improper rebuttal because it was outside the scope of the mitigation evidence presented by the defense team. *TR*,

---

[15]On cross-examination, he admitted he was not an expert:

Q:    How familiar are you with those medications?

A:    I'd say I have a nodding familiarity. I'm not – I don't prescribe. I'm not an M.D. It's not my – I wouldn't say by any stretch of the imagination I'm an expert in those medications.

*TR*, 3206.

45

3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude.

80.   Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not suffer from organic brain damage and failure to impeach or otherwise counter the vulnerable testimony of Dr. Price.  Instead of hearing the wealth of evidence of Mr. Fields' organic brain damage, or at a minimum, hearing nothing at all regarding Mr. Fields' brain functioning, the jury heard only that Mr. Fields tested poorly in isolated areas but on the whole did not have any significant neuropsychological impairment.  Had trial counsel not elicited Dr. Price's harmful testimony, or if trial counsel properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different.

### F.     Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.

81.   Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-

46

undiagnosed bipolar disorder.  The Government countered that his behavior before and after the offense indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression.  This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

### 1.    Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression.

82.    Trial counsel called Dr. Grinage and Dr. Woods to testify that Mr. Fields committed the offense while experiencing a manic flip caused by the ill-advised administration of the antidepressant Effexor.  Dr. Grinage testified that a manic flip caused by Effexor would sometimes put a person into a "really high, flighty, euphoric state, but many times I have seen with patients very irritable and unable to concentrate." *TR*, 2812.  Dr. Woods, too, testified that Effexor could have caused a manic flip and that mania leads to "impaired judgment." *TR*, 2990.  In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point." *TR*, 3438.

83.    The Government challenged the defense's theory by arguing that the circumstances surrounding the offense demonstrated that Mr. Fields' judgment and

47

concentration were not impaired. According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later. *TR*, 3413-22. As the prosecutor told the jury, "The Defendant had no delusions. It's impossible, virtually impossible, for Effexor to trigger a single manic episode. The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness." Id. at 3451-52.

84.     The jury apparently was persuaded by the Government's argument, rejecting the impaired capacity mitigating factor. *TR*, 3480-81. Because impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no mental health mitigation.

85.     Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression. Compulsive aggression, unlike impaired judgment or concentration, would have been consistent with the Government's view that Mr. Fields was able to deliberate before and after the offense. Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his

48

conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion could thus have been mitigating under the (a)(1) significant impairment factor, as a severe mental or emotional disturbance or as catch-all mitigation (18 U.S.C. § 3592 (a)(6) & (8)).

86.     Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. In a peer-reviewed article published in 2003, Dr. Peter Breggin described various case reports, epidemiological studies and clinical trials showing an increased rate in obsessive aggression and violence in patients who were being treated with selective serotonin reuptake inhibitors ("SSRIs"). Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A* − 14. Effexor, or venlafaxine, is a non-selective serotonin reuptake inhibitor that is in the category of SSRIs. Id. at 32. Obsessive aggression observed in SSRI patients includes a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Id. at 36.

49

87.   After Dr. Breggin's article was published, the United States Food and Drug Administration ("FDA") issued a related public health advisory. On March 22, 2004 – over a year **before** Mr. Fields' sentencing hearing – the FDA asked the manufacturers of ten anti-depressant drugs, including venlafaxine (Effexor), to alter their labeling to include a warning statement recommending "close observation" of patients being treated with these drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric." FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A* – 15. The FDA also recommended that "therapy should be evaluated, and medications may need to be discontinued, when symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms." Id.

88.   The PHA was widely reported in the general media. See, e.g., Elizabeth Kaledin, *People Taking Antidepressants Need to be Monitored for Turbulent Emotions, Including Possible Risk of Suicide, CBS Evening News Transcript*, March 22, 2004, *A* – 16; Gardner Harris, *Labels on Antidepressants Sought to Warn of Suicide Risk*, N.Y. Times, March 22, 2004, *A* – 17; *Antidepressants May Have*

50

*Opposite Effect, FDA Warns*, USA Today, March 22, 2004, *A* – 18.

89. Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to the PHA by changing the drug's Medication Guide to include the warnings requested by the FDA. Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**." Effexor Medication Guide (2004), *A* – 19, at 12. The Medication Guide also advised that these changes "**may be abrupt**." Id.

90. Trial counsel failed to investigate and present this evidence even though it would have been highly mitigating and was consistent with the facts of his case. Mr. Fields' behavior around the time of the offense closely matched the kinds of obsessive aggression observed in SSRI patients, including a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Breggin Article at 36. In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127. There

was evidence that Mr. Fields filled this prescription the day before the homicides.[16]

This evidence is consistent with Wyeth's warning that adverse effects were more likely to occur after an upward adjustment to the Effexor dosage. Effexor Medication Guide (2004) at 12.

## 2. Trial Counsel's Ineffective Assistance.

91.     Trial counsel were ineffective for failing to present evidence that patients treated with SSRI-type medications, such as Effexor, can experience increased rates of compulsive aggressiveness.

92.     The defense's theory that Mr. Fields experienced a manic flip which impaired his capacity to conform his actions to the requirements of the law or to appreciate the wrongfulness of his actions was vulnerable to the Government's argument that his actions before and after the homicides appeared to be deliberate. Evidence that Effexor caused or added to Mr. Fields' sudden compulsive aggressiveness would have been highly mitigating and entirely consistent with the facts of this case. There was no reasonable basis for failing to investigate and present this evidence.

93.     Mr. Fields was prejudiced by trial counsel's deficient performance.

---

[16]The Government withheld exculpatory and material evidence regarding the amount of Effexor that Mr. Fields consumed. This is discussed in Ground Seven, below.

Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that the verdict would have been different.

### G. Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified.

94. Because trial counsel poorly prepared Dr. Grinage and Dr. Woods for their testimony, the Government was able to damage their credibility on cross-examination. Each expert believes that they were not properly and adequately prepared. Grinage Dec., ¶¶ 5-12, Woods Dec., ¶¶ 4, 8; Glori Shettles agrees (Shettles Dec., ¶ 14) and Ms. O'Connell acknowledges this as well. O'Connell Dec., ¶¶ 11-12.

95. Aside from a general sense that the testimony was ill-prepared and presented, some specific examples demonstrate the problems each expert encountered. For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7, causing him on cross-examination to contradict some of the answers he gave on direct examination. *TR*, 2816-18; <u>see also</u> O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7. Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the

wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired." O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1). As a result, Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination. *TR*, 3048; see also O'Connell Dec., ¶ 12.

## GROUND TWO

### THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION.

96.     As set forth in connection with Ground One, above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function. Although the cause of the process is not yet clear, and the precise rate of decline has yet to be determined, Mr. Fields' mental health will not permit his execution.

97.     First, the evolving standards of decency – by which cruel and unusual punishments are adjudged under the Eighth Amendment – no longer permit the execution of profoundly mentally ill people. The evolution of these standards is seen in the prohibition of the execution of people with mental retardation, people who were under eighteen at the time of their offense, and those who are not mentally competent to be executed. Although there is no current holding of the United States

Supreme Court precluding the execution of those with profound mental illness, counsel submits that this date is not far off. Given the apparent pace of Mr. Fields' mental decline, it is likely that, by the time his execution, his mental health status would preclude his execution.

98.    Second, the Supreme Court has ruled that the Eighth Amendment precludes the execution of people who are not competent for execution. Such people are not aware of the reason for their execution or that they are to be executed. Again, by the time of Mr. Fields' execution, it is likely that he will be incompetent for execution.

99.    Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to the Court through treaty and convention.

100.    Although neither of these Eighth Amendment bases for precluding Mr. Fields' execution are now ripe for adjudication, he raises them in this *Motion* to ensure that they are not waived.

## GROUND THREE

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS.**

101.  The jury found, among others, the statutory aggravating factor against Mr. Fields that he shot Mr. and Mrs. Chick after substantial planning and premeditation, and it found the non-statutory aggravating factor, among others, that he inflicted mental anguish on Mrs. Chick.  See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).[17]

102.  The Government presented false and at best misleading testimony and

---

[17]The statutory aggravating factor of substantial planning and premeditation is found at 18 U.S.C. § 3592(c)(9) and states:

(c)    Aggravating factors for homicide – In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(9)    Substantial planning and premeditation – The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

56

argument to support the substantial planning aggravating factor. First, the Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument. Second, the Government selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides. The Government also twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings, and made it appear that he tried to concoct an alibi for his whereabouts on the night of the offense. It presented flawed expert opinions that ignored basic facts about the crime scene to support its theory that Mr. Fields returned to the scene hours later to stage a robbery.

103.    Yet at every step, trial counsel failed to attack the aggravating factors in any meaningful way. Before the sentencing hearing, trial counsel failed to consult with experts who could have helped them expose the vulnerabilities of the Government's experts on cross-examination. During cross-examination, trial counsel failed to correct distorted testimony elicited by the Government. During the defense's case-in-chief, trial counsel neglected to call their own experts to rebut the flawed testimony of the Government's experts. At closing, trial counsel never argued why

the Government had failed to prove the aggravating factors beyond a reasonable doubt.

104.   Thus, through knowing presentation of false and/or misleading evidence and counsel's ineffectiveness for failing to put this aspect of the Government's case through adversarial testing, the jury was permitted to find two aggravating factors it either should not have found, or, if found, should not have weighted as heavily as it did.

105.   Had trial counsel conducted a reasonable investigation – by adequately interviewing friendly Government (i.e., civilian) witnesses and consulting with a crime scene investigator or pathologist – they could have discovered and presented evidence rebutting the Government's claim that Mr. Fields shot the Chicks after substantial planning and inflicted mental anguish on Mrs. Chick.  Had the defense done so, it is likely that the jury would have rejected these aggravating factors.  Had these aggravating factors been rejected, in whole or part, there is a reasonable probability that the jury's weighing of the remaining aggravating and mitigating circumstances would have been different, and Mr. Fields' life would have been spared.  Counsel's ineffective failure to properly challenge these circumstances allowed the jury to consider facts that they would not otherwise have had before it. Thus, counsel's failure caused Mr. Fields significant prejudice.

## A.  Evidence Rebutting the Substantial Planning Aggravating Factor.

106.  To prove the substantial planning aggravating factor, the Government introduced evidence purporting to show that Mr. Fields had been laying the groundwork to shoot a human being for a year or more before the offense, and that he devised a specific plan to shoot the Chicks after setting up an alibi for his whereabouts.  The Government also introduced evidence purporting to show that, at least six hours after shooting the Chicks, Mr. Fields returned to the campsite and staged a robbery to make it appear that his objective had been to steal, not to kill.  All of this evidence could have been rebutted by proper defense investigation.

### 1.  Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning.

107.  The Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become a sniper and shoot human beings. The prosecutor argued in closing:

> Didn't start on July 10th, 2003, started long before that.  It started about a year before that when, as you heard the testimony, the Defendant was with Penney to help to create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.
>
> \*   \*   \*
>
> His plan down the road is to become a predator, a sniper.  This was the first step in that action.

59

TR, 3406-07.

108.   According to the Government, Mr. Fields finally decided to put his plan "to become a predator, a sniper" into action on the evening of July 10, 2003 after meeting the Chicks at the Winding Stair Campground a few days earlier.  As evidence of this plan, the Government argued that Mr. Fields attempted to create an "alibi" for the evening of July 10, 2003 – when he purportedly intended to shoot the Chicks – by telling his former girlfriend that he planned to go fishing with a friend that night and would be home late.  TR, 3412-13.

109.   If trial counsel had conducted a reasonable investigation by adequately interviewing a friendly Government witnesses – Daniel Presley – they would have discovered evidence refuting the Government's allegations.  Mr. Presley could have explained to the jury that certain remarks and actions by Mr. Fields that the Government made seem ominous were in fact innocuous.

110.   Had he been asked by trial counsel on cross-examination, Mr. Presley could have given testimony contradicting the Government's argument that, because Mr. Fields used a ghillie suit and scoped rifle, he must have been planning a sniper attack.  Under questioning by the Government, Mr. Presley told the jury that Mr. Fields went squirrel–hunting in his ghillie suit, that he attached a powerful scope to his .22 rifle, and that he was a "[g]reat shot." *TR*, 2378-79.  He also told the jury that

60

Mr. Fields had ghillied his rifle. Id. at 2384-85. However, he has now explained that it was common for hunters in the area to use ghillie suits and to ghillie their weapons – questions he was never asked by trial defense counsel:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go to any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself.
>
> \* \* \*
>
> Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't because it wasn't unusual.

Declaration of Daniel Presley ("Presley Dec."), *A* – 20, ¶¶ 4, 5.

111.   Mr. Presley also would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles. He states, "You an either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's." Presley Dec., ¶ 5.   Moreover, Mr. Presley would have testified that Mr. Fields

attached the scope to his rifle at least a year before the homicides. Id.

112. Mr. Presley also could have rebutted the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides, if only trial counsel had inquired into the matter. The Government first called Mr. Presley to testify that on the evening of July 10, 2003 he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." TR, 2382. The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2005 and told her he had plans with his Mr. Presley for that evening. Ms. Tipton testified:

> Those plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work. He was a very timed person and he got home at exactly the same time every night and he knew – at this time I was not working, so, he knew that I would worry. So, he wanted me to know that him and Danny would be out fishing and that he wouldn't be right home.

TR, 2558-59.

113. From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts. TR, 3412-13.

114. However, Mr. Presley would have testified on cross-examination that Mr. Fields came over to his house after work that day and **asked him to go snake-**

62

**hunting that night**. Presley Dec., ¶ 3. Mr. Presley declined to go hunting because he had plans to go to the casino with sister, <u>id.</u>, but the fact that Mr. Fields suggested that the two of them go snake-hunting that evening shows that, as he indicated to Ms. Tipton, he **did** hope to do something with Mr. Presley that evening. As Mr. Presley observes:

> When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m. – or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

<u>Id.</u>

115. Although trial counsel did not question Mr. Presley about this information on cross-examination, they had been alerted to its existence. In Mr. Presley's statement to the FBI, he mentioned that, just hours before the offense,[18] Mr. Fields asked him if he "wanted to do something." FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview") *A* – 21, at 3. Mr. Presley's statement was produced to the defense in discovery. Yet trial counsel never followed

_____

[18]Mr. Presley told the FBI that Mr. Fields came over to his house sometime after 4:00 p.m. Presley Interview at 3. In his testimony at the sentencing hearing he said he "thought it was around 4:00" that he last saw Mr. Fields that day, but he had "heard since that it was later than that." *TR*, 2382. His wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven, I believe." *TR*, 2462.

up with Mr. Presley – either through investigation or cross-examination – to find what it was that Mr. Fields "wanted to do." Had trial counsel followed up on this remark during their investigation, they would have learned that Mr. Fields wanted to go snake hunting the night of the offense, not shoot the Chicks, and could have presented that information to the jury to contradict and challenge the substantial planning and premeditation aggravating factor.

116. Trial counsel never asked Mr. Presley these matters. See Presley Dec., ¶ 3.

### 2. Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.

117. As further proof that Mr. Fields had a premeditated plan to shoot the Chicks, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned several hours later to stage a robbery. This claim was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal. The Government argued:

> To [Agent Dalley] this was not a true burglary or robbery. This was staged.
>
> So you have to ask yourself why would he do this. Why would he come back some hours later to commit this crime. Don't know. But one thing I throw out to you is this. The evidence suggests that he knew he may

have been caught by those people coming in. These people may have recognized his truck and when he had completed his plan, when he had killed the Chicks, when he had finally murdered his prey, when he had graduated from squirrels to humans, he left the area.

*   *   *

So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery and if anyone says anything I can say, well, I was – they were – I was there using the bathroom. They were already dead.

*TR*, 3421, 3422; see also *TR*, 2019 (Government explains relevance of staged robbery theory to statutory aggravating factor).

118. To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma. Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried:

A:      In addition to the blood that is in the runners of the foot well and on top of the sandals, I also note that there are these small, shiny fragments here which are pieces of broken glass.

Q:      And did you find those pieces of broken glass significant?

A:      Yes, sir.

Q:      And how did you find them significant?

A:      In two ways. One, they were consistent with being from the driver's window, which I found had been broken, such that there was an impact to the window from the driver's side towards the passenger's side.
The other thing that I noted was there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood.

*TR*, 2098-99.

119.   In addition, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot. *TR*, 2026-32, 2111-15.

120.   If trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator – they would have learned that the evidence supporting the Government's "staged robbery" theory could have been soundly impeached.

66

121.   Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. Referring to a photograph marked Government's Exhibit 43, Agent Dalley testified "there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood." *TR*, 2099.   Agent Dalley did not explain on direct examination how she arrived at this conclusion, nor did trial counsel ask this question on cross-examination.

122.   In the report Agent Dalley prepared almost two weeks after the homicides, however, she recorded no observations about these glass fragments and failed to mention whether she examined the fragments at the scene or collected them for later examination.[19]   Trial counsel never cross-examined her about the fact that

---

[19]Agent Dalley reported about these objects as follows:

DALLEY opened the front passenger door.  Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep.  Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep.  *Fragments of broken glass were on top of the sandals and blood in the doorstep.*  DALLEY collected the three sandals and the tissue-like fragment.

her report is utterly silent as to whether the glass fragments had any blood on them. If these fragments were such important pieces of evidence, as the Government argued, Agent Dalley's failure to note their significance in a report written two weeks after the crime raises serious questions about whether she did in fact examine them to determine whether they were free of blood – particularly since she neglected to collect and preserve the fragments as evidence. Her testimony could have been severely impeached on this fact alone.

123. Moreover, while Government's Exhibit 43 does not show any blood visible on the glass fragments, another crime scene photograph taken by Agent Dalley – a close-up of the area depicted in Government's Exhibit 43 – reveals that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), $A - 23$, ¶ 8. This fact contradicts Agent Dalley's testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Mrs. Chick's blood while the blood was still viscous. Id., ¶ 9. If even one glass fragment landed on Mrs. Chick's blood while it was still viscous, the driver's side window must have been broken before the blood had time to dry. Thus, the Government's theory is deeply flawed and was eminently impeachable.

―――――――――――

OSBI Crime Scene Investigation Report dated August 1, 2003, $A - 22$, at 3.

6:03-cr-00073-RAW Document 305-1-3 Filed in ED/OK on 05/26/20 Page 117 of 429
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 117 Restricted

6:10-cv-00113-RAW Document 1-3 Filed in ED/OK on 04/06/10 Page 9 of 67

124. Even if other glass fragments had no blood on them, trial counsel could have offered a reasonable explanation for this fact during Agent Dalley's cross-examination. Agent Dalley testified that the front passenger door was closed when she arrived on the scene and that she had to open it in order to view the interior of the van. TR, 2098. It is likely that Agent Dalley disturbed a number of glass fragments when she opened the door, causing them to fall onto the dried blood at that time. This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door. Tressel Dec., ¶ 12. Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so. Id.

125. Trial counsel also could have attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot. Government's Exhibit 51 is a photograph depicting Mr. Chick's right hand. It shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist. Mr. Chick's right hand must have

69

been exposed to this debris while he was being moved from the picnic table to the ground. Tressel Dec., ¶ 16. If Mr. Chick had been moved many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground, and pine needles and other ground debris would not have become attached to the dried blood. Id. Thus, Mr. Chick's body likely was moved within an hour after he was shot,[20] not more than six hours later, as the Government argued. Id.

126.   In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. Tressel Dec., ¶ 17. The air temperature on the evening of July 10, 2003 was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot. Id., ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot, not more than six hours later as the Government argued.

127.   The Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body. Lividity is a

---

[20]Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. *TR*, 2099-2100. The blood on Mr. Chick's right hand appears to be considerable less thick than the blood found in the van, and thus would have dried in less time.

70

discoloration of the skin caused by the settling of blood in the capillaries due to gravity. Tressel Dec., ¶ 18. It does not occur in areas of the body that are in contact with the ground or another object. Id. Although lividity can become become "fixed," or unchangeable in less than four to six hours after death, although lividity can be fixed is less time in colder temperatures. Id. Dr. DiStephano and Agent Dalley testified that livor patterns on Mr. Chick's body were consistent with lividity having become fixed while Mr. Chick was seated at the picnic table. See, e.g., *TR*, 2031-32 (testimony of Dr. DiStephano), 2177 (testimony of Agent Dalley).

128. Trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body **also** were consistent with lividity having become fixed while Mr. Chick was lying where he was found. Mr. Chick was discovered face down beside the picnic table with his left arm extended across his chest, his right foot bare, and the top of his right foot pressed against the ground. Tressel Dec., ¶¶ 19-20. Mr. Chick's body shows lividity on his left side, right abdomen, top thigh and right bottom toes, which is consistent with the position in which he was found and inconsistent with being seated at the picnic table. Id. These livor patterns could not have occurred if lividity had been fixed before Mr. Chick's body was moved. Id.

129. Some livor patterns on Mr. Chick's body are inconsistent with the

position in which he was found. These patterns include areas of discoloration on the backs of Mr. Chick's thighs. Trial counsel nevertheless could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

## B. Evidence Rebutting the Mental Anguish Aggravating Factor.

130. In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor:

> [Mr. Chick's] wife Shirley sitting right in front of him face to face in the darkness sharing moments of the beautiful scenery and the vista. What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his [sic] face. What was the horror, the shock, the sheer oh, my God, the terror that went through her mind at that instant?

*TR*, 3415-16.

131. As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. *TR*, 2088-91. She

also testified that high velocity spatter can travel up to two feet and still remain visible on an object. *TR*, 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face:

> Well, if I can explain just a bit. Since it appears to be from a gunshot wound, then I look for any other gunshot wound in the scene that would be in a position that could cause that staining on her face. And subsequent to the autopsy and getting that information, I could exclude the wounds to her head as producing these stains down on her – especially down on her cheek. I could exclude the wound to her foot. That leaves Mr. Chick having two wounds. And one of those wounds then would be consistent with the staining on her face.

*TR*, 2090. Agent Dalley never explained why she could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point, although trial counsel did establish that the blood spatter on Mrs. Chick's face was never tested to determine the source.[21] *TR*, 2213.

132. Had trial counsel consulted a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and

---

[21]Agent Dalley also did not test high velocity blood spatter that she observed on Mrs. Chick's hands. *TR*, 2213. She attributed this spatter to Mrs. Chick's head wound, claiming it could be accounted for if her hands had been in a defensive position. *TR*, 2180-81.

73

a nearby exit wound. Tressel Dec., ¶ 26. According to Mr. Tressel, either of these wounds could have created high velocity blood spatter[22] and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

## C.    Trial Counsel's Ineffective Assistance.

133.   Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing.

134.   Trial counsel were deficient for failing to adequately challenge the aggravating factors. The Government's evidence of substantial planning and mental anguish effectively went unrebutted even though trial counsel had readily available information that could have undermined that evidence or placed it in its proper context. Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting and that Mr. Fields wanted to go snake hunting with him on the night of the offense. Presley Dec., ¶¶ 3-5. A crime scene investigator or other

---

[22]Indeed, Agent Dalley conceded this fact when she attributed the high velocity blood spatter on Mrs. Chick's hands to her head wound.

74

appropriate expert could have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. Tressel Dec., ¶¶ 8, 9, 12, 16-17, 19-20, 26. At the very least, trial counsel could have consulted with such an expert to assist in cross-examining the Government's witnesses. Trial counsel concedes that she did not even consider retaining a crime scene investigator or pathologist and that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses." O'Connell Dec., ¶ 22. Trial counsel not only failed to consult with appropriate experts and attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors, but in closing argument she failed to utter a single word about these aggravating factors.

135. Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims. O'Connell Dec., ¶ 22. Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr.

75

Fields eligible for the death penalty, and trial counsel had every reason to rebut the aggravating factors to convince the jury that mitigating factors outweighed aggravating factors.

136. Mr. Fields was prejudiced by trial counsel's deficient performance. The Government vigorously argued that its evidence supported both the substantial planning and mental anguish aggravating factors. See, e.g., TR, 3406-13, 3415-16, 3420-22, 3454, 3456. That evidence went unchallenged. Trial counsel could have injected reasonable doubt into the jury's deliberations by cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. There is a reasonable likelihood that, had trial counsel vigorously attacked the Government's evidence in these ways, the verdict would have been different.

## D. The Government's Due Process Violations.

137. The Government presented false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

1. **False and Misleading Testimony and Argument About a Purportedly Staged Robbery.**

138. As discussed above, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill. *TR*, 3421, 3422. This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Field eligible for the death penalty and was weighed by the jury. See, e.g., *TR*, 2019 (explaining relevance of staged robbery theory to statutory aggravating factor).

139. The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried. Id. at 2098-99.

140. Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation

77

report, and (2) photographs she took at the crime scene.

141. In a report she prepared approximately two weeks after the homicides, the only observation Agent Dalley made about the glass fragments was that "[f]ragments of broken glass were on top of the sandals and blood in the doorstep." OSBI Crime Scene Investigation Report dated August 1, 2003, 3. Agent Dalley mentioned nothing more about the glass fragments, nor did she include those fragments in the list of evidence she collected at the scene. Id. at 7-9.

142. Although Agent Dalley testified that the glass fragments were "significant" because they were not stained by blood, TR, 2098-99, her report fails to mention any characteristic that made them significant, indicating that either she did not physically inspect the fragments at the scene or she inspected them but did not observe anything significant about them. Because the glass fragments were not collected as evidence, she could not have examined them at a later time. Thus, her testimony that the fragments were "significant" because they were not stained with blood could not have been based upon her physical examination of those fragments.

143. Nor could Agent Dalley's claim that the glass fragments were "significant" have been based on her examination of photographs. The bottom surface of these glass fragments is not visible in any photograph. More importantly, one of the photographs taken by Agent Dalley shows that at least one glass fragment

78

resting on the dried pool of Ms. Chick's blood *does* have a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* – 24.[23] This photograph – which the Government never asked Agent Dalley about – contradicts her testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Ms. Chick's blood while the blood was still viscous. If even one glass fragment landed on Ms. Chick's blood while the blood was still viscous, the driver's side window must have been broken before the blood had time to dry.

144.   The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not solicit Agent Dalley's false and misleading testimony, they had a duty to correct it.

145.   Despite the fact that the prosecutors knew or should have known that Agent Dalley's testimony was false and misleading, they nevertheless argued in closing that her testimony supported the substantial planning aggravating

_____

[23]The photograph included in the Appendix is not a clear copy and is included for identification purposes only.

circumstance. *TR*, 3456 (prosecutor argues that glass fragments proved that Mr. Fields staged a robbery).

### 2. Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi."

146. As discussed above, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offense. This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton. The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382. The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR*, 2558-59.

147. Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day. **He had already set up us [sic] alibi**. If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him. **He's**

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 129 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 129   Restricted

6:10-cv-00135-RAW   Document 1-3   Filed in ED/OK on 04/06/10   Page 21 of 67

**already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth**.

TR, 3412-13.

148.   The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August 2003, Mr. Presley told the FBI that, on the day of the offense, Mr. Fields came to his house sometime after 4:00 p.m.[24] and asked him if he "wanted to do something." Presley Interview at 3.  Mr. Presley replied that he had "plans to play the casino in Fort Smith." Id.  This statement was memorialized in a FBI 302 Report and provided to the prosecutors. Id.  During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening.  The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

149.   It was clear from Mr. Presley's complete statement to the FBI that Mr.

─────────────

[24]At the sentencing hearing, Mr. Presley testified that it may have been later than 4:00. *TR*, 2382.  His wife Marilyn testified that it was between 6:30 and 6:45 p.m. *TR*, 2462.

Fields **did** intend – or at least wanted – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence shows that he had no plan to shoot the Chicks at the time at the time he made this statement to Ms. Tipton. It also shows that he had no intention of shooting the Chicks when he suggested to Mr. Presley that they go snake hunting, which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3.    The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.

150.    There is a reasonable likelihood that the judgment of the jury could have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The

82

Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigators. Moreover, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR.

151. The defense's presentation of Mr. Fields' social history evidence was disjointed, incomplete and unpersuasive. A handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family. Yet, as trial counsel were well aware, the defense's mitigation specialist had collected compelling evidence that, contrary to the

83

impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. This information would have been mitigating in its own right, and also would have helped a mental health expert explain his mental state at the time of the offense. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life. Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

### A. Evidence of Family Dysfunction that the Jury Never Heard.

152.   Mr. Fields was raised in a severely dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. Ms. Shettles was retained by trial counsel in August 2003. Shettles Dec., ¶¶

2-3.[25] She spent the next several months interviewing persons who knew about Mr. Fields' family and background and collecting relevant documents, including his medical, mental health and school records. Id., ¶ 3. She provided trial counsel with the results of her investigation and advised them about mitigation themes. Id., ¶ 3-5.

153.    According to Ms. Shettles, Mr. Fields' family history "was marked by notable dysfunction." Shettles Dec., ¶ 5. Both of his parents came from family backgrounds where sexual abuse and violence were prevalent. Id. His father spent part of his youth in a foster home. Preliminary Assessment, dated September 11, 2003 ("Shettles Memo") A – 25, at 4. Three of his father's sisters experienced sexual abuse and rape, one was disabled from polio, and another was disfigured in an automobile accident. Id. at 4-5. In his mother's family, sexual abuse, gambling and drinking took place. Id. at 7.

154.    Mr. Fields' mother, Margaret Fields, suffered from depression her entire life and "placed her own emotional needs above those of her family ...." Shettles Dec., ¶ 5. His father was largely absent from his upbringing, and his mother "jealously

---

[25]As is typical in such cases, Glori J. Shettles is a well-credentialed (masters level educated) and vastly experienced mitigation specialist. As her declaration reveals, she has law enforcement experience, and for approximately the last 17 years she has been involved as a mitigation specialist in over 70 capital cases. Shettles Dec., ¶ 2. Counsel hired the right person, but failed to effectively use the mitigating evidence she unearthed.

guarded her relationship with her husband" by keeping him from their children. Id., ¶ 6. As Cherie Fields, Mr. Fields' sister, explains, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father." Declaration of Cherie Fields ("Fields Dec."), ¶ 3, $A - 26$. She recalls that her parents never hugged her or Mr. Fields or told them they were loved. Id., ¶ 5.

155.    Cherie Fields also recalls that her mother "took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security." Fields Dec., ¶ 5. As a result, Mr. Fields received love from no one in the family. According to Ms. Shettles, "the relationship between the parents and Mr. Fields and his sister ... was distant, cold and unemotional." Shettles Dec., ¶ 6. Mr. Fields' apparent inability to express emotions may have its roots in the lack of appropriate parenting he received as a child. Id., ¶ 9.

156.    The problem was compounded by the family's transient lifestyle. Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned the significance of the family's nomadic life: that Mr. Fields had a difficult time forming and keeping friendships, which increased his sense of

isolation at a time when he already felt emotionally cut off from his parents.

157. Mr. Fields and his sister were the recipients of "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." Shettles Dec., ¶ 6. Cherie Fields describes this discipline:

> I recall my father being provoked by our mother to have us whip each other with belts – our Dad would be the one to say if we were doing it hard enough. If we weren't, then he would take a lick.
>
> * * *
>
> When we got a whipping, we'd have to take our pants off and lie on the bed. Dad would whip us with a belt until we'd cry and scream. It didn't matter what time of day or night it was. If Mom ordered him to give us a whipping he'd do it. It was all very bizarre and Eddie really got the worse of it.

Fields Dec., ¶ 6.

158. For most of his life, Mr. Fields suffered from chronic depression. Shettles Dec., ¶ 8. He appeared "unhappy," "moody" and "strange," lacked motivation and moved from one activity or relationship to the next without any obvious reason. Id., ¶ 8. As a result, he was frequently and inaccurately dismissed by those who knew him as "lazy." Id., ¶ 10. To Cherie Fields, her brother's depression made him act "weird." She states that, when she was growing up with her brother, "there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird." Fields Dec., ¶ 9.

87

By the time the family was preparing to move to Virginia, she recalls, "my brother was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

159.    In addition, intergenerational mental health and neurological issues plagued Mr. Fields' family, particularly on his mother's side. Shettles Dec., ¶ 8. Cherie Fields explains that Mr. Fields' mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill. Fields Dec., ¶ 8. Mr. Fields' mother reported having brain lesions. Shettles Memo at 2. On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor. Id. at 3-4.

160.    The jury never learned about Mr. Fields' severely dysfunctional family. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields. During her direct examination, trial counsel focused on a handful of non-controversial subjects – the impact of the deaths of her father and grandfather and her mother's physical ailments, for instance[26] – which gave the

---

[26]On direct examination, Cherie Fields testified about: the places her family lived, *TR*, 2674-76; fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not

misleading impression that the Fields were a more or less typical family. Trial counsel never inquired into subjects that would have revealed Ms. Fields' own tortured upbringing, significant family dysfunction, including the kind of parenting she and Mr. Fields received, how they were disciplined, the struggles of Mr. Fields and his mother with depression and other mental health issues, or inter-generational mental illness.

161. One of the reasons Cherie Fields' testimony failed to reveal the degree of family dysfunction was that trial counsel never explained to her why it was important for the jury to learn about such matters. Fields Dec, ¶ 12. She states, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

162. As a result, the defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. As Ms. Shettles, who attended the entire sentencing hearing, describes it:

[W]hile some isolated social history facts were provided to the jury,

---

spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offense, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687.

89

there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

163.  Trial counsel also never asked the defense's testifying mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction.

164.  Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

165.  Not only was this social history information never presented to the jury, but much of it was not even presented to Dr. Grinage and Dr. Woods to use in evaluating Mr. Fields. Trial counsel provided Dr. Grinage only with the Shettles Memo, a "preliminary" document that Ms. Shettles had prepared in the very early stages of her investigation. Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005 at *A − 28* at 2; Shettles Memo at 2. Similarly, the only information about family dysfunction that trial counsel provided Dr. Woods, the other defense psychiatrist, was "family historical records" which

included the medical records of his parents and maternal grandmother.  Letter from

Dr. George Woods to Julia O'Connell dated June 25, 2005 $A - 28$ at 1.

### B.    Trial Counsel's Ineffective Assistance.

166.    Trial counsel were ineffective for failing to present Mr. Fields' complete

social history – including family dysfunction and other mitigating evidence – through

the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert

such as Dr. Woods or Dr. Grinage.  Trial counsel also were ineffective for failing to

argue that Mr. Fields' social history was a mitigating factor and to provide this

evidence to the defense's mental health experts to help evaluate his mental state at the

time of the offense.

167.    Trial counsel performed deficiently when they failed to present a

complete social history and argue that social history as a mitigating factor.  Ms.

Shettles had collected valuable information about Mr. Fields' background that the

jury never heard.  Either she or a mental health expert such as Dr. Woods or Dr.

Grinage could have developed this information into compelling mitigation themes of

parental abandonment, emotional and physical abuse, family dysfunction, and mental

illness.  All three individuals were available to testify on this subject. Dr. Woods and

Dr. Grinage actually did testify at the sentencing hearing (although they were not

asked about Mr. Fields' social history), and Ms. Shettles, while not called as a

91

witness, attended the entire sentencing hearing and could have testified anytime. Shettles Dec., ¶ 13.

168.    Had trial counsel asked Ms. Shettles, Dr. Woods or Dr. Grinage to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields. The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records. All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life. See, e.g., Shettles Dec., ¶ 11.

169.    From a mitigation and mental health standpoint, this information would have been compelling evidence for the jury to consider. Dr. Grinage explains:

> I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did

92

we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented.

Grinage Dec., ¶ 10.

170. Moreover, Dr. Woods and Dr. Grinage should have been asked about how this information affected their opinions of Mr. Fields' state of mind at the time of the offense. Dr. Grinage notes, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10.

171. Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and ultimately presented a smidgen of this evidence, e.g., through the testimony of Cherie Fields. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to

93

accomplish that result.

172. Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented and argued a number of relatively minor biographical facts as mitigators – for instance, that he served in the Navy, worked as a prison guard and performed well at his job at Kenco Plastics. *TR*, 3400-01. However, trial counsel never presented or argued the far more powerful mitigation that was at their fingertips: family dysfunction and the long-term effects of that dysfunction on Mr. Fields' personality and behavior. As Ms. Shettles observes, "counsel were not seeing the forest for the trees as a result of their [own] dysfunctional relationship." Shettles Dec., ¶ 16. Prejudice is well-established:

> In my view, based on over twenty years working in the criminal justice system and with significant experience in capital sentencing, **I am shocked that the jury failed to find a single mental health-related mitigating factor in this case,** when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.

Shettles Dec, ¶ 15. Had the jury heard evidence of Mr. Fields' dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death.

94

## GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

173. The Government's closing arguments were rife with misrepresentations of law and fact, impermissible witness bolstering, *ad hominem* attacks, and speculation intended to inflame the passions of the jury. As a result, Mr. Fields was deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence. These comments violated his due process right to a fundamentally fair trial. Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal.

### A. Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence.

174. The Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase Mr. Fields' burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns. These instances of prosecutorial misconduct had

95

a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited discretion to extend mercy based on the evidence presented.

175.   The Government twice told the jury that the mitigating factors had to outweigh aggravating factors in order to justify a sentence less than death:

> The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie.  The mitigating factors – (Interrupted)
>
> MR. DERRYBERRY:  Objection to that based on the law.
>
> THE COURT:  Overruled.
>
> MR. SPERLING:  The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

*TR*, 3463-64.  This argument incorrectly stated the law, which requires that the aggravating factors must "sufficiently outweigh" the mitigating factors in order for the jury to impose a sentence of death.  18 U.S.C.A. § 3593(e). Trial counsel appropriately objected to this argument. This Court erred in overruling the objection. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

176.   The improper comments were made worse when this Court overruled the objection in front of the jury, thus suggesting that the Government's incorrect statements were in fact correct.  The official imprimatur thereby placed upon the

96

prosecution's misstatements of law obviously amplified their potential prejudicial

effect on the jury.

177.   The Government also urged to the jury to reject mercy based on the

evidence as a basis for a sentence less than death:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

*TR*, 3430. To the contrary, mercy is one of the most central and important factors to

guide the jury's sentencing discretion.

178.   Despite Mr. Fields' unquestioned statutory and constitutional right to

have a penalty hearing before the jury, the Government told the jurors that the entire

proceeding was unjust:

> **The Defendant wants to choose a sentence**. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

*TR*, 3457.

> Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.

97

*TR*, 3459. The Government's comments invited the jurors to sentence Mr. Fields to death merely for exercising his Eighth Amendment right to individualized sentencing. This also violated Mr. Fields' Sixth Amendment right to a trial on these sentencing facts the jury was required to consider.

179.   The Government improperly invoked societal concerns about lenient sentences and recidivism as a basis for rejecting a sentence less than death:

> You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence.  I can't believe they gave probation to a child molester. You know [sic] longer have that luxury.

*TR*, 3431.   These sentiments were echoed in later comments, invoking popular opinion that prison was too easy on criminals:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment.  If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation.  Don't let this Defendant be a hero to his incarcerated criminal inmates.

*TR*, 3457.[27]   The Government's comments were an invitation to reject the individualized sentencing determination required by the Eighth Amendment, and a

---

[27] The Government's argument was based upon facts not in evidence.  The only testimony about so-called jailhouse perks was elicited from Daniel Presley, who testified about the policies at the minimum security Oklahoma state prison where he was employed.  *TR*, 2408-09. Mr. Presley had no knowledge of the conditions of confinement on the Special Confinement Unit of the Federal Death Row at the United States Penitentiary at Terre Haute, Indiana.

98

naked appeal to vengeance designed to inflame the passions of the jury.

180.   Individually and collectively, these improper arguments denied Mr. Fields his right to a jury that would consider and give effect to the mitigating evidence presented and to an individualized determination of the appropriate sentence in his case.

**B.    Improper Arguments Denying the Right to a Fair Trial.**

181.   The Government's closing argument contained numerous statements misrepresenting the record and contained comments designed to inflame the passions of the jury, thus inviting the jury to decide Mr. Fields' punishment on factors other than the evidence properly presented at trial.   The Government also improperly embellished and bolstered the testimony of its witnesses throughout its closing.

182.   Given the nature of the mitigating evidence of Effexor-induced "manic flip" presented by trial counsel, the credibility of the mental health experts presented by both Mr. Fields and the Government was a critical aspect of the trial.   The Government engaged in a series of attempts to improperly bolster and vouch for the credibility of its experts.   Referring to Dr. Price, the Government stated:

> He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns.

*TR*, 3429.  The Government continued: "Dr. Mitchell – and he may be the best one of all ... Dr. Mitchell who has no axe to grind here, ladies and gentlemen." TR, 3429-30.[28]

183.   The Government echoed the earlier bolstering of Drs. Price and Mitchell, personally vouching for their credibility by stating, "I respectfully submit, thought [sic], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns." *TR*, 3452.  At the same time, both attorneys for the Government denigrated Mr. Fields' expert witnesses as "high dollar shrinks," id.; "hired guns," *TR*, 3429, from the "left coast," id., who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion." *TR*, 3429.

184.   This improper bolstering of the Government's experts was paired with the Government's gross misrepresentation of the testimony of Drs. Grinage and Woods about a significant factual issue raised by the Government in support of the aggravating factors – whether Mr. Fields' prior use of the ghillie suit to sneak up on other people undermined Mr. Fields' contention that he killed the Chicks in an

---

[28]Contrary to the Government's "left coast – hired gun" attack, Dr. Grinage is from Topeka, Kansas.  *TR*, 2768.  Like the Government's expert Dr. Mitchell, Dr. Grinage had never before testified in a capital case.  Grinage Dec., ¶ 2; see also *TR*, 3429-30 ("Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case.").  Thus, Dr. Grinage was neither a hired gun, nor from the "left coast."

Effexor-induced manic state.  The Government argued:

> On cross examination, the doctors we asked about the Ghilley suit.
> Well, I didn't know he had the Ghilley suit and had snuck up on people
> beforehand.  I didn't know that at all.

*TR*, 3427.  The Government's statements are false.  Dr. Woods testified, "I was aware that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit and observed someone...." *TR*, 3024.  Dr. Grinage was **never asked** if he was aware that Mr. Fields put on the ghillie suit and observed people.

185.   In addition to improperly bolstering its own expert witnesses and denigrating those of Mr. Fields, the Government launched a series of *ad hominem* attacks on Mr. Fields:

- "But it was he who chose to turn his back on his family five years ago. It was he who chose to be abusive. It was he who chose to ignore his kids and not even pay child support. ... he's already turned his back on his family..."  *TR*, 3431.

- "He abandoned them though. He abandoned them." *TR*, 3458.

- "The Defendant used and discarded people." *TR*, 3449.

- "He lied.  He was trying – manipulative, a con artist." *TR*, 3450.

- "And was financially irresponsible, parasitic and promiscuous." *TR*, 3450.

- "The Defendant is unalterably and fundamentally different from most human beings." *TR*, 3455.

- "Selfish. Selfish. Narcissistic. It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his widowed mother move halfway across the country." *TR*, 3459.

- "He's the one who put all of us here. What a sense of power he may feel. The narcissistic kind of selfish collections of reality that he has become." *TR*, 3460.

- "He had talked often enough about committing suicide in a transparent ploy to gain sympathy and money from his marks." *TR*, 3464.

- "The fight and Terry Hanna. That was illustrative, wasn't it? That tells you who the Defendant will choose to be near. A child abuser." *TR*, 3465.

These arguments were designed to inflame the passions of the jury, inviting the jurors to sentence Mr. Fields to death, not because any of the aggravating factors that were offered or proven, but because Mr. Fields was a fundamentally bad person, the kind of man who pals around with child abusers and who did not support his family.

186. Without factual basis in the record, the Government attempted to elicit fear of Mr. Fields – and bolster its claim that Mr. Fields posed a future danger – by arguing that he had been diagnosed as a sociopath.[29] The Government told the jury:

_____

[29] The Government repeatedly sought without success to have some witness tar Mr. Fields with the label of sociopath. Neither of the Government's mental health experts diagnosed Mr. Fields as a sociopath. At most, Mr. Sperling was able to elicit from Dr. Price a diagnosis of personality disorder not other specified with antisocial, psychopathic and narcissistic features and traits. *TR*, 3148. Dr. Price did not diagnose Mr. Fields as antisocial, psychopathic, sociopathic or narcissistic. *TR*, 3215-

102

"His own doctors are saying, yeah, he has the traits of a sociopath...." *TR*, 3428; "He's a sociopath." *TR*, 3449. To the contrary, neither Dr. Grinage nor Dr. Woods testified that Mr. Fields was a "sociopath" or even had sociopathic traits. Mr. Sperling had attempted to elicit such evidence from Dr. Grinage, whom he questioned extensively about whether Mr. Fields exhibited any of the traits of a sociopath. See TR, 2841-46. Dr. Grinage, however, denied that Mr. Fields exhibited any such traits, as this Court itself noted. TR, 2849 ("I think Mr. Sperling is simply asking the doctor if he noticed these characteristics or traits in the Defendant. I don't think he's asking to give that. And, of course, I know the doctor didn't and I think he said he didn't."). Dr. Woods was never questioned regarding a diagnosis of sociopathy.[30]

---

17. The Government then tried to adduce evidence that Mr. Fields' experts had diagnosed him as having sociopathic "tendencies" by calling a lay witness, Marilyn Presley, to testify that Mr. Fields "stated that they were – had said that he had some sociopathic tendencies, I believe, and wanted me to look it up on the computer for him." *TR*, 3086. Although the Government's theory was that the "they" who purportedly told Mr. Fields he had "sociopathic tendencies" referred to mental health experts retained by the defense, see *TR*, 3428, Mrs. Presley testified that Mr. Fields never told her who "they" were and in fact conceded it was a "good possibility" that the comment had been communicated to Mr. Fields by trial counsel who were merely reporting what other attorneys had said about him. *TR*, 3086, 3090. Thus, there was no evidence that Mr. Fields' experts had diagnosed him as having "the traits of a sociopath," contrary to Mr. Fries' assertion during closing argument. The reports of the defense trial experts confirm that neither diagnosed Mr. Fields as a sociopath nor observed in him any psychopathic traits.

[30] Trial counsel appropriately objected to the Government's statement that Mr. Fields' "own doctors are saying, yeah, he has a traits [sic] of a sociopath." *TR*, 3428-

187.   In addition to arguing that Mr. Fields was a sociopath, the Government made a number of other improper arguments without factual basis in the record in order to bolster its case in support of the aggravating factor of substantial planning and deliberation.  The Government argued that Mr. Fields planned for many months to commit this crime, contending that his hobby of squirrel hunting – and his construction of the ghillie suit for that hobby – was really a prelude to murder:

> Didn't start on July 10, 2003, started long before that.  It started about a year before that when, as you heard, the Defendant was with Penny to help create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.

*  *  *

> Look at the painstaking manner that must have been done in order to complete this Ghilley suit.  This is not the act of a man who's frenzied or has flights of thoughts.  It's the actions of a man who is methodically thinking out what he wants to do.  His plan down the road is to become a predator, a sniper.  This is the first step in that action.

*  *  *

This is when the plan really began to take form.  Plan was not to kill

---

39. However, this Court overruled the objection. *TR*, 3429.  The Court did so despite previously sustaining an objection to the question asked to Marilyn Presley: "Did he explicitly identify the doctors who had made that finding?" *TR*, 3086.  The Court erred in overruling the objection to the statement made in the Government's closing argument, as there was no factual basis in the record for the Government's assertion that Mr. Fields' doctors said that he had the traits of a sociopath.  Appellate counsel was ineffective for failing to raise this issue on direct appeal.

104

Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

* * *

At this time the Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper.

*TR*, 3406, 3408-9. The Government continued: "He had mastered his craft. He had practiced with squirrels and now he was moving to humans." *TR*, 3414; "in the days, weeks and months before the killing ... the killing germ began to take root in his mind ...." *TR*, 3454.

188.   However, there was nothing in the record to support the inference that Mr. Fields constructed the Ghillie suit with the idea of shooting a human being, or that he hunted squirrels for reasons other than to enjoy a hobby with his friend. Indeed, the evidence adduced at trial actually contradicted such an inference. The undisputed evidence at trial established that Mr. Fields' purpose in making the Ghillie suit was to use it for hunting squirrels, and nothing more. See *TR*, 2378-79 (Mr. Presley testified that he went hunting several times with Mr. Fields, who wore the Ghillie suit to shoot squirrels); *TR*, 2458 (Mrs. Presley testified, "It's just a Ghilley suit that people go hunting in."); *TR*, 3121 (Dr. Price testified, "And [Mr. Fields] preferred to use this Ghilley suit that he had constructed and hide and let the squirrels

105

come close to him."); *TR*, 2487 (David Love testified, "He told me that he had basically made it to hunt squirrels with."). Additionally, Jovanna Fields testified Mr. Fields was prepared to abandon the ghillie suit weeks before the Chicks were killed. *TR*, 2656-57.

189.   The Government further misrepresented and twisted the testimony of Daniel Presley in order to bolster its argument that Mr. Fields' hobby of squirrel hunting – and use of the ghillie suit for that hobby – was part of a greater plan to murder the Chicks.  The Government told the jury that Mr. Presley – Mr. Fields' hunting partner – testified that Mr. Fields "[d]idn't need to have a ghilley suit to go squirrel hunting" and that "there's no need to have a scope like this on this kind of gun, a .22," and contended that Mr. Presley called it a "sniper's rifle."  *TR*, 3407-8. Mr. Presley provided no such testimony, and disavows any suggestion that the Government's arguments correctly interpreted his testimony.[31]  See *TR*, 2370-2410; Presley Dec., ¶¶ 4-5.

190.   Additionally, the Government misrepresented the testimony of Daniel Love.  Mr. Love testified that during the spring of 2003 Mr. Fields said he had snuck

---

[31]The Government also contended that Mr. Presley testified about an incident when Mr. Fields scared Mr. Presley while the two were hunting and Mr. Fields was wearing the Ghillie suit.  *TR*, 3408-9.  Mr. Presley never testified about this incident – the story was recounted in the testimony of Dr. Price.  *TR*, 3122.  The Government never attempted to elicit this story from Mr. Presley.  See *TR*, 2370-97; 2408-10.

up on a couple on Talimena Drive while dressed in the Ghillie suit. *TR*, 2487. Mr. Love further testified that he told Mr. Fields to stop doing that or he would "get his ass shot off." Id. The Government contended that "the Defendant just kind of laughed at [Mr. Love]," *TR*, 3408, which was untrue. Mr. Love testified was that Mr. Fields was "[k]ind of aggravated a little bit. He took [the Ghillie suit] back out to the truck." *TR*, 2487. Mr. Love's actual testimony suggests that Mr. Fields was upset by Mr. Love's comments, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. TR, 3409.

191. The Government also contended that Mr. Fields used the campground to scout out potential victims:

> So he begins to look for victims. What is the testimony? He's hanging out at the Winding Stair Campgrounds. He's up in the Talimena Drive. He's going snake hunting. He's doing all these things, but he's also searching for a victim. Not a particular individual, but an individual or individuals who unfortunately have put themselves in a position of danger. He's at the Winding Stair Campgrounds and he's there several times a week. He's taking a shower, he's going to the bathroom. He's using it because his girlfriend won't let him live in their house anymore, but he's also using it as a place to search for a victim. He keeps track of when people are there, who's staying there, when they're staying there, what the habits are.

*TR*, 3410. Contrary to the Government's assertion, there was absolutely no testimony that Mr. Fields used to campground to identify a victim, much less any evidence that

107

he "ke[pt] track of when people are there, who's staying there, when they're staying there, what the habits are." Id. At most, the evidence indicated that Mr. Fields was aware the Chicks were staying at the campground. The Government's argument impermissibly exaggerated the trial evidence in a manner designed to mislead and inflame the jury.

192. In support of the mental anguish aggravating factor, the Government argued that the jury could reasonably infer that Shirley Chick's death was not silent:

> He likely heard whatever cries or moans or expressions of fear from at least one of his human prey. He killed from a short distance....

> And by the way, may I suggest one area in which the evidence establishes really our witness's credibility? Special Agent Gary Graff didn't pump things up. He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me. But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

TR, 3462; see also TR, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life."). There was no evidence that Mrs. Chick cried out when she was shot. This argument was pure speculation and was calculated to elicit an emotional reaction from the jury. It is also another example of the Government's improper witness bolstering.

193. The Government concluded its closing argument with an extended and

wholly improper recitation of scripture to support its position that Mr. Fields was worthy of death. The Government related to the jury the well-known "writing on the wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my Government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

*TR*, 3466-67; compare Daniel 5:1-31. The Government then argued that Mr. Fields should be weighed in the balance and found wanting. TR, 3467. The Government's

109

invocation of biblical support for its position invited the jurors to decide the question of Mr. Fields' punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance. Bible references as a basis for a death sentence are anathema to the Eighth Amendment.

194. Individually and in combination, the improper statements by the Government had a substantially prejudicial effect on Mr. Fields' rights under the Sixth and Eighth Amendment, and rendered his trial fundamentally unfair. These comments exaggerated and improperly bolstered the evidence in support of the Government's position while denigrating the mitigating evidence presented by Mr. Fields, and invited the jury to decide the question of Mr. Fields' punishment in a manner other than set out by statute and the Constitution. It is the prosecutor's job to seek justice, not victory. Here, the Government crossed that line, using a pattern of attacks, misrepresentations and improper appeals to passion, vengeance and fear to seek victory in the form of a death sentence.

### C.     Trial Counsel's Ineffectiveness.

195. Other than in the two instances noted above, trial counsel failed to object to any of the Government's improper statements throughout its closing arguments. Trial counsel's failure to object to these blatantly improper comments was deficient

110

performance, and trial counsel could have had no strategic reason for their failure to do so. O'Connell Dec., ¶ 23 ("Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issue for appellate review.").

196. Mr. Fields suffered prejudice from trial counsel's failure to make meritorious objections to the Government's improper closing arguments. As a result, the jury was encouraged to ignore the substantial mental health evidence presented by Mr. Fields, which it did in refusing to find that Mr. Fields committed the offenses under severe mental or emotional disturbance. *TR*, 3481. Based upon the Government's improper embellishment of its evidence, the jury also found that Mr. Fields committed the offenses after substantial planning and premeditation, and that Mr. Fields inflicted mental anguish upon Mrs. Chick. *TR*, 3479-80. If trial counsel had objected to the Government's misrepresentations of the law and the evidence, its *ad hominem* attacks on Mr. Fields, and its appeals to passion and vengeance, there is a reasonable likelihood that the verdict would have been different.

197. Appellate counsel rendered deficient performance by failing to raise these repeated instances of prosecutorial misconduct on direct appeal. Had appellate

111

counsel raised these, there is a reasonable likelihood that Mr. Fields' sentence would have been vacated and the matter remanded for resentencing. Appellate counsel can have no reason for failing to raise meritorious claims on direct appeal, particularly in a capital case.

## GROUND SIX

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

198. Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death. Trial counsel not only failed to object to this unconstitutional weighing process and general verdict, but they requested instructions and a jury verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form approved by the Court. United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009). Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United

States Constitution.

## A.     The Unified Weighing Process and General Death Verdict.

199.    Mr. Fields pled guilty to two counts of first degree murder: Count 1 (the murder of Mrs. Chick) and Count 3 (the murder of Mr. Chick). The Government sought the death penalty for Counts 1 and 3 based on seven aggravating factors, including three factors that exclusively applied to Count 1 (murdering Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and inflicting mental anguish on Mrs. Chick) and two factors that exclusively applied to Count 3 (murdering Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick).[32] *TR,* 3396-99.

200.    Although Mr. Fields pled guilty to two separate murder counts, the Court never instructed the jury that it had to determine the penalty for **each** murder count individually and that it could consider only those aggravating factors applicable to a particular count in determining the sentence for that count. See generally *TR*, 3393-3304; see also *TR*, 3478-83 (Special Findings Form). Instead, the Court's instructions and the Special Findings Form required the jury to vote on a single verdict of life or death. *TR*, 3404 (instructions), 3484 (Special Findings Form). Moreover, although

---

[32]The other aggravators argued by the Government were: (1) killing more than one person in a single episode; and (2) future dangerousness. *TR*, 3396-99.

113

the Court instructed the jury to decide each aggravating factor separately, *TR*, 3403-04; see also *TR*, 3396, 3399 (Special Findings Form), **the jury was permitted to consider all seven aggravators in deciding whether Mr. Fields should live or die.**[33] *TR*, 3403-04; see also *TR*, 3483-84 (Special Findings Form).

201. Consistent with the Court's instructions, the jury "f[ou]nd by unanimous vote that *a* sentence of death shall be imposed on the Defendant." *TR*, 3484-85 (Special Findings Form). The jury rendered no verdict distinguishing between each murder count,[34] nor did the jury apply specific aggravating factors to particular murder counts. See id.

202. The jury's general verdict of death denied Mr. Fields his right under the

---

[33] The Special Findings Form instructed:

The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death .... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer "yes" below [and] record your verdict on [the general verdict form for death] .... If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations [and] sign [the general verdict form for life imprisonment].

*TR*, 3483-84.

[34]The Court's poll of the jury after the verdict also failed to distinguish between each count. *TR*, 3485-87.

114

Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. In imposing the sentence, the jury had no mechanism for separating out the two counts. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on the other count. Such a verdict was not merely a theoretical possibility. The mental anguish aggravating factor applied only to Mrs. Chick, *TR*, 3399, arguably making her death more egregious in the eyes of the jury. The unitary weighing process used here, however, did not give the jury the option of returning a verdict of death for the murder of Mrs. Chick but life without the possibility of release for the murder of Mr. Chick. Instead, the jury faced an "all or nothing" proposition as its sole sentencing option.

203. More importantly, the unitary weighing process approved by the Court skewed the weighing of aggravating and mitigating factors, denying Mr. Fields his right to reliable sentencing guaranteed by the Eighth Amendment. The Court instructed the jury to consider the substantial planning aggravating factor separately for each of the Chicks. *TR*, 3396; see also id. at 3478 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been

115

6:03-cr-00073-RAW Document 305-13 Filed in ED/OK on 05/26/20 Page 164 of 429
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 164 Restricted
6:10-cv-00115-RAW Document 13 Filed in ED/OK on 04/06/10 Page 56 of 67

able to consider two plans to kill the Chicks when deliberating about the verdict for each murder count. Under a unitary weighing process, however, the substantial planning aggravating circumstance or instruction skewed the weighing of aggravating and mitigating factors because it allowed the jury to double-count the substantial planning circumstance. The instruction had the effect of allowing the jury to consider two separate plans to kill each of the Chicks even though the Government argued only that Mr. Fields had one plan to kill both of the Chicks in a single criminal episode.

204. The Court also instructed the jury to consider the victim impact aggravating factor separately with regard to each of the Chicks. *TR*, 3398-99; see also *TR*, 3479-80 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been able to consider any victim impact related to the death of Mr. Chick when deliberating about the verdict for killing Mrs. Chick, nor would it have been permitted to consider any victim impact related to the death of Mrs. Chick when deliberating about the verdict for killing Mr. Chick. Under a unitary weighing process, however, the Court's instruction on applying the victim impact aggravating factor skewed the weighing of aggravating and mitigating factors

116

because it added an aggravating factor that would not have been present had the jury separately considered each murder count. The jury was permitted to weigh victim impact related to the deaths of **both** of the Chicks in deciding whether the aggravators outweighed the mitigators.

### B. Trial Counsel's Ineffective Assistance.

205. This ground was raised as court error on direct appeal. The Court of Appeals for the Tenth Circuit stated:

> Fields argues that it was error to allow the jury to consider a general death sentence in a multi-count case, based on a weighing process incorporating a set of aggravators that combined, and consequently exceeded, those it found applicable to the individual counts for which the death penalty was sought. Fields, however, did not object to the collective weighing process and general verdict below. Indeed, as the government emphasizes, the instructions and verdict form tendered by the defense were functionally the same as those ultimately used by the court. Therefore, because Fields invited any error of which he now complains, we decline to review it.

Fields, 516 F.3d at 939.

206. While the invited-error doctrine relied upon by the Court of Appeals in denying relief may be an appropriate analysis for a direct appeal (where claims of ineffectiveness of counsel may not be raised or decided), it leaves open the question of whether trial counsel were ineffective for failing to object and in requesting the objectionable unified weighing process. The answer to that question is rather

117

obvious.

207. Trial counsel were ineffective for failing to object to the unified weighing process and general death verdict that denied Mr. Fields his rights under the Sixth and Eighth Amendments. For the reasons discussed above, the instructions and verdict form deprived Mr. Fields of his right to reliable sentencing and a unanimous sentencing verdict on each count to which he pled guilty. Not only did trial counsel fail to object to these unconstitutional instructions and verdict form, but, as the Court of Appeals noted, they proffered their own instructions and verdict form that were "functionally the same as those ultimately used by the court." Fields, 516 F.3d at 939; see also Defendant's Tendered Penalty Phase Instructions. Counsel could have had no reasonable tactic or strategy to fail to object to this clearly disadvantageous weighing scheme. O'Connell Dec., ¶ 23.

208. Mr. Fields was prejudiced by trial counsel's deficient performance. Because the jury was allowed to consider all of the aggravating factors in the aggregate in rendering a general verdict, its weighing of aggravating and mitigating factors was skewed in favor of death. The jury was allowed to double-count the substantial planning aggravating factor and to consider an additional victim impact aggravating factor, neither of which would have been possible if the jury had been required to render a verdict separately on each murder count. Accordingly, there is

118

a reasonable likelihood that, had the jury been required to deliberate individually on each murder count, the verdict of the jury would have been different.

**GROUND SEVEN**

**THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

209.   The Government withheld exculpatory, material evidence that it had an obligation to disclose to the defense, including but not limited to evidence that would have corroborated the defense's argument that Mr. Fields had taken an increased dose of Effexor before the offense, emails and other documents on Mr. Fields' computers supporting the fact that he was mentally ill, and witness statements containing favorable information.  To the extent the Government did not have an obligation to disclose this evidence, or the information was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Accordingly, Mr. Fields was denied his rights to due process and the effective assistance of counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

**A.      The Undisclosed Exculpatory Evidence.**

210.   The Government had a duty to disclose exculpatory evidence to the

119

defense that included but was not limited to the following.

### 1. Bottle of 150 mg Effexor Capsules.

211. In a report dated July 18, 2003, Agent Iris Dalley of the Oklahoma State Bureau of Investigation ("OSBI") stated that, during a search of Mr. Fields' truck, she observed two prescription pill bottles. *A* – 29. OSBI Report of Iris Dalley dated July 18, 2003 at 1. Later in her report she noted that she observed a "pharmacy sack label" dated July 9, 2003 for "30 Effexor 150 mg capsules for EDWARD FIELDS" and a bottle of pills with the same label. Id. at 3.

212. Five days later, Special Agent James Alford of the United States Forest Service prepared an inventory of items found in Mr. Fields' truck, including an item described as "'Effexor XR 3.75mg/75mg' blister pack containing three pills" but **not** the pharmacy sack label or the bottle of Effexor 150 mg capsules observed by Agent Dalley during her search of the truck. Inventory of Items in 1989 Chevrolet Truck dated July 23, 2003, *A* – 30, at 2.

213. The FBI subsequently turned over to Mr. Fields' mother the items found in his truck. The defense's investigator prepared an inventory of these, including "July 9, 2003 - Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg" and "14-day sample packet of Effexor XR. Three (3) capsules remain in the package." Memorandum from Glori J. Shettles dated January 1, 2004,

*A* – 31 at 1, 4. The bottle of 150 mg Effexor that Agent Dalley observed in July 2003 was not returned. See id.

214. Law enforcement officials seized the bottle of 150 mg Effexor and are charged with the knowledge of what was in the bottle. The Government elicited agreement from defense expert Dr. Woods that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage? [i.e., the 150 mg dosage of Effexor]" *TR*, 3029-30. The Government also implied that Mr. Fields took a 37.5 mg dose of Effexor from the fourteen-day blister pack, not the 150 mg dose from the thirty day prescription bottle. *TR*, 3030.

215. The Government elicited this testimony from Dr. Woods while being in sole possession of the 150 mg bottle and knowing or being able to determine the contents of it. Thus, the 150 mg Effexor bottle contains exculpatory evidence relating to the quantity of Effexor capsules Mr. Fields ingested prior to the offense. The Government failed to disclose this exculpatory evidence to the defense. See O'Connell Dec., ¶ 20.

121

## 2.   Emails and Documents from Mr. Fields' Computers.

216.   On August 28, 2003, Patrick Kennedy of the OSBI imaged the hard drive of a computer used by Mr. Fields.  OSBI Report of Patrick Kennedy dated November 20, 2003 at 3.  This hard drive contained 7,904 documents and 544 email messages. Id. at 4.  On September 4, 2003, Mr. Kennedy imaged the hard drive of a second computer used by Mr. Fields.  Id. at 3.  This hard drive contained 8,095 documents and 6,418 email messages.  Id. at 4.  According to Mr. Kennedy's report, these drives were "searched for images, documents and web pages relevant to camouflage clothing and particularly Ghillie Suits; snipers; and homicide; in a variety of manners."  Id. at 4-5.

217.   The hard drives of these two computers contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails.  The Government failed to produce this exculpatory evidence to the defense.[35]

---

[35]In response to written requests from undersigned counsel, the Government permitted inspection of the computers seized from Mr. Fields.  Counsel appeared at the FBI office to inspect the computers and following that inspection the Government shipped three such computers to the defense for forensic analysis.  Upon such analysis, counsel were told that the computers they were permitted to inspect, and which ultimately were shipped to them, are **not** the computers or hard drives references by Agent Kennedy. Those have not been provided by the Government, and counsel will soon include a request for those in a to-be-filed discovery request.

### 3. FBI Forms 302 and Reports of the OSBI.

218. On information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information. The Government failed to produce this exculpatory evidence to the defense.[36]

### B. The Undisclosed Exculpatory Evidence Was Material.

219. The exculpatory evidence withheld by the Government was material, both considered separately and because of their cumulative impact. See, e.g., O'Connell Dec., ¶ 20 (discussing importance of Effexor pills). There is a reasonable likelihood that, had this evidence been disclosed to the defense, the result of Mr. Fields' sentencing hearing would have been different. Also, when considered along with the due process violations set forth in Ground Three, above, materiality is established.

### C. Trial Counsel's Ineffective Assistance.

220. To the extent the Government did not have an obligation to disclose this evidence or it was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Trial counsel rendered

---

[36]Counsel will soon file a discovery motion seeking all of these materials as well as others.

deficient performance by failing to discover exculpatory evidence that could have been used to prove the defense's case-in-chief and to impeach the Government's witnesses. There was no reasonable basis for failing to investigate, discover and present this evidence. See, e.g., O'Connell Dec., ¶ 20 (discussing lack of strategy or tactics regarding discovery of Effexor pills). Mr. Fields was prejudiced by trial counsel's deficient performance because, had the jury learned of this exculpatory evidence, there is a reasonable likelihood that the verdict would have been different.

## GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.

221. Each of the grounds presented in this *Motion* individually entitles Mr. Fields to relief from his death sentence. However, even if this Court finds that Mr. Fields is not entitled to relief based on any particular ground, the cumulative effect of these errors described herein, have denied him due process and a reliable sentencing hearing as guaranteed by the Fifth and Eighth Amendments to the United States Constitution. Moreover, counsel's cumulative errors and omissions individually and cumulatively entitle Mr. Fields to relief for violations of the Fifth, Sixth and Eighth Amendments to the United States Constitution,

124

## GROUND NINE

### THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.

222. The manner of Mr. Fields' execution, if carried out under current Bureau of Prison lethal injection protocols, would violate the Eighth Amendment to the United States Constitution. The protocols governing his execution, including the combination of drugs that would be used to accomplish his death, the use of untrained non-medical and unqualified personnel to carry out his execution, the physical space in which his execution would take place, and other factors which are currently not within counsel's knowledge, would result in the infliction of unnecessary pain and suffering.

223. While the manner of Mr. Fields' execution would be unconstitutional, this claim is not ripe for review at this time. Mr. Fields is not at imminent risk of execution, and this claim may be moot if this Court grants him the relief he seeks pursuant to other claims in the Petition. Mr. Fields asserts this claim only to preserve it against a later challenge by the Government based on waiver or other defenses. Mr. Fields will amend this claim if the Court deems it appropriate to address it in connection with these proceedings.

Respectfully Submitted,

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Dated:     Philadelphia, PA
           April 5, 2010

6:03-cr-00073-RAW   Document 305-13   Filed in ED/OK on 05/26/20   Page 175 of 429
6:10-cv-00115-RAW   Document 1-3   Filed in ED/OK on 04/06/10   Page 6 of 67
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 175   Restricted

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on the 6th day of April, 2010 I caused a copy of the foregoing to be served on the following by hand delivery:

Honorable Sheldon J. Sperling
United States Attorney
Eastern District of Oklahoma
1200 W. Okmulgee
Suite 201
Muskogee, Oklahoma 74401-6848


Michael Wiseman

# EXHIBIT C

AMENDED (INITIAL) MOTION TO VACATE CONVICTIONS AND
SENTENCE PURSUANT TO 28 U.S.C. § 2255 (FILED OCTOBER 13, 2015)

6:03-cr-00073-RAW Document 305-16 Filed in ED/OK on 05/26/20 Page 177 of 429
6:10-cv-00115-RAW Document 146 Filed in ED/OK on 10/13/15 Page 1 of 94

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 177   Restricted

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. CIV-10-115-RAW |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
| v. | : | HON. RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| Petitioner. | : | |

# GROUNDS IN SUPPORT OF AMENDED MOTION PURSUANT
# TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE,
# OR CORRECT A SENTENCE
# BY A PERSON IN FEDERAL CUSTODY

Cristi Charpentier
Katherine Ensler
Hunter Labovitz
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520
FAX: (215) 928-0826

Counsel for Petitioner Edward Fields, Jr.

Dated: October 13, 2015
Philadelphia, PA

## INDEX TO GROUNDS

**GROUND ONE**

The Eighth Amendment Was Violated When the Jury Failed to Find as Mitigating Factors Any of the Uncontested Mental Health-Related Mitigating Facts Presented to It. The Sixth Amendment Was Violated When Trial Counsel Rendered Ineffective Assistance in Investigating, Presenting and Arguing Mitigating Mental Health Evidence, Including Failing to Argue that the Uncontested Mitigating Facts Constituted Mitigating Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.  Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating. The Jury's Failure to Find any of this Uncontested Mitigating Evidence Violated the Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.  Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . 14

C.  Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage. . . . . . . . . . 16

    1.  The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence. . . . . . . . . . . . . . . . . . . . . . . 17

    2.  The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price. . . . . . . . 24

    3.  Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . 26

D.    Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    1.    The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 37

E.    Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price. . . . . . . . . . . 39

    1.    The Direct and Cross-Examination Testimony of Dr. Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 42

F.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    1.    Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 52

G.    Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified. . . . . . . . . . 53

**GROUND TWO**

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION. . . . . . . . . . . . . 54

## GROUND THREE

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS...............56

A.      Evidence Rebutting the Substantial Planning Aggravating Factor. ........................................59

      1.      Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning....................59

      2.      Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.................64

B.      Evidence Rebutting the Mental Anguish Aggravating Factor. ........................................72

C.      Trial Counsel's Ineffective Assistance........................74

D.      The Government's Due Process Violations...................76

      1.      False and Misleading Testimony and Argument About a Purportedly Staged Robbery.......................................77

      2.      Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi"...............................80

      3.      The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.......................................82

## GROUND FOUR

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

A.    Evidence of Family Dysfunction that the Jury Never Heard. . . . . . . 84

B.    Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . 91

## GROUND FIVE

MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.    Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence. . . . . . . . . . . . . 95

B.    Improper Arguments Denying the Right to a Fair Trial. . . . . . . . . . . 99

C.    Trial Counsel's Ineffectiveness. . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## GROUND SIX

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

A.    The Unified Weighing Process and General Death Verdict. . . . . . 113
B.    Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . 117

## GROUND SEVEN

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 119

A.    The Undisclosed Exculpatory Evidence.. . . . . . . . . . . . . . . . . . . . 119

    1.    Bottle of 150 mg Effexor Capsules. . . . . . . . . . . . . . . . . . 120
    2.    Emails and Documents from Mr. Fields' Computers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    3.    FBI Forms 302 and Reports of the OSBI.. . . . . . . . . . . . . . 123

B.    The Undisclosed Exculpatory Evidence Was Material. . . . . . . . . . 123

C.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . 123

## GROUND EIGHT

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.. . . . . . . . . . . . . . 124

## GROUND NINE

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

## STATEMENT REGARDING CITATIONS AND APPENDIX

The transcript of the trial proceedings are sequentially numbered and will be cited as "*TR*" followed by a page citation. Other proceedings will be cited as *TR* followed by the date of the proceeding and page number. Mr. Fields cites a number of documents that are not currently of record. Those documents are included in the accompanying *Appendix*, which will be cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix*, but will be cited. Defendant, Edward Leon Fields, the movant herein, will be referred to as Mr. Fields. The United States of America will be referred to as the Government. All other citations are either self-explanatory or will be explained.

All emphasis is supplied unless otherwise indicated.

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 184 Restricted

## GROUND ONE

**THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS.**

### A.     Introduction.

1.     While there was significant debate at trial regarding whether the offenses to which Mr. Fields pled guilty could be mitigated by the occurrence of what the defense termed a "manic flip," there was no serious controversy that Edward Leon Fields has had a lifetime of mental illness. There was no dispute between the parties that he suffered from chronic depression, nor was there any serious dispute that he experienced auditory hallucinations before and after the offenses. Yet, counsel never presented these significant mitigating facts to the jury as possessing mitigating value independent of the "manic flip." Although the presence of these facts were largely conceded by the Government, the jury did not find depression or auditory hallucinations to be mitigating factors. The failure of counsel to present them as such violated the Sixth Amendment, and the jury's failure to find and give effect to these uncontested mitigating factors violated the Eighth Amendment.

1

2.     Counsel's closing argument was confusing, but to the extent it can be read as asking the jury to find some of the uncontested mental health-related mitigating facts, it was deficient in suggesting to the jury that they could be given mitigating effect only through one of three available statutory mitigating factors.

3.     Mr. Fields suffers from a progressive neurological disease (discussed in detail below), and at the time of trial this disease had already caused him organic brain damage localized in his frontal lobes.  However, this extant mitigating factor was not presented at all to the jury, and accordingly the jury never found his organic brain damage as a mitigating factor.  This evidence was not presented despite the fact that counsel had an expert ready to testify to the presence of this damage, and relied upon this factor in arguing to the Department of Justice not to authorize this case as a capital prosecution.

4.     These were not counsel's only failures.  They failed to call available witnesses who would have testified – contrary to the Government's position – that Mr. Fields was not malingering his illness.  These witnesses include those who treated Mr. Fields in the community before the offenses and during his pre-trial incarceration at the Muskogee and Tulsa County Jails.  Counsel also ineffectively opened the door to damaging testimony by a Government expert.  Counsel ineffectively failed to investigate, marshal and present available evidence showing

2

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 186    Restricted

that one of the drugs that Mr. Fields had been prescribed in the weeks before the offenses was associated with causing aggressive and violent behavior. And, counsel ineffectively prepared the mental health experts that she did call to testify.

5.      Trial counsel rendered ineffective assistance in investigating, presenting and arguing nearly every aspect of Mr. Fields' mental health mitigation defense. These failures – and all of the failures set forth elsewhere in this *Motion* – were due to the dysfunction of the defense team. Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer. In this capital case, Ms. O'Connell alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument. Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful.  See App. 32; App. 33.

6.      Ms. O'Connell initially anticipated that Mr. Gant would share the work of preparing and trying this case. Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A* – 1, ¶¶ 2-3. To Ms. O'Connell's dismay and Mr. Fields' significant detriment, however, Mr. Gant made no meaningful contribution to the defense effort. He punted the critical Department of Justice authorization meeting to Ms. O'Connell at the last minute, ignored pleas for assistance in drafting jury instructions, gave

contradictory and unfocused advice about whether Mr. Fields should plead guilty, and, other than fumbling through a portion of the voir dire,[1] played no role at the sentencing hearing. Id., ¶¶ 4, 6-10. By the time trial began, Mr. Gant had ceased to play any meaningful role in assisting the defense. See App. 32; App. 33.

7.    Because Ms. O'Connell shouldered nearly all the burdens of preparing and trying this complex case, she became overwhelmed. The defense team repeatedly made important decisions without giving them appropriate consideration. Witness preparation was either poorly done or in some cases, non-existent – some witnesses the defense intended to call were not called at all. Ms. O'Connell acknowledges, "There is no question in my mind that the bulk of the ... errors [in this case] were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case." O'Connell Dec., ¶ 24.

8.    The defense team's dysfunction not only adversely affected the performance of Mr. Fields' lead lawyer, but also the performance of the mental health experts who were the anchors of his mitigation defense. Dr. George Woods, a

---

[1] See e.g. TR, 340 (The Court: "Now, we've got to work on the opening and closing argument way of questioning jurors, because I don't like it. Mr. Gant, are you listening. Okay, I really don't. And I may just cut off questioning completely by counsel if we don't restrain ourselves."); TR, 373 (The Court: "We've hoed this road [sic] before. We've hoed this road before. I'm going to start putting a limit on counsel of five minutes each. You're [Mr. Gant] done, okay.").

4

psychiatrist who testified for the defense, recalls:

> Even though Ms. O'Connell was the engaged member of the team, I never believed that she gave the presentation I ultimately made the proper time and attention that it required. I had the definite sense that Ms. O'Connell was in over her head. To be clear, I do not mean that she was not capable of handling a complex set of issues, such as those presented by Mr. Fields' case. Instead, I believed that she was being required to handle too much work to be able to responsibly and competently make the required presentation. From my perspective, it was rather obvious that her inability to pay the required attention to the preparation and presentation of my testimony was traceable to Mr. Gant's failure to carry his share of the work.

Declaration of George W. Woods, M.D. ("Woods Dec."), $A-2$, ¶ 4. Another defense psychiatrist, Dr. Bradley Grinage, states that he was contacted "rather close in time to the trial," his preparation time was "short ... and only right before [he] testified" and trial counsel "appeared to be overextended." Declaration of Bradley D. Grinage, M.D. ("Grinage Dec."), $A-3$, ¶ 5.

9. The mitigation specialist retained by the defense, Glori J. Shettles, also recounts that Ms. O'Connell was effectively alone in her work:

> Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. . . . It was quite clear that Ms. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

> I was in close contact with Ms. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial - a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation

that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of the defense. Ms. O'Connell examined every witness in the case. This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation. During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day. Evenings seemed to him to be more in the nature of a social event than a serious endeavor. I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court. Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden. I recall her finally giving up on trying to get him to perform a meaningful role.

Declaration of Glori J. Shettles ("Shettles Dec."), $A - 4$, ¶¶ 12-13. She observed

the damage caused by the dysfunctional team:

> In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties. I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Ms. O'Connell being effectively on her own.

Id., at ¶ 15.

10.    While the defense team's dysfunction caused problems that permeated

the entire sentencing hearing, it had an especially acute impact on Mr. Fields' mental

6

health mitigation case for the reasons discussed below.[2]  Accordingly, trial counsel's

performances were ineffective in violation of the Sixth Amendment to the United

States Constitution.

> **B.    Trial Counsel Ineffectively Failed to Argue that Mr.
> Fields' Uncontested Mental Illness Was Mitigating.
> The Jury's Failure to Find any of this Uncontested
> Mitigating Evidence Violated the Eighth Amendment.**

11.    Although the defense presented mitigating facts related to Mr. Fields'

mental health – including his pre-offense history of chronic depression and auditory

hallucinations – trial counsel ineffectively failed to argue that this evidence had

---

[2]As Ms. O'Connell notes, this dysfunction did not effect just her performance with regard to the mental health evidence discussed in this Ground.  It had an impact on virtually ever significant decision and action that she took.  After recounting many of her trial shortcomings, her Declaration concludes that they are all traceable to her status as sole counsel:

> I am an experienced, dedicated and conscientious criminal defense attorney. I am disturbed by many of the events that I have discussed In this statement. As the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, I accept full responsibility for my acts or omissions described above. Although Mr. Gant failed to perform his role, I should have either forced the issue with him, or brought it to the attention of the Court. **There is no question in my mind that the bulk of the above-described errors were a result of my being overburdened by essentially functioning without cocounsel in this complex and difficult case.**

O'Connell Dec., ¶ 24.  Accordingly, rather than repeat the allegations regarding the team dysfunction in each succeeding ground for relief, counsel will refer back to this section outlining the relevant events.

7

mitigating weight independent of the "manic flip" opinion presented by Dr. Woods and Dr. Grinage. This evidence could have been presented as free-standing mitigating evidence under 18 U.S.C. § 3592(a)(1) (significantly impaired capacity), (a)(6) (severe mental or emotional disturbance), or (a)(8) (other factors).[3] Even when counsel mentioned depression and hallucinations separately from the theory of manic flip, counsel never told the jury it could give these facts mitigating effect through anything but the (a)(1) circumstance. This, too, was ineffective.

12.    The defense presented two psychiatrists, Dr. Bradley Grinage and Dr.

---

[3]These three mitigating factors state in full:

(a) Mitigating factors – In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1)    Impaired capacity – The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(6)    Disturbance – The defendant committed the offense under severe mental or emotional disturbance.

(8)    Other factors – Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

18 U.S.C. § 3592 (a).

8

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 192 Restricted

George Woods, to establish that Mr. Fields suffered from bipolar disorder at the time of the offenses. *TR*, 2775 (Dr. Grinage); *TR*, 2973 (Dr. Woods). Both doctors also testified that the administration of Effexor to Mr. Fields caused him to endure a manic flip. *TR*, 2812 (Dr. Grinage: "[S]pecific to patients with bipolar disorder is you may treat the depressions with an antidepressant, but, there's a risk when treating someone with bipolar disorder that you might actually not only go past treating depression, but, put them into a manic episode or give them symptoms of mania.... the term that is described in the literature is called switching."); *TR*, 2989 ("[I]t's the medication and the blood level. In the same way that some people have unusual responses to penicillin or unusual responses to other types of medicine, there are people who have unusual responses to antidepressants as well. And one of the unusual responses for someone that is bipolar is to switch into mania."). Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of depression as early as age sixteen and, in the months before the offenses, suffered from sleeplessness, command auditory hallucinations and dramatic weight loss. *TR*, 2778, 2800 (Dr. Grinage); *TR*, 2974, 2981 (Dr. Woods). Dr. Grinage and Dr. Woods also testified that for many years prior to the offenses Mr. Fields had been treated with a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor. *TR*, 2745, 2804 (Dr. Grinage); *TR*, 2974, 2987 (Dr. Woods).

9

13.     While contesting the core of each expert's opinion, the Government

conceded much of the mental health evidence presented by the defense. Dr. Jeffrey

Mitchell, a psychiatrist who testified for the Government on rebuttal, agreed that Mr.

Fields suffered from severe depression. See, e.g., *TR*, 3263-64 (Dr. Mitchell testifies,

"I think Dr. Kemp gave – diagnosed depression which I think was a correct

diagnosis."). Dr. Randall Price, the Government's rebuttal psychologist, also noted

that Mr. Fields suffered from depression which improved with treatment. *TR*, 3220.

In closing argument, the Government did not dispute depression. *TR*, 3425

(Government telling the jury: "Was the Defendant depressed during this time period?

**Absolutely.**"); *TR*, 3428 (Government arguing that Mr. Fields was depressed and not

bipolar). In addition, Dr. Mitchell testified that Mr. Fields' history of hearing voices

was "credible," *TR*, 3284, and that he did not "doubt that [Mr. Fields] heard voices

...."[4] *TR*, 3315.

14.     Trial counsel requested that the Court instruct the jury on twenty-two

---

[4]Dr. Price did not endorse auditory hallucinations and believed Mr. Fields was malingering in this respect. But he was the only doctor at trial who did not believe that the hallucinations were genuine. As indicated in other portions of this *Motion*, every doctor who has ever treated Mr. Fields for a mental health-related symptom or illness, or administered mental health-related testing, has found his reports of symptoms and his testing credible. **None have found him to be a malingerer – Dr. Price stands alone in this regard.** And, in any event, Dr. Price agreed he could not rule out that the hallucinations were genuine. *TR*, 3221, 3228.

10

mitigating factors that they contended were present in the case. The Court charged

the jury in accordance with trial counsel's request, i.e., the Court did not refuse to

charge on any mitigating facts or factors requested by the defense.[5] In closing, trial

counsel argued these factors more or less as the Court charged them. Despite the

exquisitely detailed list of mitigating factors given by the Court and argued by

counsel (e.g. Mr. Fields was a good cook), nowhere was the jury told by the Court or

---

[5]The Court charged the jury that the defense had offered as mitigating factors the following factors: (1) the Defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge; (2) the Defendant did not have a significant prior history of other criminal conduct; (3) the Defendant committed the offenses under severe mental or emotional disturbance; (4) the Defendant served in the Navy and was honorably discharged; (5) the Defendant worked as a prison guard for the Oklahoma Department of Corrections; (6) the Defendant has special talents in cooking, art, and computers; (7) the Defendant excelled in his manufacturing job at Kenco Plastics; (8) the Defendant is a loved father; (9) the Defendant is a loved brother; (10) the Defendant is a loved son; (11) the Defendant is a valued friend; (12) the Defendant endured the death of his father months before the offenses; (13) the Defendant's mother moved away weeks before the offenses; (14) the Defendant's ex-wife and children moved away months before the offenses; (15) the mother of the Defendant's children, Teresa Fields, has recently had cancer which may or may not be in remission; (16) the Defendant's death will impact his children, family and friends; (17) the Defendant cooperated with authorities after his arrest; (18) the Defendant confessed to the crimes; (19) the Defendant pled guilty to the crimes; (20) the Defendant has expressed remorse for the crimes; (21) the Defendant sought treatment for his mental illness; (22) the Defendant will not present a future danger to society by being imprisoned for life without possibility of release. *TR*, 3400-01. The Court also instructed the jury that "any other relevant mitigating information presented in this proceeding" could be considered as a mitigating factor. *TR*, 3402.

11

by counsel that it could:

- consider whether manic flip was a mitigating factor under (a)(6)[6] or (8); the (a)(1) mitigating factor was the sole basis offered to the jury for finding and giving effect to manic flip;

- find or give mitigating effect to Mr. Fields' uncontested depression under (a)(1), (6) or (8);

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under (a)(1), (6) or (8);

- find mental health mitigation (depression and hallucinations) under (a)(1), (6) or (8), even if it did not accept the manic flip theory.

Thus, caught up in presenting and arguing Dr. Woods' and Dr. Grinage's opinions regarding manic flip, counsel made these critical errors which unconstitutionally cramped the jury's ability to find and give mitigating effect to mitigating facts, including those that were uncontested. Simply put, the jury was left without an option by which to give mitigating effect to any of the mental health evidence except under (a)(1), and was given no means of finding and giving effect to depression and hallucinations at all.

15.   The jury rejected trial counsel's presentation of manic flip under the

---

[6]While trial counsel did offer the (a)(6) severe disturbance mitigating factor, they argued that it was proven, not by mental health evidence, but by the facts that Mr. Fields was in rocky relationships, he was apart from his family, his father had recently died, his mother was ill and he was living out of his truck. *TR*, 3440.

12

(a)(1) mitigating factor. *TR*, 3480-81. Yet, there are two other ways that the jury could have found and given effect to manic flip. If the jury believed that Mr. Fields experienced a manic flip, and that it impaired him but did not "significantly" impair him – in the words of the statute – the jury could have found it under the (a)(8) catch-all factor. Counsel never argued that, nor did they ask the Court to so instruct. Similarly, the jury may have accepted that Mr. Fields underwent a manic flip, and that this constituted a "severe mental disturbance" – to quote the statute – even if it did not "significantly impair" his capacity. Had the jury believed this, it could have found manic flip under the (a)(6) factor. Again, counsel never argued that and did not ask the Court to so instruct. And, the jury may have believed he was bipolar, but did not experience a manic flip. In that case, it may have wanted to give effect to this finding under any of the three discussed mitigating factors. But, again, counsel failed to ask for such an instruction, or provide the jury with this choice. Because of counsel's failure to provide the jury with these alternative means of finding and giving effect to the manic flip, the jury was left with no other way to give expression to the mitigating value of that evidence.

16. In similar fashion, counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations.

13

17.    The jury found no mental health related mitigation, and voted for death. *TR*, 3484-85. Although the jury rejected the manic flip-based impaired capacity mitigating factor, this did not mean it must have rejected evidence that Mr. Fields suffered from mental illness. One of the seventeen mitigating factors the jury did find was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482. Concluding that seeking treatment for mental illness is mitigating assumes the existence of mental illness. It is likely, then, that the jury was persuaded that Mr. Fields suffered from mental illness. The jury, however, lacked a means for giving effect to these uncontested mitigating facts. When a capital jury is not given the means by which to give effect to existing mitigating facts, the Eighth Amendment is violated.

### 1.    Trial Counsel's Ineffective Assistance.

18.    Trial counsel rendered deficient performance by failing to argue that Mr. Fields' mental health impairments were mitigating independent of the manic flip theory and the (a)(1) mitigating factor. Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations. Mental illnesses such as these are plainly mitigating even if they do not rise to the level of significantly impaired capacity, yet trial counsel argued the mitigating value of this evidence only through the impaired capacity mitigating factor. Trial counsel acknowledges, "I should have told the jury that they could find these facts as mitigating and ask the

14

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 198 Restricted

Court to charge them on those facts as separate mitigating factors." O'Connell Dec., ¶ 18.

19. Trial counsel concedes that she had no tactical or strategic reason for proceeding in this way. O'Connell Dec., ¶ 18. Nor could there be any reasonable tactic or strategy for doing so. By proceeding in this manner, counsel made it far less likely that the jury would find the defense's mental health evidence to be mitigating, which is the opposite of what reasonable counsel would have intended.

20. Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented significant evidence of his history of mental illness and current diagnoses. Some of this evidence was accepted by the Government's own rebuttal mental health experts. Both Government experts conceded that Mr. Fields suffered from depression, and one even agreed that he experienced command auditory hallucinations. See, e.g., TR, 3263-64, 3220, 3284, 3315. Given that Mr. Fields' history of depression was undisputed, and that the jurors apparently believed at least some evidence of mental illness was credible, the jury likely would have found this evidence to be mitigating had it been given a way to express such a finding. As a result, there is a reasonable likelihood that, had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the statutory impaired capacity mitigator, the verdict would have been different.

15

21.     Mr. Fields submits that, when a jury fails to find uncontested mitigation, the Eighth Amendment is violated. In addition, when counsel fails to take advantage of a prosecutor's concession that mitigating facts exist, and the jury does not find those mitigating facts, Sixth Amendment prejudice is established.

### C.     Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage.

22.     At the time of the offenses, Mr. Fields suffered from organic brain damage.[7] Trial counsel failed to discover the full extent of his brain damage because they arranged for Mr. Fields to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing.

23.     Nonetheless, the testing done by the defense neuropsychologist showed that Mr. Fields' frontal lobes were impaired. These impairments affected his executive functioning in areas such as judgment and impulse control. Evidence of this damage would have been mitigating in its own right and also would have bolstered the defense that Mr. Fields experienced a manic flip at the time of the offenses. Because trial counsel did not fully investigate and discover this brain

---

[7]As discussed in more detail below, Mr. Fields' brain damage is progressive and he is now even more severely impaired than he was at the time of the offenses.

16

damage, the jury never heard this crucial mitigating mental health evidence.

### 1. The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence.

24. Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage, should have sought appropriate evaluation and should have presented such evidence to the jury. See App. 32.

25. When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). Because this condition can cut off oxygen to the brain for periods of time, it creates a serious risk of brain damage. Trial counsel anecdotally learned that Mr. Fields suffered from something described to them as "hollow membrane" – a non-existent medical condition – but they failed to obtain legible medical records that would have identified hyaline membrane as the actual diagnosis and documented the resulting respiratory distress. Shettles Dec., ¶ 4. Mr. Fields' current counsel obtained a legible copy of these records which clearly describe his actual condition. They demonstrate that Baby Boy Fields was in dire condition, unable to breathe and near death. Counsel's failure to obtain a legible set of these crucial records was ineffective.

26. The legible records recount that Baby Boy Fields had Hyaline Membrane Disease – an illness in newborns which is associated with twenty to thirty percent of

17

all neonatal deaths. The records show that the "baby sox" (which measured the level of oxygen saturation) was thirty percent when he was taken away from his mother to a specialized hospital. The records also note Baby Boy Fields had "mucous in the lung [that] was so thick" the medical staff was unable to siphon it out. The records show that Baby Boy Fields had "very labored breathing," and "appear[ed] in distress." Radiographs showed "diffuse pulmonary infiltrates, " and that "prognosis [was] guarded." At the time he was removed from his mother, he was administered emergency baptismal rites and transferred in "isolette by ambulance." Subsequent tests showed that "in comparison to earlier films [there was] persistent increase in the markings of the right lung. Persistent inadequate pneumonization of the right lung [was] indicated." See Records of Hillcrest Osteopathic Hospital, A–5, at pp. 1, 3, 4, 7, 10, 14, and 16.

27.    In addition, Mr. Fields experienced a number of head injuries and losses of consciousness before the age of twenty. When he was thirteen he had a sleigh-riding accident in which he crashed and lost consciousness for several minutes. Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), A – 6, at 2. At the age of sixteen he rolled a truck down a hill, flipping it over four times. Id. Two days later he became unconscious while riding a dirt bike and required four days of hospitalization. Id. He also experienced an

18

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 202   Restricted

episode of syncope at boot camp after he enrolled in the U.S. Navy. Id.

28.    Thus, for good reason, trial counsel arranged for Mr. Fields to receive neuropsychological testing. On August 11, 2004, Dr. Michael Gelbort, a neuropsychologist, conducted an evaluation of Mr. Fields on behalf of the defense. Dr. Gelbort's testing battery included the Wechsler Adult Intelligence Scale-III, portions of Weschsler Memory Scale-III, Wide Range Achievement Test-III, Category Test, Trail Making Test, Lateral Dominance Test, Strength of Grip Test, a partial Sensory Perceptual Examination, Aphasia Screening, and items from the Luria Nebraska. Gelbort Report at 3.

29.    This testing showed, among other things: "mild suppressions in working verbal and visual memory"; short-term memory for meaningful information "vacillat[ing] with the overall level of functioning in the borderline defective range of functioning"; verbally mediated tasks "mildly slowed to mildly impaired"; higher-level reasoning tasks demonstrating "mild impairment"; and "[i]mpulsivity of mild proportions." Gelbort Report at 3-4. Dr. Gelbort noted that "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance." Id. at 4. In short, he found that Mr. Fields suffered from organic brain impairments. See also App. 34.

30.    Most significantly, based on his testing, Dr. Gelbort concluded that Mr.

Fields likely suffered from frontal lobe damage that required further evaluation:

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. **He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted**. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

Gelbort Report at 3; see also App. 34.

31. Although Dr. Gelbort recommended further testing, his August 2004 evaluation was the only neuropsychological examination ever conducted for the defense. Nonetheless, there is no question that, based on Mr. Fields' birth history, the other red flags in his background and on Dr. Gelbort's testing, defense counsel knew that Mr. Fields suffered from neuropsychological impairments.

32. That the defense knew Mr. Fields' suffered from impairments is shown by several facts. In the late summer and fall of 2004, the defense filed a number of pleadings with the Court indicating that it intended to conduct further neuropsychological testing and present neuropsychological testimony at trial. Shortly after Dr. Gelbort's testing showed the presence of neuropsychological deficits with frontal lobe involvement, on August 27, 2004, the defense notified the Court "that

defendant's neuropsychological test results indicate the presents [sic] of frontal lobe impairment in his brain functioning." Defendant's Ex Parte Supplement to Motion for Extension of Time at 1. On September 17, 2004, the defense notified the Court that they had:

> [C]onferred with the neuropsychologist, and was informed that testing indicated the presence of frontal lobe impairment. This information was then shared with the neuropsychiatrist, who determined that additional medical testing is mandated to confirm the existence, nature and extent of Fields' brain damage. The doctor arranged to return to Tulsa at the end of September to conduct a neurological examination. Thereafter, additional time is necessary for the doctors to analyze testing results, determine if any further testing is indicated, formulate opinions and confer with counsel.

Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice at 6. This filing included an affidavit from an attorney stating that "[a] neurologist is often necessary as well when any brain damage, disease, or dysfunction is suspected" and that "[n]eurologists are usually best equipped to interpret the array of data gathered from the client's history, neuropsychological tests, measures of brain structure and functioning (CT and MRI scans, EEG's, PET scans), and additional tests ...." Id., Exh. B at 7. On November 1, 2004, the defense gave notice that its experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist. Defendant's Notice of Intent to Present Expert Testimony (Rule 12.2 Notice).

21

33.    On December 1, 2004, the defense met with the Government to discuss the results of their mental health investigation in hope of settling the case for a sentence of life imprisonment without parole.    United States Attorney Sheldon Sperling memorialized this meeting in a letter sent the next day.    He wrote, among other things:

> Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. . . . no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case. You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004, $A - 7$, at pp. 1, 2, 4.

34.    Whatever doubts may have remained regarding Mr. Fields' organic impairments after Dr. Gelbort's testing were resolved in June 2005, when Dr. Jack Randall Price conducted a neuropsychological evaluation of Mr. Fields on behalf of the Government.    On July 1, 2005, Dr. Price reported impaired performance on a number of significant neuropsychological tests, including the Trail Making Test, Part A (27th percentile), Trail Making Test, Part B (7th percentile), Digit Vigilance Time (9th percentile), Selective visual attention (variable), COWA (7th percentile) and RFFT (1st percentile).    Report of Neuropsychological Evaluation dated July 1, 2005 ("Price

22

Report"), *A* – 8, at 21-25.  On the Frontal Systems Behavior Scale Subscales of Apathy, Disinhibition, and Executive Dysfunction, Dr. Price found that Mr. Fields ranged from 83rd percentile to above 99th percentile.  Id. at 25.  He noted no evidence of malingering on the neuropsychological testing portion of the evaluation.  Id. at 21.[8]

35.    Ms. O'Connell provided Dr. Price's report to Dr. Gelbort, who told her that Dr. Price's data was consistent with his, even though Dr. Price's conclusions understated the significance of the data and Mr. Fields' impairments.  O'Connell Dec., ¶ 16 ("I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own – that Mr. Fields was brain damaged and neurologically impaired.").  Ms. O'Connell confirmed that Dr. Gelbort would testify.  Id.

36.    On July 3, 2005 – just before the start of jury selection – trial counsel sent Dr. Gelbort a contract to cover his anticipated testimony at the sentencing hearing.  Trial counsel informed him that he would be needed to testify around July 18, 2003, and also would be needed to consult about the cross-examination of Dr. Price.  O'Connell Dec., ¶¶ 10,  15 ("Through the months leading up to the trial, I stayed in contact with Dr. Gelbort about conducting further testing and his ability to

---

[8]Despite these impairments, Dr. Price concluded, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27. However, as noted by Dr. Daniel Martell and discussed below, Dr. Price misrepresented the significance of his findings.

23

testify.... Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage."); see also App. 34.

37.    Mr. Fields never received further neuropsychological testing as recommended by Dr. Gelbort, nor did Dr. Gelbort ever testify at Mr. Fields' sentencing hearing. O'Connell Dec., ¶¶ 10, 17 ("I never had him perform the additional testing.... I had no strategy or tactic for abandoning the specific factor of organic brain damage."); see App. 32; App. 34.

### 2.    The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price.

38.    At the request of current counsel, Mr. Fields has been evaluated by neuropsychologist Dr. Daniel A. Martell.[9] Dr. Martell was asked to assess Mr. Fields' current neuropsychological state and functioning, and to assess the accuracy of Dr. Price's opinions and testimony. His conclusions are stunning and compelling.

---

[9] Dr. Martell is a member of *Park Dietz and Associates*. He is routinely retained by and testifies on behalf of the Government and state prosecutors in both capital and non-capital cases. See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Coe v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes. Dr. Martell finds that Dr. Price's testimony did not accurately reflect the significance of his data. Dr. Martell's current testing shows that Mr. Fields has experienced a "catastrophic decline in functioning over the five years since he was seen by Dr. Price" and that "some of his test performances were among the worst I have seen") Report of Daniel A. Martell, Ph.D., ("Martell Report"), $A - 9$, at p. 10.[10]

39.     On Dr. Martell's testing, Mr. Fields scored in the severely impaired range on the gold-standard of neuropsychological tests, the Halstead-Reitan battery. Martell Report at 10. Mr. Fields' executive functioning – a function controlled by the frontal lobes – was "among the most profoundly impaired area tests." Id. Based on his review of the data provided by Dr. Gelbort and Dr. Price, Dr. Martell is easily able to opine that the progressive disease process observed on his testing had its origins prior to the time of the offenses. Id. at 16.

40.     Dr. Martell finds that Dr. Price inaccurately portrayed his neuropsychological data. Dr. Price also gave a false impression that Mr. Fields malingered, when his own testing – and the testing of every doctor who has ever

_____

[10]Dr. Martell cannot yet be certain of the causes of this progressive decline. He believes it may be related to a tumor or another process involving stroke. He recommends further imaging to determine the cause. Martell Report at 17. Counsel will shortly move for an order to have Mr. Fields transported to an appropriate imaging facility.

25

evaluated Mr. Fields — shows that he has never malingered. Dr. Martell himself administered multiple, objective, and scientifically sound and accepted tests for malingering, which show conclusively that Mr. Fields did not malinger on his most recent testing. Martell Report at 9.

41.   Dr. Martell also finds that Dr. Price employed a "faulty basis" for concluding that Mr. Fields' reports of auditory hallucinations were false, i.e. that they were malingered. Martell Report at 13-14. Dr. Price's faulty conclusions were not challenged by the defense as they could have been.

42.   Dr. Martell finds that Dr. Price testified outside of his area of expertise when he opined on the impact of several of the psychotropic medications administered to Mr. Fields. Martell Report at 14. This testimony violated the standards articulated by the American Psychological Association's *Ethical Principles of Psychologists and Code of Conduct* and that group's *Specialty Guidelines for Forensic Psychologists*. Id. at 14-15.

### 3.   Trial Counsel's Ineffective Assistance.

43.   Trial counsel were ineffective for failing to fully develop and present evidence of Mr. Fields' organic brain damage and to present this evidence to the jury. Trial counsel also were ineffective for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological

impairments.

44.     Almost a year before Mr. Fields' sentencing hearing, Dr. Gelbort informed trial counsel that he suspected frontal lobe dysfunction and recommended further testing. Gelbort Report at 3. Trial counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG. Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing. O'Connell Dec., ¶ 15.

45.     Presentation of evidence that Mr. Fields' frontal lobes were damaged would have been highly mitigating. Woods Dec., ¶ 7 ("People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition -- that is, an impaired ability to control one's impulses. Such people act out without making the types of judgments that intact people can make. By itself, this type of impairment is a highly mitigating factor."); Grinage Dec., ¶ 12 ("If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his 'cognition' ... I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.").

46.     Furthermore, organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offense. As Dr.

27

Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." Woods Dec., ¶ 7. Dr. Grinage agrees that "the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers."[11] Grinage Dec., ¶ 12. Trial counsel never considered organic brain damage to be inconsistent with a manic flip defense and agreed that "[p]resentation of brain impairments would have been an important part of our mitigation presentation." O'Connell Dec., ¶¶ 15, 17.

47.    There was no reasonable basis for trial counsel's failure to fully develop and present this evidence. Trial counsel concedes she had no strategic or tactical reason for failing to arrange for additional testing to be done. O'Connell Dec., ¶ 17.

48.    Trial counsel were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments which showed frontal lobe dysfunction. Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so. O'Connell Dec., ¶ 15. As late as the start of jury selection, it was still trial counsel's intention to call Dr.

---

[11]Dr. Grinage notes that the previously undiscovered legible records of Mr. Fields' birth also strengthens this opinion. Grinage Dec., ¶ 12.

28

Gelbort as a witness. O'Connell Dec., ¶ 15. Dr. Gelbort's testimony would have been highly mitigating by itself and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12; see App. 32; App. 34.

49.    In addition, Dr. Gelbort's testimony was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who told the jury that Mr. Fields did not suffer from brain dysfunction even though his own testing showed significant impairment. See *TR*, 3154; Price Report, at 21-25; see also Martell Report, pp. 12-13. (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist); App. 34.

50.    Trial counsel fell below a reasonable objective professional standard when they failed to present this known and available mitigating evidence and failed to rebut Dr. Price's conclusions. According to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem. O'Connell Dec., ¶ 17. Trial counsel concedes she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Id. Nor could she have had a sound strategy. One of counsel's most fundamental duties is to present her client's case. It is therefore incumbent upon trial counsel to invoke the

29

court's processes, if needed, to insure the attendance of a witness, or else to seek a continuance until the witness is available. See App. 34.

51.   Mr. Fields was prejudiced by trial counsel's deficient performance in failing to investigate and present evidence of organic brain damage. Evidence of frontal lobe damage would have been highly mitigating, especially when considered in combination with Mr. Fields' other diagnosed mental illnesses and his use of the antidepressant Effexor. Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Had the jury known that Mr. Fields suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different.

52.   Mr. Fields also was prejudiced by trial counsel's failure to rebut Dr. Price's testimony. That testimony was devastating, but trial counsel failed to challenge his conclusions in any meaningful way, and actually elicited more harmful testimony on cross-examination.[12] Not only did the jury never learn that Mr. Fields was brain-damaged, but it was affirmatively led to believe he was **not** brain-damaged by Dr. Price's misleading testimony. Had the jury known that Mr. Fields suffered from significant neuropsychological impairments consistent with frontal lobe dysfunction, there is a reasonable likelihood that the jury's verdict of death would

---

[12]   Mr. Fields also alleges that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price. See Part E, below.

have been different.

**D.** **Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered.**

53. The Government contended that Mr. Fields was malingering when he reported experiencing auditory hallucinations, and also attacked the diagnosis of manic flip presented by Dr. Woods and Dr. Grinage as the opinions of "left coast ... hired guns." *TR*, 3429. Trial counsel could have rebutted these contentions by calling the medical professionals who treated him before and immediately after the offenses. The testimony of local medical professionals, who treated Mr. Fields would have silenced the Government's "left coast ... hired guns" argument. Moreover, as treating providers, these witnesses had a unique opportunity to see and evaluate Mr. Fields' condition, and to offer persuasive testimony about it. Trial counsel neither investigated these medical professionals nor called them to testify. Their unpresented opinions would have carried great weight.

1.    **The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges**

54.    Dr. Randall Price, a psychologist called as a rebuttal witness for the Government, testified that Mr. Fields was malingering when he reported hearing voices:

Q:    In your report what did you say you concluded about auditory hallucinations?

A:    That the way he described them to me was consistent with exaggerated or malingered auditory hallucinations that were inconsistent with genuine auditory hallucinations experienced by psychotic individuals.

Q:    What about the description is inconsistent with the voices described by other psychotic individuals?

A:    Having identified the – a single voice and referring to that voice as a little friend that tells you what to do and that being the only kind of content to the voice, to a single voice. Not having any strategies to be able to deal with those voices except to obey them and those voices being talked about without an associated delusional system. Those things are inconsistent with psychotic individuals.

Q:    All right. The fact that he said it was just a lone voice, you say that's not consistent with – that's not credible?

A:    That's correct.

*TR*, 3221-22.

32

55.    The Government also suggested in closing argument that Mr. Fields' suicide attempt was not a real one, but simply a means of gaining attention and sympathy. *TR*, 3464 (Government arguing that suicide attempt was a "transparent ploy" to gain sympathy and imploring the jury not to be "fooled" by it).

56.    Ostensibly to address the charge that Mr. Fields was malingering his auditory hallucinations, trial counsel questioned Dr. Woods about whether Mr. Fields' treating doctors believed he heard voices. All Dr. Woods could say was that Mr. Fields' treating doctors (i.e., those who treated him before and after the offenses) did not make any notes in their files indicating a belief he was malingering and that they continued to prescribe medication. *TR*, 2979-80. But trial counsel never presented the available source evidence – evidence that would not have been vulnerable to the Government's "left coast – hired guns" argument. Nor did counsel present any evidence showing that Mr. Fields' suicide attempt while incarcerated at the Muskogee jail was an earnest and serious attempt to take his life.

57.    In closing argument, the Government repeated its claim that Mr. Fields was a malingerer. His report of auditory hallucinations was vigorously attacked:

> Not at the confession, not in that conversation [with Michelle Tipton].
> Voices, she says, are real and influential? Not his. The voices like the
> robbery and burglary were a convenient afterthought. Remember the
> voice made him falsely claim that cannot be measured. This alleged
> voice that the Defendant claims in this case at about the time he chose

33

to activate his long though out plan to become a double murderer is just not real. When had the Defendant had any of these voices or had previously heard voices beside the issue here? ... These voices are suspiciously fabricated consistent with exaggeration or malingering, inconsistent with genuine auditory hallucinations described by psychotics. A little friend that tells him what to do? Heard by a person with no strategies to deal with the voice but obey? Unaccompanied by a delusional system, the doctors say, Dr. Price, not credible.

*TR*, 3450-51.

58.   The Government also hammered its "left coast – hired guns" mantra in attacking the credibility of the defense experts:

We didn't have to go out to the left coast to find somebody who testified for the defense every time. **We got people in our own back yard who were credible,** who would give an honest opinion who were not hired guns.

*TR*, 3429.

59.   **The Government was correct.** There were credible local providers "in our own back yard" – to quote the Government – who could have provided extremely helpful testimony. Such testimony would have rebutted the claim that Mr. Fields was a malingerer, supported the manic flip defense, showed that his suicide attempt was genuine, and demonstrated that, on the whole, Mr. Fields was a truly sick individual. Counsel did not call any of these medical professionals at trial, each of whom examined Mr. Fields before or immediately after the offense. They are each local practitioners, which would have given them far greater credibility with the jury than

34

the defense's out-of-state mental health experts who were vulnerable to the Government's charge of being "left coast ... hired guns." *TR*, 3429.

60.    Dr. Louise Bumgardner is a life-time resident of Oklahoma.  She is a psychiatrist who treated Mr. Fields at the Muskogee Jail after the homicides.  Dr. Bumgardner states that Mr. Fields reported "that he was suffering from auditory hallucinations (hearing voices) and was feeling 'very suicidal.'  He reported to me that he was depressed throughout his life."  Declaration of Dr. Joyce Louise Bumgardner ("Bumgardner Dec."), *A* – 10, ¶ 3.  She further states:

> Based upon my review of my records and my recollection of this patient, I believe that his suicide attempt was a genuine effort to take his life.  I also believed that he was suffering from actual psychiatric symptoms and was not malingering them.  I have treated many prisoners presenting with psychiatric complaints, many of whom were malingering for secondary gain.  When I believed that prisoners were malingering I would not hesitate to place that conclusion in my notes.  The absence of that notation, my actual notes and my recollection of Mr. Fields, show that I believed he was genuinely mentally ill.

Id., ¶ 4.

61.    In addition, Dr. Bumgardner agreed with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offense:

> Based on his history, the materials I have reviewed, and my own impressions at the time I treated him, I believe that Mr. Fields presented a classic case of the adverse impact that can occur when anti-depressive medications are given to a person with bi-polar disorder. Providing anti-depressive medications alone (that is, without appropriate additional

35

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 219 Restricted

medications), to a person in Mr. Fields' condition can cause an explosion of extant smoldering manic symptoms, with devastating effects. I have seen such a reaction in other patients I have treated, and I have read about this phenomena in the literature. I also believed that he was a mentally ill individual and was not malingering.

Bumgardner Dec., ¶ 5.

62. When Mr. Fields was transferred to the Tulsa County Jail, he was treated by Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections. Like Dr. Bumgardner, Dr. Trombka believed that Mr. Fields was hearing voices:

> I diagnosed schizoaffective because of Mr. Fields' complaints of auditory hallucinations which were reported concurrent with his mood symptoms. Although reasonable mental health professionals could disagree with regard to the most appropriate diagnosis for Mr. Fields' (whether depression with psychotic features or bi-polar illness with psychotic feature), it was clear to me that he was ill. There was no indication in the jail records upon which to conclude that he was faking his illness, or that his complaints were not genuine .... My notes of February 2, 2004 indicates that he told me that he was feeling better than he had in years. I also noted observations by correctional personnel, which caused me to believe that Mr. Fields was genuinely ill.

Declaration of Larry Trombka, M.D., $A - 11$, ¶ 2.

63. Other medical professionals who treated Mr. Fields in the years before the homicides confirm that he presented no signs of malingering in describing his symptoms. Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000, states that "he

36

presented with chronic depression which I treated in a standard manner. There is no indication in either my records or my memory that I believed Mr. Fields was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression." Declaration of R.L. Winters, M.D., *A* – 12, ¶ 4.

64. In 1999, Dean Anderson, a physician's assistant at the Heavener Clinic, also treated Mr. Fields for depression. Mr. Anderson states that "I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different")." Declaration of Dean Anderson, *A* – 13, ¶ 11.

65. Although they were each available and willing to testify at trial, none were called. Bumgardner Dec., ¶ 6; Trombka Dec., ¶ 4; Anderson Dec., ¶ 12.

### 2. Trial Counsel's Ineffective Assistance.

66. Trial counsel were ineffective for failing to call the medical professionals who treated Mr. Fields to testify that they did not believe he malingered his complaints of auditory hallucinations or suicide attempt, and to bolster the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip.

67. Trial counsel admits that she had no tactic or strategy for not

37

investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. Mr. Fields' reports of auditory hallucinations were important to the defense's claim of manic flip, as well as to establishing other mental health mitigating factors. After the Government called Dr. Price to rebut this evidence, the defense needed to counter this charge of malingering. The views of local medical professionals who worked in local jails and treated Mr. Fields, would have assumed far greater weight and would have been greeted as more credible by the jury. Yet trial counsel failed to call them, relying instead on nothing more than the speculative inferences that Dr. Woods was able to draw from Mr. Fields' medical records. Trial counsel also failed to call Dr. Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even though those opinions went to the heart of Mr. Fields' mitigation defense. There was no reasonable basis for trial counsel's failure to present this evidence when it was readily available and vital to Mr. Fields' defense.

68. Mr. Fields was prejudiced by trial counsel's failure to call the medical professionals who treated him to rebut the Government's allegations that he was malingering. In closing, the Government argued these allegations at length. This argument not only undermined the defense's claim that Mr. Fields suffered from impaired capacity at the time he shot the Chicks, but it also suggested that he was fabricating an excuse for his behavior, and thus was a powerful indication of

38

consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). There is a reasonable likelihood that, had trial counsel called these witnesses to rebut allegations of malingering, the verdict would have been different.

### E.   Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price.

69.   The defense team's dysfunction and ineffective handling of the neuropsychological evidence was reflected in trial counsel's cross-examination of Dr. Price. Although trial counsel previously sought to limit the testimony of Dr. Price to exclude discussion of organic brain damage, trial counsel elicited the very conclusions they argued were outside the scope of Dr. Price's rebuttal testimony. Furthermore, these conclusions were elicited without meaningful challenge by the defense team, even though the defense team possessed significant information to impeach the testimony of Dr. Price. See App. 35; App. 36.

### 1. The Direct and Cross-Examination Testimony of Dr. Price.

70.   As set forth above, trial counsel ineffectively failed to present evidence of Mr. Fields' organic brain damage during the course of trial. This error was compounded by trial counsel's elicitation from rebuttal witness Dr. Price of testimony that Mr. Fields had no significant brain impairment. Counsel's combined failures left

39

Mr. Fields with the worst of both worlds.

71.     Trial counsel initially sought to limit the scope of Dr. Price's direct testimony regarding organic brain damage:

> MS. O'CONNELL:  What I was getting ready to tell the Court is that that brings to mind for me the fact that a great deal of what Dr. Price did was testing in relation to brain injury.  And during the course of our case we presented no information, no evidence, no testimony of brain injury.
>
> THE COURT: Meaning that would not be proper rebuttal?
>
> MS. O'CONNELL: Yes.

*TR*, 3080. The Court declined to rule in a vacuum and stated that it would address the matter through any specific objections raised during the course of testimony.  *TR*, 3083-84.

72.     Despite bringing the issue to the attention of the Court, trial counsel failed to object when the Government brought out harmful, but limited, testimony from Dr. Price regarding brain damage.  See, e.g., *TR*, 3106 (observing that Mr. Fields' "cognitive processes ... were intact"); *TR*, 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16).  Notably, trial counsel did not object when Dr. Price suggested that his evaluation did not detect any organic brain damage.  *TR*, 3154 ("But I thought there was probably going to be some brain dysfunction, something there to have people

evaluating him for this.").

73.    Although the bulk of Dr. Price's neuropsychological opinions were not presented in his direct examination, counsel elicited them on cross-examination. She inexplicably elicited from Dr. Price the opinion that he hinted at in his direct testimony, and the opinion trial counsel initially sought to exclude:

Q:    Yesterday you said that you didn't see at least much impairment in Mr. Fields, is that right, when you testified at the jail? When you saw him at the jail you did not see much impairment?

A:    I did not see much neuropsychological impairment, not significant neuropsychological impairment, that's correct.

Q:    Not much neuropsychological impairment?

A:    Right.

Q:    The kind of impairment that comes from damage to the cells in the brain?

A:    Primarily, yes.

TR, 3204-5.[13] After eliciting this testimony, trial counsel moved on to another subject and did not return to the issue of organic brain damage, leaving Dr. Price's opinion as the final – and as it is now known, inaccurate – word on the issue of organic brain

_____

[13] Trial counsel could not have been surprised by this testimony, as Dr. Price's report states, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27; see also O'Connell Dec., ¶ 16.

41

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 225   Restricted

damage.

### 2.    Trial Counsel's Ineffective Assistance.

74.    Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to use readily available information to impeach his testimony.

75.    Trial counsel could have presented Dr. Gelbort in anticipation of or in rebuttal of Dr. Price's testimony. Trial counsel were aware of the mitigating significance of the evidence of Mr. Fields' organic brain damage. O'Connell Dec., ¶ 17. Trial counsel also were aware that Dr. Price's opinion regarding organic brain damage was vulnerable to impeachment:

> About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell. I saw that Dr. Price opined that Mr. Fields did not have significant brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered. I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own — that Mr. Fields was brain damaged and neurologically impaired. Dr. Gelbort again confirmed that he was available to testify.

O'Connell Dec., ¶ 16. In fact, trial counsel cross-examined Dr. Price regarding the testing areas where Mr. Fields demonstrated impairment. See *TR*, 3195-96 (e.g., testimony that Mr. Fields performed at 7th percentile on Trail Making Test and Verbal Fluency, 17th percentile on Stroop Test); see also Apps. 34-36.

76.    Despite this, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neurobehavioral impairments and over-reported Mr. Fields' actual level of functioning. See Martell Report, pp. 12-13. While trial counsel questioned Dr. Price regarding individual tests on which Mr. Fields scored poorly, they failed to demonstrate to the jury the combined significance of those results. Trial counsel failed to pull together the isolated testing results to show that "there was a pattern of impairments suggestive of brain damage." Martell Report at 12-13. This could have been accomplished through cross-examination or by presenting the testimony of Dr. Gelbort, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4; see Apps. 34-36.

77.    Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the practice effect in neuropsychological testing. Martell Report at 13. The practice effect occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the practice effect).

43

Dr. Price's opinion was vulnerable to impeachment on this front, as he repeated many of the tests that Dr. Gelbort administered ten months earlier. Id.; see Apps. 35-36.

78. Trial counsel failed to object to Dr. Price's testimony regarding the effects on Mr. Fields of the administration of Effexor. *TR*, 3129-30.[14] As Dr. Martell points out, Dr. Price is a psychologist and is not expert in the effects of such medications. Indeed, Dr. Price acknowledged as much when he refused to answer a question on cross-examination about the effects of the medication, because of his lack

---

[14] On direct examination, Dr. Price gave the following testimony:

Q:    By the way, Doctor, do you know what happens if you were—let's say you were prescribed 150 milligrams of Effexor and instead of taking one, you took four. You took 600 milligrams. What would happen?

A:    Well, I think you would— that you would feel bad. That you would get— I mean, that you might get sick. It might cause you to be sick to your stomach.

Q:    Would it screw up behavior?

A:    **No.** I know on Effexor that if you stopped taking it abruptly that you could get dizzy. But taking extra. **I don't think immediately, antidepressants don't have an effect on behavior immediately.**

*TR*, 3129.

44

of expertise in this area. *TR*, 3206.[15] Counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

79.    Trial counsel had no strategic reason for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Trial counsel originally sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence (filed March 31, 2005). Furthermore, just before Dr. Price's direct testimony was presented, trial counsel sought to **prevent** Dr. Price from testifying about organic brain damage, on the basis that it was improper rebuttal because it was outside the scope of the mitigation evidence presented by the defense team. *TR*,

---

[15]On cross-examination, he admitted he was not an expert:

Q:    How familiar are you with those medications?

A:    I'd say I have a nodding familiarity. I'm not – I don't prescribe. I'm not an M.D. It's not my – I wouldn't say by any stretch of the imagination I'm an expert in those medications.

*TR*, 3206.

45

3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude.

80. Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not suffer from organic brain damage and failure to impeach or otherwise counter the vulnerable testimony of Dr. Price. Instead of hearing the wealth of evidence of Mr. Fields' organic brain damage, or at a minimum, hearing nothing at all regarding Mr. Fields' brain functioning, the jury heard only that Mr. Fields tested poorly in isolated areas but on the whole did not have any significant neuropsychological impairment. Had trial counsel not elicited Dr. Price's harmful testimony, or if trial counsel properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different. See Apps. 34-36.

## F. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.

81. Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-

undiagnosed bipolar disorder. The Government countered that his behavior before and after the offense indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression. This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

### 1. Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression.

82.   Trial counsel called Dr. Grinage and Dr. Woods to testify that Mr. Fields committed the offense while experiencing a manic flip caused by the ill-advised administration of the antidepressant Effexor. Dr. Grinage testified that a manic flip caused by Effexor would sometimes put a person into a "really high, flighty, euphoric state, but many times I have seen with patients very irritable and unable to concentrate." *TR*, 2812. Dr. Woods, too, testified that Effexor could have caused a manic flip and that mania leads to "impaired judgment." *TR*, 2990. In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point." *TR*, 3438.

83.   The Government challenged the defense's theory by arguing that the circumstances surrounding the offense demonstrated that Mr. Fields' judgment and

concentration were not impaired. According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later. *TR*, 3413-22. As the prosecutor told the jury, "The Defendant had no delusions. It's impossible, virtually impossible, for Effexor to trigger a single manic episode. The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness." Id. at 3451-52.

84. The jury apparently was persuaded by the Government's argument, rejecting the impaired capacity mitigating factor. *TR*, 3480-81. Because impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no mental health mitigation.

85. Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression. Compulsive aggression, unlike impaired judgment or concentration, would have been consistent with the Government's view that Mr. Fields was able to deliberate before and after the offense. Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his

48

conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion could thus have been mitigating under the (a)(1) significant impairment factor, as a severe mental or emotional disturbance or as catch-all mitigation (18 U.S.C. § 3592 (a)(6) & (8)).

86.    Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. In a peer-reviewed article published in 2003, Dr. Peter Breggin described various case reports, epidemiological studies and clinical trials showing an increased rate in obsessive aggression and violence in patients who were being treated with selective serotonin reuptake inhibitors ("SSRIs"). Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A* − 14. Effexor, or venlafaxine, is a non-selective serotonin reuptake inhibitor that is in the category of SSRIs. Id. at 32. Obsessive aggression observed in SSRI patients includes a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Id. at 36.

49

87.     After Dr. Breggin's article was published, the United States Food and Drug Administration ("FDA") issued a related public health advisory. On March 22, 2004 – over a year **before** Mr. Fields' sentencing hearing – the FDA asked the manufacturers of ten anti-depressant drugs, including venlafaxine (Effexor), to alter their labeling to include a warning statement recommending "close observation" of patients being treated with these drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric." FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A* – 15. The FDA also recommended that "therapy should be evaluated, and medications may need to be discontinued, when symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms." Id.

88.     The PHA was widely reported in the general media. See, e.g., Elizabeth Kaledin, *People Taking Antidepressants Need to be Monitored for Turbulent Emotions, Including Possible Risk of Suicide, CBS Evening News Transcript*, March 22, 2004, *A* – 16; Gardner Harris, *Labels on Antidepressants Sought to Warn of Suicide Risk*, N.Y. Times, March 22, 2004, *A* – 17; *Antidepressants May Have*

50

*Opposite Effect, FDA Warns*, USA Today, March 22, 2004, *A* – 18.

89.    Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to the PHA by changing the drug's Medication Guide to include the warnings requested by the FDA.  Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**."  Effexor Medication Guide (2004), *A* – 19, at 12.  The Medication Guide also advised that these changes "**may be abrupt**."  Id.

90.    Trial counsel failed to investigate and present this evidence even though it would have been highly mitigating and was consistent with the facts of his case.  Mr. Fields' behavior around the time of the offense closely matched the kinds of obsessive aggression observed in SSRI patients, including a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions."  Breggin Article at 36.  In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127.  There

51

was evidence that Mr. Fields filled this prescription the day before the homicides.[16]

This evidence is consistent with Wyeth's warning that adverse effects were more

likely to occur  after an upward adjustment to the Effexor dosage.  Effexor

Medication Guide (2004) at 12.

### 2. Trial Counsel's Ineffective Assistance.

91.    Trial counsel were ineffective for failing to present evidence that patients

treated with SSRI-type medications, such as Effexor, can experience increased rates

of compulsive aggressiveness.

92.    The defense's theory that Mr. Fields experienced a manic flip which

impaired his capacity to conform his actions to the requirements of the law or to

appreciate the wrongfulness of his actions was vulnerable to the Government's

argument that his actions before and after the homicides appeared to be deliberate.

Evidence that Effexor caused or added to Mr. Fields' sudden compulsive

aggressiveness would have been highly mitigating and entirely consistent with the

facts of this case.  There was no reasonable basis for failing to investigate and present

this evidence.

93.    Mr. Fields was prejudiced by trial counsel's deficient performance.

---

[16]The Government withheld exculpatory and material evidence regarding the
amount of Effexor that Mr. Fields consumed.  This is discussed in Ground Seven,
below.

Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that the verdict would have been different.

### G. Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified.

94. Because trial counsel poorly prepared Dr. Grinage and Dr. Woods for their testimony, the Government was able to damage their credibility on cross-examination. Each expert believes that they were not properly and adequately prepared. Grinage Dec., ¶¶ 5-12, Woods Dec., ¶¶ 4, 8; Glori Shettles agrees (Shettles Dec., ¶ 14) and Ms. O'Connell acknowledges this as well. O'Connell Dec., ¶¶ 11-12.

95. Aside from a general sense that the testimony was ill-prepared and presented, some specific examples demonstrate the problems each expert encountered. For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7, causing him on cross-examination to contradict some of the answers he gave on direct examination. *TR*, 2816-18; see also O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7. Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the

53

wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired." O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1). As a result, Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination. *TR*, 3048; see also O'Connell Dec., ¶ 12.

## GROUND TWO

### THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION.

96. As set forth in connection with Ground One, above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function. Although the cause of the process is not yet clear, and the precise rate of decline has yet to be determined, Mr. Fields' mental health will not permit his execution.

97. First, the evolving standards of decency – by which cruel and unusual punishments are adjudged under the Eighth Amendment – no longer permit the execution of profoundly mentally ill people. The evolution of these standards is seen in the prohibition of the execution of people with mental retardation, people who were under eighteen at the time of their offense, and those who are not mentally competent to be executed. Although there is no current holding of the United States

54

Supreme Court precluding the execution of those with profound mental illness, counsel submits that this date is not far off. Given the apparent pace of Mr. Fields' mental decline, it is likely that, by the time his execution, his mental health status would preclude his execution.

98. Second, the Supreme Court has ruled that the Eighth Amendment precludes the execution of people who are not competent for execution. Such people are not aware of the reason for their execution or that they are to be executed. Again, by the time of Mr. Fields' execution, it is likely that he will be incompetent for execution.

99. Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to the Court through treaty and convention.

100. Although neither of these Eighth Amendment bases for precluding Mr. Fields' execution are now ripe for adjudication, he raises them in this *Motion* to ensure that they are not waived.

## GROUND THREE

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS.**

101. The jury found, among others, the statutory aggravating factor against Mr. Fields that he shot Mr. and Mrs. Chick after substantial planning and premeditation, and it found the non-statutory aggravating factor, among others, that he inflicted mental anguish on Mrs. Chick. See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).[17]

102. The Government presented false and at best misleading testimony and

---

[17]The statutory aggravating factor of substantial planning and premeditation is found at 18 U.S.C. § 3592(c)(9) and states:

(c) Aggravating factors for homicide -- In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(9) Substantial planning and premeditation -- The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

56

argument to support the substantial planning aggravating factor. First, the Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument. Second, the Government selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides. The Government also twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings, and made it appear that he tried to concoct an alibi for his whereabouts on the night of the offense. It presented flawed expert opinions that ignored basic facts about the crime scene to support its theory that Mr. Fields returned to the scene hours later to stage a robbery.

103. Yet at every step, trial counsel failed to attack the aggravating factors in any meaningful way. Before the sentencing hearing, trial counsel failed to consult with experts who could have helped them expose the vulnerabilities of the Government's experts on cross-examination. During cross-examination, trial counsel failed to correct distorted testimony elicited by the Government. During the defense's case-in-chief, trial counsel neglected to call their own experts to rebut the flawed testimony of the Government's experts. At closing, trial counsel never argued why

57

the Government had failed to prove the aggravating factors beyond a reasonable doubt.

104.   Thus, through knowing presentation of false and/or misleading evidence and counsel's ineffectiveness for failing to put this aspect of the Government's case through adversarial testing, the jury was permitted to find two aggravating factors it either should not have found, or, if found, should not have weighted as heavily as it did.

105.   Had trial counsel conducted a reasonable investigation – by adequately interviewing friendly Government (i.e., civilian) witnesses and consulting with a crime scene investigator or pathologist – they could have discovered and presented evidence rebutting the Government's claim that Mr. Fields shot the Chicks after substantial planning and inflicted mental anguish on Mrs. Chick.  Had the defense done so, it is likely that the jury would have rejected these aggravating factors.  Had these aggravating factors been rejected, in whole or part, there is a reasonable probability that the jury's weighing of the remaining aggravating and mitigating circumstances would have been different, and Mr. Fields' life would have been spared.  Counsel's ineffective failure to properly challenge these circumstances allowed the jury to consider facts that they would not otherwise have had before it. Thus, counsel's failure caused Mr. Fields significant prejudice.

## A. Evidence Rebutting the Substantial Planning Aggravating Factor.

106. To prove the substantial planning aggravating factor, the Government introduced evidence purporting to show that Mr. Fields had been laying the groundwork to shoot a human being for a year or more before the offense, and that he devised a specific plan to shoot the Chicks after setting up an alibi for his whereabouts. The Government also introduced evidence purporting to show that, at least six hours after shooting the Chicks, Mr. Fields returned to the campsite and staged a robbery to make it appear that his objective had been to steal, not to kill. All of this evidence could have been rebutted by proper defense investigation.

### 1. Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning.

107. The Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become a sniper and shoot human beings. The prosecutor argued in closing:

> Didn't start on July 10th, 2003, started long before that. It started about a year before that when, as you heard the testimony, the Defendant was with Penney to help to create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.
>
> *  *  *
>
> His plan down the road is to become a predator, a sniper. This was the first step in that action.

59

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 243 Restricted

TR, 3406-07.

108. According to the Government, Mr. Fields finally decided to put his plan "to become a predator, a sniper" into action on the evening of July 10, 2003 after meeting the Chicks at the Winding Stair Campground a few days earlier. As evidence of this plan, the Government argued that Mr. Fields attempted to create an "alibi" for the evening of July 10, 2003 – when he purportedly intended to shoot the Chicks – by telling his former girlfriend that he planned to go fishing with a friend that night and would be home late. TR, 3412-13.

109. If trial counsel had conducted a reasonable investigation by adequately interviewing a friendly Government witnesses – Daniel Presley – they would have discovered evidence refuting the Government's allegations. Mr. Presley could have explained to the jury that certain remarks and actions by Mr. Fields that the Government made seem ominous were in fact innocuous.

110. Had he been asked by trial counsel on cross-examination, Mr. Presley could have given testimony contradicting the Government's argument that, because Mr. Fields used a ghillie suit and scoped rifle, he must have been planning a sniper attack. Under questioning by the Government, Mr. Presley told the jury that Mr. Fields went squirrel–hunting in his ghillie suit, that he attached a powerful scope to his .22 rifle, and that he was a "[g]reat shot." TR, 2378-79. He also told the jury that

Mr. Fields had ghillied his rifle. Id. at 2384-85. However, he has now explained that it was common for hunters in the area to use ghillie suits and to ghillie their weapons – questions he was never asked by trial defense counsel:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go to any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself.
>
> * * *
>
> Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't because it wasn't unusual.

Declaration of Daniel Presley ("Presley Dec."), $A - 20$, ¶¶ 4, 5.

111. Mr. Presley also would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles. He states, "You an either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's." Presley Dec., ¶ 5. Moreover, Mr. Presley would have testified that Mr. Fields

attached the scope to his rifle at least a year before the homicides. Id.

112. Mr. Presley also could have rebutted the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides, if only trial counsel had inquired into the matter. The Government first called Mr. Presley to testify that on the evening of July 10, 2003 he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." *TR*, 2382. The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2005 and told her he had plans with his Mr. Presley for that evening. Ms. Tipton testified:

> Those plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work. He was a very timed person and he got home at exactly the same time every night and he knew – at this time I was not working, so, he knew that I would worry. So, he wanted me to know that him and Danny would be out fishing and that he wouldn't be right home.

*TR,* 2558-59.

113. From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts. *TR*, 3412-13.

114. However, Mr. Presley would have testified on cross-examination that Mr. Fields came over to his house after work that day and **asked him to go snake-**

**hunting that night**. Presley Dec., ¶ 3. Mr. Presley declined to go hunting because he had plans to go to the casino with sister, id., but the fact that Mr. Fields suggested that the two of them go snake-hunting that evening shows that, as he indicated to Ms. Tipton, he **did** hope to do something with Mr. Presley that evening. As Mr. Presley observes:

> When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m. – or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

Id.

115. Although trial counsel did not question Mr. Presley about this information on cross-examination, they had been alerted to its existence. In Mr. Presley's statement to the FBI, he mentioned that, just hours before the offense,[18] Mr. Fields asked him if he "wanted to do something." FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview") $A - 21$, at 3. Mr. Presley's statement was produced to the defense in discovery. Yet trial counsel never followed

---

[18]Mr. Presley told the FBI that Mr. Fields came over to his house sometime after 4:00 p.m. Presley Interview at 3. In his testimony at the sentencing hearing he said he "thought it was around 4:00" that he last saw Mr. Fields that day, but he had "heard since that it was later than that." *TR*, 2382. His wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven, I believe." *TR*, 2462.

up with Mr. Presley – either through investigation or cross-examination – to find what it was that Mr. Fields "wanted to do." Had trial counsel followed up on this remark during their investigation, they would have learned that Mr. Fields wanted to go snake hunting the night of the offense, not shoot the Chicks, and could have presented that information to the jury to contradict and challenge the substantial planning and premeditation aggravating factor.

116. Trial counsel never asked Mr. Presley these matters. See Presley Dec., ¶ 3.

### 2. Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.

117. As further proof that Mr. Fields had a premeditated plan to shoot the Chicks, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned several hours later to stage a robbery. This claim was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal. The Government argued:

> To [Agent Dalley] this was not a true burglary or robbery. This was staged.
>
> So you have to ask yourself why would he do this. Why would he come back some hours later to commit this crime. Don't know. But one thing I throw out to you is this. The evidence suggests that he knew he may

64

have been caught by those people coming in.  These people may have recognized his truck and when he had completed his plan, when he had killed the Chicks, when he had finally murdered his prey, when he had graduated from squirrels to humans, he left the area.

\* \* \*

So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery and if anyone says anything I can say, well, I was – they were – I was there using the bathroom.  They were already dead.

*TR*, 3421, 3422; see also *TR*, 2019 (Government explains relevance of staged robbery theory to statutory aggravating factor).

118.    To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma.  Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door.  *TR*, 2099.  According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried:

A:    In addition to the blood that is in the runners of the foot well and on top of the sandals, I also note that there are these small, shiny fragments here which are pieces of broken glass.

Q:    And did you find those pieces of broken glass significant?

A:    Yes, sir.

Q:    And how did you find them significant?

A:    In two ways.  One, they were consistent with being from the driver's window, which I found had been broken, such that there was an impact to the window from the driver's side towards the passenger's side.
The other thing that I noted was there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood.

*TR*, 2098-99.

119.    In addition, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot. *TR*, 2026-32, 2111-15.

120.    If trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator – they would have learned that the evidence supporting the Government's "staged robbery" theory could have been soundly impeached.

66

121. Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. Referring to a photograph marked Government's Exhibit 43, Agent Dalley testified "there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood." *TR*, 2099. Agent Dalley did not explain on direct examination how she arrived at this conclusion, nor did trial counsel ask this question on cross-examination.

122. In the report Agent Dalley prepared almost two weeks after the homicides, however, she recorded no observations about these glass fragments and failed to mention whether she examined the fragments at the scene or collected them for later examination.[19]  Trial counsel never cross-examined her about the fact that

---

[19] Agent Dalley reported about these objects as follows:

DALLEY opened the front passenger door. Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep. Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep. *Fragments of broken glass were on top of the sandals and blood in the doorstep.* DALLEY collected the three sandals and the tissue-like fragment.

67

her report is utterly silent as to whether the glass fragments had any blood on them. If these fragments were such important pieces of evidence, as the Government argued, Agent Dalley's failure to note their significance in a report written two weeks after the crime raises serious questions about whether she did in fact examine them to determine whether they were free of blood – particularly since she neglected to collect and preserve the fragments as evidence. Her testimony could have been severely impeached on this fact alone.

123. Moreover, while Government's Exhibit 43 does not show any blood visible on the glass fragments, another crime scene photograph taken by Agent Dalley – a close-up of the area depicted in Government's Exhibit 43 – reveals that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), *A* – 23, ¶ 8. This fact contradicts Agent Dalley's testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Mrs. Chick's blood while the blood was still viscous. Id., ¶ 9. If even one glass fragment landed on Mrs. Chick's blood while it was still viscous, the driver's side window must have been broken before the blood had time to dry. Thus, the Government's theory is deeply flawed and was eminently impeachable.

---

OSBI Crime Scene Investigation Report dated August 1, 2003, *A* – 22, at 3.

68

124.   Even if other glass fragments had no blood on them, trial counsel could have offered a reasonable explanation for this fact during Agent Dalley's cross-examination. Agent Dalley testified that the front passenger door was closed when she arrived on the scene and that she had to open it in order to view the interior of the van. TR, 2098. It is likely that Agent Dalley disturbed a number of glass fragments when she opened the door, causing them to fall onto the dried blood at that time. This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door. Tressel Dec., ¶ 12. Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so. Id.

125.   Trial counsel also could have attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot. Government's Exhibit 51 is a photograph depicting Mr. Chick's right hand. It shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist. Mr. Chick's right hand must have

69

been exposed to this debris while he was being moved from the picnic table to the ground. Tressel Dec., ¶ 16. If Mr. Chick had been moved many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground, and pine needles and other ground debris would not have become attached to the dried blood. Id. Thus, Mr. Chick's body likely was moved within an hour after he was shot,[20] not more than six hours later, as the Government argued. Id.

126.   In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. Tressel Dec., ¶ 17. The air temperature on the evening of July 10, 2003 was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot. Id., ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot, not more than six hours later as the Government argued.

127.   The Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body. Lividity is a

---

[20]Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. *TR*, 2099-2100. The blood on Mr. Chick's right hand appears to be considerable less thick than the blood found in the van, and thus would have dried in less time.

discoloration of the skin caused by the settling of blood in the capillaries due to gravity. Tressel Dec., ¶ 18. It does not occur in areas of the body that are in contact with the ground or another object. Id. Although lividity can become become "fixed," or unchangeable in less than four to six hours after death, although lividity can be fixed is less time in colder temperatures. Id. Dr. DiStephano and Agent Dalley testified that livor patterns on Mr. Chick's body were consistent with lividity having become fixed while Mr. Chick was seated at the picnic table. See, e.g., TR, 2031-32 (testimony of Dr. DiStephano), 2177 (testimony of Agent Dalley).

128. Trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body **also** were consistent with lividity having become fixed while Mr. Chick was lying where he was found. Mr. Chick was discovered face down beside the picnic table with his left arm extended across his chest, his right foot bare, and the top of his right foot pressed against the ground. Tressel Dec., ¶¶ 19-20. Mr. Chick's body shows lividity on his left side, right abdomen, top thigh and right bottom toes, which is consistent with the position in which he was found and inconsistent with being seated at the picnic table. Id. These livor patterns could not have occurred if lividity had been fixed before Mr. Chick's body was moved. Id.

129. Some livor patterns on Mr. Chick's body are inconsistent with the

71

position in which he was found. These patterns include areas of discoloration on the backs of Mr. Chick's thighs. Trial counsel nevertheless could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

### B.    Evidence Rebutting the Mental Anguish Aggravating Factor.

130.    In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor:

> [Mr. Chick's] wife Shirley sitting right in front of him face to face in the darkness sharing moments of the beautiful scenery and the vista. What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his [sic] face. What was the horror, the shock, the sheer oh, my God, the terror that went through her mind at that instant?

*TR*, 3415-16.

131.    As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. *TR*, 2088-91. She

72

also testified that high velocity spatter can travel up to two feet and still remain visible on an object. *TR*, 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face:

> Well, if I can explain just a bit. Since it appears to be from a gunshot wound, then I look for any other gunshot wound in the scene that would be in a position that could cause that staining on her face. And subsequent to the autopsy and getting that information, I could exclude the wounds to her head as producing these stains down on her – especially down on her cheek. I could exclude the wound to her foot. That leaves Mr. Chick having two wounds. And one of those wounds then would be consistent with the staining on her face.

*TR*, 2090. Agent Dalley never explained why she could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point, although trial counsel did establish that the blood spatter on Mrs. Chick's face was never tested to determine the source.[21] *TR*, 2213.

132. Had trial counsel consulted a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and

---

[21]Agent Dalley also did not test high velocity blood spatter that she observed on Mrs. Chick's hands. *TR*, 2213. She attributed this spatter to Mrs. Chick's head wound, claiming it could be accounted for if her hands had been in a defensive position. *TR*, 2180-81.

a nearby exit wound. Tressel Dec., ¶ 26. According to Mr. Tressel, either of these wounds could have created high velocity blood spatter[22] and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

## C.     Trial Counsel's Ineffective Assistance.

133.    Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing.

134.    Trial counsel were deficient for failing to adequately challenge the aggravating factors. The Government's evidence of substantial planning and mental anguish effectively went unrebutted even though trial counsel had readily available information that could have undermined that evidence or placed it in its proper context. Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting and that Mr. Fields wanted to go snake hunting with him on the night of the offense. Presley Dec., ¶¶ 3-5. A crime scene investigator or other

---

[22]Indeed, Agent Dalley conceded this fact when she attributed the high velocity blood spatter on Mrs. Chick's hands to her head wound.

74

appropriate expert could have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. Tressel Dec., ¶¶ 8, 9, 12, 16-17, 19-20, 26. At the very least, trial counsel could have consulted with such an expert to assist in cross-examining the Government's witnesses. Trial counsel concedes that she did not even consider retaining a crime scene investigator or pathologist and that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses." O'Connell Dec., ¶ 22. Trial counsel not only failed to consult with appropriate experts and attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors, but in closing argument she failed to utter a single word about these aggravating factors.

135. Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims. O'Connell Dec., ¶ 22. Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr.

75

Fields eligible for the death penalty, and trial counsel had every reason to rebut the aggravating factors to convince the jury that mitigating factors outweighed aggravating factors.

136.    Mr. Fields was prejudiced by trial counsel's deficient performance. The Government vigorously argued that its evidence supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456. That evidence went unchallenged. Trial counsel could have injected reasonable doubt into the jury's deliberations by cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. There is a reasonable likelihood that, had trial counsel vigorously attacked the Government's evidence in these ways, the verdict would have been different.

**D.    The Government's Due Process Violations.**

137.    The Government presented false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

76

### 1. False and Misleading Testimony and Argument About a Purportedly Staged Robbery.

138.  As discussed above, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill. *TR*, 3421, 3422. This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Field eligible for the death penalty and was weighed by the jury. See, e.g., *TR*, 2019 (explaining relevance of staged robbery theory to statutory aggravating factor).

139.  The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried. Id. at 2098-99.

140.  Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation

77

report, and (2) photographs she took at the crime scene.

141.   In a report she prepared approximately two weeks after the homicides, the only observation Agent Dalley made about the glass fragments was that "[f]ragments of broken glass were on top of the sandals and blood in the doorstep." OSBI Crime Scene Investigation Report dated August 1, 2003, 3.   Agent Dalley mentioned nothing more about the glass fragments, nor did she include those fragments in the list of evidence she collected at the scene. Id. at 7-9.

142.   Although Agent Dalley testified that the glass fragments were "significant" because they were not stained by blood, *TR*, 2098-99, her report fails to mention any characteristic that made them significant, indicating that either she did not physically inspect the fragments at the scene or she inspected them but did not observe anything significant about them.   Because the glass fragments were not collected as evidence, she could not have examined them at a later time.   Thus, her testimony that the fragments were "significant" because they were not stained with blood could not have been based upon her physical examination of those fragments.

143.   Nor could Agent Dalley's claim that the glass fragments were "significant" have been based on her examination of photographs.   The bottom surface of these glass fragments is not visible in any photograph.   More importantly, one of the photographs taken by Agent Dalley shows that at least one glass fragment

resting on the dried pool of Ms. Chick's blood *does* have a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* − 24.[23] This photograph − which the Government never asked Agent Dalley about − contradicts her testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Ms. Chick's blood while the blood was still viscous. If even one glass fragment landed on Ms. Chick's blood while the blood was still viscous, the driver's side window must have been broken before the blood had time to dry.

144. The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not solicit Agent Dalley's false and misleading testimony, they had a duty to correct it.

145. Despite the fact that the prosecutors knew or should have known that Agent Dalley's testimony was false and misleading, they nevertheless argued in closing that her testimony supported the substantial planning aggravating

---

[23] The photograph included in the Appendix is not a clear copy and is included for identification purposes only.

79

circumstance. *TR*, 3456 (prosecutor argues that glass fragments proved that Mr. Fields staged a robbery).

### 2. Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi."

146. As discussed above, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offense. This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton. The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382. The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR*, 2558-59.

147. Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day. **He had already set up us [sic] alibi.** If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him. **He's**

**already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth**.

TR, 3412-13.

148.    The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August 2003, Mr. Presley told the FBI that, on the day of the offense, Mr. Fields came to his house sometime after 4:00 p.m.[24] and asked him if he "wanted to do something." Presley Interview at 3.  Mr. Presley replied that he had "plans to play the casino in Fort Smith."  Id.  This statement was memorialized in a FBI 302 Report and provided to the prosecutors.  Id.  During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening.  The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

149.    It was clear from Mr. Presley's complete statement to the FBI that Mr.

---

[24]At the sentencing hearing, Mr. Presley testified that it may have been later than 4:00. *TR*, 2382.  His wife Marilyn testified that it was between 6:30 and 6:45 p.m. *TR*, 2462.

Fields **did** intend – or at least wanted – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence shows that he had no plan to shoot the Chicks at the time at the time he made this statement to Ms. Tipton. It also shows that he had no intention of shooting the Chicks when he suggested to Mr. Presley that they go snake hunting, which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3. The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.

150. There is a reasonable likelihood that the judgment of the jury could have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The

82

Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigators. Moreover, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR.

151. The defense's presentation of Mr. Fields' social history evidence was disjointed, incomplete and unpersuasive. A handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family. Yet, as trial counsel were well aware, the defense's mitigation specialist had collected compelling evidence that, contrary to the

83

impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. This information would have been mitigating in its own right, and also would have helped a mental health expert explain his mental state at the time of the offense. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life. Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

### A.    Evidence of Family Dysfunction that the Jury Never Heard.

152.    Mr. Fields was raised in a severely dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. Ms. Shettles was retained by trial counsel in August 2003. Shettles Dec., ¶¶

84

2-3.[25]  She spent the next several months interviewing persons who knew about Mr. Fields' family and background and collecting relevant documents, including his medical, mental health and school records.  Id., ¶ 3.  She provided trial counsel with the results of her investigation and advised them about mitigation themes.  Id., ¶ 3-5.

153.   According to Ms. Shettles, Mr. Fields' family history "was marked by notable dysfunction."  Shettles Dec., ¶ 5.  Both of his parents came from family backgrounds where sexual abuse and violence were prevalent.  Id.  His father spent part of his youth in a foster home.  Preliminary Assessment, dated September 11, 2003 ("Shettles Memo") A – 25, at 4.  Three of his father's sisters experienced sexual abuse and rape, one was disabled from polio, and another was disfigured in an automobile accident.  Id. at 4-5.  In his mother's family, sexual abuse, gambling and drinking took place.  Id. at 7.

154.   Mr. Fields' mother, Margaret Fields, suffered from depression her entire life and "placed her own emotional needs above those of her family ...."  Shettles Dec., ¶ 5.  His father was largely absent from his upbringing, and his mother "jealously

_____

[25]As is typical in such cases, Glori J. Shettles is a well-credentialed (masters level educated) and vastly experienced mitigation specialist.  As her declaration reveals, she has law enforcement experience, and for approximately the last 17 years she has been involved as a mitigation specialist in over 70 capital cases.  Shettles Dec., ¶ 2.  Counsel hired the right person, but failed to effectively use the mitigating evidence she unearthed.

85

guarded her relationship with her husband" by keeping him from their children. Id., ¶ 6. As Cherie Fields, Mr. Fields' sister, explains, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father." Declaration of Cherie Fields ("Fields Dec."), ¶ 3, A − 26. She recalls that her parents never hugged her or Mr. Fields or told them they were loved. Id., ¶ 5.

155.   Cherie Fields also recalls that her mother "took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security." Fields Dec., ¶ 5. As a result, Mr. Fields received love from no one in the family. According to Ms. Shettles, "the relationship between the parents and Mr. Fields and his sister ... was distant, cold and unemotional." Shettles Dec., ¶ 6. Mr. Fields' apparent inability to express emotions may have its roots in the lack of appropriate parenting he received as a child. Id., ¶ 9.

156.   The problem was compounded by the family's transient lifestyle. Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned the significance of the family's nomadic life: that Mr. Fields had a difficult time forming and keeping friendships, which increased his sense of

86

isolation at a time when he already felt emotionally cut off from his parents.

157.  Mr. Fields and his sister were the recipients of "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." Shettles Dec., ¶ 6.  Cherie Fields describes this discipline:

> I recall my father being provoked by our mother to have us whip each other with belts – our Dad would be the one to say if we were doing it hard enough.  If we weren't, then he would take a lick.
>
> *   *   *
>
> When we got a whipping, we'd have to take our pants off and lie on the bed.  Dad would whip us with a belt until we'd cry and scream.  It didn't matter what time of day or night it was.  If Mom ordered him to give us a whipping he'd do it.  It was all very bizarre and Eddie really got the worse of it.

Fields Dec., ¶ 6.

158.  For most of his life, Mr. Fields suffered from chronic depression. Shettles Dec., ¶ 8.  He appeared "unhappy," "moody" and "strange," lacked motivation and moved from one activity or relationship to the next without any obvious reason.  Id., ¶ 8.  As a result, he was frequently and inaccurately dismissed by those who knew him as "lazy."  Id., ¶ 10.  To Cherie Fields, her brother's depression made him act "weird."  She states that, when she was growing up with her brother, "there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird."  Fields Dec., ¶ 9.

87

By the time the family was preparing to move to Virginia, she recalls, "my brother was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

159.   In addition, intergenerational mental health and neurological issues plagued Mr. Fields' family, particularly on his mother's side. Shettles Dec., ¶ 8. Cherie Fields explains that Mr. Fields' mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill. Fields Dec., ¶ 8. Mr. Fields' mother reported having brain lesions. Shettles Memo at 2. On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor. Id. at 3-4.

160.   The jury never learned about Mr. Fields' severely dysfunctional family. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields. During her direct examination, trial counsel focused on a handful of non-controversial subjects – the impact of the deaths of her father and grandfather and her mother's physical ailments, for instance[26] – which gave the

---

[26]On direct examination, Cherie Fields testified about: the places her family lived, TR, 2674-76; fighting with Mr. Fields, which she described as "normal teenage type stuff," TR, 2676; her father's long hours at work and the fact that he did not

88

misleading impression that the Fields were a more or less typical family. Trial counsel never inquired into subjects that would have revealed Ms. Fields' own tortured upbringing, significant family dysfunction, including the kind of parenting she and Mr. Fields received, how they were disciplined, the struggles of Mr. Fields and his mother with depression and other mental health issues, or inter-generational mental illness.

161. One of the reasons Cherie Fields' testimony failed to reveal the degree of family dysfunction was that trial counsel never explained to her why it was important for the jury to learn about such matters. Fields Dec, ¶ 12. She states, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

162. As a result, the defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. As Ms. Shettles, who attended the entire sentencing hearing, describes it:

[W]hile some isolated social history facts were provided to the jury,

_____

spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offense, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687.

89

there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

163. Trial counsel also never asked the defense's testifying mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction.

164. Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

165. Not only was this social history information never presented to the jury, but much of it was not even presented to Dr. Grinage and Dr. Woods to use in evaluating Mr. Fields. Trial counsel provided Dr. Grinage only with the Shettles Memo, a "preliminary" document that Ms. Shettles had prepared in the very early stages of her investigation. Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005 at *A* − 28 at 2; Shettles Memo at 2. Similarly, the only information about family dysfunction that trial counsel provided Dr. Woods, the other defense psychiatrist, was "family historical records" which

90

included the medical records of his parents and maternal grandmother.  Letter from

Dr. George Woods to Julia O'Connell dated June 25, 2005 *A – 28* at 1.

### B.    Trial Counsel's Ineffective Assistance.

166.   Trial counsel were ineffective for failing to present Mr. Fields' complete

social history – including family dysfunction and other mitigating evidence – through

the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert

such as Dr. Woods or Dr. Grinage.  Trial counsel also were ineffective for failing to

argue that Mr. Fields' social history was a mitigating factor and to provide this

evidence to the defense's mental health experts to help evaluate his mental state at the

time of the offense.

167.   Trial counsel performed deficiently when they failed to present a

complete social history and argue that social history as a mitigating factor.  Ms.

Shettles had collected valuable information about Mr. Fields' background that the

jury never heard.  Either she or a mental health expert such as Dr. Woods or Dr.

Grinage could have developed this information into compelling mitigation themes of

parental abandonment, emotional and physical abuse, family dysfunction, and mental

illness.  All three individuals were available to testify on this subject.  Dr. Woods and

Dr. Grinage actually did testify at the sentencing hearing (although they were not

asked about Mr. Fields' social history), and Ms. Shettles, while not called as a

91

witness, attended the entire sentencing hearing and could have testified anytime. Shettles Dec., ¶ 13.

168. Had trial counsel asked Ms. Shettles, Dr. Woods or Dr. Grinage to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields. The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records. All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life. See, e.g., Shettles Dec., ¶ 11.

169. From a mitigation and mental health standpoint, this information would have been compelling evidence for the jury to consider. Dr. Grinage explains:

> I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did

92

we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented.

Grinage Dec., ¶ 10.

170. Moreover, Dr. Woods and Dr. Grinage should have been asked about how this information affected their opinions of Mr. Fields' state of mind at the time of the offense. Dr. Grinage notes, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10.

171. Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and ultimately presented a smidgen of this evidence, e.g., through the testimony of Cherie Fields. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to

93

accomplish that result.

172. Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented and argued a number of relatively minor biographical facts as mitigators – for instance, that he served in the Navy, worked as a prison guard and performed well at his job at Kenco Plastics. *TR*, 3400-01. However, trial counsel never presented or argued the far more powerful mitigation that was at their fingertips: family dysfunction and the long-term effects of that dysfunction on Mr. Fields' personality and behavior. As Ms. Shettles observes, "counsel were not seeing the forest for the trees as a result of their [own] dysfunctional relationship." Shettles Dec., ¶ 16. Prejudice is well-established:

> In my view, based on over twenty years working in the criminal justice system and with significant experience in capital sentencing, **I am shocked that the jury failed to find a single mental health-related mitigating factor in this case,** when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.

Shettles Dec, ¶ 15. Had the jury heard evidence of Mr. Fields' dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death.

## GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

173.   The Government's closing arguments were rife with misrepresentations of law and fact, impermissible witness bolstering, *ad hominem* attacks, and speculation intended to inflame the passions of the jury.  As a result, Mr. Fields was deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence. These comments violated his due process right to a fundamentally fair trial.  Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal.

### A.    Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence.

174.   The Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase Mr. Fields' burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns.  These instances of prosecutorial misconduct had

95

a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited discretion to extend mercy based on the evidence presented.

175.    The Government twice told the jury that the mitigating factors had to outweigh aggravating factors in order to justify a sentence less than death:

> The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie.  The mitigating factors – (Interrupted)
>
> MR. DERRYBERRY:  Objection to that based on the law.
>
> THE COURT:  Overruled.
>
> MR. SPERLING:  The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

*TR*, 3463-64.  This argument incorrectly stated the law, which requires that the aggravating factors must "sufficiently outweigh" the mitigating factors in order for the jury to impose a sentence of death.   18 U.S.C.A. § 3593(e).  Trial counsel appropriately objected to this argument. This Court erred in overruling the objection. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

176.    The improper comments were made worse when this Court overruled the objection in front of the jury, thus suggesting that the Government's incorrect statements were in fact correct.  The official imprimatur thereby placed upon the

96

prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury.

177.    The Government also urged to the jury to reject mercy based on the evidence as a basis for a sentence less than death:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

*TR*, 3430.  To the contrary, mercy is one of the most central and important factors to guide the jury's sentencing discretion.

178.    Despite Mr. Fields' unquestioned statutory and constitutional right to have a penalty hearing before the jury, the Government told the jurors that the entire proceeding was unjust:

> **The Defendant wants to choose a sentence**.  He wants to live.  Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

*TR*, 3457.

> Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.

97

*TR*, 3459.  The Government's comments invited the jurors to sentence Mr. Fields to death merely for exercising his Eighth Amendment right to individualized sentencing. This also violated Mr. Fields' Sixth Amendment right to a trial on these sentencing facts the jury was required to consider.

179.  The Government improperly invoked societal concerns about lenient sentences and recidivism as a basis for rejecting a sentence less than death:

> You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence.  I can't believe they gave probation to a child molester. You know [sic] longer have that luxury.

*TR*, 3431.  These sentiments were echoed in later comments, invoking popular opinion that prison was too easy on criminals:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment.  If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation.  Don't let this Defendant be a hero to his incarcerated criminal inmates.

*TR*, 3457.[27]   The Government's comments were an invitation to reject the individualized sentencing determination required by the Eighth Amendment, and a

---

[27] The Government's argument was based upon facts not in evidence.  The only testimony about so-called jailhouse perks was elicited from Daniel Presley, who testified about the policies at the minimum security Oklahoma state prison where he was employed.  *TR*, 2408-09. Mr. Presley had no knowledge of the conditions of confinement on the Special Confinement Unit of the Federal Death Row at the United States Penitentiary at Terre Haute, Indiana.

98

naked appeal to vengeance designed to inflame the passions of the jury.

180. Individually and collectively, these improper arguments denied Mr. Fields his right to a jury that would consider and give effect to the mitigating evidence presented and to an individualized determination of the appropriate sentence in his case.

## B.    Improper Arguments Denying the Right to a Fair Trial.

181. The Government's closing argument contained numerous statements misrepresenting the record and contained comments designed to inflame the passions of the jury, thus inviting the jury to decide Mr. Fields' punishment on factors other than the evidence properly presented at trial. The Government also improperly embellished and bolstered the testimony of its witnesses throughout its closing.

182. Given the nature of the mitigating evidence of Effexor-induced "manic flip" presented by trial counsel, the credibility of the mental health experts presented by both Mr. Fields and the Government was a critical aspect of the trial. The Government engaged in a series of attempts to improperly bolster and vouch for the credibility of its experts. Referring to Dr. Price, the Government stated:

> He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns.

*TR*, 3429. The Government continued: "Dr. Mitchell – and he may be the best one of all ... Dr. Mitchell who has no axe to grind here, ladies and gentlemen." TR, 3429-30.[28]

183.    The Government echoed the earlier bolstering of Drs. Price and Mitchell, personally vouching for their credibility by stating, "I respectfully submit, thought [sic], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns." *TR*, 3452. At the same time, both attorneys for the Government denigrated Mr. Fields' expert witnesses as "high dollar shrinks," id.; "hired guns," *TR*, 3429, from the "left coast," id., who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion." *TR*, 3429.

184.    This improper bolstering of the Government's experts was paired with the Government's gross misrepresentation of the testimony of Drs. Grinage and Woods about a significant factual issue raised by the Government in support of the aggravating factors – whether Mr. Fields' prior use of the ghillie suit to sneak up on other people undermined Mr. Fields' contention that he killed the Chicks in an

---

[28]Contrary to the Government's "left coast – hired gun" attack, Dr. Grinage is from Topeka, Kansas. *TR*, 2768. Like the Government's expert Dr. Mitchell, Dr. Grinage had never before testified in a capital case. Grinage Dec., ¶ 2; see also *TR*, 3429-30 ("Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case."). Thus, Dr. Grinage was neither a hired gun, nor from the "left coast."

100

Effexor-induced manic state. The Government argued:

> On cross examination, the doctors we asked about the Ghilley suit. Well, I didn't know he had the Ghilley suit and had snuck up on people beforehand. I didn't know that at all.

*TR*, 3427. The Government's statements are false. Dr. Woods testified, "I was aware that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit and observed someone...." *TR*, 3024. Dr. Grinage was **never asked** if he was aware that Mr. Fields put on the ghillie suit and observed people.

185. In addition to improperly bolstering its own expert witnesses and denigrating those of Mr. Fields, the Government launched a series of *ad hominem* attacks on Mr. Fields:

- "But it was he who chose to turn his back on his family five years ago. It was he who chose to be abusive. It was he who chose to ignore his kids and not even pay child support. ... he's already turned his back on his family..." *TR*, 3431.

- "He abandoned them though. He abandoned them." *TR*, 3458.

- "The Defendant used and discarded people." *TR*, 3449.

- "He lied. He was trying – manipulative, a con artist." *TR*, 3450.

- "And was financially irresponsible, parasitic and promiscuous." *TR*, 3450.

- "The Defendant is unalterably and fundamentally different from most human beings." *TR*, 3455.

101

- "Selfish. Selfish. Narcissistic. It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his widowed mother move halfway across the country." *TR*, 3459.

- "He's the one who put all of us here. What a sense of power he may feel. The narcissistic kind of selfish collections of reality that he has become." *TR*, 3460.

- "He had talked often enough about committing suicide in a transparent ploy to gain sympathy and money from his marks." *TR*, 3464.

- "The fight and Terry Hanna. That was illustrative, wasn't it? That tells you who the Defendant will choose to be near. A child abuser." *TR*, 3465.

These arguments were designed to inflame the passions of the jury, inviting the jurors to sentence Mr. Fields to death, not because any of the aggravating factors that were offered or proven, but because Mr. Fields was a fundamentally bad person, the kind of man who pals around with child abusers and who did not support his family.

186.    Without factual basis in the record, the Government attempted to elicit fear of Mr. Fields – and bolster its claim that Mr. Fields posed a future danger – by arguing that he had been diagnosed as a sociopath.[29]  The Government told the jury:

_____

[29] The Government repeatedly sought without success to have some witness tar Mr. Fields with the label of sociopath.  Neither of the Government's mental health experts diagnosed Mr. Fields as a sociopath. At most, Mr. Sperling was able to elicit from Dr. Price a diagnosis of personality disorder not other specified with antisocial, psychopathic and narcissistic features and traits.  *TR*, 3148.  Dr. Price did not diagnose Mr. Fields as antisocial, psychopathic, sociopathic or narcissistic. *TR*, 3215-

"His own doctors are saying, yeah, he has the traits of a sociopath...." *TR*, 3428; "He's a sociopath." *TR*, 3449. To the contrary, neither Dr. Grinage nor Dr. Woods testified that Mr. Fields was a "sociopath" or even had sociopathic traits. Mr. Sperling had attempted to elicit such evidence from Dr. Grinage, whom he questioned extensively about whether Mr. Fields exhibited any of the traits of a sociopath. See TR, 2841-46. Dr. Grinage, however, denied that Mr. Fields exhibited any such traits, as this Court itself noted. TR, 2849 ("I think Mr. Sperling is simply asking the doctor if he noticed these characteristics or traits in the Defendant. I don't think he's asking to give that. And, of course, I know the doctor didn't and I think he said he didn't.). Dr. Woods was never questioned regarding a diagnosis of sociopathy.[30]

17. The Government then tried to adduce evidence that Mr. Fields' experts had diagnosed him as having sociopathic "tendencies" by calling a lay witness, Marilyn Presley, to testify that Mr. Fields "stated that they were – had said that he had some sociopathic tendencies, I believe, and wanted me to look it up on the computer for him." *TR*, 3086. Although the Government's theory was that the "they" who purportedly told Mr. Fields he had "sociopathic tendencies" referred to mental health experts retained by the defense, see *TR*, 3428, Mrs. Presley testified that Mr. Fields never told her who "they" were and in fact conceded it was a "good possibility" that the comment had been communicated to Mr. Fields by trial counsel who were merely reporting what other attorneys had said about him. *TR*, 3086, 3090. Thus, there was no evidence that Mr. Fields' experts had diagnosed him as having "the traits of a sociopath," contrary to Mr. Fries' assertion during closing argument. The reports of the defense trial experts confirm that neither diagnosed Mr. Fields as a sociopath nor observed in him any psychopathic traits.

[30] Trial counsel appropriately objected to the Government's statement that Mr. Fields' "own doctors are saying, yeah, he has a traits [sic] of a sociopath." *TR*, 3428-

103

187.    In addition to arguing that Mr. Fields was a sociopath, the Government

made a number of other improper arguments without factual basis in the record in

order to bolster its case in support of the aggravating factor of substantial planning

and deliberation.  The Government argued that Mr. Fields planned for many months

to commit this crime, contending that his hobby of squirrel hunting – and his

construction of the ghillie suit for that hobby -- was really a prelude to murder:

> Didn't start on July 10, 2003, started long before that.  It started about
> a year before that when, as you heard, the Defendant was with Penny to
> help create a Ghilley suit, a black Ghilley suit – a black shirt and a
> Ghilley suit, I believe the testimony was, and they made that Ghilley suit
> and it continued.

                                    *   *   *

> Look at the painstaking manner that must have been done in order to
> complete this Ghilley suit.  This is not the act of a man who's frenzied
> or has flights of thoughts.  It's the actions of a man who is methodically
> thinking out what he wants to do.  His plan down the road is to become
> a predator, a sniper.  This is the first step in that action.

                                    *   *   *

This is when the plan really began to take form.  Plan was not to kill

---

39. However, this Court overruled the objection. *TR*, 3429.  The Court did so despite previously sustaining an objection to the question asked to Marilyn Presley: "Did he explicitly identify the doctors who had made that finding?" *TR*, 3086.  The Court erred in overruling the objection to the statement made in the Government's closing argument, as there was no factual basis in the record for the Government's assertion that Mr. Fields' doctors said that he had the traits of a sociopath.  Appellate counsel was ineffective for failing to raise this issue on direct appeal.

104

Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

* * *

At this time the Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper.

*TR*, 3406, 3408-9. The Government continued: "He had mastered his craft. He had practiced with squirrels and now he was moving to humans." *TR*, 3414; "in the days, weeks and months before the killing ... the killing germ began to take root in his mind ...." *TR*, 3454.

188.    However, there was nothing in the record to support the inference that Mr. Fields constructed the Ghillie suit with the idea of shooting a human being, or that he hunted squirrels for reasons other than to enjoy a hobby with his friend. Indeed, the evidence adduced at trial actually contradicted such an inference. The undisputed evidence at trial established that Mr. Fields' purpose in making the Ghillie suit was to use it for hunting squirrels, and nothing more. See *TR*, 2378-79 (Mr. Presley testified that he went hunting several times with Mr. Fields, who wore the Ghillie suit to shoot squirrels); *TR*, 2458 (Mrs. Presley testified, "It's just a Ghilley suit that people go hunting in."); *TR*, 3121 (Dr. Price testified, "And [Mr. Fields] preferred to use this Ghilley suit that he had constructed and hide and let the squirrels

105

come close to him."); *TR*, 2487 (David Love testified, "He told me that he had basically made it to hunt squirrels with."). Additionally, Jovanna Fields testified Mr. Fields was prepared to abandon the ghillie suit weeks before the Chicks were killed. *TR*, 2656-57.

189. The Government further misrepresented and twisted the testimony of Daniel Presley in order to bolster its argument that Mr. Fields' hobby of squirrel hunting – and use of the ghillie suit for that hobby – was part of a greater plan to murder the Chicks. The Government told the jury that Mr. Presley – Mr. Fields' hunting partner – testified that Mr. Fields "[d]idn't need to have a ghilley suit to go squirrel hunting" and that "there's no need to have a scope like this on this kind of gun, a .22," and contended that Mr. Presley called it a "sniper's rifle." *TR*, 3407-8. Mr. Presley provided no such testimony, and disavows any suggestion that the Government's arguments correctly interpreted his testimony.[31] See *TR*, 2370-2410; Presley Dec., ¶¶ 4-5.

190. Additionally, the Government misrepresented the testimony of Daniel Love. Mr. Love testified that during the spring of 2003 Mr. Fields said he had snuck

---

[31]The Government also contended that Mr. Presley testified about an incident when Mr. Fields scared Mr. Presley while the two were hunting and Mr. Fields was wearing the Ghillie suit. *TR*, 3408-9. Mr. Presley never testified about this incident – the story was recounted in the testimony of Dr. Price. *TR*, 3122. The Government never attempted to elicit this story from Mr. Presley. See *TR*, 2370-97; 2408-10.

106

up on a couple on Talimena Drive while dressed in the Ghillie suit. *TR*, 2487. Mr.

Love further testified that he told Mr. Fields to stop doing that or he would "get his

ass shot off." Id. The Government contended that "the Defendant just kind of

laughed at [Mr. Love]," *TR*, 3408, which was untrue. Mr. Love testified was that Mr.

Fields was "[k]ind of aggravated a little bit. He took [the Ghillie suit] back out to the

truck." *TR*, 2487. Mr. Love's actual testimony suggests that Mr. Fields was upset by

Mr. Love's comments, explaining Mr. Fields' later refusals to tell people why he had

a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to

tell anyone he planned to use the ghillie suit to kill people. TR, 3409.

191.   The Government also contended that Mr. Fields used the campground

to scout out potential victims:

> So he begins to look for victims. What is the testimony? He's hanging
> out at the Winding Stair Campgrounds. He's up in the Talimena Drive.
> He's going snake hunting. He's doing all these things, but he's also
> searching for a victim. Not a particular individual, but an individual or
> individuals who unfortunately have put themselves in a position of
> danger. He's at the Winding Stair Campgrounds and he's there several
> times a week. He's taking a shower, he's going to the bathroom. He's
> using it because his girlfriend won't let him live in their house anymore,
> but he's also using it as a place to search for a victim. He keeps track of
> when people are there, who's staying there, when they're staying there,
> what the habits are.

*TR*, 3410. Contrary to the Government's assertion, there was absolutely no testimony

that Mr. Fields used to campground to identify a victim, much less any evidence that

107

he "ke[pt] track of when people are there, who's staying there, when they're staying there, what the habits are." Id. At most, the evidence indicated that Mr. Fields was aware the Chicks were staying at the campground. The Government's argument impermissibly exaggerated the trial evidence in a manner designed to mislead and inflame the jury.

192. In support of the mental anguish aggravating factor, the Government argued that the jury could reasonably infer that Shirley Chick's death was not silent:

> He likely heard whatever cries or moans or expressions of fear from at least one of his human prey. He killed from a short distance....
>
> And by the way, may I suggest one area in which the evidence establishes really our witness's credibility? Special Agent Gary Graff didn't pump things up. He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me. But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

TR, 3462; see also TR, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life."). There was no evidence that Mrs. Chick cried out when she was shot. This argument was pure speculation and was calculated to elicit an emotional reaction from the jury. It is also another example of the Government's improper witness bolstering.

193. The Government concluded its closing argument with an extended and

108

wholly improper recitation of scripture to support its position that Mr. Fields was worthy of death. The Government related to the jury the well-known "writing on the wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my Government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

*TR*, 3466-67; compare Daniel 5:1-31. The Government then argued that Mr. Fields should be weighed in the balance and found wanting. TR, 3467. The Government's

109

invocation of biblical support for its position invited the jurors to decide the question of Mr. Fields' punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance. Bible references as a basis for a death sentence are anathema to the Eighth Amendment.

194. Individually and in combination, the improper statements by the Government had a substantially prejudicial effect on Mr. Fields' rights under the Sixth and Eighth Amendment, and rendered his trial fundamentally unfair. These comments exaggerated and improperly bolstered the evidence in support of the Government's position while denigrating the mitigating evidence presented by Mr. Fields, and invited the jury to decide the question of Mr. Fields' punishment in a manner other than set out by statute and the Constitution. It is the prosecutor's job to seek justice, not victory. Here, the Government crossed that line, using a pattern of attacks, misrepresentations and improper appeals to passion, vengeance and fear to seek victory in the form of a death sentence.

## C.   Trial Counsel's Ineffectiveness.

195. Other than in the two instances noted above, trial counsel failed to object to any of the Government's improper statements throughout its closing arguments. Trial counsel's failure to object to these blatantly improper comments was deficient

110

performance, and trial counsel could have had no strategic reason for their failure to do so. O'Connell Dec., ¶ 23 ("Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issue for appellate review.").

196. Mr. Fields suffered prejudice from trial counsel's failure to make meritorious objections to the Government's improper closing arguments. As a result, the jury was encouraged to ignore the substantial mental health evidence presented by Mr. Fields, which it did in refusing to find that Mr. Fields committed the offenses under severe mental or emotional disturbance. *TR*, 3481. Based upon the Government's improper embellishment of its evidence, the jury also found that Mr. Fields committed the offenses after substantial planning and premeditation, and that Mr. Fields inflicted mental anguish upon Mrs. Chick. *TR*, 3479-80. If trial counsel had objected to the Government's misrepresentations of the law and the evidence, its *ad hominem* attacks on Mr. Fields, and its appeals to passion and vengeance, there is a reasonable likelihood that the verdict would have been different.

197. Appellate counsel rendered deficient performance by failing to raise these repeated instances of prosecutorial misconduct on direct appeal. Had appellate

111

counsel raised these, there is a reasonable likelihood that Mr. Fields' sentence would have been vacated and the matter remanded for resentencing. Appellate counsel can have no reason for failing to raise meritorious claims on direct appeal, particularly in a capital case.

## GROUND SIX

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

198.    Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death. Trial counsel not only failed to object to this unconstitutional weighing process and general verdict, but they requested instructions and a jury verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form approved by the Court. United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009). Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United

112

States Constitution.

### A.    The Unified Weighing Process and General Death Verdict.

199.    Mr. Fields pled guilty to two counts of first degree murder: Count 1 (the murder of Mrs. Chick) and Count 3 (the murder of Mr. Chick).  The Government sought the death penalty for Counts 1 and 3 based on seven aggravating factors, including three factors that exclusively applied to Count 1 (murdering Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and inflicting mental anguish on Mrs. Chick) and two factors that exclusively applied to Count 3 (murdering Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick).[32] *TR,* 3396-99.

200.    Although Mr. Fields pled guilty to two separate murder counts, the Court never instructed the jury that it had to determine the penalty for **each** murder count individually and that it could consider only those aggravating factors applicable to a particular count in determining the sentence for that count.  See generally *TR,* 3393-3304; see also *TR,* 3478-83 (Special Findings Form).  Instead, the Court's instructions and the Special Findings Form required the jury to vote on a single verdict of life or death.  *TR,* 3404 (instructions), 3484 (Special Findings Form).  Moreover, although

---

[32]The other aggravators argued by the Government were: (1) killing more than one person in a single episode; and (2) future dangerousness.  *TR,* 3396-99.

113

the Court instructed the jury to decide each aggravating factor separately, *TR*, 3403-04; see also *TR*, 3396, 3399 (Special Findings Form), **the jury was permitted to consider all seven aggravators in deciding whether Mr. Fields should live or die.**[33] *TR*, 3403-04; see also *TR*, 3483-84 (Special Findings Form).

201.   Consistent with the Court's instructions, the jury "f[ou]nd by unanimous vote that *a* sentence of death shall be imposed on the Defendant." *TR*, 3484-85 (Special Findings Form). The jury rendered no verdict distinguishing between each murder count,[34] nor did the jury apply specific aggravating factors to particular murder counts. See id.

202.   The jury's general verdict of death denied Mr. Fields his right under the

---

[33] The Special Findings Form instructed:

The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death .... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer "yes" below [and] record your verdict on [the general verdict form for death] .... If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations [and] sign [the general verdict form for life imprisonment].

*TR*, 3483-84.

[34]The Court's poll of the jury after the verdict also failed to distinguish between each count. *TR*, 3485-87.

114

Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. In imposing the sentence, the jury had no mechanism for separating out the two counts. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on the other count. Such a verdict was not merely a theoretical possibility. The mental anguish aggravating factor applied only to Mrs. Chick, *TR*, 3399, arguably making her death more egregious in the eyes of the jury. The unitary weighing process used here, however, did not give the jury the option of returning a verdict of death for the murder of Mrs. Chick but life without the possibility of release for the murder of Mr. Chick. Instead, the jury faced an "all or nothing" proposition as its sole sentencing option.

203. More importantly, the unitary weighing process approved by the Court skewed the weighing of aggravating and mitigating factors, denying Mr. Fields his right to reliable sentencing guaranteed by the Eighth Amendment. The Court instructed the jury to consider the substantial planning aggravating factor separately for each of the Chicks. *TR*, 3396; see also id. at 3478 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been

able to consider two plans to kill the Chicks when deliberating about the verdict for each murder count. Under a unitary weighing process, however, the substantial planning aggravating circumstance or instruction skewed the weighing of aggravating and mitigating factors because it allowed the jury to double-count the substantial planning circumstance. The instruction had the effect of allowing the jury to consider two separate plans to kill each of the Chicks even though the Government argued only that Mr. Fields had one plan to kill both of the Chicks in a single criminal episode.

204. The Court also instructed the jury to consider the victim impact aggravating factor separately with regard to each of the Chicks. *TR*, 3398-99; see also *TR*, 3479-80 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been able to consider any victim impact related to the death of Mr. Chick when deliberating about the verdict for killing Mrs. Chick, nor would it have been permitted to consider any victim impact related to the death of Mrs. Chick when deliberating about the verdict for killing Mr. Chick. Under a unitary weighing process, however, the Court's instruction on applying the victim impact aggravating factor skewed the weighing of aggravating and mitigating factors

116

because it added an aggravating factor that would not have been present had the jury separately considered each murder count. The jury was permitted to weigh victim impact related to the deaths of **both** of the Chicks in deciding whether the aggravators outweighed the mitigators.

### B.     Trial Counsel's Ineffective Assistance.

205.   This ground was raised as court error on direct appeal. The Court of Appeals for the Tenth Circuit stated:

> Fields argues that it was error to allow the jury to consider a general death sentence in a multi-count case, based on a weighing process incorporating a set of aggravators that combined, and consequently exceeded, those it found applicable to the individual counts for which the death penalty was sought. Fields, however, did not object to the collective weighing process and general verdict below. Indeed, as the government emphasizes, the instructions and verdict form tendered by the defense were functionally the same as those ultimately used by the court. Therefore, because Fields invited any error of which he now complains, we decline to review it.

Fields, 516 F.3d at 939.

206.   While the invited-error doctrine relied upon by the Court of Appeals in denying relief may be an appropriate analysis for a direct appeal (where claims of ineffectiveness of counsel may not be raised or decided), it leaves open the question of whether trial counsel were ineffective for failing to object and in requesting the objectionable unified weighing process. The answer to that question is rather

117

obvious.

207. Trial counsel were ineffective for failing to object to the unified weighing process and general death verdict that denied Mr. Fields his rights under the Sixth and Eighth Amendments. For the reasons discussed above, the instructions and verdict form deprived Mr. Fields of his right to reliable sentencing and a unanimous sentencing verdict on each count to which he pled guilty. Not only did trial counsel fail to object to these unconstitutional instructions and verdict form, but, as the Court of Appeals noted, they proffered their own instructions and verdict form that were "functionally the same as those ultimately used by the court." Fields, 516 F.3d at 939; see also Defendant's Tendered Penalty Phase Instructions. Counsel could have had no reasonable tactic or strategy to fail to object to this clearly disadvantageous weighing scheme. O'Connell Dec., ¶ 23.

208. Mr. Fields was prejudiced by trial counsel's deficient performance. Because the jury was allowed to consider all of the aggravating factors in the aggregate in rendering a general verdict, its weighing of aggravating and mitigating factors was skewed in favor of death. The jury was allowed to double-count the substantial planning aggravating factor and to consider an additional victim impact aggravating factor, neither of which would have been possible if the jury had been required to render a verdict separately on each murder count. Accordingly, there is

a reasonable likelihood that, had the jury been required to deliberate individually on each murder count, the verdict of the jury would have been different.

## GROUND SEVEN

### THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.

209.   The Government withheld exculpatory, material evidence that it had an obligation to disclose to the defense, including but not limited to evidence that would have corroborated the defense's argument that Mr. Fields had taken an increased dose of Effexor before the offense, emails and other documents on Mr. Fields' computers supporting the fact that he was mentally ill, and witness statements containing favorable information.  To the extent the Government did not have an obligation to disclose this evidence, or the information was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Accordingly, Mr. Fields was denied his rights to due process and the effective assistance of counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

### A.     The Undisclosed Exculpatory Evidence.

210.   The Government had a duty to disclose exculpatory evidence to the

119

defense that included but was not limited to the following.

### 1.     Bottle of 150 mg Effexor Capsules.

211.   In a report dated July 18, 2003, Agent Iris Dalley of the Oklahoma State Bureau of Investigation ("OSBI") stated that, during a search of Mr. Fields' truck, she observed two prescription pill bottles. $A-29$. OSBI Report of Iris Dalley dated July 18, 2003 at 1. Later in her report she noted that she observed a "pharmacy sack label" dated July 9, 2003 for "30 Effexor 150 mg capsules for EDWARD FIELDS" and a bottle of pills with the same label. Id. at 3.

212.   Five days later, Special Agent James Alford of the United States Forest Service prepared an inventory of items found in Mr. Fields' truck, including an item described as "'Effexor XR 3.75mg/75mg' blister pack containing three pills" but **not** the pharmacy sack label or the bottle of Effexor 150 mg capsules observed by Agent Dalley during her search of the truck. Inventory of Items in 1989 Chevrolet Truck dated July 23, 2003, $A-30$, at 2.

213.   The FBI subsequently turned over to Mr. Fields' mother the items found in his truck. The defense's investigator prepared an inventory of these, including "July 9, 2003 - Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg" and "14-day sample packet of Effexor XR. Three (3) capsules remain in the package." Memorandum from Glori J. Shettles dated January 1, 2004,

120

*A* – 31 at 1, 4. The bottle of 150 mg Effexor that Agent Dalley observed in July 2003 was not returned. See id.

214.   Law enforcement officials seized the bottle of 150 mg Effexor and are charged with the knowledge of what was in the bottle. The Government elicited agreement from defense expert Dr. Woods that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage? [i.e., the 150 mg dosage of Effexor]" *TR*, 3029-30. The Government also implied that Mr. Fields took a 37.5 mg dose of Effexor from the fourteen-day blister pack, not the 150 mg dose from the thirty day prescription bottle. *TR, 3030.*

215.   The Government elicited this testimony from Dr. Woods while being in sole possession of the 150 mg bottle and knowing or being able to determine the contents of it. Thus, the 150 mg Effexor bottle contains exculpatory evidence relating to the quantity of Effexor capsules Mr. Fields ingested prior to the offense. The Government failed to disclose this exculpatory evidence to the defense. See O'Connell Dec., ¶ 20.

## 2.    Emails and Documents from Mr. Fields' Computers.

216.    On August 28, 2003, Patrick Kennedy of the OSBI imaged the hard drive of a computer used by Mr. Fields. OSBI Report of Patrick Kennedy dated November 20, 2003 at 3. This hard drive contained 7,904 documents and 544 email messages. Id. at 4. On September 4, 2003, Mr. Kennedy imaged the hard drive of a second computer used by Mr. Fields. Id. at 3. This hard drive contained 8,095 documents and 6,418 email messages. Id. at 4. According to Mr. Kennedy's report, these drives were "searched for images, documents and web pages relevant to camouflage clothing and particularly Ghillie Suits; snipers; and homicide; in a variety of manners." Id. at 4-5.

217.    The hard drives of these two computers contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails. The Government failed to produce this exculpatory evidence to the defense.[35]

---

[35]In response to written requests from undersigned counsel, the Government permitted inspection of the computers seized from Mr. Fields. Counsel appeared at the FBI office to inspect the computers and following that inspection the Government shipped three such computers to the defense for forensic analysis. Upon such analysis, counsel were told that the computers they were permitted to inspect, and which ultimately were shipped to them, are **not** the computers or hard drives references by Agent Kennedy. Those have not been provided by the Government, and counsel will soon include a request for those in a to-be-filed discovery request.

122

### 3.      FBI Forms 302 and Reports of the OSBI.

218.   On information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information. The Government failed to produce this exculpatory evidence to the defense.[36]

### B.      The Undisclosed Exculpatory Evidence Was Material.

219.   The exculpatory evidence withheld by the Government was material, both considered separately and because of their cumulative impact. See, e.g., O'Connell Dec., ¶ 20 (discussing importance of Effexor pills). There is a reasonable likelihood that, had this evidence been disclosed to the defense, the result of Mr. Fields' sentencing hearing would have been different. Also, when considered along with the due process violations set forth in Ground Three, above, materiality is established.

### C.      Trial Counsel's Ineffective Assistance.

220.   To the extent the Government did not have an obligation to disclose this evidence or it was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence.  Trial counsel rendered

---

[36]Counsel will soon file a discovery motion seeking all of these materials as well as others.

deficient performance by failing to discover exculpatory evidence that could have been used to prove the defense's case-in-chief and to impeach the Government's witnesses. There was no reasonable basis for failing to investigate, discover and present this evidence. See, e.g., O'Connell Dec., ¶ 20 (discussing lack of strategy or tactics regarding discovery of Effexor pills). Mr. Fields was prejudiced by trial counsel's deficient performance because, had the jury learned of this exculpatory evidence, there is a reasonable likelihood that the verdict would have been different.

## GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.

221. Each of the grounds presented in this *Motion* individually entitles Mr. Fields to relief from his death sentence. However, even if this Court finds that Mr. Fields is not entitled to relief based on any particular ground, the cumulative effect of these errors described herein, have denied him due process and a reliable sentencing hearing as guaranteed by the Fifth and Eighth Amendments to the United States Constitution. Moreover, counsel's cumulative errors and omissions individually and cumulatively entitle Mr. Fields to relief for violations of the Fifth, Sixth and Eighth Amendments to the United States Constitution,

124

# GROUND NINE

## THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.

222.    The manner of Mr. Fields' execution, if carried out under current Bureau of Prison lethal injection protocols, would violate the Eighth Amendment to the United States Constitution.  The protocols governing his execution, including the combination of drugs that would be used to accomplish his death, the use of untrained non-medical and unqualified personnel to carry out his execution, the physical space in which his execution would take place, and other factors which are currently not within counsel's knowledge, would result in the infliction of unnecessary pain and suffering.

223.    While the manner of Mr. Fields' execution would be unconstitutional, this claim is not ripe for review at this time.  Mr. Fields is not at imminent risk of execution, and this claim may be moot if this Court grants him the relief he seeks pursuant to other claims in the Petition. Mr. Fields asserts this claim only to preserve it against a later challenge by the Government based on waiver or other defenses. Mr. Fields will amend this claim if the Court deems it appropriate to address it in connection with these proceedings.

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 309   Restricted

Respectfully Submitted,

/s/Hunter Labovitz
_____
Hunter Labovitz
Katherine Ensler
Cristi Charpentier
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520
FAX: (215) 928-0826

Counsel for Petitioner Edward Fields, Jr.

Dated: October 13, 2015
Philadelphia, PA

126

## CERTIFICATE OF SERVICE

I, Hunter Labovitz, hereby certify that on this 13th day of October, 2015, I

electronically transmitted the foregoing document to the Clerk of Court using the

Court's electronic case filing system. Based on the records currently on file, the

Clerk of Court will transmit a Notice of Electronic Filing to the following ECF

registrants:

Christopher J. Wilson, Attorney for Respondent

Jeffrey B. Kahan, Attorney for Respondent

/s/ Hunter Labovitz
Hunter Labovitz

# EXHIBIT D

DISTRICT COURT § 2255 OPINION AND ORDER (DECEMBER 15, 2016)

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

EDWARD LEON FIELDS,                          )
                                             )
      Petitioner/Defendant,         )
                                             )
vs.                                          )    Case No. 10-CIV-115-RAW
                                             )
UNITED STATES OF AMERICA,                    )
                                             )
      Respondent/Plaintiff.         )

## OPINION AND ORDER

This is a proceeding initiated, on April 6, 2010, by the above-named petitioner's

filing of a Motion to Vacate, Set Aside, or Correct Sentence.[1]   The motion to vacate

conviction and sentence is brought pursuant to 28 U.S.C. § 2255.  The government has filed

a response by and through the United States Department of Justice and the United States

Attorney for the Eastern District of Oklahoma.  On November 15, 2010, Petitioner filed his

reply.

## PROCEDURAL HISTORY

On August 1, 2003, Petitioner was named in a six-count indictment.  The indictment

charged Petitioner with Counts 1 and 3: First Degree Murder, in violation of 18 U.S.C. §§

1111(a) and (b), 7(3) and 13; Counts 2 and 4, Use of a Firearm in a Federal Crime of

---

[1]The motion itself does not contain any of the grounds for relief.  Rather, Petitioner states:

> Mr. Fields raised ten grounds for relief.  They are set forth in the pages
> attached to the back of this form.  To aid the Court, Mr. Fields includes an Index to
> Grounds which is at the beginning of the attachment.
> With respect to each of the ten grounds raised, none were raised on direct
> appeal or in any other post-conviction proceeding."  Dkt. # 1, at p. 5.

Only nine grounds, however, are raised in the pages attached to the original motion to vacate.
Dkt. #s 1-2 and 1-3.

Violence Causing the Death of a Person, in violation of 18 U.S.C. §§ 924(c)(1)(A), (d), (j), 7(3) and 13; Count 5, Assimilative Crime   Robbery with a Firearm, in violation of 18 U.S.C. § 7(3) and 13; and Count 6, Assimilative Crime   Burglary of an Automobile, also in violation of 18 U.S.C. § 7(3) and 13.  On March 15, 2004, the government gave notice of its intention to seek the death penalty in the event of a conviction on Counts 1 and/or 3.

On June 30, 2005, Petitioner appeared before this court and waived jury trial as to stage one only and entered pleas of guilty to all of the six counts contained in the indictment. Thereafter, on July 5, 2005, this court began death penalty qualification of potential jurors. On July 13, 2005, the second stage jury trial was commenced.  On July 22, 2005, the jury unanimously returned a verdict of death.  Cr. Dkt. # 228.

On November 8, 2005, the court sentenced Petitioner to death on Counts 1 and 3; 405 months on Counts 2 and 4, to be served consecutively to one another and consecutively to any other term of imprisonment imposed; 405 months on Count 5; and 84 months on Count 6.  Additionally, in the event of subsequent release, Petitioner was ordered to serve 36 months of supervised release.  Petitioner was further ordered to pay restitution in the sum of $15,323.84 and a $100 special assessment on each count, for a total special assessment of $600.  The judgment and commitment was filed of record on November 15, 2005.

Following his conviction, Petitioner filed a direct appeal.  The following issues were raised on appeal:

1.  The federal government lacked subject-matter jurisdiction to prosecute Fields for crimes committed in the Quachita National Forest.

2.  The district court erred in sustaining the government's challenge to a potential juror for cause.

3.  Double-counting of the aggravator for substantial planning and premeditation unconstitutionally skewed the weighing process because the victims were killed in a single episode.

2

4.  The single verdict of death on two counts of murder deprived Fields of a unanimous verdict on each count.

5.  The evidence was insufficient to prove substantial planning and premeditation.

6.  The non-statutory aggravating factor for future dangerousness is unconstitutionally vague and overbroad, should have been limited to future danger in the prison setting, and was not supported by the evidence.

7.  Since the jury was not required to unanimously agree on the which factual predicates applied to the future dangerousness aggravator, petitioner's right to a unanimous verdict was violated.

8.  The non-statutory aggravator relating to the infliction of anguish or other special suffering on the part of a victim is unconstitutionally vague and overbroad and statutorily preempted.

9.  The trial court improperly admitted evidence regarding the impact of the murders on people unrelated to the victims.

10.  The unanimous rejection of the severe disturbance mitigator was prejudicial error.

11.  The jury should have been required to find that the aggravating factor(s) sufficiently outweigh the mitigating factors beyond a reasonable doubt.

12.  The trial court's decision to allow the "guilley suit" in the jury room during deliberations was improper.

13.  Cumulative error requires reversal.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed Petitioner's conviction. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1905, 173 L.Ed.2d 1060 (2009).[2]

On April 6, 2010, Petitioner filed his Motion to Vacate pursuant to 28 U.S.C. § 2255 (Dkt. # 1).  As previously indicated, Petitioner raised nine (9) grounds for relief.  Seven of those grounds contain Sixth Amendment claims that he received ineffective assistance of counsel.  In addition, he claims the Eighth Amendment was violated because the jury did not

---

[2]Certiorari was denied on April 6, 2009.

find as mitigating factors any of the uncontested mental health-related mitigating factors presented; the Eighth Amendment and international law bar his execution because he is not competent to be executed and the death penalty is precluded due to his deteriorating mental health; prosecutorial misconduct deprived him of due process and a fair trial; his Due Process rights were violated because the government withheld exculpatory evidence; cumulative errors deprived him of Due Process and a reliable sentencing hearing; and the manner of Petitioner's death, if carried out, would violate the Eighth Amendment.

Following extensive discovery of the issues herein, the record was expanded on October 13, 2015, with the filing by Petitioner of a document styled: "Grounds in Support of Amended Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a person in federal custody" (Dkt. # 106)[3] and an Amended Appendix in support thereof consisting of thirty-six (36) exhibits (Dkt. #s 106-1 & 106-2). Thereafter, the record was further expanded on October 15, 2015, when the government filed a motion for summary judgment (Dkt. # 110) containing thirty-nine (39) new exhibits. On January 6, 2016, Petitioner filed his response adding thirteen (13) additional exhibits. Finally, on February 2, 2016, the government filed a reply (Dkt. # 122) containing eight (8) more exhibits. This Court has reviewed the relevant trial court records associated with Case No. CR-03-73-RAW, including pleadings, pretrial and trial transcripts as well as all of the pleadings and exhibits filed herein.

---

[3]This amended pleading contains the same nine grounds contained in the attachment to the original motion.

4

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act")

delineates the circumstances under which a federal court may grant collateral relief. Title 28,

section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). A prisoner seeking post-conviction relief under this statute must allege

as a basis for relief: (1) lack of jurisdiction by the court entering judgment; (2) an error of

constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error

of law or fact where the claimed error constitutes "a fundamental defect which inherently

results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185,

99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

Section 2255 is not a substitute for an appeal and is not available to test the legality

of matters which should have been challenged on appeal. *United States v. Khan*, 835 F.2d

749, 753 (10th Cir. 1987), *cert. denied*, 487 U.S. 1222 (1988). Failure to raise an issue on

direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to

Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier,

and that the court's failure to consider the claim would result in actual prejudice to his

defense, . . ." *Id*. "An error of law [or fact] does not provide a basis for collateral attack

unless the claimed error constituted 'a fundamental defect which inherently results in a

complete miscarriage of justice.'" *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir.

1997) (citations omitted).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings.  A petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue.  Where the omitted issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel. *Hooks v. Ward*, 184 F.2d 1206, 1221 (10th Cir. 1999). *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion.  *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

## STATEMENT OF THE FACTS

On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case. *Fields*, 516 F.3d, at pp. 927-928.  Therefore, this court will not recite them here.  The court will, however, discuss various facts as they become relevant to a particular issue.  The court would also note that during the sentencing stage of the proceedings, the government presented twenty (20) witnesses and the defendant called nine (9) witnesses.  Thereafter, the government put on three (3) rebuttal witnesses. *See*, Tr. of Jury Trial, Vol.  VIII-XIII.

6

## PETITIONER'S CLAIMS FOR RELIEF

### I. Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of counsel in Grounds One, Three, Four, Five, Six and Seven. *See*, Dkt. #s 14 and 106. Claims of ineffective assistance of counsel are governed by the now familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The performance prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id*., 466 U.S., at 688. While the prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*., at 694. Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims. *Id*., at 696.

"There is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." *United States v. Kennedy*, 225 F.3d 1187, 1196 (10th Cir. 2000) (quoting *United States v. Williams*, 948 F.Supp. 956, 960 (D.Kan. 1996), *cert. denied*, 522 U.S. 1033, 118 S.Ct. 636, 139 L.Ed.2d 615 (1997)). *See also*, *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). "Effective assistance does not mean victorious or flawless counsel. To be ineffective, the representation must have been such as to make the trial a mockery, sham or farce, or resulted in the deprivation of constitutional rights." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994) (citations omitted). "The sixth amendment right to reasonably effective counsel does not mean 'errorless counsel' or counsel judged ineffective by hindsight." *Clark v. Blackburn*, 619 F.2d 431, 433 (5th Cir. 1980).

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.*, at 689. In order to establish prejudice at the penalty stage of a capital trial, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.* Establishing prejudice imposes a heavier burden on a petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Moreover, "admissions of inadequate performance by trial lawyers are not decisive in ineffective claims." *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998). Ineffectiveness is a question the court must decide. *Id*.

8

6:03-cr-00073-RAW   Document 305   Filed in ED/OK on 05/26/20   Page 320 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 320   Restricted
6:10-cv-00113-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 9 of 53

*A. Failure to investigate, present and effectively argue mitigating mental health evidence*

In his first ground for relief, Petitioner claims counsel were ineffective "with regard to nearly every aspect of [his] mental health mitigation defense," Dkt. 14, at p. 5, enumerating six specific claims dealing with counsel's alleged failures regarding investigation, presentation and summation of mental health evidence. In essence, Petitioner asserts his counsel ineffectively argued his mental health history and failed to request jury instructions to the effect that his asserted mental conditions satisfied multiple mitigating factors. Although conceding that counsel presented "significant mental health-related mitigating evidence, including his pre-offense history of chronic depression and auditory hallucinations and a post-offense diagnosis of bi-polar disorder" (Dkt. # 14, at p. 21); substantial evidence of mental illness[4] and argued his various conditions established specific mitigating factors, petitioner complains because his lawyers did not argue that his mental health issues satisfied multiple mitigating factors. Petitioner also argues counsel were ineffective for failing to assert that his uncontested mental health history was mitigating and the Eighth Amendment was violated because the jury did not find any of this uncontested evidence was a mitigating factor in his case.

Petitioner further contends, despite the fact that in 2011 an MRI of his brain showed it was "normal",[5] counsel were ineffective for failing to investigate and present evidence of his organic brain damage. Petitioner also complains because counsel failed to call local

---

[4]Declaration of trial counsel states, in pertinent part, "[w]e offered and argued to the jury the existence of twenty-two mitigating factors. In the realm of mental health statutory mitigating factors: that he suffered a severe mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired. . . . .one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument." Dkt. # 2-2 at pp. 11-12.

[5]*See*, Dkt. # 110-23, at p. 78.

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 321    Restricted

6:03-cr-00073-RAW    Document 305-15    Filed in ED/OK on 05/26/20    Page 321 of 429
6:10-cv-00115-RAW    Document 125    Filed in ED/OK on 12/15/16    Page 10 of 93

medical professionals to support his manic flip defense and to testify that his mental illness was genuine. Additionally, petitioner states counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price and for failing to investigate and present evidence of compulsive aggression in effexor patients. Finally, petitioner complains trial counsel ineffectively failed to thoroughly and properly prepare two mental health experts who testified.

To support his claims, petitioner relies primarily upon an affidavit by Julia O'Connell, Federal Public Defender for the Northern and Eastern Districts of Oklahoma and lead defense counsel in the criminal proceedings from which this § 2255 action arose. Ms. O'Connell indicates she was an Assistant Federal Defender at the time of appointment but had never tried a federal death penalty case. Ms. O'Connell had, however, tried two state capital cases while employed by the state public defender's office. Dkt. # 2-2, at ¶ 2. While counsel bemoans the fact she was overworked and didn't have a clue what she was doing, the record reveals there were actually four (4) attorneys who made appearances in this matter, three of whom were from the local federal defender's office and each of those attorneys had substantial federal and/or state criminal trial experience.[6] *See also*, Dkt. # 110-1 (email in which Paul Brunton, Federal Public Defender advises Judy Clark, National Capital Resource Counsel that his office has "very able lawyers both with lots of trial, motions and appeal experience in state [death penalty] cases." Brunton forwarded his email and the response

---

[6]The docket sheet in this matter reflects Michael A. Able, Assistant Federal Public Defender appeared at Fields initial appearance on July 21, 2003. Mr. Abel was admitted to practice in the United States District Court for the Eastern District of Oklahoma on November 8, 1995 and he was not terminated as counsel in this case until November 15, 2005, following Fields' formal sentencing. Additionally, on July 25, 2003, both Julia O'Connell and Barry L. Derryberry entered their appearances on behalf of Fields. *See*, Dkt. #s 9 and 10, respectively. Finally, on August 12, 2003, Mr. Isaiah S. Gant filed a Motion to appear *pro hac vice* on behalf of Fields. Dkt. # 19. On September 9, 2003, the motion was granted. Dkt. # 29.

6:10-cv-00115-RAW Document 125 Filed in ED/OK on 12/15/16 Page 11 of 93

thereto to Michael Abel, Barry Derryberry and Rob Ridenour, three assistant federal public defenders in his office. This would imply more counsel were available to assist on this case than those who actually made a formal appearance in the case.) Additionally, Ms. O'Connell's emails establish that she consulted numerous times with attorneys from the National Capital Resource Counsel regarding the facts of this particular case and ideas on how best to defend it. *See*, Dkt. #s 110-1-110-10.

Ms. O'Connell claims, despite the fact her client "remained insistent, and ultimately pled guilty," if Isaiah "Skip" Gant, counsel deemed "Learned Counsel by the Federal National Resource Counsel Project" had joined her in counseling against the plea, together they might have convinced Fields not to plead guilty. *Id*., at ¶¶ 6 and 7. To the extent she admits Fields was insistent on pleading guilty, it is nothing more than wishful thinking to speculate that one more attorney would have been able to convince Fields to follow counsel's advice. Ms. O'Connell continues her affidavit by claiming she had no tactical or strategic reasons for everything which is challenged in the case. *Id*., at p.8 (¶¶s 11 and 12); p. 9 (¶¶s 13 and 14); p. 11 (¶ 17); p. 12 (¶ 18); p 13 (¶¶s 19 and 20); and p. 15 (¶¶s 22 and 23).

Statements by trial counsel in affidavits filed years after trial, where counsel in effect "fall on their swords," do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary. *Jackson v. United States*, 638 F.Supp. 2d 514, 528 (W.D.N.C. 2009). *See also*, *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (court relied on contemporaneous court record to discount trial counsel's testimony in competency trial). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064.

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 323 of 429
6:10-cv-00115-RAW Document 125 Filed in ED/OK on 12/15/16 Page 12 of 93

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 323 Restricted

In this court's opinion, the arguments made by petitioner are the kind of arguments which the Supreme Court in *Strickland* cautioned against, those made with the advantage of 20/20 hindsight. *Id*., 466 U.S., at 689, 104 S.Ct., at 2065. A review of the record reflects, despite the circumstances surrounding the murders of two individuals who were stalked like animals before being killed in cold blood, defense counsel presented a strong case in mitigation premised on several theories of mental illness, including the testimony of two mental health experts, Brad Grinage and George Woods. Grinage, a forensic psychiatrist testified Fields suffered from bipolar disorder and he described symptoms which led him to his diagnosis as depression, rushing thoughts which were episodic in nature and distractibility. *See*, Tr. of Jury Trial, Vol. XI at pp. 2778, 2790-2791, and 2794-2795. Additionally, Grinage indicated Fields had the classic symptoms of mania with regard to pleasure seeking behaviors and hypersexuality. *Id*., at pp. 2791-2792 and 2795. Moreover, Grinage explained the most compelling evidence in his diagnosis was the fact Field's primary care doctor had documented that Fields suffered from auditory hallucinations prior to the murders. Grinage also explained to the jury that treating bipolar patients with antidepressants, especially Effexor, carried an increased risk of causing mania or symptoms of hypomania and/or enhancing any existing psychosis. *Id*., at p. 2780. Finally, Grinage indicated, in his professional opinion, Fields was suffering from a "severe emotional mental disturbance, mainly bipolar disorder with psychotic features" with the psychotic features being auditory hallucinations. *Id*., at p. 2815.

The other defense expert, Dr. Woods, a neuropsychiatrist who specialized in examining the relationship between a person's brains and their behavior, testified that Fields had suffered from a mood disorder for many years beginning in childhood. *See*, Tr. of Jury Trial, Vol. XII at p. 2946. Woods also discussed Fields history of depression beginning at

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 324    Restricted

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 324 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 13 of 93

age sixteen and the many different medications which had been tried.  Woods further indicated Fields had a history of mania which he described as being at "the other end of the bipolar."  *Id*., at p. 2973.  Woods continued by explaining the symptoms experienced by Fields such as irritability, impaired judgment, hypersexuality, "anger and rage that's come out of nowhere," impaired functioning, problems sleeping, problems with his appetite and hearing voices both before and after the offenses.  *Id*.  Based upon his examination, Woods diagnosed Fields with either a schizoaffective disorder or a bipolar disorder with psychotic features which led Fields to display poor judgment and have erratic thinking.  *Id*., at p. 2976-2977.  Woods explained to the jury that the Effexor, which Fields was taking at the time of the murders, could "flip" people with bipolar disorder from depression to mania, further impairing his judgment.

Moreover, during closing argument, counsel addressed all aspects of Fields mental health discussing his depression and how it affected everything in his life, his inability to control what was going through his mind continually because of "rushing thoughts," and counsel implored the jury to show empathy for Fields since he had already accepted responsibility for his actions.  Tr. of Jury Trial, Vol. XIV, at pp. 3434-3436.  Counsel indicated his mental disease impaired his abilities. *Id*., at p. 3436.  Counsel also emphasized the bipolar flip theory, pointing out to the jury that the Effexor built up like it was supposed to and then it hit a tipping point so bad that a girl friend of Fields called the prescribing doctor worried about either suicidal or homicidal behavior.  Thus, counsel argued when Fields committed these offenses he was "under severe mental or emotional disturbances." *Id*., at p. 3440.  Counsel also reminded the jury that all of the physicians who had treated Fields endorsed the idea that the voices were credible.  *Id*., at 3439.

While the right to effective assistance of counsel extends to closing arguments, counsel still has wide latitude in deciding how best to represent their client, and deference to counsel's tactical decisions in their closing arguments is extremely important because of the broad range of legitimate defense strategy at this stage of the case. *Yarborough v. Gentry*, 540 U.S. 1, 4, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003). The purpose of closing arguments is to "sharpen and clarify the issues for resolution by the trier of fact . . . . " *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

> Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed it might sometimes make sense to forgo closing argument altogether.

*Yarborough*, *supra*. Therefore, as in all challenges to effectiveness of defense counsel's actions, this court's review of a defense attorney's summation is highly deferential.

Furthermore, in spite of petitioner's claim counsel should have argued these alleged mental issues satisfied multiple mitigators, the jury outright rejected this evidence, finding petitioner did not commit the offenses under severe mental or emotional disturbance. Cr. Dkt. # 229, at p. 6. To the extent the jury did not believe the mental health testimony was mitigating, it is pure speculation to suggest the jury would have viewed the evidence differently if counsel had argued it fit under several different mitigating factors. Ms. O'Connell's correspondence reveals she was aware she faced a difficult task to convince the jury to rely on her mental health evidence. Dkt. # 110-7. Counsel's criminal trial experience clearly gave her the ability to make a strategic decision as to the best way to argue the mental health evidence to the jury.

14

Fields argues failure to find the uncontested mental health evidence[7] was mitigating violates the Eighth Amendment. The government makes a compelling argument that this claim has been procedurally defaulted. Whether or not the claim has been defaulted, this court finds no authority to suggest that a jury is automatically required to find uncontested mental health evidence automatically qualifies as a "mitigating factor." Rather, the Supreme Court has suggested complete jury discretion is constitutionally permissible so long as the jury is not precluded from considering any relevant mitigating evidence offered by the defendant to support a sentence less than death. *See, Graham v. Collins*, 506 U.S. 461, 508, 113 S.Ct. 892, 919, 122 L.Ed.2d 260 (1993) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). The Eighth Amendment simply requires jurors be allowed to consider and determine for themselves the existence and weight to be accorded alleged mitigating factors. *See, Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

Additionally, regardless of the reasons counsel did not followup with an MRI,[8] in light of the results of a 2011 MRI, this court finds petitioner has failed to establish prejudice based upon counsel's failure to investigate and/or present evidence of his alleged organic brain damage. While Petitioner urges this court to disregard the post-trial information of Dr. James Seward regarding a peer-reviewed psychological and neuropsychological evaluation of

---

[7]Fields argues "counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations." Dkt. # 106, at ¶ 16. There is nothing within the record to indicate the jury was prevented from considering **any** of the evidence which they heard at trial.

[8]In February, 2005, counsel advised the United States Attorney's office that the cost of a PET scan was $35,000 and suggested the prosecution team should absorb this cost. Thus, the cost of a brain imaging scan clearly played a role in counsel's decision to rely on their expert testimony and forego conducting a brain scan. *See*, Dkt. # 106-8.

15

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 327   Restricted

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 327 of 429
6:10-cv-00135-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 16 of 93

Fields, Dkt. # 110-23, because it did not exist at the time of trial,[9] it is petitioner's burden to establish prejudice. The government's burden is to rebut the arguments presented by petitioner.

To support his argument that counsel was ineffective for failing to investigate and present evidence of his organic brain damage, petitioner submitted a neuropsychological examination report dated April 1, 2010, by Daniel A. Martell, Ph.D, Dkt. # 106-10. Dr. Martell claims the report of Dr. Price unequivocally demonstrates organic impairment in the frontal lobes. In that report, Dr. Martell indicates "any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments (sic) Mr. Fields' brain functioning, primarily involving frontal lobe functioning", *id*., at p. 13, and "Mr. Fields has experienced a catastrophic loss of brain function over the past five years." *Id*., at p. 17. Dr. Martell goes on to state that "[t]his apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve (sic) functioning." *Id*. In addition, petitioner submits an affidavit from Dr. Grinage, which state "[i]t is highly likely that [Fields] has frontal lobe impairment that would affect his bipolar behavior and treatment." Dkt. # 106-4. To rebut Field's argument that he has significant brain impairments which trial counsel failed to follow up on, the government had the right to rely on current psychological testing, including an MRI of his brain. To hold otherwise, would allow post-conviction counsel to make arguments which could never have been proven at trial even if trial counsel had taken the very steps which post-conviction counsel argue they should have taken. While petitioner cites to, *United States v. Gonzalez*, 98

---

[9]*See*, Dkt. # 119, at pp. 31-32.

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 328   Restricted
6:03-cr-00073-RAW    Document 305-15   Filed in ED/OK on 05/26/20   Page 328 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 17 of 93

Fed.Appx. 825, 832 (10th Cir. 2004), an unpublished Tenth Circuit opinion, for the proposition that this court cannot resolve differences among the parties mental health experts without an evidentiary hearing, petitioner submits nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011 was normal.

Fields further argues the trial counsel failed to object when the Government "brought out harmful, but limited, testimony from Dr. Price regarding brain damage." Dkt. # 106, at p. 47. A review of the testimony, however, reveals interposing an objection to the limited testimony elicited by the government which briefly indicated Fields "cognitive processes . . . . . were intact"[10] and Price's statement he "thought there was probably going to be some brain dysfunction"[11] would have drawn the jury's attention to the testimony. Giving counsel's desire to limit the jury's exposure to such testimony, this court finds counsel's decision to not object was a reasonable trial strategy. Again, to the extent Fields does not have organic brain damage, counsel's limited cross-examination of Dr. Price was not ineffective. Nor did this brief testimony likely impact the outcome of the trial. Therefore, this court finds petitioner has failed to establish prejudice.

Petitioner also is dissatisfied with counsel's decision to not call his local medical professionals, *i.e.*, two psychiatrists who treated him while he was in custody - Joyce Bumgardner and Larry Trombka - and a physician and physician's assistant who treated petitioner prior to the murders - Dean Anderson and R.L. Winters, respectively. This testimony, however, was cumulative to the evidence, discussed above, which was presented

---

[10]Tr. of Jury Trial, Vol. XII, at p. 3106.

[11]Tr. of Jury Trial, Vol. XII, at p. 3154.

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 329    Restricted

6:03-cr-00073-RAW    Document 305-15    Filed in ED/OK on 05/26/20    Page 329 of 429
6:10-cv-00115-RAW    Document 125    Filed in ED/OK on 12/15/16    Page 18 of 93

at trial through defense experts, Dr. Grinage[12] and Dr. Woods.[13]  Moreover, trial counsel used this evidence in closing arguments to remind the jury that Fields had reported auditory hallucinations prior to the murders.[14]  Counsel's failure to call witnesses whose testimony is cumulative of evidence already presented at trial is not considered constitutionally deficient performance.  *Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007).  Since evidence which is essentially cumulative would not have led the jury to reach a different result in the sentencing phase of a capital case, failure to present such evidence could not have prejudiced the defendant.  *Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th Cir. 2001).  Petitioner has failed to establish his attorneys actions regarding this omitted testimony rendered their assistance ineffective or that he was prejudiced thereby.

Petitioner further attacks counsel's failure to investigate and present evidence regarding how the use of Effexor correlates with compulsive aggression.  Petitioner then cites to an FDA public health advisory asking manufacturers of ten anti-depressant drugs, including Effexor, to alter their labeling to include a "warning statement recommending 'close observation' of patients being treated with these drugs for increased depression or suicidality and noting that '[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania . . . .'"  Dkt. # 106, at p. 57 (bold in original).  Yet, the two experts presented by counsel attributed Fields behavior to the effects of Effexor.  First, Dr. Grinage opined Fields

> . . . . . had gone for some time with a depression that alternated with bipolar-like symptoms and could probably have been diagnosed with bipolar had it been recognized.  And when given multiple fail trials of antidepressants which

---

[12]Tr. of Jury Trial, Vol. XI, at pp. 2795-2810, 2821, 2893-2894.

[13]Tr. of Jury Trial, Vol. XII, at pp. 2978 - 2995 and Vol. XIII, at pp. 3209-3210.

[14]Tr. of Jury Trial, Vol. XIV, at p. 3442.

you might expect with a bipolar patient given an antidepressant with some norepinephrine activity that he developed an irritable manic mania. He went from depression or mixed depression manic state into a more irritable state. He continued to have depressive symptoms, so, he was - - in essence, he may have been completely in a mix, both depression and mania, but, he tended to have more of a diagnosable irritable mania as he described classically an increase in his rushing thoughts, hearing the voices more frequently and having anxiety associated with the voice.

Tr. of Jury Trial, Vol. XI, at pp. 2814-2815. Thereafter, Dr. Woods discussed "mania" and indicated that newer studies showed "often mania does not show up as   just pure grandiosity but that it really shows up in irritability, in spontaneous anger, in kind of this inability to control your anger." *Id*., Vol. XII, at p. 2953. Dr. Woods further discussed the pharmacological literature surrounding Effexor, testifying:

[w]hen you look at the literature - - not the PDR, not the Physicians Desk Reference, because the Physicians Desk Reference is not a learned treatise by any stretch of the imagination. But when you look at the actual literature, pharmacological literature, you see that Effexor has a significant incidence of flipping people into mania, of making that switch. When a person switches into mania, they often become - - their judgment becomes increasingly impaired.

*Id*., at p. 2990. Fields' argument that counsel would have learned that patients treated with Effexor "experience increased rates of compulsive aggression" is just another way of saying what defense experts actually said, *i.e.* Effexor increases the incidence of causing spontaneous anger, irritability or inability to control your anger. Therefore, this court finds counsel were not ineffective for failing to hire more experts who would have said the same things about the potential side effects of Effexor.

Finally, Petitioner states trial counsel failed to thoroughly and properly prepare their mental health experts. While trial counsel failed to provide Dr. Grinage with the transcript of Fields' change of plea hearing or to inform Woods of a pertinent statutory mitigator, this court finds petitioner has not established any prejudice occurred as a result of these oversights. Rather, as noted by the government, both experts testified consistent with the

19

written opinions they rendered before Fields entered his guilty pleas and defended their

conclusions on cross-examination.  Fields has failed to establish counsel was ineffective in

investigating, presenting and/or arguing his mitigating mental health evidence.

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 332   Restricted

6:03-cr-00073-RAW   Document 305-1   Filed in ED/OK on 05/26/20   Page 332 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 21 of 93

*B. Failure to investigate, present and argue evidence rebutting aggravating factors*

In his third ground for relief, Petitioner claims trial counsel's failure to challenge the statutory aggravating factor of substantial planning and premeditation and the non-statutory mental anguish aggravator violated his right to effective assistance of counsel. Moreover, Petitioner contends the government presented false and misleading testimony and argument in support of the substantial planning and premeditation factor thereby violating his right to due process guaranteed by the Fifth Amendment.

   1. Substantial planning and premeditation

In regard to this aggravating factor, the jury was instructed as follows:

> The government seeks to prove that the defendant committed the offense of murder after substantial planning and premeditation to cause the death of Charles Glenn Chick, Jr. and/or Shirley Elliot Chick. "Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand. "Substantial planning" means planning that is ample or considerable for the commission of the crime at issue.

Cr. Dkt. # 227, at p. 22.

Petitioner argues counsel was ineffective for failing to conduct a reasonable investigation by asking his friend and government witness, Daniel Presley, about his knowledge of ghillie suits and rifles with scopes. First, he claims Presley would have testified that "ghillie suits and ghillied weapons were common among hunters in the area."[15] He also claims Presley "would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles;"[16] and "Fields attached the scope to his rifle at least a year before the homicides."[17] Additionally, Fields

---

[15]Dkt. # 14, at p. 50; Dkt. # 106, at p. 61; and Dkt. # 106-21, at p. 4.

[16]Dkt. # 14, at p. 50; Dkt. # 106, at p. 68; and Dkt. # 106-21, at p. 5.

[17]Dkt. # 14, at p. 50; Dkt. # 106, at pp. 68-69; and Dkt. # 106-21,  at p. 6.

21

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 333 of 429
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 333 Restricted
6:10-cv-00115-RAW Document 125 Filed in ED/OK on 12/15/16 Page 22 of 93

asserts Presley could have rebutted the government's claim that he had tried to set up an alibi for the night of the homicides by testifying that Fields had asked him to go snake hunting on the night of the murders. Finally, Fields argues a reasonable investigation, including consulting with an independent crime scene investigator, would have found evidence to refute the government's allegations that Fields returned to the crime scene many hours after the shooting to "stage" a robbery. Dkt. # 14, at p. 66; Dkt. # 106, at pp. 71-79; and Dkt. # 106-24. According to Fields this additional testimony would have rebutted the substantial planning and premeditation aggravating factor.

If this testimony had been elicited, however, it would not have changed the defendant's own statements regarding the what he had done on the evening of July 10, 2003, which were introduced through Special FBI Agent Graff. In particular, Agent Graff begin by telling the jury that the defendant originally denied having any firearms and stated that he did not hunt. Tr. of Jury Trial, Vol. IX, at pp. 2249-2250. Additionally, Fields originally denied having been to the Winding Stair campground and told the FBI agent he had made a ghillie suit approximately four years before, but he had thrown it away about two or three years ago. *Id*., at pp. 2255-2256. Finally, Fields initially denied shooting the Chicks. *Id.*, at pp. 2256-2257.

Once confronted with the facts known by Agent Graff,[18] Fields changed his story and admitted that he had killed the Chicks. *Id*. In his confession to the FBI, Fields stated he went to the Winding Stair Campground on the evening of the 10th to use the bathroom. When he arrived at the campground, "he observed the Chicks over at the vista, which was an overlook

---

[18]These facts included: 1) defendant's truck had been seen at Winding Stair on the evening of the 9th; 2) agents were in the process of searching his truck; 3) a .22 rifle had been found behind the seat in his truck and it appeared to be consistent with the firearm that was used in the killings of the Chicks; 4) a ghillie suit had been found in the back of his truck which contained fibers that appeared to be consistent with fibers found at the crime scene and 5) items secluded under a blanket in his truck appeared to be personal items which belonged to the Chicks, including a camera and a portable Casio T.V. *Id*., at pp. 2257-2259.

which overlooks the valley to the north.  And he described the vista as being approximately seventy-five yards from their campsite." *Id*, at p. 2261.  Upon seeing the Chicks, Fields "put on his ghillie suit and took his [.22 caliber] rifle and went over in the woods and secreted himself in the woods near their campsite." *Id*.  Fields could not say how long he watched and waited for them to come back from the vista; but he observed them for approximately fifteen minutes after they had returned to the picnic table at their campsite before he crept up, on his belly, closer to their campsite (taking another five minutes) and when he heard Mr. Chick say he was going to the tent, he fired a shot into Mr. Chick's head.  *Id*., at pp. 2263-2267.  After shooting Mr. Chick, Fields told Agent Graff he moved closer to the campsite; Shirley Chick had gotten up from the picnic table and was running towards the van, so he fired two to three shots at her as she ran.  *Id*., at pp. 2267-2268.  Fields approached the van and shot Ms. Chick in the head at least two times.  *Id*.  Thereafter, Fields told the FBI that he went back to the picnic table and because he thought Mr. Chick might still be alive, he shot him in the head a second time.  *Id*., at p. 2268.  Further, Fields stated he then removed forty dollars from Mr. Chick's pants pocket, which he kept.  *Id*., at p. 2270.  Fields continued his confession to the FBI, indicating he went back to his truck, took off his ghillie suit and drove back to the Chicks' campsite, picked up a rock, broke the window of the van and took personal items of the Chicks from the van.  *Id*.  Following his interview with the defendant, the FBI agent wrote a synopsis of what Fields had said.  It was introduced as Government's Exhibit 131 and read to the jury.  The written confession stated the following:

> I, Edward L. Fields, have been advised of my Miranda warnings pursuant to my arrest for shooting Charles and Shirley Chick resulting in their deaths.  I waive my Miranda rights and voluntarily provide the following written statement.
> On approximately Tuesday, July 8th, 2003, I observed a man and woman, whom I later determined to be Charles and Shirley Chick, camping at the Winding Stair Campground.  My purpose for being there was to use the bathroom.  The Chicks appeared to be using a tent and a blue van.

23

During the evening hours of July 10th, a Thursday, I returned to Winding Stair Campground to use the bathroom. Just before dark, I observed the Chicks at the vista approximately seventy-five yards from their campsite. I dressed myself in a guillie (sic) suit, and with a .22 caliber rifle crept up close to their campsite and waited for them to return.

I had been short of money all week and intended to rob the Chicks. The main reason I was short of money was because of child support payments I have to pay. My intent was to rob the Chicks at gunpoint, tie them up, and leave.

The Chicks returned from the vista and were sitting at the picnic table at their campsite. I remained concealed in the woods for about fifteen minutes after their returning to the campsite.

At one point Charles Chick said he was going to the tent. I shot Charles Chick with one shot to the head. I then shot at Shirley Chick a couple of times. I followed Shirley Chick to the van and shot her twice in the head. I then returned to Charles Chick and shot him once in the head. I removed forty dollars cash from Charles' pants pocket.

I returned to my truck, a blue Chevrolet, parked about seventy-five yards away, and brought my truck over to the Chicks' campsite. I broke the driver's side window out of the Chicks' van using a rock. I removed the Chick's van -- I removed from the Chicks' van two backpacks, a camera with a long lens, a mini television, Charles Chicks' wallet, a battery charger, two mini flashlights and a radar detector. One mini flashlight, the camera, the mini television, and the radar detector remain in my truck at the present time. I disposed of one of the backpacks, which included the battery charger at Kerr Lake. I disposed of the other backpack which contained Charles Chick's wallet, Shirley chick's purse and a rock in Lake Wister. I recovered $300 from Shirley Chick's purse before I disposed of it.

Both Charles and Shirley Chick were dead when I left their campsite the evening of July 10th. After leaving the Chicks' campsite, I returned to my campsite located near Lake Wister. Between the hours of 7:00 and 8:00 a.m. on Friday, July 11th, I purchased gasoline at the Wal-Mart in Poteau using Charles Chick's credit card.

During the week prior to July 10th, I had been very depressed. I had felt suicidal. I had no money, and I felt desperate. Since shooting the Chicks, I have felt very sick and very remorseful. I would like to tell the Chicks' family and relatives that I am sorry for this incident.

I make the above voluntarily. The above statement, Pages 1 through 3, are true and accurate.

Signed by Edward Fields, 7-18-03, witnessed by myself, Agent Jones and Donnie Long.

*Id.*, at pp. 2280-2283.

In addition to the defendant explicitly admitting he had seen the Chicks two nights prior to the murders, that he stalked them for at least fifteen minutes before shooting them like animals, evidence supporting the substantial planning and premeditation aggravator was

24

introduced thru several other witnesses.  First, Ms. Hairrell testified she helped make a "sniper suit"[19] for the defendant a few years before the murders.  She asked the defendant several times what the suit was for and the defendant never would answer.  *Id.*, at pp. 2326-2331.  On one occasion when Ms. Hairrell saw the defendant's rifle, the defendant said "[h]e could shoot anybody a hundred yards off."  *Id.*, at pp. 2329.

Carol Lamb testified, on June 15, 2003, she accompanied the defendant to Atwoods where he purchased gunny sacks.  Later that day, Ms. Lamb helped the defendant cut the gunny sacks into strips.  When Ms. Lamb observed the defendant tying the strips to his rifle, she asked him what he was doing and "[h]e just kind of laughed it off and said, 'You don't want to know.'" *Id.*, at pp. 2238 and 2340.  Additionally, the defendant admitted to Ms. Lamb that he had previously snuck up on a couple while wearing his ghillie suit.  *Id.*, at p. 2348.

On July 7, 2003, the defendant told his friend, Daniel Presley, he had seen a couple parked in a car and he had snuck up on them in his ghillie suit.  *Id.*, at p. 2377.  Another witness, Brenda Stacy, also heard the defendant say "You don't really want to know" when asked what the ghillie suit in the bed of his truck was for.  *Id.*, p. 2421.  Further, Marilyn Presley testified on July 7, 2003, the defendant also told her, he had donned his ghillie suit and watched a couple in a car for a few minutes.  *Id.*, Vol. X, at p. 2463.

Charles Love testified about the defendant telling him he had worn his sniper suit "on Talimena Drive and had slipped upon on a couple of people on Talimena Drive."  *Id.*, at p. 2487.  This incident occurred sometime in the spring of 2003.  *Id.*, ap p. 2486.  Mr. Love indicated the defendant had told him that he got within 20 yards of this couple and they did

---

[19]This was the term the defendant used to refer to the ghillie suit.  *Id.*, at p. 2331.  *See also*, Tr. of Jury Trial, Vol. X,  at p. 2486.

25

not know he was there. *Id.* A couple of weeks after this incident, the defendant asked Mr. Love about making a silencer. *Id.*, at pp. 2487-2488.

Finally, Dawn Michelle Bond testified the defendant called her from the Poteau Police Department to tell her "that he was in jail for murdering the people that I had joked with him about murdering." *Id.*, at p. 2584. During the course of her testimony, Ms. Bond said the defendant had told her he had watched the victims have sex in their car on some day prior to the shootings. *Id.*, at p. 2583.

All of this evidence establishes the defendant planned these murders for at least two days, if not substantially longer, prior to actually committing them. Even if Presley had testified about lawful uses of ghillie suits and rifles with scopes, that Fields had attached the scope to his rifle at least a year before the murders or that "lots of guys who use ghillie suits also ghillie their guns,"[20] it would not have lessened the impact of the evidence the jury heard regarding Fields ghillying his rifle less a month before the murders; his statements to so many people that they didn't want to know what his ghillie suit was for; the fact that the defendant became proficient in sneaking up on people while wearing his "sniper suit;" or finally, his statements that he drove to a secluded area, laid in wait for over fifteen minutes (even crawling closer on his belly) before killing two unsuspecting campers in cold blood. Each of these actions established the substantial and methodical planning and premeditation that went into the murders of these two innocent campers which the defendant ultimately carried out on July 10, 2003. Moreover, whether or not the defendant knew he was definitely going in for the kill when he told Ms. Tipton he would not be over because he would be going "fishing" with Presley, does nothing to lessen the substantial amount of planning which defendant engaged in to finally fulfill this human hunting expedition.

---

[20]Dkt. # 106, at p. 68 and Dkt. # 106-21 at p. 6.

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 338   Restricted

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 338 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 27 of 93

Fields continues his attack on counsel's investigation by arguing counsel was ineffective for failing to consult an independent crime scene investigator. According to Fields, if counsel had consulted with such an expert, counsel could have introduced evidence contradicting an Oklahoma State Bureau of Investigation (O.S.B.I.) agent's testimony that Fields staged the robbery many hours after the shootings and/or suggested cross-examination questions to challenge the accuracy of the testimony regarding glass fragments and/or blood flow evidence at the scene. During the trial, Agent Dalley testified as a crime scene investigator, having expertise in blood stain pattern analysis and crime scene reconstruction. Tr. of Jury Trial, Vol. VIII, at p. 2080. Agent Dally indicated she was called to the scene on July 11, 2003, at which time she took numerous photographs of both of the victims and different areas of the victim's van. Many of the photographs taken at the scene were introduced in the trial. Agent Dalley explained each of the photographs to the jury and discussed gravity blood flow patterns depicted within those photographs, including pooling on the pavement , around the victims and in the victims' clothing. The agent also described blood spatter on Ms. Chick's face and while the photograph depicting this blood was not admitted into evidence, Dalley testified, after reviewing the photograph, she believed the only source for the blood on Ms. Chick's left cheek was from one of Mr. Chick's wounds. According to Dalley, Ms. Chick would have been approximately two feet from Mr. Chick when he sustained a gunshot wound thereby spraying high velocity spatter onto Ms. Chick. *Id.*, at pp. 2082-2091. Dalley further testified she observed glass fragments at the scene of the murders which were consistent with the broken driver's window of the van. Dalley surmised, because there was no blood stains on these fragments, that the glass had to have been shattered, at least an hour, after the murder in order to allow the blood to dry enough that it was not transferred to the glass on contact. *Id*., at p. 2099.

Petitioner now claims

Agent Dalley's testimony that the glass fragments found resting on a dried pool of Mrs. Chick's blood were not stained with blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. In her report, Agent Dalley recorded no observations about these glass fragments, nor did she note whether she examined the fragments at the scene or collected them for later examination.

Dkt. # 14, at p. 66. *See also*, Petitioner's Exh. # 22, Dkt. # 106-23. Defense counsel, however, got Dalley to admit on cross-examination that she did not collect any of these glass fragments. Tr. of Jury Trial, Vol. IX, at p. 2216-2217.

Petitioner further claims the government argued he left the campground after shooting the Chicks and returned several hours later to stage a robbery and that this argument "was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal." Dkt. # 106, at p. 71. Based upon the evidence in this trial, the court does not believe the length of time after the murders the robbery occurred was relevant to the jury's finding beyond a reasonable doubt that the "substantial planning and premeditation" aggravator applied to these murders. The defendant admitted in his confession that he took $40 from Mr. Chick's pocket right after the murders, then he left the victim's campsite, returning with his truck to complete the robbery. Nowhere does his confession indicate the length of time he was in his truck before he returned to the victim's campsite and completed the robbery, Tr. of Jury Trial, Vol. IX, at pp. 2281-2282; but, again, this was not relevant. As a result, the court finds it was not unreasonable for defense counsel to not consider hiring experts to contest evidence related to the robbery.

Next, petitioner argues trial counsel should have "attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot." Dkt. # 106, at p. 76. Nowhere does Fields state that he advised

28

counsel that this evidence was not accurate; yet, Fields would have been the one person who would have known how long after the murders he moved the bodies.  If counsel did not know of facts which would alert her to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 892 (9th Cir. 2003).  Moreover, the opinions now proffered by Robert Tressel regarding blood flow and lividity do not convince this court that any reasonable probability exists that his conclusions would have altered the jury's decision in this particular case regarding the substantial planning and premeditation aggravator.  Since Tressel concedes Mr. Chick was found in full rigor 24 hours after his killing, there is no basis for this court to find Tressel's estimations regarding rigor would have undermined the testimony that the body was moved about six hours after death.  In fact, the testimony at trial noted various factors which could have altered the timeline before full rigor mortis occurred and defense counsel adequately cross-examined the witnesses.  *See*, Tr. of Jury Trial, at Vol. VIII, at pp. 2047- 2054; Vol. IX, at pp. 2196-2224;  and Vol. XI, at pp. 2639-2650.  Based on the record before the court, this court finds failure to hire an expert, like Robert Tressel, did not so undermine the proper functioning of the adversarial process such "that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064.  Once again, how long it took the victim to "bleed out" and whether or not the victim was moved from the picnic table within an hour or after six hours is irrelevant to whether or not the defendant engaged in "substantial planning and premeditation" in relation to the actual murders.  Regardless of the government's closing argument, what occurred after the victims were killed was relevant only to establish the defendant's mental state and/or state of mind after the murders.

## 2. <u>Mental anguish</u>

Petitioner also argues his attorneys were ineffective for not contesting the source of the blood spatter on Ms. Chick's face since it could have come from her own head wounds as opposed to being from Mr. Chick's head wounds. Petitioner claims this testimony would have rebutted the mental anguish aggravating factor because it was the only evidence used by the government, in conjunction with what he claims was "sheer speculation designed to inflame the passions of the jury,"[21] to provide a basis for the jury to find the mental anguish aggravating factor. Fields fails, however, to consider many of the facts known both by defense counsel, as she considered how to best defend this case, and the totality of the evidence heard by the jury. The evidence indicated the campground where these murders occurred was fairly rural and isolated. Tr. of Jury Trial, Vol. IX, at p. 2210. Defendant admitted that the victims were sitting at a picnic table when he silently approached and shot Mr. Chick in the head. Corroborating this confession, investigators found two partially empty beverage containers at the picnic table. *Id*., at pp. 2118-2119. The jury could use their common sense in determining that Ms. Chick would likely have heard the shot and seen her husband fall seconds before she began to run for her life, only to be shot in the foot as she attempted to escape to her van. She probably caught a glimpse of the ghillied up creature shortly before her death. While the prosecutor mentioned the blood spatter evidence in regard to this aggravator, his focus was on Ms. Chick's perceptions in the final moments of her life trying in vain to escape death. *See*, *id*., at Vol. XIV, pp. 3415-3418. These facts clearly allowed the jury to find beyond a reasonable doubt that Ms. Chick suffered mental anguish in the last moments of her life. Putting on an expert to opine as to the source of blood spatter

---

[21]Dkt. # 20, at p. 41.

on Ms. Chick's face would not have altered the jury's finding regarding the mental anguish aggravating factor.

Just as mitigating evidence can be important in a capital sentencing trial, defense counsel can not overlook the real risk of offending the jury by contesting points that, based upon a totality of the facts, are insignificant. This is never more important than in a case like this where the defendant is trying to convince the jury that his actions were the result of a manic flip from taking legally prescribed drugs, he has accepted full responsibility, and he wants the jury to believe that his apology to the victims' family was sincere.

There is no question that defense counsel could have hired more experts to contest the government's case. In the last twenty years, defense of criminal cases, especially capital cases, has become much more complex. Experts have sprung up for virtually every aspect of every case. Still all the high dollar experts money could buy would not have overcome the insurmountable task of convincing the jury in this particular case that the defendant deserved anything less than death for these two murders. The emails from defense counsel recognize she knew she was fighting an uphill battle to convince jurors to believe her mental health experts as jurors tend to distrust/discount expert testimony. Dkt. #110-7. To have contested either the length of time which elapsed between the killings and the robbery or the source of the blood spatter on Ms. Chick's face with expert witnesses, would have been counter-productive in convincing the jury that the defendant deserved a sentence less than death if the murders were solely the result of a manic flip from taking a prescription drug. Accordingly, this court finds counsel was not ineffective in failing to investigate or present evidence to rebut these aggravating factors. Moreover, despite counsel "falling on her sword" and swearing she had absolutely no trial strategy, counsel's decision regarding her closing remarks fall within the broad range of reasonable trial conduct under *Strickland*. Counsel emphasized

31

the evidence she wanted the jury to remember in the jury room. Accordingly, no prejudice has

been shown.

## C. Failure to present defendant's social history through mitigation specialist or mental heath expert

Fields further argues counsel's presentation of his social history "was disjointed,

incomplete and unpersuasive." Dkt. # 106, at p. 90. Fields admits trial counsel was aware

that the defense mitigation specialist "had collected compelling evidence" that he "was raised

in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his

mental health and his adult functioning." *Id*., at pp. 90-91. While it is relatively easy in

hindsight to look at an unsuccessful trial strategy and recreate various scenarios of all the

things which could have been done differently, this is the exact type of post-trial exercise the

Supreme Court in *Strickland* cautioned courts from becoming entangled in. The defendant

has a "heavy burden"[22] to "overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S., at 689,

104 S.Ct., at 2065 (citation omitted). This court recognizes that "counsel is strongly presumed

to have rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment." *Id*., 466 U.S., at 690, 104 S.Ct., at 2066. "For counsel's

performance to be constitutionally ineffective, it must have been 'completely unreasonable,

not merely wrong, so that it bears no relationship to a possible defense strategy.'" *Le v.*

*Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citations omitted).

Counsel's duty in regard to mitigation was to conduct a reasonable investigation since

professional decisions and informed legal choices can only be made after an investigation of

---

[22]*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002).

the options.  In this case, there is no question that counsel had fully investigated petitioner's social history.  Thus, despite Ms. O'Connell's affidavit that she had no strategic reason for not submitting Fields history through one of his doctors or through her mitigation specialist,[23] it is clear counsel fulfilled her duty to conduct a reasonable investigation into petitioner's social history.  Decisions regarding which witnesses to call at trial are "quintessentially a matter of strategy for the trial attorney."  *Boyle v. McKune,* 544 F.3d 1132, 1139 (10th Cir. 2008).  Where it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes "virtually unchallengeable."  *Strickland*, 466 U.S., at 690, 104 S.Ct., at 2066.

Moreover, submission of the evidence which Fields now suggests should have been introduced into evidence would not have changed the jury's verdict.  Rather, it would have actually undermined the defense theory that the Effexor caused an anomaly, a one-time switch to flip in Petitioner's brain thereby leading an otherwise law abiding citizen to commit these horrific murders.  The decision not to submit evidence that these murders were, in some way, the product of a long-standing lack of socialization or empathy, caused by a less than idyllic family life  approximately twenty years earlier, would have diluted the defense theory that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies.  Furthermore, evidence Fields was emotionally estranged from his family would have directly contradicted the defense arguments that the death of defendant's father and his mother's illness caused the defendant to experience severe emotional disturbances. Similarly, evidence the defendant had difficulty forming relationships would have undermined the notions that the defendant was remorseful and that he was a loved relative and friend.  Simply put, presentation of additional evidence that petitioner had a dysfunctional upbringing, or was

---

[23]Dkt. # 106-2, at pp. 13-14.

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 345    Restricted
6:03-cr-00073-RAW    Document 305-1    Filed in ED/OK on 05/26/20    Page 345 of 429
6:10-cv-00115-RAW    Document 125    Filed in ED/OK on 12/15/16    Page 34 of 93

cruel and violent toward his relatives, would have substantially weakened, as opposed to strengthening, the defense's mitigation case. Fields has not met his burden to establish counsel's decision to not call the mitigation specialist or put more social history evidence before the jury through a mental health expert was an unreasonable trial strategy.

### D. Failure to object to the government's closing argument deprived the petitioner of his right to individualized sentencing, due process and a fair trial

Petitioner claims the Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase the defense's burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Fields to death based upon irrelevant and inflammatory societal concerns. Dkt. # 14, at pp. 89-90; and Dkt. # 106, at p. 102. Additionally, petitioner claims the prosecutor improperly vouched for its own expert witnesses while denigrating defense witnesses; launched *ad hominem* attacks against petitioner that were irrelevant to any issues in the trial; misrepresented the record and the testimony of witnesses; made arguments not supported by the evidence; and recited Biblical scripture at length. Thus, petitioner claims because this was a "close case,"[24] these alleged errors, individually and cumulatively, resulted in a fundamentally unfair trial thus rendering his death sentence "arbitrary and capricious." Most of the alleged prosecutorial conduct which Petitioner now challenges was not objected to at trial. Of course, "many lawyers refrain from objecting during opening and closing argument, absent egregious misstatements." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir 1993). One reason to refrain from objecting is counsel may simply be calling the jury's attention to something which counsel, observing live jury reaction to, is not overly

---

[24]Petitioner defines "close case" as one in which he "presented a significant case for life and the jury found mitigation to exist." Dkt. # 14, at p. 103.

concerning. *Phyle v. Leapley*, 66 F.3d 154 (8th Cir. 1995). As a result, the failure to object during closing argument is considered within the "wide range" of permissible professional legal conduct. *Necoechea*, 986 F.2d, at 1281. In an effort to overlook this arguably permissible conduct, petitioner asserts appellate counsel were ineffective for failing to raise these issues on direct appeal. Petitioner further argues, because of counsel's ineffective assistance, he was "deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence." *Id*. Petitioner also argues his Fifth Amendment rights were violated because the government presented false and misleading testimony to support the substantial planning aggravating factor. The government argues Fields' claims of prosecutorial misconduct are procedurally barred.

In an effort to bolster his ineffective assistance of counsel claims, Petitioner complains of prosecutorial misconduct. Inappropriate prosecutorial comments, standing alone, will not justify reversal since the statements must be reviewed in context. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). In a § 2255 action, relief for prosecutorial misconduct is only appropriate "when the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[F]or due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987).

> To establish that a prosecutor's remarks were so inflammatory that they prejudiced substantial rights, a petitioner must overcome a high threshold: he or she must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty.

*Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006).

35

Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 347    Restricted

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 347 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 36 of 93

As previously indicated, however, § 2255 "is not available to test the legality of matters which should have been raised on appeal." *United States v. Khan*, 835 F.3d 749, 753 (10th Cir. 1987), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988). As can be seen, to overcome this procedural bar, petitioner argues he received ineffective assistance of appellate counsel. The Sixth Amendment does not require an attorney to raise every nonfrivolous argument on appeal. Rather, the relevant questions in this proceeding are whether appellate counsel was "objectively unreasonable" in failing to raise these issues on direct appeal and, if so, whether there is a reasonable probability that, but for his counsel's unreasonable failure to raise these claims, he would have prevailed in his direct appeal. *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue on appeal, the court considers the merits of the omitted issue. *Id*. (citations omitted). Therefore to resolve this claim, this court will focus on the merits of the alleged prosecutorial-misconduct claims.

Initially, Fields argues the prosecutor misstated the law regarding the weighing of mitigating and aggravators, this court erred in overruling the objection of trial counsel and appellate counsel was ineffective for failing to raise this issue on appeal. The specific rebuttal portion of the closing arguments challenged by Fields contained the following statements:

> MR. SPERLING:  . . . . . . . . . . .Let's remember and honor the two people who are unable to be here. The aggravating factors have been proved beyond a reasonable doubt. The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie. The mitigating factors - - (Interrupted)
>
> MR. DERRYBERRY:    Objection to that based on the law.
>
> THE COURT:    Overruled.
>
> MR. SPERLING:    The mitigating factors - - and I submit all of this to you based on the evidence that has been admitted - - do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant. She sought to

36

escape the monstrous form the Defendant had chosen to
assume in the final moments of her life.

Tr. of Jury Trial, Vol. XIV, at pp. 3462-3463.

While petitioner argues the prosecutor's comments seemed to imply the mitigating factors had to outweigh the aggravating factors, taken in context this does not appear to be what the prosecutor was saying. Rather, the prosecutor was attempting to emphasize how, despite the mitigating evidence, the crime was so calculatingly heinous that the jury should easily find the aggravating factors outweighed all mitigating factors. Moreover, the court properly instructed the jury on how to weigh the aggravating and mitigating evidence, stating:

> The second step involves a weighing process. You must decide whether the proved aggravating factors outweigh the proved mitigating factors sufficiently to justify the death sentence. (If you do not find any mitigating factors, you still must decide whether the aggravating factors are sufficient to justify imposition of a death sentence). If you determine as a result of this weighing process that the factors do not justify a death sentence, such a sentence may not be imposed, and your deliberations are over.

Cr. Dkt. # 227, at p. 6; Tr. of Jury Trial, Vol. XIV, at p. 3384. The court also instructed the jury: "You must determine whether the proven aggravating factor[s] sufficiently outweigh any proven mitigating factor[s] to justify a sentence of death." *Id.*, at p. 28; and p. 3403. Therefore, this court finds counsel's failure to raise this issue on direct appeal was not objectively unreasonable.

Next, Fields argues his counsel was ineffective for failing to object to prosecutorial comments during closing arguments regarding defendant's plea for mercy. In particular, Fields focuses on the following comments of the prosecutor:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and what he's done for the last two and a half years and say, oh,

37

6:03-cr-00073-RAW Document 305-1 Filed in ED/OK on 05/26/20 Page 349 of 429
6:10-cv-00115-RAW Document 125 Filed in ED/OK on 12/15/16 Page 38 of 93
Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 349 Restricted

there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

Tr. of Jury Trial, Vol. XIV, at p. 3430. Thereafter, during rebuttal, the prosecutor said:

Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs, (sic) like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates. All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice, give him what he deserves.

**The Defendant wants to choose a sentence.** He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick? You know, the Defendant made Shirley do something she would never have done, never have done, unless she knew there was absolutely nothing she could do for her dying husband, her best friend. This Defendant made her do something she would never have done unless she knew her life was in absolute, absolute jeopardy. And if we have to go much farther down the aggravating factor road that (sic) Shirley's fightingly horrible murder, there is something really wrong with us. This disturbing criminal conduct is far beyond the capital line. The Defendant didn't need to commit this murder. Even if we concede that the robbery was the motive, he said he had $500 in Michelle's panty drawer. Danny said he had seen the Defendant more broke. Michelle told him that he could move in within a day or so. He wanted the thrill of the kill. And even if we concede that robbery was a motive, the most we could argue is that he thought with premeditation and deliberation if I'm going to rob them and kill them, I may as well kill them and rob them. That's no excuse.

Sympathy. It's hard not to feel sympathy for the Defendant's family members. He abandoned them though. He abandoned them. Only resurrecting contact with them conveniently now that he's in jail. . . . . What did his former wife say about him? Do you remember that one word? Selfish. Selfish. Narcicisstic. (sic) It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his on (sic) widowed mother move halfway across this country. Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life. We can only imagine what Shirley must have said in the waning moments of her life. She came face to face with a killer who wore this suit. The Defendant's best friend now is down to a monthly phone call. Whatever he does for other people is far outweighed by what he has done. He has paid for membership in the club of the most hardened, the worst group of criminals. Remorseless, wanton, senseless, without any empathy or feeling, no emotion for a wonderful man and woman whose lives he extinguished that with six semi-automatic gun shots.

*Id*., at p. 3457-3459 (emphasis added by petitioner).

38

Petitioner argues these comments urged the jury to reject mercy based on the evidence and invited the jurors to sentence him to death simply for exercising his Eighth Amendment right to individualized sentencing. This court disagrees. These comments simply focused the jury's attention on the aggravating nature of these crimes and was based upon the evidence before the jury. Moreover, the jury was instructed they could consider mercy (and petitioner's own trial counsel advised the jury - "Mercy is not precluded."),[25] the defendant's lack of remorse, the mental anguish the defendant inflicted on Shirley Chick, his value as a friend, his value as a family member and the impact his death would have on his relatives and friends. *See*, Cr. Dkt. # 227, at pp. 6, 23, and 25-26. Attorneys are given wide latitude during closing arguments and challenged remarks must be evaluated in the context of the trial as a whole. *United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013). Since each of these subjects were before the jury, the court finds they were proper topics for the prosecutor to touch upon during closing arguments and such comments did not result in a fundamentally unfair trial.

Fields continues his challenge to the prosecutor's closing arguments by alleging the prosecutors improperly "invoked societal concerns about lenient sentences and recidivism." Dkt. # 106, at p. 105. Fields focuses this argument on the following comments of the prosecutors:

> Ladies and gentlemen, when you look around this courtroom you see a lot of people. They haven't come here to see me or Mr. Sperling or defense counsel or not even the judge. They've come here to see justice. They've come here to see what you are going to do today. Because today you are justice. You decide what is right. You decide what is wrong. You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know (sic) longer have that luxury. We ask you to do what's right, ladies and gentlemen.

---

[25]Tr. of Jury Trial, Vol. XIV, at p. 3443.

Tr. of Jury Trial, Vol. XIV, at p. 3431. These comments were made right as the prosecutor's first closing arguments concluded. Although the court does not really understand the reference to giving "probation to a child molester," it is clear all the prosecutor was telling the jury was that the decision as to an appropriate sentence in the case was solely their decision. Fields continues, however, that "these sentiments were echoed in later comments, invoking popular opinion that prison was to easy on criminals." Dkt. # 106, at p. 105. The rebuttal comments to which Fields objects seem designed to convince the jury that petitioner's crimes warranted greater punishment than lifetime incarceration and have already been discussed by this court. Furthermore, this court finds the prosecutor's comments suggesting incarceration would be an inadequate sentence, was an appropriate response not only to the defense counsel's suggestion that life imprisonment would be spent in a space smaller than the jury box[26] but also to the testimony during trial of Daniel Presley[27] which described various things inmates could do in prison such as working, receiving visitors, receiving and sending mail, reading and watching television.

Claiming the mental health experts' credibility was a "critical aspect of the trial," Petitioner continues his attacks on the prosecutor's closing arguments by arguing the prosecutor improperly embellished and bolstered the testimony of its mental health experts and improperly vouched for their credibility, while denigrating the defense experts. Dkt. # 106, at p. 106. To support his argument, petitioner highlights terms contained in the prosecutors' arguments, such as "high dollar shrinks," "hired guns," "from the left coast," "an axe to grind" and "an honest opinion." Dkt. 14, at p. 80.

---

[26]Tr. of Jury Trial, Vol. XIV, at p. 3442.

[27]Tr. of Jury Trial, Vol. IX, at pp. 2405-2406 and 2408-2409.

Appellate Case: 20-7026 Document: 010110353486 Date Filed: 05/28/2020 Page: 352 Restricted
6:10-cv-00115-RAW Document 1-25 Filed in ED/OK on 12/15/16 Page 41 of 93

To the extent that there is no bright red line separating acceptable advocacy from improper advocacy, prosecutors have sometimes breached their duty to refrain from overzealous conduct by commenting on a defendant's guilt or offering unsolicited personal views on the evidence. *United States v. Young*, 470 U.S. 1, 7-8, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985). As a result, the federal courts have been required to police prosecutorial misconduct. In order to assist the courts, the legal profession has developed Codes of Professional Responsibility. *Id.* The American Bar Association's Standing Committee on Standards for Criminal Justice has complemented these efforts by developing Criminal Justice Standards, one of which states:

> The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

ABA Standards for Criminal Justice 3-5.8 (b)(3rd ed. 1993). The Unites States Attorney acts as a representative of a sovereignty whose obligation is to govern impartially. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935). In this role, a federal prosecutor becomes a

> servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not a liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id*.

Use by a prosecutor of "we know" statements in closing arguments should generally be avoided because such statements can blur the line between improper vouching and legitimate summary. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). An argument will be considered improper vouching "only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit

personal assurance of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witnesses' testimony." *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005)(quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990)). "[I]t is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility." *Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005).

The prosecutor in this case said the following, during the first closing remarks, in regard to the expert witnesses:

> Our doctors came in, ladies and gentlemen, and told you a number of different things also and I'll just run through those quickly because obviously they had a different opinion. They thought most of the Defendant's problems were based upon his depression. Kind of look at - - who do I believe? Which is the one for me? Who am I going to believe out of this? What does Dr. Price tell you? He tells you he's done hundreds of these things. And over half the time, 60 percent of the time, he testifies for the defendant. He told you he fully expected to find some type of mental illness here but didn't. He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left (sic) coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns. Dr. Mitchell - - and he may be the best one of all, one because he's never been a witness before in a criminal case. He's in charge of a well-recognized psychiatric care center. He comes in and he says I've never testified before. I'm just doing the best I can. But I did this evaluation and, yeah, I did give some credence to the voices. I thought the voices may be part of his problem. Whether or not he actually heard them I can't tell you, but they may be part of it. He even tells you with that knowing with the voices, he had the ability to conform his conduct to the requirements of the law. These were volitional choices on this Defendant's part. Dr. Mitchell who has no axe to grind here, ladies and gentlemen.

Tr. of Jury Trial, Vol. XIV, at pp. 3429-3430. During rebuttal arguments, the prosecutor returned to topic of experts stating:

> . . . . The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness. He was just emotionally variable. Even united bipolarities, Dr. Price, I'm mostly on the low side, he says. High dollar shrinks were hired by the defense and we paid ours as well. I respectfully submit, thought (sic), that

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 354 of 429
Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 354   Restricted
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 43 of 93

Randy Price and Jeff Mitchell were straight shooters.  Not hired guns.  The defense got to substantially determine the parameters, we were told, of Dr. Price's exam.  They both came into this case with an open mind, open to the prospect that the defense might be right.  They found them wrong.  Sure, the Defendant was depressed, but no evidence exists of bipolarity or mania.  He now wants us to bail him out after he wrecked his life.  People who experience traumatic, even depressing circumstances in their life are obligated at a minimum not to lash out at innocent people.  The defense experts, one from far away, with a 60 to zero record, he has never testified for the Government.  Every single time he testifies, sixty to zip, is for the Defendant.  There's no evidence of mania here.  The spending spree was a rational criminal effort to impress Michelle.

*Id.*, at p. 3452.

While this court might have sustained an objection, if it had been made as soon as the prosecutor stated, in regards to Dr. Price:  "He has a lot of credibility";[28] the comment was immediately followed by a statement derived from evidence in the record which established that Dr. Price did not always testify for the defense.  In context, this statement was not error.

The prosecutor went farther, however, by stating:  "We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns."  *Id*.  This statement shows how quickly an argument can enter into the "gray zone"[29] between acceptable and improper advocacy.  When considered, however, in context with the evidence introduced in this particular case this court finds the prosecutor's comments did not render petitioner's trial fundamentally unfair.  Rather, this court concludes the comments, as a whole, were designed to remind the jury of its duty to scrutinize and weigh all of the witnesses' testimony, including that of the experts. *See, United States v. Franklin-El*, 555 F.3d 1115, 1127 (10th Cir. 2009) (finding no prosecutorial misconduct where the prosecutor stated in rebuttal, "The defendants had to go all the way to Missouri to find some blow hard expert who talked a lot

---

[28]Tr. of Jury Trial, Vol. XIV, at p. 3429.

[29]*United States v. Young*, 470 U.S., at 7, 105 S.Ct., at 1042.

43

but said very little of significance in this case.") As can be seen, the government began by urging the jury to decide who was the most believable. To focus the jury's thoughts, the prosecutor discussed the experts' experience based upon testimony presented in the trial.[30] In particular, the evidence established that Dr. Price was licensed to practice in the field of psychology in Texas and Oklahoma. Tr. of Jury Trial, Vol. XII, at p. 3094. Dr. Price had extensive experience in murder cases, having consulted on close to 200 cases. *Id*, at p. 3097. Dr. Price indicated he was retained by the defense in about 60% of those cases. *Id*. Dr. Price testified he began his evaluation of Fields anticipating that there was

> probably going to be some brain dysfunction, something there to have people evaluating him for this. And I thought there was going to be a mental illness there, probably more than the depression. I thought there was going -- you know, I didn't know what effect it was going to - - it would have had on the crime, but I thought there was going to be evidence of those things.

*Id*., at 3154. And, he was open to considering that the defense experts might be right. *Id.* The evidence further established Dr. Mitchell was a clinical assistant professor at the University of Oklahoma College of Medicine, practicing at Laureate, a large psychiatric hospital in Tulsa, Oklahoma, and vice president of St. Francis Health Care System. *Id*., Vol. XIII, at pp. 3248-3250. Dr. Mitchell testified he had never previously testified in a criminal case for either side. *Id*., at p. 3352. Dr. Mitchell indicated he gave Fields the benefit of the doubt regarding whether or not he was hearing voices. *Id*., at p. 3284. It was proper for the prosecutor to contrast this evidence with the testimony of the defense expert, Dr. Woods, who testified his primary office was in Oakland, California. *Id*., at Vol. XII, at p. 3000. Additionally, Dr. Woods testified approximately 40% of his practice was devoted to forensics and he had been qualified as an expert approximately 60 times. *Id*., at p. 3001. Dr. Woods indicated he had never been retained by the United States or by a state government in a

_____

[30]Tr. of Jury Trial, Vol. XII, at pp. 2938-3068; 3091-3162; Vol. XIII, at pp. 3171-3356.

criminal prosecution. *Id*., at p. 3002. After commenting on the differences in the doctors' qualifications, it was not inappropriate for the prosecutor to say that Dr. Mitchell had no "axe to grind" and this court finds the comment was not "improper vouching." Rather, it was simply one way for the prosecutor to direct the jury's attention to evidence from which the jury could determine the expert witnesses' credibility. Similarly, while stating the defense hired "high dollar shrinks," the government immediately admitted they too had paid their shrinks. Thus, it could not have unfairly characterized only the defense experts. While it is true, not all defense experts were from the west coast, this court finds, based upon the evidence at trial, that it was not improper for the government to emphasize that the expert from the west coast had always testified on behalf of the defense.

Fields also argues the government "grossly misrepresented the testimony of Dr. Woods, Dr. Grinage and other witnesses on several factual issues critical to the assessment of Mr. Fields' mental state." Dkt. # 14, at p. 81. After reviewing the closing arguments in light of the evidence presented at trial, this court finds the comments of the government attacked by Fields were supported by the record or appropriate inferences to be made therefrom.

Finally, petitioner argues the government improperly invoked Biblical Authority in support of a sentence of death. Dkt. # 14, at p. 84. The comments, which petitioner complains of were contained in the following passage of the rebuttal argument of the government:

> Thousands of years ago the kind of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshiped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the

astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though he turned down all of the riches, all the honor and all of the prestige. The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the king was killed. His kingdom was separated among his neighboring enemies.

The Defendant weighed his options on July 10, 2003. Under the Court's instructions and the law given by the court, the Defendant should be, as it were, weighed in the balance and found wanting.

Tr. of Jury Trial, Vol. XIV, at pp. 3466-3467.

Fields argues these remarks were similar to an arguments held improper and highly prejudicial in *Sandoval v. Calderon*, 241 F.3d 765, 775 (9th Cir. 2000).[31]  In *Sandoval*, the prosecutor's language was "eloquent, powerful, and unmistakably Biblical in style." *id*., at 778; "[t]he lay juror would readily understand the words as referring to Scripture", *id*.; and the message was clear: those who have opposed the ordinance of God should fear the sword-bearing state, whose task, as an avenging minister of God, is to bring wrath upon those who, like Sandoval, practice evil." *Id*.  The *Sandoval* court recognized that "[t]hose learned in the New Testament would recognize the argument as closely following the thirteenth chapter of the Book of Romans." *Id*.  Additional comments made by the prosecutor following this

_____

[31]Petitioner also cites to *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991) to support his argument that the prosecutor's analogy was improper. While the *Cunningham* court condemned the prosecutor's closing arguments, the case was reversed for other reasons. Further, the closing arguments in *Cunningham* were significantly worse than any comments in this case where statements found offensive included comments that the prosecutor was "'offended' that Cunningham had exercised his Sixth Amendment right to a trial by jury in the guilt-innocence phase of the trial;" "improperly implied that Cunningham had abused our legal system in some way by exercising his Sixth Amendment right to a jury trial;" "questioned whether Cunningham was even entitled to his Sixth amendment rights;" and "made numerous appeals to religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot." *Id*. (footnote omitted).

portion of his summation told the jury they were "not playing God" but were "doing what God says." *Id*., at 779.

Despite religious arguments being condemned by both state and federal courts, relief is not warranted unless the remarks prejudiced Fields chances of receiving life without the possibility of parole instead of the death penalty. *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998)(recognized argument that Bible condones capital punishment was inappropriate, but did not constitute reversible error). The remarks in this case are clearly distinguishable from those discussed by the court in *Sandoval*. While the analogy given by the prosecutor may have been paraphrased from the "writing on the wall" sermon in the Book of Daniel, the argument was not delivered in biblical style. The prosecutor did not argue that God or any other religious authority justified the death penalty in this case. Rather, the prosecutor used a story devoid of any religious connotation, to emphasize the defendant knew what could happen to him when he decided his course of action on July 10, 2003 and it was now up to the jury to impose the appropriate sentence based upon the court's instructions, which included a balancing (*i.e.*, weighing) of the aggravating and mitigating factors. Moreover, unlike *Sandoval*, where the jury deliberated over three days before advising "it was hopelessly deadlocked," *id*., only to later return to court with a unanimous verdict; this was a case where the defendant pled guilty to murdering two people by randomly stalking them while wearing a ghillie suit; shooting them while hidden in the woods; and then stealing from them. The jury rendered their sentencing verdict in less than four hours. *See*, Criminal Docket sheet minutes for July 22, 2005, indicating the bailiff was sworn at 11:40 a.m. and the jury returned its verdict in open court at 3:38 p.m.

Accordingly, this court finds none of the prosecutorial arguments, either individually or collectively, would have warranted reversal of the sentence on appeal. Therefore, appellate counsel was not ineffective for failing to raise these issues on appeal.

*E. Failure to object to instructions and verdict form*

Fields claims in his sixth ground for relief that trial counsel were ineffective for failing to object to the jury instructions and the use of a single verdict form which allowed the jury to approve a general verdict of death based on the combined weighing of aggravating factors applicable to two separate murder counts. According to Fields, the jury was allowed to consider all seven of the aggravating factors argued by the Government, including five factors which applied to only one of the two counts of murder thereby allow the jury to improperly aggregate factors in their weighing analysis.

As the Government points out in its motion for summary judgment, however, the thrust of the defense was to characterize the murders as a single behavioral irregularity caused by the manic-flip nature of the psychotropic drug - Effexor. *See*, Dkt. # 110-20, at p. 1; and Dkt. # 110-2, at p. 37. Separating the verdict form would have emphasized the separate protracted nature of the two murders. Moreover, separate verdict forms would have required the jury to focus more on the aggravating facts of the case since they would have been required to consider them twice. Thus, this court finds it was a sound strategic choice by defense counsel to request a unitary verdict form.

Furthermore, since Fields pled guilty to both murders, this is not a case where one count could have been reversed on appeal and the sentence on that count had to be vacated. The jury was given a single basis for imposing a death sentence and they unanimously found that the aggravators outweighed the mitigators. If the jury had been required to make separate findings, it is possible the jury could have returned a sentence of life without possibility of

48

Appellate Case: 20-7026     Document: 010110353486     Date Filed: 05/28/2020     Page: 360     Restricted

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 360 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 49 of 93

release on one of the murders and a death sentence on the other. But, as pointed out by the

Tenth Circuit,

> [t]he jury was not presented with alternative routes to the death penalty; it was given a single basis for imposing a death sentence   the jury had to unanimously find that the aggravators (themselves unanimously found) collectively outweighed the mitigators. Thus, we know what the basis for the jury's verdict was and that it was unanimous.

*United States v. Fields*, 516 F.3d at 939-40. There can be no question that all twelve jurors,

after weighing the aggravating factors that they found to exist, concluded Fields should be put

to death for at least one, if not both, of the murders. The suggestion by counsel that the jury

might have returned two life sentences had it used separate verdict forms has no basis in fact

and is nothing more than unsupported conjecture and speculation. Even assuming counsel

was ineffective for failing to request two separate verdict forms, this court finds petitioner has

failed to establish prejudice. Accordingly, this claim is denied.

## II. Alleged Brady violations

The seventh ground for relief alleges the government withheld exculpatory, material

evidence from the defense in violation of due process and trial counsel was ineffective for

failing to investigate and present exculpatory evidence. Specifically, petitioner argues certain

evidence would have corroborated the defense's argument that Fields had taken an increased

dose of Effexor before the offense and emails and other items on his computer would have

tended to help establish he was mentally ill. Finally, petitioner argues the government

withheld certain witness statements or interviews which would have been helpful to his

defense. To the extent the government had no duty to disclose this evidence, petitioner claims

his counsel were ineffective for failing to investigate, discover and present this evidence.

The Supreme Court has held "that the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material

6:03-cr-00073-RAW Document 305-15 Filed in ED/OK on 05/26/20 Page 361 of 429
6:10-cv-00115-RAW Document 125 Filed in ED/OK on 12/15/16 Page 50 of 93
Appellate Case: 20-7026    Document: 010110353486    Date Filed: 05/28/2020    Page: 361    Restricted

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). In *Strickler v. Green*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court identified three components or essential elements of a *Brady* prosecutorial misconduct claim as follows: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Id.*, 527 U.S., at 281-282, 119 S.Ct., at 1948. To show evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 91995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S., at 434, 115 S.Ct., at 1566.

If a defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence, *Brady* does not compel disclosure because no suppression occurred. *United States v. Erickson*, 561 3d 1150, 1163 (10th Cir. 2009). *See also*, *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)(*Brady* violation does not occur when defendant "knew or should have known the essential facts permitting him to take advantage of exculpatory information" or where the evidence was available to him from another source).

*A. Bottle of effexor pills*

In his reply (Dkt. # 20) and in his answer to government's motion for summary judgment, petitioner concedes "[t]he bottle containing the remaining prescription pills was provided to Muskogee County Detention Center by the FBI after it was found in Petitioner's truck." Dkt. # 119, at p. 49. Petitioner goes so far in his reply to state that the "fourteen Effexor pills he consumed while at the Muskogee County Detention Center came from the bottle in his truck." Dkt. # 20, at p. 70. Petitioner has not established that the government took an inventory of the number of pills contained within the pill bottle prior to delivering the same to the jail and then failed to release that information to them. The government had no obligation to provide information to the petitioner that was never collected. Moreover, Fields is the only one who can say exactly how many pills from that the bottle he actually took. As a result, the information regarding the Effexor pills was information the defendant knew or should have known. Accordingly, this court finds no *Brady* violation occurred in relation to this bottle of Effexor pills.

Furthermore, assuming counsel was ineffective for failing to inspect the bottle of pills pre-trial and/or submit the bottle as evidence in trial to establish that Fields had taken the prescribed amount of pills or possibly more, this court finds Petitioner has failed to establish prejudice.

*B. Seized computers*

Fields summarily claimed in his motion to vacate that the "hard drives . . . . contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails."  Dkt. # 1-3, at p. 62.  Additionally, he stated the "exculpatory evidence withheld by the Government was material."  *Id*., at p. 63.  During the course of these proceedings, Fields has made no effort to supplement these conclusory statements with any facts which would establish what information contained on these computers, if any, was relevant to his criminal case. Therefore, this court finds petitioner has failed to establish any *Brady* violation in regard to the two seized computers.

## III.  Execution issues

In ground two of his amended motion, Petitioner argues he is not competent to be executed and, therefore, his execution would violate the Eighth Amendment to the United States Constitution and international law.  In his ninth ground for relief, Petitioner argues his execution would violate the Eighth Amendment to the United States Constitution.  Petitioner submits no facts to support these claims.   Moreover, Petitioner admits these issues are not ripe for review.

Article III of the United States Constitution only extends the judicial power of this court to real cases or controversies.  U.S. Const. art. III, § 1.  "Under Article III of the Constitution, [this court] may hear only cases involving a live case or controversy, and this requirement adheres at all stages of judicial proceedings."  *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009) (citations omitted).  Courts have routinely held that claims of incompetency are not ripe for review until the execution is imminent.  *See*,

6:03-cr-00073-RAW   Document 305-15   Filed in ED/OK on 05/26/20   Page 364 of 429
6:10-cv-00115-RAW   Document 125   Filed in ED/OK on 12/15/16   Page 53 of 53

Appellate Case: 20-7026   Document: 010110353486   Date Filed: 05/28/2020   Page: 364   Restricted

*Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). Further, even if the claims were justiciable, Petitioner has failed to identify any facts which might give rise to relief under the Eighth Amendment. Accordingly, these claims are denied.

## IV. Cumulative Errors

Cumulative-error analysis evaluates only the effect of matters determined to be error, not the cumulative effect of non-errors. *U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990). In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial." *United States v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000). Since this court has found Petitioner has failed to prevail on any of the claims he raises, cumulative-error analysis is not appropriate. Accordingly, this claim is denied.

## CONCLUSION

For the reasons stated herein, the Petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied. Furthermore, this Court finds the Petitioner has failed to establish that he has been deprived of any constitutional rights. 28 U.S. § 2253(c)(2). Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this Court hereby declines to issue a certificate of appealability.

Dated this 15th day of December, 2016.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

# EXHIBIT E

DISTRICT COURT § 2255 JUDGMENT (DECEMBER 15, 2016)

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

|                                    |     |                      |
|------------------------------------|-----|----------------------|
| **EDWARD LEON FIELDS,**            | )   |                      |
|                                    | )   |                      |
| **Petitioner/Defendant,**          | )   |                      |
|                                    | )   |                      |
| **vs.**                            | )   | **No. 10-CIV-115-RAW** |
|                                    | )   |                      |
| **UNITED STATES OF AMERICA,**      | )   |                      |
|                                    | )   |                      |
| **Respondent/Plaintiff.**          | )   |                      |

## JUDGMENT

This matter came before the Court for consideration of Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255. The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United State of America, and against petitioner, Edward Leon Fields, on his challenge to the legality of his sentence.

IT IS SO ORDERED this <u>15th</u> day of December, 2016.

**Dated this 15th day of December, 2016.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

# EXHIBIT F


TENTH CIRCUIT § 2255 OPINION (DECEMBER 30, 2019)

Appellate Case: 17-7031   Document: 010110353486   Date Filed: 12/30/2019   Page: 368   Restricted

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 30, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDWARD LEON FIELDS, JR.,

    Defendant - Appellant.

No. 17-7031

———————————————————

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. Nos. 6:10-CV-00115-RAW and 6:03-CR-00073-RAW-1)**

———————————————————

Hunter Labovitz, Assistant Federal Defender (Katherine Ensler, Assistant Federal Defender, with him on the briefs), Capital Habeas Unit, Federal Community Defender Office for the Eastern District of Pennsylvania, Philadelphia, Pennsylvania, appearing for Appellant.

Jeffrey B. Kahan, Deputy Chief, Capital Case Section, United States Department of Justice, Washington, DC (Brian A. Benczkowski, Assistant Attorney General, United States Department of Justice, Washington, DC; Brian J. Kuester, United States Attorney, Christopher J. Wilson, Assistant United States Attorney, and Linda Epperley, Assistant United States Attorney, Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, with him on the brief), appearing for Appellee.

———————————————————

Before **BRISCOE**, **McHUGH**, and **CARSON**, Circuit Judges.

———————————————————

**BRISCOE**, Circuit Judge.

———————————————————

Appellate Case: 20-7062   Document: 010110353486   Date Filed: 05/26/2020   Page: 369   Restricted

This is a federal death penalty case arising from two murders committed in a national forest in Oklahoma. Petitioner Edward Leon Fields pleaded guilty in federal court to two counts of first degree murder, two counts of using a firearm during a federal crime of violence causing the death of a person, and two counts of assimilative crime. Fields was sentenced, following a penalty phase proceeding before a jury, to death on each of the two murder convictions, and to significant terms of imprisonment on each of the remaining convictions.

After completing the direct appeal process, Fields initiated these proceedings by filing a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. The district court denied Fields's petition, and also denied him a certificate of appealability (COA). We subsequently granted Fields a COA with respect to four issues. Now, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand to the district court with directions to conduct an evidentiary hearing on Fields's claim that his trial counsel was ineffective for failing to adequately investigate and present at trial evidence of his organic brain damage.

I

*Fields's criminal conduct*

We previously, in addressing Fields's direct appeal, outlined the underlying facts of Fields's crimes:

> Edward Leon Fields killed Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest on July 10, 2003. He had seen the couple there days earlier and drove there the evening of July 10 with a homemade ghillie suit (a covering for head and body made to resemble underbrush that Fields referred to as his sniper suit) and a

2

Appellate Case: 20-7021   Document: 010110353486   Date Filed: 05/26/2020   Page: 370   Restricted

camouflaged and powerfully scoped rifle in his truck. He found the Chicks
on a vista some distance from their campsite. He retrieved the rifle, put on
the ghillie suit, and hid near their campsite as it grew dark. In time, the
Chicks came back to the campsite and sat at a table. Fields waited and
watched them for about twenty minutes. When Charles told Shirley he was
going to the tent, Fields shot him in the face. As Charles slumped to the
table, Shirley got up and began running toward the couple's van. Fields
shot at her and a bullet tore through her foot. She reached the passenger
door of the van, but was shot again, on the side of her head. Fields caught
up and shot her once more, in the back of the head, in the doorway of the
van. Shirley died as a result of both head wounds. Fields returned to the
table and shot Charles a second time in the head. Charles also died as a
result of both of his wounds.

Physical evidence indicated that Fields then left the campsite and
only returned hours later, when he broke the driver's window of the van
and stole some items. He rummaged through only the driver's area of the
van; the rest of the van and the Chicks' tent were untouched. A tip
eventually led police to Fields'[s] truck, where they found the rifle, the
ghillie suit, and some of the items stolen from the Chicks' van. In the
meantime, Fields had been taken in for questioning. He initially denied any
connection to the crime, but confessed when confronted with the evidence
taken from his truck.

*United States v. Fields*, 516 F.3d 923, 927 (10th Cir. 2008) (*Fields I*).

*The trial proceedings and sentencing*

On August 1, 2003, a federal grand jury in the Eastern District of Oklahoma

returned a six-count indictment charging Fields with: two counts of first degree murder

(Counts 1 and 3), in violation 18 U.S.C. §§ 1111(a) and (b), 7(3) and 13; two counts of

use of a firearm in a federal crime of violence causing the death of a person (Counts 2

and 4), in violation of 18 U.S.C. §§ 924(c)(1)(A), (d), (j), 7(3) and 13; one count of

assimilative crime – robbery with a firearm (Count 5), in violation of 18 U.S.C. §§ 7(3)

and 13; and one count of assimilative crime – burglary of an automobile (count 6), in

violation of 18 U.S.C. §§ 7(3) and 13.

3

Appellate Case: 20-7021   Document: 010110353486   Date Filed: 05/26/2020   Page: 37   Page Restricted

On June 30, 2005, Fields entered pleas of guilty as to all six counts alleged in the indictment.  Shortly thereafter, the district court began death penalty qualification of potential jurors.  On July 13, 2005, the penalty phase proceeding, which was conducted pursuant to the Federal Death Penalty Act of 1994 (FDPA), began.  "At the conclusion of the proceeding, the jury determined that Fields was eligible for a death sentence under §§ 3591(a)(2) and 3593(e)(2) by finding, unanimously and beyond a reasonable doubt, (1) that he possessed the requisite homicidal intent, and (2) the presence of one (here, two) statutorily defined aggravating factors ('statutory aggravators'): substantial planning and premeditation to cause death (§ 3592(c)(9)), and multiple intentional killings committed in a single episode (§ 3592(c)(16))."  *Fields I*, 516 F.3d at 927.

"The jury then turned to the ad hoc non-statutory aggravators framed and formally noticed by the government under § 3593(a)."  *Id.*  "The jury found, again unanimously and beyond a reasonable doubt, that Fields (1) posed a future danger to the lives and safety of other persons; (2) caused permanent loss to Charles Chick's family, friends, and community; (3) caused permanent loss to Shirley Chick's family, friends, and community; and (4) inflicted mental anguish on Shirley Chick before her death."  *Id.* at 927–28.

"Next, the jury considered a host of mitigating factors offered by the defense" and made a number of findings.  *Id.* at 928.

> At least one juror found, by the required preponderance of the evidence, that (1) Fields did not have a significant prior criminal history; (2) Fields served in and was honorably discharged from the Navy; (3) Fields had worked as a state prison guard; (4) Fields has special talents in cooking, art, and computers; (5) Fields is a loved father; (6) Fields is a loved brother; (7)

Appellate Case: 20-7021   Document: 010110353486   Date Filed: 05/26/2020   Page: 372   Page Restricted

Fields is a loved son; (8) Fields is a valued friend; (9) Fields'[s] father died months before the offenses; (10) Fields'[s] mother moved away weeks before the offenses; (11) Fields'[s] ex-wife and their children moved away months before the offenses; (12) Fields'[s] ex-wife recently had cancer that may or may not be in remission; (13) Fields'[s] death will impact his children, family, and friends; (14) Fields cooperated with authorities after his arrest; (15) Fields confessed to the crimes; (16) Fields pled guilty to the crimes; and (17) Fields sought treatment for mental illness. All jurors, however, rejected several mitigators, including that (1) Fields'[s] capacity to appreciate the wrongfulness of his conduct and conform his conduct to the law was significantly impaired; (2) Fields committed the offenses under severe mental or emotional disturbance; (3) Fields expressed remorse for the crimes; and (4) Fields will not present a future danger to society by being imprisoned for life without possibility of release.

*Id.*

"Finally, pursuant to § 3593(e), the jury weighed all of the aggravating and mitigating factors to determine whether the aggravators sufficiently outweighed the mitigators to justify a sentence of death." Id. "The jury concluded, unanimously, that they did." Id. "Thereafter, the district court imposed death sentences on both murder counts." Id.

On November 8, 2005, the district court sentenced Fields to death on Counts 1 and 3, 405 months on Counts 2 and 4, to be served consecutively to one another and consecutively to any other term of imprisonment imposed, 405 months on Count 5, and 84 months on Count 6.

### *The direct appeal*

Fields filed a direct appeal asserting thirteen propositions of error. These included a challenge to "the jurisdictional basis for his federal conviction, which [wa]s a matter not waived by his guilty plea," and "many other objections with respect to the sentencing

5

proceeding." Id.  On February 28, 2005, we issued a published opinion "conclud[ing]

that federal jurisdiction was properly exercised and that no reversible error occurred in

the proceedings." Id.

Fields filed a petition for writ of certiorari with the United States Supreme Court.

That petition was denied on April 6, 2009. *Fields v. United States*, 556 U.S. 1167 (2009).

*The § 2255 proceedings*

On April 6, 2010, Fields, through appointed counsel, initiated these proceedings

by filing a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §

2255.  The motion asserted nine general grounds for relief, as well as numerous sub-

issues.

In October 2015, following years of extensive discovery, Fields filed an amended

brief in support of his § 2255 motion, and the government in turn filed a motion for

summary judgment.

On December 15, 2016, the district court issued an opinion and order denying

Fields's § 2255 motion in its entirety.  The district court entered final judgment on that

same date.

Fields filed a motion to alter or amend the judgment.  The district court denied that

motion.

Fields filed a timely notice of appeal.  A judge of this court subsequently issued an

order granting Fields a COA on four issues that we shall proceed to address.

6

## II

### *Standards of review*

Section 2255(a) provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

"[A]s a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal." *Foster v. Chatman*, 136 S. Ct. 1737, 1758 (2016). Instead, relief under § 2255 is generally confined to situations where (a) the "convictions and sentences [were] entered by a court without jurisdiction," (b) the sentence imposed was outside of the statutory limits, (c) a constitutional error occurred, or (d) a non-constitutional error of law or an error of fact occurred that constituted a fundamental defect which inherently resulted in a complete miscarriage of justice, i.e., that rendered the entire proceeding irregular and invalid. *United States v. Addonizio*, 442 U.S. 178, 185–186 (1979).

Section 2255(b) states, in pertinent part, that "[u]nless the [2255] motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the [district] court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." The Supreme Court has interpreted this statutory language to mean that a hearing is unnecessary in those

instances (a) "where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court," or (b) where the motion alleges circumstances "of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection." *Machibroda v. United States*, 368 U.S. 487, 494–95 (1962). In contrast, where "[t]he factual allegations contained in the petitioner's motion and affidavit" are "put in issue by the affidavit filed with the Government's response" and "relate[] primarily to purported occurrences outside the courtroom and upon which the record could . . . cast no real light," a hearing is required under the statute. *Id.*

"On appeal from the denial of a § 2255 motion, ordinarily we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015) (quotations omitted). "Where, as here, the district court does not hold an evidentiary hearing, . . . our review is strictly de novo." *Id.* (quotations and brackets omitted). That "review proceeds in two steps." *United States v. Herring*, 935 F.3d 1102, 1107 (10th Cir. 2019). "First, we ask whether the defendant's allegations, if proved, would entitle him to relief, an inquiry we conduct de novo." *Id.* (citations omitted). "If so, we then determine whether the denial of the evidentiary hearing constituted an abuse of discretion." *Id.*

*Issue One – ineffective assistance of trial counsel for failing to adequately
investigate and present evidence of Fields's organic brain damage*

In his first issue on appeal, Fields argues that the district court abused its discretion by failing to conduct an evidentiary hearing on his claim that his trial counsel

8

Appellate Case: 20-7021    Document: 010110353486    Date Filed: 05/26/2020    Page: 376    Restricted

was ineffective for failing to investigate and present evidence of Fields's organic brain damage. To resolve this claim, we begin by outlining the legal standards that are applicable to the claim. We then review Fields's allegations of ineffective assistance and determine whether, if proved, they would entitle him to relief under the applicable legal standards. Finally, we review the evidence presented by both parties that is relevant to the claim and determine whether the district court abused its discretion by rejecting the claim without benefit of an evidentiary hearing. Given the applicable legal standards, we separate this final portion of our analysis into two components: whether trial counsel's performance was deficient and whether Fields was prejudiced by the allegedly deficient performance. As we shall proceed to explain, we ultimately conclude that the district court abused its discretion by failing to conduct an evidentiary hearing on both of these components, and therefore remand the case to the district court to conduct an evidentiary hearing on Fields's claim.

### a) Law applicable to Fields's claim

The seminal Supreme Court case addressing claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Id.* at 687. "First," the Court held, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* "Second," the Court held, "the defendant must show that the deficient performance prejudiced the

9

defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

> b) *Fields's allegations of ineffective assistance regarding evidence of organic brain damage*

Fields alleged in his amended § 2255 motion that, "[a]t the time of the offenses," he "suffered from organic brain damage." ROA, Vol. 11 at 36. He further alleged that his "[t]rial counsel failed to discover the full extent of his brain damage because they arranged for [him] to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing." *Id.* Fields alleged that even the limited neuropsychological testing that was actually performed "showed that [his] frontal lobes were impaired" and "[t]hese impairments affected his executive functioning in areas such as judgment and impulse control." *Id.* Fields alleged that "[e]vidence of this damage would have been mitigating in its own right and also would have bolstered the defense that [he] experienced a manic flip at the time of the offenses." *Id.* Fields in turn alleged that "[b]ecause [his] trial counsel did not fully investigate and discover this brain damage, the jury never heard this crucial mitigating mental health evidence." *Id.* at 36-37. Lastly, Fields alleged that, "[h]ad the jury known that [he] suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different." *Id.* at 50.

Considering these allegations in light of the applicable legal standards outlined in *Strickland*, we have little trouble concluding that the allegations, if ultimately proven by Fields, would entitle him to federal habeas relief from his sentence. Therefore, we proceed to review the evidence that was submitted by the parties in support of and in opposition to these allegations.

*c) The performance prong of the Strickland test*

We begin by outlining the evidence relevant to the issue of trial counsel's performance. This includes evidence contained in the record of the trial proceedings, as well as extra-record evidence obtained by Fields and presented in support of his § 2255 motion, including a post-conviction declaration from Fields's lead trial attorney.

"*Strickland* requires a reviewing court to 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 477 U.S. at 690). The Supreme Court emphasized in *Strickland* that "[t]here are countless ways to provide effective assistance in any given case." 466 U.S. at 689. Consequently, Fields "must overcome the strong presumption that [his] counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Sanders*, 372 F.3d 1183, 1185 (10th Cir. 2004). In determining whether Fields has overcome this strong presumption, we must consider "counsel's overall performance, before and at trial," and not focus exclusively on the "particular [alleged] act or omission" giving rise to the claim of ineffective assistance. *Kimmelman*, 477 U.S. at 386.

11

Appellate Case: 20-7026   Document: 010486281046   Date Filed: 05/26/2020   Page: 12

Fields's lead trial attorney was Julia O'Connell, who at that time was an assistant federal public defender in the Northern and Eastern Districts of Oklahoma. O'Connell was assisted by three other attorneys: Isaiah Gant, a federal public defender from Nashville, Tennessee, and Michael Able and Barry Derryberry, both of whom worked in O'Connell's office.

In July 2004, O'Connell retained neuropsychologist Dr. Michael Gelbort "to conduct a forensic neuropsychological evaluation of . . . Fields." ROA, Vol. 11 at 504. Gelbort "met with . . . Fields on August 11, 2004 at the Muskogee County Jail," "conducted a clinical interview[,] and administered a battery of neuropsychological tests." *Id.* at 505. Based on the interview and testing, Gelbort concluded that "Fields suffer[ed] from brain dysfunction and cognitive impairments . . . focused in the frontal lobes." *Id.* "Frontal lobe damage," according to Gelbort, "is well-known to adversely impact executive function, which acts in part as the 'brakes' for a person's actions." *Id.* at 506. The deficits caused by this frontal lobe damage, according to Gelbort, "impact[ed] [Fields's] ability to think in a logical, adaptive and goal-directed manner" and "also affect[ed] his social functioning."[1] *Id.* at 507.

---

[1] According to the evidence compiled by Fields's post-conviction counsel, Fields suffered from neonatal respiratory distress syndrome shortly after he was born. ROA, Vol. 11 at 37. This syndrome, according to the record, "creates a serious risk of brain damage." *Id.* The record also indicates that "Fields experienced a number of head injuries and losses of consciousness before the age of twenty," including "a sleigh-riding accident" that occurred when he was thirteen years old and resulted in him losing "consciousness for several minutes." *Id.* at 38.

Gelbort "relayed [his] preliminary finding of brain dysfunction focused on the frontal lobe to Ms. O'Connell on August 24, 2004." *Id.* Gelbort "provided a preliminary report to . . . O'Connell on November 10, 2004," and "provided an updated report to [her] on March 8, 2005." *Id.* Gelbort concluded, in pertinent part, that Fields "display[ed] a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted." ROA, Vol. 9 at 227.

In June 2005, O'Connell asked Gelbort if he "could do additional testing" of Fields, and Gelbort responded by asking "what kind of additional testing [she] wanted [him] to conduct." ROA, Vol. 11 at 507. According to Gelbort, "[h]ad [O'Connell] followed up and asked [him] to conduct additional neuropsychological testing, [he] would have told [her] it was unnecessary and would have instead suggested that a qualified expert conduct medical testing such as PET scan or EEG to analyze . . . Fields's brain from a physical standpoint." *Id.* Gelbort alleges that O'Connell never got back to him on this issue. *Id.* O'Connell alleges in her post-conviction declaration that she "can offer no tactical or strategic reason for not having the additional testing performed" by Gelbort. *Id.* at 164.

"On June 19, 2005, . . . O'Connell requested [Gelbort's] final report, which [he] provided to her." *Id.* "On July 1, 2005, . . . O'Connell informed [Gelbort] that she would need [him] to testify at trial and that the defense case could begin as early as July 18, 2005." *Id.* at 508. On July 3, 2005, O'Connell "sent . . . Gelbort a contract to cover his anticipated testimony" and "informed him [again] that he would be needed to testify

13

around July 18, 200[5], and also would be needed to consult about the cross-examination

of" the government's expert witness, Dr. J. Randall Price. *Id.* at 43.

O'Connell, in her post-conviction declaration, alleged that "[t]he evening before

trial testimony was to begin, . . . Gelbort notified [her] that he was going to be traveling

and would not be available on the dates of trial that had been set." *Id.* at 164. O'Connell

alleges that she "made no motion to continue the trial" and "had no strategy or tactic for

abandoning the specific factor of organic brain damage." *Id.* Instead, O'Connell alleges

that she "was overwhelmed with the trial in progress."[2] *Id.* Gelbort, in his own post-trial

declaration, alleges that "[o]n July 11, 2005, [he] sent a reminder e-mail to . . .

O'Connell, letting her know that [he] could testify on July 18 or July 19, but that [he] was

leaving the country on the evening of July 20." *Id.* at 508. Gelbort further alleges that he

"ha[s] no recollection or record of any contact with . . . O'Connell or any other trial

counsel representing . . . Fields after July 11, 2005." *Id.*

The government, for its part, points to various emails sent by O'Connell that

contradict her affidavit and suggest she may have intentionally decided to forego any

reliance on frontal lobe impairment and instead focus on evidence that Fields suffered

from a mood disorder and had a "manic flip" or "manic switch" just shortly prior to the

murders. For example, on June 18, 2005, O'Connell sent an email to Dr. George Woods,

a neuropsychiatrist who she presented as an expert witness at trial. In that email,

---

[2] O'Connell alleges in her declaration that her "errors were a result of [her] being overburdened by essentially functioning without co-counsel in this complex and difficult case." ROA, Vol. 11 at 169. O'Connell explains that Gant was appointed "as Learned Counsel in th[e] case," but failed to "carry[] his share of the work." *Id.* at 154–55.

Appellate Case: 20-7026   Document: 010353486281   Date Filed: 05/28/2020   Page: 15   Restricted

O'Connell noted that she "didn't let Gelbort administer any personality testing" to Fields, "although [Gelbort] REALLY wanted to do the MMPI, so badly that he left a test and answer sheet with [her] to have someone administer it to [Fields] if [O'Connell] changed her mind." ROA, Vol. 12 at 160. O'Connell asked Woods in the email if she should allow Fields to undergo any personality testing by the government's expert, to which Woods responded: "The answer is no. Price [(the government's expert)] is dangerous. We need to see what he has put together so far." *Id.* One week later, on June 25, 2005, O'Connell sent an email to another attorney asking for advice about her presentation of Fields's mental health history. In that email, O'Connell stated, in pertinent part: "Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment." *Id.* at 122. This email suggests that O'Connell may have made a strategic decision, or was at least considering making a strategic decision, to focus on the "manic-flip" theory favored by Woods and to abandon any reliance on Gelbort's theory of frontal lobe impairment.

Additional evidence pointed to by the government indicates that O'Connell had reservations about Gelbort and his preliminary report. For example, on March 9, 2005, O'Connell sent an email to other attorneys stating that Woods was her "real mental health expert," that Woods's "report w[as] far more comprehensive (and valuable)," and that she would "rather rely on" Woods than Gelbort. *Id.* at 170. O'Connell also noted in that email: "The potential brain damage [identified by Gelbort] has some value, but it's not a huge part of my mitigation. It just enters the equation, complicating the client's ability to make it through his hyper-manic state." *Id.* In another email dated March 24, 2005,

O'Connell said, referring to Gelbort: "anyone asks you about him, tell them not to hire him. He sucks. Not because he's not smart, or doesn't know his field, but because he's too difficult to work with. I think it's because he's smarter than all of us, if you know what I mean." *Id.* at 171. And, in an email dated January 27, 2005, O'Connell stated that she was "not a fan [of Gelbort] at th[at] point" and she described Gelbort's written report as follows: "[E]ven though it's a 'draft,' his report is one of the crappiest I have ever seen. No, I take that back. It is THE crappiest one I've ever seen." *Id.* at 178.

The record also indicates that, in February of 2005, approximately five months prior to trial, O'Connell advised the prosecution that the cost of a PET scan was $35,000 and suggested that the prosecution should absorb this cost. *Id.* at 580. The district court in these § 2255 proceedings construed this evidence as indicating that "the cost of a brain imaging scan clearly played a role in [O'Connell's] decision to rely on the[] expert testimony and forego conducting a brain scan." *Id.*

During the penalty phase proceeding, each side presented expert witnesses who had evaluated and diagnosed Fields. Dr. Brad Grinage, a psychiatrist retained and presented by the defense, opined that Fields suffered from bipolar disorder with psychotic features, and that this disorder caused significant impairment in his ability to behave in a particular way. Similarly, Woods opined that Fields suffered from one of two types of mood disorders—schizoaffective disorder or bipolar disorder with psychotic features— either of which resulted in him exhibiting poor judgment. Woods also opined that, at the time of the murders, Fields was unable to conform his conduct to the law because of his mood disorder. Both Grinage and Woods opined that Effexor, an antidepressant that had

16

Appellate Case: 20-7067-7006 Document: 010110353486281 Date Filed: 05/26/2020 Page: 384 Page: Restricted

been prescribed to Fields by his personal physician (a non-psychiatrist) shortly prior to the murders, could have caused him to "flip" or "switch" from a depressed state to a manic state, which in turn could have further impaired his judgment.

The government presented testimony from Price, who is a clinical and forensic neuropsychologist. Price testified that he conducted a neuropsychological evaluation on Fields, including the administration of an adult IQ test. Price testified that Fields scored average to high average on the IQ test, including scores of 98th percentile in expressive vocabulary, 84th percentile in comprehension, and 9th percentile in arithmetic. Price diagnosed Fields with a dysthymic disorder (i.e., depression that is chronic but relatively mild) and a personality disorder not otherwise specified with anti-social and psychopathic narcissistic and dependent traits and features. Price testified that he disagreed with the defense experts who diagnosed Fields as suffering from a mood disorder. Price further testified that, in his opinion, Fields had the ability, at the time of the murders, to conform his actions to the requirements of the law, and that he acted in a very controlled and selfish manner, and with a lack of empathy and remorse. On cross-examination by defense counsel, Price testified that Fields exhibited some minor impairment on some of the tests that Price administered. Price testified, however, that he did not see much neuropsychological impairment of the type that had been identified by Gelbort. During his direct examination, Price testified that there is no treatment for a personality disorder, and that a structured environment is probably the best way to prevent such a person from making poor choices and manipulating people.

17

Appellate Case: 20-7067     Document: 010110354862     Date Filed: 05/26/2020     Page: 385     Restricted

At the conclusion of the evidence, the jury found, in pertinent part, that Fields intentionally killed both of the Chicks, that he committed both murders after substantial planning and premeditation, and that he posed a future danger to the lives and safety of other persons, as evidenced by his lack of remorse.  The jury declined to find that Fields's capacity to appreciate the wrongfulness of his actions was impaired, or that Fields committed the offenses under severe mental or emotional disturbance.

Subsequently, during preparation of Fields's § 2255 motion, Fields's post-conviction counsel contacted Gelbort and provided him with additional records and information, including Price's preliminary report, Price's raw data, and a September 15, 2015 declaration from Dr. Alan Kaufman.  *Id.*, Vol. 11 at 508–510.  Kaufman, a clinical professor of psychology at the Child Study Center of the Yale University School of Medicine, "concluded to a reasonable degree of scientific and professional certainty that Dr. Price did not conduct a competent evaluation of . . . Fields's intelligence because of: (1) administration errors, (2) scoring errors, (3) interpretation errors, and (4) judgment errors."[3]  *Id.* at 525.  Gelbort, after reviewing this information, similarly concluded that Price "made significant errors in his testing" of Fields, including "scoring errors on the WAIS-III [(the Wechsler Adult Intelligence Scale)] that ma[de] . . . Fields seem less impaired than he actually is."  *Id.* at 510.  Gelbort "agree[d] with" Kaufman "that Dr. Price's neglect in administration of the WAIS-III raise[d] significant concerns about the reliability of his expert opinion."  *Id.* at 510–511.  For example, Gelbort concluded that

---

[3] Kaufman did not offer an opinion in his report regarding what he believed Fields's IQ actually was.

18

"Price's . . . conclusions . . . understate[d] the impact that the impairments had on . . . Fields's behavior." *Id.* at 510.  Gelbort also, in his declaration, noted that "[f]rontal lobe damage" of the type exhibited by Fields "is well-known to adversely impact executive function, which acts in part as the 'brakes' for a person's actions," and thus "affect[s] his ability to adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions." *Id.* at 506.

Fields's post-conviction team also obtained declarations from three additional experts: Grinage and Woods (the two experts who testified for the defense at trial) and Dr. Daniel Martell.  Grinage alleged in his declaration that, had he been presented with the information from Gelbort and Martell regarding "Fields'[s] organic brain dysfunction and . . . been asked to consider [Fields's] 'cognition,'" he "would have testified that [Fields's] organic brain damage, focused in his frontal lobes, [wa]s a mitigating factor." ROA, Vol. 11 at 181.  Woods alleged in his declaration that, "[r]egardless of whether one accepts [his] opinion about a manic switch, the presence of frontal lobe impairments is highly significant" because "[p]eople with frontal lobe impairments as severe as those present in . . . Fields experience disinhibition—that is, an impaired ability to control one's impulses." *Id.* at 172.  "They also," Woods alleged, "experience impairments in social judgment." *Id.*  "By itself," Woods alleged, "this type of impairment is a highly mitigating factor." *Id.*  Lastly, Martell alleged in his declaration "that any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments [in] . . . Fields'[s] brain functioning, primarily

Appellate Case: 20-7027    Document: 010110353486    Date Filed: 05/26/2020    Page: 20    Restricted

involving frontal lobe functioning." *Id.* at 282. Martell further alleged that Price, "[i]n his reports and during his testimony[,] . . . (a) minimized . . . Fields'[s] actual neurobehavioral impairments, and (b) over-reported his actual level of functioning." *Id.* Martell alleged that "[i]t [wa]s apparent from the current testing that . . . Fields ha[d] experienced a catastrophic loss of brain function over the past five years" and that "the most likely disease process would appear to involve the cerebral vasculature, including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia." *Id.* at 286. Martell concluded that "an MRI study of [Fields's] brain [wa]s strongly indicated to aid in proper differential neurodiagnosis and treatment." *Id.*

The government, in its response to Fields's § 2255 motion, submitted a post-conviction report prepared by neuropsychologist James Seward. Seward stated in his report that "an MRI of [Fields's] brain [was] conducted in 2011" and that the results were "normal." ROA, Vol. 12 at 259. Seward further stated that "the available testing" of Fields "exhibit[ed] no findings reflective of frontal lobe or other meaningful brain damage." *Id.*

Seward concluded, after examining "both . . . Gelbort's 2004 evaluation and . . . Price's 2005 evaluation," "that the majority of the scores were within normal limits, with no pattern emerging that would be indicative of 'significant impairments.'" *Id.* at 254. Seward noted that "Fields did display generally improved scores when seen by . . . Price versus . . . Gelbort," and he opined that "[t]his may have been a manifestation of a practice effect, a variable level of effort, changes in his affective status, or other

situational or transitory factors." *Id.* Seward stated that "Fields gave indications of inadequate effort in the course of [Seward's] evaluation of him." *Id.* "Even given [Fields's] lack of full effort," Seward opined, "Fields's scores on measures of executive functioning ranged from borderline abnormal to average, with no clearly impaired scores." *Id.* at 255. Seward also noted that the "pertinent collateral history," including standardized testing scores from school and the Navy, was "not consistent with the presence of 'significant impairments [in] . . . Fields's brain functioning.'" *Id.* For example, Seward noted, "in school [Fields's] scores on standardized testing, including the GED, clustered in the average range." *Id.* Seward also noted that the "MRI of the brain conducted in 2011 was normal," and that "the available testing exhibit[ed] no findings reflective of frontal lobe or other meaningful brain damage." *Id.* at 259. These MRI results, Seward opined, undercut Martell's suggestion that Fields had suffered a catastrophic decline in functioning. *Id.* at 260. Seward noted, relatedly, that "[i]f . . . Fields indeed ha[d] a major neurodegenerative condition causing a 'catastrophic decline' in his mental functioning, this should be readily apparent in all aspects of his life that are in any way dependent upon intact brain functioning," but that "[n]o such monumental decline ha[d] been noted in . . . Fields's functioning, either through formal evaluations or in his day-to-day life." *Id.* at 260–61. Seward concluded that "[t]he most evidence-based DSM 5 diagnosis for . . . Fields [wa]s Other Specified Personality Disorder." *Id.* at 265 (footnote and emphasis omitted). Seward also concluded, based upon his review of the records, that the "evidence d[id] not allow one to conclude with psychological certainty whether or not . . . Fields ever heard voices." *Id.* at 268. Indeed, Seward noted, "FBOP

21

mental health staff, who monitored . . . Fields's psychiatric status for the past eight years, have expressed doubts over the veracity of his reported auditory hallucinations and other atypical symptoms (i.e., visual hallucinations and amnestic periods)." *Id.* "What [wa]s apparent," Seward concluded, "[wa]s that any such voices did not rise to the level of a disorder; they were not manifested in his day-to-day functioning, and people who had close contact with him were unaware of any such condition." *Id.* Ultimately, Seward concluded that the assertions of the defense experts, including Martell, were "entirely fictional" in nature. *Id.* at 279.

### d) Our conclusion regarding the performance prong

The district court did not reach a conclusion regarding the performance prong of the *Strickland* test; instead, it rested its decision exclusively on the prejudice prong of the *Strickland* test. For our part, we conclude, given the conflicting evidence discussed above, that "the files and records of the case" do not "conclusively show that" O'Connell's performance fell "within the wide range of reasonable professional assistance." 28 U.S.C. § 2255(b); *Sanders*, 372 F.3d at 1185. In other words, we conclude that the evidence presented by Fields, including most notably O'Connell's declaration, relates "to purported occurrences outside the courtroom," and creates a genuine issue of material fact regarding whether O'Connell made a strategic decision to forego the use of Gelbort's testimony or otherwise rely on evidence of Fields's possible brain damage. *Machibroda*, 368 U.S. at 494.

*e) The prejudice prong of the Strickland test*

Before deciding whether a remand for an evidentiary hearing is necessary, however, we must first consider the prejudice prong of the *Strickland* test. More specifically, we must determine whether the district court erred by resolving the issue of prejudice on the merits, without benefit of an evidentiary hearing. That determination hinges on whether Fields's "motion and the files and records of the case conclusively show that" Fields was not prejudiced by his trial counsel's failure to fully investigate and present testimony from Gelbort. 28 U.S.C. § 2255(b).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692.

"Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

23

The district court, in its opinion and order denying Fields's § 2255 motion, noted that O'Connell "presented a strong case in mitigation premised on several theories of mental illness, including the testimony of" Grinage and Woods.  *Id.* at 577.  The district court further noted that, "during closing argument, [O'Connell] addressed all aspects of Fields['s] mental health discussing his depression and how it affected everything in his life, his inability to control what was going through his mind continually because of 'rushing thoughts,' and counsel implored the jury to show empathy for Fields since he had already accepted responsibility for his actions."  *Id.* at 578.  O'Connell also argued, the district court noted, that Fields's "mental disease impaired his abilities" and "emphasized the bipolar flip theory" that was posited by Grinage, "pointing out to the jury that the Effexor" that was prescribed by Fields's local physician shortly before the murders "built up like it was supposed to and then it hit a tipping point so bad that a girl friend [sic] of Fields called the prescribing doctor worried about either suicidal or homicidal behavior."  *Id.*

The district court concluded that, "regardless of the reasons [defense] counsel did not followup [sic] with an MRI, in light of the results of the 2011 MRI, . . . [Fields] . . . failed to establish prejudice based upon [O'Connell's] failure to investigate and/or present evidence of his alleged organic brain damage."  *Id.* at 580.  The district court explained:

> To support his argument that counsel was ineffective for failing to investigate and present evidence of his organic brain damage, [Fields] submitted a neuropsychological examination report dated April 1, 2010, by Daniel A. Martell, Ph.D., Dkt. # 106–10.  Dr. Martell claims the report of Dr. Price unequivocally demonstrates organic impairment in the frontal

24

Appellate Case: 20-7027-7036 Document: 010110353486281 Date Filed: 05/26/2020/2019 Page: 392 Page: 25 Restricted

lobes.  In that report, Dr. Martell indicates "any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments (sic) Mr. Fields'[s] brain functioning, primarily involving frontal lobe functioning", *id.*, at p. 13, and "Mr. Fields has experienced a catastrophic loss of brain function over the past five years." *Id.*, at p. 17.  Dr. Martell goes on to state that "[t]his apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve (sic) functioning." *Id.* In addition, [Fields] submits an affidavit from Dr. Grinage, which state[s] "[it] is highly likely that [Fields] has frontal lobe impairment that would affect his bipolar behavior and treatment." Dkt. # 106–4.  To rebut Field's [sic] argument that he has significant brain impairments which trial counsel failed to follow up on, the government had the right to rely on current psychological testing, including an MRI of his brain.  To hold otherwise, would allow post-conviction counsel to make arguments which could never have been proven at trial even if trial counsel had taken the steps which post-conviction counsel argue they should have taken.  While [Fields] cites to[] *United States v. Gonzales*, 98 Fed. Appx. 825, 832 (10th Cir. 2004), an unpublished Tenth Circuit opinion, for the proposition that this court cannot resolve differences among the parties [sic] mental health experts without an evidentiary hearing, [Fields] submits nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011 was normal.

*Id.* at 581–82.

In short, the district court concluded that Fields could not establish prejudice in light of the fact that the 2011 MRI of Fields's brain, which was submitted as evidence by the government, was deemed "normal." *Id*. at 574, 582.  Although the district court did not expressly say so, it apparently found, or perhaps simply assumed, that a "normal" MRI of the brain precludes any finding of organic brain damage, and that, consequently, Gelbort was wrong in his findings.

Fields argues in his appeal that "[n]othing in the record or scientific literature supports the district court's assumption that a purportedly normal brain scan contradicts,

Appellate Case: 20-7002   Document: 010110353486   Date Filed: 05/26/2020   Page: 26   Restricted

let alone conclusively negates, the neuropsychological testing showing [his] brain

impairment." Aplt. Br. at 43. Indeed, Fields asserts that this assumption "is scientifically

wrong." *Id.* at 45. Fields notes, for example, that Seward, the post-conviction expert

relied on by the government, "did not contend that a 'normal' MRI precludes . . . Fields

from having brain damage." *Id.* "Presumably," Fields argues, "if the MRI in 2011 was

dispositive on the impairment issue, . . . Seward would not have needed to 'administer[] a

variety of psychological and neuropsychological tests to . . . Fields'[s] over the course of

three days in 2013." *Id.* Nor, Fields argues, would Seward "have spent six pages in his

report discussing how that psychological testing as well as collateral records and

anecdotes—all apart from the MRI—led him to his opinion." *Id.* "Instead," Fields notes,

"Seward briefly mentioned the purportedly normal MRI result once, only to state it was

'not surprising[]' given his opinion." *Id.* at 45–46 (quoting ROA, Vol. 12 at 259). Fields

also asserts, citing to two different authorities, that "[b]rain imaging such as an MRI is

*not* determinative of brain damage, particularly where, as here, neuropsychological

testing shows otherwise." *Id.* at 46 (emphasis in original). In sum, Fields asserts that,

contrary to the conclusion reached by the district court, "[a]n individual can have a

normal MRI and still have brain damage based on neuropsychological testing and

evaluation." *Id.* Fields also argues, relatedly, that "for capital mitigation purposes,

neuropsychological testing is distinct from, and more probative than, neuroimaging." *Id.*

at 47. Lastly, Fields argues that "[n]oticeably absent from any of the Government's

district court pleadings was any argument that [his] MRI report precludes a finding of

brain damage." *Id.* at 49.

Based upon the record before us, we agree with Fields. At a minimum, we conclude there is a genuine issue of material fact regarding whether an individual, such as Fields, can have organic brain damage that is revealed by neuropsychological testing, but that does not otherwise appear on an MRI of the brain. Therefore, we in turn conclude that the district court erred in basing its conclusion of no prejudice solely on the 2011 MRI results.

That of course still leaves a key question that was not addressed by the district court: assuming that the results of the 2011 MRI do not effectively undermine Fields's organic brain damage theory, is there a reasonable probability that, had O'Connell presented that organic brain damage evidence at trial, the result of the proceeding would have been different? On that point, Fields asserts that O'Connell "omitted evidence that is among the most persuasive types of mitigation evidence, particularly in comparison to the case the jury heard." Aplt. Br. at 20. In support, Fields argues that "available experts could have testified about [his] brain damage and how it interfered with his judgment, reasoning, and behavior." *Id.* Such expert testimony, Fields argues, "would have humanized [him] and explained why he 'c[a]me to participate in a violent, murderous event.'" *Id.* at 21 (quoting *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007)). In addition, Fields argues that O'Connell could have used the evidence of his brain damage "to enhance [the defense's] bipolar-based mitigation presentation in support of the two state-of-mind mitigating circumstances, as well as the 'other factors' mitigator." *Id.* at 22. Fields also argues that presenting evidence of his organic brain damage "would have strengthened another mitigating factor that the jury unanimously rejected: [that he]

'w[ould] not present a future danger to society by being imprisoned for life without possibility of release.'" *Id.* at 23.

It is true, as a general matter, that we have noted "that evidence of mental impairments 'is exactly the sort of evidence that garners the most sympathy from jurors,'" *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) (quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004)), and that "[o]rganic brain damage is so compelling . . . because 'the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action.'" *Id.* (quoting *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012)). But we must examine the evidence in the record on appeal to determine whether, in this specific case, Fields was prejudiced by O'Connell's failure to present Gelbort's testimony.

We begin with the written report that Gelbort prepared and submitted to O'Connell prior to trial. That report stated, in pertinent part:

> Measures of higher cognitive abilities found mildly slowed to mildly impaired processing speed for verbally mediated tasks. Impulsivity of mild proportions was also found. Higher level reasoning tasks demonstrated mild impairment (performance in the bottom three percent of the population) with better performance noted on some of the more difficult tasks and worse performance on some that were easier. Again, deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance.
>
> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally

28

effective.  He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted.  The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

ROA, Vol. 9 at 227.  Respondent asserted below, and we tend to agree, that Gelbort's "report of 'mild' symptoms did not suggest this was a potentially rich vein of untapped mitigation evidence."  *Id*. at 683.  And, indeed, the email evidence that was submitted by respondent suggests that both O'Connell and Woods viewed Gelbort's report in a similar manner.

Gelbort's post-trial declaration, however, is more compelling and, we assume, reflects how Gelbort would have testified had he actually been adequately prepared by O'Connell and presented as a witness at the penalty phase proceeding.  To begin with, Gelbort notes in his declaration that Fields's organic brain damage "affect[s] [Fields's] ability to adequately judge and comprehend a situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions."  ROA, Vol. 11 at 506.  Gelbort further notes that "[s]tressful situations exacerbate . . . Fields's inability to control his actions and solve problems in a reasonable manner."  *Id.* Gelbort's declaration also contains a critique of Price's testing and conclusions.  "For instance," Gelbort states in his declaration, Price "repeatedly made scoring errors on the WAIS-III that make . . . Fields seem less impaired then he actually is," and that "[t]hese errors call into question the validity of . . . Price's testing results and the competency of his trial testimony."  *Id.* at 510.  In our view, discrediting Price would have been critical to the defense, since Price, in contrast to the defense experts who testified at trial, opined

29

Appellate Case: 20-7036    Document: 010110353486    Date Filed: 05/28/2020    Page: 30    Restricted

that Fields suffered from an untreatable personality disorder with anti-social and psychopathic narcissistic and dependent traits and features.

We turn next to the post-conviction psychological evaluation report prepared by Martell. In that report, Martell stated that he performed a neuropsychological examination of Fields in early 2010 and, as part of that examination, administered "[a] comprehensive neuropsychological test battery." *Id.* at 286. Martell stated that "Fields'[s] test performance overall was in the range of moderate-to-severe brain damage, and [that] this represent[ed] a catastrophic decline in functioning over the five years since he was seen by Dr. Price." *Id.* Martell further stated that "[i]mpairment was seen in almost all areas of function," the only exceptions being "preserved or spared abilities in visual organization . . . and pure motor speed with the non-dominant hand." *Id.* According to Martell, "Fields'[s] executive control functioning was the most profoundly impaired area tested," and "[h]is scores on diverse measures of discreet frontal lobe functions were all moderately to severely impaired, including . . . impulse control" and "disinhibition." *Id.* at 287.

As part of his report, Martell also commented on Price's findings and testimony. To begin with, Martell concluded that "Price: (1) minimized Mr. Fields'[s] actual neurobehavioral impairments, and (b) over-reported his actual level of functioning." *Id.* at 288. Martell in turn concluded that "[t]he jury in this case was never provided with a countervailing opinion that there was a *pattern of impairments* in his test performances suggestive of brain damage," nor was the jury "told about impairments found in . . . Gelbort's data that got worse by the time of . . . Price's testing (e.g., WAIS-III

Arithmetic, Trails B)." *Id.* at 288–89 (emphasis in original). "Regarding the issue of . . .

Price over-estimating . . . Fields'[s] level of functioning," Martell opined that this was the

result of "'practice effects' in neuropsychological testing, whereby individuals who are

tested twice in a relatively short period of time will show artificially inflated scores the

second time, due to the effects of prior experience and practice with the test stimuli." *Id.*

at 289. Martell also stated that "Price repeatedly offered the opinion that Mr. Fields was

malingering auditory hallucinations, which the objective record strongly contradicts," and

he opined that Price's "testimony could have been challenged with rebuttal using . . .

Price's own prior inconsistent statements that he found . . . Fields to be cooperative and

effortful, that his test results were valid and reliable and that he impressed . . . Price as,

[sic] 'trying hard.'" *Id.* (citations omitted). Martell opined that Price also testified

outside his expertise. Specifically, Martell opined that Price "went beyond where

[psychologists] generally are qualified to go in testifying about the specific effects and

side effects of various psychotropic medications." *Id.* at 290. In his summary, Martell

stated: "It is apparent from the current testing that . . . Fields has experienced a

catastrophic loss of brain function over the past five years," and that Fields's "pattern of

impairments" was "strikingly consistent with the pattern of brain impairments detected in

[his] mother, Mary Margaret Fields, in September of 2001." *Id.* at 292. This pattern,

Martell opined, raised "the possibility of an inherited vulnerability to brain dysfunction

and the need for a more comprehensive neurodiagnostic workup, including MRI and

neurological examination." *Id.* Martell further opined that, "[i]n light of his family

history and the results of the present examination, the most likely disease process would

31

appear to involve the cerebral vascalature [sic], including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia." *Id.* Martell conceded, however, that Fields's "overall level of cognitive functioning was significantly higher at th[e] time" he was evaluated by "Gelbort and Price." *Id.* at 293.

The problem with Martell's report and his opinions, however, is that Martell was only a post-conviction witness, and, as we have noted, Fields does not claim that O'Connell should have investigated and presented testimony from Martell. Rather, Fields argues only that O'Connell should have presented at trial expert testimony from Gelbort, and in turn asked Woods and Grinage to testify "about the connection between . . . Fields's brain damage and his criminal behavior." Aplt. Br. at 14. Thus, Martell's declaration is, at best, of limited value in assessing the prejudice prong of *Strickland*.

Lastly, we turn to the post-conviction declarations prepared by Woods and Grinage, the two defense experts who testified at trial. Woods stated in his declaration that "[p]eople with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses," as well as "impairments in social judgment." ROA, Vol. 11 at 183. Woods further stated that "[if] this impairment [wa]s added to [his] clinical opinion that Mr. Fields underwent a manic switch, then we see a situation where Mr. Fields'[s] already impaired ability to control himself made him even less able to negotiate the flight into mania that I believe occurred." Id. Grinage, in his declaration, noted that, "[a]t the time of trial, [he] was provided only with the raw data from . . . Gelbort's neuropsychological testing," and that,

Appellate Case: 20-7026    Document: 010110353481    Date Filed: 05/26/2020    Page: 33    Restricted

because he is "not expert in the interpretation of psychological test data," he "rel[ied] on

reports written by psychologists to provide such interpretation." *Id.* at 190–91.  Grinage

in turn stated that it was his understanding, based on the report of Martell, that "Fields

was moderately impaired at the time of trial and now is severely impaired with some kind

of degenerative or progressive neurological disease." *Id.* at 191  Grinage stated that, "[i]f

[he] had been presented with th[at] information . . . and . . . been asked to consider

[Fields's] 'cognition,'" he "would have testified that [Fields's] organic brain damage,

focused in his frontal lobes, [wa]s a mitigating factor." *Id.*

The problem with the statements from Woods and Grinage is that the opinions

contained therein are based on a combination of both Gelbort's pretrial evaluation of

Fields and Martell's post-conviction evaluation of Field.  In other words, the declarations

fail to distinguish between Woods's and Grinage's reliance on information provided by

Gelbort versus information provided by Martell.  As a result, for example, it is unclear if

Woods believes that the alleged impairments found by Gelbort prior to trial were

sufficient, standing alone, to contribute to Woods's "manic switch" theory.

Ultimately, considering all of the evidence submitted by Fields and discounting

portions of it, we are still left with some evidence that is relevant to the issue of prejudice

and supportive of Fields's allegations.  Importantly, that evidence "relate[s] primarily to

purported occurrences outside the courtroom and upon which the record could . . . cast no

real light." *Machibroda*, 368 U.S. at 494–95.  Further, that evidence has been "put in

issue by the" evidence submitted by respondent. *Id.* at 494.  Consequently, we are unable

to say that "the files and records of the case conclusively show that" Fields was not

prejudiced by his trial counsel's failure to present Gelbort as a witness at trial. 28 U.S.C. § 2255(b). This is, of course, not to say that we are of the view that Fields will be able to establish prejudice. Rather, we conclude simply that the circumstances outlined by Congress in § 2255(b) under which a motion may permissibly be decided without benefit of an evidentiary hearing are not present in this case with respect to the issue of prejudice.

### f) Conclusion

For the reasons outlined above, we must remand the case to the district court to conduct an evidentiary hearing on Fields's claim that his trial counsel was ineffective for failing to adequately investigate and present at trial the testimony of Gelbort. As discussed, we conclude that, as to this claim, genuine issues of material fact exist regarding both the performance and prejudice prongs of the *Strickland* test. It will therefore be the district court's task on remand to "make findings of fact and conclusions of law with respect" to those two prongs. *Machibroda*, 368 U.S. at 494 (quotations omitted).

*Issue Two – Ineffective assistance of trial counsel for failing to present Fields's social history as a mitigating factor*

In his second issue on appeal, Fields challenges the district court's rejection of his claim that his trial counsel was ineffective for failing, during the penalty phase proceeding, to present his social history as a mitigating factor. According to Fields, the district court's "holdings under both prongs of *Strickland* were erroneous," and it also

abused its discretion by failing to conduct an evidentiary hearing on the claim.  Aplt. Br. at 50.

Because this claim is subject to the same general legal standards as the previous claim, we begin our analysis by reviewing Fields's allegations of ineffective assistance and determining whether, if proved, they would entitle him to relief under the applicable legal standards.  We then review the evidence submitted by the parties that is relevant to the claim.  Lastly, we determine whether the district court erred in rejecting the claim on the merits, without first conducting an evidentiary hearing.  As discussed below, we conclude that the district court properly rejected this claim on the merits and did not abuse its discretion by failing to conduct an evidentiary hearing.

*a) Fields's allegations of ineffective assistance*

In his amended § 2255 motion, Fields alleged that "[t]he defense's presentation of [his] social history evidence was disjointed, incomplete and unpersuasive."  ROA, Vol. 11 at 103.  Fields alleged that "[a] handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family."  *Id.*  "Yet," Fields alleged, "the defense's mitigation specialist had collected compelling evidence that, contrary to the impression created with the jury, [he] was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning."  *Id.* at 103–04. Fields argued that "[t]rial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records."  *Id.* at

104. "Such a witness," Fields argued, "could then have explained that information to the jury as part of a coherent, compelling mitigation theme" *Id.* Fields argued that "[t]rial counsel also should have argued to the jury that . . . Fields's social history mitigated the offenses." *Id.* Lastly, Fields alleged that he "was prejudiced by trial counsel's deficient performance" because, "[h]ad the jury heard evidence of [his] dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death." *Id.* at 114.

We conclude, after considering these allegations in light of the standards for ineffective assistance of counsel outlined in *Strickland*, that Fields would be entitled to federal habeas relief from his sentence if he were able to prove the allegations. We therefore proceed to review Fields's detailed allegations of family dysfunction and the evidence in the record on appeal that is relevant to Fields's allegations.

*b) The social history evidence cited by Fields*

According to Fields, both of his parents "grew up under challenging conditions." Aplt. Br. at 52. Fields alleges that his paternal grandfather died prematurely "in a truck fire," and "his paternal grandmother developed a brain tumor that left her blind and [ultimately] kill[ed] her." *Id.* As a result of his paternal grandmother's tumor "and her then-husband's sexual abuse of her daughters," Fields's father, Leon, "and his siblings were separated from [each other] and put in foster care or put up for adoption during their formative years." *Id.* Fields alleges that his maternal grandparents "had an unhappy marriage, which often included arguments and verbal fights." *Id.* (quotations omitted). His maternal grandmother, Fields alleges, "received electroshock treatment for her

mental health problems, and one of her sisters was 'disturbed' while another had unspecified mental problems." *Id.* Fields alleges that his mother Margaret, an only child, "suffered from depression her entire life, was diagnosed with bipolar disorder, and, as an adult, placed her own emotional needs above those of her children." *Id.* at 52–53.

Fields allegedly had a "near-death experience at the time of his birth." ROA, Vol. 11 at 187. According to his mother, "he had a 'hollow membrane disorder'" that made it difficult for him to breathe at birth. *Id.* Fields "almost died and ultimately was sent to another specialized hospital where he spent about one week." *Id.* These facts, Fields alleges, "raise[] the possibility of organic brain damage at the time of birth, secondary to oxygen deprivation." *Id.*

During Fields's childhood, "[h]is family moved often because of his father's jobs." *Id.* at 186. This included four moves before Fields reached high school. Id. at 426–28. "His father was largely absent from . . . Fields's day-to-day life due to the long work hours his job required." *Id.* at 186. "His mother was emotionally turbulent and self-centered." *Id.* "She jealously guarded her relationship with her husband to the extent that she literally kept the father from the children so as to maximize her private time with him." *Id.* "As a result, the relationship between the parents and . . . Fields and his sister (Cherie), was distant, cold and unemotional." *Id.*

Both Fields and Cherie related "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." *Id.* at 186–87. This included their father, at their mother's direction, beating them on the bare bottoms with a belt "until [they would] cry and scream." *Id.* at 442. Further, according to Cherie, their parents

never "showed [them] any physical affection." *Id.* at 441. More specifically, their parents never hugged them "and they would never say that they loved [them]." *Id.* When Cherie was in the ninth grade, their mother "had a hysterectomy and" Cherie "remember[s] [her father] saying that he was thinking about putting [Fields] and [Cherie] on a train and getting rid of [them]." *Id.* Cherie also alleges that their "mother took pleasure in making sure [that Fields] and [Cherie] stayed at each other's throats" and was also "very good at dividing [them] and separating [them] from emotional comfort or security." *Id.*

"Fields suffered from life-long depression." *Id.* at 187. "He was predominantly described by those who knew him as 'unhappy,' 'moody' and 'strange.'" *Id.* "He did not maintain interest in any particular activities and changed jobs frequently without apparent reasons." *Id.* "He seemed to move from one activity or relationship to another, without any obvious motivation for doing so." *Id.* "Medical records document that he was variously diagnosed as 'depressed,' 'anxious' and as having mood problems." *Id.* "He reported sleep disturbances, weight loss and lack of energy as a result of his mood problems." *Id.* at 187–88. "At times, he reported hearing voices . . . ." *Id.* at 188.

Fields has also "rarely been able to express emotions or been encouraged to express emotions during his life." *Id.* As a result, he "has been almost universally perceived as an emotionally flat or cold individual." *Id.*

As a teenager, Fields allegedly "exhibited behavioral problems." *Id.* The only specific event that is mentioned in the record, however, is his suspension from high

school during the eleventh grade.[4]  *Id.* at 428.  Fields "reported the reason [for the suspension] was because he was disrespectful to the principal; his mother reported it was because he was 'making out with a girl.'"  *Id.*  Fields "did not return to high school" after the suspension and instead "received his GED."  *Id.*  Fields apparently left home at that point and "began living with a woman he described as a 'biker tramp,' who was considerably older than he" was.  *Id.*  Fields "reported that during the period of time he lived with this woman, he drank and smoked marijuana for the first time."  *Id.*

At some point, Fields's mother responded to his behavior by taking "him to the same psychiatrist who was seeing her for 'therapy.'"  *Id.* at 188.  "[T]his was short-lived," however, and Fields "was soon pushed by his family into joining the Navy as a way of addressing the 'problem.'"  *Id.*  Although Fields completed his commitment to the Navy and actually reenlisted one time, he thereafter was unable "to stay at one job for long."  *Id.* at 189.

c) *Trial counsel's efforts to gather and present social history evidence*

Prior to trial, Fields's defense team retained a Memphis-based private investigation firm, Inquisitor, Inc., "to provide capital mitigation services for the defense."  *Id.* at 184.  Gloria Shettles, an employee of Inquisitor, was assigned to the case.  *Id.*  Shettles has a masters degree in guidance and counseling, worked for a time for

---

[4] While attending high school in Virginia, Fields was allegedly "advised . . . he had a particularly high IQ."  ROA, Vol. 11 at 428.  Further, prior to his suspension from high school, "a guidance counselor [allegedly] took it upon herself to make application for [Fields] to Harvard, and other prominent universities, to which he was accepted, but could not afford to attend."  *Id.*

39

the "Tennessee Board of Paroles," and began working for Inquisitor in 1993 as an investigator and mitigation specialist. *Id.* According to Shettles, she "began working on the Fields case . . . in August, 2003." *Id.* at 185. She began by "identify[ing], locat[ing] and interview[ing] as many individuals as possible who knew about . . . Fields'[s] background." *Id.* She "also ordered and eventually obtained as many documents as possible about . . . Fields'[s] life, including medical, mental health and school records." *Id.* Shettles "took direction from" O'Connell and "interviewed only those people to whom [she] was directed by . . . O'Connell." *Id.* Shettles "brought to the attention of . . . O'Connell" what Shettles believed to be "a variety of potential mitigating factors and themes." *Id.* at 189. Shettles alleges that she "was present throughout the trial," but "was never called to testify and much of the mitigating factors that [she] found were either not presented at all to the jury or were presented in isolated fashion and without providing an overall mitigating context." *Id.* In a post-conviction declaration, O'Connell states that she "had no tactical or strategic reason for not presenting th[is] [social] history either through one of the doctors or through . . . Shettles." *Id.* at 166.

Despite not calling Shettles as a witness, O'Connell presented some evidence regarding Fields's social history through three other witnesses. The first of those witnesses was Fields's sister Cherie. She testified that their mother was a full-time homemaker and that their parents provided well for her and Fields. She further testified that she and Fields attended Catholic schools through the eighth grade. She testified that Fields was very intelligent, but rejected authority as a teenager, would often start something and then quit, didn't finish high school, and instead received a GED. In

addition, she testified that when they were growing up, she was fearful that Fields would

physically hurt her.  She testified that Fields joined the Navy at age seventeen.  She

testified that Fields, as an adult, did not take his role as a father seriously, was not

pleasant to be around, was always "bumming" money from their parents, and did not

provide much emotional support for anyone.  Notwithstanding her negative portrayal of

Fields, Cherie testified that she loved him and wanted him to remain alive.[5]

The second witness to offer descriptions of Fields's social history was Teresa

Fields, Fields's ex-wife and the mother of his two children.[6]  She testified that they

married when he was in the Navy and that, at one point, she thought he was going to

make a career out of the Navy because he reenlisted and worked as a recruiter during his

reenlistment period.  She testified, however, that Fields subsequently left the Navy and

proceeded to take and leave a number of menial jobs.  She testified that he worked for

several years as a prison guard and that that was the longest period of time that he held

the same job.

Teresa painted a bleak picture of their married life together.  In particular, she

testified that he sometimes shoved her when they argued and, on one occasion, tried to

choke her.  She also testified that he would sometimes throw things when he got mad,

was moody and grouchy, and would often lock himself in his room for long periods of

---

[5] Cherie represented a stark contrast to Fields because she was a successful business person who owned three Wendy's franchises in Virginia.

[6] Fields's two children both briefly testified, but did not offer any details regarding Fields's social history.

41

Appellate Case: 20-7067  Document: 010110353486  Date Filed: 05/26/2020  Page: 42
Appellate Case: 17-7064  Document: 01034862815  Date Filed: 05/28/2019  Page: 42  Restricted

time.  In addition, she testified that he did not take financial responsibility during their marriage and would often purchase things for himself before he would take care of family obligations.

Teresa had a few complimentary things to say about Fields.  For example, she testified that after they separated, he continued to maintain health insurance for her and their children and that the insurance was critical for her because she was diagnosed with Stage 3 breast cancer.  She also testified that, after Fields regularly started taking medication in jail, his behavior was different and that he expressed interest in their children.

The third and final witness to testify about Fields's social history was Woods, the neuropsychiatrist retained by Fields's defense team.  Woods testified that Fields has a family history of mood disorders.  In particular, Woods noted that Fields's mother was being treated with antidepressants and anti-anxiety agents, his maternal grandmother had electroshock therapy in the 1930s and 1940s, and that Fields's sister was also being treated with antidepressants.  Woods also testified that there were two times in Fields's life when Fields functioned well: when he was in the Navy and when he worked as a correctional officer.  Both of these jobs, Woods noted, were very structured.

As Fields notes in his opening brief, defense counsel did not allege or argue any mitigating factors related to "his family dysfunction."  Aplt. Br. at 56.  Instead, Fields's defense counsel focused on twenty-two other alleged mitigating factors, including: his lack of any other serious criminal offenses; events that occurred in Fields's life shortly prior to the murders (e.g., the death of his father; his ex-wife and children moving away

from Oklahoma; his mother moving from Oklahoma to Virginia); his mental illness (as testified to by Grinage and Woods) and the fact that he sought treatment for it; his skills and work history; the fact that he had friends and family members who loved or cared for him; and the fact that he confessed to the murders and cooperated with authorities. As previously noted, O'Connell alleges in her post-conviction declaration that she "had no tactical or strategic reason for not presenting" more evidence of Fields's social history and arguing Fields's social history as a mitigating factor. ROA, Vol. 11 at 166.

### d) The district court's analysis of this claim

The district court rejected on the merits Fields's argument that his trial counsel was ineffective for failing to present evidence of his social history through a mitigation specialist or a mental health expert. In doing so, the district court first addressed the performance prong of the *Strickland* test and noted that "there [wa]s no question that [defense] counsel . . . fully investigated [Fields's] social history." ROA, Vol. 12 at 598. The district court thus concluded that defense "counsel fulfilled her duty to conduct a reasonable investigation into [Fields's] social history." *Id.* The district court also noted that "[d]ecisions regarding which witnesses to call at trial are quintessentially a matter of strategy for the trial attorney," and that such strategic choices are "virtually unchallengeable." *Id.* (quotations omitted). Although the district court did not directly say so, it appears to have implicitly concluded that O'Connell's performance was not deficient, i.e., that she knowingly decided, for strategic reasons, to forego presenting all of the available social history evidence.

Appellate Case: 20-7026   Document: 010110353482   Date Filed: 05/26/2020   Page: 44   Restricted

The district court also addressed the prejudice prong of the *Strickland* test and concluded that "submission of the evidence which Fields now suggests should have been introduced into evidence would not have changed the jury's verdict." *Id.* "Rather," the district court concluded, "it would have actually undermined the defense theory that the Effexor" that was prescribed to Fields shortly prior to the murders "caused an anomaly, a one-time switch to flip in [Fields's] brain thereby leading an otherwise law abiding citizen to commit these horrific murders." *Id.* The district court concluded that "[t]he decision not to submit evidence that these murders were, in some way, the product of a long-standing lack of socialization or empathy, caused by a less than idyllic family life approximately twenty years earlier, would have diluted the defense theory that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies." *Id.* "Furthermore," the district court concluded, "evidence Fields was emotionally estranged from his family would have directly contradicted the defense arguments that the death of [his] father and his mother's illness caused the defendant to experience severe emotional disturbances." *Id.* "Similarly," the district court stated, "evidence [Fields] had difficulty forming relationships would have undermined the notions that [he] was remorseful and that he was a loved relative and friend." *Id.* "Simply put," the district court stated, "presentation of additional evidence that [Fields] had a dysfunctional upbringing, or was cruel and violent towards his relatives, would have substantially weakened, as opposed to strengthening, the defense's mitigation case." *Id.* at 597–98. Ultimately, the district court concluded that Fields failed to "me[e]t his burden to establish counsel's decision to not call the mitigation specialist or put more social history

Appellate Case: 20-7027    Document: 010110354862    Date Filed: 05/26/2020    Page: 45  Restricted

evidence before the jury through a mental health expert was an unreasonable trial

strategy." *Id.* at 598.

Fields moved to alter or amend the judgment and, in that motion, asked the district

court to "reconsider its ruling denying relief without a hearing on" his claim "that trial

counsel was ineffective in failing to present [his] social history." *Id.* at 620.  In denying

Fields's motion, the district court stated:

> While the court fully understands defense counsel's desire to prevent her
> client from receiving the death penalty at all costs, when counsel's memory
> does not accurately depict what, based upon contemporaneous documents,
> occurred in the case, the court does not need to hold an evidentiary hearing.
> Contrary to petitioner's allegations, a review of Ms. O'Connell's
> declaration when considered with various emails which were written
> contemporaneously with trial preparation convinces this court that Ms.
> O'Connell's memory was not as clear on March 30, 2010 [when she signed
> her declaration], as it was during trial preparation and/or the actual trial in
> 2005. As pointed out in the Opinion and Order denying relief, Ms.
> O'Connell claimed she did not have adequate assistance of counsel which
> was contradicted by various records in the case.  *See*, Dkt. # 125, at pp. 10-
> 11.  Similarly, Ms. O'Connell claimed she had no "tactical or strategic
> reason for not presenting [Fields's social] history either through one of his
> doctors or through Ms. Shettles."  Dkt. # 106-2.  Her emails, however, belie
> this statement.  In an email discussing trial strategy regarding a mental
> health expert, counsel explained:
>
>> . . . .I recognize that experts can cancel each other out in
>> juror's minds.  And, many of them won't care about mental
>> health.
>>
>> . . . . . .I want to keep the 'crap' away from the jury if at all
>> possible.  I think its going to be hard enough to get them to
>> feel sympathy for client.  If they get to hear all the other junk,
>> it may tip the scales (if we have any hope at all).
>
> Dkt. # 110-7.  A few days later, Ms. O'Connell sent an email to another
> attorney who she was consulting with regarding Petitioner's case.  After
> providing this consultant with her case and client in a nutshell, including a

Appellate Case: 20-7026   Document: 010348628146   Date Filed: 05/26/2020   Page: 46   Restricted

substantial description of the social history of her client, Ms. O'Connell stated:

> My client has absolutely no criminal record. But the government believes he is a psychopathic retrobate [sic]. They gathered all the garbage they could on him, by going to the community and asking what they'd heard, about a month after the murders. The town is tiny, and there was nothing to talk about except the client. So the FBI guys got all the dirt. The gov't wanted to use the dirt in aggravation. The judge has ordered that most of it stays out. I'll list most of it here; don't laugh:

> Client has always been considered a little strange. He was always coming on to women, some of whom say he was 'creepy.' He often bragged of his sexual prowess. In fact, he dated 2 women at the same time, unbeknownst to either of the women, and spoke of marriage to both. He had a webcam that he told people he jacked off in front of, with over 1000 visitors to his site, or so he bragged, anyway. (And, as mentioned above, there was the fascination with pornography during his marriage.) He chatted with women on the internet, and then went to meet them!

> Client liked to fish more than anything in the world. Once he took a device to work--it was locked in his truck, in the parking lot. It was like a pipe bomb, with a kitchen timer. But it had no detonator or explosive material. In the parking lot, he showed it off to a couple guys, and explained it was for fishing. He also took a rifle to work one day, again-- locked in the car. He'd just purchased it at Wal-Mart, and didn't have time to take it home before his shift started. He showed it off to a buddy. (The bomb thing got him fired.) He had a burmese python for a pet, and hunted rattlesnakes for extra cash (40 cents a foot).

> A distant relative believes he hung a cat over a limb when he was four years old. Jump ahead 34 years---Someone else saw him put a stray cat in a burlap bag and twirl the bag around until the cat got dizzy. He told a co-worker he shot a cat that was keeping him awake at night. Another co-worker reported that he said he fed baby kittens to his snake. And, no kidding, a (sic) witnessed him hit a cow and curse at it.

As also related above, client had some domestic violence in his life. Some people reported that his mother was afraid of him. One said he kept loaded guns by every door in the house.

\* \* \*

Judge says virtually all of this stays out, as long as I don't open the door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge (sic) and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff. Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment. The gov't has 2 docs, the examinations were taped. I have listened, and know the outcome, because the docs had been front-loaded with the creepy-crawly stuff. Lots of questions about his womanizing, probing inquiry into why someone would make up the cat hanging incident. So, I can anticipate all the "junk" will play a role in any determination made by the gov't docs. Most of that crap isn't true (like hanging a cat), or has been largely exaggerated (the bomb thing has turned into threatening people at work with a bomb). But I'm worried that, through my mental health evidence, all of it will somehow come in, because the govenrment's (sic) experts will say they reviewed it, it helped them reach their conclusions, whatever.

Whatever I don't put on the table with my mental health testimony, they will want to get it in the back door, as justification for their docs' opinions.

Dkt. 129-1, at pp. 3-4.

Given Ms. O'Connell's express desire to rely on psychopharmacology evidence while avoiding all of the "crap," this court finds Ms. O'Connell had clearly developed a reasonable trial strategy to keep this evidence from the jury. Moreover, since Ms. O'Connell had investigated and discussed the petitioner's social history with a mitigating specialist prior to trial, she knew how difficult a job she had. With all of these things in mind, Ms. O'Connell did everything she could to portray the

Appellate Case: 20-7026   Document: 010346281   Date Filed: 05/26/2020   Page: 48 Restricted

murders as an aberration caused by a "SICK" individual who, upon receiving the proper medication, was no longer dangerous. Ms. O'Connell was able to elicit positive attributes of petitioner through his sister, Cherie Fields; his ex-wife, Teresa Fields; a co-worker, Jovanna Fields; his son, Andrew Thomas Fields; and his daughter, Amanda Fields, while preventing the  government from asking these same witnesses to explain why Petitioner's mother was scared of him.

*Id.* at 644–47 (footnotes omitted).

The district court in turn noted that "[e]ven though a troubled childhood is the kind of evidence which garners the most sympathy from jurors, no case dictates that counsel must always introduce the evidence especially where, as here, the evidence could potentially backfire." *Id.* at 648 (citation and quotations omitted). The district court further noted that, "[w]hile trial counsel's strategy ultimately failed to convince the jury that Petitioner's life was worth sparing, this court believes it was a well thought out and sound trial strategy." *Id.* The district court therefore concluded that Fields "ha[d] failed to establish he received ineffective assistance of counsel," or that he was prejudiced by counsel's failure to present the social history evidence. *Id.*

### e) Fields's appellate arguments

In this appeal, Fields argues that "[t]he district court's failure to conduct a hearing and its holdings under both prongs of *Strickland* were erroneous." Aplt. Br. at 50. With respect to the performance prong of *Strickland*, Fields argues that, "[t]aking his proffer as true," he "has proven that [his] trial counsel ineffectively failed to present [his] history of family dysfunction and mental illness." *Id.* at 51. In support, he points to O'Connell's post-conviction statement "that she had no reasonable strategic basis for failing to present" this evidence at trial. *Id.* at 56. With respect to the prejudice prong of

48

*Strickland*, Fields argues that, "[g]iven the importance of social history evidence in capital sentencing trials, [his] counsel's deficient performance prejudiced [him]." *Id.* He asserts, in support, that "[w]hile a few isolated biographical facts were told to the jury, some of the most mitigating aspects of [his] life—his upbringing in a home filled with abuse, emotional deprivation and dysfunction—were never coherently presented to the jury through any of the defense witnesses." *Id.* at 56–57. He further asserts that his "social history could have been utilized by . . . Grinage to bolster his testimony related to the defense's theory because a 'collateral history is critical in assessing and presenting a complete picture of the patient/defendant . . . to explain his mental state at the time of the incident.'" *Id.* at 57 (quoting ROA, Vol. 11 at 180). He also asserts that "presentation of [his] complete social history could have provided the jury an explanation for his seeming lack of emotion or remorse, which the jury relied on in sentencing [him] to death." *Id.* Fields argues that, had his defense counsel presented evidence of his social history, "there is a reasonable probability that at least one juror would have voted for a life sentence." *Id.* Finally, Fields argues that the district court erred in refusing to hold an evidentiary hearing on the claim because his "detailed averments and proffer of evidence, if true, would require relief." *Id.* at 59. According to Fields, "[t]he district court should have resolved any disputed facts through adversarial testing rather than summary dismissal." *Id.*

Turning first to the issue of defense counsel's performance, we tend to agree with the district court that the evidence in the record appears to refute O'Connell's post-conviction declaration that she did not make a strategic decision to forego presenting

49

Fields's complete social history.  But we need not reach a final conclusion regarding the performance prong of the *Strickland* test because, as we shall proceed to discuss, we agree with the district court that Fields was not prejudiced by his counsel's failure to present evidence of his complete social history.

Although presenting the social history evidence that Fields has identified in these § 2255 proceedings might have supported the existence of additional mitigating factors, it also, as the district court aptly noted, quite clearly would have undercut the main theme of O'Connell's defense strategy: that Fields was a normal, law-abiding citizen who, due to medication-induced mania, committed a horrible crime and has since confessed and shown remorse for that crime.  The social history evidence would also have been contrary to the following specific arguments made by O'Connell during her closing: that (a) "he has a ton of people who love him"; (b) his mental illness "impaired his abilities"; (c) he "brought joy to some people"; (d) he "excelled in his job"; and (e) "[h]is support system had evaporated" due to the death of his father, his ex-wife and children moving away, and his mother moving to live with his sister.  ROA, Vol. 5 at 3435, 3436, 3441.  The social history evidence would instead have portrayed Fields as an individual who, from late high school through the time of the crimes, acted selfishly and irresponsibly, and not only failed to develop meaningful relationships with his family, but either took advantage of or neglected multiple family members and girlfriends on multiple occasions.  We therefore firmly agree with the district court that there is not "a reasonable probability" that, had the social history evidence been presented at trial, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Appellate Case: 20-7027-7036 Document 0153486281 Date Filed: 05/28/2020/2019 Page: 473 ge: 54 Restricted

We in turn conclude that the district court did not abuse its discretion by dismissing this claim of ineffective assistance without first conducting an evidentiary hearing. There are, of course, disputes of fact regarding whether or not O'Connell made a strategic decision to forego presenting the social history evidence. But, importantly, the evidence of Fields's social history is essentially undisputed. Thus, an evidentiary hearing was unnecessary for the district court, or in turn for us, to conclusively resolve the issue of prejudice.

> *Issue Three – the government's invocation of religious authority during closing argument and defense counsel's failure to object thereto*

In his third issue on appeal, Fields argues that his constitutional rights were violated when the prosecutor, during closing arguments, invoked what Fields calls "religious authority." Fields also argues that his trial counsel was ineffective for failing to object to the prosecutor's improper argument. The district court rejected these arguments. Fields now appeals from that ruling and also argues that the district court erred in violation of § 2255(B) in failing to conduct an evidentiary hearing on this claim of ineffective assistance.

We begin our analysis of this claim by reviewing the prosecutor's closing argument that is now being challenged by Fields. We in turn review the district court's rulings on Fields's claims. Lastly, we address Fields's challenges to the district court's rulings. As discussed below, we conclude that Fields was not prejudiced by the prosecutor's allegedly improper arguments, that he was not prejudiced by his trial

counsel's failure to object to those arguments, and that the district court did not abuse its

discretion in failing to conduct an evidentiary hearing.

*a) Facts relevant to the claim*

At the conclusion of the evidence at the sentencing proceeding, the prosecutor

gave two closing arguments: an initial closing that preceded defense counsel's closing

argument, and a final closing that followed defense counsel's closing argument. Near the

end of the final closing, the prosecutor stated, in pertinent part:

> Thousands of years ago the king of the world's greatest then existent
> civilization and most powerful empire held a great feast for thousands of
> his ruling friends. They ate, they drank from golden and silver goblets that
> they had stolen from the temple of a subdued and now enslaved nation.
> They drank wine and they worshiped pagan idols. All of a sudden the
> fingers of a hand began to write on the palace wall. The king saw the hand
> and was so frightened, he was so scared, that his clothing literally came
> loose. He became white. He shook. His knees banged together. He cried
> out: Bring the astrologers, bring the wise men of the nation. Whoever
> interprets this saying on the wall will become the third most powerful
> member of my government. He will have great riches. The wise men came
> in. They studied, they deliberated, they conversed, they conferred and they
> thought. But they couldn't read much less interpret the writing on the wall.
> The king's face turned ashen. The queen, though, remembered a forgotten
> man. She called for him after talking to the king. And the king made the
> man the same offer. The man, though, he turned down all of the riches, all
> the honor and all of the prestige. The man bravely interpreted the writing
> on the wall. And the writing on the wall said in three words, your kingdom
> has come to an end, your kingdom will be divided and given to your
> neighboring enemies, and then the prophet said the writing said you have
> been weighed in the balance and found wanting. Sure enough, that night
> the king was killed. His kingdom was separated among his neighboring
> enemies.

ROA, Vol. 5 at 3466-67. The prosecutor then went on to say: "The Defendant weighed

his options on July 10, 2003. Under the Court's instructions and the law given by the

Court, the Defendant should be, as it were, weighed in the balance and found wanting." *Id.* at 3467. Fields's trial counsel did not object to any of these statements.

### b) Fields's presentation of the claim to the district court

Fields first challenged the prosecutor's statements in his § 2255 motion. Fields characterized the prosecutor's statements as "relat[ing] to the jury the well-known 'writing on the wall' sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death." ROA, Vol. 9 at 143. Fields argued that "[t]he Government's invocation of biblical support for its position invited the jurors to decide the question of [his] punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance." *Id.* at 144. Fields in turn argued that his "[t]rial counsel's failure to object . . . was deficient performance, and trial counsel could have had no strategic reason for their failure to do so." *Id.* at 144–45. Fields argued that he "suffered prejudice from [his] trial counsel's failure to make meritorious objections to the Government's improper closing arguments." *Id.* at 145. "As a result," he argued, "the jury was encouraged to ignore the substantial mental health evidence presented by [him], which it did in refusing to find that [he] committed the offenses under severe mental or emotional disturbance." *Id.* "[T]he jury also found," Fields argued, "that [he] committed the offenses after substantial planning and premeditation, and that [he] inflicted mental anguish upon Mrs. Chick." *Id.* Ultimately, Fields argued that "[i]f [his] trial counsel had objected . . . , there [wa]s a reasonable likelihood that the verdict would have been different." *Id.*

*c) The district court's resolution of the issue*

The district court, in addressing this issue, acknowledged that "religious arguments [are generally] condemned by both state and federal courts," but noted that "relief [wa]s not warranted unless the remarks prejudiced Fields['s] chances of receiving life without the possibility of parole instead of the death penalty." ROA, Vol. 12 at 612. The district court found that "[w]hile the analogy given by the prosecutor may have been paraphrased from the 'writing on the wall' sermon in the Book of Daniel, the argument was not delivered in biblical style." *Id.* The district court noted, in particular, that "[t]he prosecutor did not argue that God or any other religious authority justified the death penalty in this case," and instead "used a story devoid of any religious connotation . . . to emphasize [Fields] knew what could happen to him when he decided his course of action on July 10, 2003," and that "it was now up to the jury to impose the appropriate sentence based upon the court's instructions, which included a balancing (*i.e.*, weighing) of the aggravating and mitigating factors." *Id.* The district court also noted that "this was a case where the defendant pled guilty to murdering two people by randomly stalking them while wearing a ghillie suit; shooting them while hidden in the woods; and then stealing from them." *Id.* Lastly, the district court noted that "[t]he jury rendered their sentencing verdict in less than four hours." *Id.* The district court concluded that "none of the prosecutorial arguments, either individually or collectively, would have warranted reversal of the sentence on appeal." *Id.* at 48. The district court also, therefore, rejected the claim of ineffective assistance of counsel.

54

Appellate Case: 20-7026  Document: 010110354862  Date Filed: 05/26/2020  Page: 55  Restricted

*d) Fields's arguments on appeal*

Fields argues in this appeal that "the Government violated its duty to seek justice when it concluded its closing argument in support of the death penalty with a lengthy reference to the well-known 'writing on the wall' sermon from the Book of Daniel." Aplt. Br. at 67.  More specifically, Fields argues that "the prosecutor's Bible references had a substantial prejudicial effect on [his] Eighth Amendment right to a fair and reliable sentencing." *Id.* at 70.  Fields also argues that his "[t]rial counsel was ineffective for failing to object to the Government's improper argument." *Id.* at 67.  And, lastly, Fields argues that the district court abused its discretion by failing to conduct an evidentiary hearing on this claim of ineffective assistance of counsel.

Addressing these arguments in order, we note that Fields, in asserting the impropriety of the prosecutor's arguments, relies heavily on the Ninth Circuit's decision in *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000).  But the facts at issue in *Sandoval* were substantially different than those at issue in Fields's case.  The California state prosecutor in *Sandoval*, "[a]t the close of the penalty phase" of the trial, "argued to the jury that the death penalty was sanctioned by God."  241 F.3d at 775.  "His argument paraphrased Romans 13:1–5, a passage from the Bible's New Testament commonly understood as providing justification for the imposition of the death penalty." *Id.*  "The prosecutor told the jurors that God sanctioned the death penalty for people like Sandoval who were evil and have defied the authority of the State." *Id.* at 775–76.  The prosecutor "explained that by sentencing Sandoval to death, the jury would be 'doing what God

says.'" *Id.* at 776. "The prosecutor added that imposing the death penalty and destroying Sandoval's mortal body might be the only way to save Sandoval's eternal soul." *Id.*

The Ninth Circuit in *Sandoval* "agree[d] with Sandoval that the argument was both improper and highly prejudicial." *Id.* To begin with, the Ninth Circuit concluded that "[t]he prosecutor's argument frustrated the purpose of closing argument, which is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Id.* The Ninth Circuit noted that "[a]rgument urging the jury to decide the matter based upon factors other than those it is instructed to consider is improper," and "any suggestion that the jury may base its decision on a 'higher law' than that of the court in which it sits is forbidden." *Id.* The Ninth Circuit further noted that, "[i]n a capital case," "the prosecution's invocation of higher law of extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict." *Id.* The Ninth Circuit concluded that "[t]he Biblical concepts of vengeance invoked by the prosecution" in Sandoval's case "d[id] not recognize such a refined approach." *Id.* The Ninth Circuit also concluded that "[a]rgument involving religious authority . . . undercuts the jury's own sense of responsibility for imposing the death penalty," and that in Sandoval's case, "delegation of the ultimate responsibility for imposing a sentence to divine authority undermine[d] the jury's role in the sentencing process." *Id.* at 777.

The Ninth Circuit in turn concluded "that the prosecutor's remarks actually prejudiced Sandoval" by reducing his "chances of receiving life without possibility of

parole instead of the death penalty." Id. at 778.  In reaching this conclusion, the Ninth

Circuit noted:

> This is not a case where the evidence overwhelmingly supported the jury's
> verdict.  The issue was life or death and the jury was sharply divided.  After
> over three days of deliberations, the jury informed the trial judge that it was
> hopelessly deadlocked.  It was divided 6–6 on two of the counts and 7–5 on
> the other two.  In response to the judge's question whether the jury could
> possibly reach a result if it deliberated further or perhaps had portions of
> the transcript read back to it, each juror individually answered "no."  Upon
> being returned to its deliberations, the jury took only an hour and forty
> minutes to go from a deadlock to four unanimous verdicts.
>
> We do not know what actually happened in the jury room, but we cannot
> assume that the prosecutor's religious argument did not persuade at least
> one of the jurors to change a vote for life to death on the Marlene Wells
> count.  The evidence in aggravation was countered with considerable
> mitigating evidence.  That the jury deadlocked evenly after deliberating
> over three days exemplifies the difficulty of the sentencing decision.
>
> The State argues that a finding of prejudice here would be out of step with
> cases from our sister circuits that have considered similar prosecutorial
> argument to be harmless error.  There is no discord, for the cases are very
> record-specific.
>
> In *Bennett v. Angelone*, for example, the Fourth Circuit held that a
> prosecutor's religious argument was error, but that, in light of the total
> context of the trial, the error did not render the defendant's trial unfair.  92
> F.3d at 1346.  In that case, the prosecutor told the jury that "'Thou shall
> [sic] not kill' is a proscription against an individual; it is not against
> Government.  Because Government has a duty to protect its citizens." *Id.*
> (sic in original).  The court found that religious arguments were improper
> but held that the prosecutor's comments did not deny the defendant due
> process because there was strong evidence of the defendan's guilt and
> eligibility for the death penalty. *See id.*  In that case the defendant's guilt
> trial lasted one day and defense counsel put on no evidence. *See id.* at
> 1341.  After the penalty phase, the jury took less than an hour to return a
> death sentence. *See id.*  Sandoval's trial was considerably longer and more
> complex, with the jury deliberating for over three days before reaching a
> verdict.

In *Coe v. Bell*, the Sixth Circuit held that argument that the Bible condones capital punishment was inappropriate, but that it did not in and of itself constitute reversible error.  161 F.3d at 351.  The court did not explain why, but we observe that the prosecutor in that case did not argue that the Bible commanded capital punishment for the defendant. *See id.*

The First Circuit in *United States v. Giry*, held that the prosecutor's comparison of the defendant's testimony to "Peter who for the third time denied Christ" was improper, but that its prejudicial impact was significantly reduced by the trial judge's instructions and the strength of the evidence against the defendant.  818 F.2d at 132–34.  *Giry* was not a capital case and defense counsel did not contemporaneously object to the prosecutor's statements.  *Id.* at 122–23, 133.

The prosecutor in this case, although reminding the jury on various occasions that its duty was to determine whether the evidence in aggravation substantially outweighed the mitigating evidence and to follow the trial court's instructions, clearly intended to appeal to religious authority and did so repeatedly.  The prosecutor meant this argument to have an effect on the jury.  We think it did.  At a minimum, we have grave doubts about the harmlessness of the error and therefore grant relief.  *See Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc) ("Where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error, the error is not harmless and relief should be granted.").

*Id.* at 779–80.

The district court in this case concluded, and we agree, that there are at least three important differences between the prosecutor's arguments in Fields's case and the prosecutor's arguments in *Sandoval*.  First, the prosecutor's arguments in Fields's case, unlike the prosecutor's arguments in *Sandoval*, did not effectively "urg[e] the jury to decide the matter based upon factors other than those it [wa]s instructed to consider."  Id. at 776.  Rather, the prosecutor in Fields's case concluded his argument by stating: "Under the Court's instructions and the law given by the Court, [Fields] should be, as it were, weighed in the balance and found wanting."  ROA, Vol. 5 at 3467.  By expressly

Appellate Case: 20-7027-7036   Document: 010350486281   Date Filed: 05/26/2020/2019   Page: 426   Page: 50   Restricted

referring to the law and instructions given by the trial court, the prosecutor seems to have been suggesting to the jury only that it should weigh the aggravating factors against the mitigating circumstances, find that the aggravating factors outweighed the mitigating circumstances, and ultimately find that Fields should be sentenced to death.  Importantly, nothing about that suggestion was contrary to the trial court's instructions.  Second, and relatedly, there was no reference by the prosecutor in Fields's case to any "higher law," nor any other suggestion by the prosecutor that the jury should ignore the law and instructions given to them by the trial court.  Third, the arguments by the prosecutor in Fields's case did not seek to "undercut[] the jury's own sense of responsibility for imposing the death penalty." *Sandoval*, 241 F.3d at 777.  More specifically, the prosecutor's arguments in Fields's case did not seek to "delegat[e] . . . the ultimate responsibility for imposing a sentence to divine authority." *Id.*  Rather, the prosecutor expressly asked the jury at the conclusion of his argument to follow the trial court's instructions, conduct the required weighing of aggravating and mitigating factors, and find the death sentence to be appropriate for the two murder convictions.

Fields's case is also distinguishable from *Sandoval* in terms of prejudice.  That is, even assuming that the prosecutor's arguments in Fields's case were improper, it is clear to us that, unlike the situation in *Sandoval*, they did not prejudice Fields's "chances of receiving life without possibility of parole instead of the death penalty." *Id.* at 778.  Unlike the prosecutor's arguments in *Sandoval*, the prosecutor in Fields's case did not, by way of his challenged arguments, "cloak[] the State with God's authority," nor did he "invo[ke] . . . divine authority to direct [the] jury's verdict." *Id.* at 779.  Further, unlike

the situation in *Sandoval*, the evidence presented at Fields's sentencing proceeding "overwhelmingly supported the jury's verdict," and the jury quickly reached a unanimous verdict. *Id.*

For these reasons, we conclude that the prosecutor's arguments, though perhaps misguided, were ultimately harmless.

That still leaves Fields's arguments that his trial counsel was ineffective for failing to object to the prosecutor's arguments, and that the district court abused its discretion by failing to conduct an evidentiary hearing on this claim of ineffective assistance. Having concluded that the prosecutor's arguments were harmless, we likewise conclude that Fields was not prejudiced by his trial counsel's failure to object to the arguments. And we in turn conclude that the district court did not abuse its discretion by refusing to conduct an evidentiary hearing on this claim of ineffective assistance.

*Issue Four – cumulative error*

In his fourth and final issue on appeal, Fields argues that his trial "counsel's errors had the cumulative effect of preventing the jury from hearing a powerful mitigation case while simultaneously allowing the jury to consider misleading evidence and improper argument in support of aggravation." Aplt. Br. at 75. "In particular," Fields argues, "absent counsel's deficient performance, the jury could have heard a mitigation case built not just on a single-episode manic flip, but also on evidence of brain damage that affected [his] executive functioning as well as a history of family problems." *Id.* "At the same time," Fields further argues, "counsel could have greatly diminished the Government's case by challenging the testimony of its mental health expert and the evidence it

60

presented in support of aggravating circumstances, as well as by objecting to the

Government's grossly improper argument to the jury." *Id.* at 75–76.

It is unnecessary, and indeed impossible, for us to resolve this cumulative error

claim at this point, since we are reversing the district court's denial of Fields's claim that

his trial counsel was ineffective for failing to adequately investigate and present evidence

of his organic brain damage, and remanding that claim to the district court for an

evidentiary hearing. If, on remand, the district court ultimately denies that claim of

ineffective assistance following an evidentiary hearing, it will in turn have to reconsider

Fields's claim of cumulative error. In conducting that cumulative error analysis, the

district court will have to include the two ineffective assistance of counsel claims that we

resolved in this appeal on the prejudice prong of the *Strickland* test (i.e., counsel's failure

to present the social history evidence and counsel's failure to object to the prosecutor's

allegedly improper closing argument) and the claim directly challenging the allegedly

improper remark made by the prosecutor during closing argument, since we resolved that

claim on the basis of harmlessness. In addition, if the district court denies the remanded

ineffective assistance claim (failure to investigate and present evidence of organic brain

damage) on the prejudice prong of the *Strickland* test, it will have to include that claim in

its cumulative error analysis as well.

III

The judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.