# EXHIBIT
# D

## Declaration of Maureen Patricia Baird
### Pursuant to 28 U.S.C. § 1746

I, Maureen Patricia Baird, declare that the following statements are true:

### BACKGROUND OF DECLARANT

1.      I am an independent prison consultant. From March 1989 through September 2016, I was employed by the Department of Justice, Federal Bureau of Prisons (BOP), and served in many capacities. My last three positions held were Warden, Federal Correctional Institution (FCI), Danbury, Connecticut (2009-2014), Senior Executive Service (SES) Warden, Metropolitan Correctional Center (MCC), New York (2014-2016), and SES Warden, United States Penitentiary (USP), Marion, Illinois (2016-retired).

2.      In my capacity as Warden at these institutions, I was responsible for the overall operation and all components of each prison. I am fully knowledgeable of the operations and policies of the BOP and specifically familiar with the operations of, and types of inmates assigned to, the Communication Management Unit (CMU) at USP Marion. The CMU at USP Marion is one of two CMUs in the federal prison system, along with the one at USP Terre Haute.

3.      A CMU is a self-contained prison housing unit within a BOP facility designed to isolate and segregate certain inmates from the rest of the BOP population and the outside world. Designation to a CMU may be considered for any inmate whose interaction with other persons requires greater management to ensure the safety, security, or orderly operation of BOP facilities or protection of the public; thus, individuals detained in a CMU are banned from physical contact with visitors, are barred from interacting with inmates in the general population and have their outside written and phone communications highly monitored and managed.

4.      Referrals to a CMU can come from the Counter Terrorism Unit, from the Designation and Sentence Computation Center, as part of the initial designation process, or from

1

individual institutions based upon an inmate's behavior. Inmates designated to a CMU can include: (a) inmates whose offenses included association, communication, or involvement, related to international or domestic terrorism; (b) inmates whose offenses or activity while incarcerated indicate a substantial likelihood that the inmate will encourage, coordinate, facilitate, or act in furtherance of illegal activity through communication with persons in the community; or (c) inmates with any other substantiated or credible evidence of posing a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

5.      In addition to being responsible for one of the two CMUs in the country, I also oversaw a high-security level unit when I was the Warden at MCC New York. Most of the inmates assigned to this high-security unit were under Special Administrative Measures (SAMs), authorized by the Attorney General of the United States. Some of the inmates assigned to this unit were pending trial for capital offense crimes. Also, when I was temporarily assigned to be Associated Warden at FCI Terminal Island, San Pedro, California in 2007, I helped create a high security area in the Special Housing Unit for two Aryan Brotherhood members who were temporarily housed at Terminal Island.

6.      As a former Designator with the BOP, I was responsible for deciding the location where inmates would serve their sentences. In some instances, the crime was so heinous, the Administrative Maximum Security (ADX), in Florence, Colorado, was determined to be the most appropriate facility. During my time working in various BOP Regional Offices, I had the opportunity to visit and inspect many of the institutions within those regions. These federal prisons included high-security level prisons.

2

7.    My professional experience of working in federal corrections included many areas. In two of the BOP Regional Offices in which I worked, one of my duties included the classification and designation of newly committed inmates, as well as reviewing and approving inmate transfers to other federal prisons. Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison. Another one of my duties in the Regional Offices was to review and respond to inmate grievances, regarding all topics pertaining to correctional programs, including appeals related to the discipline policy. Throughout the course of my career, in many of my positions, I was required to assess an inmate's risk formally and informally. This risk assessment was especially critical when an inmate was being considered for a lesser security prison transfer or a community program.

8.    Since my retirement from the Bureau of Prisons, I have maintained contact with many former colleagues. Since early 2017, I have worked as an independent prison consultant and have provided expert witness testimony. I have kept abreast of new policies and laws that directly impact the Bureau of Prisons.

9.    Most recently, I have been retained to prepare reports for filing in various United States District Courts throughout the country. These reports are prepared for the purpose of Compassionate Release consideration or for inmates who are being considered for release under the Incarceration Reduction Amendment Act (IRRA). In preparation for these reports, I am required to review all the prison records of each inmate so I can provide a concise and thorough report for the court.

10.    I have previously been qualified as an expert witness in federal court in the areas of prison management, prison practices, and prison adjustment.

3

11.    A copy of my resume, which includes my relevant work experience, is attached to this declaration as Exhibit A. A complete list of expert witness testimony that I have provided during the previous four years is attached to this declaration as Exhibit B.

## SCOPE OF REPORT

12.    I was contacted by Hunter Labovitz, an Assistant Federal Defender in Philadelphia, Pennsylvania, who is representing Edward Fields in an ongoing criminal matter in the Eastern District of Oklahoma. Mr. Labovitz requested that I provide my opinion regarding Mr. Fields' overall prison adjustment while detained from pre-trial to the present.

13.    In preparation for my declaration, I reviewed the following documents relevant to Mr. Fields' case: (1) the direct appeal opinion from the United States Court of Appeals for the Tenth Circuit in Mr. Fields' case; (2) Muskogee County Detention Center and Muskogee Sheriff Office records; and (3) more than 4,000 pages of Bureau of Prisons' documents regarding Mr. Fields.

14.    In assessing overall prison adjustment, I focused on three primary areas related to Mr. Fields. First, I looked at any disciplinary infractions he accrued during his time in custody. Second, I considered the rapport he shared with staff and other inmates, although I understand Mr. Fields has limited contact with others because of the type of housing unit to which he is assigned. Third, I was interested to learn how the staff view Mr. Fields, by reviewing various comments and references contained in the records. Staff comments would be indicative of whether Mr. Fields is a management problem.

4

## FINDINGS

## MR. FIELDS HAS HAD IMPECCABLE CONDUCT ON DEATH ROW

15.    Most remarkable in all the records that I reviewed is the absence of any misconduct or disciplinary reports relative to Mr. Fields. I reviewed records from Muskogee County Detention Center and the Bureau of Prisons, and found no instance where Mr. Fields violated any institutional rules. During the more than 18 years Mr. Fields has been in custody, including over 16 years at USP Terre Haute, he has maintained an impeccable conduct record. Staff at Terre Haute have specifically noted that Mr. Fields has maintained a clear institutional conduct record.

16.    During his 6-month progress review meetings with his Unit Team at Terre Haute, Mr. Fields' positive conduct record is consistently noted. Later in my report, I will provide further detail regarding these program review meetings and Mr. Fields' interactions with his Unit Team.

17.    As someone who worked in the corrections field for more than 27 years, I can attest there are few cases I have seen where an inmate has maintained such an unblemished conduct record, as Mr. Fields has done, over the course of so many years. I personally do not know Mr. Fields, but I have had the opportunity to speak with him; based upon that conversation and my experience, it appears he is an individual who respects authority, follows rules, and functions well in a structured environment.

18.    Mr. Fields has been assigned to the Special Confinement Unit (SCU) at the United States Penitentiary, Terre Haute, Indiana since his arrival at that facility more than 16 years ago. This housing assignment is reserved for federal inmates who have a sentence of death imposed in their case. Some might argue that inmates in these types of restrictive housing units

5

rarely break the prison rules. To the contrary, having been the Warden at two BOP facilities with high-security inmates as well as having worked with high security inmates at other institutions, I have witnessed inmates housed in a restrictive unit exhibit a vast array of negative behaviors, such as fighting with other inmates during periods of recreation, flooding cells, throwing feces at staff, and breaking sprinkler heads, among other things. I am familiar with misconducts by inmates in high-security BOP facilities, so it was important to my analysis that Mr. Fields has been incident-free.

19.    It is not uncommon for the initial years of an inmate's incarceration to be a bit tumultuous as they initially navigate their way through the system and come to accept the prison sentence imposed. I am incredibly impressed with how Mr. Fields handled himself immediately following the imposition of a death sentence as well as his conduct through the present.

## MR. FIELDS' PROGRAM REVIEWS INDICATE A WILLINGNESS TO PARTICIPATE IN BOP PROGRAMS, ATTEMPTS TO BETTER HIMSELF, POSITIVE INTERACTION WITH STAFF, AND CONSISTENT RESTITUTION PAYMENTS

20     BOP Program Statement 5322.13, Inmate Classification and Program Review, explains in detail the purpose and expectations of conducting regularly scheduled reviews between inmates and their classification team (available at https://www.bop.gov/policy/progstat/5322_013.pdf). In federal corrections, the classification team is comprised of the inmate's unit team, including the Unit Manager, Case Manager, and the Correctional Counselor. Other departments which have input into the team meetings are Education, Psychology, and Health Services Departments.

21.    The two types of team meetings are Initial Classification and Program Reviews. All federal inmates are normally scheduled for their Initial Classification within 30 days of arrival to their designated facility, following sentencing. Program Reviews are conducted every

six months until an inmate is within 12 months of release, at which time the meetings are conducted every 90 days.

22. During the Initial Classification with the team, a program plan is established for the inmate. This tailored plan establishes goals, determines work assignments if applicable, and offers program recommendations for each inmate. During the Program Review meetings, the team reviews the previous established goals to determine whether the inmate complied with the recommendations. Additionally, these team meetings provide inmates with the opportunity to engage in more personal interaction with staff, especially with their unit team. Although most inmates have regular contact with their assigned Correctional Counselor, these meetings are the opportune time for inmates to address concerns and questions with the entire unit team. It also provides the unit team a chance to become more familiar with the inmate and to assess how he is coping in the prison environment.

23. The meetings can at times feel monotonous and redundant, especially for those inmates serving lengthy sentences, and in Mr. Fields' case, a death sentence. Attendance for inmates at these meetings is expected, although, in my experience, as a former Case Manager, inmates often choose to not attend, especially when there was no change to their situation.

24. I reviewed numerous Program Review summaries that were completed for Mr. Fields. I noted that many positive comments were provided by staff in these summaries. A primary recurring theme pertained to Mr. Fields' positive interaction and communication with staff. Mr. Fields was described as someone who "displays good communication with staff and inmates," "achieves and follows the team's recommendations," "maintains highest level of sanitation," and "has maintained clear conduct."

7

25. The sentencing court imposed a Special Assessment of $600.00 and restitution in the amount of $15,323.84 in Mr. Fields' case. From the onset of his sentence, Mr. Fields voluntarily agreed to participate in the BOP's Financial Responsibility Program (FRP) to satisfy these financial obligations. As noted in the Program Review summaries, Mr. Fields has consistently made payments, above what is expected, through the FRP. He has satisfied the Special Assessment in full, and he continues to consistently make payments toward his court-ordered restitution. I have often witnessed inmates who do not meet these financial obligations regardless of signing an FRP contract. When this occurs, those inmates are placed in "FRP Refuse" status. I did not see any indication in any of Mr. Fields' records where he failed to make an expected payment compliant with his FRP contract.

26. The SCU at Terre Haute is a restrictive housing unit, comprised of death row inmates, that offers limited programs or leisure time activities. Despite these limited programs, Mr. Fields has participated in several different programs, albeit not in any type of group setting. Specifically, Mr. Fields has completed: Colored Pencil Class; Charcoal Pencil Class; Watercolor Paint Class (2 classes); Hobbycraft Paint Class; Introduction to Crochet; and Abdominal Techniques.

## MR. FIELDS' WORK HISTORY AND EVALUATION SHOW THAT STAFF AT USP TERRE HAUTE TRUST HIM

27. Mr. Fields was selected approximately six months ago to work as an orderly in the SCU where he is assigned. These types of job assignments in restrictive housing units like the SCU are highly sought, coveted positions, and very few inmates ever receive this type of job opportunity. A level of trust of inmates by the staff is a prerequisite before being selected for these types of orderly positions. In a housing unit strictly comprised of death row inmates an even greater level of trust would be required. In addition to the level of trust, there is usually a

8

cordial and mutual respectful relationship between the selected inmate and the staff assigned to the housing unit.

28. It is very unusual for inmates to have a job assignment when they are in a restrictive housing setting like Mr. Fields. Inmates assigned to Special Housing Units and the Special Confinement Unit (SCU) at Terre Haute rarely leave their cells. Work assignments within these restrictive housing units are ordinarily reserved for a select few inmates. Only those inmates who have established a positive rapport and those who have garnered a certain level of trust amongst staff will be selected for these positions. In most prisons, inmates must receive approval by the institution Captain, and, in some facilities, the decision would be made at the Associate Warden or Warden level.

29. I had an opportunity to speak with Mr. Fields, via a legal call with his counsel, approximately six months ago. During our call, Mr. Fields informed me of his job duties and how he enjoyed a sense of comradery and banter that he shared with the corrections officers assigned to the SCU.

30. Mr. Fields' duties as an orderly are varied. He works the evening shift, Monday through Friday, and he is responsible for maintaining the cleanliness of the unit, more specifically, the food preparation area. Orderly duties assigned to Mr. Fields include clearing and cleaning the inmate food trays from the evening meal, sweeping and mopping the area, emptying the trash receptacles, and ensuring the area is clean and tidy. As the SCU Orderly, Mr Fields is given freedom to move about the unit while collecting food trays and trash, and handling other duties assigned to him.

31. Mr. Fields works 40 hours per week. Inmate orderlies usually earn a small monthly wage for their work and are normally assigned to a Grade 4 Performance Pay Level, in

9

compliance with BOP Program Statement 5251.06, Inmate Work and Performance Pay (October 2008) (available at https://www.bop.gov/policy/progstat/5251_006.pdf). When I spoke with him, Mr. Fields confirmed that he was paid a nominal monthly stipend, as a Grade 4 worker, earning 12 cents per hour.

32.    In our phone call, Mr. Fields expressed his appreciation for this work opportunity and although the pay was minimal, what seemed more important to him, was the intangible rewards he was receiving. After speaking with him, I quickly realized he was not motivated by the money he receives each month for his duties, but rather more interested in ensuring he completed the tasks assigned to him to the best of his ability. The emotional lift Mr. Fields felt was evident during our phone call and I believe he appreciates being in a position of trust and being tasked with these additional responsibilities. In turn, he wants to demonstrate to the correctional officers and the Captain at Terre Haute that they made the right decision in selecting him as the SCU orderly.

33.    Work performance evaluations are issued quarterly; however, these are not always completed on time and sometimes not completed at all. Mr. Fields received his first and only work performance evaluation on March 31, 2022, several months after he was assigned the orderly duties. He received an overall favorable rating for his work. Among other things, Mr. Fields was noted as being a willing and inquisitive worker who does a full day's work without wasting time, who shows interest in his job, who generally does what he is told without complaint, and who is considered to be prompt and dependable. He was awarded with a pay bonus for his efforts, raising his pay to approximately 17.6 cents per hour. Per BOP regulations, the bonus cannot exceed one-half of the inmate's monthly pay, so Mr. Fields' bonus pay was just

10

about the maximum allowable. It is uncommon for inmates who have recently been assigned to the job to receive a bonus or a recommendation for a bonus, from their work detail supervisors.

34.    BOP regulations also indicate that bonus pay can only be awarded when "the supervisor of an inmate worker or program participant believes the inmate has made exceptional accomplishments or appreciably contributed to the work assignment." BOP Program Statement 5251.06, Inmate Work and Performance Pay. As a former work detail supervisor, myself, and having completed these types of work evaluations during my career, I quickly surmised in Mr. Fields' case that he must have made a strong and favorable impression on the correctional officers to garner this type of recognition during his first year of working.

## MR. FIELDS MAINTAINS STRONG FAMILY TIES
## DESPITE HIS CONTINUED MENTAL HEALTH ISSUES

35.    Because of Mr. Fields' assignment in the SCU, Psychology Services staff are required to conduct an assessment, although at times limited, with Mr. Fields. It is common knowledge that the isolation associated with a restrictive housing unit, like the SCU, has been identified in multiple studies as a contributing factor in the decline of an inmate's mental and emotional health. These face-to-face assessments, conducted by a psychologist or mental health provider every 30 days, provide staff with an opportunity to gauge Mr. Fields' current mental health status and determine if further intervention is necessary.

36.    Mr. Fields has been assigned various mental health diagnoses over the last several years of his incarceration. I noted he had a prior suicide attempt, following his arrest in the instant offense, while detained at the Muskogee County Detention Center more than 16 years ago. Any inmate who has a history of suicide attempts is always concerning to BOP staff and especially BOP psychologists. Careful attention is provided to inmates who have this history during scheduled assessments and reviews.

11

37.    During his many years of isolation in the SCU at Terre Haute, there have been a few occasions where Mr. Fields has appropriately addressed with the psychology staff his feelings of hopelessness and thoughts of suicide. Noted in the records, as reported by the intervening psychologists during these interventions, was Mr. Fields love for his family, especially his grandchildren, and his strong Christian beliefs, all of which contribute to his resilience in resisting the urge to end his life. He experiences these "depressive episodes," but fortunately, he has been able to cope with, and overcome, them.

38.    As evidenced in the psychology notes, Mr. Fields suffers from auditory hallucinations. These hallucinations have tormented Mr. Fields from a young age and continue to cause him mental and emotional turmoil. Mr. Fields is prescribed psychotropic medications to assist with managing his mental health concerns, but the medication does not eliminate all the accompanying symptoms.

39.    During the many conversations with Terre Haute psychologists, as previously indicated, the love and support Mr. Fields has for his family is steadfast and unwavering. Mr. Fields unabashedly expresses the value he places in his role as a father and grandfather, and he is committed to fulfilling those roles, regardless of time, place, and circumstance. He has played an active role in his daughter's recovery from heroin, and he has been an amazing and supportive resource in her sobriety. He treasures the telephone calls with his grandchildren, who provide meaning in his life. Mr. Fields has been able to maintain supportive relationships with many of his family members, which is crucial to the well-being of an inmate in his situation.

40.    I have vast experience dealing with mentally ill inmates, though I am not a mental health expert. In describing Mr. Fields, the various correctional institution psychologists have offered many positive comments reflective of their dealings with Mr. Fields. Some of the

12

psychologists' descriptive comments include phrases and terms like "affect was bright," "pleasant and relaxed," "daily functioning within normal limits," "socially appropriate," "coherent thoughts," and other similar descriptions. It is evident through reviewing the records that Mr. Fields suffers from mental illness; however, he appears to me to navigate the issues associated with his illness very well.

### CONCLUSIONS

41.    I am aware of Mr. Fields' current offense, and I have reviewed the Presentence Report prepared in his case. While I acknowledge the seriousness of his criminal actions, I have been asked only to provide my opinion of Mr. Fields' overall prison adjustment for the last 18 plus years. In my opinion, Mr. Fields has experienced a very positive adjustment to prison life. He has maintained an exemplary conduct record and appears to share a positive rapport with institution staff.

42.    Mr. Fields has been in the SCU, an extremely restrictive housing unit that is technically isolation, with limited programs and activities, yet he has managed himself well.

43.    Many staff have described Mr. Fields as polite and well-mannered, suggesting he shares a common respect with these individuals. It would be very unusual for inmates who present management or behavioral problems to receive such favorable remarks from prison staff.

44.    Based on his overall positive adjustment, I would predict Mr. Fields' remaining years in a prison environment, including in general population of any correctional facility, will mirror the last, almost two decades, and he will continue to demonstrate this type of responsible and positive behavior regardless of any circumstances presented. Further, I believe, if his death sentence was converted to life imprisonment, Mr. Fields could be managed at a medium-security level federal prison and would not require the security constraints of a penitentiary

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: 4|12|2022

Maureen Patricia Baird

14

# EXHIBIT A

# Maureen Patricia Baird

618-694-7703  |  New Fairfield, CT 06812  |  moiep@aol.com

*Professional Profile*

I currently work as a corrections consultant, specializing in Federal Corrections. I have provided Expert Witness testimony in United States District Courts, at Sentencing Hearings for defendants who are facing a sentence of incarceration in the Federal System. I work as an independent Consultant and provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates' Court in the UK regarding conditions of confinement in the Bureau of Prisons. My career in Adult Male/Female Corrections spanned 28 years with the Bureau of Prisons in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal Bureau of Prisons. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden at the Metropolitan Correctional Center in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013. I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups. I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

*Professional Experience*

## *Warden*                                                    *Dec 2015 - Oct 2016*

### *United States Penitentiary - Marion, IL*

- Was CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness
- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics, and code of conduct requirements and both basic and advanced correctional duties

## *Warden*                                                    *Jun 2014 - Dec 2015*

### *Metropolitan Correctional Center - New York City, NY*

- Was CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois

## Warden                                                    *Oct 2009 - Jun 2014*

Federal Correctional Institution - Danbury, CT

- Was CEO of an institution which employed 250 staff and housed 1200 female offenders
- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders

## Correctional Institution Administrator/Associate Warden    *Aug 2007 - Oct 2009*

Metropolitan Detention Center - San Diego, CA

- Provided direction and leadership to 230 employees
- Assisted in the management of a multi-million-dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends

- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates
- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

**Regional Correctional Programs Administrator**          *Feb 2005 - Aug 2007*

Bureau of Prisons, Western Regional Office - Dublin, CA

- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis
- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions Recommendations were made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

**Correctional Institution Administrator/Executive Assistant** *Aug 2000 - Feb 2005*

Federal Correctional Institution - Schuylkill, PA

- Planned, supervised, and evaluated programs, training of new staff, and quarterly training of correctional officers
- Was the Chairperson for inmate's initial classifications and program reviews
- Conducted ongoing training and guidance for mentors and proteges as the Mentoring Coordinator

18

**Assistant Correctional Programs Administrator**            *Apr 1997 - Aug 2000*

Bureau of Prisons, Northeast Regional Office - Philadelphia, PA

- Committee Member
- Assisted in designing the current Security and Classification System utilized for classifying sentenced female offenders
  - Performed extensive research which suggested a need for a separate classification system for male and female offenders
  - The Bureau of Prisons compiled our findings and in a short time implemented the Committees' suggestions and created a separate Classification System for female offenders, which is still being utilized to date
- Coordinated and conducted annual training programs for all case management coordinators throughout the 23 institutions that comprised the Northeast Region
- Submitted recommendations for policy changes which were adopted and implemented
- Conducted on-site staff assistance visits at various institutions to provide training to staff
- Participated in after-action reviews following significant incidents at institutions within the region


**Case Management Coordinator**                            *Dec 1992 - Apr 1997*

Federal Correctional Complex - Allenwood, PA

- Served as Victim Witness Coordinator, Central Inmate Monitoring Coordinator, Inmate Performance Pay Coordinator and Public Information Spokesperson for the institution
- Oversaw security with regards to review and approval of inmates designated to the institution
- Wrote lesson plans and provided on-the-job training for new case managers and new counselors
- Provided ongoing training to all case managers, counselors, unit secretaries, and correctional officers regarding correctional programs, procedures, and responsibilities
- Was responsible for quality control of all case management paperwork prior to submission to the warden for signature


**Assistant Parole Liaison Administrator**                  *Oct 1991-Dec 1992*

Mid-Atlantic Regional Office – Annapolis Junction, MD

Duty Station – U.S. Parole Commission – Chevy Chase, MD

- Was responsible for Security Classifications and Designations of parole violators returning to federal prisons

19

**Case Manager**                                            *Mar 1989 – Oct 1991*

Federal Correctional Institution-Danbury, CT

Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV

- Oversaw programs related to the 150-200 inmates assigned to my caseload
- Provided training to new case managers
- Conducted inmate classification and program reviews
- Assisted inmates with their release planning
- Provided guidance to inmates
- Conducted security and shakedowns within the institution
- Regularly filled in for correctional officer posts
- Wrote all reports pertaining to inmates on my caseload
- Regulated institution security and housing

*Education*

## Western Connecticut State University - Danbury, CT

### Bachelor of Science in Justice and Law Administration, May 1988
- Recipient of Justice and Law Administration Award of 1988

*References*

References will be provided upon request.

20

# EXHIBIT B

**Expert Witness Testimony in the United States and the United Kingdom for the years 2018-2022:**

July 6, 2018: *United States v. Charles M. Hallinan*, United States District Court, Eastern District of Pennsylvania, Philadelphia, Pennsylvania.

July 1, 2019, and November 4, 2019: *United States of America v. Jabir Motiwala*, Westminster Magistrates' Court, London, United Kingdom.

June 23-25, 2020: *United States of America v. Arif Naqvi*, Westminster Magistrates' Court, London, United Kingdom.

September 29, 2020: *United States of America v. Julian Assange*, Westminster Magistrates' Court, London, United Kingdom.

October 27, 2020: *United States of America v. Christopher Taylor*, Westminster Magistrates' Court, London, United Kingdom.

May 26, 2021: *United States of America v. Olabanji Oladotun Egbinola*, Westminster Magistrates' Court, London, England, United Kingdom.

June 1, 2021: *United States of America v. Valerie Perfect Hayes, Jennifer Amnott, Gary Reburn*, Edinburgh Sheriff Court, Scotland, United Kingdom.

August 5, 2021: *Robert Wharton v. Jamie Sorber*, Eastern District of Pennsylvania, Philadelphia, Pennsylvania.

October 19, 2021: *United States v. Abdul Malik Abdul Kareem*, District of Arizona, Phoenix, Arizona.

October 25, 2021, *United States of America v. Anthony Baker*, Westminster Magistrates' Court, London, England, United Kingdom.

November 24, 2021, *United States of America v. Corey De Rose*, Westminster Magistrates' Court, London, England, United Kingdom.

January 27, 2022: *United States v. William Smith*, United States District Court, District of Columbia.

February 10, 2022, *United States of America v. Robert MacDonald and Christopher Hamilton*, Westminster Magistrates' Court, London, England, United Kingdom.

February 18, 2022, *United States v. Maurice Proctor*, United States District Court, District of Columbia.