# EXHIBIT
# E

**Supplemental Declaration of Maureen Patricia Baird**
**Pursuant to 28 U.S.C. § 1746**

I, Maureen Patricia Baird, declare that the following statements are true:

## BACKGROUND OF DECLARANT

1.　　I am providing this declaration as a supplement to my original declaration dated April 12, 2022.

2.　　This supplemental declaration is prepared at the request of Hunter Labovitz, Assistant Federal Defender, Philadelphia, PA, who is representing Edward Fields in an ongoing criminal matter in the Eastern District of Oklahoma. Mr. Labovitz requested I provide a summary and explanation of recent BOP records pertaining to his client and an update regarding Mr. Fields's prison adjustment for the time since my initial report was completed.

3.　　My background, CV, and a list of expert witness testimony I have provided were included with my original declaration. There are no changes to my CV and an updated list of expert witness testimony is attached to this report as Exhibit A.

## RECORDS/DOCUMENTS REVIEWED

4.　　In addition to my recent telephone call with Mr. Fields and members of his legal team, I reviewed several BOP documents ranging in date from March 31, 2022, through May 5, 2023. I also received and reviewed a copy of the BOP's Pattern Risk Assessment form dated October 31, 2019, which was not available when I completed my initial report. The documents I reviewed in preparing this supplemental declaration included:

> My original declaration dated April 12, 2022
> Male PATTERN Risk Scoring
> Male Custody Classification Form
> Chronological Disciplinary Record
> Work Performance Rating Forms
> Individual Needs Plan – Program Review Records

**PATTERN RISK ASSESSMENT**

5.    The First Step Act ("FSA") of 2018 mandated the development of a recidivism risk assessment tool referred to as the Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN"). BOP staff were required to calculate the risk of all sentenced inmates using this tool.

6.    PATTERN calculates an inmate's risk of recidivism in two areas – general recidivism and violent recidivism – and categorizes risk into four levels: Minimum, Low, Medium, and High. In its current state, PATTERN does not account for factors that may have a strong impact on mitigating recidivism risk but are hard to quantify or measure. Namely, the PATTERN scores do not include an inmate's release plan or family and community ties and support, important factors which may contribute toward success following release from prison.

7.    In calculating Mr. Fields's PATTERN score, the case manager utilized 17 factors applicable to Mr. Fields. These factors combine his criminal history, prison adjustment, and activities while incarcerated. Each factor weighs differently and, when combined, make up the overall recidivism risk score.

8.    In Mr. Fields's case, his Male PATTERN Risk Scoring form and his May 5, 2023, Individual Needs Plan – Program Review Summary Report document his current PATTERN score. The BOP has calculated Mr. Fields's risk in two areas: general recidivism and violence. Based on their calculations, the Agency has determined Mr. Fields' overall recidivism risk score, which includes general and violence risk, to be "Minimum Risk Recidivism Level."

## INMATE SECURITY DESIGNATION AND CUSTODY CLASSIFICATION

9.      There are five security levels utilized by the BOP to classify federal prisons, which is based upon the BOP's Program Statement for classifying inmates.[1] Those security levels include Minimum, Low, Medium, High, and Administrative.  Sentenced inmates are usually designated to federal prisons that are commensurate with their security levels. Pre-trial detention facilities and federal medical prisons are classified as Administrative and are comprised of inmates of all security levels.

10.     Following sentencing, inmates are initially classified and designated for service of their sentence by staff assigned at the Designations and Sentence Computation Center (DSCC), in Grand Prairie, Texas.  The documents utilized by the DSCC during the initial classification are the Presentence Investigation Report, Judgment in a Criminal Case, disciplinary record from prior or current commitment, and any additional, relevant documents originating from various law enforcement agencies.

11.     Several factors are considered by BOP officials that comprise an inmate's security classification.  Some of the factors that impact classification include age, pending charges/detainers, seriousness of current offense, history of violence and escape, sentence length, and voluntary surrender status.  Each of these areas have a corresponding point value, which is then totaled to determine an inmate's overall security level.

12.     BOP staff also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for additional security considerations, not captured in the other categories.

---

[1] U.S. Department of Justice, Federal Bureau of Prisons, *"Program Statement P5100.08 "Inmate Security Designation and Custody Classification,"* September 12, 2006.

The MGTVs and PSFs are used to justify an inmate's designation to an institution which is not commensurate with his numeric security point total. There are specific factors, which if applicable to an inmate, would indicate his need for increased security to ensure the orderly running of the institution where the inmate is assigned and to protect society. In most cases, the PSF's impact the inmate's security level, causing an increase that overrides the security point score. The PSF's for male offenders include Disruptive Group, Greatest Severity Offense, Sex Offender, Threat to Government Officials, Deportable Alien, Sentence Length, Serious Escape, Prison Disturbance, Juvenile Violence, and Serious Telephone Abuse.

13.    Custody Classification reviews are conducted annually by an inmate's case manager. Many of the same factors utilized to score the initial security classification are used when scoring an inmate's custody level. Additional criteria utilized in the Custody Classification are percentage of time served, drug/alcohol abuse history, type and frequency of misconduct reports, responsibility demonstrated during the period of incarceration, and family/community ties. The outcome of the Custody Classification is used to determine if an inmate warrants a transfer to a lesser or greater security prison or whether the current institution is appropriate to address his security needs and concerns.

14.    In determining Mr. Fields's most recent security and classification level on December 15, 2022, the case manager considered his overall prison adjustment, including his conduct and programming records, and utilized the additional factors I previously identified. Mr. Fields's numeric security point total equals six points, which is commensurate with minimum security level; however, two PSFs were correctly assessed; Sentence Length (resulting from his death sentence) and Greatest Severity (based on the nature of his instant offense). These two PSFs override the numeric point score, making him a high security level

4

offender. These PSFs and his high security level classification will remain in place regardless of a sentence of death or life imprisonment. If a life sentence is imposed for Mr. Fields, he will not be eligible for transfer to a prison below the security level of a penitentiary, unless at some point, the BOP waived his PSF, which is extremely unlikely.

## DISCIPLINARY INFRACTIONS

15.    An updated disciplinary record dated April 23, 2023, was provided for my review. Mr. Fields continues to maintain a pristine conduct record. He has not incurred a single infraction in his 20 years of incarceration.

16.    Mr. Fields's unit team continues to document his unblemished disciplinary record during their six-month reviews of his case. Mr. Fields was trusted by staff to work as an orderly in the Special Confinement Unit (SCU) at Terre Haute, which means he is not restricted to his cell for 22 to 23 hours a day as most of the inmates are who reside in the SCU housing unit. The additional out-of-cell time provides him more independence, but also an increased opportunity to violate the rules and engage in misconduct, which for Mr. Fields, has never occurred. He successfully and consistently demonstrates his respect of staff and authority figures and his commitment to abide by the rules of the institution.

## WORK PERFORMANCE EVALUATIONS

17.    Mr. Fields was afforded a rare opportunity to work as a unit orderly within the SCU where he is housed. As explained in my initial declaration, it is uncommon for inmates in any type of restricted housing status to have job assignments. Inmates assigned to the SCU, and other restrictive housing units, can pose a danger to staff and other inmates; therefore, a very careful approach and selection process is in place when considering potential candidates for these types of coveted work assignments.

5

18.     According to the Individualized Needs Plan – Program Review dated May 2023, Mr. Fields  commenced employment as the SCU Orderly on September 20, 2022. Typically, the work performance evaluations are completed quarterly by staff and retained in the inmate's central file.   Unfortunately, there are only two Work Performance Reviews available.  The older Work Performance Review dated March 31, 2022, was summarized in my initial report.  The more recent evaluation is dated May 24, 2023, and Mr. Fields's work supervisor evaluated him in nine different categories.  These categories include 1) Quality of Work, 2) Quantity of Work, 3) Initiative, 4) Interest; Eagerness to Learn, 5) Ability to Learn, 6) Need for Supervision, Dependability, Safety, Care of Equipment, 7) Response to Supervision and Instruction, 8) Ability to Work with Others, and 9) Overall Job Proficiency.

19.     The ratings of the recent work evaluation were even more impressive than his first.  The work supervisor documented favorable ratings which describes how Mr. Fields works a full day with little supervision, takes initiative, plans well, learns quickly, displays interest in his job, and is dependable and prompt.  Additionally, based on Mr. Fields positive work performance and ethic, the supervisor recommended him for bonus pay.  I would expect if other evaluations had been completed and were available, they would mirror the other two evaluations.

## INDIVIDUALIZED NEEDS PLAN – PROGRAM REVIEW

20.     As provided in my original declaration, Inmate Program Reviews are conducted every six months.  Inmates meet with their unit team, which is comprised of the Unit Manager, Case Manager, and Counselor.  Oftentimes the Education and Psychology Departments, as well as the inmate's work supervisor, will provide input into these scheduled reviews.  The purpose of these meetings is for the unit team to review the inmate's adjustment, programming,

and any additional applicable factors affecting the inmate. It also provides an opportunity for inmates to address any issues they may have and to ask questions. The reviews are documented on a form and maintained in the inmate's central file.

21.    Two Program Reviews were conducted since the time of my initial declaration and the forms, summarizing these meetings, were provided to me for review. Both reviews document Mr. Fields's consistent participation in the Inmate Financial Responsibility Program and show he has been making monthly payments toward his court ordered restitution. To date, he has satisfied the court ordered special assessment and he has paid thousands of dollars toward his restitution, something remarkable, considering his current circumstances.

22.    The unit team noted the satisfactory work ethic he displays with his job as an orderly in the SCU. Mr. Fields's various program assignments and activities, including hobbies and craft projects are also noted in the record. Some long-term and short-term program goals were recommended, including Spanish and a program titled, START Now. Finally, his impeccable conduct record was reiterated by his unit team.

## CONCLUSIONS

23.    Mr. Fields continues to serve his prison sentence in a constructive and positive manner, which is impressive, considering his situation on death row at USP Terre Haute, Indiana. If not for his pending death sentence, because of his impeccable record, minimum PATTERN Risk score, minimal security classification points, and respect for institution rules and staff, the BOP would likely transfer him to general population within a United States Penitentiary. This could mean a transfer to the general population at the penitentiary where he is currently incarcerated. He would be housed in a penitentiary for the remainder of his life.

24. Based on my many years of experience of working in correctional environments, as detailed in my April 2022 declaration, I believe that, if given the opportunity, Mr. Fields would and could be safely managed at a mainstream penitentiary and his behavior would likely mirror that of the last 20 years.

25. From a non-mental health expert perspective, I believe Mr. Fields would acclimate well to general population and the environment would afford him with more diverse programming opportunities which are not available for inmates on death row. It is extremely unlikely that he would pose any issues which would negatively impact the orderly running of any institution at which he was housed or present any safety concerns to staff or other inmates. He has already demonstrated his commitment to obeying the rules and has not posed any security or safety concerns for the two years he has been assigned as an orderly within his current housing unit. Because he has been afforded an opportunity to work as an orderly, under limited staff supervision, his transition from a restrictive setting to a general population environment should be much smother and easier than it would be for others who may have been kept in complete isolation for several years.

26. Finally, based on his consistent positive programming and adjustment, I believe his future adjustment and behavior will reflect the same as the last 20 years. Based on my almost three decades of working in federal corrections, I do not believe Mr. Fields would pose any concerns for the BOP regardless of the prison where he is incarcerated.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: Aug 9, 2023

_Maureen P Baird_
Maureen P Baird (Aug 9, 2023 14 28 EDT)
Maureen Patricia Baird

8

# EXHIBIT A

**Expert Witness Testimony in the United States and the United Kingdom for the years 2018-July 2023:**

United States of America v. Charles M. Hallinan, United States District Court, Eastern District of Pennsylvania.

United States of America v. Jabir Motiwala, Westminster Magistrates' Court, London, United Kingdom.

United States of America v. Arif Naqvi, Westminster Magistrates' Court, London, United Kingdom.

United States of America v. Julian Assange, Westminster Magistrates' Court, London, United Kingdom.

United States of America v. Christopher Taylor, Westminster Magistrates' Court, London, United Kingdom.

United States of America v. Olabanji Oladotun Egbinola and Ibrahim Davies, Westminster Magistrates' Court, London, England, United Kingdom.

United States of America v. Valerie Perfect Hayes, Jennifer Amnott, Gary Reburn, Edinburgh Sheriff Court, Scotland, United Kingdom.

Robert Wharton v. Jamie Sorber, et al., United States District Court, Eastern District of Pennsylvania.

United States of America v. Abdul Malik Abdul Kareem, Attorney Daniel Drake, United States District Court, District of Arizona.

United States of America v. Robert William Perry, Attorney Milagros Cisneros, United States District Court, Northern District of Oklahoma.

United States of America v. Joseph Gray, Attorney James Whitehead, DC Superior Court, Washington DC.

United States of America v. Anthony Collier, Attorney Daniel Goldman, DC Superior Court, Washington DC.

United States of America v. Anthony Davis, Attorney Catherine McCarthy, DC Superior Court, Washington DC.

United States of America v. Herbert Smith, United States District Court, Eastern District of Pennsylvania

9

United States of America v. Hargobind Tahilramani, United States District Court, Southern District of California, Westminster Magistrates' Court, London, England, United Kingdom.

United States of America v. Richard Bracey, Attorney Stephen Laudone, Law Firm Sidley Austin, DC Superior Court, Washington DC

State of Texas v. Dwayne Chance Chadwick, Attorney Ashley Schell, State of Texas 51st Judicial District Court.

United States of America v. Daniel Barwell, United States District Court, Southern District of Ohio, Westminster Magistrates' Court, London, England, United Kingdom.

United States of America v. Peter Weinzierl, Westminster Magistrates' Court, London, England, United Kingdom.

United States of America v. William Smith, Attorney David Iraola, DC Superior Court, Washington DC.

United States of America v. Julian Paul Assange, United States District Court, Westminster Magistrates' Court, London, England, United Kingdom.

United States of America v. Joseph Wolfe, United States District Court, District of New Hampshire.

United States of America v. Robert Bowers, United States District Court, Western District of Pennsylvania.