IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )    Case No.  03-CR-00073-RAW
                                   )
EDWARD LEON FIELDS, JR.,           )
                                   )
                    Defendant.     )


TRANSCRIPT OF PROCEEDINGS

OCTOBER 7, 2024

BEFORE THE HONORABLE GERALD L. JACKSON

UNITED STATES MAGISTRATE JUDGE

EVIDENTIARY HEARING

VOLUME I

APPEARANCES:


FOR THE PLAINTIFF:          CHRISTOPHER J. WILSON
                            United States Attorney
                            520 Denison Avenue
                            Muskogee, Oklahoma 74401

                            AARON J. STEWART
                            Capital Case Section
                            U.S. Department of Justice
                            1331 F Street, NW
                            Washington, D.C. 20530

(Appearances Continued)

REPORTED BY:                JOANNA SMITH, CSR, RPR
                            United States Court Reporter

United States District Court
Eastern District of Oklahoma

APPEARANCES CONTINUED:

FOR THE DEFENDANT:              KATHERINE E. ENSLER
                               HAYDEN NELSON-MAJOR
                               KATHERINE C. THOMPSON
                               Federal Community Defender Office
                               Suite 545 West, The Curtis
                               601 West Walnut Street
                               Philadelphia, Pennsylvania 19106

                               HUNTER S. LABOVITZ
                               Federal Public Defender Office
                               Dean A. McGee Avenue, Suite 707
                               Oklahoma City, Oklahoma 73102

INDEX

PAGE

WITNESSES ON BEHALF OF THE DEFENDANT

ISAIAH S. GANT
  Direct Examination by Ms. Ensler              15
  Voir Dire Examination by Mr. Wilson           40
  Direct Examination Continued by Ms. Ensler    43
  Cross-Examination by Mr. Wilson               56
  Redirect Examination by Ms. Ensler            144

MICHAEL ABEL
  Direct Examination by Mr. Labovitz            153
  Cross-Examination by Mr. Wilson               183
  Redirect Examination by Mr. Labovitz          191
  Recross-Examination by Mr. Wilson             195

BARRY DERRYBERRY
  Direct Examination by Ms. Nelson-Major        200

**United States District Court**
**Eastern District of Oklahoma**

4

PROCEEDINGS

OCTOBER 7, 2024:

THE COURT: All right. Good morning. We are here on the record in Case Number CR-03-73-RAW, the United States of America versus Edward Leon Fields.

Will counsel please enter their appearance?

MR. WILSON: Christopher Wilson for the United States.

MR. STEWART: Aaron Stewart for the United States.

MR. LABOVITZ: Good morning, Your Honor. Hunter Labovitz for Mr. Fields.

MS. ENSLER: Katherine Ensler for Mr. Fields.

MS. NELSON-MAJOR: Hayden Nelson-Major for Mr. Fields.

MS. THOMPSON: And Katherine Thompson for Mr. Fields.

THE COURT: Okay. Everybody accounted for. All right. Good morning. Welcome to the Eastern District of Oklahoma.

Before we get started, I know we talked on Friday about getting some preadmission of exhibits. We want to address that first. Are the parties ready to identify all the unobjected to and exhibits that we can preadmit.

MR. WILSON: Yes, Your Honor.

THE COURT: All right. We want to start with the

United States District Court
Eastern District of Oklahoma

petitioner's -- the petitioner's exhibit list?

MR. LABOVITZ:  Yes, Your Honor.  And do you prefer that we speak from the podium?

THE COURT:  It would probably help just so the microphone can pick it up better.

MR. LABOVITZ:  One other issue first, Your Honor. I just want to put on the record that by our motion and the Court's order, Mr. Fields is not present in the courtroom. He will not be appearing in person or by video during these proceedings.

THE COURT:  Okay.  Yes, that is correct.  All right.  Thank you.

MR. LABOVITZ:  Your Honor, first, I would like to list the seven witness stipulations that the parties have agreed on for the record.  I'm just going to them in general.  I'm not going to, per the Court's instructions, read the actual text of that.

THE COURT:  Okay.

MR. LABOVITZ:  First, the parties stipulate that Rob Ridenour, R-I-D-E-N-O-U-R, if called by Mr. Fields to testify at this evidentiary hearing, would testify consistent with the statements contained in his declaration, dated February 4th, 2021, which has been submitted to the Court as Defense Exhibit 245 for this hearing; and, two, the contents of Mr. Ridenour's declaration shall be admitted as

substantive evidence.

THE COURT:  There's no objection to that, I take it?

MR. WILSON:  No objection, Your Honor.

THE COURT:  All right.  It is so admitted.

MR. LABOVITZ:  The parties further stipulate that Paul Brunton, B-R-U-N-T-O-N, if called by Mr. Fields to testify at the evidentiary hearing, would testify consistent with the statements contained in his declaration, dated April 24, 2024, which has been submitted to the Court as Defense Exhibit 246 for the purposes of this hearing.  The contents of Mr. Brunton's declaration shall be admitted as substantive evidence.

MR. WILSON:  No objection.

THE COURT:  So admitted.

MR. LABOVITZ:  The parties stipulate that David Bruck, B-R-U-C-K, if called by Mr. Fields to testify at the evidentiary hearing, would testify consistent with the statements contained in his declaration, dated January 16, 2024, which has been submitted to the Court as Defense Exhibit 247 for the hearing, and the contents of Mr. Bruck's declaration shall be admitted as substantive evidence.

MR. WILSON:  And, again, no objection.

THE COURT:  So admitted.

MR. LABOVITZ:  The parties further stipulate that

Robin Maher, M-A-H-E-R, if called by Mr. Fields to testify at the evidentiary hearing, would testify consistent with the statements contained in her declaration, dated January 13, 2024, which has been submitted to the Court as Defense Exhibit 248 for the hearing, and the contents of Ms. Maher's declaration shall be admitted as substantive evidence.

MR. WILSON:  No objection.

THE COURT:  So admitted.

MR. LABOVITZ:  The parties stipulate that Judy Clarke, C-L-A-R-K-E, if called by Mr. Fields would testify at the evidentiary hearing, would testify consistent with the statements contained in her declaration, dated October 21, 2022, which has been submitted to the Court as defense Exhibit 249 for the hearing, and the contents of Ms. Clarke's declaration shall be admitted as substantive evidence.

MR. WILSON:  No objection.

THE COURT:  So admitted.

MR. LABOVITZ:  The parties stipulate that Alex Bunin, B-U-N-I-N, if called by Mr. Fields to testify at the evidentiary hearing, would testify consistent with the statements contained in his declaration, dated December 30, 2020, which has been submitted to the Court as Defense Exhibit 250 for the purposes of this hearing, and the contents of Mr. Bunin's declaration shall be admitted as

substantive evidence.

MR. WILSON:  No objection.

THE COURT:  So admitted.

MR. LABOVITZ:  The last stipulation, Your Honor, on witnesses, is that the parties stipulate that Kevin McNally, if called by Mr. Fields to testify at the evidentiary hearing, would testify consistent with the statements contained in his declaration, dated August 9, 2024, which has been submitted to the Court as Defense Exhibit 251 for this hearing, and the contents of Mr. McNally's declaration shall be admitted as substantive evidence.

MR. WILSON:  No objection.

THE COURT:  So admitted.

MR. LABOVITZ:  Now, Your Honor, I would like to provisionally offer into evidence the following unobjected to exhibits.  I'll just list them.  I've talked to Mr. Wilson, and the parties would like to reserve the right to object to any exhibits at the end of the hearing that have not been used through witnesses and, you know, take that up with the Court at the end of the hearing because there may some exhibits that are not -- that are marked and sort of, you know, preadmitted, but not actually used with a witness.

THE COURT:  Okay.  So we're going to go through

the preadmitted exhibits, but, at the end, anything not --
from that list not been used, we'll have objections and deal
with that then?

MR. LABOVITZ:  Yes.

THE COURT:  Okay.  All right.  Understood.

MR. LABOVITZ:  Okay.  So the unobjected to
exhibits for petitioner are Exhibits -- and we would offer
into evidence the following exhibits:  1, 2, 4, 7, 8, 9, 11,
12, 14, 16, 17, 18, 20, 30, 31, 32, 35, 36, 37, 38, 39, 40,
43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 59,
60, 61, 65, 66, 67, 68, 71, 72, 73, 74, 75, 76, 77, 78, 79,
80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 95,
96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108,
109, 110, 111, 112, 113, 114, 115, 116, 118, 121, 122, 123,
124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135,
136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147,
148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159,
160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171,
172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183,
184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195,
196, 197, 198, 199, 200, 201, 202, 203, 206, 207, 208, 209,
210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221,
222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 237,
238, 239, 240, 243, 244, 245, 246, 247, 248, 249, 250, 251,
252, 253, 254, 256, 257, 258, 259, 260, 261, 262, 263, 264,

266.

Those are the exhibits that have been filed as of record with the Court, and we have provided copies to the government.  I would note -- and I don't know how the Court wants to handle it -- over the weekend, we did not take your admonishment and we did work, so we have five additional exhibits that we -- I don't -- we haven't yet filed notice with the Court, and we will do that.  I think we would prefer to wait until maybe the end of this week to see if there's any additional exhibits that arise during the hearing, then we'll file an updated exhibit list.

THE COURT:  Okay.  You don't plan on using any of those this week then, or is it --

MR. LABOVITZ:  Yes.  These -- these current five that have been provided to the government will be used.

THE COURT:  Okay.  I see what you're saying.

MR. LABOVITZ:  And they are objecting to at least two of them.  So I can -- I can list the numbers that they don't object to, but it's going to be Exhibits 267 through 271.  We have copies for the Court and the various binders, but, like I say, we haven't put it onto -- we haven't filed them on the docket yet, so I don't know if the Court would like hard copies now.  One of -- I believe one, if not more, might be referred to during the testimony of our first witness, Mr. Gant.

THE COURT:  Yeah, then I think we need the copies now if you have them.  That would be good.

(Counsel confer.)

MR. LABOVITZ:  And just for, I guess, you know, administrative purposes, Your Honor, maybe at the end of this week, would the Court like us to provide new -- get a new cover sheet for Binder Number 9, which currently says through Exhibits 266?

THE COURT:  Sure.  I mean, that would be helpful just so we can make sure we keep everything -- keep track of everything.

MR. LABOVITZ:  Yes, we will do that.

THE COURT:  All right.  So we've got all the preadmitted exhibits now for the defendant's list.

MR. LABOVITZ:  Yes, Your Honor.  I'm not certain that I was complete.  I just want to make a note.  There's also Defense Exhibits 270 and 271.  There is no objection from the government to those.

THE COURT:  Okay.

MR. LABOVITZ:  But, yes, that's the current defense unobjected to exhibit list.

THE COURT:  All right.  Mr. Wilson, do we want to do now the government's preadmitted exhibits?

MR. WILSON:  Yes, Your Honor.  And I will try to expedite this a little bit.  It's my understanding, through

counsel, that the government has listed, prior to today, 1 through 74.  We have requested an additional of Number 75, which is -- copies have been provided to the Court.  Those will not be discussed today.  But it's my understanding from counsel that both parties agree that all 75 of those exhibits would be provisionally admitted at this point, subject to the previous announcement.

THE COURT:  Okay.  So all 75.  That makes it easy.  Okay.  All right.  Anything else preliminarily we need to address before we get started?

MR. WILSON:  Nothing from the government, Your Honor.

MR. LABOVITZ:  Nothing else from the defense, Your Honor.

THE COURT:  Do the parties want to invoke sequestration for any witnesses as it relates --

MR. WILSON:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So any witness shall be -- shall not be permitted in the courtroom or to discuss any of their testimony with any other witnesses or prospective witnesses.  I'm going to have to rely on you all -- you know who your witnesses are -- so we can identify any with that.  All right.

MR. LABOVITZ:  Your Honor -- sorry -- I just want to put on the record too that a paralegal from our office,

Miranda Yost, Y-O-S-T, is present in the courtroom.  She will not be a witness.

THE COURT:  Okay.  All right.  Very well.

MR. WILSON:  Also, just for the record, Your Honor, Ms. Thiemecke from our office is also present.  She is not on the record.

THE COURT:  Very well.  All right.  Thank you.

All right.  Anything else preliminarily before we get started then?

MS. ENSLER:  May I ask a question, Your Honor?

THE COURT:  You may.

MS. ENSLER:  I will be presenting the first witness today.

THE COURT:  You'll need to get into that microphone and identify yourself for the court reporter.

MS. ENSLER:  That's important.  I will be presenting the first witness today.  In referring -- when I need to refer to the witness, I will have two large binders. Would the Court be okay if I sat here or do I need to stand at the podium?

THE COURT:  It works so much better at the podium.

MS. ENSLER:  Okay.

THE COURT:  Just with these microphones, it's very hard for her to hear and pick up.

MS. ENSLER:  That's fine.  If the Court will just

indulge if I'm --

THE COURT:  And we need a good transcript, so ...

MS. ENSLER:  Yeah, if I'm moving a little bit.

THE COURT:  I know it is -- I know you'll be juggling.  There is that desk beside there you can kind of utilize.

MS. ENSLER:  Great.

THE COURT:  I'm assuming nobody is going to be using an ELMO during this process, at least I hope not.

All right.  With that, then the parties may proceed.  The defendant may go, put on your first witness.

MS. ENSLER:  The defense would call Mr. Isaiah Gant.

THE COURT:  All right.  Mr. Gant, if you will please come forward, the clerk will place you under oath.

(Witness sworn.)

THE COURT:  All right.  Mr. Gant, have a seat.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning.  I'm going to tell you what I'm going to tell everyone else.  You have to kind of lean towards that microphone.  While they look impressive, they actually don't pick up unless you're very close to them.  So if you'll do that and if we need, I'll remind you occasionally if we forget.

THE WITNESS:  Judge, I'm struggling with a cold,

so if I -- if I -- if my voice drops, let me know.

THE COURT:  Okay.  And there should be water in that pitcher there that will help you, and there's some tissue, so ...  having just gotten over one myself, I am very sympathetic.

All right.  You may proceed.

ISAIAH S. GANT,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. ENSLER:

Q.   Good morning, Mr. Gant.

A.   Good morning.

Q.   Could you please state your full name for the record?

A.   Isaiah S. Gant.  Isaiah is spelled I-S-A-I-A-H.

Q.   And are you currently employed?

A.   I retired in December of 2022.  No.

Q.   And what did you do for a living prior to retirement?

A.   I'm a licensed attorney.

Q.   And did you -- what type of law did you practice?

A.   Criminal defense.

Q.   And how long did you practice criminal defense?

A.   Forty -- almost fifty years.

Q.   And, in that time, did you represent Mr. Edward Fields in his federal capital trial in the Eastern District of

Oklahoma?

A.    I did.

Q.    And that was from 2003 to 2005?

A.    Yes.

Q.    And prior to Mr. Fields's trial, what attorney positions had you held?

A.    I was in private practice in Chicago for 12 or 13 years, Cook County Assistant Public Defender a couple of years.  Worked with the -- what was it called? -- the Tennessee Resource Counsel in Nashville.  From there, I went to Southeast Asia, worked with the Cambodian Defender Project.  And from there -- gee -- New York State Defender Association, did that a couple of years.  And then went to work with the Capital Resource Project; from there, to the Federal Public Defender's Office.

Q.    Thank you.  And have you taught law courses in the past?

A.    I have.

Q.    And conducted numerous trainings?

A.    I have.

Q.    And now I would like to turn to the case at hand.  Who did you work for at the time of Mr. Fields's trial?

A.    I was employed as one of the lawyers for the Capital Resource Project.

Q.    And who -- who was your supervisor?

A.    My direct supervisor would have been Kevin McNally.

Q.    And did you also work closely with or in conjunction with Jim Wyda?

A.    I did.

Q.    And they were part of the National Capital Resource Counsel Project?

A.    Yes.

Q.    And when we're referring to the National Capital Resource Counsel Project, is it sometimes referred to as "the Project"?

A.    Yes, it was.

Q.    Okay.  Moving forward when I say that.  Could you explain what the Project is?

A.    Well, at the time, you know, we were new, but the objective of the Project was at that time -- and, again, we're talking 2001, 2002, somewhere in there -- there was an increase in federal capital litigation, and it was not unknown that most of the lawyers in the federal public defender's office, some had capital experience, state capital experience, but most had no federal capital experience.  So it was the objective of the Project to train lawyers, literally, train lawyers on the defense of federal capital cases.

Q.    And how many attorneys were part of the Project at the time?

A.    Two of us.

Q.    And was the other person?

A.    Judy Clarke.

Q.    Okay.  And what were the different types -- you mentioned training, but what were the different types of involvement the Project would have in a federal capital case?

A.    It would depend on, you know, if the Federal Public Defender's Office called and said they needed help.  It could be direct representation of a client.  It could just be training.  It could be consultation, drafting pleadings, that kind of thing.

Q.    And when you say "direct representation," would that mean co-counseling as learned counsel in the case?

A.    Yes.

Q.    When you say "learned counsel," are you referring to the federal statute, 18 U.S.C. 3005?

A.    Yes.

Q.    Regarding a defendant being indicted and being entitled to two counsel, one of which being learned?

A.    Correct.

Q.    And do you recall how the Project got involved in Mr. Fields's case?

A.    My recollection is we were contacted -- when I say "we," the Project, I don't think I was directly contacted,

at least, initially -- contacted by the Federal Public Defender's Office in, I want to say, Oklahoma City maybe, asking for assistance.

Q.    And what was your understanding of the counsel that currently had the case or that office?  What was your understanding of their prior capital experience?

A.    Oh, at least one.  I think Ms. O'Connor had some state capital experience, maybe somebody else in the office, but she had some state capital experience, but no federal capital experience.

Q.    And when you say Ms. O'Connell, who are you referring to?

A.    Julie O'Connell.

Q.    And so were you assigned --

A.    I'm saying O'Connell, it might be O'Connor.

Q.    I think -- O'Connell is right.

A.    Okay.

Q.    And were you assigned to be learned counsel in the Fields case?

A.    I was.

Q.    And had you previously served as learned counsel in a federal capital case?

A.    I had.

Q.    Do you recall how many times before?

A.    At least once, maybe twice; one case in Miami, and the

other case, Judge -- it was in Ohio, Columbus, Ohio.  I was trying to think of the name of the case.  At 77, you know, stuff slips by you every now and then.

Q.    If the case was *Mayhew*, would that ring a bell?

A.    *Mayhew*, yes.  Judge Marbley, I think, was his name.

        THE COURT:  Yeah, you're going to have to lean forward for that microphone, sir.  I apologize.

        THE WITNESS:  That's all right.

        THE COURT:  It may not be comfortable, but it's the only way she can hear you.

Q.    (By Ms. Ensler)  And, generally speaking, what were your responsibilities in a case as learned counsel?

A.    Well, it would depend on what, you know, the office was seeking, but primarily as a resource, to provide whatever it is that was needed by the respective team.

Q.    And was that the same with when you were directly representing the client?

A.    Yes.

Q.    And when you were appointed as learned counsel, how did you know what your primary responsibility would be on a case?

A.    Well, usually, it would be a discussion with the core members of the team, depending on what it is that they needed, what it is they wanted.

Q.    How did your role as learned counsel on a case compare

**United States District Court**
**Eastern District of Oklahoma**

to when you were just consulting?

A.    As learned counsel, you were more of a resource there to provide, you know, expertise in terms of identifying experts, brainstorming, especially in terms of motions and strategy.

Q.    And were you appointed learned counsel on every case that you worked on with the Project?

A.    I may have been appointed learned counsel, but, again, if the case was a consultation type of case, the identification as learned counsel really didn't mean that much.  Again, I was basically like resource, you know.

Q.    Excuse me, I should have been more clear.  In cases where you were -- in all of your cases, did you get admitted in court for those clients?

A.    Yes.

Q.    In every case that you --

A.    I say yes.  We're talking about when I was involved in direct representation.

Q.    And so with the Project did you have other cases where you were not involved with direct representation?

A.    I did.

Q.    Okay.  And about how often were you involved with direct representation versus non-direct representation or consulting only?

A.    There was more consulting.  Like I say, at that time,

there was just two of us so we couldn't get involved directly with direct representation because there were too many cases and not enough of us.

Q.     Now, turning towards this case, but in this case, you were appointed directly to Mr. Fields's case; correct?

A.     Correct.

Q.     And that was in September of 2003?

A.     Excuse me.

Q.     Take your time.  And that was in 2003?

A.     Yes.

Q.     And who was your co-counsel in Mr. Fields's case?

A.     Julie, I mentioned earlier.  Derryberry, I remember the last name.  Those are the two lawyers that I remember most vividly.

Q.     And were there any other team members?

A.     Yes.  Yes.

Q.     And who was that?

A.     Of course, we had some expert witnesses, mitigation specialists.

Q.     Do you recall the mitigation specialist's name?

A.     Shettles, Glori Shettles.

Q.     And how did she get involved in the case?

A.     I believe I probably contacted her boss, Ron Lax.  Ron and I had been involved in a number of cases.  My recollection is somehow I contacted him, and then she got

assigned to the case.

Q.    If you -- this is going to be where you're going to be referring to a binder, Mr. Gant.  If you could pull out Binder 5 and turn to what has previously been --

A.    Let me get my eyes.

Q.    -- marked as Defense Exhibit 94.

A.    Yes, I have it.

Q.    And can you identify this document for the Court?

A.    It's a declaration by me.

Q.    And turning to page number 3, is that your signature?

A.    It is.

Q.    And before signing this in 2015, did someone from my office meet with you to discuss Mr. Fields's case?

A.    Yes.

Q.    And they then typed up what you told them?

A.    Yes.

Q.    And then did you review this declaration before signing it?

A.    I did.

Q.    And now have you reviewed this declaration more recently?

A.    I have.

Q.    And are there any errors in it to the best of your knowledge?

A.    Well, it has been brought to my attention that Mr. --

pardon me -- Dr. Gelbort was not in Muskogee during the course of the trial.

Q.    And do you recall why you may have thought he was in Muskogee at the time?

A.    I recall during the course of -- at least, when I say the trial, the whole process of getting ready for the trial, having talked with him, been with him, but, again, I could be mistaken.

Q.    And who told you that he was not in Muskogee?

A.    Mr. Wilson advised me of that during the course of a telephone interview.

Q.    And so at the time of signing this declaration, you thought Dr. Gelbort was in Muskogee, but you are not sure exactly when you saw him; is that correct?

A.    That's correct.

Q.    And is everything else in your declaration accurate to the best of your recollection?

A.    Yes.

Q.    Now, how would you define your role on Mr. Fields's case in particular?

A.    Again, I keep -- I'm trying to move close to the -- I keep saying "resource."  Basically to provide, to give the team whatever it is that they needed or wanted.

Q.    And on Mr. Fields's case, what did you consider your primary responsibility?

A.    My primary responsibility was trying to get the case settled, to get the case deauthorized if at all possible.

Q.    And could you elaborate on what you mean by get it deauthorized in terms of the actions you would take?

A.    Well, I mean, back then, the ABA standards on the appointment of counsel in capital cases, death penalty cases, I mean, it was -- you know, the principle, you go into these cases with the idea that somehow you got to get them settled.  You don't want to try these cases.  Excuse me.  So from day one until, you know, last I was involved in the case, it was all about getting the case deauthorized, trying to convince -- I think his name was Shelly to take death off the table.

Q.    And what was Mr. -- you mentioned Mr. Derryberry. What was his role or responsibility in the case?

A.    Mr. Derryberry was primarily -- and I don't mean this in some kind of derogatory sense, he was the paper guy.  He was the individual who did -- who drafted most of the motions and very good at it, but that was his primary responsibility.

Q.    And when you were appointed to the case, was there any discussion between you and Ms. O'Connell about the division of labor for preparing for trial?

A.    I'm sure there was.  I don't remember any specific date or event that would have caused us to sit down and say,

well, okay, you're going to do this, but it had to have happened.

Q.    But just for the record, you do not recall for certain that it happened?

A.    I do not.

Q.    And would you agree that you did not lead the representation in Mr. Fields's case?

A.    Yes.

Q.    And was your understanding that you were there to help if asked?

A.    Yes.

Q.    And did Ms. O'Connell ask for help?

A.    I'm sure she must have, but I'm not sure.  I don't recall any specific, hey, you know, Skip help me do this.  I don't recall that.

Q.    Pardon me.  I would ask you to pull out Binder 9. Sorry, Binder 8, and turn to Defense Exhibit 210.

A.    I'm sorry, I didn't hear you.

Q.    That's okay.  Defense Exhibit 210.

A.    Yes, I have it.

Q.    Sorry, pardon me.  I have to also catch up.  Could you identify that email for the Court?

A.    It's an email -- looks like it's from Ms. O'Connell to me, dated 6/6/2005.

Q.    And if you could just read kind of the fifth paragraph

starting with "If."

A.    Certainly.  "If we actually have to try this baby, how are we splitting it up?  And are you going to be here eventually or what?"

Q.    Do you -- did you respond to this email?

A.    Well, as I sit here now, I don't know.

Q.    Okay.  And in that same vein, did you offer to do any parts of the trial?

A.    I don't recall whether I did or didn't.

Q.    Okay.  And in preparing for the trial, what parts of the trial preparation did you handle?

A.    I recall doing jury selection.  Specifically, I recall that.

Q.    And do you recall if you did the entire jury selection?

A.    No, I did not do the entire jury selection.

Q.    But that was the plan?

A.    I don't know if it was a plan, but I'm sure it was expected, but on capital -- in capital trials, in jury selection, it's not unusual for lawyers to switch up.

Q.    And do you recall why that happened?

A.    No, I don't.

Q.    I would like to now turn to talk about some of the experts involved in this case.

A.    All right.

28

Q.   Do you recall the mental health experts that were hired for the case?

A.   Some of them, I do.

Q.   Do you recall a Mr. George Woods?

A.   Yes.

Q.   Do you recall Mr. Michael -- sorry, I should be saying doctor -- a Dr. George Woods.  Dr. Michael Gelbort?

A.   I do.

Q.   Do you recall Dr. Bradley Grinage?

A.   I do.

Q.   And did you help select any of these experts retained in the case?

A.   I'm sure I did.

Q.   Do you recall which of those you may have helped with selecting?

A.   Probably George Woods because I had worked with him in cases before.

Q.   Okay.  And did you communicate with the experts in this case?

A.   I did.

Q.   All of them or primarily specific ones?

A.   Primarily, Dr. Woods and Gelbort.

Q.   And were you the primary attorney contact for these experts?

A.   No.

Q.   Who would that have been?

A.   It would have been Julie.

Q.   And did you ever meet in person with any of these experts other than immediately before trial?

A.   Yes.

Q.   Could you tell us about that meeting or meetings?

A.   The -- excuse me.  The one meeting that I vividly recall was a meeting on a Saturday morning, and it was in Tulsa at the Federal Defender's Office.  Dr. Woods was there.  I know one of the other two experts, either Gelbort or Grinage -- whatever his name is -- was there.  Shettles was there.  Barry was there -- Derryberry was there.  Seems to me there may have been others, but that particular meeting I recall vividly.

Q.   And what was the general nature of the discussion of that meeting?

A.   The meeting was primarily called because Dr. Woods had developed this concept, panic switch or something like that, which was exciting, but it was a little over my head.  And this particular Saturday was basically, hey, Skip, listen, here's what this is all about.  So it was, you know, a primer basically on this concept that he had developed and trying to get Skip, me, to understand that.

Q.   And do you recall when that meeting was?  You mentioned October.

A.    October.

Q.    Do you recall the year?

A.    '3 or '4, somewhere in there.

Q.    Okay.  If I showed you some notes from your file relating to that meeting, would that help refresh your recollection?

A.    Certainly.

Q.    In the last binder, Binder 9, if you could refer to Defense Exhibit 266.

A.    Did you say 2-?

Q.    266.  I may have said 56.  Sorry about that.  And just referring you to the bottom of page 3 once you get there. Sorry, I know you're not there.

A.    Yes.

Q.    Does that refresh your recollection around the time when this meeting that you're describing took place?

A.    It does.

Q.    And what year was that?

A.    2004.

Q.    Okay.  And then, if you don't mind, now putting that binder away and getting out Binder 8.  I would ask you to turn to Defense Exhibit 240.

A.    What was that exhibit, please?

Q.    Sorry.  Exhibit Number 240.

A.    Yes, I have it.

**United States District Court**
**Eastern District of Oklahoma**

31

Q.    And who is that an email from?

A.    Ms. O'Connell.

Q.    And is that to you?

A.    It is.

Q.    And what date was that sent?

A.    September 20th, 2004.

Q.    And in that paragraph number one, as she's numbered it, what is she suggesting for the team?

A.    That we have a meeting to discuss mental health issues.

Q.    And did she describe two phenomena in that email?

A.    Oh, yes, I'm sorry.  Brain damage and manic switch.

Q.    And earlier, just to clarify for the record, when you said "panic switch," were you referring to that phenomena of manic switch?

A.    Yes.  Forgive me.

Q.    That's fine.  When was Ms. O'Connell suggesting you have that meeting?

A.    Well, I know it was -- she was suggesting that we have it soon, that was for sure.

Q.    And given this email was written on September -- in September of 2004, would this be referencing the in-person meeting you had previously described?

A.    Yes.

Q.    You may put away that binder, Mr. Gant.  Thank you.

**United States District Court**
**Eastern District of Oklahoma**

Now, turning back to Mr. Fields's -- or to Mr. Fields's background. Do you recall any challenges Mr. Fields faced at the time of his birth?

A. I do recall that there were challenges, the specifics right now elude me.

Q. If I were to show you an email you wrote on the issue, would that refresh your recollection?

A. I'm sure it would.

Q. Please pull out Binder 5 and Defense Exhibit 97.

A. Yes.

Q. Does that review refresh your recollection?

THE COURT: Wait for me. I'm slower than he is. Sorry.

MS. ENSLER: No, I'm sorry about that.

THE COURT: Rachel is not helping me with my exhibits.

DEPUTY COURT CLERK: I'll come up there.

THE COURT: That's all right.

THE WITNESS: Yeah, I'm getting great assists here.

Q. (By Ms. Ensler) And what challenge --

MS. ENSLER: Oh, I'm sorry, Your Honor. Let me know when you're there.

THE COURT: Okay. I'm there.

Q. (By Ms. Ensler) And what challenge did Mr. Fields

face at birth?

A.    The oxygen deprivation, yes.

Q.    And did you think that was significant?

A.    I did.

Q.    And why -- why was that?  Why did you think that was significant?

A.    Well, I mean, oxygen deprivation to the brain normally leads to impairments in brain development.

Q.    And why would have impairments in brain development been significant in Mr. Fields's case?

A.    Well, in terms of that kind of mental health issue, I mean, that would be a compelling piece of mitigation.

Q.    And is that based on your experience in doing capital cases?

A.    Yes.

Q.    I would like to turn now to a few other names in this case.  Who is David Freedman?

A.    David Freedman was a resource that the Project often contacted regarding issues like mental health.

Q.    And was he emailed regarding this case?

A.    Yes.

Q.    And what was his -- you mentioned he was a resource. Was that his role in this case?

A.    Yes.

Q.    He was not part of the core team?

A.    He was not.

Q.    And, likewise, who is Lisa Greenman?

A.    Lisa Greenman is, and at the time was, an attorney, again, who the Project often contacted because of her expertise in mental health issues.

Q.    And you mentioned she was an attorney, but was she -- was she appointed to the case?

A.    No, no, no.  No.

Q.    Okay.  And did you email her regarding this case?

A.    I did.

Q.    And why did you involve her in this case?

A.    I knew that she was a resource with regard to mental health issues, and I thought that I would reach out to her and explain what was going on in the case and get some suggestions from her, basically.

Q.    Thank you.  And who was -- turning to the experts you mentioned previously.  Who was Dr. Woods?

A.    Dr. Woods was a psychiatrist.

Q.    And do you recall how Dr. Woods got involved in the case?

A.    I do not recall, as I sit here now, how he got involved, but I'm thinking --

Q.    Had you previously worked with Dr. Woods?

A.    I had worked with him a couple of times prior to the Fields case.

Q.    What were Dr. Woods' findings regarding Mr. Fields's mental health?

A.    The one thing I remember is the manic switch, and he was -- he was big on that.  But that's what I recall about his diagnosis.

Q.    And did Dr. Woods testify at trial?

A.    Yes, I believe he did, yes.

Q.    And who was Dr. Mild -- Mild -- sorry, excuse me.  Who was Dr. Michael Gelbort?

A.    Gelbort was a psychologist, neuropsychologist, I believe.

Q.    And what was his general finding regarding Mr. Fields?

A.    He identified brain damage, frontal lobe damage.

Q.    And I'd ask you to pull out -- back for Binder 9, an exhibit we've already looked at, Defense Exhibit 266.

      MS. ENSLER:  Thank you for your help.

A.    What was that exhibit, please?

Q.    (By Ms. Ensler)  266.  And when you get there, I'd refer you to page -- the middle of page 3.

A.    Page 3?

Q.    Yes.

A.    Yes.

Q.    What was conveyed in your entry from August 24th, 2004?

A.    Julie called concerning, that is "Re:  Doc says

36

defendant, Mr. Fields, has frontal lobe damage."

Q.    And just for clarity, when you say defendant, that's because you have written a Delta sign?

A.    That's correct.

Q.    And when you're referring to the doctor, would that have been Dr. Michael Gelbort?

A.    Yes.

Q.    And did you receive draft reports of Mr. -- Dr. Gelbort's findings?

A.    I did.

Q.    If you could refer to Binder 5, Defense Exhibit 81.

A.    I have it before me.

Q.    Okay.  You have gotten there -- sorry -- faster than me.  And after the first kind of "Forward Header" notation, can you identify the middle email?  Who sent that email?

A.    Oh.  Julie O'Connell sent an email to me.  "Skip: Here is the Fields draft of Dr. Gelbort.  Please make any suggestions that you want.  Thanks."

Q.    And when did Dr. Gelbort send that draft to Ms. O'Connell?

A.    I am not sure.

Q.    Would it help to refresh your recollection by looking at an email?

A.    Oh, I'm sorry, duh.  January 3rd, 2005.

Q.    Is when Ms. O'Connell sent the draft to you; correct?

**United States District Court**
**Eastern District of Oklahoma**

37

A.    Correct.  That's correct.

Q.    Did she previously receive that draft from Dr. Gelbort?

A.    Yes, she must have.

Q.    And would that be the email below your email?

A.    Yes.

Q.    And that was sent to Ms. O'Connell when?  The draft of his report?

A.    November 10th, 2004.

Q.    Okay.  Sorry.  I'm going to now refer you to Binder Number 9.

A.    We should just keep that one.

        THE COURT:  Which exhibit number?

        MS. ENSLER:  Exhibit 267.

A.    Did you say 57?

Q.    (By Ms. Ensler)  67.

        THE COURT:  Oh, this is one of the additional ones; right?

        MS. ENSLER:  Yes.  Sorry, Your Honor, that would be in the newly added packet.

        THE COURT:  Yeah, I got it.

A.    Yes, I have it before me.

Q.    (By Ms. Ensler)  And what is on -- what is page one?

A.    That's an email from Julie O'Connell to me with the draft of the -- Dr. Gelbort's report.

Q.   And when was that sent?

A.   March 9th, 2005.

Q.   And what are the -- if I could have you refer to the second and third pages of this exhibit.  What are those?

A.   Yes, I've referred to them.

Q.   Is that the draft of Dr. Gelbort's report?

A.   Yes, it is.

Q.   And is that report signed?

A.   In typewritten form, yes.

Q.   Okay.  And is that your handwriting in the margins on page 2?

A.   It is.

Q.   Would these be your annotations you would have made in reviewing that draft?

A.   Yes, ma'am.

Q.   And what would your placing -- what I will call -- sticky arrows on page 3, what would that likely signify in a document?

A.   These were important, significant parts of the report.

Q.   And that would be referring to the last two paragraphs of Dr. Gelbort's report?

A.   Yes.

Q.   And what were those two paragraphs regarding?

A.   Frontal lobe impairment.

MR. WILSON:  Your Honor, I'm going to object at

this point.  I don't believe this document is actually in evidence at this point.

THE COURT:  Is this -- well -- is this one of the ones that was agreed or not?

MR. WILSON:  That was one that was not agreed on, Your Honor.

THE COURT:  All right.  Well, I think you need to lay the foundation for its admission, and then we can address whether it gets there or not.

MS. ENSLER:  Okay.

Q.    (By Ms. Ensler)  Was it in your practice, Mr. Gant, to print emails and attachments to put in your case file?

A.    Oh, yes.

Q.    And would you have done that at the time -- at the time of the case?

A.    Yes.

Q.    And if these -- if this document was found in your --

MR. WILSON:  Objection, Your Honor.  That's leading.

THE COURT:  Overruled.

Q.    (By Ms. Ensler)  If this document was found in your file, would you have any reason to believe that these were -- these annotations or the report were done by anyone -- sorry.  The report was not done, but the annotations were done by anyone else?

A.    No, they were done by me.

MR. WILSON:  I renew my objection as leading, Your Honor.

THE COURT:  Same thing, overruled.

MS. ENSLER:  Court's indulgence.

Your Honor, I believe I have laid the foundation, but I can ask further questions if the Court feels it is required.

THE COURT:  Well, are you moving to admit 267?

MS. ENSLER:  I am, Your Honor.

THE COURT:  I assume there's an objection?

MR. WILSON:  Your Honor, may I voir dire?

THE COURT:  Okay.

MR. WILSON:  May I use this podium, Your Honor?

THE COURT:  Yeah, for this -- if it's short.

MR. WILSON:  It will be.

                    VOIR DIRE EXAMINATION

BY MR. WILSON:

Q.    Mr. Gant --

A.    Yes, sir.

Q.    -- counsel has referred you to Defendant's Exhibit Number 267.

A.    Yes, sir.

Q.    And the first page of that appears to be an email that you received from Ms. O'Connell; is that correct?

A.    That's correct.

Q.    The second and third pages are what appear to be a neuropsychological report by Mr. -- or Dr. Gelbort; is that correct?

A.    That's correct.

Q.    Are these the only -- is this the only report that you received from Ms. O'Connell -- or this is the only Dr. Gelbort report that you received from Ms. O'Connell?

A.    That's the only one I received at that time.  There were some subsequent reports.

Q.    And so you received reports after this; is this correct?

A.    Yes.  My recollection is I did or we did.

Q.    Okay.  And can you say specifically, from your independent recollection, that, in fact, this two-page document, neuropsychological evaluation, is, in fact, the same report which is reflected on this email?

A.    Yes, sir.

Q.    You're sure that this is the -- this is the written evaluation?

A.    Yes, sir.

Q.    And how are you -- can you say, 100 percent sure, that this, in fact, is the report?

A.    I'm sorry.  Did you say isn't or --

Q.    How can you say 100 percent sure that this, in fact, is the report?

A.    It's the notation in the margin, that's my handwriting.

Q.    I'm sorry.  Let me rephrase my question.

A.    I'm sorry.

Q.    It's poorly asked.  I apologize.  The email, on page one, at the bottom, shows a little icon.  Would you agree with that?  It says "Fields.doc"?

A.    Yes.

Q.    How can you say that this two-page document is, in fact, that same file?

A.    I mean, I have no reason to believe that it was not.

        MR. WILSON:  May I have just one moment, Your Honor?

        THE COURT:  You may.

Q.    (By Mr. Wilson)  Mr. Gant?

A.    Yes, sir.

Q.    Would you agree with me that there is not a date on this neuropsychological evaluation report, a date of preparation?

A.    I don't see one, Mr. Wilson.

Q.    And did you actually prepare this exhibit yourself?

A.    I'm not sure I understand your question.

Q.    Did you prepare this exhibit and provide it to defense counsel?

A.    I am sure it was part of my file that I turned over to

them years ago.

MR. WILSON:  I believe that's all I have, Your Honor.

THE COURT:  Okay.

MR. WILSON:  I would just renew my objection.

THE COURT:  Okay.  I mean, obviously, we've got a report here from an out-of-court declarant.  I'm assuming you're not offering this report for the report contents itself but simply this particular witness's observations or commentary on it?  Is that where we're headed here?

MS. ENSLER:  Correct, and what he was told.

THE COURT:  Okay.  All right.  I'll overrule the objection.  I would admit 267, Defendant's Exhibit 267, for the limited purposes of this witness.

<u>DIRECT EXAMINATION CONTINUED</u>

BY MS. ENSLER:

Q.    Now, previous to receiving this report in March, we had discussed a report you received in January, that initial -- an initial report from Dr. Gelbort.  What were your impressions of that initial draft by Dr. Gelbort that was sent in January of 2005?

A.    I remember -- sorry -- the first report was a report that was -- I was not impressed with at all.  I remember being critical of that first report.

Q.    And do you recall discussing that draft with Lisa

Greenman and David Freedman over email?

A.    I do.

Q.    And did they provide feedback on that draft as well?

A.    They did.

Q.    Now, while you expressed concerns, did you ever suggest not presenting Dr. Gelbort in Mr. Fields's case based on that draft?

A.    No, not -- no.

Q.    Likewise, did you ever suggest not presenting his findings even through another expert?

A.    No.

Q.    In your experience, if neuropsychological testing shows that your client has brain damage or cognitive impairments or impairments in executive functioning, is that -- are those things that you would want to develop and present?

A.    Yes.

Q.    Is that something that you wanted to develop and present here in Mr. Fields's case?

A.    Yes.

Q.    And did you have any strategic reason for not developing or presenting evidence of brain damage and cognitive impairments in this case?

A.    No.

Q.    Did Ms. O'Connell lead the consultation with

Dr. Gelbort?

A.    I'm sorry.  Did Ms. O'Connell --

Q.    Lead -- lead the expert work with Dr. Gelbort?

A.    Yes.

Q.    And did the defense team discuss having Dr. Gelbort do more testing following his initial report?

A.    Yes.

Q.    And did you -- sorry.  And was Dr. Gelbort asked to do more testing?

A.    I don't recall whether he was or was not.

Q.    If I showed you an email from your file written on the topic, would that refresh your recollection?

A.    I'm sure it would.

Q.    Okay.  Please go to Binder 5, Defense Exhibit 84.

A.    That exhibit number again, please?

Q.    84.

A.    Yes, I have it before me.

Q.    If you could just review the email exchange?

A.    I have reviewed it.

Q.    Does it refresh your recollection as to whether Dr. Gelbort was asked to do more testing?

A.    It does.  He was asked to do more testing.

Q.    And did you ask him to do specific tests?

A.    I asked him to do ...

Q.    Let me withdraw that question.  Was Dr. Gelbort

willing to do additional testing?

A.    He was.

Q.    Did you provide the testing to Dr. Gelbort that you wanted him to do the additional testing?

A.    I don't recall if I specifically did that.

Q.    Okay.

        MS. ENSLER:  Sorry.  Court's indulgence for one second.

Q.    (By Ms. Ensler)  So it is clear, Mr. Gant, that the team had some issues with Dr. Gelbort's initial report.  Did that affect the team's plan to call Dr. Gelbort as a witness in Mr. Fields's trial?

A.    No.

Q.    Did you have any doubt about his findings as relayed to you?

A.    No.

Q.    And do you recall being a part of the pretrial decision-making process as to who -- which experts would be presented?

A.    Yes.

Q.    And at that time, was the plan to present Dr. Gelbort?

A.    Yes.

Q.    And do you remember any discussion about not calling Dr. Gelbort?

A.    No discussion that I was involved in about not calling

him.

Q.    So if you told the government that there was no disagreement regarding not calling Dr. Gelbort, was that because you did not make a plan not to call Dr. Gelbort?

A.    Okay.  You got me there.

Q.    That's okay.  I'll slow down.  If you told the government that there was no disagreement regarding not calling Dr. Gelbort, was that because there was no plan ever to not call Dr. Gelbort?

A.    There was no plan that I recall being involved in to not call Dr. Gelbort.

Q.    Okay.  Do you recall considering what presenting Dr. Gelbort would do in regards to possibly opening the door for the prosecution to file -- to have responsive evidence?

A.    There was -- I do recall there was a discussion about some things in Mr. Fields's background that we didn't want to get in, and that there was a possibility of us running the risk of opening the door and allowing that in.  There was discussion about that.

Q.    And did the team decide, after that discussion, not to call Dr. Gelbort, to try to limit the government's expert's testimony?

A.    No.

Q.    Would you have tried to get a determination from the Court before making that type of decision?

A.    Yes.

Q.    How would you have done that?

A.    Filed a motion in limine of some type asking the judge to address it before we proceeded in the sentencing proceeding.

Q.    And would you have sought clarity from the court before taking such a strategy?

A.    Sure.

Q.    Was Ms. O'Connell in charge of making the necessary arrangements with the experts to secure their presence at trial?

A.    My recollection, counsel, is that that was more in the hands of Julie, in terms of the actual scheduling and that kind of thing, making the arrangements.

Q.    And do you recall whether Dr. Gelbort ever said he would not be able to come to testify at trial?

A.    I do not recall him saying that.  I do recall that there was some scuttlebutt, some rumor that he might not be available.

Q.    And what do you mean by rumor?

A.    Among the team, there was some discussion about his availability.  I don't remember specific, but it was being discussed.

Q.    And do you recall, in reference to the trial, the beginning of the trial, when that discussion or rumor was

happening?

A.    No.  I know it wasn't -- it was not at -- when you say the beginning of the trial, you mean the actual trial proceeding?

Q.    Correct, yes.  Sorry.  The sentencing proceeding.

A.    Yes.  It was shortly before the sentencing proceeding. When I say shortly, we're only talking about a couple of days maybe, certainly not more than that a week, but there was some discussion about his possible unavailability.

Q.    And just for clarity of the record, when we're talking about the sentencing proceeding --

A.    Yes.

Q.    -- are you talking about before the presentation of the defense witnesses?

A.    Yes.

Q.    Okay.  And did Dr. Gelbort end up testifying?

A.    No.

Q.    And up until the beginning of trial, did you expect Dr. Gelbort to testify?

A.    Yes.

Q.    And did you have any strategic reason to not incorporate the brain damage and frontal lobe impairment findings in Dr. Woods' -- findings of Dr. Gelbort in Dr. Woods' testimony?

A.    I'm sorry?

Q.    Let me start that again.  Did -- was there any evidence presented at trial about frontal lobe impairments and brain damage from the defense experts?

A.    As I sit here now, I don't recall.  I'm sorry.

Q.    That's okay.  Assuming there was no -- assuming there was no mention of brain dysfunction and brain damage, did you have any strategic reason to not incorporate that into the defense experts that did testify at trial?

A.    No.

Q.    And that would include Dr. Woods and Dr. Grinage?

A.    Right.

Q.    And did you work with Dr. Grinage?

A.    I'm sure I spoke with him.  But in terms of preparing him as a witness, is that your question?

Q.    (Nods head.)

A.    I don't recall.

Q.    Okay.  But he did testify as you recall?

A.    I do recall that he testified.

Q.    And with Dr. Woods, did you help prepare his testimony?

A.    I cannot say that I did, but given this whole thing about the manic switch, I would think that I had worked with him.  I don't recall.

Q.    But you don't recall for certain whether you helped him?

A.    I do not.

Q.    And did -- and Dr. Woods did testify?

A.    He did.

Q.    Do you recall the name Dr. Randall Price?

A.    I do now, yes.

Q.    Did he testify for the government?

A.    Yes, that's my understanding.

Q.    And assuming he testified -- sorry -- not assuming, he did testify.  Assuming you had criticisms of Dr. Price, the government's expert's testing, would you have wanted to point those out on cross-examination?

A.    Yes.

Q.    Would you have any reason to have not pointed those out if you had them?

A.    No.

Q.    And did the defense team ever consider diagnostic imaging of Mr. Fields's brain?

A.    There was some discussion of that.

Q.    Was any imaging ever completed?

A.    No, not that I recall.

Q.    If neuroimaging shows that Mr. Fields's brain is not normal --

          MR. WILSON:  Objection, Your Honor, to the form of the question.  I believe it's leading and suggesting evidence -- and suggesting things which are not currently in

evidence.

THE COURT:  Sustained.

Q.    (By Ms. Ensler)  Dr. Gelbort, have you ever had imaging done on a client?

A.    Gant.

Q.    Sorry.  Sorry.  I'm sorry.  Mr. Gant, have you ever had imaging done on a client?

A.    Yes.

Q.    And have you ever had a client have an abnormal image?

A.    Yes.

Q.    And was that abnormal image about a brain?

A.    Yes.

Q.    And would you present that abnormal image in the case that you are working on?

A.    I just want to be sure I'm answering your question. In the situation where I had imaging, okay, your question is would I admit that?

Q.    Would you have wanted the jury to know about that?

A.    Oh, yes.  Yes.

Q.    And why is that?

A.    Again, when you talk about traumatic brain injury or other serious mental health issues, that is very compelling mitigation.

Q.    And if -- if you have imaging that supports your other experts, is that something you would want to present in a

case?

A.    Sure.

Q.    And if -- sorry.  Withdraw that.  Would you have had reason to not present Mr. Fields's cognitive impairments and brain damage in addition to the manic flip?

A.    No.

Q.    I would like towards -- to the actual sentencing. What responsibilities did you have at trial?

A.    At the sentencing?

Q.    At the sentencing, I should say.

A.    Primarily, the jury instructions is the thing that I remember.

Q.    And following voir dire --

A.    When I said jury instruction, I meant jury selection.

Q.    Sorry, and I should have clarified that.  Following voir dire, what were -- what were your responsibilities as you recall?

A.    I don't know if I had been identified to do any specific thing.  I may have, but I just don't recall.

Q.    Did you discuss with Ms. O'Connell dividing up the witnesses for sentencing?

A.    I'm sure I did.

Q.    Did you recall that specifically?

A.    No.

Q.    Did you offer to present any of the defense witnesses?

A.    Again, I don't recall.

Q.    Okay.  Did you present any -- did you do any cross-examination, I should say, of the government's witnesses?

A.    No, I don't recall doing that.

Q.    And did you do either the opening or the closing arguments?

A.    No, I did not.

        MS. ENSLER:  Court's indulgence?

        THE COURT:  Yes.

Q.    (By Ms. Ensler)  Sorry, Mr. Gant.  Just a few further questions.  We had briefly talked about David Freedman.

A.    Yes.

Q.    Do you know what mental health credentials David Freedman had at the time -- if any, at the time of trial?

A.    No.

Q.    Okay.  And then referring to -- pardon.  Referring to Dr. Gelbort's report that you had put arrows, sticky arrows, on --

A.    Yes.

Q.    -- which is Defense Exhibit 267.  If you would refer in the Binder 9, I guess it would be.

A.    Yes, I have it before me.

Q.    Just going back to the two areas that you had put the arrows on, could you just explain -- you had said they were

important, that's what the arrows would signify.  Could you explain why those were important in terms of the strategy of the case?

A.    Well, again, they talk about what I deemed to be substantial brain impairment, frontal lobe impairment.  I mean, those are, again, very important pieces of evidence that you would want to present to the sentencing jury because in a lot of cases, it's very, very compelling mitigation.

Q.    And just to -- my final question, just to clarify. Assuming that Dr. Gelbort was unavailable, was there any reason not to present Mr. Fields's brain damage through one of your testifying experts?

A.    There would have been no reason not to do that, no.

            MS. ENSLER:  Thank you.  No further questions.

            THE COURT:  All right.  We're at 10:30.  It seems like a good time for our midmorning break.  Before we do, I did want to address, Ms. Ensler, you had asked this -- you had this witness, Mr. Gant, look at Exhibit 94, which appears was not one of the ones preadmitted.  I think this was Mr. Gant's declaration.

            MS. ENSLER:  Yes, Your Honor.

            THE COURT:  Are you seeking that admitted now?

            MS. ENSLER:  Yes.

            THE COURT:  Okay.  It's your choice.

All right.  Any objection to the admission of Defendant's Exhibit 94?

MR. WILSON:  Yes, Your Honor.  It's hearsay testimony.  He's testified -- he will have his testimony in the record.  This would be hearsay.

THE COURT:  All right.  I'm going to deny the admission of 94.  I do think he had the opportunity to testify.  whatever he had to say, he was allowed to say.

All right.  We're going to take a 15-minute break.  we'll be back at -- looks like at 10:50.  All right.  With that, we are in recess.

(Recess taken.)

THE COURT:  All right.  We are back on the record. Are the parties ready to proceed?  Okay.

All right.  Mr. Wilson, you may conduct your cross-examination.

MR. WILSON:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY MR. WILSON:

Q.    Mr. Gant, you began practicing law, I believe in 1974; is that right?

A.    Yes, sir.

Q.    And as part of your career as an attorney, you said it was almost exclusively, if not exclusively, in criminal defense; is that correct?

A.    That's correct, yes.

Q.    And from 2002 to 2006, you actually served as a -- what's referred to as learned counsel; is that correct?

A.    Yes, sir.

Q.    And as part of the Project; is that right?

A.    That's right.

Q.    And the Project is a program which was actually created by the Administrative Office of the Courts; is that correct?

A.    That's correct.

Q.    And it was designed specifically to assist criminal defense attorneys, specifically in the federal system, on how to defend capital cases; correct?

A.    Correct.

Q.    And you and only one other attorney back in 2003 were attorneys on the panel or on the Project; is that correct?

A.    Correct.

Q.    But you had the ability to consult with other attorneys, other resources; is that right?

A.    That is right.

Q.    And you had developed those contacts over your years of representing defendants specifically in the federal system; is that correct?

A.    Yes.

Q.    And I believe -- I believe you said you previously had

served in the state side in Chicago; is that correct?

A.    I did, yes.

Q.    In the Cook County Public Defender's Office?

A.    Yes, sir.

Q.    And you were also on the Capital Case Unit, if you will, in the state of Tennessee; is that right?

A.    Yes.

Q.    And all of that was before you represented Mr. Fields in this case; is that correct?

A.    That's correct.

Q.    And I believe you went to the Middle District of Tennessee in around 2006; is that right?

A.    If you say so.  Yeah, I have no reason to doubt that.

Q.    Okay.  And you served there in the Middle District of Tennessee continuously until you retired in 2020; is that correct?

A.    Yes.

Q.    I believe that was in December, I believe you told me, of 2020?

A.    Yes, sir.  2022.

Q.    I'm sorry.  I'm sorry, 2022.  Thank you.  I believe you testified that one of your duties as learned counsel was to assist in the authorization/deauthorization protocol for the death penalty in federal cases; is that correct?

A.    Yeah.  When requested to do so, yes.

Q.    And did you participate in the initial discussions with the U.S. Attorney's Office in the Eastern District of Oklahoma and also with the Capital Case Section in D.C., attempting to not have this case authorized for death?

A.    Yes.

Q.    And did you actually travel to the District of Columbia and meet with officials there and make a recommendation that the department not authorize the death penalty?

A.    Mr. Wilson, I think so.  I think I did; I'm not sure. But I was in the case early enough to have done that.

Q.    And you agree with me that in order for a case to proceed under a notice of intent to seek the death penalty, that has to be authorized by the attorney general?

A.    Yes, sir.

Q.    And that had to be the case -- that was the case back in 2003, '4, and '5; is that right?

A.    That's right.

Q.    And as we all know, the attorney general authorized the death penalty in this case as to Edward Fields; is that right?

A.    Yes, sir.

Q.    I believe you testified a moment ago; I just want to make sure I'm correct.  Prior to the representation in this case, you had two other cases that you served as learned

counsel in the federal system; is that right?

A.    At least two.

Q.    And did you have other federal death penalty experience other than those two cases?

A.    I may have been, Mr. Wilson, involved in some other federal capital cases, but not direct representation that I recall.

Q.    You may have been called upon to give consultation; is that right?

A.    Yes, sir.

Q.    How many actual trials, federal death penalty trials, had you participated in prior to the representation of Mr. Fields?

A.    I think just the two.  Jose Dennis, that was in Miami, and I can't recall whether the case before Judge Marbley, in Columbus, Ohio, I can't recall whether that was also before Mr. Fields's case, but those would have been the only two.

Q.    But I take it, based on your experience, that's why you were asked to be part of the Project; is that right?

A.    I don't know.  I can't answer that one.

Q.    Okay.

A.    I think I was asked to be part of it because of my experience, yes.

Q.    All right.  Are you familiar with the petition that was filed in this particular case?

A.    The petition --

Q.    Petition for post-conviction relief?

A.    No, sir.

Q.    Have you had an opportunity to read it?

A.    I have not.

Q.    And would that be the original petition and also the amended petition?  You've not read either one?

A.    I have not read either one.

Q.    And have you read the December 15th, 2016, order of the district court denying the amended petition?

A.    I have not.

Q.    Have you read the Tenth Circuit opinion reversing the district court in part and remanding for an evidentiary hearing that we're doing here today?

A.    I have not.

Q.    Have you -- have you read your declaration that was signed back in September of 2015?

A.    Yes.

Q.    You've read it since that time, I assume?

A.    I have ad nauseam.

Q.    And are you aware that Mr. Fields is alleging ineffective assistance of counsel in this case?

A.    I am.

Q.    And are you aware that Mr. Fields is specifically alleging ineffective assistance of counsel in the

investigation and presentation of evidence of organic brain damage?

A.    I am.

Q.    You were appointed -- and I believe according to previous testimony -- as counsel in this case to be direct representation; is that right?

A.    That's correct.

Q.    Not just consultation, but actually filing an entry of appearance and participating in the case?

A.    Yes, sir.

Q.    Now, early on, I assume you were given a summary of what the facts were alleged -- that alleged to have occurred in July of 2003; is that right?

A.    Do you mean before I entered an appearance in the case?

Q.    Yes, sir.

A.    Yes.

Q.    And you were aware that Mr. Fields donned a ghillie suit and stalked and murdered two people at the Winding Stair Campground in the Ouachita Mountains in Southeastern Oklahoma?

A.    Yes, sir.

Q.    And you're aware that as part of the representation, that Mr. Fields entered a guilty plea to those murders and associated robbery crimes; is that right?

A.    That's right.

Q.    And were you involved in the decision for Mr. Fields to enter a guilty plea?

A.    Yes.

Q.    Did you appear at the guilty plea?

A.    I'm not sure.  I don't think so.  I'm not sure.

Q.    But you weren't the only person that was involved in the defense team; is that right?

A.    Correct.

Q.    I believe you previously testified that Julia O'Connell was the lead counsel; is that right?

A.    Yes.

Q.    And you were aware of -- going in, that Ms. O'Connell was lead counsel; is that right?

A.    Yes.

Q.    And when you agreed to become involved in this case, what was your understanding of what your role was going to be?

A.    I was to be a resource to the team, provide them with whatever needs they had, whatever expertise I had.

Q.    And when you say "the team," you're referring to Julia O'Connell; correct?

A.    Yes, sir.

Q.    Barry Derryberry?

A.    Yes.

64

Q.    And Glori Shettles?

A.    Yes.

Q.    And then the mental health experts; is that correct?

A.    That's correct.

Q.    Were there any other members of the team that we've not talked about so far?

A.    I can't remember whether it was you or maybe someone on behalf of Mr. Fields mentioned Abel or Abel, Michael Abel, Abel, or something like that.

Q.    All right.  Do you recall a person by the name of Michael, Michael Abel?

A.    I do not.

Q.    And do you recall at any time during the representation of Mr. Fields, having any discussions with an attorney by the name of Michael Abel?

A.    I do not.  It's not to say that I didn't; I don't recall it.

Q.    And I guess this kind of goes without saying, but all of this representation was 20 -- over 20 years ago; correct?

A.    Yes.

Q.    And we're asking you to remember things which are over two decades old; is that right?

A.    Right.  And I apologize for not being able to remember most of this stuff, but ...

Q.    And you would agree with me that there's a lot of

things, Mr. Gant, that you simply do not remember?

A.    Yes, sir.

Q.    And but for some email traffic, you may have absolutely no recollection of events.  Would you agree with that?

A.    That's possible.

Q.    And if there's not an email referencing a particular discussion, there may be -- there may have been additional discussions which you simply do not remember?

A.    That's certainly possible.

Q.    There could have been --

        MS. ENSLER:  Objection.  Speculative.

        THE COURT:  Overruled.

Q.    (By Mr. Wilson)  There could have been phone calls, phone discussions between you and Ms. O'Connell, which were not memorialized in any way.  Would you agree with that?

        MS. ENSLER:  Objection.  Speculative.

        THE COURT:  Overruled.

A.    Mr. Wilson, that's highly unlikely.  One of the things that I did religiously in the case was try and make a notation every time something of significance, anyway, happened.

Q.    (By Mr. Wilson)  Okay.  And I believe that would have been on the notes which were previously shown to you; is that right?

A.    Yes, sir.

Q.    And I believe that was Defense Exhibit, I believe, 266; is that right?

A.    I believe so.

Q.    So it's your testimony that if there was ever a substantive discussion, then that would be reflected in your notes?

A.    Yes.

Q.    And would you agree with me -- can you just look at Exhibit Number 266?  And I believe that was in Binder Number 9?

A.    Yes, I have it before me.

Q.    Let's just look at page number 5.

A.    Yes, sir.

Q.    About, oh, not quite halfway down, there's an entry of 01/24/05.  Do you see that?

A.    I do.

Q.    What does it say?

A.    "Julie called re:  Gelbort."

Q.    All right.  Tell me about that discussion.  What happened during that call?

A.    I could not tell you the substance of that call.

Q.    I thought you said that your notes would reflect all substantive calls?

A.    It does note the call.

Q.    But the subject matter is not reflected.  Would you agree with me on that?

A.    I would.

Q.    Okay.  So if there's not a specific entry giving you information about what took place during a phone call, you simply -- you may not remember what took place during that call.  Would you agree with me on that?

A.    I would agree with you.

Q.    As you discussed earlier, the Project had resources that you could tap into to help with the defense of any capital case, federal capital case; correct?

A.    Correct.

Q.    And I believe we've already referred to a person by the name of Glori, G-L-O-R-I, Shettles; is that right?

A.    Yes, sir.

Q.    It's my understanding that Ms. Shettles was an employee of the Inquisitor, Incorporated; is that right?

A.    That is right.

Q.    And Inquisitor, Incorporated was a mitigation services company that was owned by a gentleman by the name of Mr. Lax, L-A-X?

A.    Yes.  It wasn't limited to mitigation, but that was certainly part of it.

Q.    But they were an investigative agency?

A.    Yes, sir.

Q.    And they did mitigation specialty services for federal capital litigation; correct?

A.    Yes.

Q.    And I believe you actually recommended that entity to assist in this case; isn't that right?

A.    I'm sure I did.

Q.    And did you consider Glori Shettles part of the team?

A.    Yes.

Q.    And was she involved in discussions regarding who would be testifying as witnesses in the case?

A.    I'm sure she was.

Q.    Well, I'm not asking you was -- I'm sure she was.  Do you specifically remember Ms. Shettles being involved in discussions on who was going to be called as witnesses for the defense?

A.    I do not.

Q.    You testified earlier about a gentleman by the name of David Freeman [sic]?

A.    Yes.

Q.    And you knew Mr. Freeman before 2003 when you got involved in the Fields representation; is that correct?

A.    That's correct.

Q.    And had you previously consulted with David Fields in cases prior to 2003?  And I'm sorry, David Freeman.

A.    Freedman.

MR. WILSON:  Thank you, counsel.

A.    I don't recall whether I have or have not.

Q.    (By Mr. Wilson)  Okay.  Why would you have reached out to this David Freedman person?

A.    David was involved -- and I'm sure I was also involved -- in some training programs at some point in time.  I think that's how I got to know him or know of him, even before the Project, but --

Q.    And so you became familiar with him and his expertise; is that correct?

A.    Yes.

Q.    And he was a psychiatrist; right?

A.    Yes.  Yes, I believe he was.

Q.    And did you respect his opinion?

A.    I did.

Q.    And when you consulted him, would you follow his advice?

A.    Well, I guess that would depend on the advice.

Q.    Granted.  If you agreed with it, you would follow it?

A.    Yes, sir.

Q.    If you didn't agree with it, you wouldn't follow it; is that what you're telling us?

A.    Probably not, if I didn't agree with it.

Q.    Okay.  As a matter of fact, you were recommended to get involved in this case by David Freedman; is that

correct?

A.    I don't remember that.

Q.    I'm going to direct your attention to Binder Number 6, in Tab Number 128.  Tab 128.

A.    Thank you.  Yes, sir, I have it before me.

Q.    And I'm going to tell you in advance, this is a little bit difficult to read.

A.    I can see that.

Q.    Because it's an email, but it also -- it has all the embedded code printed.

A.    Yes, sir.

Q.    Okay.  Do you -- let's look at the top of the document first.  Do you agree with me that this was an email that was sent by David Freedman to you back on July the 28th of 2003?

A.    Yes, sir.

Q.    And the murders actually took place on July the 10th of 2003; is that correct?

A.    If that's what you say.  I have no reason to doubt that.

Q.    Have no reason to doubt that?

A.    Right.

Q.    So with less than a month after the crime was committed, this email was received?

A.    Yes.

Q.    And I want to direct your attention to about -- just a

little over halfway down, and you're going to notice a sentence that begins with a symbol and then "blockquote type."  I want you to move down about four lines, where it says "Julia O'Connell."  Do you see that?  And then parenthetically, next to it, it says "7:00 p.m."

A.    Yes, sir.

Q.    Can you just read what that says there for me, please?

A.    You want me to read it out loud?

Q.    Yeah.  Let's move up actually one line before, where it says "I just got off the phone."

A.    Give me a minute here.

Q.    And I apologize.  The line actually begins with "&nbsp" and a whole bunch of characters, and then it says "I just got off the phone."  Do you see that?

A.    Oh, yes, I do.

Q.    Okay.  Can you start there and just read that for me, please?

A.    You want me to read it out loud?

Q.    Yes, please.

A.    "I just got off the phone talking to Julia O'Connell about the Fields case in Oklahoma and suggested that you might be very valuable in the case.  It seems to me, based upon my -- on my discussion with her, that's a strong push to get the local AUSA to recommend no death -- no death in this case, and it might be strategically beneficial.  I'm

told that the AUSA is very spiritual and is less than enthusiastic about pursuing death in this case.

Q.    Okay.  You can stop there.  So you would agree with me that Mr. Freedman had had discussions with Ms. O'Connell about getting you involved in the case?

A.    Yes, sir.

MS. ENSLER:  Objection.  I think he's mischaracterizing the evidence.

THE COURT:  In what way?

MS. ENSLER:  I believe he has the sender and the recipient switched.  This is Mr. Gant saying he just got off the phone with Julia.

MR. WILSON:  Judge, these emails are very difficult to read.  I think the bottom -- if I could just ask this question.  And the purpose of it was simply to determine whether or not Mr. Freedman wanted Mr. Gant to be involved in the case.  Would he agree with that?

THE COURT:  Well, I mean, it is very hard to follow, but the only thing it seems to indicate -- the sender and recipient, it seems, indicate Mr. Freedman was the sender and Mr. Gant was the recipient; therefore, I assume this is Mr. Freedman speaking when he says he just got off the phone, etcetera.  But for purposes of this question, I'm not even sure it really matters.  He clearly was either a sender or recipient.  He was involved in this

email chain.  So for purpose of the question, the objection is overruled.

Q.    (By Mr. Wilson)  I want to direct your objection to the next tab, 129.

A.    I have it before me.

Q.    And would you agree with me that this appears to be an actual email chain?  At the top, referring to an email which also took place on July the 29th, from David to you, David Freedman to you; is that correct?

A.    Yes.

Q.    And would you agree with me that it appears that Mr. Freedman is responding to an email that you sent to him? And that's at the bottom of this same email chain.

A.    It does appear so, yes.

Q.    And would you agree with me that in this email, you're asking David up front that you recommended me to get involved in this case, I would like for you to be involved in assisting and giving consultation?  Would you agree with that?

A.    Yes.

Q.    And, in fact, Mr. Freedman did provide consultation to you and Ms. O'Connell on a number of occasions during the representation of Mr. Fields; isn't that right?

A.    That is right.

Q.    And, specifically, he gave consultation on the

information -- on the mental health evidence; correct?

A.   Yes.

Q.   Because he was a psychiatrist; correct?

A.   Correct.

Q.   And he was a trusted consultant for you prior to your representation of Mr. Fields; correct?

A.   That's correct.

Q.   Now, you also mentioned another person by the name of Lisa Greenman; is that correct?

A.   Yes.

Q.   And Ms. Greenman, I believe, is an attorney; right?

A.   Yes.

Q.   And she was an attorney back in 2003, '4, and '5; correct?

A.   Correct.

Q.   And I don't believe she was a member of the Project at that time, was she?

A.   No.

Q.   I believe she is now a member of the Project; is that right?

A.   That, I don't know.

Q.   Could I take it that you knew Ms. Freeman -- sorry -- Greenman prior to representation of Mr. Fields?

A.   Yes.

Q.   And, again, you respected her; correct?

A.   Correct.

Q.   And did she have any particular expertise that you would have tapped into in this particular case?

A.   Yes.  She also specialized, if you would, in mental health issues.

Q.   And do you know or do you recall if you had sought Ms. Greenman's advice in other cases before the Fields representation?

A.   I do not recall.

Q.   But, again, it's not uncommon for defense counsel to reach out to consultants to get advice; correct?

A.   Not unusual at all, no.

Q.   Not unusual in your past experience, is it?

A.   No.

Q.   And would you agree with me that a reasonable attorney would do that; correct?

A.   Yes.  That is reach out to outside experts, yes.

Q.   Specifically, when we're talking about issues of mental health; correct?

A.   Yes, sir.

Q.   Because those can be nuanced, very particularized issues; right?

A.   Right.

Q.   There was a number of questions asked to you earlier about, in fact, the mental health experts, and I want to go

through those.  I believe the first person you talked about was Dr. George Woods; is that right?

A.    Yes.

Q.    And Dr. Woods, back in 2003 and still is a neuropsychologist -- neuropsychiatrist; correct?

A.    Correct.

Q.    He's a medical doctor?

A.    Yes.

Q.    And you had used him in previous cases before the representation of Mr. Fields; correct?

A.    That's correct.

Q.    And you respected his opinion; correct?

A.    I did.

Q.    As a matter of fact, I believe you recommended him to the team; isn't that right?

A.    I believe that I did.

Q.    I want to direct your attention to Binder Number 5?

A.    Got it.

Q.    Here we go again.  And I believe we're going to go to Tab Number 100.

A.    Give me one second here.  I have that before me.

Q.    And would you agree with me, sir, that this, again, appears to be an email exchange; correct?

A.    Yes, sir.

Q.    And at the top of the document is an email from you to

gloris@inquisitorinc.com.  That would be Glori Shettles; correct?

A.    Correct.

Q.    And that's dated April the 20th of 20 -- of 2004?

A.    Yes.

Q.    Go down to, if you will, the bottom portion of that document, and it appears that that is a -- that your email is actually a response to an email received from Glori; is that correct?

A.    Yes, it appears to be.

Q.    Some five days before, on April the 15th of '04; right?

A.    Yes.

Q.    Take a moment and look at that and see if that refreshes your memory about this particular email conversation.

A.    All right.

Q.    Have you had a chance to look at it?

A.    I have.

Q.    And do you recall the last time you actually saw this email?

A.    No, sir.

Q.    Did defense counsel, post-conviction relief counsel, had they shown you this email prior to today's hearing?

A.    No, sir.

Q.    Okay.  And would you agree with me that it appears that Ms. Shettles is asking you if you know anything about Dr. George Woods?

A.    Yes.

Q.    And then you respond saying "I've known him for years and I've always been impressed"; is that right?

A.    Correct.

Q.    And so, going into this representation and retaining Dr. Woods, you had a preexisting belief or feeling about Dr. Woods; correct?

A.    That's correct.

Q.    And as a result of your representation of Mr. Fields, has that opinion of Dr. Woods changed?

A.    Let me be sure I understand the question.

Q.    Let me rephrase the question.  Dr. Woods testified in this case; correct?

A.    Yes.

Q.    Prior to him testifying, you had an opportunity to consult with him in regards to what his testimony would be; correct?

A.    Yes.

Q.    As a result of your interaction with Dr. Woods prior to trial and during trial, has your opinion changed or did your opinion change?

A.    No, sir.

Q.    And so when Dr. Woods gave you advice or recommendations, you would have -- would you have followed that advice or recommendation?

A.    Well, I certainly would have seriously considered it, yes.

Q.    Fair enough.  And are you aware that Dr. Woods has never testified on behalf of the government in any case?

A.    No, I was not aware of that.

Q.    The second -- and we'll get back to Dr. Woods in a little bit.  But the second doctor that was referred to was Dr. Michael Gelbort?

A.    Yes.

Q.    And I'm not sure how you pronounce his name.  Is it Gelbort or is it Gelbort, or do you remember?

A.    I've been going with Gelbort.

Q.    Okay.  We'll go with that.  Did you know Dr. Gelbort before the representation of Mr. Fields?

A.    I am not sure, Mr. Wilson, and I -- may I tell you why?

Q.    Sure.

A.    He may have been an expert in some other case that I consulted on, but, specifically, I don't recall being involved with him in a case before Fields.

Q.    This is -- and I need to ask you, based upon your recollection, okay?  At the time that Dr. Gelbort was

retained as an expert, did you have a preexisting opinion of him at that time?

A.    No, sir, not that I recall.

Q.    And would you agree with me that you didn't actually -- you weren't the person who actually retained Dr. Gelbort?

A.    No, I was not.

Q.    As a matter of fact, I believe it was -- Ms. O'Connell did; correct?

A.    Yes.

Q.    And I think that was a result of recommendation by Susan Otto?

A.    I don't know anything about that.

Q.    Do you know who Susan Otto is?

A.    Oh, yes.  Yes.

Q.    Who is that?

A.    At the time, she was the federal public defender in Oklahoma City, I believe, and she and I had met each other through some training programs or something.

Q.    And you would agree with me that Dr. Gelbort is a Ph.D.; correct?

A.    Yes.

Q.    He is not a medical doctor?

A.    Right, he is not a medical doctor.

Q.    He is a neuropsychologist; correct?

A.    That's correct.

Q.    After the Fields representation, did you -- were you involved in any other federal criminal death penalty cases?

A.    I'm sure I was.

Q.    Did you ever retain Dr. Gelbort in any of those representations?

A.    No.

Q.    Do you recall what the -- what the plan was or the strategy for use of Dr. Woods and Dr. Gelbort?

A.    You're asking me, do I recall that?

Q.    Yes.  Not what you think, but what you specifically recall.

A.    I do not.

Q.    Do you remember what Dr. Gelbort was retained to specifically do as part of the defense of Mr. Fields?

A.    Yes.

Q.    What was he specifically asked to do?

A.    To assess the possibility or potential of brain damage.

Q.    And was he asked to consult with Dr. Woods as part of the defense team?

A.    Again, you're asking me, do I recall him?

Q.    Was he asked, as part of his tasking, to consult with Dr. Woods?

A.    I do not recall that.  I don't know.

Q.    Would looking at his engagement letter help refresh

your memory of that -- those instructions?

A.    It may.

Q.    Well, direct your attention to Binder Number 5, Tab Number 74.

A.    Did you say 74?

Q.    74, yes, sir.

A.    Mr. Wilson, I have it before me.

Q.    If you'll just take a moment and -- first of all, would you agree with me this appears to be a letter from the Federal Public Defender for the Northern and Eastern District of Oklahoma?

A.    It does.

Q.    And addressed to Michael Gelbort, Ph.D.?

A.    That is correct.

Q.    Dated July the 5th of 2004?

A.    Yes.

Q.    Okay.  If you would just take a moment and read through that letter.  I think it's only a little over a page long.  See if that refreshes your memory.

A.    Yes, sir.

Q.    And does that refresh your memory on what he was tasked to do?

A.    It does.

Q.    And I believe on page 2, he actually signed this letter; isn't that correct?

A.    That appears to be the signature of a Dr. Michael Gelbort.

Q.    And I want to direct your attention specifically to paragraph 2 on the first page.

A.    Yes, sir.

Q.    Where it says "For your part, you'll be required to review all pertinent records in the case, which we will supply, and consult with the defense team and Dr. Woods, the neuropsychiatrist retained in this case."

A.    I see that, yes.

Q.    "Thereafter, you will travel to meet with Mr. Fields in the Tulsa jail and administer appropriate psychological testing and evaluation to be determined by Dr. Woods in consultation with you."  Do you see that?

A.    Yes.

Q.    And "You also agree to prepare a report of your examination for the defense team."  Is that correct?

A.    Yes, sir.

Q.    And isn't it true that Dr. Gelbort violated the terms of that agreement?

        MS. ENSLER:  Objection.

        THE COURT:  Sustained.  I don't think there's a foundation yet for that.

Q.    (By Mr. Wilson)  Isn't it true that Dr. Gelbort went to Tulsa and evaluated Mr. Fields before ever speaking to

Dr. Woods?

A.    I don't know that.

Q.    Do you recall that Dr. Gelbort did not inquire of Dr. Woods as to what tests he wanted performed?

A.    Mr. Wilson, I have no knowledge of that.

Q.    Fair enough.  You don't recall whether that happened or not?

A.    I do not.

Q.    Are you aware of whether or not Dr. Gelbort actually came to Tulsa and administered testing to Mr. Fields?

A.    No.

Q.    Are you aware of whether or not Dr. Gelbort prepared a report of his evaluation of Dr. Fields -- excuse me -- of Mr. Fields?

A.    Yes.

Q.    How many different reports did you look at?

A.    To my recollection, counsel, I want to say three. Maybe three.

Q.    And why is that your recollection today?

A.    Well, obviously, having been prepared by defense counsel and questioned by you, you know, you start to think about these things, and I'm trying not to fill in, you know, like you do these things.  But I know there was an initial report by him, which was like zero in mind.  A request to do -- you got to do better than this was basically our response

to the first letter.  Okay.  There was a follow-up.  That's when there were serious discussions -- as I recall, serious discussions with Freedman and Ms. Lisa Greenman about this letter.  We can do better than this, and there was a final one.  That's what I remember.

Q.    Okay.  Well, let's -- we're going to look at these reports.  And I want to direct your attention, first off, to one that I believe you've already been shown, but look at Defendant's Exhibit Number 121.  And let's see which binder that's in.  That would be in Binder 6.

A.    That's a new one.

THE COURT:  We're doing so well.

THE WITNESS:  Throwing a curve here.

A.    And the tab, Mr. Wilson?

Q.    (By Mr. Wilson)  I'm sorry.  Number 121.

A.    I have it before me.

Q.    Do you know which report that is?

A.    No, sir.  If your -- I'm sorry.  If your question is, is this number two or three?

Q.    Is this one, two, three, four?  Do you know which number this is?

A.    I know it's not one.

Q.    Okay.  And why do you know it's not number one?

A.    One is the initial letter where I had made comments and made notes on it.

Q.    Okay.  All right.  Let's look -- and I want you to keep that one with you because we're going to be doing some side by side here in a second.

A.    All right.

Q.    I need you to go back to Number 5, Binder Number 5.

A.    Yes, sir.

Q.    And go to Tab Number 73.

A.    Yes, sir, I have it before me.

Q.    And I want you to take a look at this one and tell me if you -- first of all, take a look at it and see if you recognize it.

A.    Yes.

Q.    And do you know which one -- which report this is?  Is this one, two, three, four?  Which report is this?

A.    I believe this is the third -- Mr. Wilson, I'm not sure.  I'm not sure.

Q.    Fair enough.  And hang with me here.

A.    Yes.

Q.    I need you to look at Binder Number 1 now.

         THE WITNESS:  Thank you so much.

Q.    (By Mr. Wilson)  Don't get rid of those other ones because we're coming back.

A.    Yeah, I got them on my lap.

Q.    Okay.  And I want you to go to Tab Number 4, please.

A.    I have it before me.

Q.    Take a look at that and see if you recognize that particular report.

A.    I remember some facets of this.

Q.    All right.  Again, let me ask you the same question. Do you know which report number this is, one, two, three, four, whatever?

A.    I do not.

Q.    Would you agree with me, of the three that I've shown you thus far, this is the only one which is actually signed?

A.    You are correct.

Q.    Okay.  So this is the only one that's actually signed; correct?

A.    Yes, sir.

Q.    Now -- and I don't want you to be confused, okay?  And I'm not trying to confuse you.  I need to -- I need you to refer -- I need to refer to one more defense exhibit, okay?

A.    I hope it's in one of these three books.

Q.    I need you to go back to Binder 9, the last one.

A.    You're doing this on purpose.

Q.    I -- well --

A.    You're just messing with me.

Q.    Some would accuse.

A.    Yes, sir.  What tab, sir?

Q.    Number 267.

A.    Yes, sir.

Q.   Okay.  And I apologize, but would you agree with me that the report, which was purported to be in 267, is the same report which is -- I've previously shown you, which is Defendant's 121, which, again, now, is in tab -- is in Binder 6, 121?

MR. WILSON:  Judge, I apologize.  I don't know any other way to do this.

THE COURT:  There is no other way.

A.   Give me one second.

Q.   (By Mr. Wilson)  You're fine.

A.   And your question, again?

Q.   Would you agree with me that those two reports are the same, that the one which is the second and third pages of 267 is the same report as Defendant's 121?

A.   Your question, Mr. Wilson, is 267 and --

Q.   121.

A.   -- 121 the same?

Q.   Yes, sir.

A.   No, sir, unless I'm looking at them wrong.  They are not the same.

Q.   And the difference being --

A.   Just give me a second to see if I can -- okay.

DEPUTY COURT CLERK:  I'll take that so you don't spill your water.

THE WITNESS:  I'll put that one here.  Don't need

that one.

DEPUTY COURT CLERK:  Which one do you need?

THE WITNESS:  Okay.  120 -- this one and this last one.

MR. WILSON:  Judge, I'm going to see if I can move through this.  Substance -- I believe counsel agrees, and I think everybody agrees that substance, they're exactly the same.  One sentence at the bottom of one may be at the top of the next page, but the substance, everything else, exactly the same.

THE COURT:  And counsel agrees to --

MS. ENSLER:  We do.

THE COURT:  Okay.  All right.

MR. WILSON:  Okay.

THE COURT:  Then I think we can move on from that question.

MR. WILSON:  Thank you.

Q.    (By Mr. Wilson)  Now --

THE COURT:  Mr. Gant doesn't have to do all the side-by-side reading.

MR. WILSON:  Yeah.

Q.    (By Mr. Wilson)  All right.

A.    Give me room

Q.    Now, earlier in your direct examination, you were asked --

A.    Just give me a little room here to get --

Q.    Okay.

A.    I know that these may be used again.  I'm trying not to tear the pages out here.

Q.    And while you're folding, go to -- go ahead and go to 267, okay?  Because that's where I'm going to talk about just for a second.

A.    All right.  Did you say 267?

Q.    Yes, sir.

A.    I have it before me.

Q.    Which is the email with the psychological evaluation on the second page; correct?

A.    Yes, sir.

Q.    All right.  Looking now at that psychological evaluation, earlier, in direct examination, counsel was asking you about the significance of organic brain damage; correct?

A.    Yes.

Q.    And that if organic brain damage existed, that that would be significant potential mitigation; correct?

A.    That's correct.

Q.    Where in that report does it refer -- does it say that Mr. Fields has organic brain damage?

A.    I don't believe the word "organic brain damage" is in here.

Q.    Why does it say he has brain damage?

A.    I don't see the word "brain damage" here.

Q.    You agree that all it says is that he has -- that his cognitive abilities were consistently in the mildly impaired range?

A.    Yes.

Q.    Anything else in that document that would refer to organic brain damage or brain damage in any way?

A.    Yes.  I mean the second sentence -- pardon me -- second paragraph, on page 3, "Mnestic functions overall were grossly functional but clearly abnormal due to patterns of sometimes average performance intermittent with impaired functioning."  Then two paragraphs down, he talks about low average coupled with mildly impaired performance and impulsivity.

Q.    Let me -- correct -- I say correct.  Let me stop you. You said it said "low average"?

A.    Yes.

Q.    And "mildly impaired"?

A.    Yes, sir.  But it goes on to say "mildly impaired performance" -- and I can't tell what's under the arrow there -- "by impulsivity and disinhibition."  The next paragraph talks about mild impaired in frontal lobe functions.

Q.    Any reference to severe impairment in frontal lobe?

A.    I mean, when you read that, Mr. Wilson, there is clearly a suggestion that there's some kind of substantial problem, at least when I read it anyway.

Q.    All right.  Did you have an opportunity to look at the raw data?

A.    I did not.

Q.    And when I say "raw data," what's raw data?

A.    That's, you know, the information that the expert gets from the various tests that he performs.

Q.    And I believe you previously testified, you don't recall whether or not Dr. Gelbort actually gave tests or not?

A.    I did say that too.

Q.    But you don't recall seeing any raw data, if he gave psychology tests?

A.    I do not.

Q.    Would you agree with me -- and I think you would -- that this is a two-page report?

A.    Yes, sir.

Q.    And I don't want to spend a lot of time bouncing back and forth, but the other two reports that I gave you, that you looked at, would you agree with me that those were both four pages in length?

A.    Yes.

Q.    And I believe you previously testified that

Defendant's Exhibit Number 73 -- and that's in Binder Number 5 ...

A.    I'm with you.

Q.    Number 73.

A.    Yeah, I have it before me.

Q.    Okay.  I believe you previously testified that you recognized this report; correct?

A.    Yes, sir.

Q.    And you agree with me it's four pages in length?

A.    I do.

Q.    It's not signed?

A.    You're correct.

Q.    At the top, it appears to be in handwriting "Draft"?

A.    Yes, sir.

Q.    Do you know, is this the one that -- that you were critical of, that you didn't like?

A.    It was the first one, the 16 -- pardon me -- 267.  The one with the arrows, that was the one that was -- just as you have identified, there are certain words that are not there, traumatic brain damage and all that.  The problem with the letter was you had all this information that was suggesting that that's exactly the problem, but it wasn't said.

Q.    So you believe the first one was the two-pager?

A.    Yes, sir.

MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  You may.

Q.    (By Mr. Wilson)  We're going to stay with this -- this report, which is labeled as draft for a little bit, okay?

A.    73?

Q.    Yes.  I want you to hold that.

A.    All right.

Q.    And now I want you to turn over in that same book to Tab Number 97.

A.    Yes, I have it before me.

Q.    And I believe you actually have testified about this earlier during direct.  But this appears to be, again, an email chain; correct?

A.    It does.

Q.    And in the middle is an email between you and Ms. O'Connell because it says "Julie," do you see that?

A.    I do.

Q.    Take a moment and just read that to yourself and see if that refreshes your memory about this exchange.

A.    It does.

Q.    And, Mr. Gant, again, I apologize.  I know we're talking about something which took place two decades -- over two decades ago.  But in this email, I believe -- you would agree with me that you are critical of Dr. Gelbort's preliminary report; correct?

A.    Yes, sir.

Q.    Believing that the oxygen deprivation was given short shrift in the report?

A.    Yes, sir.

Q.    Last sentence:  "Doc as much as waved the back of his hand to the frontal lobe damage."

A.    Yes, sir.

Q.    And that was your opinion of a report that you reviewed?

A.    Yes.

        MR. WILSON:  And, Your Honor, I just -- I know this is very confusing and I apologize to the Court.

Q.    (By Mr. Wilson)  But, Mr. Gant, would you agree with me that the date of that email is January the 7th of 2005?

A.    I would.

Q.    Do you know -- and I'm not trying to confuse you.  But do you know which of those three reports that I've shown you today, you're talking about in this email?

A.    No.

Q.    Okay.

A.    I can't say, as I'm sitting here now looking at it, that I can tell you that this email relates to either the first, second, or third.  I can't tell you.

Q.    And it makes it difficult and I apologize, but you agree with me that you shared the reports that you received

from Dr. Gelbort with your consultation -- your consultants, David Freedman, Lisa Greenman?

A.    Yes.

Q.    And you agree with me that they were likewise critical of Dr. Gelbort's report?

A.    Yes, sir.

Q.    Turn to Tab Number 95, please.

A.    Yes, I have that before me.

Q.    Again, an email chain, but the top of this document appears to be an email from you to Lisa Greenman, Freedman99, Julia O'Connell.  Do you see that?

A.    I do.

Q.    Dated January the 7th of 2005; correct?

A.    Correct.

Q.    And that's an email that you sent to Lisa Freedman -- I'm sorry -- Lisa Greenman and David Freedman; correct?

A.    Correct.

Q.    And if you'll just take a moment and read that to yourself and see if that refreshes your memory of this discussion.

A.    I have read it.

Q.    Okay.  And would you agree with me that this is an email where you're actually sending the preliminary draft report for their consultation; correct?

A.    Yes.

Q.    And that you actually, without saying, express an opinion about it?

A.    Yes.

Q.    Again -- and this says "Again, I've got an opinion.  I am refraining from voicing it for fear of influencing how you may review the report."

A.    Yes, sir.

Q.    You didn't like the report, did you?

A.    No.

Q.    Do you recall either getting correspondence back from them -- and when I say "them," David and Lisa, as to their opinions of this preliminary report?

A.    I do.

Q.    Go to Tab 96, one over.

A.    Yes, sir.

Q.    Would you agree with me that this is a two-page document?

A.    I would, yes.

Q.    And it appears to be an email from dfreedman -- or freedman99.  Is that David Freedman?

A.    Yes.

Q.    And he sent it to you, and he cc'd Lisa at two different email addresses and also cc'd Julia O'Connell; correct?

A.    That's correct.

Q.    And, again, this is dated January the 7th, 2005, same date?

A.    Yes, sir.

Q.    I ask you just take a moment and read through that email and see if that refreshes your memory about this exchange?

A.    Yes, sir.

Q.    So you had an opportunity to read both pages?

A.    I did.

Q.    And at the bottom, it is signed "df," and I assume that is David Freedman; correct?

A.    Like you, I assume that it is, yes.

Q.    Okay.  And I think I asked you earlier, but Mr. Freedman was critical of the preliminary report, and this is his assessment; correct?

A.    Yes, sir.

Q.    And he also is asking to look at the raw data; is that correct?

A.    Yes.

Q.    Did you obtain the raw data?

A.    No, sir.

Q.    You did not?

A.    I did not.

Q.    Did you know if it was ever obtained?

A.    I do not.

MR. WILSON:  Could I have just one moment, Your Honor?

THE COURT:  You may.

MR. WILSON:  Now, I'm going to throw you a curveball, okay?

A.    Another one?

Q.    I'm going to go to a government's exhibit for a second, okay?

THE COURT:  That's more of a knuckleball, I think.

A.    Mr. Wilson, may I have --

Q.    (By Mr. Wilson)  Book 1, Tab Number 6.

A.    Do I still need to maintain this draft of the --

Q.    It probably wouldn't be a bad idea.

A.    All right.

THE COURT:  You said 6?

A.    And the exhibit number for the government?

Q.    (By Mr. Wilson)  Number 6, Tab 6.

A.    Yes, sir, I have it before me.

Q.    This appears -- and if you'll agree with me, that this appears to be, again, an email exchange, a number of emails going from bottom to top?

A.    Yes, sir.

Q.    And at the top of this document, again, dated January the 7th, this is an email from David -- or from Freedman, freedman9 to you; correct?

A.    That's correct.

Q.    Take a look at what it says right under the subject line of "Fields report."

A.    Yes.

Q.    Do you agree with me that Mr. Freedman agreed with you that Dr. Gelbort's report, that he waved -- or it was a handwave to the frontal lobe damage?

A.    Yes, it's dismissive.

Q.    He dismissed that; correct?

A.    Yes.

Q.    So your own expert in his report was being dismissive of --

        MS. ENSLER:  Objection.  Mischaracterization.

        THE COURT:  Well, I didn't get the whole question out before he got the objection.  So let me hear the whole question and then we'll see.

Q.    (By Mr. Wilson)  In your opinion, your own expert was dismissive of the lobe damage?

        MS. ENSLER:  Objection.

        THE COURT:  Overruled.

A.    My comment regarding being --

Q.    (By Mr. Wilson)  The question was, sir, is your opinion -- was it your opinion that your own expert was dismissive of lobe damage?

A.    No.

MS. ENSLER:  Objection.  What expert is he referring to?

MR. WILSON:  Dr. -- I'm sorry.  I'll repeat the question.  I'll try to clean up the question.

Q.   (By Mr. Wilson)  Based upon this email exchange that you had with Mr. Freedman --

A.   Yes.

Q.   -- wherein you said that he was waving the back of the hand, being dismissive of lobe damage --

A.   Yes, sir.

Q.   -- it was your opinion that in his own report, he was dismissive of lobe damage?

A.   No, sir.  The comment with regard to being dismissive went with -- went with respect to the asphyxia, the oxygen deprivation.  That's what he was dismissive of.  It was not with regard to frontal lobe damage.  Now, I see the email that you have asked me to look at, and that response from Freedman saying "I think your email is right about the handwave to frontal damage" is in error because the handwave was with regard to the deprivation -- the oxygen deprivation.

Q.   Well, let's look at this same email?

A.   All right.

Q.   Government's 6.

A.   I'm sorry?

Q.   Government 6, the one we're still looking at.  I want you to go down the page, about middle-way down --

A.   Yes, sir.

Q.   -- to the email that you sent to Julie at 10:59 a.m.

A.   Yes.

Q.   And that's the one you were just talking about; correct?

A.   Yes.

Q.   And in this email, you say "I gotta tell you, I'm not at least at all -- at least at all impressed;" correct?

A.   Yes, sir.

Q.   "I'm still convinced that the oxygen deprivation at the time of Ed's birth is very significant"; correct?

A.   Yes.

Q.   The doc just gives it short shrift; correct?

A.   Yes.

Q.   Then you say "The combination of the consequences of oxygen deprivation and frontal lobe damage has to have a profound effect on the individual development"; correct?

A.   Yes.

Q.   Then you say "Doc as much as just waved the back of his hand to the frontal lobe damage."  Is that what it says?

A.   That does say that, yes, sir.  I stand --

Q.   And David agreed with your assessment; correct?

A.   Yes, sir.  I stand corrected.

Q.   Now, you mentioned earlier during your testimony, that not only did you share that report with David Freedman, but you also shared it with Lisa Greenman?

A.   Yes, I believe I did.

Q.   I want you to go to Defendant's Number 136, which is in Binder 6.

A.   The tab again, please?

Q.   136.

MR. LABOVITZ:  Your Honor, I just noticed -- I never met Mr. Abel nor has anyone from our team, but I just approached him and saw he walked in and asked who he was --

THE COURT:  He just walked in; right?  I don't think he was here very long.

MR. LABOVITZ:  Yeah, I believe it was within a minute, and so I told him there's a sequestration.

THE COURT:  Okay.  Well, thank you.  I appreciate that.

Mr. Wilson, let me just ask a question.  I'm not trying to cut you short.  How much more do you think you have with this witness on your cross-examination?

MR. WILSON:  Another hour.

THE COURT:  Okay.  Is now a good breaking point?

MR. WILSON:  Sure.

THE COURT:  I mean, we're at 12:15.

MR. WILSON:  That's fine.

THE COURT:  I was hoping to get him done before noon, and that, obviously, is not going to happen.  I would rather stop if we're at a good point now and come back, and we can finish that.

How long do you folks want for lunch?  Is an hour enough time, adequate time, for the defense team?

MS. ENSLER:  An hour is fine for us.

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Well, let's come back then at 1:15, and we'll take up where we are on this exhibit.

All right.  We are in recess.

(Recess taken.)

THE COURT:  As you can see, you wore out our courtroom deputy.  We had to bring in a substitute for the afternoon because of the notebooks, so be kind.

All right.  Is everybody ready to proceed?

MR. WILSON:  Yes, Your Honor.

THE COURT:  Mr. Gant, are you ready?

THE WITNESS:  I am, Your Honor.

THE COURT:  Okay.  All right.  Mr. Wilson, you may continue.

MR. WILSON:  Thank you, Your Honor.

Q.   (By Mr. Wilson)  Mr. Gant, before the lunch recess, we were talking about the fact that you had shared the

preliminary report with David Freedman, and you also shared with him the data, the raw data.  Do you recall that?

A.    I did not have the raw data.

Q.    Okay.  Did you ever have any discussions with David Freedman about concerns he had with the testing battery or the data that was generated by Dr. Gelbort?

A.    I believe there was some email traffic about that.

Q.    I would direct your attention to government, white binder, Number 25.  Tab Number 25.

A.    Yes, sir, I have it before me.

Q.    And if you would just take a moment and take a look at that and see if you recognize that email chain.  It's actually two pages.  Would you agree?

A.    Yes, I agree it's two pages.  Yes, sir.

Q.    And at the top of this document, it appears to be an email between you and Mr. Freedman; is that correct?

A.    That is correct.

Q.    And it references Luria tests.  Do you see that?

A.    I do.

Q.    What are Luria tests, do you know?

A.    No, not as I sit here.

Q.    Okay.  And below that -- well, first off, there's some handwriting along the left column and on the top.  Do you see that?

A.    I do.

Q.  Do you recognize that handwriting?

A.  That's mine.

Q.  Okay.  And there appear to be --

MR. LABOVITZ:  Court's indulgence.  Your Honor, the copy that we have been provided of Government's 25 does not have any handwriting.

MS. ENSLER:  We must be working from a different version.

(Counsel confer.)

Q.  (By Mr. Wilson)  All right.  Mr. Gant.

A.  Yes, sir.

Q.  I believe you said that the handwriting appears to be yours; is that correct?

A.  That's correct.

Q.  And there also appear to be some -- at some point, some tabs that were affixed to that document?

A.  I see that.

Q.  Okay.  And would those have been similar to the tabs we saw in one of the previous exhibits?

A.  Yes, sir.

Q.  And those would be tabs that you placed on that email at some point or do you recall?

A.  I'm sure I did.

Q.  Do you recall that or do you just believe you probably did that?

A.   I just believe that I did that.

Q.   Okay.  And would you agree with me that this particular email, which is a part of this chain, is between Mr. Freedman and Ms. O'Connell?

A.   Yes, sir.

Q.   Okay.  And did you have an opportunity to look at that, that email?

A.   I did.

Q.   You did?

A.   Yes, sir.

Q.   Okay.  And would you agree with me that Mr. Freedman was expressing concerns about some of the battery and some of the testing that was performed by Dr. Gelbort?

A.   I would agree with that.

Q.   And do you recall ever having a discussion with Dr. Gelbort about those concerns that David had with the testing battery?

A.   I do not.

Q.   But, again, Mr. Freedman is the gentleman that you consulted with regularly; correct?

A.   Yes, sir.

Q.   And you respect his opinion?

A.   I did.

Q.   Specifically, on issues regarding mental health; correct?

A.    Yes.

Q.    Now, we can close that one for right now.  I want to direct your attention to Defendant's Exhibit Number 136, and that's in Binder Number 6, I believe.  Yes, Number 6.

A.    Yes, I have it before me.

Q.    You have 136?

A.    I do.

Q.    Okay.  Take a moment and see if you recognize that email, please.

A.    Yes, sir.

Q.    Okay.  You would agree with me that this is an email that Lisa Greenman sent to David and to you and cc'd Lisa and Julia?  I guess she cc'd herself.

A.    Yes.

Q.    Okay.  And the date of this email would be January the 8th of 2005; correct?

A.    Correct.

Q.    And that would have been within a day of the previous email I showed you between you and David Freedman, where he expressed criticism of Dr. Gelbort's report; correct?

A.    Correct.

Q.    Read the first line of that email please out loud.

        MS. ENSLER:  Objection.  I think that's a mischaracterization of the previous email.  Are you talking about -- oh, I thought you were referring to government.

MR. WILSON:  No.

MS. ENSLER:  Okay.  Sorry about that.

Q.   (By Mr. Wilson)  Exhibit Number 136, can you read the first -- it starts off with a word and then a sentence. Read that first word and then that first sentence.

A.   Certainly.  "Okay.  I just read the -- I just read the report and I hate it.  I hope I'm recalling correctly that you have had" -- pardon me -- "you have plenty of time ahead of you" -- it's hard to read -- "and are not needing to turn over anything -- to turn anything over to the government immediately" -- pardon me -- "imminently."

Q.   Okay.  And this would be an email from Lisa in reference to her evaluation of Dr. Gelbort's preliminary report; correct?

A.   Yes.

Q.   That she hated it?

A.   Yes.

Q.   And in this particular email, she references some specific statements that are included in the report that she is critical of?

A.   Yes, sir.

Q.   And, specifically, just for example, let's look at the fourth paragraph which starts "The history section."

A.   Yes, sir.

Q.   Do you see that?

A.    Yes.

Q.    Parenthetically, it says "why describe a hospital visit for treatment of venereal disease as 'a dose of the clap?'"  Do you see that?

A.    Yes, I do.

Q.    Same paragraph, "why characterize a very serious suicide attempt with the words 'a shaving accident?'"  Do you see that?

A.    I do.

Q.    Dr. Gelbort, in his report, referred to what -- referred to a dose of the clap and a shaving accident; is that correct?

A.    Yes.

Q.    And Lisa was critical of his using that language in his report; correct?

A.    Yes, sir.

Q.    As a result of that criticism, did Dr. Gelbort amend his report and excise that language?

A.    I don't know.

Q.    You don't recall one way or the other?

A.    I do not.

Q.    And this -- again, this is Lisa Greenman, a person that you had consulted with prior?

A.    Yes.

Q.    And you respect her opinion; correct?

A.    Correct.

Q.    And do you know whether or not this -- this complaint was ever communicated to Dr. Gelbort?

A.    I do not.

Q.    Now, let me narrow that down a little bit, okay?

A.    Sure.

Q.    Do you recall specifically communicating that complaint to Dr. Gelbort?

A.    I do not recall.

Q.    Do you know whether or not Julie O'Connell communicated that complaint to Dr. Gelbort?

A.    No, I do not.

Q.    Do you know whether Barry Derryberry communicated that to Dr. Gelbort?

A.    No, sir, I do not.

Q.    Do you know if anyone communicated that to Dr. Gelbort?

A.    No.

Q.    Let's look at the bottom of page 1 and the top of page 2.  Ms. Greenman includes a comment, "Just a niggling thing:  On page one Effexor is described as a neuroleptic.  It's not, it's an antidepressant.  Neuroleptics are antipsychotics."  Do you see that?

A.    I do.

Q.    Do you know whether or not Lisa Greenman is correct on

that?

A.    I do not.

Q.    Okay.  You are aware that Dr. Woods, as part of his opinion, and this -- and the idea of a manic flip, that it was based upon the use of Effexor; is that correct?

A.    I believe that is correct.

Q.    And if Lisa is accurate, then she is critical of your expert not knowing what Effexor is; is that correct?

A.    I don't -- I don't know if I agree with that.

Q.    Fair enough.  Again, Mr. Gant, we're talking about something that happened two decades ago, but how many times did you talk with Dr. Gelbort?

A.    I would be guessing, Mr. Wilson.  I don't recall how many times I actually spoke with him.

Q.    Let me ask you this way.  The best you recall, would it have been more than five times?

A.    I would think --

        MS. ENSLER:  He's asking him to speculate. Objection.

        THE COURT:  Overruled.

A.    I think it would be at least five.

Q.    And how would you characterize your ability to interact with Dr. Gelbort when you tried to reach out to him?  Did you have problems communicating with him?

A.    Yes, communicating in the sense of trying to get a

hold of him.  He was always kind of difficult to get a hold
of.  You would call him, ask him to call you back, leave a
message, sometimes he would, sometimes he wouldn't.

Q.    Did you ever get frustrated about that?

A.    I did.

Q.    Did you talk with Ms. O'Connell about that?

A.    I'm sure I did.

Q.    Did she express her frustration and inability to
communicate with Dr. Gelbort?

A.    She did at some point, yes.

Q.    Would you characterize your interaction with him as
typical or atypical when you're dealing -- in comparison to
other experts that you've dealt with?

A.    Well, I've certainly had experts who have been
difficult to catch up with, but he was probably one of the
more problematic.

Q.    Direct your attention to Government's Exhibit
Number 13.

A.    Yes, sir, I have it before me.

Q.    And would you agree with me that that's actually a --
it's a three-page document, but there's only writing on two
pages?

A.    I would agree to that.

Q.    Let's begin on page 2, and then we'll move back to
page 1, okay?  And would you agree with me that this appears

to be an email that -- where you said "Haven't reached him yet." Do you see that at the top?

A. I do.

Q. And do you know who we're talking about in that email?

A. Dr. Gelbort.

Q. Okay. Now, let's flip over to page 1, right at the bottom. It appears to be an email from David to you, June 3rd of 2015; correct?

A. June 3rd of 2005?

Q. I'm sorry. I added a 1 in there. 2005.

A. Yes.

Q. And, actually, what David says at the top of page 2, "Well, that seems par for the course with him. Good luck on catching him." Do you see that?

A. I do.

Q. And David expressing the fact that he has a difficult time catching Dr. Gelbort as well; correct?

A. That's correct.

Q. Turn to tab --

MR. WILSON: Strike that.

Q. (By Mr. Wilson) You mentioned in your testimony earlier about a meeting that you remember specifically taking place in Tulsa, in October of 2004?

A. Yes.

Q. And that Dr. Woods was present?

A.    Yes.

Q.    And that you believed that one or the other experts, mental health experts, was present?

A.    Correct.

Q.    Do you know who that was?

A.    I do not.  I racked my brain, but I just don't remember which one, but some other expert witness was there.

Q.    Was that the only face-to-face meeting -- well, strike that.  Did you ever have a face-to-face meeting with Dr. Gelbort?

A.    I'm sure I did.

Q.    Do you specifically remember a face-to-face meeting?

A.    No, sir.

Q.    Do you remember having to go -- or someone from the defense team having to go to New Orleans and actually catch him at a conference where he was attending?

A.    I only know that as a result of being prepared for this hearing.

Q.    Okay.  You don't remember that from independent recollection?

A.    I do not, no.

Q.    Any reason to doubt that that actually had to happen?

A.    No.

Q.    I want to direct your attention to Defendant's Exhibit Number 159.  And, of course, that's in another binder.

That's in Number 7.

MR. LABOVITZ:  What number?

MR. WILSON:  159.  Defendant's 159.

A.    I have it before me.

Q.    (By Mr. Wilson)  All right.  Do you agree with me this appears to be, again, an email exchange?  The top of the document being an email from you to David Freedman, David Bruck, and I believe K. McInally would be Kevin McInally?

A.    McNally, yes.

Q.    I'm sorry, McNally.  Dick Burr.  Who is Dick Burr?

A.    At the time, Dick was another resource lawyer, a great deal of capital litigation experience.

Q.    But someone that you routinely consulted with?

A.    Yeah, frequently.  Yes.

Q.    Okay.  Do you know who these other persons would be?  Mickell Branham?

A.    Yes.  Mickell -- I think at that point, she was still in mitigation, branched off into liaison with victim's family.  I can't think of the name, but, yes.  Michael Burt was a lawyer.  He was, at that time, part of the Project, I'm sure.  And Dick Burr may have been as well.

Q.    So Mr. Burt would have been someone that you had consulted with on death penalty cases in the past; is that correct?

A.    Yes, sir.

Q.   What about -- I think there had been previous testimony about Judy Clarke; correct?

A.   Yes.

Q.   And she was the other lawyer in the Project with you; correct?

A.   Correct.

Q.   And in this email, you were referencing the email below from David Freedman to David Bruck; is that correct?

A.   Yes.

Q.   And, basically, Mr. Bruck is communicating information he had been receiving about how that defense counsel was having a difficult time interacting with Dr. Gelbort; is that correct?

A.   Yes, sir.

Q.   And the summary is:  "We had a pleasant conversation, and I know very little more than I knew before.  I tell you: Anyone asks you about him, tell them not to hire him.  He sucks.  Not because he's not smart or doesn't know his field, but because he's too difficult to work with."  Is that correct?

A.   That's what it says, yes.

Q.   And you, in your email, start your email by saying what?

A.   "I concur wholeheartedly."

Q.   So you concur that Dr. Gelbort sucks; is that correct?

United States District Court
Eastern District of Oklahoma

A.   Yes.

Q.   And that "He has continued to conduct himself in this manner even after I politely chastised him before doing so." Is that correct?

A.   That's what I said, yes.

Q.   You remember chastising him?

A.   Yes.

Q.   What was the purpose of your chastisement?

A.   I explained to him the difficulty that those of us who were on the team were having trying to contact him.

Q.   And you end by saying "Maybe I shouldn't have been so polite." Is that right?

A.   I can be impolite.

Q.   And that would have been March of 2005; correct?

A.   Yes, sir.

Q.   I'm not the brightest, but I think that's about four months before jury trial; correct?  Jury trial started in the first part of July of 2005.

A.   Okay.  Yes.

Q.   Actually, closer to three months.  So three months before trial, you're telling your colleagues that Dr. Gelbort sucks; correct?

A.   Yes.

Q.   The same Dr. Gelbort who was not called at the trial of Edward Fields; correct?

A.    That's correct.

Q.    And Julia O'Connell had that same opinion of Dr. Gelbort, didn't she?

A.    She expressed that, yes.

Q.    I talked to you earlier about raw data, and I believe you said you didn't recall obtaining any raw data.  Let me direct your attention to Defendant's Exhibit Number 208.

MR. LABOVITZ:  208; right?

MR. WILSON:  208, yes.

Q.    (By Mr. Wilson)  Tab Number 208.

A.    Yes, I have it before me.

Q.    And this appears, again, to be an email; correct?

A.    I'm sorry?

Q.    And this is an email from Julie, Julia O'Connell, to Lisa and to you; correct?

A.    Yes.

Q.    And do you recall this email?

A.    I do not have an independent recollection of it.

Q.    Would you agree with me that there's a discussion about trying to get Dr. Gelbort's scores?

A.    It says his info.  I don't know if info is referring to scores.  Oh, I see --

Q.    Well, it says "Just want you to know that I've asked Dr. G for scores."

A.    Yes, I see that now.

Q.    Okay.  So when it says "scores," what does that indicate to you that the email is concerning?

A.    It would be scores from test results.

Q.    All right.  And in this email, Julia expresses the fact that she may "have to jump on his head before he'll give them up"; is that correct?

A.    Yes, sir.

Q.    So it appears that there was some problems going on between defense counsel and Dr. Gelbort, the expert, trying to get his raw data; is that right?

A.    It was more about communicating with him.

Q.    Okay.  So there was problems with communication?

A.    Yes.

Q.    And she was going to have to jump on his head to try to get it from him; correct?

A.    Yes.

Q.    Do you recall the fact that Dr. Gelbort wouldn't return -- wouldn't release the information directly to Ms. O'Connell?

A.    No, I don't recall that.

Q.    Did Ms. O'Connell express frustration to you that she couldn't get the raw data from the expert that you had retained -- that the defense team had retained?

A.    I am sure at some point, yes.

Q.    And I'm going to double back now to Government's

Exhibit Number 13.  This is an email that you and I looked at a few moments ago, Government's Tab Number 13.

A.   All right.  Give me a moment here.

Q.   You're fine.

THE WITNESS:  Thank you so much.

A.   Yes, I have it before me.

Q.   (By Mr. Wilson)  Previously, we had referenced the bottom half of page 1, the top of page 2.  I want to reference the top of now -- of Government's Number 13, being an email from you, again, to you David cc'ing Julia.  Do you see that?

A.   I do.

Q.   And that was dated June the 3rd of 2005; correct?

A.   Yes.  I'm sorry, yes.

Q.   And that would be, almost to the day, one month before jury selection began?

A.   Yes, sir.

Q.   Can you explain to us what you were trying to communicate to David in this email?

A.   My dissatisfaction with Dr. Gelbort.

Q.   In what -- in what regard?

A.   In his explanations of some questions I apparently had asked him about.

Q.   Earlier, I asked you about Luria tests.  Do you recall that?

A.    You did.

Q.    And you didn't -- you didn't know what that was?

A.    I just don't recall what it was.

Q.    Okay.  But, apparently, there was some frustration in your mind about -- the Luria were test results; correct?

A.    Yes.

Q.    And you didn't like his explanation that he gave you; correct?

A.    It appears that I did not.

Q.    And this would -- this email actually went to Ms. O'Connell as well; correct?

A.    I can only assume that it did.

Q.    You cc'd her; right?

A.    Yes.

Q.    And you intentionally did that so that she would be a part of this communication?

A.    Certainly.

Q.    Is that correct?

A.    Yes, sir.

Q.    Now, counsel, in direct examination, asked you about additional psychological testing.  Do you remember that? About whether or not there would be additional psychological testing performed by Dr. Gelbort?

A.    I don't know if she limited it to psychological, but, yes, it would have had to have been about mental health,

yes.

Q.    Okay.  Well, let's like focus on psychological and then we'll talk about physical scans in a moment, okay?  As part of this same email, there was some discussion about additional -- the potential for some additional psychological testing; correct?

A.    Some additional frontal lobe testing, frontal lobe-specific testing, yes.

Q.    Okay.  Can you explain to the Court and to counsel what were you -- what were you meaning in reference to additional frontal lobe testing?

A.    That means --

Q.    Why were you writing this email in reference to that particular topic?

A.    Probably because I wanted additional testing done.

Q.    And, again, do you have specific recollection of having a conversation with Ms. O'Connell about whether or not there should be additional psychological testing?

A.    No, I do not have a specific recollection of that.

Q.    Do you recall having a conversation specifically with Dr. Gelbort requesting additional psychological testing?

A.    I do not.

Q.    I believe counsel, during direct examination, showed you an email where Dr. Gelbort stated that he would be willing to do additional testing.  Do you recall that?

A.    I do.

Q.    That was never done, was it?

A.    I don't know.

Q.    You don't know whether additional frontal lobe-specific testing was done?

A.    I do not.

Q.    Do you know that -- do you recall whether or not Dr. Gelbort wanted to do additional personality testing, an MMPI?

A.    I do not specifically recall that.  I'm not saying it didn't happen.

Q.    Okay.  Do you recall any particular discussion you had with Ms. O'Connell as to whether or not you should, as a defense team, request Dr. Gelbort to conduct additional frontal lobe-specific testing?

A.    No, sir.

Q.    If Dr. Gelbort were to testify or to submit a written document saying that he wouldn't have recommended additional testing, even if asked, would that surprise you?

A.    I don't know if surprise would be the word, but no.

Q.    It wouldn't have surprised you?

A.    No.

Q.    And this conversation, again, would have been about one month before trial; correct?

A.    We're talking about Exhibit 13?

Q.    Yes, sir.

A.    Yes.

Q.    So we've talked about additional psychological testing.  Let's talk about physical scans.  What's the difference between psychological testing and a physical scan?

A.    I'm sure -- excuse me.  As I sit here now, I don't recall.

Q.    Okay.  Is an MRI a psychological test or is it a physical scan?

A.    Physical scan.

Q.    Is a physical scan?

A.    Yes.

Q.    Was there any MRI or other physical scan conducted of Mr. Fields's brain before the trial?

A.    I don't know, Mr. Wilson.

Q.    Isn't it true that Dr. Woods advised against doing physical scans?

A.    I believe that's true.

Q.    And you respected Dr. Woods, did you not?

A.    I did.

Q.    And you would follow his advice on something like that, wouldn't you?

A.    It would depend.

Q.    It didn't -- no physical scan took place -- or you

don't recall; correct?

A.    I don't recall.

Q.    Okay.  Do you recall whether Dr. Gelbort ever requested physical scans to occur?

A.    I do not.

Q.    Would you agree with me that Dr. Gelbort, as a Ph.D. neuropsychologist, could not perform physical scans himself?

A.    Yes.

Q.    He would have to rely upon a neurologist?

A.    Correct.

Q.    Is that correct?

A.    Yes.

Q.    He's not qualified to read an MRI, is he?  And I'm talking specifically about Dr. Gelbort.  Do you know whether or not he's qualified to read an MRI?

A.    I do not.

Q.    Okay.  So we talked about Dr. Woods, we've talked about Dr. Gelbort.  The third mental health expert was Dr. Grinage or Grinage, and I'm not sure which -- how you pronounce it.  Do you remember interacting with Dr. Grinage?

A.    I do.  I can't tell you any specific date or occasion, but I remember -- we've had -- we had some conversations because he was from Kansas.  I'm from Missouri.  You know, we talked about the four-state area or something.  We had those kind of conversations, I know.

Q.    All right.  Well, let's talk about conversation regarding Ed Fields.  Did you have any conversations with Dr. Grinage about Ed Fields, the defendant?

A.    You're asking me if I specifically remember?

Q.    Yes, sir.

A.    I do not specifically remember.

Q.    Do you know who recommended retaining Dr. Grinage or Grinage?

A.    No, I don't.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  You may.

(Counsel confer.)

MR. WILSON:  Sorry, Judge.  Thank you.  I'm going to go with Grinage.

THE COURT:  Let's just all agree on that and we can move along.

MR. LABOVITZ:  We'll find out soon enough.

THE COURT:  If he's here, he'll tell us if we're wrong.

Q.    (By Mr. Wilson)  And, again, let me ask you.  Do you recall why Dr. Grinage was retained to consult in this particular case?

A.    No, sir.  No.

Q.    Do you recall that Dr. Grinage had a specialty in

pharmacology, psychopharmacology?

A.    I do now.

Q.    Okay.

A.    Thank you.

Q.    Now, having me asked that question, does that spark a memory of why Dr. Grinage was retained?

A.    Vaguely, yes.

Q.    What do you -- the best you recall, what do you recall about why he was retained?

A.    Mr. Wilson, there was this interplay.  It had to do with this manic switch and medication that Mr. Fields may have been on that may have caused it, something like that, as best I remember.

Q.    Dr. Woods -- and I believe based upon your direct examination testimony earlier -- had this -- this theory that he wanted to tell you about; correct?

A.    Yes, sir.

Q.    And that's why you had the meeting in Tulsa, in October of '05 -- I'm sorry, '04?

A.    It wasn't that he wanted to tell me about it. Everybody else understood it, and he was trying to get me on board.

Q.    Okay.  He wanted to get you on board?

A.    Right.

Q.    Okay.  With this idea of Mr. Fields taking some sort

of medication, because of that, had a manic flip?

A.    Yes, sir.

Q.    Which impacted his mental capacity; correct?

A.    Yes, sir.

Q.    And having Dr. Grinage, with specialty in pharmacology, would have been able to buttress Dr. Woods; is that correct?

A.    Well, that was -- yes, that was the understanding.

Q.    And Dr. -- do you recall what Dr. Woods' diagnosis was of Ed Fields by any chance?

A.    You asked me earlier.  I think I responded, but now I've forgotten.  I'm trying.

Q.    No, you're good.  It's 20 years ago, I get it.

A.    My response is that, that whole manic flip and what caused it.

Q.    Okay.  Let's move on.  That's fine.  In addition to defense expert witnesses and the issue of mental illness or mental health, the government also retained witnesses -- or excuse me -- experts; correct?

A.    I now know that.

Q.    When you say you now know that --

A.    Well, my recollection with regard to that was jarred when I spoke with you.  I had forgotten who they were.

Q.    Do you -- before you and I talked, did you remember that the government actually presented expert witnesses at

the trial?

A.    Yes, sir.

Q.    And those expert witnesses were called in the area of mental health; correct?

A.    That's correct.

Q.    And I think I maybe told you the names of those doctors, Dr. Price --

A.    Yes, sir.

Q.    -- and Dr. Mitchell?

A.    Correct.

Q.    And do you recall having a discussion with Julie O'Connell and the rest of the defense team about Dr. Price's report?

A.    I do not have a specific recollection of that.

Q.    I'm sorry to do this, but we're going to a new book. This is Binder Number 2, Defense Binder Number 2.  Tab Number 28, Mr. Gant.

A.    I'm sorry?  30 --

Q.    38.

A.    I have it before me.

Q.    All right.  Would you agree with me that Defense Number 38 is a 45-page exhibit, which is described as the report of neuropsychological evaluation of J. Randall Price, Ph.D.?

A.    A 44-page report of --

Q.   Actually, 45 pages, actually.

A.   There may be a page missing here then, but --

Q.   Well -- and maybe I'm calling the cover sheet page one, so -- all right.

A.   Yes.

Q.   It would be 44 pages.  I stand corrected.  Do you recognize this document?

A.   I do not.

Q.   Do you recall ever seeing this document before?

A.   I'm sure I did.

Q.   And when you say "I'm sure I did," that would have been in reference to your participation in the Edward Fields defense; is that correct?

A.   Yes, sir.

Q.   And you agree with me that Dr. J. Randall Price is the doctor who testified at the trial; correct?

A.   Yes, sir.

Q.   And this report, dated July the 1st, was generated as a result of his evaluation of Mr. Fields; is that right?

A.   I assume that that's true.

Q.   Okay.  Now, I want to direct your attention to -- in the exhibit, it's actually 31, starts on page 31.

A.   Yes.

Q.   And that's referred to or labeled a "Timeline Based on Records Review."  Do you see that?

A.    I do.

Q.    Do you recall discussions about this particular report containing what's characterized as "creepy stuff"?

A.    I want to be sure I'm answering your question.  Do I recall this document referring to it?

Q.    Do you recall having discussions about this document containing creepy stuff?

A.    Yes, sir.

Q.    What do you recall about that?

A.    There were some things in Mr. Fields's background that the government wanted to introduce that gave us some concern.

Q.    Okay.  Specifically, looking right there on page 31, the third entry:  "ED age 4, ED hung a cat with a string and killed it."

A.    I see that.

Q.    Is that one of the creepy things that you wanted to keep out from -- keep from the jury not hearing?

A.    Yes, sir.

Q.    Next page, page 32, five bullet points down:  "At age 16, ED made napalm bomb in backyard with chemicals."

A.    Yes, I see that.

Q.    Is that part of the creepy stuff you wanted the jury not to hear about?

A.    I don't remember that specific one, but, certainly, it

would have been.

Q.    If this report contained references to Mr. Fields taking a bomb to work, would that have been something creepy that you wouldn't want the jury to hear about?

A.    Yes.

Q.    Taking guns -- taking a gun to work?

A.    Yes, sir.

Q.    Having guns at every doorway of his home?

A.    I don't remember that, but yes.  If that's in here, that would be one of the things that we would want to try and keep out.

Q.    And in order to try to keep that information out, I believe you testified earlier that you would have, in a similar setting, filed a motion in limine, to try to keep -- you know, for the judge to rule pretrial to not allow that information in; correct?

A.    Correct.

Q.    You can also do that during the trial by making an oral motion in limine; correct?

A.    Certainly, that's possible.

Q.    You could also move to limit the testimony of a witness to keep them from testifying about particular things, couldn't you?

A.    Yes.

Q.    And do you recall Ms. O'Connell doing just that,

making a motion to limit the testimony of Dr. Price so that he didn't talk about -- about brain injury at all?

A.    I don't remember that specifically.  I'm not saying it didn't happen, I just don't remember it.

Q.    So you don't recall whether or not Ms. O'Connell, in a hearing during the trial, not in front of the jury, argued to the Court to limine Dr. Price's testimony regarding brain injury?

A.    I do not have a specific recollection of that.

Q.    Okay.  If it's in the transcripts, you wouldn't disagree with that?

A.    If it's in the transcripts, I would not disagree with that.

Q.    As a matter of fact, as part of the defendant's case in chief in mitigation, the defense specifically avoided any testimony about brain injury; isn't that correct?

A.    I don't remember that being true.

Q.    If that was -- if that was a part of the argument that Ms. O'Connell made in the motion in limine, you wouldn't have any reason to doubt that, would you?

A.    I would not.

Q.    Do you recall discussions with the team about ways -- and when I say "the team," I'm going to use that expansively, and I'm going to include in that David Freedman and Lisa Greenman, okay?

A.    All right.

Q.    Do you recall any discussions with them, including Julie, Mr. Derryberry, yourself, Glori, about ways to try to keep Dr. Price from being able to testify at all?

A.    No.

Q.    Are you aware that David recommended or suggested the possibility of not bringing up or not calling Dr. Gelbort in order to potentially not -- potentially, not allow -- the government not being allowed to call Dr. Price? Terrible question.  Let me back up and ask it again.

THE COURT:  At least you admit it.

A.    The answer is going to be the same.

Q.    (By Mr. Wilson)  Do you recall the question?  Do you understand the question?

A.    I do.  There were clearly discussions about that.

Q.    But do you remember them?

A.    No.

Q.    Were you -- do you remember being involved in them at all?

A.    I do not remember being involved in them.

Q.    But Dr. Gelbort was not called, was he?

A.    He was not.

Q.    Now, I believe it was your testimony in direct that you were not involved in those discussions as to whether or not he should be called.  Was that your testimony?

A.    No.  I don't think I said that.

Q.    Okay.

A.    If I did, I misspoke.

Q.    Do you remember having those specific discussions about whether Dr. Gelbort should testify or not?

A.    No.

Q.    All right.  One of the things that you testified early on, that your primary focus when you got involved in this case, was attempts to try to keep this case from ever being authorized for the death penalty; correct?

A.    Correct.

Q.    Once that actually took place and the notice of intent was approved by the AG, the question doesn't end there, does it?

A.    No, sir.

Q.    There's -- there's not -- there's a mechanism whereby defense can petition that the case be deauthorized; correct?

A.    That's correct.

Q.    And you continued down that path; correct?

A.    I did.

Q.    Because, based upon the ABA standards, you don't want to go to trial if you don't have to?

A.    Correct.

Q.    You want to try to get death off the table; right?

A.    That's right.

Q.   And so you continued to work towards a gaining -- or gaining that goal; correct?

A.   Correct.

Q.   As a matter of fact, as late as June 28th, just a few days before jury selection started, you are still trying to get to AG's -- the AG to deauthorize the death penalty; correct?

A.   Yes, sir.

Q.   And can you describe how you go about that?  Do you -- do you go to D.C. again and make a presentation?  How does that happen?

A.   My recollection was I -- and forgive me, I keep saying Shelly because I forgot his last name.

Q.   Shelly.  Sheldon Sperling went by Shelly, that's correct.

A.   Sperling.

Q.   That's correct.  He was the U.S. attorney.

A.   I kept basically lobbying him to take death off the table.  As I recall, there was also a procedure whereby we could go back to D.C. and ask them to reconsider their previous decision.

Q.   All right.  And so you lobby Mr. Sperling.  If he's not on board with that, then you can go back to the Department of Justice and make a request that the department take death off the table; correct?

A.    Yes, sir.

Q.    And you have to do that through what's known as the Capital Case Unit at that time, the CCU?

A.    Yes, sir.

Q.    Do you know a person by the name of Margaret Griffey?

A.    She may have been a member of the committee.

Q.    Okay.  I'm going to direct your attention to government number -- this is the second volume -- Government Exhibit Number 51.

A.    Yes, sir, I have it before me.

Q.    You're looking at 51; correct?

A.    I am.

Q.    And it's -- do you agree with me that it's actually a four -- wait -- six-page document?

A.    Yes, sir.

Q.    And it's not signed; is that right?

A.    That's correct.

Q.    But it appears to have been created by you?

A.    Yes, sir.

Q.    Do you recall drafting this document?

A.    I do not.

Q.    Do you know whether or not this document was conveyed to the department?

A.    I do not.

Q.    Okay.  And, again, the purpose of a document like this

is -- especially, when we're talking about a matter just a few days before jury selection begins -- it's your last-ditch effort to try to get the Department of Justice to deauthorize seeking the death penalty against your client, Mr. Fields; correct?

A.    Yes, sir.

Q.    And when you create a document like that, what's going through your mind?  What are you wanting to accomplish? What are you wanting to submit to the authorities that be, what they should consider?

A.    I mean, my objective was to get them to deauthorize death.

Q.    And in order to do that, would you agree with me that you're going to put the best, most compelling information in that document?

A.    Certainly.

Q.    And on page 2, you start off with saying, by heading, calling Mr. Fields an atypical case; correct?

A.    Yes, that's what it says.

Q.    And when you call it an atypical case, do you mean that this particular fact situation is atypical for others who have been authorized to receive the death penalty?  Is that what you're meaning?

A.    Are you asking me if that's what I meant at the time I drafted this?

Q.   Yes.

A.   Yes.

Q.   Okay.  And you start off by saying Ed Fields has no criminal history; correct?  Heading A.  "No Prior Criminal History."

A.   That's above the "Atypical"?

Q.   Just below roman numeral I.  "Atypical Case."

A.   Yes.

Q.   Subparagraph A.

A.   I see it.

Q.   "No Criminal History."

A.   Yes.

Q.   Okay.  Then you go to the fact that Mr. Fields is a former Navy member; correct?  Had a military service?

A.   Yes, sir.

Q.   And you spend the rest of page 2 and three-fourths of page 3 talking about Mr. Fields's military career; correct?

A.   Yes.

Q.   And then you talk about the fact that he has children.  That if he were to be executed, would deprive them of a relationship with his children; correct?

A.   Yes, sir.

Q.   Now, you get to page 4, then you start talking about mental illness; correct?

A.   Yes.

Q.   And when you -- when you're creating this document, you're wanting to include in there the most compelling information about mental illness; right?

A.   Yes, sir.

Q.   Where, in your discussion of mental illness, is there any reference to brain damage?

A.   I do not see that in here, the specific words "brain damage."

Q.   In paragraph 2, you refer to "Edward suffered from 'another yet-to-be identified mental impairment.'"

A.   I'm sorry.  Say that again.

Q.   Middle of the second paragraph, the paragraph which begins "Counsel for Edward Fields."  Do you see that?

A.   I see that paragraph, yes.

Q.   About middle way down that paragraph, it says "Although undetermined at the time, it was believed by counsel that Edward suffered from 'another yet-to-be identified mental impairment.'"

A.   Yes, I see that.

Q.   "Due to the well-substantiated proof that Edward had been hearing a voice in his head since adolescence."  Correct?

A.   Yes, sir.

Q.   Any reference in that paragraph about impairment of his frontal lobes?

A.    Not specifically, no.

Q.    Now, the next portion is -- and that was under the heading of "Initial Submission."  And when you refer to initial submission, what you're talking about, I believe, is what was originally advocated to the committee before the initial decision to authorize the death penalty; correct?

A.    Yes.  Yes.

Q.    And then, now, you have a subsequent investigation. So you're supplementing, adding, what's been learned since that point; correct?

A.    Yes, sir.

Q.    I want you to read, to yourself, that paragraph and let me know when you're finished.

A.    Yes, sir.

Q.    You've had an opportunity to read that now; correct?

A.    I have.  I'm sorry.

Q.    And you would agree with me there's no reference to brain damage; correct?

A.    Correct.

Q.    No reference to brain impairment; correct?

A.    Not those words, correct.

Q.    And the focus of that paragraph is on the manic flip caused by Effexor; correct?

A.    Yes, sir, primarily.

Q.    Well, what else is there?

A.    Yes.  I'm sorry?

Q.    That's all it talks about is the manic flip; correct?

A.    Correct.

Q.    Which was -- which was what Dr. Woods had proposed and had this meeting to get you on board with; correct?

A.    Correct.

Q.    No mention of Dr. Gelbort; correct?

A.    No, sir.

Q.    And, again, the purpose of this document is to present to the Department of Justice your best argument why the death penalty should not be authorized; correct?

A.    Yes, sir.

Q.    Apparently, the eggs were in the Dr. Woods' basket; correct?

A.    Well, I don't know if I would say that totally, Mr. Wilson.

Q.    Well, that's what you've submitted to the department; correct?

        MS. ENSLER:  Objection.  That is inserting a fact we do not know.

        THE COURT:  Well, it's argumentative; I'll give you that.  Sustained.

        MS. ENSLER:  Submitted.  We don't know that it was submitted.

        THE COURT:  All right.  Fair enough, but I've

sustained it.

MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  You may.

MR. WILSON:  Pass the witness, Your Honor.  Thank you.

THE COURT:  Okay.

MR. WILSON:  Thank you, Mr. Gant.

THE WITNESS:  You're welcome.

THE COURT:  All right.  Ms. Ensler, do you have any redirect?

MS. ENSLER:  I do, Your Honor.  May I have one second?

THE COURT:  You may.  I'll even give you more than one second.

MS. ENSLER:  Thank you.

THE COURT:  Don't say I'm not magnanimous.

THE WITNESS:  Judge, may I just step away over here a moment to blow my nose?

THE COURT:  Oh, no, absolutely.  Do you need a tissue?  There's some right there.  Okay.  Good.

THE WITNESS:  Sorry.  Thank you.

THE COURT:  You bet.

REDIRECT EXAMINATION

BY MS. ENSLER:

Q.    Hello again, Mr. Gant.  I would like to first start at

the beginning of your cross-examination.  You discussed that you -- from 2002 to 2006, you were learned counsel of the Project.  I just wanted to clarify.  In your work at the Project, were there cases where you were admitted as learned counsel?

A.    Yes.

Q.    And then were there also cases where you were not admitted, and you were just a resource for those -- those attorneys directly representing clients?

A.    Yes.

Q.    And moving to David Freedman.  On cross-examination, you said that David Freedman was a psychiatrist and that knowing -- knowing that, did that affect how much weight you gave his opinion?

A.    Well, certainly, it was a consideration, yes.

Q.    And you said on cross-examination that you knew Ms. Lisa Greenman.  That prior to this case, you said she specialized in mental health issues?

A.    Yes.

Q.    What was your understanding of her experience that led you -- that led you to believe she specialized in mental health issues?

A.    I believe that I had been involved in some training programs where she was also present and presented.  I am not sure if I had worked with her or not on some prior cases,

but my recollection is, you know, I got to know her through training programs.

Q.   And on cross-examination, the government asked you a question about dealing with "nuanced and complicated mental health issues."  Were Dr. Gelbort's ultimate findings clear to you?

A.   Yes.

Q.   And there has been quite a bit of discussion about the multiple versions of reports that Dr. Gelbort provided you. When I'm talking about the reports, I'm just talking about all of the reports that we have reviewed today.

A.   All right.

Q.   Did you review those reports prior to trial?

A.   Yes.

Q.   And from that review, did you believe Mr. Fields had frontal lobe damage?

A.   I did.

Q.   And when we say frontal lobe damage, would you have also referred to that as brain damage?

A.   Yes.

Q.   And you would have wanted the jury to know that fact?

          MR. WILSON:  Objection.  It's leading, Your Honor.

          THE COURT:  Overruled.

          MS. ENSLER:  Pardon, Your Honor.  I missed what you had said.

THE COURT:  Pardon?

MS. ENSLER:  I just --

THE COURT:  Overruled.

MS. ENSLER:  Okay.

THE COURT:  The witness can answer if he recalls the question or if you want to rephrase it.

Q.   (By Ms. Ensler)  Do you recall the question?

MR. WILSON:  I just would -- my objection was leading, not misleading.  I wanted to make sure the Court understood my objection.

THE COURT:  Okay.  I understand, yeah.

MR. WILSON:  Okay.

THE COURT:  It was leading in a misleading way, is that what --

MR. WILSON:  There you go.

THE COURT:  Nonetheless, it was overruled, so --

A.   The question again, please?

Q.   (By Ms. Ensler)  Would you have wanted the jury to have known that information about brain damage?

A.   Yes.

Q.   And was it your practice to give jurors copies of written reports from your mental health experts at trial?

A.   Yes.  If they were admitted into evidence, yes.

Q.   Would you typically admit mental health experts' pretrial reports into evidence?

A.    I would certainly try.

Q.    And you stated that Gelbort could be difficult to get a hold of at times.  Did that cause you to rethink calling him at trial?

A.    No.

Q.    And referring you -- sorry.

MS. ENSLER:  Court's indulgence.

Q.    (By Ms. Ensler)  Do you recall the emails where we were discussing that Ms. O'Connell referred to Dr. Gelbort and said that he sucks?

A.    Yes, I remember that.

Q.    I just want to clarify.  When you -- when you concurred in that sentiment, was that related to his findings or his expertise?

A.    No.  No.

Q.    What was that related to?

A.    The difficulty in getting him to respond to phone calls.  It had nothing to do with -- even though I may not have agreed with some of the things that he said, but the frustration was all about trying to catch up with this guy.

Q.    And there -- on cross-examination, there was a mention of his raw data, Dr. Gelbort's raw data.

A.    Yes.

Q.    In your experience, do you know if mental health experts typically share their raw data with a non-expert?

A.    With a non-expert?  I'm not sure.  I don't recall having been confronted with a situation like that, before this case anyway.

Q.    And then when asked on cross-examination whether Dr. Woods advised you not to conduct scans, you said, "I believe that is true."  Are you certain of that?

A.    As I sit here now, no.

Q.    Okay.  And now I would like to return to the exhibit that was touched upon at the very end of cross-examination. The government's exhibit for the Binder 2, Exhibit 51.

A.    Yes, I have it before me.

Q.    Do you know if this letter is a final version?

A.    I do not.

Q.    Could there have been additions?

A.    I'm sure there could have been.

Q.    I would like you to refer to page 5.

A.    Yes.

Q.    Is this -- I guess, what is on page 5, beginning with roman numeral III?

A.    Roman numeral III discusses non-statutory aggravating factors.

Q.    And just on this page, the small numbers, a., b., and c., when they're discussing those aspects of the non-statutory aggravating factors --

A.    Yes.

Q.    -- could you just read -- I guess, let's just start with a. -- to yourself for a second, and then I'll ask a question.

A.    I'm sorry?

Q.    Just read to yourself.

A.    Uh-huh.  (Witness complies.)  Yes.

Q.    And in the latter part of that paragraph, is there almost a response addressing that aggravating factor?

A.    Yes.

Q.    And the same with b., could you glance through that paragraph quickly?  Or slowly, at whatever speed you would like.

A.    (Witness complies.)  Yes.

Q.    And, again, does it appear that there has been a response provided to address that aggravating factor?

A.    There does.

Q.    And then moving ahead to page 6, on Number 2, a. and b. Could you glance at both of those paragraphs?

A.    Yes, I've read it.

Q.    And do -- as compared with the page before subsection, do these subsections have responses for each of those?

A.    No.

Q.    And might that -- could that be indication that this is a draft?

MR. WILSON:  Objection.  That's leading.  So I

object to the form of the question.

THE COURT:  Sustained.

Q.   (By Ms. Ensler)  Do you -- do you know if anyone on the Fields trial team ever sent a final signed version of this to DOJ?

A.   I do not.

MS. ENSLER:  Your Honor, may I have one second to confer with counsel?

THE COURT:  You may.

MS. ENSLER:  I have no further questions.  Thank you, Mr. Gant.

THE WITNESS:  You're welcome.

THE COURT:  Mr. Wilson, any recross?

MR. WILSON:  I have no additional questions, Your Honor.

THE COURT:  Okay.  All right.  I know Mr. Gant was on the government's witness list as well.  Is this witness now excused or is he --

MR. WILSON:  We have no reason to call him back, Your Honor.

THE COURT:  Okay.  All right.  Thank you, Mr. Gant.  You may step down.  You are excused.

THE WITNESS:  Thank you, Judge.

THE COURT:  All right.  The defendant may call its

next witness.  Let me ask you this.  Would you rather take a break now?  Is Mr. Abel your next witness?

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  How long do you anticipate him -- I mean --

MR. LABOVITZ:  I would guess, hopefully, not more than a half an hour total, but -- well, at least on direct.

MR. WILSON:  My cross will not be long, Your Honor.

THE COURT:  Why don't we go ahead and try to get Mr. Abel in now.  I know he's been waiting out in the hall a long time.

MR. LABOVITZ:  Yes.

THE COURT:  So we'll get him in before we take our afternoon break.

All right.  Mr. Abel, you may come forward.  I believe you are their next witness.

All right.  The clerk will place the witness under oath.

(Witness sworn.)

THE COURT:  All right.  Mr. Abel, have a seat.  As you probably know, you need to kind of lean into that microphone so it picks you up and our court reporter can hear you.

Mr. Labovitz, you may proceed.

MICHAEL ABEL,

having first been duly sworn, was called as a witness and

testified as follows:

DIRECT EXAMINATION

BY MR. LABOVITZ:

Q.   Good afternoon, Mr. Abel.  Can you state and spell

your name for the record?

A.   Michael Abel, A-B-E-L.

Q.   And I'm Hunter Labovitz, one of Mr. Fields's

attorneys.  Have we ever met before today?

A.   We spoke over the telephone, I believe.

Q.   And what is your current occupation?

A.   I am a semi-retired attorney.

Q.   Have you ever worked at the Federal Public Defender

Office for the Northern District of Oklahoma in Tulsa?

A.   When I worked there, it was combined, Northern and

Eastern Districts, yes.

Q.   When was that?

A.   From 1997 to 2006.

Q.   Who was the chief defender of the office in Tulsa when

you worked there?

A.   Stephen Knorr, originally, and then Paul Brunton

followed him.

Q.   You said that the office was the combined defender for

Northern District of Oklahoma and Eastern District of

Oklahoma.  Did the office then represent clients in both of those federal districts?

A.     Yes.

Q.     Did you have a particular assignment as between cases that were handled in federal court in Tulsa versus cases that were handled in the federal court here in Muskogee?

A.     I think what you're looking for is that I was the assistant that was primarily handling the Eastern District, but I also handled cases in the Northern District as well.

Q.     And when you say primary attorney, did anybody else from the office in Tulsa, the Federal Defender Office in Tulsa, assist you on a primary basis with cases here in Muskogee?

A.     Well, no one assisted me primarily, but others handled cases down here.

Q.     As the primary attorney here in the Eastern District of Oklahoma for the federal defender, what did your job entail?

A.     Representing defendants charged with a crime in the Eastern District.

Q.     Did you also have occasion to appear at hearings for colleagues who were in Tulsa, as part of the office, who could not make it to Muskogee on a particular day?

A.     Rarely, but, yes, occasionally.

Q.     Was your office located here in Muskogee or in Tulsa?

A.    There was an office in both places.  I had an office in the main office in the Williams buildings in Tulsa, and then there was a satellite office across the street in the Bank of Oklahoma building that the federal defender had here.

Q.    Did you have a designated office in the Bank of Oklahoma building here?

A.    Yes.  There was an office space that was just for the Federal Public Defender.

Q.    Did you share that space with anyone else from the Federal Public Defender Office or was it just sort of come as can be?

A.    It was a satellite office.  It was unstaffed unless I happened to be there.

Q.    Do you recall that while you were employed by the Federal Public Defender, that the office represented a capital trial defendant named Edward Fields here in the Eastern District of Oklahoma?

A.    During my tenure with the Federal Defender's Office, I think Mr. Fields was the only capital case that we had that I recall.  Certainly, in the Eastern District.

Q.    Do you recall being in court on July 21st, 2003, to represent Mr. Fields at his initial appearance here in Muskogee?

A.    I don't particularly recall it.  I know that typically

I would be the one that would make an initial appearance with whatever defendant. When the office would get a call that they needed an attorney, I would be the one that would come to the initial appearance in the Eastern District, whatever case it was.

Q.    If the docket in Case Number 03-CR-73, United States versus Edward Fields, indicates that you did, indeed, appear for Mr. Fields at that initial appearance on July 21st, 2003, would you have any reason to dispute that?

A.    No.  If the record reflects that, I'm sure that's what happened.

Q.    Do you -- I guess -- well, maybe you addressed this. But can you detail a little bit more why you, in particular, would have been the assistant federal public defender to appear at Mr. Fields's initial appearance?

A.    Well, I mean, I'm not sure what you're looking for.  I was the assistant that would routinely handle matters in the Eastern District.  I don't know what all the reasons were that the defender assigned me to that, but that was just kind of a given, and everyone in the office recognized that an Eastern District matter would be something that would fall to me typically, and the court staff and personnel would likewise understand that, and I might be the one that actually got the call.

Q.    Did you have a sense, you know, at that moment, that

Mr. Fields's case could potentially be tried as a capital case?

A.    Well, I knew the nature of the charges, yes, that it was alleged as a homicide, and there were two victims as I recall.  So, yes, I knew that it was something that would be eligible in that sense.

Q.    At that time, had the office -- the Federal Public Defender Office for the Northern District of Oklahoma and the Eastern District of Oklahoma represented other federal capital defendants?

A.    I don't know.  Not to my knowledge in the Eastern District during my tenure here.  They may have in the Northern District, and they may have in the Eastern District at other times, but I don't know of any others.

Q.    So do you have any recollection of talking to any of your colleagues at the Federal Public Defender before you came to appear at Mr. Fields's initial appearance back in July of 2003?

A.    I have no specific knowledge of any conversations.  It may have been that I was already in Muskogee for other reasons and just came over here.  I don't even know if I talked to my office at all, if they're the ones that notified me or if the court did or court personnel.

Q.    As a regular matter, sort of on a daily basis when your morning started, would you be here in Muskogee, or

would you be in Tulsa and then make your way over here as needed?

A.    That would vary from day to day depending on what was going on.  I might go to the Tulsa office first.  The office had a staff car, and so I probably would have gone to the Northern District in Tulsa and picked up the staff car and left my car and driven here, but I may not have gone up to the office.  I don't know.  I don't remember that day in particular, what I was doing, or what time I came even.

Q.    Do you have recollection that at the initial appearance, Magistrate Shreder appointed you specifically to represent Mr. Fields in his case?

A.    As I said, that would have been something that would have happened routinely.  I don't know that Magistrate Shreder was looking at it differently because it was a death penalty potential case.  It would not surprise me if the record reflects that's what he did, I'm sure that's what happened because I was the assistant that was known to all the court personnel.

Q.    And is -- so I don't want to put words in your mouth, but it sounds like it's more of a routine matter because you're here versus the court was appointing you as counsel for Mr. Fields for a particular reason?

A.    Well, you would have to check with Judge Shreder on his motivation, but that would have been why I would have

just routinely showed up because I was the assistant that routinely showed up in the Eastern District.

Q.    Prior to the time that you were appointed by Magistrate Shreder -- this is July 21st, 2003 -- on this case, had you been counsel of record in a federal capital trial on behalf of a defendant?

A.    No.

Q.    Had you -- prior to this appointment, had you ever assisted counsel of record in a federal capital trial on behalf of a defendant?

A.    No.

Q.    Prior to your appointment, had you attended any trainings for lawyers to learn about how to handle a federal capital trial?

A.    No.

Q.    Okay. And prior to your appointment, had you attended any trainings on how to present and investigate mental health evidence for use at a federal capital trial?

A.    I had no training related to federal capital trials prior to that date.

Q.    How about state capital trials?

A.    I don't remember any specific cases -- or training that was related specifically to capital cases.

Q.    Okay. And did you, during the course of your representation of Mr. Fields, attend any trainings on how to

investigate, develop, and present mental health evidence in a capital trial?

A.    Well, I don't even remember how long I was representing him.  I want to make that clear.  I appeared and then soon thereafter -- and I can't tell you if it was days or a week later -- I was advised that Ms. O'Connell would be the assistant federal public defender who represented Mr. Fields.  So, no, I didn't have any training during the time between my initial appearance and the time being told that I would not be the assistant handling the case as the lead attorney.

Q.    Do you -- and by Ms. O'Connell, you mean Julia O'Connell?

A.    Yes.

Q.    Okay.

A.    She's now the Federal Public Defender for the Northern District, I believe.

Q.    Who advised you that she would be the lead attorney representing Mr. Fields?

A.    I don't honestly remember.  It may have been Paul Brunton and it may have been Julie that came and told me that Paul asked her to do it.

Q.    At this time of your appointment, back in July of 2003, you mentioned Mr. Brunton, you mentioned Ms. O'Connell.  Were there any other attorneys that you

worked -- not that you worked with, I'm sorry -- that worked at the Federal Public Defender for the Eastern and Northern Districts of Oklahoma?

A.    Mr. Brunton was the federal public defender.  There were three assistant federal public defenders, myself, Julia O'Connell, Rob Ridenour, and I guess those are the three assistants.  And then Barry Derryberry was a writing specialist in the office.

Q.    I want to ask you about a pretrial detention hearing for Mr. Fields that took place on July 23rd, 2003, two days after your appointment.  Do you have any recollection of being in court to represent Mr. Fields at this preliminary detention -- I'm sorry -- at this pretrial detention hearing?

A.    I believe that you emailed me a copy of that record of that hearing, and I read over that.  I didn't have any particular memory of that.  If I recall, though, that record indicates that, by this time, Julie O'Connell was the attorney that was the assistant federal public defender that was the lead attorney on the case, if I'm not mistaken.

Q.    Yes.  And if the transcript from that hearing indicates that you and Ms. O'Connell asked for time to speak with Mr. Fields prior to the hearing, do you have any recollection of what you would have discussed with Mr. Fields?

A.    I don't recall that conversation if it was held. Again, I think by that time she was the assistant that was handling it, and so I would have just -- I don't even know if I sat in on the meeting.  I don't remember.

Q.    Do you recall any discussion with Ms. O'Connell about how to proceed at the pretrial detention hearing in terms of strategy, argument, things like that?

A.    I'm sure there was some conversation.  My input, if any, would have been geared towards my familiarity with the court and the judicial officers and the proceedings, as they were typically handled in the Eastern District.  Strategy was not something I was consulted about that I recall at all.

Q.    And I think you mentioned that Ms. O'Connell, even by this point, on July 23rd, is taking the lead.  If the transcript indicates that Ms. O'Connell handled the substance of the pretrial detention hearing, would you dispute that?

A.    No.  Once she was in the case, I was not substantively involved in the strategy or the handling of hearings or anything like that.  Once she got involved, I would have been just here because of my familiarity with the court procedures in this courthouse.

Q.    And can you explain then -- sort of given what you're saying about how Ms. O'Connell took over the case, can you

explain then why -- then there's a competency hearing on July 28th, 2003, five days later. And if I represent to you that Ms. O'Connell and Mr. Derryberry were the counsel for Mr. Fields at that hearing, would that be consistent with what you're saying about Ms. O'Connell taking over?

A.    It sounds like it would be.

Q.    Okay. Now, I want you to ask you about a pretrial status hearing that took place -- fast-forward to 2004 now, February 20th, 2004. Do you have any recollection of being in court for a status hearing on that date on behalf of Mr. Fields?

A.    Nothing in particular. I think you did send me a transcript of multiple hearings. I'm not sure, I assume that was one of them.

Q.    Yes. Well, I'm happy to show you again, if you want, but did your review of that refresh your recollection that you did, in fact, appear to represent Mr. Fields on February 20th of --

A.    I don't deny it. If that's what the record reflects, I'm sure that's accurate.

Q.    Okay. So no dispute that as long as the transcript says that, you were there for Mr. Fields on February 20th, 2004, you were there?

A.    Whatever the record reflects is probably more accurate than my memory at this point.

Q.   So, now, we're about -- let's see here -- seven, eight months after your appointment.  Do you know why you would have been in court at that point, given what you're talking about Ms. O'Connell taking over the case, why you would have been in court on behalf of Mr. Fields in February of 2004?

A.   If you want me to look at the transcript, I can refresh my recollection about, but whatever the transcript says I was there for is what I was there for.

MR. LABOVITZ:  May I approach, Your Honor?

THE COURT:  You may.

MR. LABOVITZ:  Yeah, I -- just because we're using these for refreshing recollection, I didn't add these to the binders, but if the Court wants -- and I believe there was an agreement among the parties that, you know, any --

THE COURT:  You need to step back to that microphone if you're going to keep talking.  I know.

THE WITNESS:  If you want to proffer what I said, I'm not challenging you.

MR. LABOVITZ:  Okay.  No, no.  I just want to say the parties had agreed that any transcript in this case is -- you know, can be used for examination, but I have copies to provide to the Court if you want --

THE COURT:  Well, if you'll do that.  Just provide defense -- or the government a copy and the witness a copy and perhaps me a copy.

165

Q.    (By Mr. Labovitz)  Mr. Abel, can you just review page 2 of that -- well, let me ask you this.  First of all, do you recognize, on the first page, this is a transcript of status hearing before Judge White in this case, United States versus Edward Leon Fields?

A.    Yes, that's what it appears to be.

Q.    And can you take a look at page 2 and just, you know, read that, maybe about half the page, just see if you can get a sense if that refreshes your recollection as to that status hearing?

A.    Well, yes.  The Court advised me that --

MR. WILSON:  Your Honor, the government would stipulate that Mr. Abel was not substantively involved in the status hearing.  He was there simply -- he was at the courtroom, Ms. O'Connell had not arrived yet, that she arrived and then handled the substantive hearing.  I would stipulate that Mr. Abel was not involved other than just being there at the beginning of the hearing.

THE COURT:  All right.  Is there anything else more you're wanting to --

MR. LABOVITZ:  Well, if I'm --

Q.    (By Mr. Labovitz)  I just would like to ask if you had any recollection of speaking to Mr. Fields before that hearing?

A.    Well, no, I don't have any independent recollection.

I'm not sure if you're asking if I spoke to him by myself or after she arrived.

Q.    Before Ms. O'Connell arrived, do you have any recollection of speaking with Mr. Fields?

A.    I don't have any recollection of speaking to him independent of -- I'm sure I spoke to him briefly before his arraignment, told him what the Court was going to do at the arraignment, but that's based on my long-standing practice of providing a copy of the information -- the indictment and advising a client what would happen at a particular hearing. In this particular matter, I don't remember having any conversation with him about it because I think I was surprised that I was going to be standing in for her while she was running late.

Q.    Yes.  And if -- on page 2, if the transcript says, "I guess Mike Abel appearing for the defendant, Your Honor," would that be just because you were in the courtroom while Ms. O'Connell was running late?

A.    Yes.  I would sit in the courtroom on various occasions not intending to be involved in anything, and if something happened, such as she was late getting there, the Court or someone might ask me if I knew what was going on, and that's what that sounds like, that I was guessing -- I was advised she was running late, and I guessed that I would be there for her until -- you know, trying to satisfy the

Court that we're not ignoring the case as a firm.

Q.   Okay.  Sure.  Now, I want to jump forward about a year to January 12th of 2005.  There is a hearing for Mr. Fields on mental health issues.  Do you recall being present for that hearing?

A.   I have no specific recollection of that.

Q.   And if -- if I represent to you that you did appear and the transcript reflects that, would you have any dispute?

A.   Not with just that much of a representation, no.

Q.   And you said you have no independent recollection of that hearing?

A.   That's correct.

Q.   If the transcript indicates that Ms. O'Connell was also present at that hearing and made all the substantive arguments, would you have any reason to dispute that?

A.   No, that would be consistent with my testimony so far and my recollection.

Q.   And this was actually a bit of a substantive hearing about mental health issues, so I want to ask you if you had any recollection of discussing strategies for that hearing with Ms. O'Connell prior to the hearing?

A.   No, I don't have any recollection of having any substantive input on strategy for any hearing in his case.

Q.   Well -- okay.  And we've discussed four hearings in

this case, pretrial, that I could find that you appeared for Mr. Fields. I just want to be -- you know, did you have any conversations -- I'm sorry. Do you recall any conversations you had with Mr. Fields, you know, at any of these hearings?

A.    As I say, the only thing that I am pretty confident of, and I don't have an independent recollection, but I'm sure I talked to him before he was arraigned on his initial appearance, and I provided him a copy of the indictment, advised him, made sure he understood the allegations and advised him of what to expect from the Court at that time and advised him legally about how we should proceed as a defendant in his position, but I don't have any independent recollection of conversation with him or his questions or anything like that.

Q.    Do you recall ever visiting with Mr. Fields at any of the detention facilities in which he was held pretrial?

A.    I don't have any memory of having a meeting with him at that, unless I did it at a detention facility before his arraignment. If he was over here at Muskogee County, I would do that before the marshals brought him over sometimes, but I don't know if that was the case in his situation or not.

Q.    If there are some trial pleadings in this case in which the signature block says "Michael Abel for Julia O'Connell," and then underneath the signature block is

Ms. O'Connell's name typed in, would that have been something that you would have signed for her?

A.    Routinely, I believe this was probably before electronic filing because if there's an actual signature, electronic filing would be a typed signature.  So if I wrote that in, that would have been something that was either emailed to me or given to me and asked that I file it while I was down here for convenience sake, in all likelihood.

Q.    When you did that for convenience sake to help, I guess, colleagues back in Tulsa?

A.    That would be correct.

Q.    Would you review the document before signing it?

A.    It would be a cursory review for anything that was just obviously wrong.  I wouldn't review it for details or substance as far as -- because I know you sent me like a 30-page -- it seems like it was a voir dire document, and I can tell you I did not have any hand in drafting something like that.

Q.    Oh, yes.  I'm going to ask you about that in a few minutes.

A.    Okay.

Q.    I just -- the way I was reading the record, there are some documents that say -- are signed, they're not S slash, but, actually, you know, a script signature, Michael Abel for Julia O'Connell.

A.    Right.

Q.    Then there's some documents that are Michael Abel. But so the ones that are Michael Abel for Julia O'Connell, would you discuss the substance of those -- the substance of the document before you signed it?  You said you reviewed it, but would you then say to Ms. O'Connell, hey, we need to change this?

A.    I don't ever remember having to have her modify anything.  My review would have been a very cursory review. I felt like she probably knew what she was doing since she had been placed in that responsible position.

Q.    There are some binders up there to your left, and I would ask for you to take a look at Binder Number 5.

A.    I have the Binder Number 5 in front of me.

Q.    Okay.  Yes, can you please take a look at Tab Number 111?

        MR. LABOVITZ:  Court's indulgence.

        THE WITNESS:  Pardon me?

        MR. LABOVITZ:  Sorry.  Court's indulgence for a minute, Your Honor?

        THE COURT:  Sure.

A.    I've got 111 in front of me.

Q.    (By Mr. Labovitz)  Okay.  Sorry.  Can you take a look at that and see if that is an ex parte application for subpoena in this case, United States versus Edward Fields?

Is that how it's captioned on page one?

A.    Yes, it's an ex parte application for subpoena filed on July 22nd of '03.

Q.    It was filed under seal; correct?

A.    Yes.

Q.    And just so it's clear for you and for the record, this document was sealed at trial, but upon the defense's recent request, the Court entered an order unsealing this document on July 15th, 2024.  So I just want to ask you a couple of questions about that, now that it's been unsealed. If you look at page 2 of this application for a subpoena, do you see a signature on this page?

A.    I do.

Q.    Whose signature is that?

A.    It appears to be my signature.

Q.    And then under the signature block, does just your name appear?

A.    It does.

Q.    Do you know why you would have signed the subpoena application as Michael Abel versus Michael Abel for Julia O'Connell?

A.    No, I don't -- I don't know why there would be a distinction there.  I don't know if this was before she got involved.  I don't remember the date you gave me when she first appeared.

Q.    Do you know if you then -- if Ms. O'Connell had not yet been involved in the case, do you know if you would have been the one to prepare this application?

A.    I don't believe I was.  I don't recall preparing an application for subpoenas in this matter, so I don't think I prepared it.  It may have been along the lines of a form we had, but I just don't know.  I don't remember this document at all independent.

Q.    So this could have just been a standard form that was used in the office for subpoenas?

A.    Well, it appears to be.  With the exception of changing the name and the times, I don't see anything remarkable that stands out to me about this document.

Q.    And turning to page 5 of Defendant's Exhibit 111, you see that's a praecipe for the subpoena?

A.    Yes.

Q.    And at the bottom of the page, is that your signature?

A.    It is.

Q.    With your name underneath it?

A.    Yes.

Q.    Okay.

A.    That's my bar number too.

Q.    And do you know -- like I asked you about the subpoena itself, do you know why you would have signed this praecipe instead of Ms. O'Connell?

A.    I have no independent recollection of this at all.

Q.    Now, I would like you to turn to the next exhibit, which is Defense Exhibit 112, 112.  Do you recognize this as a three-page pleading entitled "United States of America vs. Edward Fields, Defendant's Objections to Government's Proposed Amendment to Order Regarding Mental Health Evidence and Examination"?

A.    That's what it appears to be.

Q.    Okay.  And this is dated February 28th, 2005, at the top; correct?

A.    Yes, the filed date.

Q.    Now, do you see on the top right, it says "Sealed" on page one?

A.    Yes.

Q.    I also just want to make clear to you and the record that this document was also part of the order -- recent order of the Court unsealing documents in this case.

A.    Okay.

Q.    Do you see on page 2 of that document, that you signed your name?

A.    I do.

Q.    Do you know why you would sign this as Michael Abel and not Michael Abel for Julia O'Connell?

A.    Well, my name is on it and -- along with hers.

Q.    Yes.

A.    And I'm sure I was the one actually filing it.  I just didn't put "for."  I notice on page 3 of that, I did write for Julie O'Connell because she put her name under the bottom.  I'm thinking, probably, it's something that she prepared because on the first page of it, it indicates it's by and through Julia O'Connell.  So I assume that's why my -- I signed it for Julie because I was doing this as a courtesy or to help her.

Q.    On page 3, when you did the "for" Julia O'Connell, that's on the certificate of service; correct?

A.    Right.

Q.    Yeah.  Okay.

A.    And the certificate alleges she did it, so I put my name for her doing it.

Q.    And you said your recollection would be that you did this for her.  Do you know if you had any role in drafting this pleading?

A.    No, I didn't have any role in it.

Q.    Now, you mentioned a few minutes ago about a voir dire pleading.  If you would turn to Defendant's Exhibit 113.  It should be the next exhibit in that binder.  And I would ask you if that is the -- what you were referencing before, a longer document, related to defendant's proposed voir dire procedures in this case, United States versus Edward Fields?

A.    This appears to be -- I mean, you sent it to me, so if

that's what you put in here, it is what --

Q.    Well, if you would turn to page 30 of Exhibit 113.  Do you see that?  Did you see --

A.    My signature on it?

Q.    Yes.  Is your signature on page 30 on the signature block?

A.    It is.

Q.    Do you know why -- and now, again, this is Michael Abel instead of, you know, versus Michael Abel for Ms. O'Connell.  Do you know why you would have signed this as Michael Abel?

A.    I don't know that there was a strategy involved in that except that I was the one filing it.  And I do notice, again, on the next page, I signed it for her because she had her name under the line for service.

Q.    Do you know if you had any role in helping to draft this pleading on voir dire procedures?

A.    I did not.

Q.    Do you know what lawyers from your office, when you were in the federal defender for the Eastern District and Northern Districts of Oklahoma, represented Mr. Fields at the trial itself?  Or rather -- I'm sorry, there was attorneys outside the office.  Do you know what attorneys represented Mr. Fields at his trial?

A.    Well, I know that Julie was the lead attorney.  I'm

almost certain that I probably sat in the courtroom at least for some part of the trial, and I'm sure Julie was there because I don't remember being surprised she wasn't. And then there was another attorney, I believe from Nashville, that was related to the mitigation, death penalty side of the case, that helped her prepare the case and try it.

Q.   And if I told you that Isaiah Gant was an attorney from Nashville, does that sound familiar?

A.   Well, it doesn't sound familiar, but it doesn't sound foreign either. It's probably who it is.

Q.   Okay. If the record --

A.   I was not familiar with him except I saw him in the office a time or two.

Q.   And if the record reflects that, you know, looking at the transcripts, that counsel for Mr. Fields at trial were Julia O'Connell, Barry Derryberry, and Isaiah Gant, would you have any reason to dispute that?

A.   No.

Q.   Okay. Did you ever speak with Ms. O'Connell before the trial about how to approach plea negotiations in Mr. Fields's case?

A.   Any conversations I had with her would have been probably in the nature of courtesy, office banter. Just, you know, how are things going with the case, or, you know, have they decided on the death penalty issue. You know, I

would know from -- because it's a small office.  I would know generally what was going on, but any conversation I had with her would have been just general conversation.  It would not have been her seeking my input for strategy purposes or me providing suggestions in that regard.  So I -- I don't want to say I didn't have any conversations about a broad subject, when I'm sure there were generic conversations about it at some point.

Q.    How about a conversation regarding -- with Ms. O'Connell -- what pleadings to file in Mr. Fields's case before the trial started?

A.    No, I don't remember discussing any pleadings before trial, but I mean, we could have in a general sense.

Q.    Okay.  Did you have any discussion with Ms. O'Connell about what experts to retain in Mr. Fields's case?

A.    Again, it probably would have been in a sense of her response to me in a general way, telling me what experts she was looking at or had hired.  I don't recall anything specific, but it would have been a very general way, and it would not have been a two-way conversation in the sense of me having input into experts or analyzing the value of approaching it in this particular manner.  It would have been just, you know, where we stand, how's it going, just general stuff.

Q.    Okay.  So just to be clear, if Ms. O'Connell said I'm

going to -- I'm thinking of hiring Dr. Smith.  What do you think about that?  You never got to that level of conversation?

A.    No.  She wouldn't have asked me what do I think about it, is my point.  I don't think she --

Q.    Okay.  Would that -- would the same hold for any lay witnesses that Ms. O'Connell or other members of the defense were going to call at trial?  Did you have any discussions about that?

A.    I don't recall anything about any lay witnesses that were involved in the case.

Q.    Okay.

A.    I don't -- that were available or involved, so ...

Q.    What about any discussions with Ms. O'Connell regarding what mitigating factors the defense should present at the sentencing stage of Mr. Fields's trial?

A.    I don't remember anything like that because she was working, I believe, with Mr. Gant on that stuff.

Q.    Did you have any discussions with Ms. O'Connell about how to approach the cross-examination of any of the government's expert witnesses that it was calling at Mr. Fields's trial?

A.    No, I never talked to her about government witnesses at all, I'm sure.

Q.    How about any discussions with Ms. O'Connell about,

you know, what to argue to the jury in opening statement -- well, what to say to the jury in opening statement or what to argue in the closing statement?  Did she bounce any ideas off you?

A.    There were no strategy discussions either about witnesses or arguments to make or -- that I recall.

Q.    So, I mean, if Ms. O'Connell was making decisions in Mr. Fields's case, would you have been involved in any of that decision-making?

A.    No.

Q.    And then, you know, I'll try to streamline it, but some of the same questions with respect to Mr. Gant.  You said he was, as far as you understood, sort of the mitigation guy.  Did you talk with him about what mitigating witnesses to call?

A.    No.  I talked about friends I had in Nashville.

Q.    Okay.

A.    That would have been the extent of our conversation.

Q.    Were any of them experts?

A.    No.  My friends are all musicians in Nashville.

Q.    So -- and then you said -- you know, what about the specific mitigating factors that the defense would present.  Any discussions with Mr. Gant about that?

A.    No.  I just -- he was not a regular in the office, so it would have been how are you doing today type; would have

been the depth of our conversations.

Q.   Did Mr. Gant ever ask you for assistance in strategizing about the case?

A.   No.

Q.   Did he ever ask you for any assistance in making any decisions about the case?

A.   No.

Q.   You mentioned Mr. Derryberry was a research and writing specialist.  Do you -- what did you understand his level of involvement to be in the case?

A.   I didn't know about his level of involvement.  I didn't know.

Q.   Did you ever speak with him about Mr. Fields's case?

A.   I saw him in the hallway out here while I was waiting, and he said he was here to testify.  That's the only conversation I remember having with him about it.

Q.   Okay.  Between the time of your appointment and today, that's the first conversation you've had about the case?

A.   That's the first time.  I mean, he was a research and writing specialist that handled appellate issues.  If I were going to speculate, I would say that would be where your speculation would end up, that he was protecting the record, but that would be sheer speculation, and I wouldn't do that.

Q.   Did you -- do you know the name Glori Shettles?  Does that sound familiar to you?

A.    Say it again, please.

Q.    Glori, G-L-O-R-I, Shettles.

A.    I don't know that I've ever heard that name.

Q.    Did you ever give any assistance to Mr. Fields's trial counsel on investigating the case, whether for the purposes of the guilt decision or purposes of the penalty decision?

A.    No.  We had an investigator in the office.  All the investigating would have been something that she handled with him.

Q.    And what about talking to witnesses involved in the case?  Did you do that ever?

A.    I don't know of any witnesses in the case.

Q.    Okay.  So you don't recall any counsel for Mr. Fields asking you, can you go talk to, you know, Mr. Jones and see what he could help -- you know, say for the case?

A.    No, I didn't do that.

Q.    Okay.  And did you -- the same -- would the same hold for experts that were involved in the case?

A.    Absolutely.  I didn't get involved in anything beyond what I've told you already I don't think.

Q.    Okay.  Did you have any role in deciding what witnesses defense counsel for Mr. Fields would present or not present at trial?

A.    No.

Q.    Did any of Mr. Fields's trial counsel ever ask you for

Q.    your assistance in making that decision?

A.    No.

Q.    Did you have any role at Mr. Fields's trial?

A.    No.

Q.    I believe you said earlier, you may have been in the courtroom during some of the trial; is that correct?

A.    As a spectator only.  I would have sat back in the corner and just watched and observed.  I learn something every time I watch.

Q.    Did there ever come a point where any of Mr. Fields's trial counsel asked you to help them at the trial?

A.    I had no involvement in the trial that I recall.

Q.    I hope I'm pronouncing this correctly, but you mentioned there was a lawyer in your office, Rob Ridenour?

A.    Yes, sir.

Q.    Did he -- do you know if he did any work on Mr. Fields's case?

A.    I don't know.

Q.    Do you know if Mr. Brunton did any work on Mr. Fields's case?

A.    I don't know.

Q.    Now, if the docket sheets in this case state or show that you were not terminated as counsel for Mr. Fields until November 15th, 2005, when you were appointed back in July of 2003, so over two years later, do you know why that would

be?

A.    I never withdrew from the case if that's what you're asking.

Q.    Right.

A.    And I still get things from the 90s.  When it shows up on electronic filing, I'll get a random filing in a new case -- in an old case, so ... I don't know how that works with the clerk's office when they decide to extinguish me.

Q.    Okay.  Between your initial appearance, on July 21st, 2003, and then when the Court terminated your involvement on November 15th, 2005, is it fair to say that your involvement in Mr. Fields's case was limited to the four pretrial proceedings that we discussed and signing documents as we discussed?

A.    You found more involvement in the case than I recall having, so I have to assume you found everything, but I don't remember anything else.

Q.    Okay.

        MR. LABOVITZ:  No further questions, Your Honor.

        THE COURT:  Okay.  Any cross-examination?

                CROSS-EXAMINATION

BY MR. WILSON:

Q.    Mr. Abel, counsel provided you a declaration they asked you to sign; is that correct?

A.    He did.

Q.    And you signed that; correct?

A.    I did.

Q.    You didn't draft it yourself, did you?

A.    I did not.

Q.    And you and I had an opportunity to talk about it recently; correct?

A.    Yes, we did.

Q.    And not everything in that declaration was accurate, was it?

A.    Not totally, and it was not in -- I think we talked -- a lot about the fact it wasn't necessarily in my wording or how I would have said things.

Q.    Fair enough.

A.    The general tenor was fairly accurate.

Q.    You weren't asked to do a docket search yourself and find any documents that you signed; correct?

A.    That's correct.

Q.    You weren't asked to do an examination of all the transcripts to see where you appear; correct?

A.    That's correct.

Q.    Counsel just provided you some documents and asked what your involvement was on each one of those; correct?

A.    Well, yes.  I mean, he talked to me over the telephone, I want to say, two or three times, and he sent me that document probably a year ago, and I didn't sign it

initially because I didn't write it.  So -- I mean, I signed it eventually because I thought there was a possibility I wouldn't have to sit here and do this if I did.

Q.    But it wasn't accurate; correct?

A.    You take your best shot.  I thought that that might be good enough.

Q.    All right.  You mentioned the fact that from time to time, you might have discussion with Julie or with Rob Ridenour or Paul about cases they're involved in; correct?

A.    That's correct.

Q.    Just at the office?

A.    Uh-huh.

Q.    But not getting into substantive discussion about the case; correct?

A.    Exactly.

Q.    And would it be uncommon, if one of your colleagues was frustrated about a case, to maybe spout off in the office about what was frustrating them about the case?

A.    I would probably be the one most likely to do that, but, yeah, that stuff happened.

Q.    All right.  Do you recall if Ms. O'Connell ever expressed any frustration about a gentleman by the name of Michael Gelbort?

A.    Michael Gilbert?

Q.    Gelbort, G-E-L-B-O-R-T.

A.    That name doesn't sound familiar.  I don't remember anything.

Q.    Okay.  So you don't recall if she expressed any frustration about her expert, Michael -- Dr. Michael Gelbort?

A.    No, and I wouldn't have known he was an expert, except your question implies that.

Q.    Fair enough.  We're talking about something that would have taken place 22 years ago; right?

A.    That's about right.

Q.    And I think I know the answer to this, but you don't remember what happened every moment of every day --

A.    No.

Q.    -- in the last 22 years; correct?

A.    The little I remember about the case was because it was a death penalty case, and that was unique.  But beyond that, no, I wouldn't remember details that long.

Q.    And so if there were discussions in the office that weren't -- they may have happened, but you don't recall any discussions; correct?

A.    I'm sure there are, but I don't recall, and they were probably not something that would be important to anybody.  They're just casual things.  There were never any high-level discussions in the form of strategy discussions that I was involved in, in the case.

MR. WILSON:  May I have a moment, Your Honor?

THE COURT:  You may.

Q.   (By Mr. Wilson)  Mr. Abel, you've worked -- you've worked with Julie O'Connell for how long?

A.   Julie was in the Federal Defender's Office before I came to the Federal Defender's Office.  And I can't remember if she left just before I got there or after, but then when Mr. Brunton became the federal defender, she came back to the Federal Defender's Office, and I don't honestly remember what year Mr. Brunton became the defender, but most of the time I worked with her would have been after he was there.

Q.   Did you ever try any cases with her?

A.   No.

Q.   Would she ever sit second counsel or second chair with any of the cases that you were handling?

A.   I never had second chair counsel at any trial --

Q.   Okay.

A.   -- that I can recall.  Now, I did have panel attorneys sit with me.  I take that back.  I did have panel attorneys, who were wanting to get on the CJA Panel, sit to get experience, but, no, no one from the office ever tried one with me that I recall.

Q.   When Paul Brunton was the chief federal defender, what was the -- as far as the supervisory hierarchy, did he have a chief assistant?

**United States District Court**
**Eastern District of Oklahoma**

A.    I think the consensus was our office didn't have a large enough caseload to have, like, a first assistant title.  We didn't have a -- what's the -- senior litigator, I believe, or something.  There are those titles that -- those positions that are either statutory or whatever.

Q.    For larger offices?

A.    Yeah.  And we didn't have any of that stuff that I know of.  The distinction would have been Mr. Derryberry was a research and writing specialist as opposed to assistant, and that was the only distinction between the defender, the assistant, and then the research writing specialists.

Q.    And did Mr. Derryberry ever assist you in trial?

A.    Not at all.  He helped on motions and stuff.  He was a -- legal researcher was his forte, and he was helpful.  He was always willing to help if I had questions that he might have insight to.

Q.    But in this particular case, although you testified that you came in and did sit in -- you recall maybe sitting in, just watching; right?

A.    Right.

Q.    And do you recall seeing Mr. Derryberry at counsel table?

A.    No, I don't.

Q.    Suffice it to say, Mr. Abel, that your involvement in this case was simply signing some documents; correct?

A.    Right.

Q.    You appeared for the initial appearance?

A.    Right.

Q.    Because Mr. Fields was originally charged by way of a complaint --

A.    Okay.

Q.    -- so he would have had an initial appearance and a detention hearing; right?

A.    Okay.  Yeah, I didn't remember the complaint, but, yes, I appeared for the complaint.  I think by the time he was indicted, I was probably out of the case, I'd guess, but I don't know for certain.

Q.    So there was a complaint, and so there would have been an initial appearance and a preliminary hearing and a detention hearing; correct?

A.    Right.

Q.    Which I believe was -- the subpoena request was for Ms. Lamb to appear for the detention hearing; correct?

A.    I believe so, if the date was correct as I saw.

Q.    But as far as being involved in trial strategy, witness determination of who was going to be called, you weren't involved in that in any way?

A.    No.

Q.    And is that unusual for a case of that magnitude, for you not to have been called in to be involved in those

discussions?

A.    Probably the unusual part was a case of that magnitude in the sense that it was a death penalty case, but I don't remember ever being involved in one of Ms. O'Connell's other cases that was going to trial in any way any differently. And I don't ever recall her handling another case in the Eastern District where I would have signed documents for her, but I -- they may be out there.  I just don't remember them.

Q.    And if Ms. O'Connell would have asked you, "Mike, can you come in and help me with this," you would help her; right?

A.    Well, I -- you know, there were cases that Paul Brunton handled up till pretrial, and then I tried the case. So, you know, that stuff happened.  I don't recall it with Julie O'Connell, but, yeah, I would help in other cases.  I tried cases in the Northern District that I didn't handle all the way through like that because they wanted somebody to try it.

Q.    Okay.

        MR. WILSON:  Can I have just a moment, Your Honor?

        THE COURT:  You may.

Q.    (By Mr. Wilson)  I have no further questions.  Thank you, Mr. Abel.

        THE COURT:  Any redirect?

MR. LABOVITZ:  One moment, Your Honor.

REDIRECT EXAMINATION

BY MR. LABOVITZ:

Q.   I just want to clarify one area that you were asked on cross-examination, Mr. Abel.  You said that your declaration, which is Exhibit 265, in Binder 9, is not -- I believe you used the words "totally accurate"?

A.   165?

Q.   It's Binder 9, document -- I'm sorry -- Defense Exhibit 265.

A.   Right.  Okay.

Q.   Do you see that?

A.   I said it wasn't totally accurate, yes, that's correct.

Q.   And what part of the declaration is inaccurate?

A.   Paragraph 3 says the only attorneys in the office were me, Barry Derryberry, and Julie O'Connell, and it did not list Paul Brunton.  I didn't see that as a significant distinction, but that's why I said it wasn't exactly accurate.

Q.   Any other inaccuracies in your declaration, Mr. Abel?

A.   If you give me a moment, let me -- because there were several things that I would say were semantically, it wouldn't have been the way I would have said it, but it wasn't, I wouldn't say, intentionally inaccurate.

Paragraph 1 appears accurate and paragraph 2.

Paragraph 3, in addition to the omission of Paul Brunton, the last sentence would indicate that I would stand in for attorneys from the Northern District who had a case in the Eastern District.  I don't remember that specifically except for this case.  I mean, it was a -- this is the one case I recall somebody else handling the case in the Eastern District.

Paragraph 4 seems accurate.

Paragraph 7, again, it says I routinely stood in for colleagues, and that would not be something that routinely happened, but it would on occasion.  So that's more of a semantic difference, and I don't have any quibble with the quote that's in there.

Paragraph 12 as, I think, mentioned in my cross-examination, I didn't really search these and make the list.  I just relied on your providing this information in it.

Q.   You're referring to the first line --

A.   Yes, sir.

Q.   -- "The court appearances and pleadings" --

A.   Yes, sir.

Q.   -- "I have listed above were the extent of my involvement."

A.   Right.  And I don't remember you telling me that I was

terminated, but I don't doubt that you did.  And my involvement would be whatever is in the record, and if you found everything that's in the record, then that would be correct in that last paragraph.

Q.    When I sent you this declaration for your review, did I tell you that you, you know, should take a look at it and let me know if you had any changes?

A.    Right.

Q.    And did you ask me to make any changes?

A.    No, I didn't.  I just ignored it to begin with.

Q.    I'm sorry?

A.    I just ignored it and didn't sign it to begin with, and then we had another conversation later and ...

Q.    The version that you signed on September 17th, 2024, that's Defendant's Exhibit 265, you said that any inaccuracies you -- I'm sorry -- you called them semantic or semantics?

A.    I think for the most part.

Q.    Okay.

A.    I don't think there was any intentional misrepresentations in there.  I think Paul Brunton's name is probably the largest omission, if you will.  And the other things were semantic, and it wouldn't have been the way I might have said it, but I think it may have been a fair understanding of our conversations by you, and I thought

that -- I didn't think it was a gross misrepresentation of my position.

Q.    Taking this declaration as a whole, did you think that you needed to ask me to make any substantive changes?

A.    No, I didn't.  I didn't think there was anything that was misleading to the issues as I knew them, and I don't really know the issues, but I didn't think it would skew the matter.

Q.    And finally, Mr. Wilson asked you a question.  If Ms. O'Connell had asked you for help, would you have helped her?  And you said yes; right?

A.    Well, yes, I would have.

Q.    Okay.  Did Ms. O'Connell ever ask you for any help on Mr. Fields's trial?

A.    No.

Q.    Thank you.

A.    Not a -- let me qualify that by not other than what you found in the record there that you reminded me of, the signing and filing things for her.

Q.    Yeah.  On substantive matters, did Ms. O'Connell --

A.    Right.

Q.    -- ask you for any help on Mr. Fields's trial?

A.    No.

          THE COURT:  Anything, Mr. Wilson?  Please make it short.  Our poor court reporter needs a rest.

MR. WILSON:  Thank you.

RECROSS-EXAMINATION

BY MR. WILSON:

Q.    All right.  Just very quickly.  On the declaration, on paragraph 6, I believe there are discussion --

A.    I've got it in front of me.

Q.    Okay.  Good.  Because I can't remember the number. Sorry.

A.    265.

THE COURT:  265.

Q.    (By Mr. Wilson)  265.  There was a reference in paragraph 6 about why the hearing didn't take place that day; is that correct?

A.    That's correct.

Q.    And --

A.    After it says she handled the substance of it, and it characterized why it didn't happen.

Q.    Did you know why the hearing didn't take place that day?

A.    That may be two questions in the sense that I was in court and I heard what was said about why, whatever the record reflects, but as far as her thinking or strategy behind why she made the announcement, she probably told me before she made the announcement what it was going to be, but that would have been the extent of it.  The logic behind

her announcement I don't know anything about.

Q.    Okay.  And I know this is just obviously, I would assume, a typographical error, but on paragraph 7, the status hearing didn't take place on February the 20th of 2024, did it?

A.    No.  That was one of the other things you mentioned to me when I talked to you about it.

Q.    Okay.

A.    The date was wrong.

Q.    And then in paragraph 9, when it says "These four -- these four brief pretrial proceedings were my only court appearances in Mr. Fields's case," that was based upon what Mr. Labovitz provided you; correct?  You didn't have any independent recollection?

A.    Well, that -- yes.  When I mentioned that assuming you caught everything, that would have been everything I -- because he caught more than I remembered independently.

Q.    Okay.

        MR. WILSON:  That's all I have, Your Honor.  Thank you.

        THE COURT:  All right.

     All right.  Mr. Abel, thank you.  You are dismissed and may be excused.

        THE WITNESS:  Thank you, Judge.

        THE COURT:  All right.  We're going to take our

belated afternoon break, but before we do, Mr. Labovitz, I know 265 was one of the exhibits not preadmitted. We've obviously been discussing it and having a witness examined on it. Do you wish to seek its admission?

MR. LABOVITZ: I think in light of the allegations of inaccuracies, Your Honor, we would move for its admission.

THE COURT: That makes everything easier. Thank you.

All right. Very well. We will take a break. We will come back --

MR. LABOVITZ: I do move for its admission.

THE COURT: Oh, you do?

MR. LABOVITZ: I'm sorry. What did I say?

THE COURT: I thought you said with its inaccuracies, you weren't going to.

MR. LABOVITZ: No, no. I say given these allegations of inaccuracies, we would move for its admission so that we can compare it to what the testimony was.

THE COURT: Okay. Mr. Wilson, do you have an objection to the admission of Defendant's 265?

MR. WILSON: Based upon what the testimony has been, no, Your Honor.

THE COURT: Okay. All right. 265 will be admitted then. And we will come back at 4:05 and see --

who's your next witness?

MR. LABOVITZ:  Barry Derryberry.

THE COURT:  Derryberry.  Okay.  I know we have listed an hour and a half for him.  Is that still likely?

MR. LABOVITZ:  I'll defer to Ms. Nelson-Major.

MS. NELSON-MAJOR:  That was the estimate for the direct examination.  I am not sure how long the government is anticipating questioning.

THE COURT:  Well, do you still anticipate an hour and a half of direct?

MS. NELSON-MAJOR:  I think within an hour and a half.

THE COURT:  Are you satisfied if we come back -- well, maybe we should come back at four, and that will take us to 5:30 today.  Is that agreeable with everyone if we do that? Assuming you do it in an hour and a half.  I'm not holding your feet to the fire, but then we can return for cross.

Do you think you'll have much cross-examination on Mr. Barry Derryberry?

MR. WILSON:  I don't anticipate a lot, Your Honor, no.

THE COURT:  Well, then we may be able to -- I'd rather not have him have to come back for a short -- all right.  Well, let's try to do that.  We'll come back at

4:00.  All right.  We're in recess.

(Recess taken.)

THE COURT:  We are back on the record.

Are the parties ready to proceed with the next witness?

MS. NELSON-MAJOR:  Yes.

THE COURT:  All right.  The defendant may call its next witness.

MS. NELSON-MAJOR:  All right.  Mr. Fields calls Mr. Barry Derryberry.

THE COURT:  All right.  Mr. Derryberry, if you'll come forward, the clerk will place you under oath.

(Witness sworn.)

THE COURT:  All right.  Mr. Derryberry, if you'll have a seat.  We'll caution you.  You need to sort of lean forward or pull that microphone back as close as you can.  It doesn't pick up very well.

All right.  Do you go by Nelson-Major or just Nelson?

MS. NELSON-MAJOR:  I know it's confusing.  Nelson-Major.

THE COURT:  All right.  Ms. Nelson-Major, you may begin your examination.

MS. NELSON-MAJOR:  Thank you.  I'm just going to let Mr. Derryberry get situated.

BARRY DERRYBERRY,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. NELSON-MAJOR:

Q.    Good afternoon, Mr. Derryberry.  Would you please state and spell your name for the record, please?

A.    Yes.  My name is -- my legal name is Barron, but I go by Barry.  Last name Derryberry, spelled D-E-R-R-Y-B-E-R-R-Y.

Q.    And what is your education background?

A.    Before law school or as of law school?

Q.    Let's start with law school.

A.    Okay.  Juris Doctor, University of Tulsa, awarded in 1988.  That's the extent of my degrees past a four-year degree.

Q.    And after graduating law school, where were you employed?

A.    The Tulsa County Public Defender's Office.

Q.    And what years were you employed at the Tulsa County Public Defender's Office?

A.    Was employed beginning June of 1988 as an intern, and then in March of 1989, as an assistant public defender.  And then that held until 2001, at which time, then, I was hired at the Federal Public Defender's Office.

Q.    And what type of work did you do at the Tulsa County

Public Defender's Office?

A.    Apart from the first couple of months as an attorney, when I had a trial docket, I spent 12 years as an appellate attorney there.

Q.    And what do you mean by appellate attorney?

A.    So I handled appeals to the Oklahoma Court of Criminal Appeals, briefing, oral argument, from misdemeanors to capital punishment.

Q.    And you mentioned that you had a brief assignment in the trial docket when you were an intern.  After you were a full-time employee at the Tulsa County Public Defender's Office, did you handle any trials?

A.    I was, for that period, assigned to Judge Hopper, Clifford Hopper's docket, and before him, I tried a jury trial and a nonjury trial to him.

Q.    Those were the only two trials?

A.    Yes.

Q.    And during your time at the Tulsa Public Defender's Office, did you work on any capital trial cases?

A.    Both as far as trial work, yes, and appellate work, yes.

Q.    Let's start with the trial work.  Can you explain to the Court what your involvement was in capital trial cases while at the Tulsa County PD Office?

A.    So we had cases where we endeavored to have what we

would call an appeal chair, somebody that is present to try to protect the record for issues and to advise the attorney. So, in that capacity, which is not to be examining witnesses, I participated in a case that -- a death penalty case that the defendant's name was Ronald Fluke, but it ended up being a volunteer death penalty case, and then, quickly, that was an appeal. But also was present throughout the trial in a case against Sterling Williams that did result in the death penalty.

Q. And then those were the two capital cases you worked on during that time period?

A. In trial court, yes.

Q. And you said you were appellate chair for those cases. Did you actually enter your appearance on behalf of those defendants at trial?

A. I -- yeah, I don't want to say -- as we understand it in federal court, you enter an appearance by filing an entry of appearance. And so, no, I don't think I did that, but I did participate as any attorney appearing before the court in those two proceedings.

Q. And you said that your involvement in those two matters was as appellate chair, and I believe you said to protect the record. Can you explain what you meant by that?

A. With the appellate attorney's expertise in understanding the necessities of error preservation, the

mechanics of error preservation, knowing case law perhaps better than the trial attorneys, who are more oriented about factual development.  So it's a matter of being there to provide the expertise, to support the attorneys as they are making objections, identifying objections, to writing proposed instructions, reviewing the court's, you know, draft of instructions, so handling basically all the filings that may occur during the course of trial.

Q.    And of the one case that went to trial, I believe you said it was Mr. Williams' case, did you question any witnesses at that trial?

A.    No.

Q.    Did you have any involvement in making decisions about what evidence would be presented at that trial?

A.    Only at most -- and I say this because I don't have a memory of a specific act, but the role that I was fulfilling was to be present if the attorneys -- let's say, you know, as an example, but a constant practice, at the end of their examination of a witness, they may come over to the table and say, do you have any questions I should ask?  In that very limited sense, that's the extent of my participation in developing evidence.

Q.    But you didn't interview witnesses prior to trial?

A.    No.

Q.    Or work with experts to develop what their opinions

might be presented at trial?

A.    No.

Q.    And who was lead counsel on those two trial counsel cases -- excuse me -- trial capital cases you worked on at the Tulsa County Public Defender's Office?

A.    In the Sterling Williams case that went to verdict, lead counsel was Syd Conway, who was principally responsible for the second stage, the punishment stage, of the trial. The other counsel was Julie O'Connell, who did the first stage, the guilt stage, and so she was lead counsel on first stage, I suppose, is accurate to say, but Syd Conway was in the punishment stage.

Q.    And after leaving the Tulsa County Public Defender's Office, where were you employed?

A.    The Federal Public Defender's Office for the Northern and Eastern Districts of Oklahoma.

Q.    And are you still employed by the Federal Public Defender Office for the Northern and/or Eastern District of Oklahoma?

A.    Yes.  Post-split of those two offices, that office and the two offices, I remain at the Northern District office.

Q.    And what positions have you held at the -- and I'm going to just generically for our purposes -- Federal Defender Office in Oklahoma?

A.    So I was hired as a research and writing specialist.

At the time of the Ed Fields trial, I held that position, and I can't swear to the year because I've been there 23 years, but I guess about ten years ago, I then was changed to be an assistant federal public defender, and, right now, I am the first assistant.

Q.    And when did you become first assistant?

A.    I would say it was early 2022.

Q.    And were you counsel of record in Mr. Fields's federal capital trial here in Muskogee?

A.    Yes.

Q.    And if the record reflects that you entered your appearance in Mr. Fields's case on July 25th, 2003, do you have any reason to dispute that?

A.    No.  That should have been filed by me.  I would always file that myself.

Q.    And were there other attorneys of record on that matter?

A.    Julie O'Connell was attorney of record.  I know that Michael Abel -- they were both assistant federal public defenders during that two-year period of time from the filing of the case through trial.  And so I know Mike Abel was counsel of record.  The chief public defender -- often, you will find the chief's name on the docket, but that person did not -- I believe it was Paul Brunton at the time -- did not participate in the case.

Q.    And did any attorneys from outside of the Federal Public Defender's Office also enter their appearance on behalf of Mr. Fields?

A.    So our learned counsel provided to us was Isaiah "Skip" Gant, and I never noted his filing of an entry, but he did appear in cases, so he was counsel of record.

Q.    And at the time of Mr. Fields's prosecution, how many other lawyers were employed at the Federal Public Defender's Office?  I know you mentioned a few already.

A.    So there were, at that time, I believe three assistant federal public defenders.  There was the lead public defender and there was me, research and writing specialist. And so Mike Abel was one of the assistants.  So was Julie. The third person may have initially been Jack Schisler.  At some point, Rob Ridenour may have come into our staff and replaced one of those people by the time the trial occurred.

Q.    And throughout the prosecution of Mr. Fields's case, what was your position at the federal defender?

A.    Research and writing specialist.

Q.    And what were your primary duties as a research and writing specialist?

A.    I handled the appeals.  I was principally involved in the appeals and writing the briefs.  I would argue cases in many of those.  Sometimes one of the other attorneys might argue one.  And I would write pretrial motions, motions to

suppress.  I appeared in court at some suppression hearings, usually as a supportive chair or appeal chair, again, if you will, role.  I do remember putting on one hearing I had, 2254, 2255 cases, a smattering, a limited number of those, but I remember a 2254 case within my first year that involved witnesses, and so I was on my own and handled that situation, and did the appeal chair role in a few trials, less than five trials, when I was present for the duration of the trial.

Q.    And when you say there were five trial cases where you served in this appeal chair role, were those all before Mr. Fields's prosecution or just throughout your time?

A.    As I recall, I think they were -- I think they were before.

Q.    And I believe you mentioned that Ms. O'Connell's title was assistant federal defender.  Was there a difference in responsibilities between you as a research and writing specialist and an assistant federal defender at the office?

A.    Yes.  So the research -- and we call it an RWS.  I don't know if I should break into that, but the research writing specialist is a -- the job description is support staff, but it's an attorney position.  But the job description says that an RWS is not to be used in substitution of an assistant federal public defender.  And so following that, it was not our practice to say -- give me

a file and say this is -- tell me this is set for trial, go try this case, or even within the representation of a defendant in one case, for the RWS to examine witnesses. That was not our practice in keeping with the job description.

Q.   And so following up on that, at the time of Mr. Fields's prosecution, were there limitations on what you were permitted to do as a research and writing specialist?

A.   There were limitations that we observed as a matter of course, because that's a routine that our office had, to observe those limitations. And so there was no discussion held about whether I should examine any witnesses because that's not my role at the office, that's not the role I ever took in cases if I was at trial with another attorney.

Q.   And at the time of Mr. Fields's prosecution, how many lawyers in the office handled appeals?

A.   I was the only one that handled appeals.

Q.   And throughout the time that you were working on Mr. Fields's case, was your other appellate workload reduced in any way?

A.   No. I juggled that work, as it were.

Q.   And you mentioned Mr. Gant was also of record on Mr. Fields's behalf. What is your understanding of how Mr. Gant became involved in the trial?

A.   So at the early threshold of the case, he was provided

to us as learned counsel in compliance with the statute that requires that. And so that wasn't done by the time of initial appearance, but shortly after that, I do recall he came to town and we met him, and so he was in that role early on.

Q. And I'm going to ask you to take a look at Exhibit -- Defendant's Exhibit 114. It's in Binder Number 5.

A. I have it.

Q. And do you recognize this document?

A. I don't recall it, so I cannot say I recognize it.

Q. Okay. And the name that appears next to it, sender, Paul Brunton. That's the federal defender at the time of the case?

A. That's right.

Q. And your name, along with Judy Clarke, Michael Abel, and Julia O'Connell appear in the recipient line of the email?

A. That's right.

Q. And can you just take a moment and read the text of the email? It's rather short.

A. And I have read it.

Q. You have read it. Okay. So I know you said you don't recognize this document, but after reading it, do you recall Ms. Clarke having some contact with Mr. Brunton in which you were cc'd about the Fields case?

A.    Would you repeat that?

Q.    That was an unartful question.  Yes, I will repeat that.  After reading this email, does it refresh your recollection as to whether Paul Brunton had contact with Judy Clarke about Mr. Fields's prosecution?

A.    It refreshes me that Judy Clarke had that role of sorting through available learned counsel potential candidates and assigning them.  So I can say it makes sense that he's reaching out to her.  That's as far as anything refreshes for me.  That's how it was set up.

Q.    Okay.  And then I'm going to ask you to turn to the second page of Exhibit 114.

A.    Okay.  I am there.

Q.    And is this -- does this appear to you to be an email that Paul Brunton sent to you, Michael Abel, and Rob Ridenour?

A.    It is apparently an email sent to me and those other two, yes.

Q.    And after you take a moment and review the contents of the email that appears below where Paul Brunton writes "FYI," let me know when you've had a moment to do that.  And I would like to direct you to the second full paragraph.  And I realize the paragraph breaks are a bit oddly laid out on the page, but there's a line between the first block of text and the second block of text starts.  "I'm attaching a

brochure we put together that lets you know of some of the resources available."

A.    Okay.

Q.    And what did you understand "resources available" to refer to?

A.    Well, I believe that that is making available to us brief banks, motion banks, people to talk to, to confer with.

Q.    And those were resources, as you understood it, available to your office through the National Resource Counsel Project?

A.    Yes.

Q.    Okay.  And you can close Binder Number 5.  We're done with Exhibit 114.  And we're going to switch to Volume I of the government's exhibits.  And we're going to take a look at what's been marked as Government Exhibit 35.

A.    Okay.  I have it.

Q.    Okay.  What is this document?

A.    So this is entitled "Federal Defender Organizations and The Federal Death Penalty," an introduction to the resources available to federal defender organizations in the appointment and defense of federal capital cases.

Q.    And if I told you that this Government Exhibit 35 is the brochure that Mr. Brunton forwarded to you from Ms. Clarke, would you have any reason to dispute that?

A.    I wouldn't have reason to dispute it.  That's all I can say about it.

Q.    And a moment ago, you referred to Mr. Gant as learned counsel.  What was your understanding of the role learned counsel serves on a capital trial case?

A.    So my understanding originated from the statute that requires learned counsel in potential death penalty cases, that requires background experience in death penalty litigation, that there must be learned counsel in any such case that might be eligible for the death penalty.  And then that -- I mean, I think that it's intended to comply with ABA standards of representation.

Q.    And only if you know, but were any of the other attorneys within your office qualified to meet that statutory definition for learned counsel.

A.    Mike Abel had never tried any capital case.  I did not qualify, clearly.  Julie had tried two capital cases, but I don't think she had done sentencing stage in either of those, and so I would not consider her qualified as learned counsel.  So -- and there is no one -- Robert Ridenour, if he was -- he apparently was there at that point in time, and I don't think he ever had tried a death penalty case.

Q.    And based on Mr. Gant's role as learned counsel on Mr. Fields's case, what did you expect his involvement to be?

A.     The ABA standards require that --

MR. WILSON:  Your Honor, I object to the relevance of that particular question.  The witness has already testified that his role was simply to be research and writing assistant, and so his opinion as to what Mr. Gant's role was going to be is not --

THE COURT:  Well, I think it goes to the team. Overruled.

A.     The ABA standards back at that time -- I will try to make sure I'm not trying to channel my understanding presently.  But my understanding of the standards for attorney representation are that it's essential for counsel to begin to represent people in the capacity of a death penalty case with a concern about the special needs of a case like that, early on, as soon as possible, to begin the mitigation investigation before you even know what the aggravating circumstances are going to be.  And then throughout every critical step, all the way through the entirety of the litigation.

Q.     And based just on your observations, did Mr. Gant take an active role in pretrial preparations?

A.     I was, I guess, the go-to person in my role as RWS for doing pretrial motions.  It was my job to try to ascertain the motions that we should file.  I certainly dialogued with Julie about that and would have received her input.  She

would have seen everything I planned to do.  That bridge, though, between me and Julie, I did not have that bridge with Skip Gant.  I did not communicate with Skip Gant by emails that I recall.  Skip Gant communicated with Julie.  And I do recall when he had come to town, and we met in person here in Muskogee, that he made some suggestions of motions, although we didn't have discovery, we didn't know much about anything.  I remember him suggesting a grand jury abuse motion, and, you know, some things that were -- you know, a limited set of suggestions that he did make orally.  And he did email some potential motions to Julie.  I believe they went to her, not me, but it could have been cc'd to me too, that I reviewed.

Q.   And did you end up filing a motion related to, I think you said, grand jury abuse?

A.   I don't think we did.

Q.   Do you know why not?

A.   We were mystified.  We thought it didn't make any sense.  And so we asked -- we determined very early on that there was not a ground for a motion like that.

Q.   Okay.  And so when talking about your time at the Tulsa County Public Defender's Office, you testified that you served as appellate chair on those two capital cases. Was that role that you played in those two state capital cases similar to the role you played on Mr. Fields's trial

team?

A.    Yes.

Q.    Okay.  And can you explain for the Court what your role was, in fact, on Mr. Fields's trial team?

A.    To provide advice regarding legal points, legal authorities, grounds for objections, points of -- points in which one should object, writing notes and passing notes among the attorneys, monitoring the evidence as it progressed, to be thinking about potential jury instructions, to be ready to submit written proposed jury instructions.  Probably -- assuredly, writing -- writing proposed jury instructions along the way.  You know, after the trial is over at the end of the day, going back to the office and, after trial, somewhat in this case, and filing motions.  I recall there was one regarding a jury, then a for-cause excusal issue that I remember going back to the office, when everyone else went back to the rental place where we were staying, and writing a motion that I filed the next morning.  So there was a -- there was an extent of my -- my ability to go and write a motion, which was my forte, as a research writing specialist.

Q.    And I believe you said one of your roles was to make suggestions for objecting.  Did you actually make those objections on the record yourself?

A.    Witness -- I did not make witness objections that I

recall.  I do recall making objections at the -- at the phase of closing arguments by the government, I recall making a record then.

Q.    And why did you not make objections during witness arguments?

A.    That would not have been the ordinary role of an RWS to -- you know, in those days, at that time.  We did keep pretty close to the bone on not having an RWS assume the role of the trial lawyer, and so that's -- that's the background policy behind that.

Q.    And at some point during the course of pretrial preparations, did you and Ms. O'Connell ever discuss your role on Mr. Fields's case being limited to that of appellate chair, as you've described it?

A.    I do not recall a discussion.  The fact that I was there demonstrates that there was communication regarding me being there and participating.  But, of course, I was present at that very early meeting with Skip Gant, so it was clearly understood.  There had to be obviously communication to line me up as -- and you see from the email we just looked at, I was identified by Paul Brunton as somebody that would be one of the attorneys in the case.

Q.    And I want to be more specific with that question.  Did you discuss with Ms. O'Connell the limited nature of your appearance in the matter?

A.    I don't recall discussing it with her, so I can't answer yes or no without that recollection.

Q.    I appreciate that.  And, similarly, did you ever have a conversation with Mr. Gant about the limited nature of your involvement in Mr. Fields's team?

A.    I very much -- I strongly doubt that I would have had that conversation with him because it -- it's just outside what he needed to know.

Q.    And are you aware that Ms. O'Connell had conversations with other members or -- of the National Resource Counsel Project, besides Mr. Gant, about Mr. Fields's case?

A.    I have very, very misty memories.  That is my understanding what you just described, but I do not have -- I just remember her using me as a sounding board on things like that as we would go through, and she would say, oh, I just talked to so and so and told them X and -- you know, I have definite memories of her informing me or updating me about many of those developments, but it was not something that she and I jointly were -- were doing together.

Q.    Did you read the discovery that the government provided to Ms. O'Connell?

A.    No.

Q.    Why not?

A.    Because that was not relevant to my role in the case, and it's -- as I alluded to juggling things before, I had a

very robust load of appeals, and so I didn't have the time to read all of that, but also I was not involved in developing witnesses, interviewing witnesses, preparing witnesses, questioning witnesses, all those various things that you do.  That was not my role in the case, so, therefore, I did not need to read all of the discovery, but that doesn't mean that I'm saying I did not read any of it.

Q.    And are you aware at some point that Ms. O'Connell and Mr. Gant attended a meeting in Washington, D.C., to discuss the authorization of the case as a death penalty matter?

A.    Yes.

Q.    Were you present for that meeting?

A.    No, I did not go to Washington, D.C.

Q.    And prior to that meeting, did you participate in any conversations with either Ms. O'Connell or Mr. Gant about what they intended to present at that meeting?

A.    I think I'd read a draft of what was going to be said to that committee.  I think I recall reading a draft of it. I did not have any discussion with Skip Gant.  Skip Gant was not in town to prepare for that here in -- in Tulsa, we were principally working and preparing for the case, that I recall, so I didn't see him in that period of time.

Q.    And do you recall providing substantive feedback on that draft after you read it?

A.    I do not recall providing feedback.  You know, I can

only characterize what I might have done, which, of course, is not my personal knowledge.

Q.   And after Mr. Fields's prosecution was authorized as a capital case, do you know whether Ms. O'Connell or Mr. Gant made additional efforts to settle the case for a life sentence?

A.   Julie absolutely made efforts to settle the case in communications with Sheldon, aka Shelly, Sperling, and -- the answer is yes to that.

Q.   And were you involved in those negotiations with Mr. Sperling?

A.   I was not involved.  Again, I was a -- I recall being a sounding board, and I remember Julie expressing some, I guess, angst about revealing our mitigating circumstances to the prosecution.  And I understood that Shelly was saying, look, I'm in good faith here, I'm a good faith actor.  I'm not going to just listen to your mitigation without any open mind; I will have an open mind to consider it, and, perhaps, reverse the position we have on pursuing the death penalty. And so there were, I think, multiple times that Julie and I discussed that matter.

Q.   And did you help Ms. O'Connell decide which mitigating circumstances to address in that letter?

A.   No, I did not have -- that I recall, do not -- I do not recall having input into just what should be revealed.

That is not to say that I wouldn't have contributed my thoughts about, you know, how far to go, maybe not everything should be revealed, etcetera, so ... but I don't have a definite recollection about what I would have said.

Q.    And at any point, did you talk to Mr. Fields about his decision to plead guilty in this matter?

A.    No.

Q.    And did you have any discussions with Ms. O'Connell or Mr. Gant about Mr. Fields's decision to plead guilty?

A.    I did not have any discussions with Mr. Gant about that, that I recall.  I had a discussion, at least one discussion, with Julie.  Again, that was informational.  I recall her informing me that that's what she planned to do. I do recall being in the know about it before we went to court and did it.  I don't even -- I don't think I went to court at that time.  I was not present when it occurred.

Q.    Did you have any substantive conversations with Mr. Fields at any point in time?

A.    Pretrial, I did not go and meet with him in jail. Julie would have been the one to do that, and Skip Gant did to some extent, a lesser extent.  I did not go have contact with him in jail.  During trial, I did communicate with him, but I don't think I was sitting next to him.  In other words, it was not in depth.  We did not discuss issues and substantive matters.

Q.    And at any point prior to the trial, were you involved in discussions with Mr. Gant and/or Ms. O'Connell about potential mitigation strategy or themes?

A.    No discussions with Mr. Gant on my part; with Julie, again, on an informational basis.  She would inform me as things progressed about her experts, but I was not an equal partner in making those -- making the decisions that were ultimately made.

Q.    And why weren't you an equal partner in those decisions?

A.    Julie would be the one that has the answer about why she didn't say, hey, get with me on this, let's decide X, and then we would hash it out at length and decide X.  And so I don't know the answer as to why.  I remember reading one of the reports by one of the experts.  I remember I was present when she had a visit with Dr. George Wood [sic].  I think those events occurred because Julie asked me, would you read this?  Would you -- you know, I think with George Wood, I think it was if you want to be here, you can come in here and listen, but I didn't ask George Wood any questions. I did not participate as a co-counsel in those events that I just described.

Q.    Was a mitigation specialist retained to work on Mr. Fields's case?

A.    Yes.

Q.    And do you recall what that person's name was?

A.    I think that was Glori Shettles, I think is that one, if I recall right.

Q.    And did you have any discussions with anyone on the team about which witnesses Ms. Shettles should interview?

A.    No, don't have -- I don't have any recollection about that.

Q.    And did you participate in any discussions about what Ms. Shettles should discuss with the witnesses that she intended to interview?

A.    I don't -- I don't recall discussing that, but I think it's because I was not there.

Q.    When you mean you were not there, can you explain?

A.    Well, because I don't want to give an impression that I was there.  I just don't recall what was said, okay?  So I was not involved in those discussions.

Q.    And after Ms. Shettles did, in fact, interview witnesses, did you participate in any discussions about what she had learned?

A.    I don't have a memory of that.  I could have been present when some of that was discussed or when Julie may have been discussing what was learned by Glori.  There were -- you know, I scarcely recall Glori being present in our Tulsa office, and what she may have said, I don't recall.

Q.    And did you review any interview notes or memoranda

223

that Ms. Shettles prepared?

A.    Not to my recollection.

Q.    And did you personally meet with any witnesses prior to trial?

A.    I did not.

Q.    And why not?

A.    Because that was not my role.  That was the trial attorney's role.

Q.    And did you participate in any discussions about which records Ms. Shettles should collect?

A.    Not that I recall.

Q.    And do you recall reviewing any of the social history records that Ms. Shettles did collect?

A.    I don't -- no, I do not recall reviewing that.  I cannot reconstruct what records I reviewed before trial.  So there are possible records that I did read.  And I had an eye toward mitigation.  I wrote the proposed instruction for the defense enumerating the mitigating circumstances.  And so early on, I had an eye to what I wanted to populate that instruction with.

Q.    And a moment ago, you testified that you were not involved in deciding what mitigating factors would be pursued.  If you weren't involved in those discussions, how did you know what to include in that document?

A.    I would have been monitoring whatever I heard about

mitigating circumstances that are being developed. Obviously, the critical concern is what is developed at trial through testimony.  It has to obviously be trial-evidence supported.  But I would have had an open ear to anything about mitigating circumstances because that is directly my wheelhouse, so to speak, or within my direct concern as an RWS on the case.

Q.    And when you say you had an open ear towards that, does that mean you were listening to what Ms. O'Connell and/or Mr. Gant were telling you were the mitigating circumstances?

A.    I would have been very attuned is what I'm trying to say.  I cannot recall specific statements.  I'm just saying that that was part of my role.  It wasn't developing questioning or testimony by a witness, and so I was not vigilant about monitoring those things, but I would have been vigilant about what is the mitigation that is being developed in this case, so I can be thinking through how it could be supported through the proposed instructions.

Q.    And are you aware that Ms. Shettles prepared a summary of her investigation in the form of an assessment?

A.    Now you mention it, I think I do remember that.  Maybe I'm suggestive, but I think I remember there being a report by her, basically.

Q.    And I'm going to ask you to take a look at Defendant's

Exhibit Number 3.  It's in Binder Number 1.

A.    Okay.  I have it.

Q.    And do you recall seeing this document at any point during the course of your representation of Mr. Fields?

A.    I don't recall one way or the other whether I saw this.  I just do recall that she had compiled a report.

Q.    And you can close that binder if you don't want to juggle it.  I'd like to shift gears and ask you some questions about the experts that worked on this case.  Do you recall having conversations with Mr. Gant or Ms. O'Connell about which types of experts would be retained to work on Mr. Fields's case?

A.    I recall no conversations with Mr. Gant.  With Ms. O'Connell, again, I believe that I received information from her about what she was planning to do, a sounding board type of role, where she might say, well, I'm thinking about doing this or I'm thinking about doing that, and those were not matters, though, where I had read all the information and was prepared to join in making decisions.  I was just -- I was there every day, and so she talked to me and as things progressed on these various issues.

Q.    And are you aware that at some point in time, Ms. O'Connell decided to retain mental health experts in this matter?

A.    Yes.

Q.    And were you involved in deciding what specialty or credentials those mental health experts should have?

A.    I feel certain I was not involved in those decisions.

Q.    And do you recall who was hired to provide expert services in Mr. Fields's case?  The names of the experts?

A.    There was George Woods, who I mentioned already; a Dr. Gelbort, and Grinage.  I don't know if I'm pronouncing his name right.

THE WITNESS:  I'm sorry, court reporter.

THE COURT:  We've had trouble with that one all day.

MS. NELSON-MAJOR:  Yes.

Q.    (By Ms. Nelson-Major)  Did you have any role in selecting those three particular experts?

A.    I did not.

Q.    And were you involved in making any decisions about what those experts should focus on?

A.    So to the extent of it's likely in some of these areas that Julie shared with me what her thinking was, but we didn't make joint decisions.  I was not part of the decision-making, I guess, formulation of a decision, as to those things.  I would be a sounding board, and I'd say, well, sounds like this or it sounds like that, you know, but nothing you would want to take to the bank at the superficial level of my involvement and familiarity with the

fine points as to all those issues in the reports.

Q.   And did that also extend to decision-making around -- about what tests the doctors would administer?

A.   I would say I was not involved in that.  I may have heard about that, usually after it was done and what results might have been.

Q.   And did you provide any input as to what should or should not be included in the reports that those experts authored?

A.   I would not have been involved in that.  I know I was not.

Q.   Do you recall reading -- and I think you mentioned you recalled reading one expert report during the course of your involvement in the case.  Is that accurate?

A.   At least one.  Possibly, I read all of them.  I just cannot recall.

Q.   And so do you also -- and it's fine if you don't recall.  Do you recall providing any feedback or suggestions in response to the reports that you did read?

A.   I don't recall providing any feedback to the other two attorneys regarding those reports.

Q.   And prior to trial beginning, did you participate in any meetings with Dr. Woods?

A.   I was present for a meeting with Julie and Dr. Woods. My interaction with -- I don't know if I want to say I met

with him because we just exchanged pleasantries.  I didn't have any questions for him.  It was Julie that was talking to him about what he had found, and where do we go from here?  That was her and him discussing that.

Q.    And so you didn't provide any input as to either question, what he had found or where you should be going?

A.    Right.  Yeah, I was not prepared to go into that meeting to provide input.  I was just sort of a -- more of a fly-on-the-wall presence.

Q.    And what about Dr. Grinage?  Do you recall meeting with him prior to trial?

A.    I don't recall meeting with him prior to trial.

Q.    And what about Dr. Gelbort?

A.    Yeah, I don't recall ever seeing Dr. Gelbort.

Q.    Did you help Ms. O'Connell prepare Dr. Grinage's testimony?

A.    No.

Q.    What about Dr. Woods?

A.    No.

Q.    Why not?

A.    She didn't request me to do that.  I think that her role as a trial attorney encompassed her being the one to prepare those witnesses.  And so beyond that, she's the one that can say why she didn't ask me.  You know, we're all looking at -- we're all doing different things, various

things, and many times an attorney is like, "I can handle this, I'll do this myself."

Q. Prior to trial, did you participate in any conversations about the possibility of obtaining an MRI or other imaging of Mr. Fields's brain?

A. I don't recall discussions with Julie about that. She may have, again, bounced things off of me regarding that. That's a possibility.

Q. But you don't recall whether, in fact, she did bounce ideas about the possibility of obtaining an MRI or imaging off of you?

A. So I did not recall that occurring.

Q. And, again, prior to trial, did you participate in any conversations about whether or not to present evidence of Mr. Fields's brain damage to the jury?

A. I don't recall discussions about presenting brain damage evidence one way or the other, or substantively what that evidence might consist of. I don't have any recollection of being in conversations about those matters.

Q. And one more expert about -- one more question about the experts. Do you recall at any point in time discussing Dr. Gelbort's findings with Ms. O'Connell or Mr. Gant?

A. The answer is certainly no as to Mr. Gant. I recall Julie being stirred up. Gelbort was controversial with her, and so I recall her talking to me about that, but I cannot

recall the substance of what she said.

Q.    And when you say "stirred up," was she stirred up about the substance of his findings or some other matter?

A.    I believe it was the substance of his findings. Beyond that, I don't know.  I cannot recall at this point any more specifics about that.

Q.    I'm going to ask you to turn to Binder Number 7, Exhibit 152.

A.    I have it.

Q.    And do you recognize this document?

A.    Yes, I recognize this document.

Q.    And what is it?

A.    It's the verdict form.

Q.    And I'm going to ask you to turn to page 5.  And I will direct your attention to the heading B, which is titled "Mitigating Factors."

A.    Yes.

Q.    And then if you could flip through the next couple of pages, the list goes up to Number 22.

A.    Okay.

Q.    Did you provide the Court with a written list of the mitigating factors that are identified in this section?

A.    Yes.  This is one of the proposed instructions that I submitted.

Q.    And did you make the decision about which factors were

231

listed on the verdict form under "Mitigating Factors"?

A.    I made a draft of the factors, and then I reviewed them with Julie.  And from there, I could not tell you what was added.  Probably none were taken away.  But Julie and I did make the decision together.

Q.    And you can close that binder.  Did you participate in any discussions about which witnesses should testify at the penalty phase?

A.    Not that I recall.

Q.    And did you help identify and select the witnesses that were, in fact, called at the penalty phase?

A.    I did not identify and select on my own behalf that, no.

Q.    And did you participate in any discussions about what those witnesses would testify to when called?

A.    I don't recall doing so, but it wouldn't surprise me if I was involved in those discussions.

Q.    But at this point in time, you don't have a memory of any particular conversations you had about lay witness testimony?

A.    And you're talking about at the time of trial?

Q.    Yes.

A.    Yeah.  All I can say, we were all living in a mansion.  We were living together.  So things were being discussed openly and freely.  So any manner of things could have been

discussed, but I'm unable to supply specific discussions and what I participated in.

Q.   And when you say we were all living together in a mansion, who was we?

A.   Skip Gant; the jury selection expert, Beth -- I don't recall her last name, but she stayed on through the duration of trial -- myself, and Julie.  I think it was just the four of us, as I recall, rented an old mansion here in town.

Q.   And do you recall whether Ms. Shettles was also present at the mansion?

A.   I think she -- yeah, I can't -- I can't recall her being there.  I wouldn't be surprised if it turned out that she was there.  I don't -- I don't recall her living there with us.

Q.   Did you participate in any conversations about the possibility of having Ms. Shettles testify at the penalty phase to describe what she had learned about Mr. Fields's life history?

MR. WILSON:  Objection, Your Honor.  It goes to our previous motion in limine.  It's not relevant to this determination.

THE COURT:  All right.  I'm going to allow a little bit here to see where we go.  Overruled.

A.   I don't have any recollection of that.

Q.   (By Ms. Nelson-Major)  And were you involved in

233

deciding which experts would be called to testify at the penalty phase?

A.    I may have over -- it's reasonable that I heard or was told things by Julie that bear on what you just asked.  So involved -- I'm not sure what to do with the question involved, right.  I did not join in making decisions as to that.

Q.    And did you help make decisions about which topics or issues the experts would address when they were testifying?

A.    No, I did not.

Q.    And if you recall, before trial started, did Ms. O'Connell tell you which experts she intended to call at trial?

A.    I don't recall specifically that she did that, but I was likely in the know about those plans.

Q.    And prior to trial commencing, was it your understanding that Dr. Gelbort was going to be called to testify at the penalty phase?

A.    I don't recall.  I don't recall that.  I recall early, before trial, that there was a possibility that he was going to testify, and then we have information that he's not available, and so it didn't happen.  So I don't know for sure that he was going to testify or what he was going to do.  I don't -- I don't know.  I mean, I was not privy to communications between Julie and him and what she had him

prepared to do.  I don't know what the answer to that is.

Q.    And only if you can recall, do you have a memory of when you first learned that Dr. Gelbort was unavailable, as you said?

A.    Would you repeat that, please?

Q.    Do you recall when you first learned that Dr. Gelbort was unavailable to testify, as you put it?

A.    Well, he was unavailable to be here.  He was -- I mean, he was coming and making a trip to be at court at the time of the trial, is what I recall that we expected from him.  And then there was some transportation problem, logistical problem that he couldn't be here, and so, then, therefore, he wasn't here.

Q.    And during trial itself, what was your role?

A.    A substantive role as far as assisting with objections, motions, proposed instructions; a supportive role as to advising the attorneys in the work that was their primary concern.

Q.    And were you present in the courtroom during trial?

A.    Yes.

Q.    And were there times that you left the courtroom while proceedings were ongoing?

A.    I recall one time that I think I was not present when the trial commenced.  It might have been -- I want to think it could have been during the jury selection phase.  And I

wasn't present, I believe because I was at our office in the bank building across the street from here writing a motion that I was trying to file. I think it was regarding a juror challenge, and so I was trying to get that typed so I could physically file it. We didn't have CM-ECF in those days.

Q.    And what was Mr. Gant's role during jury selection?

A.    Mr. Gant's role was to handle the jury selection, and we had the expert on jury selection that was present. He had worked with her before in previous cases, and so they had a close relationship. They had a good rapport. And so that was his role, but even though he handled all of the questioning at the initial few days of jury selection, we would go back to the mansion and sit and we would kind of take a little time off, but then we'd collect together at a certain time in the sunroom, and all four of us would go through all the jurors that we saw that day, or venire members, and rank them or rate them and vote on who to keep and who not to keep. So we did all actually participate in that way at that juncture.

Q.    And after jury selection, what did you observe Mr. Gant's role to be at trial?

A.    No role at trial. He just wrote in his -- wrote in his big, black journal constantly and was very quiet, and so he didn't have any observable role in trial.

Q.    And did that surprise you?

A.    Yes.

Q.    And why was that surprising to you?

A.    Because he -- well, he was -- he was one of the trial attorneys, and, as well, he is learned counsel.  And so he would --  I mean, we, you know -- there were many capital trials that he talked of having the experience and trying in the past, and so I thought it was natural for him to have a very active role in the evidence phase of trial.  I thought that Julie and he would be co-counsel in the evidence phase of trial.

Q.    I want to ask you some questions about what you observed and what you did in the evenings after court adjourned for the day.  Were you working on other cases during Mr. Fields's trial?

A.    To some extent.  Not all during the trial, but there was one case I had a brief due with the Tenth Circuit. About by the time of the middle of trial, I had -- it was like a supplemental brief, but I did have a brief due, and so I was trying to get that done as well as be present at Mr. Fields's trial every day.

Q.    And did you participate in preparing any witnesses in the evenings before they testified the next day?

A.    No.  I recall witnesses arriving that were going to testify the next day, and Julie would take them to a room, a bedroom somewhere, and she would prepare them.  I did not

participate in any of that.

Q.   And why not?

A.   That was not my role because I was not a trial attorney, as such, where I'm going to be examining witnesses.

Q.   Did you ever -- excuse me -- did Ms. O'Connell ever ask you to help prepare any witnesses for direct examination?

A.   No.

Q.   And did she discuss with you at any point the questions she intended to ask of witnesses?

A.   As someone present during all these hours and getting up in the morning and coming to the courthouse and talking about things, it's entirely possible, but that's not a helpful answer because I cannot say I recall what she said about which witness, but I was very privy to information that she would feel fit to share.

Q.   But in terms of sitting down and meeting with a witness, that happened in a separate room.  Is that --

A.   Well, I was not witness to those preparation sessions.

Q.   And did you question any defense witnesses at trial?

A.   No.

Q.   Did you ever offer to do so?

A.   No.

Q.   And, again, why not?

A.    Because that's not the job description of the research and writing specialist as we applied it in our office. That's not what I ever did at trials.

Q.    And does the same thing go for cross-examining government witnesses?

A.    Yes, the same thing goes.

Q.    And did you assist Ms. O'Connell in preparing her opening statement or closing argument?

A.    I did not assist on her opening statement. I don't recall assisting in her closing argument either. I think I recall her going -- the night before we were going to have closing, I recall her going into a bedroom to work on it. She just kind of retired and worked on it as I recall.

MS. NELSON-MAJOR:  Your Honor, may I have a moment to confer with my co-counsel?

THE COURT:  You may.

Q.    (By Ms. Nelson-Major)  I think -- a few more questions. Early on in your testimony, you mentioned that Michael Abel had entered his appearance in this matter. What was his involvement that you observed in Mr. Fields's prosecution?

A.    So this was his duty station, which is, again, the office across the street. It was a very small office. He went there every day. He had an office also in the downtown Tulsa office. But in terms of having an attorney ready to

make appearances in court instantaneously as comes up with initial appearances, this was his duty station. And so Ed Fields's case appeared on the docket, and so in that role as the duty attorney, Mike Abel appeared at the initial appearance. And then we heard at the office what had occurred and what this case was about, we're looking into it, looking up the news, and very swiftly -- that's a relative term because I don't know how many days -- but within a few days, it was determined that Julie was going to be the one who handled the case, and Mike Abel was not going to be involved in handling the case.

Q. And after that point, as far as you were aware, he was not involved in handling the case?

A. He was not involved. He was not part of discussions and prep work.

Q. And when talking about Mr. Gant's role as learned counsel, you referred to a statute that governs the responsibilities of learned counsel. Were you referring to 18 U.S.C. 3005, if you recall?

A. Yes.

Q. And so the verdict slip that we looked at and the jury instructions that you mentioned, were those documents that you were preparing while trial was ongoing?

A. The verdict form and which instructions?

Q. I believe you said you helped work on some penalty

phase instructions, jury instructions.

A.    Yes.  All of the proposed instructions that you would see filed were drafted by me, and so I obviously would have always got Julie's input before filing those, but I would have been the original drafter of all of that, including the verdict form.

Q.    And were those documents things that you drafted during trial or prior to trial?

A.    The verdict form I definitely recall drafting during the trial and not before the trial.  The other instructions, I wouldn't have had time during trial to make those drafts from scratch, and so I'm pretty sure I was preparing before trial those materials.

Q.    And was the verdict form that listed mitigating factors prepared during trial because it needed to reflect the evidence that had come in during trial?

A.    Yes.  It needed to be responsive to the evidence that I heard.

Q.    And you testified that it was prior to trial, you believe, that Dr. Gelbort was going to testify at trial.  Do you know what he was going to testify to?

A.    I don't recall that he was going to testify at trial. I thought that there was a possibility that he might testify at trial.  And so I think I said earlier, I don't know what expectation Julie communicated to him, but he needed to be

here was what she expected and hired him to do and to -- I do recall this. She wanted him to be present while Dr. Price testified. Now, you know, whether he might testify following up to that or not, I don't -- I don't know what she was thinking, but that's certainly -- that's out of the playbook, you know, to do that, to kind of have an expert to rate the opposing counsel's expert, and then they tell you if there's something that they could say that's helpful if you put them on the stand.

Q. But at this point in time, you can't recall with particularity the conversations that might have happened about whether Dr. Gelbort was, in fact, going to testify?

A. I don't recall conversations about that. I just know that he needed -- she expected him to be here. She was counting on him, and then he didn't show up.

MS. NELSON-MAJOR: No further questions, Your Honor.

THE COURT: All right. Well, congratulations, Ms. Nelson-Major. You beat your hour and a half allotted time.

MS. NELSON-MAJOR: Look at that.

THE COURT: By ten minutes almost. So now we'll see if Mr. Wilson --

MS. NELSON-MAJOR: Wait, wait, wait. I have ten more minutes of questions.

THE COURT:  No, you can't.  We'll see if Mr. Wilson can stay within a very limited amount of time.  Are you doing the cross?

MR. WILSON:  Yes, sir.

THE COURT:  Okay.  I mean, obviously -- well, let me ask.  How long do you think you're --

MR. WILSON:  It's going to be -- it will be at least 45 minutes to an hour, Your Honor.

MS. NELSON-MAJOR:  Could I just consult with -- oh, sorry.

THE COURT:  Well, I was going to ask Mr. Derryberry because, obviously, you're the witness.  If we adjourn now, you're going to come back tomorrow.  It sounds like if we don't adjourn now, you're in for another hour or so.  So we're going to be going to 6:30 or so.  Do you have a preference?

THE WITNESS:  No.  I am an officer of the court.

THE COURT:  Well, I appreciate that response.

It pains me not to finish this witness today, but I really think if it's going to take that long, I'm trying not to -- it's going to be a long week.  I don't want to wear out our staff on the first day.  So if it's all right, we'll adjourn for this evening and come back and start with the cross-examination of Mr. Derryberry in the morning, if that's all right.

**United States District Court**
**Eastern District of Oklahoma**

And I apologize you have to come back, sir, but if it were shorter, I would try to run it through tonight, but I think that's the best way to do it.

All right. Well, with that, anything else before we adjourn for the evening?

MS. NELSON-MAJOR: No, Your Honor.

MR. WILSON: Judge, I don't know that we need to do this on the record. I just -- for purposes of scheduling --

THE COURT: Well, let's do that. Let's adjourn for the record, and then we could talk about scheduling for tomorrow. Okay. All right. With that, we're adjourned for the evening.

(PROCEEDINGS CONCLUDED.)

REPORTER'S CERTIFICATE

I, Joanna Smith, Registered Professional Reporter, do hereby certify that the foregoing is a correct transcript from the official proceedings in the above-entitled matter.

CERTIFIED:  /s/Joanna Smith
            Joanna Smith, CSR, RPR
            United States Court Reporter
            101 North 5th Street
            Muskogee, Oklahoma 74401