**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,               )
                                        )
                    Plaintiff,          )
                                        )
                    vs                  ) No. 03-CR-73-RAW
                                        )
EDWARD LEON FIELDS,                     )
                                        )
                    Defendant.          )
                                        )

TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME II
BEFORE THE HONORABLE GERALD A. JACKSON
UNITED STATES MAGISTRATE JUDGE
OCTOBER 8, 2024

Shelley Ottwell, RPR, CSR
United States Stenographer
P.O. Box 607
Muskogee, Oklahoma 74402

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

**A P P E A R A N C E S**

ON BEHALF OF THE GOVERNMENT
Christopher Wilson, Esq.
United States Attorney's Office
520 Denison Ave.
Muskogee, Oklahoma 74401

Aaron J. Stewart, Esq.
United States Department of Justice - Capital Case
Section
1331 F. Street, NW, Room 656
Washington, D.C. 20530


ON BEHALF OF THE DEFENDANT
Katherine Ensler, Esq.
Hayden Nelson-Major, Esq.
Katherine Thompson, Esq.
Federal Community Defender Office for the Eastern
District of Pennsylvania
601 Walnut Street, Suite 545
Philadelphia, Pennsylvania 19106

Hunter Labovitz, Esq.
Federal Public Defender Office - Western District of
Oklahoma
215 Dean A. McGee Avenue, Suite 707
Oklahoma City, Oklahoma 73102

**E X A M I N A T I O N**

BARRY DERRYBERRY
      Cross-Examination By Mr. Wilson            247
      Redirect Examination by Ms. Major-Nelson   272

MICHAEL GELBORT
      Direct Examination By Ms. Ensler           277
      Cross-Examination By Mr. Stewart           378
      Redirect Examination By Ms. Ensler         474
      Recross-Examination By Mr. Stewart         482


Stenographer certification                       489

**P R O C E E D I N G S**

(ON THE RECORD AT 9:01 a.m.)

THE COURT:  All right.  We are back on the record in CR-03-73, United States of America v Edward Leon Fields.  And it appears all attorneys are present.

Anything we need to address before we return to Mr. Derryberry?

MR. WILSON:  Nothing from the government, Your Honor.

MR. LABOVITZ:  Nothing from the defendant, Your Honor.

THE COURT:  All right.  Very well, then.

MR. LABOVITZ:  Oh, actually I'm sorry.

Just administratively, we just provided the Court with a hard copy of that second successive petition that the Court had asked for to be bound up.

THE COURT:  Okay.  All right.  Very well. Good.

Okay.  All right.  Mr. Derryberry, if you would come forward.  I don't need to, but I will remind you that you are still under oath, so have a seat.

Let's see if we can wrap this up.

All right.  Mr. Wilson, you may proceed.

**CROSS-EXAMINATION**

**BY MR. WILSON:**

Q.   Mr. Derryberry, you have been practicing law since -- I believe you said 1988; is that right?

A.   March 1 of 1989.

Q.   Okay.  Sorry about that.  Since March of 1989.

And you have been working at the Federal Public Defender's office for about 23 years; is that right?

A.   Correct.

Q.   How long have you worked with Julia O'Connell?

A.   I worked with Julia O'Connell at the county public defender's office.  She joined the staff around '91. My best recollection is it could have been '90 or '91.

So initially she worked at our juvenile bureau, so I wasn't really working with her, so it was the same office.  But, yeah, we go back a very long time.

Q.   So you've known Ms. O'Connell for over 25 years.

A.   Absolutely.

Q.   Okay.  And Ms. O'Connell is currently -- I'm not sure what the title is, but the chief public defender; is that correct?

A.   She is the public defender.

Q.   And actually held the position of public defender for the Northern and Eastern until those two offices were separated; is that correct?

A.   Yes.

Q.   And I believe that you testified yesterday that

you are currently serving as Ms. O'Connell's first assistant; is that correct?

A.    Yes.

Q.    And how long have you served in that capacity?

A.    I believe two and a half years.

Q.    Okay.  Has it been since the offices were divided?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    And I believe there's testimony yesterday from Mr. Able that for a period of time, several years, the Eastern and Northern were combined and one office served both districts, correct?

A.    Yes.

Q.    As a result of *McGirt* and the result of all of this, that it divided into two districts?

A.    Correct.

Q.    As part of your duties over the years, when the cases, excuse me, when the offices were combined, you came and assisted in cases other than just the *Fields* case; is that correct?

A.    Yes.

Q.    Have you actually been involved in trials with Ms. O'Connell other than the *Fields* trial?

A.    So the *Sterling Williams* trial that you described

yesterday.

Q.    I'm sorry.  Let me make it more specific.

In the federal system.  So think about that.

A.    I don't recall one, but it's been 23 years ago.

Q.    All right.  Other than the *Fields* case, which is the present case, in the federal system, have you been involved in any other federal death penalty cases?

A.    No.

Q.    And so the fact that this is the one and only case that you had of a federal death penalty, does that have any significance to you?

A.    In reference to what?

Q.    Would you remember more things than you would on a 922(g) case that you did 25 years ago?

A.    I think that my memory would be relatively reliable despite what type of case it is.

Obviously, to your point, a death penalty in federal court is a very unique and emphatic experience, and so my memory, I'm sure, is very strong as to a lot of what occurred.

Q.    Have you read the petition for post-conviction relief in this case?

A.    The 2255 petition?

Q.    Yes.

A.    No, I don't think I've read it.  I've read a

couple of orders and that's how up to speed I am on this case.

Q.   Okay.  We'll get to that.  So you don't recall reading the initial petition?

A.   No, I don't recall, like, sitting and reading that one.  I mean, there was a curiosity factor, but I didn't resolve that curiosity by reading it.

Q.   All right.  How about the amended petition?

A.   I have not read that.

Q.   Did you happen to read the district court's order from December 15 of 2016, denying the application for post-conviction relief?

A.   I would say that I read more than half of it.  Not a dedicated read, but spot reading, yes.

Q.   How about the Tenth Circuit opinion?

A.   Same answer to that.

Q.   And based on your reading, you're aware that part of the allegations were that defense counsel was constitutionally ineffective, allegedly, in investigating and presenting evidence regarding organic brain damage.

     Are you aware of that?

A.   Yes, I'm aware of that.

Q.   And you were part of that trial team, correct?

A.   Yes.

Q.   And you got involved in the case a short time after the complaint was filed.  I believe specifically in July of 2003; is that right?

A.   That's right.

Q.   And at the time, you were serving as I believe what you referred to as an RWS?

A.   Correct.

Q.   Research Writing Specialist.

A.   Yes.

Q.   And I believe you testified yesterday that you had been doing that for some time prior to 2003, correct?

A.   Yes.

Q.   And you fully understood what your role was going to be in this case; is that correct?

A.   Yes.

Q.   Even though you and Ms. O'Connell did not have any -- I believe your testimony was you didn't have any specific discussions on that, that you recall.

     You understood your role?

A.   Yes.

Q.   And you knew that you would be primarily responsible for drafting of motions, correct?

A.   Yes.

Q.   For obviously protecting the record for any potential appeal, correct?

A.    Right.

Q.    For drafting jury instructions, correct?

A.    Right.

Q.    And also as part of those jury instructions, potentially a verdict form if the case went to trial, correct?

A.    Yes.

Q.    And that verdict form would have special findings in a death penalty case where the aggravators and mitigators are set out, correct?

A.    Yes.

Q.    And so I believe your testimony yesterday also was that you had, and I think your words were, "an eye on mitigation," correct?

A.    Yes.

Q.    And you testified that you did not review all of the government's discovery?

A.    That's correct.

Q.    But you aware, generally, of the alleged facts in this case, correct?

A.    Yes.

Q.    And you were aware that the defendant was alleged to have murdered two campers, Charles and Shirley Chick, in the Winding Stair Campground, correct?

A.    Yes.

Q.    And you were aware that Mr. Fields, initially, when he was interviewed by the FBI, that he initially denied any involvement in that crime; isn't that correct?

A.    That is a faded memory, but I believe that's correct.

Q.    And that, but for the fact that the agents confronted him with the evidence found in his pickup truck, then he then confessed to his involvement; is that correct?

A.    Yes.  I am very well aware of knowing that at the time.

Q.    All right.  And also that, as part of that interview, that there was a written statement made by the FBI agent, which Mr. Fields initialed each page and signed at the end; is that correct?

A.    That I don't recall, but I wouldn't dispute that.

Q.    And being a person who has a mind on -- an eye on mitigation, you're looking for whatever potentially, if there is a trial, could be relevant in mitigation, correct?

A.    My eye on mitigation isn't for the purpose of developing the evidence.  It's spotting evidence that I see as it's being discussed by the trial counsel as it's being admitted.  So that's the qualified eye, if

you will.

Q.   All right.  So you are mindful of what's being discussed about potential litigation, correct?

A.   Yes, sir.

Q.   And potential litigation in this case was mental health issues, correct?

A.   Yes.

Q.   And specifically, mental health issues regarding auditory hallucinations, right?

A.   Part of it, yes, that's part of it.

Q.   And you also recall that at the time of the initial interview of Mr. Fields that he never indicated anything about auditory hallucinations, right?

A.   That point I have no recollection about.

Q.   And I believe you also testified, you used this expression yesterday that you were monitoring the evidence; is that right?

A.   At trial?

Q.   Yes.

A.   Yes.

Q.   And that as the pretrial discussions, when I say pretrial that's -- I'm using that in the expanded term. From the time to time you got involved all the way up until trial started, that's the whole pretrial, okay?

     But during that whole process, I believe you

testified that Ms. O'Connell would update you from time to time on developments, discussions with witnesses; is that right?

A.    That's right.

Q.    And that specifically, in reference with expert witnesses, that she would update you on that; is that correct?

A.    From time to time, correct.

Q.    And she would advise you on developments.  I believe that is what your testimony was, right?

A.    Yes.

Q.    Okay.  And it was -- as a matter of fact, you actually participated -- no.  Strike that.

That you were present in a meeting where Dr. Woods met with Ms. O'Connell; is that correct?

A.    Yes.

Q.    And I believe that your testimony was that you listened in, but you didn't actually participate in that meeting; is that correct?

A.    That's correct.  I feel certain that I didn't have a dialogue with him or ask him any questions.  Fly on the wall.

Q.    And was there any other expert witness at that meeting that you recall?

A.    I know there was no other expert present at that

meeting.

Q.   And do you recall that during that meeting there was discussion about Dr. Woods and his theory of the case?

A.   I'm certain that that was the core of what that meeting was about.

Q.   And you're aware that Dr. Woods' theory of the case was Mr. Fields was suffering from bipolar, and that as a result of taking Effexor that he went into what was referred to as manic flip; is that correct?

A.   That's correct.

Q.   And as part of those discussions, Dr. Woods never recommended any physical scans, did he?

A.   I don't have a recollection about what his recommendations were.

Q.   Okay.  If Mr. Gant testified yesterday that that's what Dr. Woods had -- did not recommend physical scans; would you agree with that?

        MS. NELSON-MAJOR:  Objection.  The witness just testified that he had no memory of whether that was discussed or not.

        THE COURT:  He's asking if he would agree with another witness, so overruled.

        THE WITNESS:  I don't have a basis of knowledge to be able to say I agree or disagree.

MR. WILSON:  Fair enough.  Thank you.

Q.   (BY MR. WILSON) I believe that you also testified, and correct me if I'm wrong, the expression that you used yesterday was that served as a sounding board for Ms. O'Connell.

A.   Yes.

Q.   And that when issues would come up and she would talk with you about those, that you wouldn't necessarily always give input, but that she would sound those off of you, correct?

A.   Correct.

Q.   That would include mental health issues, correct?

A.   Yes.

Q.   And specifically issues regarding experts, correct?

A.   Yes.

Q.   One of the experts that was retained in this case was a Dr. Michael Gelbort.  There was some testimony about him here yesterday.  Do you recall that?

A.   Yes.

Q.   Did you ever met Dr. Gelbort?

A.   I don't recall ever meeting him.

Q.   I believe your testimony yesterday was that Dr. Gelbort was "controversial" was the word that you used; is that right?

A.    With Julia O'Connell.

Q.    And in what capacity, or what do you mean that he was controversial with Julia O'Connell?

A.    She was not satisfied with his report and communication with her.

Q.    And I believe you used the expression that she was "stirred up" about Dr. Gelbort; is that correct?

A.    Yes.  Yes.

Q.    As a matter of fact, she was frustrated; wasn't she?

A.    I think that that's a fair assessment.

Q.    Okay.  As part of the sounding board regarding Dr. Gelbort, did she tell you that his report was the crappiest that she had ever seen?

A.    I don't recall those words at all.

Q.    Did she express anything similar to that?

A.    I don't recall words from her that I can present today in court about that.

Q.    They're not appropriate or you just don't remember specifically?

A.    Yeah, it's not a specific thing, and unfortunately the frustrated part is more of a cloudy recollection. It is a solid recollection, but I can't tell you the words from her mouth that that was based on.

Q.    But based upon those interactions as you being a

sounding board, was it your impression that she was, in fact, disappointed with Dr. Gelbort's report?

A.    At some juncture she was, yes.

Q.    Was she -- did she also sound off to you that she was frustrated with him because she couldn't get in touch with him?

A.    I think at a different interval.  Not at the time that she received the report, but I think more around the trial or right before trial.  That's when that was at issue.

Q.    Were you aware that she had to go to New Orleans and actually go and find him?

A.    I don't recall that from the time.

Q.    Did she also express that she questioned the quality of his testing data?

A.    I'm not aware of that.

Q.    Did she ever use the expression that she thought that Dr. Gelbort sucked?

A.    I cannot answer that "yes" or "no" based on my recollection.

Q.    Did you ever recall her saying that she wouldn't recommend him to her worst enemy?

A.    I have the same answer to that too, sir.

Q.    Is that you don't recall?

A.    I don't recall one way or the other.

Q.   You testified yesterday that you may have read a report of an expert.  Is that what your testimony was yesterday?

A.   Yes.

Q.   And do you recall which expert it was that you read?

A.   With the memory that I barely trust myself on, I think it was probably Gelbort, but it could have been Dr. Woods.

Q.   Now there were government experts that also were retained in this case, correct?

A.   Yes.

Q.   Did you ever read any of the government expert reports?

A.   I think it's likely that I read Dr. Price's, but I can't say I remember actually reading that.

Q.   Okay.  We'll come back to that, all right?

A.   Okay.

Q.   Limited notebook shuffling today, okay.

    You testified that you might have remembered a Dr. Gelbort report.

    I want to direct your attention, first of all, to Defendant's Exhibit Number 121, and that's in binder number six.

A.   I have it.

Q.    And look at Tab Number 121.  Have you got that?

A.    Yes.

Q.    Would you agree with me that's a two-page document?

A.    Yes.

Q.    Do you recall if that is a report that you reviewed?

A.    I do not have a memory of reading this report.

Q.    Fair enough.  Let's now move to Defendant's Exhibit Number 73, that's in binder number five, Tab 73.

A.    I have it.

Q.    Would you agree with me this is actually a four-page document, which has what appears to be on the top in handwriting "draft."

A.    Yes.

Q.    Take a look at that and see if you recall -- if this is the report that you may have read.

A.    So I have scanned this to make sure, but I don't have a memory of reading this report.

Q.    All right.  Let's look at one more, and it's in binder number one.  It's Defendant's Exhibit Number 4.

A.    I'm ready.

Q.    Do you agree, once again, that this is a four-page document?

A.    Yes.

Q.    And on the final page it's actually signed.  Do you see that?

A.    Yes.

Q.    I'm going to ask the same thing.  Take a look at that and see if you recall reviewing that particular report.

A.    I don't recall this report, no.

Q.    Okay.  And I believe that you previously testified that Ms. O'Connell expressed frustration regarding the quality of Dr. Gelbort's report; is that correct?

A.    That is her response to -- what I am coming from is the memory that it's either his conclusions or the report, which may be one in the same, but not just the report.

Q.    And quite frankly, isn't it true that Dr. Gelbort's report only found that Mr. Fields had mild impairment, correct?

More than anything.

MS. NELSON-MAJOR:  Objection, Your Honor. The witness testified that he had not previously recalled reading any of the versions of Dr. Gelbort's report.

MR. WILSON:  I'll rephrase the question, Your Honor.

THE COURT:  Okay.

Q.    (BY MR. WILSON) Ms. O'Connell used you as a sounding board regarding experts, correct?

A.    To a degree, yes.

Q.    And she used you as a sounding board regarding Dr. Gelbort and his report, correct?

A.    She may have, but my memory is not that granular.

Q.    Okay.  Is your memory granular enough to recall that Ms. O'Connell did not consider the report to find anything other than mild impairment?

A.    I don't have a memory about that issue.

Q.    Okay.  Did you at any time consult with David Freedom or Lisa Greenman?

A.    No.

Q.    Do you know who these persons are?

A.    I think that Lisa was -- Lisa's name rings a bell. I think she was a federal public defender somewhere, maybe.

Q.    There's previous testimony yesterday that each of those individuals were consultants in this case.  Were you aware of that?

A.    As to her, I have some memory about that.  The David persona does not ring a bell with me.

Q.    Okay.  Did Ms. O'Connell or did you serve as a sounding board for Ms. O'Connell in any discussions she

had with you regarding the opinions of Ms. Greenman?

A.    I don't have any recollection about that.

Q.    Now, you testified a few minutes ago when we were talking about reports.  You said that you may have read Dr. Price's report, correct?

A.    Yes.

Q.    I want you to look at binder number two, tab number 38, Mr. Derryberry.

A.    I have it.

Q.    Take a moment and thumb through that.  Would you agree with me that's a multiple-page document?

A.    Yes.

Q.    Which is a cover sheet identifying it as a neuropsychological evaluation of J. Randall Price; is that correct?

A.    That's correct.

Q.    Take a moment and see if you recall if that's the report that you read.

I know it's really, really long so I'm not asking to look at everything.

A.    I don't have a memory of reading this report.

Q.    Do you recall Ms. O'Connell using you as a sounding board regarding the report of Dr. Price?

A.    No.  I have no specific memory of that.

Q.    Do you recall Ms. O'Connell using you as a

sounding board about ways to keep Dr. Price from actually testifying at the trial?

A.   I believe that was something that was discussed between me and Ms. O'Connell.

Q.   Isn't it true that there was a discussion about the possibility of not calling Dr. Gelbort to prevent Dr. Price from being able to testify in rebuttal?

A.   I don't recall that.  I don't recall that being part of discussion.  That's my memory that I'm reporting, so I don't have any more to say about it, yeah.

Q.   Okay.  But that's your recollection.  You're not saying that discussion did not happen?

A.   Right, yes.  I mean, a lot of these things that were discussed are just faded in my memory.

Q.   Did she use you as a sounding -- well, I think you already answered that question.  Let me backup.

Dr. Price's report contained a timeline, do you recall that, of a lot of alleged acts that Mr. Fields had done going back to his early years beginning at age four?

A.   I just identified some of that in my spot reading of the report.

Q.   Do you recall allegations that Mr. Fields hung a cat?

A.    I do remember that.  I mean -- I don't -- I mean, I don't know whose reports that appeared in, but I do remember that anecdotally.

Q.    And there was an effort and actually a motion filed to try to prohibit that testimony coming into the trial, correct?

A.    It comes back to me now.

Q.    And were you involved in drafting that?

A.    I don't remember drafting that.  But I'm sure that I was part of that because that was my wheelhouse.

Q.    Do you recall Ms. O'Connell using you as a sounding board on the issue or concern of opening the door during the case to allow some of this, what we refer to, as creepy things coming in?

A.    I don't have a memory to that specific point.

Q.    Again, you're not saying that did not take place.

A.    Yes, correct.

Q.    So we talked about Gelbort.  We talked about Dr. Woods.  There was another defense expert by the name of Dr. Grinage or Dr. Grinage?

A.    Yes.

Q.    Do you remember that person?

A.    From trial, yes.

Q.    Did Ms. O'Connell use you as a sounding board on having Dr. Grinage or Dr. Grinage not make reference to

Dr. Gelbort or his findings in Dr. Grinage's report?

A.   I don't have a memory of that.

Q.   Now, again earlier you testified that you had an eye on mitigation.

You knew that this -- if this went to trial, you would be drafting both jury instructions and the verdict form, the special findings, correct?

A.   Correct.

Q.   And I believe counsel showed that yesterday, and that was Defendant's Exhibit Number, excuse me, 152. And that's in binder number seven.

And I believe counsel yesterday went specifically to page six of that exhibit.

A.   Okay.  I see it.

Q.   And on that page, it begins a list of what were potentially mitigating factors from the trial, correct?

A.   Correct.

Q.   And you drafted this, correct?

Well, you drafted a proposal for which the court gave a very similar jury verdict form, correct?

A.   I initially drafted it, but by the time I tendered a draft to the court it was probably a co-write between me and Julia O'Connell.

Q.   Okay.  But you had input on what went into this mitigator list, correct?

A.   Yes.

Q.   I believe that you testified yesterday that you and Julia together agreed; is that right?

A.   Yes.

Q.   And the first of those was the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, correct.

A.   Correct.

Q.   That's what the law says, right?

A.   Yeah.  I'd like to know what my source was for this, but I did try to couch it in terms of legal standards.

Q.   And the jury marked "no," correct?

A.   Yes, that's correct.

Q.   So obviously they made a finding that there was no significant impairment.

A.   No single juror made a finding that there was.

Q.   That's correct.  I'm sorry.  Thank you.

Same thing with number three.  Number three is the defendant committed the offenses under severe mental or emotional disturbance.  That's the language that was submitted as part of the special findings, correct?

A.   Correct.

Q.   And not a single juror found that the defendant

was acting under severe mental or emotional distress.

A.   I remember that, correct.

Q.   At the end of your testimony yesterday there was a discussion specifically about Dr. Gelbort and his status as a witness.

Do you recall those discussions yesterday?

A.   Yes.

Q.   And I believe it was your testimony that there was no specific plan to call Dr. Gelbort as a witness at the trial; is that correct?

A.   I don't -- I don't recall to the point that I can answer that question, "yes" or "no."  I don't recall that there was a plan.

Before trial, I didn't know -- well, I don't know what I knew.  Today I don't remember who was going to be called in terms of a witness list, if you will.  I don't have a memory of that.

Q.   Okay.  And I believe your testimony was that Dr. Gelbort was going to be sitting -- and the plan was that he was going to be sitting in the courtroom while Dr. Price testified; is that correct?

A.   I believe so.  I mean, he was intended to come to town by Julia O'Connell, and that would have been why.

Q.   And that at some point Ms. O'Connell gets word that Dr. Gelbort is not available; is that correct?

A.    Correct.

Q.    Do you recall when that was?  Was this before jury selection, after jury selection, or do you remember?

A.    I think it was in the midst of trial.  I think it was after jury selection.  During the evidence phase, may be while the government's case was ongoing.

Q.    And did Ms. O'Connell use you as a sounding board on that particular issue?

A.    She would have been discussing that with all of us.  We were all together after trial in the mansion, if you will.  So she would have been discussing with all of us or just advising us about that situation.

       So I just don't want to paint a picture of "it's she and me across the coffee table."

Q.    Fair enough.

       Do you recall what, if anything, she used you as a sounding board on regarding specifically Dr. Gelbort not being in trial?

A.    I don't have a specific memory about that except that it was a surprise to her that he did not show up.

       MR. WILSON:  Can I have just a moment, Your Honor?

       THE COURT:  You may.

       MR. WILSON:  Your Honor, that's all the questions that I have.  I would pass the witness.

Thank you.

THE COURT:  All right.  Very well.

Ms. Nelson-Major, any redirect?

MS. NELSON-MAJOR:  I have a few questions.

THE COURT:  Okay.

**REDIRECT EXAMINATION**

**BY MS. NELSON-MAJOR:**

Q.   Good morning Mr. Derryberry.

A.   Good morning.

Q.   Mr. Wilson asked you a moment ago if you were part of the trial team and it appeared that you hesitated a moment before responding "yes."

Can you explain to the Court why you hesitated?

A.   Because the word "team" requires some context to really deliver an accurate meaning.  Because "team" might suggest or connote if you think football team and they're all doing the same thing with the ball, and I wasn't doing the same thing with the ball in this situation.

I had my roles, as I've already described and -- but I was there for -- I mean, I could have provided any advice or information or work product that anyone wanted to ask me to do.

So I'm not saying the constraints on an RWS job description and such were the lid or the limit to what

I did. I was available, and I think that maybe explains why Julia would talk to me about things was maybe just to see what my reaction was to things.

But I was not part of the team in terms of "Berry, help me figure out how we're going to utilize Dr. Gelbort, so read all the stuff. Read all the reports, read his report, and help me figure out what the best path forward is."

It was more about she would tell me what she's thinking, stream-of-consciousness style, so I wasn't steeped in the knowledge necessary to join as a teammate in making those decisions.

Q. So is it fair to say that any understanding of how Dr. Gelbort might have been used or intended to be used at trial would have come from what Ms. O'Connell told you?

A. Yes.

Q. I'm going to ask you to take a look at Government's Exhibit 23. I believe it's in the binder number one.

A. I have it.

Q. Do you recognize this document?

A. No.

Q. Is this your handwriting?

A. No.

Q.   All right.  You can close that binder.

Mr. Wilson asked you several questions about your understandings of the frustrations that Ms. O'Connell expressed to you about Dr. Gelbort's report, and you testified that those frustrations might have been in response to the report or his findings.

But today, you can't tell us with any certainty what Ms. O'Connell actually expressed to you in terms of those frustrations; is that right?

A.   Right.  That's -- that's a characterization, but I don't have a specific factual memory about what those frustrations directly went to.

Q.   And do you recall at any point in time Ms. O'Connell informing you that she no longer intended to present Dr. Gelbort at trial in light of those frustrations?

A.   I don't have any memory of that or sort of the embedded point that she had, at some point, intended to call him at trial.  I don't recall that being the case.  I don't recall it not being the case.

Q.   Understood.  And you had testified that your eye on mitigation was a qualified eye.  And that you were focused on the mitigating evidence as it was being admitted.

Can you explain what you meant by that?

A.   So as I sat through the trial, that's the prime time for me to be thinking -- while everyone else is thinking about the evidence being elicited and developed, I'm thinking on a different level which is, what are going to be the subjects or topics that feed into the proposed instructions, and the proposed mitigation list that I was thinking making.  And I'm sure I made notes of those points, too.

Q.   And prior to the trial actually commencing, what role did that eye on mitigation have in terms of your involvement in pretrial preparations?

A.   It was a much broader consideration because I'm listening to discussion of the mental health issues and what might get developed at trial.

I'm not beginning my draft at that juncture on the list of mitigators, but I'm developing my knowledge of what's coming at trial.  But obviously I couldn't make my mitigation proposed instruction based upon what I gathered before trial began.

Q.   And several times throughout your testimony, you stated that you were a sounding board for Ms. O'Connell.

As a sounding board, did you have any decision-making responsibility on which experts would, in fact, be called at trial?

A.    No.

Q.    And that was solely up to Ms. O'Connell?

A.    Yes.

MS. NELSON-MAJOR:  May I have just a moment to confer with my co-counsel?

THE COURT:  You may.

MS. NELSON-MAJOR:  No more questions.

THE COURT:  All right.  Very well.

MR. WILSON:  No questions.

THE COURT:  All right.  Thank you, Mr. Derryberry.  You are finished with your testimony. You may be excused.

MS. ENSLER:  We're just getting our next witness.

THE COURT:  All right.  Is that going to be Dr. Gelbort?

MS. ENSLER:  That is.

THE COURT:  Okay.  I guess you're going to call your next witness.

MS. ENSLER:  The defense would call Dr. Michael Gelbort.

THE COURT:  Mr. Gelbort, if you'll come up here, please.  The clerk will place you under oath.

COURTROOM DEPUTY:  Do you solemnly swear that the answers that you will give before this honorable

court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right, sir.  You can have a seat.

The only instruction is that microphone doesn't pick up very well.  So you'll need to either scoot up a little bit or lean into that so the recording and the court reporter can hear you.

All right. Ms. Ensler, you may proceed.

*MICHAEL GELBORT*

having been first duly sworn, testifies as follows:

**DIRECT EXAMINATION**

**BY MS. ENSLER:**

Q.   Good morning, Dr. Gelbort.

Could you state your full name for the record?

A.   Michael M. Gelbort.

Q.   G-E-L-B-O-R-T.

Dr. Gelbort, what is your profession?

A.   I am a clinical neuropsychologist in private practice.

Q.   And this is going to begin some binder shuffling that will take place throughout.  But could you turn to binder seven, tab number 198.

A.   If you can speak up a little bit louder, please.

Q.   Sure.  Tab number 198.

     Could you identify this document for the court?

A.   It's a copy of my vita.

Q.   And does this vita accurately summarize your educational and professional history?

A.   Reasonably so, yes.

Q.   And could you briefly summarize the parts of your educational background that are relevant to your qualifications as a neuropsychologist?

A.   Sure.  I completed my undergraduate training at Grinnell College, Grinnell, Iowa.  I finished in three-and-a-half years with a double major in psychology and general sciences.  I graduated with high honors.

     I went on to a Ph.D., a doctoral program in clinical psychology at the Texas Tech University in Lubbock.  I went through that program in a fairly standard fashion.  After the first semester, I was seeing patients which is a little unusual in a doctoral program that you're able to work with clients so quickly.

     I also worked on the side, as do most graduate students.  I had a minor in applied human neuropsychology.  And in the course of earning that, I worked at the medical school for two neurologists and

neurosurgeons performing neuropsychological evaluations and providing interpretation under the auspices of my major professor Dr. Roger Green.

Finished there, and went on for a postdoctoral fellowship in medical and neuropsychology at the Rehabilitation Institute of Chicago. While there, I was also on staff at Northwestern University Medical School, and after that I went to work.

Q. How many years have you been in practice?

A. I started in practice in 1985.

Besides my full-time job as Director of Neuropsychology at the Institute of Rehabilitation and Research in Houston at the medical center, I started a private practice in 1985 and did that for four years while I remained in Houston. And then I moved back to Chicago, which is where I grew up for the most part, and went into practice, clinical practice, with my -- the woman who had been my supervisor/mentor overseer while I was on postdoctoral fellowship. I have been practicing ever since.

Q. And what percentage of your practice is clinical work, and I ask that as related to forensic work?

A. Ninety-five percent of my time anyway and income comes from clinical work. So about four to five percent comes from other activities, but probably

the majority of those would be forensic work working to assist attorneys as they represent their clients.

About two-thirds of the forensic work that I do is in the civil court, personal injury cases. Many of my patients -- I spend a lot of time on a rehabilitation unit working with physical medicine, rehabilitation patients and a number of those are there because they have been involved in auto accidents or they have been assaulted, or different things that happen to them and they end up with civil cases, and I get drawn into these.

I also do some IMEs, independent medical examinations, on patients like that as an expert. And then I do some criminal work as well.

Q. And in your clinical practice, how many patients do you see a week approximately?

A. Oh, boy. So my clinical practice is split between my private office and other places. There are occasions that I'll be drawn out into the community or around the country to see patients.

And then hospital work, and the hospital work is split between working on the rehabilitation unit, and our rehab unit has 35 active beds, and I've got responsibility for all those patients if they have clinical needs from a neuropsychologist. But I also

get pulled throughout the hospital.

In particular, three of the neurosurgeons at my hospital where I have primary responsibilities, as well as four or five neurologists, internal medicine docs, gerontologist, pediatricians, psychiatrists when there is a concern about cognitive function and dysfunction, they will quite often put in a request, make a referral, for a neuropsychological evaluation.

So I'm seeing about half of my patients are outpatients in my office where they come form for diagnostic interview, testing, and then debriefing, explanation of the results.

Occasionally, I will do therapy with some of these patients, typically surrounding their medical issues. I try not to do straight generic psychotherapy, but rather I do adjustment counseling after medical issues.

And then the remainder of my time is either at my primary hospital or at -- there's also a psychiatric hospital I spend a fair amount of time at, seeing typically adolescents, but also adults and assessing them for neuropsychological and clinical issues.

Q.   What are the goals generally of these evaluations when you're assessing these individuals?

A.   So the evaluations are requested by all sorts of doctors, neurosurgeons, and neurologists.  I went

through the list.  Psychiatrists, and their concern when they send a patient is they see something in the patient's behavior that's other than normal or that they're not sure what it's coming from, what the etiology or the cause of anomalies in their behavior are.  And their question to me is, is this cognitive or organically based?  Is there something wrong with their nervous system?  Most of these patients have been seen by a neurologist and have undergone MRI, CT, EEG, other neuroradiological testing, which doesn't answer the question or clarify the information.

So they're looking for more of a functional or behavioral assessment, which is what neuropsychology looks like.  They want to know what to do.  How do we treat them?  Is there something wrong?  Is it more emotional or organic and what do we do about it?

Q.   And when you are being retained in a forensic setting, do you always conduct an evaluation?

A.   It depends on the question.  I think that's a constant in my practice is what I do in response to a referral question is depending on what the referral question is asking for.

So there are times when I may simply review someone's records and say, Based on the records, here's what I see going on or what could be going on, and here

are suggestions as to what you might want to do next.

More often than not, if I'm involved in a case, I will do some testing, anywhere between a screening battery or some spot testing, if you will, all the way through a more comprehensive battery.

Q.    And in your forensic cases where you conduct evaluations based on your kind of predeterminations of what you should do, about how often do you find no neuropsychological impairments?

A.    It's less frequent that I find no impairments, but I might point out that that's because I will typically prescreen a case, meaning if there's nothing in the person's history that would suggest that there's any sort of neurocognitive difficulties, I'll have a pretty frank discussion asking why did you want testing or why do you want an evaluation?  There's nothing here that from, at least from the neuropsychologist perspective, would warrant, would give rise to a need for testing.

That being said, I still find 20, 25, even 30 percent of the patients that I see come up with something of a clean slate that there's nothing wrong or nothing of significance wrong or out of the ordinary.

Q.    Have you previously been qualified as an expert in neuropsychology?

A.    Yes, I have.

Q.    About how many times?

A.    Somewhere around 100, I would suspect.

Q.    And were some of these qualifications in federal court.

A.    Yes.

Q.    And have you ever failed to qualify as an expert in neuropsychology?

A.    No.

Q.    I'd like to offer Dr. Michael Gelbort as an expert in neuropsychology.

        MR. STEWART:  No objection, Your Honor.

        THE COURT:  All right.  We'll recognize him as an expert.

Q.    (BY MS. ENSLER) Before we begin, I would like to talk about Mr. Fields' case.

      Speaking generally, could you briefly describe what neuropsychology is?

A.    I think the most common brief description, and what I would ascribe to, it's the study of brain-behavior relationships.  In other words, how the brain gives rise to normal, as well as abnormal behavior and trying to understand how to evaluate and assess, as well as talk about what to do with people who have abnormalities.

Q.    And what is the purpose of a neuropsychological assessment?

A.    It can have a wide variety of purposes.  As I have been saying, for the most part it's to understand what's going on with the individual.  Now, that is kind of a broad and lay way of saying it.

Frankly, what I understand landed me my postdoctoral fellowship was my explanation that when we do a neuropsych evaluation, we're trying to understand who this person is, who the patient is.  In other words, what makes them think the way they think and what causes them to think in abnormal ways.  And we do this using evaluation techniques that are standardized.

So the goal is to be able to appreciate how and to some degree why the person thinks as they do, what parts of it are normal, what parts of it fall outside the normal range, and then to be able to recognize what's giving rise to this as well as where do we go next.

Q.    And you mentioned the actual evaluation and assessment.

Is that the best way to determine how someone's brain is performing or functioning?

A.    Well, you know, there's a lot of ways to look at the brain.  Look not with our eyes specifically but to

appreciate what's going on with the brain.

And the brain is -- you're getting the neuropsychologist perspective, but it's the most amazing organ certainly in our body and it's a phenomenal model.  What it does, it's structural, meaning it has structure to it.  It's electrical.  It works on electrical impulses.  It's a chemical organ.  There's chemistry within it and there's probably other ways if we want to start parsing this more closely.  We can talk about how it functions, what it does, what it is.

A neuropsychologist is the one who's most interested in the outgrowth of how it functions.  So when things are working the way they're supposed to, what does that give rise to?  So we most often work from an information processing model.  So the brain or through the sensory organs, which there are several, takes in information, compares information with what it already knows, assigns meaning to the incoming information.  Understands, comprehends what's going on using language, and then problem solves, raises hypotheses, figures out what to do with all that information, and then formulates some sort of a response.

A breakdown in different portions of that process

or arising from problems in different areas of the brain, will change the way the person thinks, hence brain-behavior relationships.

So a neuropsychologist is interested in all that, and over the years different people have put together tests to assess these different abilities.

Q.   And you mentioned in passing, the brain structure and chemistry.  Were you referencing -- are there additional types of tests that can look into those aspects of the brain?

A.   Yes.  So, you know, for example, if a patient is struggling with weakness in one extremity, that's the sort of thing that is of interest to me, but not in my province to really try to figure out what's going on. So that's a person who will probably see a neurologist who will order a CT, computerized tomography, or MRI, magnetic resonance imaging, looking at the brain as well as perhaps the spinal column, the spinal cord, and looking for structural lesions.  In other words, perhaps a tumor has grown or there's an impingement or a stenosis in the spinal column that's putting pressure on the spinal cord and causing weakness in that affected limb.

So, you know, the different radiological tests look at structural issues.  If a person is having what

appears to be absence seizures or different times when they stare and blank out, if they're having the obvious, the grand mal seizures, that's going to cause the neuro people, and I'm included in that, but I'm not central to this one, to do something like an EEG, an electroencephalogram, suspecting, based on the symptoms that they see, that there may be electrical abnormalities in the brain.  An EEG is the way to assess for electrical problems.

You know, my province, my piece of the pie, when I stand shoulder to shoulder with a neurosurgeon, and a neurologist, and a physiatrist, I get to look at the behavioral changes.

So when someone has difficulty learning and remembering, that's more my province.  The neurologist will do a five-minute medical status examination, which is a very shallow, narrow screening evaluation of cognition.

Many people with significant brain impairments will pass MSE without any trouble whatsoever because the questions are somewhat light, if you will.  It's like looking at the moon with binoculars.  You'll see something up there, but you're not going to see as much as if you take a high-powered telescope.  So those patients will end up getting referred to someone like

me for, you know, a three-hour evaluation rather than a five-minute evaluation where we go broader and deeper and have more data to look at, to understand what's going on.

Q.   Okay.  Thank you.  We'll talk more about the radiological testing a little bit later.

But, briefly, can someone with brain dysfunction as captured by the neuropsychological assessment have a, quote, normal brain image?

A.   Not only can someone who has evidence of brain dysfunction based on neuropsych testing have a normal image, MRI, certainly CT, but I'm still amazed when I was in Houston in the medical center, I had neurosurgeon friends show me normal MRIs of people who died of their brain injuries because the MRI doesn't pick up the more micro-level of damage that was occurring in some of these patients that killed them.

So, yes, you can have a normal MRI and still have significant brain injury.

Q.   I'd like to now turn to your retention in this case.

Back in 2004, were you contacted by the defense team for Mr. Edward Fields?

A.   I believe I was.

Q.   And do you recall who contacted you?

A.    I'm believing it was Julia O'Connell, one of his attorneys.

Q.    And do you recall what, generally, Ms. O'Connell asked you to do?

A.    As I remember, she was asking for neuropsychological assessment/evaluation.

Q.    And do you recall what you were provided prior to the assessment?

A.    I don't believe I was provided -- I don't recall being provided with any particular documents or anything to review prior to evaluating.

Q.    And I'd ask you -- we'll just start the binder shuffle again.  Binder five, Tab 73.  Just hold that higher.  I'm sorry.

      Do you recall when you assessed Mr. Fields?

A.    I'm sorry.  When I?

Q.    Do you recall when you assessed Mr. Fields?

A.    I saw him on August 11 of 2004.

Q.    And so I'd like to talk a little bit about your assessment.

      What did your assessment entail?

A.    I sit with the patient and interview them, which I refer to as the diagnostic interview.  It's my way of collecting background information based on what the patient recalls and what they report.  It's also my

opportunity to observe them in conversation mode.  How they function.  Do they understand my questions?  Is their comprehension adequate?  Do they recall what I'm asking them and answer on target or are they more tangential?

It's a way to collect clinical data about how they perform, and it's the time I have to assess, you know, their recall of their background information, and then I administer tests.

Q.   And do you also sometimes review records?

A.   I quite often review records, especially in cases of significance or consequence.  Clinical cases in my every day practice, more often than not if it's an inpatient, I'll review the hospital records.  I go through the patient's medical chart.  My hospitals are good about having background information also included in the current chart, so I don't have to go search that out.

But, yes.  Part of a typical evaluation is to review some sort of documentation.

Q.   And what can records, historical records, offer?

A.   Well, the way that I was trained to get a good assessment of an individual, you're hoping for three different types of data.  You know, the clinical interview, as I mentioned, the test data using

standard, valid appropriate tests, and then comparison with the person's history.

History gives us an idea of how they function and what issues that they have dealt with in the past. So I look for medical history. I look for academic/educational history. I look at their family history. I look for job history, things like that. So these are all bits of information that are useful.

And the point is that when you have bits of information coming from different quarters or in this case thirds, I guess, that all kind of reconcile with one another and that agree with one another, then it's like a three-legged stool. If all three legs are fairly similar in height or length, you have a decent basis of support for your opinions and conclusions.

Q. And have you reviewed records in this case that my office provided?

A. I have.

Q. Did those records include birth records?

A. They are somewhat sparse, but there are birth records.

Q. Medical records.

A. There are some medical records.

Q. A report about his military record.

A. Yes.

Q.    And are the documents and materials that you reviewed regarding Mr. Fields, the type of materials reasonably relied upon by a neuropsychologist, such as yourself, in forming opinions as to the issues that we asked you to examine?

A.    Yes.

Q.    I'd like you to turn -- sorry.  I'm going to have you actually go to binder one to begin with.

       Defense Exhibit 1.

       Does this document look familiar?

A.    It does.

Q.    What do these records appear to be?

A.    I'm sorry?

Q.    What are these records?

A.    It's entitled, Amended Exhibit List, and it's records that have been provided to me.

Q.    Oh, sorry.  I think you're on the -- are you on page one of Defendant's Exhibit 1?

       THE COURT:  You need to go to Tab 1.

       I think that's the preliminary list in front of each notebook.

       THE WITNESS:  Thank you.

       THE COURT:  It's a little confusing.

       THE WITNESS:  That's rather different.

       This is a medical record from -- as part of the

birth history, if you will, and, yes, I have seen this before.

Q.    (BY MS. ENSLER) And in kind of reviewing these birth records, did certain aspects of anything jump out at you as relevant?

A.    It says right in the middle of the page, "probable hyaline membrane of the lung."

       And I'm suspecting it's okay to go past the first page?

Q.    It is.

A.    As I recall from this, the writing is largely illegible.

Q.    Maybe if you could refer to pages -- I think it gets more legible starting at page 13.

A.    Yes, it does.  What was significant to me on that page is that it talks about possible cyanosis.

       There's indication, based on review of the record, that Mr. Fields was likely hypoxic, possibly overtly anoxic, but he was low on oxygenation early on.

Q.    Does that page also reflect that he -- that he has had some mild respiratory distress and required oxygen?

       Is that where you are taking that from?

A.    Yes.  The recommendation is that he was put on $O_2$, oxygen.  It also makes mention of possible aspiration, which is not a good thing.  And it indicates, rule out

RDS. So more was to be done with him in addition to just the acute treatment that they were offering.

Q. And I would ask you to turn to page 14, the following page. Please feel free to just review that for a second if there was anything on that page that was relevant.

A. Okay.

Q. What was his prognosis as described?

A. Prognosis, the last couple of words, prognosis guarded.

Q. What does that mean?

A. Not anything real good. It means that they're not sure which way things are going to go, is the general interpretation of that. That there is some -- I mean, what it says above is that, had respiratory distress during the night, predominately the past two hours, talks about x-ray shows diffuse pulmonary infiltrate. Likely bronchial obstruction.

It looks like, you know, there was an acute issue going on affecting his ability to breathe and take in oxygen, and that they weren't sure which way things would go. The plan was to transfer him to another facility it looks like.

Q. And you mentioned hypoxia. Just for the record what is "hypoxia"?

A.    Low oxygenation.

Q.    And as a neuropsychologist, are you interested in hypoxia?

A.    Yes.

Q.    Why?

A.    Well, being without oxygen certainly and low on oxygen commonly is not good for our brain.  You know, death occurs if you're 17 minutes thereabouts without oxygen.  Damage starts occurring when you're without oxygen for two to four minutes thereabouts.  And being hypoxic, especially chronically, long-standing low on oxygen is very stressful and can be damaging to the brain.

Q.    And I would ask you to turn to binder five, Tab 79.  And I would direct you to the bottom of page three.

      Could you identify this document for the court?

A.    So these are my notes from my diagnostic interview on August 11 of '04.

Q.    And in your notes, did you discuss hypoxia with Mr. Fields?

A.    At several points.  Sometimes by name in particular and sometimes just asking about different experiences that he might have.

Q.    And do your notes indicate there are no hypoxia?

A.    Yes.

Q.    And we've talked about that there was possible hypoxia at birth.

Is that consistent with -- is there reason that Mr. Fields might have not told you about that hypoxia?

A.    Sure.

Q.    Is that a reason that records can sometimes be helpful?

A.    It's certainly a good indication that records are helpful.

Q.    And you did not have -- you did not -- you did not rely on these records in reaching your neuropsychological conclusions, correct?

A.    Which records?

Q.    The birth records.

A.    I didn't.  I don't think I had them at the time. I'm not sure when I saw them originally.

Q.    And while you did not rely on them, what do the birth records do?  Are they consistent with your conclusions about Mr. Fields' brain impairments?

A.    They are.

Q.    I would next like to ask you to turn to binder nine, Tab 268.

A.    You said 2-6-8?

Q.    2-6-8.

A.    2-6-0?

Q.    2-6-8, sorry.

A.    2-6-8.

Q.    And do these records -- did you review these records?

A.    At some point I saw them.

Q.    Do you recall generally what these records concern?

A.    They're, I believe, in reference to patient -- he described when he was about 16 being -- driving a -- I think it was a Chevy S-10 and it rolled.  He believed it rolled four times or five times.  I think this is arising from that acute treatment.

Q.    And do these records reflect a finding or a diagnosis following that accident?

A.    Yes.

Q.    And what is that?

A.    Well, it describes in the final diagnosis cerebral concussion, cervical sprain, and auto accident.

Q.    Is anything -- are those findings relevant to your analysis or assessment?

A.    Concussion certainly is and the cervical sprain counts, too, but much lesser and in a different way.

Q.    And is this incident consistent with your findings, from your neuropsychological assessment?

A.    It is; they are.

Q.    Now, when you assessed Mr. Fields, was he on any medication?

A.    He was.

Q.    Do you recall offhand what those medications were?

A.    At the time that I saw him he was on four, possibly or five medications.  The names of which I'd have to look back in my notes.

Q.    If I direct you to your notes, that would be binder five, Tab 79.

      Have you found that tab?

A.    Yes.

Q.    On page one, middle of the page, do you record what medication that Mr. Fields is currently on?

A.    Yes, what he reported being on.

Q.    And what was that?

A.    He said that he was taking a Prozac, lithium, Loxitane, and artane.

Q.    And do you also -- the notation to the right.  Is that about how long he had been on it?

A.    That's what he reported.

Q.    How long was that?

A.    About six months.

Q.    And what effect would those drugs have had on neuropsychological testing?

A.    They're given in appropriate dosages for someone who needs them.  They should allow the person to perform or function as well as they're able.

Q.    And when you say they should allow someone to perform as well as they're able, could you just describe how that would happen?

A.    Well, interestingly if you look at the line after the four medications that are listed it says, before was having anxiety attacks, quote, one right after the other, closed quotes.

So if I had tried to test him when he was having anxiety attacks, he likely would not have been able to perform optimally.  Medication is designed to control the anxiety, will allow him to function better in everyday life and hopefully treat the anxiety attacks, also allow his thinking to be more effective.

Q.    And if Mr. Fields was not properly medicated, would you have been able to tell if it was hurting his performance?

A.    Hurting his performance?

Q.    That he was not performing -- not providing full effort.

A.    Well, I mean, effort is a different issue.

If he was not properly medicated, at least with psychotropic medications, those which affect your

ability to function socially as well as cognitively, he likely would have performed less well on the formal testing.

And in those cases, you know, it may have been misconstrued that he was not putting forth good effort.

Likelihood is that his emotional upheaval and disturbance would be negatively affecting his test results, and it gets more complicated. But what we're looking for is how well can someone function, and preferably, in my practice, we always instruct patients to take your medication as prescribed when you come in. We want to see how you function when you're properly medicated.

Q. And when you assessed Mr. Fields, did you have any concerns about his effort or that he may be malingering?

A. I always have concerns, but I assess whether it appears someone is putting forth proper effort. And you have to assess for malingering. That's just part of the deal. That's certainly in any sort of forensic situation, but in clinical practice you assess for effort as well. And whether or not someone is meeting the assumptions of the test, which is that they're not intoxicated, they're not under the influence, that they're properly aroused, awake. We don't want to test

someone who hasn't slept all night and is sleepy.  And someone who understands that putting forth good effort is needed to get proper results.

Q.    In your testing of Mr. Fields, did you have any of those concerns that you outlined?

A.    Again, I always have the concern.  But the evaluation produced results that had very, very good internal consistency, when you go and use the test measures as a way to assess whether the person is putting forth proper effort.  But they all checked out.

So there's different ways to assess for effort, malingering, feigning bad.  It's harder to fake good.

There are some that use what are referred to as "standalone tests" that have been put together.  You know, ostensibly, for example, they may be reported to measure memory, but they're really not looking at memory.  They're assessing for whether or not someone is trying.

And then the original style is to look within the data, which has been around since the 1950s, and that's the way that I choose to make that assessment.

Either one is a reasonable approach.  People get to choose for themselves.

Q.    And when you discussed internal consistency, could you talk a little bit about what you mean by that?

A.   So there are many different abilities that are being evaluated during testing and we look at similar types of abilities at different points during the test protocol.

We also look at a person's performance and compare it with their past history and then there's also some tests that are known to state -- they're whole tests they stay put.  They don't tend to change much even if there's mild or even mild to moderate neurological disturbance.

If you look through the different results and compare one with the other, you get a pretty good picture.

I remember when I was being trained, when I was on fellowship, we would get someone who was clearly not putting forth proper effort.  We would get a pattern, which is what you're looking at in the data, the whole pattern, the data, the footprint of the data.  The postdoctoral fellows used to joke, The brain don't work that way.  Meaning if you have a high score on this, you should have a high score on that.  If you have a high score on one and a low score on the other and you see that pattern again and again where things don't have internal consistency, it's evident that something other than maximal effort or proper effort is being

made.  Then you have to wonder why.  What's going on?

Is it the test administration?  Is it the person not doing what they're supposed to do?  You need to assess for that.

In this case, it checked out.  I can show you specific places within the data where if you understand how the data is collected, you say, yeah, it makes sense.

MS. ENSLER:  I'm going to turn to a new subject.  I just wanted to check with the court.  Yesterday you had stopped at . . .

THE COURT:  It does seem we're at a good breaking point.  We're at 10:30.

MS. ENSLER:  I'm fine.

THE COURT:  Does everybody agree to take our midmorning break now just so we can keep her fingers fresh and ready to go?

Okay.  All right.  We're going to take a 15-minute break.  We will return at 10:45.

Anything before we need to address before we adjourn?

MR. STEWART:  No, Your Honor.

THE COURT:  All right.  We'll be in recess until 10:45.

(Recess taken from 10:31 a.m. to 10:50 a.m.)

THE COURT: All right. We're back on the record. Counsel are present.

Ms. Ensler, are you ready to proceed?

MS. ENSLER: I am. Thank you, Your Honor.

THE COURT: All right.

Q. (BY MS. ENSLER) Hello, Dr. Gelbort.

A. Hello.

Q. We were wrapping up a discussion kind of whether Mr. Fields had put forth sufficient effort. And now I'd like to turn to your neuropsychological battery.

What is a neuropsychological battery?

A. It's a set of tests or group of tests designed for a specific purpose. I think it should be designed for a certain purpose and the purpose may be specific or it may be fairly broad.

Q. Is there one set battery that all neuropsychologists use for neuropsychological testing?

A. No, there's not one set battery.

Q. Is it common practice for a neuropsychologist to select their own battery?

A. Pretty much, yes.

Q. Why is that?

A. Everybody has different, slightly different training anyway. Everybody has different experiences.

People have different patient populations. So,

for example, in my office we have two, possibly three, somewhat standard or set batteries depending on what the patient coming in is being referred for.

But there's 7-, 8-, 900 different tests that you can pick from.  And the majority, frankly, don't have good validity.  And then there are others that are kind of the gold standards most people turn to because they do have good reliability, good validity, and I would say that they're appropriate and applicable.  They're useful.  You know, for example, the Wechsler intelligence scales.  Most everybody will use those in some form, either in-toto or in part.

Q.   And is that because they have good validity?

A.   They have good validity and they're clinically significant.  They're relevant.  You know, the assessment of IQ is something that's kind of central in many sorts of evaluation questions.

Q.   And when you said "clinically significant" or "relevant," what do you -- is that what you mean by that?

Could you explain what you mean by that?

A.   Sure.  So, as I said, there's hundreds and hundreds and hundreds and hundreds of tests.  Graduate students, I was one of them, come up with a test to publish something because you need to publish certain

things.  But they don't necessarily have a whole lot of relevance or import to understanding who a person is in everyday life.

So, for example, I use many of the subtests or several of the subtests anyways.

So on the Halstead-Reitan Neuropsychological Battery there is one called . . .

THE COURT:  Can you spell that or a least maybe repeat that slowly so she can get that down.

THE WITNESS:  Halstead, H-A-L-S-T-E-A-D. Reitan, R-E-I-T-A-N.

THE COURT:  Thank you.

THE WITNESS:  Okay.  There's this speech sounds perception test, which is amusing to administer and it's kind of fun to take and watch, but unless you have a diagnostic question about a person's ability to decode incoming sounds, and specifically around double E diphthong words, it's not all that useful.

So you can do well or do poorly and it doesn't have a lot of bearing on a person's everyday life.  As opposed to things, like, their intellect.  How smart they are.

Q.   (BY MS. ENSLER) And you mentioned some of the tests you use.

Do you use the same battery for every evaluation?

A.    No.

Q.    And how do you construct your battery?

A.    Well, as I mentioned before, it's driven by what the question is to answer.  What's been presented.

So when I'm looking at a general diagnostic question, I typically look at the intellect, learning in memory, academic achievement, verbally-based as well as visually-based problem-solving and reasoning, sensation and language functions.  Those are pretty much the major areas.

Q.    And did your battery measure all different aspects of the brain, all the different parts of the brain, I should say?

A.    I don't think I can say all of the different aspects or parts.  But it is a pretty good survey of cognitive abilities arising from the front or frontal lobes to the back, the occipital lobes, from the left side to the right side, and more or less from top to bottom.

It also is a pretty good synthesis, as I had mentioned before, of the information processing.  So it looks at sensory awareness.  Are you seeing things in a way that's meaningful?  Are you hearing and taking apart incoming auditory information adequately?  Tactile perception, is that intact?

309

Can you refer back to things that you should have known or reference information that you have seen in the past?  Can you use problem-solving and reasoning to some effective degree, and can you synthesize and answer and then put it out there into the world so you can make an impact?

The battery does a reasonable job of assessing information processing.

Q.    And you mentioned frontal lobes.  What do the frontal lobes do?

A.    Frontal lobes are in some ways the control center. And they are the part of our brains that distinguish us and separate us from -- I don't know if it's a pejorative term or not -- lower animals.

Frontal lobes allow us to have much more complex language.  It allows us to appreciate the ramifications of different behaviors.  They have embedded within them kind of start-and-stop mechanisms, initiation and inhibition.  They pull together a variety of different cognitive activities.  So they're very important.

Sometimes they are referred to as holding the executive cognitive abilities, the top end, higher up. And they're important in terms of a person's ability to function and adapt.

Q.    When you say "executive cognitive abilities" is

that also sometimes termed "executive functioning"?

A.    Yes.

Q.    We'll discuss this a little more in-depth later.

But in terms of your battery, does it -- do some of your tests focus on executive functioning?

A.    They get at executive function.  So focus upon -- they assess the integrity of executive cognitive abilities.

Q.    And can you identify those tests within your battery that are the ones that you would look to assess?

A.    The Category Test is shown by research to be associated with frontal lobe integrity, functioning, Trail Making Test also to a significant degree, and then some of the individual subtests from the IQ, from the Wechsler.

Q.    Now, I'd look to turn to Mr. Fields' assessment in particular.

What testing did you do as part of Mr. Fields' assessment?

A.    So he sat for aphasia screening, which is language screening, perceptive and expressive.  He sat for a partial sensory exam.  He was administered subtests or portions of the Wechsler Memory Scale, Third Edition. He sat for the Wechsler Adult Intelligence Scale, Third

Edition.  Trail Making Test.  Category Test.  Wide Range Achievement Test, Third Edition.  And there some -- I did do some mental status testing.  I administered some selected items, a few items, from the Luria-Nebraska, which is a different neuropsychological test battery.  Diagnostic interview, and I think that's got it all.

Q.   If it would help -- would it help your recollection to look at one of your reports?

A.   Sure.

Q.   Binder five, Defendant's Exhibit 73.

A.   You said 73?

Q.   Seventy-three, sorry.

A.   Got it.  There's a paragraph on page three.  The fourth full paragraph that lists the test that were given.

Q.   And for some of those tests you mentioned, you just did some subparts of the full test battery; is that correct?

A.   Yes.

Q.   And is that appropriate?

A.   I think it's reasonable, appropriate.

Q.   Do other neuropsychologists in the field also do similar subpart administration?

A.   Other neuropsychologists, whose reports I've read,

will use bits and pieces of various tests as well, sure.

Q. And then in terms of -- is it your practice to also to have somebody who's familiar with these tests score them or check your work?

A. I generally do.

Q. Why do you do that?

A. Trying to be as accurate as possible, which doesn't always work.

Q. And did you have someone do that here?

A. I had one of my technicians go through the test protocol for scoring purposes.

Q. And referring to -- if I could have you look at binder five, Tab 78.

Are you there, Dr. Gelbort?

A. Yes.

Q. In preparation for this hearing, did you review your raw data?

A. Yes.

Q. Are there any corrections to your data --

A. Yes.

Q. -- that you noticed?

Do you recall those corrections?

A. In general, I'd have to look at my own notes to find all of them. I see one here that's noted, and the

313

scores that -- the full scale IQ, I think, increased I believe. Is it okay if I look at my notes?

Q. Yes.

A. The full scale IQ is a 94 rather than a 93, and the performance, the non-verbal IQ, should be a 95 rather than a 94.

Q. And you're referring to the summary sheet, page one.

A. Yes, the PIQ should be a 95. It's listed as a 94. The FSIQ, full-scale IQ, should be a 93. You can see the picture arrangement has been adjusted from an eight up to a 9. And in conjunction with that, there are also, in terms of following protocol, I think it was picture or range, one of subtests, where he zeroed out the last three items. I didn't record them in the protocol.

So essentially it looks like I stopped prematurely. He actually took all the items. I just didn't record the times or the mistakes, that he had made mistakes, and there maybe have been something else too, one other spot. I don't recall offhand.

Q. Was it related to block design, or BD?

A. I'm sorry?

Q. Is it related to something regarding BD number 13?

A. Block design?

Q.    Yes.  Maybe.

A.    I can look.

No.  Block design is accurate.

Q.    I might have that wrong, Dr. Gelbort.

A.    Yeah.  I'll find it for you.

Q.    In your review and given these adjustments, did your opinions, your overall conclusions, and your opinions regarding Mr. Fields' impairments change in any way based upon these changes?

A.    No.

By the way, it was picture arrangement was the one where the last three items he was incorrect, and I don't have the zeros circled showing that he was in error.  And I don't have his responses notated.

Q.    Thank you.

And following your assessment, do you recall giving Ms. O'Connell, counsel in this case, a summary of your findings soon after the evaluation?

A.    I did.  I do remember.

Q.    And then did you write-up your preliminary findings?

A.    I think that that's correct.

Q.    I would ask you to turn to binder five.  Maybe that's already in front of you.  Defense Exhibit 81.

Referring and directing your attention to the

first email in the chain that shows up on the bottom of the page, is that an email from you?

A.    It appears to be, yes.

Q.    And who are you sending that to?

A.    It appears to be sent to Julia O'Connell.

Q.    What were you sending Ms. O'Connell?

A.    It says, "Hi, Julia.  Here it is - draft.  Let me know what to do next.  Thanks."

Q.    When was that sent?

A.    It is dated November 10, 2004.

Q.    And now I'd like you to turn to -- in the same binder five, Defense Exhibit 73.

     Can you identify this document?

A.    Yes.  It appears to be a draft report regarding Mr. Fields.

Q.    In addition to it saying "draft" on the top of page one, is it signed?

A.    No, it is not.

Q.    Is this the first report that you sent to Ms. O'Connell that is referenced in the email that we just discussed?

A.    I think that's correct.

Q.    And referring you to the last page of that report, page four, to the final paragraph, what was your overall conclusion at the time?

A.   In general terms, that he was having some cognitive deficits showing up in the testing.

Q.   And in that paragraph, you mentioned he displays a pattern often found in individuals with frontal lobe or non-dominant -- dominant hemispheric neurocognitive dysfunction of brain damage with further evaluation warranted.

What did you mean by, "further evaluation warranted"?

A.   I was hoping that he would be referred for neuroradiological studies, such as FMRI or PET scan.

Q.   And does the absence of medical testing such as an FMRI or a PET scan, does that make you any less able to reach your conclusions that you reached regarding his cognitive impairments?

A.   No.   The cognitive impairment is there whether or not you have additional testing.   But sometimes the other testing is nice to have to help others gain confidence in the opinions coming from the neuropsychological evaluation data.

Q.   And did you also suggest giving Mr. Fields an MMPI?

A.   I did.

Q.   What is the MMPI?

A.   Well, in particular, I suggested the MMPI II.   I

believe, which is the Minnesota Multiphasic Personality Inventory, either the original or the second edition.

It's an objective personality test as opposed to a projective personality test. And it's the most widely researched and used psychological test in the world.

Q. And does the fact that you did not administer the MMPI make you any less able to reach the conclusions regarding Mr. Field's cognitive impairments that you reached?

A. No.

Q. Why not?

A. The test is nice to have certainly, and I prefer to give it. But in light of these data and the consistency within the data, I was not concerned about what the MMPI is used for, which is it's -- it's a personality test, but it has some nice validity scales with it that tell you about the person's or affirm the person's test-taking attitudes. And when someone is not approaching testing as requested, meaning putting forth good effort, if they do that on the MMPI II it will show up in the validity scales quite often. Now, it's not categorically. You can't just look at the validity scales and say yes, they are or no, they're not putting forth good effort. But it gives you some additional outside the cognitive realm affirmation that

they're doing what they're supposed to be.

In this case, because the internal consistency of the neuropsych data was very good, I didn't worry that he was not doing what he was supposed to do.

On the other hand, when I go into constructing a battery, it is something that I'd like to have.

Q. And did you need to administer any additional neuropsychological testing to Mr. Fields in order to reach the conclusions that you reached.

A. I didn't feel like I needed to administer any more of the tests that I use, no.

Q. Now prior to trial, did counsel ask you about additional testing?

A. I think there was a discussion, and I believe I made them aware that I was hoping that there were would be other types of tests given.

Q. Okay. Did counsel ask you about additional neuropsychological testing?

A. I think that that came up. I'm not positive. And I don't have a complete independent recollection, but that likely was part of the discussion.

Q. Would showing you an email from the time of the trial help refresh your recollection?

A. Probably if it's relevant.

Q. I would ask you to go to binder five, Defense

Exhibit 85.

A.   Okay.

Q.   Did you -- referring to the initial email, who is that an email from?

A.   From Julia O'Connell.

Q.   May I just have-- sorry.  I got ahead of myself. Will you just briefly read through that email before I start?

A.   Okay.

Q.   Does that refresh your recollection as to whether counsel asked for additional testing?

A.   There was a discussion of additional testing.

Q.   When did counsel ask you to do that?

A.   So it's dated June 13, 2005.

Q.   And you were willing, correct?

A.   I was.

Q.   And do you recall counsel ever specifying what additional testing they wanted?

A.   I don't believe I do, no.

Q.   Now, we have just -- earlier we were talking about the preliminary report that you did in this case.

     Did you do another draft report?

A.   Yes.

Q.   I'd ask you to -- hopefully you still have binder five, Defense Exhibit 82.

A.    82?

Q.    82, correct.

Could you identify that document for the court?

A.    What I have under 82 --

Q.    It should be an email chain, Dr. Gelbort.

A.    Yeah.  It looks like something -- it says, "Julie, be sure to send a copy of this to Lisa and David."

Q.    And then the initial email at the bottom.

A.    Is apparently from me, "Check this out.  See attached file.  Fields.doc."  And then I don't know if that's considered an emoji or just an image that shows there was a document attached.

Q.    And referring you to -- and when was this document sent to Julia?

A.    March 8, 2015.

Q.    And now I'd like to show you -- I'm sorry to have to switch binders, but binder six, Defense Exhibit 121.

A.    Do you say 1-2-1?

Q.    1-2-1.

Could you identify this document for the court?

A.    It appears to be the second draft of the report.

Q.    And you say "draft".  Is this report signed?

A.    No.

Q.    And how many pages is this draft?

A.    Two.

Q.   And I direct your attention to the last two paragraphs.  Could just explain what your general conclusions that you provided to Ms. O'Connell were?

A.   So in the second-to-last paragraph it starts off, Tests of higher cognitive abilities were consistently in the mildly impaired range.  Suggests impaired frontal lobe and whole brain functioning; slowed processing speed.  Mild impairment in performance flawed by impulsivity and disinhibition.  Performed better on untimed tasks.  Additional poor planning, difficulty generalizing.

Last paragraph, average to low-average intellectual disabilities, mild impairments in frontal lobe functions correlate with poor impulse control, poor reasoning and judgment, impaired abilities to reason adaptively and anticipated consequences of one's own actions appear to be long-standing issues.  They appear to have a detrimental affect on his behavior; would contribute to his having had difficulty in unstructured situations and understanding appropriate from inappropriate behavior.

Q.   And I'd like you to start with kind of that first -- the first conclusion that you started with.

How did Mr. Fields do on tests of higher cognitive ability?

A.    His performance, we had mentioned before categories, the Category Test and Trail Making, and he was showing borderline impairment to moderate impairment on both of those tests.

Q.    And when you say "mild impairment," what does that mean?

A.    Mild shouldn't be thought of as a lay -- in the lay parlance, you know, when I talk with patients about this, we normally end up arriving at mild cognitive impairment is not like a mild cold where it's not a big deal and it goes away.  But rather mild cognitive impairment statistically means that you're pretty much in the bottom of 7 to 5 percent of the population. You're toward the back of the proverbial line and it affects how you function in terms of cognitive situations.  So it's a mistake to think that "mild" is not a big deal.  It does not matter much.

      In fact, 95 percent people of who suffer or acquire traumatic brain injuries are classified as suffering a mild injury, which is also considered to be life changing for the majority.  So it's a significant issue despite the word in lay parlance of being "not a big deal."

Q.    And you mentioned the Category Test and the Trails test.

A.    Yes.

Q.    Were Mr. Fields' results on these consistent with mild impairment?

A.    Yes.

Q.    What type of -- in regarding, especially that Category Test, what type of functioning does that test test?  Sorry for the double test.

A.    It's viewed as being a visuospatial or non-verbal type of problem-solving task.  And I would love to demonstrate.  I think it's the most fascinating test we have on the whole battery.  But it's kind of -- sometimes I describe it as the *Jeopardy!* of tests in that on *Jeopardy!* they don't ask you a question and have you give an answer, but rather they give you the answer and it's the reverse.  You have to come up with the question.

So on categories that are for each particular question, there's over 200.  It's a forced choice where the answers are either one, two, three, or four. You're shown a variety of cards that are separated into various subtests and within each subtest, say for the last one, there's one idea or concept.  The test administrator doesn't say here's the idea, here's the concept.  Go ahead and use it.  That would be the non-*Jeopardy!* version.  But rather the patient is

instructed that there is a concept or an idea.  And if you can figure it out, you should be able to get the following items correct.  There's one idea per subtest.  It could be repeated or could be novel, and I'll tell you if you're right or wrong.  You get one guess per card.

Again, there's four choices.  So just if you were guessing you would get one correct and three incorrect out of every four on average.  And the patient, if they're up to it, tries to figure out a hypothesis or an approach.  When they're wrong, hopefully they don't give you the same answer or the same type of answer and they go on and figure out the concept and apply it.

So they generalize from one stimulus to another stimulus once they figure it out and they have to reject wrong answers and not become stimulus bound.

I don't know that I've done a great job of painting a word picture of it, but if you watch someone take it, it's remarkable.  And as a tester, it's fun because you see a lot of information.  When people make wrong answers, you can see which way they're going, kind of follow the target offtrack.

Q.    And if you have your data up there, if it would be of assistance, but can you tell us about kind of the --
some parts of that test that stood out and how they

reflect Mr. Fields' limitations or thinking?

A.    Sure.  So Mr. Fields was interesting to test just for some of the reasons I'm saying in that he arrived at correct answers some of the time, and on the easier tasks when he figured out the right answer, he did a reasonable job of continuing to use it even when what he was looking at changed slightly.  That's part of the test.  You have to apply what you just learned to a different stimulus configuration or to a different situation, to use more common language.  And then there were other times when he did become stimulus bound. For example, there is one task where the information inside the task progresses.  So it goes -- let's see if I can give an example without giving away the test.  It goes from one point to another point to another point. And Mr. Fields figured out the way to approach the test to get the right answer, but he got confused or he didn't recognize that the information was progressing from point one to point two to point three to point four.  And because of some natural pull within the stimulus, he went from one to two to four to three. And, hence, was getting certain questions incorrect just because -- he understood what he was supposed to do.  But he didn't apply it and catch on that he was going one, two, four, three rather than one, two,

three, four and kept making the same mistake for a long period of time. So he didn't give up even though he was hearing wrong on one out of two of the answers. The ones and twos he was getting correct, but the threes and fours he kept reversing, and he didn't catch on to that. He got stuck.

So you could see, just based on that, what was happening to him.

Q.    And just to clarify, when you mentioned without giving away the test, what were you referring to? Just you had said I don't -- without giving away the test. Is there -- are you able to show the testing today?

A.    I should not be showing the testing and, you know, granted it's in your binders. I understood the test results and the test questions are in the binders.

But as a psychologist, and there's two principles. There's the American Psychological Association ethical principles that preclude me from giving away the test questions. So if people knew what the test questions were it would invalidate the test and then they're not useful and then we can't help people, because that's what we're supposed to be doing with this stuff.

Then the other issue is that the publishers have copyright. The questions are not supposed to be let out or given out unless you can prove to the publisher

that you're trained to safeguard and use the test appropriately on behalf of patients.  You're not supposed to be able to access -- to get access to those -- the test questions.

So, you know, when people -- the thing I see over and over again, which is disturbing, is the Rorschach cards are published in public domain.  That's not a good thing, but I try to safeguard.  I try to do what I'm supposed to do.

Q.   When you try to do what you're supposed to do, does that usually entail providing your raw data to another neuropsychologist rather than a non-expert?

A.   Well, I can provide my raw data.

You know, in my office when someone says, We'd like you to send the data somewhere.  The automatic response is, Please have that person forward their license.  And if the license is as a -- if they're a licensed or registered psychologist, depending on the jurisdiction, we just go ahead and release the data. Because by virtue of their training, they should know how to safeguard it, as do I.  It gets a little sticky sometimes.  We'll have someone call for us to send the data to a physician.  Well, just because they're an M.D. doesn't mean they're trained on how to utilize psychological test data.  So the fall back and it's not

just for physicians but anyone.  If you can show that you have proper training to utilize the data appropriate, safeguard the questions, we'll release it.  But, you know, short of that, then we end up going through a bit of a rigmarole.  And I can't tell you how many times that I've sent it to a judge with the envelope that's sealed with the same instructions that I've just given you in asking the judge to please safeguard it and the reasons why.  It's up to them.  I'm not going to tell the judge, no I won't.  I'll give it to the judge and let them make the best judgment.

Q.    Thank you for that explanation.

We have just been talking about the Category Test, and you also mentioned relying on Mr. Fields' performance on the Trails test to come -- to reach your conclusions regarding the high -- his higher cognitive impairment.

Can you talk just briefly how he did on the Trails test?

A.    He was a little slow on Trails A, which is the easier version.  On Trails B, his speed was based on Halstead-Reitan norms into the -- just into the impaired range and he made an error.  No errors are -- you're not supposed to make errors on either one of them.  The test is straightforward enough.  It's not

that difficult to go error free.

Errors normally reflect impulsivity or disinhibition.  Excuse me.

Q.   And then the third thing that you had mentioned in terms of what tests that you had relied on to reach the higher cognitive abilities determination, was his performance on the WAIS-III, some of the subsets?  Could you talk briefly about that?

A.   So the -- so it takes a little bit of digression.  There's absolute impairment.

So, for example, his speed on Trails B was based on Halstead-Reitan norms in the absolutely impaired range.  Meaning 95 out of 100 individuals will score better than a certain cutting score, and he was slower than that.  So that puts him at the bottom of five percent in absolute terms.

On the Wechsler Intelligence Scales, you can also -- it's very easy to look at relative performance.  So someone who is performing reasonably well, ten is average, standard deviation is about two and a half on the subtest.  Someone who is scoring 13s, 14s, 15s, for example, the verbal subtests, things that are verbally mediated where it takes verbal skills to perform, but they're only scoring with eights and nines on the visuospatial performance subtests, eights and nines are

still in the normal range, but if you're consistently in the high average or even superior range verbally but you're average to low average on visuospatial, you're not in the absolute impaired range.  But relatively speaking, those numbers are coming from different domains, and the appropriate and fair interpretation is something has happened.

There's a reason the visuospatial scores are suppressed, even if they're not in the absolutely impaired range.  They're not you know, the low fives or whatever.  Something is different, and you have to recognize that there is something amiss there.  That's not normal.

Q.   And looking at all of the results that we've discussed, are those results of a normal functioning brain?

A.   My interpretation, based on training and over 30 years of clinical practice, is that this pattern of data is coming from something other than a normal functioning brain.  It's not grossly impaired.  It's not severely impaired, but it is different from what you expect from a normal functioning brain.

Q.   Would this classify as brain dysfunction?

A.   Correct.

Q.   What type of brain dysfunction, specifically?

A.    Well, the areas of the low side that seem to be having more difficulty based on the pattern of test results, tend to be more anterior or frontal, as well as slight tendency more towards the right cerebral hemisphere, or the non-dominant cerebral hemisphere, which is likely the right hemisphere.

Q.    And just going back to you -- that talked a little bit about that Mr. Fields did not always score in the impaired range; is that correct?

A.    When you say "did not always," we're not talking about across time.  We're talking about across tests, I think, right?

Q.    Correct.

A.    Yeah.  No, some of his scores are absolutely in the normal range.

Q.    Do average performances on specific tests rule out or contradict your finding of brain dysfunction?

A.    Not at all.  In fact, as I was explaining, when you're looking at relative functioning from a person strong to their weak, average performance says that they're capable.  That the brain in some ways or some areas is capable of average performance.

So just because there's some average scores doesn't mean that the scores that are other than average are in the impaired range don't count.  They

all count.

In fact, that's kind of where you get the story as to what do you do with a person like this?  You start saying they've got some strengths, those are the average scores.  They have some weaknesses, those are the ones that are much lower.

You start -- if you're trying to treat them, which I've done for years and years, you try to help them use their strengths, the average abilities, to overcome the weaknesses.

Q.   And in Mr. Fields' cognitive profile that has weaknesses and strengths, is it surprising that he was able to hold a job?

A.   Not to me, no.

Q.   Is it surprising that he could have done some computer programming?

A.   No.

Q.   Why is that not surprising?

A.   Well, first off, to delve into it, hold a job. Does that mean he was -- there's a nuclear power plant very close to my office so I use this as an example. Does that mean that he could run the board?  Meaning control that nuclear power plant?  Is that the job that you're talking about?  I would suggest, no, he's not capable of that kind of a job.

Is he capable of doing some simple, straightforward, repetitive concrete factory work and the like?  He should be able to do that.  He may take longer to learn it than someone with a more normally functioning brain.  But if emotionally he's up to it, he could certainly hold a job like that and you could call him successful.

Q.   Okay.  Now, I'd like to turn to just kind of discussing a little bit more about executive functioning.  We've talked about executive functioning and frontal lobe functioning.

Would these be the same description for the same type of functioning?

A.   They're synonymous, yes.

Q.   And generally speaking, how do frontal lobe impairments affect one's daily life?

A.   There's no one pattern, if you will.  It depends on which areas are working less well, which areas are still better preserved.  But what you can anticipate overall, as I said the frontal lobes are responsible for initiating and inhibiting, inhibiting inappropriate impulses, squashing those inappropriate thoughts we all have, but know not to act on.

If there's defects in frontal lobe functioning, all of a sudden some of those things may break through.

People may have trouble sorting, figuring out what I see in front of me.  "Here's the information that I have.  How do I put that together to arrive at some sort of an action plan?"

Again, when I'm debriefing patients, I oftentimes will hold up my hand with all five fingers, and say, you know, there's five bits of information in front of you.  Some patients who have frontal lobe disturbance, may only react to the first two or three or four.  They don't realize that you need to look at all five.

Other patients may react to all five equally when only two, three, and four are the only relevant or salient bits of information.

So the more functional your executive cognitive abilities are, the better you are at reasoning, problem-solving, demonstrating appropriate judgment, real-life applications, understanding the ramifications of your behavior and your actions, being able to anticipate what's going to come next.  If I do this, that or the other, what's that going to get me?  Is it okay to do this, that, or the other?

Those are all the things that come through your frontal lobes.  And when the frontal lobes are the weak link, if you will, they're not keeping up with the rest of the brain, you get people who make bad decisions,

who have bad judgment, who don't problem-solve or reason very well.

Q.   And would that be Mr. Fields in this case?

A.   His testing shows evidence of weakness in those types of cognitive endeavors.  While he has held a job, he's not been a real stable member of the workforce. His interpersonal life has certainly had its ups and downs.

It's easy for people because that's where -- how we look at one another as attributing that to emotional issues or personality quirks.  But cognition is, again when I'm working with patients, this is where I hold up my left hand and I say that's your cognitive ability and I hold up my right hand, that's your emotional or interpersonal ability, and I link the fingers together and they affect one another.  They drag each other up or down.  They help or hinder each other.

Q.   And now at some point did you -- turning away from your findings for a minute, were you asked to do a final report?

A.   Yes.

Q.   Could you turn to -- in binder five, Defense Exhibit 86.

A.   Yes, I did.

Q.   When did -- reviewing that email chain, did

Ms. O'Connell ask for a final report in June of 2005?

A.    So the third paragraph she is asking, so how soon can you have me a final version, referring to the report.

Q.    And then, sorry to make you switch, but if you can pull out binder one and Defense Exhibit 4.

A.    I have it.

Q.    Could you identify this document?

A.    I'm sorry?

Q.    Just could you identify the document?

A.    That is my final neuropsychological evaluation report.

Q.    Is that report signed?

A.    That one is.

Q.    And based on the -- I would refer you to the header or footer, I should say, is it possible to tell the date that was sent?

      I think it's called the footer but the bottom, at the bottom of the page.

A.    It looks like it -- it's upside down now, July 1st of 2005.

Q.    Okay.  And some of the conclusions in this report are the same as in previous drafts and some are phrased slightly differently than earlier drafts.

      Such as here on page four, it states, "In general,

there are indications and evidence of cognitive anomalies and abnormalities such that his, being Mr. Fields, neurocognitive abilities cannot be seen as normal."

Are cognitive abnormalities --

THE COURT:  Where were you reading from?

MS. ENSLER:  Pardon me.  Page four, middle of the paragraph of the top of page four.

Q.    (BY MS. ENSLER) Dr. Gelbort, are cognitive abnormalities and cognitive dysfunction the same thing?

A.    Yes.

Q.    Did your findings from the data ever change despite different iterations of your reports?

A.    No.

Q.    In short, did your data show that Mr. Fields' brain was functioning dysfunctionally, was not functioning?

A.    That's easy for you to say.

The data showed scores that in some cases based on absolute levels, and other cases based on relative levels, were different from what you see, or expect to see, from a normal functioning brain.  And there was enough consistency.  It wasn't --

Frankly, I'm always looking for three or more data points before I want to make an interpretation.  I

don't want to find one piece of evidence.  It can be particularly abnormal, in which case you have to explain it.  But I would much rather find a pattern.

As I said before, that's what diagnosis is, is finding the pattern and understanding what it reflects.

In this case, the pattern was there.  There's not gross abnormalities, but there's a consistent pattern of abnormalities and the interpretation is there's dysfunction.

Q.   And would this dysfunction have impaired Mr. Fields?

A.   It certainly would have affected him.

Q.   How long after the crime did you conduct your testing, if you recall?

A.   Something about a year post at least.

Q.   Regarding the impairments that you found, has Mr. Fields had these impairments since the time of the crime?

A.   Correlating what I saw going on in the data with his presentation with the history I had, yes, they would have been long standing.

Q.   When you say history, did you know of any intervening incidents between the crime and when you assessed Mr. Fields that would have affected his impairments?

A.    I didn't -- certainly, I was not aware of and there could have been.  But I wasn't aware of any injuries or accidents, which would have caused brain dysfunction or damage.

And then his medical condition, it appeared that when I tested him, he was probably functioning as well or better than he had been in the past.  The acute anxiety that he described was not evident, not present when I saw him.  So the effects of anxiety that might have affected testing in a detrimental way in the past were not present that I could see.

Q.    Are you somewhat aware of the circumstances, Mr. Field's crime?

A.    I have read descriptions of what reportedly happened, yes.

Q.    And that would include seeing the victims, Mr. and Ms. Chick days before and then returning to the crime scene days later.  And that would include his actions on the day in question, putting a camouflage suit, known as a ghillie suit, on as well as waiting at a distance before shooting the victims.

A.    That's what I have read.

Q.    Would you describe this as aberrant behavior?

A.    Yes.

Q.    And were Mr. Fields not to suffer from these

cognitive impairments that we've discussed, would this aberrant behavior have been less equal or more likely to have occurred?

A.    I think it would have been less likely to have occurred.

Q.    Absent his impairments?

A.    Correct.

Q.    Why is that?

A.    When you have problems with your thinking abilities, that they are present with you and you carry them with you always --

Going way back when we were talking about selecting tests and I said some tests don't have clinical significance or they're not terribly relevant, you know, so I gave the example of speech sounds perception.  If he had difficulty in that area or didn't have difficulty in that area, I don't think it would have a whole lot of impact on what occurred in this case.

But having difficulty with problem-solving and reasoning, being less able than a normal person to effect appropriate, adaptive goal-directed in a positive way, problem-solving and reasoning, leads to people being more likely to engage in inappropriate behaviors.

They don't have the benefit of having the cognitive ability to say, if I do this, that may happen, so I shouldn't do this.

So if he didn't have those deficits, in all likelihood he would have been less likely to engage in something that is aberrant.

Q.   How would stress affect his impairments?

A.   Stress, you know, a certain -- you need a little bit of stress to be motivated to do things.  There is a lot of research on the inverted U-shape function about stress.

But when you're at levels of stress that can be debilitating, confusing, cognitively disorganizing, it's like the gyroscope that's spinning.  It's winding down, it's starting to wobble, stress tends to make people have more difficulty making good decisions.

Q.   Was Mr. Fields under any stress at the time of the crime?

A.   Based on the records that I saw, he was under financial stress and he was living in his truck.

Didn't know where he was going to have any money.

Q.   Okay.  I'd like to turn to a little - I'd like to turn to a different topic.

When you see people with impairments like this, what do you do?

A.    Hopefully, catch them early.

We see patients with this pattern not infrequently.  I see them more often than not on the psych unit.  And the ones I see more often than not, again, is adolescents, who are having mild cognitive issues, and the typical story is they do something that they will refer to "as bone-headed" or being "like a knucklehead" and they get put out on the psych unit.  Then we evaluate them, trying to figure out what to do with these individuals.

So the outgrowth is we treat them in trying to restrict their environment starting off with being on the psych unit, which is locked, so they have fewer choices to make.  You know, their big choice is, Do I take the apple or the orange out of the basket?  A bad decision is to take the whole basket, and that gets them in trouble and they learn not to do that because they're instructed.

But, generally, we remove a lot of choices from them to kind of clamp down, if you will, and then we talk with them.  We provide talking psychotherapy treatment to help them recognize if you do this, then that's going to happen.  The ones that are very concrete, we do a very concrete job.  With those who have some capacity for insight, we try to develop that.

And then we also will medicate, so there are certain conditions where medication is absolutely the first approach to treatment.  Bipolar disorder people need medication.  Otherwise their nervous system doesn't really allow them to conform their behaviors and to recognize what gets you what.  There's also mood stabilizer medications that help take the highs and the lows out so they're not as impulsive.  They're not ruled by their brain chemicals and the abnormalities of the brain chemicals.

So between those, you know, also teach the family, you know, work with the people in terms of controlling the environment, providing the proper medication, and doing some therapy.

Q.   When you said controlling the environment, was the key aspect of that creating structure in the environment?

A.   Structure is if not a 100 percent of the time, it's 98 or 99 percent of the time.

You know, it's harder to get in trouble if you're not running around on the streets at 11:00 at night or 2:00 in the morning.  So, yes, we work very hard to impose structure so that there's fewer bad choices that can be made by the person.

Q.   And did my office provide you with an expert

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

report related to Mr. Fields' military experience?

A.    Yes.

Q.    Could you open binder two, Exhibit Number 25.

A.    Did you say 35?

Q.    Twenty-five.

        MR. STEWART:  Your Honor, at this point the government would like to renew its objection to the relevance of the navel records as set out in our motion in limine.

        THE COURT:  Very well.  Let's see where this goes.

    Twenty-five; is that correct?

        MS. ENSLER:  Twenty-five.

Q.    (BY MS. ENSLER) Dr. Gelbort, is this a report from Mr. Art Cody that you reviewed?

A.    It is.

Q.    Do you recall how Mr. Fields did in the military according to Mr. Cody?

A.    Mr. Cody described Mr. Fields as having done reasonably well.  That he got good reviews.  He was given access to things that showed his supervisors were confident in his ability to act appropriately.

Q.    And is his performance in the military surprising given his impairments?

A.    I wouldn't say surprising.  I think it's more a

testimony to the fact that in a controlled environment,
he can conform and do a reasonably good job.

Q.   When you say a "controlled environment," you're
referring to the military?

A.   Absolutely.

Q.   Did my office also ask you to review a report from
a Ms. Maureen Baird?

A.   Yes.

MR. STEWART:  Your Honor, we would also
object to Ms. Baird's --

THE COURT:  Well, let's deal with 25.

Is defendant moving to admit Defendant's
Exhibit 25?

MS. ENSLER:  I would be moving to admit it
under documents that Dr. Gelbort reasonably relied on.

THE COURT:  I don't think he -- I didn't
really hear all the foundation for that.

So, I don't think it's admissible at this point
based on Dr. Gelbort's testimony.

MR. STEWART:  And, Your Honor, we would be
objecting to Ms. Baird's as well.

THE COURT:  All right.  What number are we on
now?

MS. ENSLER:  May I go back to Mr. Cody's
report, Your Honor?

THE COURT:  Okay.  Back to 25.

Q.   (BY MS. ENSLER) Dr. Gelbort, in forming opinions, is this type of report discussing a client's background and professional experience, a type of report that you would reasonably rely on in coming up with your opinions?

A.   If it's available, sure, I would entertain this.

MS. ENSLER:  I would ask that this be offered under rule -- Evidentiary Rule 27.

THE COURT:  Well, it's dated April of 2022. So I'm trying to see how it was relevant to Dr. Gelbort's formation of his opinions in 2005.

Frankly, I haven't even heard that he's reviewed it yet.  But even to the extent he has, this is dated well after he would have formed his opinions.  So I'm not trying -- I'm trying to understand how that would be relevant to his opinions at the time that we're talking about, which was the trial in 2005.

MS. ENSLER:  Counsel could -- there's -- counsel could have gotten this report and provided it to Dr. Gelbort.  The origination --

THE COURT:  But we do not know that.

Again, it's -- I know it's dated and I assume that you are going to have Mr. Cody, that was one of your witnesses, but I don't know when or what this was done.

I don't know how it was done.  We do not know anything about it.  We just know it's current or recent, and has no relevance to what I think we're talking about here, which is Dr. Gelbort's opinions in 2005.

So I don't see the relevance, at least as it relates to this witness, so denied.

Not admitted at this stage.

MS. ENSLER:  May I reurge --

THE COURT:  You may reurge it when you have Mr. Cody here since he drafted it.  But at this point in time, I don't see the relevance to this witness.

Q.   (BY MS. ENSLER) Dr. Gelbort, if there was information at the time that you did your report and could have testified at trial, that about Mr. Fields' performance in the military, would you have incorporated that in your testimony?

A.   I would have considered it.

Q.   And did my office provide you a report from Ms. Maureen Baird?

A.   Yes.

Q.   I would ask you to --

MR. STEWART:  And, Your Honor, this is where we would reurge our objection to Ms. Baird.

THE COURT:  Well, let's get there and let's see what we can do.

Q.    (BY MS. ENSLER) I'd ask you to turn to binder two, Defendant's Exhibit 27.

Did you review this report, Dr. Gelbort?

A.    I did.

Q.    Is a report of this nature something experts in your field would routinely rely upon -- would reasonably rely upon in coming up and forming their opinions and conclusions?

A.    I think so, yes.

Q.    And do you recall whether Mr. Fields had any disciplinary issues as described by Ms. Baird pretrial?

A.    My recollection is that he did not.  He had none.

Q.    And how long was he incarcerated pretrial?

A.    I think it was approximately two years.

Q.    Is it surprising that he did not have any disciplinary issues those two years?

A.    In my experience with individuals who are incarcerated, it's remarkably rare to go a couple of years with no infractions whatsoever.

Q.    And so is it your opinion that prison could control Mr. Fields' behavior?

MR. STEWART:  Objection.  I'm going to object that that's outside the scope of his expertise.

He has not testified as a prison expert or anything.  He's a neuropsychologist, which obviously we

can see, but he doesn't have the expertise.

THE COURT:  Sustained.

Q.   (BY MS. ENSLER) Is it your opinion that Mr. Fields, based on his cognitive impairments would perform better in structured settings?

A.   Structured settings is an appropriate way to try to help him conform his behavior or behave better, if you will, yes.

Q.   And now I'd like to move to the -- your pretrial experience.

Did Ms. O'Connell also tell you that you would be needed to testify at Mr. Fields' trial?

A.   That was my understanding.

Q.   Did she ever tell you otherwise?

A.   No.

Q.   Did Ms. O'Connell send a contract for your trial testimony and travel expenses?

A.   I'm pretty sure that she did.

Q.   I would ask you to open binder five and turn to Exhibit 75.

Do you recognize this document?

A.   It's a letter.  I think it's the contract.

Q.   Referring you to the bottom of page one, what were you -- what were you agreeing to do for Ms. O'Connell under the contract?

THE COURT:  Are we on the cover page or --

MS. ENSLER:  Oh, I'm sorry.  The bottom of page two.  I misspoke.

Thank you, Your Honor.

THE WITNESS:  All right.  It discusses fee structure.  It goes on saying, "For your part," referring to me, "you agree to travel to Muskogee, Oklahoma, to testify regarding your neuropsychological evaluation of Mr. Fields."  Also, "Additionally, you will prepare for your testimony by reviewing reports of other defense and government experts, which" -- I can't read through the overtype.  Something that I think they will provide to me.  "Agree to meet with the defense team prior to testimony to prepare for your examination."

Q.    (BY MS. ENSLER) And when was that contract sent?

A.    It's dated July 6 of 2005.

Q.    Okay.  Oh, could you just read the full paragraph? You did not read the last.

A.    The last line and a half, "Finally, you agree to consult with all members of the defense team, including other experts, in an effort to prepare the attorneys to cross-examine government's mental health expert witnesses."

Q.    In preparing your contract, do you recall when she

told you, she being Ms. O'Connell, told you that she would need you?

A.    The next page it goes on to say, Jury selection begins July 5th.  Sentencing hearing -- anticipated sentencing hearing will begin on July 13th, and it's not contained in here, but she had suggested that she would probably need me on July 18th.

Q.    And at some point, did you remind Ms. O'Connell of your schedule?

A.    I did.

Q.    Do you recall when?

A.    Not offhand.

Q.    Would an email regarding your scheduling help refresh your recollection?

A.    If it addresses that issue, sure.

Q.    Could you turn to binder seven, Defendant's Exhibit 195.

When did you let Ms. O'Connell know your scheduling?

A.    Monday, July 11th at 9:13 a.m. is when I sent this.

Q.    And did you let her know certain times that you would be available?  And did you also let her know that you would be leaving the country?

A.    I did.

Q.   When would you be leaving the country?

A.   The evening of July 20th.

Q.   And following this email, do you have any -- do you recall any further communication with -- from you or from Ms. O'Connell to you?

A.   I don't recall anything back from Ms. O'Connell.

MS. ENSLER:  Court's indulgence for one moment.

THE COURT:  Yes.

Q.   (BY MS. ENSLER) I'd like to start with just a couple of clarifying questions before moving on to the next topic.

You mentioned mild and borderline impairment.  Are these psychology terms of art?

A.   "Mild" and "borderline" are certainly terms used within my profession.  Borderline, there's no one specific set standard definition of those, but there is pretty much reasonable agreement as to what they refer to.

Q.   And in discussing Mr. Fields' mild brain impairment, did you convey to Ms. O'Connell that was an important issue despite being mild, as you just defined it?

A.   I believe so.

Q.   Have you, among other things, have you reviewed

the report of the government's expert, Dr. Randall Price?

A.    If I have.

Q.    And his raw data?

A.    I've seen that.

Q.    And is Dr. Price also a neuropsychologist?

A.    Yes.

Q.    And did he also conduct neuropsychological testing?

A.    That's my understanding, yes.

Q.    Do you recall when he did his assessment?

A.    It was approximately ten months after I did mine.

Q.    And what is a "practice effect"?

A.    Practice effect refers to what occurs when someone has previously seen the same test questions or instruments, that certain performances are going to be typically enhanced or improved by having previously had experience with those tasks, test questions, activities.  So you can expect on various tests improvement in functioning or score -- or their scores, not necessarily their function.  They score better.  They did perform before.

Q.    And are certain types of tests more vulnerable to the practice effect --

A.    Research shows that the practice effect tends to

be greater on non-verbal sorts of activities.  So different visuospatial or tasks which involve motor movements, statistically show more improvement due to the practice effect than do those that are more verbally mediated.

Q.    And within those tests, would that include the Category Test?

A.    Yes.

Q.    Why is that?  Let me just clarify, why would the Category Test be more vulnerable to the practice effect?

A.    The Category Test is administered verbally, but it taps into visuospatial problem-solving and reasoning. And it's kind of a novel sort of task for most people. Simply having -- the research shows that simply having had experience with something like that previously allows them to function better from the start.

Beyond that, it's just an empirical fact that if you've seen the test before, you stand a better chance of doing better on it than someone who has never seen it before.

Q.    And could that explain the changes in score on -- could that explain change in score on Mr. Fields' performance on the Category Test in Dr. Price's administration?

A.    Sure.  It certainly could be a factor that would lead to Mr. Fields performing better after having seen it before, sure.

Q.    And have you reviewed -- been provided and reviewed the expert reports of Dr. Alan Kaufman and Dr. Clark Clipson?

A.    Regarding Mr. Fields and the testing that he's been administered, yes.

Q.    I'd like you to start -- could you pull out binder four?  I'm sorry, binder two.  Tab 42.

A.    Which one?  I'm sorry.

MS. ENSLER:  Tab 42.

Sorry.  The Court's indulgence, I'm just missing a piece of paper.

Forgive me.  I'm sorry.  Let me get to the page.

Q.    (BY MS. ENSLER) Is this the report from Dr. Kaufman that you reviewed?

A.    Yes.

Q.    Dr. Kaufman and Clipson -- did Dr. Kaufman review Dr. Price's report and raw data?

A.    Reviewed, I'm sorry?

Q.    Did they review Dr. Price's raw data and report?

A.    Yes, that's what it says.

Q.    If Dr. Kaufman found that numerous errors in the administration of the WAIS-III, all of which violated

the standard practices and accepted rules of standard practice, is that something that you could have incorporated in your testimony?

MR. STEWART: Objection, Your Honor, to the extent that the witness is testifying as to what he could have testified to at the time.

These declarations are much later in time than the trial.

THE COURT: The issue is, you know, there is an underlying issue with the investigation that could have been done.

All right. Let's -- we're going to tread carefully, but let's -- I'm going to allow the question.

Overruled.

Q. (BY MS. ENSLER) Could you have incorporated the errors that I have just discussed -- if Dr. Kaufman found that there were errors in the administration of Dr. Price's WAIS-III, which violated standardized procedures and accepted rules of standard practice, could you have incorporated that in your testimony?

A. I could have. And I had seen the errors earlier and made mention of them myself.

Q. In addition to administration errors, Dr. Kaufman describes scoring errors as well. That he made

numerous -- that Dr. Price made numerous scoring errors on the WAIS-III reflecting a failure to adhere to standardized practices.

Could you have incorporated that into your testimony?

A.    Yes.

MR. STEWART:  Objection, Your Honor, to the frame of the question, that he could have incorporated Dr. Kaufman's findings into his testimony.

THE COURT:  Well, I mean, an expert can incorporate another expert's report into their own findings.

MR. STEWART:  Certainly, Your Honor, the report --

THE COURT:  I mean, it's speculative, but speculation is sort of what we're here about.

MR. STEWART:  Well, I guess the specific, concrete issue is that this report that he would have incorporated came in 2015 as opposed to 2005.

THE COURT:  I understand.  The question really goes to could it have been in 2005.

MR. STEWART:  Well, if that was the question that was asked, we wouldn't object.

THE COURT:  Well, I understand.

Ms. Ensler, the question is a little hard to

follow.  Can we try again to get what you're trying --
there needs to be a little more foundation laid here
about what you're trying to get to as to whether he can
or he cannot answer the questions I think that you want
to ask.  I think you're laying much of a predicate for
those questions, though.  So can we back up and try to
lay a little foundation here about what you are really
wanting him to answer.

MS. ENSLER:  Yes, Your Honor.

Q.    (BY MS. ENSLER) Dr. Gelbort, you reviewed
Dr. Kaufman's report.

A.    I did.

Q.    Did you agree with Dr. Kaufman's assessment of
Dr. Price's administration and scoring errors?

A.    I had seen the same errors, not so much in the
administration.  I didn't have access to the audio
tapes, but the description and what was showing up on
the protocol, you know, certainly the scoring errors
were readily apparent and some of the administration
errors based on what was reported it appeared that
there had been some wandering away from the protocol.

Q.    And, therefore, could you have included that in
your testimony or your rebuttal testimony of Dr. Price?

A.    Certainly.

Q.    Could you also have conveyed that to counsel?

A.   Yes.

Q.   I'd like to now turn to binder two.

     I'm sorry; forgive me.  Did I say binder two, Tab 34?

A.   I'm sorry.  Which tab?

Q.   Thirty-four.

     Is this Dr. Clipson's report that you reviewed, Dr. Gelbort?

A.   Yes.

Q.   And did Dr. Clipson also find criticisms with Dr. Price's administration and scoring?

A.   Yes.

Q.   And to the -- with the understanding that you have not listened to the recordings of Dr. Price's administration, do you agree with Dr. Clipson's critiques as they relate to scoring and administration?

A.   Yes.

Q.   And is that information and those criticisms something that you could have incorporated into your testimony at trial?

A.   Yes.

Q.   Is it also something that you could have told Ms. O'Connell?

A.   Yes.

Q.   To prepare her to cross Dr. Price?

A.    Yes.

Q.    Okay.  Dr. Gelbort, I know that we've provided you a lot of materials.  Have you been provided Dr. Erin Bigler and Dr. Travis Snyder's reports?

A.    I know I've seen Bigler's and I'm pretty sure I've seen Snyder's as well.

Q.    Regarding the physical structure of Mr. Fields' brain?

A.    Yes.

Q.    Are the abnormalities that Dr. Snyder and Bigler regarding his large ventricles and thinning corpus callosum, are those consistent with the impairment that you have identified?

A.    Large ventricles, perhaps not in a primary.  In other words, large ventricles are not necessarily a cause of frontal lobe disturbance or executive cognitive weakness, but frontal enlarged ventricles are atypical or abnormal.  And in that sense, if you have someone who has suffered some type of brain injury, brain trauma or congenital issue or some other developmental issue, it may give rise to both enlarged ventricles as well as cognitive impairments.  So it's not that one gets you the other, but they both may be arising from something in the patient's medical history.

Q.   And even if Mr. Fields had a normal MRI, is that dispositive regarding brain impairment either way?

A.   Once more, please.  I'm sorry.

Q.   Sorry.  Even if -- assuming that Mr. Fields had a normal brain MRI, is that dispositive of his impairments that we've discussed today, either way?

A.   No.  As we've already said that, no.  That does not mean that there's -- that you ignore or overlook or make believe there's no dysfunction on his normal testing.

Q.   And, Dr. Gelbort, have you reviewed the reports of the government neuropsychologist Dr. Seward?

A.   Yes.

Q.   I'd like to focus on his second report from this year.  This is going to be -- is there a white binder up in front of you?  Sorry.  I don't know where Government's Exhibit 38 is.  I just know which binder, I'm sorry.  The first binder.

THE COURT:  Okay.  What is the exhibit number?

MS. ENSLER:  Sorry.  Government's Exhibit 38.

THE COURT:  We'll need more Band-Aids from the paper cuts we get.

MS. ENSLER:  Pardon me?

THE COURT:  I'm just commenting on paper

cuts.

MS. ENSLER:  A number of people on our team have received paper cuts in the last two days.  So if you need a Band-Aid.

Q.   (BY MS. ENSLER) We've talked about your assessment of Mr. Fields' effort during your testing.

Dr. Seward criticizes you for not doing a standalone validity test.

Is a standalone symptom validity test required to adequately assess whether an individual is putting forth good effort or malingering?

A.   Contrary to what Dr. Seward writes, no.  At least not per the American Psychological Association, ethical standards, which say that the effort needs to be assessed and you can do it via either things like standalone tests or you can do it, as I mentioned earlier, based on internal consistency of the data, comparing how the data falls out, which is the way it's been done for seven decades.

Q.   And Dr. Seward notes that you made -- this is on page 31.  But that you made test administration errors --

THE COURT:  Let me get there.  Exhibit 31.

MS. ENSLER:  Oh, sorry.

Are you ready, Your Honor, Sorry.

THE COURT:  I am.  I hope everybody -- I mean I just think everybody ought to be ready.

MS. ENSLER:  Yeah, I don't -- I didn't mean to single you out.  I'm sorry about that.

Q.   (BY MS. ENSLER) On page 31, Dr. Seward states that you made test administration errors which had the potential of lowering Mr. Fields' scores.

We've already discussed some corrections.  Do you know of any other errors that Dr. Seward would be referring to?

A.   I don't know.  As much detail as Dr. Seward has provided throughout his 69-page report, he has failed to give the detail here, which I find interesting.

I've already described one of the errors where I didn't finish writing, or I didn't write the three answers that were incorrect.  You know, he's suggesting that if we give full credit for things where there's been a mistake, it would raise the score.  I can tell you that that's what's happened.  So I'm not aware of other errors.

It would not surprise me if there's another mistake or two somewhere in that battery.  You know, the battery takes four or five or six hours to give, and the scoring can be tedious.  That's no excuse, but errors do occur.  It is what it is.

One other point, as long as I am looking at this, it says most of those were administration errors as opposed to scoring errors.  If he's saying most of these, I'm trying to figure out if that means some of them were scoring errors and he just hasn't bothered to list them or is this just a turn of a phrase with a purpose, I don't know.

MS. ENSLER:  Your Honor, I need court's indulgence for a minute or if now would be an okay time to take lunch.

THE COURT:  Well, is your indulgence going to be trying to determine how much longer you have?

MS. ENSLER:  It is.

THE COURT:  Okay.  Let's do that, then we can assess the next question.

MS. ENSLER:  Between 20 or 25 minutes.

THE COURT:  I would rather finish, if that's okay with everybody, the direct.  That way we can break for lunch and then come back on a fresh page.

MS. ENSLER:  Then may I consult with my counsel?

THE COURT:  You may.

If that works for you all down here.

(Pause in proceedings.)

MS. ENSLER:  Thank you, Your Honor.  I think

it will be briefer.

THE COURT:  We like to hear that.  I know the court reporter does.

Q.   (BY MS. ENSLER) Just a few follow-ups, Dr. Gelbort.

First, did the brain impairments that you found on the neuropsychologist testing of Mr. Fields make it more likely that Mr. Fields would commit crimes in the fashion that we described previously?

MR. STEWART:  Objection, Your Honor.  Lack of foundation.  I think that's outside the scope of his expertise.

THE COURT:  Sustained.  At least without any foundation.

Q.   (BY MS. ENSLER) Dr. Gelbort, do you recall whether counsel ever provided Mr. Fields' Navy records?

A.   I don't recall offhand.

Q.   Do you recall whether she provided you his incarceration records or a report from an expert similar to Mr. Cody?

A.   I'm not for sure.  I don't remember it, but I can't say categorically, no.

Q.   And was everything, Dr. Gelbort, that you testified today based on information that was in existence at the time of trial, setting aside

Dr. Seward's report?

A.    That I'm aware of, it was in existence at the time of the trial, yes.

Q.    If counsel had asked you at the time of Mr. Fields' trial to testify to all of the opinions that you have testified today, would you have been able to do that?

A.    Yes.

Q.    And are the opinions that you have given today made to a reasonable degree of neuropsychological and scientific certainty?

A.    Yes.

MS. ENSLER:  No further questions.

THE COURT:  Okay.  All right.  We're at 12:30.  It's a good time to break for lunch.  We can come back and start -- I assume that you're going to have some cross-examination.  Maybe I'm being presumptuous.

MR. STEWART:  Just a few, Your Honor.

THE COURT:  All right.  I expected there might be.

Is an hour enough for lunch for everybody?

MR. STEWART:  That would be fine.

THE COURT:  All right.  We'll be back at 1:30, and we are in recess.

(Luncheon recess taken from 12:31 p.m. to 1:31 p.m.)

MR. LABOVITZ:  Good afternoon, Your Honor.  I think this --

THE COURT:  Wait.  Wait.  Let me get back on. We're back on the record.  It's my understanding that the witness is not present, and that the parties have a legal issue that they wish to address.

MR. LABOVITZ:  Yes, Your Honor.

I think this is going to be a recurring issue with both Dr. Gelbort as well as Dr. Woods and Dr. Grinage, the three mental health experts that trial counsel hired.

And we briefed this a little bit in our response to the government's motion in limine, but we didn't have an opportunity to address it with you during the oral argument the other day.  And I would just note that the Tenth Circuit has held that when the Court is assessing whether a defendant, such as Mr. Fields, was prejudiced by trial counsel's failure to present evidence of defendant's brain damage at a capital trial sentencing proceeding, the Court has to consider whether the brain damage is, quote, treatable, as well as whether the omitted brain damage evidence would have been, quote, double-edged.

And the primary case on that is *Littlejohn v.*

*Royal*, 875 F.3d 548 at -- I'm sorry, Tenth Circuit 2017, primarily at pages 559-60, and 565.

And so when, Ms. Ensler was asking about -- Dr. Gelbort about Mr. Fields' Naval performance as well as his pretrial incarceration adjustment, those -- both those facts can form the expert's opinions as to treatability and double-edged at a minimum.

And so we believe that those questions are appropriate, not only to the testifying expert but, of course, to Mr. Cody, Ms. Baird.  And I would also cite the case, *Frederick v. Quick*, a very recent Tenth Circuit case, at 79 F.4th 1090, (10th Cir. 2023).  The Court reiterated the *Littlejohn* principles and said that the petitioner, like Mr. Fields, has the burden to show that their brain damage is both treatable and double-edge when the court is assessing prejudice.

And under Section 2255, case law from the Supreme Court, we must be allowed to make a full and fair record of our hearing burden.  And I think the fact that this is a capital case emphasizes that point, and I would also note that in *United States v. Kenneth Barrett*, which we mentioned during the call the other day, the only other capital 2255 case from this district, much less in the entire Tenth Circuit, the Court held that the hearing court has to determine if

the defendant has a valid claim for relief.  That's at 797 F.3d at 1224.  I just have the pinpoint cite.

But the Court cannot make the determinations that *Littlejohn* requires, that *Frederick* requires, that *Barret* requires regarding treatability and double-edge without hearing this evidence about Mr. Fields's Naval performance and his pretrial adjustment.

And I just want to note that the evidence is not being offered to prove that Mr. Fields, in that context, has brain damage or that this is somehow rebutting future dangerousness.  It's simply to meet the *Littlejohn* factors that we have to deal with.

And, finally, I would note that if trial counsel had done a reasonable investigation of Mr. Fields' brain damage, she could have developed this evidence that we've been proffered through Mr. Cody, there are Mr. Stanik through Mr. Mach, M-A-C-H, through Ms. Baird as to how Mr. Fields did in a structured setting in both the Navy and his pretrial incarceration because he did conform to all the rules and requirements.

And our position is that the Court has asked questions about whether trial counsel adequately investigated.  And our position is that reasonably diligent trial counsel, whether they, you know, you retrained Mr. Cody or Ms. Baird, they were qualified

experts at the time of the pretrial investigation, who could have reviewed Mr. Fields Naval records, as well as his pretrial incarceration records and given counsel an opinion.

Mr. Mach and Mr. Stanik in their declarations say they were available to trial counsel. The fact that these declarations and reports were written one year ago, two years ago post-trial is irrelevant. Because the question is, was that information in the ether, in existence, at the time trial counsel was assigned to represent Mr. Fields. And had they done a reasonable investigation, could they have uncovered it, presented those, either those witnesses directly, or provided that information to an expert who the Court has acknowledged under Rule 703 is entitled to incorporate hearsay information.

So, I guess, as a bottom line, you know, our position is that Mr. Fields must be able to present this evidence not only, you know, through Dr. Gelbort as well as the experts, who did testify at trial on behalf of Mr. Fields, Dr. Grinage and Dr. Woods. So the Court can both assess the adequacy of counsel's investigation as well as the prejudice factors specific to failure to present brain damage as explicated by the Tenth Circuit.

And I don't know how the Court wants to proceed --

THE COURT:  Well, I want to hear from the government.

MR. LABOVITZ:  Sure.  But in terms of --

THE COURT:  And then I'll explain --

MR. LABOVITZ:  -- I just want to --

THE COURT:  -- my reasoning for what I've done, and maybe between your argument and the government's argument, I'll change my mind.

MR. STEWART:  Your Honor, briefly on kind of an initial point, the idea that counsel had no information about his Naval service is simply belied by the record itself.

The question is, did counsel present as much evidence about his Naval service as defense says he should have?  Incidentally, that claim was raised and denied by Judge White and affirmed by the Tenth Circuit.  So the question of whether they actually knew about his Naval service is sort of beside the point.

The real question is, and this why Dr. Gelbort is kind of a tricky witness, as you've probably recognized, he's testifying to prejudice, and counsel mentioned the *Littlejohn* factors.  We're talking about the *Strickland* factors, which is deficient performance and prejudice.

Now *Littlejohn* has some stuff about prejudice and how it folds into the overarching evaluation, but the question is, if counsel had not made the errors that are alleged, would the trial have been different?  And so the question to Dr. Gelbort that we objected to multiple times is, you know, if you had Dr. Cody's declaration, could you have discussed it, you know, at trial?  And, of course, it's assuming something that just wasn't in existence at the time.

So that was really the heart of, you know, our objection is that it is pure speculation.  You know, obviously experts are allowed to speculate a little bit.  But it's even more beyond the pale of speculation that he would have testified to something that wasn't even provided to him or couldn't have been provided to him.  I know they say, you know, that these experts were out there.  But, of course, there's innumerable experts that might be out there.  This is not a retrospective fishing expedition.  It is a petition under 2255.

So our objection stands as made earlier.

THE COURT:  Okay.  Mr. Labovitz, let me -- are you objecting to my rulings?  Are you making a record of that?  I mean, you have argued the law.

I'm trying -- what is it that you want right now?

MR. LABOVITZ:  I'm just trying to lay some parameters, Your Honor, because we intend to ask similar questions of Dr. Woods, who will be testifying later this week, as well as Dr. Grinage.

And I just would just note that under the government's view as to something wasn't made available, some document or some fact was not made available to an expert by trial counsel then, you know, essentially a trial counsel who does absolutely nothing is never going to be found ineffective.  That's not the question.

THE COURT:  And I understand.  And I thought I -- maybe I wasn't as clear in my ruling, but let me -- I'll backup and give you a little more clarity on why I ruled the way I did.

First of all, I allowed, sorry, Ms. Ensler to ask certain questions of Dr. Gelbort.  Frankly, I thought she failed to lay foundation.  She more or less seemed to me trying to get to the final point she wanted to make without laying the foundation.

We've got issues of, you know, if we have declarations from 2022.  The issue is not, did you review that declaration.  I mean, that's a question you need to ask.  But it's, like, based on that is that the information that had you had it in 2005, would that

have been something that you considered?  Had you considered it?  Would it have been reflected in your opinion?  Had you known that, would your opinion have changed?  If so, how or if not, how.

I mean, those are the types of questions that I thought she was trying to get to.  I just felt like she just jumped to the end.  But I allowed her to ask the questions ultimately, even though I thought it was a little disjointed.

I'm not criticizing it.  It's not easy.  I'm just saying from sitting here, it's a whole lot easier to judge, hence the robe.

But I thought that I allowed it.  What I didn't allow is the admission of, for example, is it, Mr. Cody, or Dr. Cody, or whatever, I mean, that is -- experts can rely on out-of-court statements, they can rely on inadmissible evidence.  But you can't admit that evidence necessarily through an expert witness when it's clearly otherwise inadmissible.

So I didn't allow the admission of the exhibit, but I allowed -- I thought I allowed Dr. Gelbort to testify and answer the questions as asked, even though I felt like there could have been a better foundation laid.

MR. LABOVITZ:  Okay, certainly, Your Honor.

No, and I agree as to the admissibility when, right, it's something under Rule 703 the experts can rely upon, but the admissibility is a separate question.

I just wanted to make clear for the record why we were asking those questions because we believe, you know, that's part of our burden to show.

And to Mr. Stewart's point, you know, the *Strickland* prejudice prong has been within this context of this specific claim of brain damage and failure to present it, in the *Littlejohn* and *Frederick* cases and the whole line cases, they have specifically assessed -- I'm sorry addressed, how do you assess *Strickland* prejudice? So we are trying to meet that burden that the Tenth Circuit has imposed upon us.

So that's --

THE COURT: And I understand. I mean, we discussed this somewhat on Friday. And, you know, to the extent it's not clear, I mean, what we're doing is looking in the rear-view mirror. And by definition, all of this is about, or a lot of this is about, what wasn't done.

So to argue the fact that it wasn't done, makes it inadmissible, I agree with you. I mean, the whole point here is, should this -- I mean, at the end of the

day the decision we have to help render and help Judge White render is:  Were there failures and to the extent there were failures, were they prejudicial and did that make it ineffective assistance of counsel?  We'll figure this out when we're done with all of the evidence.

But I do see that -- I mean, it is speculative had -- I mean, everybody is going to engage in some speculation.  Had they known something back in 2005, what would it have done?

That's a lot of what we're here about.  So it's all going to be that.  I am trying to walk that line of allowing you to ask those questions, but I'm not going to let you put in inadmissible documents based on witnesses that simply cannot bring those documents in.

MR. LABOVITZ:  Certainly.  As I think the Court made clear, we intend to present the actual declarants.

THE COURT:  Okay.  All the more reason why I didn't admit it through Dr. Gelbort.

MR. LABOVITZ:  Yes.

THE COURT:  All right.  Anything else?

MR. LABOVITZ:  No, thank you.

THE COURT:  Mr. Stewart?

MR. STEWART:  I just had one more comment on

that. I also do want to highlight that when we talk about the affidavits from the Navy declarants as well as Ms. Baird, those declarations are even more removed in time because the amended petition was filed years before those even came out. So that wasn't even before Judge White when he decided the 2255.

THE COURT: I understand.

MR. STEWART: With that, we're ready to go.

THE COURT: Well, I mean, again it goes -- Dr. Cody -- is it doctor -- is it Dr. Cody or Mr. Cody?

MR. LABOVITZ: He's a retired captain, yes.

THE COURT: Okay. All right. Captain Cody. If he could have -- had he been approached in 2005, would he have given that declaration, well, maybe he'll tell us. I don't know. But until then, it's not, you know -- until then we don't know. So I can't -- I'm not going to speculate as to what the witness might say later on in the week or November, so.

All right. We're hopefully -- at least you understand where I'm coming from. Whether you agree with me or not, that's just the way it goes.

Anything else?

MR. STEWART: No, Your Honor.

THE COURT: All right. So we're ready for Dr. Gelbort's cross-examination.

Welcome back, Dr. Gelbort.

THE WITNESS:  Thank you.

THE COURT:  Welcome back, Dr. Gelbort.  Have your seat.  I'll just simply remind you you're still under oath.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Mr. Stewart, you may proceed.

**CROSS-EXAMINATION**

**BY MR. STEWART:**

Q.   Dr. Gelbort, you've done quite a bit of testifying in capital cases, correct?

A.   I have done a bit, yes, sir.

Q.   Have you ever testified for the government in capital case?

A.   I've never been brought into the court by the government, no.

Q.   Do you know when the last time that you testified in a federal capital case was?

A.   I do not offhand, but it's been a while.

Q.   Okay.  Could it have been around time of Mr. Fields' trial?

A.   I'm sorry?

Q.   Could it have been around the time of Mr. Fields' trial?

A.    His trial was some time ago.  I think it's been subsequent that.

Q.    When was the last time that you testified in a state capital case; do you know?

A.    That has been some time as well.

Q.    Now you're a Ph.D.?

A.    Correct.

Q.    So you're not a medical doctor?

A.    That's correct.

Q.    And you mentioned that you do both forensic and clinical work?

A.    I do 95 percent clinical work and a small percentage is forensic.

Q.    Very good.  Now, you aren't a board certified forensic neuropsychologist, correct?

A.    Actually, I am.

Q.    Oh, you are?  Okay.  Very good.

      And is there any kind of, you know, amount of testifying in the forensic field that you have to do to keep that certification or?

A.    No, not that I'm aware of anyway.

Q.    Now, what was the scope of what you were asked to do in this case?  I think you mentioned it before, but I just want to clarify it.

A.    As I recall, it's not codified that I can see, but

I was asked for a neuropsychological evaluation.  That was what Ms. O'Connell brought up and after discussion it made sense.

Q.    Now, are you familiar with Dr. George Woods?

A.    I don't know him personally.

Q.    Are you aware that he was also retained for this case by the defense counsel?

A.    I think he's a neuropsychiatrist.

Q.    That is correct.

Do you know if you were retained before or after Dr. Woods?

A.    Couldn't tell you; don't know.

Q.    Now, as expected you would examine the defendant, administer neuropsychological testing, produce a report and potentially testify, correct?

A.    I think that was discussed in the original scope, yes.

Q.    Now, was the scope of your examination going to involve conducting neurological imaging of the brain?

A.    I don't do neurological imaging.

Q.    That was my next question.

You are not qualified to conduct those types of tests?

A.    That's correct.

Q.    And you aren't qualified to interpret those types

of tests?

A.    I get to read the reports authored by others who are.

Q.    Okay.  Very good.

So your involvement was going to be limited to the neuropsychological examination and testing of the defendant.

A.    That's generally my understanding, yes.

Q.    And perhaps testifying at trial?

A.    Correct.

Q.    Now, you're qualified to evaluate the testing and evaluations of other neuropsychological experts, correct?

A.    Yes.

Q.    And so there was some discussion in direct about Dr. Price's testing.  So you're saying through your experience, your knowledge, your education, you are fully qualified to catch any errors in scoring and administration?

A.    That's kind of a broad statement.  So if there are certain tests that I give routinely and I'm familiar with, there are other tests where I have either not seen them whatsoever, or I don't -- I certainly don't routinely give them so I would be hesitant other than if I went to the manual and could decipher it

adequately to start opining about someone else's tests if they're not in my scope.

Q.   Okay.  So if they were tests that you do on a regular basis, you could determine the scoring and administrative errors on those?

A.   I can seriously read the protocol and see if it comports with what they're supposed to be.

If I'm able to observe the testing or have some record of the testing, I can have an opinion as to the adequacy there.

Q.   But if there's a situation where it's a test that you're not familiar with you could probably go research it most likely?

A.   I certainly can research it.  There are certain tests that I would be hesitant to have opinions about. Certain tests are pretty straightforward and those are not that hard to figure out.

And then there's others that if you don't have some experience with them and you see some of the nuances, I can certainly have an opinion, but I wouldn't want to be judging.

Q.   Were there any tests that were referred to by Doctors Kaufman or Clipson that you were not familiar with that you would have felt uneasy evaluating Dr. Price's administration?

A.   I'd have to go through the list, but reading the reports of those two doctors by and large what they were judging or assessing was familiar to me.

Q.   So you probably wouldn't have needed them to come up with your own critiques of Dr. Price's exam?

A.   For the most part.

Q.   So you evaluated the defendant in August of 2004, correct?

A.   I think that's right, August 11th.

Q.   Do you know how long you spent with him?

A.   I was probably there on the order of five hours, plus or minus a little.

Q.   Now, before your evaluation, did you have any collateral sources of information that you relied upon?

A.   I don't think I did other than just a discussion, a general discussion, with Ms. O'Connell.

Q.   Did you receive any collateral records afterwards?

A.   Afterwards, I think I did.

Q.   Was that before you drafted your report?

A.   I don't recall.

Q.   So there's a chance that you drafted your report before looking at collateral information?

A.   Certainly the first draft I may have done sometimes referred to as blind without the benefit or the aide of any outside information.

Q.    Now, you mentioned in your direct examination that sometimes you do a prescreen before you decide what battery of tests to run, correct?

A.    I'm not sure that you have that right.

Q.    Okay.  Well, correct me if I am wrong.

You mentioned a prescreening.  What does that mean?

A.    So I think what I was referring to, the only time I think I talked about screen was in my office that, excuse me, we have several different somewhat set batteries.

So if your grandma comes in and the concern is she is suffering with dementia, we will use -- I put together a battery that's designed specifically to assess for dementing illness, be it Alzheimer's, or vascular events of Parkinson's disease, Wernicke-Korsakoff, any of the other ones that focuses largely on memory as well as to a smaller degree, but still significant degree on frontal lobe types of functions and language skills.  Because those are the hallmarks of that type of syndrome.

Then I will also use, much like this, a comprehensive battery that's someone who suffered perhaps a traumatic brain injury in an automobile accident, someone who has had a significant stroke and

they're still working age, so hopefully they'll be considering going back to work, I'll give more different tests and more variety of tests for them.

Q.   So with a comprehensive battery like you did with Mr. Fields, do you review -- anything you want to know before you actually perform the battery besides obviously you do a sit-down clinical evaluation, a diagnostic interview.

A.   There are certain circumstances where it's nice to know.  One of the advantages of having information ahead of time or upfront is that many patients, that I get to see anyway, have memory disturbance and they may not remember certain things.  So having information ahead of seeing the patient, may clue me on areas I should ask into that they may or may not know to tell me about.  So there are certain circumstances.

Some of the doctors that I work with really want to get on the phone and talk with me and tell me all about the patient.  I'm happy to do that, too.

Q.   And you mentioned that you did eventually review some collateral materials, correct?

A.   Yes.

Q.   Now, did you list those materials you reviewed in your report?

A.   I'm not for sure.  I don't think they're listed in

the report.

Q. Okay. You've looked at Dr. Price's report, correct?

A. Yes.

Q. Have you seen the pages in which he lists the materials that he reviewed?

A. Right down to reviewing the registration for the patient's truck, yes.

Q. And so Dr. Price were on cross-examination and you were curious about what he reviewed, it would be right there, correct?

A. It's listed. It is.

Q. And that wouldn't be the same for your report, correct?

A. Correct.

Q. Did you see -- let me ask you this, because you've reviewed your report and we talked about it in direct or we didn't, maybe we as the whole have.

That report indicates frequently that you relied on information from Mr. Fields himself, correct?

A. Absolutely.

Q. And that's pretty normal?

A. It's pretty normal to take a history from the patient and to obtain -- ask them about what they remember about, you know, different areas of their

life, sure.

Q.    But it's also important to confirm some of that with collateral information; isn't it?

A.    It depends on what you're trying to accomplish. If you're trying to describe an accurate and complete as-best-as-you-can history of the individual, then sure.  Multiple sources are always better than a single source.

Q.    Well, is there ever a time you're not trying to get a complete view of the person?

A.    The purpose of this evaluation was to understand his thinking abilities.  To have access to things like the registration of his truck does very little to help me understand his thinking abilities unless for some reason he misstated his name or misspelled it.

As I said, it's convention to take a history almost always from the patient.  In my office, I will take history from patient and oftentimes I'll bring in a family memoranda, especially for dementia work-up because the patient, almost by definition, is going to have difficulty recalling.  The information that I am providing that is unique and helpful has less to do with whether or not I've been a good history taker and more whether or not I've appreciated, palpated the different cognitive issues that are present.  And that

comes from the testing.  It does help to reconcile it with history.

Q.    Right.  Because you said during direct that really neuropsychology and your testing and everything is to get a sense of the person, who they are, correct?

A.    Correct.

Q.    And often patients don't necessarily have a lot of insight into who they are?

A.    Patients generally have an awareness of who they believe themselves to be and how they see themselves.

Q.    Sometimes that's not accurate?

A.    Absolutely.  You know, just like a history taken from a patient is their version of what they remember. It's not written in stone and it's not -- in some cases is good as objective outside information.

Q.    Now, I do want to talk to you about some of the things that Mr. Fields told you about during your evaluation.

He told you that he had some issues at birth.

A.    That was his understanding.

Q.    And some trouble breathing is, I believe, how it's said in your report.

A.    That sounds like what he said.

Q.    Do you ever ask defense counsel to provide you with medical records that would give some insight into

that issue?

A.    I asked them if they could provide medical records, yes.

Q.    Did you receive those?

A.    At some point.

Q.    So you did receive those records?

A.    I think I testified earlier I had talked about that I had seen the medical records.  We talked about the birth records and the fact that there was breathing difficulty.

Q.    I don't want to interrupt to cut you off.  But I do want to clarify because I think we might have a bit of misunderstanding.

    I say "counsel", I mean Ms. O'Connell and trial counsel not post-conviction counsel.

    Did Ms. O'Connell or Mr. Gant or one of their team give you the birth records for Mr. Fields?

A.    I'm not for sure.  I don't remember them giving them to me.

Q.    Did you ask them for those records?

A.    I almost certainly made mention that I was interested in seeing medical records, as well as school records, and any mental health records, that's part of my discussion generally.

Q.    And you mentioned that you reviewed some records

before you drafted your final report, correct?

A.    Yes.

Q.    So at some point, counsel did give you some records.

A.    I think that's accurate.

Q.    But sitting here today you don't know what records those are?

A.    I don't recall offhand.

Q.    And we couldn't find that in your report could we?

A.    It's not in my report.

Q.    Now, Mr. Fields told you that he had a motor vehicle accident at 16, correct?

A.    Yes.

Q.    He rolled a truck?

A.    Correct.

Q.    Did you happen -- did you know if you saw those medical records from that accident?

A.    I did eventually, yes.

Q.    Did you see it before you drafted your report?

A.    I don't know.

Q.    And he reported an incident of syncope while he was in the Navy.

A.    Yes, he did.

Q.    Were there any other incidents that you were aware of while you were writing this report that occurred in

his life that could have accounted for some kind of organic brain damage?

A.   Could have contributed to or accounted for?

Q.   Sure.

A.   Sure.

Q.   So what were those?

A.   So he described having an incident when he was 13 or 14.  I think he said that he was on a sleigh or a sled, didn't make a corner and ended up with hypoarousal, or a lack of memory, some amnesia for a period thereafter, maybe up to four days.

Q.   Sure enough, that's in my notes.  So I forgot to ask you about that.

     Was there anything else besides that?

A.   That and he also talked about when he was in the Navy that he was responsible for doing a good bit of painting, and wasn't provided with a respirator or any sort of breathing apparatus.

     He talked about -- I can't remember if his words were "high as a kite," but he essentially described being intoxicated on the fumes for an extended, extended period of time.

Q.   I believe he used the word "stoned."  That might have been from your report or one of your reports.

     Was there anything past his time in the Navy?

A.   There was some description of alcohol use or abuse.  I think that was largely in the Navy, so that would be past.

And then he had been medicated, and at different points he described having some adverse reactions to the medications, something like that.  Not feeling right.  I don't know that that would necessarily rise to the level.  Depends.

Q.   Now, we've kind of danced around his Navy service.

Could he be successful in the Navy with organic brain damage?

A.   Yes.

Q.   Could he be successful in the Navy without organic brain damage?

A.   Yes.

Q.   So his success in the Navy is maybe one factor, but it's not determinative.

A.   Determinative?

Q.   As in you can't look at his time in the Navy and say he has it or he doesn't have it?

A.   As a neuropsychologist, we tend to look at those things saying perhaps he could have more successful had he not had any sort of problems, be they emotional or cognitive.  But, yes, he was able to have what, I think, would be deemed a successful career.  He had an

honorable discharge.  He was promoted.  He was never busted in rank or pay.  He came out as an E5.

So, you know, in the grand scheme of things, that's successful.

Q.   Now, did you ever review Mr. Fields' confession to the crime?

A.   I don't believe I have.

Q.   Did you discuss the crime with Mr. Fields during his evaluation?

A.   Minimally.

Q.   So you didn't discuss details?

A.   If we talked about details, they were relatively few.

Q.   Don't you think it would be important when you're assessing his brain functioning to assess the event that occurred most recently, most traumatically?

A.   You know, I have wracked my brain and in all of the years I was in school and training and my post-doctoral fellowship no one ever said you have to ask people to understand their neuropsychological functioning about what was going on at the time they had a car accident or a parking ticket or any other legal issues, when they go through a divorce.

So as part of an understanding of his neuropsychological functioning, which is done through

testing, no, I don't think so.

Now, there are times when I'm asked the question as to what was going on at the time of a particular issue, and then it is relevant, but that's not necessarily part of their cognitive testing. That's trying to understand what were they thinking and what was going through their mind and how were they processing and problem-solving.

That was not part of this referral question.

Q. You keep mentioning the referral question. Do you recall where that came from?

A. I think I said it earlier from Ms. O'Connell.

Q. Now, I want to talk about your testing for a little bit, and you mentioned the battery. And I think you mentioned it's not one of the -- forgive me for the word "standard."

But like, for instance, you didn't perform the entire Halstead-Reitan battery, correct?

A. Correct.

Q. You left off some items. I think you mentioned the sounds.

A. Seashore rhythms?

Q. Yeah, I don't know that --

A. Speech sounds is what I think I said.

Q. The speech sounds is what I was thinking of, but

you also didn't do the seashore rhythms?

A.    Correct.

Q.    You didn't do the Tactual Performance Test.

A.    Correct.

Q.    You didn't do the Finger Tapping Test.

A.    Correct.

Q.    And so, but you crafted this battery?

A.    Yes.

Q.    So you decided this is the battery I'm going to perform, and then you did it?

A.    Correct.

Q.    Now, I do want to talk about the tests that you specifically administered.  I'm going to have you pull out binder number five.

And unlike all of those other attorneys, I'm going to kept the shuffling to a minimum.  So you're welcome.

THE COURT:  Nobody likes a bragger.

Q.    (BY MR. STEWART) And I want you to in there to go to Exhibit Number 78.

And you recognize this first page?

A.    Yes.

Q.    And that's the summary of the testing that you performed, correct?

A.    Yes.

Q.    Now, I want to specifically ask you a couple of

things.  Now, we see there is a test that says "TPT" and there's an "X" through it.

A.   That's correct.

Q.   Is that the Tactual Performance Test?

A.   It is.

Q.   Which we just discussed you didn't administer.

A.   Correct.

Q.   Which would be why there's an X through it?

A.   Correct.

Q.   Okay.  And then we talked about the tapping test, and there's an X through that as well, correct?

A.   Correct.

Q.   And we talked about -- let's see.  What is the sensory?  What does that refer to?

A.   That's Sensory Perceptual Examination.

Q.   Okay.  You didn't perform that?

A.   I did most of it.

Q.   So there's no data there, right?

A.   Correct.

Q.   And you have it X'd out.

A.   Well, it's got an "X" through the word "sensory."

Q.   Right.  Just like TPT and tapping, correct?

A.   Correct.

Q.   And you also have X's through "Lateral Dominance."

A.   Correct.

Q.    Dynama -- dynamomma -- I practiced it.
Dynamometer.  Close?  You go ahead.  I'm going to let
you say it.

A.    Dynamometer.

Q.    Dynamometer.  There.  It is perfect.  You have an
X through.

      Now, what is that?

A.    That's a small gizmo-rater or apparatus that
measures how strong your hand is, how much you can
squeeze.  How many pounds or kilograms of squeeze you
have.

Q.    So colloquially, that's the Strength of Grip Test?

A.    That's the technical piece of equipment used to
assess strength of grip.  As opposed to what I do, what
many neuropsychologists do is, which is grab my fingers
and squeeze as hard as you can without twisting them
and breaking them, please.

Q.    So you did that test with Mr. Fields?

A.    Correct.

Q.    But not the thing I'm not going to try to
pronounce again?

A.    You know, one of the common threads to what you're
asking about are that these all involve pieces of
equipment, which are very difficult to bring into a
prison.

So the TPT, for example, the first one that you mentioned.  There's a couple of different versions of it.  One looks like a -- we always call it the "cat box."  It weighs 15 pounds.  It's made of wood.  It's got multiple pieces, and it's not terribly portable.  It also doesn't give information that's all that relevant unless you have someone who -- if the referral question revolves around whether someone had --

Q.   Doctor, I'm just going to stop you.  I understand.

So what you're saying is that there are some pieces of equipment that are just too burdensome to take into the prison?

A.   Yeah.  I don't think the dynamometer is anything I'm ever going to get into a prison.  It's metal.  It looks like brass knuckles on steroids, and I don't even like carrying it around.

Q.   Fair enough.  And you also have the Aphasia Screening X'd out, correct?

A.   Correct.

Q.   Okay.  So I guess the question I -- in your report you said that you did the aphasia screening, correct?

A.   I did.

Q.   And so why is it X'd out on your data?

A.   For some reason an X was put through there on the summary sheet.  As the same with the lateral dominance.

That was also performed.  The same with the sensory exam.  Dynamometer was -- the test was administered even without the piece of equipment.

The Wechsler Memory scale.  WMS administered partial, that's true.  The R was not given.

Q.   So you conducted those tests, but there's no data for these tests?

A.   Well, there's data recorded in the report.

Q.   Can you go ahead and flip through that for me for those tests?

A.   I'm sorry?

Q.   Could you flip to those places in your data where you report the data for those tests.  We'll start with aphasia screening.

A.   So aphasia screening, there's probably no -- well, there may be a data sheet.  I'm not for sure if I put it in there or not.

Aphasia screening responses is not in the file.

Q.   How about the Lateral Dominance Test?  Is there a page for that?

A.   Again, well, there's not even a page for that.

Q.   Is there any data for that?

A.   If you look at the top page you see that it says hand and "R" is circled, that would have been accompanied with the same -- the questions regarding

which foot that he prefers or uses predominately, as well as which eye.  He's right-side dominate.

Q.   So but that's not written down there on the lateral dominance.  So, I guess, what I'm asking is, is there no actual -- is no actual data generated for that test.

A.   Data is generated and it's summarized with hand, right, and it's summarized in the report.  It's the sort of thing -- let's see if I can give you an analogy.

I don't know.  It's not a great analogy.  But if I ask you your address and you give me your street number and your street and don't give me the town or the zip code, I'm going to assume or believe that you know it. And if you don't, that will be recorded.  You know, if I ask you and you can't provide that, then that absolutely is recorded.

Q.   And there's also no data for the strength of grip test, correct?  It's not on there.  Do you know if it's in here at all?

A.   No, I don't believe that sheet with the one of numbers is in there either, which you can understand means that the grip strength was normal bilaterally.

Q.   And so as a practitioner, isn't it fairly important to preserve your data?

A.    Of course, it's important to preserve the date.

Q.    Especially when you're going to testify in a capital trial.

A.    Correct.

Q.    So is there that -- don't you think that someone looking at this, seeing the lack of aphasia screening that you said you did and it's not there, couldn't they look at that and think that's a little sloppy?

A.    They can wonder if it was administered, especially when there's an X through it.  And I can certainly understand someone else picking up this file is going to say, I'd like to see that or what was the result?

If you look in the report, the result is absolutely reported and it's my convention, especially on these little tests that if it's in the normal range, it may or may not get written down at all.

Q.    So if you had testified that could have been a problem on cross-examination?

A.    It would have been a discussion, as it is here, I'm sure.

Q.    Now, you also list in your report that you did some items from the Luria Nebraska, correct?

A.    Correct.

Q.    And that data is not in there either?

A.    Correct.

402

Q.   And I believe, at some point, you told counsel it's just kind of a mental status exam, correct?

A.   I use the items from the Luria much as mental status items are used.  They're very similar.  So on a mental status exam, I'm not giving away the store here. The examiner will give you a particular word.  There's one that's used repeatedly and ask you to spell it backwards.  There's similar sorts of items from the Luria.  It's one of these things that you can use it out of your pocket, if you will.

You don't need protocols and pages like are listed after the summary sheet.

Q.   Now you also, in your report you mentioned that you administered a majority of the Wechsler Memory Scale, correct?

A.   Yeah, I don't know if I would say the majority, but, yes, I gave the Wechsler Memory Scale.

Q.   Let's go to binder number one, that's going to be Exhibit Number 4.

THE COURT:  What was the exhibit?

MR. STEWART:  Exhibit Number 4, Your Honor.

THE COURT:  Four, okay.

Q.   (BY MR. STEWART) And I want you to go page number three.  That last line.  Start reading at Wechsler Memory Scale, and then go ahead and turn the page and

just read that to yourself.

So, Doctor, do you see there --

A.   You're talking -- I'm sorry.  You're talking about page number two, not three.

Q.   Oh, that's correct.  I was looking at the three on the bottom.  My apologies, yes, page two, near the bottom there.

A.   Yes, it does say majority of test administered.

Q.   Do you know how many subtests that you administered?

A.   Not offhand.

Q.   Well, then I'm going to drag you back to binder number five.  I'm sorry.  I lied about the shuffling.

We're going to go back to -- this is Exhibit Number 78, and I'm going to take you -- if you notice in the lower right-hand corner it says "Defendant's Exhibit 78."

A.   Yes.

Q.   I'm going to go bring you to page number seven.

A.   Yes.

Q.   Are you with me?

A.   Got it.

Q.   How many subtests did you administer?

A.   So what's showing there are two.

Q.   And how many subtests are in the WMS-III?

A.    Hang on one second, please.

Q.    Certainly.  Take your time.

A.    So if you count all the subtests two, four, six, eight, 10, 11.

Q.    So 11?

A.    11 total.

Q.    And you administered two.  There's two that are recorded here.

A.    I'm pretty sure that there is a second WMS-III scoring protocol that's not in here that somehow has been misplaced.

Q.    Do you know who might have misplaced it?

A.    It could have been me or it could have been my office staff when they went through and copied or it could have just simply fallen out, but I kind of doubt that.

Q.    So I guess the question I'm having is or posing is based on this, the data that we have, we can only say for sure you did two of the tests?

A.    Correct.

Q.    That's not a majority.

A.    No, that's not.  There is reporting and the report -- I mean, I'm comfortable saying that the data was misplaced or whatever happened to it after I put together the report because there is reference in the

report to more data than just these two subtests. But I do not have and I don't know where the protocols are that have the rest of the data.

Q.   Well, that's actually my next question.  Do you recall administering the Family Pictures II?

A.   Not as I sit here today.

Q.   Do you recall administering the Logical Memory II?

A.   Again, I don't have an independent recollection.

I'm quite comfortable saying that I would have given them, and I think that they're referenced in the report.

Q.   And your report does reference some troubles he has from some variability in memory and short-term and long-term recall, correct?

A.   Correct.

Q.   And that's what those tests would measure, correct?

A.   Those would contribute to that sort of a statement.  There's other clinical testing that may have also been involved, but those should be here and they are not.

Q.   So there's no actual way to confirm your data if you had testified at trial as to that specific finding in your report?

A.   At this point, no, there is not.

Q.    Now, could an oversight like this make your work look sloppy?

A.    I'm not happy with it.  And, sloppy, I'd probably choose a different word.  Maybe one that's harsher.

Q.    What word would you choose?

A.    I mean, I find it embarrassing that I can't -- it's a rarity that my data is not intact and frankly I don't think I can -- it's 20 years later, but this would have been misplaced early on in the process.  Which doesn't please me.

Q.    Let's talk about this specific testing on the Wechsler Adult Intelligence Scale, the WAIS-III.

You had administered 11 subtests, right?

A.    Correct.

Q.    And the letter number sequencing, object assembly, simply search, those are optional, correct?

A.    Yeah.  They're intended to be to be used.  I mean, if you have a specific question that those might address I'm sure it would be reasonable to use them.  But the way the manual is set up it will tell you that if you can't give one of the standard tests that you can intersperse or interject one of these optional tests in lieu of the other ones.

Q.    Now you mentioned on direct that there was an error, a scoring error, on the picture arrangement,

correct?

A.   Not so much a scoring error, but I did not record the last three responses which were "I don't knows."  I didn't record that.

Q.   Now, we don't -- obviously, I'm not impugning your integrity, Doctor.  But we don't know that the response was "I don't know," correct?

A.   We don't know, no.  Other than me telling you.  It's not written down.

Q.   Now the discontinue rules are four consecutive zeros and you quit, correct?

A.   On which subtest.  It's different on several of them.

Q.   The picture arrangement, sorry.

A.   I'd have to look.  It's been a long time since we've used the WAIS-III.

Q.   It's a little hard to read.  Let me see if I can't get you a page number here.  Yes, it's page number 16 of Exhibit Number 78.

A.   You're right.  So the discontinue rule it says -- you're accurate, four consecutive scores of zero starting with item two.

Q.   And so this wouldn't have been a case where you discontinued it because he didn't have four consecutive zeros?

A.    Well, the test would discontinue anyway because those were the last -- the ones that are not recorded are the last three items.

Q.    That's correct.  I'm just asking if we were to look at this the way that you have it written that you disconnected it would not be a possible explanation, correct?

A.    Oh, correct.  It was not discontinued.  It was simply -- I mean, I stopped writing rather than discontinuing.  And for that matter on item number eight there's completion time in seconds, which should be there as well.

Q.    Well, you anticipated my next question.  So that should be there and it's not?

A.    Correct.

Q.    Now, I want to look at the comprehension test which is the next page, 17.

It seems like the same thing happened here; doesn't it?

A.    Yes.

Q.    The final three responses are blank.

A.    Yeah, I can't -- it's too dark to read the discontinue rule for comprehension.  I don't remember if it's three, four or five zeros and you stop.

Q.    But we certainly don't have three or four or five?

409

A.    No, it was not meant to be discontinued.  And the items were administered.  Again, there's nothing there, which means they were "I don't knows."

Q.    Fair enough.  But we -- once again, other than you just telling us that, we do not know from your data.

A.    That's correct.

Q.    Now, I had a quick question actually on -- let me see if I can find it here.  Actually, page 17, that's a good place to start.  I want you to look at the scoring column on the right side, and look at the first two, twos, and then I want you to look down at the third two.

Did you write both of these twos or all three of those twos?

A.    I think so.

Q.    So you write twos in two separate ways?

A.    Well, I just to kind of gift you the inside skinny.  Certainly items are scored while giving the test.  If you know the answer, the answers are very clearly one way or the other.  And then others are left blank.  At least that's the way I do it.  If I'm not sure and I don't want to take the time to look up the answer in the book, and I know that we're going to continue on, I'll leave it blank and come back later.

So, yes, both look like my twos.  They're just in

410

a different mood, if you will.

Q.   Do you have a curly mood occasionally?

A.   I have all sorts of moods.

Q.   Fair enough.

A.   My wife cannot read my writing anymore.  It's kind of sad.

Q.   We're in the same boat, Doctor.

I want to look at the vocabulary subtest.  Let me find the exact page number here.  I think it's going to be ten.  And, actually, I want to take you to page 11, Exhibit 78 page 11.

Now, with the vocabulary test, you gave the patient a word and they give you a response, correct?

A.   You ask for the definition of the word and they provide it.

Q.   And you give scores of zero, one, or two.

A.   Correct.

Q.   Now there are administration rules where sometimes you follow up, correct?

A.   Where sometimes you?

Q.   Follow up?

A.   Yes.

Q.   And I want to look at question number or word number 11, "sentence."  And I'm going to try to interpret your handwriting.  You tell me if I'm wrong.

"Assembly of words," and then I'm assuming that you followed up?

A.    Correct.

Q.    And he said "could be a sentence decree handed down by the judge" and those were his two definitions of "sentence."

A.    Correct.

Q.    And you scored him a one.

A.    That's what it says.

Q.    Now, both of those definitions sound reasonable, correct?

A.    They sound reasonable, sure.

Q.    Is there a reason that he would get a one instead of a two?

A.    I'd have to go back and look at the manual and see what examples it gives.

"Assembly of words" I'm not surprised that would have triggered an inquiry, the question mark.  Meaning I asked him, Can you tell me more, something to that, effect.

And then, Could be a sentence.  So now he's given two answers.  The second one doesn't help at all.  It's just repeating the word.

And then a third answer, Decree handed down by the judge.

It strikes me that that's probably better than a one point answer.  I'm not sure what the manual would say, so I can't rescore it based on what I'm seeing here, but it wouldn't surprise me if that possibly could have been a two.

Q.   All right.  And so but -- you're just following the manual as you score this, though, correct?

A.   Correct.

Q.   Now, I want to look at 16.  The word is "tranquil" and his response is, "relaxed, soothing."  And that was also a one word or a one point answer.

A.   Correct.

Q.   I'm assuming that you're just following manual on that.

A.   I think so.

Q.   It does seem somewhat of a reasonable response from him, though, correct?

A.   It's in the ballpark.  I don't know that it -- again, I'd have to look at what the manual suggests. It's more of a two point than a one point.

Q.   You would admit that there's -- I'm not saying that the manual is necessarily subjective, but there's some subjectivity to this test, correct?

A.   There's judgment to scoring vocabulary, comprehension, sure.

Q.    And so if, for instance, a jury was hearing his responses to the definitions regardless of what the manual says, they could think, he knows what that word was.

A.    The jury can think whatever they choose to think.

Q.    Well, would they be reasonable in their assumption?

A.    Well, they may be reasonable in their feelings and thoughts, but the test is standardized and there are examples of different answers in the manual.

It's nice when the patient actually gives you one where you can say, there it is, and then, you know, generally you shouldn't score it.

On the other hand, there still is judgment.  And that's part of the training is figuring out is this more of a one or a two, or as Dr. Kaufman said, it's the perfect 1.5 answer?

Q.    So you would admit that one practitioner could score something a one and another could score it a two, and you can't really say one is right or wrong?

A.    You can make arguments.  You can have discussion about it.  Certainly, the hope is that if there's very few of those answers, the total score isn't going to change much and the interpretation shouldn't change much.

You certainly do your best and recalibrate, yeah. But, yeah, you certainly can add.  So in this case, his total score --

Q.    I believe it's probably written in the back.

A.    Vocabulary, his raw score was a 43.  And, you know, this is, again, I would need the manual.  It may be that scores of 43, 44, 45, and 46 get you a scale score of ten.  It could be the other direction.

You know, on average because there is a range, it won't change the scaled score, which is the one that's used to compute IQ.

On vocabulary this is one where his scaled score of ten that's an H-corrected scale score, ten is the absolute average.  It's right in the middle.

If we were to go through on these items and gave him another point or two, again and again, it may or may not change that ten.  It won't make it lower.  It could make it higher.  So that ten perhaps could have been an 11, slightly better than average, just a third of a notch above average or a third of a standard deviation.

For what it's worth in terms of the interpretation, that's an estimate.  That's one of the whole tests that kind of gives you an idea of how he probably functioned pre-morbidly.  If anything, that's

going to argue that his lower scores are relatively lower yet.

So it doesn't matter to me which way it works, but in this case it would work more in his favor saying there's more likelihood a brain dysfunction, but a very small amount. It's kind of statistically not significant as opposed to saying, oh, no that more likely says he doesn't have brain dysfunction.

Q. So let me go back to --

A. Either way you cut it, the question is scored accurately.

Q. Okay. And the one thing that, I guess, I want to get to is, when we look at this scoring, it is perfectly reasonable to look at the scores that he got, look at the responses he made and determine that the test might not completely capture his full level of intellectual functioning based on a number.

A. Well, and, in fact, that's accounted for. We have something called the standard error of measurement. What that denotes, and the reason this is the gold standard is that the numbers actually cluster pretty close together. There's not wide variability. That's just up to chance. The test actually does a very good job and gives you strong, reliable, and valid results. Because it can be scored fairly close. Like I said,

there's just vocabulary, comprehension, where there's more subjectivity or more room to discuss is that a one or a two.  Is that a two -- or is that a one or a zero.

Q.   I want to ask one more question about the vocabulary, then we'll move on.

A.   Sure.

Q.   On 29 the word is "epic" and he says like a novel, story, and you scored that a zero.

A.   Correct.

Q.   Are you aware of the noun definition of epic?

A.   Yes.

Q.   Do you think that "story" would fall under that definition?

A.   I think when you look it up in the manual that this score of zero is accurate.

Q.   Okay.  But just for sake of argument, a juror could think, Well, I've read "Beowulf" in high school. I know that an epic is a story.

     They could think that, correct?

A.   I'm sure they could.

Q.   Now are you -- well, let me ask you this, if you had testified for Mr. Fields at trial, the prosecutors would have had access to all of this, correct?

A.   I believe so.

Q.   It's very likely they would have elicited many of

the same questions I'm asking now.

A.    Sure.

Q.    Probably better questions, I'm willing to admit.

So the jury would hear you admit that your scoring was a little -- had some issues or not -- sorry.  That you didn't write down some of your data.

A.    Correct.

Q.    And that some of your data might be missing.

A.    Correct.

Q.    And you also mentioned that you had the full scale IQ, performance IQ, you had to change the numbers on your summary sheet?

A.    Yes.

Q.    Did you ever change those numbers in your report?

A.    The copy of the report I have, I've made the changes.  I don't think it made it into the copy that had already been sent, maybe it has.  I'm not sure.

Q.    I'll have you pull out binder number one.  We'll go to Exhibit Number 4.  Exhibit 4, page number three.

A.    Exhibit 4.

Q.    Exhibit 4, and that first full paragraph on page three, what scores did you report?

A.    It has not been corrected.  So it shows verbal performance and full case IQ scores of 92, 94, and 93.

Q.    So those are incorrect?

A.   Yeah.  The last two numbers should be 95 and 94, rather than 94 and 93.  So each one goes up by one point.

Q.   And that doesn't make a huge amount of difference in the data, correct?

A.   It doesn't make much differences at all in terms of the interpretation.  It is evidence that it needed to corrected.

Q.   What is the mean score for a full scale IQ on the WAIS-III?

A.   Did you say "mean"?

Q.   Mean, yes.

A.   It's one hundred.

Q.   So he was -- and I forget now that we've gone back and forth.

What was your full scale for Mr. Fields?

A.   94 is the accurate number.

Q.   Okay.  So he had a 94 with a mean of a hundred.

Now, I want to go back to binder number five.  I'm sorry.  I'll try to stay here for a little bit.

Exhibit 78.

A.   Do you say Tab 78?

Q.   Tab 78, yes, sir, and then page 156.

Wait.  I'm on the wrong place.  I'm sorry.  Let me grab the right one.

A.   And you said page 56?

Q.   I misspoke.  It's actually page 18.

A.   By the way, on page 56, those scores have been corrected.  I've got in here.

Q.   On page 18 there is a box down below where you have in one column, you have the scaled scores written out, correct?

A.   I mean, there is a bunch of columns with the scaled scores.

Q.   So on Defendant's Exhibit 78 --

A.   Are you talking about the bottom part?

Q.   Yeah.  The bottom box?

A.   Yes.

Q.   And there's a place to put in the mean score.

A.   Put in the --

Q.   Okay.  Like there's a column -- the next column beside where you put the scaled scores?

A.   Yes.

Q.   There's a column for mean scores?

A.   Yes.

Q.   There's a column for difference from the mean, correct?

A.   Correct.

Q.   And there's a column for statistical significance.

A.   Yes.

Q.    And then strength?

A.    Yes.

Q.    And weaknesses?

A.    Correct.

Q.    And that's all blank.

A.    Correct.

Q.    So that would be where you would put data to compare to the population, correct?

A.    You can, sure.

Q.    And you didn't do that, though?

A.    No, I didn't make any entries in there.

Q.    And you mentioned on 56, and we'll just go over there since you brought it up.  Page 56 of Exhibit 78.

      You mentioned those scores had been corrected. Could you explain what you mean by that?

A.    So the updated scoring has been entered.  There's a line, for example, on the sums of scaled scores under the PIQ, the 46 has one line through it.  The 47 is written next to it.

Q.    Okay.  Perfect, thank you.

      Now, I want talk about one of the tests that you said Mr. Fields showed some impairment on, which was the Trails B, correct?  And I want to clarify something because I don't know if I misheard it or what.

      But you mentioned that with the Trails B on direct

examination that he was slower and that he made an error. Is that what you testified to on direct?

A. I think that's accurate, yes.

Q. Okay. Did he actually make an error on Trails B?

A. I'm sorry. I'm looking at the data sheet. It's the other way around. He made an error on trail A not B.

Q. So his time was fairly normal on Trails A.

A. It was 29 seconds on Trails A is in the normal range.

Q. But he did make an error.

A. Correct.

Q. He was slower on Trails B.

A. He was in the impaired range, over 90 seconds, yes.

Q. But he didn't make an error?

A. Correct.

Q. Is it possible that he slowed so that he wouldn't make an error?

A. That's certainly possible.

Q. We talked about Mr. Fields being on several medications when you examined him, correct?

A. Yes.

Q. And I think -- I can't remember the exact phrase you used, but you said something along the lines that

the prescribed amounts were in the good range.  That's very inartful.  I'm sorry.  That you would not expect it to inhibit his test-taking ability.

A.    Generally when you're on medications appropriate for your condition and they're in -- they're being prescribed at appropriate levels, they will facilitate you performing better.

Q.    Occasionally those kind of medications can impair the test taking, correct?

A.    Those kind of medications?

Q.    Well, let's take it one by one.  Prozac.  Can that impair test-taking abilities if perhaps not appropriately prescribed?

A.    If it's not appropriately prescribed, sure.

Q.    What about lithium?

A.    Lithium can as well.

Q.    And Loxitane.

A.    Yes.

Q.    And so every one of those medications, if not appropriately prescribed or in proper doses, could impair -- could have impaired Mr. Fields' performance.

A.    Possibility exists.

Q.    Now did you mention that possibility in your report?

A.    I don't believe so.

Q.   Now, we talked a little bit about malingering. Malingering is fairly important in the forensic setting; isn't it?

A.   Sure.

Q.   In the clinical setting, you are dealing with people who are trying to get help?

A.   By and large, yeah.

Q.   In the forensic setting you're dealing with people who at least have a motivation to exaggerate?

A.   They may.

Q.   So you mentioned that one of standards that you use, that you have chosen to use, is with the internal consistency on certain tests, correct?

A.   Yes.

Q.   And internal validity.  I think you mentioned the digit span.

A.   That's an example.

Q.   Now -- and you mentioned that there's, you know, practitioners disagree, or not necessarily disagree, they differ?

A.   That's fair.

Q.   In practice.

In a situation where exaggeration is more likely, wouldn't a free-standing malingering test be more appropriate?

A.    I don't think so.

Q.    So if you are dealing with someone who, for instance, is on trial for their life, you don't that doing a few extra malingering tests would be appropriate?

A.    As I said, I don't think so.

Q.    Now you mentioned internal consistency, correct?

A.    Yes.

Q.    What do you mean by that?

A.    Where the data -- different types of data and different data points, point in the same direction or agree with one another where they reconcile nicely.

Q.    Now, I want to take you to binder number one and look at your report, that's Exhibit 4.

And on page number three there at the last paragraph, the first line says that "The overall pattern is characterized by some variability in performance from one test to another even when the tasks are fairly similar in nature."

Is that -- did I read that correctly?

A.    You did.

Q.    And so there are tests where they're pretty much the similar test and he does well on one and badly on another?

A.    It doesn't say that, does it?

425

Q.    Well, you tell me what it says.

A.    Well, it's easy to read.

Some variability in performance, that's what it says.

Q.    Okay.  Could that indicate malingering?

A.    Could it indicate?  It's something to be considered when looking at whether or not the pattern reflects malingering or something else.

Q.    So you -- I'm assuming in that paragraph there's something about how it does not indicate malingering?

A.    The overall interpretation of this data set is that it's not reflecting malingering.

Q.    Now, I wanted to ask you actually, specifically, on the malingering.

You mentioned in your declaration that you looked at the reliable -- or the digit scale.  Digit -- I forgot what it's called now.

A.    Digit span.

Q.    Digit span, that is correct.  That you kind of looked at that for reliability and validity, correct?

A.    It's one thing that I do look at.  It's actually clinically not a great test for reliability, but it is cited as being a test, the reliable digit span test.

Q.    And you cited it in your declaration as something that you looked at when considering its reliability.

A.    I did.

Q.    Now, did you mention any specific reliability or validity test that you considered in your report?

A.    I summarized, but just saying that the overall pattern is one that appears to be not reflecting malingering.

Q.    But you didn't give any specific citation?

A.    I did not go through the arguments or the discussion.  I did a little bit earlier today.  I can certainly go back through and you give you more of that if you would like.

Q.    You mentioned that on some tests, and you actually reference this as being -- I'm trying to remember exactly how you phrased it, but you said in some -- like verbal he did very well.  Verbal performance he did very well or well and then visual he did not do well?

A.    He was in the normal range or perhaps better if we add an extra point in based on rescoring.  If we go back and look and perhaps rescore, I suspect that it will remain the same.

On what are referred to as "hold tests" these are tests that, assuming that there's no severe or even moderately severe acquired traumatic brain injury, they have been finding through research to reflect how a

person functioned during much of their adult life. Those were some of his higher scores on the intellectual subtests.

Where he performed less well were on tests that do -- are known to change when a person has some sort of neurological problem.

Q.    And you mentioned that, even though the test he performed less well on we're still maybe average range, that the difference between the scores was indicative of possible dysfunction?

A.    The ones where he performed less well were oftentimes more in the low-average range.  And the point I think you're making is that, as I said, there's absolute impairment versus relevant impairment.  And both count when you're in the -- when your numbers are so low as to be in the absolutely impaired range, such as when you're below the fifth percentile.  As his timed score was Category Test, that's clearly different that it probably comes from a different grouping of data than the normal individuals would score.  And then you can also go back and look at the relevant changes. So when someone is strong in some areas and weaker in others, it's all coming from the same brain.  And the assumptions are that the same brain should have fairly similar levels of performance.

So when there's disparates, these discrepancies, then you have to say why is that?  And typically it reflects cognitive impairment.

Q.    Didn't Mr. Fields tell you that he had variable performance in school based on whether or not he liked a class?

A.    Yes, he did.

Q.    Could it have been the same thing on a test?  Maybe he liked the test and he did better?

A.    That's an interesting thought.  I don't think it holds water, but it certainly -- you can offer that as an explanation.

Q.    Do you recall the scaled score that you calculated for Mr. Fields' performance on the Halstead Category Test?

A.    On the Category Test, I do not.

Q.    I'm not going to make you guess at it.  Let's go back to binder number five.  That's going to be Exhibit 78.

A.    Page 38, I think.

Q.    I think that's right.

    Yes, there it is.  So that's the total score.  Do you have a scaled score on there?

A.    I do not.

Q.    Does "eight" sound right or in the ballpark?

A.   For the Category Test?

Q.   As in like a scaled, scaled score on the Category Test?  No, okay, I was just checking.

A.   I don't think so on the Halstead-Reitan norms.

Q.   Do you know what the mean is on the categories test?

A.   I don't know the mean.

Q.   We talked a little bit about the Trails B.  I want to go back to that briefly.

Do you know what the scaled score for that time was?

A.   I don't know it offhand.

Q.   Now you reference his performance on the arithmetic, the digit symbol coding and digit span subtesting, as consistent with frontal lobe impairment, correct?

A.   I think that's accurate.

Q.   And you characterized those scores as below average.

A.   They're low average to low average/average.

Q.   Now you wanted to administer the MMPI you said, correct?

A.   I would have chosen to, yes.

Q.   Do you happen to recall telling Ms. O'Connell that you wanted to administer it?

A.   Twenty years ago, I don't recall that in particular, no.

Q.   Do you recall leaving a copy of the test with her to have somebody else administer it?

A.   I don't recall that offhand, but I may have done so.

Q.   So if you did, counsel would have specifically probably not done that, correct.

A.   Say again, please?

Q.   Inartfully worded.

     As far as you know the MMPI was never administered?

A.   No, it was not.

Q.   Didn't you say the MMPI has some very robust validity scales?

A.   I don't know if I said robust, but it does have some very nice validity scales.  I like them.

Q.   I like the word "robust," but I'll go with yours.  Very nice validity scales.

     So you're saying that counsel specifically did not have a test administered that had nice validity scales?

A.   That appears to be the case.

Q.   All right.  I want to talk to you about this specific report that you have and hopefully this will be the last major bit of the binder shuffling.

But I want to -- actually, I think I can do it without. We've mentioned the two-page report. It was Exhibit 121. It was a two-page report.

A.    A report that -- a draft report? Is that what you're asking?

Q.    I believe it was a draft report. You know what, let's just look at it because I want to make sure we're very clear.

So let's go to Exhibit 121. That is going to be binder number six.

Are you with me?

A.    Yes.

Q.    How many pages is that report?

A.    Two.

Q.    Do you have any independent recollection of when you sent this report?

A.    No, I don't.

Q.    And I believe you testified on direct exam that this was the report that you sent in March of 2004.

A.    It could be.

Q.    But you have no independent recollection of that.

A.    That's correct.

Q.    Now, let's go back to binder number five to Exhibit 73. And this is a draft report?

A.    Correct.

Q.   And I believe that you testified on direct examination that this would have been the report that you sent in January of 2005, correct?

A.   I think that's right.

Q.   And so is your testimony that you submitted a four-page report, and then you submitted a two-page report, and then a final report?

A.   The first two were drafts, not reports.

Q.   Correct.

A.   Just to make the distinction.  And, yes, the first one was four pages, the second one was two pages, the last one was four pages.

Q.   Any reason why the report would shrink down to two in the middle?

A.   There was a bit of background information from my read that was omitted in the second version of the second draft and a lot of the language was more -- was tighter, if you will.  Words more carefully chosen.

     The first one, when I read it -- I think I probably dictated all of them.  But the first one was more reflecting stream of consciousness, which sometimes is my first draft.

Q.   But a lot of the background information was added back in for the final draft?

A.   Correct.

Q.    Now, I want to look at this draft report.  You mention in there that he wasn't able to breathe at birth, correct?

A.    That he wasn't able to breathe?  I didn't hear the last word.

Q.    At birth, or that he couldn't breathe.

A.    Where are you looking, please?

Q.    Sorry.  First -- well, right there at the bottom of the page at the beginning of that paragraph that ends on that page, starting with "health history."

A.    It says in quotes, When I was born, I couldn't breathe, close quotes.

Q.    Now you quote him in this -- I want to go on to the second page.  Actually, we're going to go on to the third page.

Second full paragraph, you note that he never kept a job, correct?  Page three, second full paragraph, first sentence.

A.    Where in the --

Q.    First sentence.

A.    First sentence?

Q.    Yes.

A.    Yes.  Work history was somewhat limited, and he worked at odd jobs but, quote, never kept a job, close quote.

Q.    Now, he did stay in the Navy for three years.

A.    That's correct.

Q.    And he was a security guard for several years.

A.    Security guard?

Q.    Isn't that what it says there in that paragraph?

A.    He was a correctional officer.

Q.    I want you to go down a little bit further.  Go right after he drove a truck for a year, was a fill-in cleaner for six months, and worked as a security guard for several years.

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    So that is in there.  And he was a correctional officer for four years.

A.    I think that's accurate.

Q.    And he was a warehouseman for several years.

A.    Yes.

Q.    And you talked about his medications, correct?

A.    Yes.

Q.    And you mentioned that he had been prescribed Effexor, correct?

A.    Correct.

Q.    Now, on page one you refer to Effexor and you imply it's a neuroleptic; don't you?

And this is going to be kind of near the middle of the first full paragraph. Starting with the sentence, "He had been prescribed Effexor."

A.    So it says, "He had been prescribed Effexor before the incarceration and reportedly other neuroleptics had been considered."

Q.    So in reading that, it seems like you're saying Effexor is a neuroleptic, correct?

A.    That's not the intention. I guess it could be misunderstood or I wrote it poorly or both.

Q.    Would you be surprised that the trial team did misunderstand that.

        MS. ENSLER:  Objection. Mischaracterizing the evidence.

        THE COURT:  He's asking a question. The witness can answer if he knows. Overruled.

Q.    (BY MR. STEWART) Did you happen to discuss if Mister --

        THE COURT:  Did the witness answer? Oh, I think he actually did, but I'm not sure.

Q.    (BY MR. STEWART) I'll ask it again:  Would you be surprised if trial counsel did misunderstand it?

A.    I don't know what trial counsel construed from that.

Q.    Are you aware of an incident Mr. Fields had with

another inmate in the middle of 2004?

A.    I don't think so.

Q.    He didn't mention that during your evaluation?

A.    I don't believe so.

Q.    And this would have occurred after the crime in 2004, correct?

A.    I suspect the crime was in 2003, correct.

Q.    And so he didn't tell you anything about getting attacked by another inmate and beaten about the face?

A.    I don't recall.

Q.    Now, you talked on direct examination about how mild in the neuropsychological parlance doesn't really mean the same as mild in the lay sense, correct?

A.    Yes, that is accurate.

Q.    Now, jurors are lay people; aren't they?

A.    Jurors can come in all shapes and sizes and flavors.  They can -- you can have doctors on your jury, so I don't know.  It depends on your jury, I guess.

Q.    Do you imagine that a neuropsychologist would actually get accepted to a jury that would involve testimony about neuropsychology?

A.    That's kind of beyond the scope of my knowledge.

Q.    Fair enough.

      Now, in your report, do you state that Mr. Fields

had brain damage?

A.    I'm sorry?

Q.    Brain damage.

A.    I don't think I ever say that he had brain damage.

Q.    Did you ever specifically say that he had brain dysfunction?

A.    I may have.  I normally use the phrase "cognitive dysfunction."

Q.    Now, in this preliminary draft that we're looking at -- I'm sorry.  Did you just put away the binder?

A.    It's right there in front of me.  I can grab it easily.

Q.    Okay.  Very good.  Let's go to page four of Exhibit 73.  I should have told you to hold on to it just a little bit longer.

A.    Okay.

Q.    Page four.  I want you to look at -- about midway up on that last paragraph where it starts with, "He displays a pattern."

A.    Yes.

Q.    And you said that, He displays a pattern found in individuals with frontal lobe or non-dominate hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted, correct?

A.    No.  I said, "He displays a pattern often found."

You missed the word and the rest of it I think is pretty accurate.

Q.    Thank you for the correction.

And so you didn't actually come down with a specific diagnosis.  You just identified a pattern.

A.    If you're just referring to that sentence, I'm not making a specific diagnosis in that sentence, that's correct.

Q.    Did you make a specific diagnosis anywhere in this preliminary report?

A.    I would have to reread through.  I think it's pretty clear that I'm saying that he has cognitive dysfunction, which is not a diagnosis that you'll find in DSM or ICD9, 10 or 11.  But it is a description of what was going on with him that would be diagnosed as MCI, mild cognitive impairment from those nomenclatures.

Q.    So if the defendant alleged that you found Mr. Fields had organic brain impairments, would that be strictly accurate based on this report?

A.    This report certainly supports that contention that there's organic brain dysfunction going on.  And that's the whole thrust of this, in fact.  It's kind of hard to miss if you read it.

Q.    Sure.  That leads me to another question.

Is there a difference between "brain damage" and "brain dysfunction"?

A.    I would say, yes.  The terms are slightly different.

Q.    Have you read Dr. Woods' most recent supplemental report?

A.    I don't know.  That's one of these questions that's kind of hard to answer.  He may have turned one in in the last week.  So maybe I have seen one which was the last one until he wrote another.

Q.    Did you happen to read a report that he submitted in which he said that brain impairment is different than structural damage to the brain?

A.    That's an interesting discussion.  Structural damage to the brain, that's fairly easily understood.  Brain impairment is a little bit more nebulous.  And I would have to ask him his definition, how he's going to explain brain impairment, what he's referring to?

Q.    Stick around until tomorrow, maybe you guys can talk about it.

So you're saying it would be incorrect, though, to characterize your -- this preliminary report as finding brain damage?

A.    It would be incredibly unlikely that you'll ever find me diagnosing brain damage based on

neuropsychological testing.

Brain damage is referring to a physical problem and these tests look at functioning, the function that comes from the brain.

So I can have a patient where the neurosurgeon says there is brain damage, but I am not going to make that diagnosis based on my testing. I may reference, you know, that Dr. So and So said there is brain damage present and it correlates or accompanies the brain dysfunction that shows up on these functional tests.

You know, the rare exception may be if someone comes in and they take their helmet off and the skull has been taken out and there's a major divot, which I've seen half a dozen times. I will believe there's brain damage there because there's a lack of brain, but I'm not going to be the one diagnosing that.

MR. STEWART: Fair enough.

Your Honor, I don't know what time you wanted to take the afternoon break.

THE COURT: Let me ask, how much longer do you have?

MR. STEWART: Probably about 45 minutes to an hour, maybe a little less.

THE COURT: Are you at a good breaking point?

MR. STEWART: I'm at a good breaking point.

I'm at the Court's, whatever.

THE COURT:  Well, I'm trying to accommodate, make this work as smoothly as possible.

All right.  Well, then if we're at a good breaking point, we'll take our afternoon break.

It's 3:10.  We'll come back at 3:25.

All right.  We are in recess until then.

(Recess taken from 3:08 p.m. to 3:27 p.m.)

THE COURT:  We're back on the record.

It looks like all counsel are present. Dr. Gelbort is in the witness box.

Mr. Stewart, you may continue.

MR. STEWART:  Thank you.

Q.    (BY MR. STEWART) Doctor, I had a quick question.

You mentioned on direct exam when we were talking -- when counsel was asking you about some of the corrections with the picture arrangement and the blank answers.

And you mentioned looking at your notes to determine what scores were adjusted.  I think it was also with the IQ scores as well.  You referred to some notes to determine what scores had been corrected.

A.    I don't recall what you're getting at.

Q.    Well, so when counsel was asking you about your

data summary, the data summary. And how you had changed the IQ scores from 93 or 95 -- or 94 to 95 and 93 to 94. And you asked to consult your notes on that.

Do you recall that?

A. I think what I did was I looked at my scoring sheets. So "notes" is probably the wrong word. I looked at the data sheets.

Q. Okay. I just wanted to confirm that you weren't referring to some notes of some sort.

A. No, there is no notes, and I didn't look at anything that would be notes.

If I misspoke, forgive me if that's what I said.

Q. Now, when did you review your scoring and determine there were errors?

A. I'm not exactly sure. It was clearly after I wrote the last report because I hadn't corrected it in the report.

Q. Do you know if it was before trial?

A. I don't recall offhand.

Q. Okay. So it could have happened well after trial.

A. That's possible.

Q. Now, I want to return to your report, and that was Exhibit 4, which is in binder number one.

If you could flip to the end of page four and just confirm that it is signed, correct?

A.   It is.

Q.   This is your final report.

A.   Correct.

Q.   Now I want you to go page number three to the third, full paragraph, and you note that measures of higher cognitive function showed impulsivity and disinhibition, correct?

A.   Yes.

Q.   And then a little further down, where untimed work -- I'm sorry.  I should read the full sentence for you.

"Furthermore, slowed information processing speeds were seen on more complex tasks and this is consistent with what was found on other neuropsychological measures where untimed work or that where he could take his time to perform the task lead to better functioning than performance on timed or 'speeded' tasks."

Is that -- you're basically saying that he did better when he wasn't on a time crutch?  If he -- pretty much.  If he had to work quickly, his performance deteriorated.

Q.   And I want you to turn to page four, and look to the first full sentence starting with "in addition."

"In addition," it says, "there was indication of impulsive or disinhibited types of behaviors,

especially when he was encouraged to work quickly or under more taxing tasks and demands."

Kind of saying the same thing, correct?

A.   It's a little broader, but, yes, it's making the same point.

Q.   And you mentioned earlier you didn't read Mr. Fields' confession, correct?

A.   That's right.

Q.   But you did say that you were somewhat aware of what happened.

A.   Correct.

Q.   That he observed the victims at a distance on one day, correct?

A.   Yes, that had been described.

Q.   And the next day that he went back to the same area, correct?

A.   Yeah.  I don't know if it was the next day, but shortly thereafter.

Q.   And observed the victims at a distance again, correct?

A.   Yes.

Q.   And he then went back to his truck to get his ghillie suit and his rifle, correct?

A.   I think that is accurate.

Q.   And then he went back to the campsite, correct?

A.   Yes.

Q.   And then he hid in the underbrush, correct?

A.   I think that's been described, yes.

Q.   And the victims returned to their campsite, correct?

A.   Right.

Q.   And he waited there for a bit, correct?

A.   That's my understanding.

Q.   And he watched them, correct?

A.   I think that's accurate.

Q.   And then he shot them, correct?

A.   Yes.

Q.   He wasn't under a time crutch, was he?

A.   I'm not aware of that being a time crutch.

Q.   Back on those facts, this doesn't appear to be a frenzied attack in which he was forced to act quickly, does it?

A.   I don't think that I would describe it that way.

Q.   And you mentioned stress.  That he was under some stress, correct?

A.   Yes.

Q.   And that can affect behavior.

A.   Certainly.

Q.   With cognitively impaired individuals, correct?

A.   Most anyone.

Q.   Now, he had some other stresses in his life, correct?

A.   I believe so, sure.

Q.   He had been through a divorce?

A.   Twice, I think.

Q.   He didn't engage in any violent behaviors though, correct?

A.   Not that I'm aware of.

Q.   You mentioned that the red flags for brain damage you noticed were, you know, the childhood hypoxia, correct?

A.   You're talking about brain damage now?

Q.   So when we talked earlier, sorry.  I'm dragging you all the way back.  We talked about some of the red flags for frontal lobe damage or impairment.  And we talked about him being hypoxic at birth.

A.   That can cause -- that actually can cause brain damage, but I'm only here to talk about dysfunction.

Q.   Okay.  We talked about his sleigh ride accident.

A.   Yes.

Q.   The truck crash.

A.   Yes.

Q.   Syncope in the Navy.

A.   The syncope in the Navy was, at least the way he related it, is he saw a needle and he said he's very

sensitive.  So that, I don't see, as being related to brain dysfunction.

Q.   Okay.  Then him, as he said, getting stoned on the paint fumes, correct?

A.   That was pretty significant, yes.

Q.   And there was nothing after that that you saw in the records or his self-report, correct?

A.   I don't think I'm aware of anything else.

Q.   So between the time he was out of the Navy to the time he committed the crime, are you aware of any violent behavior on his part?

A.   I don't think I am.

Q.   Now, you mentioned cognitively impaired people will have bad judgment, correct?

A.   They may.  They're at greater risk.  It happens more often with people with cognitive impairment.

Q.   Bad judgment does not necessarily mean they're likely to murder someone, correct?

A.   It does not mean they're likely, no.  That's correct.

Q.   Now, one of the things that you mentioned is that you said, and forgive me if I'm mischaracterizing. I believe the question was:  Is it less likely that he would engage in aberrant behavior if he were not cognitively impaired?  I believe that was the question

that you said yes, correct?

A.   I would agree to that.

Q.   Can you quantify that?  Can you say it's 80 percent less likely?

A.   I don't think I can give you a percentage likelihood.  I can just say that consistently people who have brain dysfunction are at greater risk to engage in aberrant, inappropriate, maladaptive dangerous types of behaviors.

Q.   But as far as quantifying that level of risk, that wouldn't be something that you could do just based on just neuropsychological testing?

A.   I don't think that I can give you a percentage.

Q.   Now, you note in your report that there are indications and evidence of cognitive anomalies and abnormalities such that his neurocognitive abilities cannot be seen as normal, correct?

A.   Yes.

Q.   And you note they affect his ability to think in a logical, adaptive, and goal-directed manner, correct?

A.   Yes.

Q.   Do his actions during the time of murder seem goal-directed?

A.   I would suggest that they were goal-directed.  It appears -- we don't know -- I don't know anyway what

his intentions were per se.  If he was just trying to get money and that was part of the situation from what I've read.  I don't know that he ever said, "I wanted to kill someone.  I was intent on killing someone."

Q.   I want to move on to your interactions with trial counsel in this case.

Now you kept mentioning a referral letter or a referral question I think is what you said.  I want to -- I'd like you to go to binder number five.  It's going to be Exhibit Number 74.  Could you flip to the second page?

Is that your signature?

A.   It is.

Q.   What is the date there?

A.   July 18, 2004.

Q.   Okay.  Let's go back to the first page.

Do you recognize this document?

A.   I think so, yes.

Q.   This looks like the retention letter from Ms. O'Connell to you, correct?

A.   Yes, I think so.

Q.   Now, can you go to the second full paragraph in the middle?  I'm going to read it out loud.  I'm going to have you read along silently.

"For your part, you will be required to review all

pertinent records in the case, which we will supply, and consult with the defense team and Dr. George Woods, the neuropsychiatrist retained in this case." Correct?

A.   Yes.

Q.   "Thereafter, you will travel to meet with Mr. Fields in the Tulsa jail and administer appropriate psychological testing and evaluation to be determined by Dr. Woods in consultation with you; is that correct?

A.   Yes.

Q.   Now, you testified earlier that the battery of tests that you came up with were yours, correct?

A.   Yes.

Q.   Did you consult with Dr. Woods about the battery?

A.   I didn't consult directly with him regarding the battery.  I was made aware that he was hoping to get certain types of testing performed, that he was interested in results from certain types of testing.

Q.   Did you learn about that after you had done your testing?

A.   No, I think it was before.

Q.   Did you ever consult with Dr. Woods?

A.   I don't think I ever directly spoke with him.

Q.   Did you do any of the tests that Dr. Woods would have liked you to have done?

A.   As far as I know, he was not requesting specific

tests.  But rather, as I said, asking for certain types of information.

Q.    But you don't know that because you didn't talk to him, correct?

A.    Well, he never -- I never spoke with him, that's true.  And my recollection is that through the attorneys, I was made aware of things he was interested in or looking for, which frankly, is part of my battery.

Q.    Are you sure about that?

A.    Pretty sure.

Q.    So would you be surprised if the attorneys said that you never consulted with Dr. Woods prior to your testing?

A.    No.  As I said, I never spoke with Dr. Woods.

Q.    Okay.  So I want to make very clear:  When did you examine Mr. Fields?  August 11, correct?

A.    Correct.

Q.    So within less than a month after signing this retention letter, you tested Mr. Fields without consulting with Dr. Woods.

A.    I think that's accurate.

Q.    So you violated two of the core provisions in this retention letter within a month of your retention?

MS. ENSLER:  Objection about the use of

"violation" as a legal term is inappropriate.

THE COURT:  Overruled.

THE WITNESS:  I'm not sure how to characterize it.  Discussion with the attorneys made it that Dr. Woods was hoping to have assessment of executive or frontal lobe types of abilities, so I didn't hear that directly from Dr. Woods.

And perhaps it was mischaracterized by the attorneys, but in discussion with them they conveyed to me that is what he was interested, and I would have said to them -- or I said to them, I got that covered, that I will do that.  There were no specific tests, per se, mentioned.

So as far as I know, even though I did not speak directly with Dr. Woods, I did take care of his concerns and addressed his concerns.

It says here that I will speak with him.  So, no, I did not talk directly with him, but I do believe that the consultation with me came through the attorneys, from Dr. Woods.  And in return, I responded that, yes, I would take care of that.  I would address those issues or concerns.

Q.   (BY MR. STEWART) After you sent counsel your draft report, did counsel start asking you for your raw data?

A.   I don't recall.

Q.   If I told you they were asking for it in January of 2005, would you have any reason to disagree with that?

A.   As I said, I don't recall.

Q.   So you wouldn't have any reason to disagree with it?

A.   I don't think that I could disagree with it.  I don't know if it's true or not.  I don't have any data or otherwise.

Q.   Would it surprise you that by March of 2005, that you still hadn't given them the data?

A.   I probably would not have given them the data.  I actually gave it to another expert that they hired.

Q.   Now, do you recall a meeting with Ms. O'Connell in New Orleans?

A.   I don't remember that offhand.

Q.   You don't recall her coming to a conference, at which you were speaking, to meet with you?

A.   I don't remember.

Q.   Do you recall them having any trouble getting ahold of you?

A.   Any trouble?  I'm sorry?

Q.   Getting ahold of you on the phone or for a meeting?

A.   That Ms. O'Connell had trouble getting ahold of

me?

Q.    Correct.

A.    No.  I think that you would have to ask her if she felt like she had trouble getting ahold of me.

Q.    Do you recall having a conversation with Mr. Gant?

A.    I spoke with Mr. Gant a couple of times in my life, and I don't recall if it was regarding Mr. Fields or not.

Q.    Do you know if he asked you about test data?  Well, I guess you just said that you don't recall.  You don't recall, so I'll just move on actually.

In your affidavit, you said that the defense team, and you repeated it in direct examination, "If the defense team had asked for additional neuropsychological tests, you would have told them that they didn't need any," correct?

A.    Yes, I didn't think that there was anything else, at least from my perspective that was necessary.  Although if they asked for specific testing and it wasn't inappropriate, I'm sure I would have complied.  I would have been able to do that for them if they wanted.

Q.    I'm going to change over to a white binder.  That is right, I'm throwing you a curveball.  And I want to go to the first book, one of two.  It's going to be

Exhibit 14.

And I want you to -- this appears to be an email chain between you Ms. O'Connell, correct?

A.    It looks like it, yes.

Q.    And in the lower email she says, Skip called you a few weeks ago to see if you might be willing to come do a little more testing, correct?

A.    That's paraphrasing, but, yes, that's pretty close.

Q.    And then she says, "I'm still hopeful that we can settle, which is one reason why I wanted to know if you could come back in case the team decides there are any gaps we could fill."  Correct?

A.    Yes.

Q.    And then your response you say -- the second full sentence, "As for more testing, not a problem." Correct?

Your response is there at the top starting with, "Hi, Julia."

A.    "As for more testing, not a problem," correct.

Q.    And you assume that she was talking about neuropsychological testing, correct?

A.    I think so.

Q.    You wouldn't be performing any other type of testing, I'm assuming.

A.    No.    There was other testing that I was hoping that they would do.  But in response to her question, it wouldn't make sense that I was responding to neuroradiological testing, so I suspect that that's correct.  It's been 20 years.  I don't remember specifically.

Q.    Fair enough.  Now, you don't say anywhere in this email, you don't need additional neuropsychological testing, do you?

A.    No, I do not.

Q.    And you don't say that you should have a brain scan done, do you?

A.    Not in this email.

Q.    Is there another email where you do?

A.    I don't know.  I believe I communicated it.  It may have been by phone, possibly by email, I don't know.  But that was my feeling at that time.

Q.    But you don't recall.

A.    I recall believing that other testing was appropriate, and I think I said it somewhere.  I'm not for sure if it's in an email or if it was by phone. But it was clearly an issue.  It was clearly something I thought would be appropriate.

Q.    Well, if it's clearly something you thought would be appropriate, you probably would have just told her;

wouldn't you?

A.    You seem to know what I would think and do; don't you?

Q.    Well --

A.    No.  I said it was clearly an issue.

And I'm pretty sure I communicated that to her directly.  I don't know if it was in writing or if it was on a phone call.  But it was the sort of thing where -- I mean, it came up before and it was discussed that would be the appropriate thing to do in this case. That was what I felt back then.

I think it may be listed in one of the reports.  I don't recall where I've seen it, but I think it's written somewhere.

Q.    Well, let me ask you, you might be referring to -- there's a line in your draft report that says, "further evaluation warranted," correct?

A.    That's correct.  I think that's right.

Q.    "Further evaluation" could mean a lot of things, correct?

A.    Absolutely.

Q.    That report doesn't say "brain scans," does it?

A.    No, I don't think it does.  But that was what I was hoping for for Mr. Fields.

And like I said, I'm pretty comfortable saying

that I discussed that in some fashion.  It was probably by phone if it's not -- it sounds like you would know if it was written and you're not identifying it, so.

Q.   Well, I have a good poker face.

But you certainly didn't express that hope in this email, right?

A.   It's not in this email, no.

Q.   Now, I want you to stay in the same binder and I want to flip over one tab.  Easiest transition we have had all day.

Ms. O'Connell is letting you know in this email chain that she's hiring an additional expert, correct?

A.   Yes.

Q.   She's asking you for your final report.  It's going to be like the third paragraph of her email there.

A.   Yes. How soon can you have me a final version, question mark, yes.

Q.   And she wants to discuss it, correct?  That would be the next paragraph down.

A.   Yes.

Q.   Let's look at Government's Exhibit 16, which is the next page.  Do you recognize this email?

A.   I've seen it.

Q.   This is an email between Ms. O'Connell and

yourself discussing Dr. Price's evaluation, correct?
Or some excerpts of that evaluation.

A.   Yes, I think that's accurate.

Q.   And I believe that she was wondering if she could send you the data, and you said to go ahead and fax it or overnight it.  But, in any event, you were discussing her sending you the data.

A.   Correct.

        MS. ENSLER:  Objection.  That is a mischaracterization of the email.

        MR. STEWART:  I'll rephrase it, Your Honor.

Q.   (BY MR. STEWART) You and Ms. O'Connell were discussing her sending you Dr. Price's, some of his data or his preliminary -- excerpts from his preliminary report.

A.   Yes, I think that's accurate.

Q.   Now, I want you to turn over to Exhibit 18 the same binder.  Now, if you look at the very bottom there's a notation that says, "Julie - Here's Price's report."  Correct?

A.   Yes.

Q.   It says, "See attached file: Price's report.pdf," correct?

A.   Yes.

Q.   So this is likely that you received the excerpts

that she said that she was going to send in the previous email?

A.   I mean, from what appears to be my response, I think it's evident that I received data and conclusions from Price -- of Price?

Q.   Now, you noted that his data and conclusions were not inconsistent with your own, correct?

A.   Yes.

Q.   So did you have any reason at this point to doubt Dr. Price's data?

A.   I always have reason to doubt data until I've looked at it and see if it has internal consistency, if it was performed accurately.

But this is responding to or referring to his conclusions.  It's not addressing the data, and I don't know if, at this point, if I've gone ahead and rescored the data or not.  I just know that having read his conclusions, I'm suggesting that if he's asked proper, you know, reasonable questions, he's going to be in agreement.

Q.   Well, don't you say there in that first line, "Price's data and conclusions are not inconsistent with my own"?

A.   Correct.

Q.   So you were at least offering some evaluation of

his data and conclusions even though that might be somewhat incomplete.

A.   Well, I'm saying that the data and conclusions, so the numbers are not inconsistent with my own.  I have not said, and I've rescored and his scoring is poor, or that I need to rescore.  But that's something, you know, that I can say that I would have looked at what was sent to me, read through it, and then come up with a response to Ms. O'Connell, and at some point I went and rescored.  I looked at his data.

Q.   Do you know when you actually rescored his data?

A.   I am not sure.

Q.   Do you know if it was before trial?

A.   I don't know.

Q.   Do you know when you actually received Dr. Price's data?

A.   Sometime before June 23rd, it would appear, but I can't recall for sure.

Q.   Do you recall in your affidavit saying that you were never provided that information by Ms. O'Connell?

A.   I don't recall.  Possible.  I may have forgotten.

Q.   Did you ever ask to be provided this raw data from Ms. O'Connell?

A.   I am sorry?

Q.   Did you ever ask Ms. O'Connell for Dr. Price's raw

data?

A.   I don't know if I asked for it specifically.  But it says here that -- it's evident that I received it.

Q.   Well, and I don't want to quibble too much.  But this was just the excerpts of his report; weren't they?

A.   What I'm reading here at the bottom says, "Here is Price's report."

So, you know, it could have been an excerpt.  But it does not say, Here's an excerpt of his report.  It says, Here's his report.

Q.   It doesn't say it's his raw data, though, correct?

A.   No.  I respond saying, "His data and conclusions are not inconsistent," so I must have seen some of his data.  Although, it could be that I read his report, which was reporting the data, and I hadn't actually seen the raw data.

It says, Price's data, which could be the raw data or it could be a description of it.  I don't know.

Q.   I'm going to have you grab the other white binder.  Don't put that one away.  We're going to go back to it.

Number 56, Exhibit 56 in the government's binder.

Now, this is another email chain between you and Ms. O'Connell, correct?

A.   Yes.

Q.   And if you go to -- I guess it would be the last

email, so the one at the bottom.  So, I guess, technically it would be the first email chronologically at the bottom of the page, which this is how emails get printed.

It says, Dr. Woods looked at the excerpts, told me the same thing and even more, correct?

A.    Yes.

Q.    Then she talks to you about getting a new contract, correct?

A.    Yes.

Q.    And in the next email you tell her your rate for testifying.  That would be the next email up starting with "Hello."

A.    Yes.

Q.    And then you talk about scheduling, correct?

A.    Yes.

Q.    And then the next email up starting with "Hi again."  She sends you a contract and asks you to sign it and send it back to her, correct?

A.    That's what it looks like, yes.

Q.    And then she says, "I probably need you around the 18th of July."  Correct?

A.    Yes.

Q.    "But that won't get firmed up for a couple of days."

A.    Correct.

Q.    "Also, will want you to consult re:cross-exam of Randy Price."  Correct?

A.    Yes.

Q.    Now, here at the top you said that you couldn't get the contract to open, correct?

A.    Yes.

Q.    Did you ever -- I think you were shown this contract on direct examination.

      Was that contract signed?

A.    I think so.

Q.    I'm going to have you go back to the other book to Exhibit 32.  And this is an email -- the email above is between Dr. Woods and Ms. O'Connell, correct?  It appears.

A.    I can't tell from what's there.

Q.    Are you on 32?

A.    I am.

Q.    Okay.  Do you see at the top where it says, George Woods, M.D., and then Julia O'Connell?

A.    I do.

Q.    Okay.  If you skip down to the email below in the "To" line, do you see your email address?

A.    Yes.

Q.    And so this was sent from Ms. O'Connell to you and

others, correct?

A.   That's what it looks like, yes.

Q.   And she is saying that she needs you for trial.

A.   So the email is addressed to one, two, three, four people, and then CC'd to a fifth.

It says, "Anyway, I'll need you both."

Q.   Let me help you out, Doctor.

Do you happen to know who David Freedom is?

A.   No, I do not.

Q.   If there's testimony that he was a consultant with the defense that wouldn't surprise you.

A.   Considering he's listed on this email, I suspect that he is in some way affiliated with the defense. But I don't know who he is or what his affiliation is.

Q.   Well, maybe the better way to ask you is this:  Do you think Ms. O'Connell needed you at trial?

A.   It was my understanding all along that she was hoping that I would come or wanting me to come testify, yes.

Q.   Now, she notes that testimony for the government will probably begin the 13th, correct?

A.   Correct.

Q.   "My evidence may begin as early as the 18th, maybe more like the 20th."  Correct?

A.   That's what it says.

Q.   And then it says, "Anyway, I'll need you both,"
correct?

A.   Yes.

Q.   And the email addresses are yours, a
gwwoods@comcast.net, correct?

A.   Yes.

Q.   Most likely Dr. Woods, would you agree?

A.   I suspect.

Q.   And then a freedman99@earthlink.net?

A.   Correct.

Q.   And lgreenman@starpower.net?

A.   Yes.

Q.   Then CC is kickntake@swbell.net, correct?

A.   Yes.

Q.   Phonetically.

     So Ms. O'Connell is informing you that her case
will most likely begin as early as the 18th, probably
more like the 20th.

A.   She says, "my evidence may begin."  I don't know
if there was more to her case that began earlier or
later.

Q.   You've testified in a lot of cases, right, Doctor?

A.   I have.

Q.   And the defense case is when the defense starts
putting on evidence, correct?

A.    You know, we're crossing over from my specialty to your specialty.  I don't know the terminology.  When she says "my evidence may begin," I don't know if that's when she begins her case or if there's something that preceded that.  I can't tell and it's outside the scope of my knowledge.

Q.    Fair enough.  I'm willing to concede that she says, "Her evidence will begin."

A.    Well, that's good because that's what it says.

Q.    Her evidence will begin as early as the 18th, maybe as late as the 20th.

A.    That's what it says.

Q.    Now, at some point you tell Ms. O'Connell that you'll be out of the country for portions of the trial, correct?

A.    I don't think I ever said for portions of the trial.  I told her I was leaving the country the evening the 20th.

Q.    Okay.  As we see, she expected her evidence could start as late as the 20th.

A.    That's what she says in this email.

Q.    I'm assuming that she would be presenting the evidence at trial, not on the street, correct?

A.    Again, what you presume is what you presume.  I don't know what you're referring to there.  I don't

understand.

Q.    So, I guess, do you recall having a conversation with Ms. O'Connell -- well, you mentioned you emailed her on July 11th, correct?

A.    That seems correct, but I'm not sure.

Q.    Let's make sure we're clear.  Let's go to Defendant's Exhibit 195.

A.    Which book?

Q.    And that's going to be in binder number seven.

A.    Binder number seven?

Q.    This is the email that you sent to Ms. O'Connell, correct?

A.    Yes, or it's an email.  There were more than one.

Q.    Correct.  Sorry.  The one we were just talking about.

A.    Sure.

Q.    "Just a reminder, I had told you I would be leaving the country the evening of the 20th."  Correct?

A.    Yes.

Q.    All right.  It says, "Just as a reminder, I had told you," was there previous conversation about this?

A.    Evidently there was.

Q.    Do you recall a phone call?

A.    I don't remember if it was a phone call or an email or some other form of communication.  It's pretty

clear that I had let her know previously prior to this date that I was going to be leaving the country the 20th in the evening.

Q.    Now, did you tell her that when she said that she was going to need you at trial?

A.    Again, I don't recall offhand.  There may be an email or there was a phone call, one or more, where I gave her my parameters.

Actually, I know there's an email somewhere that I said that I could, you know, the 18th, I could work on the 18th.  I could also do -- somewhere there's one that says I could do it on the 19th.  And I think the gist of it was, but I have patients on the rehab unit that day so it's less convenient, but I could be there on the 19th.

Q.    I think it's this exact same email a little further down that you're actually referring to, Exhibit 195.

You say that you could maybe make the 19th work.

A.    There you go.

Q.    When Ms. O'Connell talked to you about testifying, did she say that she was going to call you in her case-in-chief or in rebuttal of Dr. Price?

And I recognize I'm using some legal terms, so if you need me to clarify, I'd be happy to.

A.    No, I think I understand those.

And I don't know that she specified if it was one, the other, or both.  She certainly showed indication that she was hoping I would consult or provide some assistance in terms of working on Dr. Price's testimony or rebutting it or, however, you want to say it.

But all along, it was my understanding that she was considering using the neuropsych data for mitigation.

Q.    And did you -- I'm sure that you've helped with cross-examinations before of other experts, correct?

A.    A few times.

Q.    Do you typically listen to their testimony?

A.    There are occasions where I have.  There's other occasions where witnesses are precluded from hearing one another.  And, honestly, it hasn't happened all that often, and it's been a long time.  So my memory is a little foggy on how that's played out.

Q.    Do you recall where you were on July 18, 2005?

A.    I think I ended up testifying, actually, in another case in Pennsylvania.

Q.    The Hammer case, correct?

A.    I think that's correct.

Q.    When did you decide to take that case on?

A.    I had been working with Mr. Hammer.  I don't

recall which iteration of his --

Q.   Sorry.  I'm going to interrupt you.  I think my question was inartfully worded.

At what point did you decide you were going to testify on the 18th in that case as opposed to this case?

A.   I don't think I decided.  I think very shortly before the 18th, I had not been contacted or was not made aware from Ms. O'Connell that she needed me on the 18th.  And the other attorneys were asking if I could possibly make it.

So at some point, I said, yes, I have somebody ahead of you in line, but they're not going to use me it would appear, and I can be available.

Q.   Did you let Ms. O'Connell know?

A.   I believe I did.  It would have been shortly before the 18th.  I would have reached out, I think, and let her know that somebody else would like to use me on that date.  Do you need me or not?  You get right of first refusal.  You get to choose.

But I can't -- I don't remember specifically.

Q.   You had some critiques of Dr. Price's testing, correct?

A.   Yes.

Q.   Did you actually review Dr. Price's data before

472

reading Dr. Clipson and Dr. Kaufman's reports?

A.   I did.

Q.   And have you listened to Dr. Price's audio files?

A.   I have not.

Q.   So any issues that might have been determined by Doctors Clipson or Kaufman from the audio files you would not have independent knowledge of that, correct?

A.   Correct.

Q.   Have you read the transcripts of his evaluations?

A.   I think I've seen parts of it.  I'm not for sure if I've read all of it.

Q.   Did you record or transcribe your evaluation with Mr. Fields?

A.   No.  Other than recording answers on the test protocols.

Q.   So if you made administration errors, we just wouldn't know.

A.   Other than what you can see in the protocols.

Q.   Now, in your affidavit you say that you could have called Dr. Price's mistakes out on rebuttal, correct?

A.   I'm sorry.

Q.   You could have rebutted Dr. Price's mistakes, correct?

A.   I could have rebutted.  I could have explained the mistakes that I saw.

Q.   If you had been present.

A.   Sure.

Q.   There is one thing I want to note.  At the end of your direct, you testified that everything that you reviewed was in existence at the time of -- well, I don't want to mischaracterize it.

But the underlying facts that counsel went over with you, would have been available to you to review at the time of your -- at the time of the trial.

A.   Well, I mean, certainly the reports that were authored, for example, in 2015 were not available.

Q.   Let me rephrase.  His Naval history was available to you at the time of the trial, if it had been sought out by counsel and given to you.

A.   He had served in the Navy prior to the trial. Again, I don't think the document from Mr. Cody had been authored at that point in time.

Q.   But the information within existed, and the same with his pretrial detention information.

A.   Correct.

Q.   And you mentioned Dr. Bigler's report.  Do you recall the date of the MRI that he was discussing?

A.   I don't know that I mentioned Dr. Bigler's report.

Q.   Well, you had mentioned Dr. Bigler's findings about the MRI and the ventricles.

A.    Yes.

Q.    That MRI didn't exist in 2005, did it?

A.    I don't think so.

Q.    Now, you mentioned that there were scoring errors with Dr. Price, correct?

A.    Yes.

Q.    As we kind of gone over there were some scoring errors with yours as well?

A.    Correct.

Q.    Problems with your data.

And as you said, It is what it is, correct?

A.    Yes.

Q.    And at trial if you had been presented and Dr. Price had been presented, there would have been testimony from two doctors with some issues with their data, correct.

A.    There would have been.

        MR. STEWART:  That's all I have, Your Honor.

        THE COURT:  Ms. Ensler, any redirect?

        MS. ENSLER:  Courts' indulgence for one moment?

        THE COURT:  You may.

                    **REDIRECT EXAMINATION**

**BY MS. ENSLER:**

Q.    Good afternoon, Dr. Gelbort.

A.    Good afternoon.

Q.    Now, I'd like to start with what Mr. Stewart identified during cross-examination as errors and missing data in your raw data.

Do those affect your opinion as it relates to Mr. Fields' dysfunction, his cognitive dysfunction?

A.    No.

Q.    And why not?

A.    Well, first off, some of the errors will not change the scoring, you know.  Omitting/writing in "I don't know, I don't know, I don't know" doesn't change the scoring.

Now obviously, someone cannot take my word for it that that's what occurred, so be it.

But that's part of a clinician's, unfortunately, shorthand is that there are times when you just proceed on and leave the blank spaces.  Bad habit.

The scoring changes that did occur, that we've acknowledged, that I've acknowledged, do not change the pattern or the nature of the data to any significant degree whatsoever.  So the overall footprint of the data remains intact and the interpretation is the interpretation.

People can, again, disagree with it but, having done this for many years with many, many patients and

having the benefit in my clinical practice of seeing patients with issues, patterns of data such as this, and getting to visit them a year, and then three years, and then five years, and eight or ten years later and seeing how things play out, I'm quite comfortable with the interpretation of the data that I have made.

So I don't see any of those errors as being something that would merit a need to change the interpretation.

Q.    Thank you.

And can you have an average or even above-average IQ and also have brain impairments?

A.    Absolutely.

Q.    Why is that?

A.    Well, the level of your scores, while it is significant in some ways, it also doesn't tell the story as to whether or not there's impairment.

So, you know, the kind of silly example is if you take someone with multiple doctorates and they suffer a brain injury and now they score in the high-average range, high average range, those scores are better. You know, most people would trade their own scores considering half the population is below average. So at least half the population might trade for that person's score. But when you have lost something, when

you've had dysfunction occur because something has damaged your brain and it doesn't work right, you don't process information the same way that you would if you didn't have the dysfunction or impairment.

Q.    And the government has said Mr. Fields' Trail B time may have been caused by his slowing down.

What is your response to that?

A.    Okay.  Can you say that again?  I didn't hear you.

Q.    Yeah, I'm sorry.  I don't think that helps to lean forward.

The government had said on cross-examination, suggested that Mr. Fields' Trail B time may have been caused by his slowing down.

What is your response to that?

Q.    So the rest of the concept was or the rest of the idea had been that on Trails A he had made an error and I think what was being intimated was that maybe he had slowed down to be error-free.  That's perfectly fine, and that's a reasonable thing for the patient to do. You know, you're encouraged on that test to not make any errors but to work as quickly as you can.

So any way you cut it, if his score is in the impaired range, if he's slower than 95 percent or more of the population and makes no errors, he's still slowed.

You know, there's a whole concept out there that we should compare people with others who are like them, and that's very reasonable.  There's a whole set of norms that profess that.  The problem is, is that if you're comparing someone who is intellectually disabled, for example, with other intellectually disabled people and you say, well, he's in the middle of that group or someone has slowed down to not make errors, if their performance is in the impaired range, if they're weaker than most other people, they're weak and you can expect them to perform in a weak fashion when they're out in the world in everyday life.

So, yes, it's good that he slowed down and made no errors, but by doing so he's now in the impaired range. He's below 95 percent of the population.

Q.   And I just wanted to ask regarding Dr. Price.

What did Dr. Price find regarding Mr. Fields' effort or whether he was malingering?

A.   Dr. Price did two of those free-standing tests and his interpretation, at least in his report, was that Mr. Fields was not malingering, that was not feigning bad.

Q.   And just to clarify, that was not malingering on the cognitive -- his neuropsychological assessment?

A.   Correct.  And that was his general opinion, he was

not malingering.

Q.   And I would just ask if there are emails indicating that Dr. Woods spoke with you after your testing, would you dispute that?

A.   No.

Q.   I would ask you to look at Government's Exhibit 18, so that would be the white binder.

And the top is an email that you wrote to Ms. O'Connell.

A.   Yes.

Q.   And in this email are you letting -- what are you telling Ms. O'Connell about Mr. Fields' brain functioning?

A.   Basically that the conclusions, that the report from Price is not inconsistent that it does not dispute or does not argue that there is no brain impairment, but rather that, you know, it's open to interpretation. And if it's approached in a reasonable fashion, I suspect that Dr. Price will conclude or will agree that this is other than normal behavior.

Wait a minute.  I'm saying that wrong.

Q.   And the first line, are you referring to your own conclusion when you say, His conclusions are not inconsistent with my own?

A.   Correct.

Q.    In the third line or second to third line, are you saying he should say that this is not a fully functioning or normally functioning brain?

A.    Correct.

Q.    Which is -- is that your conclusion as well?

A.    Yes.

Q.    When did you convey that to her?

A.    The date on this is June 23, 2005.

Q.    And then I'd like you to turn to Government's Exhibit 14.  I'm going to have you not worry about looking at Exhibit 14.

But just going back to what we had just talked about, the email saying this is not a normally functioning brain.

Is this a consistent message that you had been telling Ms. O'Connell all along?

A.    Very much.

Q.    On cross-examination you were asked about your attendance at Mr. Hammer's proceeding on July 18th.  I have just a couple of questions about that.

Mr. Hammer's case was a 2255; is that correct?  A 2255 proceeding.  Was there a jury?

A.    I do not recall.

Q.    Assuming it was a post-conviction proceeding and Mr. Fields' case was a trial proceeding, if you had

been asked to prioritize the cases, which case would you have prioritized in terms of attending?

A.    I think the first issue is that the Fields case was on my schedule before the Hammer case.  And at least the way I do business, maybe people should do it differently but that would take precedence.  I would have explained to the Hammer attorneys that I already have a certain date blocked out.

In my office if -- sometimes attorneys will call, ask me to block out two weeks, and within - prior to two months before that time period, we will let them know, if you want me to block out two weeks, unfortunately you're going to have to buy the two weeks.  Because I can't schedule things in my office.  That's really what drives my schedule.

So the Fields' case was taking precedence until it was evident that I wasn't going to be called or I wasn't getting a response showing that I was going to be called, at which point I would have contacted the other attorneys and said, okay, I am available.  I don't remember all the specifics, but that's pretty much a hard-and-fast rule over the past 35 years in my office.

Q.    And you testified in Mr. Hammer's case on July 18th.  If you had been asked to fly directly from

the Hammer case to Mr. Fields' trial, would you have been able to do that?

A.   I believe so.

Q.   Would you have been willing?

A.   Absolutely.

Q.   Setting aside any questions I have talked to you about directly related to Dr. Seward's report, Dr. Bigler, and Dr. Snyder's report, reports done post-trial, had trial counsel for Mr. Fields called you at trial and asked you the questions during your trial testimony that we have talked about today, could you have given the same opinions regarding Mr. Fields' brain dysfunction?

A.   I would have.

MS. ENSLER:   No further questions, Your Honor.

THE COURT:   Any?

MR. STEWART:   Two or three questions or on redirect or recross.

**RECROSS-EXAMINATION**

**BY MR. STEWART:**

Q.   Doctor, you said on redirect that the errors you made wouldn't change the scoring or your interpretation, correct?

A.   Wouldn't change the interpretation.  The scoring

has been changed, obviously.

Q.    But it could hurt your credibility, correct?

A.    I don't like making arrows.  As I said before, it's an embarrassing thing to do.  It happens.  If you counted the data points in a battery, you know, you would be probably over 5- or 600.  So it absolutely happens, but it's not anything that I think is okay.

I shoot for perfection in terms of scoring. There's no reason not to.

Q.    Now, you talked a little bit with counsel about the Trail Making Test B, we kind of went back and forth on it, and you mentioned even if he slows down to fix to avoid an error, that's still impaired, right?

A.    If he's slowing down such that he's in the impaired range, then he's in the impaired range.

Q.    It still could show that he was learning and adapting, though; couldn't it?

A.    I don't follow.

Q.    Learning from his mistakes.  Adapting to not make the same mistake again.

A.    You certainly could say that he learned because he made an error when he was moving more quickly that maybe he should slow down in order to be accurate.  The test counts both speeds and accuracy.

Q.    And you mentioned Dr. Price noting in his report

that Mr. Fields was not malingering, correct?

A.    Correct.

Q.    Now that doesn't really mean he couldn't have malingered during your test, correct?

A.    That's accurate.

Q.    Pull out the white binder, book one of two, and go to exhibit -- Government's Exhibit 18.

Are you there?

A.    Yes.

Q.    You discussed this email with counsel on redirect and you mentioned that really the disagreement between you and Price is going to come down to interpretation and conclusion, correct?

A.    That's without recognizing that the data scoring and the administration is an issue, but it always comes down to interpreting the data.

Q.    So it would essentially set up a battle of the experts, correct?  You have your data; he has his. You're both presenting your interpretations, the jury hears both, correct?

A.    Everybody ends up working from the same data has been my experience because it's all shared.  It's not like you can't see mine and I can't see his.  Then it comes down to working through and understanding what the data means and why.  So sometimes the data is so

clear-cut and so significant, that nobody is going to argue over it.  Then there are other times when you end up explaining why I'm interpreting it this way.  And things like explaining absolute versus relative deficits.

Some people don't understand that concept, so it needs to be taught.

Q.   Fair enough.  And you talked briefly about the Hammer proceeding and when you said it was evident that you were not going to be called in the Fields' trial you went ahead and took that other testifying job; is that correct?

A.   I think that's correct?

Q.   Did you ever call Ms. O'Connell and let her know that you were taking that other job?

A.   That I wasn't going -- that I was giving up the slot?  I think I probably did communicate it in some fashion, but I can't say that for sure.  And that decision would have been made -- I'm pretty comfortable saying that it was made the day before.

Q.   And you did talk about the email that you sent to her on July 11th, correct?

A.   We did talk about it.

Q.   Jury box had already started at that point, correct?

A.    I don't know.

Q.    Well, on cross we talked about an email in which she told you jury selection was going to start July 5th, correct?

A.    We talked about that the email said it was going to, but that doesn't mean -- I don't know which day it actually started.  It may have been on the 5th or it may have been some other date.

Q.    Assuming it was on the 5th, the trial had already started by the time you emailed her, correct?

A.    I think that's accurate.

Q.    And this was in 2005, correct.

A.    Yes.

Q.    Email was a little different back then; wasn't it?  In terms of our access to it; wouldn't you agree?

A.    I'm not sure I understand.  You know, as I recall even back then you typed something in your computer and you pushed "send" and the email went.

       I don't think it took three days for an email to go at that point in time.

Q.    It was inartfully worded.  So certainly the method was not different, but the accessing of email at all times was probably a little different; wouldn't you agree?

A.    I don't believe that you could pull it off your

phone at that point in time.  But my recollection anyway is that I had for myself, I had a computer on my office desk.  I had a computer on my home desk.  And while I still don't access my email as I'm driving between the two, you could get email pretty quickly.

Q.    Do you think Ms. O'Connell had a computer on her trial desk?

A.    I don't have any idea.  I see computers here, but I don't know what was going on back then.

MR. STEWART:  Certainly.

No more questions, Your Honor.

THE COURT:  All right.

Thank you, Dr. Gelbort.  You are excused, sir.

You are not going to recall him in any way?  I know you have him listed, but you exhausted all the questions that you have, I would hope?

MR. STEWART:  That's correct.

THE COURT:  All right.  Dr. Gelbort, you are excused as a witness, and you may step down.

THE WITNESS:  Thank you.

MS. ENSLER:  Your Honor, is it okay if I escort Dr. Gelbort out?

THE COURT:  You may.

I guess, my question is we are at 4:35 on day two, and we have barely gotten through any witnesses.

I don't want people throwing rocks and garbage at me from this front row down here.  I'm not inclined to put on a new witness at this hour of the day unless you tell me you would prefer to do so.  I see she's -- I mean, I thought the next witness was going to be Ms. Greenman.

Is that still correct?

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  Okay.  You have listed at two hours.  I assume there's going to be a modicum of cross-examination.  So finishing her tonight would seem unrealistic.

I know she is, I assume, from out of town.

MR. LABOVITZ:  She is, but she has arranged to stay to tomorrow.

THE COURT:  Well, we were not going to finish her tonight anyway so she was going to have to come back tomorrow.

Well, I hate burning 30 -- well, now 25 minutes of our time, but I just don't think it makes sense to get started to stop.

All right.  So we will take up tomorrow morning at 9:00.

Anything else while we're here to address?

MR. STEWART:  Nothing from the government,

Your Honor.

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  Very well then.  We stay in recess until 9:00 a.m. tomorrow morning.

Have a good evening.

(Evening recess at 4:35 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    October 29, 2024


/S/ Shelley Ottwell, RPR
Shelley Ottwell, RPR, CSR
U.S. STENOGRAPHER