**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA**


UNITED STATES OF AMERICA,        )
                                 )
                 Plaintiff,      )
                                 )
                 vs              ) No. 03-CR-73-RAW
                                 )
EDWARD LEON FIELDS,              )
                                 )
                 Defendant.      )
                                 )


TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME III
BEFORE THE HONORABLE GERALD A. JACKSON
UNITED STATES MAGISTRATE JUDGE
OCTOBER 9, 2024


Shelley Ottwell, RPR, CSR
United States Stenographer
P.O. Box 607
Muskogee, Oklahoma 74402


UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

**A P P E A R A N C E S**

ON BEHALF OF THE GOVERNMENT
Christopher Wilson, Esq.
United States Attorney's Office
520 Denison Ave.
Muskogee, Oklahoma 74401

Aaron J. Stewart, Esq.
United States Department of Justice - Capital Case
Section
1331 F. Street, NW Room 656
Washington, D.C. 20530

ON BEHALF OF THE DEFENDANT
Katherine Ensler, Esq.
Hayden Nelson-Major, Esq.
Katherine Thompson, Esq.
Federal Community Defender Office for the Eastern
District of Pennsylvania
601 Walnut Street, Suite 545
Philadelphia, Pennsylvania 19106

Hunter Labovitz, Esq.
Federal Public Defender Office - Western District of
Oklahoma
215 Dean A. McGee Avenue, Suite 707
Oklahoma City, Oklahoma 73102

# E X A M I N A T I O N

LISA GREENMAN
    Direct Examination By Mr. Labovitz          496
    Cross-Examination By Mr. Stewart            534
    Redirect Examination Mr. Labovitz           559
    Recross-Examination Mr. Stewart             570

DAVID FREEDMAN, Ph.D.
    Direct Examination By Mr. Labovitz          575
    Redirect Examination By Mr. Stewart         645
    Redirect Examination By Mr. Labovitz        687

GEORGE WOODS
    Direct Examination By Mr. Labovitz          700

Stenographer certification                      765

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

**P R O C E E D I N G S**

(ON THE RECORD AT 9:04 a.m.)

THE COURT:  All right.  We're in United States of America v Edward Leon Fields, Case Number CR-03-73.

Before we get started -- it looks like all counsel are present.

Before we get started this morning, I wanted just to cover a couple of things real quick.  We're going exceedingly slow.  I'm trying to be patient and let everybody put on their case, and I know the importance of this.

But, you know, I was looking, and based on the witness list for the defendant, there is at least five-and-a-half days of direct testimony left based on their estimates.  And if we count the cross, we're looking at between eight-and-a-half and nine days, and we only have five days left on the schedule.  I'm no math genius but that doesn't equal.

So, I guess, I would just say having what I have witnessed so far, I think there's been a tendency -- I'm not telling anybody -- again, I'm going to let you put on your case but not every witness can put on every fact you need in this case.  There's lots of witnesses; each witness has their own limited area of knowledge.

Focus on that.  Don't try to get every point you need to make for the entire case with each and every witness.

There's an old John Wooden -- and I may be giving away my age.  He was a lot older -- a basketball coach back in the '60s and '70s that had a phrase.  Said, Go fast, but don't be in a hurry.  And hopefully, we all know what that means.

But you can go fast, but you need to cover what you need to cover.  We need a good record so that we can sort this all out at the end of the day.  Because even when we're done with this evidentiary hearing, we've got a lot of work to do.

We're going to have proposed findings of fact and conclusions of law.  We're going to have to put our R & R together and it's, I'm sure, going to end up on Judge White with an objection.

We've got a long way to go.  I'm trying to give everybody time to do what they need to do, but we really need to try to pick up the pace.

I will tell you, I know we had spoken last week about potentially more days if we don't have enough at the end of our time in November.  I have looked at my calendar, and I can tell you that right now that I am available the week of the 16th of December.  And I

understand what that means, but that is the next available time that I have a block of time that would be available.

So as we move through this week and as you see people, that witnesses may not be done this week or may not be able to be done in the November dates, that may be where you need to start getting them penciled in and getting their availability locked down.  Because that is what we're looking at if we can't get it done in the remaining time.

All right.  I'm done with my speeching.  Now, I'm going to let the parties do what they need to do.

Is the defendant ready to call its next witness?

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  All right.  Very well.

MR. LABOVITZ:  One minor administrative issue.  I believe we addressed this on Monday, but just to be clear, our witnesses for today will all be in person and then tomorrow and Friday we will have some video witnesses.

THE COURT:  Okay.  That was still my understanding.  Thank you.

MR. LABOVITZ:  Your Honor, at this time the defense would call Lisa Greenman.

THE COURT:  All right. Ms. Greenman, if

you'll come forward.

You'll have to wind around.  However, you can find a way.

All right.  If you'll raise your right hand and the clerk will swear you in.

COURTROOM DEPUTY:  Do you solemnly swear that the answers that you will give before this honorable court will be the truth, the whole truth, and nothing but the truth, so help you God.

THE WITNESS:  Yes, I do.

THE COURT:  All right.  Just have a seat there.  I will just tell you that that microphone doesn't pick up very well, so you'll need to either move it back a little bit or lean in and speak into it, so we get a good recording and the court reporter can hear you.

THE WITNESS:  Thank you.

*LISA GREENMAN*

having been first duly sworn, testifies as follows:

**DIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q.   Good morning, Ms. Greenman.  Can you spell your name for the record?

A.   My name is Lisa Greenman.  Lisa is L-I-S-A.  Greenman, G-R-E-E-N-M-A-N.

And if you need me to speak up or do anything else, please let me know.

THE COURT:  We will.

Q.   (BY MR. LABOVITZ) How are you currently employed?

A.   I am a lawyer, and I live and work in Washington, D.C.  I am a sole practitioner.

My work, particularly of relevance to this case, is that I work as part of the Federal Capital Trial Project, which is a group of death penalty specialists. We're really employed in two different capacities. There are some people who are part of something called the Capital Resource Counsel Project, who are federal employees, and then there are a group of lawyers who are contracting through the CJA program, through the Administrative Office of the U.S. Courts, and I'm part of that group, which is called the Federal Death Penalty Resource Counsel Project.

Q.   How long have you been an attorney?

A.   I was admitted to the bar in 1977.

Q.   Do you hold any other advanced degrees, such as an M.D., Ph.D. or a Master's?

A.   No, I don't.

Q.   You just mentioned the Federal Death Penalty Resource Counsel Project.  Can you describe what that group does workwise?

A.    The Federal Death Penalty Resource Counsel Project --

MR. STEWART:  Objection, Your Honor, just under 403, we've kind of heard this already, so it might be more efficient to just skip past it.

THE COURT:  Let's just -- I think it helps a little flavor and background of this particular witness.  So if we can do this quickly, that would be helpful.  Overruled.

THE WITNESS:  The Federal Death Penalty Resource Counsel Project was established in the early 1990s to provide assistance to the courts and defense counsel in federal death penalty cases.  The goal is to improve and enhance the quality of representation and assist in the management of costs by providing assistance and training.

Q.    (BY MR. LABOVITZ) And you mentioned that your part of the project is paid through the CJA system; is that correct?

A.    The entire Capital Trial Project is funded through the CJA system.  But there are some of us that are contractors and there are others who are part of the Capital Resource Counsel Project.  Capital Resource Counsel Project was established specifically to be able to provide assistance to federal defender offices by

providing lawyers who could actually take appointment as co-counsel in death penalty cases.

The Resource Counsel Project, the contractor's side, does not do that.

Q.   In fact, in July of 2003 to July 2005, were you contracting with the Federal Capital Trial Project?

A.   Now, so my relationship to the world of the federal death penalty has evolved over time.

Back in 2003 to 2005, I was actually a staff attorney with the Federal Public Defender Office in Maryland.  And I had a half-time position, and I worked on more or less special projects, most often in collaboration with the Resource Counsel Project.  So I was not a formal part of the project at that time.

There were four lawyers who comprised the Resource Counsel Project:  David Bruck, Kevin McNally, Dick Burr, and Michael Burt.  I was not a formal part of that project, but I did work alongside them in a more limited way.

Beginning in 2013, I was a contractor with the Resource Counsel Project.

Q.   Going back to that time again, July 2003 to July 2005, did you collaborate with an individual by the name of David Freedman?

A.   Yes.

500

Q.   Can you describe that collaboration?

A.   Sure.  It might help if I moved back a little bit and just give you a little bit of my background and how I came into the death penalty work because that is how I met David Freedman.

So I began my career in 1997 as a lawyer with the Washington, D.C., Public Defender Service, that's our local public defender office.  I left there in 1995, and I went to work for the Administrative Office of the U.S. Courts in the Defender Services Division, which is the part of AO that administers the Criminal Justice Act Program.

While I was there for those -- I was there for three years, and I worked on administrative and bureaucratic matters relating to the federal death penalty, and I became very well acquainted with people, with lawyers in the federal death penalty community.

After three years, I left and I worked at the D.C Public Defender Service again for another three years in the mental health division.  And after I left that job, is when I began working with the Maryland Federal Defender Office.

Both while I was at the PDS Mental Health Division and then once I joined the federal defender office, I got to know and work with David Freedman.  We met in

the late 1990s.  I was introduced to him by other members of the capital defense community and we worked together on various projects.

Q.   Again with this frame, prior to July 2003, have you ever been counsel of record on a capital case in state court?

A.   No.  I have never been counsel of record in a capital case at all.  My involvement has been consulting.

Q.   And speaking of consulting, did you come to be involved in consulting in the federal capital trial case of *United States v Edward Fields* here in Muskogee?

A.   I had contact with defense counsel, Julia O'Connell and with Skip Gant.  Mr. Gant was working as part of the Capital Resource Project at the time.  I had contact with them about the case.

I did not have an ongoing role as -- I was not assigned to that case.  I answered questions as they came up.

Q.   Do you recall, as between Mr. Gant and Ms. O'Connell, who first contacted you about Mr. Fields' case?

A.   The first contact that I had about the case was from Mr. Gant.

Q.   Do you recall approximately when was that?

A.    So let me preface this by saying this was 20 years ago.

Q.    Yeah.

A.    And my recollection of those events has been very much refreshed by reviewing emails that were provided to me that I understand to be exhibits in this case.

From having reviewed those exhibits, my recollection is that I received an email from Mr. Gant in January of 2005.

Q.    Okay.

A.    Asking me to review a document.

Q.    I want to get into that document in a minute, but let me just clarify a couple of things first.

You mentioned Mr. Gant and you mentioned Ms. O'Connell.

Were you aware that a man named Barry Derryberry was also counsel of record for Mr. Fields?

A.    No.

Q.    Did you ever speak to Dr. Derryberry about Mr. Fields' case?

A.    No.

Q.    Are you aware that a man named Michael Able was counsel of record for Mr. Fields?

A.    No.

Q.    Did you ever have any contact in any way with

Mr. Able about Mr. Fields' case?

A.    No.

Q.    Now, you mentioned that you had answered questions that counsel posed to you.  Is that an accurate summary at least in a global sense?

A.    Yes.

Q.    Okay.  Did you have any regularly scheduled phone calls with Mr. Gant and/or Ms. O'Connell about Mr. Fields' case?

A.    No.

Q.    Did you ever have any in-person meetings with either or both of them?

A.    No.  Well, let me say this:  I have memories of seeing Mr. Gant.  I was never at a meeting about this case.

Q.    What was the -- given that, what was the nature of your contact with trial counsel in this case?

A.    Let me just add one thing, which is that I have a vague memory that I met Julia O'Connell at some point.

      I have this recollection of putting a name -- a face to a name, but I don't -- I can't tell when that was other than it would have been at a training program.

      I don't have any recollection at having been at a meeting at any time about the case.

Q.    If there were no regular phone calls or in-person meetings about the case with trial counsel, can you tell the Court then what was the nature of your contact with trial counsel on this case?

A.    When I received an email with a question, I responded.  Based on my review of the emails, those responses were sometimes to send pleadings from other cases that I believed to be relevant or potentially help them, and there was a draft report sent to me. That was my first involvement was I reviewed a draft report, and I believe at some point later I was asked to review a list of proposed tests that the government or a government expert had submitted.

Q.    In pleading to this case, the government has asserted that Ms. O'Connell was, quote, regularly communicating with you.

Do you have a response to that assertion?

A.    I wouldn't call it regular communication.  I certainly had email exchanges with her and I responded when she reached out with questions.

I was not a regular -- there was nothing regular about the communication.  There are situations in which I might have, as you referred to it earlier, a regularly scheduled call, a standing, you know, virtual meeting or phone call about a case.  That was not the

situation in Mr. Fields' case.

Q.    Did any trial counsel for Mr. Fields ever provide you with a social history, background information about Mr. Fields for your review?

A.    I was not provided a social history with Mr. Fields.

Q.    And you mentioned -- maybe we can get into it later.  But you mentioned sort of how -- a little bit of a comparison with your contact in this case versus other cases that you have been involved in at the federal capital level.

Did you ever consider yourself part of Mr. Fields' trial defense team?

A.    No.

Q.    Now, I want to turn to this email that you have been referencing that you were sent, a report, asked to provide some feedback on that.

And before I ask about the specifics, were you made aware at some point that Mr. Fields' trial counsel had retained a mental health expert/psychiatrist named Dr. George Woods?

A.    I was aware that Dr. Woods had been retained, yes.

Q.    Were you made aware at some point that Dr. Woods had recommended that neuropsychological testing be administered to Mr. Fields?

A.    I can't say that I am aware of the chronology.
So, no, I'm not aware that it was Dr. Woods'
suggestion.  I'm certainly aware that doing a
neuropsychological evaluation is kind of a foundational
piece in capital mental health evaluation.  But I can't
say what happened first in this case.

Q.    And so do you recall that in early January of
2005, Mr. Gant emailed you a copy of a first draft
neuropsychological report from Dr. Michael Gelbort?

A.    Yes.

Q.    Okay.  I'd like you to take a look at Defense
Number 59, which hopefully will appear on the screen in
front of you.  If not, we have it in a binder.

A.    Yes, I can see that.

Q.    Can you just take a look at that and see if that
is an email that you received from Mr. Gant about this
case and Dr. Gelbort's findings?

A.    Yes, it is.

Q.    Okay.  Is this email from January 7, 2005, the
first contact that you had with any trial counsel on
Mr. Fields' case?

A.    So far as I know, yes.

Q.    In this email, did Mr. Gant ask you to review
Dr. Gelbort's first draft?

A.    Yes.

Q.    And if you could -- yeah, you can see at the bottom of -- basically this is like an email chain.

If you can see at the bottom, sort of the initial email is dated 11-10-2004.

Do you see that?

A.    Yes.

Q.    And can you describe what that initial email appears to be back from November of 2004?

A.    This appears to be an email from Dr. Gelbort to Julia O'Connell providing his draft and asking for guidance about what to do next.

Q.    Do you know, only if you know, but do you know why you were not provided Dr. Gelbort's first draft until some two months after trial counsel received it?

A.    I don't know.

Q.    At the time that you received this draft report of Dr. Gelbort's, what was your understanding from trial counsel as to whether the defense was calling Dr. Gelbort to testify at trial?

A.    This was in January of 2005, I assume that he was a defense witness, who had been retained to evaluate the client and to testify about him.

Q.    To testify about what, if you know.

A.    To testify about his neuropsychological findings.

Q.    If you're not sure that you knew that in January

of 2005, do you know when you came to that understanding?

A.   I mean, I'm not for sure how to answer that question.

I understood Dr. Gelbort to be the neuropsychologist on Mr. Fields' case, and I was being asked to look at a draft of his report.

Q.   Okay.  I'm just trying to drill down as to whether you ever had any understanding that Dr. Gelbort, was going to be a testifying witness for the defense.

A.   Yes.  Oh, I assume that he had been retained in order to be a testifying witness.  And I was familiar with Dr. Gelbort.  He had played that role in a number of federal death penalty cases.

Q.   So when you received a report from Dr. Gelbort was there anything that trial counsel had told you that would have changed that assumption?

A.   No.

Q.   And at any point during your contacts with trial counsel, did they tell you anything that led you to believe that Dr. Gelbort would not be called as a witness about his neuropsychologist findings?

A.   No.

Q.   Was it your -- what was your understanding as to where Dr. Gelbort's findings of brain impairments was

going to be part of the defense mitigation themes at trial?

A.    I assume that findings about brain impairment would be a significant part of the mitigation case.

Q.    Was that based on your prior work with Dr. Gelbort?

A.    I had not worked directly with Dr. Gelbort.  But it's based on my understanding of what happens during the sentencing phase of a capital trial and that mental health was a significant part of the defense presentation in this case.

Q.    Did trial counsel for Mr. Fields ever tell you anything to sort of disavow that understanding?

A.    No.

Q.    Now, Mr. Gant asked you to review this draft from Dr. Gelbort.

    Did you have an opportunity to review that back in 2005?

A.    Yes.

Q.    Just to confirm that we're on the same page --

        MR. LABOVITZ:  I don't know if there's a way to do two side-by-side.

Q.    (BY MR. LABOVITZ) Okay.  Can you take a look at Defense Exhibit 73?

    Can you just -- I don't know if you would have the

ability to scroll on the screen.

If you can just scroll through just to see, you know, what this is, document 73, sorry, Exhibit 73.

Does Defense Exhibit 73 appear to be the draft that Mr. Gant sent you January 7, 2005?

A.   Yes, it does.

Q.   Now, after you reviewed the draft, did you send Ms. O'Connell and Mr. Gant your thoughts?

A.   Yes.

Q.   And if you could take a look at Defendant's Exhibit 136.

Is that the email that you sent to Mr. Gant and Ms. O'Connell following your review of Dr. Gelbort's first draft?

A.   Yes.

Q.   And I'm just going to ask you some questions about this.

In that email, the first paragraph on line one, did you tell Mr. Gant and Ms. O'Connell, quote, I just read the report and I hate it?

A.   Yes.

Q.   And then going down into paragraph three, the second line there, did you tell Mr. Gant and Ms. O'Connell, quote, From an interpretive perspective this report gives you nothing other than some enticing

leads?

A.    I'm not seeing that on my screen.  If you can direct me where to.

Q.    Okay.  Yeah, I guess it would be the second -- yeah, it's the third paragraph of the document, but I think it gets enlarged, so I think it might be the second.

We've got to go up a little bit.  Sorry.

A.    Yes.  I see that.

Q.    Okay.  And then the next paragraph below that starts with, "The history section."

Do you see that?

A.    Yes.

Q.    Did you say that I find the -- quote, I find the entire tone of this section counterproductive?

A.    Yes.

Q.    There, in that paragraph, you talk about that treatment for venereal disease was described as a dose of the clap. Is that right?

A.    Yes.

Q.    And then you say that a very serious suicide attempt was called a shaving accident?

A.    Yes.

Q.    And go back to Defense Exhibit 73.  Do you recall -- on page one of Defense Exhibit 73,

Dr. Gelbort's draft, do you recall that in the first paragraph that he used language about a shaving accident and a dose of the clap?

Does that confirm your belief that Defense Exhibit 73 is Dr. Gelbort's first draft?

A.   Yes.   My comments relate to the language that he used in the draft report.

Q.   Sorry.   Going back to your email, Defense Exhibit Number 136, in that same paragraph about the history section, on the sixth line you started talking about the section on job history.

And did you tell Ms. O'Connell and Mr. Gant that section, quote, fails to inquire into whether there's a clinical significance to the client's movement from one job to another and from employed to unemployed status?

A.   Yes.

Q.   And then in the next paragraph at the bottom of the screen, do you see where it begins, "As David pointed out"?

A.   Yes.

Q.   Is that referring to Dave Freedman that you mentioned earlier?

A.   Yes.

Q.   And just to make it clear, but he'll be testifying later, but did he also -- was he also a contact, for

lack of a better word, in Mr. Fields' case?

A.   Yes.   And my email with comments on the draft followed an email from David with comments on the draft.

Q.   So in that paragraph following, as David pointed out, do you say that, quote, The reliance exclusively on information from the client here is extremely unhelpful?

Do you see that?

A.   Yes.

Q.   And you testified earlier that counsel for Mr. Fields had never provided you with background materials about Mr. Fields.

Had trial counsel told you at this point if they had given Dr. Gelbort background materials on Mr. Fields?

A.   I did not know what had been provided to Dr. Gelbort.   What was surprising to me was to see in a report like this reliance on the client's self-report as opposed to documentation, collateral sources that would relate things, like whether the client had oxygen deprivation at birth, whether he had had head injuries, records relating to medication he had taken.   All of those things I would have expected to see documented through collateral sources.

Q.   And that would be expected based on your experience even with a first draft of a neuropsychological report?

A.   Yes.

Q.   Now, can you go to page two of Defense Exhibit 136.  The first full paragraph that begins, "There is also no information."  Do you see that?

A.   Yes.

Q.   This is in the third line.  It says, quote, There's no mention of the possible cognitive suppression or other impact of the medications the client is taking.  Loxitane (misspelled in the report) is an antipsychotic.  We don't know what the client's lithium level is, but that could affect cognitive function as well.

Am I reading all that correctly?

A.   Yes.

Q.   So I pointed out some, I think, I imagine the government may ask some questions, of course.  But I pointed out some of your comments in this email.

Given your understanding -- well, let me ask you this, sorry:  What was your aim with this email to trial counsel?

A.   Well, I think it's pretty clear from the tone of what I said that I was not happy with the way that the

report was written.

I thought that the style of it was casual about things that should have been documented in a different fashion, that I would have expected to be documented in a different fashion.

My goal was to provide information to help strengthen the next iteration of this report so that it would look more like what I expected a neuropsychologist report to read like.

Q.   How did that advice to counsel fit in with your overall understanding that when Dr. Gelbort is involved in a case it's because it's intended that he would be testifying as a defense expert?

A.   So my goal here was to help counsel help the expert make the most effective presentation possible.

And so I provided feedback about what was there so that it could be strengthened and then, you know, the goal would be for the report to be turned over, eventually turned over to the government and to be a strong report, and would form the basis of testimony, which would be the actual evidence that would be provided about the client's neuropsychological function and brain deficits.

Q.   So when you're talking about the presentation, the strengthening of the presentation, you're talking

about -- I don't want to put words in your mouth, but are you talking both about Dr. Gelbort's report as well as his subsequent trial testimony?

A.   Yes.  Michael was to help counsel, help the expert establish the best presentation possible.

Q.   Did Ms. O'Connell ever follow up with you with an email or any other way about any of these comments that we just discussed in Exhibit 136?

A.   My recollection from having reviewed the emails is that there was -- there was not feedback specifically about these comments.  And that at some point later, I think, David Freedman asked a question about whether the feedback was helpful.

Q.   Well, you don't recall trial -- well, do you recall trial counsel asking you about your comments, whether Mr. Gant or Ms. O'Connell?

A.   I don't -- I don't have a recollection of that, no.

Q.   If trial counsel for Mr. Fields -- I'm just going to save time, I'll just talk -- I'll use "trial counsel" for Mr. Gant and/or Ms. O'Connell, okay?

If trial counsel had followed up with you and asked you to answer any questions they had about your comments in this Defense Exhibit 136, would you have been available to answer those questions?

A.    Yes.

Q.    Would you have done so?

A.    Yes.

Q.    Now, sticking with Defense Exhibit 136, let's go back to page one, please.  In paragraph one, on lines one through three at the end, does that say, quote, I hope I am recalling correctly that you have plenty of time ahead of you and are not needing to turn anything over to the government imminently.

      Did I read that correctly?

A.    Yes.

Q.    What were you trying to convey to trial counsel in this part of your email?

A.    I was saying that I thought this report needed to be revised and that I hoped there was time in which to do that, work with the expert make sure that he was citing to collateral sources for the history, and that he was providing the sort of illuminating information that I know Dr. Gelbort to be capable of providing. That is to say, not simply talking about test data in the general way that he does in this draft report but really using the -- analyzing the data.

Q.    And you had mentioned earlier that one of your goals was to get Dr. Gelbort's report strengthened so that when it would be presented to the government in

discovery it would be as strong as possible; is that right?

A.   Yes.

Q.   Is it your understanding that a report, an expert report that's provided to the government in a criminal trial is only done for purposes of informing the government as to who the defense will be calling as a witness at trial?

A.   I think you may be referring to the exchange of information that's required under the Rules of Criminal Procedure, Rule 12.2.

Q.   Correct.

A.   Yes, and the report is provided during the 12.2 discovery process, yes.

Q.   And it's your experience and understanding that as part of the 12.2 discovery process, that is for witnesses that are intended to be called at trial?

A.   That's correct.  The defense gives notice under Rule 12.2 about witnesses that are expected to be called at trial.

Q.   So when you were making recommendations to shape Dr. Gelbort's report, was it with an eye towards this 12.2 disclosure?

A.   Yes.

Q.   Now, I'd like to go to --

A.   So can I just add --

Q.   Yes.

A.   So in addition, I believe my recollection of the emails is there was some discussion also about negotiations with the U.S. Attorney's Office, and that there was an interest in developing information to provide to the U.S. Attorney's Office as well to discuss possible disposition of the case.

Q.   In your work with the Capital Resource Counsel at this time frame, had you advised attorneys in other federal capital cases on Rule 12.2 procedures?

A.   Yes.

Q.   Had you given any lectures on that prior to July of 2003?

A.   Rule 12.2 was one of the topics that I did training on, yes.

Q.   Training, yes.  A CLE, for example?

A.   Yes.

Q.   On page two of Defense Exhibit 136, the first full paragraph.  I apologize.  The second paragraph.  The second paragraph at the end of the second line, did you say, quote, There's lots of good stuff to work with here, and I do not mean to be demoralizing?

A.   Yes.

Q.   Jumping around, again, back up to page one.  In

the first paragraph of page one of Defense Exhibit 136, could you take a look at line seven?

Do you see a sentence that begins with "Doesn't sound"?

A.    Yes.

Q.    And in this January 8, 2005, email, did you tell trial counsel, quote, It doesn't sound, at least initially, like you will be needing/wanting Gelbort to have to carry much of the storyline at trial.

Did I read that correctly?

A.    Yes.

Q.    Going to the last few lines of that paragraph, did you say, did you tell trial counsel, quote, Your client's underlying psychiatric problems and the impact of the medications on his functioning sound like much more significant storylines.  Is that right, how I did it?

A.    Yes.

Q.    Was it your intent with that part of this email to tell trial counsel not to present Dr. Gelbort as a trial witness?

A.    No, not at all.  I was not saying that at all.  In fact, I think my email assumes that he is a witness at trial.

Q.    So what was the purpose of these last two

sentences that we read?

A.    I'm trying to think how to explain it other than exactly what it says.  I mean, the neuropsychological test data was, in my email, anticipated to be a part of what was important to the defense.

There was, in my understanding, a very dramatic story of psychosis, of hearing voices, that the client being, you know, given antipsychotic medication and so on, that had a more dramatic feel to it.

But neuropsychological testimony is at the foundation of any capital mental health evaluation.  It is fundamental.  It's the foundation of what comes next.  It is almost always the first evaluation that is done, and other things are premised upon it.

So I was commenting on the fact that there was important psychiatric testimony.  But I was not suggesting that the neuropsychological testimony was not also an important part of the trial case.

Q.    And sticking with paragraph one of your January 8, 2005, email on line five, do you see it at the end of line five it says, quote, And on the brighter side, once you got the test scores, you'll be able to use this information to help you move ahead; is that right?

A.    Yes, I think that's kind of illustrating what I was trying to explain about how this neuropsychological

information is foundational.

Q.   By test scores, is it accurate that you're referring to Dr. Gelbort's scores from his neuropsychological testing of Mr. Fields?

A.   Yes, exactly.

Q.   And then going to line nine of paragraph one, do you say, quote -- do you tell trial counsel, quote, The neuropsych data sounds to me far more likely to play a supporting role to testimony from an M.D.?

A.   Yes.

Q.   What were you telling trial counsel in this, you know, in this phrase about using the test scores from Dr. Gelbort's neuropsychological testing of Mr. Fields at trial?

     What was your aim?

     What were you trying to express to trial counsel about the test scores and, you know, how they would play a supporting role to testimony from an M.D.?

A.   So I would expect any psychiatrist to be informed by the test data that was obtained by the neuropsychologist.  And this would be why a neuropsychological evaluation would be completed first, as a first step in a capital mental health evaluation. And the psychiatric evaluation in the ordinary course of things would be built upon that.

Q.   And would you say "a supporting role to testimony from an M.D.," what do you mean by a "supporting role"?

I mean, is there anything else that you want to add previously to what you said just a few seconds ago about what you were trying to tell counsel?

I just want to make sure that you explained everything that you meant about this supporting role issue.

A.   Well, I want to make clear I was not suggesting that the neuropsychological testimony was not important.  So when I say it was supporting, I'm saying supporting in a foundational sense.  That it needs to be there and that, I thought, when I was expressing this that there is -- that it is a part of the story.

Q.   Now, after you sent this email on January 8, 2005, did you ever tell trial counsel that the defense team should not share Dr. Gelbort's test scores with Dr. Woods?

A.   No.

Q.   Did you ever tell trial counsel following your email about this supporting role, that they should not share Dr. Gelbort's test scores with any psychiatrist, you even refer to an M.D.  So, say, not Dr. Woods but any psychiatrist that the defense was using as an expert?

A.   No.

Q.   After your email in Defense 136, did you ever tell trial counsel that the defense should not present evidence of Mr. Fields' brain impairments through Dr. Woods?

A.   No.

Q.   How about through any other qualified psychiatrist?

A.   No.

Q.   How about through any other qualified mental health expert?

A.   No.

Q.   Now, I'd like to talk to you about another email that you -- I'm sorry "another" is not the right word. This would be the first one.

An email that you received from Ms. O'Connell on March 9, 2005.  It's Defense Exhibit 178.

Do you see that exhibit?

A.   Yes.

Q.   And does this appear to be an email that's been forwarded from Dr. Gelbort to you and to Mr. Freedman by Ms. O'Connell?

A.   Yes.

Q.   And in this email is Ms. O'Connell asking for your thoughts on Dr. Gelbort's report?

A.   Yes.

Q.   Is it your understanding that this was -- that some revisions had been made then to Dr. Gelbort's report?

A.   Yes.

Q.   Do you recall reviewing the draft of Dr. Gelbort's report that was sent to you by trial counsel on March 9, 2005?

A.   I don't.

Q.   Do you recall responding with an email or phone call, you know, to this request from Ms. O'Connell?

A.   No.

Q.   Now, I'd like you to take a look at Defendant's Exhibit 4.  This is a four-page document, if you want to just scroll through that for a minute.

     Could you see on page four that there's a signature from Michael M. Gelbort?

A.   Yes.

Q.   Do you recall if you ever received this signed version of Dr. Gelbort's report from trial counsel?

A.   I don't believe I ever received this document.

Q.   Okay.  Now, going back to these responses that you gave to trial counsel on January 8, 2005, given the comments that you made in that email, did you ever tell trial counsel that Dr. Gelbort's pretrial testing of

Mr. Fields showed that Mr. Fields did not have brain damage?

A.    No.

Q.    And given the comments that you made in that January 8, 2005, email did you ever tell trial counsel that what Mr. Fields' neuropsychological testing showed, should not be presented as mitigating evidence by the defense at Mr. Fields' trial?

A.    No.

Q.    Did you ever tell Ms. O'Connell that the defense should not present Dr. Gelbort as a witness at Mr. Fields' sentencing stage?

A.    No.

Q.    Did you ever tell Mr. Gant that?

A.    No.

Q.    Were you ever made aware that trial counsel had retained a psychiatrist by the name of Dr. Bradley Grinage as an expert for the defense?

A.    The name is familiar to me from having reviewed emails, I think, that were provided to me.  But I don't recall having had anything to do with Dr. Grinage.

Q.    Do you recall ever giving -- no, that's fine.

     In looking at Defense Exhibit 4, and I know that you said that you don't recall receiving it, but I would represent to you that that's Dr. Gelbort's final

report.

Did you ever tell trial counsel that, just globally, that once you get a final report from Dr. Gelbort, you should not share that final report with Dr. Woods?

A.    No, I did not.

Q.    Did you ever tell trial counsel that the defense should not share Dr. Gelbort's final report, you know, whenever it was signed and ready with Dr. Grinage?

A.    No.

Q.    Or any other mental health expert after that the defense was consulting with?

A.    No.

Q.    Were you ever made aware that trial counsel intended to present -- well, actually I think we talked a little bit about this, but psychiatric conditions.

So were you aware if trial counsel intended to present evidence that Mr. Fields underwent a manic switch at the time of the crime and that was going to be part of their mitigation case at the sentencing stage?

A.    I was aware of that, yes.

Q.    Did you ever tell trial counsel that presenting testimony about the brain impairments that were shown on Mr. Fields' neuropsychological testing would be

inconsistent with manic-switch presentation?

A.   No.

Q.   Did you ever tell trial counsel that the defense should not --

          MR. LABOVITZ:   Court's indulgence.   Sorry.

Q.   (BY MR. LABOVITZ) Did you ever tell trial counsel that the defense should not present through Dr. Woods evidence of Mr. Fields' brain impairments?

A.   No.

Q.   Did Mr. Gant ever tell you that the defense was not going to present Dr. Gelbort as a testifying witness in the defense case at Mr. Fields' trial?

A.   No.

Q.   Did Ms. O'Connell ever tell you that the defense was not going to present Dr. Gelbort as a testifying witness in the defense's case at Mr. Fields' trial?

A.   No.

Q.   Did trial counsel ever tell you that even if they were not going to present Dr. Gelbort himself as a witness in the defense case, that they would not even be presenting any evidence of Mr. Fields' brain impairments at trial, whether through -- Dr. Gelbort, if he was available, Dr. Woods, Dr. Grinage, any expert?

A.   No.

Q.    Now, I'd like to ask you some questions about an email that you wrote to trial counsel about Dr. Price.

Do you recall who Dr. Price was in relation to this case?

A.    Yes.

Q.    What was that or who was that?

A.    He was the government neuropsychologist.

Q.    I'd like you to turn to Defense Exhibit 141.

Do you recognize this as a two-page email that -- well, a two-page email chain that at the top, at least on page one, is an email that you sent to Ms. O'Connell on June 27, 2005?

A.    Yes.

MR. LABOVITZ:  Court's indulgence, please.

Q.    (BY MR. LABOVITZ) I'll get to your response in a minute.

But if you look at the first -- the bottom of half of page one and then on to page two, what is your understanding of what Ms. O'Connell was asking you advice-wise?

A.    She was concerned about anecdotal information in Dr. Price's report that portrayed her client in a very negative light, and whether or not there was a way to keep that evidence from coming in because it would be prejudicial to the jury.

Q.   Do you see on page two, towards the bottom of her email there's a paragraph that begins, "Just by putting on my mental health defense"?  Do you see that -- and Ms. O'Connell is asking, quote, Do I open the door to everything that would support the government's mental health expert's opinions?

A.   Yes.

Q.   So is that consistent with what you're saying, you know, letting in all this information about Mr. Fields?

A.   Yes.

Q.   And going back to page one, at the first paragraph of page one, I want to talk about your response and you say, quote, Well, I guess one thing that you are entitled to know is whether -- what you propose to put on will or will not open the door.  So you may want to get very specific.

Did I read that correctly?

A.   Yes.

Q.   Okay.  What were you suggesting that trial counsel do in response to this opening-the-door question?

A.   So as an evidentiary matter that she identify what she intends to put in and seek an in-limine ruling about what would and would not open the door.

Q.   Okay.  Actually, getting close to the end of the direct, Ms. Greenman.  But I just want to ask you a

couple of questions about your background.

You mentioned some of your experience at the public defender service in Washington, D.C., working on mental health cases.

Can you describe that a little bit more for the court?

A.    When I was at the Mental Health Division of D.C. Public Defender Service, we represented people who were being involuntarily committed to the public mental health system.  So I represented people whose liberty was being taken away from them because they were believed to be dangerous as a result of mental illness. So that was the primary work in that role.

In addition, we represented people who had been found not guilty by reason of insanity and were held for that reason and had continuing liberty interests and so we represented those people in seeking as much freedom as they could be provided safely.

Q.    In that work, did you have the opportunity to consult with psychologists to see if they could assist you in representing your client's interest?

A.    In that role, I worked a lot with psychologists and psychiatrists, yes.

Q.    Do you work with neuropsychologists in that role?

A.    Yes.

Q.    Neuropsychiatrists.

A.    I'm not sure whether any of the psychiatrists that I worked with would have identified themselves as neuropsychiatrists at that time.

Q.    Okay.  Now, during the time that you had this contact with trial counsel on Mr. Fields' case, July 2003 through -- oh, I'm so sorry.  It looks like January 2005 through July 2005, did you have any formal training in conducting neuropsychological assessment?

A.    No.

Q.    Do you have any formal training in psychological tests as part of neuropsychological assessment?

A.    No.

Q.    Did you have any formal training in selecting what tests are appropriate to administer in neuropsychological assessment?

A.    I had no formal training.  I had the understanding of a lawyer who works with those experts, but did I have formal training in those substantive fields, no.

Q.    Did you have any formal training at that time in the interpretation of neuropsychological testing?

A.    No.

Q.    Do you know if Mr. Gant, from his contacts with you through this Capital Resource Counsel, knew of your work experience and credentials?

A.    We worked as part of the same project.  And so I assume he knew at least something about me in terms of my interest in mental health issues in particular.

MR. LABOVITZ:  Court's indulgence.

THE COURT:  Yes.

MR. LABOVITZ:  I just need to consult with co-counsel.

Q.    (BY MR. LABOVITZ) Ms. Greenman, you talked about counsel for Mr. Fields, Ms. O'Connell and Mr. Gant never followed up with your comments that we just discussed in Defense Exhibit 136.

A.    I'm sorry.  Can you tell me which one is 136?

Q.    Oh, I'm sorry.  That is your email.  If you want to look again, that was your email on January 8, 2005, with your comments about Dr. Gelbort's first draft.

A.    If there is an email that you can refresh my recollection with that that suggests that we communicated about that, then I would like to be refreshed.  But I don't -- I don't recall that there was feedback.

What I do recall was that there was a later request from David Freedman to know whether the information had been helpful.

Q.    But if counsel had followed up specifically with you after you sent your email on January 8, 2005, would

you have explained what you meant in that email, excuse me, as you have done today here in court?

A.   Yes.

Q.   And does the same hold true specifically for Defense Exhibit 136 that you would have answered any questions that trial counsel posed to you back in 2005 in the same fashion and manner that you've answered them here today?

A.   Yes.  Although, I think my answers to you have been pretty short and "yes" or "no."

And these are issues about which I would have expected to have a really fulsome discussion.

Q.   At least to some of the, you know, purpose behind your emails, the themes that you were trying to get at with Dr. Gelbort's report and testimony, you would have -- would you have explained to counsel at a minimum, at least, how you explained things to the court today?

A.   Absolutely.

MR. LABOVITZ:  Thank you.

THE COURT:  All right.  Any cross-exam?

MR. STEWART:  Yes, Your Honor.

THE COURT:  Okay.

**CROSS-EXAMINATION**

**BY MR. STEWART:**

Q.    Ms. Greenman, it's fair to characterize your experiences as pretty extensive in the capital realm as a consultant.

A.    Yes.

Q.    Now, admittedly you have more experience now than you had in 2004 or 2005.  But you were an experienced attorney at the time, correct?

A.    I had been practicing law since 1987.  So, yes, I was an experienced attorney.

Q.    And at that time that Mr. Fields' case came to trial, you had experience dealing with experts?

A.    Yes.

Q.    Especially mental health experts?

A.    Yes.

Q.    You knew how to read reports?

A.    Yes.

Q.    And you had a good hold on how juries react to certain evidence.

        MR. LABOVITZ:  Objection, Your Honor.  Ms. Greenman testified that she had never been counsel of record in a capital case in any court, so she would not know how a jury would react.

        THE COURT:  I don't know that we've limited it to capital cases.

        Overruled.

Q.   (BY MR. STEWART) And you're aware of how prosecutors tend to attack certain evidence, correct?

A.   Yes.

Q.   And obviously attorneys are ultimately responsible for their cases, but you were definitely someone they could consult and trust in crafting strategy for a capital offense?

A.   Yes.

Q.   And you've read good expert reports, correct?

A.   Yes.

Q.   And you've read bad expert reports, correct?

A.   Yes.

Q.   This draft report that you testified to, how would you categorize that?

A.   I was disappointed in the quality of the draft. It was fortunately just a draft.  I thought it had a long way to go to be ready to be a final report.

Q.   And you didn't review the final report, did you?

A.   No.

Q.   So you don't know if it actually went that long way, did you?

     You don't know if it actually ended up in a better position than it was in the draft, correct?

     Let me rephrase.  Since you didn't read the final report, you don't if the final was any bit of

improvement over the draft that you reviewed?

A.   No.

Q.   Have you consulted with a defense team since Mr. Fields' case that had retained Dr. Gelbort?

A.   I'm sorry.  Can you state this again?

Q.   After the Fields' trial, did you ever consult with another capital defense team that had retained Dr. Gelbort?

A.   I'm thinking about that because I remember that the last, like before today, the last time that I saw Dr. Gelbort was when both of us were witnesses at the 2255 hearing for Angela Johnson in Iowa.

So I know that he was a witness in that case, but I was involved at the 2255 stage.  So I don't know.

I do know that Dr. Gelbort was involved in a number of federal death penalty trial cases.

Q.   After Mr. Fields' case, did you ever recommend Dr. Gelbort to anyone?

MR. LABOVITZ:  Objection, Your Honor. Ms. O'Connell -- I'm sorry.  Ms. Greenman did not recommend Dr. Gelbort in this case.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

Q.   (BY MR. STEWART) After you became involved in Mr. Fields' case, you were just a consultant with the

mitigation phase, correct?

A.   I beg your pardon?

Q.   You were just consulting about the mitigation piece of the trial?

A.   I guess the reason I struggle with that a little bit is there are cases in which I would view myself as a consultant that I was, you know, had an ongoing role in a case.

What struck me when I reviewed the emails here is that they were -- there were significant gaps.  There wasn't ongoing conversation about the case.  So, yes.  I absolutely -- I responded to questions.  A number of my responses were not a lot more than forwarding an order from another case or a motion from another case.

Q.   Certainly.  And your first substantive work, I think you testified on direct, was reviewing this draft report, correct?

A.   Yes.

Q.   And you were aware that David, or David Freedman, had some significant criticisms of the report?

A.   Yes.

Q.   And then you had your own criticisms, correct?

A.   Yes.

Q.   Now, I want to pull up Defense Exhibit 136.  I wrote it down.  I was going to do better.  I figured we

would keep it on the same binder for the record's sake.

And you mentioned that you said you hated it, correct?

A.   Yes.

Q.   And on direct I think before we actually got into this email, you mentioned that you had assumed that the brain impairment would play a significant role in the mitigation case, correct?

A.   Can you restate that, please?

Q.   Sure.  On direct you testified that you thought that the brain impairment would play a significant role in the defense.

A.   Yes.

Q.   Now, according to this email at the time, you obviously didn't think it was the most significant, correct?

A.   Yes.

Q.   In fact, you say that you think the psychiatric evidence would be much more significant, correct?

A.   Yes.

Q.   And that the neuropsychological evidence would play a supporting role.

A.   Yes.

Q.   And you say the report gives nothing but enticing leads, correct?

A.    Yes, sir.

Q.    That you were critical of the fact that Dr. Gelbort just reported the ranges in which the scores fell without any real interpretation, correct?

A.    Yes.  What I was hoping to find, what you would like to find in a neuropsychological evaluation is -- you know, you find the data and an analysis of the data and that means in terms of the individual's functioning and how they experience the world and how they respond to it.

Q.    And that wasn't in this draft report?

A.    No.  But I want to be clear, I have worked with experts a lot.  I've seen a lot of lousy first drafts. I've had plenty of frustrations.  There are experts that are really wonderful testifying experts who take a lot of work to get them ready, to get their attention. They're busy.  They're overcommitted.  They're moving too quickly.

So I certainly expected there to be better findings underneath what we were presented with.

Q.    And I'm going to follow up on that because I want to get a little bit of specifics from you because you mentioned that you would like to see data and interpretation of the data, correct?

Would you want to see actual test scores, like

such-and-such test he scored this number, which is this scaled score, which leads me to believe whatever?

A.    Yes.

Q.    That's what would you expect to see in a final report?

A.    Yes.

Q.    Now, you had some concerns with the background section, correct?

A.    Yes.

Q.    You didn't like the inappropriate phrasing.

A.    I didn't like the reliance exclusively on client's self-report, and it came across to me as more casual than I would expect.

MR. STEWART:  I want to go down - could you scroll up a little bit so I can count the paragraphs?

Yeah, the fourth paragraph.

Q.    (BY MR. STEWART) Do you see where you say, "the phrasing does seem inappropriate"?

A.    Yes.

Q.    And you were concerned about that?

A.    Yes.

Q.    You also -- you just mentioned that you didn't like the fact that Dr. Gelbort seemed to rely completely on Mr. Fields, correct?

A.    Yes.

Q.   And you thought the job history section was misleading, and that's going to be in the same paragraph near the bottom.  It starts about the middle, the section on job history.  Do you see that?

A.   Yes.  And I think that was because it said that he had had a job for a certain period of -- I'd have to look at the report to make sure.

MR. STEWART:  Can we pull up Defense Exhibit 4?  Sorry not four.  Seventy-three.  And scroll down.  Let's look at the first full paragraph.  Actually, further down.

Q.   (BY MR. STEWART) There we are.  The second full paragraph of that page.

And if you could read that for a second, that might refresh your recollection.

So why did you think that was misleading?

A.   So confusing is perhaps more accurate.  But there's a quotation of the client saying that he had odd jobs and never kept a job, but then it goes on to say that he served in the Navy for three years.  That's a significant period of employment, and worked as a recruiter for two years, and then it says that he drove a truck for a year, worked as a security guard for several years, and then was a correctional officer for a period of four years.

So that seems like significant employment.  I mean, there are breaks, but it was just sort of confusing that there was a suggestion that he had never kept a job.

Q.   Let me ask you; if he had said the same first line and then removed every job but his job in the Navy, would that be more misleading?

A.   I beg your pardon?

Q.   If he actually worked those jobs and every other job but the Navy were removed, would that be more misleading?

A.   I don't really know how to answer that question.

Q.   Well, let me just ask this, if in a final report, he still said that he never kept a job but did not refer to any job but the Navy, would you find that misleading?

A.   Can you show me the sentence, so I can tell you?  I don't --

Q.   Yes.

          MR. STEWART:  Can we pull up Defense Exhibit 4?

     Let's scroll up.  Keep going.

     Okay.  We're going to stop.

Q.   (BY MR. STEWART) And look at the third full paragraph, and job history, work history shows is the

sentence that starts about midway down.

A.    I wouldn't characterize it as misleading. There's -- obviously there are additional facts that came from client's self-report.  I don't know what the records revealed.  Hopefully, there were social history records that were provided.

Q.    So do you think the records revealed that he didn't work all the jobs he said that he did?

A.    I have no idea.

Q.    Now, you said -- let's go back to Defense Exhibit 136.  You said that Dr. Gelbort's reliance on Mr. Fields' report was extremely unhelpful, correct? I'll point you to the paragraph.  I'll scroll down.  Oh, actually, it's this.  Yeah, the second paragraph from the bottom.  It starts, "As David pointed out."

A.    Yes, I see that.

Q.    Now, as an experienced litigator, you knew that would be disastrous on cross-examination; didn't you?

            MR. LABOVITZ:  Objection.  Her testimony was that the report is only for discovery purposes.  It's not for purposes -- she talked about there was the preparation for your report and there's the preparation for your testimony.  Those are two distinct things.

        So the idea that this report would be somehow

disastrous in front of a jury is a mischaracterization of Ms. Greenman's testimony.

THE COURT:   That wasn't the question. Overruled.

Q.   (BY MR. STEWART) And I want to go a little further in that paragraph.

Don't you say that it would be awful to include that info in a report that would be turned over to the government?

A.   That's what my email says, yes.

Q.   And you were also critical that he offered no interpretation or context or insight about Mr. Fields' background, correct?

A.   Yes.

Q.   Does that mean he just really didn't tie anything about Mr. Fields' background to his actual testing data?

A.   Yes.  It was lacking that interpretation and analysis.

Q.   And you worried about the fact that the report didn't talk about the possible effect of the medications that Mr. Fields was taking during the testing.

A.   That's correct.

Q.   Because as we've discussed before, any competent

prosecutor is going to make hay of that stuff on cross-examination.

A.   Yes.  And I want to emphasize that this was a first draft, and so this was the opportunity to prepare better for future testimony and written report.

Q.   Certainly.  Now, I want to just highlight in the end, you say that there are good things in the report, correct?

A.   Yes.

Q.   And you're not trying to be demoralizing, correct?

A.   Yes.

Q.   But overall, the tone of your email is not positive.

A.   That is correct.

        MR. STEWART:  Let's go to Exhibit 26, Government's Exhibit 26, sorry.

Q.   (BY MR. STEWART) Ms. Greenman, this is an email among trial counsel and then you and it looks like Mr. Freedman as well, correct?

A.   Yes.

Q.   There at the bottom, Ms. O'Connell is talking about trying to get the data from Dr. Gelbort.

A.   Yes.

Q.   And she's having a little bit of trouble with that.

A.    Yes.

Q.    Would you pull up Government's Exhibit 4?

And this is another email in which you were copied, correct?

A.    Yes.

Q.    And Ms. O'Connell is saying that they spoke with Dr. Gelbort, she and Mr. Gant spoke with Dr. Gelbort, correct?

A.    Yes.

Q.    And she arranged to meet with him in New Orleans to discuss the case, correct?

A.    Yes.

MR. STEWART:  Now, pull Government's Exhibit 20, and scroll down.  Even further.  Okay. Stop there.

MR. LABOVITZ:  Which one?

MR. STEWART:  This is -- the Bates Number is 4685.  It's the third page of Exhibit 20.  It should say "3" down there.

Q.    (BY MR. STEWART) Now, this is another email in which you, Freedman, and defense counsel are all on the email.

A.    Yes.

Q.    It looks like this is from Ms. O'Connell.

A.    Yes.

Q.   And she says that Dr. Woods is her real mental health expert, correct?

A.   Those are her words, yes.

Q.   And that she would rather rely on Dr. Woods than, quote, this guy?

A.   Yes.

Q.   And she knows that brain damage is not a huge part of her mitigation.

A.   Yes.

Q.   Now, Ms. O'Connell contacted you and Mr. Freedman about Dr. Price's requested testing, correct?

MR. STEWART:  And this is Defense Exhibit 140, and go ahead and scroll down.

THE COURT:  What number was that?

MR. STEWART:  140, Defense 140.

THE COURT:  Okay.

MR. STEWART:  Let's scroll all the way to the bottom there.  This is going to be on page two.

Q.   (BY MR. STEWART) And you see the email from Ms. O'Connell that says "David and Lisa," and it looks like she is sending you the list of testing that Dr. Price is going to do or wants to do?

A.   Yes.

Q.   And she wants to get your take on it.

A.   Yes.

MR. STEWART:  And I want you to scroll up to where your response is.  Let's scroll to where you can see both page one and page two because your response covers both.

Let's scroll down.  Let's actually -- yeah, there. The first full paragraph on the second page.

Q.    (BY MR. STEWART) You advised Ms. O'Connell that she needed to prepare Mr. Fields for the fact that he would be taking malingering tests, correct?

A.    Yes.

Q.    And Mr. Freedman had some suggestions in this email, correct, as well?  Scroll up to the top, please. To the top of page one.  It looks like Mr. Freedman responded with some thoughts of his own.

A.    Yes.

Q.    And Dr. Price did eventually examine Mr. Fields, correct?

A.    Yes.

Q.    And Ms. O'Connell emailed you with the information about that, correct?

A.    Yes.

MR. STEWART:  Let's do Government's Exhibit 17.  And let's scroll down a little further.

Scroll back up to that second page.  We're going to start with the page that has the Bates Number 3292.

Q.    (BY MR. STEWART) And Ms. O'Connell is basically giving some general information about Dr. Price's testing, correct?

A.    Yes.  She is emailing about the testing, yes.

MR. STEWART:  Let's go to Defense Exhibit 141.

Q.    (BY MR. STEWART) And this is an email that you went over with counsel about kind of game planning on how to deal with Dr. Price, correct?

A.    I'm sorry.  Can you restate the question?

Q.    Sure.  This is an email that Ms. O'Connell sent to you talking about how to keep out some of Dr. Price's more creepy information about the defendant, correct?

A.    Yes.

Q.    And she was very concerned with all of the behavior that Dr. Price had included in his report.

A.    Yes.

Q.    And the judge had previously excluded the evidence, but she was worried it would come in through the expert.

A.    Yes.  Yes, I'm reviewing her email.

Q.    Sure.  If you need to scroll up, that's fine.

A.    Yes.  She said the judge has sustained the objections, but says that the door can be opened to the information coming in.

Q.   Now, at some point -- or you gave some advice on how to avoid it like having the experts disclaim an AXIS II diagnosis, correct?  If you need to refer to the email.  It's right there.

A.   It's a little hard for me to follow my own reasoning there.

Q.   Well, that's why I'm asking because I was not quite understanding.  I was just wondering if you could maybe give us an idea of what you meant.

A.   I'm not sure I can explain that.  I think the beginning point is very clear to me.  I was suggesting in-limine litigation to determine what would be the scope of the government's appropriate rebuttal.

Q.   Do you know if Dr. Gelbort did any personality testing?

A.   I don't believe so.  I don't believe that he did.

Q.   But Dr. Price did.

A.   I would have to review Dr. Price's report, which I have not.

Q.   Is that what you refer to, though, when you talk about the AXIS II diagnosis?  What is that?

A.   So up until the DSM-V, which abandoned the multiaxial system of diagnosis, AXIS II -- AXIS I would be major mental illness.  AXIS II would be personality disorders, and also intellectual disability.

And what we would have been referring to here about AXIS II would be a diagnosis of antisocial personality disorder.

Q.   Were you thinking that if you could avoid Dr. Price being able to testify about an AXIS II diagnosis, then he couldn't -- he would have no reason to discuss the weird behavior?

A.   What you just stated is accurate.  It's hard for me to unpack my words here in this email to get there.

Q.   Certainly.  But that sounds sort of like what you might have been saying as best you can remember.

A.   Yes.  This was generally about keeping out a diagnosis of antisocial personality disorder.  And I think I attached an article about keeping out a diagnosis of antisocial personality disorder and how to demonstrate that antisocial personality disorder is not a warranted diagnosis.

That, according to the principles of the diagnostic and statistical manual of psychiatrists, if things are better accounted for, right, if symptoms are and behaviors are associated with the bipolar diagnosis, then they can't be the basis for an antisocial personality disorder diagnosis.

Q.   It's at least clear that Ms. O'Connell was very concerned about keeping that information away from the

jury, correct?

A.    Yes.

Q.    Now, you connected Ms. O'Connell with another attorney who had dealt with a bad Axis issue as well, correct?

A.    Are you referring to the email with Alex Bunnin?

Q.    I am.

A.    Another federal defender.  Yes, I remember.  I have reviewed that email, yes.

Q.    And so to try to help Ms. O'Connell work through this thorny issue, you put her into contact with another attorney who had dealt with something similar.

A.    Yes.

Q.    And you also put her in contact with Michael Burt.

A.    Yes.

Q.    For the same reason.

A.    I'm not sure -- I know that I did put her in touch with Michael Burt.  I do not recall what the specific reason was.

Q.    Now, Mr. Freedman suggested that Ms. O'Connell could drop Dr. Gelbort altogether, correct?

A.    Not exactly.  He --

        MR. LABOVITZ:  Your Honor, I'd ask what exhibit they're referring to because there are emails between David Freedman and trial counsel that

554

Ms. Greenman is not on, so it might be outside of her knowledge.

THE COURT:  Well, I'll allow her to answer to whatever knowledge she has.

MR. STEWART:  Certainly.

THE COURT:  Objection overruled.

Q.   (BY MR. STEWART) So are you aware that David Freedman ever suggested to Ms. O'Connell that she drop Dr. Gelbort altogether?

A.   I have reviewed an email that is an exhibit that doesn't exactly say what you are saying, but that does relate to the potential to trade off the testimony of a neuropsychologist in exchange for avoiding the testimony of the government's neuropsychologist.  And I believe goes on to suggest that Dr. Woods would cover the neuropsychological evidence.

MR. STEWART:  Could you pull up Government's Exhibit 12.

Q.   (BY MR. STEWART) Now I want to look at the very top of this email.  You're copied on this email, correct?

A.   Yes.

Q.   So you received this email?

A.   This email that you're showing me now, yes, sir.

MR. STEWART:  Okay.  Could you go ahead and

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

scroll down?  Keep scrolling.  I just realized that we had several emails there.

All right.  Let's stop there.

Q.    (BY MR. STEWART) On this email, you're copied on this email as well, correct?

A.    Yes.

Q.    And I want to look at the third paragraph.

Could you read that just silently, just kind of review it?

What was the alternative option that Mr. Freedman provided there?

MR. LABOVITZ:  Your Honor, I would object. Mr. Freedman will be testifying.  Those questions could be asked of him.  The government is asking Ms. Greenman to interpret what Mr. Freedman meant. That's pure speculation.

THE COURT:  Well, she was on the email and we can hear what she understood it to mean.  So overruled.

THE WITNESS:  May I read the entire email?

MR. STEWART:  Certainly.

THE WITNESS:  So there in that paragraph the suggestion of not putting Gelbort on as a witness in exchange for Price not being allowed to testify as a witness.  But as an exchange, as a matter of strategy.

Not simply not putting him on and hoping for the

best.

Q.   (BY MR. STEWART) Do you think that would have been a reasonable strategy?

MR. LABOVITZ:  Objection, Your Honor, as to reasonable.  That calls for a legal conclusion.

THE COURT:  She is a lawyer.

MR. LABOVITZ:  But she is not here as a *Strickland* expert, Your Honor.  They filed a motion.

THE COURT:  She is here as someone with lots of experience in this area.  Overruled.

THE WITNESS:  It would not be reasonable to just not put on an expert.  If there were a decision being made about it, I would expect there to be negotiations with the government initially about what it would mean, about whether the government would agree that they were not calling their neuropsychologist if she were not calling hers.  And then litigation before the court about, again, getting at what is the scope. Get a ruling on what is the scope of government rebuttal because the government -- the governmental health evidence is always by way of rebuttal to what the defense puts forward.

Q.   (BY MR. STEWART) Now, you mentioned Rule 12.2 on direct examination and the idea that when you provide Rule 12.2 notice, it's necessarily in anticipation of

557

testimony by an expert, correct?

A.   Yes.

Q.   Is that a -- does that mean if you give Rule 12.2 notice you have to put on that witness?

A.   No.

Q.   Okay.  Does it specify whether you have to know whether you're putting them on in your case-in-chief or in your rebuttal?

A.   Rule 12.2 -- now, I'm -- I would have to take another look at Rule 12.12.

Q.   Would you disagree with me if I told you that it doesn't?

A.   Okay.  My recollection -- but it would be helpful for me to review 12.2, which I have to say I do anytime I'm going to be dealing with Rule 12.2 because it can be very confusing.

Q.   Okay.  Fair enough.

A.   But Rule 12.2 notice, the defense provides notice to the government of what it anticipates introducing.

Q.   And I know that you kind of went back and forth with counsel a lot over whether you knew that they were not going to call Ms. O'Connell [sic] or if you ever anticipated that she wouldn't be called.

Was there any discussion as to whether she would be called in the defense's case-in-chief or in

rebuttal?

A.    No.

Q.    So they could have planned to call Dr. Gelbort in rebuttal to Dr. Price, but you wouldn't know.

A.    It wouldn't really make sense to do it that way.

Q.    What if they were trying to exclude Dr. Price before he testified and if that failed, then put on Dr. Gelbort?

A.    I don't -- I don't think that would be a reasonable strategy.

Q.    Now, would it be a reasonable strategy -- well, strike that.

      You don't know anything about Dr. Gelbort's availability during trial, correct?

A.    No.

Q.    Would it have been unreasonable for her to not call him if he was going to be out of the country?

          MR. LABOVITZ:  Your Honor, I understand your prior ruling, but again "reasonable" is delving into the *Strickland* expert area that the government has filed a motion in limine on to preclude our witnesses to testifying about what we agreed to.

          THE COURT:  It is getting a little far afield, Mr. Stewart.

          MR. STEWART:  Sure.  I'll withdraw the

question, Your Honor.

Just a moment, Your Honor, I think I might be done.

Q.    (BY MR. STEWART) Did you ever talk to Ms. O'Connell after the trial?

A.    I saw an email exchange that, I think, is among the exhibits here where I asked her how she was, but that would have been my only conversation with her.

Q.    She never told you what happened with Dr. Gelbort.

A.    No.

MR. STEWART:  No more questions.  Thank you.

MR. LABOVITZ:  Court's indulgence.

THE COURT:  Any redirect?

MR. LABOVITZ:  Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q.    Ms. Greenman, can you please turn to Defense Exhibit 136?

I believe it's paragraph four that begins with the history section, and then about halfway down it starts talking about the section on job history.

And the government asked you some questions about the job history seems to be misleading.  Do you recall those questions?

A.    Yes.

Q.   Did trial counsel give you any independent information at any point about Mr. Fields' job history?

A.   No.  I got no social history information.

Q.   And "by social history" that would include job employment?

A.   That is correct.

Q.   Was your response then to trial counsel based simply upon what you read in the draft report?

A.   Yes, it was based only on the draft.

Q.   Now I'd like to ask you -- you were asked some questions about Government's Exhibit 20.

MR. LABOVITZ:  If you can pull that up.

Q.   (BY MR. LABOVITZ) There's an email from Ms. O'Connell to you and David Freedman back on March 9, 2005.  And the government asked you about paragraph one, lines three and four, where they say, quote, I'd rather rely on George than this guy.  And they specifically said -- they read to you a sentence -- I'm sorry a part of a sentence.  On line four it says, "It's not a huge part of my mitigation."

Can you just read that entire sentence that starts on line four through line five?

A.   Did you want me to read where it begins with "The potential brain damage"?

Q.   Yes, please.

A.    "The potential brain damage has some value, but it's not a huge part of my mitigation.  It just enters the equation, complicating the client's ability to make it through his hyper-manic state."

Q.    And with respect to the first part of that sentence, "the potential brain damage has some value," is that consistent with your testimony on direct about your understanding of brain damage not necessarily being the main focus of counsel's mitigation case, but a part of it?

A.    Yes.  You would -- you would never ignore evidence of brain damage.  You would never decline to tell a jury that your client had brain damage.  So, yes, that is consistent.

Q.    The language of "potential brain damage having some value."  Is that consistent with the understanding that you had throughout this -- your entire contacts on this case about the defense's mitigation strategy?

A.    Yes.

Q.    And as well as their trial -- anticipated trial testimony and evidentiary presentation?

A.    Yes.

Q.    Now, I'd like you to turn to -- you were asked some questions about Dr. Price and keeping him out, potentially opening the door, things like that.

I'd like to turn to Defense Exhibit 141.

Do you see that?

A.    Yes.

Q.    And this is an exhibit where the government asked you about AXIS II diagnoses, and you know sort of these trade offs with Dr. Price, things like that.

Did trial counsel ever provide you with -- and I believe Mr. Stewart mentioned that there was either in the email or from his questions there was a ruling about Dr. Price's scope of his testimony.

Do you recall those questions?

A.    Yes.

Q.    Okay.  Did trial counsel, whether Ms. O'Connell or Mr. Gant, ever provide you with the district court's ruling regarding this scope of Dr. Price's testimony?

A.    No.

Q.    Is it fair to say, then, that your advice was, you know, given in sort of a vacuum?

A.    Yes, it was general.

Q.    The government asked you some questions about 12.2 notice.  Would you like --

Well, I guess, let me ask you this:  I have the rule available if you would like to look at that to refresh your recollection.

Would that help?

A.   Yes.

THE COURT:   Ummm.

MS. NELSON-MAJOR:   May I approach the witness?

THE COURT:   Yes, you may.

MS. NELSON-MAJOR:   Sorry.

THE WITNESS:   If it would be helpful for the record, I'm looking at something that has a title 2021 Little FDPA Book.   And it has excerpts from the U.S. Constitution, the federal rules, and various statutes.

Q.   (BY MR. LABOVITZ) And in your work consulting on federal death penalty cases, are you familiar with that book?

A.   Yes.

Q.   Okay.   Can you just tell the Court what that is? Does it come out every year?

A.   It comes out almost every year, yes.

Q.   What is it?

A.   The purpose is to just to have a handy guide to relevant statutes and rules in federal death penalty cases.

Q.   Just, you know, review Rule 12.2 because I just want to ask you some follow-up questions about that.

The government asked you, Is it your understanding that the defense can give Rule 12.2 notice to the

government but then not call that expert at trial.

Do you remember that question?

A.    Yes.

Q.    As a corollary to that, though, what is your understanding about whether the defense has to give Rule 12.2 notice before they are permitted to call a mental health expert at trial?

A.    The defense is required to provide Rule 12.2 notice about any mental health expert they intend to call at trial.

Q.    So if no Rule 12.2 notice is given about a particular expert, that expert cannot testify at trial is your understanding.

A.    Yes.

Q.    Did Ms. O'Connell or Mr. Gant ever provide you with any 12.2 notice that the defense filed in this case?

A.    No.

MR. LABOVITZ:  Court's indulgence, Your Honor.

THE COURT:  Sure.

Q.    (BY MR. LABOVITZ) And I believe that you testified on redirect about working with difficult experts.

Do you remember that?

A.    Yes.

Q.   In your experience as an attorney working with mental health experts, have you consulted with experts that you would consider to be difficult?

A.   Yes.

Q.   Have you, in such situations, not everyone, not every case, but are there situations where the expert that you have consulted with and have you then retained them for trial despite their being difficult to consult with and work with?

A.   Yes, absolutely.

Q.   Now, I imagine not every case, but are there cases where you had an expert in mental health that has been difficult to work with, you know, difficult to shape their testimony, what have you, but still you presented them at trial?

A.   Yes, absolutely.

Q.   Why did you do that despite their difficulties?

A.   Because there are some people who can be challenging to work with who are extremely talented and skilled, and are good teachers and explainers.  And when you give them the opportunity to get up on the stand and talk about their work, their testimony is compelling and persuasive.

Q.   In your work that you describe as a consultant with the Federal Death Penalty Resource Counsel Project

with the Capital Resource Counsel Project, have you had occasion to be involved with difficult experts that the trial counsel has selected?

A.   Yes.

Q.   And upon review of those --

MR. STEWART:  Objection, Your Honor.  I think we might be straying a little bit from the scope of cross.

THE COURT:  I'm going to allow it as long as we get to the point quickly.

MR. LABOVITZ:  I'm getting there.

Q.   (BY MR. LABOVITZ) Are there situations where you still advised counsel to present the helpful findings that would be considered mitigating of the mental health expert despite any difficulties in the working relationship?

A.   Absolutely.  Even if it were to be an expert that I did have high regard for.  If this is where the evidence is of the impairment, then that is the person who has to be put forward.

Q.   You were asked about Defense Exhibit 136, all these concerns that you had about the first report of Dr. Gelbort, the first draft report of Gelbort's.

Despite those concerns, did you still want Mr. Fields' trial counsel to convey the findings that

Dr. Gelbort produced from his testing of Mr. Fields to Mr. Fields' sentencing jury?

A.   Yes.   The findings demonstrated that Mr. Fields had brain damage, that he had deficits that needed to be explained to the jury.

Q.   In your experience, both representing people with mental health problems and presenting experts in mental health, as well as in your consultations with defense lawyers representing defendants in federal capital trials in this country, what was your experience as to whether the jury would receive a testifying expert's report as an exhibit versus just hearing their testimony and any, you know, accompanying background materials or exhibits that supported their testimony but not the report itself?

A.   The evidence in the sentencing phase would come from the expert's testimony, not from the expert's report.  An expert's report might be used for cross-examination of the expert.

     But the evidence going to the jury and the fullest explanation of the expert's opinions and conclusions and so on would come from testimony.

Q.   Is your understanding that only the expert's final report signed that has been provided in the Rule 12.2 notice would be potentially used by the government in

cross-examination?

A.   Yes, that's correct.

Q.   So these draft reports that the government and I asked you about, assuming there was no slip-ups by trial counsel, is it your understanding that those would remain confidential and the jury would never learn of those?

A.   Yes.

Q.   Did Ms. O'Connell ever tell you or Mr. Gant ever tell you that, at least, you know, there was a ruling from the trial judge here that the jury would not be receiving expert reports?

A.   I'm sorry.  Can you restate that question?

Q.   Did Ms. O'Connell or Mr. Gant, you know, trial counsel, did they ever tell you that there had been a ruling by the judge before the sentencing stage began that the jury would not be receiving any expert's trial report as an exhibit?

A.   No.

Q.   Independent of cross-examination as an exhibit.

A.   I was not aware of that one way or another.

Q.   Okay.  So just about done.

     At the bottom line, accounting for all these concerns that the government asked you about on cross-examination, did you ever tell Mr. Fields' trial

counsel that they should not present evidence of Mr. Fields' brain impairments to the sentencing jury?

A.    No.

Q.    At the bottom line, did you ever tell Mr. Fields' trial counsel that a neuropsychological, Dr. Woods or Dr. Grinage, could not have integrated the results of the neuropsychological testing into their trial testimony?

A.    Excuse me.  I might have misheard, but I think you said neuropsychologist and I think that you mean to be asking about neuropsychiatrist.

Q.    No, I'm sorry.

Did you ever tell Mr. Fields' trial counsel that the neuropsychological testing results could not have been used by a neuropsychiatrist, I apologize, Dr. Woods or Dr. Grinage, to incorporate and integrate into their trial testimony.

A.    No.  And quite to the contrary.  Had I been asked, I would have said that it could and should be incorporated.

Q.    And that's consistent with the email that we discussed on direct where you talk about using the M.D. to help with the neuropsych at that time?

A.    Yes.

        MR. LABOVITZ:  Thank you.  No further

questions.

MR. STEWART:  Just a few more questions, Your Honor.

THE COURT:  Yes.

Underpromise overdeliver, that's the best approach.

MR. STEWART:  Could you pull up Government's Exhibit 20, please?

**RECROSS-EXAMINATION**

**BY MR. STEWART:**

Q.   Ms. Greenman, you went over this potential or this email and you read the entire line, "The potential brain damage has some value, but it's not a huge part of my mitigation," correct?

And this email was sent in March of 2005.

A.   Yes.

Q.   Ms. O'Connell calls it "potential brain damage;" doesn't she?

A.   That's the word she uses, yes.

Q.   Now, you never reviewed Dr. Gelbort's data, correct?

A.   That is correct.

Let's just be clear, I'm understanding you to mean his raw data.  The results --

Q.   That's correct.

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

A.   -- of the actual report.

Q.   You looked at his report.  You didn't look at his scores or raw data?

A.   I did not.

Q.   So you don't know if there were any problems with those.

A.   No.

Q.   Now, you talked a little bit about Rule 12.2, and I believe what trial counsel or what counsel was getting to is, if you want to present a witness you have to give Rule 12.2 notice on the issue of mental health in a capital case, correct?

A.   Yes.

Q.   If you had -- so if you had three expert witnesses and you were on the fence about one, you would give notice for all three, correct?

A.   If there were three witnesses that you thought that you might want to put forward.

Q.   Correct.

A.   You would give notice about three witnesses, yes.

Q.   Yes.

     You wouldn't just say, I'm on the fence about one, so I'm not going to notice them.

A.   If you want to be able to call the witness, you need to give notice.

Q.    That's correct.

So you're leaving your options open for trial to be able to call all three witnesses, correct?

A.    Yes.

Q.    Because if you don't give notice for all three witnesses, they won't be able to testify, correct?

A.    Yes, that's correct.

Q.    You mentioned that the report said that he had brain damage.

What do you mean by "brain damage"?

A.    I mean a brain that does not function normally.

Q.    Okay.  So you think brain damage means impairments on tests?

MR. LABOVITZ:  Objection.  She just said what she meant.  She said a brain that doesn't function normally.

THE COURT:  Well, I think we're also getting outside of the scope of redirect.

MR. STEWART:  Well, Your Honor, she did mention that she said he had brain damage.  I'll move on.

THE COURT:  Well, if we can get it in a question or two, let's wrap it up.

MR. STEWART:  That was my question.  If she answers that one, I'm good on that.

Q.   (BY MR. STEWART) Okay.  Do you equate impairment on neuropsychologist testing with brain damage?

A.   I would use the words pretty interchangeably, that a person has an impairment, they have damage.  Their brain isn't functioning properly, yes.

There may be technical distinctions.  They're not part of the way that I would speak about it, but I'm not a neurologist.

Q.   Fair enough.

Now, you mentioned that reports often don't go back with the jury, correct?

A.   Yes.

Q.   And sometimes they're used to cross-examine expert witnesses, correct?

A.   Yes.

Q.   And occasionally lines of those reports are shown to the witness, correct?

A.   Yes.

Q.   And the jury will see the lines of those reports, correct?

A.   Yes.

MR. STEWART:  That's all.

THE COURT:  Okay.  All right, thank you, Ms. Greenman.

Is there any intent to recall this witness?

MR. STEWART:  No, Your Honor, we're done.

THE COURT:  All right.  Ms. Greenman, thank you.

You are excused, and you may be excused.

We're at 11:00.  It seems like a good time to take our what-should-have-been 10:30 break.  But I wanted to get this witness finished.

All right.  We will be in recess until 11:15.  Anything we need to address before?

MR. STEWART:  No, Your Honor.

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  We'll be back at 11:15.  We're in recess.

(Recess taken from 11:01 a.m. to 11:19 a.m.)

THE COURT:  All right.  We're back on the record after a morning break.

Before we get started, I just want to also say, thank you for getting the documents up electronically and also thank you for the government and defense counsel working together.  I think this is helping us meet my goal of being quick but not in a hurry.

So, all right, with that the defendant may call its next witness.

MR. LABOVITZ:  Thank you, Your Honor.  We'll be calling David Freedman.

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

THE COURT:  All right.  Mr. Freedman, come forward, and the clerk will place you under oath.

COURTROOM DEPUTY:  Do you solemnly swear that the answers that you will give before this honorable court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right.  Have a seat.

You'll need to kind of speak into that microphone, get as close as you can.  It doesn't pick up very well.

All right.  You may proceed.

**DAVID FREEDMAN, Ph.D.**

having been first duly sworn, testifies as follows:

**DIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q.   Good morning.  Can you please state and spell your name for the record?

A.   David Freedman, D-A-V-I-D  F-R-E-E-D-M-A-N.

MR. LABOVITZ:  Is that okay, Your Honor?

THE COURT:  Yeah.  You need to speak up just a little if you can.  I know that she would really appreciate it.

THE WITNESS:  Sorry.  I'll try.

THE COURT:  I'll remind you if you don't remember.  Don't worry.

Q.    (BY MR. LABOVITZ) How are you employed?

A.    I'm self-employed.

Q.    In what capacity?

A.    I am a consulting mental health expert primarily in federal capital trials.

Q.    Since when?

A.    2009.

Q.    And prior to 2009, have you ever worked with the Federal Capital Resource Counsel Project?

A.    Starting in 2002, I was a full-time employee until 2009, and now I contract with them.

Q.    Back in 2002, when you started with that project, what was your position?

A.    I don't know the answer to that exactly.  A mitigation mental health consultant.

Q.    And I would ask you to take a look at Government's Exhibit 35, which hopefully will now be on a screen.

       If you could just scroll -- Ms. Nelson-Major will scroll it.  If we could just scroll through this exhibit and you take a look at it and see if it's something that you recognize.

A.    I do recognize it, so I don't need to.

Q.    What is this Exhibit 35, Government's Exhibit 35?

A.    If I remember correctly, it was prepared by Judy Clarke and Skip Gant as an introduction to Federal

Defender offices and new CJA counsel with new cases and it was to describe what the Federal Death Penalty Project did.

Q.   Okay.  If you could take a look at page two of that exhibit.  I'm sorry, page three.

In the left-hand column there's some texts with dots, and then right below that, do you see it says that "The CRC are assisted by David Freedman, an experienced mitigation investigator."

A.   Yes.

Q.   Okay.  Would that be -- let me ask you this:  If this exhibit was found in trial counsel's file in Mr. Edward Fields' case would that description as an experienced mitigation investigator be an accurate description of your work back in, you know, when you started with this project in 2002?

A.   Yes.  I just don't know the title that the federal government assigned me from your earlier question.

Q.   Okay.  I understand.

So you said that the federal government, were you in a paid position with the federal government back when you started with this project in 2002?

A.   Correct.

Q.   What agency were you part of?

A.   Federal public defender.

Q.   Okay.

A.   But I was assigned initially to the Northern California, and then transferred to the Southern California, to San Diego, and then I moved out of state.

Q.   And you mentioned that Skip Gant -- is that Isaiah Skip Gant --

A.   Yes.

Q.   -- and Judy Clarke are on this document 35.

Were those attorneys that you were associated with when you were working with the Capital Resource Counsel Project?

A.   My position was attached to Ms. Clarke's but, yes, I worked with both of them.

Q.   Are you still working with the Capital Resource Counsel Project?

A.   I'm a consultant, and I have a contract with them now.

Q.   I know that you mentioned something about 2009. Is that when your, I guess, official role as an employee through the public defender's office ended?

A.   Correct.

Q.   Focusing on the time period that's relevant here July 2003 to 2005, were you working with Ms. Clarke and Mr. Gant as part of the Capital Resource Counsel

Project?

A.    I was working with the project.

Q.    Okay.

A.    Yes.

Q.    And you mentioned that you were assigned, if I remember correctly, to work with Ms. Clarke.

A.    My position was attached to her position when they created the Capital Resource Counsel Project.

They created a second position when they hired her and I was hired into that second position.  Not as a lawyer, as a person to work with her.

Q.    And at this time frame, July 2003 to July 2005, were there other people, other attorneys, involved in the Capital Resource Counsel Project other than Mr. Gant and Ms. Clarke?

A.    I don't believe so.

So Mr. Gant had a paralegal, I believe, who I never met, and I don't know who that is.  Who technically would have been attached to his position.

Q.    And when you talked about being attached to Ms. Clarke's position, how was your time, your work time, allocated between assisting cases that Ms. Clarke worked on versus cases that Mr. Gant worked on?

A.    I don't believe I have ever worked with Mr. Gant. I mean, this case is the most I ever worked with him on

a case, and I can't name another case I worked with him on.

I worked with Ms. Clarke or separate from the both of them on a couple things.

Q.   Was there a reason that even though the project had at that time two attorneys, Mr. Gant and Ms. Clarke, that you mostly worked with Ms. Clarke?

A.   In my view, Mr. Gant was not interested in ongoing work with me.  I mean, I don't really know the answer to that.

He never really asked me to work with him.  There were not cases that I joined him on, other than this, and this is quite an unusual involvement from my perspective.

Q.   We'll definitely get into your involvement in a few minutes.  I just want to ask you before I do that.

Going back, again, to July 2003 to 2005, what was your educational background at that time?

A.   I had a Master's in Public Health.

Q.   What year did you earn that?

A.   '99, so May of '99.

Q.   What was your -- sorry.  I don't know much about that area.

What was your concentration or area of study as a Master's in Public Health?

A.    My degree is in health policy and management.  I was focused primarily on violence prevention.

Q.    And I think you talked about this case.  Just to be clear when you were talking about this case, that would be referring to your involvement in the federal capital trial case of *United States v Edward Fields*?

A.    Correct.

Q.    Do you recall how you first came to be involved in Mr. Fields' case?

A.    Somewhat.  I've reviewed some exhibits which helped me, you know, sort of dates and things.  But I mean the -- there's a much more long-winded answer than you want.

      The project, the broad project tries to track, identify track and every potential capital case.  So that case came to the project from a call from a federal public defender to Ms. Clarke.  And then she would have sent an email to the rest of the project talking about who is going to be assigned to it from within the project to provide assistance.

Q.    Okay.  Is it your understanding that the call, the original call, would have been from the federal public defender for what was then the Northern and Eastern Districts of Oklahoma in Tulsa, Oklahoma?

A.    Yes.

Q.   And when you referred to the exhibits that you reviewed, is that prior to your testimony today?

A.   Correct.

Q.   Would those be exhibits that I provided to you to refresh your recollection about events that happened almost 20 years ago?

A.   Yes.

Q.   I'd like you to look at Defense Exhibit 128.

I believe this is a two-page document. Unfortunately it's the best copy we could find. It's got a lot of coding in it, but if you could at least take a look at that and see if you recognize that exhibit.

A.   I do.

Q.   Okay. Is that -- at least at the top appear to be an email that you sent on July 28, 2003, to Mr. Gant?

A.   Yes, in reply to one that he had sent to me, yes.

Q.   And there was some -- just for a little background today, I would like to try to make this clear for the record.

Yesterday there were some questions to another witness about this exhibit, and it wasn't clear if Mr. Gant had sent this email to you and you were responding or you sent an email to Mr. Gant and he was responding to you.

So do you have any -- what is your understanding of sort of the chronology of Defendant's Exhibit 128?

A. So it's hard to see, but about halfway down is an email from Mr. Gant to me. And then the top half of that page is my response to him. I mean, I don't know how to draw you -- draw your attention to.

Q. Okay. But from your review of this email, you believe that at least only sort of the first half of page one down, that is an email from Mr. Gant to you, and then the top half of page one is your response to him?

A. Correct. There's a line that's hard to see that says, talk to you soon, David. That's the end of my response to him and below that is his initial email to me.

Q. With this email on July 28, 2003 -- well, it's unclear what date Mr. Gant sent you his email.

But your response and the email from Mr. Gant is that your first -- was that the first reach out by Mr. Gant to you about the Edward Fields case?

A. I believe so.

Q. Was Mr. Gant suggesting to you to come to Tulsa to meet with Mr. Fields?

A. Correct.

Q. What did you tell him?

A.    He wanted me to come in like the next week or within a few days.  And I said that it was too quick for me, that I was committed to a number of other cases and things and I couldn't get there that fast.  But that I would be happy to work with him.

What I was hoping was that the team would do some basic mitigation work before I got involved, fully involved.  But that I was happy to help them with that if they needed help with that as well.

Q.    Now, I'd like you to take a look at Defense Exhibit 129.

And do you recognize that document?

A.    I do.

Q.    Is this an email at the bottom half from Mr. Gant to you and then a response by you on July 29, 2003?

A.    Yes.

Q.    And is Mr. Gant telling you that he, quote, I just wanted to put you on notice that I'd welcome your assistance in this matter.  I realized that this was short notice.  Is that accurate?

A.    Yes.

Q.    And how did you respond to him?

A.    I said that, you know, basically good.  And keep me in the loop and we'll talk again.

Q.    At this time, now we're in late July 2003, what

was your understanding, if any, of Mr. Gant's role in Mr. Fields' case?

A.    I thought at this point in time that he was assigned by the project as resource counsel most likely.

Q.    What is resource counsel as it's understood through the Capital Resource Counsel Project?

A.    So that's somebody who provides materials and resources and meets with teams and helps teams get organized, helps them fill out the full scope of the team, right.  So if they need paralegal assistance, they may help them find a contract paralegal or a mitigation specialist.  So it's somebody who helps the team get organized and get going, and they work with the project.

So every eligible capital case gets assigned a resource counsel.  Their level of involvement depends on the likelihood that the case will get authorized, that the government will seek death.

Q.    Authorized means to seek the death penalty?

A.    Yes, sorry.

Q.    Did you become aware, at least after this period of July 2003, that Mr. Gant moved to be admitted into the Eastern District of Oklahoma pro hac vice and be appointed as learned counsel in Mr. Fields' case?

A.    Yes.

Q.    And can you describe how within the framework of the Capital Resource Counsel Project, can you describe any shift in responsibilities that that would entail?

Before you said initially he was resource counsel, now he's shifting into learned counsel.  What would that entail?

A.    So part of the reason that the Capital Resource Counsel Project got set up, which is different than the project, so that Ms. Clarke and Mr. Gant could enter their appearance and could become part of the team. And learned counsel has responsibilities defined by 3005, which make them responsible for the leadership of the case, right?  I mean, they make an appearance in court.  They go and they are, in theory, offering their expertise in capital, federal capital, defense on that case.

Q.    And you said 3005.  Are referring to 18, U.S.C., Section 3005?

A.    Yes.

Q.    And so is it your understanding at that point when Mr. Gant enters his appearance as learned counsel, that he is then on equal footing with any other lawyers that have entered their appearance in the case in terms of what is expected of them, or maybe even a higher

footing because he's learned counsel?

A.    Higher, correct.  I mean, he has more responsibility towards the organization and decision-making in the case as learned counsel.  I mean, the idea is that learned counsel brings specific expertise that people who don't have a breadth of capital trial, federal capital trial, experience have, and so they are supposed to be learned in the law.  Whatever that exactly means, I don't know.  But I leave that to somebody else.

Q.    Now, looking back again at Defense Exhibit 129, at the bottom of that exhibit, the last few lines, do you see Mr. Gant is saying, quote, Maybe sometime in the second week of August, the both of us can go to Tulsa to meet with the entire team?

A.    Yes.

Q.    And you're the only other person on this email, so "both of us" means you and him?

A.    Correct.

Q.    Did you in, August of 2003, go to Tulsa to meet with the Fields' defense team?

A.    I did not.

Q.    Why not?

A.    I don't think I heard back from Skip until January of '04.  I don't think I heard anything about this case

again until the following year.

Q.    And does your email response to him about, maybe you can go to Tulsa with me, do you tell him -- did you ever say to him, I can come to Tulsa or do you say, no, let's regroup at a later time?

A.    No.  I thought I would go.

Q.    But not at this time in August of 2003?

A.    No, I would have gone.  I would have gone with him -- right, in the -- so this is correct; that's right, sorry.  Yeah.

So I couldn't go the week following, which was the original email, which would have been August, but I was perfectly happy to go later.

Q.    All right.  So let's talk about later.  Let's look at Defense Exhibit 131.  Just take a look at that and see if you can recognize that.

A.    I do.

Q.    Is this an email that you sent to Mr. Gant and CC'd Ms. Clarke back on December 1, 2003?

A.    Correct.

Q.    And can you -- why did you send that email to Mr. Gant?

A.    So we had, the three of us, had like review meetings, maybe you could call them, like every six months or every year.  Where the three of us, as

the Capital Resource Counsel side of the project, would meet and sort of update each other. Skip often didn't join those calls. I mean, I worked with Ms. Clarke all the time, so we didn't need that. I knew her cases. She knew my cases. They were really so we knew what Mr. Gant was doing.

And I think this was one of these end-of-the-year calls we had that I'm saying, Oh, this came up during this call.

And then I'm responding to him because clearly there had been no follow up between August and December, so I'm trying to figure out what I can do to help him.

Q. And hopefully it is obvious for the record, but I'm in my appellate lawyer hat, I just want to make the record clear, when you say the three of us: you, Ms. Clarke, and Mr. Gant?

A. Correct.

Q. Now in this email from December 1, 2003, if you could take a look at around line five through line six.

Do you see that you have made reference to, quote, continuing the vague long-distance consulting I've been doing.

A. Yes.

Q. What did you mean by that?

A.    So I'm trying to figure out from him what would be useful to him in running this team.  So what I felt like I was doing was if they emailed me or asked me something, I would respond, and I would describe that as sort of the vague long-distance consulting as I hadn't met the client.  I was trying to figure out if he wanted me to meet the client.  Whether I would start meeting the client regularly, which I did in other cases, whether I would work with the team and go to team meetings, in-person team meetings.  I'm trying to figure out what it is he envisions for my assistance to look like.  And he could have said, No, this is working fine.  I'll email you when I want you.

Q.    Do you recall what he said in response to your email --

A.    I do not.

Q.    -- on December 1st?

A.    I don't.

Q.    Why do you -- if you know, why would you CC?  Why would you include Ms. Clarke on that email?

A.    I think because the three of us just had this phone call together.  But also she was -- I don't know that she would agree with this, but I think that she was viewed within the Resource Counsel Project as his supervisor, even though I don't think that she was his

supervisor. They were peer-to-peer in terms of hiring. But she was there longer and she participated more, I think, in the discussions with the rest of the Resource Counsel compared to Skip. So I wanted her to know what he was -- what his response to this was, so that she would know what he was planning to do or asking me to do as well.

Q. If you know, did Ms. Clarke ever consult with Mr. Gant about Mr. Fields' case?

A. I don't believe so.

Q. Do you know, if you know, did Ms. Clarke ever consult with trial counsel of Mr. Fields on this case?

A. Other than a couple of emails, which I think are included in what you provided to me, which are sort of general, like here's a news story, or here's the call from the federal defender for Oklahoma.

Q. You mentioned a call from the federal defender in Tulsa. Would Ms. Clarke have been the one to respond to that?

A. I think she is the one the call went to and then she let everybody else in the project know that call had come in and asked Skip to follow up on it. Mr. Gant, sorry, to follow up on it.

But so she was involved sort of bureaucratically, but I don't know that she had any real contact with any

of the lawyers on this case.

Q.   As a substantive matter?

A.   Correct.

Q.   What members of Mr. Fields' trial counsel team did you have contact with other than Mr. Gant?

A.   Ms. O'Connell.

Q.   That's Julia O'Connell?

A.   Yes.

Q.   Did you know that Barry Derryberry was trial counsel, appointed trial counsel, for Mr. Fields?

A.   I did not.

Q.   Did you know that Michael Able was trial counsel, appointed trial counsel, for Mr. Fields?

A.   I did not.

Q.   Did you have any contact with Mr. Derryberry?

A.   No.

Q.   About this case?

A.   No.

Q.   Did you ever have any contact with Mr. Able about this case?

A.   No.

Q.   Now, talking about your contact with trial counsel for Mr. Fields, did you ever -- I know, you know, some of these exhibits have talked about, suggest coming to Tulsa for a meeting to meet the team, stuff like that.

Did you ever have any -- did you ever go to Tulsa to meet with Ms. O'Connell about this case?

A.   No.

Q.   Did you ever -- let me ask you this:  Did you have regular phone calls?  You mentioned that, you know, that the project would have phone calls to see how cases were going.

Did you ever have phone calls on a regular basis with Ms. O'Connell about this case?

A.   No.

Q.   How about with Mr. Gant?

A.   No.

Q.   Was your consultation with Mr. Fields' trial counsel limited to email?

A.   Yes.

Q.   And can you describe the nature of, you know, the just generally speaking like the number of contacts, not the particular.  But how would you describe the nature of that contact with trial counsel in this case?

A.   It was very limited.  I mean, they would reach out at a certain time.  There was very little background. So there's a point at which I'm discussing something about -- which sounds like 12.2 notice and Ms. O'Connell tells me, Oh, we have an order on 12.2 already.  I didn't know that.  I mean, I wasn't kept

up-to-date on things that were happening in the case. They would just reach out when there was some specific question.

So I didn't attend team meetings.  We didn't have team calls.  As far as I know, there weren't any.  But maybe they had them and I just didn't know.

Q.   And you mentioned 12.2 notice, and you're referring to Federal Rules of Criminal Procedure 12.2?

A.   Correct, sorry.

Q.   I'll correct you just because, again, sometimes I've got the appellate hat on.

A.   Sorry.

Q.   The government has asserted that Ms. O'Connell was, quote, regularly communicating with you.

I just wanted to know if you had a response to that assertion?

A.   I would not describe this as regular communication.  This was periodic communication, somewhat random from my perspective because I didn't know when things were coming or what was about to happen.

Q.   In other words, cases that you consulted on through the Capital Resource Counsel Project, would you have regular team meetings in person?

A.   Yes, almost every case.

Q.    How often would the teams meet in person?

A.    When they're decently sized teams.  So some at-large at least monthly, sometimes weekly.  Depending on the, you know, where in the process the case is, but at least monthly.

Q.    In other cases that you consulted on, would you supplement those in-person meetings with phone calls?

A.    Yes.

Q.    And how often would those occur?

A.    Calls are almost always weekly, and then there are sometimes, like, task-driven subgroups.  So, you know, somebody gets assigned to do -- some part of the team gets assigned to a task.  They'll talk to each other much more frequently.  Then at a team meeting, they will describe how it went or what happened or, you know, what got filed or whatever.

Q.    Are these regular team meetings and phone calls, that you have just described from your other cases that you have assisted the appointed counsel on in federal capital trials, is that important to your ability to provide assistance to the trial counsel?

A.    For me to participate in those?

Q.    For you to have those regular phone calls and meetings.

A.    Yeah.  I mean, federal capital defense is a

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

team-driven process, right?  You have to be meeting with people and talking about what everybody is doing, have people knowledgeable about the pace at which stuff is going, when things are expected, where, you know, how mitigation development is going.

You gain insight from people who may not be assigned to a particular task, but who have some experience with something relevant and they mention it at a team meeting that you otherwise would have never asked them.  Sure.

Q.    And had trial counsel asked you in Mr. Fields' case, you know, from this period -- you know, you were first contacted in July of 2003.  So this period of July 2003 to July 2005, when the trial took place, if they asked you, would you be available for monthly team meetings, would you have been?

A.    Yes.

Q.    Or even weekly phone calls?

A.    Yes.

Q.    Okay.  Whatever counsel wanted as you described from your other cases in terms of meetings, you would have made yourself available?

A.    Yes.  You know, I might have missed some because I had other commitments.

Q.    Generally speaking.

A.   If I know they're coming, I can schedule them and schedule around them for other things.

Q.   Did you ever meet Mr. Fields?  I know there was an email we went through where Mr. Gant asks you to come to meet with him.

Did you ever have the opportunity to meet with Mr. Fields in person?

A.   I did not.

Q.   Do you know why not?

A.   Mr. Gant never followed up on that.

Q.   So you made a request in July of 2003, but did not follow up on that?

A.   Correct.

Q.   Did you attend Mr. Fields --

Let me ask you this:  In other cases on which you consulted as Capital Resource Counsel Project, do you have opportunities to meet the clients or the defendants rather?

A.   Almost always.

There are very few cases where I haven't met a client at least once.

Q.   Why is -- well, not why.

Is that important to your ability to give advice and assist trial counsel in a federal capital trial case?

A.   I believe so.

Q.   Why would you believe that?

A.   I mean, it helps me to know who we're talking about, so I, you know, have some actual human being to think about and to get to know.  It helps me recognize some symptoms that may be there.  It helps me understand when counsel says what their experience with that client is, what might be going on.

Sometimes I typically -- I will do this in an ongoing way, so I get to see the client over time and get to know them and it does help me give advice or to think about what kinds of things counsel may need to do.

Q.   Had trial counsel for Mr. Fields renewed their request that you meet with him and you had availability, would you have done that?

A.   Yes, I expected to.

Q.   Now, did trial counsel ever provide you with what I would call, social history materials, background materials about Mr. Fields for your review?

A.   I was not provided any biopsychosocial history materials in this case at any point.

Q.   When you say "biopsychosocial history," can you tell us what that -- what you mean by that?

A.   Sure.  So the biopsychosocial history is the

foundation of capital mitigation, and it's a multi-generational, very broad records and interview-based material; this tries to capture through at least three, sometimes five generations back, the kinds of things that influence the social context of the client, and it includes things like school records, and military records, hospital records, custodial records.  Not just for the client, but for the client's entire family, immediate family and extended family.

Q.   In your other consulting cases with the Capital Resource Counsel, would you normally have the opportunity to review biopsychosocial history documents?

A.   Yes, and I often suggest to people that they might be missing something after I review them and that they should go get more.  That there's some -- there's an area for which it seems like there probably were records and they don't have them.  And I try to make sure that they have looked.

Q.   And we discussed in Government's Exhibits 35 that at least as to the brochure from your project that went to Julia O'Connell, you were presented in the public light as an experienced mitigation investigator.

So did you, in your consulting cases, would you go out and retrieve these materials or would they be

provided to you by the assigned trial counsel?

A.    They were typically provided to me.  It was very rare that I would be the one to go out to get records.

Q.    If Mr. Fields trial counsel had provided you with biopsychosocial history records from Mr. Fields, would you have reviewed those?

A.    Yes.

Q.    Would you have discussed -- well, let me ask you: Why is it important to review those records when you're assisting trial counsel in a federal capital case?

A.    I mean, they are the core of the case, right? They frame the life history of the client.  They tell you the context about that client, they help develop themes, and give you guidance as to the behavior and functioning over time.

They provide sort of a longitudinal sort of view of the client, which is what mitigation is about.  So they help you make decisions about hiring experts and what kinds of testing need to be done and what kinds of other things there are to do, right?  It's the foundation on which you build a mitigation case and without it, you can't really build because you don't know.

Q.    And in this case, had counsel provided you these biopsychosocial history foundational materials that

you're talking about and you had reviewed them, could you have discussed your interpretation on those records with counsel had they asked?

A.    Yes.

Q.    Could you have shared ideas for follow-up investigation had they asked?

A.    Yes.

Q.    Now going back to Defense Exhibit 131, and this is where you talked about the vague, long-distance consulting that you had been doing.

Would it be accurate to characterize this email that you sent to Mr. Gant that you're seeking clarification about your role in Mr. Fields' case?

A.    Yes.  I mean, two things.  Clarification of what he's -- what I can do to help him, but also I'm trying to get him engaged in talking to me.  I mean, this is an email that's aimed at "respond to me", tell me how I can help you, right?  So it's asking him to respond.

So let me know these answers, but also to be engaged with me in discussing them.

Q.    And did Mr. Gant ever clarify what was expected -- what he was expecting you to help him with?

A.    I don't believe so.

Q.    Given that, did you ever consider yourself to be part of Mr. Fields' trial defense team?

A.    No.  I don't even think there was a team.  I mean, my contact, from my perspective my contact with them was individual.  I would get an email from Skip.  I would get an email from Julia.  Like, there were no joint emails mostly or meetings, right?  I mean, the responses were between them, and that I would not describe as a team.

Q.    Well, to the extent, you know, that the counsel for Mr. Fields, appointed counsel, I'm just calling that the team, did you ever consider yourself part of that structure?

A.    No.

Q.    Were you made aware at some point that trial counsel had retained Dr. George Woods as a mental health expert in this case?

A.    I was.

Q.    Did you have familiarity from your work with Dr. Woods?

A.    I knew Dr. Woods, yeah.

Q.    What did you know his area of expertise to be?

A.    He's a neuropsychiatrist.

Q.    Were you made aware at some point that Dr. Woods had recommended that Mr. Fields undergo a neuropsychological evaluation?

A.    I did not know that Dr. Woods recommended that.

Q.   Were you made aware at some point that Mr. Fields was administered neuropsychological testing?

A.   Yes.

Q.   Were you ever made aware that before you -- okay. Before your review of those -- of that material, were you made aware that trial counsel had retained Dr. Michael Gelbort to administer the neuropsychological testing?

A.   Yes.

Q.   Now, let's take a look at Defense Exhibit 95.
     You've reviewed that?

A.   I'm good.

Q.   At the top is this an email dated January 7, 2005, that you send to -- I'm sorry.  That you are -- I'm sorry.  An email from Skip Gant on January 7, 2005, to you, Ms. O'Connell, and Lisa Greenman?

A.   Yes.

Q.   Just for the record, who is Lisa Greenman?

A.   Lisa Greenman, who is she?

Q.   What is your working relationship at this time with Ms. Greenman?

A.   We worked on a number of cases together.  She -- we had met in the late '90s.  We had done some litigating together in a capital case in Maryland. She -- we had stayed in touch.  We talked about experts

often.  We talked about mental health issues in cases. We consulted sometimes on cases together.

We often referred teams to call the other if they had questions that the other person could answer better.

Q.   Now, in Defense Exhibit 95, in this January 7, 2005, email is Ms. O'Connell -- I'm sorry, is Skip Gant asking you -- he says, Lisa and David.  So he's asking you and Ms. Greenman to review a draft report from Dr. Gelbort.

A.   Correct.

Q.   I just want to ask you at the bottom of Defense Exhibit 59, do you see it says, "Subject:  Re:  Re: Fields' report.  Author:  DrGelbort@ aol.com," and then the "Date 11/10/2004"?

A.   Yes.

Q.   Do you have any knowledge as to why you were not sent this draft report until some two months after counsel received it?

A.   No.

Q.   At this time in January of 2005, when you received Dr. Gelbort's draft report, what was your -- I'm sorry.

What was your understanding about whether the defense was intending to call Dr. Gelbort as a witness in the defense case at trial?

A.     I would assume that he was going to testify.

Q.     Why would you assume that?

A.     I mean, part of why we do neuropsychology testing is so that person can testify to a jury about behavior and functioning based on the test results.  So I would think that the person that they hired to do that testing would be testifying.

Q.     Would that testimony about behavior and function include, by definition, testimony about brain function?

A.     Correct.

Q.     And brain impairments to the extent they're found on the testing?

A.     Correct.

Q.     At any point when you were involved with consultation on Mr. Fields' case with trial counsel, did you ever think that -- were you ever led to think that trial counsel would not be calling Dr. Gelbort as a witness in the defense case to testify?

A.     No.  I thought that he was going to testify.

Q.     And I should preface that by case-in-chief to offer mitigating evidence during the defense's affirmative mitigation presentation?

A.     Yes.  Yes, I assumed that he was going to testify for them.

Q.     Was it your understanding, then, that

Dr. Gelbort's findings regarding Mr. Fields' brain impairments was going to be part of the defense's affirmative mitigation presentation at Mr. Fields' trial?

A.   Yes.

Q.   Now, let's talk about your review of Dr. Gelbort's draft report, and let's take a look at Defense Exhibit 154.

I believe this is two pages.  So if you could just, you know, scroll through that and see if you recognize it.

A.   I do recognize it.

Q.   Is this your response to Mr. Gant's earlier email to take a look at Dr. Gelbort's first draft?

A.   Yes.

Q.   And this is dated January 7, 2005, at 12:36: p.m.?

A.   Yes.

Q.   So going through this email, did you first -- let's look at -- you've got some numbers there.  So, I guess, it would be the second full paragraph, but it says "number one" next to it.

Do you see that?

A.   I do.

Q.   And it says "his."

I assume "his" being Dr. Gelbort?

A.    Correct.

Q.    Yeah.  Quote, His, quote, recounting of the social history as told to him by Fields would be much stronger if he referred to collateral sources of information, did you say?

A.    Yes.

Q.    By "collateral sources of information," are you referring to the biopsychosocial history documents that you reference -- that you talked about earlier in your testimony?

A.    Yes.  That if he could describe the history through those records it would be a stronger report.

Q.    Had trial counsel for Mr. Fields told you at this point in January of '05 whether they had provided any biopsychosocial collateral information to Dr. Gelbort?

A.    They had not told me.

And the next paragraph is the question of have you given any of it to him?  Right.  I don't know the answer to that.  I had not seen any, and I didn't know whether they had given him any.

And I am asking that question, does he have it or did he do the assessment of Mr. Fields without it?  And I don't know the answer to that at this time.

Q.    Now, taking a look at -- it's hard to say what paragraph number it is.

A.    Sorry.

Q.    It says number two next to it maybe sort of halfway down on this page.  Do you see that, it says "Some restructuring"?

A.    I do.

Q.    "Some restructuring and reorganizing would help," did I quote correctly?

A.    Correct.

Q.    What did you mean by that?

A.    I mean, that's stylistic.  I think the report could be easier to read and to make its point in a clearer manner.  I mean, that's not atypical for when you read somebody's draft, right?  I mean, that's part of giving feedback on a draft, that you could do a better job explaining yourself.

Q.    Would you consider that in sort of a semantic issue versus a substantive issue?

A.    Yeah.  You know, this is the question of like do you have -- do you ask the expert to write a summary paragraph of conclusions that they put at the beginning rather than waiting until the end.  It's a structural thing.  It's not a content issue.

Q.    Moving down towards the bottom of the page, there's a paragraph that begins with "3."

      Do you see that?

A.    Yes.

Q.    I want to ask you about the seventh line down.  It says, quote, The variability and inconsistency reported on memory and learning will be made out by the prosecution to be malingering.

A.    Yes.

Q.    What did you mean by that?

A.    Well, part of my job, right, I'm not a testifying expert, part of my job is to help counsel know what to be prepared for.  But also what to go back to their expert and ask about, what to clarify with their expert, what should be clearer in the report, which is not currently clear, is how he answers this question about malingering, how he knows what these results reflect and don't reflect.

And what I'm saying is, if you don't clarify this, he will get crossed on it, but you have a chance now to clarify it and fix it in his report.

And so in my experience, the government almost always makes an allegation that our clients are malingering, and so you should expect that allegation.  And this is one of the places where I thought they might point to to say, How do you know this guy is not malingering?

Q.    And you said to help, you know, be prepared for

610

what might be coming.  Is that to be prepared for when defense counsel is presenting the expert at trial?

A.    Correct.

Q.    Now, take a look at -- starts on page one of Defense 154.  It says number "4" by the paragraph.  And then it goes down on to the next page.  Let's see.  It should be the fifth line on page two.

It says, quote, "He did not do any specific malingering assessment and the government expert will eat him alive on this I fear."

What did you mean by that?

A.    So there's nowhere in his draft report where he explains having considered malingering and effort, whether he's looked at these questions.  He didn't give standalone measures, and he doesn't explain any process that he went through, and that should be in the report.  Right?  I mean, he needs to explain that he considered it, and how if he did rule it out.  If he did not rule it out, he needs to explain that.

So there's nothing in this draft that gets at this question of effort and whether the client is trying or faking.  And so that needs to be in there.  And in my experience in cases, that is a primary focus of the government when they challenge defense neuropsychologists, is to say he just tricked you.

This is all made up.  He wasn't trying.  So you need to be prepared to answer that question.

Q.   So when you were talking about, in this paragraph, that the government expert will eat him alive, you're talking about -- is that talking about trying to make sure that Dr. Gelbort is properly prepared at trial?

A.   Yes.  I mean, this is also before the government had an expert go and do an evaluation, right?  So, you never know how that's going to go.  And not that you care, but in this case the government's expert, Dr. Price, didn't suggest that the client was malingering.  So in some sense, none of this ended up mattering because Dr. Price didn't go to that, didn't reach that conclusion.

So they're actually -- so this is, right, long in advance.  There's a chance to fix this in the report and it ended up probably being irrelevant.

Q.   Okay.  And when you talk about "long in advance," is that -- is your advice with an eye towards ultimately shaping to the defense perspective, the testimony of Dr. Gelbort?

A.   Yeah.  I mean, in the immediate setting, helping make the report better and the report would be the basis for expected testimony.

Q.   Now, I want to jump to number six on page two.

You said, quote, It would be helpful if he could discuss the role of the medication Mr. Fields is currently taking on the testing, right?

A.   Yes.

Q.   Would medication that Mr. Fields had been taking, would that be something that would have been in the biopsychosocial history?

A.   Yes.

Q.   Below that, below paragraph number six, it says, quote, There's potentially very helpful neuropsych info here.

Do you see that?

A.   Yes.

Q.   And just so the record is clear, neuropsych, does that mean neuropsychological?

A.   Yes.

Q.   What did you mean by that?

A.   I mean, he finds evidence of impairment, of functional impairment on the test that he administers. And I think it can be part of telling the story of the client's life experience, about how he functions, and what his life was like.

Q.   Did Ms. O'Connell ever follow up with you about any of these comments that we've just discussed?

A.   I mean, we had a lot of back and forth.  I'm not

sure I would describe most of it as follow up.

Q.    Well, I want to show you an email in a second.

But do you recall any specific emails or phone calls, whatever, you know, when -- from Ms. O'Connell saying, oh, I don't -- what do you mean by "variability and inconsistency"?

A.    No.

Q.    Or what do you mean by "malingering"?

A.    No.  I don't remember real content back and forth. I remember mostly failed phone call scheduling back and forth.

Q.    Yes?

A.    Sorry.

Q.    I want to get to that in a minute.

Did Mr. Gant ever specifically follow up on your January 7th email?

A.    No.  I think I emailed Mr. Gant not long after this and said, Was it helpful to you?

Q.    Yes.  Yes, let's take a look at Government's Exhibit 36.

Thank you for predicting the next question.  We'll just let you do the direct on your own like Woody Allen and the *Bananas*.

Okay.

THE COURT:  I'm not going to comment on that.

614

Q.    (BY MR. LABOVITZ) Okay.  Can you take a look at --
this is a long email chain.

I believe chronologically it starts the first
email would be page four, and then goes to four, three,
two, and one.

So if we can just start on page five.  Do you see
page five?  Does that appear to be an email from you on
January 14, 2005?

A.    Yes.

Q.    And you're asking, quote, Was this feedback on
Gelbort helpful?  Do you guys want to talk more about
it or next steps?

A.    Yes.  That is what I was referring to.  So I had
not heard back from them in what I think was a week or
so, and I emailed again to say, Do you want to talk
about it?

Q.    And I think that, you know, the exhibit speaks for
itself.  It's a long email chain, but can you sort of
summarize what then happened in terms of, you know,
providing feedback from this exhibit?

A.    I mean, there was no more content discussion.

There was a lot of discussion, Can we schedule a
phone call?  Can anybody, like, figure this out so we
can all get on the phone together?

That never happened.

Q.    Okay.

A.    We just kept setting times and dates and somebody wouldn't show up or wouldn't answer their phone.

Q.    Can you go to page one a minute?

Is the oldest email or the latest email rather in this chain from January 21, 2005?

So is it accurate to say at this point there's been sort of two weeks just back and forth not substantively but simply scheduling to talk about the substance?

A.    Yes.  Or to see if they wanted to talk about the substance.  I didn't get an answer to that.  I don't know what they wanted.  But, yes, we kept scheduling and not actually talking.

Q.    Now, if you can please take a look at Government's Exhibit 6.  This is going to take us back to January 7th for a minute.

Do you see that at the top, it says 1/7/05, 3:45 p.m., and so this is an email from you to Mr. Gant, right?

A.    Yes.

Q.    This is after you have given your comments that we discussed about, you know, on Defense Exhibit 154.

Do you see at the top it says on the second line, "I think your email is right about the handwave to

616

frontal damage"?

A.    Yes.

Q.    Can you explain what that was about?

A.    I mean, that's a reference to Mr. Gant's email which he sent to Ms. O'Connell but then is forwarding to me what he had sent to her previously.  And in it he says the doc just gave a back of the hand or a handwave to the frontal lobe damage.

I agreed with that because I take that to mean that it was downplayed in the draft report.  There was no focus on the significance of that or the scope of it or what it meant to function or how it related to anything at all.  It's just a reference to some -- not even test scores, but just poor performance on some tests.  And I would view that as a handwave past what should have been viewed as significant information, and it should have been more fully discussed in the report.

Q.    And to be clear, by a handwave to frontal lobe damage, did you ever imply to Mr. Fields' trial counsel that there was no frontal lobe damage found on the testing?

A.    No.  There was frontal lobe damage.  That's why we're having this discussion about, like, there is damage and he's not paying enough attention to it.  He just sort of acknowledges it and moves on.

Q.   I see.  So by "handwave," just sort of dismisses it as being critical.

A.   That's what I take that to mean.  I mean, Mr. Gant might have meant something different, but that's what I'm responding to.

Q.   Now, I'd like you to take a look at Defense Exhibit Number 178.

A.   Okay.

Q.   Do you recognize this as an email that Julia O'Connell sent to you and Ms. Greenman, on March 9, 2005?

A.   Yes.

Q.   Does it say that, quote, Here is the first draft of Dr. Gelbort's report.  Your thoughts are appreciated.

A.   Yes.

Q.   Do you recall reviewing this draft of Dr. Gelbort's report?

A.   I think so.  I think this is what I would refer to as the second draft not the first.  I mean, I don't -- because we had already in January reviewed a first draft.  So I'm not quite sure.  I think this is the second draft.

Q.   Okay.  But do you recall at least, I guess, the first -- you know, forgetting the sort of nomenclature.

But Mr. Gant sent you a draft in January and then you received something else about Dr. Gelbort in March of '05?

A.   Yes.

Q.   Okay.

A.   I mean, I did see a second, a different draft.

Q.   So do you recall reviewing that?

A.   Vaguely.

Q.   Vaguely, okay.  Do you recall that you made -- sent an email with any comments similar to what you sent on January 7, 2005, in Defense Exhibit 154?

A.   I do not remember responding to it.

Q.   If you could take a look at Defendant's Exhibit 4. Just scroll through that.

Do you see on -- turning to page four, do you see that there's a signature by Michael M. Gelbort, Ph.D?

A.   I do.

Q.   Do you recall if trial counsel ever provided -- well, let me ask you this question first.

Did trial counsel ever ask you to talk to Dr. Gelbort directly?

A.   No.

Q.   Okay.  Do you recall if you ever received this signed version of Dr. Gelbort's report from Mr. Fields' trial counsel?

A.    I don't believe so.

Q.    Focusing back on Defendant's Exhibit 154, your responses to the first draft of Dr. Gelbort's report. Given, you know, these six points that you were making, did you ever tell Mr. Gant that Dr. Gelbort's pretrial testing showed that Mr. Fields did not have any brain impairments?  I'm asking in the negative.

A.    You are.  His testing does show brain impairments and that is all I would ever have said to trial counsel, that that's what the testing shows.

Q.    Okay.  So you would never, just to be clear, you would never have said that the testing was a nothing burger or didn't show brain damage?

A.    No.  It does show brain damage, so I would not.

Q.    Do you ever tell Ms. O'Connell -- let me ask for the court, did you ever tell Ms. O'Connell that Dr. Gelbort's testing did, in fact, show brain damage?

A.    Yes.  I mean, yes.

Q.    Okay.  So you would never have told her the opposite of that?

A.    No.

Q.    Did you ever tell trial counsel, whether Mr. Gant or Ms. O'Connell, that the testing from Dr. Gelbort showing brain damage, that that should not be presented by the defense as a mitigating factor at Mr. Fields'

capital sentencing stage?

A.   I never told them that.

Q.   Did you ever tell trial counsel that the defense should not present Dr. Gelbort as a witness in the affirmative, you know, mitigation case at trial?

A.   I did not tell them that.

Q.   I'd ask you to take a look at Defense Exhibit Number 164.

At the top, does this appear to be an email that you sent to Ms. O'Connell copying Ms. Greenman on June 23, 2005?

A.   Yes.

Q.   And the record will reflect it, but did you know, did you have any sense of when Mr. Fields' trial was beginning?

A.   I don't believe so.  And I couldn't tell you today when it did start so.

Q.   So in the third paragraph of Defense Exhibit 164, do you see a sentence beginning with "so," and it is says, quote, So what does your defense mental health team look like at this point?

A.   Yes.

Q.   "Will George testify?

Gelbort?

Did you get that psychiatrist?"

A.   Yes.

Q.   Do you recall if Ms. O'Connell ever responded to you about this or Ms. Greenman?

A.   I don't remember getting an answer to that.

Q.   Is your question, asking about who is going to be called as a defense mental health expert, is that consistent with the understanding that you testified to earlier that Dr. Gelbort was going to be called to testify at trial?

A.   Yes.  And also, I think, reflects my lack of involvement in the case overall.  Right?  I don't actually know very much about what's going on.

Q.   Now, I want to ask you some questions about an email that you sent to Dr. Woods.  And ask you to take a look at Defense Exhibit 158.

A.   Okay.

Q.   And do you recognize this as an email that you sent to Dr. George Woods on February 1, 2005?

A.   Yes.

Q.   Did you say -- do you reference a conversation that you had with Julia O'Connell, a long conversation rather.  So at least at some point, you had a phone call with her?

A.   Yes.

Q.   And then going into the third line, did you say,

quote, I recommended to her that you, being Dr. Woods, review the Gelbort stuff and just include what helps the bipolar diagnosis?

A.    Yes.

Q.    What did you mean "stuff"?

A.    His findings, his conclusions about the neuropsychological testing that he did.

Q.    What were you suggesting -- what were you trying to suggest to Dr. Woods here in this email about Dr. Gelbort's findings?  Like, what are you suggesting that he should be doing, Dr. Woods?

A.    So psychotic disorders, of which bipolar is one, are brain-based psychiatric disorders.  And so Dr. Woods is an expert at that time in particular among other things.  But he is exceptional at explaining the brain basis for those kinds of psychotic disorders.

So in shorthand, because we had worked together many times, I'm saying to him you should incorporate the neuropsychological findings into your discussion of bipolar into how you're talking about bipolar disorder in this case.

Q.    At this point, in February 1, 2005, was it your understanding that the defense would be calling Dr. Woods to testify in the defense case-in-chief about mitigation at trial?

A.    Yes.

Q.    Did you ever -- I know this email that we're looking at, 158, did not go to Ms. O'Connell.  But you did -- it does reference a conversation that you had with Ms. O'Connell saying that she could use Dr. Woods to incorporate the findings from the neuropsychological testing.

      Did you ever change your view of that, that Dr. Woods could incorporate Dr. Gelbort's test findings into his testimony?

A.    No.

Q.    Okay.

A.    I mean, Dr. Woods is a -- I mean, the role that he typically plays in a case is as a broad neuropsychiatric witness who incorporates everybody's evidence, right, lay witnesses, people he's interviewed.  All the work he's done, but also all the other expert evidence, and he incorporates that into a presentation that is maybe concise depending on the, you know, the questions.

Q.    Up to trial counsel?

A.    I can't really blame lawyers for some of us not being concise.  That might be our own fault.  Sorry.

Q.    Did you ever tell Ms. O'Connell that it would not be a good idea to share Dr. Gelbort's test findings

with Dr. Woods?

A.   No, she should have.

Q.   Just so the record is clear, this email is from February 1, 2005?

A.   Yes.

Q.   Going back to your email where we were talking about, like, those six points of contention, for lack of a better word, back in January 7, 2005, is your email and discussion of what you told Ms. O'Connell coming after you sent her comments on Dr. Gelbort's first draft?

     Does that make sense?

A.   Yes.

Q.   I can rephrase it.  In other words --

A.   The dates, you're asking me about the dates.

Q.   Don't worry about the dates.

A.   Okay.

Q.   I guess we talked about an email with your initial impressions and now we have this subsequent email, right?

     I just want to make clear:  Despite those initial impressions, you were still talking about brain impairments with Ms. O'Connell?

A.   Yes.

Q.   Were you ever made aware that trial counsel had

retained an expert by the name of Bradley Grinage?

A.    I did not know his name, I don't think.  I don't know him.  I knew that she was hiring a psychiatrist or intended to.

Q.    Okay.  And then in Defense Exhibit 164, that third paragraph where you say, "Did you get that psychiatrist," might that be Dr. Grinage?

A.    Yes, it could have been.

Q.    But you're not certain.

A.    I didn't know the name.  And I wasn't sure whether it was a prior treating psychiatrist or a current new psychiatrist.  But I knew that she was looking to hire an M.D. psychiatrist.

Q.    And much like in Defense Exhibit 158 where you recommended to Ms. O'Connell that she have Dr. Woods include the findings of Dr. Gelbort into his diagnosis, did you ever tell trial counsel not to do something similar with the psychiatrist?

A.    To not do it?

Q.    To not.

A.    No.

Q.    Did you ever tell trial counsel that the defense should not share whenever Dr. Gelbort finalized his report, signed it, that they should not share that report with Dr. Woods?

A.    No.

Q.    Would that be the same for the psychiatrist or any other expert that the defense retained?

A.    Yes.  I mean, part of the point of getting a neuropsychological report is that other experts can look at it.

Q.    Did you ever advise counsel as to the timing of -- you know, you talk about in 158, you know, that Ms. O'Connell -- this is in February of '05.  She should be sharing the results of Dr. Gelbort's findings, you know, with Dr. Woods.

Did you ever talk about the timing with Ms. O'Connell about when to provide Dr. Woods with the final report of Dr. Gelbort?

A.    I mean as soon as she got it finalized and signed, it could have gone.  I mean, there would be no reason to wait once it's final.

Q.    Did she ever ask you any questions about when should I try to get Dr. Gelbort's finalized report so that he can provide it to Dr. Woods?

A.    I don't believe so.

Q.    And do you -- would you have advised her about the timing, the timing of that, to make sure that Dr. Woods, you know, could use it to incorporate it?

A.    Yes.

THE COURT: Let me inquire. I'm not rushing you. How much more do you think that you have with this witness on your direct?

MR. LABOVITZ: Yeah. I would estimate half an hour, Your Honor.

THE COURT: All right. Are we at a good breaking point, or you tell me when you're at a good breaking point. I'm not imposing. I'm asking if you're at one or close to one.

MR. LABOVITZ: Yes, Your Honor.

THE COURT: Is now good?

MR. LABOVITZ: Very good.

THE COURT: All right. Why don't we do that then if you've got a half hour to go.

Let's break for lunch. It's 12:30. We'll do our standard one hour, if that still works for everyone.

We'll be back at 1:30. All right. We are in recess.

(Luncheon recess taken from 12:31 p.m to 1:32 p.m.)

THE COURT: All right. We are back on the record. Counsel are all present. Is defendant ready to continue with their examination? And the witness is present. I didn't mean to leave you out, sir.

Q.    (BY MR. LABOVITZ) Good afternoon.

A.    Good afternoon.

Q.   Before lunch we were talking about some of the advice about finalizing Dr. Gelbort's report.

I would just also sort of make things clearer. Sometimes I'll just say "trial counsel" and that would mean for your purposes, Skip Gant and Julia O'Connell, the trial counsel you dealt with.

A.   Good.

Q.   So I won't ask the same question twice.  I'll just lump trial counsel together.

A.   Great.

Q.   So did you ever tell trial counsel that Dr. Woods should finalize his report before Dr. Gelbort had finalized his report?

A.   No.

Q.   Are you aware, I'm sorry, were you made aware at the time of your connection to this case back from July '03 to July '05, that trial counsel intended to present evidence that Mr. Fields underwent a manic switch at the time of the crime as mitigation in the defense case?

A.   I believe I was aware of that at the time.

Q.   Did you ever tell trial counsel that presenting testimony about Mr. Fields' brain damage as reflected on the neuropsychological testing either via Dr. Gelbort as a witness or through Dr. Woods as a, you

know, incorporation with that be inconsistent with the manic switch defense?

A.    No, they're entirely consistent.

Q.    Did you ever tell trial counsel to not present testimony about Mr. Fields' brain damage at the penalty phase in their case-in-chief through Dr. Woods?

A.    No.

Q.    And we discussed Defendant's Exhibit 158 if you wanted to take a look at that minute.

    Is it correct to characterize your advice in that February 1, 2005, email as being, in fact, the opposite of what I just asked you?

A.    Yes.

Q.    Did Mr. Gant at any point tell you that the defense would not present -- I'm sorry -- was not going to present Dr. Gelbort as a witness during the defense case at Mr. Fields' trial?

A.    No.

Q.    And I should clarify this, because it's been an issue, defense case-in-chief.

A.    He never said.  There was no point at which I thought Dr. Gelbort was not testifying.  Mr. Gant never suggested to me that he was not going to testify.

Q.    Did Ms. O'Connell ever suggest to you that the defense would not be presenting Dr. Gelbort as a

witness in the defense case-in-chief at Mr. Fields' trial?

A.    No.

Q.    Given that understanding, I want to turn back a minute to Defense Exhibit 154.

Given that understanding that the defense was going to be presenting Dr. Gelbort as a witness at trial, what was your objective with these points that you were making in Defense Exhibit 154.

A.    So I thought his report could be stronger and clearer, and I thought counsel could be better prepared to work with him, and then also prepare him for his testimony.

Q.    And then if you could take a look at Government's Exhibit 6.  We talked about this when you made the comment about the handwave for frontal damage.  Again, looking at this from the rub about this case of your understanding of counsels' intent as they indicate to you with respect to Dr. Gelbort being a witness in the defense case, what was your intent in this email of defense -- I'm sorry, Government Exhibit 6?

A.    I was trying to help counsel figure out what to focus on in talking to Dr. Gelbort in preparing his testimony and what he needed to do a better job articulating than he had done in the report.  So what

he needed to really be able to explain about his findings that were not fully fleshed out.

Q.   And didn't this email after your -- the two lines that you wrote at the top.  Do you see it says, "Skip_gant@fd.org, wrote"?

A.   Yes.

Q.   Then it says "David," that's you.

In the second paragraph of Mr. Gant's email, do you see it says, "In terms of scores and categories and such, I see no reason you can't have access to them."

A.   Yes.

Q.   "As far as I'm concerned as CRC personnel, you are, ipso facto, a consultant on this case."

Can you go back to the top of that document when you say, quote, I agree about being part of the team and under all the same protections as CRC.

Can you -- I just want to clarify because you testified earlier that you did not consider yourself as part of the defense team.

Can you just explain what this "team" is referring to?

A.   So I'm trying to get the raw data, so I can review the raw data.  And the discussion is about whether the attorney/client privilege would attach to me as a non-lawyer, non-immediate member of the team.  And

because of my role in CRC, the view has always been that the attorney/client privilege from the specific team applies to Resource Counsel and to the project. So materials shared with us come under the same protection as attorney/client's protections that the appointed counsel have.

So people can send us stuff and we're not subject to disclosing it or, you know, some government subpoena any different than trial counsel would be. So I was agreeing with Skip that as part of the project those protections cover me as well.

Q.   Did Ms. O'Connell ever tell you that the defense would not take your advice about incorporating, you know, that you could, as an alternative, incorporate some of Dr. Gelbort's findings into Dr. Wood's testimony?

Did she ever tell you that that was not something that the defense was going to do?

A.   I don't believe so.

Q.   Did Mr. Gant ever say anything about that?

A.   I don't believe so.

Q.   Your email is addressed to Ms. O'Connell, but I just wanted to make sure that Mr. Gant didn't say anything about that.

A.   Not that I recall.

Q.    Now, I'd ask you to return to Defense Exhibit 166. This is another exhibit where the chronology is that later -- the response is above the initial email.

So I want to start with the initial email. Let me first ask you, at least at the top, is this an email that you sent to Ms. O'Connell July 4, 2005?

A.    Yes, with a CC to Ms. Greenman.

Q.    Okay. Now, going down at the bottom of the page is it -- it says "Julia O'Connell wrote: Yes, we start tomorrow."

Then do you see the next line that says, quote, my entire case will hinge upon my cross-examination of Price?

A.    Yes.

Q.    Now, let's go back to the top. Does she go on to express concerns about Dr. Price as far as being damaging to the defense case?

A.    Yes.

Q.    So you gave a response at the top of this Exhibit 166. When you get her email and you shaped your response, did her -- did what she said about Dr. Price, you know, her whole case hinging on Dr. Price's cross-examination, did that have any impact on how you shaped your response to her on July 4, 2005?

A.    Yes.

Q.    In what way?

A.    That's what I'm trying to get, right?  I'm taking that her reflecting that is her fear about how the case is going to go, and I'm trying to offer ways in which she might be able to narrow the harm that Dr. Price would do to her mitigation case.

Q.    Taking a look at paragraph one in line two, do you say, "I think your stronger argument is that this is peripheral and/or unrelated to the opinion?"

A.    Yes.

Q.    And later in that paragraph at the end, you say, "I know there is a debate as to whether 404 and 403 apply to penalty phase, but I think they apply to the government's experts regardless."

A.    Yes.

Q.    Are you referring to the Rules of Evidence, 404 and 403?

A.    I am.

Q.    At least with respect to 403, would that be a rule about relevance and prejudicial value of exhibits --

A.    Yes.

Q.    -- or testimony, as well as testimony?

     Now, in the third paragraph of Defense Exhibit 166, do you see where it says, "In the alternative"?

A.    Yes.

Q.    "You might consider not putting Gelbort on, sticking with the psychiatric evidence for penalty phase and the storytelling about his life, of course, and denying them the opportunity to put Price on the stand.  If you want more feedback on this, I would be happy to ask the rest of the project their thoughts, too."

And what was your intent there?

A.    So I'm telling her that her assessment is correct, that Dr. Price is potentially devastating to her case, and I'm suggesting alternative paths to try to mitigate that harm.

One of them could be, and has been used in other cases, where the defense team may not call an expert in order to deny the government the rebuttal right on that expertise.  And that's what I'm suggesting is something to consider, that if she could make a trade where she drops Gelbort, the evidence comes in through other witnesses, but if she drops calling him and can get the court to rule that, that bars the government from calling Price because he's rebuttal to Gelbort, that that might be a successful strategy to keep Price off the stand if Price is truly that devastating a witness to her case.

Q.   Now, I'd like you to take a look at Defense
Exhibit Number 167.

In the bottom half, does this appear to be an
email that Ms. O'Connell sent you on July 5, 2005,
discussing her concerns about Dr. Price again?

A.   I can't see when she sent it to me right now, but
my response to her is July 5th, and I probably would
have responded the same day.

Q.   Right.  Did you respond in the first paragraph,
fifth line, I think you might seriously consider just
using your shrinks, George and the other guy, and
objecting to Price as not proper rebuttal.  That forces
the government to put on the shrink who basically
agreed with the key problems?

A.   Yes.

Q.   And in that email as well, did you recommend that
Julia O'Connell consider an in limine motion to keep
out some of this damaging evidence from Price?

A.   Yes.  I mean, this is that same issue, right, is
trying to figure out strategies to limit the
non-neuropsychology based testimony from Price, which
she has identified as harmful or potentially harmful.

Q.   Between these two emails, Defense Exhibit 166 and
167 on July 4 and July 5, 2005, overall what were you
trying to advise counsel?

A.    So I was trying to offer her or get her to think through options for limiting the rebuttal from Dr. Price, and the non-test based things that he was going to introduce, because that's what she had identified as to where the harm would come from.  So it wasn't about his testing battery.  It was about all this other stuff that was in his report and that she was worried that would be very harmful to the mitigation case.

So I went through a series of things that we have used in other cases to limit the scope of the government's rebuttal.

Q.    To be clear, was your advice in Defense Exhibits 166 and 167 aimed solely at ways that you could, not you but that the defense lawyers could, block rebuttal testimony by Dr. Price?

A.    Yes.

Q.    Did your advice in these two exhibits have anything to do with whether Dr. Gelbort's testing of Mr. Fields showed brain impairments?

A.    No.

Q.    Did this advice have anything to do with whether trial counsel should present the results of the neuropsychological testing through Dr. Woods, Dr. Grinage or another qualified mental health expert?

A.    No.  It premises that evidence is going to come in through one of them if not directly through Dr. Gelbort.

Q.    Did these emails from July 5 of 2005, reflect your understanding of as of that date that the defense was going to be presenting evidence of Mr. Fields' brain impairments to the sentencing jury in their case-in-chief?

A.    Yes.

Q.    Did trial counsel, whether Mr. Gant or Ms. O'Connell, ever respond to these emails to say, oh, don't -- there's no need to worry about trying to brainstorm on blocking Dr. Price because the defense isn't calling Dr. Gelbort.

A.    They never said that.

Q.    Did your advice in Defense Exhibit 166 and 167, have anything to do with whether Dr. Gelbort's neuropsychological test findings showed evidence that would be considered mitigating in a capital sentencing hearing?

A.    No.  I'm simply addressing ways to limit Dr. Price.

Q.    Now, I want to ask you a question about Defense Exhibit 167, paragraph one, lines nine through ten.

      Do you say there, "As I recall from the report,

Gelbort's testing and finding of frontal damage is based only on a couple of tests, at least one of which Price repeated and did not find damage on"?

A.   Yes.

Q.   At least one of the tests, do you know what test that Dr. Gelbort administered that then Dr. Price also administered?

Do you know what test they're referring to?

A.   I actually think there are two that he repeated. So Category Test, and I think that he also repeated the Trails Making.

Q.   Sorry.  During the time that you were consulting on this case, were you a licensed neuropsychologist?

A.   No.

Q.   During the time that you were consulting on Mr. Fields' case, were you a licensed psychologist?

A.   No.

Q.   You mentioned your master's degree that you had at the time of your consultation in this case.  At that time of the consultation, did you have any educational degree in neuropsychology?

A.   No.

Q.   Psychology?

A.   No.

Q.   A law degree?

A.   No.

Q.   At the time of your consultation in this case, you know, pretrial, did you have any formal training in conducting a neuropsychological assessment?

A.   Such as that I could administer one?

Q.   Yes.

A.   No.

Q.   Now, to your knowledge, did Mr. Gant know about your credentials at the time of your consultation on this case?

A.   I don't really know.  I mean, we did not work together very much.  I assume he did because we were part of the same group.

Q.   Okay.  But I'd ask you to take a look at Government's Exhibit 4.

Do you see this as an email from Ms. O'Connell to yourself, and Ms. Greenman on March 4, 2005?

A.   Yes.

Q.   Going down to the fourth paragraph that begins with "David."  Do you see that?

A.   Yes.

Q.   Does it say, quote, Dr. Gelbort was uncomfortable giving data to anyone other than a psychologist.

Are you that guy?  Skip seems to think so.  Let me know.

Did you ever tell Ms. O'Connell that you were a psychologist?

A.   No.

Q.   During the time you consulted on Mr. Fields' case, were you a licensed psychiatrist?

A.   No.

Q.   Did you have any training at that time as a medical doctor?

A.   No.

Q.   If Mr. Gant testified in these proceedings that he knew you to be a psychiatrist at the time you were consulting on this case, would that be correct or incorrect?

A.   Incorrect.

Q.   Have you ever earned a medical doctor degree?

A.   No.

Q.   Just a few more questions.  I would like you to turn to Defense Exhibit 160.

Is this an email that, at least at the top -- oh, I'm sorry.  There is an email from you to Skip Gant at June 1, 2005, right?  At the top?

A.   Yes.

Q.   Then going down, do you also see that it looks like you sent an email to Ms. O'Connell on May 31 of 2005.

A.    Yes.

Q.    And have you had a chance to review this email prior to today?  Are you familiar with it?

A.    Yes.

Q.    Okay.  If you would go down to the paragraph that begins with "third."  Then go up three lines from the bottom of that paragraph, does it say -- well, is this email your giving -- it appears that you have now received data from Dr. Gelbort's testing.

A.    Correct.

Q.    And now you're giving some comments to Ms. O'Connell about that data.

A.    Correct.

Q.    And do you say in paragraph three, three lines from the bottom, quote, Basically I think his evidence for frontal damage is there but weak and could be bolstered by additional testing?

      Is that what you told Ms. O'Connell?

A.    Yes.

Q.    "By weak," what did you mean to convey to Ms. O'Connell?

A.    So I am encouraging her to go back to Dr. Gelbort and try and get him to do further testing on executive functioning.  So there is clear evidence in his testing, but he could do more.

Executive functioning covers a lot of domains of function. It is possible to test lots of different areas of executive functioning. He did a couple of tests. I was suggesting that they do many more tests, that he do many more tests, and it would be a stronger finding if they could parse the ways in which his brain worked and didn't work, where those deficits really were clearest. So it's an area of brain function that is -- I don't need to go on but differentiates us from other kinds of animals.

Executive functioning is the thing that makes us humans unique and there -- it covers a lot of territory.

Q. And you mentioned that -- you said something "clear evidence."

Clear evidence of what you found, that you were advising that was in Dr. Gelbort's testing?

A. There is clear evidence of executive dysfunction in his testing. I mean, from the Category Test and Trails, the performance on those tests is clear to me.

Q. And to, you know, my lawyer, non-doctor terms, can executive dysfunction be to a lay person mean brain damage?

A. Yes. Yes.

Q. Was your bottom line, regardless of any concerns

about possibly doing more testing, that there was, as you put in this email, "there was evidence for frontal damage is there"?

A.   Yes.

Q.   Okay.  Did you ever retreat from that position in your communications with Mr. Gant?

A.   No.

Q.   Or Ms. O'Connell?

A.   No.

Q.   Was your bottom line that this evidence of frontal damage in Mr. Fields' brain should be heard by his sentencing jury?

A.   Yes.

Q.   And did you ever retreat from that position?

A.   No.

Q.   Now, we've gone through a lot of emails on direct and, you know, basically that reflects some of the comments that you made contemporaneous to your consulting back in 2003 to 2005, if trial counsel had followed up with you on any of the emails that we've discussed today, would you have been able to explain your thinking to trial counsel as you've it explained here in court today?

A.   Yes, probably more so because it was at the time.

MR. LABOVITZ:  No further questions, Your

Honor.

THE COURT:  Okay.  Any cross-examination?

MR. STEWART:  Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MR. STEWART:**

Q.   All right.  Mr. Freedman, you talked to counsel on direct examination how you're not -- you weren't a psychiatrist at the time.

A.   Correct.

Q.   Have you since gotten some education in that field?

A.   I'm not a psychiatrist.

Q.   Okay.  Well, what education do you now have?

A.   I have a Ph.D. in Psychiatric Epidemiology.

Q.   Okay.  I'm not even going to ask what that means, because I'm sure it's over my head.

But at the time you were a consultant, correct?

A.   Yes.

Q.   And you were paid to consult on capital cases, correct?

A.   Correct.

Q.   In mitigation cases?

A.   Yes.

Q.   And you dealt -- in that realm, you dealt with mental health mitigation frequently?

A.    Yes.

MR. STEWART:  Let's pull up Exhibit 7, Government's Exhibit 7.  Now, I want you to scroll down to the bottom there.  Okay.  Actually, stop right there where the Bates Number says 4673.

If you could scroll up a little bit.

Q.    (BY MR. STEWART) All right.  Now it seems that Ms. O'Connell is emailing you here, correct?

A.    Yes.

Q.    And she's asking you if you have worked with Dr. Gelbort before, correct?

A.    Yes.

Q.    And above you respond, right?

A.    Yes.

Q.    And your previous experience, as you note, is once removed, correct?

A.    Correct.

Q.    And you said, "I had a hard time with him actually.  He hadn't done all the testing that needed to be done, and he basically just said that he wouldn't go back and do more."  Is that correct?

A.    Yes.

Q.    "But I know other people like him and use him quite often so maybe that was just a peculiar situation."  Is that correct?

A.    Yes.

Q.    So your previous experience with Dr. Gelbort he was difficult to work with.  He wouldn't do the testing that really needed to be done, but other people liked him so maybe that was just a weird situation?

A.    Correct.

Q.    All right.  Let's scroll up.  Actually, no, let's go to Defense Exhibit 154.

And you talked a little bit with counsel about this, but I had a couple of follow-up questions, as you might imagine.

And this is the summary of your criticisms of this draft report, correct?

A.    Yes.

Q.    And you thought recounting the social history would be a problem because Dr. Gelbort didn't review collateral sources, correct?

A.    I couldn't tell whether he had, right.  It does not indicate anything other than he's reporting what the client told him.

Q.    Which could be assumed that he only relied on Mr. Fields' reporting?

A.    Correct.

Q.    And you thought that some of his assertions such as that he had never held a job were contradicted by

the social history report itself, correct?

A.    They were contradicted by what I knew of the client, yes.

Q.    And you were also concerned with how he reported the test results, correct?

A.    Yes.

Q.    And, in fact, you were worried that the prosecution could make the variability in results look like malingering?

A.    Yes.

Q.    And on direct you mentioned -- I believe that there was an issue with the fact that he would not say, I administered this test.  He scored this.  Therefore, and in interpreting it; is that correct?

A.    Yes.  I mean, I would say that slightly different.

     So he doesn't report any of the results, test results, in his report, right?  He just sort of uses -- it's technical language.  I mean, it's not inappropriate language the way he describes it, but it doesn't tell you how the person performed, right?  So you don't know whether it's one-and-a-half standard deviations below expected or one.

Q.    And you would expect that information to be in an expert report in a case like this?

A.    I don't know if I would expect it, but I would

want it, and I would always want it.

Q.    So as a consultant with some experience, that would be your preference?

A.    Yes.

Q.    Now, you said that the most promising findings were undercut by Dr. Gelbort's conclusion that mild impairment is a result of concentration and attention deficits, correct?

A.    Yes.

Q.    And you thought he should do some more testing to determine whether it was malingering or brain damage, correct?

A.    So you're mixing two things.

So just to be clear, he says that part of his findings could be a lack of attention and concentration, which is a domain of assessment -- so you do test for that -- versus executive dysfunction, which you do test for that.  And the tests often overlap, and so not malingering in this part.

This is about, Could you tell the difference?  Because he suggests that maybe the finding is not related to what it appears to be related to.

Q.    Okay.  So I want to follow up on that specific point, then.  You thought that some additional testing could actually clarify whether it was executive

function or he just wasn't -- he had some deficits in attention or concentration?

A.    Correct.  It could make that clearer.

Q.    You were also concerned about the malingering issue, though, correct?

A.    Yes.

Q.    And when he writes about the pattern of behavior found with individuals with frontal lobe damage, you took that as him basically just guessing, correct?

A.    Not guessing but a --

Q.    Isn't that the word that you used?

A.    It might have been.  Point me to it.

Q.    Sorry.

        MR. STEWART:  Scroll down a little bit, a little bit further.  Okay.  Stop right there.

        Yeah.

Q.    (BY MR. STEWART) Let's look at number five there. And it says, "He should have tested for this and not guessed at it by virtue of prior behavior."

A.    Yes.

Q.    Okay.  So you would agree that you thought it seemed like he was guessing.

A.    Yes.  Or might have been, yeah.

Q.    And you thought that he needed to discuss how Mr. Fields' medication could have affected the results?

651

A.    Yes.

Q.    And you were talking about the medication he was taking while he was being tested, correct?

A.    Yes.

Q.    Not something that would be in his medical records, but what he told Dr. Gelbort that he was on.

A.    Well, I mean, he should have known that as well to determine whether the behavior is unique to the current testing.  You would certainly want to know what medication somebody has been on over time.

But for the testing assessment, yes, you would want to know what medication somebody is on at the time they're being tested.

Q.    Because on cross-examination, a prosecutor could say, Well, he was on this medication.  This could have made him score low, correct?

A.    Right.  Or so alternatively with anti-psychotic medication, it may have taken away some of the interference that he would have been experiencing from the psychosis and actually made the testing more accurate, right?

So it's a better reflection of his capacity rather than somebody who is having hallucinations or interference with their ability to concentrate.  So you would want to know.

Q.   So ultimately it's a reliability issue?

A.   Yes, sure.

Q.   And you weren't pleased with the battery of tests that Dr. Gelbort ran.

A.   I thought it was too narrow.

Q.   And you didn't think that it was the test that should have been done based on the history and the other red flags.

A.   I think it was too narrow.  I'm not sure any of the tests that he gave were bad.  I think they were just -- he needed to spend much more time and do much more testing.

Q.   And you wanted to see his data.

A.   Yes.

Q.   And Skip Gant agreed with much of your evaluation, correct?

A.   I mean, he wrote me back an email that said something like, you said it better than I said it, and here's what I said.  But, yeah, I mean, he agreed I think.

        MR. LABOVITZ:  Now, I want to go to Government's Exhibit 6.  Scroll down just a slight bit there.  Actually, a little further.

     All right.  Stop right there.

Q.   (BY MR. STEWART) Do you see the email that Skip

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

Gant sent on January 7 at 2005, at 10:59 a.m.?

A.   I do.

Q.   And he believes that Dr. Gelbort gave short-shrift to the oxygen deprivation issue, correct?

A.   That's what it says.

Q.   And he thought that he had merely given it a handwave to the frontal lobe damage?

A.   Yes.

Q.   And you agreed with that assessment?

A.   I agreed with the handwave part.

Q.   Yes, correct.

And, Ms. Greenman also had criticisms of the report, correct?

A.   Yes.

MR. STEWART:   Okay.  Now I'd like to go to Exhibit 7, Government's Exhibit 7, and then scroll to the bottom of the page.  Actually, no, we don't need to scroll to the bottom of the page.  Okay.  Let's stay on.  Okay, yeah.

Q.   (BY MR. STEWART) So Ms. O'Connell's understanding was that Dr. Gelbort would talk to Dr. Woods before beginning testing, correct?

A.   That's in this email.  I mean, I don't have any independent knowledge of that.

Q.   But as far as you know?

A.   That's what she wrote.  I wasn't part of the conversation with Dr. Woods that she had.  So I know it from this, that she says, this is what I thought was going to happen.

Q.   According to Ms. O'Connell in this email, Dr. Gelbort did not talk to Dr. Woods before doing the testing.

A.   Yes, that's what it says.

Q.   Doesn't it seem like your observation that Dr. Gelbort was hard to work with might have been an accurate one?

A.   Yeah.  I think he probably is hard to work with. Lots of experts are hard to work with.  We're quite a pain in the butt as it turns out.

Q.   And the issue with testing that you dealt with in the last case seems like it's being repeated here, correct?

A.   Yes.  It's similar.

Q.   So your previous experience wasn't necessarily a peculiar case, correct?

A.   No, it seems similar.

Q.   You could call it a pattern.

A.   Well, two.

        MR. LABOVITZ:  Objection, that pattern and habit evidence.

THE COURT:  Sustained.

Q.   (BY MR. STEWART) Now, let's see.  Dr. Woods was apparently not happy initially with what Dr. Gelbort performed, correct?

A.   Again, I know that from this email.

Q.   Now, it does say that he was more comfortable after he and Dr. Gelbort talked.

A.   It does.

Q.   Ms. O'Connell was not a fan of Dr. Gelbort according to this email, though.

A.   I don't remember that it's in this email, but I will agree with you overall that she was not a fan.

Q.   Fair enough.

She notes in this email that it was the crappiest report that she had ever read, correct?

A.   Yes.  Sorry, I had not found that.  But, yes, it does say that here.

Q.   And "The" is uppercased or all uppercase, right?

A.   It is.

Q.   Now, after receiving this report you reached out to Dr. Woods, correct?

A.   The timing.

Q.   I'll tell you what, I'll pull up the exhibit.

A.   If you can just tell me the date, that's fine.

Q.   Yeah.  It's Government's Exhibit 8.  I'll show it

to you.  I don't want you to guess.

February 1, 2005, that's an email from you to Dr. Woods, correct?

A.   Yes.

Q.   And you mentioned having a long conversation with Ms. O'Connell about Dr. Woods?

A.   Yes.

Q.   And she really likes Dr. Woods.

A.   Yes.

Q.   And you recommended to Ms. O'Connell that she -- or that Dr. Woods review the Gelbort stuff and just included what helps the bipolar diagnosis, correct?

A.   Bipolar disorder, yes.

Q.   And then you follow up with that by saying, "Gelbort is exceedingly difficult to work with and sloppy in my humble opinion, of course."

A.   Yes.

Q.   And so your opinion that you conveyed to Dr. Woods was Gelbort is difficult to work with and he's sloppy.

A.   Yes.

Q.   Now, you mentioned on direct that you weren't telling Dr. Woods not to rely on Gelbort or incorporate his work into his own work, which isn't that fair?

A.   Yes.

Q.   Now, Dr. Woods is obviously an expert in this

field, correct?

A.    In the --

Q.    In the neuropsychiatric field?

A.    Yes.

Q.    And he's testified in many cases?

A.    Yes.

Q.    Capital cases?

A.    Yes.

Q.    He's, you know, a fairly well-known commodity, correct?

A.    Yes.

Q.    Do you think that you really need to tell him what he should and should not review?

A.    What he should and should not review.  He certainly will make that decision on his own.

     We have a relationship where we talk about these kinds of things on a case that we're both working on. So this is not unusual.  It's not me instructing him to do something.  It's just me expressing an opinion about what I think could happen.

Q.    Certainly.  I think what I'm getting at is, you are not really instructing Dr. Woods what to consider. You're warning him about what to -- about the pitfalls; aren't you?

A.    I mean, I'm reflecting on a conversation that I

had with Ms. O'Connell and I'm trying to describe to Dr. Woods the conversation I had with her and the expectation that she's going to call Dr. Woods and repeat what I said, and I would like him to know it from me so he has a context for listening to her.

But my point is one that I suspect that he would agree with.

Q.   "Just include Dr. Gelbort's stuff that's helpful."

A.   Right.  So take the part that is relevant to bipolar, right, that has to do with the brain basis for a psychiatric disorder, and talk about that.  You're not responsible for everything that he did but incorporate the parts of it that are relevant to what your -- what I expect your testimony will be about.

Q.   Now, Dr. Woods appears to agree with you about Gilbert being difficult to work with and sloppy; doesn't he?

A.   He says I'm right about Gelbort.

Q.   Let's go ahead and go to Government's Exhibit 9.

And this is an email in which Ms. O'Connell is expressing that she is having a little bit of frustration of getting a hold of Dr. Gelbort still, correct?

A.   Yes.

Q.   And she says she would not recommend him to her

659

worst enemy, correct?

A.    Correct.

Q.    Let's go to Government's Exhibit 20.

Now, we see here this is an email among several people:  you, Ms. Greenman, Ms. O'Connell.

And she notes that she was able to get the data from Dr. Gelbort, correct?

A.    You would have to point me to it, but I think so.

Q.    So let's go down to, what is that, the third paragraph.

Right there it starts with, "By the way, my psychologist friend ...."

A.    "... has agreed to get it, so I'm not -- right.  .

So it's coming.

Q.    She has figured out a way to get ahold of it.

A.    Yes, it's on its way.

Q.    Very good.

MR. STEWART:  Let's go to Government's Exhibit 4.  Let's scroll down.  There we go.  Let's stop right there.

Q.    (BY MR. STEWART) Now, this is an email to you from Ms. O'Connell in March of 2005.

A.    Yes.

Q.    And she's finally able to have a conversation with Dr. Gelbort about the case, correct?

A.   Yes.

Q.   Now, he did -- they were going to have a meeting and he stood her up, correct?

A.   Yes, I think twice.

Q.   According to this email?

A.   Yes.

Q.   And she had to track him down at a presentation that he was giving, correct?

A.   Yes.

Q.   And she told you that even after their conversation, that she didn't know much more than she did before?

A.   Yes.

Q.   And she told you, if anyone asked about Dr. Gelbort you should tell them not to hire him.

A.   Yes.

Q.   And she said he sucks?

A.   Yes.

Q.   And she said it wasn't because he wasn't smart, correct?

A.   Yes.

Q.   But that he was difficult to work with, correct?

A.   Yes, and he knows his field.

Q.   Yeah, he knows his field, correct?

But he thinks he's smarter than everyone else.

A.    Yes.

Q.    Now, you passed on this assessment to your colleagues at the Capital Resource Project; didn't you?

A.    I did.

Q.    Okay.  Why did you think that was important?

A.    I think there were members of the project who recommended Dr. Gelbort to other teams, other capital trial teams, and I thought they should know this is what the person currently working with him had to say about him.

Q.    And Doctor -- sorry.  Mr. Gant agreed with that assessment, correct?

A.    I don't remember.

Q.    If you could pull up Exhibit 69, Government's Exhibit 69.  I won't make you guess.

As you see there Mr. Gant says that he concurs wholeheartedly, correct?

A.    I do.

Q.    And that's to the email below in which you passed on the assessment.

A.    Correct.

Q.    And he says he had to politely chastise him for his behavior.

A.    Yes.

Q.    All right.  Let's go to Government's Exhibit 25.

Now, when Ms. O'Connell finally did get the data, she asked you to look at it, correct?

A.    Yes.

Q.    And you did?

A.    Yes.

Q.    Now, you note that he only did a partial battery, correct?

A.    Yes.

Q.    And you were worried because it only -- it makes it difficult to get an overall sense of functioning, correct?

A.    So I'm going to answer you technically.

Q.    Feel free, sir.

A.    So he gave part of the Halstead-Reitan, which is a full battery, and the Halstead-Reitan has summary calculations for different ways of looking at overall functioning.

So similar to like an IQ test.  You can get a full-scale IQ only if you give the full test.  If you only give part of it, you either have to estimate or guess at what the full scale is.  So the Halstead-Reitan is to that, only more complex.

And he didn't give the full battery, so it wasn't possible to calculate the two summary scores that give you an overall brain dysfunction number on the

Halstead-Reitan.

Q.   And you also note that there's a lack of explanation for some of the score discrepancies on some of the IQ scores, correct?

A.   So I believe this is why I had referred to him as sloppy.

So there's different -- he reports the full-scale IQ differently in different pages of the raw data, and so I wasn't sure how that happens.

Q.   And you didn't think that the battery that he gave would allow for an evaluation of overall brain functioning, correct?

A.   I mean, it was an evaluation of overall brain functioning, but it wasn't -- you couldn't do the summary calculations to get to the equivalent of a full-scale IQ, right?

So it's a GNDS score usually or an HAI score on the Halstead-Reitan battery, and you couldn't calculate those overall scores.  What you could see is the individual test scores, which do give you an idea of brain impairment.  They just don't let you calculate the full summary score.

Q.   And you also noticed a fair amount of score revisions I think that you note here.

A.   Yes, or scoring errors.  Yes, I think I only

talked about the revisions.

Q.   And you indicated that maybe he was not scoring everything himself.

A.   Yes.

Q.   And you thought that was kind of indicative of the time and attention that he was giving to this case.

A.   I worried that it was, yes.

Q.   And you concluded that he based his frontal lobe damage findings on just two tests, correct?

A.   Correct.

Q.   Categories and Trails.

A.   Correct.

Q.   And you were concerned because there's debate over whether Categories actually differentiates between frontal lobe damage and more general brain damage, correct?

A.   Correct.  Meaning that it's not specific, right?

So it's not a test that only gets at executive functioning.  It also incorporates other kinds of things.  So the findings on Categories is that it's a very good test of general brain impairment or brain damage, but it doesn't necessarily tell you where in the brain that's happening.

A.   Right.

Q.   It doesn't localize the damage or dysfunction?

A.    Not well, right.

Q.    And your concern with the Trails Test was that poor performance could indicate issues other than brain damage, correct?

A.    No.  No.  I mean, Trails is a good test of executive functioning, but there are other things that it is always capturing.

Q.    Well, you were concerned that maybe it would show that he was learning and adapting, correct?

A.    So he -- right.  That is not a reflection of whether he has brain damage or not.  That's whether he's learned some ways in which to adapt to what his life is like, right, from the brain damage.

So if somebody has traumatic brain damage, they don't stay that same person for the rest of their lives.  They can be taught and develop skills to be able to function in the world better.  So he may have learned a strategy to overcome a deficit he had.

Q.    And you also note that you believe the brain damage evidence was weak.

A.    I think it could have been stronger.

Q.    Did you say it could be stronger or did you say it's weak?

A.    I think I said it's weak.

Q.    And you didn't know why Dr. Gelbort wouldn't do

additional executive functioning testing?

A.   Oh, that's absolutely true.

Q.   And you also note that there's missing data on the Luria, correct?

A.   Yes.

Q.   Now, I want you to scroll down to the bottom here.

And let's look at the paragraph right before you mention San Antonio.  San Antonio is very interesting, by the way.

And you say that you're not terribly impressed with his testing?

A.   Yes.

Q.   And you also say it's difficult to anticipate whether additional testing will actually improve the situation.

A.   Yes.

Q.   And you asked Mr. Gant to follow up with Dr. Gelbort about the Luria data and the IQ test issue, correct?

A.   I remember asking about the Luria data.  Oh, and the scores on the IQ test.

MR. STEWART:  Can you scroll up to the top of that email, please?

Q.   (BY MR. STEWART) At the very top of the first page, he responds to you, correct?

A.    Yes.

Q.    And he says, the doctor said that the Luria is just a mental status exam, that he didn't include the data, correct?

A.    He does say that.

Q.    He doesn't say it doesn't exist, correct?

A.    The Luria is not a mental status exam, so I don't know what this means.  And I don't know whether Skip Gant got it wrong, Mr. Gant got it wrong, or asked a different question than I was trying to get him to ask.

But the Luria is not a mental status exam.  It's a battery of tests.  So I don't know what that answer means.

Q.    And, let's see.  He said that he had no explanation for the discrepancy in the IQ test, right?

A.    Yeah, right.  He's going to look at it and try to figure out why it's reported differently in two places. That's not an unreasonable response, right?  Somebody points out an error that you made, you want to go look at it?

Q.    Certainly.  You recommended the Delis-Kaplan Executive Systems Test, correct?

A.    I did.

Q.    And that's a specific executive functioning test?

A.    It's multiple tests but, yes, it combines into one

battery.

Q.    Now, Ms. O'Connell reached out to you all about -- you and Ms. Greenman, about Dr. Price's recommended testing, correct?

A.    Yes.

Q.    And you gave some advice?

A.    Yes.

MR. STEWART:  I want to pull up Defense Exhibit 184.

Q.    (BY MR. STEWART) Now, Ms. O'Connell mentioned she wanted to avoid testimony from the government establishing that Mr. Fields was low in a couple of areas but overall functioning well, correct?

I think it would be there at the end of the paragraph.  Starting with, "The thing I want to avoid" is the fourth line from the bottom.

A.    Yes.

Q.    And Ms. O'Connell makes contact again in July of 2005, correct?  Government's Exhibit 17.  We'll grab it for you.

So she is reaching out to you all, and it seems like this is after Dr. Price has examined Mr. Fields.

A.    Yeah, I don't see a date.  But otherwise, yes.

MR. STEWART:  Can we scroll up just a little bit?

Q.    (BY MR. STEWART) Can you see the date there now?

A.    Yes.

Q.    And she has received some preliminary findings from Dr. Price?

A.    Yes.

Q.    She is discussing Dr. Price's conducting the Frontal Systems Behavior Scale, correct?

A.    Yes.

Q.    And she is skeptical as to whether that's an appropriate test.

A.    Yes.

Q.    And she asks you if you know anything about it.

A.    Yes.

Q.    And there at the top you say that you're not familiar with it.

A.    Correct.

Q.    And you recommend having Dr. Gelbort do the Delis-Kaplan again?

A.    Yes.

Q.    You really like that test apparently.

A.    I do like that test.  It's quite good.

Q.    Which you refer to as a "real executive function test," right?

A.    Right.

          MR. STEWART:  Now, let's pull number 12,

Government's Number 12.

And let's scroll all the way up to the top. Actually, let's -- yes. Let's actually scroll down. A little further, a little bit further.

Okay. Let's scroll up, actually, sorry. Right there.

Q. (BY MR. STEWART) So Ms. O'Connell has reached out and she is noting that the government reports are full of inadmissible materials, correct?

A. Yes.

Q. And she notes that since the government doctor concludes that Mr. Fields' hallucinations were credible, she anticipates the government will not call him.

A. Yes.

Q. And you respond, I believe at some point, saying that you'll look at them. I don't know if it's on this email flow.

A. I'm sorry. I didn't hear you.

Q. You ended up looking at the reports, correct?

A. I looked at Price.

Q. Right.

A. I don't know if I looked at Mitchell. I don't remember that.

MR. STEWART: And let me scroll up a little

bit.  Let's scroll down or scroll all the way up.

Sorry.  There we go.

Q.   (BY MR. STEWART) Now, right there you say that you're going to look at them but you're moving.

A.   Yes.

MR. STEWART:  Now, let's scroll down to the next page, and this is the second page of this exhibit.

Q.   (BY MR. STEWART) And now there in Ms. O'Connell's email, because this is a different email that she sends talking about her case will hinge on Dr. Price's cross.

A.   Yes.

Q.   She notes that her greatest concern is Price's inclusion of bad acts that Mr. Fields allegedly committed.

A.   Correct.

Q.   And she wants to try to exclude it.

A.   Right.

Q.   She think it's going to be, I think she says, virtually impossible.

A.   I'll take your word for it.

Q.   Well, don't take my word for it.

A.   Well . . .

Q.   I think it actually says, "nearly impossible."

A.   "Nearly impossible," correct.  I see it.

Q.   So it's a good thing that you didn't take my word

for it.

And you give some advice for trying to get the bad evidence stricken, correct?

A.    Yes.

Q.    And you say that once I've read I'll give you more detailed advice, correct?

A.    Yes.

Q.    And one of the things that you note here.

Well, actually we're going to scroll down to the next page there.

And you have read it at this point, correct?

A.    Yes.

Q.    And you've noted that Dr. Price's results, testing results, are similar to Dr. Gelbort's, correct?

A.    I did, yes.

Q.    He just simply disavows any brain damage.

A.    That's correct.

Q.    And you think that Dr. Price's data does show impairment?

A.    Dr. Price's data does show impairment, yes.

Q.    And you were concerned that Mr. Fields did better on some tests with Dr. Price than Dr. Gelbort.

A.    Yeah.  Yeah, I don't know about "concerned."  He did do better on some tests.

Q.    You just noted it?

A.    I noted it, yes.  That's not unexpected.

Q.    And you said that Dr. Gelbort will have to address that.

A.    Yes.

Q.    And you note that the Frontal Behavior System Scale show impairment but Price says it's malingering.

And that's going to be that middle -- that second paragraph near the bottom.

A.    Yeah. I don't . . .

MR. STEWART:  Let's zoom it in.  Thank you, Hunter -- Tanner.  Thank you, Hunter, too, for something.

THE WITNESS:  Yes.  He discounted it as malingering.

But also says there is no evidence of malingering on anything else and all the testing is valid.

So the problem with that FSBS is that it's a self report instrument, which is what makes it pretty much useless, so it's not really a test of executive functioning.  It's a test of how people have -- self-perceive.  And somebody who has a psychotic disorder by definition is going to have trouble with self-perception.  So it's a pretty useless test.  But he does say it looks like that he's malingering on it, which means that he's reporting inaccurately.  But I

didn't find malingering on anything else that he did and he gave tests that can be used to assess malingering.

Q.   (BY MR. STEWART) But you acknowledge that sometimes individuals being examined, doing these kind of testing, their self-perception is not actually accurate, correct?

A.   Yes.

Q.   That's one of the reasons that you're a little concerned Dr. Gelbort didn't rely on collateral reports.

A.   Yes.  But it's also why I don't think that the FSBS should have been given, right?  It's why -- it's a meaningless test.

Q.   Now you have said that that would -- you know, Dr. Price's belief that it's malingering would show he was bias, correct?

A.   Yes.  Because he's taking that conclusion from a test that has virtually no reliability or validity and comparing it to a test that actually assesses effort and malingering, and he's drawing a conclusion in conflict with what the data shows.  That would seem to be bias to me.

Q.   And you went over this on direct with counsel, but here in this paragraph that starts with "In the

alternative" you suggested perhaps sticking with the psychiatric evidence for the penalty phase and denying them the opportunity to put Price on the stand, correct?

A.    Correct.

Q.    Now, there was a little bit of discussion with counsel on direct, so I want to clear this up.  Because he kept implying that Dr. Woods could talk about the neuropsychological testing and discuss it instead of Gelbort, correct?

A.    So had Ms. O'Connell made -- gotten the court to agree that if she didn't call Gelbort the government would not call Price, right, so they do that exchange of experts so there's no rebuttal.

Q.    I'm sorry.  I want to back up.

Are you saying like the government and the defense will agree to not call experts because one is not calling the other.  That seems unlikely; don't you agree?

A.    No.  What I'm saying is that Ms. O'Connell -- I was advising Ms. O'Connell to file something with the court saying we would like a ruling on Dr. Price not being proper rebuttal under the rule, under rule 12.2. If I don't call a neuropsychologist, the government should be barred from calling their rebuttal witness to

my neuropsychologist.

If the court had agreed with that, she could then make a decision whether to call him or not. And Dr. Woods would be able to testify to the brain impairment, brain damage regardless of whether Dr. Gelbort testified or not.

Q. Well, I guess my question of where I'm a little confused is that if Dr. Woods is testifying to the materials that Dr. Price tested on, Dr. Price would still get to testify about that; wouldn't he?

MR. LABOVITZ: Objection, Your Honor, that's -- that's, again, a legal matter. He's not a lawyer. He's not a judge and it is -- that would be for the Court to rule upon. I don't even think that expert -- this witness --

THE COURT: Well, I think the way it was asked, there's probably a way to ask it that you might get an answer to it. But the way that you asked it, it's not going to get it.

Sustained.

You can try again if you would like.

Q. (BY MR. STEWART) Let me ask it in this manner: If Dr. Woods was talking about brain impairment, isn't that the thing -- isn't that the subject on which Dr. Price tested?

A.    Yes.

Q.    And so if Dr. Woods testified about brain impairments, Dr. Price could testify in rebuttal about brain impairments.

A.    Well, that's up to a judge, right?  I mean, so if we lose that motion, we lose motions all the time, right?  So if you go to the judge and you say, we would like you to order this and the judge says, no, well, then you move on.  And that's no, right?

But the idea of asking the judge about it is different than what the answer is.

Q.    And that's why you -- oh, no.  In this email you say consider not putting him on, correct?  You don't say, ask the judge for a motion -- for a limiting order, correct?

A.    In this email, I don't think I said that.  I don't remember the timing, but the point of not putting him on is to keep Price off because Price is what she is most worried about.

So the whole point of whether Gelbort, how they're using them, is what she has identified as the most risk for her case.

Q.    So if you use Dr. Woods for the same reason, that risk would once again be present.

A.    Well, I don't agree with you, but I'm not a judge.

So you would be asking the judge to rule on that, but I don't agree with that. We've been successful in other cases in limiting the scope of rebuttal on the basis of what we intend to put on. That's what the rule is for, that's what Rule 12.2 is. It's to limit the government's right to rebuttal given what you have given them notice of and what you're putting on the stand.

So you should, a defense team should ask the judge to rule on that.

Q.   Do you know if the defense team did in this case?

A.   There is a 12-2.0 -- 12.2 ruling in this case that I have never seen. I was never given it at the time and I have never seen it since.

Q.   Do you know if they asked for a ruling in limine at trial?

A.   I do not.

MR. STEWART:  Hunter, can you -- or Tanner, sorry. Tanner and Hunter.

Can you zoom out a little bit, and scroll down, please?

TANNER COX:  12?

MR. STEWART:  Yeah, same exhibit. We're still on, yeah, I believe it's 12.

Yes, we're still on 12.

Keep scrolling.

MR. LABOVITZ:  So on the last page?

MR. STEWART:  Yeah, this is the page right here.  It's the one -- it's 12.5, 12-5, or the Bates Number is 15059 if you're looking on your laptop.

MR. LABOVITZ:  Okay.  Thank you very much.

MR. STEWART:  Are you there?

MR. LABOVITZ:  Yes.

MR. STEWART:  So let's scroll up a little bit so we have -- yeah, there we go.

Q.   (BY MR. STEWART) Ms. O'Connell responds to you with some ideas of her cross-examination of Price, correct?

A.   Yeah.  Yeah, I don't know the timing of this if it is before or after the one we just read.  You don't have to scroll.

I just want to make it clear because the email that you're showing me about, "I smell blood" is the one that made me most worried for her, and that's the one that said to me that she was not prepared for this at all.  Because I have -- as I tried to indicate to her, I think that's a mistake, and you are not perceiving how good a witness Dr. Price is and how many times he's done this, and you're not going to cross him in his field of expertise better than he can be a

witness for.  And that made me panicked when she wrote that to me.

Q.    So that informs your response right here then on July 5th, correct?

A.    Correct.

Q.    In which you cautioned her about Dr. Price.

A.    I tried to be polite about it, but, yes.

Q.    And you believed that he would be a handful.

A.    Yes, that's the polite version.

Q.    And you suggest she seriously consider putting only Dr. Woods and Dr. Grinage on, and objecting to Dr. Price's improper rebuttal, correct?

A.    Yes.

Q.    And you note Gelbort only found brain damage on a couple of tests?

A.    Yes.

Q.    And you recognize that Dr. Price did the same test and didn't find brain damage in his conclusions.

A.    On one of them at least, yes.

Q.    And you note that jurors won't follow the details of that testing?

A.    Yes.

Q.    And instead would focus only on big ideas.

A.    Correct.

Q.    And Price's testimony would tell a creepy story

that would disturb the jury.

A.    Judging from his report, yes.

Q.    Now, Ms. O'Connell kind of agreed with you about jurors, correct?

A.    I think so.

Q.    Why don't we scroll down a little bit further.

Let's go to the second paragraph there that says, "This doesn't change the fact."  She mentions less than two dozen of the people in her jury pool would have college educations.

A.    Yes.

Q.    Only a handful aren't exceedingly in favor of the death penalty.

A.    Yes.

Q.    And experts will cancel each other out in the juror's minds?

A.    Yes.

Q.    Most won't care about mental health.

A.    Yes.

Q.    She wanted to keep the crap away from them if at all possible.

A.    Yes.

Q.    And she thought that bad acts evidence could tip the scale.

A.    Yes.

MR. STEWART:  We're going to scroll all the way to the bottom scroll, the last page here.  Scroll a little bit up there.  There we go.

Q.    (BY MR. STEWART) This is July 6, which is the next day, correct?

A.    Yes.

Q.    And you're checking in on Julia, correct?  And below there's an email from her.

A.    Yes.

Q.    Does that appear to be a response to your last email?

A.    Yes.

Q.    And she says, "That may be a plan," correct?

A.    Well, I mean, that is what it says, yes.

Q.    And "the team will have to decide."

A.    Yes.

Q.    And so in response to your, as you said I panicked, suggestion not to put on Price or not to put on Dr. Gelbort?

A.    My panic was about Dr. Price coming on, so taking steps to keep him off.

Q.    Which was -- which amounted to not putting Gelbort on.

A.    Well, one option was to not put Gelbort on if you could get a court to agree.

Another option was the 403 and 404 stuff that we had talked about earlier in the limine motions.

Q.   Well, is that what she was responding to or the email that you sent just the day before?

A.   All she's saying to me here is "thanks very much, good-bye.  We'll talk about it."

Q.   Well, she actually says "That may be a plan."

A.   Yes.  But that's not the --

Q.   Then she says, "the judge has already indicated that he believes proper rebuttal is whatever the medical guys decided was proper to test on."

Which indicates, doesn't it, that she was concerned about the rebuttal and how to avoid it?

A.   I mean, that indicates to me that she believes the judge would not rule in her favor if she tried to keep Price off by keeping Gelbort off and that could be right, but I don't know that she ever filed that motion to find out.

Q.   She said it might be a plan to try to keep Gelbort off, but she doesn't know how -- whether or not it will work, correct?

A.   Yeah.  She is saying, thanks very much.  That might be a plan.  We'll talk about it and get back to you.

Q.   Now, one of the things that you mentioned on

684

direct examination is that this was all -- all your suggestions are all in the context of "this is an attorney telling you what's going on in the case, her concerns" and that's framing your responses, correct?

A.   Yes.

Q.   She is the attorney.

A.   Yes.

Q.   She knows the jury.

A.   Yes.

Q.   She knows her case.

A.   Hopefully.

Q.   So she is -- so she is at least more informed that you are at this point.

A.   Well, I don't know that, but she is going to make the decisions --

Q.   Well, doctor --

A.   -- about the case regardless.

THE COURT:  Wait.  Wait.  Let him finish his answer before you start arguing with another question.

MR. STEWART:  All right.

THE WITNESS:  I mean, regardless of whether she knows what she is doing or not, she is going to make the decision about how to litigate it.

Q.   (BY MR. STEWART) Certainly.

And by the way, if they had discussions about who

to call and who to not to call, you already said that you weren't really a part of it, correct?

A.   These emails reflect my participation.  So if there were other discussions, I don't know.

Q.   Now, after the trial, you reached out to Ms. O'Connell and asked her how everything went, correct?

A.   Yes.

Q.   Did she ever respond?

A.   I think she did.

Q.   Okay.  Did you all ever have a substantive discussion about Dr. Gelbort and how the mental health mitigation went?

A.   No.

Q.   Did you ever read Dr. Gelbort's affidavit that he filed in the post-conviction case?

A.   Not recently.  I may have read it in 2021, but I have not reviewed it.

Q.   Well, are you aware that in the affidavit he says if he had been asked to do additional neuropsychological testing, he would have said they were unnecessary?

A.   That rings a bell.

        MR. LABOVITZ:  Objection to relevance, Your Honor.

THE COURT:  Overruled.

MR. STEWART:  Just a moment, Your Honor.  That's all I have.

THE COURT:  All right.  Any redirect?

MR. LABOVITZ:  Your Honor.  Court's indulgence.

THE COURT:  I'm indulgent.

MR. LABOVITZ:  Is this a good time for a break?

THE COURT:  Well, tell me how long you plan on taking.

MR. LABOVITZ:  Yeah, if I can just confer.  Maybe if we take a break I can confer with my co-counsel.

THE COURT:  I would rather finish this witness before we take a break unless it's going to be a very long redirect, which I would hope not.

MR. LABOVITZ:  All right.  Let me just confer with them for a minute.

THE COURT:  All right.

(Pause in proceedings.)

MR. LABOVITZ:  I would estimate 15 minutes max.

THE COURT:  Okay.  Well, let's go ahead and finish it up.

I would only encourage you not to replow the field that's already been plowed. There's not a jury here. You don't need to have the last word. It's all in the record.

MR. LABOVITZ: I'll try to context it up to Mr. Stewart's questions.

THE COURT: All right. Well, let's finish that, then we can likely be done with Mr. Freedman and let him go, which I'm sure he would appreciate.

**REDIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q. You were asked by the government as to whether you were a psychiatrist at the time of your advice and that you have subsequently gotten some additional education.

Can you just tell the Court, subsequent to your consultation on Mr. Fields' case, what degrees, if any, you have earned and when?

A. I have a Ph.D. in psychiatric epidemiology that I completed in 2014 at Columbia School of Public Health.

Q. When did you begin your Ph.D. program?

A. 2009.

Q. You were -- there was probably multiple exhibits where the government went through that showed that you had some concerns about hiring -- not hiring -- using Dr. Gelbort in cases.

You wrote a letter to your colleagues at the Resource Counsel Project. Sort of the general gist is that this is someone who is difficult. Is that a fair characterization?

A. Yes.

Q. "This" being Dr. Gelbort, not you.

Okay. So have you, in your consultations -- when you were consulting with the Capital Resource Counsel or working with the Capital Resource Counsel Project and consulting on federal capital trial cases, was it, you know, often would you encounter difficult defense mental health experts?

A. Frequently.

Q. And in those situations, would you still -- not every time, but would you still have occasion to advise the trial counsel, the appointed trial counsel that you were working with, that they should present that expert at trial nonetheless?

A. Yes. I mean, you know, part of the task is to figure out how to work with difficult people. So you have to figure that out, so you can get them on the stand and get the evidence out. Otherwise, what is the point of all of this, right?

Q. Have there been occasions where you have reviewed, as a consultant, you have reviewed mental health expert

reports and found that they contained, what you believed to be, mitigating evidence in a capital proceeding about mental health issues, such as brain damage, and you have advised counsel to call that expert regardless of any difficulties and finding them at a conference or what have you?

A.    Yes.

Q.    And why is that?

A.    I mean, you're trying to -- you have hired this person.  So unless you're going to hire somebody else to replace them and do it all over, and you have unlimited time and resources, in my cases that doesn't ever happen to be the case, so you have to figure out a way to get mitigating evidence in front of the jury so that the only thing they hear is not the government's aggravation.

They're going to hear the aggravation.  So if you can't figure out how to get your mitigation on, then you have failed to do your job.

Q.    Right.

I would ask you to turn to Defendant's Exhibit 154.  That's the email that has been the focus of your -- a lot of the cross-examination as well direct about your criticisms.  And I would like you to look at paragraph five.

Is that up on your screen, Doctor?

A.    Yes, it is.

Q.    And you were asked by the government about the pattern of behavior and, quote, He, being Dr. Gelbort, should not have -- should have tested for this, not guessed at it --

A.    Yes.

Q.    -- by virtue of prior behavior?

A.    Yes.

Q.    Were you telling Ms. O'Connell that Dr. Gelbort is guessing as to whether Mr. Fields has brain damage?

A.    No.

Q.    Okay.  What is the "guessing" referring to there?

A.    I mean, it's a snotty way, which right now I regret, of having said that he could have done more testing, more executive frontal lobe testing, that would have answered these questions better than just saying, Oh, look back in history.  He did this odd thing and that's probably frontal, right?

So it's not whether or not he's got brain damage or not.  It's about whether you can explain the behavior that he's saying, Oh, this is consistent.

As what I recall was, his report has a sentence that says something like, Oh, this is consistent with people who have frontal lobe damage.  That's really not

an explanation of anything, right?

I mean, that's not as helpful as he could have been.  So he should have gone and done more testing in my view.  I think that's clear in my 85 emails saying he should go do more testing, right, and he didn't.  And then he's reaching this conclusion about, Well, he's got these deficits that look just like other people with these deficits.

Well, I mean, that's the point in neuropsych is to not -- it's not a psychiatric evaluation where you're doing an interview of the person.  It is testing.  There are tests that get at these things.  I wish he had done more testing.

Q.   Okay.  You were asked by the government about how some advice to Dr. Woods that Dr. Woods would make his own decisions, correct?

A.   Yes.

Q.   Did you have any decision-making authority in this case on what experts to call at trial?

A.   No.

Q.   How about on what motions to file?

A.   No.

Q.   How about on what evidence to present at trial?

A.   No.

Q.   Now, you were asked some questions about Defense

Exhibit 184.  If you could turn to that.

Are you there?

A.    I am.

Q.    Oh, sorry.  So going towards -- or Mr. Stewart asked some questions about, we checked 25 -- "I don't want to be facing government testimony."

Can you go to the line above that, the fourth line from the bottom?  Does it say, quote, The thing I want to avoid is this:  My testing is clearly directed to frontal lobe impairment?

A.    Yes.

Q.    This is an email on June 10, 2005, from Julia O'Connell to you and Ms. Greenman.

A.    Yes.

Q.    What is your understanding of what Ms. O'Connell was talking about her, "my testing is clearly directed to frontal lobe impairment"?

A.    So, I mean, that's what the finding is, right, that there's frontal lobe impairment.

And her concern, which is common among lawyers who don't spend a lot of time doing neuropsych -- working with neuropsychologists is that you often get functioning that is that -- that varies, right?  I mean, there are some strengths and some weaknesses. That's what neuropsych is trying to tease out.

What she's saying is what I don't want is, he's got this one area of weakness, which is executive function, but he's got strengths in other areas and that's not the testimony that I want.  And the truth is that you get that in every case because people have some strengths.

But executive function is not the same as attention, right?  I mean, the impairments in executive function impair every day, in every decision, in every way in which somebody interacts in the world.  That's not true of all of the domains.

So you can test a hundred domains and see impairment only in executive functioning, that person may not be able to function in the world, and they could do great on all the other things.

So her point is -- I understand her point.  She does not want two days worth of testimony, Oh, he did great on this test.  He did great on this test, but it actually shows a lack of understanding of what executive impairment is.

Q.    Okay.  And you were asking questions about further executive functioning.  If you would take a look at Government's Exhibit 17.

And you were recommending what in your email of June 23 of 2005?  You were asking this, "DKEFS"?

A.   Yes.

Q.   What does that stand for?

A.   The DKEFS is the Delis-Kaplan Executive Functions System.

Q.   Do you know whether trial counsel asked Dr. Gelbort at any point before or after this email to administer the DKEFS to Mr. Fields?

A.   I don't believe so.

Q.   Do you know if trial counsel asked Dr. Gelbort at any point after your comments and recommendations to give any other test to Mr. Fields?

A.   I don't know.

Q.   Okay.  Could you take a look at Defense Exhibit 84?

A.   Yes.

Q.   Is this an email on June 3rd from Skip Gant to you and CC'ing Ms. O'Connell?

A.   Yes.

Q.   Do you see in the fifth line down -- Well, do you see that it's talking about Skip Gant had reached Dr. Gelbort that day in the morning?

A.   Yes.

Q.   But in the fifth line down, does it say -- well, the fourth line down.

     He said that he would be available for additional

frontal lobe-specific testing, and then he asked me what particular test I had in mind.  And, of course, I don't have that with me, the email that you sent me, and I couldn't remember the names of the test.

A.    Yes.

Q.    So at least as of June 3rd is it your understanding that counsel had not communicated what additional testing to get at frontal lobe-specific issues Dr. Gelbort -- they would want Dr. Gelbort to do?

A.    Yes.

Q.    And could you look at Defense Exhibit 85.

This is another series of emails.  Look at the middle part.  It's an email from Julia O'Connell to drgelbort@aol.com June 13, 2005.

Do you see that?

A.    Yes.

Q.    Do you see in the first line at the end it says, I know Skip called you a few years back to see if you might be willing to do a little testing if we thought it was necessary.

Is that what it says there?

A.    Yes.

Q.    Then if you go up to the top of that document, do you see Dr. Gelbort is responding to Ms. O'Connell on

696

6/14/05 and says on the second line, quote, As for more testing, not a problem. It would take some lead time if I don't have the test that you want in my office and have to order it. Let me know and good luck.

Do you know if Ms. O'Connell or Mr. Gant ever followed up and gave Dr. Gelbort a specific test to administer to Mr. Fields?

A. I don't know, but they never asked me again about what tests maybe we should ask him about.

Q. Okay. And I would ask you now -- you were asked some questions about Government's Exhibit 12. It was a seven-page document with multiple emails on it.

I would ask you to look at page six.

A. Okay.

Q. Maybe page five. Yes, okay.

So this is a composite exhibit, of course. But on page five of Government's Exhibit 12, do you see this is an email to you from Ms. O'Connell on July 5, 2005, and we mentioned this a little bit on direct and you were cross-examined on it. But you said that at least one of Dr. Price's tests, that he repeated one of the tests that Dr. Gelbort did, and did find damage on it. And you said one of those was possibly the -- one was the Category Test and one was the Trails Making Test.

A. Right.

Q.   Okay.  Did you ever tell Ms. O'Connell that there's a phenomenon in psychological testing called the "practice effect"?

A.   I don't remember whether I did.  It's not in this email.

Q.   At least in this email when you're saying that Dr. Price had repeated a test that Dr. Gelbort administered.

MR. STEWART:  Objection, Your Honor.  This is beyond the scope of cross.

MR. LABOVITZ:  He was --

THE COURT:  I don't recall any testimony on cross about the practice effect.

MR. LABOVITZ:  No, no, but he was asking him questions about --

THE COURT:  Do you just have one or two questions on this?

MR. LABOVITZ:  I have one more question.

THE COURT:  All right.

MR. LABOVITZ:  Thank you.

THE COURT:  If you just have one more question, then you can do it, and we'll move on.  But it is getting outside of the scope.

Q.   (BY MR. LABOVITZ) Do you know when Dr. Price did his testing of Mr. Fields in comparison to Dr. Gelbort?

A.    Not more so than after.

Q.    After?

A.    After.

Q.    Okay.  You don't know how soon after?

A.    I don't.  I don't remember.

MR. LABOVITZ:  Can I just consult one more second?

No further questions, Your Honor.

THE COURT:  All right.  Any recross?

MR. STEWART:  No recross.

THE COURT:  Thank goodness, okay.

Thank you, Mr. Freedman.  I assume that you're not going to be -- you don't intend to recall him?

MR. STEWART:  He will not be recalled, Your Honor.

THE COURT:  All right.  Mr. Freedman, you are excused.  Thank you, sir.  I appreciate it, sir.  Safe travels.

All right.  We are at 3:00.

Who do you intend to call next?

MR. LABOVITZ:  Dr. George Woods.

THE COURT:  George Woods.  Okay.  He's going to take a while, right?

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  Well, let's take our break now

then.  We'll come back and finish the day with Dr. Woods, and see how far we can get with him before we wrap up.  Maybe we can get done at least with direct and maybe cross.  Maybe all of it.  I'm going to be optimistic.

All right.  We'll take a break until 3:15.  We are in recess.  All rise.

(Recess taken from 3:00 p.m. to 3:19 p.m.)

THE COURT:  All right.  Be seated.  We're back on the record.  All counsel are present.

Defendant ready to call its next witness?

MR. LABOVITZ:  Yes, Your Honor.  Petitioner calls Dr. George Woods.

THE COURT:  Dr. Woods, if you would come forward.

All right.  If you'll place the witness under oath.

COURTROOM DEPUTY:  Do you solemnly swear that the answers that you will give before this honorable court will be the truth, the whole truth, and nothing but the truth, so help you God.

THE WITNESS:  I do.

THE COURT:  All right.  Dr. Woods, please be seated.

I would just advise you when you sit down, you

need to bring that microphone to you or lean into it because it doesn't pick up very well.

THE WITNESS:  Thank you very much.

THE COURT:  All right.  Mr. Labovitz, you may begin your examination.

*GEORGE WOODS, M.D.*

having been first duly sworn, testifies as follows:

**DIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q.   Good afternoon.  For the record can you, please, state and spell your name?

A.   Sure.  Hold on one second.

Can you hear me?

THE COURT:  Yes.

THE WITNESS:  Okay, great.  George Woods, G-E-O-R-G-E  W-O-O-D-S.

Q.   (BY MR. LABOVITZ) And what is your current occupation?

A.   I'm a physician specializing in neuropsychiatry.

Q.   And what is neuropsychiatry?

A.   Neuropsychiatry is the subset of psychiatry that looks at how the brain is a part of psychiatric disorder.

Q.   And you said -- are also -- you said a subset. Are you also a psychiatrist?

A.   I am a psychiatrist.

Q.   What is the difference, if any, between the practice of, you know, psychiatry and neuropsychiatry?

A.   I think that the practice of neuropsychiatry focuses more on the medical aspects of psychiatry as it relates to neurology.  But even as it relates to other things like the gut.  Other medical issues that impact psychiatric illness.

Q.   And specifically with respect to neuropsychiatry, does that examine the relationship between brain functioning and behavior?

A.   That's a significant part of it, yes.

Q.   Can you detail that a little bit more?

A.   Sure.  We know that brain function is a significant part of the manifestation of behavior.

    How one's brain is working impacts your ability to adapt and impacts your ability to problem solve.  It impacts your ability to remember.  And so consequently the health of the brain really is an important factor in how you're able to function in society both independently but also within the social realm.

Q.   And you mentioned that neuropsychiatry, at least the way I interpreted it, goes beyond the brain.

    You mentioned the gut, but does it -- there is a focus at least on this brain behavior/brain

functioning.

A.   Yes.  The reason I say that is because we are finding, as opposed to the brain being the final common pathway, we're finding that other organs, and their impact on the brain are also equally important.

So over time we're understanding that the brain is really more than the final common pathway, but it is where there are multiple connections with other parts of the body that also influence behavior.

Q.   How long have you been a practicing psychiatrist?

A.   Since 1982.

Q.   Where are you licensed to practice medicine?

A.   I'm licensed to practice medicine in Oakland, California, is my basis, but I'm licensed in other states as well.

Q.   I'd ask you to take a look at Defendant's Exhibit 199.  Hopefully, it will show up on your screen right there.  We can scroll through if you want.  It's a 27-page document.  We can just kind of scroll through.  I just want to see if you recognize it.  Let me know if and when you recognize this document.

If you need to start on page one again, we can do that.

A.   Sure.  Yes, I'm just trying to get to the last page here to determine -- yes, this is my most recent

CV.

Q.    And does this curriculum vitae that's Defense Exhibit 199 accurately -- well, let me ask you this: You said this is your most recent.  So this is from February of this year.  Are there any updates to your CV that are relative to your education, training, professional experiences, things like that?

A.    I just did two trainings, perhaps two weeks ago on neuropsychiatry, but I don't think that they would add anything to it.

Q.    Is this CV that's in the exhibits, does that accurately, for the most part, reflect your education, training, professional experience, presentations, and publications?

A.    Yes.

Q.    Can you describe for the court your educational background?

A.    Sure.  I went to Westminster College in Salt Lake City, Utah.  I graduated in 1977.  I then sold computers for IBM for about four or five years.  And after that period of time, I came back and went to medical school.  I'm sorry.  I take that back.  I graduated from Utah in 1969, and then I left and sold computers for IBM, then I went back to medical school in 1972.

I finished the University of Utah in 1977.  I then went to Highland Hospital and did an internship, a straight medical internship.  I then left Highland and did a psychiatric residency at Pacific Presbyterian. In my last year, I was chief resident.

I then left Pacific Presbyterian and did fellowship in geriatric psychopharmacology with the National Institute of Mental Health and the American Psychiatric Association.

Q.   During your residency that you talked about, would you have received any specific training or specialized training in neuropsychiatry or if it wasn't at your residency -- during your residency, do you have specialized training in neuropsychiatry?

A.   Yes.  I did specialized electives at Kaiser Hospital and also the University of California, San Francisco, in neurology.  And I did that for three -- off and on for three years.

Q.   Have you had any appointments as a doctor at any hospitals?

A.   Yes.  Let me start current and work back.

I'm currently the Chief Scientific Officer for Crestwood Behavioral Health.  Crestwood Behavioral Health is a 30-facility organization in California.  We serve 7,000 people.

MR. WILSON: Objection. It's non-responsive, Your Honor.

THE COURT: Overruled. If we can speed up through the background. I don't know if there's going to be any objection to the qualifications that this person is an expert.

MR. LABOVITZ: Yeah, I'm just trying to make a record.

I'll try to speed things up, Your Honor.

THE WITNESS: And I am the research arm of that organization.

Prior to that, I held positions at various hospitals, Doctor's Hospital in California, for Noah, California. I've held positions at Pacific Presbyterian Hospital in San Francisco, California. But I've not been hospital based at Crestwood for probably the last ten years.

Q.    (BY MR. LABOVITZ) Are you a member of any professional organizations relevant to neuropsychiatry?

A.    Yes.  I'm a member of the International Neuropsychology Association, which is a neuropsychological association, but I'm also a member as a neuropsychiatrist.

I'm a member of the International Academy of Law and Mental Health. I'm actually the president of the

International Academy of Law and Mental Health, and we have a subsection on neuropsychiatry.

I think those would be the two most relevant.

Q. Do you have any current academic appointments?

A. Yes. I am an adjunct professor at Berkeley Law. I've been at Berkeley, this is my eleventh year. I'm currently on sabbatical since 2023. But I've been there for 11 years, and I teach mental health and the law.

Q. Are you board certified in psychiatry?

A. I am.

Q. What about neuropsychiatry?

A. I am not.

Q. Okay. With respect to board certification, what does that mean?

A. The board certified in 1992. The board certification in psychiatry is 70 percent psychiatry, 30 percent neurology, and so the board certification in psychiatry is really a step that is aimed at academic teaching or research. I consider it to be, particularly psychiatry, to be an important board.

Q. Can you describe the nature of your current medical practice?

A. Sure. I have a clinical practice. I see people. I see people three days a week. I have a research

practice.

Within that research practice, I am consulting to all of our facilities. We serve at Crestwood seriously mentally ill people. Most of our facilities are locked facilities. Approximately 80 percent of our people are -- of those we serve are what we call gravely disabled, they have been conserved by the State of California.

So I consult with -- we have 140 providers, nurse practitioners, as well as psychiatrists, as well as internists, and I do the peer review for that organization, run the peer-reviewer committee as well as consult on any problematic cases that occur.

In addition, we are developing research articles on polypharmacy. We're developing research articles on medications that may impact things like diabetes or hypertension, what is called the metabolic syndrome for antipsychotics. We're looking at specific antipsychotics like clozaril, a very potent antipsychotic, but we're also looking at the impact of diet on it, so we're doing research as well.

Q.   Okay. And this case that we're here for today, a forensic matter. I imagine that you do other forensic work?

A.   I do.

Q.   Can you just tell the court what is the breakdown
in your practice of forensic work versus clinical work?

A.   Sure.

Q.   Versus research, I guess, too.

A.   Sure.  Forensic work is probably about 30 percent
of my practice.  Within that context, the majority of
it is civil, and within that context it's primarily
employment law, the other is criminal.  And at one time
it was a much larger percentage than it is currently.
But my criminal practice has primarily been habeas but
also some pretrial as well.

Q.   Does your clinical practice inform your forensic
work?

A.   Yes.

Q.   Can you describe that?

A.   A clinical practice allows you to see the range of
psychiatric disorders.  It allows you to see the person
that may have significant impairments and yet is
functioning quite well in certain areas.  But it also
allows you to see that person that may have
vulnerabilities and may not be doing as well or maybe
doing poorly, even though there may be what appears to
be very little wrong.

     So it's really important to have a clinical
practice so that you're seeing people and you're seeing

the range of possible manifestation of psychiatric wellness as well as psychiatric health.

That isn't always the case in a forensic setting and so it's important to be able to bring that depth and breadth of expertise into a forensic environment.

Q. Dr. Woods, have you been qualified to testify as an expert witness in a criminal case before?

A. Yes.

Q. Okay. Can you estimate how many, or do you even know maybe, but how many times have you been qualified in court as an expert in a criminal case? You mentioned habeas trial or in any case.

A. I really stopped count at about 500. I've been doing this since 1992.

Q. Does that include state and federal courts?

A. Yes.

Q. Does that include here in this court in the post-conviction proceedings of the *United States of America v Kenneth Barrett*?

A. Yes.

Q. Does your qualification as an expert include other capital cases besides Mr. Barrett's case?

A. Yes.

Q. And have you always testified for the defense or do you testify for prosecution as well as in criminal

cases?

A.   I've never been asked to testify for the prosecution.  I would be more than willing to, but I never have been asked.

Q.   Now I want to ask if you recall being retained by the defendant team at the trial or in the pretrial stage in the case of *United States of America v Edward Fields*, that was here in this -- that was tried here in Muskogee?

A.   Yes.

Q.   And if the records in trial counsel's file indicate that the defense formally retained you as an expert on May 1, 2004, would you have any reason to dispute that?

A.   No.

Q.   If the transcript from trial indicates that you were qualified at trial as an expert in psychiatry, would you dispute that?

A.   No.

Q.   A few more qualification questions.  Have you ever been retained by the defendant, but in a criminal case, told them after your review, I cannot give you an opinion that would be helpful to the position that you're seeking?

A.   I actually testify in about 11 percent of the

cases that I'm asked to consult on.

Q.   Have you ever been offered as an expert in neuropsychiatry and not been qualified by the court to testify?

A.   No.

MR. LABOVITZ:  At this time, Your Honor, the defense offers George Woods as an expert in neuropsychiatry.

MR. WILSON:  No objection, Your Honor.

THE COURT:  All right.

THE WITNESS:  Thank you.

THE COURT:  The witness is so qualified.

Q.   (BY MR. LABOVITZ) Dr. Woods, we discussed very briefly how trial counsel for Mr. Fields hired you prior to the trial here.

Did the federal public defender office in Philadelphia also hire you in connection with Mr. Fields' post-conviction case, the current matter?

A.   That's correct.

Q.   Did they send you some materials for your review and ask you about your involvement in the case at trial?

A.   Yes.

Q.   If you could take a look at Defense Exhibit 119. This is a three-page document.  If you can just take a

look at that to see if you can recognize it.

A.   I do.  Hold on.  So I'm having trouble moving it, scrolling.

I got it, okay.  Yes.

Q.   Dr. Woods, we can control for you, but apparently you're not able to move the exhibit --

A.   Oh, okay.

Q.   -- at your seat there.  So if you need to look at other pages, let us know.

A.   I would like to review it, yes.

Q.   What is Defense Exhibit 119?

A.   This is a declaration that I did in 2010, I believe.

Q.   If you turn to page three of the declaration.

Is that your signature there?

A.   Yes.  I have it on page four but, yes.

Q.   Is it dated March 28, 2010?

A.   That's correct.

Q.   Is everything in that declaration true and correct to the best of your knowledge?

A.   Yes.

Q.   Are the opinions that you gave in this 2010 declaration to a reasonable degree of neuropsychiatric certainty?

A.   That's correct.

Q.   Did the office, the Federal Public Defender Office, in Philadelphia contact you more recently and ask you to submit a supplemental declaration in connection with your work on the case?

A.   That's correct.

Q.   Do you know why that was?

A.   My understanding is there had been some further developments, some testing that had been performed, and they wanted me to take a look at that.

Q.   Okay.  I'd ask you to take a look at Defendant's Exhibit Number 242.  This is a four-page document.

We'll just scroll through it, and let us know if you have had an opportunity to review this.

A.   Yes.

Q.   And this -- this has 20 paragraphs, do you see on page four?

A.   Yes.

Q.   But on that same document?

A.   Yes.

Q.   On page four is that your signature at the bottom there?

A.   Yes, it is.

Q.   And is the date May 22, 2024?

A.   Yes, it is.

Q.   And go up to paragraph four a minute.

Do you see that it says, I have reviewed the following additional materials?

Is it in paragraph four on page one?

A.   Yes.

Q.   Is that what you're referring to that you believe that there have been some additional information that was brought to your attention by the lawyers representing Mr. Fields?

A.   That's correct.

Q.   Is everything in this 2024 declaration true and correct to the best of your knowledge?

A.   Yes.

Q.   Are the opinions in your 2024 declaration to a reasonable degree of psychiatric certainty?

A.   Yes.

Q.   All right.  I'll try not to jump around temporally too much, but now I want to go back to your work on the trial and the pretrial.

So do you recall if trial counsel provided you with materials as part of your review of the case that would be relevant to or related to Mr. Fields' background, family history, work experience, medical history, things like that?

A.   Yes.

Q.   Okay.  Did you review those materials?

715

A.   I did.

Q.   I would ask you to go to Defense Exhibit 65, and take a look at that.  And this is a, I believe, a ten-page document.  So if you would slowly, you know, scroll through that and see if you recognize that document.

A.   Okay.  Can we start at the top?  Thank you.

Okay.  Next, please.

Next one, please.

Next, please.

Next, please.

Next, please.

Next, please.

Next, please.

Next, please.

Thank you very much.

Q.   Do you see on page ten there's a signature above the typed "George Woods, M.D."?

A.   I do.  It has deteriorated over time.

Q.   Do you recall if that was your signature style?

A.   I do recall.  That is my signature.

Q.   Okay.  But you use this as -- well, do you recognize this document, Defense Exhibit 65, as the trial report that you prepared?

A.   I do.

Q.   If you go back up to page one of this exhibit. I'd ask you to take a look at paragraph two.

Does that begin with, I have reviewed pertinent police records of the offense?  Do you see that?

A.   I do.

Q.   Does it also list other materials about the case and Mr. Fields that you reviewed?

A.   Yes.

Q.   Did the office, the Philadelphia Defender Office, you mentioned a little bit in Exhibit 242, did that office also provide you with background materials regarding Mr. Fields and his case?

A.   That's correct.

Q.   And just -- I think it's clear, but exhibit, Defense Exhibit 242, page one, paragraph four, does that list 18 items, plus a protective order relevant to this case and raw data?

Do you see that?

A.   Yes.

Q.   So the 19th item is just a protective order, but would you agree that the first 18 items are information relevant to the case?

A.   Yes.

Q.   All right.  And those are -- I won't read those to save time, but those -- one through 18 are detailed and

717

described accurately in paragraph four of your 2024 declaration?

Why don't you look at paragraph four and just make sure that those are documents that you were provided back in May that accurately reflects that.

A.   Yeah, they are.

Q.   Did you review --

A.   Wait.  Wait.  Wait.

Q.   Did you review those materials listed in paragraph four of your 2024 declaration?

A.   I did.

Q.   Did you review the materials listed in paragraph two, page one of your trial report?

A.   Yes.

Q.   Do you recall that subsequent to you signing this supplemental declaration back in May of this year, that I provided you with some additional materials to review via email?

A.   Yes.

Q.   Would that, if you recall, would that have included Mr. Fields' pretrial --

MR. WILSON:  Objection, Your Honor, it's leading.  If we can ask questions.

Q.   (BY MR. LABOVITZ) Okay.  What did -- what did I provide you via email most recently?

A.   Most recently.  I don't recall what was provided most recently.  I do recall a copy of my notes that you provided, but I don't recall the other material.

Q.   Okay.  Are you aware that the government has provided reports from three experts?

A.   Right.

Q.   Dr. Arambula, Dr. Seward, and Dr. Shimony all within recent time?

A.   That's correct.

Q.   In post-conviction?

A.   That's exactly right.  Sorry.

Q.   Would that have been whether it was given to you in this most recent email from me or not, but have you reviewed the government's expert reports from the post-conviction proceedings?

A.   Let me understand because there was Dr. Seward, there were two reports by Dr. Arambula, if I'm correct.

Q.   Yes.

A.   And there was another report, a neuroradiologist report if I remember correctly.

Q.   Would that be Dr. Shimony?

A.   Right.

Q.   If Dr. Arambula, Dr. Seward, and Dr. Shimony each had two post-trial reports, would you have reviewed all of those reports?

A.    I did.

Q.    Is it important to look at materials about Mr. Fields' background in conducting a forensic neuropsychiatric evaluation?

A.    Yes.

Q.    Why is that?

A.    The social history of environmental information is often the most scientific information that one has, because a person is interacting with their environment. And so it's important that you understand how that interaction works.  You can't evaluate someone independent from their environment.

So being able to look at that social history over time allows you to gain some understanding.

Similarly, be able to have some history, for example, of family; gives some clues of possible vulnerabilities that person may or may not have in terms of medical or psychiatric disorders.

So it's not valuable always to look at someone independent of their history.  Their history gives you a much richer understanding.

Q.    Are the background materials, the social history materials that you have been provided and reviewed regarding Mr. Fields, both that you got from trial counsel, as well as that were provided by the federal

defender office in Philadelphia and myself, are those the types of materials that are reasonably relied upon by neuropsychiatrists, such as yourself, in forming opinions on issues of forensic inquiry?

A.    Yes.

Q.    And did you rely on the documents and materials that you reviewed when reaching the opinions about which you will be testifying here today?

A.    I did.

Q.    All right.  Let's go back again to pretrial times.

You said, as is reflected in your report, that trial counsel -- let me ask you, first of all, who were the trial counsel for Mr. Fields that you had contact with?

A.    Mr. Gant and Julia.  I'm blocking on her last name.

Q.    Okay.  Let's talk about Mr. Gant.  Is that Isaiah "Skip" Gant.

A.    Exactly.

Q.    And then Julia, would that be Julia O'Connell?

A.    That's correct.

Q.    And they would be the ones that would have provided you background materials pretrial?

A.    That's correct.

Q.    And you said that you reviewed those materials.

After you did that, did you recommend to trial counsel that Mr. Fields undergo --

MR. WILSON:  Objection, Your Honor, leading.

THE COURT:  Overruled.

Q.   (BY MR. LABOVITZ) After you made that review of the background materials that trial counsel provided to you regarding Mr. Fields, did you recommend to counsel that Mr. Fields undergo neuropsychological testing?

A.   Yes.

Q.   Why did you do that?

A.   Well, two reasons.  First, my pattern and practice has been to recommend neuropsychological testing.

And, second, one of my impressions was that Mr. Fields may be suffering from a mood disorder. There was significant history in his family and with him.  And it's very important to understand the cognitive aspects of mood disorders, as well as the emotional aspects, and those could be examined in neuropsychological testing.

Q.   Okay.  Let me just back up a second.  What is -- what is a "mood disorder"?

A.   A mood disorder is a disruption of emotions, sadness, depression, or hypomania.  Hypomania is moving faster, sleeping less, needing to eat less, but not necessarily moving into alterations of reality.  Mania

can be not sleeping, not eating, and really having alterations of reality and cognition.

So a mood disorder is really designed to look at impairments of emotion as opposed to a thought disorder, which is designed to look at impairments of thinking.

Q.   What in the records -- I am sorry.  From your review of the records what -- you said that you had an impression that Mr. Fields had a mood disorder.

Is there a specific mood disorder that you reached an impression about from your review of the records?

A.   You mean just at the time of reviewing the records?

Q.   Yes.

A.   No.  No.  I really was looking at what we call a differential diagnosis.  There are multiple mood disorders.  And I was really looking at the range of possible mood disorders.

Q.   Okay.  Maybe I didn't phrase my question very clear.

You said that you recommended neuropsychological testing.  One, because it is your pattern and practice, but you're drilling down specifically to Mr. Fields.

I wrote down that you said that there was an impression from the records that he had a mood

disorder.  So can you just tell what in the records suggested that Mr. Fields had a mood disorder?

A.   Okay.  So that's a little bit of a different question.

Q.   Yes.

A.   Okay.  The records, number one, reflected a history of depression and a potential history of depression in the family.  The records also reflected a history of what we would call negative symptoms, problems with motivation at times, but doing well within a structured environment.

The records also reflected periods of anger, but also periods of suicidality.  So, and the records also reflected some treatment with antidepressants.  So that was what I was looking at in terms of my impression.

Q.   And I believe you said it's in your opinion that neuropsychological testing can help to understand more about mood disorders?

A.   Yes.

Q.   Why is that?

A.   Because there are certain mood disorders that have -- what are called "cognitive symptoms."

Cognitive symptoms are ways of your brain working:

Problem-solving;

Sequencing;

What we call working memory, that memory that you need to kind of hold things in one place while you're working on another, another problem;

Verbal learning, being able to learn things directly through language.

Not all mood disorders reflect these cognitive symptoms.  Mild mood disorders, like what we call dysthymia, don't really reflect these types of cognitive symptoms.  But there are other types of mood disorders, like bipolar disorder, where cognitive symptoms are a component of their -- of the picture.

Q.   All right.  And, just for the record, can you spell -- you know, I have no idea, "dysthymia"?

A.   Dysthymia is "I'm having a bad hair day."  Dysthymia is this very mild depression, things are not going quite the way that you want during the day.  You know, you missed your ride.  But it happens often enough that it kind of brings you down.

Q.   Okay.

A.   It doesn't necessarily give you what are called neurovegetative signs.

Q.   I just wanted to make sure the record is clear, can you just spell that?

A.   Sure.  D-Y-S-T-H-Y-M-I-A.  I'm sorry.

Q.   Can you explain things like working memory, verbal

learning, but I wrote down that you mentioned sequencing.

A.    Right.

Q.    Something that you would be interested in.

Can you define sequencing within the context of psychology and psychiatry?

A.    Sure.  Sure.

When we talk about sequencing it's the ability to move from one task to the next in the appropriate manner, to not necessarily get waylaid.  But if you have multiple tasks that you have to do to move through them in a way that allows them to be complete and accurate.

Q.    If you -- well, let me ask you this:  Do you have -- my understanding is a medical doctor, such as yourself, is not generally one to administer neuropsychological testing, right?  There's ethical and professional certain things, but do you have experience with -- have you learned about what kinds of tests neuropsychologists can administer?

A.    Yes.

Q.    Do you have any experience with that?

A.    Sure.  Most psychiatrists do not administer neuropsychological testing unless they have chosen to get a Ph.D. in psychology.  But if I could explain that

relationship.

Q.   Yes, please.

A.   So you come into your doc and you're having certain complaints and your doc does an examination and they say, Well, you know, I'm going to get some labs on you.  I think these are the labs that you need.

And so you go to the lab and you get your labs.

Well, your doctor doesn't know how they did those tests necessarily.  They don't know necessarily the algorithms or the laboratory techniques, but they are able to interpret the findings of those tests.

So it's been important for me to understand the interpretation, not the administration.  I don't -- I shouldn't say that.  There are screening instruments, the Montreal cognitive assessment that I'm actually certified to give, but I'm not certified to give neuropsychological tests.

But I have taken the time to understand and interpret those certain tests in order to help my patients.

Q.   Is it standard in your field to rely upon a neuropsychologist to do the actual neuropsychological test administration in forensic cases that you work on?

A.   That's correct.

Q.   Do neuropsychologists, such as yourself, then

routinely rely upon the results of that neuropsychological testing in forming opinions on the issues in the forensic cases that work on?

A.   I think that you said "neuropsychologist," but you meant "neuropsychiatrist."

Q.   I apologize.

Do neuropsychiatrists then rely upon the results of the neuropsychologist testing in forming opinions on the neuropsychiatric issues --

A.   That's correct.

Q.   -- that you deal with in forensic cases?

A.   That's correct.

Q.   Okay.  I'd ask you to take a look at Defense Exhibit Number 47.

Do you see that, Dr. Woods?

A.   Yes.

Q.   This is an email from -- I would ask you to take a look at the middle.  It says, "Original message from JuliaO'Connell@fd.org to gloris@inquisitorinc.com."

At the top it says, "Glori Shettles."

Do you know who Glori Shettles is?

A.   I do.

Q.   Is this an email from Ms. O'Connell to Ms. Shettles?

A.   Yes.

Q.   And if Ms. O'Connell says that she --

MR. WILSON:  Objection, Your Honor.  This witness cannot testify about it.  That's an email he's not a party to it, so I'm going to object to this witness's ability.

THE COURT:  Well, let's see what the question is and then we'll go from there.

Q.   (BY MR. LABOVITZ) Yeah.  If the email says that Dr. Woods --

MR. WILSON:  Objection to the form of the question, Your Honor.  He's going to start reading the email.  I would object.

MR. LABOVITZ:  Okay.  That's fine.

THE COURT:  Yeah.  It's sustained.  If you have a question about what he knows, that's fine, but interpreting other people's emails is a little challenging.

MR. LABOVITZ:  All right.

I'm just honestly, Your Honor, just trying to establish the timing a little bit, but we can do that with Ms. O'Connell when she testifies.  I guess, you know they had a date and it says that Dr. Woods was confirming with Ms. O'Connell about neuropsychological testing, which I'm just trying --

THE COURT:  Now, he's testifying.

MR. WILSON:  It's improper.

MR. LABOVITZ:  I'm sorry, Your Honor.

THE COURT:  Look, ask questions, but not out of this email.  He's not a party to it.  I don't know how that's going to be.  I know what you're trying to do, but I just don't think this is the email to use to do it.

Q.   (BY MR. LABOVITZ) But we did talk about that you recommended Mr. Fields undergo neuropsychological testing.  At that time, do you know if trial counsel had hired a neuropsychologist prior to your recommendation?

A.   I don't.  I didn't.

Q.   Okay.  Do you know whether, after you made up your recommendation -- well, let me ask you this:  Do you have any recollection of approximately -- we said that you were retained around May 1, 2004, do you have any recollection of when you would have made that recommendation for neuropsychological testing?

A.   Probably after the review of the materials.

Q.   And do you know if counsel for Mr. Fields did, in fact, hire a neuropsychologist to administer neuropsychological testing to Mr. Fields?

A.   Yes.

Q.   Okay.  Do you know who that was?

A.   Dr. Gelbort.

Q.   Do you know when Dr. Gelbort went to visit with Mr. Fields to administer neuropsychological testing to him?

A.   I believe it was about August of 2004.

Q.   If Dr. Gelbort's report, that's an exhibit here, reflects it was August 11 of 2004, would you have any reason to dispute that?

A.   No.

Q.   Did you speak with Dr. Gelbort before he administered his test to Mr. Fields to ask him what tests he planned to administer?

A.   No.

Q.   Do you know why you did not do that?

A.   Because I wouldn't do that.

Q.   Why would you not do that?

A.   Because he's the neuropsychologist, and I would not make recommendations to him about what tests he should be doing.

Q.   If there are emails that have been exhibits in this case where trial counsel O'Connell, Ms. O'Connell, is representing that her understanding that you and Dr. Gelbort would talk before he did his testing, do you have any knowledge about that?

A.   About the emails?

Q.    No.  No.  Just do you have any recollection of Ms. O'Connell telling you to call Dr. Gelbort before he did his testing?

A.    I don't.

Q.    And so if there was an email about that, you would not know why Ms. O'Connell said that?

A.    There is a tendency for those that don't understand the relationship between neuropsychiatry and neuropsychology or psychiatry and psychology to believe that the psychiatrist directs the testing.  That is not accurate.

The psychologist directs his testing or her testing.

Q.    Do you have any recollection in this case where you explained that to Ms. O'Connell?

A.    I don't recall that conversation coming up, so I don't recall explaining that to her.

Q.    Were there certain areas of brain functioning, or rather, were there certain areas of functioning that you thought would be important to target in the neuropsychological testing?

A.    Yes.

Q.    Can you detail that?

A.    Sure.  If we're looking at a differential diagnosis and differential diagnosis is really, is it

this or is it that, then you would look at executive functioning difficulties, difficulties weighing and deliberating, difficulties, perhaps sequencing, deep difficulties with social expectations, difficulties with working memory.  Working memory is, as I have mentioned, is the immediate memory holding on to things, which moves you much more toward a bipolar diagnosis if those are found.

If you are looking at other types of memory, it might move you more toward a major depressive disorder, so that's why you want to be able to get an array.

Q.   I used the term "areas of functioning," would an expert such as yourself perhaps use a term like "neurological domains"?

A.   Yes.

Q.   Would you have suggested particularly psychological tests to Dr. Gelbort that he should administer as part of his battery of tests?

A.   No.

Q.   Why not?

A.   Because Dr. Gelbort is the expert in that area.

Q.   Now, do you recall that you -- after looking at background materials, after talking about getting a neuropsychologist involved in the case that you went -- actually, you came out here to Oklahoma and you

visited with and evaluated Mr. Fields in person?

A.    Yes.

Q.    Do you have any recollection of the dates of that?

A.    I think it was October 24th and 25th.

Q.    Okay.

A.    And maybe again in November.

Q.    Okay.  If I showed you your trial report that contained the dates, would that help to refresh your recollection?

A.    Yes.

Q.    Can you take a look at Defense Exhibit 65.

In the first paragraph on page one, can you look at that first paragraph, read that to yourself and then I'll ask you a question.

A.    I was off a couple of months, right.  August 24th and 25th, and October 9th.

Q.    Okay.  So does that -- reviewing that refresh your recollection that your first visit with Mr. Fields was August 24 and 25, 2004?

A.    Correct.

Q.    Focus -- and then it sounds like you went back in October.

A.    That's correct.

Q.    But we'll talk about that.

Let's focus on the first visit in August in 2004.

What did your visit with Mr. Fields entail at that time?

A.    My first visit with Mr. Fields, really is -- I try, for most of my first visits to be, to develop some type of rapport.  So they were really more about his history, his current experiences in the jail, some medical history.  Really just trying to make him comfortable so that I could come back again.

Q.    At that first visit over those two days, do you already have an intention to come back again to see Mr. Fields?

A.    If possible.  My pattern and practice is to try to see someone at least twice at different monthly intervals because you can have a change in mental state.

Q.    Is there anything that would you cause not to come back for a second visit with a criminal defendant as part of a neuropsychiatric evaluation?

A.    If there was a wealth of material that provided really the basis for all the information, for example, if the question was:  Is this person intellectually disabled, for example, and I had school records and IEP and family history, et cetera, then that might be a time that I would not come back.

Q.    Can you describe the difference between that first

assessment that you conducted of Mr. Fields in August of 2004, and what you were understanding the neuropsychological assessment of Mr. Fields that you recommended trial counsel would entail?

I'm just trying to make clear, like you recommended the neuropsychological assessment, then that was done, but you still went to see Mr. Fields.

What are -- can you just describe the difference in what those two, you know, Dr. Gelbort was getting at versus what you're getting at?

A.    Got it, okay.  It depends.

In many situations a neuropsychological expert may not be asked to opine on the legal question.  They might just do the testing.  And in that same sense, they may not have the depth and breadth of social history that I would have.

Similarly, a neuropsychologist may not utilize the neuropsychological testing as underpinning of a psychiatric diagnosis.  They may just see the function or dysfunction but not necessarily tie it to a specific psychiatric diagnosis.  That would be my role.

Q.    After your initial evaluation or visit, let me call it, after your initial visit with Mr. Fields in August of 2004, were you able to reach a conclusion, firm conclusion, about any mental health condition that

Mr. Fields might have?

A.    After my initial evaluation?

Q.    Yes.

A.    No.

Q.    Why not?

A.    It was too early.

Q.    In what respect was it too early?

A.    Psychiatric diagnoses are complex, and it's certainly true in the forensic setting.  So I try not to come to firm diagnostic categories.  I really try to develop a differential diagnosis, and then over time whittle it down if possible.

Q.    Okay.  As of August 24th or August 25, 2004, had you learned of the results of Dr. Gelbort's neuropsychological testing?

A.    I don't recall.

Q.    Would you want to know more about that before you formed a final opinion about a forensic matter?

A.    Yes.

Q.    Would that have been part of the reason that you asked counsel to get those psychological testings?

A.    That's correct.

Q.    Why would it be important to your final opinion or conclusion in this case -- again, going back to the pretrial to have waited for the results of the

neuropsychological testing before reaching your opinions?

A.   Well, because it can provide, as I said, input into the difference or diagnoses, for example.  It can provide input and create even other diagnoses.  For example, Mr. Fields had had what appeared to be a history of head injuries.

MR. WILSON:  Objection, Your Honor.  That's non-responsive to the question.

THE COURT:  Sustained.

Dr. Woods, if you can just try to constrain your answer to the question asked.

THE WITNESS:  Okay, Your Honor.  I'm sorry.

THE COURT:  Sometimes it's not easy, I understand.

Q.   (BY MR. LABOVITZ) Did you ever tell Mr. Fields' trial counsel that the results of the neuropsychological testing that Mr. Fields -- by Dr. Gelbort that, you know, was done in August of 2004 -- that that would not be relevant to you in forming your opinion?

A.   No.

Q.   If records in this case indicate that you learned, you first learned, about the results of Dr. Gelbort's testing, not necessarily a final report, but you

learned something about what he had uncovered during his testing in August of '04, if you learned about that approximately August 26, 2004, soon after you visited with Mr. Fields for the first time, do you have any reason to dispute that timeline?

A.   I don't recall learning that.  I don't have any reason to dispute that timeline.

Q.   Do you have any recollection that when you went to see Mr. Fields the first time on August 24 and 25, you knew the results of Dr. Gelbort's testing?

A.   I don't recall having the results of Dr. Gelbort's testing.

Q.   Once you did learn, again not a final report, but once you learned what Dr. Gelbort's testing of Mr. Fields showed from the neuropsychological standpoint, what was it that you were told about Dr. Gelbort's testing?

A.   Well, that he had completed the testing.  And I don't recall Ms. O'Connell telling me anything about the testing, so I'm not sure about your point.

Q.   And what about -- what did you learn, again sort of trying to focus in on this August of 2004, after you see Mr. Fields, do you recall learning any substantive information about the results of Dr. Gelbort's testing?

A.   I don't recall the time frame.  I did eventually

receive information from Dr. Gelbort.

Q.   And what was that information that you received from Dr. Gelbort?

A.   That he had completed the testing, and that in his impression -- in his opinion there were some relevant findings.

MR. WILSON:  Your Honor, I object.  Is there some sort of timeframe as to when this interaction took place?

THE COURT:  Well, it would be helpful, but that's the way the question was asked.  Overruled.

Q.   (BY MR. LABOVITZ) Okay.  I will ask you to take a look at Defendant's Exhibit 146.  And I would ask you to go to page 21, and I'd ask you to review the paragraph that begins with "g."  Do you see that, Dr. Woods?

A.   I'm reading it.  I'm reading the whole thing. Hold on a minute.

Q.   Well, if you want to go up a page, you can get a little more context of this.

Would that help you?

A.   Yes.  That would help me.

Q.   Okay.  We can go up one page.

A.   Okay.

Okay.  Next page, please.

Okay.

Q.   Does your review of that, those two pages, refresh your recollection that you were told about the results of Dr. Gelbort's testing evaluation of Mr. Fields on August 26, 2004.

MR. WILSON:  Objection, Your Honor.  Counsel is testifying.  I'm objecting to the form to the question.

MR. LABOVITZ:  I'm asking him if this refreshes his recollection.

MR. WILSON:  Well, he's giving him the answer, so I'm going to object to leading.

Q.   (BY MR. LABOVITZ) Does that refresh your recollection --

THE COURT:  Wait.

Q.   (BY MR. LABOVITZ) -- the results of Doctor --

THE COURT:  Over --

Q.   (BY MR. LABOVITZ) -- Gelbort's --

THE COURT:  The objection is overruled.  You can ask the question.

THE WITNESS:  Yes.

MR. LABOVITZ:  And, Your Honor, just to move things along, this document, Exhibit 146, I would also -- I would move for its admission and I would request the Court to take judicial notice of it.  This

is a filing by Ms. O'Connell, as an officer of the court that she is representing that that's when the testing was done.

THE COURT:  I have a --

MR. LABOVITZ:  I don't think that she would lie in a pleading to the court.

THE COURT:  Well, I have document or Exhibit 146 as preadmitted.

Is my list wrong?

MR. WILSON:  No, Your Honor.  I believe that's on the list.

THE COURT:  Okay.  I thought I was careful. I have it checked off as preadmitted.

Is that consistent, Katie?  Do you have that?

COURTROOM DEPUTY:  Yes.

THE COURT:  All right.  We, at least, all have it as preadmitted.  So it's admitted.

MR. LABOVITZ:  Okay.

THE COURT:  You won that one.  Take your win.

MR. LABOVITZ:  It's good now.  All right.

Q.   (BY MR. LABOVITZ) So it sounds like that you had -- you say you had conversation with Dr. Gelbort about his neuropsychological testing.

What did you learn about the results -- I'm sorry. Let me ask you first, what did you learn about the

testing itself?  You said it was complete.  What do you mean by that?

A.   Well, I mean that the testing that he had done, he had completed it.  The testing that he planned on doing, performed, he had completed.

Q.   Did you form any opinion from talking to Dr. Gelbort on whether the neuropsychological tests that he administered to Mr. Fields were appropriate to address the areas of functioning or, you know, the neurological domains that you were interested in having tested?

A.   Yes, I believed that they were.

Q.   And I'd ask you to take a look at Defendant's Exhibit 179.  And I'd ask you to take a look at paragraph four that begins with "Dr. Woods was dismayed."

          MR. WILSON:  Objection, Your Honor.

     Again, this witness is not a party to this email, so I'm going to object.

          MR. LABOVITZ:  I have asked the question.  I'm asking after.

          THE COURT:  Well, let's see what the question is, then we'll decide if there is reason to object.

Q.   (BY MR. LABOVITZ) Can you take a look at paragraph four, Dr. Woods?

A.    Yes.

Q.    Does looking at that refresh your recollection as to what you told counsel for Mr. Fields about the testing that Dr. Gelbort administered?

MR. WILSON:  Objection to the form of the question, Your Honor.  Counsel didn't ask a question. The witness didn't say that he didn't remember.

THE COURT:  If you're trying to use this to refresh, we skipped a couple of steps in the chain here.

Q.    (BY MR. LABOVITZ) Okay.  Do you remember what you told Ms. O'Connell about whether Dr. Gelbort's testing was appropriate to address the domains that you were interested in testing?

A.    Yes.

Q.    What did you tell Ms. O'Connell?

A.    That it is.

Q.    And was that --

THE COURT:  Can we take this down now if we're not using it to refresh?

MR. LABOVITZ:  Yes, Your Honor.  You can take it down.

Q.    (BY MR. LABOVITZ) And why would you tell Ms. O'Connell that the testing Dr. Gelbort administered was appropriate for the areas that you were interested

in assessing?

A.    Because the testing that Dr. Gelbort administered answered -- helped me with my differential diagnosis.

Q.    After you spoke with Dr. Gelbort to discuss the testing he had administered, did you also talk to him about the results that you found from that test administration?

A.    Yes.

Q.    What did he tell you about the results of the testing?

A.    That he had found -- first of all, that Mr. Fields did not have a 168 IQ; it was about 93 average, below average.  There were issues of sequencing on the Trail Making Test.  As Mr. Fields moved into higher levels of complexity, he required a longer period of time.

He told me that Mr. Fields had done poorly on the Digit Span, which is really a test of working memory. People think of it as a test of arithmetic, but it's actually a test of working memory.

And he told me that Mr. Fields had scored outside of the normal range on the Categories Test which is a test of complex problem-solving.

He told me that he had done well on the similarities, and he also told me that on the Wide Range Achievement Test, which is a test of academic,

some academic functioning, some reading, sight reading. At that time, the WRAT-III was a test of sight reading comprehension.  But that he had done poorly on the mathematics part of it, and that he had also, and that also mathematics or arithmetic was his lowest score on his WAIS-III, on his IQ test.

That's what I recall.

Q.   And the WAIS-III, is that the Wechsler Adult Intelligence Scales?

A.   Third edition, correct.

Q.   Third edition.

Did Dr. Gelbort tell you -- you talked about some tests that Dr. Gelbort told you about.  Did he tell you anything about how the results of those tests -- I'm sorry.

Did Dr. Gelbort tell you if the results of those tests showed that Mr. Fields has any brain impairments?

A.   It was pretty clear that in certain areas he had brain impairments, so I'm not sure that Dr. Gelbort actually said that.

Q.   So based upon your expertise and the way Dr. Gelbort described the results, were you able to -- what was your impression as to what the testing showed regarding brain impairments?

A.   Well, I think we agreed that in these areas that

there was a brain impairment.

Q.   Did the testing that Dr. Gelbort describe to you and the results, did that help with this differential diagnoses that you have been talking about?

A.   Yes.

Q.   How so?

A.   They were more consistent, particularly the working memory.  They were more consistent with bipolar disorder or a disorder that had cognitive symptoms than a dysthymia or a mild depression.  That was number one.

Number two, they were also much more consistent with a lower IQ.  Still a low average IQ, but certainly a lower IQ than Mr. Fields had described historically. And it also gave me some insight into the people who were describing him as really, really smart.  It gave me some insight into his intellectual strengths and weaknesses.

Q.   And you mentioned bipolar disorder.  How did the testing help you to think about bipolar disorder with respect to Mr. Fields, the neuropsychological testing?

A.   It made the -- it raised bipolar disorder higher in my differential as being what I thought might be the most important.

Q.   Why is that?

A.   Well, because Mr. Fields had already described

auditory hallucinations for a long time.  He had described mood swings for a long time.  I think even in one of the early reports someone else had described him as having mood swings.

Because of the treatment with Effexor within a short period of time right before the event, I was concerned because major depressive disorder, what we call unipolar depression and the depression of bipolar disorder look just alike.  It's very difficult to see the difference.  And many people, when they see someone that has been chronically depressed, even treated, may not pick up bipolar disorder.  So this would allow you to kind of separate out the unipolar depression from the bipolar depression.

Q.   Does bipolar disorder have a cognitive component to it?

A.   Yes.

Q.   Can you describe that or detail that for us?

A.   Bipolar disorder, as I said, will often manifest itself with problems with memory, particularly working memory, some difficulty effectively problem-solving. It's not that they just fall on themselves and can't solve any problems but effectively problem-solving. And you see that more in a bipolar disorder than you see in a major depressive disorder.

Q.    Can you have bipolar disorder without having cognitive impairments as well?  Is there some connection between the two?

A.    The cognitive symptoms are on a spectrum, just like all the symptoms of a bipolar disorder.  There are bipolar disorders -- people have bipolar disorders that are geniuses, that are writers, Tolstoy, for example. They're on a spectrum, but they are a component of bipolar disorder.  And so if you find that, you know that's a piece of the puzzle.

Q.    Just to be clear, when you find that someone has bipolar disorder, a cognitive component is also part of that?

A.    That's correct.

Q.    Are there other components of bipolar disorder?

A.    Sure.  The mood swings that people often -- although, in fact, the mood swings aren't necessarily on any particular pattern.

When you look at the best literature, *Kaplan and Sadock Comprehensive Textbook of Psychiatry*, you can have one manic episode in a lifetime and still carry a diagnosis of depression.

So like with Mr. Fields, who had this string of depressive episodes, that's very common in bipolar disorder.  You have less impact of what we call

neurovegetative science.

Neurovegetative science are signs that the body is telling that it's depressed. Your eating is thrown off. Your sleeping is thrown off. Your activity is thrown off. And, in fact, one of the core symptoms of bipolar disorder, which we used to think was grandiosity, I have an IQ of 168, we now know is actually irritability. And you really see irritability in bipolar disorder much more than you do in major depressive disorder.

MR. LABOVITZ: Court's indulgence.

Q. (BY MR. LABOVITZ) I believe you said that you could have one episode of mania. I may have misheard, but have one episode of mania and that would then carry a diagnosis of depression.

Did you mean of a diagnosis of bipolar?

A. I'm sorry, yeah. You might have one episode of mania in a lifetime, but that's bipolar, right.

Q. So after speaking to Dr. Gelbort about the neuropsychological testing results, did you have any reason to doubt that the testing Dr. Gelbort administered to Mr. Fields showed that Mr. Fields had brain impairments?

A. No.

Q. Are you aware of the medications that Mr. Fields

was taking at the time that Dr. Gelbort administered his testing to Mr. Fields?

If you don't know, we'll figure out a way to get there.

A.    I'm close.  Loxitane, lithium, artane.  There's one more that I'm missing.

Q.    Okay.  If I showed you some notes from your visit, one of your visits, with Mr. Fields might that help you remember the fourth one?

A.    Let's hope so.

Q.    Okay.  Can you take a look at Exhibit 66, Defense Exhibit 66?  Looking at page one, do you recognize that as your handwriting?

A.    Yes.

Q.    I'd ask you, then, to take a look at page 15 of Defense Exhibit 66, and ask you to see if there is anything -- also let me ask you this:  is that your handwriting?

A.    Yes.

Q.    Is there anything -- review that and let me know if that helps refresh your recollection as to what the fourth or, I'm sorry, any additional medications Mr. Fields was taking at the time of Dr. Gelbort's evaluation.

A.    I'm sorry.  It was Prozac, yes.

Q.   Can you discuss the impacts, if any, of the medications that Mr. Fields was taking on his cognitive functioning at the time Dr. Gelbort administered his testing?

MR. WILSON:  Objection, Your Honor.  I believe that's misleading.  I believe the notes are talking about when Dr. Woods evaluated Mr. Fields, not when Dr. Gelbort did.

THE COURT:  Can you try to rephrase the question?  Let's see if we can get by that.

MR. LABOVITZ:  The Court's indulgence.  I need to look at Dr. Gelbort's report or actually Dr. Gelbort's raw data.

Q.   (BY MR. LABOVITZ) Okay.  I'm going to try to speed up things for you, for me at least.

Assuming, Dr. Woods, that the medications that Mr. Fields told you he was taking on October 9, 2004, were the same medications that he was taking on August 11, 2004, okay?  Just hypothetically.  Assuming I'm correct about that, can you discuss the impact of those four medications on Mr. Fields' cognitive functioning at the time that the testing was administered to Mr. Fields on August 11th by Dr. Gelbort?

A.   Sure.  Can I ask a question?

Q.   Yes.

A.   Should it be a general answer or should it be an answer about each of the medications?

Q.   Whatever you prefer.

You know, I'm asking you if, in fact, those medications that Mr. Fields told you that he was on on October 9th if he, in fact, was on those same medications, those same dosages back on August 11th, what impact, if any, that that would have had on his cognitive functioning?

A.   Okay.

Q.   So if you want to go through individually or collectively.

A.   I'll do it quickly, okay.

So loxitane, loxitane is an antipsychotic.  So it was really aimed at the auditory hallucinations that Mr. Fields described.

Lithium is a specific medication for bipolar disorder.  It's a mood stabilizer, and there really is no other indication for lithium.

Prozac is an antidepressant and antidepressants can be used in bipolar disorder if they have a -- if they have a mood stabilizer to help suppress the potential of elevations.

Artane is a drug that is designed, what we call an

anticholinergic drug, and it's a drug that is designed to help if a person has any side effects from the antipsychotics.

None of these medications enhance cognitive functioning.  In fact, we don't have any medications in psychiatry that enhance the cognitive impairments in diseases like bipolar disorder or schizophrenia.

Q.   Okay.  What about -- would these -- again assuming these were the drugs that Mr. Fields was on at the time of the neuropsychological testing, would they have impaired his cognitive functioning?

A.   No.

Q.   Why not?

A.   Well, the loxitane was antipsychotic.  If Mr. Fields had been distracted because of the auditory hallucinations that he was suffering from, that would have helped.

Prozac is an antidepressant.

Artane is really for side effects.

So these are not medications.

Artane can create what's called a delirium, an anticholinergic delirium.  There was no evidence that Mr. Fields was in any way delirious during this period of time.

So there's no indication for any of those

undermining his cognition.

Q.   So is it your opinion that, again, assuming those four drugs that you have discussed, were the ones that Mr. Fields was prescribed and taking at the time of Dr. Gelbort's neuropsychological testing, there would have been no impact one way or the other on his ability to take those tests and perform on those tests?

A.   Correct.

Q.   Now, did you -- I think you mentioned October 9, 2004, is that when you went back to see Mr. Fields for the second time or at least the second -- you had two days earlier in August.

     This was your second visit?

A.   Correct.

Q.   What was the purpose of that visit with Mr. Fields in October of 2004?

A.   To see if there had been any change in his mood. To delve more into the offense itself, but to really to see if there had been any change in his mental state, to get more history.

Q.   And if your handwritten notes in Defendant's Exhibit 66, reflect at least just in terms of number of pages, more pages of your handwriting on the October visit as compared to the August visit.  Would there be a reason for that?

755

A.    Most likely it was just the material that I was gathering and his ability -- his willingness to talk.

Q.    Now, we'll get into the details of your opinion.

But I just wanted to first ask you, generally speaking, if at the pretrial stage of this case based upon the information about Mr. Fields, the background information from counsel that you reviewed, your neuropsychiatric evaluation of Mr. Fields, your discussion with Dr. Gelbort of the testing that he administered, and your expert experience and analysis, I'd like to know if you were able to reach an opinion pretrial as to a reasonable degree of psychiatric medical certainty as to whether Mr. Fields had brain impairments at the time of the crime?

I'm just asking:  Could you have reached an opinion about that?

A.    I could have, yes.

Q.    Okay.  What would that opinion be, again going back to pretrial?

A.    That he suffered from brain impairments, primarily left lateral frontal lobe, which covers some executive functioning, covers some working memory.  That he may have suffered some impairments -- this is really learning more than the type of executive functioning, that he may have suffered some impairments in

mathematic skills because we see him doing poorly on the IQ testing, which was his lowest score, I believe it was a seven, and also in his Wide Range Achievement Test, where it was also his lowest score. I believe it was fifth grade.

So we see impairments in executive functions. We see impairments in problem-solving. We see impairments in working memory.

Q. Going back again to pretrial, what was your opinion as to Mr. Fields having brain impairment at the time of the crime?

What was the basis for that opinion? What did you base that on from your review of everything?

A. Well, I based it on, I mean, my initial impression was -- let me see if I can answer your question.

I believe that his brain impairments were secondary to his bipolar disorder. But that was reinforced -- I wasn't clear about that because I was looking to see for a differential diagnosis. So it was reinforced by Dr. Gelbort's testing.

Q. Is "secondary" a medical term as you have just used it?

A. It's not a medical term, but I think it adequately explains how I look at it, yes.

Q. What do you mean by the "brain impairments were

secondary to the bipolar disorder"?

A.    That the brain impairments were part of the bipolar disorder.

Q.    Going back again pretrial, were there indications in what you learned from your review of social history, background records about Mr. Fields that helped to support your opinion that he had brain impairment at the time of the crime?

A.    Well, as I said the -- can you rephrase that please?

Q.    Yes, this is now -- I'm asking you about any review of materials related to Mr. Fields whether educational, medical, employment, any materials that trial counsel gave you that you reviewed or that Mr. Fields communicated to you during your evaluation.

If any of that indicated to you information that would help to support your opinion that Mr. Fields had a brain impairment at the time of the crime.

A.    I think the most important information that I received was equivocal.

And what I mean by that, was that Mr. Fields apparently did well in very structured environments. He did well in the Navy, for example, very straightforward kinds of work.  And that's what you really see with people that don't have brain

impairments, but certainly those that do you see them able to function when there's less, what we call, ecological validity.  They're able to function better when they are in a structured environment.

What I did see was Mr. Fields not doing so well when he was not in a structured environment.  There were situations where his work was described as, you know, he was working -- he was the fastest one in a certain -- but we have no idea what he was actually doing, right?  So we don't understand what he was doing.

So I think the real question in terms of brain impairment was really crystalized for me once I was able to see the testing and also see his history of, what I believed, to be a bipolar disorder.

Q.   I guess, again, I mean, late in the day I'm inartful.

But, you know, were there -- I guess, for example, was there anything in Mr. Fields' medical history that you learned of from reviewing records, talking to counsel, talking Mr. Fields that would have helped to support your opinion that he had brain impairments at the time of the crime?

A.   I remember certain instances, like he had a traumatic -- he had an automobile accident.  And we

weren't clear what the -- apparently there was a record of a cerebral concussion, but we really don't know exactly what that really looked like. And the neuropsychological testing could reflect a TBI, but that's really what I was most focused on.

Q.   Okay. How would an accident that might reflect some kind of brain -- traumatic brain injury, how would that help you to inform or support your opinion as to Mr. Fields' brain impairments at the time of the crime?

A.   Well, a concussion, which is twisting of the neuronal tissue, can -- it's not a hit, it's a twist -- it can, in fact, create problems in terms of neuronal function. It can create problems in terms of your frontal lobe. It can create problems in terms of your social functioning.

Most commonly they last 18 to 24 months. But even mild concussions can, in fact, impact somebody for a lifetime.

Q.   And you said you recall knowing about this concussive incident before, you know, in the pretrial stage?

A.   Correct.

Q.   Was there anything in Mr. Fields' school performance records -- I'm sorry, educational records that you reviewed pretrial that would help support your

opinion as to his brain impairment at the time of the crime?

A.   Mr. Fields' school records were not great.  He got a GED.  However, the school records really looked more at intellectual functioning.  So where the school records were really valuable were in validating Dr. Gelbort's findings.  Because the school records, particularly the difficulty with math, was something that had existed for a period of time.

And to find this also in the neuropsychological testing, really gave me a sense of what kind of effort Mr. Fields had undertaken in the neuropsychological testing.

Q.   Was there anything that you learned about Mr. Fields' birth that would have, as you reviewed records and talked to him or, you know, counsel, that helped to support your opinion as to him having brain impairment at the time of the crime?

A.   Mr. Fields' mother did describe a hypoxia or an umbilical cord around his neck when he was born.  It's unclear how long the cord was there.  That certainly could have some impact as well in terms of looking at Mr. Fields neuropsychological functioning.

Q.   And you said that you knew that information pretrial.  Can you just explain how that incident that

you learned about from Mr. Fields' birth would affect someone's brain functioning?

A.    It depends on how long the cord was wrapped or how the cord was wrapped.  But obviously not being able to -- what we call hypoxia, a lack of oxygen, having a cord wrapped around so that the infant nearly can't get oxygen for a period of time, particularly in a very vulnerable newborn brain, can have an impact.

Q.    And you mentioned that the -- your review of Mr. Fields' employment records with respect to some of his positions that involved structured settings versus other positions that did not involve structured setting, can you describe how -- well, can you describe the relationship between structure or rather lack of structure and executive functioning and what impact the lack of structure has on someone's executive functioning?

A.    Sure.  Executive functioning means that you have to figure more things out yourself.  A lack of structure means, in executive functioning, you have to figure out more things on your own.

When you're in a structured environment, you have less stimuli.  You have less things to figure out; therefore, you can often look better and do better because your tasks as redundant.  Your tasks are the

same.  If they're relatively simple you can often master those tasks very effectively.  So.

That's why when we started the conversation today, I was saying that environment makes a difference because if your environment is fairly limited, it can limit your psychiatric symptoms.

We have to keep in mind that until 1947, we had no psychiatric medications.  We actually treated people by limiting them and limiting their environment.

Q.   And what parts of the brain are involved in making those decisions within a structured environment or outside -- what parts of the brain are involved in making these executive decisions?

A.   That's kind of a loaded question.

Q.   Okay.

A.   Because we think of the frontal lobe primarily. However, frankly all parts of the brain.

Q.   Okay.

A.   The brain is two billion neurons that are multiply connected.  So the idea that there are these specific, discrete areas of the brain that only do certain things is really not true.  For example, if you have a sequencing issue, and the sequencing issue may start in the left lateral part of the frontal lobes, but it is going to end in the medulla or on the right parietal

lobe.  So I'm not trying to -- it's just that it's really more complex than that.

Q.    Okay.  Do you recall telling Ms. O'Connell, Mr. Fields' trial counsel, pretrial that you had an opinion about Mr. Fields' brain impairments?

A.    I recall telling Ms. O'Connell that I thought that the testing was relevant and important.

Q.    In what way?  When you're talking to Ms. O'Connell in what way did you tell her that testing was relevant and important?

A.    Because it helped me -- it helped support, in my opinion, bipolar disorder versus other types of mood disorders.

Q.    When you spoke with Ms. O'Connell pretrial did you ever tell her that it was your opinion from talking to Dr. Gelbort, reviewing records, and learning the results of Dr. Gelbort's testing, that Mr. Fields did not have any brain impairments?

A.    No.

Q.    Did there come a time when trial counsel asked you to prepare a written report?

A.    Yes.

Q.    Do you recall when that was?

A.    I believe it was mid-2005, somewhere in that time, maybe June.

THE COURT: Mr. Labovitz, I just want to inquire. I'm not -- I mean, what is your anticipated time?

MR. LABOVITZ: I would estimate one hour, Your Honor.

THE COURT: Okay. Then at some point if we're at a good breaking point coming forward, I'm not saying it's now, I'm just asking if you have one coming up soon, I think it might be -- I'm not going to make these folks stay until 6:00 tonight. As much as I would like to get this witness done on direct, he's going to have to come back for cross anyways.

THE WITNESS: I'm sorry, Your Honor. But I need to go to the bathroom.

MR. LABOVITZ: Actually, Your Honor, this is a very good time to break for many reasons.

That's okay.

THE COURT: His physiological reasons are always good.

All right. Well, then let's do that. Let's recess for the evening.

We'll start back in the morning at 9:00 a.m. continuing your direct with Dr. Woods. Dr. Woods, we'll let you take your break.

I apologize that you have to come back for

tomorrow, but that's just the way it goes.

So we will stand in recess -- unless anybody has anything we need to address before the evening?

MR. WILSON:  No, Your Honor.

THE COURT:  We will be in recess until tomorrow.

(Evening recess taken at 5:02 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    November 3, 2024


/S/ Shelley Ottwell, RPR
Shelley Ottwell, RPR, CSR
U.S. STENOGRAPHER