IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )

      Plaintiff, )

               )

VS. )      NO.  03-CR-00073-RAW

               )

EDWARD LEON FIELDS, JR., )

      Defendant. )

EVIDENTIARY HEARING

BEFORE THE HONORABLE GERALD L. JACKSON

UNITED STATES MAGISTRATE JUDGE

OCTOBER 10, 2024

VOLUME IV

COURT REPORTER:      KARLA McWHORTER

                        UNITED STATES COURT REPORTER

6:03-cr-00073-RAW   Document 422   Filed in ED/OK on 11/05/24   Page 2 of 230

767

**A P P E A R A N C E S:**

**FOR THE PLAINTIFF:**

     **MR. CHRISTOPHER J. WILSON,** US Attorney (OKED)

520 Denison Avenue, Muskogee, Oklahoma 74401

     **MR. AARON J. STEWART,** Oklahoma Attorney

General, 313 NE 21st Street, Oklahoma City, Oklahoma 73105


**FOR THE DEFENDANT:**

     **MR. HUNTER S. LABOVITZ,** Federal Public

Defender – OKC (Capital Habeas),  215 Dean A. McGee,

Suite 707, Oklahoma City, Oklahoma 73102

     **MS. HAYDEN NELSON-MAJOR,** Federal

Community Defender – EDPA, 601 Walnut Street, Suite 545 W,

Philadelphia, Pennsylvania, 19106

     **MS. KATHERINE CLEARY THOMPSON**, Federal

Community Defender – EDPA, 601 Walnut Street, Suite 545 W,

Philadelphia, Pennsylvania 19106

     **MS. KATHERINE E. ENSLER,** Federal Community

Defender – EDPA, 601 Walnut Street, Suite 545 W, Philadelphia,

Pennsylvania, 19106

<u>**I N D E X**</u>

<u>**PAGE**</u>

<u>**DEFENDANT'S CASE-IN-CHIEF**</u>

<u>**DEFENDANT'S WITNESSES:**</u>

<u>**DR. GEORGE W. WOODS, JR.**</u>

Direct Examination Continued by Mr. Labovitz    769

Cross Examination by Mr. Wilson    817

Redirect Examination by Mr. Labovitz    916

<u>**DR. BRADLEY D. GRINAGE**</u>

Direct Examination by Ms. Thompson    926

Cross Examination by Mr. Wilson    971

Recross Examination by Ms. Thompson    989

Recessed until October 11, 2024    995

**<u>COURT IN SESSION</u>**

**(9:00 a.m.)**

THE COURT:  All right.  Sorry about that little I.T. hiccup, but we got it fixed and we are on the road.

Go ahead, Mr. Labovitz.

**<u>DR. GEORGE W. WOODS, JR., PREVIOUSLY SWORN</u>**

**<u>DIRECT EXAMINATION CONTINUED</u>**

**BY MR. LABOVITZ**:

Q    Good morning, Dr. Woods.

A    Good morning.

Q    When we finished with court yesterday I was asking you some questions about your meeting with Mr. Fields for your second visit back on October 9th, 2004.

A    Yes.

Q    And do you recall that at that time Mr. Fields was housed at a jail in Tulsa, Oklahoma?

A    I do.

Q    Do you recall that after that meeting you met with Ms. O'Connell and some other members of Mr. Fields' defense team at Ms. O'Connell's office in Tulsa?

A    Yes.

Q    Okay.  Do you recall if Ms. O'Connell asked you any questions -- well, let me ask you this:  What was the purpose of that meeting?

A    I am not sure if there was a specific purpose.  I think it was

perhaps to get caught up on my visit, but to just talk generally about the case.

Q  Okay. And to talk also, I guess, about your role in the case, mental health issues --

A  Correct.

Q  -- things like that? Okay. Did Ms. O'Connell ask you any questions -- well, did you discuss with Ms. O'Connell in Tulsa anything about Dr. Gelbert's testing and your understanding of it to that point?

A  I don't recall that.

Q  Do you recall if Ms. O'Connell asked you any questions about the I.Q. testing of Mr. Fields?

A  I recall that Ms. O'Connell had some concerns that the I.Q. testing mitigated against brain impairment.

Q  And do you recall why she thought that? What did she communicate to you as to why she thought that?

A  Well, Mr. Fields' I.Q. testing was in the low-normal range. And it was my sense that Ms. O'Connell didn't -- and there is no reason why she should have at that point -- understand that you can have a normal or even high I.Q. and still have brain impairment and brain damage.

Q  Did you explain to Ms. O'Connell at that meeting in Tulsa that there was no inconsistency -- whether there was an inconsistency between Mr. Fields' I.Q. scores and his brain impairments?

A     Yes.

Q     And at some point did Ms. O'Connell ask you to prepare a written report of your opinions in the case?

A     Yes.

Q     Okay.  I would ask you to take a look at Defense Exhibit 211. Yes.  Do you see that Exhibit 211?

A     Yes.

Q     Do you see towards the bottom this is an email from Julia Ms. O'Connell to gwwoods@comcast.net?

A     Yes.

Q     And is that your – at least at the time in 2005 was that your email address?

A     That was my email address at that time.

Q     And what is Ms. O'Connell asking you for on June 12th, 2005?

A     She was asking me for a draft report.

Q     And does she use the words, quote, "please, please?"

A     Correct.

Q     Did that create any impression on you as to the timing of your draft report?

A     Well, there had already been pressure to try to get the report out, so that just reflected the continued pressure.

Q     Now, I would ask you to take a look at Petitioner's Exhibit 187.  Do you recognize this as an email from Ms. O'Connell to you on June 18th, 2005, and then your response at the top?

A     Yes.

Q    And then going to the third paragraph -- well, from reviewing that is it your impression that as of June 18th, you hadn't provided Ms. O'Connell with a draft?

A    Correct.

Q    And then going to the third paragraph of Ms. O'Connell's email, do you see in the first line it says, quote -- well, it's talking about jury selection and then it says, quote, "Once that starts, no way in hell will the case settle.  So, I need the report double-top-ASAP.  And, Skip is going to start bothering you, just so you know. . ."

A    Yes.

Q    And what was your impression from that email as to the urgency with which counsel wanted you to prepare a report?

A    That it was urgent and that she wanted it as soon as she could.

Q    Now, we talked about your trial report, Defense Exhibit 65.  We will just pull that up in a second.  And do you see on the top of Page 1 that is dated June 25th, 2005?

A    Correct.

Q    And we talked about you signed it.  So this is your final report that you provided in response to Ms. O'Connell's demands?

A    Correct.

Q    And you then testified on June 20th, 2005 for the defense at Mr. Fields' trial?

A    June 20th?

Q    If the record reflects that, you wouldn't dispute -- no, July 20th. I apologize.

A    Okay.

Q    July 20th, 2005.

A    Correct.

Q    Your memory is better than mine.

Now, in a case that you work on, a criminal case, as a forensic neuropsychiatrist, when a neuropsychologist is also involved who has done a testing assessment of the defendant, is it important for you to have a final signed report from that neuropsychologist as you are forming your opinions and writing your trial report?

A    Yes.

Q    Why is that?

A    Because if I am going to rely upon the neuropsychologist, I want to make sure that I have the report that is going to the Court in order to depend upon their findings.

Q    Now, in this case we discussed yesterday that you had talked to Dr. Gelbort sometime in, you know, approximately August of -- late August of 2004. You had a meeting with Ms. O'Connell after that.

A    Right.

Q    So you -- I don't want to put words in your mouth, but is there any dispute that at least while you were writing your report you had a sense of Dr. Gelbort's findings?

A    Yea, I could say that I had a sense, sure.

Q    So would there be a reason why -- well, okay, let me ask you this:  But what is your standard practice at least with respect to having the final signed report from a neuropsychologist?

A    A conversation is not a written report.  There are many things that could change.  Scoring can change.  A person's thinking can change.  I have always relied upon a written report if I am going to incorporate those findings into my report or into my testimony.

Q    Okay.  In this case do you know if you had Dr. Gelbort's final signed report at the time Ms. O'Connell was asking for your report and then when you finalized your report?

A    I did not.  I know I did not have his final report.

Q    In other capital trial cases that you have worked on where there is neuropsychological testing by a defense expert showing brain impairments, when does trial counsel normally provide you with the final report from the neuropsychologist?

A    Before I finalize my report.

Q    Did Ms. O'Connell or Mr. Gant ask you to discuss in your trial report how – you said you didn't have Dr. Gelbort's report yet.

A    Correct.

Q    Did they at least ask you to discuss your impressions of Dr. Gelbort's findings that you had learned from talking to him?

A    No.

Q    And if you need to take a look at your trial report. . .but would you agree with me that there is no discussion of trial -- I am sorry -- in your trial report of Dr. Gelbort's findings?

A    That's correct.

Q    Did you ask trial counsel about whether they could provide you Dr. Gelbort's final report given your standard practice before you finalized your report?

A    I don't recall specifically, but I would assume that I did.

Q    I would ask you to take a look at Defense Exhibit 263.  Do you see that exhibit?

A    I do.

Q    Okay.  Is this an email exchange between you and Ms. O'Connell on June 18th, 2005?

A    Yes.

Q    And what were you asking Ms. O'Connell for in this email?

A    The neuropsych report, Dr. Gelbort's report.

Q    Okay.  Why did you want to know that?

A    Because I wanted to include -- I wanted to review it and include it in my report.

Q    And is it your position that without -- I am sorry -- that the discussion with Dr. Gelbort was not a sufficient basis for you to opine in your report?

A    They are not, they would not be.

Q    Now I would ask you to look at Defense Exhibit 215.  Do you see that -- at the top that is an email from you to Ms. O'Connell on

June 19th?

A    Yes.

Q    And are you asking Ms. O'Connell for the neuropsychologist's phone number?

A    Correct.

Q    And that's Dr. Gelbort?

A    Correct.

Q    And why did you do that?

A    Well, I thought perhaps I could try to get -- see where he was in terms of his report. I don't recall exactly, but obviously I was trying to get my report completed.

Q    Do you recall any phone calls with Dr. Gelbort around that time?

A    No.

Q    Did you ever tell trial counsel, after she asked for your report, that you could not complete your report without first receiving the final neuropsychological report from Dr. Gelbort?

A    I don't recall telling her that.

Q    Okay. Would there be a reason you wouldn't have pushed back on her demands?

A    No.

Q    Okay. Did you have any decision-making authority in this case when defense experts would provide their final reports to trial counsel?

A    No, I did not.

Q    Did trial counsel ever give you the opportunity to review Dr. Gelbort's final signed report before you prepared your report?

A    No.

Q    Now, this is hypotheticals, but I would like to ask you if trial counsel had provided you with Dr. Gelbort's report, his final report, before you finalized your report and there had been an adequate amount of time for you to incorporate that into your opinion, how could you -- what -- how could you have augmented the written report that you filed -- I am sorry -- that you provided for trial?

A    Well, I would have, number one, reviewed the report and determined how it interacted with what I was writing.  And then I would have most likely reviewed the literature to tie that bridge in as well.  And then I would have included it in my report.

Q    In other cases that you have worked on where there is an opinion that you are giving regarding bipolar disorder and there is also neuropsychological findings of brain impairment, how have you used those – your opinion and those neuropsychological opinions in conjunction in your written reports?

A    Well, I think that bipolar disorder has significant cognitive symptoms.  So consequently I would have understood from the neuropsychologist exactly what their findings were and how the tests interwove with the symptoms that we were seeing or not.  And then I would have included it in my report or in my testimony.

Q    Okay.  Let's just focus on your report right now.  Could you

have included a section on the cognitive components of bipolar disorder in your report had you gotten Dr. Gelbort's final report timely?

A     I would have either included the sections on the cognitive aspects of bipolar or I would have included specific aspects of Dr. Gelbort's report, and then discussed the manifestations of the bipolar symptoms in a different way to include how they would have been impacted by the cognition.

Q     And are you aware that Dr. Gelbort finalized his report on or about July 1st of 2005?

A     Yes.

Q     Do you know when you first received Dr. Gelbort's final signed report from trial counsel?

A     I don't.

Q     Is a final signed report from a neuropsychologist detailing brain impairments of a defendant when there is a -- you know, in a case that you are also working on, is that the type of data that experts in neuropsychiatry reasonably rely upon in forming their opinions?

A     Yes.

Q     Do – you said that you don't know the date that you first received Dr. Gelbort's report.  Do you believe -- do you have any recollection of seeing Dr. Gelbort's report or final report before you testified?

A     I don't.  I'm sorry.

Q    Okay.   Can you pull up. . .I'm sorry. . .pull up Defense Exhibit 60. . .no, 119.  This is the declaration that you prepared back in 2010.  Can you go down to paragraph 8?  Can you just review paragraph 8 for a minute?

A    Yes.

(PAUSE)

A    Yes.

Q    Does that -- paragraph  say that  you were provided with –

MR. WILSON:  Objection, Your Honor.  I think if counsel laid a proper foundation to use this document to refresh --

MR. LABOVITZ:    I'm not trying to refresh his recollection.

MR. WILSON:  Then I'm going to object to the line of questioning then.  It is not relevant.

THE COURT:  Well, it seems like it is too late to object to him using it to refresh his -- since he has already used it to refresh his recollection apparently.

MR. LABOVITZ:  I am. . .

THE COURT:  Well, I mean, I think it is too late.  So, I mean, he has read it and now he can testify as to what he knows, I guess or recalls.

MR. WILSON:  My objection is regarding foundation because there have been no questions as to how this particular document was generated.  It is purported to be his declaration, but I don't know whether he prepared it or if someone else

prepared it and he signed it.  It goes to the competence of this particular witness to testify regarding what is in this document.

MR. LABOVITZ:  Okay.  I will withdraw the question.

**BY MR. LABOVITZ**:

Q    I will ask you a hypothetical, Dr. Woods.  So your testimony today is you don't know if Ms. O'Connell at any point ever gave you Dr. Gelbort's final report?

A    Correct.

Q    Okay.  If she had done that, given you the final signed report -- and would you agree with me it would have to have been after July 1st, 2005 --

A    Correct.

Q    -- because that's when the report was prepared?

A    Correct.

Q    If she had given you a final signed report from Dr. Gelbort and asked you to prepare a supplemental report to address the impact of Dr. Gelbort's findings on your opinion, how much lead-time would you have needed to do that?

A    I really can't say.  It would depend upon what I saw in Dr. Gelbort's report.  It would depend upon whether I had questions about Dr. Gelbort's report for him, which means I would have liked to have talked with him about his report, and not just get it in my hands but really have some understanding of what his findings were. So I think it would probably -- and it would depend upon what my schedule was at that time.  So I think it would take at least a couple

of weeks.

Q     And knowing that you testified on July 20th, 2005, if counsel had asked you between the date that Dr. Gelbort's report was finalized and your testimony to prepare a supplemental report, would you have at least tried to do that?

A     It obviously would have been a top priority.

Q     Okay.  Now I want to ask you a question about your trial testimony and -- and if you could look at the testimony from July 20th, 2005.  Do we have that available?  Do we have hardcopies?

MR. LABOVITZ:  May I approach, Your Honor?

THE COURT:  What are we doing here?

MR. LABOVITZ:  I just wanted to show Dr. Woods' some testimony that he gave at trial.

THE COURT:  Why?

MR. LABOVITZ:  Why?  Because I believe he -- well, I don't want to testify but I have a question about it.

THE COURT:  I mean, are you asking him questions about what his testimony was?

MR. LABOVITZ:  Yes.

THE COURT:  Well, can you –

MR. WILSON:  He could ask the Court to take judicial notice of the prior testimony.

THE COURT:  Well, I mean, I -- I am just trying to understand.  Does it -- first it seems like we need to ask if he he recalls and then if he doesn't, then maybe you can use the

transcript to refresh --

MR. LABOVITZ:  Okay.

THE COURT:  -- and then we can walk through that whole process, but we can't just start at the end.  We've got to start at the beginning.

MR. LABOVITZ:  Certainly, Your Honor.

**BY MR. LABOVITZ**:

Q    Dr. Woods, if you testified at trial on cross examination that your trial report indicated that you had reviewed Dr. Gelbort's report, would that have been a misstatement on your part?

A    Yes.

Q    Did you ever tell Mr. Gant that Dr. Gelbort did not find that Mr. Fields has brain damage?

A    No.

Q    Did you ever tell Mr. Gant that Dr. Gelbort did not find that Mr. Fields has brain impairments as shown on the neuropsychological testing?

A    No.

Q    Did you ever tell Mr. Gant that Dr. Gelbort's testing of Mr. Fields did not uncover mitigating evidence to present in a defense case-in-chief at trial?

A    No.

Q    And then I am going to ask you the same questions about Ms. O'Connell.  Did you ever tell Ms. O'Connell that Dr. Gelbort did not find that Mr. Fields has brain damage?

A    No.

Q    Did you ever tell Ms. O'Connell that Dr. Gelbort did not find that Mr. Fields had brain impairments as shown on the neuro-psychological testing?

A    No.

Q    And did you ever tell Ms. O'Connell that Dr. Gelbort's testing of Mr. Fields did not uncover anything that should be presented to the jury as mitigation in the defense case-in-chief?

A    No, I did not.

Q    You mentioned that you are not sure if you spoke to Dr. Gelbort after you asked for his phone call --

A    Correct.

Q    But you also testified  yesterday that you do recall conversations along the way with Dr. Gelbort.

A    Yes.

Q    Based on those conversations what was your understanding as to whether trial counsel would be calling Dr. Gelbort to testify about Mr. Fields' brain impairments?

          MR. WILSON:  Objection.  It sounds like it is based upon hearsay, Your Honor.

          MR. LABOVITZ:  Of course.

          THE COURT:  Yes, it is.  Can you try again?

          MR. LABOVITZ:  Your Honor, I would say, number one, this goes to the effect on the listener and what Dr. Woods' impression from Dr. Gelbort was as to whether Dr. Gelbort would

be a witness. It is not hearsay.

THE COURT: Well, can we ask it --

MR. LABOVITZ: I am not offering it for the truth. I am offering it for what was Dr. Woods told by Dr. Gelbort.

THE COURT: Well, how about we try. . .well, what is Dr. Woods' understanding of --

MR. LABOVITZ: Yes, I did say that, Your Honor. What was your understanding based on your conversations with Dr. Gelbort as to whether trial counsel would be calling him to testify in the case-in-chief about Mr. Fields' brain impairments?

THE COURT: You may answer.

THE WITNESS: Okay.

BY THE WITNESS:

A    It was my understanding that Dr. Gelbort would be called.

**BY MR. LABOVITZ:**

Q    Did Mr. Gant ever tell you the defense would not be calling Dr. Gelbort in the case-in-chief at trial?

A    No.

Q    Did Ms. O'Connell ever tell you the defense would not be calling Dr. Gelbort in the case-in-chief at trial?

A    No.

Q    Do you recall receiving an email from Ms. O'Connell telling you when the trial was starting and talking about her plans for your testimony?

A    I'm sure that I received an email stating when the trial was

starting. I don't recall the second part of. . .in terms of my testimony and --

Q    And if I showed you an email exchange, might that refresh your recollection?

A    Yes.

Q    I would ask you to take a look at Defense Exhibit 220. And I would ask you to just take a look at that and let me know when you are -- the whole page and let me know when you are finished.

A    Okay.

Q    Does that help to refresh your recollection as to what Ms. O'Connell told you about coming to court for testimony?

A    Yes.

Q    Was it your understanding that you would be called by Ms. O'Connell or the defense team to testify as a witness in the case-in-chief?

A    Yes.

Q    Was it your understanding that Dr. Gelbort would be called by the defense to testify in the case-in-chief?

A    That's correct.

Q    And is this email dated July 1st, 2005?

A    Correct.

Q    Did Ms. O'Connell ever tell you anything different from that email?

A    Not that I recall.

Q    Now, did trial counsel, be it Ms. O'Connell or Mr. Gant, ever tell you that even if they weren't going to present Dr. Gelbort as a witness that they would still not be -- that they would not be presenting evidence and testimony of Mr. Fields' brain damage at trial through another testifying expert such as yourself or Dr. Grinage?

A    No.

Q    Now I would like to talk a little bit about, you know, what you said at trial, what you could have said at trial.  When you were preparing to testify with trial counsel, did they ever ask you to incorporate the findings and opinions from Dr. Gelbort's testing into your trial testimony?

A    No.

Q    And if you recall, yesterday we talked about an email from David Freedman to you where he suggested you could incorporate Dr. Gelbort's findings into your opinion?  And I can show you the email if you don't remember.

A    I would like to see it.

Q    Okay.  Can you look, please, at Defense Exhibit 158?

A    Okay.

Q    Does that refresh your recollection as to what Mr. Freedman was recommending to you about incorporating Dr. Gelbort's findings into your opinion?

A    I am not sure that Mr. Freedman ever. . .(PAUSE).  I don't recall his email.  Obviously I got it, but I really hadn't recalled it.

Q    Okay.  But your recollection is trial counsel never discussed this idea of incorporating --

A    No.

Q    -- Dr. Gelbort's findings into your trial testimony?

A    That's correct.

Q    Did you ever -- as a corollary, did you ever tell trial counsel, as you are preparing, you know, I should not incorporate Dr. Gelbort's findings into my testimony?

A    No.

Q    If Mr. Fields' trial counsel had provided you with Dr. Gelbort's final signed report far enough in advance to incorporate into your trial testimony, -- and I know you don't know the date that you got it, but I think you were talking about a few weeks you would need -- could that information have been used by you to support your opinions about bipolar disorder at trial?

A    (NO RESPONSE)

Q    Just as a general matter, we will get into the details but. . .

A    As a general matter, yes.

Q    So I want to discuss with you now, again hypotheticals here, how you could have incorporated Dr. Gelbort's neuropsychologist findings into your trial testimony if trial counsel had asked you. And I want to break down into two parts.  I want to start with how you could have talked about Mr. Fields' brain dysfunction standing alone and then I want to talk with you about what you could have said about the interplay between brain dysfunction

and bipolar disorder, the cognitive aspects of bipolar disorder that you've mentioned.  Does that make sense, those two parts?

A    Sure.

Q    Do you recall if when Ms. O'Connell questioned you at trial whether she asked you any questions about Mr. Fields' brain damage or brain impairments?

A    I don't recall her asking me any questions.

Q    And the record will reflect that, right?

A    Yes.

Q    Okay.  And let me ask you, if she asked you questions about Mr. Fields' impairments globally or generally and you knew that Mr. Fields had brain impairments and your testimony doesn't reflect any mention of that, would there be a reason for that?

A    Well, the reason would be just getting a report with the data is not enough.  I would have wanted to talk with Dr. Gelbort to make sure that I have a good understanding of how that data flowed and what his findings were, not just reading the numbers. And so just having the report would not have been enough for me to include it.

Q    If trial counsel had asked you directly and clearly, during your trial testimony, if you had an opinion as to whether Mr. Fields' has brain damage, could you have answered that question?

A    Yes.

Q    And what would you have said?

A    I would have said that he does have brain impairment.

Q    And if trial counsel followed up and said can you explain to the jury how those brain impairments standing alone effect Mr. Fields' behavior and functioning, what could you have said at trial?

A    I could have said that there were clear issues of making good decisions, of effective decisions, that there were clear issues of working memory or really recalling things correctly, that there were issues of effective weighing and deliberating and sequencing.

Q    Could you have discussed any issues, again just with the brain impairments, on how that would impact Mr. Fields' problem solving?

A    Yes.

Q    And what would you have said about that, if asked?

A    That in stressful situations -- in new, novel and stressful situations, that these are the kinds of impairments that, in fact, do impair problem solving.

Q    Now, I want to continue on with this hypothetical and then I am going to narrow it even more.  Assume for the purposes of your trial testimony that you had not made a diagnosis of bipolar disorder and Dr. Grinage had not made that either.  So bipolar, just for the purposes of this hypothetical, is not a part of the equation.  The only deficits of which you were aware were the cognitive deficits found on Dr. Gelbort's testing.  So I want to ask you then, do you understand the hypothetical?

A    I do.

Q    Okay.  In that scenario would the impairments shown on Dr. Gelbort's neuropsychological findings on their own affect Mr. Fields' functioning?

A    Yes.

Q    How?

A    Again in very similar ways.  By a slow processing speed, it means that you often don't capture things accurately.  And if I could give a quick analogy that I tend to give most of the time in these situations. . .it is the analogy that – I don't know how many of us are still familiar with *I Love Lucy,* but the *I Love Lucy* show has a particular episode where she and Ethel are working at a factory, a candy factory, and there is an assembly line.  I see some of you already smiling.  If you recall that, they start out and they are wrapping the candy or whatever it is very, very accurately and effectively, but as the assembly line speeds up they are having trouble keeping up and as the assembly line goes faster and faster, they are trying to eat the candy, they are putting it in their pockets, they are throwing the candy away, and that's really an example of working memory and how working memory can become impaired effectively.  And working memory was one of the issues that we saw in Dr. Gelbort's testing, as well as some sequencing issues.  We saw him slow down when there were -- and, in fact, even miss certain areas.  So those are the kinds of things that I would have talked about.

Q    And if there is a report in this case from a government

expert that talks about when Mr. Fields worked at a factory and was reportedly, quote, "the fastest person on the machine," how does that -- what do you -- how do you respond to that in terms of your *I Love Lucy* analogy?

A     I have no idea what that means.  I don't know what the machine is, I don't know what he was doing, I don't know what being the fastest really means.  So there is no way to quantify that.  Whereas, when you look at aspects of his IQ testing, in particular, you see that he has working memory problems.  Those are or were his lowest scores on his IQ testing.  And so that is really what you want to be able to look at.

Q     Now, sticking with my hypothetical about no bipolar disorder, just the brain impairments as shown on the neuropsychological testing, based just on the brain damage do you have an opinion as to whether Mr. Fields could conform his conduct to the requirements – I am sorry, let me rephrase that.

Do you have an opinion, just based on the cognitive impairments, as to whether Mr. Fields' capacity to conform his conduct to the requirements of the law was significantly impaired?

A     I would say yes, they are impaired purely as a functioning -- his capacity would have been impaired, yes.

Q     And what is the reason you would say that?

A     Because the specific types of neurological impairments lend themselves to impairing your potential and that is exactly what we are looking at when we are looking at. . .(inaudible).

Q    And if I just tell you that you mentioned -- this is a -- and what I am trying to get at is the statutory mitigator under the Federal Death Penalty Act under 18, U.S.C., 3592(a)(1), and if I -- if there was testimony that you gave at trial about that statutory mitigator, do you remember that?

A    I don't recall what the mitigator is, so I would appreciate it if you would refresh --

Q    Yes, yeah, okay.  So it is this issue about conforming conduct to the --

A    Correct.

Q    -- the requirements of the law.

A    Right.

Q    Do you recall if trial counsel discussed before the trial that she would like you to opine on that statutory mitigating factor?

A    I don't recall us having that discussion.

Q    Do you -- okay.

         MR. LABOVITZ:  Court's indulgence?

         THE COURT:  Yes.

(PAUSE)

**BY MR. LABOVI**TZ:

Q    Okay. I may have read the question or the statute -- I am sorry.  I may have read the statute incorrectly, so let me just back up and be clear.  The statute says, "The defendant's capacity to conform conduct to the requirements of law was significantly impaired regardless of whether the capacity was

so impaired as to constitute a defense to the charge."

A    Well, I would still agree with it, right, but I don't -- but I don't recall talking about it.

Q    Okay.  But if you had been asked that question by someone who could read clearly the statute at trial, based on just the neuropsychological findings, what would have been your answer?

A    Yes.

Q    Based on the neuropsychological -- I am sorry.  Based on the neuropsychological findings alone, do you still hold your opinion that Mr. Fields has brain impairment regardless of whether he, under my hypothetical, also has bipolar disorder?

A    Yes.

Q    And why is that?

A    Because the testing and the neuro imaging, although that came later, but the testing definitely reflects brain impairment.

Q    And –

MR. WILSON:  Objection, Your Honor.  The witness has just testified regarding imaging that came later, so I don't think it is relevant, and so I am going to object to the last answer given by the witness.

MR. LABOVITZ:  I can withdraw that, Your Honor.

**BY MR. LABOVITZ**:

Q    Okay.  Dr. Woods, just focusing on the neuropsychological testing, regardless of whether Mr. Fields has bipolar disorder, do you still hold your opinion about whether he has brain

impairment?

A    Yes.

        MR. WILSON;  That's been asked and answered, Your Honor.

BY MR. LABOVITZ:

Q    Why is that?

A    I think, number one, the social history is consistent with the neuropsychological testing.  The ability to function more effectively in structure is consistent with the neuropsychological testing.  The issues of sequencing and working memory and abstract thinking are consistent with the neuropsychological testing.  And so, they all stand separate from a diagnosis of bipolar disorder.

Q    And do the issues of neuropsychological dysfunction stand separate from your opinion that you gave at trial about a manic switch?

A    Yes.

Q    Why is that?

A    Because they are separate neuropsychological symptoms.  Neuropsychological symptoms stand alone and then they can be applied to a number of different circumstances.  And so consequently, they don't have to be applied to the bipolar disorder, although they are a component of a bipolar disorder.  They could be applied to a brain injury.  They could be applied to other situations, or they could stand independently.  So they are an

independent factor rather than a – yeah, they are an independent factor.

Q    Okay.  Now, I would like to turn back to the second part of that big hypothetical I gave you about what you could have said at trial had you been asked by trial counsel about the interrelatedness of cognitive impairments on the bipolar disorder that you diagnosed on the manic switch that you diagnosed.

If trial counsel had asked you to consider opining on that very question about this connection between Mr. Fields' brain impairments and your trial opinion about bipolar disorder, what could you have said?

A    I could have said that cognitive symptoms are an important component of bipolar disorder, particularly in the manic phase. That they exacerbate the mood symptoms and create even more significant symptomatology than would be found in just what we call an euthymic state of bipolar -- of mood disorder.  Euthymic is basically you are not manic, you are not depressed.  And that -- as I said, that is just an integral, integral part of the bipolar disruption.

Q    Are these cognitive impairments that you have been discussing consistent or inconsistent with the trial -- I am sorry -- with the diagnosis that you testified about at trial?

A    They are consistent.

Q    And why is that?

A    Because we knew in 2005 that things like verbal memory or

sequencing or problems with digit span, etcetera were part and parcel of bipolar disorder.

Q    Have you testified in other cases that bipolar disorder -- or that brain damage is part and parcel of bipolar disorder?

A    Yes.

Q    Could you have done that here if trial counsel had asked you questions at trial?

A    Yes.

Q    How, if at all, do the testing results from Dr. Gelbort based on standards, norms and data affect the certainty of your opinion about the psychiatric disorders that you testified about at Mr. Fields' trial?

A    They reinforce it.

Q    In what way?

A    Well, we know that cognitive disorders, as I said, are a part of bipolar disorder.  They are less a part of other mood disorders, really not a part of dysthymia, for example.  They present differently and you have different types of cognitive disorders and major depressive disorders.  So these are more consistent with what we see in bipolar disorder.

Q    And is there anything that you could have told the jury in terms of the data and the sort of -- you know, that Dr. Gelbort's testing is grounded in data and whether or not that would have strengthened your opinion about the psychiatric disorders?

A    I'll have to think about that.  I think it would have provided a

greater foundation for me to discuss bipolar disorder and the depth and breadth of bipolar disorder rather than just the mood component of it. Most people think of just the mood component of it, the mood swings, etcetera, and we had those from Teresa Fields and others in terms of mood swings, but I think it would have grounded it in a much more neurological phenomenon, as well as just a psychiatric phenomenon.

Q    If you had been given Dr. Gelbort's final signed report far enough in advance for your satisfaction, you know, to incorporate into your opinion and then asked by trial counsel about this cognitive component of bipolar disorder, could you have explained all of what you had been saying this morning to the jury at trial?

A    Yes.

Q    Do you think that your trial testimony was not as strong as it could have been because Ms. O'Connell did not ask you about the cognitive components of bipolar disorder?

A    I think that there was obviously a piece that I could have talked about that I didn't talk about. I don't know whether that would have strengthened it, but it certainly would have deepened it in terms of me being able to talk about another piece of bipolar disorder.

Q    Now, I would like to ask you about your preparations with Ms. O'Connell and/or Mr. Gant for your trial testimony. Do you recall if prior to testifying at trial you met with Ms. O'Connell to discuss your testimony?

A    Yes.

Q    Did you meet with Mr. Gant?

A    I don't recall meeting with Mr. Gant.

Q    Do you recall meeting with Mr. Barry Derryberry?

A    I recall meeting Mr. Barry Derryberry –

A    It's a tongue-twister.

Q    I've got it.  I can't believe it, but I believe I got it.

I remember meeting with him.  I don't recall meeting with him, for the latter part of your question, which was to discuss or in preparation.

Q    So who was responsible for your -- which of the trial counsel were responsible for your trial preparation, if any?

A    (NO RESPONSE)

Q    Okay, let me ask you this then:  Who do you recall speaking with about preparation for your trial testimony?

A    Ms. O'Connell.

Q    When you spoke with Ms. O'Connell had she told you which witnesses she had already called in the case, the defense case-in-chief?

A    I believe so.  I don't recall exactly, but I believe so.

Q    Did Ms. O'Connell give you any sense when she was preparing you for your testimony, prior to trial, about what types of mitigating evidence the defense had presented so far?

A    I don't recall that.

Q    Do you recall -- what is your recall of the trial preparation --

I am sorry -- the pretrial preparation for your trial testimony?

A    It was limited.

Q    And what do you mean by that?

A    I recall it being the night before.  I frankly do not recall preparation.  I recall some discussion, but unfortunately what I do recall from it was a fairly chaotic circumstance of just feeling unprepared.

Q    Is there any particular memory you have that leads you to use the word chaotic?

A    I remember that there was a Thai dinner being cooked and it seemed as though it was the priority.  And that's really pretty much all I recall.

Q    Okay.  Now, I would like to ask you some questions about how somebody like Mr. Fields with frontal lobe impairments does in structured settings.  And I know you got into this in a little bit in your trial testimony, but I would like to explore that a little bit more.

      Did Ms. O'Connell, in your preparation for her, discuss with you that she wanted you to testify about how somebody with frontal lobe damage could perform an act in a structured prison setting?

A    I don't recall that.

Q    Have you testified on these issues before?

A    Yes.

Q    Prior to Mr. Fields' trial?

A    Yes.

Q    Do you have -- sitting here today do you have an opinion as to whether Mr. Fields' brain impairment that you've testified about is treatable in a prison setting?  And I should say treatable in a structured prison setting.

A    Sure.  You have to take into consideration that as I started out in the first part of our conversation that environment is really treatment and the more structure, the more redundancy, the more repetition, the less choices someone has to make, the less potential stressors someone may be under the greater is their potential for not manifesting certain psychiatric symptoms.  And so structure is very important, as I said yesterday.  Before we had psychiatric medications, we had structure.  So the idea that structure is just where someone resides, that's not true.  Structure is actually a form of treatment that has the potential of limiting people's options, which helps their executive functioning because they don't have to solve as many problems.  They don't have to weigh or deliberate as many things.  And it often reflects an ability to do much better given their cognitive makeup.

Q    Is there any correlation between structure, as a treatment for people and particularly people with frontal lobe brain impairments -- is there any relationship between imposing structure on people with frontal lobe brain impairments as a means of regulating their behavior?

        MR. WILSON:  Objection, Your Honor.  That's not

relevant.  The issue is whether it is treatable, not controlling their behavior.

THE COURT:  Overruled.

BY THE WITNESS:

A     When you say frontal lobe. . .

**BY MR. LABOVITZ:**

Q     Okay, let me rephrase it then.  Given the brain impairments that you identified that Mr. Fields has, is there any connection between those particular impairments and imposing structure on someone with those impairments and then that structure treating the impairments?

A     So the impairments that Mr. Fields had, which is basically impairments of sequencing, working memory, some problem solving, particularly in terms of abstractions, are really impacted by structure because -- for example, in some of the testing we see -- in some of the timed testing Mr. Fields would have to slow down in order to do the test effectively.  Out in the community you can't always slow down, but if you are in a situation where time isn't the issue and you are able to do things redundantly over and over again, number one, you both learn how to do them more effectively and you can do them more quickly, but also the onerous of time pressure is now not on you and it really allows you to function more effectively.  And those kinds of things could work very well for Mr. Fields.

Q     Could you have given this opinion about the treatability of a

structured setting on Mr. Fields' brain impairments at trial had you been asked?

A    Yes.

Q    And when you are giving this opinion about treatability, are you relying on any evidence that -- whether you had it or not – that was not in existence at the time of trial?

A    Well, I am certainly relying -- at the time of trial I am relying on his experience at the two facilities that he was in where he did well.

Q    Pretrial facilities?

A    Pretrial facilities.

Q    Yes.  I just want to make sure that, like, when you are opining -- I just want to be clear when you are opining about this treatability issue, are you relying upon -- let's just use a hypothetical.  Are you relying upon a Bureau of Prisons' record from 2018?

A    I am relying upon all of the Bureau of Prisons' records.

Q    But can I ask you to limit your opinion to what was available to – what was either given to you pretrial or would have been in existence in the realm of the world at that moment.  So don't talk upon -- don't' rely upon anything post-trial.

A    Oh, no.  Well, I -- as I said, I was -- when you asked the question, I was relying upon the pretrial --

Q    Oh, okay.  By BOP, I am referring to his --

A    I understand.

Q    -- his placement in a federal prison.

A    I understand, right.

Q    So if you limit your opinion on treatability to information that you knew or that could have been provided to you at the time of trial because it was in existence, what would be -- would you still hold your opinion about treatability?

A    Yes.

Q    Do you recall that you testified about Mr. Fields' naval service at trial?

A    Yes.

Q    And did the public defender or the federal defender office from Philadelphia, my colleagues or my co-counsel, did they recently provide you with additional information about Mr. Fields' performance when he was serving in the Navy?

A    Yes.

Q    Did that include material -- did that new material include a report from Art Cody?

A    Yes.

Q    Have you reviewed Mr. Cody's report?

A    I have.

Q    To your knowledge is the information contained in Mr. Cody's report based upon information that existed and was knowable at the time of Mr. Fields' trial?

A    Yes.

Q    Did Mr. Gant or Ms. O'Connell provide you with a report

like Mr. Cody's before you testified?

A    I don't recall.

Q    If they had done so, could you have incorporated Mr. Cody's report findings into your opinion had trial counsel asked you questions about treatability at trial?

A    Yes.

Q    Did the new material provided to you for the purposes of this post-conviction proceeding include a declaration from retired United States Navy Captain Raymond Mach?

A    Yes.

Q    Have you reviewed Captain Mach's declaration?

A    I have.

Q    Is it your understanding he was Mr. Fields' commanding officer?

A    Correct.

Q    Is Captain Mach's declaration based on information that existed and was knowable at the time of Mr. Fields' trial?

A    Yes.

Q    Did trial counsel provide you with information such as a declaration from Captain Mach or you know Mr. -- or from Mr. Fields' commanding officer before you testified?

A    Yes.

Q    They did?

A    I'm sorry.

Q    Yeah, that was a bad question.  Did trial counsel provide you

with information from Mr. Fields' commanding officer before you testified?

A    No.

Q    Had they done so, could you have incorporated that into your opinion about Mr. Fields' treatability?

A    Yes.

Q    And did the new materials that were recently provided to you include a declaration from Joseph Stanik, a first lieutenant on Mr. Fields' ship?

A    Correct.

Q    Did you have a chance to review that declaration?

A    I did.

Q    And to your knowledge is that declaration based on information that existed and was knowable at the time of trial?

A    Yes.

Q    Did trial counsel provide you with information like this -- like that is contained in the declaration from Lieutenant Stanick before you testified?

A    That's correct.

Q    They did?

A    They did not.

Q    I keep asking confusing questions.  Could you have incorporated a declaration like Lieutenant Stanik's into your testimony at trial to support your opinion on treatability if counsel had asked?

A    I could have.

Q    So just focusing on those three documents, Mr. Cody's report, Captain Mach's declaration, and Lieutenant Stanik's declaration, how does that information form (sic) your opinion on whether Mr. Fields' brain impairments are treatable in a structured setting like prison?

A    Well, these were structured settings. He was in the Navy. His job was repetitive and redundant. He was part of a larger, obviously a very well-organized, very well-structured group. And all in all, he did well. And that's the type of -- when you stop and think about cognitive impairments, they deteriorate in new, novel, and stressful situations. When you are able to provide this level of redundancy and repetition -- and you can even develop relatively complex abilities if those complex abilities are reenforced over and over and over again. It takes away the guesswork, it takes away the questioning. It allows you to adjust to the speeds. So that really works when you are looking at trying to make sure that cognitive impairments are working at their best.

Q    And did trial counsel discuss with you during this pretrial at any point, whether it was, you know, when you came to Muskogee to testify or during the course of your work on the case. . .did they discuss with you about whether you should -- if they wanted you to -- I am sorry. Whether trial counsel wanted you to incorporate Mr. Fields' naval performance in your testimony to try to support

this treatability issue?

A    No, I don't recall it.

Q    I want to ask you, have you reviewed two reports prepared for the purposes of these post-conviction proceedings by Maureen Baird?

A    I have.

Q    Do those reports focus on Mr. Fields' behavior in a correctional setting?

A    Correct.

Q    I want to just focus on the parts of Ms. Baird's reports that talk about Mr. Fields' behavior while he was incarcerated pretrial.  So information that was in existence and knowable at the time of trial.

Did trial counsel provide you with a report such as like the report that you received from Ms. Biard in this post-conviction proceeding?

A    No.

Q    Had you received that could you have incorporated the information about Mr. Fields' pretrial incarceration conduct into your trial testimony if trial counsel had asked you questions about it?

A    Yes.

Q    And does Ms. Baird's report about Mr. Fields' pretrial incarceration behavior have any impact on your opinion about the treatability of Mr. Fields' brain impairments in a structured

setting?

A    It reinforces my opinion.

Q    In what way?

A    Well, Ms. Baird is an experienced correctional professional, who has seen many prisoners in similar circumstances.  So her opinion as to Mr. Fields' --

MR. WILSON:  Objection, Your Honor.  I don't think this witness can testify about his opinion of another expert. He can testify about what she said --

THE COURT:  Well, I think he can testify as to his reliance and why he is relying on another expert's opinion.

Overruled.  You can continue.

BY THE WITNESS:

A    So. . .may I continue?

THE COURT:  Yes, you may continue.

BY THE WITNESS:

A    So taking into consideration her experience and her sense that Mr. Fields did not have any untoward behavior except early with the suicide attempt, of course, I thought it was very important and supported my opinion.

BY MR. LABOVITZ:

Q    Now, I want to go back to the crime for a minute.

MR. LABOVITZ:  Court's indulgence?

(PAUSE)

BY MR. LABOVITZ:

Q    Okay.  Before I move on, I just want to go back a second to your pretrial preparation with Ms. O'Connell when you arrived here in Muskogee to testify.  It sounds like -- I believe you testified you remembered a Thia dinner was being cooked.

A    Correct.

Q    Do you recall who was preparing that dinner?

A    Mr. Gant.

Q    Okay.  Do you recall what others were doing while the dinner was being prepared?

A    I don't recall trial preparation.  I think I would have to leave it at that.

Q    And in going back to the -- I just want to ask a question about the crime itself, the murders that Mr. Fields confessed to.

Do you have an opinion on whether Mr. Fields' brain impairments played a substantial role in causing him to commit those murders?

A    Yes.

Q    And what is that opinion?

A    Mr. Fields' brain impairments, and what I consider to be his exacerbated brain impairments at that time, impacted his problem solving and his ability to effectively weigh and deliberate.

Q    Now, are the opinions that you have testified to today and yesterday opinions that you could have testified to at the time that you were called as a witness at Mr. Fields' trial proceedings back in July of 2005?

A   Yes.

Q   Had trial counsel for Mr. Fields', Ms. O'Connell, asked you the questions during your trial testimony that I have asked you today and yesterday, could you have given the same answers that you have given during your testimony in these post-conviction proceedings?

A   I believe so.

Q   Are all the opinions that you have reached during your testimony today and yesterday to a reasonable degree of psychiatric and neuropsychiatric certainty?

A   Yes.

Q   Now I would like to ask you if you have reviewed the -- as a part of your work on Mr. Fields' post-conviction proceedings, so post-trial, did you have an opportunity to review a report by Daniel Martell?

A   I did.

Q   And could you take a look at Defense Exhibit 59?

A   Can you scroll down?  (PAUSE)  Okay, okay, okay, okay, okay, okay, thank you.

Q   Is this -- is Defense Exhibit 59 a report that you believe you've been provided during the post-trial proceedings in Mr. Fields' case?

A   Yes.

Q   Do any -- I'm sorry.  And did you have an opportunity at some point prior to today to review this report from Dr. Martel?

A    Yes.

Q    Do any of the opinions that you have expressed today rely upon anything that Dr. Martel said in his report, Exhibit 59?

A    No.

Q    Can you reach the opinion -- and I think I misspoke earlier. So going back one second, the opinions that you have testified to and reached -- I am sorry. The opinions that you have reached and testified to both today and yesterday, are all of those opinions to a reasonable degree of medical and neuropsychiatric certainty?

A    Yes.

Q    Okay. Can you reach the opinions that you have testified to today and yesterday to a reasonable degree of medical and psychiatric certainty without relying on anything in Dr. Martel's report?

A    Yes.

Q    And is that what you have done today and yesterday?

A    Yes.

Q    If you had never been provided with this report from Dr. Martel during these proceedings, would that have had any effect on the opinions that you have given today and yesterday?

A    No.

Q    Why not?

A    Because the opinions or the testimony -- or the testing of Dr. Gelbort provided the indications that I relied upon specifically.

Q    I'm just about done, Dr. Woods, believe it or not.  I just want to ask you some questions about Defense Exhibit 80, if you could take a look at that.

A    Yes.

Q    Do you recognize this as an email that trial counsel, Ms. O'Connell, sent you on September 20th, 2004?

A    Yes.

Q    And I would direct your attention to the paragraph that begins with the number 4.  "What about possible diagnostic imaging?"  Do you see that?

A    Yes.

Q    What is Ms. O'Connell asking you in this September 20th, 2004 email?

A    It appears as though she is asking me about -- it's a broad question diagnostic imaging, which is the field of primarily neuroimaging.

Q    And what is your understanding of -- from this email of diagnostic imaging versus, you know, neurological assessment, you know, or psychological assessment?  Do you have an understanding of what in particular Ms. O'Connell was homing in on there?

A    Sure, sure.  So neuroimaging is really looking at structure and brain function and there are specific instruments like CT scans, for example, that look more at brain structure, is there a hole in the brain, are there other structural abnormalities,

particularly in the boney parts of the brain. And then there are other types of -- and this is very quick. There are other types of imaging that look -- that tend to look at how the brain functions and those are like, you know, MRIs, magnetic residence imaging, positron emission tomography or PET scans. And so you can use neuroimaging to help add another layer of neurological investigation to neuropsychological testing.

Q    And do you see that Ms. O'Connell was asking was there any neuro or any brain imaging that you were considering?

A    Yes.

Q    Do you recall if you responded to her about that particular question?

A    I don't recall responding to her.

Q    Do you know if trial counsel for Mr. Fields ever made arrangements for Mr. Fields to undergo any brain imaging pretrial?

A    I don't recall any brain imaging pretrial.

Q    If during the pretrial proceedings Mr. Fields' counsel had provided you with a report from an expert that documented structural abnormalities in Mr. Fields' brain as shown on MRI testing, is that something that you could have relied upon in reaching your opinion?

A    Absolutely.

Q    And why is that?

A    Because if there had been an MRI that had shown certain types of -- well, there can be many, but certain types of

neurological changes, that would have been very useful in supporting Dr. Gelbort's findings.

Q    And had you gotten such a report or if you had gotten such a report, could you then have testified at trial in July of 2005 about the significance of damage shown on structural brain imaging to your opinion?

A    Really more functional brain imaging than structural, and what I –

Q    Well, if you had gotten a report about -- a MRI report about ---

A    MRI --

Q    -- an MRI report about showing the results of –

A    Yes.

Q    -- brain imaging done of Mr. Fields, could you have testified about the significance of that at trial?

A    Sure.

Q    Have you done -- have you given such testimony about brain imaging and the impact on your opinion in other cases?

A    I have.

Q    Can you have significant -- well, actually I like the word you used better.  You said what you would – what was the adjective that you used about Mr. Fields' brain impairments, like the descriptor?  Do you remember?

A    I don't. . .

Q    Exacerbated.

A    Exacerbated.

Q     If you have exacerbated brain impairments as shown on neuropsychological testing,. .okay?  Let's assume that.

A     Right.

Q     And now let's assume there is MRI imaging that is, quote, unquote, "normal," you know that is the opinion of the radiologist who read the scans. . .okay?  Again it's just a hypothetical.

A     Okay.

Q     Assuming you have the neuropsychological testing that you had in this case and then assume you have this apparent -- or there is an allegation of a normal MRI, can you still have those exacerbated brain impairments?

A     Of course.  It happens all the time.

Q     Why is that?

A     Because. . .it is depending upon so many factors.  Number one, the quality of the machine.  Are you dealing with a –

COURT REPORTER:  Can you repeat that?

BY THE WITNESS:

A     The quality of the machine --

THE COURT:  You need to repeat what you said, the name of --

THE WITNESS:  Oh, I'm sorry.  I apologize.

THE COURT:  It's challenging, I get it.  I'm sorry.

BY THE WITNESS:

A     Are you dealing with a .3 Tesla, a 1.5 Tesla, what kind of machine are you dealing with?  You are also dealing with -- are

you -- do you have a neuroradiologist that is reading the finding as opposed to, you know, a very, perhaps, qualified radiologist that looks at knees and hands and everything else and happens to look at the brain as well, but more importantly neuroimaging doesn't always capture the nuances that is captured by neuropsychological testing. So you can have it both ways. You can have brain images that are significant in terms of their unusual presentation with no everyday functioning problems, or you can have functioning problems that are important and relevant but not necessarily (sic) impairments in the brain -- in the brain imaging.

MR. LABOVITZ: The Court's indulgence, Your Honor.

THE COURT: Yes.

MR. LABOVITZ: I have no further questions for direct, Your Honor.

THE COURT: I assume you are going to have some cross examination, Mr. Wilson?

MR. WILSON: I think so, Your Honor.

THE COURT: All right. We are at 10:25. Why don't we take a break now and we will come back and maybe see if we can get that done by noon, but if not, obviously we will deal with that. We will take our mid-morning break. We will come back at 10:40. We are in recess.

(10:25 a.m.)

(SHORT RECESS)

(10:44 a.m.)

COURT IN SESSION

THE COURT:  All right, please be seated.

We are back on the record from our mid-morning break.

Mr. Wilson, are you ready to proceed?

MR. WILSON:  Yes, Your Honor.  Thank you.

THE COURT:  Dr. Woods, are you ready?

THE WITNESS:  I am.

THE COURT:  All right.  You may proceed.

CROSS EXAMINATION

BY MR. WILSON:

Q    Dr. Woods, how much are you being paid for your testimony at this hearing?

A    $500.00 an hour.

Q    And I believe counsel asked you yesterday, but you've never testified on behalf of the United States; is that correct?

A    I've never been asked to, that's correct.

Q    You've never testified on behalf of any state prosecutors; isn't that correct?

A    Many, many years ago, in the 1990s.

Q    In the 1990s?

A    In the 1990s.

Q    In a criminal case?

A    Yes.

Q    And I believe you testified that currently your practice is about twenty percent or -- I am sorry -- thirty percent forensics; is that right?

A    That's correct.

Q    Okay.  And so back in 2005, it was forty percent, so it has dropped about ten percent?

A    Correct, that's correct.

Q    Okay.  And you are not a board-certified neuropsychiatrist; isn't that correct?

A    That's correct.

Q    And you have been qualified as an expert -- I believe your testimony yesterday was – excuse me – you stopped counting at 500?

A    Correct.

Q    When did you stop counting?

A    I actually probably wasn't counting even before that, but my office was kind of keeping up and I don't really consider it to be a relevant number.

Q    So you are only going to answer the questions that you believe are relevant?

A    No, I answered the question.  No, I said I didn't really consider the number times I've testified to really be a relevant number, not the question.

Q    At the time you testified in this case back in 2005, you had been qualified about sixty times; is that correct?

A    I really don't know, but probably.

Q    If that was your testimony, you have no reason to doubt that, correct?

A    No.

Q    And you were initially retained --

MR. WILSON:  Judge, I apologize.

THE COURT:  That's okay.  This weather is getting to us all, or the allergies I guess I should say.

**BY MR. WILSON**:

Q    You were retained in this particular case and not from a post-conviction relief side but originally in April of 2004, correct?

A    I will take your word for that.  I don't know the exact date, but approximately --

Q    Let me strike that.  You were actually contacted by Ms. O'Connell in April of 2004.

A    Okay, sure.

Q    And I believe contracted around the first of May of 2004.

A    Okay, okay.

Q    And you had previously worked with Isiah Skip Gant, correct?

A    Yes.

Q    But you had never worked with Ms. O'Connell before; is that correct?

A    That's correct.

Q    And when you got involved in this case, you were asked to

provide your expertise in the area of neuropsychiatry, correct?

A    That's correct, sir.

Q    When you talked with Ms. O'Connell initially do you remember what your discussion or plan was with how you were going to proceed with your assessment in this case?  Was there a plan or a roadmap?

A    I don't recall having that conversation with Ms. O'Connell, but I have a pretty standard approach to cases.

Q    Okay.

A    So I –

Q    So you don't recall any particular conversation?

A    No.

Q    But you do know that you did request that there be some neuropsychological testing performed, --

A    Correct.

Q    -- correct?

A    That's correct.

Q    And I believe counsel had maybe asked you this yesterday, but do you remember chronologically speaking whether you were retained first or where Dr. Gelbort was retained first?

A    I don't know, but I am -- I am not speculating, but I think that I was retained first and Dr. Gelbort may have been retained second, but I am not sure.

Q    And I believe there has been testimony that Dr. Gelbort performed his evaluation and testing of Mr. Fields in August of

2024 --

A    I think that's --

Q    I am sorry, 2004.

A    I got you.  I think that's correct.

Q    And so that would have been roughly four or five months after you were retained, correct?

A    Yes, sir.

Q    Okay.  And are you aware that -- do you have any reason to disagree -- if Dr. Gelbort was retained in July of 2004, do you have any reason to doubt that?

A    No.

Q    And prior to Dr. Gelbort conducting his evaluation and testing, did you and he talk?

A    No.

Q    When is the first time that you and Dr. Gelbort talked?  Do you recall?

A    I think that it was after he had completed his testing.

Q    And so sometime after August of 2004?

A    Correct.  And when we say you talked, can you tell the Court in what way that took place?  Was it telephonically, was it in person, or do you remember?

A    No, I don't remember, but I am sure that it was not in person.  I am sure that it was on the telephone.

Q    And was that a conference call including Ms. O'Connell or Mr. Gant, if you recall?

A    I recall it being a call between Dr. Gelbort and myself, that first call.

Q    And what was the purpose of that initial conversation?

A    Well, I didn't know Dr. Gelbort and so I wanted to, first of all, acquaint myself with him. And I wanted to get some understanding of what testing he had done.

Q    And again, I know this took place just a couple of years ago -- and I say that facetiously. Do you have a best recollection of the time frame in which that initial conversation took place? You said it was after the testing.

A    Right.

Q    But would it have been within a short period of time after the testing, or do you recall?

A    What I do recall, Mr. Wilson, is that it took several calls, but I don't recall the timing.

Q    All right. Let's drill down into that a second. Okay?

A    Okay.

Q    You say it took several calls.

A    Right.

Q    What do you mean by that?

A    We played phone tag for a while, and that's what I recall.

Q    Professionals are sometimes busy, correct?

A    Right, right.

Q    So you tried to call him, he tried to call you; is that right?

A    Correct.

Q   And that happens, I understand, but at some point that difficult or that communication then crosses the line into difficulty.

A   Right.

Q   And then maybe another line into frustration?

A   Right.

Q   Okay.  Let's talk about that.

A   Okay.

Q   In setting up that initial conversation did it get to the point where it became difficult?

A   So. . .it took some time.  I understand the differentiation that you are making, but I tend to be non-judgmental about those things unless there is a time frame, there is a time limitation. So it took some time.

Q   Let me ask it this way.  Did you ever -- did you get frustrated in trying to set up your initial conversation with Dr. Gelbort?

A   Given where I was in my evaluation, I didn't get frustrated, but I wanted to talk to him.

Q   Because you --

A   I am sorry?

Q   And why is it that you wanted to talk to him at that stage in your evaluation?

A   Because -- Mr. Wilson,  yesterday I talked about differential diagnoses.  And as a neuropsychiatrist, a lot of my differential diagnoses rely upon what I find in neuroimaging or in

824

neuropsychological testing.  So it was hard for me to move forward and really, as you said, drill down.

Q    And I take it -- and you correct me if I'm wrong, but I take it you had already begun to review social history?

A    I had.

Q    And you had already begun to formulate a potential Hypothesis or maybe again looking at the differential diagnosis, correct?

A    Correct.

Q    And so in order to assist you in your evaluation, it was necessary to find out what Dr. Gelbort had done, what testing he had performed, and what he had found out, correct?

A    Correct.

Q    And so at whatever point you were able to consult with him regarding that data and his findings, correct?

A    Correct.

Q    And that included the specific findings that he reached in reference to the psychological tests that he performed, correct?

A    Correct.

Q    And I believe you testified about some of those yesterday, the trail making. . .

A    Trail making, the Wechsler Memory Scale, partial, the Reitan Category Test –

Q    All right.

A    -- the

Q    That's all right, I didn't ask you for all of them.

A    Yes,  you probably wouldn't get all of them, so. . .

Q    But those results were, I believe you testified, valuable to you as a part of your determining this differential diagnosis, correct?

A    Yes.

Q    So when you are -- in your report that was ultimately generated in June of 20 -- no, excuse me 2005, you informed the reader of this report that you had consulted with Dr. Bradley Grinage?

A    Correct.

Q    But you didn't put in there that had consulted with Dr. Gelbort, did you?

A    I don't recall that I did.  I mean, I don't recall that I put that in my report.

Q    You don't remember or do you just. . .would looking at it help refresh your memory?

A    I don't recall what I put it in.

Q    Okay.  And so is it because you forgot that you consulted with him or did you choose not to include that in your report?

A    Well, I would have not (sic) chosen to put it in.

Q    So you forgot?

A    Yes.

Q    I know that opens a huge door to go through what else did you forget, and I am not going through that door, okay, at this point.  But you testified that -- in this hearing that Mr. Fields has

brain impairment; is that correct?

A    Yes.

Q    Counsel asked you about -- asked you a question and he phrased the question in the form of brain damage.

A    Yes.

Q    And your response was he has brain impairment.

A    Yes.

Q    There's a difference between the two, correct?

A    That's correct.

Q    He is not brain damaged?

A    He is brain damaged, but the discussion that we were having did not include material that I received after the trial. So based upon the material that I received or that I relied upon pretrial, I would call it brain impaired.

Q    So all of the information that you've testified about that you used, the neuropsychological testing, and your own evaluations, determined that he had brain impairment, correct?

A    Yes.

Q    Not that he had brain damaged, but brain impairment?

A    Yes.

Q    So we had the initial conversation with Dr. Gelbort. Did you have other conversations with Dr. Gelbort regarding his findings concerning Mr. Fields?

A    I probably would have had one more, perhaps two.

Q    And I take it when you had those conversations that you

would have shared the results of those with Ms. O'Connell; is that correct?

A    I certainly would have shared the overall impression.

Q    Fair enough.  Counsel asked you about a meeting that took place, and I don't believe he asked you about when it took place. I am going to ask you.  Do you recall that line of questioning that you had earlier about a meeting that took place?

A    I do and I am not sure. . .there were several meetings.  And I think the meeting he was talking about was after I had seen Mr. Fields and I believe we had received or I had received some of Dr. Gelbort's information.  I had not received it, but he and I had talked.

Q    Okay.  Because I wanted to ask you about what you meant by that.  When you said you received his information, you just talked with him?

A    Correct.

Q    Had you seen the raw data?

A    I couldn't see the raw data.

Q    Okay.  Had he provided you the raw data?

A    He couldn't provide me the raw data.

Q    When you say he couldn't. . .

A    As a psychiatrist --

Q    Wasn't able or wasn't physically able to do that?  What do you mean?

A    As a psychiatrist he could not provide it to me directly.  He

thought --

Q    Did you ask for it?

A    I don't think that I asked for it because --

Q    The question was, did you ask for it?

A    Yeah.  Well, I am just explaining.

Q    I didn't you to explain --

A    I don't believe that I --

        MR. LABOVITZ:  I would ask that the witness be permitted to answer the question.

        THE COURT:  Well, they are talking over each other.

        THE WITNESS:  I'm sorry.

        THE COURT:  Let's ask questions and get an answer and then we will --

        THE WITNESS:  I apologize.

        THE COURT:  -- sort it out.

BY THE WITNESS:

A    I -- the American Psychiatric Association has --

        MR. WILSON:  Your Honor, I would object to the answer.  May I just rephrase the question?

        THE COURT:  You may.

BY MR. WILSON:

Q    Did you ask for the raw data?

A    I couldn't ask for the raw data.

Q    So the answer is no?

A    Correct.

Q   Okay.  But in your discussion with him, he provided you the interpretation of that raw data, correct?

A   Correct.

Q   And so you had had that conversation with him and then you did your own sit down, multiple sit downs --

A   Correct.

Q   -- with Mr. Fields, correct?

A   Correct.

Q   And then we are talking about the meeting which counsel and you talked about yesterday, correct?

A   Correct.

Q   And there was some testimony earlier in the week about a meeting which took place in Tulsa and --

A   Yes.

Q   And I think it took place in Ms. O'Connell's office?

A   Yes.

Q   And is that the same meeting that you were talking about?

A   I believe so.

Q   And that Mr. Derryberry was in the room?  Do you recall that?

A   No, I -- no, t hat's a different meeting.

Q   Oh, that's a different meeting?

A   Yes.

Q   Okay.  Well, do you know whether or not the meeting you and counsel were talking about yesterday, was that before or

after the meeting that Mr. Derryberry was in?

A    The meeting with Mr. Derryberry was right before the trial testimony.

Q    So you didn't see Mr. Derryberry until right before trial?

A    I may have.  I don't recall.  I recall dealing primarily with Ms. O'Connell and at times with Mr. Gant.

Q    If Mr. Derryberry testified that he was involved in a meeting in October in the office and you were there and Ms. O'Connell was there, is he mistaken or you just don't remember that?

A    He may have been.  I don't recall.

Q    Was Dr. Gelbort in that meeting in October?

A    I think he may have been on the telephone.  He wasn't in the -- he wasn't there.

Q    Not physically there?

A    Correct.

Q    But you believe he was there telephonically?

A    Yes.

Q    And so in that meeting that you, Ms. O'Connell for sure. . .

A    Yes.

Q    And maybe Mr. Derryberry?

A    Yes.

Q    And Dr. Gelbort telephonically?

A    Yes.

Q    Anybody else that you remember?

A    I think Mr. Gant.

Q    Okay. Mr. Gant was present?

A    Yes.

Q    And I believe he testified earlier in the week that he was invited to come to this meeting so he could -- so you could talk with him about your theory of the case –

MR. LABOVITZ: Objection, Your Honor. Theory of the case is a legal determination by trial counsel. Dr. Woods is a medical and mental health expert. He gives his opinions to trial counsel and they make their theory of the case. That is a complete mischaracterization by the government to try to put theory of the case onto the expert.

THE COURT: Overruled. I mean, he can ask the question and the witness can answer it if he can.

BY MR. WILSON:

Q    But your theory of the case was that --

MR. LABOVITZ: I would renew my objection.

THE COURT: Same ruling, overruled.

BY MR WILSON:

Q    That your theory of the case was that Mr. Fields had experienced -- and that has been referred to a couple of different ways – a manic flip or a manic switch.

A    Correct.

Q    Do you recall that?

A    Yes.

Q    And that you wanted Mr. Gant to be present so you could

discuss that with him, correct?

A    Uh. . .well, I do want to state that I don't have a theory of the case.

Q    Okay, I appreciate that.

A    You know, my differential diagnosis --

Q    So you -- I am sorry.

A    -- was -- included a manic switch.

Q    So you wanted to talk about your differential diagnosis that you had eliminated other things.  Isn't that what you do in a differential diagnosis?

A    Yes, although I don't believe at that point I had eliminated all other things.

Q    Did you have a working hypothesis as to what was going on in Mr. Fields' brain and mind on July the 10th when he murdered two people in southeast Oklahoma?

A    I believe that -- I could not say that I had narrowed it down to a definitive diagnosis, but I had narrowed it to a mood disorder.

Q    And in the field of science, we use hypothesis, and we do testing to reach that hypothesis.

A    Correct.

Q    And does that apply in the field of neuropsychiatry?

A    Sure.

Q    So in your assessment at that time had you reach a hypothesis that at the time that Mr. Fields killed two people that he was acting under a manic flip or manic switch?

A    No.

Q    You had not reach that hypothesis --

A    No.

Q    -- at that point?

A    No.

Q    Had you considered it at that point?

A    Yes.

Q    And you wanted to discuss that consideration with Mr. Gant and Ms. O'Connell, correct?

A    Among others, yes.

Q    I am sorry?

A    Among others.

Q    And you also wanted to talk with Dr. Gelbort and see how his findings would factor into that potential hypothesis, correct?

A    I really wanted him to -- well, not quite, Mr. Wilson. I really wanted him to talk about his findings to the team.

Q    And that would be helpful to you as a part of your diagnosis to determine how that fit into a potential diagnosis of manic switch or manic flip, correct?

Q    Again, I – I want to make it clear that I wasn't just focused on manic switch, but I did think that having him present his findings would give the team enough -- would give the team enough information that I could then take it further. I had another -- at least one other diagnostic (inaudible) and that was schizoaffective disorder. So I wasn't really focused totally on

the manic switch at that time.

Q    If Mr. Gant testified that the purpose of the meeting was for you to educate him on the manic switch, then he maybe misunderstood that purpose?

A    That was certainly part of it.  I am not denying that.

Q    Okay, fair enough, fair enough.  So you had the conversation sometime after the original testing by Dr. Gelbort.  You had the meeting in October which Dr. Gelbort was involved in, correct?

A    Correct.

Q    And then do you recall if there were any other meetings that took place either telephonically or in person before the trial?

A    I believe there was one other meeting and there was a point at which I received the raw data.

Q    And so before the trial you had an opportunity to review the raw data, correct?

A    Yes.

Q    And were you aware – and I apologize, we are going to circle back, okay, in a minute?

A    That's okay.

Q    But based upon your answer, you were aware that there were some questions about the testing that Dr. Gelbort had performed?  Were you aware of that?

A    I don't recall that.

Q    Do you know a person by the name of David Freedman?

A    I know David.  I knew Dr. Freedman or I mean I know

Dr. Freedman, yes.

Q    Okay.  And at the time back in 2004 and 2005, he wasn't Dr. Freedman at that time.

A    Correct.

Q    Is that correct?

A    Correct.

Q    But you knew him back in 2004; is that correct?

A    That's correct.

Q    Did you work with him in cases back in 2004?

A    Yes.

Q    And you had worked with him in cases before you had gotten in the Fields' case, correct?

A    Yes.

Q    And you respected him, right?

A    Yes.

Q    Okay.  Do you know Lisa Greenman?

A    Yes.

Q    And she's an attorney, right?

A    Correct.

Q    And had you consulted with her in cases before the Fields' case back in '03, '04 and '05?

A    Uh. . .most likely.  I am not as sure as I am of Mr. -- may I call him Dr. –

Q    Sure, that's fine.

A    Okay, sure.  -- of Dr. Freedman.

Q    Let me ask you this:  Did you ever see a report from Dr. Gelbort?

A    I think I did eventually, yes.

Q    Did you ever see a draft report?

A    No.

Q    You weren't shared a draft report?

A    No.

Q    Did you ask to see a draft report?

A    I have never asked to see a draft report.

Q    So the answer is no?

A    Correct.

Q    Were you aware that Dr. Gelbort had prepared a draft report?

A    No.

Q    So you didn't have any conversation with Ms. O'Connell about the fact that there was a draft report?

A    Correct.

Q    And did you do that intentionally?

A    I've never asked for a draft report.

Q    And did you have a conversation with Mr. Gant about whether or not there was a draft report?

A    No.

Q    At any time did you become aware that there were scoring errors in Dr. Gelbort's report or his findings?

A    I don't recall that -- becoming aware of that.

Q    If you were to testify using information from Dr. Gelbort's findings, then you would be subjected to the cross examination that would come along with that, correct?

A    Correct.

Q    And if there were scoring errors, then when you were testifying and relying upon that data, you would have had to encounter the questions about the errors in the data?

A    Correct.

Q    Counsel earlier, I think yesterday and today, provided you or showed you an email, Defendant's Exhibit 158. Do you see that?

A    Yes.

Q    And do you recognize that as one of the exhibits that you were asked about earlier?

A    Yes.

Q    And again, this is an email from Dr. Freedman or Mr. Freedman?

A    Sure.

Q    David?

A    Yes, David.

Q    And it is dated February the 1st of 2005, correct?

A    Correct.

Q    And that was obviously after the October 20, 2004 meeting?

A    Correct.

Q    Do you know if it was before or after you had received the

raw data?

A    I don't.

Q    You don't know one way or the other?

A    No, sir.

Q    But when he referred to. . ."I recommend to her that you review the Gelbort stuff," what is the Gelbort stuff?

A    I would assume it would be his findings.

Q    You don't know whether that included the raw data or not?

A    I don't, not at that time.

Q    And when it says, ". . .just include what helps the bipolar disorder," would you agree with me there is an inference that that means that you leave out something else?

MR. LABOVITZ:  Your Honor, I would object.  He is asking Dr. Woods to interpret what another witness intended. That witness was present yesterday and he could have --

THE COURT:  Sustained.

MR. WILSON:  May I rephrase the question?

THE COURT:  Yes.

BY MR. WILSON:

Q    What did you infer he meant when he said, ". . .just include the things that –" sorry, Judge.  ". . .just include what helps the bipolar disorder."  What did that mean to you?

A    Mr. Wilson, I really don't know how to interpret that because I can't leave out -- if I am getting testing, I can't leave out certain testing and include certain testing.

Q    So I take it that you contacted David and said David, I got this email; what do you mean?

A    No, I didn't. I didn't do anything with that. In fact, I don't recall this email, but I really didn't do anything with this email. I was really more focused on this second to last sentence about preparing a very careful chart of onset and course. . .which, as I recall, never happened. So I really -- I kind of put -- I kind of understood what Dr. Gelbort's findings were as he related them to me, but I did not -- but I don't recall talking to her (sic) about that.

Q    So is it your testimony you just received this email kind of out of the blue?

A    Yeah, yes.

Q    And there had been no previous discussion concerning issues with Dr. Gelbort?

A    And I mentioned this earlier, Dr. Gelbort and I had been exchanging – we had been playing telephone tag. And so was I able to reach him every time that I would have liked, not necessarily, but I felt like it was probably reciprocal. I did not find him to be difficult, but my interaction with him was pretty limited.

Q    Had you previously discussed with Mr. Freedman that -- any concerns about the sloppiness of Dr. Gelbort?

A    I really don't recall talking to Mr. Freedman in the case or Ms. Greenman. Ms. Greenman --

Q    Well, obviously there was -- just looking at this email, did it give you the impression that David understood that you were going towards a bipolar disorder diagnosis?

A    I think that is probably true, yes.

Q    And so at this point you had left schizoaffective disorder and now had focused on bipolar, correct?

A    I don't believe that I ever left schizoaffective.  As I recall in my report, I used both -- I put in both of them, but -- because you can have a bipolar component of schizoaffective.  But it was certainly more being framed around bipolar, whether it was bipolar schizoaffective or bipolar alone.

Q    Had you reached an opinion at that point regarding whether or not Dr. Gelbort was sloppy?

A    I had not.

Q    As a result of your interaction with Dr. Gelbort in the -- or excuse me -- in the evaluation of Mr. Fields, did you reach an opinion as to whether or not Dr. Gelbort was sloppy?

MR. LABOVITZ:  Your Honor, I just would ask for a clarification.  I think sloppy is a big ambiguous and. . .I mean, it could refer to his style of clothing.  I mean, it just is. . .I would like to know what they mean by sloppy.

THE COURT:  Overruled.

BY THE WITNESS:

A    Not being someone who does test scoring, it would have been difficult for me to determine that Dr. Gelbort was sloppy.

**BY MR. WILSON:**

Q    Fair enough.  I want to direct your attention to Government's Exhibit Number 8, and I want to go to Page 2.  It appears that this is a different chain involving the same email that we looked at a few minutes ago.

A    Yes.

Q    And at the bottom of Page 2 it is the same email regarding reviewing the Gelbort stuff.  Would you agree with that?

A    Yes.

Q    And then at the top of this page there is an email from you, I believe, gwwoods@gwwoods.cnc.net.  That was also one of your email addresses, --

A    That's correct.

Q    -- correct?

         THE COURT:  He answered.  He said that's correct, if you were waiting –

         MR. WILSON:  Oh, I'm sorry.

         THE COURT:  -- for the answer.

         MR. WILSON:  Yes, I didn't --

         THE COURT:  There was a little cross talk, but --

         MR. WILSON:  That wasn't a pregnant pause for --

         THE COURT:  Well, I assumed. I am trying to help here wherever I can.

         MR. WILSON:  I think I will put my hearing aid back one more level.

BY MR. WILSON:

Q    Can you explain what this email was about?  When you say did she tell you. . .do you know who you were referring to?

A    You know, I was trying to. . .I was looking at that.  (PAUSE) I don't know if. . .I find it hard to believe that this would be Ms. O'Connell.  It may have been Ms. Shettles or it may have been an interview with some -- and I keep forgetting who Teresa Fields is, but some other person.  I find it hard to believe that it was Ms. O'Connell because Ms. O'Connell really didn't have any knowledge about the manic switch.

Q    Hang on, let me ask you about that.  Look at the date of the email.

A    Right.

Q    What's the date?

A    February 1st.

Q    Of 2005?

A    Correct.

Q    The meeting regarding manic switch was in October of 2004, correct?

A    Correct.

Q    So Ms. O'Connell was well aware of the manic switch, correct?

A    She was knowledgeable about -- that there was such a thing, yes.  This seems a bit different to me.  This is about -- it seems more in depth, like it is actually related to the medication.  This

strikes me as something that you would find in a medical record or in a social history.  It may have been Ms. O'Connell.  I just don't know.

Q    All right.  And the reason I go to this particular email is because earlier you testified that you really didn't know why David would have sent you this email.

A    Correct.

Q    But apparently you responded talking about the case, correct?

A    Yes.

Q    So you obviously had had some previous discussion with him about the case, correct?

A    I am not sure of the connection you are making between the lower email and the upper email.

Q    I don't either.  That's why I am asking you the question, Doctor.

A    Okay, so ask me the question again.

Q    Let's just move on.  Let's turn to Page 1 of that document. And I believe you said you had not formed an opinion about Dr. Gelbort, correct?

A    Yes.

Q    Well, you apparently had.  Look at the top of Page 1, Government 8.  And again, you would agree with me that this is an email dated February the 1st of 2005, right?

A    Yes.

Q    And it is from the same email address -- oh, no, I am sorry. It is from comcast.net, that email address, correct?

A    Correct.

Q    To David Freedman, correct?

A    Correct.

Q    Can you just read that out loud, please?

A    I would rather not.  You mean my response?

Q    You can dash-dash-dash some of the words if you feel more comfortable.

A    "I dash-dash-dash hope so.  Thanks so much.  You're right about Gelbort."

Q    So you had formed also a similar that Dr. Gelbort was sloppy, correct?

A    No.  You see, when I looked at this -- I think I've already said to you that -- you asked me was I frustrated, etcetera.  I think I said that I gave him the benefit of the doubt in terms of trying to contact him and him trying to contact me.  So I can't comment on the sloppy, but what I can comment was -- and I think this was more upon the exceedingly difficult to work with part because in the --

MR. WILSON:  I am going to object as nonresponsive, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A    So as I said before, I cannot comment on the sloppy, but I

can comment on the fact that I had -- and I think others had had difficulty communicating with him.

Q    So you agree with the fact that he is difficulty to work with?

A    He was difficult to communicate with.  I couldn't get in touch with him.

Q    And did you express that same opinion with Ms. O'Connell?

A    I think on several occasions I did ask her to see if she could get the neuropsychological findings and testing.

Q    And when you have to ask her several -- more than one time to do that, it gets more and more frustrating to you, correct?

A    Yeah, yes.

Q    I get it, I get it.  All right.  So that's an email that took place in early February of 2005.  And at this point you obviously have not finalized your report because you didn't finalize it until June of 2005, --

A    Correct.

Q    Is that correct?

A    That's correct, sir.

Q    And this may be -- this is a difficult question.  I'll tell you that right up front.  Between February 1st of 2005 and the date in June when you signed your final report, at what point did you reach your opinion?  And when I say reach your opinion, your opinion on what was going on with Mr. Fields at the time he murdered two people in southeast Oklahoma.

A    I would say. . .this is February. . .I don't know, but I would

say by May or June.

Q    Between February 1st and May or June, had you had conversations with Ms. O'Connell?

A    I don't recall. I. . .

Q    You could have, you just don't remember?

A    I am sure that I did, but I don't recall.

Q    And in those conversations that you likely had, you would have been discussing your thoughts, your ideas about what your theory was at that point, correct?

A    About what my differential was.

Q    What your differential was. And during this time frame, I assume you are still looking at social history, all the records that have been collected by Gloria Shettles, correct?

A    Correct.

Q    And that includes the naval records, correct?

A    Correct.

Q    And that includes the reports of the case itself, the discovery that we call it?

A    That's correct.

Q    It would have included the law enforcement reports, --

A    Correct.

Q    -- correct? Is that right?

A    Yes.

Q    It would have included all of the mitigation interviews that Ms. Shettles had performed, correct?

A   That's correct.

Q   Looking at all of the medical history of not only Mr. Fields but of his family members as well, correct?

A   Yes, sir.

Q   Because you were aware of his mother's mental health history, correct?

A   Yes.

Q   And his sister's mental health history?

A   Yes.

Q   Because you testified about both of those at trial, didn't you?

A   Yes.

Q   And you testified about his naval time at trial, --

A   To some degree.

Q   -- correct?  Is that right?

A   To some degree, that's correct

Q   And you called it a structured environment, didn't you?

A   Yes.

Q   So you testified in front of the jury in this case that Mr. Fields performed well in a structured environment, correct?

A   I don't' recall my testimony.  I do recall that I did talk about a structured environment, but I don't recall exactly. . .I am sure it was something similar to that.  I don't recall exactly what it was though.

Q   And all of that information that you were consuming is all part of your making of a differential diagnosis, correct?

A    Yes.

Q    Which ultimately I believe, according to your testimony, was in May or June finalized and then you created your report in June of 2005?

A    Yes.

Q    Now, I think counsel went through some emails and I am going to go through some of them quickly with you.  Defendant's 211 is the first one that counsel showed you.  Do you recognize that email?

A    Yes.

Q    And Ms. O'Connell asked you for a draft report?

A    Yes.

Q    What is a draft report?

A    A draft report is an initial report before you have put in your complete findings.

Q    All right.  So what is the purpose of a draft report when you are going to give it to a defense attorney?

A    Even though defense attorneys and other attorneys frequently ask for draft reports, my pattern and practice has been to write my complete report and call it a draft report but unless there are very minor changes, certainly nothing substantive, I don't really give reports that can be changed substantially.

Q    Well, you recall receiving an email from Ms. O'Connell about send me a report because we may need -- strike that.  I'll come back.

So when you provide a report your pattern and practice is basically that's the final product?

A    Correct.

Q    And when you -- did you ever provide a draft report to Ms. O'Connell or did you just give her the one on June the 25th?

A    I don't recall providing her a draft report.

Q    Does that mean you didn't, or you just don't recall?

A    I don't recall.  I can't imagine, although I may have.  There have been occasions, but providing draft reports are rare in my experience unless they are 99 percent complete.

Q    So your answer to my question is you don't know for sure?

A    I'm sorry.  I just. . .I don't recall.

Q    Okay.

A    I apologize.

Q    And then in 212, Defendant's Exhibit 212, is an email the same day -- I apologize.  I need to go back to 211 for a moment.

Just so the record is clear, 211, that email was generated on June the 12th, 2005 at 6:01 p.m.  Do you see that?

A    I see it. . .oh, yes, 6:01.

Q    Your response is at 6:01.

A    Got it.

Q    Okay.  Now, let's move to 212.  There appears in 212 -- and this is kind of a timing anomaly.

A    Right.

Q    But the bottom of this email was actually generated at

3:08 p.m.  Do you see that?

A    I do.

Q    And obviously Ms. O'Connell is thanking you for getting back with her on the previous email quickly, correct?

A    Right, right.

Q    All right.  And in this email, I believe -- and I don't want to belabor this, but you are just telling her I will get to it as quick as I can?

A    Correct.

Q    Okay.  Let's move to Defendant's Exhibit Number 187. We are now at June the 18th.  Would you agree with that?

A    Yes.

Q    Some six days later.

A    Correct.

Q    And Ms. O'Connell sends you this email and then you respond at 12:35 p.m., correct?

A    Correct.

Q    And in this email counsel pointed out a portion of it earlier about. . ."so I need the report "double-top ASAP."

A    Correct.

Q    All caps ASAP, right?

A    Yes.

Q    But she also indicates why she needs this particular report, does she not?

A    Yes.

Q    And it is something associated with the defense of Mr. Fields but not the trial, correct?

A    Yes.

Q    It was to present this as part of a request to have the death penalty deauthorized, right?

A    Correct.

Q    And you are aware of what that process is, correct?

A    Yes.

Q    And you were aware of it back in 2005, correct?

A    Yes, yes.

Q    That a U.S. Attorney can't independently determine whether or not to seek the death penalty.

A    Correct.

Q    It has to go through the Department of Justice, correct?

A    Correct.

Q    And the A.G. is the one who authorizes?

A    Correct.

Q    But the A.G. -- even though that person -- the A.G. can authorize it, it can be deauthorized afterwards, correct?

A    Correct.

Q    And you had discussions with Ms. O'Connell about that, correct?

A    I am not sure that I did.  I understood the process, but I am not sure that she and I talked about it specifically.

Q    Okay.  But was it clear to you that to resolve this email,

she wanted to use your findings to maybe buttress an argument to ask the Department to deauthorize to seek the death penalty?

A    Yes.

Q    And so you respond, "Ill work on it," correct?

A    Yes.

Q    Now, let's move to Defendant's Exhibit Number 186. Can you see that email, please?

A    Yes.

Q    All right. And again, these go from bottom to top as far as timeline. But you will agree with me that this particular email is also on the 18th of June, correct?

A    Yes.

Q    And that Ms. O'Connell sends it to you right after lunch time, about 12:07, correct?

A    Correct.

Q    And in this particular email, do you agree with me that she is talking with you about the government's expert witness?

A    That's correct.

Q    You were aware that the United States was seeking to have Mr. Fields independently evaluated, correct?

A    Yes.

Q    Is that correct?

A    That's correct.

Q    And did you know before this email who the government's expert was?

A    Hmmm. . .I believe I might have seen Dr. Price in the case before this, but I don't recall exactly what. . .as I think about it, I believe I had seen him in the case before this.

Q    Okay.  But you knew that Dr. Price was the Government's neuropsychologist in this --

A    Correct.

Q    -- case, correct?

A    Correct.

Q    And Ms. O'Connell is asking for your advice, correct?

A    Regarding whether or not she should allow Mr. Fields to be subjected to an MMPI.

Q    Yes.

Q    And again, there was some testimony previously about what an MMPI is.

A    Okay.

Q    A personality test --

A    Correct, personality test.

Q    And it is your position "no;" is that correct?

A    Correct.

Q    That's how your email starts, the answer is no.

A    Right.

Q    And I believe you tell us why you believe the answer is no. What do you say?

A    We need to see what he has put together so far --

Q    No, no, let me back you up.  Right after you say the answer

is no, what is the next thing that you tell her?

A    Oh, yes, "Price is dangerous."

Q    What do you mean by that?

A    My experience with Dr. Price was that his conclusions did not always match his testing.

Q    Okay.  And I assume that -- you didn't type that here, correct?

A    No.

Q    And I assume that you shared that at some point with Ms. O'Connell, correct?

A    I probably did after we got the testing.

Q    So at some point you actually saw Dr. Price's raw data, correct?

A    I think. . .I don't know if I saw his raw data.  I know that I saw his report.

Q    But you didn't want him to do an MMPI, and Dr. Gelbort didn't do an MMPI, correct?

A    I'm sorry would you repeat -- would you say that again?

Q    You didn't want Dr. Price to do an MMPI, correct?

A    Yes.

Q    And did Dr. Gelbort did not do one either, did he?

A    Correct.

Q    Even though he wanted to, correct?

A    I don't know.

Q    You are not aware of that?

A    No.

Q    Because you don't tell the doctor what tests to perform, --

A    Correct.

Q    -- correct?  Is that right?

A    That's correct.

Q    Do you ever recommend?

A    I might recommend a second string of tests.  I would never recommend their initial battery, but I might recommend a second string of tests.

Q    And you didn't recommend one in this case, did you?

A    No.

Q    Not a second battery?

A    No.

Q    Because you believed the initial battery was sufficient?

A    Yes.

Q    You agreed with Dr. Gelbort that the initial psychological -- the neuropsychological testing was sufficient, correct?

A     Yes.

Q    And if Ms. O'Connell would have asked you. . .do you think we need to do another test, you would have told her, nay, we are good, correct?

A    I don't think she said that, and I don't think I said that.

Q    So you don't recall that conversation?

A    No.

Q    In addition to this email regarding Dr. Price, do you recall further conversations. . .and I touched on this a moment ago

and I want to drill down a little bit more on it.  Do you recall further conversations that you had with Ms. O'Connell specifically about Dr. Price?

A    No.

Q    I believe you said that you believe that you saw his final report, correct?

A    Yes.

Q    And you would agree with me that Dr. Price's final report contained a timeline; is that correct?

A    Can you be more specific?

Q    I'm sorry.  I didn't mean to be vague.  Would looking at his report help refresh your memory about what was in it?

A    Sure.

Q    Defendant's Number 38, please.  And this is a really long document, okay?  And I'm not going to ask you to go page by page, okay?

A    Okay.

Q    What I'm asking you to look at is. . .if you will just scroll down to Page Number -- I think it is 32.  No, 31.

Okay.  Dr. Woods, what is on the screen is –

A    I'm sorry.

Q    Okay.  Have you had an opportunity to take a look at that page?

A    Yes.

Q    And at the top of it, it says, "Edward Leon Fields Timeline

Based on Records Review."

A    Yes.

Q    Do you see that?

A    Yes.

Q    Do you recall that part of Dr. Price's report?

A    I recall it being in here, yes.

Q    Okay.  And if I were to tell you that if we scroll down, there are multiple pages there setting out a timeline of activities involving Mr. Fields?

A    Yes.

Q    And in that timeline are all sorts of references to behaviors of Mr. Fields including hanging a cat.  Do you recall that?

A    I do.

Q    Bringing a bomb to work?

A    I do.

Q    Having guns at every door?

A    Yes.

Q    A lot of very -- and I am going to use a legal term here, but prejudicial things, correct?

A    Well, I -- there were certain parts of it that were prejudicial. I wouldn't say there was a lot, but --

Q    Okay.

A    But I would say there were factors that were prejudicial.

Q    Did you have any discussion with Ms. O'Connell about items like that and her concern about those getting in front of

the jury?

A   I don't recall that.  I don't recall having -- I am sure that I did not have that.

Q   Oh, you are sure you did not have that conversation?

A   About these items getting in front of the jury.

Q   Okay.  All right.  I want to move now to Defendant's Exhibit 213, because I am trying to do this chronologically, Doctor.  Okay?

A   Okay.

Q   Because obviously June 18th was a busy day between you and Ms. O'Connell, correct?

A   Correct.

Q   This is another email on the same day, June 18th, correct?

A   Yes.

Q   And it -- and would you agree with me that the initiating email, which is at the bottom, is Ms. O'Connell asking a question?

A   Correct.

Q   And as you look at that email today, do you -- what does that mean to you today?

A   It means I was asking her if she agreed and if he agreed that I would like to talk with Dr. Grinage.

Q   Okay.  This is the first you and I have talked about a person by the name of Dr. Grinage.

A   Correct.

Q   Okay.  Who is Dr. Grinage?

A    Dr. Grinage is a psychiatrist, I believe, from Kansas that had been brought into the case relatively late.  He had some pharmacological experience and that's what I recall.

Q    And I take it, just based upon the fact that she is asking about Dr. Grinage, that you were already aware that Dr. Grinage was involved in this case, correct?

A    Correct.

Q    And I take it that you had discussions with Ms. O'Connell about Dr. Grinage, correct?

A    What I recall is that she either --

Q    So am I incorrect?

A    Oh, I'm sorry.

Q    Did you or did you not have previous conversations with Ms. O'Connell about Dr. Grinage?

A    I think we had one.

Q    Okay.  And I take it -- and you correct me if I am wrong -- that you -- did y'all discuss the fact that y'all – y'all.

THE COURT:  It's where we are.

MR. WILSON:  Southeast Oklahoma, Judge.

THE COURT:  These Philadelphia lawyers may not understand you, but I do.

BY MR. WILSON:

Q    Did you and Ms. O'Connell at this previous discussion talk about the fact that Dr. Grinage had some pharmacological expertise?

A    That's what I was getting to.  I don't think we talked.  I think it was an email, which you have every email so maybe not, but my thinking is that it was an email and a CV, but there may have been a conversation.

Q    Did you recommend to Ms. O'Connell that she obtain a separate psychiatrist with pharmacological expertise?

A    No.  Actually that's what made me -- when you asked the first question, my --

Q    So the answer is no?

A    The answer is no.

Q    Okay.  Did you ultimately end up talking to Dr. Grinage?

A    Yes, I believe so, yes.

Q    And. . .all right.  Let's just go quickly, Defendant's Exhibit 263.  Let's go through this chain.  Do you agree this is another email also from June 18th?

A    Yes.

Q    And in this email do you agree that – in here Ms. O'Connell is  basically giving you the name of the neuropsychiatrist that she also retained, correct?

A    I am not. . .oh, you mean Dr. Grinage?

Q    Yes.

A    Yes.

Q    And I think counsel asked you about this earlier in direct referring to the top, your response asking about the neuropsych report, correct?

A    Correct.

Q    So I take it from this you had not seen any report?

A    That's correct.

Q    And when I asked you earlier, I believe you said you had not seen any draft report?

A    That's correct.

Q    Were you aware that draft reports existed?

A    No.

Q    And that's based upon your recollection not on emails, but on your independent recollection today twenty plus years after the fact?

A    That's correct.

Q    And did you have any conversations with Skip Gant about whether or not there where draft reports provided by Dr. Gelbort?

A    I don't recall a conversation with Mr. Gant about that issue.

Q    Don't recall or it just didn't happen?

A    I don't believe that it happened, but I don't recall.  I frankly say that because I don't recall almost any conversations with Mr. Gant.

Q    Fair enough, and we are talking about something over twenty years ago, but we do have some emails, correct?

A    Okay, yes.

Q    Would the same answer be true if I were to ask you about Ms. O'Connell, about whether or not you had a conversation with Ms. O'Connell about whether or not there were draft

reports floating around?

A   Yes.

Q   You don't think it happened, or you don't know for sure?

A   Correct.

Q   All right.  Government's Number 67 would be the next in this chain, and we will finish up June 18th.  Again you agree that this is an email chain from June 18th of 2005?

A   Yes.

Q   And if I were to tell you that -- without going back -- that these were in chronological order or actually timewise in order from the 18th, would you have any reason to disagree with that?

A   No.

Q   Okay.  And in this email Ms. O'Connell is referencing Dr. Grinage, but she is also referencing specifically Dr. Price; is that correct?

A   Correct.

Q   When you say, "let's look at them," are you talking about the CVs?

A   Yes.

Q   Okay.  And when it says at the bottom, "Want me to send," -- for the record, what I am -- at the bottom of the first email from Ms. O'Connell.  When it says, "Want me to send e-version of the Government's docs CVs," that's what we are talking about, correct?

A    Yes, sir.

Q    And you respond by saying, "Yeah, I know Price," correct?

A    Correct.

Q    And when you say, "We might be able to work with him," do you recall twenty years later what you might have meant by that?

A    I can't specifically, but I can tell you what my impressions were.  Would that be satisfactory?

Q    When you say your -- you can't specifically remember, correct?  Is that what you are saying?

A    Well, I recall generally. . .

Q    Let me ask it this way:  Do you recall -- is that we can work with him as teammates or we can work with him in addressing his report?

A    It is the latter.

Q    Okay.  It is not that you can cooperate and Kumbaya and agree, --

A    Right.

Q    -- but you would be able to assist her in addressing his opinions, correct?

A    Well, I think they were -- I think addressing his opinions is getting him to cooperate.  I don't see those as -- I think we could address his opinions in a way that would be scientific and rigorous and that would, in fact, allow him to. . . (inaudible).

Q    And then finally, Defendant's 214, same day, do you agree

with this – again, it is June 18th, same email chain, correct?

A    Yes.

Q    It follows that she was planning on talking to Dr. Grinage and now she has now talked to Dr. Grinage, correct?

A    Yes.

Q    And that you are just saying that you will call him.

A    Correct.

Q    Do you remember whether you did?

A    I remember that he was much more assessable, so I think I did.

Q    Much more assessable than Dr. Gelbort?

A    Correct.

Q    So you do remember talking to him at some point?

A    I do remember talking to him, yes.

Q    I know it is twenty plus years ago, but do you remember what the subject matter of that conversation was?

A    I think the subject matter was again the differential diagnosis, was this a schizoaffective disorder bipolar presentation versus a bipolar disorder because both of them have psychotic features.  And also the question of. . .I seem to really remember this for some reason -- the literature around manic switch.

Q    So at this point do you know or do you recall whether or not Dr. Grinage had evaluated Mr. Fields?

A    I don't recall.  It seems like in an earlier email he was either meeting or just leaving from Oklahoma and coming back

to Lawrence, Kansas, so he may have evaluated him, but I don't recall.

Q    Do you recall -- did you have a conversation before an evaluation and then a conversation after an evaluation or do you remember?

A    Our initial -- I certainly had a conversation after the evaluation because our conversation was -- as I recall, it was really focused on the scientific literature.

Q    So at some point you had a conversation with him after he had actually evaluated Mr. Fields?

A    Correct.

Q    And I believe based upon your earlier testimony, you had a discussion about potential -- about schizoaffective disorder and/or bipolar disorder, correct?

A    Correct.

Q    And I assume, and you correct me if I am wrong, that during that conversation you discussed with him his expertise involving pharmacological training?

A    I. . .I probably looked at his CV and then we just had a conversation and I gathered his expertise based upon the conversation rather than plumbing him or trolling him about his. . .

Q    But part of your diagnosis ultimately was that medication was a contributing factor to this manic switch, correct?

A    Correct.

Q    And it was based upon your evaluation --

A    Correct.

Q    -- of Mr. Fields taking Effexor?

A    Correct.

Q    Which you testified about during the trial of this case in front of a jury in the Eastern District of Oklahoma, correct?

A    Correct.

THE COURT:  Mr. Wilson, may I inquire?  I will use my privilege.  How much more cross exam do you think you are going to have with this witness?  Can you give me a ballpark estimate?  I am just asking.  I am not implying any answer I desire, although in my head I am sure I have one.

MR. WILSON:  It is going to be at least an hour, Your Honor.

THE COURT:  All right.  Well, you tell me, are we at a good breaking point?

MR. WILSON:  This is fine, yes, this is fine.

THE COURT:  You had indicated you thought you were -- it sounded like you were at a shifting point.  So if this is a good point --

MR. WILSON:  Yeah, we finished the 18th  This is perfect.

THE COURT:  Okay, all right.  Then let's take our lunch break.  It is 12:10.  We will return at 1:10.

Anything before we adjourn that we need to discuss?

MR. WILSON:  No, Your Honor.

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  Then we will take our lunch break.  We will return at 1:10.  We are in recess.

(12:12 p.m.)

(LUNCH RECESS)

(1:11 p.m.)

**COURT IN SESSION**

MR. LABOVITZ:  Your Honor, I just wanted to note that Ms. Ensler has to attend to a witness at two p.m., so she is going to move to the back and Ms. Thompson will be handling the next witness.

THE COURT:  Okay, all right.  Very well.

All right.  We are back on the record.  All counsel are present with the seat shift as noted by counsel.

MR. LABOVITZ:  One more question, Your Honor. Is it okay if Ms. Ensler leaves at two p.m.?

THE COURT:  Yes, since she is behind the rail, that's fine.

MR. LABOVITZ:  Thank you.

THE COURT:  Not a problem.

All right.  Are the parties ready to proceed?

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  Mr. Wilson, you may continue your cross examination.

MR. WILSON: Thank you, Judge.

**CROSS EXAMINATION CONTINUED**

**BY MR. WILSON:**

Q    Dr. Woods, I want to direct your attention to Government's Exhibit Number 67. And this is an email that we talked about and I apologize because I have to backtrack just a second.

A    Sure.

Q    Earlier we were talking about reports and draft reports and things like that. Do you recall that conversation we had?

A    Yes.

Q    Okay. And in this particular email from Ms. O'Connell on Saturday, June the 18th, I want to direct your attention to the second paragraph of her email.

A    Right, I saw that.

Q    You saw that?

A    Yeah, I did.

Q    Yes, because I began to ask you earlier about tweaking a report and --

A    Correct.

Q    And that's what I was referring to.

A    Sure.

Q    I notice you didn't respond saying I don't do draft reports or I don't --

A    I don't. . .I mean, she can write whatever she wants to write, but I -- typically if there are typos or something that I haven't

made clear, then -- but that's -- and I have a lot, but that's really it.

Q    All right.  Thank you.  Now, let's move ahead to Defendant's Exhibit 214, and I think it's actually the email we were on when we took the lunch break.  It is also from that same date, June 18th?

A    Correct.

Q    And it appears that Ms. O'Connell had sent you this email around 2:30 after her discussion with Dr. Grinage, correct?

A    Correct.

Q    And it appears that she is sharing with you what Dr. Grinage has told her about his diagnosis.

A    Correct.

Q    Would you agree with that?

A    Yes.

Q    And his diagnosis was. . .

A    Bipolar with psychotic features.

Q    Because in the previous email you talk about whether or not he would concur; is that right?

A    That's correct.

Q    All right.  And that would dovetail with your thought at that point, correct?

A    I am going to have to go back and look at my report because I thought even in my report I said schizoaffective versus bipolar disorder.  So I would be looking at both of them because both of them have a bipolar component.  So I was looking at –

it's like fever, Mr. Wilson, where you can have a fever that is a

symptom and you can have a fever that is a disease.  So bipolar

can be a part of schizoaffective but it can also be separate.

And I just don't recall.  I thought that -- I thought even through

my report I had that differential, but I may not have.

Q    Well, in your report when you actually list the diagnosis

and when this was done  under the DSM at that time, you still

had Axis I,  Axis II, --

A    Right, Axis –

Q    -- Axis III –

A    Exactly.

Q    Do you recall that?

A    Yes.

Q    Okay.  And I believe that in your report in June of 2005,

Axis I was schizoaffective disorder bipolar subtype --

A    Got it.

Q    -- versus bipolar disorder severe with psychosis and

pharmacological re --

A    Got it, right.  That's what I thought.  That was always -- I

didn't have just a working diagnosis of bipolar.  It was

schizoaffective disorder which has a bipolar subtype versus a

bipolar disorder.

Q    All right.  Well, I think that is going to lead me perfectly into

my next question.  All right.  Look at Government's Exhibit

Number 75.  And in all candor, this is actually a five-page document,

okay?

A    Yes.

Q    And we are going to be looking at the first page at this point. Okay?

A    Yes.

Q    And this is an email the next day, would you agree, June the 19th?

A    Yes.

Q    And it begins with Ms. O'Connell talking about going to be sending you some records; is that right?

A    Correct.

Q    What is she going to be sending you?

A    Probably the mental health records for -- all of the medical records from the jail.

Q    And there's a reference to the Kemp records.

A    The Kemp records -- Dr. Kemp was the treating physician that prescribed the Effexor.

Q    All right.  And so his records would be extremely relevant to your determination, correct?

A    That's exactly right.

Q    And apparently up until this point, you may have been relying upon Gloria Shettles' summary of those records?

A    That's correct, and probably Mr. Fields's description of his treatment.

Q    Okay.  But you were actually going to get your hands on the actual faxed copy of the records?

A    Correct.

Q    And there is a discussion in here where Ms. O'Connell advises you that Mr. Fields is being treated while incarcerated and his current physicians have rendered a diagnosis.  Do you see that?

A    Yes.

Q    And according to the jail, he has schizoaffective disorder.  Do you agree that that's what the email says?

A    Yes.

Q    All right.  And again, that would go back to what we just talked about, about the fact that in your final report you said schizoaffective --

A    -- versus --

Q    -- bipolar.

A    Correct.

Q    Because looking now at the to of Government's 75, Page 1, in your response you inform Ms. O'Connell correctly that schizoaffective is what he really is.  Is that what you typed?

A    Yes.

Q    What he really is versus what?  What do you mean, versus the bipolar that Dr. Grinage diagnosed?  Because it appears -- I'm sorry.  I'll let you answer that question.  Sorry.

A    Mr. Wilson, can I take a moment and explain the difference between the two because I think it might add some clarity?

Q    Well, I've read the transcript from the trial, and I think I know the answer to that.

A    Okay.

Q    And so I am not asking at that point.  Okay?

A    Okay.

Q    Let's just move on.  Now, let's go to the second page of Government's 75.  Now, just for the record –

MR. WILSON:  And I apologize, Your Honor, but. . . Tanner, could you go back to the previous page, to Page 1?

**BY MR. WILSON**:

Q    Dr. Woods, your response email where you talked about schizoaffective is what he really is.  Would you agree that that was said at 5:37 p.m.?

A    Yes.

Q    Okay.  Now, let's go back to two -- Page 2.

A    I'm sorry?

Q    Now go to Page 2.  It appears that this is another email that you sent at 5:45 p.m., correct?

A    Yes.

Q    Some eight minutes later.  And it is not in response to a new email?

A    Correct.

Q    And you say, "I am making some changes now.  Wait for this version."

A    Yes.

Q    Had you already sent her a version?

A    I don't recall having sent a version.

Q    Well, it implies here that there is a version that you've already sent.

A    Yes.

Q    So you did do a draft?

A    I may have done a draft.

Q    Okay.  So you may have already provided a draft copy to Ms. O'Connell?

A    I can't imagine, but I may have.

Q    Again, we are talking about twenty plus years ago --

A    Well, I --

Q    -- and I am looking at this --

A    -- don't --

Q    -- email, correct?

COURT REPORTER:  I'm sorry.  I didn't get the whole question or the answer.

THE COURT:  Yes, you've got to stop talking over each other, if you will, please.

MR. WILSON:  Sorry.

BY MR. WILSON:

Q    Would you agree with me that your response was, "I am making some changes now.  Wait for this version?"

A    Yes.

Q    Now, let's look at Page 3.  Do you agree with me that this is also June the 19th?

A    Yes.

Q    And the time is 5:48 p.m., correct?

A    Yes.

Q    And this is again an email exchange between you and Ms. O'Connell, correct?

A    Yes.

Q    She is responding and giving you a phone number, but I want to direct your attention specifically to Paragraph 2.  She says, "I just want to tell you the jail diagnosis, so you would have it in the back of your mind.  Then I remembered I had already told you. . . remember we talked about the way psychiatrists do their diagnoses and how in cases with multiple facets it all adds up to the same."  Do you see that?

A    Uh-huh.

Q    And that's after you said I am going to make some changes in the version, correct?

A    Can we go back to that previous email.

Q    Sure.  Page 2?

A    Okay.

Q    All right.  So we've talked about emails on the 18th, we've talked about a couple of emails on the 19th.  And you are working over the weekend, it is a Saturday apparently, correct?

A    Oh, yes.

Q    Because you are talking about happy father's day the next day.

A    Right.

Q    Okay. Now we are going to move to June the 21st. I am going to direct your attention to Government's Number 68. Have you had an opportunity to look at that? Again that's another email exchange.

A    Yes.

Q    Earlier you and I went through an email talking about Dr. Price and you said something to the affect we may be able to work with him. Do you recall that email?

A    Yes.

Q    Ms. O'Connell is now, just a couple of days later, informing you that Dr. Price is not someone that you are going to be able to work with; is that correct?

A    Correct.

Q    But you are not really concerned about that, are you?

A    (No Response)

Q    And the reason I am asking that question is I would direct your attention to your response. What is the first thing that you type?

A    That he doesn't know. . .and I apologize. You are finding out in the light of day what a bad mouth I have. That he doesn't know much about medications.

Q    You start off by saying he is a psychologist.

A    Exactly.

Q    And a psychologist can't prescribe medication, correct?

A    It's not his specialty.

Q    Would you agree with me that Ms. O'Connell ultimately didn't call any psychologists?

A    Say that again.

Q    Would you agree with me that Ms. O'Connell never -- ended up not calling any psychologists --

A    That's correct.

Q    -- to testify?

A    That's correct.

Q    She called medical doctors, –

A    Correct.

Q    -- correct?

A    Correct.

THE COURT:  Dr. Woods, just so we can make this a little easier for our poor court reporter, if you could wait until he finishes his question before you answer, and then he will wait until you finish your answer before he asks his next question, it will be easier --

THE WITNESS:  I'm sorry.

THE COURT:  No, it's all right.  It happens, but I just have to remind everyone every now and then to --

THE WITNESS:  Thank you very much.  And I actually just did it to you, so. . .

THE COURT:  And I wasn't going to call you out on it, but. . .

THE WITNESS:  Yes.  (LAUGHTER)

THE COURT: It has been a long week and we are all getting giddy.

**BY MR. WILSON:**

Q    All right. I want to turn your attention now to Page 2 of this same exhibit, Government's Number 68. And I believe this is another email exchange following up the previous email where Ms. O'Connell said she was going to fax you the report from Dr. Price, correct?

A    That's correct.

Q    And she questions his diagnosis with -- and I want you to say it for me –

A    Dysthymic.

Q    Dysthymic disorder question mark, question mark, question mark.

A    D-Y-S-T-H-Y-M-I-C, dysthymic disorder.

Q    All right. When he -- and when I say "he," Dr. Price – obviously his diagnosis must have been dysthymic disorder?

A    Correct.

Q    You had a pretty strong response to that, did you not? What did you type?

A    I typed, "Call me. We will eat this guy up."

Q    We are no longer going to try to work together, are we? It is now gloves are off; we are going to eat this guy up. Is that correct?

A    You know, that's not quite right, Mr. Wilson. It wasn't just

function of his diagnosis.  It was the function of his testing.

Q    Okay.

A    And I felt as though -- as I said before, there was a place where we might be able to find some cooperation based upon his test findings, but I wasn't as concerned about his report as perhaps I could have been.

Q    And so by the time you wrote, "Call me.  We will eat this guy up," you had an opportunity to read his report, correct?

A    Correct.

Q    And I don't suppose you had had time to look at all of the raw data, had you?

A    I don't recall whether Dr. Price automatically turns over his raw data.  Psychologists are not supposed to do that to psychiatrists.

Q    Ms. O'Connell didn't indicate in the previous email that she was faxing you the raw data.

A    Right.  So I don't recall that.  I know that I saw the report, but I don't. . .

Q    So based upon your reading of Dr. Price's report and what he indicated from the tests; you believed that you could eat this guy up, correct?

A    I felt as though we had some action.

Q    And I don't want to be cagey at all.

A    Right.

Q    I mean, when counsel hires an expert there is a relationship

that is formed.  Would you agree?

A    I would.

Q    And you work together, correct?

A    I agree.

Q    And especially when the expert has as particular diagnosis and somebody else has something contrary to that, you want to be able to defend that diagnosis, correct?

A    Certainly the first part.  I am -- I am -- I mean, certainly the second part.  I do think it is important to be able to support my findings.

Q    Okay.  And assisting counsel that hired you, retained you, assisting counsel to be able to attack the credibility of the other report would be beneficial to the client, correct?

A    Yes, that's true, but I don't see that as my role, Mr. Wilson.

Q    Okay.  And we can talk about that more in a moment, but would you agree with me that that would be important to your client?

A    Sure, sure, and I do do that.  I am not saying that doesn't occur.

Q    And that would be very important to Ms. O'Connell, correct?

A    Yeah, correct.

Q    Okay.  Let's move now to actually June 22nd, Defendant's Exhibit Number 217.  It is somewhat of an innocuous email but I just need to ask you a question about it.  It appears to be an email again from you to Ms. O'Connell, correct?

A     Correct.

Q     And you are saying I am sending the report again?

A     Correct.

Q     So that's your report?

A     Yes.

Q     And this is June the 22nd?

A     Correct.

Q     So the report, which is signed June 25th, obviously is a different report than this one, correct?

A     I don't know.

Q     Fine, fair enough.  But a person just looking at this could make the assumption that we are talking about two separate reports.  Would you agree?

A     Sure, I could see that.

Q     So you very well could have had a draft report?

A     That's why I went back and looked at that.  I don't recall a draft report, but I could have.

Q     Fair enough.  As we talked earlier, not only was the trial sitting out there and coming up pretty rapidly –

A     Right.

Q     -- but also once the trial starts, the possibility of getting the case deauthorized for death penalty also is in jeopardy, correct?

A     Correct.

Q     And again, Ms. O'Connell had wanted your report in order to assist with that process, correct?

A    Yes.

Q    Okay.  So now we are going to move ahead about a week, it looks like, in just the records we have to an email – Defendant's Exhibit Number 91, which is dated July the 1st of 2005.  Do you agree with that?

A    Yes.

Q    And this appears to be not just excerpts of a report of Dr. Price's, but an actual report that she is sending you.  Would you agree with that?

A    Yes.

Q    And not only is it the report of Dr. Price, but another doctor by the name of Dr. Mitchell.

A    Correct.

Q    Do you recall Dr. Mitchell?

A    I don't recall Dr. Mitchell.

Q    Okay.  Jeff Mitchell?  Does that help at all?

A    Jeff Mitchell?

Q    Dr. Jeff Mitchell, Jeffery Mitchell?

A    No.

Q    She actually apparently sent you the report.  Do you remember looking at that?

A    I remember Dr. Price's, but I don't remember Dr. Mitchell's.

Q    And you responded -- it's a very typical response.  You said, "I will read them and I will let you know what they say; is that correct?

A    Correct.

Q    I want to direct your attention again to the email from Ms. O'Connell that generates this exchange. She characterizes Dr. Price's report as whore dog awful?

A    Yes..

Q    When you got that what did that mean to you, that that report was "whore dog awful?" Or did it even have any impact on you?

A    It didn't have a -- it didn't have a specific impact. I felt as though the report was disingenuous. So I assume that that's what she was referring to.

Q    So when you read this, that this report was whore dog awful, you took that to mean or that she meant it was disingenuous or that she hated it, or do you know?

A    Well, I took it to mean that she hated it.

Q    Okay, all right. Fair enough. Because again, we are talking about the report that had the timeline with all of these horrible things in it, correct?

A    I didn't -- as I said before, I didn't see the timeline with all of these horrible things as being the problem.

Q    Okay.

A    I thought that was actually the least of the concerns.

Q    All right. Now, we are talking about -- at this point it is July the 1st, and we are starting to pick a jury in just a couple of days?

A    Correct.

Q    And counsel then began to talk with you about getting ready for trial.  And I take it, based upon your testimony, that there must have been some planning involved to say to come to Muskogee and we are going to get together and we are going to pretrial prep for the case; is that correct?  Or the alternative is you just showed up at a location by accident?

A    What I recall, Mr. Wilson, was travel arrangements being made and the most relevant part of the conversation was this beautiful bed and breakfast place that we would be staying at. And I think all of us were actually staying there.  And it was someplace -- it had to be in Muskogee.  It was this incredibly beautiful mansion that was where everybody was staying.

Q    You didn't know that was my house?  Just kidding, just kidding.

A    Well, you've got great taste then.

Q    No, no.  I am just kidding.  For the record, I am just kidding.

(LAUGHTER)

A    I mean, I hate to say that, but that's -- that was really. . . when are you going to get here?  Who is going to pick you up? When are people coming in?

Q    And let me drill down on that.  This conversation about this mansion and when are you going to get here and who's going to pick you up, was that with you and Mr. Gant or you and Ms. O'Connell or do you remember?

A    It was with both Mr. Gant and Ms. O'Connell because Mr. Gant was also bringing his wife.

Q    Okay. And were you bringing a spouse along as well?

A    No.

Q    Okay. I guess I just made a wrong assumption there.

A    My wife has never seen me testify, ever.

Q    Okay. And I take that when you got there Ms. O'Connell was there?

A    Yes.

Q    And was it -- did you arrive after the court had recessed for the day, or do you even know?

A    Excuse me. I arrived in the evening. I think it was the night before or maybe it may have been two nights before, but I recall it was, you know, maybe the night before.

Q    That's okay.

A    It was two nights; it was two nights.

Q    That's okay. That's a difference.

A    Yeah.

Q    The night before versus two nights.

A    It was two nights; it was two nights.

Q    Okay. And counsel didn't ask you anything or any details about this discussion other than Thai food. So we are going to talk a little bit more about it, other than Thai food. Okay?

A    Okay.

Q    There was a nice Thai dinner that Mr. Gant was preparing?

A    Correct.

Q    And the impression I got from your previous testimony was that Thai food was offered, everybody ate Thai food, and then you were like sent to your room as a child who was being disciplined and no one spoke to you again?  Is that what happened?

A    It was not quite like that.  It was really more of a social evening.  I don't drink.  So I wasn't really involved.  I spent some time, but I was kind of freaked out because, you know, I didn't feel like I was really prepared to testify.

Q    All right.  So let's talk about that.  So you have a Thai dinner.  I take it some people must have been drinking some sort of –

A    Right.

Q    -- alcohol; is that correct?

A    Yes, yes.

Q    You testified either two days later or the next day, correct?

A    Probably two days.

Q    Two days later?

A    Right.

Q    And as a part of your testimony you had a PowerPoint presentation that you used, correct?

A    I don't recall, but I probably did.

Q    Have you not read the transcript of your testimony?

A    I have read my transcript.

Q    You have?

A    I have.

Q    When was the last time you read it?

A    Last week.

Q    And you had forgotten that since last week?

A    I'm sorry?

Q    You forgot since last week that you had a PowerPoint?

A    I just don't recall.  Yeah, I didn't recall that I had one.

Q    When you read the transcript last week that didn't refresh your memory about having a PowerPoint?

A    It may have, but when you said it, it didn't just jump up. I was just reading the transcript.

Q    All right.  So. . .and I apologize.  I am not trying to get into the weeks here.  Okay?

A    No, no, no.

Q    But your testimony was that you were not prepared for the case; is that correct?

A    When I say – yes.  When I say I was not prepared, I mean I was not being prepared.

Q    You were not being prepared by counsel?

A    Correct.

Q    And let me see if I understand this.  You are telling me that you and Ms. O'Connell did not discuss your testimony?  Is that your testimony?

A    No, I am not going to say that.

Q    Well, I want you to explain to us exactly what you recall happening in your pretrial preparation other than eating Thai food.

A    Sure, sure.  When I read my testimony I didn't really think of it in terms of the PowerPoint, but when you said that, I do recall creating one because at that time it was my pattern and practice to do PowerPoints.  So I do have some memory of developing a PowerPoint.  I don't -- and I am sure that I talked with Ms. O'Connell about that PowerPoint.  I don't recall talking to Mr. Gant about that PowerPoint, but I am sure that I recall talking with her.

Q    All right.  So you did talk with Ms. O'Connell about the PowerPoint?

A    Yes.

Q    Did you talk with Ms. O'Connell about how you were going to go about convincing this jury that Mr. Fields experienced a manic switch due to taking Effexor?

A    I can't say that I recall that conversation, other than through the PowerPoint.

Q    So it's your testimony you created a PowerPoint and you told her -- I take it you told her about the PowerPoint?

A    I believe that we actually looked at the PowerPoint.

Q    And as you looked at the PowerPoint, was it quiet, silent as one just read it on their own, or did you talk about it slide-by-slide?

A    I don't remember her input.  I am sure that we did it slide-by slide.

Q    Are you saying she didn't give input or you just don't remember her --

A    I don't recall her giving input.

Q    You don't recall her giving it, or it didn't happen?

A    I don't recall her giving it.

Q    And I want to just make sure I understand the answer. Okay?  There is a difference between I don't recall whether it happened or it didn't happen.

A    Sure, I understand.  I don't recall a substantive conversation about the PowerPoint.  I recall presenting the PowerPoint.  I am sure -- I really don't recall her commenting, but I am sure that she did, and that was it.

Q    Did you and Ms. O'Connell -- let me back up.

        MR. WILSON:  I apologize, Your Honor.

**BY MR WILSON**:

Q    Mr. Woods, counsel earlier showed you a copy of a declaration that you signed in March of 2010.

A    Correct.

Q    Do you remember that?

A    Yes.

Q    And in Paragraph 8 of that. . .

        MR. WILSON:  Counsel, are you going to object?

        MR. LABOVITZ:  Yes, sir, I am, or yes, Your Honor. I was not permitted to ask Dr. Woods any questions about this because apparently there was no foundation laid as to who

prepared this, when it was prepared, etcetera. So I don't see how it is now -- I don't see how the door is now open for this to be used on cross examination.

THE COURT: Well, as I recall, you showed the witness this exhibit, he looked at Paragraph 8 before any objection was raised, and so I denied the belated objection to him looking at that. Now, it was never admitted, and you moved on, but that was my recollection.

MR. LABOVITZ: Yeah. I guess my objection would just be if Mr. Wilson is trying to establish a substantive fact through the declaration at this point without laying a foundation as to who prepared it and when and the background of it. I don't think it --

THE COURT: Well, my response is I haven't heard the whole question yet.

MR. LABOVITZ: Okay.

THE COURT: So I don't know what he is actually going to get to, other than he is talking about Paragraph 8 and then that's where we stopped. So I will deny your objection and it may be re-urged at the appropriate time.

BY MR. WILSON:

Q   The declaration that you were shown earlier, did you recognize that declaration?

A   Yes.

Q   Did you prepare that declaration?

A    The declaration was prepared and I reviewed it.

Q    So someone else typed it?

A    Yes.

Q    And then you signed it?

A    Correct.

Q    And at the time that you signed it were you -- by doing so were you declaring that everything in there was true and correct to the best of your knowledge?

A    Yes.

Q    And so within his declaration  you made the comment or the comment was made, which you signed, "The presentation of brain damage dropped out of the picture." At what point did the brain damage drop out of the picture?

A    It was earlier than that night, but I don't recall exactly.

Q    Now, let's talk about that.  Earlier than the night before trial or two nights before trial -- I am sorry –- before your testimony.

A    Correct, correct.

Q    But was it before February the 1st?

A    No, I don't think it was before February the 1st.

MR. WILSON:  Judge, I am not going to go through every date on the calendar.  Okay?

THE COURT:  I hope not.

MR. LABOVITZ:  Your Honor, we would object and ask that Mr. Wilson be required to impose the Rule of Completeness and red the entire sentence to Dr. Woods because I believe that

would clarify it.

THE COURT:  We are talking about the declaration now?

MR. LABOVITZ:  Yes.

THE COURT:  And Paragraph 8?

MR. LABOVITZ:  Yes, Your Honor, about the presentation of brain damage.

THE COURT:  All right.  I think that's appropriate if there's more to that paragraph, but we are not looking at it, so I am relying on Mr. Wilson to read it all.

MR. WILSON:  I will be happy to, Your Honor.

**BY MR. WILSON**:

Q   "The presentation of brain damage dropped out of the picture in the lawyer's last minute and rush preparation during trial."

So it wasn't before, it was in the last that minute that. . . that's what I am trying to find out.

A   Sure.  There was no conversation about any brain damage in those last two days.  There had been a previous conversation about whether there was inconsistencies between brain damage and bipolar, and I had clarified that there wasn't.  And that was the last conversation that I recall.

Q   And that was the meeting in October of 2004; is that correct?

A   No, that's not correct.  The meeting in October of 2004 was

when these all -- these are all being presented, but that wasn't clarified that there was a -- for the attorneys that there was a conflict. They thought there was a conflict.

Q    I believe you testified that Ms. O'Connell asked the question or posed the question about the inconsistency in discussing it in that meeting in October; isn't that correct?

A    No, I don't believe that's what I said, sir. I said -- what I actually said was that Dr. Gelbort presented the findings and we talked about the manic switch, but not that there was a -- that at that point there was a conversation about there being a conflict.

Q    So when did the conversation about there being a conflict take place?

A    It was after that October meeting. And I thought there was an email about it, but I don't know the exact date.

Q    And obviously can have a whole lot of different definitions.

A    Sure.

Q    And so last minute was sometime between February the 1st and the day you took -- and the night before you took the stand?

A    No, I wouldn't say that it was that broad. For me, particularly given the way this case shaped up, last minute was even during the time that I was trying to get my report out and I was trying to find out what Dr. Gelbort's report was saying. So, you know, we are talking about May or June, not all of the way back to

February.

Q    All right.  So we will narrow it down to May or June.  Now, let's talk about those conversations that -- strike that.  So did you actually have a specific conversation with Ms. O'Connell wherein she said we are dropping Gelbort's brain impairment?

A    No.

Q    That didn't take place?

A    No, not with me.

Q    Okay.  So when you are preparing this PowerPoint you are still, in your mind, including Dr. Gelbort, correct?

A    I am assuming that Dr. Gelbort is going to testify.

Q    So you are going to incorporate that into your testimony, correct?

A    If Dr. Gelbort is going to testify.

Q    And when did you find out that Dr. Gelbort was not going to testify?

A    It was in that period of time.  I don't know if I really knew that Dr. Gelbort was not going to testify, but I knew that Dr. Gelbort wasn't there.

Q    So you are preparing your testimony as if Dr. Gelbort is going to testify.  Is that what your testimony is?

A    I am preparing my testimony so that -- assuming that Dr. Gelbort is going to testify.

Q    And because you had all of his raw data, you had his findings; isn't that correct?

A    But I did not have a signed report.

Q    Okay.  And so in your mind you were carving out everything that he said because you didn't have a signed report?

A    I am not going to include information based upon a conversation and based upon my review of his records.  My pattern and practice is to have the report and I guess we did, but to have a report that I can incorporate into my information.

Q    And you actually signed your report on June 25th, correct?

A    Correct.

Q    And at that point you didn't have a signed report of Dr. Gelbort?

A    I don't recall having one, that's correct.

Q    And that's why you didn't include it in your report?

A    Correct.

Q    But Ms. O'Connell didn't tell you not to include anything about Dr. Gelbort?

A    No.

Q    And it is just a coincidence that you forgot to put Dr. Gelbort's name in the list of people you consulted with; is that right?

A    It is a coincidence, yes.

Q    And it is a coincidence that you just misspoke when testifying about whether or not you consulted with Dr. Gelbort?

A    I said that I consulted with Dr. Gelbort.  I just -- I told you that I had talked with him.

Q    No.  When counsel asked you on direct if you testified at trial -- if you misspoke at trial about talking to Dr. Gelbort you said, yeah, I misspoke.

A    I don't think that was in talking to Dr. Gelbort.  I think that was in terms of including Dr. Gelbort's report in my report.

Q    The record will stand for itself.  Thank you.

So Ms. O'Connell didn't tell you to excise reference to Dr. Gelbort, correct?

A    That's correct.

Q    Mr. Gant did not tell you to excise reference to Dr. Gelbort?

A    Absolutely -- correct

Q    And so you testified on your not just differential diagnosis at this point based upon your diagnosis of what was going on, correct?

A    Correct.

Q    So at the time that you were sworn and took the oath in front of a jury here in the Eastern District of Oklahoma, you testified that Mr. Fields on July the 10th, when he murdered those two persons, was suffering from a manic switch, correct?

A    Correct.

Q    Based upon Effexor, correct?

A    Correct.

Q    And you testified to the ladies and gentlemen of the jury about all of the different disorders, mood disorders. . .you give a presentation to them about different types of mood disorders;

is that correct?

A    Yes.

Q    And you went through the entire spectrum, correct?

A    I'm not sure if I went through the entire spectrum.  I went through the relevant disorders.

Q    Including Dr. Price's –

A    Dysthymia.

Q    There it is, yes.

A    Yes.

Q    And as a part of your testimony you talked about, did you not, that a bipolar disorder includes cognitive deficits, correct?

A    I don't recall --

Q    Strike that.  That's a terrible question.  Let me back up.  I apologize.

Didn't you testify that someone who has bipolar, symptoms of that can be cognitive, correct?

A    I don't recall that.  You can show that to me.  I apologize, but I don't recall that.

Q    All right.  Let me ask it this way:  Someone who has a bipolar disorder, they have issues with problem solving, correct?

A    Yes.

Q    And that is a cognitive issue, correct?

A    It can be.

Q    They have problems with rushing of thoughts, correct?

A    Do you mean flight of ideas, or should I just take it literally,

rushing of thoughts?

Q    Well, when you say you know all of the energy may be internal, maybe in rushing thoughts. . .

A    Sure, flight of ideas.  Yes, they do have.

Q    Okay.  And that's a cognitive issue?

A    No, it's not.

Q    But the problem solving is?

A    It can be.

Q    And would you agree with me, and I believe you testified in direct earlier, that many of the cognitive issues that are associated with the diagnosis of brain impairment can mirror bipolar symptoms, correct?

A    They aren't (sic) the same, they are just within the bipolar diathesis.

Q    All right.  And you would agree with me that I don't have a problem solving thought impairment that I can readily identify as being from brain impairment versus a thought impairment due to bipolar?

A    Yes, you can differentiate those two.

Q    One looks green and one looks red?  You understand the --

A    Yes, I understand what you are saying, no, I understand what you are saying.

    All right.  You separate those out because not every cognitive impairment is a specific cognitive impairment that are in that process.  So if you see someone that has these, and I think I

said this in direct, these cognitive impairments could sit separate from bipolar or they could be a part of bipolar, but they could sit completely separate and still be problematic.

Q    I think we are talking through each other here, and I apologize, but your testimony -- if you were to have been called, as counsel suggested earlier, you would have been talking to a jury in the Eastern District of Oklahoma that Mr. Fields on July the 10th was having problem solving issues because of a manic switch, but also have problem solving issues because of brain impairment?

A    Yes.

Q    Which of the problem-solving skills are brain impairment and which problem-solving skills are manic switch?  Do you see my question?

A    Uh-huh, uh-huh.  The problem-solving skills, as you describe them, come from things like flight of ideas, things like what I just said -- I'm sorry I didn't say it -- pressured speech.  The problem solving ideas that come from the cognitive -- it comes from issues like sequencing or, like, being able to effectively weigh and deliberate.  The problem-solving issues that come from bipolar are things like grandiosity or empiric insight,  but the problem-solving issues that come from cognition are things like impaired working memory.  So those are the ways in which you can separate out those.  They are both problem solving issues, but those are the ways that you can look at them separately.

900

Q    And someone who – I believe it was your testimony that someone that is impaired, has a brain impairment. . .are they more or less susceptible to a manic switch?

A    That's a very interesting question.  (PAUSE)  If a person. . . it would have to depend upon the cause of the impairment.  What is the brain impairment from, and not just – for example, if you had a brain impairment to a secondary -- to a traumatic brain injury, that would make you more vulnerable to bipolar disorder, which would make you more vulnerable to a manic switch.  But if you had a brain impairment secondary to meningitis, that would not create the same vulnerability.

Q    Did you -- and maybe counsel didn't ask you this question.  Based upon the information that you know as of today, not what you knew back in 2005, --

A    Correct.

Q    -- but as of what you know today, is it your testimony that Mr. Fields was more susceptible to a manic switch because of his brain impairment?

A    Susceptible to a main switch because of his brain impairment. . .(PAUSE)  No.  I think that his brain impairment are the -- can you ask me that one more time?  Same question.

Q    I'll try.  I think I asked you based upon what you know now --

A    Right.

Q    -- was Mr. Fields more susceptible to a manic switch because of his brain impairment?

A    I don't think I can answer that.

Q    Fair enough.  You did testify that Mr. Fields had times in his past, based upon his social history of structured environments.

A    Correct, correct.

Q    You talked about the fact that he had been in the Navy.

A    Yes, sir.

Q    And also talked about the fact that he had been employed by the Department of Corrections.

A    Correct.

Q    And you talked about the fact that he performed very well under structured environments.

A    Correct.

Q    But at the end of the day the jury did not agree with your diagnosis.

A    That's correct.

Q    And when you wrote your declaration you -- I am sorry.  The declaration which you signed expresses some thoughts about that.

A    Yes.

Q    Defendant's 119, please.  Dr. Woods, we have been making reference to this declaration.  Do you see it on the screen?

A    I do.

Q    Let's go to Page 2, please.  No, I'm sorry, Page 1. I apologize.  Right at the bottom of Page 1, Paragraph 5, you say -- do you agree with me that you say that they rejected it

and you respect that.

A    Yes, sir.

Q    Is that correct?

A    Yes, sir.

Q    In the next sentence you said, "What is even more troubling to me. . ." is that how it starts?

A    Yes.

Q    So the fact that they rejected your diagnosis was troubling to you, correct?

A    Yes.

Q    Okay.  You said it was even more troubling that the jury didn't find -- and you go down to the next page -- didn't find your theory as a mitigating factor; is that correct?

A    Well, no, that's not correct.  They did not find that he suffered from chronic depression and auditory hallucinations.

Q    I'm sorry, I'm sorry.  That's correct.  Because at the trial you testified about the auditory hallucinations, correct?

A    Yes.

Q    And the Government's own witness talked about auditory hallucinations.

A    Correct.

Q    And Dr. Grinage talked about auditory hallucinations.

A    Correct, and family members talked about auditory hallucinations.

Q    And you talked about all of the other medical records --

A    Correct.

Q    -- that you reviewed from other doctors who found or at least Mr. Fields reported having auditory hallucinations?

A    That's correct.

Q    Would you agree with me, sir, that this declaration wasn't presented to you until after Dr. Martel had evaluated Mr. Fields?

A    I think that's correct.

Q    And so no one had approached you asking your opinion until after Dr. Martel had done his evaluation?

A    I think from a chronological point of view that's accurate.

Q    So if you were to have testified using not only bipolar with the manic switch -- sometimes I think it's referred to as manic flip --

A    That's fine.

Q    -- you would have told the jury that Mr. Fields was experiencing both of those, correct, or suffering from both of those?

A    Yes.

Q    And that not only did he have issues from impairment, but I believe your term was it was exacerbated by the bipolar and by the manic switch?

A    I think it was the other way around. That the cognitive symptoms were exacerbated -- I'm sorry. No, you are correct, the bipolar, that's correct.

Q    So the jury would have to believe that he would even been more frenzied, correct?

A    He would have to have been more. . .

Q    More manic.

A    I don't think they would necessarily have had to believe that he was more manic.  I think it was an explanation of his mental state.

Q    Dr. Woods, you were aware of the facts that were alleged in the case?

A    Yes.

Q    And you would have been subject to cross examination that goes like this:  Dr. Woods, on July the 9th, Mr. Fields -- actually let me back up.   The week before he killed these two persons, Mr. Fields went to work every day; is that correct?

A    Yes.

Q    And that his coworkers, when they were interviewed, indicated that they did not observe anything -- nothing unusual about his behavior during that week; isn't that correct?

A    Yes.

Q    Is it also correct that the day before and the evening before the murders that the Defendant went to dinner with Carol Lamb; is that correct?

A    I believe that's correct.

Q    And that she didn't report anything unusual or different about his behavior.

A    Yes.

Q    And the day of the murder, that he went to work that day,

correct?

A    Yes, he went to work.

Q    And that after going to work, he went by and visited with two of his friends, Marilyn and Dan Presley; is that correct?

A    Correct.

Q    And visited with them and they both told the FBI that they didn't observe anything out of the ordinary about Mr. Fields that day,

A    I don't recall that, so I am taking your word for it, but I don't recall that.

Q    And isn't it true, Doctor, that he left Mr. and Mrs. Presley's home and he drove out to the park; is that correct?

A    That's what the confession said, yes.

Q    And that he got there before dark; –

A    Yes.

Q    -- isn't that correct?

A    That's correct.

Q    And that the Defendant saw Mr. and Ms. Chick; isn't that correct?

A    Yes.

Q    He had already seen them a couple of days before out there in the park; isn't that correct?

A    I believe that's correct.

Q    And that he observed them at a distance, some distance away from the camp site; isn't that correct?

A    That's what his confession said.

Q    And that Mr. Fields knew exactly where Mr. and Mrs. Chick were camping on the faithful night of July the 10th; isn't that correct?

A    That's what his confession said, yes.

Q    And also that he when he saw them, he went back to his truck; isn't that correct?

A    That's what his confession said, yes.

Q    You keep saying that's what the confession says. Isn't that what happened?

        MR. LABOVITZ:  Objection, Your Honor. That is beyond the scope of Dr. Woods' knowledge.

        THE COURT:  Sustained.

**BY MR. WILSON**:

Q    Isn't that what Mr. Fields told you happened?

A    That's not what Mr. Fields told me specifically happened, but -- and that's why I said that's what he said in his confession.

Q    Did anything that Mr. Fields told you contradict what I just asked you about?

A    No.

Q    Okay. That he went back to the truck that he was driving. . . is that what the confession says?

A    Yes.

Q    That he then dawned his ghillie suit; isn't that correct?

A    Yes.

Q    A ghillie suit that he had made, correct?

A    Correct.

Q    He got his .22 rifle with a scope on it, correct?

A    Correct.

Q    A scope that he had camouflaged himself, correct?

A    I don't recall that, but. . .

Q    If that was the testimony, you have no reason to doubt that, do you?

A    A rifle that he didn't call a hunting rifle, but that he called a sniper rifle; isn't that correct?

A    I don't recall that.

Q    If that was the testimony, do you have any reason to doubt that?

A    If that's the testimony. . .

Q    That he took that sniper rifle and put on his ghillie suit and then he went from his truck, which he had parked a distance away, and hit outside Mr. and Mrs. Chick's campsite; isn't that correct?

A    Yes.

Q    And that he waited for them until they returned; isn't that correct?

A    Yes.

Q    And that he not only waited just a few moments, but that he waited two different periods of twenty minutes or more?

A    I think that's correct.

Q    That he saw them arrive and that he then crawled closer to the campsite wearing his ghillie suit; isn't that correct?

A    Yes.

Q    He stopped and waited twenty more minutes until after dark; isn't that correct?

A    That's what I understand, yes.

Q    And that being illuminated by the candlelight on the table, he was able to watch them through the scope of his rifle; isn't that correct?

A    I don't recall that.

Q    And he was wearing the ghillie suit that he had used previously to sneak up on and observe people being intimate in a vehicle in that same park, correct?

A    Yes.

Q    And as he waited and the sun went down, he hears Mr. Chick saying I am going into the tent, where he could no longer see him.  Do you remember that?

A    Yes.

Q    At which point, before he is able to get up, and he meaning Mr. Chick, Mr. Fields shot him underneath his left eye.

A    I believe that's correct.

Q    At which time then he began to shoot Mrs. Chick as she started to flee, correct?

A    That is my understanding.

Q    Shot her one time in the foot, didn't he?

A    Yes, that's my understanding.

Q    Understanding – no,  strike that.  Shooting her in the foot as she then proceeded to try to get into her own van; isn't that correct?

A    That's what I understand.

Q    And he pursued her, correct?

A    Yes.

Q    And he caught up to her in the doorway of the van and shot her in the head; isn't that correct?

A    Yes.

Q    And then shot her a second time in the head; isn't that correct?

A    Yes.

Q    And then turned and noticed that Charles Chick is still, what he believed, alive at the picnic table; isn't that correct?

A    I believe so.

Q    At which time he chose to shoot him in the head a second time?

A    Yes.

Q    And then leave and go back to his truck; isn't that correct?

A    Yes.

Q    And take of his ghillie suit; is that correct?

A    Yes, yes.

Q    But isn't it also true, and you would be asked this, that while Mr. Fields is there with the bodies of the people he has

just shot and killed, that a vehicle pulls up into the campsite area; isn't that correct?

A   Yes.

Q   And do you recall what Mr. Fields did in response to that?

A   I don't.

Q   And he got still and didn't move until that vehicle left.

A   Okay.

Q   Is that correct?

A   I. . .I don't recall that, but. . .

Q   If that's the testimony, you have no reason to disagree with that?

A   Sure.

Q   And once the coast was clear, then he moved and then went  and got the vehicle and came back; is that correct?

A   Yes.

Q   Broke out the window of the van?

A   Yes.

Q   And took personal property?

A   Yes.

Q   Went to work the next day?

A   Correct.

Q   And the people he worked with reported nothing unusual about his behavior, correct?

A   Yes.

Q   And after that cross examination, you are still going to --

911

you are then going to ask a jury to believe that Mr. Fields was

in a worst condition because of his brain impairment than

just if he was experiencing a manic switch because of Effexor?

A     The series of events that you have described are exactly the

type of thing that occurs in a brain impairment with a manic

switch --

Q     -- your testimony is going to be because he was experiencing

irritability; is that correct?

A     No.  I wasn't finished.  It is exactly the type of out of

character, over the top experience that one has in a manic switch

with no prior history of that kind of significant behavior.  So the

answer is, yes, I would

Q     And again, the jury didn't agree with that when you testified

back in 2005?

A     That's correct.

Q     Even though that is the evidence that you presented back

then about the manic switch, correct?

A     Correct.

Q     And I'm not being facetious, Doctor, but yesterday you

testified that Mr. Fields, in looking at his education records,

performed poorly in math, correct?  Is that right?

A     Correct.

Q     And that was a part of your determination that he was

experiencing a brain impairment --

A     Yes.

Q    -- because he had poor math performance?

A    Yes.

Q    So everybody who performs badly in math is brain impaired?

A    No.

Q    Because I am terrible at math, okay?  But that's just one of the factors that you used?

A    It's a very important factor because when you look at Mr. Fields performing poorly in math early in his life and then also the arithmetic in his WAIT III being his lowest score and  his digit span being his lowest score, you see a pattern that makes you think of another differential diagnosis because in other things he did relatively well.  So if I were looking at just those math scores, I would say, well, does he have some -- and he doesn't obviously, but does he have some fetal alcohol problem with difficulty with his corpus collosum because those are the kind of scores you get with an impaired corpus collosum.

        THE COURT:  I didn't understand the last part of what you said.

        THE WITNESS:  Impaired corpus collosum, C-O-R-P-U-S  C-O-L-L-O-S-U-M.

BY THE WITNESS:

A    So that's the kind of information -- it is not just bad math.  It is looking at this on his pattern (inaudible) --

Q    Did you use --

913

A    -- to tell something is wrong with that brain.

**BY MR. WILSON:**

Q    But you testified that his performance – strike that.  Does his math performance have anything to do with your diagnosis of his mood disorder?

A    Of course, because his performance –

Q    Thank you.

A    Oh, okay.

Q    Because they co-exist is what your testimony is?

A    No, not that they just co-exit, but that when you look at them over the course of multiple years and multiple testing, they speak to issues with working memory.

Q    Which is symptomatic in bipolar disorder, correct?

A    Symptomatic of a cognitive disorder, and that could be a part of the --

Q    Could be part of --

A    Yes.

Q    -- bipolar, correct?

A    Yes, exactly.

Q    Or schizoaffective disorder?

A    Yes.

MR. WILSON:  May I have just a second, Your Honor?

THE COURT:  You may.

MR. WILSON:  I'm sorry.  Thank you.

(PAUSE)

MR. WILSON: A couple of more things and then I'll be done.

**BY MR. WILSON:**

Q    Towards the end of the direct examination, counsel was talking to you about, again, the structured environment.

A    Yes.

Q    And he was asking you about whether or not you could have testified about prison being a treatment for brain impairment. Do you recall that?

A    I don't recall him testifying about prison, but I do recall him testifying about such a structured environment, but a prison can be.

Q    But it can be?

A    Yes.

Q    Okay. And if called upon to testify, you would say that prison could be a form of -- could be a way to treat someone with brain impairment?

A    It works both ways. It depends upon -- it Is not just anyone with brain impairment. It depends upon where their brain impairments are. There are some people that have brain impairments and being in prison is absolutely the worst possible place they could be. There are other people that are able to respond very effectively to the structure of a prison setting.

Q    And in reference to Mr. Fields, it would be your testimony that prison would be a way to treat his specific brain impairment?

A     Working memory, processing speed, yes.

Q     So you are going to testify that he needs to be locked up for life; is that correct?

A     That was not my testimony.  My testimony --

Q     You are going to treat him and that's the best way to treat him, he needs to be locked up for life; is that --

A     I don't think that I said it was the best way to treat him. I said that it is a manner of treating him that allows him to function effectively, but I didn't say that it was the best way to treat him.

MR. WILSON:  Can I have just one moment, Your Honor?

THE COURT:  You may.

MR. WILSON:  Pass the witness.  Thank you, Doctor.

THE WITNESS:  Thank you, Mr. Wilson.

THE COURT:  Do you have any redirect?

MR. LABOVITZ:  Yes, Your Honor.  And I am ready to start, but if the Court wanted to afternoon break. . .I am estimating twenty minutes.

THE COURT:  Well, I would rather – I think if that's all and we can finish -- and if you will follow  my previous admonition that, as you may notice, there is no jury or jury box in this courtroom.  So having the last grand work is not helpful or necessary.  Just anything you feel like you need to clarify or correct is preferable.

MR. LABOVITZ:  Yes, Your Honor, of course.

**REDIRECT EXAMINATION**

**BY MR. LABOVITZ:**

Q    Good afternoon, Dr. Woods.

A    Good afternoon, Mr. Labovitz.

Q    Do you recall that on cross examination Mr. Wilson asked you some questions about whether you had a draft report versus just a final report?

A    Correct.

Q    Now. . .and he asked you that or he showed you some emails where Ms. O'Connell asked you for a preliminary report?

A    Correct.

Q    And there were suggestions that you complied with that request?

A    Yes.

Q    If Ms. O'Connell upon receipt of a preliminary report from you had reviewed that and asked you to include Dr. Gelbort's findings, assuming --- I am sorry -- Dr. Gelbort's final opinion, assuming it was available at that time, could you have done that in your report?

A    Yes.

Q    Now, counsel asked you some questions about are you saying that Mr. Fields has brain impairment or brain damage and, you know, some technical terms were thrown around.  I would ask regardless of what technical term is used, brain

impairment, brain dysfunction, cognitive dysfunction, brain damage, what is your opinion as to whether Mr. Fields's brain is normal or abnormal?

A    It's abnormal.

Q    And then counsel talked to you about -- counsel asked you some questions on cross examination about your theory of the case.  Do you remember those questions?

A    Yes.

Q    That's how he -- that was the term he used.  Were you responsible for deciding what theory trial counsel would present at trial?

A    No.

Q    Do you ever, in any of your forensic work over these many years, tell trial counsel what you believe their theory of the case should be?

q    Absolutely not.

Q    Why is that?

A    Because I am not a lawyer.

Q    Is it -- as the mental health expert, is it your role -- well, is it a fair characterization to say your role is to share your thoughts and opinions with trial counsel?

A    About my information.

Q    About the information you have received and analyzed and then you share your thoughts and opinions with trial counsel?

A    Correct.

Q    And then who, in your experience, decides whether to accept those opinions?

A    It is up to the attorney.

Q    And who decides what to present in court?

A    That's up to the attorney.

Q    Now, you were asked some questions on cross examination about a meeting in Tulsa with Ms. O'Connell, possibly Mr. Grant and Mr. Derryberry.  This was after you saw Mr. Fields the second time in October of 2004.  Do you remember those questions?

A    Yes.

Q    And your testimony was that Dr. Gelbort may not have been present, but you recall him being on the phone?

A    Correct.

Q    Do you recall if on that phone -- well, I'm sorry.  At that meeting did Dr. Gelbort share the findings from his neuropsychological assessment of Mr. Fields?

A    I believe he did.

Q    And were those findings about Mr. Fields' brain impairments?

A    Yes.

Q    If trial counsel -- well, let me ask:  Is it your understanding that Ms. O'Connell was present in the room when Dr. Gelbort made that explanation over the phone?

A    Yes.

Q    And if Ms. O'Connell -- was Mr. Gant also present?

A    I don't recall  Mr. Gant.

Q    If Ms. O'Connell having heard Dr. Gelbort discuss Mr. Fields ' brain dysfunction, as reflected on his neuropsychological testing, had asked you to include that in your opinion as you were preparing your report, could you have done that?

A    Yes.

Q    And could you have testified to that opinion as well?

A    Yes.

Q    Is there any inconsistency in a finding of brain damage as well as bipolar disorder?

A    No.

Q    Is there any inconsistency in a finding of brain damage and schizoaffective disorder bipolar type?

A    No.

Q    And can you just tell us briefly why there is no inconsistency?

A    Because the --

MR. WILSON:  Your Honor, I object.  I think that was already testified to on direct.

THE COURT:  All right.  Can you make it a quick explanation?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Objection overruled.

BY THE WITNESS:

A    Because the problems with the brain that occur in cognitive disorders can also occur in a bipolar disorder or an schizoaffective disorder.

**BY MR. LABOVITZ:**

Q    Now, you were asked some questions on cross examination about had you then adopted Dr. Gelbort's neuropsychological test findings into your testimony at trial, you could have been cross examined on some possible scoring errors that Dr. Gelbort made in his testing or when he scored the testing?

A    Yes, that was asked.

Q    Okay.  Now, you testified that there were some tests that Dr. Gelbort administered that were significant to your opinion about Mr. Fields brain dysfunction, correct?

A    Correct.

Q    Did those tests include the trail making test, the category test, and the digit span backward test?

A    Correct, forward and backward.

Q    Forward and backward.  If the supposed errors that Dr. Gelbort made in the scoring did not involve any errors on those three tests that you have just discussed, what would you have said on cross examination when you were asked about Dr. Gelbort's errors or supposed errors?

A    I would have said if the errors did not reflect on the testing I was most looking at, it would not impact my testimony.

Q    And are the results that you have reviewed from Mr. Fields' neuropsychological testing and that you relied on. . .are those sufficient to reach an opinion about Mr. Fields' brain impairments independent of whether there were any errors in the scoring?

A    Well, there were no errors in that scoring, but --

Q    Okay, okay.  But if there were errors in some other tests that were administered, did you still have enough sufficient amount of information to reach an opinion to a reasonable degree of medical certainty?

A    I did.

Q    You were asked on cross examination if you were ever provided by draft reports by counsel that Dr. Gelbort prepared.

A    Yes.

Q    Would you ever rely upon a neuropsychologist's draft report in forming your final opinion?

A    No.

Q    Why not?

A    Well, I have always required the final report because that is the last word.

Q    You were asked some opinions about -- on cross examination about your declaration as to whether – you know, your belief that the jury did not agree with your diagnosis.  Accounting for your clinical experience, your teaching experience, your research experience, your forensic experience going back over forty years, can you discuss how exacerbated brain damage is perceived by the public versus a mood disorder?

          MR. WILSON:  I am going to object to this witness competence to talk about the sociological effect of that testimony on jurors.  I don't think he is –

MR. LABOVITZ: That was not my question. I am asking if --

THE COURT: I thought it was more of the effect on the public at large, which is maybe a bigger problem.

MR. WILSON: Maybe. . .

MR. LABOVITZ: I mean, he has researched this, he has lectured on this, he has published in this field or in this area.

THE COURT: The public's perception of this issue --

MR. LABOVITZ: No, no, no, just. . .

THE COURT: I mean, if I understood the question, you were asking what the public at large misunderstood about this area in which he is an expert. He is an expert, but I am not sure he is an expert on the public's perception of his expertise. I guess that is the problem, if I understood the objection. If that's it, then I am sustaining.

MR. WILSON: Well, you have more artfully stated it than --

THE COURT: Well, I have the luxury of sitting up here. I'll sustain that. I mean, I think you can ask something in that realm maybe, but just not about what the public is doing or thinking.

BY MR. LABOVITZ:

Q    Based on all of your experience, Dr. Woods, can you discuss how brain damage or exacerbated brain damage differs

from mood disorder in terms of its impact on a person's functioning?

MR. WILSON: I believe that has been asked and answered.

THE COURT: I does -- I mean, I think you've covered that in direct, unless there is some nuance to this question that wasn't addressed before.

I mean, Dr. Woods, can you answer that quickly? I will give you the chance if you can give me a CliffsNotes' version. How is that?

THE WITNESS: I can, I can.

THE COURT: Okay, overruled. You may answer.

BY THE WITNESS:

A    The population literature is pretty clear that people look at brain damage and brain impairment much more thoughtfully than they look at mood disorders.

MR. WILSON: Objection. That's nonresponsive to the question. I move to strike.

THE COURT: Overruled.

BY MR. LABOVITZ:

Q    Dr. Woods, my final -- the final area I would just like to ask about briefly. You were asked on cross examination about if you had added the bipolar -- I am sorry -- the brain damage testimony to your trial testimony you would have been cross examined and then Mr. Wilson went through a whole host of questions about the facts of the crime and Mr. Fields affect prior

to the crime and after.  Do you remember those questions?

A    Very well.

Q    So I just want to go back a little bit to that -- very quickly to that hypothetical I set up for you during the direct about let's talk about brain damage standing alone versus the brain damage added back -- the cognitive part of bipolar -- as a part of the cognitive component of bipolar.

A    Right.

Q    So focusing on brain damage alone, if trial counsel had consulted with you and gotten you Dr. Gelbort's final signed report before you prepared your report and then said to you, Dr. Woods, I've considered your opinion, I've considered Dr. Gelbort's opinion, I've considered Dr. Grinage's opinion, I've reviewed Ms. Shettles' social history, I've also learned a lot about Mr. Fields, and I, as the trial lawyer, believe that we should just present you to testify about Mr. Fields' brain damage alone, could you have written your report that way?  Erase your trial report and trial counsel told you I just want to present to the jury evidence of Mr. Fields' brain damage.

(PAUSE)

A    If I had been given a specific referral question that focused on brain damage as opposed to a referral question looking at a neuropsychiatric diagnosis, I could have written a report that focused on brain damage and I would have had to have that specific referral question.

Q    And the referral question would come from trial counsel?

A    Yes.

Q    And then could you have testified that way?

A    Yes.

Q    And is that consistent with -- is that idea that, you know, you could have shaped your report to conform with the request of trial counsel consistent with testimony that you have given in other cases where you say that counsel drives the bus or it is up to counsel to decide what evidence to present at the capital sentencing stage?

A    It is not that so much in terms of -- it is what specific referral question have I been asked.

Q    Okay, thank you.

THE COURT:  Okay.  Any recross?

MR. WILSON:  No, sir.  Thank you.

THE COURT:  All right, very well.  I assume nobody is going to recall Dr. Woods in this?

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  Dr. Woods, you are finally finished.  You are dismissed and excused.  Thank you for coming here.  We appreciate it.

All right.  With that we are at a little past 2:45 and I think it is a good time for our afternoon break.

Who is your next witness for the Defendant?

MS. THOMPSON:   The defense calls Dr. Bradley

926

Grinage.

THE COURT:  All right.  Dr. Grinage is going to be called next.  And I know we had anticipated some videos.  We will see.  I hope they have not been on the line.  You would have a heck of a phone bill.

All right.  We are going to take our break until 3:00 and we will come back start with Dr. Grinage.  So we are in recess.

(2:48 p.m.)

(SHORT RECESS)

(3:03 p.m.)

**COURT IN SESSION**

THE COURT:  All right.  We are back on the record. Counsel are all present.  Are you ready to proceed?

All right.  The Defendant may call its next witness.

MS. THOMPSON:  Dr. Grinage.

**DR. BRADLEY D. GRINAGE, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

THE COURT:  All right.  You may proceed.

BY MS. THOMPSON:

Q    Good afternoon, Dr. Grinage.

A    Afternoon.

Q    Can you please state and spell your name for the record.

A    Bradley D. Grinage, G-R-I-N-A-G-E.

Q    And what is your current occupation?

A    I'm a psychiatrist full time with the Veterans Health

Administration in Oklahoma City, although I live in Kansas. And I do have a private forensic psychiatry practice.

Q    And can you describe the difference between your clinical and your forensic practice, just briefly?

A    Sure. I see clinical patients and I supervise about eight positions and a couple of mid-level providers. I am the medical director for telehealth services to the rural areas in Oklahoma. So I see patients and I do supervision. That's my VA job.

In my forensic practice I mostly, in the past ten years, have done criminal and some civil medical malpractice litigation, but I do evaluations for courts and judges in my forensic practice.

Q    And what's the approximate breakdown between clinical and forensic?

A    I'm one hundred percent clinical, so forty hours full time. And I -- my current medical malpractice is about ten hours a week, but I don't put in ten hours a week. This is -- I don't have too many cases these past few years. Since COVID it has kind of gone down.

Q    And can you briefly describe your educational background as relevant to your psychiatric degree?

A    I graduated from the University of Kansas in 1982 or -- excuse me -- 1986. And then I went to medical school at the University of Kansas in Kansas City.

MR. WILSON: Your Honor, the government will stipulate that Dr. Grinage's qualified to testify in his field.

928

THE COURT: Okay, all right. Do you just want to move then to admit him as an expert?

MS. THOMPSON: Sure. Can I just. . .I just. . .have him look at Defendant's Exhibit 200 really quick, just his CV? We will pull that up in just a second.

BY MS. THOMPSON:

Q    Can you please identify the document?

A    This is my CV.

Q    And is it -- does it accurately reflect your education, training, professional experience, presentations --

A    It does. It is a couple of years old. It is not updated, but that is the most updated one I have.

Q    Okay.

MS. THOMPSON: The defense offers Dr. Grinage as an expert in psychiatry.

THE COURT: Okay. No objection? Okay, so admitted.

BY MS. THOMPSON:

Q    All right. I would like to ask you some questions about the federal capital trial of Mr. Fields. Can you describe your role in Mr. Fields' 2005 trial?

A    I was asked to do an evaluation on him. That's about it.

Q    Okay. And you were retained by the defense?

A    I was retained by the defense.

Q    I should go back, I apologize, just more generally about your experience. Have you in all of your forensic work, your

criminal forensic work, has all of that work been on behalf of the defense?

A    No, ma'am. I would have to look at my past records, but it was pretty close to fifty-fifty. There was some civil work as well, both plaintiff and defense.

Q    Okay. But your criminal work has been -- you have done about equal about of working testifying as a prosecution expert?

A    Correct.

Q    But here you were retained by the defense?

A    (No Response)

Q    Do you recall who first contacted you about getting involved in this case?

A    Julia O'Connell.

Q    Okay. Did you have any contact with an attorney named Isaah Gant?

A    You know, I don't recall that, but I think from the records he contacted me initially and I talked with him by phone, but thereafter it was working with Ms. O'Connell.

Q    Okay. And did you ever meet with an attorney named Derry -- I am sorry -- Barry Derryberry?

A    I don't believe so, not that I can recall.

Q    And what about an attorney named Michael Abel?

A    No, ma'am.

Q    Did you ever talk to anyone or any persons (sic) that were working with something described as the National Capital

Resource Center?

A    Not that I'm aware of.

Q    Okay.  So just Ms. O'Connell was who you worked with, correct?

A    Right.  I don't recall speaking with Mr. Gant, but I do believe there are some records showing that he called, or I spoke with him at some point or initially.

Q    Okay.  And can you please turn to -- or take a look at Defense Exhibit 6?  I'm sorry, Defense Exhibit 169.  Do you recognize this document?

A    I do.

Q    Can you describe it?

A    It's an initial contract for work for the Federal Public Defender to evaluate Mr. Fields.

Q    Okay.  And if you turn to -- I believe it is Page 3 of this letter or of this exhibit.  Is that your signature?

A    It is.

Q    And what date did you sign this contract?

A    June 13th of 2005.

Q    Okay, I'm sorry.  Going back to the first page, if you look at the third paragraph, do you see the sentence that begins, "Your role as a defense expert. . ."

A    Yes, ma'am.

Q    And do you see where it says. . ."will be in the area of medicine and psychology?"

A    Yes.

Q    Was that an accurate description?

A    Generally I am a psychiatrist, so I am a medical doctor, but I also address psychological issues, so. . .

Q    Okay. you said that you signed your contract on June 13th, 2005, correct?

A    Yes, ma'am.

Q    And do you recall what date Mr. Fields' trial began?

A    Oh, I think it was in July, maybe mid-July.

Q    Okay. If I represented to you that it began on July 5th, 2005, would you have any reason to disagree?

A    No, no, I would not.

Q    Okay. I would like you to turn next to Defense Exhibit 264. And can you tell us what this is?

A    This is my report dated June 24th of 2005.

Q    And can you briefly describe the work you performed in order to be able to write this report?

A    Yes. I reviewed several of the records as shown on the previous. . .or the next page. And in addition to this, I discussed at some consultation with defense counsel and then I evaluated the patient, saw the Defendant, on the 18th, it looks like, and wrote my report on the 23rd or 24th.

Q    Okay. And did you also consult with some other physicians or with some treating physicians?

A    I did and you can see that in my sources of information.

I had a brief interview with Dr. Woods and did an interview with Mike Kemp.

Q    Okay.  And just to be clear, Mike -- I had said treating physicians.  That would be Dr. Kemp --

A    Dr. Kemp.

Q    But Dr. Woods was not a treating physician?

A    Correct.

Q    What was his role in this case?

A    My understanding is he is a neuropsychiatrist and was at that point planning to be involved in the defense of the case with Ms. O'Connell.

Q    And I believe you said this, but what date did you conduct your in-person evaluation of Mr. Fields?

A    June 18th, 2005.

Q    Okay.  So you examined Mr. Fields just five days after signing the contract to work on this case, --

A    That's correct.

Q    -- correct?  And is that your typical practice, that you would see the defendant so soon in your forensic --

A    No, ma'am.

Q    How would that normally go?

A    Routinely it depends.  Like if it is a sexual predator evaluations, there is a massive amount of records, but on average, especially for a case of this extent, I need at least a month to review records that are available and then I spend a month doing

the evaluation before -- even before I could initiate writing a report. That's a generality.

Q    And then based on the date of your report, you completed that report in just six days after evaluating Mr. Fields, correct?

A    Correct.

Q    And is that typical?

A    As I said before, no, ma'am. That is -- usually I take – usually I have several weeks, if possible or if available, to generate my report. So this is probably -- as I look back at it and recall, this is probably one of the fastest reports that I have done where I signed a contract, within a week saw the patient and then within a week having done a report. That is highly unusual. I don't know that I have ever done that before.

Q    Okay. I would like to talk to you next about some of the emails you exchanged with Ms. O'Connell between June 13th, when you started working on the case and June 24th when you had completed your report.

Let's start with Defense Exhibit 171. Can you describe this document?

A    This is an email from Julia O'Connell dated June 13th, 2005. It is an email apparently to me talking about having a conclusion from the neuropsychiatrist, George Woods, and she mentions at the end of that email that she got the results from Dr. Gelbort.

Q    Okay. And there is some handwriting on this document.

Is that your handwriting?

A    Probably, possibly.  It kind of looks like it, yes.

Q    Okay, but if you are not sure. . .

A    That's twenty years ago, but it kind of looks like mine.

Q    Okay.

A    Although it is actually readable, so it may not. . .

Q    And I think you described the text of the document a little bit, but just to ask you – well, so -- from the handwriting it seems that there was a call with Ms. O'Connell.  Well, let me ask you this:  Do you have any recollection of whether you had spoken by telephone to Ms. O'Connell around the time that you signed your contract?

A    Do I. . .repeat that, please.

A    Do you have a recollection that you had a telephone call with Ms. O'Connell around June 13th, 2005, which was also the day you signed your contract?

A    I am sure I did, but I have no recollection of that.

Q    Okay.  So in this email -- and I think you said this -- she refers to the neuropsychological testing – well, I guess she refers to Gelbort --

        MS. THOMPSON:  I am sorry.  Can I move this closer to me.  Is that – am I going to, like, break it?

        THE COURT:  If you break it, you pay for it.

BY MS. THOMPSON:

Q    So she says -- she tells you, "George Woods, my

neuropsychiatrist, reached his conclusions without reliance on --

MR. WILSON:  Objection, Your Honor.  I would just ask that counsel ask a question and not just read the email. That is not --

MS. THOMPSON:  Well, okay --

THE COURT:  Well, I think it is preparatory to a question, or we hope.  So we will see where it goes.

MS. THOMPSON:  I am just trying to move things along.

BY MS. THOMPSON:

Q     Do you know – I think we've covered this, so you already answered.  Dr. Woods is a neuropsychiatrist.  Do you have an understanding -- do you see where the email refers to Gelbort's testing?

A     It states that we got the results from Gelbort, which is why she described the testing as icing on the cake.

Q     So in the first -- I am sorry.  In the first sentence at the very end, there is a reference to Dr. Gelbort's testing.

A     Oh, without -- oh, yes, she states that Dr. Woods has reached his conclusion without reliance on Gelbort's testing.

Q     And do you have an understanding of what Gelbort's testing referred to?

A     At that time I did not.  At that particular I -- well, this was on the 13th, so I hadn't received the results yet.  And the results, as I clarify them, are raw testing data.  So I believe -- you know,

she -- for a neuropsychologist to do any kind of testing, you are looking at brain function to determine any kind of impairment.

Q    Okay.  So just to step back -- so Dr. Gelbort, Dr. Michael Gelbort, do you recall what role he played in this case?

A    My understanding is he was the neuropsychologist --

Q    Okay.

A    That she had hired and -- and, you know, things were pretty rushed and fast.  So you can see in my notes there. . .you know, there is a neuropsychiatrist, and I didn't -- and it was kind of unclear whether there was a neuropsychologist as well, but there was, and what particular role he was playing at that time.

Q    I'm sorry, I missed that last part.

A    I just said that in my notes it looks as if I was trying to under-stand if there was a neuropsychiatrist and a neuropsychologist, but at that particular point I assume she was obtaining testing. I do not recall the conversation, but when she said "icing on the cake," I assume that Dr. Gelbort had some positive results from his neuropsychological testing.

Q    Okay.  And going back to the first sentence when she says, "Dr. Woods reached his conclusions without reliance. . ." on June 13th here had you received a final report from Dr. Woods at that point?

A    I had just signed the contract, no.  I don't think I received his report until probably a couple of weeks later.

Q    Okay.  Let's turn to Defense Exhibit 185.  And this document

has two emails.  I would like to start with the bottom email.

Can you describe this?

A     It looks like it is an email from Julia O'Connell to myself indicating that she faxed the neuropsych data and please confirm that I received it.  I had been asking for reports because normally I review as many records as I can and have all of the records prior to rendering an opinion.  I asked for Curt Grundy's competency evaluation, --

Q     So did --

A     -- but she did not have that.

Q     Sorry to stop you, but you don't need to go through the whole email.

A     Oh, okay.

Q     I just wanted to ask you -- so it's an email from Ms. O'Connell to you?

A     Correct.

Q     And it is still dated June 13th, right?

A     It is.

Q     So we are still on that initial date that you started working.

A     Yes.

Q     And as you said she tells you that she had faxed the raw data.  And what is your response regarding just that first point?

A     I had asked did you have a formal written report.  That's what I was looking for.

Q     Okay.  And why did you ask that?

A    Well, if you are -- I mean, I -- in order to formulate an opinion, you like to have as much information as you can have.  When it comes to certain testing, like psychological and neuropsychological testing, I am not credentialed to review or read those or interpret those.  So it is just kind of like ordering a lab test.  I don't know how to calibrate the complete blood count machine, but I know what the result means.  So I was looking for a particular result in order to see if that might help with my opinion one way or another.

Q    Okay.  And let's turn to Defense Exhibit 170.  And this is another email from Ms. O'Connell to you?

A    Correct.

Q    Still on June 13th?

A    Yes, ma'am.

Q    And do you see it looks like there is an icon on there that to me I would interpret as an attachment to the email.  Do you agree with --

A    Correct.

Q    And how is that labeled?

A    Neuropsych data.

Q    And what does she tell you about what she is sending in that attachment?

A    She shows this as excerpts from emails that she traded with Dr. Gelbort and these excerpts that she had sent are a part of a draft report.  There is no final opinion report available.  She

indicated she would provide a final opinion report when it was finished.

Q     Okay. Do you have any independent recollection of receiving this email that we are looking at?

A     I do not.

Q     Do you have any recollection of what was in the attachment to that email?

A     Well, I believe she faxed the raw data, so this might have been in her actual emails from Dr. Gelbort or excerpts from a draft of some sort. I honestly do not know.

Q     Okay. But it seems that in addition to the raw data, which was separately faxed, you had also received some sort of excerpts in addition to that.

A     It appears so, yes.

Q     Okay. And then Ms. O'Connell goes on in this email to say that whatever she was sending you -- we don't have that attachment, but whatever it was she thinks it covers what you want to know. Do you recall what you wanted to know?

A     I do. You know, drafts come and go. I really don't have any idea of what was in this. She indicated that she may be administering more tests. So I would reserve even reading the result unless you had completed testing. In order for me to utilize a result, it needs to be a formalized opinion saying what that result is.

Q     Okay. And I think you just mentioned this, but. . .so you

said that you were hoping or wanting a final report.  And does she indicate in this email why she does not yet have a final report from Dr. Gelbort?

A    She indicates that she may have him do more testing.

Q    Okay.  And would it be your practice generally to wait for the final report before incorporating information from another expert into your own opinion?

A    Absolutely.  I mean, there may have been information in there, or there may not, that might or might not have been useful, but I don't consider that useful without a formalized opinion.

Q    And why is that?

A    Well, people write drafts all of the time and change their opinions and new evidence comes out.  So I -- it's better to be able to -- you know, to be able to list all of the reviews that you have done to have the opinion in your report and the bottom line of the opinion is what I use.  It is just like any other lab data or testing that I get.  You know, it doesn't matter how often they have seen the person or exactly what they are doing, but it is what is the end result is what I was looking for.

Q    And Ms. O'Connell also states in this email that you can call Dr. Gelbort.  Did you do that at that time

A    Well, this is June 13th, so I had just signed the contract.  There may be more testing.  I don't have a final report, so I did not contact Dr. Gelbort because at that particular time I didn't know if this was even information that was valid or useful.

Certainly -- you know, I think -- well, this is early on. Later on, if I had been under the understanding that the brain abnormality or the frontal lob abnormality was going to be a part of what we needed to be prepped for and talked to, I would have insisted on a formal report or at least a conversation to get a verbal formal opinion from Dr. Gelbort. At this point it wasn't clear to me and there was a lot of stuff being brought in and it was pretty rushed. So I focused on what was available to me that could be corroborated and formalized.

Q    Okay. Let's turn to Defense Exhibit 172. And can you describe this document?

A    Yes, this is an email, June 19th, the day after I saw the Defendant, from Ms. O'Connell. She was writing to see how I feel about the neuropsychological stuff and that if it is not vital, to consider not mentioning it in my report.

Q    Okay. And then --

A    And she gives, it looks like, a legal reason why she may not consider using Dr. Gelbort.

Q    Okay. So I just want to step through a couple parts of the email. So I think you said it was dated June 19th. So this would have been less than one week after you started working on the case and gathering records?

A    Correct.

Q    And it was the day after your in-person evaluation of Mr. Fields?

A    Correct.

Q    And what is the subject of this email, like the subject line?

A    It says Fields report.

Q    Did you have an understanding as to when Ms. O'Connell wanted to have your final report?

A    Yesterday.

Q    Okay. So --

A    She was pretty insistent on trying to gather the reports and quickly go with -- or get as many reports as she could.

Q    Okay. And then turning to the text, as you said, she asked whether you could reach an opinion without Dr. Gelbort's info and specifically she asked whether you must rely on that information, correct?

A    Yes.

Q    And then she also says, "is it vital to your conclusion," correct?

A    Correct.

Q    Okay. And then does she explain why she wants to know this? I think you already said this, but just to be clear.

A    Yes. She indicated -- and I am certainly not an expert in legal defense -- that there may be a reason why legally that she may not use Dr. Gelbort's information.

Q    And what does she exactly on that?

A    She says that if I have to go to trial and their neuropsychol-ogist reaches some conclusion contrary to Dr. Gelbort's, I can

jettison the neuropsychologist's testimony and then the

government's neuropsychologist probably wouldn't be allowed to

testify.

Q    Okay.  And did you offer her thoughts on whether this was

a sound legal strategy as it was expressed to you?

A    No, that's over my pay grade.  That is outside my scope and

practice.  That's between her and the client, the legal strategy.

Q    Okay.  And do you recall whether at this point where she

is asking you about the neuropsychologist stuff, had you received

a final report from Dr. Gelbort?

A    I  had not.

Q    And how can you be certain?

A    In my report, by the time I wrote my report -- and there are

a couple of things going on here.  I had to explain to her that

everything that I review I feel necessary to be able to list it in

my report, whether I use -- whether that information is weighed

towards my conclusion or not.  So that was one thing, listing the

raw data and listing the information that I obtained from Dr. Gelbort.

But then the second thing would be if I had a formalized conclusion

and if I had -- as I said before, if I had a formalized conclusion, I

would have really pressed to be able to say I can't get this out of

my head because this is a part of my evaluation.  I would need

to use it, but it is pretty straightforward to say that it wasn't

necessary because there wasn't a formal opinion, there wasn't

anything available to me to opine upon.

Q    Okay.  And I think you are anticipating the response, but –
so let's go ahead and get to that.  I think you -- let's turn to
Government's Exhibit 3.  And there are two emails here again.
So if we can scroll down. . .I am so sorry.  Go back up just to get
the date.  What is the date of this email?

A    June 21st.

Q    June 21st.  So this is two days after the one where
Ms. O'Connell is asking if you can reach a conclusion with
Dr. Gelbort's -- without the neuropsychologist stuff?

A    Correct.

Q    And in the bottom email, what does she say in the first line
of that email?

A    She is checking on the progress of my report a mere eight
days after signing the contract.

Q    Okay.  And then going down in the -- I think it is on there --
yeah, just in the penultimate paragraph or line there, she
mentions. . .I know you are in a time crunch with vacation coming
up.  So do you -- was it your understanding that she wanted you
to finalize your report before you left for that vacation?

A    Yes, ma'am.

Q    Okay.  And then turning to the top email, even though this
is dated two days later, you seem in this email to be answering
her question from June 19th?

A    Yes, ma'am, it appears that way

Q    And what do you tell her about that question, about whether

or not Dr. Gelbort's stuff was vital to your conclusion?

A    Well, it is a couple of things.  The first statement is kind of me trying to set boundaries to say if I can complete my report and with a reasonable degree of medical certainty, then I would certainly get that to her, but she was pushing to have that report.  And in the third or fourth paragraph, I suggested that I preferred having a final report and that I wanted to have the information -- the formal information from Dr. Gelbort.  However, because I was able to state an opinion, not including front lobal -- insufficiency frontal lobe dissimulation, I was able to say that I can go ahead and write my report accordingly, but I did feel the need to say, hey, I reviewed another expert's raw data anyway, you know, and some excerpts from the emails.

Q    Okay.  But essentially you were able to reach -- you were able to offer an opinion, as you said, to a reasonable degree of medical certainty that you thought would be valuable to Ms. O'Connell that would be -- that would provide her with mitigating information regardless of what Dr. Gelbort had found, correct?

A    Correct.

Q    Did you tell her that you believed your opinion would be stronger if you were able to rely on Dr. Gelbort's data?

A    I asked a couple of different ways to be able to have that data.  I prefer to have as much as possible.  If I would have known positive results -- I mean, it is easy to look back now in

retrospect – I absolutely would have pushed that. More importantly for me, having not known that, if I had -- if we were prepped for discussion of brain injury or if I knew Dr. Gelbort was testifying, I would say I need -- and I have reviewed the data, I would say I need the final report or at the very least the final opinion through a verbal interview with him, if he was going to – if this was going to be a part of that defense.

Q    Okay. But is it fair to say that the data that you had received, given that it was not final, it was excerpts of a preliminary report, it was pretty easy for you to say that it wasn't critical to whatever opinion or to the opinion that you were able to reach since you have explained that you weren't relying on that?

MR. WILSON: Your Honor, I would object. Counsel is leading. I haven't objected very much on that. I am just going to object to the leading in that question.

THE COURT: Sustained.

MS. THOMPSON: I will move on.

BY MS. THOMPSON:

Q    Okay. I would like you to look at Defense Exhibit 188. And again we have two emails. What is the date of this exchange?

A    June 21st.

Q    Okay. And just on the subject of what we've been talking about. . .I think it is all in the first paragraph -- what does Ms. O'Connell tell you?

A    She suggests that I should do what I think is right with regards

to the Dr. Gelbort stuff.  I think she may have had some confusion with the fact that I needed to list that information.  What I think is right -- really I don't use information unless I have a final report, unless I have a formalized opinion.  So it was a pretty easy call.  I would not state an opinion with raw data and excerpts from an email.  I just -- I just can't really -- one is it lends lack of credibility to a reasonable degree of medical certainty in your opinion, but two, opinions change.  So I needed a signature to an opinion to be able to have that be critical to my opinion.

Q    Okay.  But your understanding is she -- you are just talking about -- well, maybe this would be the best way to do this.

If we can go to Defense Exhibit 264, which was your trial report, again.  And on Page 2 of that report, you have sources of information.  And does this reflect what you had received from --

A    Yeah, I just listed it as records from an evaluation and not a report.  Normally I will say report dated such and such date by So and So regarding this opinion.  That's my normal standard, but I had information so I just put records from Dr. Gelbort.

Q    And in the sources of information, was that a list of everything you had taken into account on this case, whether or not it factored into your final opinion?

A    Yes, ma'am.  I mean, some of those I don't list out referral data, you know, some of those. . .there is investigative records. I mean, you could spend hours listing all of that out, so I kind

of generalized those, but yeah, there is a lot of stuff that I – that weighs to the case and a lot of stuff that does not.

Q    Okay.  Could we go to Government Exhibit 71?  And the date of this exchange is. . .can you – I'm sorry.  Can you tell me the date of this email exchange?

A    Juen 22nd.

Q    And who is it between?

A    It is from Julia O'Connell to me.

Q    Okay.  And in the bottom email what is she asking, just in the first line?

A    She is asking if I would like to see Dr. Woods' report.

Q    And how did you reply to that?

A    I tried o say it as nicely as possible and I said I would like to.  If you can send me data, I would love to see those records.

Q    Okay.  And then let's go to – oh, this is a two-page exhibit, so just the second page of this exhibit.

A    And then she asks – I said – well, I said that email is best for me.

Q    I'm sorry.  What is the date of this?

A    June 23rd.

Q    And what does she tell you in the first line?

A    That she has Dr. Woods' final report.

Q    And then you reply. . .

A    Email is the fastest and best for me.

Q    Do you recall whether you actually received Dr. Woods' report that date?

A    I don't know the exact date, possibly. I can't say with any certainty. I don't remember the date that I received his report.

Q    Do you recall the date of your trial report?

A    I believe mine was on t eh 24th. If we go back to my trial report. . .well, it had to be after because I don't think I saw Dr. Woods' report prior to writing my report, but I would have to go look at my report.

Q    Okay.

MS. THOMPSON:  Can we pull Defense Exhibit 264, Page 2 again?

BY THE WITNESS:

A    Okay. So records from Dr. Gelbort, collateral history with Dr. Kemp, collateral history with Dr. Woods regarding his neuropsychic evaluation. The issue with me contacting Dr. Woods is it was apparent he was going to be utilized and she assured me a report would be forthcoming.

Q    Okay. Had you received on -- Dr. Woods' final report on June 23rd -- per the email exchange, it seemed it was coming to you. Would you have listed it on June 24th among the sources –

A    Possibly.

Q    Okay. And do you know what date Dr. Woods' final report was signed, what it is dated?

A    I do not.

Q    If I represented to you that it was June 25th, 2005, would --

A    I would not disagree.

Q    Okay.  Are you aware of the date that Dr. Gelbort finalized his report?

A    I am not.

Q    If I represented to you that it was July 1st of 2005, would you have any reason to disagree with that?

A    I would not.

Q    Did Ms. O'Connell contact you on July 1st, 2005, stating that she was expecting Dr. Gelbort's final report that day and offering to send it to you as she had done with Dr. Woods' report?

A    Not that I'm aware of, no, ma'am.

Q    Had she done so, how would you have responded?

A    I would have said please send as soon as possible.  And in doing so -- I did not addendum my report from Dr. Woods' report simply because there wasn't a change in my opinion, but if there had been any change in my opinion, any change in my diagnosis, I would have had to addendum my report

Q    And  had you made it clear to Ms. O'Connell that you were open to receiving additional data?

A    Yes, ma'am.

Q    Okay.  Let's turn next to Defense Exhibit 4.  Do you recognize – oh, I'll wait until you have a chance to. . .

A    This is a report stated Neuropsychological Evaluation by Dr. Gelbort at the top.

Q    And if we could look at Page 4 of this exhibit quickly. . .and do you see a signature on that page?

A    Yes, I see it is from Michael M. Gelbort.

COURT REPORTER:  Can you speak up?  I'm having trouble hearing  you, you are trailing off at the end.

THE WITNESS:  I'm sorry.

THE COURT:  Yes, plus we tend to lean back at the end of a sentence.

THE WITNESS:  Yes, that too, sorry.

BY MS. THOMPSON:

Q    And so have you since Mr. Fields' trial had the opportunity to review this report?

A    I have.

Q    Okay.  I would like to ask you a couple of questions about it.  On the first page in paragraph 2, Dr. Gelbort -- sorry.  Almost to the very bottom of that paragraph, he describes some medical history.  Well, this whole paragraph deals with the medical history.  Can you look at -- I guess starting. . .it's four lines from the bottom.  He also was an inpatient. . .

A    Yes, ma'am.

Q    I guess if you want to read that through the end and then continuing on to the next page, and I guess let us know when you are ready.

A    He also was an inpatient after being involved in a motor vehicle accident in a truck at age –

Q     Okay.  Could you –

MR. WILSON:  The document speaks for itself, Your Honor.

MS. THOMPSON:  Okay.  I just wanted -- well, I was going to – I wasn't going to ask him to read it.  I was just –

THE COURT:  I'm assuming it is preparatory question, so overruled, assuming it is a preparatory question, please.

MS. THOMPSON:  I thought that would be less objectionable than me setting the foundation for the question. So I. . .

BY MS. THOMPSON:

Q     Have you had a chance to read, just to yourself, what that is referencing?

A     Yes, ma'am.

Q     Okay.  Do you recall whether you had been provided with records of the hospital stay that is being described here?

A     Not the hospital records, no, ma'am.

Q     Okay.  And if you had received Dr. Gelbort's final report and seen reference to this, is this something you might -- you would have asked trial counsel to share with you, these records?

A     Certainly.  First and foremost, having a neuropsychologist state there is brain abnormality, all of the corroborating evidence including records from previous head injuries are important.

Q     Okay.  Can we look at Defense Exhibit 268, please?  Can you just very generally describe what this is?

A    This is a record from Humana Hospital regarding – it looks like cerebral concussion dated 1983.

Q    Okay.  And have I shown you these records in connection –

A    Yes, ma'am.

Q    -- with preparing for your testimony today?

A    Yes.

Q    And had you been given these records at the time of trial, would you consider them relevant to your evaluation of Mr. Fields?

A    In conjunction with a diagnosis or a formal opinion of frontal lobe impairment, yes, ma'am.

Q    And why is that?  What is significant in these records?

A    Well, I would have to go back to the initial birth records, which I did not have at the time, but I had the history from the social history and that showed a pretty significant injury or insult at birth and every consecutive head injury thereafter can multiply and can -- or is an additive to -- when it comes to a head injury.  When you have concerns -- if you have a bad brain injury and you have another head injury, then that can be even worse.  So, yes, this would be important to have in the context of having that diagnosis.

Q    Okay.  And what is the diagnosis in these records that would have been relevant to your evaluation?

A    Cerebral concussion.

Q    Okay, thank you.  So lets go back to Dr. Gelbort's report, which is Exhibit 4.  And on the third page, here he generally

954

starts to talk about his conclusions from his testing. And having read these since the trial, did you find these conclusions relevant to or significant to your evaluation? Or I guess I should say, had you have received this report at the time of trial, would you have have found those conclusions relevant?

A    The I.Q. is somewhat interesting, but for me, in the context of the final opinion, I would find these important.

Q    And what in this report did you find significant?

A    With regard to the final opinion?

Q    Well, just with -- if you had received this report and read it, is there -- what about -- I know we had talked earlier about you are not an expert in interpreting raw data. You were waiting for a final report. Here is the final report. What stands out to you from it?

A    Well, the big thing that stands out to me that I think is kind of eye opening is generally there are indications of cognitive anomalies and abnormalities. So, you know, neurocognitive abilities cannot be seen as normal. That means he has abnormal executive functioning, abnormal frontal lobe defined by testing.

Q    Okay. And is the report of a neuropsychologist, such as Dr. Gelbort, something that experts in your field would reasonably rely on in reaching a conclusion?

A    Oh, yes, ma'am, I review neuropsych testing quite often.

Q    Okay. And so your overall take away from Dr. Gelbort's testing is. . .can you just give us what your opinion would be of that? How would you frame it?

955

A    Well, yeah.  When. . .if you have a neuropsychologist give an opinion that there are abnormalities of the brain, organic brain functioning, sort of the pieces do fall into place when you take a look at the hypoxia at birth, multiple head injuries throughout, and then you see some of the difficulty with relation- ships, remedial classes in school, not be able to finish high school, difficulty with relationships.  All of those pieces kind of fall into place when you say. . .okay, here is -- this is -- this can actually explain those.

Q    And what is this?  Are you. . .

A    Frontal lobe, the front lobe damage.  You know, some people call it dysfunction, damage from a clinical standpoint.  I think we use those interchangeably, unless you are a highly technical neuropsychologist or neuropsychiatrist, but in collaborating with my colleagues, I say frontal lobe damage, frontal lobe dysfunction.

Q    Okay.  So. . .and to the neuropsychological findings of frontal lobe dysfunction, I just wanted to ask you about some of the medical history that you -- or I should say, did you find a medical history consistent with Dr. Gelbort's conclusions of frontal lobe impairments?

A    Yes, ma'am.

Q    And I think you talked first about the 1983 medical records.  Were there other head injuries that you were aware of at the time of trial that would have been relevant?

A    I am not for sure if I knew of the sledding incident.  It was

probably in his raw data notes that he had or I -- I don't know whether that was in the psychosocial assessment, but certainly at age 13 there was a loss of consciousness with a sledding incident. But probably the bigger, more important records that I didn't have was at -- was his trauma at birth, his birth trauma.

Q    Okay. Just before we leave head injuries, you also discuss a head injury in your own trial report. Do you want to take a look at that to refresh your memory?

A    Sure.

Q    It's 264, Defense Exhibit 264. And I think it is at Page 4. It's. . .

A    It would probably be under medical health history.

Q    Health history?  Yes.  Can you just read under health history and see if that refreshes your memory?

A    A mild head injury in 1997 without loss of consciousness.

Q    Do you recall reviewing the records of that?

A    I don't.

Q    Okay.

A    If I stated medical records confirmed histories, then it is in the records there, but I can't speak to any detail about that. I do not recall that.

Q    Okay. And you note that it was without loss of consciousness. Does that mean it's not important if there was no loss of consciousness?

A    Well, we ask about loss of consciousness because that

usually indicates a more severe type of a head injury, but certainly mild concussions without loss of consciousness, especially if there are cumulative concussions, can cause pretty significant symptomology.

Q    Okay.  And then you have also referred a couple of times now to the -- something that occurred at birth.  And what was that?

A    According to the records -- and this, I think, was in the social history – that he had a respiratory distress syndrome called hyaline membrane disease, which causes hypoxia or lack of oxygen to the brain.  Now, in reviewing that or having that particular information at the time, you know, that is coming from a social worker with a social history, some of that is. . . you know, how serious was that or not?  But in reviewing the records it was pretty significant.  The Defendant as a baby was hospitalized for several days and when they say the prognosis is guarded that means they are concerned that it is potentially life threatening.

Q    Okay.  So I just want to step through that a little bit.  You were aware of the hypoxic episode at the time you wrote your trial report; is that correct?

A    Yes, I was.

Q    And I believe you said that that was based on a psychosocial history --

A    I believe so.

Q    -- that you received.  Okay.  So do you recall, had you

received actual medical records?

A    I may have.  I think I received records that were essentially readable.  I can't remember if this was from -- (inaudible) -- at that particular time, but there were records that were kind of unreadable that said hyaline membrane disease, but it was hard to say how severe or how concerning that was to the doctors --

Q    Okay.

A    -- until I reviewed these records, these newer records.

Q    Staying in 264, can we just go up to Page 2?  And again, you don't have to read them all out loud, but in looking at those sources of information, do you see any Anthony Hospital records reflected in that?

A    Probably the preliminary psychosocial assessment by Gloria Shettles.

Q    Okay.  There is nothing listed there about –

A    Yeah, there is no – LeFlore County Medical Center records.  There is no Heavener Medical Clinic records, I don't believe.  Tulsa were the jail records.  So you are correct, there are no Anthony Hospital records.  So I didn't – I received all of that information or I had an understanding of that through the psychosocial assessment from Gloria Shettles.

Q    Okay.  Let's look at Defense Exhibit 3, please.  Is this what you are talking about when you say the psychosocial assessment?  And I don't know if you want to scan through it to. . .

A    This looks like the assessment, the preliminary assessment

as it is titled, yes, ma'am.

Q    Okay.  And staying on the first page, in that first paragraph,

the third sentence of the report, can you read that?

A    The records have not yet been received.  Eddie was not

expected to live following his birth as a result of – this says

hollowed membrane disorder, but it probably meant to say

hyaline membrane, which is the membrane in the lungs that

causes problems with respiratory issues.

Q    Okay.  Does that seem consistent again with what you had

received at trial?

A    Yes, ma'am.

Q    All right.  Let's look now at Defense Exhibit 1.  And were

these records subsequently provided to you by my office?

A    Yes, they were.

Q    And did you consider these significant -- were these

meaningful -- did this communicate information to you that was

not communicated through the psychosocial assessment?

A    Yes, ma'am, the -- yes.

Q    And can you tell us what -- because I think you mentioned

this in the very beginning, but we hadn't quite established -- or

when we were talking about this episode, but what in here did

you find significant, in addition to the information that you had

received from Ms. Shettles?

A    Well, if you scroll down, there's a statement from the

doctor with some concern.  This is kind of hard to read, the second,

the third. . .keep going, keep scrolling down. Okay. Can you go back up? Okay, keep going. No, go down. I'm sorry. I apologize. Okay, keep going. Oh, here it is. This 5-16 -- I don't know. . .this is Page 14 of 19. And they are talking about diffuse pulmonary infiltrates, significant lung problems. Do not believe there is an obstruction, so this is more hyaline membrane disease. And so they were -- and they are concerned about assiduous and transferred to a nursery, like a NICU or a high intensity nursery. And the last sentence is what really kind of catches my eye. It says prognosis is guarded.

Q    And what does that mean?

A    Well, a good prognosis -- we usually don't say bad prognosis, but we say a good prognosis or a fair prognosis, but when a prognosis is guarded, it is a watch and wait and see and that's – and that to me, for most doctors -- and I can't speak specifically for this particular doctor, but for most doctors that means they are concerned about a life-threatening process occurring.

Q    Okay. Do you recall that you were asked about this episode, this hypoxic episode during your cross examination at trial?

A    Well, I reviewed the transcript, and I do believe I was, yes.

Q    Okay. Can I refer you to the transcript, Page 2868? And just reading to yourself, I would like you to start at Line 19 and just through Line 22.

A    Yes, ma'am.

Q    Okay. And do you see where the prosecutor refers to

alleged hypoxia?

A    Yes, ma'am.

Q    And do you -- and in your answer, do you take issue with that characterization?

A    At the time I did not. I think -- for a couple of reasons. I mean, we -- I was not prepped to be able to talk about – thinking about and talking about brain injury and whatnot. Obviously I didn't have the records. So that was coming from a social work history, I suppose you could call that alleged. Generally or clinically we just assume that that is accurate, but in a legal setting I can see how they might consider it alleged, but with regards to the records that we have, that's obviously false.

Q    And then -- so you are asked -- I am not sure I really understand the question, but it seems to be saying that -- I guess I -- how would you understand the prosecutor's question that you are agreeing with? Is it --

A    Yes, we had been talking about personality symptomatology. So I took this to say, as a rule, an incidence of possible hypoxia at birth -- you know, that wouldn't cover that, that wouldn't --

Q    That wouldn't by itself explain brain damage?

A    Correct, or that wouldn't by itself explain some of the personality issues and some of the other symptoms that we had been discussing before. So. . .and out of -- in the context of the information that we had, that is accurate, but when you put it into context with a diagnosis of a modified (sic) frontal lobe

abnormality with a guarded prognosis with a serious hospitalization at birth, and then you throw on top of that two or three concussions throughout the years, like I said before, that all kind of falls into place. And what I would say is that I would have answered that differently. As a rule, that can explain a lot of these symptoms.

Q    Okay. And just what you -- this hypoxia came up again at Page -- well, I guess it came up the first time at Page 2830 of the transcript. And this one is a little bit longer, but it is starting at Line 15. And again, you can just read to yourself. It goes on to Line 3 of the next page.

(PAUSE)

A    Okay, yes, ma'am.

Q    And would you have answered that question differently or that sort of set of questions or would that exchange have gone differently at trial had you been given all of the information you now have seen that was available at the time of trial and been prepared to talk about brain impairments?

A    Absolutely.

Q    And how would it have been different?

A    Well, as I discussed before, you know, there is -- I can take a moment here and say there are traumatic brain injury patients that have never had any mental health diagnosis prior to. And then once they have their traumatic brain injury, they are many times falsely diagnosed with a personality disorder. We used to call that organic personality disorder. So all of this

difficulty with classroom work and not graduating high school, along with relationship difficulties and not being able to hold a job outside of a structured environment in the military. . .all of that fits in with a frontal lobe injury that can look like personality disorder in nature.  And there is one way that you can determine the difference between personality disorder and a frontal lobe abnormality, and that is through neuropsych testing.  So there is significance in having that particular diagnosis, and it is just bolstered when you look at the hospital records showing how significant the respiratory distress syndrome was.

Q    Okay.  Now, I am going to ask you – and you may have already answered this.  I apologize if I've asked it, but I just want to be clear.  Had Ms. O'Connell sent you Dr. Gelbort's final report, that has all of the medical records that we've just discussed, would you have been willing to write a supplement to your own trial report incorporating Dr. Gelbort's finding?

A    Absolutely.

Q    And would you have been willing to incorporate Dr. Gelbort's findings in your trial testimony?

A    Yes, ma'am.

Q    Would incorporating those findings have conflicted with the opinions you testified to at trial regarding the mitigating impact of Mr. Fields' bipolar disorder and manic switch?

A    No, ma'am.

Q    And why not?

A    Well, you know, I see a lot of veterans that have PTSD or bipolar and then later, once we test them, we find out they actually have a head injury.  So you can have both a functional mental primary psychiatric diagnosis and neurocognitive issues.  We see that as patients become demented as well.  So you can have both of those.  And in some instances a neurocognitive frontal lobe disinhibition can account for almost all of the symptoms.  And so then that becomes a misdiagnosis and now that person doesn't have this diagnosis, they actually just have TBI.  And TBI can identify those particular things, but, no, it is either -- either he has a frontal lobe abnormality that caused his symptoms or he -- you know, the other possibility is he had family history and had a genetic predisposition to bipolar disorder that may have just presented after, you know, serious trauma at birth and presented that way periodically.  So, you know, I had not evaluated him with all of this information to determine the etiology, but, you know, we see folks all of the time with both diagnosis.  And sometimes, you know, understanding and having testing done, we can say this is all caused by the brain injury or the brain abnormality.

Q    Okay. And if trial counsel had asked you to do so, would you have been able to testify that Mr. Fields' frontal lobe impairments alone constituted mitigating evidence in this case?

A    I believe so, yes.

Q    And can you elaborate on that, just again leaving aside

the bipolar and just how the frontal lobe impairments have been mitigating?

A    Well, with, you know, frontal lobe and organic brain, it really does affect people's decision-making processes.  So it is a -- so their ability to incorporate data and understand what is going on, we call that insight, and the judgments that they make.  So, you know, when you look back at virtually every decision he made up until and including during the criminal activity, you know, his judgment, you can't get away from the fact that his judgment and his insight have been affected by his frontal lobe injury.  You know, I am not saying that he could not deliberate and make a decision.  I am just saying that deliberation -- you can't get outside of the way he would deliberate would be effected by a frontal lobe injury.

Q    And would the additional evidence of frontal lobe impairments, either in combination with the opinion you gave at trial or alone, been meaningfully different from your testimony at trial?

A    Well, yes, absolutely.  I think my testimony at trial -- I was asked a lot about personality symptoms and I think I -- and I mentioned this briefly before, that people with brain injuries can very much have personality disorders and have relationship problems and have difficulty with work.  And I think at the time of trial, I was not aware that either neurocognitive issues or personality issues were going to be brought up and discussed, and they certainly were.  So that would have helped my testimony

to be able to talk about – like I said, all of the pieces fall into place when you see – when I talked with Dr. Kemp, he described him as being an odd person.  People -- personality disorder people look odd, but so do people with front lobe injury.

Q     Okay.  And is there anything about the neuropsychological testing that -- well, let me put it this way:  We know in this case that the jury did not find that the testimony or the evidence that was presented by the defense in mitigation -- that it was not convincing.

A     Correct.

Q     So is there anything in talking about how presenting Mr. Fields' frontal lobe impairments may have been more persuasive in your opinion?

A     You know, I think from a psychiatric standpoint, our etiology, the way we talk about -- or actually or nosology or our diagnosis --

MR. WILSON:  Judge, I am going to object to that question and this answer.  If I understand it, the question is -- she is asking him to render an opinion as to whether that would be more persuasive to this particular jury.  So at this time I am objecting to the form of the question.

THE COURT:  All right, sustained.  Try to clarify your question, if you can.

BY MS. THOMPSON:

Q     The basis of the diagnosis of front lobe impairments, the

types of things that we have talked about that you relied on for the finding of front lobe impairments, --

A    Uh-huh.

Q    -- would that have strengthened your opinion about the mitigating circumstances in this case, which is to say strengthen your findings about whether Mr. Fields was either under an emotional -- I am sorry.  I don't have the language in front of me -- extreme emotional distress or whether he was significantly impaired in this capacity to conform his conduct to the law?

A    Are you asking would a history of --

Q    Would anything in Dr. Gelbort's findings, the -- (PAUSE).  The frontal lobe impairment,  tell me again what that's based on.

A    Okay.  The front lobe impairment --

Q    I am sorry.  I think I wasn't clear.  Your opinion -- what evidence have you received that led you to form that opinion?

A    About frontal lobe --

Q    That Mr. Fields has frontal lobe impairment.

A    Oh, well, that's the final report from Dr. Gelbort.

Q    So neuropsychological testing?

A    Yes, ma'am.

Q    And medical records?

A    Correct.

Q    And so would having -- would presenting brain impairments based on that evidence have strengthened your trial testimony about mitigating circumstances?

A    Yes, absolutely.  You know, I do think that psychiatrically we diagnose people based on observation and it is based on a description base.  From a -- it is always nice to have a lab value or a radiological value or a test value of some sort to show.  So, you know, in a clinical sense I think we treat people all of the time the same way whether we know the exact etiology or not, but I think in a forensic sense it -- to be able to say that a person has this particular condition and you have the testing to back it up lends credibility to that.

Q    Okay.  And I think you touched on this a little bit, but are the facts of Mr. Fields' capital crime inconsistent with your opinion that he has frontal lobe impairment?

A    The fact that. . .no, ma'am.

Q    So you are not saying that he was incapable of premeditation or deliberation?

A    No.  I have TBI people all of the time that can forward think and act accordingly. It is just their ability to understand what they are doing -- understand the -- having the insight -- not necessarily understand, but having the insight into those actions and the judgments that they make at the time are impaired.  It's the same way with alcohol.  I mean, as people drink alcohol, your insight and your judgment goes away and you do things you wouldn't normally do.

Q    Okay.  I just have a couple of more questions.  I am kind of switching topics.  We have talked about the fact that your

trial report was quite rushed. How would you describe your preparation to testify at trial?

A    My preparation occurred the night before I was to testify and I think the word that I used to describe it to y'all was it was very chaotic. So when I arrived there was -- I didn't meet Dr. Woods and there was a lot going on. I don't remember a whole lot of it other than the fact that for almost -- for most of the other -- although there has been some in rural settings, but most of the other murder cases I have been involved with I've been allowed to have attorney consultation preparation, you know, usually days to sometimes weeks in advance.

Q    So relative to – I'm sorry. I should have asked this before. Just ballpark, how many cases have you -- how many criminal cases have you testified in for either the prosecution or the defense?

A    Oh, gosh. . .I, I -- you would have to look at my testimony. I think there is probably forty or fifty.

Q    Okay. And is it, again, sort of typical that you would --

A    It's probably less than that because that probably includes some of my civil cases as well.

Q    Okay. But the level at which -- how does the level of preparation that you received from the attorneys (sic) compare with this case?

A    Well, as I said, this was very rushed and very chaotic. And for most cases of this particular caliber -- and, you know,

970

especially a capital case. This was my first post-sentencing case that I ever did -- well, I think maybe one of my only -- it might be my only sentencing case that I was ever involved with. It was very rushed and – but, you know, I will stand up and say I felt like I could state my opinion with a reasonable degree of medical certainty, but I do feel like I was not prepared to speak on neurocognitive frontal lobe issues at that particular time because, you know, I did not have a formal report available to me to discuss.

Q    Okay. There has been evidence submitted in these post-conviction proceedings from a neuropsychologist named Dr. Daniel Martel. Have you ever received a report by Dr. Martel in connection with this case?

A    I have not.

Q    Does your opinion that Mr. Fields has frontal lobe impairments rely in any way on any findings or conclusions by a Dr. Daniel Martel?

A    It does not.

MS. THOMPSON: The Court's indulgence just one minute?

THE COURT: Yes.

MS. THOMPSON: I think I'm done.

(PAUSE)

MS. THOMPSON: I am almost done.

THE COURT: I will tell you the same thing I told Mr. Stewart. It is best to under promise and overdeliver. Thirty-

two years of marriage have taught me that.

**BY MS. THOMPSON**:

Q    Dr. Grinage, are the opinions that you have testified to today opinions that you could have testified to at the time of Mr. Fields' sentencing in July of 2005?

A    If I had had the information, yes.

Q    And had trial counsel for Mr. Fields asked you the questions during your trial testimony that I have asked you today, could you have given the same answers that you have given today?

A    Yes, ma'am.

Q    And are all of the opinions you have reached and testified to today given to a reasonable degree of psychiatric certainty?

A    Yes, ma'am.

MS. THOMPSON:  That's all I have.

THE COURT:  Thank you.  Any cross examination?

MR. WILSON:  Yes.  I am not going to make any promises though one way or the other.

THE COURT:  That's probably the best way to go.

**CROSS EXAMINATION**

MR. WILSON:  May I proceed?

THE COURT:  You may.

**BY MR. WILSON**:

Q    Dr. Grinage, would you characterize your involvement in this case as atypical from other cases you have been involved in?

A    Yes.

Q    And I believe it is your testimony that you were retained in June and testified in July?

A    Yes, sir.

Q    Is that correct?

A    Yes, sir.

Q    And I know from going through the emails that you went through with counsel, it was apparent that Ms. O'Connell was wanting to get a report from you as quickly as possible; is that correct?

A    Yes, sir.

Q    And at the time that you actually conducted your evaluation of Mr. Fields, you actually saw him in person?

A    Yes, sir.

Q    And you saw him how many different times?

A    Once.

Q    And how long did that last?

A    I believe it was a three-hour interview.

Q    And did you believe at that time that the time that you spent with him was sufficient for you to render a diagnosis?

A    Given the general medical records and the information I had, I did.

Q    And when you said that information that you had, that included all of the items that you included in your report; is that correct?

A    Correct.

Q    And I believe you were actually given three specific referral questions; is that correct?

A    I believe in my report, and I would have to pull it up, I listed three questions there, yes.

Q    And one being -- actually the second of those three being whether the Defendant at the time of the alleged criminal conduct suffered severe mental or emotional disturbance.

A    Correct.

Q    Is that correct?

A    Yes, sir.

Q    And I believe that as you were conducting your evaluation and coming up with your diagnosis, you had an opportunity to talk to Dr. George Woods; is that correct?

A    Yes, I did, I think on the 20th.

Q    I'm sorry?

A    Yes, I did.  I think on the 20th after I saw the Defendant, yes, sir.

Q    And you had an opportunity to visit with him about what his diagnosis was?

A    Yes, sir.

Q    And what, if anything, did Dr. Woods tell you that his diagnosis was?

A    I do believe that he had diagnosed schizoaffective disorder with bipolar tendencies.

Q    And did that match your diagnosis?

A    There are subtle differences clinically between schizoaffective disorder and bipolar disorder, but we treat them the same. The real difference there is if you have a psychotic episode within, like, a two-week period without mood symptoms. When I talked to the patient and looked through the records, I could not find that. Certainly that's the way the jail records at the time had diagnosed him, as schizoaffective.

Q    All right. So your diagnosis was bipolar?

A    Yes, sir.

Q    And his was schizoaffective?

A    With bipolar tendencies.

Q    I'm sorry. Yours was bipolar?

A    Correct.

Q    And his was schizoaffective with bipolar tendencies?

A    Yes, or . . I don't know if tendencies is the right word, but, yeah, bipolar type, I guess I should say, yes, sir.

Q    Okay. And the reason your diagnosis was not schizoaffective was because of what again?

A    Well, if you look in my -- if we can look at the records, I can describe why, but the reason, as I recall, was I was not able to elicit that the auditory hallucinations were psychotic thought processes outside of a mood that was occurring. A lot of his moods were derogatory when he was depressed and hallucinatory, you know, when he sped up. So I always saw that as a part of the mood disorder, which is a classic -- which just fits into bipolar. It is just

a minor subtilty in diagnosis.

Q    When you were initially engaged to get involved in this particular case, did you have a telephonic discussion with Ms. O'Connell?

A    I'm sure I did.

Q    And did she give you – did she at that time, if you recall, have any discussion with you about this idea of a manic switch?

A    Yeah, I -- I do not -- honestly I don't recall that.

Q    That was a topic of discussion you had with Dr. Woods?

A    Possibly.

Q    I'm sorry?

A    Possibly.

Q    And that discussion was before you rendered your final report, correct?

A    If I saw -- if I talked with Dr. Woods on the 20th, I think I – I think my report was completed and finished by the 24th, I think, or the 25th, so, yes, sir.

Q    And Dr. Woods was willing to share what he believed to be his diagnosis at that time; is that correct?

A    I really don't recall, but I assume so, yes, because we talked about what we were finding, so. . .

Q    And that was before his final report, correct?

A    I believe so, yes.

Q    And so you characterized it in your report as a fifteen-minute collateral history that George Woods, M.D. conducted?

A    Yes, sir.

Q    And that's the only conversation you had with Dr. Woods?

A    That's the only – I assume that's the only conversation I had. I really don't recall too much, it being so long ago, but that's the only conversation I had prior to my report, but I certainly spoke with him when I came down for trial.

Q    And we will talk about that in a little bit.  Okay?

A    Sure.

Q    Counsel showed you a number of emails, again discussions that you had with Ms. O'Connell, but were there phone calls in addition to these emails, or was the extent of your communications with Ms. O'Connell all by email?

A    I really don't recall.  I assume that there were phone calls, but I can't say for sure.

Q    Did it strike you odd during your communications with Ms. O'Connell this discussion about limiting the information you received from Dr. Gelbort?

A    Yeah.  I always want to gain as much information as I can, so my thoughts are – you know, certainly why not?  My under-standing from her -- and this fits with -- there are a lot of things that attorneys don't tell me when they are preparing for a defense or prosecution.  And so I just accepted that and, you know, the attorney that I am working with drives the ship.  So I wouldn't say odd, but –

Q    You would say odd?

A    I would not say odd. I would say – and, you know, I've had other cases where I felt like I could be of benefit testifying and they chose not to use me for legal purposes. So I think it happens at times.

Q    Did you get the impression that Ms. O'Connell would have preferred that there be no reference to Dr. Gelbort in your report?

A    No, I don't believe so. She had said use it and be as open and honest as you can. I was really wanting a final report. And so not having a final report, I didn't really pay much attention to it because we were focused on other issues.

Q    Did you have any discussion with Ms. O'Connell about a report from Dr. Price, Randell Price?

A    I don't recall that.

Q    You don't recall any discussions or any concerns she had about trying to keep Dr. Price from testifying?

A    Oh yes, there was one -- there was an email, I think, that we went through and that may have been her statement with regards to why she wanted to limit having -- or not utilize Dr. Gelbort.

Q    And again, she wanted to limit having him -- or not utilize Dr. Gelbort?

A    Correct.

Q    And again, that's not a decision that you are involved in, correct?

A    Yeah, no, sir.

Q    And I believe the email you are referring to is Defendant's

Exhibit Number 172.  (PAUSE)

Okay.  Dr. Grinage, do you see now on the screen Defendant's 172, an email?

A    Yes, sir.

Q    And again, just so I am clear and the record is clear, is this the email you were referring to earlier?

A    That we discussed earlier, yes, sir.

Q    Okay.  And just so I am clear, do you recall any additional telephone conversations about this particular subject matter, about jettisoning Dr. Gelbort?

A    Honestly I do not recall that.  I do recall -- and some of this may be because I reviewed some of the emails that I was -- you know, I asked do you have a report and at one point she indicated, I think in one of the other emails, that she may be getting more testing.  And then there is this saying that she may not utilize it for legal purposes.

Q    So the answer to the question is you don't remember?

A    I don't remember.  I don't believe so, but I can't say for sure.

Q    Okay, thank you.  Now, in Government's Exhibit Number 3, the fourth paragraph in the response email that you sent on June 21st. . .

A    Yes, sir.

Q    You say I am really data driven and like to include as much data as possible in your analysis, correct?

A    Yes, sir.

Q    But you say I don't have a problem leaving out Dr. Gelbort's information.

A    Correct.

Q    So it appears that she is asking you to leave out Dr. Gelbort's information; is that correct?

A    Yes. I think she actually asked that in one of the emails.

Q    But you put the caveat that if I do that and I get cross examined, I am going to talk about it.

A    That refers specifically to the information that I included, the information that I read, whether it is a part of my opinion or not.

Q    Okay, fair enough. Did you ever talk to Dr. Gelbort?

A    I did not.

Q    To this day, have you ever talked to Dr. Gelbort?

A    No, sir.

Q    Okay. So you do your evaluation, you get your report together hurriedly, correct?

A    Correct.

Q    And you have -- and you are notified that you are going to testify, I assume, correct?

A    Yes, yes, sir.

Q    And you have a pretrial meeting the night before; is that correct?

A    Yes, that's my recollection.

Q    And based upon your recollection, do you recall where that took place?

A    No, sir.

Q    Okay.

A    No, sir, I don't recall that.

Q    Do you remember who was there?

A    Uh, the two that I can say with certainty are Ms. O'Connell and Dr. Woods.

Q    And you characterize it as chaotic?

A    Yes, sir.

Q    And can you be any more descriptive or explain what you mean by chaotic?  What was going on that you characterize as chaos?

A    I do believe there were more people there, I just don't know who they were and there was a lot of over speaking in the conversation and what -- what I expected, and I was wanting was individual one-on-one time with the attorney to have some preparation to have an  understanding of, you know, what was going to be asked of me.  And I just -- at that time, I do believe, I just had to rely on my report because that's usually what people talk to me about, is my report.  So. . .

Q    So did you meet with Ms. O'Connell?

A    I believe I did, but I don't recall the specifics of that.  I think that was in a group setting with other people around.  That's what I mean by chaotic, not being able to ask specific questions or be able to have a conference that wasn't interruptible.

Q    And was Dr. Woods involved in that conversation?

A    He may have been.

Q    Or he may not?

A    He may not have been.  Sorry.

Q    Was there any discussion at that time, if you remember, about Dr. Gelbort and his findings?

A    Not that I remember.

Q    Do you recall any discussion with Ms. O'Connell or Mr. Gant -- well, lets' just limit it to Ms. O'Connell first.  Did Ms. O'Connell – did she -- during that preparatory did she say I don't want you to refer to Dr. Gelbort?

A    That's a good question.  I honestly don't recall and I, I. . .I know that I wasn't prepped on that, so I can't give you the specifics, but my big concern was when it came up in testimony is that, I didn't know why and I was not prepared for that.   And a big part of that was because I didn't have any information.

Q    Did you understand my question?

A    You are saying at any point did she ask me not to use Gelbort's --

Q    Dr. Gelbort.

A    Dr. Gelbort, yes.  And I don't know.  I can say that I don't know.

Q    And did Skip Gant, if you recall, ever say don't refer to Dr. Gelbort?

A    I believe I only talked to him once, and that was at the beginning, so not that I recall, and I don't think I talked with him

much at all.

Q    Okay.  Thank you, Doctor.  Did Ms. O'Connell, if you recall, ever express any opinions about Dr. Gelbort during your meetings with her?

A    No, nothing verbally, just what's in the emails with regards to whether she might utilize him for legal purposes or not, but I don't believe she spoke of him otherwise.

Q    You don't recall her talking about his report being crappy?

A    I do not, no, sir.

Q    And that she wouldn't wish him on her worst enemy?

A    No, I. . .I do not recall hearing any of that.

Q    Okay.  According to your report, you had the preliminary psychosocial information, is that correct, from Ms. Shettles?

A    Yes, sir.

Q    Which included the information about -- well, it included a lot of information in the social history, correct?

A    Yes, sir.

Q    Including the birth issues, correct?

A    Correct.

Q    Not the full records?

A    Correct.

Q    It had military history?

A    I believe so, yes.

Q    It had other family medical issues, correct?

A    It is not in front of me.  I don't recall, but I wouldn't deny it.

Q    And all of that went into your diagnosis, correct?

A    Well, I take each report, and I weigh it. You know, I utilized some of that certainly in the body of my report because that's the history that I had.

Q    Did the testing data of Dr. Gelbort go into your evaluation?

A    No, sir.

Q    So you included it but you didn't include it?

A    I reviewed it, but I have nothing to put it into context because I am not credentialed to -- that is outside of my scope to be able to come to a conclusion with regards to the testing data.

Q    Because you don't administer tests, you don't read tests, correct?

A    No.

Q    Did you review them at all?

A    Yes, I did.

Q    So why did you review them?

A    To see if there was a modified opinion in there. I may have used -- I don't know if there were other records or not, but I may have utilized the I.Q. scores, but maybe not, in my report, but I look at everything. I mean, there are tons of records that I look at. Police reports that I scan and look through to see if there is anything of use that can be weighed for an opinion one way or against. So I had to review it to look for that.

Q    And did you -- and I guess since you are not trained, you didn't see scoring errors?

A    No, sir..

Q    Sorry?

A    No, sir.

Q    If there had been testimony that there were scoring errors, you don't have any reason to doubt that?

A    Yeah, I have no opinion on that.

Q    And if you were called to use that data in your testimony, then you would be subject to cross examination on those scoring errors, wouldn't you?

A    Well, if I were to use -- I wouldn't use the data.  I would use the final opinion and any conclusion or final opinion, I would defer to the expert in that area.

Q    But that final opinion would be based upon the data, correct?

A    Yes, sir.

Q    And if you are endorsing that final opinion, then you are going to eat the data that goes along with it, correct?

A    Again, what I will state is if I get a result, I will state a result and use that accordingly.  Now if I have awareness ahead of time that there may be errors, that may weigh to its credibility in how well I use that data or not.

Q    But you testified today that you have since seen the full report, correct?

A    Yes, sir.

Q    And were you aware, until I just told you, about any scoring errors?

A      I was not.

Q      And the fact that there were scoring errors, does that give you any concern about whether or not you are going to rely upon Dr. Gelbort's report?

A      Well, this is kind of hypothetical because it is post-fact.  If I was aware at the time and I had the report at the time, I would have stopped and questioned that.

Q      Okay.  You had the medical history regarding concussions; is that correct?

A      I think there were some in the psychosocial assessment. There was a medical record too that I referred to, and I can't recall where that was, with regards to a mild concussion in the nineties as well.

Q      And you talked to him, right?

A      Yes, sir.

Q      And when I say, "him," the –

A      Yeah, the –

Q      -- Defendant --

A      -- the Defendant.

Q      -- Mr. Fields?

A      Yes, sir.

              MR. WILSON:  Let's not talk at the same time. I apologize.

BY MR. WILSON:

Q      You interviewed Mr. Fields?

A    Yes, sir.

Q    And did he tell you about medical injuries?

A    I would have to look at my report and whether I confirmed the history or -- many times when I am talking to a defendant, I'll look at – and this is why I will want the history ahead of time. I will ask them if they have a recollection or a memory about that. So I don't recall whether I asked him specifically about that. It should be identified in my report as to whether that came from the medical history or the patient or both -- excuse me -- or the Defendant or both.

Q    Towards the end of your examination earlier, you were talking about -- you mentioned alcohol and how it can inhibit decision making; is that correct?

A    As an example, yes, sir.

Q    And so. . .and I am not being facetious here. Are you saying that someone that is using alcohol -- because of that that could cause them to make poor judgments and kill two people?

A    A point of clarification about that. That is kind of a complex question. It doesn't cause people, I think, to do things. You know, that's not the reason for it. If you are acutely intoxicated, you are more likely to make bad decisions. If you are chronically an alcoholic, sometimes you can have frontal lobe and brain injury to where that persists over time and affects your ability to make or to understand what you are doing and cause poor judgment.

Q    Was there any of that in relationship to Mr. Fields, evidence

that he was under the influence of alcohol or had been an alcoholic or used alcohol regularly at the time of the crime?

A    Again, if you will allow me to go back to my report, that should be in the substance use report. I think he did drink. It might have been with the military or navy days. I would have to refresh my memory, but he had, I think, a history of heavy drinking, but I don't recall that offhand without looking at my report.

Q    And you actually did testify in the trial, correct?

A    I did.

Q    And you testified that based upon your evaluation and your review of the records that Mr. Fields, on July the 10th of 2003, suffered bipolar disorder?

A    Yes, sir.

Q    Is that correct?

A    Yes, sir.

Q    That he was psychotic; is that correct?

A    Yes, sir.

Q    And psychotic because of the fact that he was experiencing auditory hallucinations, correct?

A    Yes, sir.

Q    And that -- let me back up. You also have some expertise regarding pharmacological matters, correct?

A    I do.

Q    And did you and Ms. O'Connell discuss that at the time of you being retained?

A     At the time I am not for sure.  I can't recall that.

Q     Did you at anytime have a discussion with Ms. O'Connell about your specialty, if you will, on pharmacological matters?

A     I can't give you specifics, but I am assuming that after I interviewed the patient and understood it from his perspective, the Defendant, understood from his perspective what he was thinking throughout his medical trials, I am sure we spoke of that, but again I don't recall the specifics.

Q     Did you testify in trial about medications?

A     I believe I did.

Q     And the affect that medications can have?

A     I believe I did.

Q     And did you talk specifically about Effexor?

A     Yes, sir.

Q     I am sorry?

A     Yes, sir, I believe I did.

Q     And that was the same medication that Dr. Woods focused on in causing this manic switch; is that correct?

A     Yes, and I think that is due to the timing of the particular medication.  Any of the antidepressants can cause a switch. Effexor tends to have a little higher rate of switch, but I -- but, you know, even if it wasn't Effexor and it was a different medication, I think it is -- I think the timing of that fits.

             MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  You may.

(PAUSE)

**BY MR. WILSON**:

Q    Dr. Grinage, Mr. Fields had not experienced a TBI: is that correct?

A    A traumatic brain injury?  I think technically -- I mean, you could call the injury at birth, the hypoxia, a traumatic trauma to the brain.  So. . .but TBI generally we consider it an accident, a head injury, or, you know, being hit over the head even if it is not an accident.  So. . .but still a head injury via hypoxemia.

MR. WILSON:  That's all I have.  Thank you, Doctor.

THE COURT:  All right.  Any redirect?

MS. THOMPSON:  Very briefly.

**<u>REDIRECT EXAMINATION</u>**

**BY MS. THOMPSON**:

Q    You are almost done.  Mr. Wilson asked you about some scoring errors in Dr. Gelbort's testing.

A    Yes, ma'am.

Q    So my question is if Dr. Gelbort testified that those scoring errors did not affect his findings or conclusions regarding frontal lobe impairments, would that be sufficient to address any concerns you might have in relying on those conclusions for your opinion on frontal lobe impairments?

A    Yes.  As I mentioned before -- I mean any processing of testing, I would defer to the expert.  And if I have an opinion or

a final opinion, I will utilize that. If there is any concerns about his credibility. . .if those are addressed, then those are addressed.

Q    And just very minor, there was some brief discussion about alcohol, and I just want to be clear. You were only drawing an analogy between ways that alcohol could affect a person's judgment or decision making. You were not saying that alcohol caused Mr. Fields' frontal lobe impairments?

A    No, ma'am. It was an analogy to describe decision making with regards to insight and judgment and how that affects our front lobes, yes.

MS. THOMPSON:  That's it. Nothing further.

THE COURT:  Okay. Anything further?

MR. WILSON:  No, Your Honor.

THE COURT:  I assume no one is planning on calling Dr. Grinage back?

MR. WILSON:  He is excused.

THE COURT:  All right. Dr. Grinage, thank you. You are excused and may step down.

All right. It's 4:55. I was doing a little back of the envelope calculating and by my estimation, we still have six days or so of witnesses and cross examination -- based on the Defendant's case. I haven't even looked -- assuming there is not any additional witnesses from the Government's case. So we have got one more day tomorrow and then two days in November, which is half of what we need.

Is there any witnesses on this list -- I know there were several -- I know we had several Navy personnel.  There was also, I think, someone who is going to criticize, I guess, and pile on poor Mr. Gant.  Is there anyone on the list that you intend to not call at this point?  And I am not asking for commitments.  I am just asking if that has been discussed or if there is anyone you know that you are not going to be calling.

MR. STEWART:  Your Honor, the Government intends to call the three witnesses that we have.

THE COURT:  Okay.

MR. STEWART:  Which would be Drs. Seward and

THE COURT:  Okay.  And I am guessing between the three of those, you are looking at at least a full day, maybe a day and a half based on your times.  I am assuming the cross times will be. . .

MR. WILSON:  Judge, we --

THE COURT:  Well, I mean, just looking at your three witnesses, that's six and a half hours of direct estimate.  So we are looking at at least a day and a half  with direct and cross on those.  So I will take my six days and add a day and a half and make it seven and a half at least.

MR. LABOVITZ:  Your Honor, in light of the ruling on the Government's Motion in limine -- I think we would want to confer a little bit more, on this but I don't -- you know, I don't see

any witness remaining that we would be eliminating with the exception of possibly one of the naval officers, in light of the Court's suggestion on cumulativeness, but that would be a fairly minor witness anyway.

THE COURT: Well, let me ask, Mr. Nodler, was he just going to criticize Gant? I mean, I am not trying to characterize it, but that was just my impression, so take that for what it's worth.

MR. LABOVITZ: Yes, Your Honor, I can confirm that we would withdraw Mr. Nodler. We might need to call him in rebuttal, but we can withdraw him for --

THE COURT: Well, I know I mentioned -- I forgot which day it was, but in looking at my schedule, really the next time after the November dates is going to be that week of the 16th of December. I will add a caveat. It came to my attention this morning my November trial, that appears to be going, may have an issue. They are trying to work out the conflict at the Tenth Circuit level. If that doesn't happen, I assume I will be getting a motion for a continuance. I am sure if I moved them to December 16th, they would squeal and holler, so I don't know if I will give them that December slot or not. So I guess some of that may depend on when we get through here.

So I guess it is something to be thinking about overnight because that really is right now -- and, you know, I've mentioned that we've got a lot to do after this evidentiary hearing closes before we can even get to our job of getting a Report and

Recommendation to Judge White so that he can do what he is going to do. So the sooner we can get this thing wrapped up. . . I mean, we are five years after the Tenth Circuit has remanded this back and we are just now getting to this evidentiary hearing. And so, you know, my hope is to get it done by the end of the year so that we can then move to the next phases. That's why I am suggesting those December dates as possibilities. I am not offering them yet. I am hoping to see what we can get through tomorrow in particular. So that's something to think about.

With that, who are you planning on calling tomorrow?

MS. THOMPSON: Your Honor, can I just say one thing? For the December dates, Your Honor, I have an evidentiary hearing that week in Pennsylvania on December 17th that the court has asked to hold.

THE COURT: Okay. Well, that's going to be the problem. We have a lot of people involved and a lot of witnesses, so getting dates is hard. That's why it took us ten scheduling orders to get here this week.

MS. THOMPSON: I apologize for --

THE COURT: Actually, eleven. Technically it was the tenth amendment. So I guess we are on the eleventh scheduling order.

THE COURT: Okay, good to know that you already have a conflict, but, you know. . .I mean, that's going to be our problem to be thinking about, and if you all can give me some

joint available dates in either early December or. . .again, you know, Thanksgiving, the week after the trial. . .I can't give you the date. The week before Thanksgiving is my trial docket week right now. I have a jury trial scheduled that appears to be set to go, unless there is a Tenth Circuits issue. So, you know, maybe y'all can confer and maybe that's something we can do after we are done tomorrow. But if we can get -- if we need additional dates, if we can get some proposed dates that everybody can figure out on their calendars.

All right. So the next item I would I like to know is who are your -- what is your plan for tomorrow witness wise?

MR. LABOVITZ: Your Honor, tomorrow we have two video witnesses, Dr. Erin Bigler and Richard Burr. And then we also have Dr. Travis Snyder here in person. I believe we would -- I believe we will start with Dr. Burr. Well, I have just elevated his status.

THE COURT: Well, I was going to say -- well, a doctor of law. We like to be called --

MR. LABOVITZ: Yes, right. Mr. Burr, esquire, Your Honor.

THE COURT: All right. So you plan on starting with Richard Burr?

MR. LABOVITZ: Yes, sir. And then because Dr. Snyder will be here in person, we would then present Dr. Snyder, and then we would present Dr. Bigler by video after

Dr. Snyder is completed.

THE COURT:  Okay, all right.  Well, it is just always helpful to know the plan.  I mean, you know, we've got a lot of multi-hour witnesses left.  So it is. . .we still have a lot left to do.

All right.  Well, anything else while we are here?

MR. LABOVITZ:  I am not sure if you mentioned this, so my apologies, but the week of November 11th, the 12th and the 13th are the available dates for the court at this moment, or are there dates that week?

THE COURT:  My recollection is that was the only two days we had that week.  Part of the problem is we are coming off -- Veterans Day is the 11th, so it is already a holiday week, so it is a shortened week.  And I think we squeezed everything else into the rest of the week to keep those two days open.  It is tough.  We are busy here.  I'm telling you.  You don't even know.  Well, we are really telling you.  I know you know.  I am talking to this table.  I am talking to the Philadelphia lawyers now.  And I don't mean that pejoratively.  That's a great movie, by the way.

All right.  Anything else while we are all here?

MR. WILSON:  No, Your Honor.

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  Very well.  Thank you all.  We are in recess for the evening, and I will see you all in the morning at nine a.m.

(RECESSED UNTIL OCTOBER 11, 2024)