**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

**UNITED STATES OF AMERICA, )**

        **Plaintiff,**       **)**

                    **)**

**VS.**                  **)**      **NO.  03-CR-00073-RAW**

                    **)**

**EDWARD LEON FIELDS, JR.,**  **)**

        **Defendant.**      **)**

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE GERALD L. JACKSON**

**UNITED STATES MAGISTRATE JUDGE**

**OCTOBER 11, 2024**

**VOLUME V**

**A P P E A R A N C E S:**

**FOR THE PLAINTIFF:**

**MR. CHRISTOPHER J. WILSON,** US Attorney (OKED)

520 Denison Avenue, Muskogee, Oklahoma 74401

**MR. AARON J. STEWART,** Oklahoma Attorney

General, 313 NE 21st Street, Oklahoma City, Oklahoma 73105


**FOR THE DEFENDANT:**

**MR. HUNTER S. LABOVITZ,** Federal Public

Defender – OKC (Capital Habeas),  215 Dean A. McGee,

Suite 707, Oklahoma City, Oklahoma 73102

**MS. HAYDEN NELSON-MAJOR,** Federal

Community Defender – EDPA, 601 Walnut Street, Suite 545 W,

Philadelphia, Pennsylvania, 19106

**MS. KATHERINE CLEARY THOMPSON**, Federal

Community Defender – EDPA, 601 Walnut Street, Suite 545 W,

Philadelphia, Pennsylvania 19106

**MS. KATHERINE E. ENSLER,** Federal Community

Defender – EDPA, 601 Walnut Street, Suite 545 W, Philadelphia,

Pennsylvania, 19106




COURT REPORTER:                    KARLA McWHORTER

                                   United States Court Reporter

**I N D E X**

**PAGE**

**DEFENDANT'S WITNESSES:**

**RICHARD BURR**

    Direct Examination by Ms. Thompson    1000

    Cross Examination by Mr. Stewart    1013


**DR. TRAVIS SYNDER**

    Direct Examination by Ms. Ensler    1015

    Cross Examination by Mr. Steart    1044

    Recross Examination by Ms. Ensler    1065


**GLORIA SHETTLES**

    Direct Examination by Ms. Nelson-Major    1071

    Cross Examination by Mr. Wilson    1121


**DR. ERIN BIGLER**

    Direct Examination by Ms. Nelson-Major    1136

    Cross Examination by Mr. Stewart    1189

    Redirect Examination by Ms. Nelson-Major    1207


RECESSED    1209

**COURT IN SESSION**

(9:07 a.m.)

THE COURT:  All right.  Good morning, everyone.

We are back on the record in the case of United States of America versus Edward Leon Fields, Jr., case number CR-03-73.  Counsel all appear present.

Is everybody ready to get started this morning?

MR. WILSON:  Yes, Your Honor.

THE COURT:  I'm seeing a lot of heads nod.  That tells me yes.

Okay, all right.  The defense may call its next witness.

MS. THOMPSON:  Your Honor, before we start, just one issue.  I need to depart to get to the airport for a prior family commitment.  I need to get back home mid-day.  So is it all right if I excuse myself after presenting Mr. Burr?

THE COURT:  Yes, that's fine.

MS. THOMPSON:  Okay, thank you.  The defense calls Richard Burr.

THE COURT:  All right.  Mr. Burr is appearing by video it appears.

Mr. Burr, the Clerk will now place you under oath.

COURT CLERK:  Please raise your right hand.

(COMPLIED)

COURT CLERK:  Do you solemnly swear that the testimony you are about to give before this Honorable Court

will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE COURT:  I would simply add that it is normally an issue, but it is even more of an issue on video, that if the witness will let the attorney finish the question before starting the answer and if the attorney will let the witness finish the answer before starting the next question, it will make life easier for everyone, but most importantly the court reporter.

So with that, you may proceed.

**RICHARD BURR, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MS. THOMPSON**:

Q    Good morning, Mr. Burr.

A    Good morning.

Q    Can you please state and spell your name for the record.

A    It is Richard, R-I-C-H-A-R-D, Burr, B-U-R-R.

Q    And what is your current profession?

A    I'm a lawyer.

Q    What type of law do you practice?

A    I have been a death penalty defense lawyer for many, many years, forty-some-odd years.

Q    And have you ever served as a member of the Federal Death Penalty Resource Council Project?

A    Yes.  I was a member of that project from 1997 to 2014.

Q    And in what capacity?

A    I was simply -- there were -- all of the members of the project have several capacities.  Our primary job was to recruit counsel for federal death penalty cases, recommend them to the court, and to consult with and work with those counsel in the representation of their clients at trial.

Q    Okay.  And would you ever individually be assigned as the consulting attorney to a particular case?

A    Yes.  we divided up all of the pending federal death cases in the country among the members of the project, and each of us had our own case load for consulting.

Q    And are you familiar with an attorney named Isaah Gant?

A    I do know -- I know Skip Gant, yes.

Q    And what was his role on the project?

A    Skip was a -- there were really two parts of the project. There was the part that I was in, and it was primarily consulting. There was the part that he was in based in the federal defender office in which his primary role was to be appointed as co-counsel, usually as learned counsel, in federal death cases.

Q    And so in those instances when Mr. Gant was appointed to a particular case, he would play a different role, vis-a-vis that case, than if he was simply acting as -- more like you as a consulting counsel?

A    Yes.  I mean, when he was appointed, he was appointed as co-counsel and functioned as such.

Q    Okay.  And when Mr. Gant would enter an appearance in a case, would that change the role of the other members of the project, vis-à-vis that particular case?

A    Yes.  When Mr. Gant or his other colleagues in that part of the project were appointed as counsel, we -- the consulting part of the project did not really have that case assigned because our assumption was that since one of our colleagues was in the case as co-counsel, we would need to consult less.  Okay?  We were always free to be called upon by any of the lawyers appointed in the case, but they were not a part of our regular case load.  The consulting case load really was focused on lawyers who were private appointed counsel, you know, not associated with our project.

Q    Okay.  I would like to turn to the federal capital trial of Edward Fields.  Was this one of the cases on which you were assigned as consulting counsel?

A    No.

Q    Did any member of the project act as consulting counsel for this case?

A    Not to my knowledge, but I -- you know, that was a long time ago and I am not sure, but I -- but the practice usually was not to have an assigned consulting counsel when one of our members was appointed as counsel.

Q    And you are aware that Mr. Gant had entered an appearance in this case?

A    Yes, I knew that.

Q    But you did  have some involvement in Mr. Fields's trial, correct?

A    I was asked to do one thing that I remember, and that was that I -- I've done a lot of work in developing mental health evidence over the years and there was a point at which the appointed counsel needed more time to further complete their investigation of mental health issues or potential mental health issues before they were required to give notice under the Federal Rules of Criminal Procedure about any mental health defense. So I talked with Ms. O'Connell and prepared a declaration that I recall explaining to the Court what was involved in the -- what was the procedure that you needed to follow to develop -- to investigate a potential mental health defense.

Q    Okay.  And I am going to pull up on this screen Defense Exhibit 146.

A    Are you going to show me that exhibit?

Q    Yes, it should be coming.

        THE COURT:  Mr. Burr, are you able to see the exbibit now?  (NO RESPONSE)

**BY MS. THOMPSON**:

Q    Do you see that?

A    Yes, I do.

Q    Okay, great.  And can we turn to Page 11, please?  Do you recognize this document, Mr. Burr?

A    Yes, that's the declaration that I just mentioned a moment ago.

Q    Okay.  And I think you said that you had filed similar declarations in other cases.

A    Yes, I have.  I was the member of the project that often played that role because of my experience in investigating and developing mental health issues.

Q    So each time that you were asked to write one of these declarations would you start from scratch or was there sort of boiler plate language that you could use for these --

A    I would --

Q    Go ahead.

A    By the time I did this declaration I had done similar declarations over a number of years, so I did not start from scratch.  What I needed to learn from the lawyer, who asked for my help, was what data -- you know, what steps they had taken to investigate potential mental health defenses.

Q    Okay.  And have you recently had the opportunity, at my request, to review the contents of this document?

A    Yes, I have.

Q    Okay.  And would it be fair to say that the paragraphs numbered 5 through 21 of the declaration are more of the type of boiler plate paragraphs that weren't tailored to Mr. Fields' specific case?  I don't know if you want --

A    Yes, that's correct.  Those paragraphs were often a part of

declarations in other cases, that asked for the same material.

Q     Okay.  Can we please turn to Page 20 of the exhibit, which would be Page 10 of the declaration?  And can you describe. starting with paragraph 22, what this section is about?

A     Yes, that's the information that counsel for Mr. Fields provided to me about what she had been doing to investigate mental health or potential mental health issues in his case.

Q     And did you receive --

A     It simply recounts what she told me.

Q     Okay.  And did you learn these facts during a personal meeting between you and Ms. O'Connell?

A     Well, I think it was either -- it was probably a phone call or an email, but I suspect it was a phone call.

Q     Okay.  Do you recall ever meeting personally with Ms. O'Connell regarding Mr. Fields' case?

A     I am sorry.  I couldn't understand your question?

Q     Did you ever meet ---

A     I am sorry.  I meant I couldn't hear it.

Q     Did you ever meet personally with Ms. O'Connell regarding Mr. Fields' case?

A     No, I did not.

Q     And what about Mr. Gant?  And again, specifically for purposes of talking about Mr. Fields' case.

A     Not that I recall.

Q     And did you ever meet with an attorney named Barry

Derryberry about this case?

A    No.

Q    Do you recall reviewing any records relating to Mr. Fields' case?

A    I saw nothing in Mr. Fields' case or no records at all.

Q    And did you ever speak with any of Mr. Fields' mental health experts about his case?

A    No.

Q    Did you speak with his mitigation specialist, Gloria Shettles, about this case?

A    No.

Q    Do you recall whether -- when Ms. O'Connell was advising you of the facts that you needed for the purposes of this declaration, she asked for your advise regarding the mental health investigation in Mr. Fields' case?

A    I don't recall that she did.  If she had, it probably would have found its way into this declaration in some fashion, but I don't recall that.  All I recall is what is reported here, is that through the procedural steps that she had taken to, you know, the investigate the case and how long it was taking her and how those steps and that amount of time compared to similar cases.

Q    Okay.  So you do not recall offering trial counsel any ideas on how best to defend this case?

A    No, I did not.  I was -- I didn't have any further conversations with counsel, either Ms. O'Connell or Mr. Gant, about the

substance of the mental health investigation.  And I did not know anything about what the life history was that was developing.  I knew nothing about any of the expert consultations.  I didn't even know who the experts were.

Q    Okay.  So let's look at paragraph 22-F, which is -- which starts at the very bottom and then --

MR. STEWART:  Objection, Your Honor.  If counsel intends to just start reading portions of the declaration. . .this is a court record.  This was filed in this case.  And I think it would be a bit of a waste of time.  There is not a whole lot of probative value in just reading a court record.

THE COURT:  All right.  Overruled.  Let's see what we can do quickly, Ms. Thompson, with whatever it is you are trying to do with this document.

MS. THOMPSON:  Thank you.  I did not plan to read the document into the record.

BY MS. THOMPSON:

Q    Referring you to 22-F where you say that counsel retained a, quote, "qualified neuropsychologist to conduct testing," were you told that -- and I think you just said this, but were you told the name of the neuropsychologist that counsel had retained in this case?

A    I was not.

Q    So were you --

A    I was not that I remember.  I may have known at the time,

but I don't remember knowing that person.

Q    Okay.  So to the best of your knowledge when you say a, quote, "qualified neuropsychologist was retained," would that be based on your own judgment or would you be relying on counsel's representation?

A    I am sure I – well, I don't know for sure.  If she mentioned the name of a neuropsychologist. I might well have known him or her and, you know, had my own opinion about it, but it is more likely that, you know, she simply said I got a neuro-psychologist whose credentials are, you know, such and such and that's what led me to say qualified neuropsychologist. I don't remember anything about who it was or their qualifications.

Q    Okay.  And then looking at the next subparagraph G, in the first sentence you refer to the qualified neuropsychologist having conducted, quote, "complete neuropsychological testing."  Were you given details about what specific testing the neuropsy-chologist in this case had performed?

A    I don't think so.  I, I -- you know, at this point I don't remember, but I don't think so.  I don't think I knew, you know, which battery or what -- or what the neuropsychologist had used.  There are two primary neuropsych batteries that include a lot of subtests, but also some neuropsychologists will sort of, you know, put together their own set of tests to fit the situation and the history of that client.  I don't know what was done and, you know, I simply -- she would have told me that -- whenever I

say they are about serious brain dysfunction, she would have told me -- Ms. O'Connell would have told me that.

Q    Okay.  You anticipated my next question.  You didn't have any independent basis, other than your -- aside from your conversation with Ms. O'Connell, for the next sentence in 22-G where you refer to this neuropsychological testing revealing, quote, "serious brain dysfunction?"

A    That's correct.  I got that straight from her.  I did not see anything from the neuropsychologist or talk to the neuropsychologist.

Q    Okay.  And do you recall trial counsel expressing any doubt about the quality of the neuropsychologist's testing in this case?

A    I don't recall that.

Q    Or the results of that testing?

A    I don't recall anything like that, no.

Q    All right.  And in 22-H, you refer there to, quote, "additional diagnostic procedures being required to fully assess Mr. Fields' brain dysfunction."  Would that again have been based solely on information you received from trial counsel?

A    Yes.  You know, part of my conversation with her, you know, over this issue was that if there was brain dysfunction revealed on neuropsych testing, that, you know, the primary expert would likely want to have some additional diagnostic work done just to assess it for further. . . well, not necessarily, but might want to.  And I think she had said that's what the consulting expert had

said.

Q    Okay. And to your recollection, did you offer any advice as to what additional diagnostic procedures might be warranted for Mr. Fields?

A    Not that I recall. I mean, I may have talked in general about what further diagnostic procedures there might be in terms of brain imaging techniques or encephalograms of it. I may have just mentioned it, but I don't think I had enough knowledge or any opinion about what those ought to be. And it is really not my expertise to determine that anyway.

Q    Okay. Can we please turn to Defense Exhibit 159? And this document has two emails. Can you describe the bottom email first, Mr. Burr?

A    The bottom one?

Q    Uh-huh.

A    We are counting from a number of -- the video is from another member of our project, David Freedman, who is not a lawyer but was a mental health -- he was a litigation specialist with a lot of expertise in mental health investigations. And he recounts what counsel's summary of trying to work with the neuropsychologist, Dr. Gelbort, was.

Q    And you are copied or you are included as one of several recipients on this email, correct?

A    I see that I am, yes.

Q    Okay. And then turning to the top email, can you just

describe that one generally, please?

A    That appears to be a response to David Freedman's email giving his views about Dr. Gelbort, and it is from Skip Gant with him saying he concurred whole heartedly with David Freedman's assessment. The assessment of Dr. Gelbort was not -- it was not that he wasn't capable, but that he was very difficult to work with. Now, you know, I -- I don't remember seeing those. What we often did in the project, when there was email correspondence about a case, was everybody on the project was cc'd, just to be sure that everybody had further information. If I -- (INAUDIBLE) -- in a case that wasn't particularly on my radar, I may not have even looked at them. I don't know. I certainly don't remember these.

Q    Okay. And when you were copied as one of several project members on one of these cases or -- I am sorry -- on one of these emails, such as you just described, was it your understanding that some sort of response or action was required on your part?

A    No.

Q    And this particular email, having taken a look at it, even if you don't remember it at the time, does it strike you as something that was seeking any sort of action or response on your part?

A    No. I mean, it is simply an email that says Dr. Gelbort, while he is capable, is difficult to work with. And, you know, that -- there were -- I saw no -- at the time, if I did pay attention

to it, I would not have seen any reason to respond or to be concerned.

Q    Okay.  And aside from providing the declaration that we have discussed and that you were drafting and providing it to Ms. O'Connell and maybe being copied on some emails in Mr. Fields' case in your role on the project, do you recall having any other involvement with Mr. Fields' capital trial?

A    I don't, no, I don't.

Q    Okay.

MS. THOMPSON:  Just one moment, with the Court's indulgence?

THE COURT:  Okay.

(PAUSE)

**BY MS. THOMPSON:**

Q    All right.  Just some follow-up to -- where I may not have been sufficiently clear in my questions.  I asked you if you had looked at records, spoken with experts, or spoken with Gloria Shettles, and I just want to confirm. . .I know you said you had not done that, but did Ms. O'Connell ever ask you to review records in this case?

A    Not that I recall.

Q    And did she ever ask you to speak with any of her mental health experts?

A    No.

Q    And did she ever ask you to speak with Gloria Shettles

about this case?

A    No.

MS. THOMPSON:  Okay.  No further questions.

Thank you, Mr. Burr.

THE COURT:  You may cross examine.

**CROSS EXAMINATION**

**BY MR. STEWART**:

Q    Mr. Burr, I just want to clarify two issues.  First, the email you reviewed, it didn't say Dr. Gelbort was difficult to work with, it said he was too difficult to work with, correct?

A    If that's what the email said, yes.

Q    And you have no independent knowledge of expert testing results or findings in the Fields' case, correct?

A    I do not.

MR. STEWART:  That's all I have, Your Honor.

THE COURT:  All right.  Any redirect?

MS. THOMPSON:  No, Your Honor.

THE COURT:  All right, very well.  All right, Mr. Burr, you are excused.  I assume the government is not intending to recall him, so he can be excused?

MR. STEWART:  No, Your Honor.

THE COURT:  All right.  You are excused.  Thank you, sir, appreciate it.  Glad we could make this work by video.  You have a good day.

THE WITNESS:  Thank you.

THE COURT: All right. The government may call its next witness. I'm sorry, the Defendant. I was so hopeful too. The Defendant may call its next witness.

MS. THOMPSON: I'm sorry, Your Honor. I told Dr. Snyder to be here at 9:30. May I just make sure he is here in the hallway?

THE COURT: Okay, please, quickly.

MS. ENSLER: I'm sorry.

(PAUSE)

MS. THOMPSON: I'm sorry, Your Honor. That went a little quicker than I expected.

THE COURT: Well, it went the time it was allotted, so. . .

(PAUSE)

THE COURT: All right. Are we ready to call the next witness?

MS. ENSER: Yes, Your Honor. The defense would call Dr. Travis Snyder to the stand.

THE COURT: All right. Dr. Snyder, if you will come forward, the Clerk will place you under oath. And you may stand over here to your left and the Clerk will place you under oath.

**DR. TRAVIS SNYDER, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

THE COURT: All right. Doctor, have a seat. You will just need to kind of scoot up close to that microphone so it can

pick you up.

All right, Ms. Ensler, you may proceed.

**BY MS. ENSLER**:

Q    Good morning, Dr. Snyder.

A    Hi, good morning.  Can you hear me okay?

Q    Yes.

A    All right.  Apologize for being a little late there.  I had a -- the security I didn't realize -- so there was a back and forth there, but thanks.

Q    Dr. Snyder, could you state your name for the record?

A    Travis Snyder, S-N-Y-D-E-R.

Q    And what is your occupation?

A    I'm a radiologist and neuroradiologist.

Q    And are you licensed in a number of states?

A    Yes.

Q    Do you recall how many?

A    Uh, it's between twelve and fifteen, something like that.

Q    And are you board certified in the field of radiology?

A    Yes.

Q    And do you also have a certificate of added qualifications in neuroradiology?

A    Yes, which is equivalent to a board certification, yes.

Q    And I would like to show you Defense Exhibit 7, starting with Page 10.

MS. ENSLER:  If you can just scroll for Dr. Snyder

through that. . . .

**BY MS. ENSLER:**

Q    Do you recognize this document, Dr. Snyder?

A    Yes.

Q    And what is that?

A    That's my CV.

Q    And does your CV accurately reflect your education, training, professional experience?

A    Yes, it is about -- unfortunately it is about two years old, but it's the -- there are a few minor changes to it, but nothing substantial.

Q    Could you summarize your relevant educational background?

A    Yes.  I went to college at Florida State University, and then following college, I then did --

MR. STEWART:  Your Honor, the government will stipulate to his qualifications as an expert to move things along.

THE COURT:  Okay, all right.  We can then --

MS. ENSLER:  But may I ask a few questions, Your Honor?

THE COURT:  You may, but just get to the -- get to the triumphant qualification stage.

MS. ENSLER:  Thank you, Your Honor.

**BY MS. ENSLER:**

Q    Do you maintain a clinical practice, Dr. Snyder?

A    Yes.

Q    And you do forensic work as well?

A    Yes.

Q    About how much of your practice is clinical versus forensic?

A    About eighty percent of my practice is clinical, interpreting images.

Q    And on average how many scans of brains do you read per day?

A    Well, it kind of varies, but maybe five to ten would be probably typical.

Q    And so in your career, can you give an -- approximately how many scans of brains you have read in your career?

A    Yeah, probably thousands or tens of thousands, something like that approximately.

Q    About five MRIs per day over the last approximately ten years?

A    Yes, whatever that math adds up to.

Q    Yes, sir.

         MS. ENSLER:  I would offer Dr. Snyder as an expert in neuroradiology, Your Honor.

         MR. STEWART:  I don't have an objection.

         THE COURT:  All right.  Dr. Snyder is so qualified.

**BY MS. ENSLER**:

Q    Dr. Snyder, did my office retain you as an expert in this case?

A    Yes.

Q    And did we ask you to review a magnetic resonance imaging study of Mr. Edward Fields?

A    Yes.

Q    Do you recall when that study was performed?

A    Well, the first study, I believe it was 2011.

Q    And do you recall the materials that my office provided you when we initially contacted you?

A    There were maybe some things, but I think I initially just looked at the image itself and then maybe things. . .I don't recall to be honest.

Q    Okay.  Would you have any reason to disagree that you were provided the image itself, and by that do you mean the DICOM images?

A    Yes, the kind of raw images or DICOM images, yes.

Q    And the neuro -- or the radiologist, Dr. Susan Koslow's report accompanied that?

A    That sounds familiar, yes.

Q    Okay.  And did you produce a report with your analysis and conclusions regarding that MRI study?

A    Yes, and also a PowerPoint presentation

Q    Thank you.

        MS. ENSLER:  If we could go back to Defense Exhibit 7 and just scroll through to the end there or – I'm sorry – to the end or like the first four pages.

**BY MS. ENSLER**:

Q    And do you recognize this as your report?

A    Yes.

Q    And does this report contain your analysis and conclusions of that MRI study, the 2011 MRI study?

A    Yes.

Q    And are your opinions expressed in this report made to a reasonable degree of medical certainty?

A    Yes.

Q    And you mentioned including your slides.  Does this exhibit, Exhibit Number 7 that we have been referring to, also include your CV and slides?

A    Maybe at the end. . .yes, I think at the end it. . .oh, yes, yes, it is there.

Q    And have you been provided some additional material since writing this report?

A    Yes, yes, I have seen -- yes, yes.

Q    Do those include reports from Dr. Erin Bigler?

A    Yes.

Q    Do those include reports from Dr. Joshua Shimony?

A    Yes.

Q    Did you review a report of a  CT scan performed in 1983?

A    Yes.

Q    And did you review a report of a -- the 2017 MRI report, as well as the accompanying DICOM images?

A    Yes.

Q    And finally, did you report -- did that – did those materials include a more recent declaration from Dr. Susan Koslow?

A    Yes.

Q    Okay.  I would like to turn now to the 2011 MRI.

MS. ENSLER:  Could you pull up Defense Exhibit 8? And can you go down to. . .yeah.

**BY MS. ENSLER**:

Q    Do you recognize this document?

A    Yes.

Q    And is this the 2011 document from Dr. Koslow accompany-ing the DICOM images you reviewed?

A    Yes.

Q    And just for the record, what does – does DICOM stand for Digital Imaging and Communications in Medicine files?

A    Yes.

Q    And to be clear, what was the MRI study -- the 2011 MRI study, what part of the body was that on?

A    The brain.

Q    And what was the quality of that imaging?

A    Uh, well. . .yeah, we are seeing some of those images there.  I wouldn't say it was a -- not a high-quality MRI.  It was like a lower field strength, but it was still -- at least the part -- the findings that I made, I was confident that --  I was confident in those findings, but it was -- yeah, it was not a high-quality MRI

certainly.

Q    And you mentioned that you were still able to make your findings. So does the lower quality mean that it cannot be interpreted?

A    No, there are just some things that you may not -- that will be below resolution imaging. I mean, it is well-known that even the high-quality MRI that you can get, there is still going to be -- depending on what the pathology is, there are still going to be things that you may only see -- you know, just the biggest ones and there is other damage underneath depending on the condition. So it is -- imaging is not all that sensitive to certain types of brain injuries, for example.

Q    And is there a limitation or inability to examine the size of Mr. Fields' ventricles in the 2011 MRI?

A    No, because as -- I mean, water in brain imaging can pretty clearly distinguish, and so that is not really impacted by the quality of the magnetic.

Q    And based on your review of the imaging, what were your overall conclusions?

A    So the main conclusion is that his ventricles, which are kind of fluid filled structures in the center of the brain, they are normal path fluid there, they are enlarged in him. And also his brain is smaller secondary to that because what happens when the brain gets smaller, the ventricles kind of fill in the space. And then his are -- and there are other parts that are smaller, such as the

corpus callosum, which is right by the ventricle, so you see it very, very well. And that's really the main finding, but it is an important finding though. It is not something that -- I wouldn't say it is an incidental finding or something to -- I mean, it is a pretty significant finding.

Q    And I would like to take each of those findings and talk a little more about each one. So you mention the ventricles. Could you tell us exactly where in the brain the ventricles are located and kind of their purpose?

A    Yeah, sure. So the brain is -- I mean, within the skull and then there is fluid basically surrounding it. So it is like a -- you know, almost like in a fish bowl with water in it that keeps it kind of stable and there are nutrients and various functions of that. But then if you go into the center of the brain, there are cavities in the center of the brain, which are also filled with fluid, and those are called the ventricles. And the largest of those. . .there are four ventricles, but really, by far, ninety-five percent of the entire ventricular system volume is in the lateral ventricles. And because it is in the center of the brain, it is adjacent (sic) to the brain, it is looked at by radiologist to -- it is something that is looked at on every --

MR. STEWART:  Objection, nonresponsive to the question asked, Your Honor, which was where the ventricle is located.

THE COURT:  Well, he is moving on. All right,

overruled. You can continue.

BY THE WITNESS:

A     I'm sorry. I am -- yes, that was -- I think I am done with it, yes, so. . .

THE COURT: It helps if you just answer the question asked and then we will get through this quicker.

THE WITNESS: Sure, sure.

**BY MS. ENSLER**:

Q     So how do the ventricles -- I think you touched upon it, but how do they relate to the brain above them?

A     Well, there are – they do indirectly reflect or directly reflect brain volume just because of -- there is never such a thing as empty space, like air in the brain. It is always either brain is there or fluid is there, one or the other. And so if one increases, the other will decrease. So that is one of the reasons to look at that system.

Q     And so what is the significance of your finding of marked prominence to the ventricles? What does that mean?

A     Well, in taken with -- I mean, I did look for other -- some other causes, such as – there are different possible causes of lateral ventricle prominence, but those other imaging findings are not there, and so -- and the brain is smaller. So it is consistent with atrophy of the brain. There is some process that is making the brain smaller or abnormally smaller.

Q     And so I would like to start with your slides. Looking at

Slide 1, that is up --

MS. ENSLER: And that is – just for the record, that is Defense Exhibit 7, Page 74.

**BY MS. ENSLER**:

Q    What are those images?

A    So these are from the 2011 images and the blue writing there just kind of -- if we need to -- it says that there, on the actual images. And then the arrows here are pointing to the ventricles and the two images on the left are two different axel images, axel meaning kind of transverse. And those are taken through the middle to the top of the brain with different slices. And then the image on the right, we are looking right at the patient through the middle of the brain. So we are seeing those fluid filled structures in kind of a different plane and the arrows are pointing to those fluid filled structures there, which is the bright signal.

Q    I'm sorry. What was the last part that you said?

A    The arrows are pointing to the bright signal, the white signal, and that's the fluid on this sequence

Q    And just to be clear, when you are saying that's the fluid, that is -- the white represents the ventricles?

A    Correct.

Q    And now moving on to slide 2, Defense Exhibit 7, Page 75, what are those images?

A    So, you know, we have the patient scan and those are -- and

those fluid filled structures are prominent.  The lateral ventricles are enlarged.  And so then you are trying to -- because -- you know, how can that be communicated in an accurate way?  And so I took a couple of normal patients and tried to put them carefully aligned at the same areas of the brain to show that -- to show the difference between your typical normal patient and the patient.

Q    And you said – you referred to using a couple of normal brains to demonstrate this difference.  Where did you obtain these images from?

A    These are from a website called *Radiopaedia.*  That's where I got them.

Q    And what is *Radiopaedia*, just for the record?

A    So it's probably -- it is probably the website I visit most often in clinical practice because it has -- it's -- it has bullet points of findings and example images, example cases.  It is a teaching website.  Our residents are there, you know, almost as much as I am.  So, you know, it is just a nice resource to look for things like this.

Q    And how do images get on *Radiopaedia?*

A    So they are submitted by a user or a radiologist or a resident and then there is a -- there is kind of like a select committee of radiologists that review it and make sure it is, you know, accurate before it goes up there.

Q    And just to be clear, did you rely on these *Radiopaedia* images, their comparison, to reach your conclusion that

Mr. Fields' ventricles were enlarged?

A    No, no.  That was -- I mean, in looking at the scan, that was how I arrived at that conclusion.

Q    And that is based on your experience and training?

A    Yes, yes.

Q    And could you -- why did you select a normal forty-year-old and a fifty-year-old normal?

A    Well, just to give it a little range.  And they don't have that many normal on that website.  There were -- I think these may have been the only ones that were close in age, so. . .I mean, I just picked the first ones that were reasonably within his age and used those.

Q    And why would you want to pick representations that were close to Mr. Fields' age?

A    Well, because as the aging process occurs, then the brain can atrophy.  So I wouldn't want to show, like, a -- you know, a younger person will have smaller ventricles than someone who is maybe elderly who will have larger, and that can be normal.  So I tried to -- and there are not a lot of changes in kind of middle to upper middle age, but I tried to give a range.

Q    And did Mr. Fields, at the time that the 2011 MRI was taken, fall within forty- to fifty-year-old -- do you recall his age, I should ask first?

A    Yes.  I think I've seen it there on the blue mark.  It looks like forty-four maybe, yes.  So he was kind of in the middle of that. . .

Q    In returning to your conclusion regarding Mr. Fields'
ventricles, you found marked prominence to the ventricles.  Are
there ways that neuroradiologists describe degrees of
enlargement?

A    There is -- I mean, if – there are terms like mild, moderate,
or severe or marked or minimal, those are terms that are used.
And there are other ways that you can quantify it, but those
are the most common in clinical practice.

Q    And where would marked fall on that spectrum that you
just laid out?

A    Oh, marked means severe, it is kind of synonymous with
severe.

Q    And referring to slide 3 in Defense Exhibit 7 at Page 76,
what are these images?

A    So this is the same idea as the previous slide, it is just a
different level.  I tried to -- I mean, it -- throughout this presentation
I was trying to make the -- trying to convey the opinion of what –
of why my opinion was what it was.  So this is just a little bit in
the mid-portion of the ventricle.  The previous slide was kind of
in the upper portion.  I tried to match them up closely with these
other patients as best I could.

Q    And when you say mid-portion and upper portion, are you
discussing as if you are starting at the top of the head and
taking slices down towards the chin?

A    Yes, yes.

Q    I am just trying to be clear for our record later.

A    Thank you.

Q    And you had mentioned before that an individual's ventricle size changes as they age. Given that would you expect a normal fifty-year-old to have larger ventricles than Mr. Fields who was forty-four at the time of imaging?

A    All things being equal, yes, slightly, yes.

Q    And referring to your slide number 4, Defense Exhibit 7 at Page 77, what does that show?

A    So we previously were looking at -- the two previous slides were axial planes or transverse planes and now we are looking at frontal planes or coronal planes. And it is the same normal, the same patient scan. I am just trying to show it in a different plane because you have more confidence as a radiologist when you are seeing the same finding in different planes.

Q    And just to be clear, when you are looking at the DICOM images, that is more than these stationery images? Are you actually able to manipulate and see many more images?

A    Yes, you can scroll them and that -- and, of course, my computer didn't make it in here, but that -- but, yes, that can be done, yes, that's how you interpret an image.

Q    And so how does Mr. Fields' ventricle size compare to typical ventricle sizes in the normal forty-year-old you have shown and the normal fifty-year-old?

A    Well, they are abnormal. I mean, they are certainly

enlarged. I don't think it is a subtle finding or something that is equivocal. I mean, that's the finding that he has.

Q    And we were discussing the effects of an enlarged ventricle causing the brain to be smaller. When you say that the brain is smaller would that mean that this brain is damaged?

A    Yes, and it is more the -- kind of the smaller brain caused the ventricles to enlarge, but yes, from damage, yes.

Q    Now, you have identified some possible etiologies in your report for the finding of enlarged ventricles. I will refer you to Defense Exhibit 7 at Pages 4 through 5. Could you explain how a – could you discuss what those possible etiologies are? And I may stop you as you mention each one.

A    Yes. So it is -- there wasn't -- there is -- the possibilities that I mentioned are -- should -- that I think are probably more likely would be -- well, the first one mentioned there is traumatic brain injury.

Q    And can you – I am going to pause you just in order because I don't want you to keep going. I would like to stop with each one. Can you explain how a traumatic brain injury would change the size of ventricles?

A    Yes. There are – in head trauma there can be -- sheering injuries are the most common imaging finding where the axons are basically broken during rotational forces. And then there is maybe some inflammation and then there will be atrophy. The brain will get smaller. And then if there is enough of them, then

the whole ventricle will become more prominent and that could be what we are seeing here.

Q    All right. And -- pardon me. Let me jump to slide at the bottom. And referring you to slide 5 on the right side, is this the phenomenon you have just described in terms of -- was this literature based on traumatic brain injury?

A    Yes, and this was -- yes, yes.

Q    And in the top left, could you just walk us through the three different images.

A    Yes. So this was a -- the reason I used this article is it has what a neuroradiologist called a normal ventricular system in A in the upper left and then what they called a mild ventricular enlargement in B in the upper right and then C is what they called moderate ventricular enlargement in the study of trauma patients.

Q    And in the literature regarding TBIs -- and we will use TBI to stand for traumatic brain injury.

A    Yes.

Q    What is the best predictor for cognitive outcomes?

A    So the lateral ventricle side is -- there are different articles that describe that as being a strong predictor of cognition in TBI patients.

Q    Thank you. And in turning to the next etiology you discussed –

        MS. ENSLER:  If you could go back, it is at Pages 4 and 5.

BY THE WITNESS:

A    So the next one is schizophrenia being described as –
described in that condition.

**BY MS. ENSLER**:

Q    Referring now to slide 6,what is -- can you describe what is on the right side of this slide?

A    Yes.  So there is -- the literature article on schizophrenia included a normal patient on the left looking at the patient and – and I don't have arrows on them, but this particular sequence is inverted so fluid is black on this -- on what they are showing here, but it's still comparable, but that's normal on the left. And the right is a patient who has -- a schizophrenic patient and then it is -- and they are more prominent in that case.

Q    And just for clarity, you said that the colors are inverted. So in the two images on the right under the title schizophrenia literature, the ventricles are black, correct?

A    Correct.  That is a T-1 sequence, so it is -- but yes, it is comparable.

Q    And is that Mr. Fields' brain on the left side?

A    Correct.

Q    And then going back to Page 4 at the front, are there other possible etiologies that you had included?

A    Yes.  So one was a -- is kind of a -- a developmental or a congenital or developmental insult.  I think that would. . .that's. . .

Q    And then could it also be a combination of these etiologies

you have described?

A    Yes.  And then also the other one was a – as a long term --
as a possibility, you know, infectious.  That's a little more unusual,
but. . .uh, yes.  So any combination thereof could result in this
and that's -- and that was kind of my opinion.

Q    And then were you -- sorry.  As a part of your – before coming
here today, were you able to review Dr. Shimony's reports that
we referred to before?

A    Yes.

Q    Dr. Shimony states that one or more of Mr. Fields' medical
conditions, such as hypertension, obesity, depression, diabetes,
or schizoaffective disorder, can lead to bigger ventricles.  Are
these likely etiologies?

A    Well, so it sounds like -- I mean, the schizophrenia or
schizoaffective, it sounds like we agree on that one.

Obesity is – I disagree if he means it by itself because – I
mean, obesity is associated with like metabolic syndrome or
hypertension or diabetes.  And then if it is severe enough, then
potentially, but it's never common but you could have atrophy from
that, but in and of itself there is plenty of – you know, plenty of
like healthy obese patients without that.

Hypertension would be possible.  I mean, your average
patient with hypertension doesn't have significant brain atrophy
like we are seeing here.  They might have minimal or something,
or you might see other findings that might suggest, like, small

strokes or small bleeds.  That would be -- that would accompany that that you might see.

Q    And you mentioned you might see other findings.  Did you see those findings in your review of this MRI study?

A    No, and. . .no, no.

Q    Turning to -- sorry.  Now, let's turn to your second general finding regarding Mr. Fields' corpus callosum.  I would like to turn to slide 7.  What is this image?

A    This is a plane we haven't – this is a side view or a sagittal view.  We haven't seen one of these types of images before, but it is looking at the patient directly in the midline from the side.  And this is a T-1 image, like those other ones, where the fluid is dark.  And then the arrows are pointing to a structure in the middle of the brain called the corpus callosum.  It is a very large fiber track that is pretty much the only connection between the right and the left brain.  So the arrows are kind of pointing to that as it curves back like a -- kind of like an upside down 'C'.  That's the structure.

Q    And what does the corpus callosum do?

A    The corpus callosum has a lot of functions.  Connecting the right and left brain is a --- for a variety of different tasks.  The most – in terms of patients that have damage or injuries to that, cognitive is the most common symptom described, but there are -- but there could be many others.

Q    I am now showing you slide 8 from Defense Exhibit 7,

Page 81. And what is this showing?

A    Well, it is trying to do the same thing because this patient doesn't have -- you know, they are not asymmetric findings on the patient. So that's -- tried to do -- the same patients we compared before, we just compared them also to this -- to this corpus callosum to attempt to show the finding.

Q    And I just want to make sure I caught that. When you say they are not asymmetric findings, can you say more about that?

A    Well, so what -- I mean I wouldn't necessarily include normal patients in a presentation. If it was a one-sided -- if it was unilateral pathology on the patient, then I would just use the other side of the brain and say just look at the right side. The left side is different and this is normal. Then we wouldn't need these normal, but because it is symmetric findings, the corpus callosum is a midline track. A lot of ventricles are paired and they are both enlarged. It would be very challenging for someone, you know, without radiology experience to identify that finding without some kind of reference point. So. . .

Q    Okay. And moving onto what could be the possible etiologies for a thinning -- I am sorry. I should say is thinning an appropriate way to describe the change in size that you have identified in Mr. Fields' corpus callosum?

A    Yes. Thinning, and also the morphologic change of it, how it is sort of elongated and it is more sort of bowed. I mean. . . but those go together, but yes.

Q    What str some possible etiologies for the changes in Mr. Fields' corpus callosum?

A    So it would be a very similar differential to – a very similar differential diagnosis from what I gave before with the lateral ventricles.  Yeah, I think it is fairly similar.

Q    And so those work somewhat together?

A    Correct, correct.

Q    And what do both of these overall findings mean for an individual's prognosis?

A    Well, when you have brain atrophy, corpus callosum, you know, atrophy, it results in prominence to the lateral ventricles.  I mean, in studies on brain injury patients, it is a poor prognostic finding, meaning that it is a bad imaging finding that has been associated with poor outcomes in those patients.  And so I tried to convey that in my presentation too.

Q    And amongst those poor outcomes, would that include brain dysfunction?

A    Yes.

Q    Or cognitive impairments?

A    Yes.

Q    And referring to Defense Exhibit 7 at Page 2. . .sorry, I lost my page.  I'm just trying to make sure I had the page right.  Sorry.

    Back to -- yeah, Page 2, I'm sorry.  In that middle paragraph starting with regardless of etiology, you had stated that you -- that

both of these findings are poor prognostic signs of resultant brain dysfunction expected. Can you tell us what you mean by expected?

A    Yes. So the -- it would just -- I would just be surprised to hear -- like to say that this patient had -- was just walking around like a normal patient or -- I mean, it would just be unusual. So that's why I said he would be most likely to have some degree of symptoms because of the imaging findings.

Q    And how would you determine if there was resultant (sic) brain dysfunction?

A    Well, that wouldn't really be for me to determine. I would recommend -- I mean, clinical correlation is a term radiologists use. Other people can assess the patient. There is neuro-psychological testing that is maybe performed or other types of clinical evaluations to determine that.

Q    And did you review a report from Dr. Wagenfuhr of the the CT of Mr. Fields' 1983 CT scan?

COURT REPORTER:  I didn't get the name you stated.

MS. ENSLER:  I'm sorry. I'll spell it.  It is W-A-G-E-N-F-U-H-R.

BY THE WITNESS:

A    Yes, I did.

**BY MS. ENSLER:**

Q    Showing you Defense Exhibit 252. And do you recall kind

of generally what this report's findings convey?

A    Yes.

Q    Are there limits to this CT scan?

A    Yes.  And I think we can infer by the way the report is worded and also just by the date of the scan from 1983, that it is a -- probably a fairly limited CT scan.

Q    And what primarily does this report discuss?

A    It's just – it is not how a typical dictation would look today or any of the, like, templates that people use to kind of start dictating a CT case.  I mean, it starts – it is talking about the bony structures for almost two thirds of the report, which is – normally it is the opposite.  You are talking more about the brain structures or -- even it is normal, you are just kind of listing the permanent negatives.  And so it is -- some of the earlier brain CT scans, you could really only see the bones well because it was X-ray technology.  So that -- you know, that may be why they were commenting on what they could see.  And the CT technology in 1983, it was not great.

Q    And the report does discuss the ventricles; is that correct?

A    Uh, it does, yeah, in kind of a -- yeah, it does, yes.

Q    And are you confident that -- I am sorry.  And what does it say about the ventricles?

A    Well, it says that they are, you know, normally outlined and appear symmetric.  And it is just a -- kind of a strange way to say that they are outlined.  It is like the -- you know, you can see like

a shadow of it or a. . .you know, I don't. . .it is just -- I wouldn't really use it.  And then the term "appear, they appear symmetric," almost sounds like you are not really sure if they are even symmetric.  So it is -- you know, I think we could infer more likely than not that this was a significantly limited exam.

Q     And so are you confident that Mr. Fields' ventricles were normal based on this report?

A     No.

Q     I would like to now show you Defense Exhibit 8, and the bottom of the page.  Again, this is the report from Dr. Susan Koslow, the radiologist who read the 2011 MRI initially.  In this report did Dr. Koslow say anything about Mr. Fields' ventricle size?

A     She didn't specifically mention that, no, no.

Q     And did she say anything about his corpus callosum?

A     No.

Q     Do you see where Dr. Koslow wrote or transcribed or dictated "no intracranial abnormality?"

A     Yes.

Q     Is it surprising that Dr. Koslow did not describe the abnormalities that you found in Mr. Fields' brain?

A     Uh, yeah, I think so.  I think. . .I think. . .yes, I think so.

Q     And can you say why?

A     Well, I am not trying to be critical.  You know, you never know what situations are and, you know, busy hospitals, but -- I

mean, I just -- it sticks out at me the size of them. Like I said, it is not a subtle finding, but it was, you know, not mentioned here, I guess.

Q   And can you move to Defense Exhibit 43? And we mentioned this before, Dr. Snyder, but did my office provide you a more recent report and imaging of Mr. Fields' brain taken in 2017?

A   Yes.

Q   I am showing you what has been marked as Defense Exhibit 43. Do you recognize this report?

A   Yes.

Q   And is that a report prepared by Dr. Burns?

A   I think that's correct. I am not seeing the name on it. Uh, yes, yes, yes.

Q   And did you have the occasion to review the DICOM files accompanying this report?

A   Yes.

Q   And how does Mr. Fields' 2017 MRI compare to a neurotypical brain?

A   It is the same – the same abnormality that I saw in the 2011. It looks fairly similar. . .I mean, overall fairly similar. In the DICOM images I did not have, for some reason, the T-2 and flair, but the rest were there and it was -- and I was able to compare it to the 2011 in a comparable way.

Q   And were there -- and was there significant change between

Mr. Fields' 2011 MRI and the 2017 MRI?

A    No, no, I did not think so.

Q    And what does that lack of a significant change tell you?

A    Well, that this was a longstanding finding that he has had, a chronic longstanding issue.

Q    And did Dr. Burns have an opinion about the ventricle size?

A    Yes.

Q    And what was that?

A    He said prominence of the lateral and third ventricles, which could indicate central volume reduction. And then he said that there was evidence of hydrocephalus, not otherwise apparent, and then he described some white matter changes and -- and I don't have any disagreement with this report. It is sort of what I said, I guess, in a clinical way.

Q    And I want to show you Defense Exhibit 256 at Page 2. I guess first, do you recognize this report?

A    Yes.

Q    And is this a report of Dr. Erin Bigler dated September 9th of 2024?

A    Yes.

Q    And did you review this report?

A    Yes.

Q    On Page 2 is the -- what are those two images?

A    So this is the comparison that I was discussing and comparing the 2011 to 2017 on the side view of the -- in the

midline.  And Dr. Bigler, I think, is nicely showing that, how they are fairly similar in terms of the finding being stable over time.

Q    And this reflects the changes --  you just said that.  Sorry.

All right.  I wanted to go back to your report on Page 5. Regarding the 2011 MRI, you had mentioned sagittal imaging is limited in assessing the aqua duct.  When you reviewed the 2017 MRI, was the imaging sufficient to assess the aqua duct?

A    Oh, thank you.  Yes, I should have mentioned that, that it -- I mean, it didn't look abnormal on the 2011, but it wasn't -- you know it was a possibility that maybe -- there is a condition called aqua ductal stenosis that can potentially cause that, but then in the 2017 we see it very nicely and it shows that it is not narrowed there.

Q    And having reviewed the -- I would like to discuss now -- return to your ultimate conclusions.  Having reviewed the images from Mr. Fields' brain from 2011 and 2017, do these images show brain damage?

A    Yes.

Q    And assuming you had not seen any abnormalities, would your scan have ruled out -- would your scan and its evaluation have ruled out that cognitive impairments or brain damage could exist?

A    No, a MRI could not rule that out.

Q    And why is that?

A    Well, we were mentioning the sensitivity before of imaging

as being a -- in terms of like a – it's -- there is histologic studies of like brain injured patients that show -- there are many findings on the microscope that are not present on the imaging.  And there are many things that you cannot diagnose from neuroimaging. Some -- like there are a number of things that you cannot diagnose from neuroimaging.

Q    And are the findings and opinions that you have testified to today made with a reasonable degree of medical certainty?

A    Yes.

Q    And if counsel had provided you with a MRI of Mr. Fields brain in 2003 to 2005, would you have been able to perform the same sort of analysis that you have discussed today?

A    Yes, yes.

MS. ENSLER:  No further questions.  Oh, sorry. I strike that.

THE COURT:  I'm going to hold you to it next time.

(PAUSE)

MS. ENSLER:  Just one quick follow up.

**BY MS. ENSLER**:

Q    In discussing the etiologies you talked about a developmental insult.  Could you just describe what you mean by that?

A    Yes.  So patients when they are – either -- often in utero, occasionally there will be almost like strokes that will occur in the brain in different areas or there will be -- the brain, when it is developed, it is sort of dynamic, it is sort of moving as it forms

and there can be arrests (sic) at different points. So that any one of those processes can -- you can see brain atrophy potentially from something like that and it will have characteristically no significant scarring around -- because it occurred so early that you often won't see scarring around it. So it is in the differential here.

MS. ENSLER: No further questions.

THE COURT: Okay. Any cross examination?

MR. STEWART: Yes. Does Your Honor want to take the mid-morning break at this point?

THE COURT: Well, let me ask: How long do you think your cross examination is going to take?

MR. STEWART: I would imagine thirty to forty-five minutes.

THE COURT: All right. Well, then let's take our mid-morning break. It is 10:30. We will be back at 10:45.

We are in recess until 10:45.

(10:32 a.m.)

(SHORT RECESS)

(10:47. a.m.)

**COURT IN SESSION**

THE COURT: You may be seated.

All right. We are back on the record. Counsel are present. Is everybody ready to proceed?

MR. STEWART: Yes, Your Honor.

THE COURT:  All right.  You may do your cross examination.

**CROSS EXAMINATION**

**BY MR. STEWART**:

Q    Dr. Snyder, your report is dated February 3rd, 2021.  Do you happen to know when you were actually retained in this case?

A    No, I don't off-hand, no.  Probably -- I mean, typically it would be, of course, before that, but I don't know how long that was.

Q    Do you think maybe a couple of months before?

A    That would be typical, yeah.

Q    Now, with your report you mention that you are an experienced neuroradiologist, correct?

A    Yes.

Q    You have looked at thousands of scans?

A    Yes.

Q    And so your practice is you look at the scans and you can eyeball certain things, correct?

A    Yes.

Q    Just because of your experience?

A    Correct.

Q    And so you can look at the ventricles and immediately say those are big ventricles, correct?

A    Correct.

Q    And that's based on your experience, your training, and your education, correct?

A    Yes.

Q    And then when you start writing a report, you boil those findings, those observations of yours down into your scientific findings, correct?

A    Correct, and also just try to prove it, you know.  That is another part of that, but yes.

Q    Certainly.  And one of the things that you did in this case is you went and you pulled some images from other brain scans, correct?

A    Correct.

Q    To kind of illustrate for the Court the differences in ventricle size, correct?

A    Correct.

Q    Now, with your report. . .do you actually write those yourself?

A    Yes, yes.

Q    Okay.  And so you don't dictate them?

A    Oh, I didn't understand the question.  No, I, I - I just type them, yeah.

Q    You type them yourself?

A    Yes.

Q    And then you review them, I am assuming, before you sign them?

A    Yes.

Q    And you signed this one, correct?

A    Yes.

Q    I am going to pull up Exhibit 7.  Let's go to Page 6 of 8. Now, I want to look at the line right here at the bottom where it says, "All opinions are to a reasonable degree of medical probability."  Is there a reason you used probability there instead of certainty?

A    Well, I was told at some point by a counsel that that was not the correct -- or that there is a different term, but I -- but I've used that as far as forensic work without any -- I thought that was the correct term, but maybe it is not, you are telling me. So. . . .

Q    So you are saying that Mr. Fields' ventricles are probably abnormal?

A    No, no.  That's just – it is trying to -- it's more -- all opinions are more likely than not is what I was trying to put in there just for the legal aspect of it.

Q    So you are fifty-one percent sure that his ventricles are abnormal?

A    No, no.  I mean, I am very sure.  I mean, I'm one hundred percent sure they are abnormal. I mean, it -- can I explain or can I --

Q    Go ahead.

A    So anytime I do a legal report, I will -- I actually have kind

of a template where that's the last sentence of the report because it is required for legal cases to have medical probability or I guess certainty is a better word for it, so that regardless of whatever I say,  I will just put that in there provided that it is true, of course, but -- so that's just -- that's just how I approached it.

Q     I want to talk about the normal scans that you mentioned, that you used as a comparison.  Your report doesn't mention the gender of those scans, correct?

A     Uh, no, I don't – because there shouldn't be a large size difference between males and females in terms of -- at least where he is.

Q     So there is no difference between ventricle size in males and females?

A     I mean, there is perhaps small differences, but it -- in terms of just trying to compare it to a normal patient. . .I mean the difference between males and females is so small that it doesn't really apply to what I was trying to show.

Q     So are you saying this could be a female brain though?

A     Yes, they could be.

Q     Now, you call these two scans normal, correct?

A     Uh, yes, the ones I showed, yes.

Q     And how do you define normal?

A     Well, they were on -- I mean, they were on this education website as normal brains for, you know, people to look at for educational purposes.  Other radiologists had looked at them.

So, you know, I used those instead of -- I mean, I could have put normal cases from my, you know, own personal list that I am reading. Just, you know, deleted the name and then used it, but I think it is a little more authoritative if it is from somewhere like that than just me doing it.

Q    Now, is normal an absolute value or is it more of a range?

A    There is a range, of course. I mean, in ventricle size there is a range, but it is -- I mean, the range would be -- and I would have to -- I mean, the range would be like this and then if -- you know, if he is up here and then. . .and the range is not a large range.

Q    So I just want to ask you, if you chose for illustrative purposes someone whose ventricles were on the smaller end of the normal range, wouldn't they look much smaller than Mr. Fields' compared to a normal brain that was on the upper end of normal range?

A    Uh, you could probably -- if you took someone who was on the upper limits of normal and someone on the lower limits of normal -- if you looked at those ventricles, you would see a difference. You could tell that one was bigger than the other, but it wouldn't look like his.

Q    But the change might not look as drastic, correct?

A    Correct. Yeah, it would be -- you would -- a lay person could look at the upper normal and the lower normal and they could say, yes, that one is bigger, but just the degree of

difference is. . .

Q    And you don't know -- the scans that you provided, you don't know where in that range they would be?

A    I am -- from looking at them, probably in the middle.

Q    And you actually just mentioned something that I want to go back to.  You said that a person who has done a lot of scans, like yourself, can just look at a ventricle and know it is abnormal, correct?

A    Yes.  I mean, when it is to the degree of this one, yes. There may be some -- I mean, not every case perhaps, but yes.

Q    And Dr. Koslow is an experienced radiologist, isn't she?

A    Oh, I assume so.  I am not sure.

Q    She could look at the ventricles and immediately see if they were normal or not, correct?

A    Yes, I believe so.

Q    And she said they were normal, didn't she?

        MS. ENSLER:  Objection.

        THE COURT:  What is the objection?

        MS. ENSLER:  She. . .her. . .withdrawn.

        THE COURT:  Okay.

BY MR. STEWART:

Q    Dr. Koslow said the ventricles were within normal range, correct?

A    Well, initially in the --

MS. ENSLER:  Objection.  That is mischaracterizing her statement.

MR. STEWART:  We can pull it out, if you would like.

THE COURT:  Let's find out what the witness knows and we will go from there.  Overruled.

**BY THE WITNESS**:

A    Well, no. . .initially yes, there was a -- that was her interpretation and then apparently -- I guess later on she re-reviewed and then did an addendum describing that they were prominent.

**BY MR. STEWART**:

Q    And you said prominent.  Didn't she actually say generous?

A    Maybe that's -- yes, thank you, yes.

Q    Did she say they were abnormal?

A    She didn't describe them quite how I would have described them, but I don't recall if she -- exactly the wording she had on that, but. . .

Q    Now, Dr. Koslow was not retained for the government or by the government, correct, or do you know?

A    No, I don't think so, no.

Q    But you are retained by the defense, correct?

A    Yes.

Q    Now, you discussed the fact that ventricles become enlarged as the brain atrophies, correct?

A    With aging, yes.

Q    And that happens naturally over time?

A    Correct, to a mild degree, yes, or to a -- actually, if you get quite old, then it can be more --

Q    Now, assuming -- I am sorry.

A    -- more advanced.

Q    Assuming these ventricles are enlarged – and sir, could you speak up a little bit at the end of your answers.  As you trail off, I think that you are stopping, so I don't want to interrupt your answer.

A    No, thank you.  I will work on that.

Q    All right.  Assuming that the ventricles are enlarged in this scan, doesn't it look like the enlargement is equally distributed?

A    Fairly, yes.

Q    It's diffuse?

A    Yes, yes.

Q    So it is not weighted towards the front of the brain?

A    I, I. . .that doesn't jump out at me.  I'm not -- if I could look at my slides, I could give a better. . .but I think that wasn't a big finding, if it was there.

Q    So your findings do not specifically pertain just to the frontal lobe, do they?

A    No.

Q    Now, you discussed a few possible causes of large ventricles, correct?

A    Yes.

Q    I just want to be clear though, can you determine from a brain scan the etiology or cause of enlarged ventricles?

A    Sometimes you can.  In this case I could not.

Q    Now, I also want to make sure I understand, when you say Mr. Fields' brain is abnormal, you don't mean that there aren't a lot of people walking around with ventricles sizes similar to Mr. Fields, correct?

A    Well, I mean, people that have -- I mean, there are people that have, of course, traumatic brain injuries, schizophrenia, you know all of the different causes that are, you know, walking around with varying degrees of function.  So in that --

Q    Are there --

A    -- sense, yes.

Q    I'm sorry, let me rephrase.  Are there people who would go ahead and score perfectly fine on any neuropsychological tests who could still have ventricle sizes similar to Mr. Fields in the entire population?

A    Well, I mean, I'm not going to say it's not possible, but I think it would be unusual.  That might be a question maybe for, you know, some of the neuropsychological people or a neurologist or someone.

Q    Well, let me rephrase it then because I don't think you quite understand what I'm saying.  Isn't it possible, as you mentioned, because of the natural aging process that there could be people in their sixties, seventies, or eighties who show

no cognitive impairment but could have similar ventricles sizes?

A    Oh, I apologize.  Yes, I understand the question now.  So if he was, yes, eighty or ninety, I would probably not call that abnormal.

Q    Maybe seventy?

A    Uh, I would still mention something about it.  It is -- that's -- I think seventy, I would still say something about it, but not to the same -- maybe I wouldn't say marked, but –

Q    Do you think maybe mildly at that point?

A    Sure, sure.

Q    So really the abnormality is just his age and the ventricles in your mind don't really match up?

A    I mean, I . . .I guess you could put it -- I guess you could phrase it that way.

Q    Now, as far as you know, there isn't a statistically significant portion of the elderly population shooting people in national parks, correct?

A    Well, I am not sure what he did or what the. . .so. . .and, no, I am not aware of elderly people doing that.  I mean, I don't think that is really a -- really a comparable -- comparable to him because -- I mean -- let me  -- maybe I'll put it this way.  If someone's brain looks like it is, you know, thirty or forty years older than it should, that is -- that is not a -- that's a bad finding. I mean, that's an abnormal finding and it's – and you would expect someone with -- that you see with that pattern to have

some abnormality, some etiology or etiologies that would be responsible for it.

Q    Well, I guess what I am getting at, Doctor, is that merely having enlarged ventricles does not itself affect cognitive function?

A    Well, if it is due to brain atrophy, then it would be associated with it or it could be associated with that.

Q    Could be associated, but not caused?

A    I mean, if someone has a small – I mean, let's just pick from trauma since that is just a – I think kind of a clear way.  If your brain is shrunk or shrunk down or smaller from trauma, that's a – it's a poor diagnostic finding and they often have associated cognitive, you know, symptoms which are – compared to other patients that don't have that finding are a lot worse.

Q    So are you saying that a brain that shrinks due to the natural aging process is not a poor prognostic finding but a brain that shrinks because of an etiology like traumatic brain injury is a poor prognostic finding, correct?

A    Correct, yes.

Q    So really it sounds like the traumatic brain injury is the poor prognostic finding, correct, and not the mere fact that the brain has atrophied?

A    Oh, well, if you put it that way, sure, that's -- and it is not just traumatic brain injury, but any -- any type of brain injury.  Studies have been done of like hypoxic brain injury.  I mean,

there is -- obviously people with schizophrenia have -- I mean,

it is -- abnormal brains and functions and those types of – and

it's the same with congenital insults.

Q   Now, you mentioned that this brain scan is from 2011,

correct?

A   The first one, yes.

Q   And you mentioned that it appears to be longstanding,

the structural abnormality, correct?

A   Yes.

Q   Now, did you review Mr. Fields' medical records?

A   At some point I had some of them.  I reviewed other people's

records that had.  I am not sure I did an in-depth review as a

radiologist of all of them.

Q   Now, you mentioned on direct that there are some causes

like obesity, hypertension. . .I can't remember the other one that

was mentioned. . .schizoaffective disorder -- that could possibly

affect ventricle size, and you kind of said maybe, correct?

A   Oh, I disagreed with obesity, but significant hypertension

potentially, but then we didn't see other findings that you might

see with that, but it would be -- I mean longstanding, uncontrolled. . .

you could see potentially something that looks like this.

Q   So you said maybe not obesity.  What if it was morbid

obesity?

A   Yeah, I don't -- obesity in and of itself without any other

associated findings -- I think any associations are fairly weak in

terms of brain atrophy.

Q    Are you aware that Mr. Fields had morbid obesity and what was called in his medical records uncontrolled hypertension?

A    I saw, I think that he had hypertension.  I am not sure if I saw that it was uncontrolled, but. . .

Q    All right.

MR. STEWART:  Can we pull up Exhibit 73, Government's Exhibit 73?  And I believe it is going to be Page Number 217.

**BY MR. STEWART:**

Q    Now, I want you to look at the note there.  Does it mention morbid obesity?

A    Yes.

Q    Does it also mention uncontrolled hypertension?

A    Yes, and it says comorbidities, which is the same sort of similar. . .

Q    And does it mention he has a long history of noncompliance with blood pressure medicines?

A    Yes.

Q    So are you saying it is not possible for someone with morbid obesity, uncontrolled hypertension and a long history of not complying with blood pressure medication -- it is not possible that that could account for the ventricles that you saw on this scan?

A    I don't think I said that.  I said that hypertension was

possible.  We just don't see other imaging findings of that.  And then what would also kind of argue against that would be how these are stable in comparing 2011 to 2017.  If he had, you know, an active hypertension that was causing the brain to atrophy, then you would see a progression or a -- and it was just unchanged.

Q    Doctor, do you see --

A    It is not a great pattern for that.

Q    Doctor, do you see the date on the top of this, the encounter date there at the top?

A    Yes.

Q    And that is 2010, correct?

A    Yes.

Q    Right before the scan?

A    Yes.

Q    Do you happen to know what his medication regimen looked like after that?

A    No.

Q    And are you also aware that Mr. Fields has adult onset diabetes?

A    I don't recall either way if I saw it.

Q    But if he did, that could play a role as well, correct?

A    Potentially.  You also will see with that chronic small vessel disease and you would see what matter starting basically in the brain, which was mentioned on the last scan but they said

it was fairly mild.  And so hypertension in diabetic patients, you would often have more -- you know, moderate or severe white matter, confluent scaring or leukosis in the brain that you would often see with those, but it could have played a role.  But then we had the same issue of why is it stable then, you know, why is it just unchanged between those scans.  It wouldn't really be typical for them to --

Q    Now, you –

A    -- for that.

Q    Now, you also mentioned traumatic brain injury, correct?

A    Yes.

Q    Are you aware that there was testimony at his trial that after the crime, while in pretrial detention, he was beaten in the head until he was nearly unconscious?

A    I don't recall or I don't really recall seeing that.

Q    That would be pretty significant for your evaluation though, wouldn't it?

A    And that was -- sorry, when did that happen?

Q    Right after the crime in 2003, while he was in pretrial detention.  The event occurred in 2004.

A    Oh, I understand, yes.  Well, essentially that could account for. . .I mean, that's trauma, unless there are other histories in the past and depending on which one was worse.

Q    But based on the mere records in this scan, you couldn't tell which actually accounted for the enlarged ventricles?

A    Correct.

Q    Now, you also discussed the corpus callosum, correct?

A    Yes.

Q    Now, you didn't offer any measurements of the corpus callosum. Once again, you just kind of eyeballed it and said it looks good, correct?

A    Well, the reserve, but yes.

Q    Sorry, yes, absolutely. Thank you. And just like ventricle scans, again you are putting up the normal and comparing them with Mr. Fields, correct?

A    Yes.

Q    And you mentioned that a corpus callosum injury correlates to poor outcomes and cognitive deficits, correct?

A    Yes, those are most commonly the ones described.

Q    And I believe in your report there was a citation to a study about imaging in traumatic brain injury cases, correct?

A    That would not -- yes. In fact, we have actually -- my research group has published an article since then finding the same thing that is. . .

COURT REPORTER: I couldn't hear the end of the answer.

THE WITNESS: Oh, I'm sorry. Am I trailing off again? I'm sorry. I said similar to that one, similar.

BY MR. STEWART:

Q    And the finding is basically that people with traumatic brain

injuries show some deficits on neuropsychological testing?

A    If they have injury to the corpus callosum, then they are more likely to have cognitive symptoms and then take longer to recover from those cognitive symptoms, yes.

Q    Now, that study that you reference in your report didn't definitively explain how the phenomenon of thinning corpus callosum and neurocognitive deficits were connected, correct?

A    As far as the theory behind it?  I mean, I think the thought is that it has to do with right/left brain communication, but I am not sure it is known exactly. . .yeah, exactly what. . .

Q    So it is just an evaluation that the two phenomenons are existing in the same traumatically injured brain, correct?

A    Yes.  And then -- and not just traumatic brain injuries but other types of brain injuries or other studies on -- the corpus callosum has been linked to similar symptoms and outcomes and it. . .well, yes.

Q    Now, someone with an abnormally thin corpus callosum could still perform normally on neurocognitive tests, correct?

A    Potentially.  I guess it is possible, yes.

Q    And they could have a normal corpus callosum and show significant cognitive deficits, correct?

A    Also possible, yes.

Q    And we discussed earlier that you didn't know if these scans showed that the brain is on the higher end or the normal end of the range.  And I am talking about the normal brains.

A   No, they look – I mean, I picked them to try to pick an average and not pick one that was, you know, skewed one way or the other, so they are about in the middle.

Q   You mentioned at some point that his brain is smaller, that comparative language.  Smaller than what?

A   To a normal brain, to an expected brain, yes, which is why those ventricles are bigger.   There is also prominence to the others -- like the -- they are called the sulci or the -- that are kind of surrounding the brain.  There are other areas that are smaller as -- I mean, I didn't get into every single area.  I just described the brain and the corpus callosum because it is right next to the ventricle.  It is easy to see, and so -- but, yes, there are – it is smaller overall.

Q   You did review Dr. Bigler's report, correct?

A   Yes.

Q   And he did volume measurement of the Defendant's brain?

A   Yes.

Q   Did you look at those measurements?

A   To some extent.  I mean, I saw that he -- he found that – I think his conclusion was that it was – well, I'll just answer the question, yes.

Q   Would you be surprised if I told you he found that Mr. Fields' brain was significantly larger in volume than his cohort, his age and gender cohort?

A   Well, I mean, you are referring to the ventricle?

Q    No, volume, cerebral or cerebrum volume and total brain volume.

A    I don't recall seeing that, but that's not what I am seeing on the scans.

Q    Okay.  Now, you mentioned something and I really want to clarify this.  You said that when the brain atrophies. . .did you say that's brain damage?

A    Correct.

Q    So Mr. Wilson is brain damaged because as he gets older his brain atrophies?

A    Whose. . .

Q    Mr. Wilson -- I'm sorry, not my co-counsel.

A    Yes, I wanted to make sure who we were talking about here. Well, it is -- I mean, from aging it would -- I mean that is what is occurring.  Cells are actually dying is why the brain gets smaller with aging, but it is not -- I mean, it is kind of -- it is a different process than having it for a different reason than aging.

Q    So if I say that -- you know, if someone were to say that someone is brain damaged; you wouldn't immediately go to. . . oh, they must be over fifty.  You would wonder did they get hit in the head, correct?

A    Right, right.  You don't – you know, the aging process, you don't call that brain damage because that's -- you know, that's not --

Q    Because under your definition anything could be brain

damage as long as the brain has atrophied at all, correct?

A    No.  My definition of it was that his brain is, you know, thirty or forty years – it looks much older than he is.  So, you know, that is abnormal, that's brain damage.  I mean, I don't think -- yeah, you wouldn't call aging brain damage.

Q    You wouldn't call aging brain damage?

A    No, I'm not -- I'm agreeing.  I'm saying –

Q    Okay.  So in other words, you come back around -- sorry.  I just want to make sure.  You are saying that just because the brain atrophies that doesn't mean it is brain damage?  The process of atrophy is not brain damage?

A    Oh, right.  That wouldn't be something that you would use that term for, no.

Q    Now, you were somewhat critical of the 1983 report in which the radiologist said that his ventricles appear symmetric, correct?

A    Well, I wasn't trying to be critical.  I think they are -- I mean maybe it was a very accurate reflection of what was on the scan, but just of the -- it was reflective of the quality of the scan was my point of it.

Q    And you mentioned you agreed with Dr. Burns's report when he said he found prominent ventricles?

A    Yes,  yes, overall, yes.

Q    But he didn't say markedly prominent, correct?

A    No, he didn't use that term.

Q    He just said prominent?

A    Yes.

Q    It could be mildly prominent?

A    I guess we would have to ask him what he thought.

Q    Now, you can't actually diagnose Mr. Fields with any kind of medical or mental disorder based on this scan, correct?

A    Not specifically that it is due to this or that.  I mean, I was looking trying to be -- to look at that question, but, no, I didn't do that.

Q    And there are no lesions besides – I think there is a subcutaneous lesion that Dr. Koslow said might be a lipoma, but there is no actual lesions on the brain, correct?

A    Well, in 2017 there was some chronic small vessel disease that was described, but within the brain, yes, I didn't -- I didn't see that within the limitations of the scan.

Q    And there were no tumors?

A    No.  Well, a lipoma is not really a -- yeah, that's outside.

Q    The only thing you found abnormal with his brain scan was his ventricle size and thin corpus callosum?

A    Yes, yes.

Q    And those observations cannot be tied to any specific symptom, correct?

A    There are symptoms that might correlate with those findings, as I mentioned, or have been correlated, but that's pretty much all I would say about it.

Q   Do you actually know how Mr. Fields performed on cognitive tests?

A   I know there was neuropsychological abnormalities in the testing, but I am not sure to what degree those were.

Q   And you really can't predict it based on the scan, correct?

A   It is not surprising that there were abnormalities.  I will put it that way, you know, but. . .yeah.

Q   Would you be surprised if there weren't any abnormalities?

A   I would be.  I mean, someone who has a brain injury and is functioning completely normal, that would be -- that would be pretty unusual.

Q   Is it possible?

A   Uh. . .I guess it is possible.

Q   Just finding our outside boundaries here.

A   No, I understand, I understand, yes.

MR. STEWART:  Just a moment, Your Honor.

(PAUSE)

MR. STEWART:  Thank you, Doctor.  That's all I have.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MS. ENSLER:  Just briefly.

### REDIRECT EXAMINATION

**BY MS. ENSLER:**

Q   Dr. Snyder, in the field of radiology why is it important to consider age in conducting an evaluation of a MRI?

A    Well, because the aging process can cause a number of imaging findings that a radiologist has to be aware of and account for.

MS. ENSLER:  No further questions.

THE COURT:  All right, very well then.  Good. Can this witness be excused?

MR. STEWART:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Dr. Snyder.  We appreciate it.  You are excused now..  You may step down.  Safe travels.

THE WITNESS:  Thank you.

THE COURT:  My understanding is you intend to call Dr. Bigler next; is that correct?

MS. NELSON-MAJOR:   Your Honor, Dr. Bigler is not available until 1:30, so we intend to call Ms. Shettles in order to not leave a gap in the court's time.

THE COURT:  Okay.  Well, I appreciate that.  Well, let me just say then, to the extent you are calling her, I want to understand and hope that whatever Dr. Bigler is going to add is not duplicative of what we just heard from Dr. Snyder.  So. . .I know you have her listed for three hours.  I hope we are not going to be plowing the same field that we just plowed with Dr. Snyder.  So to the extent there is an opportunity to think that through and whittle down whatever Dr. Bigler is -- whatever you need from her to add and not to duplicate whatever has

already been done, I would appreciate it because your time is limited and you are running out.  So. . .

All right.  So you are going to call Dr. Shettles now?

MS. NELSON-MAJOR:  Ms. Shettles –

THE COURT:  Ms. Shettles, I'm sorry.  I am getting confused with who is a doctor and who is not.

MS. NELSON-MAJOR:  By the end of the week I'll be Dr. Nelson.

THE COURT:  Yes, I think we all will be before this is done.

MS. NELSON-MAJOR:  I just. . .I do want to make the Court aware though that we anticipate it is likely that we won't finish Dr. Bigler's testimony today,  but I imagine the Court would find it preferable that we call Ms. Shettles and then --

THE COURT:  I want to use all of our time today that we have.

MS. NELSON-MAJOR:  Okay.

THE COURT:  So, yes, that's my preference.

MS. NELSON-MAJOR:  It will take just a moment to get the video link hooked back up.

THE COURT:  All right.

MR. STEWART:  Was that a – did you misspeak?  Are you not going to finish Ms. Shettles testimony or Dr. Bigler's testimony?

MS. NELSON-MAJOR:  Dr. Bigler.  If I said Ms. Shettles,

I misspoke. I am fully confident we will finish Ms. Shettles and begin Dr. Bigler this afternoon. And I highly suspect that the time estimate we provided for our direct examination of Ms. Shettles is a generous overestimate –

THE COURT: I sure hope so.

MS. NELSON-MAJOR: I did remain within the time limits that we estimated for Mr. Derryberry. So hopefully that continues to be true.

(PAUSE)

THE COURT: All right. The Clerk will now place Ms. Shettles under oath.

COURT CLERK: Please raise your right hand. Do you solemnly swear that the testimony you are about to give before this Honorable Court will be the truth, the whole truth, and nothing but the truth so help you God?

(NO RESPONSE)

THE COURT: Ms. Shettles, can you hear us?

MS. NELSON-MAJOR: Ms. Shettles, are you able to hear us?

MS. SHETTLES: (Inaudible) – working it out.

MS. NELSON-MAJOR: Can you hear us, Ms. Shettles?

MS. SHETTLES: Pardon me?

MS. NELSON-MAJOR: Are you able to hear us?

MS. SHETTLES: I can. . .I don't know what you are

asking me, and I am terribly sorry.

THE COURT:  Can you hear us, Ms. Shettles?

(NO RESPONSE)

MS. NELSON-MAJOR:  I think one of the issues might be that my computer is picking up the audio in the courtroom and I am fairly far away from it.  If it would be okay with the Court, would it – could I sit in front of my computer while I question her, or will that make it too difficult for the court reporter to hear me?

THE COURT:  Well, you are going to have to move that microphone over there for her to hear you, the one on the desk.

MS. NELSON-MAJOR:  Or I could potentially plug my computer into --

THE COURT:  If that will work, then --

MS. NELSON-MAJOR:  I'm sorry for the delay.

THE COURT:  Now y'all know why I don't like doing video witnesses.  This is always our experience.  It never goes smoothly.

(PAUSE)

THE COURT:  Ms. Shettles, can you hear us?

MS. NELSON-MAJOR:  That was just Mr. Tanner's computer connecting, so I don't think that that is going to make it. . .

(PAUSE)

MS. NELSON-MAJOR:  Can we try with me sitting here

just to see how it –

THE COURT:  Let's test it and see if we can hear.

MR. WILSON:  Judge, I am not going to have to sit in her lap when I question, correct?  (LAUGHTER)

THE COURT:  I don't know.  We will see.

MS. NELSON-MAJOR:  I would imagine you could sit where Mr. Hass (sic) is sitting because he is -- and I can send you the Zoom link.  I am just trying to ensure that we --

THE COURT:  Let's just see if we can get this started and then we will figure out what we have to do later.  One step at a time.

(PAUSE)

MS. NELSON-MAJOR:  Okay.  Ms. Shettles, are you able to hear me now?

MS. SHETTLES:  I am.  Thank you.

MS. NELSON-MAJOR:  Okay.  We are just going to –

THE COURT:  We need to get her under oath here at some point and I don't know if she can hear Katie or not from where Katie is standing.  Katie may have to go over there to her microphone, I guess, to get her under oath.

MS. NELSON-MAJOR:  I'm so sorry.  Thank you.

COURT CLERK:  Ms. Shettles, I am going to put you under oath.  Will you please raise your right hand?

(COMPLIED)

Do you solemnly swear that the testimony you are about to

give before this Honorable Court will be the truth, the whole truth, and nothing but the truth so help you God?

MS. SHETTLES:  I do.

COURT CLERK:  Thank you.

MS. NELSON-MAJOR:  Okay.

**GLORIA SHETTLES, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MS. NELSON-MAJOR**:

Q    Ms. Shettles, can you please state and spell your name for the record?

A    Sure.  It's Gloria, G-L-O-R-I-A, Shettles, S-H-E-T-T-L-E.S.

Q    And are you currently working?

A    No, I've been retired for three years.

Q    Okay.  And prior to your retirement, how were you employed?

A    I worked in the capital division of the county public defender's office for several years.  And then from 1993, I began working in an inquisitor or private investigator firm and worked there until I left to go to the public defender's office.  I think that was in 2014.

MS. NELSON-MAJOR:  And I just want to pause to ensure that the court reporter is able to hear.  Thank you.

**BY MS. NELSON-MAJOR**:

Q    And during your time at the public defender's office and inquisitor, what kind of work were you doing?

A    I was a litigation specialist at both places.

Q    And what do you mean by a litigation specialist?

A      Well, for a capital case or a life without parole case, you have a sentencing hearing and you have a second part to your trial, which is the sentencing, and in mitigation, from the very beginning of the case, you want to get to know your client's background, family members, get records on his behalf, anything you can start in the beginning of the investigation to get an idea of what kind of things you might be looking at, what kind of experts might be needed based on the information that you are getting. So it is an ongoing process, but it helps to start with immediate family members and records and then move out from there.

Q      And that process that you just explained to us, was that your typical process you followed when working as a mitigation specialist on a capital case?

A      Yes, always.

Q      And I am going to be foolish and try to show you a document on our fragile video system --

A      Okay.

Q      And hopefully it works.  All right.  Ms. Shettles, do you see a document on your screen?

A      I do.  That looks like my resume.

Q      Okay.  I am showing you what has been marked as Defendant's Exhibit 44.  You said it appears to be your resume. I can scroll through for you and let me know if I am going too quickly.

A      No, it's fine.

Q    And I know you said you are currently retired, but have there been changes --

A    Pardon me?

Q    I am sorry.  Can you hear me, Ms. Shettles?

A    Yes, I just didn't understand what you were asking.  I am sorry.

Q    Have there been any changes to your resume that we are looking at right now?

A    Uh. . .other than my public defender experience, I don't believe that is included in that.

Q    Okay.

A    Or I don't believe it was.

Q    And besides the public defender position, does this document otherwise reflect your education, training, and professional experience?

A    Yes.

Q    And what is your educational background?

A    My educational background?  I have a bachelor's degree and I have a master's in counseling.

Q    And prior to becoming a mitigation specialist, did you hold other positions?

A    I did.  I had worked at -- for the Tennessee Board of Paroles since 1977, I believe, and at some point I became appointed the regional director.  At first it was all of west Tennessee, and then that later changed just to Shelby County, to Memphis.  And I left

there – I became the director in 1985, and I left parole in 1990. I worked for the DA's office for a year and then I ran a community corrections program for a year prior to my employment with the inquisitor.

Q    And approximately how many capital cases have you worked on as a mitigation specialist?

A    I will tell you that it is about a hundred, and that is accurate. However, that is not necessarily -- they weren't trials.  Sometimes my role would be just to interview family members sometimes that lived in Memphis, Tennessee.  I would help other agencies. Then at times I would ask my attorneys just to do limited tasks, but they were all capital cases.  Certainly our goal, when we had trial set, was to do our best to settle the case in the client's best interest.  So some of those did not go to trial, but many did and then some of the cases, I am referencing, were post-conviction cases.

Q    And approximately how many of those capital cases that you worked on were prior to Mr. Fields' case?

A    Mr. Fields' case began in 2003; is that correct?

Q    Yes, that's correct.

A    Okay.  I started work in 1993, and there was -- from the day I began -- I began working on a case in Jackson, Tennessee, so I can't tell you a number, but I always had cases.  I always had multiple cases I was working on, so I really can't imagine how many it had been up until that time.

Q    That's okay.  And when you were working as a mitigation

specialist on Mr. Fields' case, were you based out of Memphis, Tennessee?

A    Yes.

Q    And in the course of your career, have you attended trainings on investigating mental health issues in capital cases?

A    Yes, I have.

Q    And did those training include sessions on investigating evidence of a client's potential brain damage?

A    Yes.

Q    And setting aside Mr. Fields' case for a moment, have you investigated evidence of brain damage on behalf of other capital clients?

A    I have.

Q    And have you testified in court before?

A    Did I attempt to what?

Q    I'm sorry.  Have you testified in court before?

A    Yes.  I'm sorry.  I've testified probably no more than five or six times over the years.

Q    And were those at trial or in post-conviction proceedings?

A    Trial.

Q    And those five or six times that you testified, were you ever qualified to testify as an expert?

A    I was.  And in one case in particular I was declared a mitigation expert, and again in another case in connection with that, I was declared a Department of Corrections expert because

I was giving testimony about prisons' classification, that kind of thing, and I had the knowledge and experience to testify about those things.

Q   And when you testified -- setting aside the time that you testified as a corrections' expert, did you testify to the results of your mitigation investigation?

A   Yes.

Q   Okay.  And Ms. Shettles, you were a member of Mr. Fields' defense team at trial, correct?

A   Yes.

Q   And I know you mentioned that you believe Mr. Fields' case was in 2003 initially.  If I told you that you began work on Mr. Fields' case in August of 2003, would you have any reason to dispute that?

A   The. . .I'm sorry.  What now?  You said it was August that I began, and I didn't hear the other question.

Q   If I told you that you began working on Mr. Fields' case in August of 2003, would you have any reason to dispute that?

A   No.

Q   How did you become involved in Mr. Fields' case?

A   My boss at the time was Ron Lax (sic) and he was contacted by Skip Gant, an attorney in Nashville that we had worked with not too long prior to this on a capital case, and he let Ron know that an attorney in Oklahoma had a capital case and it was her first capital case and he wanted someone to work on the

mitigation and he suggested to her that I do that. And at some time I obviously began -- before I began work, Julia O'Connell and Mr. Gant came to Memphis to meet with my boss and myself.

Q   Okay. And besides Mr. Gant and Ms. O'Connell, were there other lawyers working on Mr. Fields' defense team?

A   I know there was an attorney named Barry, and I had limited contact with him, but I met him, and my understanding was that his role was more in the guilt phase, but I am not sure that's true.

Q   And you said the guilt phase; is that correct?

A   Yes, meaning the first part of the trial and the investigation that goes along with that.

Q   Are you aware that another attorney by the name of Michael Abel also entered his appearance on Mr. Fields's behalf?

A   Who did? I'm sorry. Rachel?

Q   I'm sorry. The name is Michael Abel.

A   Okay.

Q   Is that a name that is familiar to you?

A   No. I'm sorry, it's not.

Q   And so you had no contact with Mr. Abel in connection with Mr. Fields' case; is that right?

A   Not that I'm aware of.

Q   Had you ever worked with Ms. O'Connell prior to Mr. Fields' trial?

A   No, no, I had never met her before.

Q    Was it your understanding that Mr. Gant was to serve as learned counsel on Mr. Fields' defense team?

A    Yes.

Q    And where did you get that understanding from?

A    Well, from the first meeting. And then certainly in later conversations with Julia, my understanding was that Mr. Gant was to help her. This was her first death penalty case. Death penalty cases are very different. Obviously the consequences are the most severe that you can get, and she was to receive help from him on filing motions or thoughts after reviewing discovery or just the whole process, whatever it might be. That's what I understood his role to be, was to help her.

Q    And at that first meeting with Mr. Lax, Mr. Gant, and Ms. O'Connell, was there a discussion about the roles and the responsibilities that each of you would have on Mr. Fields' defense team?

A    Well, I think, as I said before, Julia was the lead attorney. There's no question about that. And my role would be to provide the mitigation investigation. Mr. Lax, quite frankly, didn't have a role in the team. It was just certainly as a courtesy. I mean, he is the owner and my boss and he was present for that. And then Skip, as I said, was to be a resource to Ms. O'Connell, whatever she might need from the beginning to the end.

Q    And what did you observe Mr. Gant's contributions to be in the initial months of your work on Mr. Fields' case?

A    I don't recall having contact with Skip.  I may have.  Any memos that were sent out, any written work we sent both to Ms. O'Connell and to Mr. Gant, but I don't -- and if I was sending an email about something about the case, it would be sent to both unless there was some reason not to, and I can't think of one, but I don't recall having conversations with him or reviewing emails from him, or not that I remember.

Q    And so we established that you began working on Mr. Fields' case in August of 2003.  What did you do after you were assigned to work on his case?  How did you begin your work?

A    I traveled to the jail.  I met Mr. Fields.  He and I sat down and talked about his background.  He was very helpful and able to get me contact information for his immediate and some of his extended family.  We talked about places where he had gone to school.  He had been in the military.  He was able to give me those dates.  Mental health care, medical care, he was able to provide the names of those organizations.  So that is pretty much what we discussed.

We did not discuss the crime.  We just discussed people and relationships that were in his life at that time and those that had been in the past, just everything about him that we could discuss so that I could now go and talk to his family and try to obtain those records and continue the process.

Q    I am going to show you another exhibit, it is Defendant's Exhibit 45.  Bear with me a moment.  (PAUSE)  And I can scroll

through this document if you would, but do you recognize Defendant's Exhibit 45?

A    I do.

Q    And what is it?

A    This is a task list. And I just -- I just feel the need to say that Ron Lax did not prepare this. I did and I don't know why his name is on here, but that is neither here nor there. In any case that I had this was a helpful document quite frankly to me and to the attorneys, I believe, to show the types of information that had been obtained and where we were in the process. Obviously if it was shaded the records had been collected, but this gave me a good way of knowing who was left to interview, records to follow up with, and that kind of thing.

Q    Do you see the first gold heading that says, "Records to Collect?"

A    Yes.

Q    How did you identify the records that you were hoping to collect in this case?

A    In this case I think most of the information came from family members and just -- I don't -- like I say, everyone in Mr. Fields' family and everyone I spoke to was very cooperative. So this wasn't information that I had to pull from people. They were able to provide me dates and talk about records and other people to interview so it just came from there.

Q    In deciding who you should interview, did you have

conversations with either of Mr. Fields' attorneys when making those decisions?

A    We discussed who needed to be interviewed because several of the interviews were – well, some were in Virginia and some were in east Tennessee and -- and certainly it was a discussion, but quite frankly it was more of me pointing out that these were people that I felt were significant and Julia agreed with that.

Q    And which lawyers were those conversations with?

A    Ms. O'Connell.  I'm sorry, yeah.

Q    And how did you decide what topics to cover with those witnesses when you interviewed them?

A    Well, certainly from experience I know, but quite frankly even beyond that the TBA has written guidelines for capital cases and they are kind of considered the best reference that there can be as far as building your case and knowing the process of how to get there.  And it is an outline of questions you should ask.  You know, how was Mr. Fields' when he got angry?  How was Mr. Fields when he was happy?  Things about relationships, about attitudes and decisions and all kinds of things that people will tell you in interviews.

Q    And did you discuss which topics to cover with witnesses with either Ms. O'Connell or Mr. Gant?

A    I don't recall that, no.

Q    And did you document the interviews you had with witnesses

in this case?

A    That I've interviewed witnesses in the case or what. . .

Q    I'm sorry.  Did you document or write down notes or a memo of your conversations that you had with the witnesses in this case?

A    Oh, yes.  I'm sorry.  We -- I did not use a recorder.  I never used a tape recorder.  And I handwrote my notes and those notes were retained and from the notes I typed the interviews which were sent to the attorneys, but every person who was inter-viewed, there was a memo prepared.

Q    And which attorneys did you send those memos to once you completed them?

A    To Mr. Gant and to Ms. O'Connell.

Q    But not Mr. Derryberry?

A    No.  He was in the same office as Julia, and I could just only assume that she would have shared it with him.

Q    And int eh course of your mitigation investigation, did you learn anything about Mr. Fields' birth?

A    Yes.  That was, I guess, a topic that was brought up by everyone, but the first person I talked to about that was his mother.  And his mother told me, in length, about this story, that he was -- he was born and – and I don't recall if he was premature or -- I don't think that was the case.  But at any rate, he began having problems breathing and wasn't getting enough oxygen and it was a respiratory disorder.  And the issue was so

severe that a priest was brought in to give last rites. Fortunately that wasn't needed, but that was how serious his birth was.

Q    And at what point in your investigation did Mr. Fields' mother and family tell you about the circumstances of his birth? And I am not asking you for an exact date, but just a ballpark date.

A    Well, just whenever I interviewed her, whatever the memo reflects as the date that I initially interviewed her, that's when the topic came up.

Q    And was that information significant to you?

A    I'm sorry. Say that one more time.

Q    Was that information about Mr. Fields' birth significant to you as a mitigation specialist?

A    Well, anytime I hear about a child who has very little (sic) Apgar scores or where it is documented that he is not getting oxygen, then in my mind there is always a possibility of brain damage, either resulting in intellectual disability or in some other way throughout his life.

Q    And I know you can't recall the date on which Mr. Fields' – Edward Fields' mother told you about the circumstances of his birth, but do you recall whether it was early on in your investigation?

A    I -- no, I don't. I'm sorry. I just remember her being the first person I talked to.

Q    Okay. I am going to show you what has been marked as

Defendant's Exhibit 3.

A    Okay.

Q    And let me know if you would like me to scroll through it, but do you recognize this document?

A    I do, I do.

Q    And what is it?

A    This is -- excuse me -- it is entitled "Preliminary Assessment." This is what -- if it had been used in the hearing or presented more formally, this would have then been entitled a social history. The reason that this was done this way was because actually there were still some records that I needed to follow up on and that hadn't been collected, but this was I think a good way for the attorneys to see an overview of Mr. Fields' background and decide if they wanted to use that or certainly -- well, I can't imagine that they wouldn't want their experts to see this. Any expert wants to see background information about their client that goes along with their testing and their assessment and that kind of thing, so that was the purpose.

Q    And did you include in this assessment that you put together the information you had learned about Mr. Fields' birth?

A    Yes, I did.

Q    And I am going to scroll through. Do you recall when you wrote this document?

A    When I wrote it?

Q    Yes.

A    No, I don't.  I would -- I'm sorry.  I would think it would be closer to the time of the hearing, but I really don't recall.  Well, I see the date on it now.

Q    I know, sorry.  I was going to -- sorry.  I forget that my screen is shared -- I am also looking at this.

I am going to show you the second page.  Do you see where it is dated September 11th, 2003?

A    Yes.

Q    Do you know why you would have dated it September 11th, 2003?

A    I have no idea.  That is obviously a typo.  I have no idea why I. . .

Q    Okay.  And at some point did you discuss with Mr. Fields' attorneys what you had learned about the circumstances of his birth?

A    I certainly talked to Julia about it.  I don't recall talking to Skip about it.

Q    And I am now going to show you a different exhibit.  I am going to show you Defendant's Exhibit 255.

THE COURT:  Before we move on, Ms. Nelson-Major, do you -- Exhibit 3 had not been pre-admitted.  Are you wanting to admit that exhibit?

MS. NELSON-MAJOR:  Yes.  At this time I would like to move, with permission, the admission of Defendant's Exhibit Number 3.

MR. WILSON: Your Honor, the government has no objection on the grounds that this is what Ms. Shettles did, but not for the truth of what is asserted therein.

THE COURT: All right. Well, I mean, she has testified that she prepared it. Defendant's Exhibit 3 is admitted.

MS. NELSON-MAJOR: Thank you, Your Honor.

**BY MS. NELSON-MAJOR:**

Q    Ms. Shettles, I am showing you what has been marked as Defendant's Exhibit 255.

A    Yes.

MS. NELSON-MAJOR: I would also note that the government has -- this is not pre-admitted as well, but may I ask a couple of questions to lay the foundation?

THE COURT:   You may.

MS. NELSON-MAJOR: Okay.

**BY MS. NELSON-MAJOR**:

Q    Do you recognize this document?

A    Yes, I do.

Q    And what is it?

A    This is my timesheets. On every case -- excuse me, I'm sorry. On every case we documented anything we did on the case for billing purposes and that's an example of the timesheet.

Q    Was it important to be complete and accurate when you were compiling your timesheets?

A    I am sorry. One more time?

Q     Yes.  Was it important to be complete and accurate when putting together your time sheets?

A     How -- how important for it to be accurate?

Q     Yes.

A     Oh, well, it was very important.  It is very important to me. They are certainly -- the timesheets are reviewed.  I certainly assume that the attorneys review them.  I don't know.  But prior to us being paid, I would think that they have to go over them. So it is certainly something that I want to be accurate before it is presented anywhere.

MS. NELSON-MAJOR:  And at this time I would move for the admission of Document -- excuse me -- Defendant's Exhibit 255.

THE COURT:  Is this a business record kept in the ordinary course?

MS. NELSON-MAJOR:  Yes, but more --

THE COURT:  You need to ask the witness that.

MS.NELSON-MAJOR:  Sorry.  I thought those questions were getting at that.

BY MS. NELSON-MAJOR:

Q     Ms. Shettles, did you keep this record in the ordinary course of your work as a mitigation specialist?

A     Yes.

Q     And would you enter your time entries as you were working on a --

A    Yes, it was done -- like, for instance, when a task would be started or an interview, the time would be noted -- to begin with, the time would be noted.  And then the entry would be made for the day of different things on the case.

MS. NELSON-MAJOR:  I would note that the government has objected on relevance grounds rather than hearsay grounds.

THE COURT:  Okay.  Well, are you moving for admission now?

MS. NELSON-MAJOR:  I am moving for admission of Defendant's Exhibit 255.

MR. WILSON:  Same objection as to relevance.

THE COURT:  All right.  Defendant's Exhibit 255 is admitted.

BY MS. NELSON-MAJOR:

Q    Okay.  So in between the date column on the left edge of the document and the time column, there is three letter initials.  Can you explain what those are?

A    They are -- the GJS is my initial.  Whoever did the work, whether it be another investigator or my boss reviewing things in the file, our initials are put that way and the timekeeper would then enter the time appropriately.

Q    And is R-L-L Ron Lax?

A    Yes, it is.

Q    And is J-A-H Julie Hackenmiller (sic)?

A     It is.

Q     And what about A-D-F?

A     That's Allison Fraiser.  Allison did locations (sic) in our office.

Q     And who is Julie Hackenmiller?

A     She was another mitigation specialist, and I think at the time she was still working in our Nashville office, and she had several Nashville and Kentucky cases.

Q     I am now showing you Page 16 of Defendant's Exhibit 255. And I would like to direct your attention to the entry from October 31st, 2003, at 10:00 a.m.  Let me know when you have found it.

A     Yes, I see it, right.

Q     And what was it for, that time entry?

A     (NO RESPONSE)

Q     Does it say research hypoxia at birth/brain effects?

A     Right.

Q     Was this your time entry or someone else's at your firm?

A     This -- no, Julie was doing that.  She did a great deal of research on her own cases and helped me with mine in issues that involved possible experts or things to look into.  And so I assume that was something either I asked her or in talking about cases, she may have volunteered to do that.

Q     And why in connection with Mr. Fields' case would Julie have been researching hypoxia and brain effects on October 31st of 2003?

A    I, I -- I imagine I asked her to, to help me with that research based on what I knew about his birth and looking into possible affects of that.

Q    And what, if any, additional investigation did you do concerning Mr. Fields' birth, after you had learned about the circumstances?

A    About his birth, about the issues at birth?

Q    Yes.

A    Well, certainly when the records were obtained they were extremely difficult to read, but – and I believe another copy actually was obtained at a later time that was a little better, but that information was certainly sent to the attorneys and to alert them that this was an issue that they most likely wanted to get an expert to see Mr. Fields.

Q    And you said you obtained a copy of Mr. Fields' birth records that were difficult to read, but at some point later in time you saw a copy that was more legible.  Prior to trial in Mr. Fields' case were you able to obtain a more legible copy or did that come after Mr. Fields' trial?

A    It may have been after.  I don't recall.

Q    Oka.

A    May I tell you something?

        MR. WILSON:  Objection –

        THE COURT:  You can't –

A    The batteries in my hearing aid have –

MS. NELSON-MAJOR:  I'm sorry.  She is needing to change her hearing aids.

A      -- and I am needing to change them.

BY MS. NELSON-MAJOR:

Q      Ms. Shettles, do you --

A      It will take less than a minute.

MS. NELSON-MAJOR:  Can we pause while she changes the battery in her hearing aids?

THE COURT:  Yes, please.

A      I'm sorry.

BY MS. NELSON-MAJOR:

Q      Yes.  Ms. Shettles, go ahead and change your batteries.  Thank you.

A      Okay.  It will just take a second.

(PAUSE)

BY THE WITNESS:

A      I'm back.  I'm sorry.

BY MS. NELSON-MAJOR:

Q      That's okay.  Are you able to hear me, Ms. Shettles?

A      Yes, thank you.

Q      I am going to show you what has been marked as Defendant's Exhibit 53.  If you could take a minute and look at the document I am showing you.

A      Okay.

Q      And is this an email thread between you and Ms. O'Connell

from June 13th, 2005?

A    Yeah, I see that.

Q    And I am going to direct you to the email that appears at the bottom of the page from Ms. O'Connell to you.  Do you see –

A    Yes.

Q    Do you see where it says, "I am going to ask the judge to issue a subpoena duces tecum for Ed's birth records."

A    Okay.

Q    "I want to give it one last try."

A    Okay.

Q    Did Ms. O'Connell tell you why she was making one last try to get Mr. Fields' birth records?

A    I thought we had them.  Maybe we didn't, but. . .I don't know. I thought we had them prior to that time, but I guess I am not recalling correctly.

Q    And you mentioned earlier that the records that you obtained were difficult to read; is that right?

A    Yes.

Q    Okay.  During the pendency of Mr. Fields' post-conviction proceedings, are you aware that my office, being the Federal Public Defender's office in Philadelphia, obtained a copy of Mr. Fields' birth records?

A    I think I knew that.  I believe so.

Q    And did someone from my office show you those records?

A    I'm sure that's the case.  Maybe that's what I'm recalling.

Q    I am now going to show you what has been marked as Defendant's Exhibit 1.

A    Okay.

Q    Do you recognize this document?

A    Yeah, I do.  It's a little difficult to read, but, yes, I recognize them, yes.

Q    And if you had obtained a more legible copy of Mr. Fields' birth records, what would you have done with those records prior to trial?

A    Well, certainly they would have gone to the attorneys and any expert that they had chosen to be able to assist and testify on Mr. Fields' behalf.

Q    And I am going to direct your attention back to Defendant's Exhibit 3.  And you previously testified that this is a document you compiled after completing a portion of your mitigation investigation.

A    Yes.

Q    Why is it labeled preliminary assessment?

A    What is a preliminary assessment?

Q    I just -- let me be more specific.  Why is it preliminary?

A    Because it wasn't completed because I didn't have all of the records and because I didn't want -- I wanted the attorneys to see if they felt like it was appropriate to give to the attorneys, if it was helpful background information.  It just wasn't completed.  It would have been entitled social history if it had been completed,

but at that point I didn't feel like it was finished.

Q    And you said whether it would be appropriate to give it to the attorneys.  Did you mean Ms. O'Connell and Mr. Gant, or were you saying it would be appropriate for them to give it to someone else?  I wasn't sure what you meant.

A    Well, I am just saying they -- this would be given to the attorney and if the attorney had their experts and felt that it was an appropriate document for the experts to have, then the attorneys would have sent that on.

Q    And had you planned to write that final social history assessment in this case?

A    I did not write a final social history.

Q    And why not?

A    I wasn't asked to and it seemed to me like a waste of resources -- (inaudible) –

MR. WILSON:  Objection (inaudible) --

THE COURT:  Overruled.

BY THE WITNESS:

A    -- since the majority of the information was in this assessment and had been completed.

Q    Were you able to -- I am going to ask you to repeat your answer, Ms. Shettles, because there was a little bit of noise in the courtroom.

A    Well, I lost my train of thought.

Q    My question was -- and I'll ask it in two parts.  Were you – did

you write a final assessment in this case?

A   I didn't write a social history, as I said, because I wasn't asked to and that would have been a waste of resources just to make another document and not knowing if it was going to be used or not.  I don't know if this document was given to the experts, I am not sure, but it was certainly available for them to review.

Q   And you personally didn't give this document to any of the experts in the case; is that right?

A   I personally didn't what?

Q   You said I don't know whether this was given to the experts. You --

A   Right.

Q   I was following up to ask, did you give this document to any of the experts in the case?

A   No, not  unless the attorney -- certainly if the attorney asked me to send it on, I would, but not independently I wouldn't.

Q   And is that a general practice, that you don't send documents to experts unless you are asked to do so?

A   Correct.

Q   And if you had been asked to turn this in to a final social history, could you have done that?

A   Oh, yes.

Q   And have you done that in other cases?

A   Yes, many.

Q    And in those other cases have the attorneys, if you know, provided your social history to mental health experts?

A    Yes.

Q    I will try to speak louder over the parade.

THE COURT:  There is a Muskogee homecoming parade going down Broadway, I believe, so it may get loud because we need something else to happen.  See how little power I have? I can't stop the homecoming parade.

MS. NELSON-MAJOR:  I am happy to keep going over the parade.

THE COURT:  I would rather keep going even over the parade.

MS. NELSON-MAJOR:  Okay, yes.

BY MS. NELSON-MAJOR:

Q    And you probably can't hear it Ms. Shettles, but there is a homecoming parade outside the courthouse window right now.

A    Oh, how festive.

Q    So I will try to speak up.  So I think I had asked you if you are aware in those other cases have attorneys provided your social history to mental health experts?

A    Yes.

Q    And if you know have those experts relied on your social history when formulating opinions about brain damage?

A    I know that because they referenced information that was in there.

Q    And you testified earlier that you provided this preliminary assessment to Mr. Fields' attorneys.  Did you have conversations with any of his attorneys about what you had found and outlined in this document?

A    Yes, I'm sure – I certainly don't recall talking to Skip, but I am certain that I talked to Julia about it, yes.  In the --

Q    In particular –

A    -- same --

Q    I'm sorry.  I interrupted you.

A    Yeah.  I was just going to say that's -- that's a pretty big point and to learn about that early.  So I am sure I told her right away about it.

Q    And when you say, "that's a really big point," what were you referring to?

A    I mean the possibility of Mr. Fields having brain damage.

Q    Okay.  And do you recall having meetings -- and I mean in-person meetings with the attorneys in Mr. Fields' case?

A    Meetings with the attorneys?

Q    In person.

A    Hmmm. . .hmmm. . .no, I don't.

Q    Was there contacts --

A    No.

Q    -- over the phone?

A    I don't recall phone conferences.  I recall phone calls to Julia, but not phone conferences.

Q     And by phone conferences, do you mean conference calls with more than just Ms. O'Connell, someone else was --

A     Right.

Q     Okay.  I am now going to show you Defendant's Exhibit 99.

A     What was a 99?

Q     99, and I am going to pull it up in just a moment.  Okay.  Is this an email thread between you, Mr. Gant, Ms. O'Connell and with Mr. Lax cc'd?

A     Right.

Q     And I am going to direct you -- if you can, take a moment and take a look at it and then I am going to ask you a question.

(PAUSE)

A     Okay.

Q     I am going to direct you to the email that appears at the top of that page from Mr. Gant dated April 13th, 2004.  Do you see that?

A     Yes.

Q     And do you see where he says, "I am completely unaware of what our expert has been pursuing with respect to this case?"

A     Yes.

Q     And did you have a reaction to that?

A     Did I want a what?

Q     What was your reaction to receiving this email?

A     Well, certainly I -- I mean, I don't recall, but that is -- it is not atypical for Skip to have given this kind of response.  It was kind

of just do whatever you think is best.  That's kind of what I got from it.  So I think that's what Julia tried to do.

Q    And when you say it wasn't atypical, can you explain what you meant by that?

A    By what?  What did I say?  I'm sorry.

Q    I believe you said this kind of response from Mr. Gant wasn't atypical.

A    No, it -- no, I mean, we had had so little contact that something like this was par for the course.  I mean, he just didn't reach out.  He didn't instigate any conversations or anything with regard to the case.  So it doesn't really surprise me, no.

Q    And that level of involvement that you just described, did that apply to the work that was done with experts in this case from your observations?

A    With. . .

Q    That was a terrible question.  Let me rephrase it.

You just described from your impression what Mr. Gant's level of involvement was in this case.

A    Right.

Q    And I asked did that level of involvement apply to the work that was done with experts in this case from your observations?

A    That Mr. Gant contributed?

Q    Yes.

A    I didn't observe anything that he contributed.  There are a lot of things that I don't remember about the case, but I certainly

don't remember any involvement by Skip.  I don't remember a meeting.  I got there after the jury had been selected and --

Q    And I am going to stop you for a moment, Ms. Shettles, because we are going to get to the trial later on and I just want to focus on this question about experts for a moment.

A    I'm sorry.  Okay, no – the answer is no, I didn't see him participate in anything.

Q    I am going to now show you what has been marked as Defendant's Exhibit 46.

A    Okay.

Q    And take a moment and look it over.

A    Okay.

Q    And is this an email from Ms. O'Connell to Mr. Gant and you and –

A    Yes.

Q    -- and Mr. Lax?

A    Right.

Q    And then I am going to direct you to the first paragraph.  Do you –

A    We are going to –

Q    I'm sorry.  Can you take a look at --

A    No, I was just going to --

Q    -- the first paragraph which begins, "We are going to need a neuropsychiatrist –"

A    Right.

Q    -- "for consultation, interpretation of scans, and possible trial testimony."

A    Right.

Q    Do you recall whether you had any suggestions or involvement in hiring the neuropsychiatrist that Ms. O'Connell is referring to?

A    I don't think I had anything certainly to do with the hiring, but in Tennessee we didn't have -- or in Memphis we didn't have neuropsychiatrists, but Dr. Woods, Dr. George Woods had testified at several death penalty conferences and I was aware of him and other attorneys in Tennessee were aware of Dr. Woods and I believe I suggested his name.  And I think Mr. Gant certainly knew Dr. Woods as well.

Q    And you said -- okay, I am going to move on to the next exhibit in the interest of time.  I am going to pull up Defense Exhibit 47.  We are going to look at this document.

A    Okay.

Q    Is this another email chain between Ms. O'Connell and yourself --

A    Yes.

Q    -- dated April 29th, 2004?

A    Right.

Q    And you just mentioned that -- I am sorry.  I am going to direct you to the bottom email, which is from Ms. O'Connell to you.  And she --

A     Okay.

Q     And she is referring to Dr. Woods.  Is that Dr. George Woods who you mentioned a moment ago?

A     Right, yes.

Q     And do you see where she writes, "Dr. Woods said I should not do a PT scan yet and should  hire a good neuropsychologist to perform a battery of tests?"

A     Yes.

Q     And then I am going to turn your attention to your response at the top of the page.

A     Yes.

Q     And who did you recommend to her in response for a possible neuropsychologist?

A     Dr. Pam Auble.  She is a –

Q     No, I'm sorry.  Go ahead.

A     No, go ahead.  I'm sorry.

Q     Okay.  Had you worked with Ms. Auble before or excuse me, Dr. Auble before?

A     Yes, on several cases.

Q     And beyond suggesting Dr. Auble, did you do anything else to help Ms. O'Connell locate and retain a neuropsychologist?

A     I don't remember who it would be.

Q     And did Ms. O'Connell ask you to do anything further to locate someone who might be able to interpret brain imaging, like an MRI?

A    Right.

Q    Sorry, I'm not sure if you heard my question.  My question was did Ms. O'Connell ask you to do anything to help locate a doctor or other mental health professional who could interpret a brain image, like an MRI?

A    Oh, do a MRI?  I don't remember if she did.  I am sure if she did I would have done my best, but I just don't recall, but I think that -- I think that I probably reached out to some people and tried to help, but specifically I don't remember them.

Q    And do you recall Ms. O'Connell ever telling you that she had decided not to obtain imaging of Mr. Fields' brain?

A    I don't remember, but I am -- but from this email if Dr. Woods felt it wouldn't be a good idea, I doubt that she would go ahead and try to get it done.

Q    But you have no recall of conversations with Ms. O'Connell about her decision making around whether or not to have Mr. Fields subjected to a brain MRI or other imaging; is that right?

A    I just don't remember.  I am sorry.

Q    And anytime you don't remember, that is all -- you just need to let us know.

Do you recall that Ms. O'Connell eventually did hire a neuropsychologist named Michael Gelbort?

A    Yes, that name is very familiar.

Q    And at some point in time did Ms. O'Connell discuss with you the results of Dr. Gelbort' neuropsychological evaluation of

Mr. Fields?

A    I can't imagine that she didn't, but I don't recall what the results were.

Q    Okay. I am now going to show you Defendant's Exhibit 49. Is this an email that you sent to Ms. Shettle -- oh, excuse me, you are Ms. Shettles -- that you sent to Mr. Lax on August 25th, 2004?

A    Right, yes.

Q    And can you tell me what you are conveying to Mr. Lax in this email?

A    That Julia O'Connell is letting me know that Mr. Fields had been tested by a neuropsychologist and very soon Dr. Woods will begin testing. The psych tests denote front lobe damage which is  fairly severe.  She is hopeful of Dr. Woods' tests. Just wanted to pass this on.

Q    Okay, and we will pause there for now.  I wanted to ask you, why did you describe the results of Dr. Gelbort's testing as denoting frontal lobe damage that is fairly severe?

A    I was just repeating what Julia O'Connell had told me.

Q    Did Ms. O'Connell ever express to you doubt or skepticism about Dr. Gelbort's findings?

A    It seems that she did and I don't -- I don't know the specifics. I can't imagine that I didn't talk to her about it, but I just don't recall what she said or her issues or her possible problems with that expert.  I just don't know.

Q    And when you say possible problems with the expert, do you mean potentially his report, his findings, or how it was to work with him, or do you have no memory of what she was expressing doubt about?

A    I don't.  Her concerns, I just don't recall.

Q    Okay.  I am going to direct your attention back to Document 255, which you have testified are the timesheets of the work that you did on Mr. Fields' case.

A    Yes.

Q    And I am going to show you an entry that appears on Page 59 of this document.  I am going to direct your attention to an entry toward the bottom of the page from October 9th, 2004 at 2:06 p.m.  Do you see that entry?

A    I'm having trouble seeing.  . .

Q    Okay.  Let me zoom in and maybe it will be a bit easier to see.

A    Okay, that's helpful.  So what –

Q    So I am asking you to look at –

A    What date did you say?

Q    -- an entry from October 9th, 2004 at 2:06 p.m.  Do you see that entry?

A    Yes, yes, I do.

Q    And what is it for?

A    It's a conference call with the attorneys and the experts.  So I don't know if the -- I would assume Dr. Woods was a part of

that call. I don't recall what other expert might have been discussed. I don't remember the content of this, but. . .I am sorry. I don't remember.

Q    And I am not going to ask you just to speculate on something you don't remember.

A    Okay.

Q    I am going to now show you –

THE COURT: Ms. Nelson-Major, can I just inquire, it is almost 12:30. How far or how much left do you have or do you --

MS. NELSON-MAJOR: I am about two-thirds of the way through. Maybe half an hour, forty-five minutes left.

THE COURT: All right. Well, it is -- I hate to hold Ms. Shettles over, but I'm afraid -- we are getting – our folks up here need a little break. It is 12:30. Tell me if we are at a good breaking point. If not and we can get there shortly, then we will do that.

MS. NELSON-MAJOR: I think now is a good time.

THE COURT: Okay. Since she can't hear me I guess, then maybe you need to tell Ms. Shettles we are going to take a lunch break of one hour and we will be back at 1:30 so we can finish this witness up hopefully and then move on to the next one.

All right. We will be in recess until 1:30.

(12:30 p.m.)

(LUNCH RECESS)

<u>COURT IN SESSION</u>

(12:32 p.m.)

THE COURT: All right. We are back on the record after our lunch break. At least all of the counsel I guess we need are here.

Everybody ready to proceed?

MS. NELSON-MAJOR: Your Honor, I just wanted to make you aware of an issue that the camera that is facing you is currently not working because Ms. Yost stepped out and we need her password. Ms. Ensler is calling for it. But if you are okay with proceeding without the video, then we can do that or –

THE COURT: Well, she can't hear me anyway. I don't know whether it matters if she can see me if she can't hear me. I would rather her hear me than see me frankly. No, I would rather just get going and if and when she gets back, we can let my mug become a part of the video. So, yes, if everybody is. . . other than that, if we are ready to go, let's get to it.

MS. NELSON-MAJOR: Okay. Thank you, Your Honor.

THE COURT: All right.

**<u>DIRECT EXAMINATION CONTINUED</u>**

BY MS. NELSON-MAJOR:

Q    Ms. Shettles, are you able to hear and see me?

A    Yes.

Q    Okay. I am going to show you what has been marked as Defendant's Exhibit 51. Bear with me while I get this shared. . .

can you see Defendant's Exhibit 51?

A    Not terribly well.  It is not very clear.  I can. . .that's better, yes, I can see it now.

Q    Is this an email that you sent Ms. O'Connell on December 10th, 2004?

A    Yes.

Q    And I am going to direct you to the third paragraph.

A    Okay.

Q    Do you see where you wrote, "Also apparently Eddie is talking with Cherie," C-H-E-R- I-E, "about learning of frontal lobe damage."  Margaret said that type of damage affects your judgment.  Things make more sense to her now."

A    Yes.

Q    Who is Cherie?

A    Cherie is Mr. Fields' sister, older sister.

Q    And who is Margaret?

A    His mother.

Q    Just a moment.

(PAUSE)

Q    And do you recall any response from Ms. O'Connell to this email that you sent on December 10th, 2004?

A    No, I don't.  If we had a conversation, it should have been in my notes or in my timesheets, but I don't remember a conversation.

Q    Do you know how Eddie or Mr. Fields learned of frontal

lobe damage?

A    I would – and this is just an assumption, but I would assume --

MR. WILSON:  Objection --

A    -- that Julia told him --

THE COURT:  Yes, she can't – let's not assume.  If she knows, she knows.  If she doesn't, she doesn't.

A    -- about the experts –

BY MS. NELSON-MAJOR:

Q    Ms. Shettles, –

A    Yes.

Q    -- only if you recall.  I don't want to ask you to make assumptions or to speculate.  So only if you recall, do you know how Mr. Fields learned of frontal lobe damage?

A    No.

Q    Okay.  And when you were talking with Margaret about Mr. Fields' brain damage on December 10th of 2004, was that based on your understanding of Dr. Gelbort's findings as Ms. O'Connell had communicated them to you?

MR. WILSON:  Objection, Your Honor.

A    Yes.

MR. WILSON:  I would object to the leading and suggestive question.

THE COURT:  I know.  If we can rephrase it --

MS. NELSON-MAJOR:  Sure.

THE COURT:  Try to ask it in a non-leading way.

The objection is sustained.

BY MS. NELSON-MAJOR:

Q     So in this email you are describing a conversation you had with Margaret, is that right?

A     Yes.

Q     And in this email are you describing anything about a conversation that Cherie had with Mr. Fields?

A     Yes.

Q     And what is the content of that conversation that you are describing to Ms. O'Connell?

A     Eddie is talking with his sister that he has learned of the frontal lobe damage and then Margaret is relating that information to me.  And Margaret goes on to say that type of damage affects your judgment.  Things make more sense to her now.

Q     And again only if you know, how did Eddie learn of the front lobe damage that you just mentioned?

A     I don't know.

Q     And at the time that you were talking to Mr. Fields' family about the front lobe damage, was it your belief that Ms. O'Connell intended to present that evidence at trial?

A     Yes.

Q     And why was that your belief?

A     And what?

Q     Why did you think at this point in time Ms. O'Connell intended

to present evidence of Mr. Fields' brain damage at trial?

A    I believed that she was going to use both experts but that the front lobe damage testimony would give a better understanding of Mr. Fields' reasoning, his decisions.  I don't know why that information was not presented.

Q    And when you say both experts, who are you referring to?

A    Dr. Woods.

Q    And you stated that it was your understanding that she intended to present both experts.  Again, where did you get that understanding from?

A    Ms. O'Connell.

Q    Okay.  I am now going to show you Defendant's -- oh, excuse me – Government's Exhibit 50.  And just to back up one moment, you said it was your belief that Ms. O'Connell intended to call both experts.  I heard you say Mr. Woods or -- excuse me – I mean Dr. Woods.

A    Yes.

Q    Who was the other expert you were referring to?

A    Dr. Brian. . .his – well, his last name I am not recalling.

Q    So it --

A    The doctor that did the testing on the brain damage.

Q    So it was your belief that Ms. O'Connell intended to call Dr. Woods and the doctor who had found frontal lobe damage?

A    Yes.

Q    Okay.  I am now showing you what has been marked as

Government's Exhibit 50.

A    Okay.

Q    My apologies.  Let me make that a bit bigger for you to see. Do you recognize any portion of these handwritten notes as your handwriting?

A    It is my handwriting, except for the last two paragraphs. "They will do an exam, but we have to find a neuropsychiatrist to read it and testify.  You think we can find a traveling neuropsych? None in Tulsa who will get involved."

     And then that's my writing.  It says, "Maybe Dr. William Kenne in Nashville.  He's good.  I'll send," I guess, "his email information," or maybe send him an email.

Q    So just to be clear, the portion that you wrote begins with, "Maybe Dr. William. . ." am I understanding that correctly?

A    Yes, that's my writing.

Q    And do you know who wrote the top portion of this document?

A    I really don't.  It would make sense that it's -- it's --

Q    Well, I don't want you to --

A    It's Julia's writing --

Q    Ms. Shettles, I just -- only if you know.

A    I am sorry.  No, I don't.  I apologize.

Q    Okay.  I am going to show you what has been marked as Defendant's Exhibit 54.  Is this an email thread between you and Ms. Shettles -- I did it again.  Excuse me.  Between you and

Ms. O'Connell dated June 21st, 2005?

A    Yes.

Q    Okay. And I am going to direct your attention to the bottom email from Ms. O'Connell to you.

A    Okay.

Q    Do you see where Ms. O'Connell wrote, "I'm afraid we will have to go ahead and prepare our mitigation case?

A    Yes.

Q    Prior to this date did you anticipate that the case would settle?

A    Yes.

Q    And why did you believe that the case would settle?

A    Why did I believe that the case would settle?

Q    Yes.

A    I thought Mr. Fields had pled guilty and there was just to be a sentencing hearing and not a trial.

Q    So at this point in time when Ms. O'Connell is sending you this email she is telling you to prepare the mitigation case, which correct me if I am wrong, but is that the penalty phase or the guilt phase?

A    The penalty phase.

Q    And so at the point that this email was sent to you, you are preparing for the mitigation case. At that point in time did you still think the case was going to settle?

A    Yes, we were hoping so.

1114

Q    And why did you think the mitigation case was going to – or

excuse me -- the penalty.  Strike that.  Why did you think the case

was going to settle at the point that you were preparing for the

mitigation case?

A    I don't remember the reason that I thought it would settle.

I know that was the goal.  I don't know what steps were taken to

try to reach that goal.  And so I think that this was a warning of we

need to prepare for the penalty phase and we need to get the

mitigation case going.

Q    And what did you do in response to Ms. O'Connell telling you

that we need to prepare the mitigation case?

A    I spoke with  -- we had talked about Mr. Fields' former wife

and one of his children testifying, and I said that I would talk to

both of them and ask them about testifying at the hearing.

Q    And at some point obviously prior to trial did you and Ms.

O'Connell discuss whether you would attend trial in person?

A    I think -- I think I was just asked to -- one of the main reasons

probably was to help with the family members that were there,

family members who were going to testify and to help Julia in

any way that I could.

Q    I am going to show you what has been marked as

Defendant's Exhibit 56.  So is this another email thread between

you and Ms. O'Connell?

A    Yes.

Q    And I am going to ask you to take a look at the email on

the bottom of the page that Ms. O'Connell sent to you on July 4th, 2005.

A    Right.  Can you make it just a little bit bigger?

Q    Yes, of course.

A    I'm sorry.

Q    And I would ask you to --

A    Okay.

Q    -- take a look at the -- it is hard to see paragraph breaks, but where it starts, "First I haven't heard from Cherie or Teresa."

A    Yes, okay.

Q    And then Ms. O'Connell asks, "Can you please call them and talk with them?"

A    Right.

Q    Who is Teresa?

A    Teresa is Mr. Fields' ex-wife.

Q    Prior to the trial commencing, did you have any discussions about which experts counsel intended to present at the penalty phase?

A    I think it was -- I know Dr. Woods was preparing to testify. I don't remember if the other expert was preparing to testify.

Q    So at this point in time you don't have a memory of who, besides Dr. Woods, was going to be called to testify?  Is that correct?

A    Correct.

Q    Okay.  And prior to trial were you present for any conversa-

tions between Ms. O'Connell and Mr. Gant about what the division of responsibilities would be at trial?

A    The biggest thing I recall was that Mr. Gant was to be responsible for jury selection. He was very well known to do that and very comfortable doing that. And then as far as the other experts or other witnesses, I don't recall that he was going to examine them or have any part with their testimony.

Q    And do you recall at what point in the trial you arrived in Muskogee?

A    It was I believe just after jury selection or maybe jury selection was almost complete, but around that time.

Q    And would looking at your timesheets refresh your recollection as to the exact day that you arrived in Muskogee?

A    Yes.

Q    I am going to pull up Defendant's Exhibit 255. And I am going to turn to Page 82, and I am going to ask you to take a look at the entries on this page and see if that refreshes your recollection as to when you arrived in Muskogee.

(PAUSE)

Q    I am not sharing the screen, am I? I'm sorry, Ms. Shettles. I thought the exhibit was visible to you.

A    That's okay.

Q    Okay. Now are you able to see -- I'll make the font bigger.

A    Yes, thank you. Yes, I can see it.

Q    Okay.

A    Yes, I see when I traveled.

Q    Okay.  And after looking at this document, do you now remember when you traveled to Muskogee?

A    Yes, July 17th, 2005.

Q    And after you arrived on July 17th, 2005, did you attend court each day that trial was in session?

A    I did.

Q    And where did you sit in the courtroom when trial was happening?

A    Where did I sit?

Q    Yes.

A    I sat in the courtroom.  We were three rows from the front on the left side.  I remember that.

Q    And what did you do when court was in session and you were present?

A    I was just observing and listening.  At that time I didn't have hearing aides, it was certainly a lot easier, but during the breaks, during the recesses speaking with Julia, asking if she needed anything.  I don't remember when Cherie and Mr. Fields's wife, those witnesses, arrived, but I was then seated with them when they got there.

Q    And when you were in town for the trial where did you stay?

A    Did the trial what?  What did you ask?

Q    When you were in town for the trial where did you stay?  At a hotel or –

A    No, it was -- I guess it was like a Airbnb.  I am not sure. It was a home, someone's home, and the arrangements -- I am not sure where they were made, but we were all there for the duration of the trial and it was – like I said, it was set up like a house.  It had a kitchen.  We ate our meals there.  Everything – after court, that's where we went.

Q    And when you say we were all there, who is we?

A    Myself, Julia, Skip, his wife, and Barry that I recall.

Q    And were you able to observe some of the interactions between Mr. Gant, Ms. O'Connell, and Mr. Derryberry in the evenings after trial adjourned for the day?

A    There was not a lot of discussion with Skip.  He was present, he was there every evening, but there wasn't -- he wasn't discussing the trial or the proceedings or anything.  He was just there with his wife and we had a nice meal.  Julia and Barry and myself would talk about how the day went, what needed to be done the next day, any issues or problems or concerns, that kind of thing.

Q    And when you say you would talk about preparations for court the next day, did you meet with the witnesses that Ms. O'Connell would be presenting the next day?

A    Yes, we did.  She had met them before, but I believe that we certainly met before they testified.

Q    And when I say witnesses, are you understanding that to be lay witnesses and/or expert witnesses?

A    Both.  The -- I don't recall if the witnesses came to the home. They may have, but I imagine we went to them, wherever they were, and then the experts came one night, but I don't remember when that was during the hearing.

Q    So you said you remember experts coming one night.  Am I understanding you to say that you remember meetings with the experts just on one evening during the --

A    That's what I remember, yes.

Q    And during these meetings with the experts, who was present?

A    Julia, Barry, myself, and I believe Skip was present.  I believe he was there when the experts were there.

Q    And when you say Skip was present, do you mean for the conversation or --

A    In the room.

Q    Let me just finish my question, Ms. Shettles.

A    Sorry.

Q    Oh, no, no worries.  There is a delay with the video as well.

When you say Skip was present -- I want to ask you, during the meetings with the experts was Skip part of the conversation or was he just present in the house?

A    No, he was present in the conversation.  I don't remember exactly what he contributed, but he was definitely a part of the conversation at the house.

Q    And was this conversation that you are describing happening

during this meal that you were describing?

A   Yes.

Q   Do you know whether there was a separate conversation after the meal with the experts that you were a part of?

A   I remember the experts being there for quite some time, so I think they were there during dinner and afterwards.  So I believe the conversation just continued until they left.

Q   Did you help Ms. O'Connell prepare the questions that she planned to ask those experts?

A   No, I don't believe I did.

Q   And were you present at any point where one of the experts showed a PowerPoint presentation to either Ms. O'Connell or Mr. Gant?

A   Showed a what?  I'm sorry.

Q   A PowerPoint presentation, like a visual they had prepared to use in court.

A   I recall something like that, yes.  I don't remember what it was of, but I remember something like that.

Q   So during trial, meaning once you are in town for trial, do you recall whether Ms. O'Connell talked to you about whether she planned to present evidence of brain damage at the trial?

A   The best I recall she was concerned about that particular testimony.  I am not certain why, but I think she had made a decision that she would not use that expert with regard to brain damage, but I don't remember why.

Q    You don't remember why.  Do you remember when that decision was made?

A    I believe it was made just the -- the day before Dr. Woods' testimony or when the expert would be.  I believe it was at the end of the hearing, but she didn't make that decision until maybe a day or two prior.

Q    Did Ms. O'Connell help or ask you to help prepare any of the lay witnesses, meaning not the experts, before they testified?

A    She did.  We talked about questions for the lay witnesses.

Q    And did you and Ms. O'Connell ever talk about the possibility that you would testify at Mr. Fields' trial?

A    I don't think it was ever discussed.

Q    And did you and Ms. O'Connell ever have a discussion about whether she would present the evidence you gathered through your social history investigation?

MR. WILSON:  Objection, Your Honor, --

A    No.

MR. WILSON:  -- the issue of social history --

A    That I would present anything?  No.

THE COURT:  Overruled.

MS. NELSON-MAJOR:  Just a moment.  May I confer with counsel?  I think I am just about done.

THE COURT:  You may.

(PAUSE)

MS. NELSON-MAJOR:  No further questions, Your

Honor.

THE COURT:  Okay.  Mr. Wilson, have we worked out how you are going to be able to do this?

MR. WILSON:  We think so.

THE COURT:  Okay.  We will find out, I guess.

MR. WILSON:  Yes.

THE COURT:  Friday afternoon mystery.

**CROSS EXAMINATION**

MR. WILSON:  May I proceed?

THE COURT:  You may.

**BY MR. WILSON**:

Q    Ms. Shettles, can you hear me okay?

THE COURT:  You may need to move your microphone around to the side where it will. . .if there is room to. . . that may be as good as –

MS. NELSON-MAJOR:  Do you have the speaker selected as the E-4108?

(Off the Record Discussion)

MS. NELSON-MAJOR:  I think you need to be plugged into the HDMI for the sound.

MR. WILSON:  I am just going to go over to her computer, if that's okay.

THE COURT:  That works.

MR. WILSON:  Is that okay?

THE COURT:  Can we do that?

MS. NELSON-MAJOR: I am just going to close all of my windows and then you are welcome to –

THE COURT: I understand. We are improvising --

MS. NELSON-MAJOR: Yes.

THE COURT: -- to try to make this work.

BY MR. WILSON:

Q    Ms. Shettles, can you hear me okay?

A    Yes, sir, I can.

Q    I apologize. I had to take another chair to ask you question.

A    Fire off.

Q    Ms. Shettles, based upon your previous testimony, I believe you initially got involved in this case in 2003; is that correct?

A    Yes, sir.

Q    And I believe you testified that early on, once you were retained, that you had an opportunity to go and actually visit with Mr. Fields; is that correct?

A    Yes, sir.

Q    And that's -- and did that take place in the Muskogee County jail or in Tulsa County jail or do you recall?

A    I believe in the Tulsa County jail.

Q    All right. And how many different opportunities did you have to visit with Mr. Fields?

A    Just two on that occasion.

Q    Okay. And when you say on that occasion, you met with him in successive days or. . .

A     Yes, I was there for several days and I believe I saw him the day I arrived and the following day.  And then I was just referencing the occasion that I came -- I'm sorry, I am rambling.  I apologize.

Q     No need to apologize.  Thank you.

Other than those two days did you have an opportunity to meet with Mr. Fields any other time?

A     No, sir.

Q     And during that initial two opportunities, approximately how long did you spend with Mr. Fields?

A     Certainly I could reference my timesheet and tell you exactly, but it would most likely be four or five hours on each day that I saw him.

Q     And Mr. Fields was able to communicate with you during those discussions, I assume?

A     Yes, sir, he was.

Q     And I am not going to ask you specifically about what you talked about twenty-five years ago, but during those conversations I take it that you were seeking personal history information about Mr. Fields and his family; is that correct?

A     Yes.

Q     And was Mr. Fields able to provide that information to you?

A     Yes, he was.

Q     And was he able to tell you about his parents?

A     He was able to tell me about his parents, his family members,

yes.

Q    And extended family as well?

A    Yes.

Q    Did you discuss with him about any potential medical issues that he had?

A    Well, we talked about mental health --

Q    I am not asking you what you asked him.

A    Oh, I'm sorry.

Q    Specifics, did you ask him about medical history?

A    Yes.

Q    And he was able to answer about his own medical history?

A    Yes, sir.

Q    Did you ask him about the medical history of his parents?

A    I am not sure that I did.

Q    Did you remember asking him about the medical history of any other family member?

A    I think I asked in -- because I normally ask in big pictures – does anyone in your family have diabetes or been treated for mental health, I did that, but the specific information Mr. Fields related, I am not sure I remember it, but I asked.

Q    Fair enough.  Did you talk with him about his own employ-ment history?

A    Pardon me, his what?

Q    Employment history.

A    Yes, I did.

Q    And was he able to share with you about his employment history?

A    Yes, sir.

Q    Did you talk with him about his marital history?

A    I did.

Q    And was he able to share about his marital history?

A    He was.

Q    Also about whether or not he had any children?

A    Yes, sir.

Q    And he could provide that –

A    He was able to --

Q    -- information to you?

A    Yes.  He could tell me that.

Q    And I take it that you then took that information and then began to try to find additional information to corroborate that; is that correct?

A    That's correct.

Q    And were you able to corroborate that information?

A    Yes, I was.

Q    And I believe you said that -- obviously your time records will more accurately reflect, but these were not ten minute conversations, correct?

A    And when you created your time records you would show on there approximately how long you actually stayed visiting with him in the jail; is that correct?

A    That's correct.

Q    Okay, thank you.  In addition to your interview with Mr. Fields, you testified about collecting records; is that correct?

A    Yes, sir.

Q    And that included medical records?

A    Yes.

Q    Including mental health records, correct?

A    Yes.

Q    Of not only Mr. Fields, but also family members as well, correct?

A    Yes.

Q    And you would share that information with the defense team --

A    I did, yes, sir.

Q    And when I say the defense team, I am referring to Ms. O'Connell and Mr. Gant.

A    Yes.

Q    And I believe that you also mentioned that you had limited contact with -- but you did have some contact with Barry Derryberry?

A    I had limited contact, yes.

Q    Okay.  You never had contact with the person who was retained to do neuropsychological testing; is that correct?

A    I met with Dr. Woods, but I am not sure if he did the psychological testing.  I don't know.

Q    All right.  Do you remember meeting with any other expert other than Dr. Woods?

A    I don't.

Q    That's okay.  Thank you.  Do you remember – other than coming to Muskogee on I believe July 17th, did you come to Muskogee any other time?  Strike that.  Other than the initial visit when you met with Mr. Fields, did you come to Muskogee any other time other than right before trial?

A    No.

Q    You testified that it was your understanding that Ms. O'Connell had no capital defense experience; is that right?

A    Well, I misspoke.  She didn't have any federal capital defense history.

Q    Okay.

A    But it is my understanding that she had several on the state level.

Q    Okay.  Well, I am going to focus on one email –

        MR. WILSON:  Can you pull that up for me?

Okay, thank you.

BY MR. WILSON:

Q    Okay.  Defendant's Exhibit Number 54. . .

A    Okay.

Q    Can you see that email?

A    Yes, sir, I can.

Q    And would you agree with me that that is an email dated

June 21st of 2005?

A    That's correct.

Q    And it begins with an email sent from Ms. O'Connell to you at about 2:06 in the afternoon, correct?

A    Yes, sir.

Q    Okay. And I believe you testified about this email earlier, but in references in the first paragraph the fact that it looks like the case is going to go to trial and that there is a sticky issue about some evidence possibly being not allowed or a problem or a potential of the door being opened for that information to be presented. When you received an email that talks about opening the door, did you have any idea what that meant?

A    No. I may have known at the time, but I don't know now and I can't --

Q    Okay, that's fair enough. Did you at anytime have any discussions with Ms. O'Connell regarding a person by the name of Dr. Gelbort?

A    That sounds familiar.

Q    Do you recall Ms. O'Connell expressing any frustration about Dr. Gelbort?

A    I'm not sure if it's this particular expert, but I know there was some delay and continued delay with one expert that I believe was frustrating to her. I am not sure if it is the same person you are speaking of.

Q    But you do recall some issue regarding a delay with an

expert?

A    Yes, sir, that's to the best of my recollection.

Q    Did Ms. O'Connell ever express to you any concerns about the report that she may have received from an expert?

A    I'm sure she mentioned it to me, but I just don't remember the content of the report.

Q    Did Ms. O'Connell ever express to you that a report that was received was, quote, "the crappiest I've ever seen?"

A    Was what, sir?

Q    I was afraid of that.  Did she ever -- did she ever express that a report that she received from an expert was not good quality?

A    Well, I am. . .yes, but what it was that was not good, that's what I don't remember.

Q    Well, we are going to talk specifically now about when you came to Muskogee.

A    Okay.

Q    And I believe you testified that that was after jury selection, but the trial was --

A    Yes.

Q    -- actually going on; is that correct?

A    Yes, sir, yes.

Q    And were you asked to come to Muskogee by anyone or did you just decide to come on your own?

A    Oh, no, I would never do that on my own.  I was asked by

Julia to come to the trial.

Q   And do you know what your role was going to be once you got here to Muskogee?

A   My understanding was to help her in any way that I could, but also help with family members that were coming.  The family members that were to testify were all very nervous, as you can imagine.  And so I had a relationship with them, and I was happy to ease their fears and be with them, but I was there every day.

Q   By just looking at your records of your -- of the work that you did, you had multiple conversations with family members during the course of --

A   Yes.

Q   -- the investigation; is that correct?

A   Yes, sir, many.

Q   And you developed a rapport or a relationship with those family members; isn't that correct?

A   (NO RESPONSE)

Q   Is that yes?

A   Yes.  I'm sorry.  Yes, I did.

Q   And previously during direct examination, counsel showed you an email asking you -- from Ms. O'Connell asking you to make contact with some of those family members; is that correct?

A   Yes.

Q   And I assume that you did that?

A    I did.

Q    And so you came to Muskogee, and I believe you testified that you -- did you stay there at the house with everyone else?

A    Oh, yes, oh, yes, sir, I was at the house.

Q    And from the time you were there or that you arrived, did you stay until the trial was completed?

A    I did.

Q    And were you in the courtroom every day during trial?

A    I was.

Q    Everyday that you were in town --

A    Yes.

Q    -- and the trial was going on?

A    Right.

Q    Okay. And you were also at the house during some of the pretrial sessions, planning sessions; is that correct?

A    Yes.

Q    Okay. Now, earlier during direct examination you testified that there was some discussion about the doctor involving (sic) possible brain injury or brain damage not being –

A    Yes.

Q    -- called to testify; is that correct?

A    Right.

Q    Were you aware that Dr. Gelbort was not going to be available to testify?

        MS. NELSON-MAJOR:  Objection, Your Honor.

A    That sounds familiar.

MS. NELSON-MAJOR:  That assumes facts not in evidence.

THE COURT:  You can ask it.  Overruled.

**BY MR. WILSON:**

Q    You can answer the question, ma'am.

A    Oh, okay.  I'm sorry.  I don't remember that he was not going to be available, I don't.

Q    I thought you just said -- never mind.  Did Ms. O'Connell ever express to you any frustration or any concern during these pretrial discussions about Dr. Gelbort not being able to come to Muskogee to testify?

MS. NELSON-MAJOR:  Same objection, Your Honor.

A    I just -- I just don't remember that.

BY MR. WILSON:

Q    So when you were there, Dr. Woods was present; is that correct?

A    Yes, sir.

Q    And I believe counsel ask you about a PowerPoint.  What do you recall about a PowerPoint being discussed at the house?

A    I'm not -- I don't, I don't remember any specifics about a PowerPoint.

Q    But you do remember a PowerPoint being talked about?

A    Yes, sir, it seems to me -- it was a very long time ago and I am just trying to be very truthful in my answers.  I don't recall

what the PowerPoint was for.  I don't remember.

Q     Okay.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  You may.

MR. WILSON:  Stand by, Ms. Shettles.

THE WITNESS:  Yes, sir.

(PAUSE)

MR. WILSON:  No further questions, Your Honor.

THE COURT:  All right.  Any redirect?

MS. NELSON-MAJOR:  No, Your Honor.

THE COURT:  All right, very well.  Since she can't hear me, somebody else is going to have to tell her that she is excused and thank her for her time.

MS. NELSON-MAJOR:  Ms. Shettles, you are excused.  Thank you for coming virtually.

THE WITNESS:  Oh, okay.  Thank you.

MS. NELSON-MAJOR:  And we are just making contact with the next witness to tell him to --

THE COURT:  And we will have a better setup, we hope, with him or are we going to have to do the same thing, or are we going to find out?

MS. NELSON-MAJOR:  I am not sure they have the right hook-up to --

MR. STEWART:  I think he said he fixed it.  We will

find out.

THE COURT:  I am just saying, are we not able to use the lectern like we did with the first video witness?

MR. NELSON-MAJOR;  We can try it.  The next witness would --

THE COURT:  Ideally that would be the way I would prefer it, but, I mean, if you can't, then this is the next best thing. It doesn't make it the best thing; it just makes it the next best thing.

How long do you -- do we think we can get this done in a few minutes or. . .

MS. NELSON-MAJOR:  It will probably take five minutes realistically, but hopefully less than --

THE COURT:  All right.  You do – let me stop bothering you and you do it and we will just -- and I will shut up.  It is hard for me, but I'll try.

(PAUSE)

MS. NELSON-MAJOR:  Your Honor, may I test the audio with the witness?

THE COURT:  You may.

MS. NELSON-MAJOR:  Dr. Bigler, are you able to hear us?

DR. BIGLER:  Yes.  it is a little faint, but I can hear you.

MS. NELSON-MAJOR:  And can you insure that your volume is all of the way turned up and we will do the same.

DR. BIGLER:  Yes, my volume is all of the way up.

MS. NELSON-MAJOR:  Is the court reporter able to hear okay?

COURT REPORTER:  Yes, I can.

DR. BIGLER:  Testing one-two, one-two.  Can you hear?

THE COURT:  We are all good.  All right.  The Defendant can call its next witness.

MS. NELSON-MAJOR:  The Defense calls Dr. Erin Bigler.

THE COURT:  All right.  The Court Clerk will place the Defendant under oath.

COURT CLERK:  Please raise your right hand.

(COMPLIED)

COURT CLERK:  Do you solemnly swear that the testimony you are about to give before this Honorable Court will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

**DR. ERIN BIGLER, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. NELSON-MAJOR:

Q     Dr. Bigler, can you state and spell your name for the record?

A     Yes.  My first name is Erin, E-R-I-N, my middle name is David, typical spelling, D-A-V-I-D, and my last name is Bigler,

B-I-G-L-E-R.

Q    Dr. Bigler, are you able to pull your microphone at all closer? We are able to hear you, but it is a bit faint.

A    Okay.  Let me get the microphone a little bit closer.

Q    Okay.  And are you a licensed psychologist?

A    I am.

Q    And in what states are you licensed?

A    I'm licensed in California where I reside, Utah where I retired from, Texas where I was a professor, and also Hawaii.

Q    And when did you first obtain your license?

A    1975.

Q    And are you board certified in the field of neuropsychology?

A    I am.

Q    And what is the significance of being board certified?

A    It's the highest level of accomplishment by your peers to indicate your competency in a particular field.

Q    And what is neuropsychology as both in academic and clinical fields?

A    So neuropsychology -- it's a compound word, neuro and psychology.  So psychology has always been the study of behavior.  Neuropsychology came about because the underlying brain behavior relationships -- we could actually study behavior and make inferences about how the brain is functioning or not functioning.  And so neuropsychology is the study of the neurologic basis of behavior.

Q    And we are going to show you on the screen what has been marked as Defendant's Exhibit 203.

A    Is that something that I will see?

Q    Yes, in a moment.

A    Yes.

Q    Are you able to see this document now?

A    Yes, yes, it's my curriculum vitae.

Q    You said this is your curriculum vitae?

A    That's correct.

Q    Okay.  And we can scroll through this, but I am going to ask you generally are there any updates to this version of your CV?

A    Well, even though I am retired and emeritus, I am still very involved in research in various national institute of health sponsored research programs.  So what gets updated are new publications.  All of the background information there is the same and has been for decades actually.

Q    Okay.  And can you summarize your educational background, please?

MR. STEWART:  Your Honor, same as before.  Obviously if counsel has any highlights they want to hit, they are free to do that, but we will stipulate that he is an expert. . .

THE COURT:  If you can streamline the qualification process, we will all be better off for it.

MS. NELSON-MAJOR:  I'll streamline the questions and get to it.

THE COURT: All right.

**BY MS. NELSON-MAJOR**:

Q    So, Dr. Bigler, you have a PhD in psychology; is that right?

A    That's correct.

Q    And after you obtained your PhD, what was your employment background?

A    Well, I was a recipient of a National Institute of Health post-doctoral fellowship and that was done at the Barrow, and that's B-A-R-R-O-W, Barrow Neurological Institute at St. Joseph's Hospital and Medical Center in Phoenix, Arizona. That's a teaching training hospital associated with the University of Arizona, and I was there until 1977. When I finished my post-doctoral training, I joined the faculty at the University of Texas, and was likewise recruited by what was then called the Texas Department of Mental Health and Mental Retardation to develop the neuropsychology program -- I am sorry, I forgot to turn that off -- to develop the neuropsychology program for the state of Texas at the Austin State Hospital. So that was the first neuropsychology program statewide in the state of Texas.

Q    Your CV mentions the Brain Imaging and Behavior Laboratory at BYU. What is that and what was your role there?

A    Yes. I actually began that at the University of Texas, and part of that was psychologists measure behavior. I mean, that's what psychology, clinical psychology was all about, was developing tests to assess things like intellectual ability or

1140

academic functioning or memory.  And so psychologists like to measure things and when I was doing my post-doctoral training, that was the introduction of what was then called computerized axial tomography, CAT scanning.  And so now for the first time, you could actually have a brain scan, as coarse (sic) as it was in 1975 when it first came to  St. Joseph's Hospital -- as coarse as it could be, you could still see where a tumor was or a stroke was.  And from a measurement standpoint, what is the size?  There is a clinical rating and then there is more of an empirical rating.  So once I sat up my research program at the University of Texas, it focused on measuring behavior with standard neuropsychological tests and how that would also relate to various aspects of what might be in a brain scan.

Q    And have you received any grants to fund research into neuroimaging issues?

A    Yes, over the years any number of grants.  They are listed in my vitae.

Q    And have you been published in the field of neuroimaging and neuropsychology?

A    That's correct.

Q    And have you authored any textbooks in those fields?

A    That is correct as well.

Q    And is *Neuropsychological Assessment* one of those text-books?

A    Yes, *Neuropsychological Assessment* published by Oxford

University Press is one of those textbooks.

Q    And you are not a medical doctor; is that correct?

A    No, I am not a physician, I am not a M.D.

Q    And you have devoted a substantial part of your career to the study and the analysis of brain imaging.  Do you need a medical degree to do that type of work?

A    No.

Q    And have you been qualified to testify in court as an expert?

A    I have.

Q    And have you been qualified in the field of neuroimaging as well as neuropsychology?

A    That's correct.

MS. NELSON-MAJOR:  At this time I would offer Dr. Erin Bigler as an expert in neuropsychology and neuroimaging.

MR. STEWART:  No objection.

THE COURT:  All right.  Dr. Bigler is so qualified.

**BY MS. NELSON-MAJOR**:

Q    You were retained by my office, the Federal Community Defender Office for the Eastern District of Pennsylvania as an expert in this matter, correct?

A    That is correct.

Q    And did my office ask you to review two magnetic resonance imaging studies or MRI studies that were performed on Mr. Fields' brain?

A    That is correct.

Q    And when were those MRI studies performed?

A    2011 and 2017.

Q    And did you author two reports detailing your analysis and conclusions regarding those MRI studies?

A    That is correct.

Q    And we are going to show you what has been marked as Defendant's Exhibit 9. And it will take a moment for it to appear on your screen.

A    Sure.

Q    And do you recognize this document?

A    Yes, that's the first report, January 21st, 2022.

Q    And does this report detail your analysis and conclusions regarding the 2011 MRI scan of Mr. Fields' brain?

A    That is correct.

Q    And now I am going to show you what has been marked as Defendant's Exhibit 256.

A    Yes.

Q    And do you recognize this document?

A    Yes, that's my updated report.

Q    Dated September 9th, 2024?

A    That's correct.

Q    And does this report contain your analysis and conclusions regarding the 2017 MRI?

A    That is correct.

Q    And are the opinions expressed in these two reports to a reasonable degree of scientific and neuropsychological certainty?

A    Correct.

Q    And do the reports that we just looked at list materials that my office provided to you to review?

A    They do.

Q    In addition to the materials that are listed on those reports, did you also review some reports that the experts retained by the government, Dr. Michael Arambula, Joshua Shimony, and James Seward prepared?

A    That is correct.

Q    And also, additionally to what is listed on your reports, did you review a report of a CAT scan that was performed on Mr. Fields' brain in 1983?

A    That is correct, the report.  Apparently there is no copy of the actual images.

Q    And the materials that you reviewed and relied upon in formulating your opinions, are those the type of materials that experts in neuropsychology and neuroimaging rely on when forming opinions of the type that you are going to offer today?

A    That's correct.  They are also the type of information that we would use everyday in the clinic to make decisions about a patient or evaluating someone.

Q    I want to first ask you about the opinions that you reached in this case in general terms and then we will address each

one separately.

Overall, based on the materials that you reviewed and your experience and education, were you able to reach an opinion as to whether Mr. Fields has brain damage?

A   Yes, I think -- yes.

Q   And we will get into the details, but briefly what is the nature of Mr. Fields' brain damage?

A   So he has a ventricular system that is larger than what it should be.  He has some changes in the shape of his corpus callosum, but most importantly he has neuropsychological test results that support underlying brain dysfunction.

Q   And is corpus callosum spelled C-O-R-P-U-S, space, C-A-L-L-O-S-U-M?

A   Corpus Callosum.

Q   Okay.  And again, we will get into the details, but did you reach any opinions regarding how these abnormalities might impact Mr. Fields' functioning and cognition?

A   Well. . .so the most common observation if something appears to be amiss with the brain in a sort of non-specific way is reduction in aspects of processing speed and reduction's in what we refer to in neuropsychology as executive function.  Those two areas of neuropsychology functioning require the most – the highest level of brain integration to carry out those particular functions.  And that is why traditionally those particular measurements have been an indication that

there is underlying brain dysfunction.

Q    And did you reach an opinion whether there is a correlation between the brain damage you observed and the results of the neuropsychological testing that was administered to Mr. Fields prior to trial?

A    Yes.  So in my opinion this is a clinical correlation issue because it -- just enlargement of a ventricular system by itself may not have any particular clinical significance or meaning.  The same thing is true with the size and shape of the corpus callosum.  However, the clinical correlation aspect of this is looking at behavior, looking at neuropsychological findings, looking at history, and then trying to integrate that information.  And when you take it from that perspective, then yes, the neuropsychological data indicates underlying brain dysfunction and we have an explanation for it based in the neuroimaging.

Q    And prior to reaching these opinions, did you meet with Mr. Fields?

A    No.

Q    Did you administer personally any tests to Mr. Fields?

A    No.

Q    Or interview his family or other collateral witnesses?

A    No.  I only looked at the records that are listed in my report and imaging.

Q    And did you need to meet with Mr. Fields or review

collateral sources in order to reach the opinions that you have just outlined?

A     No.  Your office asked me to review these records and to review the imaging and to render my opinions that I would offer in any situation like this.

One of the courses that I taught was a course where the graduate students would bring in the cases that they had at that particular point in time, and we would review this kind of information, including brain imaging, and I would never see the person, but I would assist in making the clinical correlation between all of the documents and records.

Q     In the textbook that I asked you about earlier called *Neuropsychological Assess*ment, there is a chapter entitled, "Behavioral Geography of the Brain."  Can you explain what behavioral geography of the brain means?

A     So the first author in that book is Muriel Lezak, and she, in many respects, is – she has passed away now, but she is considered to be the mother of contemporary neuropsychology, and that was her favorite term because geography and landscape -- you know, in looking at maps it tells you something about the terrain, about where you are, etcetera.  The brain is the same way.  The brain is a structure.  It has an anatomy.  It also has a physiology.  And so that was her term to describe the landscape, the architecture of the human brain and what one can make of brain behavior relationships when different

areas of the brain are damaged or dysfunctional.

Q    In your January 2022 report, which is Defendant's Exhibit 9, you wrote that you view brains for two initial things initially. And that is similarity and symmetry. Can you explain what that means?

A    Yes.

Q    So from a normal brain perspective, and we will put "normal" in quotes, air quotes, each brain is unique just like every face is unique, just like every fingerprint is unique, but there are similarities to (inaudible) parts, and that includes the brain. The brain, like the face, is symmetric. And there is a fissure that runs right down the middle that divides the two halves of the cerebral hemispheres. So one side should look like the other side and both should look similar to what a normal configure of a hemisphere or a brain should appear like, and that's what those two terms are referring to in my report.

Q    And you testified that in your opinion Mr. Fields' ventricles and corpus callosum are abnormal. Could you explain where those structures are within the brain?

A    Yes. I actually have a brain model if you would like me to show that.

Q    Yes, that would be helpful. Thank you.

A    Okay. So this is my teaching model that I've had for decades. It is actually casted in part from an adult male brain. And I am going to take it off of the stand here, and hold it up. So what we are looking at here are the two cerebral hemispheres.

And the indentations here are the sulci and the humps form the convolution or the gyri and you can see that they are not perfectly the same, but they are similar. And this is the left hemisphere, this is the right hemisphere. If I now carefully remove part of the left cerebrum here, now we are looking down into the brain. And this right here is the corpus callosum -- I mean is the ventricle and right next to it is the corpus callosum that you can see. But I am going to do something a little bit different here also in holding this together. I am going to stick my finger down -- and notice that the hemisphere goes all of the way down to the top of the corpus callosum right here. So if information is going to be integrated between this part of the hemisphere and the other hemisphere, it has to go back and forth across the corpus callosum and some other areas that are called commissures in the brain.

So if I take this other hemisphere off, now we are looking down on top of the corpus callosum. And the bottom of the corpus callosum -- I am going to pull this off in just a second – butts up against the top of the ventricle. So this is called the lateral ventricle and there are different parts of it. There is an anterior part, a body part, what is called an atria part, and then an occipital horn or occipital part of the ventricle.

So now I am going to take off the corpus callosum here, and I am going to expose the ventricle, since that is one of the things we are talking about here. So if we take out the

cerebellum, the little brain here, and I am going to pull this apart -- so this is the insular cortex here and then part of the basal ganglia and this part of the brain stem and the thalamus here.  Now we are looking at the ventricle inside of the brain.

Now I am going to take it out completely and -- and so now we are looking at a ventricle, a normal appearing view of the ventricle as I turn it around.

Now what is important about the ventricle from a neuro-psychological standpoint is that the cerebral spinal fluid is pressurized and it is pressurized to push out because brain tissue is soft, it is a soft organ, and it collapses in on itself unless there is an internal pressure gradient pushing out.  So if there is something different about the health of the brain, the ventricle may expand in response to that.  And as I showed you where the corpus callosum is around the top, much of the ventricles is also surrounded by white matter.  Those are the pathways in the brain.  So that is why when there are some changes that can occur in the size of the ventricle system, it can be associated with processing speed issues and executive function control.

MR. STEWART:  Your Honor, before the next question, I did not object because I didn't want to interrupt because of it being on video and it is odd, but I would appreciate it if there were some actual questions.

THE COURT:  Well, I think that was a helpful

tutorial of the structure of the brain that we were talking about and it --

MR. STEWART:  Certainly, and --

THE COURT:  But I understand --

MR. STEWART:  -- that's why I didn't object at the time, but --

THE COURT:  All right.

MS. NELSON-MAJOR:  Is there an objection now or can I --

MR. STEWART:  I was just making it for the record that in the future I would appreciate some questions.

THE COURT:  Well, I think she asked for a description of the ventricle and he gave it.  So. . .

MR. STEWART:  I think she asked where it was located.

BY MS. NELSON-MAJOR:

Q     So I would like to turn your attention to the MRI study that was performed on Mr. Fields' brain in 2011.  I am going to show you what has been marked as Defendant's Exhibit 8, and we are going to show you an attachment to that.

Do you recognize this document as something you previously reviewed, Dr. Bigler?

A     Yes, this is the neuroradiologic report of his 2011 MRI.

Q     And in addition to the written report, did you review the actual imaging files that were generated during this MRI?

A     That's correct.

Q     And are those files sometimes referred to as DICOM files?

A     That's correct.

Q     And did you analyze those images from both a qualitative and a quantitative approach?

A     That's correct.

Q     And I am going to ask you to walk through those approaches in a minute, but could you give just a brief overview of the respective approaches?

A     Well, you can actually see Mr. Fields' image in the right -- in the upper right side of what is on the screen, even though this is like a photocopy of a photocopy, so it is not very good, but what you are looking at is what is referred to as the T-2 weighted MRI. And that particular imaging sequence highlights CSF. So cerebral spinal fluid shows up in -- as white. And it -- and when I saw that report -- I saw the report before I saw the DICOM file and I looked at that and I said, well that ventricle looks bigger than what we typically want to see. And as I mentioned previously, the clinical correlation aspect here is really kind of a binary aspect. If it is bigger, then that carries with it clinical significance depending on the history, testing, other labs, etcetera of what that may mean. It is not  necessarily the absolute size of the ventricle, it is that it is bigger. And when it – and neuropsychiatric groups have been examined, a broad spectrum of neuropsychiatric groups such as major

depression, bipolar disorder, schizophrenia, etcetera. There is a subset of individuals that have larger ventricle size. And so looking at that image, to me the ventricle was bigger than what it should be in Mr. Fields.

Q    And are both the qualitative and the quantitative approaches you used to arrive at that conclusion subject (sic) of peer review journals?

A    That's correct.

Q    And are they both commonly used within the field of neuropsychology and neuroimaging?

A    That's correct.

Q    Okay. So let's start with the qualitative analysis. Could you explain to the Court how you go about a qualitative analysis of a brain image?

A    Well, it goes back to one of your earlier questions about similarity, something being similar and also being symmetric. Now, as you -- I was just going to comment on what you had out there. If you look at one side of the brain to the other side of the brain and the size of the ventricle, it is very symmetric. So the -- the ventricle is symmetric, but from a similarity standpoint in my view it is larger than what is what we call neurotypical. So the healthy neurotypical individual is someone who has been selected and screened for absence of neurologic dysfunction or neuropsychiatric disorder and used in a control sample.

So from that standpoint this looked larger than what it should be.  And so if you compared it to other individuals similar in age within a few years, then you are likely to see that Mr. Fields' ventricular size is larger.

Q     And why would you compare Mr. Fields' brain to a neurotypical brain of a person within a few years, as you said, of Mr. Fields?

A     Well, the brain is a very dynamic organ.  Developmentally the brain develops rapidly in utero and in infancy so that from an overall brain volume standpoint by the time a child is entering kindergarten their head or their brain size is starting to approximately adult size, but then there are some dynamic changes that occur in the brain in terms of brain matter, where cell bodies are, white matter, which is the pathways in the brain, and cerebral spinal fluid.  And this dynamic change actually shows up within the ventricular system.  So there is a period of stability in the ventricular system, but then as you age, the ventricular system actually increases in size because there are some changes in brain volume associated with aging.

Likewise, as I mentioned before, there are these clinical correlations with a whole host of neuropsychiatric and neurologic conditions where the ventricle size may be different from that neurotypical size.  So that's why you make these type of qualitative comparisons looking at the scan and comparing it to others.

Q     And I am going to direct your attention back to your January 21st report, which is Defendant's Exhibit 9.  And we are going to look at Page 4, and there is an image which is labeled figure 1 on Page 4.  What is this image?

A     This is out of the textbook *Neuropsychological Assessment*, Oxford University Press, 2012. It is the fifth edition.  We are currently working on the sixth edition.  It should be out this next year.  But this is a standard image of the brain showing white matter, brain matter, but for this brain we had all of the advanced imaging analysis methods that we can apply to it. So that allows you to also classify the brain, so you can see the color coding there.

So if we wanted to talk about a specific region of the brain, then you can go to that color code, but it is not just the region of the brain that is important, it is how that part of the brain connects. But this view was selected to show -- so, like, 'B' is a comparison to make with that image that is in Dr. Koslow's radiologic report, although this is what is called a T-1 weighted image that is separating out white matter, brain matter, and cerebral spinal fluid. That other one was highlighting cerebral spinal fluid.  So the ventricle is dark now, it is not white.  So you can see with your own eyes that, yes, this is quite different.  This is actually my lab director that we did this imaging on.  And then in the upper left it is a view of the corpus callosum, a nice neurotypical view of the corpus callosum.

Q     And then we are going to turn to the next page to figure 2, which appears on Page 5.

I see that – I don't – I think the technology is fine.  I just heard it, but. . .

Can you tell us what figure 2 is depicting?

A     Yes.  Actually if you scroll back to figure 1, do you see the top next to A. . .so this is called the axial or the horizontal view.  And see, it is cutting through the body of the ventricle.  That's the darker area.  The lighter grey area is a part of the basal ganglia called the caudate (sic) --

So now if you scroll down.

Q     Just a moment, Dr. Bigler.

THE COURT:  Yes, just so we can get the court reporter -- there were a couple of words there that she couldn't quite catch.

THE WITNESS:  Oh, okay.

BY MS. NELSON-MAJOR:

Q     Can you spell – I believe it was basal ganglia?

A     Yes, B-A-S-A-L, basal, and then ganglia, G-A-N-G-L-I-A.

MS. NELSON-MAJOR:  And if we can scroll down to figure 2 now.

BY THE WITNESS:

A     So that is that same figure and you can see that the size of the ventricles is quite different.  Mr. Fields's is on the left.

The other thing that I point out here is that we started off

with the model and this inner hemispheric fissure right here that goes, you know, from the front to the back. . .and if you look at Mr. Fields' inner hemispheric fissure, it is wider. And so if there is some change in the size of brain structures and widening of fissures in sulci, then that may be in part an explanation why the ventricle is larger than what is typical.

Q    And is sulci spelled S-U-L-C-I?

A    That's correct.

Q    And why does the image on the right say similar age neurotypical control scan?

A    So this -- as I mentioned, this is my lab director. He was a bit older than Mr. Fields', but typically when you are looking at something similar in age, you are looking at something within five to seven years or so, plus or minus.

Q    All right. And now we are going to turn to figure 7, which is on Page 10 of Defendant's Exhibit Number 9. And where does this image come from?

A    This comes from a textbook on traumatic brain injury. And in traumatic brain injury, change in ventricle size is a common problem in traumatic brain injury and it is one of the things that we look at and it is one of the things that we study. And so this is just a very simple clinical rating of individuals that have had traumatic brain injury where the one on the left shows no ventricle enlargement and then each one shows some successive increase in ventricle size.

Q    And did you compare Mr. Fields' 2011 MRI to this clinical rating of ventricle enlargement?

A    Yes, you can see it in the lower right-hand corner, the red arrow pointing to it.

Q    And what was your conclusion based on that review?

A    That. . .what I've already said, that in my opinion Mr. Fields' ventricular size is larger than a neurotypical size.

Q    Did you prepare a series of PowerPoint slides to aide in your testimony today?

A    Okay.

MS. NELSON-MAJOR:  Can we pull Dr. Bigler's PowerPoint and start at slide 1.

BY MS. NELSON-MAJOR:

Q    I am showing you the first slide in your PowerPoint presentation.

THE COURT:  Is this just demonstratives, they are not exhibits?

MS. NELSON-MAJOR:  It is not an exhibit.  It is just a demonstrative.

THE COURT:  And it has been shared with the government?

MS. NELSON-MAJOR:  Yes, we did, Your Honor.

THE COURT:  All right.

BY MS. NELSON-MAJOR:

Q    And can you explain what this slide shows?

A     Yes.  So that is Mr. Fields' on the left. It is that familiar level that we looked at.  And then it is matched up to other individuals similar in age within a few years of Mr. Fields.  And this is from the Open Access Series of Imaging Studies, or the OASIS open source data base.  So it is allowing you now this very qualitative way that I had in my original 2022 report to look at a scan, look at the ventricles size, and compare it in Mr. Fields'.  and you can see that his ventricle is bigger.

Q     And there are a number of additional slides with images that you obtained from the OASIS data base.  How did you select -- and we are going to scroll through those, but before we do that, how did you identify images within the OASIS data base to include in this presentation?

A     Well, these individuals are similar in age.  And the angles that you see there are angles that have already been presented in my report.  So, like, the image on the lower right, that is right through the midsagittal view.  And you can see the corpus callosum there in the middle, the big white structure. And then the lower left is the basion (sic) view.  This is coronal, so it is cutting across like so.  And the image in the upper right is just showing the three-dimensional plane of cutting across to look at the image.  This is just so you know some landmarks and where you are in the brain.

          MS. NELSON-MAJOR:  And could we advance through the slides to -- I think it is to slide 14 and then pause with each side

for Dr. Bigler to explain – oh, sorry.  Like one and then two and then. . .

BY MR. NELSON-MAJOR:

Q    And is the individual on this slide, on the right, the image from OASIS, is that a different individual that is depicted from slide 1?

A    I think this may be -- so if you go back up, there is a number.  So, you see, it is OASIS 0018 MRI.  And then scroll down to the next one, you see, that is the same one.  I put that at the beginning just to identify the source, but this is the same research participant.

Q    All right.  And then let us know, Dr. Bigler, when you want us to advance to the next slide.

A    Yes.  So you can just advance and. . .you will be able to see with your own eyes that. . .that even when there is some increase in the ventricle size, such as in this one that you were just looking at or even as you see in this one, Mr. Fields' ventricle size is still larger.  (PAUSE)

Yes, so that is just the qualitative aspect of what we talked about earlier, of an image being similar, and so if you look at that, you come away with the conclusion that Mr. Fields' ventricle size is different than what is considered neurotypical.

Q    And did your qualitative analysis of the 2011 MRI reveal abnormalities in other parts of Mr. Fields' brain?  I believe you mentioned the corpus callosum?

A    Yes, the corpus callosum. It is in my report. It is rather elongated and has a thinner appearance than what is often considered neurotypical.

MS. NELSON-MAJOR: Let's pull up figure 8 which appears on Page 1 of Dr. Bigler's January of 2022 report, Defendant's Exhibit 9. And we are looking at Page 11, figure 8.

BY MS. NELSON-MAJOR:

Q    Can you explain how this image relates to your conclusion that Mr. Fields' corpus callosum is abnormally shaped?

A    Well. . .so the typical corpus callosum, as in the upper left and as we saw in a number of the OASIS cases, there is a front part of the corpus callosum that is referred to as the genu, and it sort of bends back. And it tends to be one of the thickest areas, as well as the back of the corpus callosum, called the splenium, S-P-L-E-N-I-U-M. So if you look at Mr. Fields' corpus callosum, it is rather uniform in size from front to back. It doesn't have the classic characteristic of what is the most neurotypical appearance of a corpus callosum.

Q    And is genu spelled G-E-N-U?

A    Correct.

Q    So in addition to the qualitative analysis you just explained, did you also conduct a quantitative analysis of the 2011 images of Mr. Fields' brain?

A    We did.

Q    And can you describe what is meant by quantitative

analysis in this context?

A    Yes.  So you have different slices within the MRI and that slice may have a certain thickness to it and there may be a gap between other slices.  So if you take that into consideration, you can make an estimate of the size and shape of a brain structure, and that's what was done.

Q    And when you say an estimate, do you mean a guess?

A    Not a guess, but this scan was done in 2011, and it was not done with contemporary standards for image quantification and everything has to be done by hand, which is what we used to do.  But now with computer technologies, as they exist in 2024, there are a variety of programs that allow you to do image quantification without operator control.  Using operator control means that you have to trace things, you have to identify different regions of interest.  And so you are estimating what these values are.  It doesn't have the same level of precision, but remember my point that I am trying to make is this is really a binary kind of decision.  If the ventricle is larger than what is neurotypical and if we have other clinical indicators of brain dysfunction, then we bring those two together to understand what the relevance is of ventricle size with neuropsychological findings.

Q    And in order to do this quantitative analysis, you calculated something called the ventricle to brain ratio; is that right?

A    Yes.  We had looked at that book – (inaudible) – traumatic brain injury book.  As I mentioned, a big part of my research

has been with traumatic brain injury and ventricle changes are commonplace in traumatic brain injury. And in part, they relate to changes in brain integrity, especially white matter of the brain where the pathways are. And the ventricle to brain ratio is a technique that has been used by researchers and clinicians for decades. And what it does is it calculates the size of the ventricle, but then it creates a ratio. So you are dividing by the size of the brain so that you more uniformly create a metric that can be compared across other individuals.

Q     And what is gained by comparing the volume of a person's ventricles to the – (PAUSE)  I'm going to back up a question.

Have you published any articles and peer reviewed journals describing this ventricle to brain ratio technique?

A     Yes. I mean, the ventricle to brain ratio technique is -- as I mentioned, it has been around for decades and we have used in a number of our studies, both aging, neurodegenerative diseases, Alzheimer's type diseases, stroke, traumatic brain injury, and also in comparison to neurotypical individuals. And, of course, the ventricle to brain ratio increases with aging. So when – because as -- of what I described earlier, the ventricle increases with age because there is loss of brain volume because there is cellular death that happens in the aging process and it changes the structure of the brain. So we have done a lot of work with the ventricle to brain ratio because it gives you a metric to change. So the neurotypical ventricle to brain ratio is somewhere around

1.5 to 2 with a standard deviation somewhere around .5 to .75. And this allows you then to start looking at it from a statistical comparative perspective.

Q    I am going to show you what has been marked as Defendant's Exhibit 257.  (PAUSE)

Is this an article that you co-authored in the *American Journal of Neuroradiology*?

A    Correct.

Q    And what does this article discuss?

A    Well, it discusses quantitative image analysis findings over -- as the title says -- *The Five Decades of Life* because the brain is changing.  This study was done in conjunction with several other studies that also were published in the same neuroradiology journal associated with traumatic brain injury because of those ventricle changes, but we wanted to establish the size of the ventricle in relation to the brain and correct for brain size differences because head size varies across people.  So you have to make some corrections so that you have a metric or a measurement that allows you to compare one individual to another.  And so if you scroll down, you will see there is a table there that has the ventricles to brain ratio.

Q    And, Dr. Bilger, when calculating Mr. Fields' ventricle to brain ratio, did you follow the methodology that is described in this article?

A    That's correct, the best that we could.  This was a different

type of scan, so it wasn't identical to the perimeters of this scan, but to the best of our ability that's exactly what we did.

Q    And can you tell the Court how you actually went about calculating Mr. Fields ventricle to brain ratio?

A    Well, you identify the ventricle, you isolate it, and then within each slide you are calculating that area and then you combine it to calculate volume over the multiple slices where you actually see the ventricle.

Q    And did you use any software programs when doing that process?

A    Yes.

Q    And what software did you use?

A    So we used a software program called Analyze.

Q    And what sorts of entities or professionals use the software program Analyze to calculate the volume of brain structures?

A    Well, Analyze is a program that allows you to calculate any image, so not just the ventricle.  It is a tool that has been used in widespread ways across image analysis.

Q    And was the ventricle to brain methodology that you used to analyze the 2011 MRI accepted within the field of neuropsychology around the time of trial, meaning 2003 to 2005?

A    Yes.  I mean, we published our first ventricle to brain ratio studies in the early 1980s with computer tomography scans.

Q    And had Mr. Fields' trial counsel provided you with a MRI of his brain that was conducted between 2003 and 2005, could

you have performed the analysis that you did on the 2011 MRI in this case?

A     Yes, both the qualitative, which is revealing in and of itself, as well as the quantitative, sure.

Q     And I would like to direct your attention to your January of 2022 report, which is Defendant's Exhibit 9.  And we are going to look at figure 3, which appeared on Page 6, I believe.  And what is this image?  Sorry.  It is not up on your screen yet, so you can't tell us.  (PAUSE)

All right.  So we are looking at figure 3 in your January 21st, 2022 report.  Can you tell us what this shows?

A     Yes.  Those are the different slices of Mr. Fields' brain.  So you can see -- at the very top you can see the dark areas.  Those are the sulci and you can see they have been actually sliced off a bit, but you can see where the gyrus would be.  And that linear line running from front to back, that is that interhemispheric fissure.  But this then forms the basis -- just like you can see the volume of his head or a 3-D appearance of his head, now you can generate a 3-D appearance of the ventricle.

Q     And did you generate this image that we are looking at that shows up on figure 3?

A     That's correct.

Q     And did you also include some slides in your PowerPoint that further illustrate how you generated this 3-D model?

A     That's correct.

MS. NELSON-MAJOR: Can we turn to the PowerPoint, slide 15? No, one more. There you go.

BY MS. NELSON-MAJOR:

Q    Can you tell us what this image is?

A    Yes. So what this image is, is you can see Mr. Fields' ventricle in his brain. This is an image we have seen previously. And then on the middle image, this is showing the ventricle, but now showing it in 3-D. So you can see it kind of bending up because there is more ventricle beyond what you see on the left-hand side, but on the right-hand side we have taken the image and we have lightened part of it so that you can see that -- see where it is bending in there that, yes, this 3-D image model butts right up against the inner table of the ventricle or the wall of the ventricle. And it is there to demonstrate that this is approximating the appearance of the ventricles in 3-D.

Q    And when you say approximating, is there a degree of error or uncertainty in this sort of process?

A    Yes, there is a degree of uncertainty here because of what is called partial volume effect. And partial volume effect is going to create problems of defining absolute boundaries, especially a scan from 2011 that has different parameters than what we would use today. And we don't have the automated classification, so this had to be done by hand. So there can be operator error, there can be thresholding errors that occur, but you do the best that you can to identify the ventricle, and that is what the far-right

image is showing you because if you take your eye and go over to the left and now take your eye and you go over to the right and you see the darker blue, the darker blue is at that level of the scan on the left. And you can see it is representative of the ventricles. So it means that the 3-D image is appropriate to view as an illustrative demonstration of the size of this individual's ventricle, which we have already seen from the qualitative stand-point is larger than what is generally neurotypical.

Q    And despite those issues, including the partial volume effect that you mentioned, is the ventricle to brain ratio metric that you described something that is accepted within the field of neuropsychology?

A    Yes, it has been widely used as a metric, especially in aging neurodegenerative diseases, in psychiatric disorders. Again, it gives you a way of measuring the size of the ventricle correcting for head size.

THE COURT:  Counsel, I just want to see if there is a moment -- or if you are coming up close to a stopping point for a break so we can take our afternoon break, but not necessarily now. You tell me when it is a good time.

MS. NELSON-MAJOR:  There is, like, two more questions and then it is a full section break.

THE COURT:  Fair enough.

MS. NELSON-MAJOR:  So I think that would be a good place to stop.

BY MS. NELSON-MAJOR:

Q    Could you scroll forward to slide 16, I believe?  No, let's go to slide 17.  And can you tell us what this slide depicts?

A    Yes.  So this shows the -- on the right-hand side that's the – that's my hand and there's the ventricle if you look in the little zoom window where you can still see me, and that's me turning the ventricle that is in the static image on the right-hand side. And on the left-hand side is Mr. Fields' three dimensional demonstration of the size of his ventricle, --

Q    And can you scroll --

A    -- the lateral ventricles.  We don't have the other components of the ventricle there.

Q    I'm sorry to interrupt.  And can you scroll forward one more slide, and this will be the last thing we look at before the break. And can you tell us what this image is of?

A    Yes.  This is from a recent publication that looks at ventricle volume, along with other findings and generates a 3-D image model of the ventricle, just as we did.  And again, if you look in the little window and I hold up this neurotypical size of the ventricle, then you compare it to what is on the left-hand side and you can see, once again, that if we are making this binary decision concerning Mr. Fields' ventricles, it is larger than neurotypical.

        MS. NELSON-MAJOR:  I believe that's a good stopping point.

THE COURT:  Okay, all right.  It is 3:30.  Let's take our mid-afternoon break.  We will come back at 3:45.

All right.  We are in recess.

(3:30 p.m.)

(SHORT RECESS)

(3:49 p.m.)

**COURT IN SESSION**

THE COURT:  Thank you, be seated.  All right.  We are back on the record.  Counsel are present.

At the risk of giving away my age, not that it matters, but I recall at the end of the old television show, the old Phil Donahue show, the next words you will hear were. . .like sands through the hourglass, these are the days of our lives.

There is no jury here.  You are not convincing a jury.  You are simply trying to create a record in an evidentiary hearing.  Please get to the points.  I know there are points that you want to make that are important with this witness, as with your other witnesses.  I don't need the entire history.  We've got documents in the record, lots of exhibits, hundreds of exhibits.  Just get to the point and let's move on so we can perhaps finish Dr. Bigler today and start fresh at our next encounter,  I just -- we've got to move faster than we are moving.  We are never going to get done at the rate we are going.  So I just implore the parties to get to the point you need to make, make it, and move to the next point.

All right.  That's my rant.  I will now turn it back over to Ms. Nelson-Major to continue her examination of Dr. Bigler.

MS. NELSON-MAJOR:  Thank you, Your Honor.

<u>DIRECT EXAMINATION CONTINUED</u>

BY MS. NELSON-MAJOR:

Q    And based on the process you explained before the break, were you able to calculate Mr. Fields' total brain volume as depicted in the 2011 MRI?

A    Yes.

Q    And do you recall what that number was?

A    Yes, it was 1444.23 cubic centimeters.

Q    And can you pull the microphone a little bit closer.  You are a bit fainter than you were before the break.

A    Okay.  How is that?  Hopefully that is better.

Q    Okay.  And when you say you calculated Mr. Fields' total brain volume, what structures did that include?

A    That included the entire brain.

Q    Okay.  So it included the cerebrum?

A    The cerebrum, subcortical areas, cerebellum, brain stem.

Q    And on average, what percentage of the brain's volume is comprised of the cerebrum?

A    It is about eighty percent.

Q    And using the process that you've explained, were you also able to calculate the volume of Mr. Fields' ventricles?

A    Yes.

Q    And the figure that -- and correct me if I am referring to your report incorrectly, but it was 89.35 cubic centimeters; is that correct?

A    That's correct.

Q    And then were you able to use this numbers to compute Mr. Fields' ventricle to brain ratio?

A    Correct.

Q    And what was that number?

A    It was 6.18.

Q    So is it accurate to say that based on the 2011 MRI images that Mr. Fields' ventricles comprised 6.18 of his total brain volume?

A    Correct.

Q    And then how does that compare to the ventricle to brain volume ratio of a neurotypical brain?

A    Well, I already mentioned it earlier based on that article that you held up, the more neurotypical is somewhere around 1.5 to 2, and so it is a smaller number than what Mr. Fields' has.

Q    And I am going to direct your attention to Page 9 of your January 2022 report.  And we are going to look. . .it is Defendant's Exhibit 9, and we are going to look at figure 6. And what is this figure?

A    That is what is called the bell curve or the normal curve. It is from a page in the *Neuropsychological Assessment* textbook.

Q    And what does this bell curve demonstrate in terms of the degree to which Mr. Fields' ventricles to brain ratio is abnormally large?

A    Well. . .so the mid-point of that is the fiftieth percentile. And then you are moving out in equal units, which are called standard deviations. And those standard deviation units can vary depending upon what you are looking at. This particular graph is based on neuropsychological tests, but it also applies to physical measurements; hat size, tie size, neck, etcetera. So the mid-point is the fiftieth percentile. Each of those vertical lines is one standard deviation. So if the standard deviation, as I mentioned earlier, for what is neurotypical is somewhere between .5 to .75, then Mr. Fields ventricle is beyond that 99th percentile value. It is that far right of the bell curve.

Q    So Mr. Fields' ventricle to brain ratio is an outlier? Is that an accurate assessment?

A    Sure.

Q    And why is it an outlier?

A    Well. . .so we don't have earlier imaging that we can look at. We have the 1983 CT scan, but we don't have the actual images. We don't have other imaging technology to look at changes over time. We do have a 2017 scan that shows similar size of the ventricle, so he has large ventricles. Now, I mentioned earlier, this is the binary issue from a clinical correlation standpoint. It is not necessarily the magnitude of

1173

the size of the ventricles. It is whether it deviates from what is neurotypical and not necessarily the size, so we have established that. We've looked at this qualitatively, we have looked at it quantitatively. His ventricle is bigger than what it should be. So now let's look at the neuropsychological data. Let's look at neuropsychiatric classification, neuropsychiatric diagnoses. If you now move into that territory, having neuro-psychological findings that are positive, that is something associated with that binary classification. Something is not right with the brain. And that is the conclusion that can be made.

Q    And does the fact that Mr. Fields' ventricle to brain ratio is an outlier, does that indicate that your measurements or calculations are somehow erroneous?

A    No. So I already indicated earlier, there are technical issues. This is an older scan. We had to use hand tracing methods, we had to use older approaches, nothing that is what we currently use, but even if we were substantially off in the size of calculating. . .you've got the bell curve still up there. His BVR would have to be down somewhere around 2.5 to 3 to be in the – to be somewhere within that bell curve. So. . . but that's not what we need to do. We need to look at it from the standpoint that Mr. Fields' ventricle is bigger than what is typical. And now we look at the psychiatric tests, the psychiatric diagnoses, and the neuropsychological findings. This suggest

to me, as a clinical neuropsychologist, that this brain is abnormal. And now that we look at the neuropsychological findings, we see abnormalities, we see psychiatric disorder. Something, as I said before, is amiss in the way the brain is functioning.

Q    And we are going to turn to the clinical correlation you were discussing in a moment, but I just want to ask a few more questions about the BVR. And you have discussed some of the limitations with the quality of technology that was used in 2011. Do those limitations in any way prevent you from calculating Mr. Fields' ventricle to brain ratio with a reasonable degree of neuropsychological certainty?

A    Yes. There is reasonable neuropsychological certainty that his ventricle are bigger than what they should be, and that is demonstrated by an elevated BVR.

Q    And I am now going to show you what has been marked as Defendant's Exhibit 7. And can you scroll to the next page?

Does this appear to you to be the report from Dr. Travis Snyder that my office prepared and -- excuse me -- that my office provided to you?

A    That's correct.

Q    And in your opinion were Dr. Snyder's conclusions about Mr. Fields' brain abnormalities consistent with your conclusions?

A    That's correct.

Q    And in your opinion are the brain abnormalities that you've identified in Mr. Fields' 2011 imaging consistent with -- or

explained by the natural aging process?

A    The natural aging process?

Q    Yes.

A    No, I don't believe so.

Q    Earlier in your testimony we took a look at the radiology report from Dr. Koslow who was the doctor who initially reviewed the 2011 MRIs, and you are aware from that review that Dr. Koslow found no intercranial abnormality.  Did it surprise you that Dr. Koslow did not describe the abnormalities that you found when reviewing the 2011 images?

A    No, not necessarily.

Q    And why not?

A    Well, when a radiologist is looking at a scan they are looking at it, first and foremost, in terms of any medical emergent circumstance that needs to be addressed, whether there is an aneurysm, whether there is a tumor, some kind of malformation, something that needs to be addressed as a medical emergency.  That was not there.  Likewise, if you go to the 2017 report where the radiologist is also commenting, the radiologist is commenting that the ventricles appear symmetric and you can see the cortical sulci.  So it doesn't look like this is hydrocephalus in the sense of there being an obstruction some place causing an increase in cerebral flow.  And as we already saw with our own eyes, the ventricles are very symmetric in their enlargement.  So I believe that's why it was commented on as no intracranial

abnormality by Dr. Koslow in 2011.

Q    And you also reviewed the report authored by the government's expert, Dr. Joshua Shimony, who reviewed the 2011 MRI as well?

A    Yes.

MS. NELSON-MAJOR:  Can we pull up Government's Exhibit 40?  You know what, I think we can do it without having to pull up the exhibit.  We will just try to speed this up a bit.

BY MS. NELSON-MAJOR:

Q    As you understand it, was Dr. Shimony's conclusion regarding Mr. Fields' ventricle size that his ventricle's were, quote, "mildly enlarged?"

A    Yes,  That's the statement that is made in Dr. Shimony's report.

Q    And do you agree with the assessment that Mr. Fields' ventricles are mildly enlarged?

A    Well. . .so let's look at it from the standpoint of meeting the threshold, that it is different than neurotypical.  So, yes, I agree with that.  I would say that this is more than mild.  But that's not necessarily the point.  The point is when we look at these disorders, and some of them were listed in Dr. Snyder's report -- when we are looking at these disorders, that clinical correlation is not whether it is so large from the BVR or what-ever measurement we may use, but that it has met that threshold, that it is larger than what it should be.  And that

gets you to the next stage of the clinical correlation.

Q    And now we are going to move on to the 2017 MRI.  And I am going to show you what has been marked as Defendant's Exhibit 43.  And is this the radiology report that you reviewed concerning the 2017 MRI?

A    That's correct.

Q    Okay.  And Dr. Burns, the radiologist who prepared this report, said that he found, quote, "some prominence of the lateral and third ventricles?"

A    Yes, under the impression he just says prominence of the lateral and third ventricles.

Q    Okay.

A    Which could indicate cerebral volume reduction.  That's an important point.

Q    And is that finding consistent with your conclusions regarding the 2017 MRI?

A    Correct.

Q    All right.  Let's turn to Page 256, which is Dr. Bigler's September 9th, 2024 report.

THE COURT:  Do you mean Exhibit 256?

MS. NELSON-MAJOR:  I am not sure what I said.  So, yes, that's --

THE COURT:  You said page, but I just want to make sure we are on the same page.

MS.NELSON-MAJOR:  I am getting a little loopy, but

yes, I meant Exhibit 256.

BY MS. NELSON-MAJOR:

Q    Defendant's Exhibit 256, Page 2, figure 1, can you explain to the Court what this image is?

A    So the question was, explain to the Court what this figure is?

Q    Yes.

A    Yeah.  So we have seen the one on the left, that's in my 2022 report.  And the one on the right is the updated imaging in 2017.  And it shows ventricle size is similar and that sort of elongation of the corpus callosum is likewise similar.

Q    And that radiology report from Dr. Burns that we --

A    I think you may be away from your microphone.  I can't hear you clearly.

Q    Oh, okay.  Are you able to hear me a bit better now?

A    Yes.

Q    Okay.  And Dr. Burns, again the radiologist who reviewed the 2017 MRI, did he also note the presence of white matter changes?

A    He did.

Q    Did you also observe the white matter changes from your review of the 2017 MRI?

A    Well, unfortunately what -- if you go to the report, what he is talking about is the fluid attenuated inversion recovery sequence, the flare sequence that is used to identify white

matter hyperintensities. And that was missing. So I – I – I don't know what happened after that. So we can only reflect back on what's in Dr. Burns' report. I don't have those images.

Q    Can you just repeat more slowly flare sequencing and what that stood for, for the court reporter, please?

A    You want me to say that again?

Q    We just need it a little bit slower so we can hear it.

A    Oh, sure, yes. It is fluid attenuated inversion recovery sequence.

Q    So you weren't able to independently verify Dr. Burns' observations of white matter changes, but just assuming the accuracy there, what is the significance of white matter changes in a MRI?

A    So Dr. Burns mentions that it can be an indication of microvascular changes. It can be an indication of other neuro-inflammatory things that are occurring in the brain. It is some-thing that happens with traumatic brain injury. It also occurs with a higher frequency across most of the major neuro-psychiatric disorders. And once again, it is an indicator that the white matter integrity of the brain may be compromised. And white matter is the basis of neurotransmission in the brain. So now we are back to the issue of clinical correlation and how that can relate to processing speed in tasks that are involved (sic) in speed of processing and executive control.

Q    Okay. And I would like to turn to the quantitative analysis

you performed on the 2017 MRI.  Did you analyze the 2017 MRI using the same methodology and techniques you described applying to the 2011 MRI?

A    Well, for the ventricles we could, but we couldn't for the rest because of  the nature of how many slices there were.

Q    So you were able to calculate the ventricle, but not the total brain volume?

A    That's correct.

Q    And if you don't recall, we can take a look at your report, but do you – what was Mr. Fields' ventricle volume based on the 2017 MRI?

A    It was right around 90 cubic centimeters, so it really had not changed.  And you can virtually see that in the comparison that is on the screen right now.

Q    So taking all of your testimony about the quantitative and qualitative analysis of the two MRIs, what is your overall opinion as to whether Mr. Fields has brain damage based on those studies?

A    I think he likely has brain damage, more likely than not.

Q    And throughout this hearing, witnesses and attorneys have been using the terms brain impairment and brain damage. What, if any, distinction is there between those two terms?

A    Well, this becomes somewhat of a semantic issue.  So brain impairment is brain pathology.  Brain pathology means that there is some kind of damage or dysfunction.  So these things get used

very interchangeably. Probably the best clarification there, when we use the term brain damage, is when we see an actual structural lesion like from a tumor or a stroke or like a contusion, something along those lines, but the brain is the master organ of behavior. It controls all aspects of cognition and motion, etcetera. And if the brain isn't quite functioning correctly, it is a brain impairment. And if you get down to the molecular level. something is damaged. It isn't working right. So these terms really become quite synonymous.

Q    And a moment ago in response to my question of does Mr. Fields' have brain damage, you stated it is more likely than not the case. Do you have -- and I want to clarify what you meant by that. Do you have any doubts as to whether Mr. Fields' brain is abnormal based on these images?

A    So you have the images, but you also have other records and other factors. And that's where one feeds the other in terms of understanding the structural pathology that the MRI shows. In and of itself, it doesn't necessarily mean anything, but when you have it with all of these other pieces of information, then it becomes clinically relevant and clinically significant, and, yes, it is telling you that that structural change that has happened in the brain is producing deficits.

Q    And so we keep returning to the clinical correlation, and it sounds like it is a good time to segway into that, but I want to make the connection a little bit more clear. Is it your opinion

that you need to assess the clinical correlation prior to making a decision about whether an individual does, in fact, have brain damage?

A    Oh, well, yes, it is the -- it is the entirety of the clinical picture, as I've just said. And we looked at the OASIS data set. You saw there were individuals in the OASIS data set that had larger ventricles than others. So just the fact that there is a larger ventricle doesn't necessarily mean any particular outcome. So you need other data points then to make inferences to understand what the clinical significance of this is. And then when you have these other clinical inferences, then the clinical picture comes together that, yes, this is abnormal.

Q    So let's switch and talk about the clinical correlation. Would you expect that Mr. Fields' would exhibit some cognitive or behavioral impairments as a result of the abnormalities we have been discussing?

A    Yes, that's the very point of clinical correlation. You expect those to show up.

Q    And what type of impairments would you expect to see in a person with the type of abnormalities that Mr. Fields has?

A    Well, like what his -- what have been shown in his neuropsychological testing. Dr. Gelbort showed slow processing with the trail making test, the category test was impaired. So you have these findings that are relevant to what the imaging tells us, but you also have a history of psychiatric issues. And

as I mentioned, essentially all of the major psychiatric disorders have a subset where there are structural findings on MRI and they have clinical relevance for that psychiatric disorder.

Q    Let's talk about Dr. Gelbort's 2004 testing a little bit more. Were the selection of tests that Dr. Gelbort administered to Mr. Fields' in 2004 a standard neuropsychological battery?

A    Yes.

Q    And how do neuropsychologists select the particular tests that they are going to administer to an individual?

A    Well, there are lots of options that -- the *Neuropsychological Assessment* textbook is over a thousand pages long.  It summarizes test results on five hundred or so neuropsychological measures and psychological assessment techniques.  So there is a large repertoire of assessment tools that psychologists can pull from. The important part is that it taps the general domains of what is important to understand a neuropsychological outcome. And Dr. Gelbort did that, he tapped all of the major domains that need to be evaluated.

Q    And in your report you wrote that the most notable testing results from Dr. Gelbort's evaluation were differences between fluid and crystalized cognitive functioning and speed of processing tests.  Can you explain that?

A    Yes.  So crystalized cognitive abilities are those very well-learned skills and abilities and a lot that tie into what happens when we are in school and things that we may

utilize in our work lives, in our vocation. The fluid means that it is more dynamic, it is changing. It taps more brain resources. And that is why fluid abilities tend to be more sensitive to structural changes that show up in the brain.

Q     And are some tests more sensitive to abnormalities and executive functioning than others?

A     Well, you see, there are also individual differences across all people being assessed. And so that is why there are different tests that are within a particular domain. And so you are trying to evaluate this individual to see what their strengths and weaknesses are. And when you come across these consistent weaknesses, that's how you make inferences from neuro-psychological tests. And again, those that fall into the fluid category, especially from a more mild to moderate level of impairment, those are the areas where there is typically the greatest impairment.

Q     And you mentioned the trail making test a moment ago. Do you see any correlation between how Mr. Fields performed on the trail making test when administered by Dr. Gelbort and the brain abnormalities you have described?

A     Well, I believe I had indicated that earlier, that if you have white matter changes that are in the brain. . .if you have some communication issues between two hemispheres because of disrupted integrity of the corpus callosum, then it reduces processing speed. It takes things longer for the brain

to process and to respond, and that is that clinical correlation with the brain finding. And we now know from 2017 that there are white matter hyperintensities as well.

Q    And I just want to ask you about one other test that Dr. Gelbort administered in particular, and that's the category test.

A    Yes.

Q    Did you see any correlation between how Mr. Fields performed on the category test and the --

A    So –

Q    -- brain abnormality --

A    Yes. Well, see the category test is requiring the individual to solve these novel visual special tasks. So it requires visual processing between the two hemispheres, but your visual space is actually bisected right down the middle and your two hemispheres integrate that information across the back of the corpus callosum. Now, that information also has to be transferred up to the frontal lobe, but some of what is in the category test is also tapping language. So you have language and you have visual spatial stimuli. Well, language stimuli are processed more by the left hemisphere. Spatial and visual spatial are more by the right hemisphere and that information again has to be integrated across the corpus callosum. And then there has to be this front to back and this back to front flow and this integration across the corpus callosum. So often

category test impairment goes hand-in-hand with impairment on the trail making test.

Q    You've explained that in your opinion Mr. Fields' brain images are abnormal.  I'm going to ask you to assume for this moment that they were, in fact, normal.  Would a normal MRI preclude a finding of brain impairments?

A    No, not at all.  No, you can have very significant neuro-psychological impairments in the context of a normal scan.

Q    And so do the neuropsychological testing results, as administered by Dr. Gelbort, by itself – and by that, I mean independent of the MRI, reveal that Mr. Fields' has brain impairments?

A    Yes, independent of it.  In fact, the whole origin of the field of  neuropsychology predated any of our modern imaging.  So that's why the field identified in the first place, was to identify brain pathology because the only way, prior to the advent of computerized tomography in the early to mid-1970s, was neurosurgery.  And so short of neurosurgery, how do you make inference about brain pathology.  Well, by the behavior and the physical examination of the patient or the client.  And so the whole field of neuropsychology was making decisions about the presence of brain dysfunction prior to any imaging.

Q    So you just explained the clinical correlation between the pretrial neuropsychological testing and the MRI studies.

I would like to change topics and ask you whether you have an opinion as to whether the brain abnormalities you've described were present in Mr. Fields' brain at the time of the crime in July of 2003?

A     Yes, I have an opinion.

Q     And what is that opinion?

A     So we see on the screen there, you know, the 2011 to 2017. . .so it really didn't change.  So this wasn't a progressive kind of thing.  It was a static observation.

We have the 1983 CT scan. Again, it was looking for some acute abnormality.  It is assessed to be within normal limits, but we don't know about the size of the ventricle from that because it is not commented on there, just like it is not commented in Dr. Koslow's 2011 scan.

So my inference here is this is a chronic condition. And again, from a neuropsychiatric standpoint, this is what the literature shows.  Depending on what major neuro-psychiatric disorder you are looking at. . .as I've said several times today, there are these subsets of individuals with that neuropsychiatric diagnosis and they have big ventricles and they have alteration in corpus callosum integrity.  So I think these are chronic findings.  They would have been there if a scan would have been done in 2004 or 2005.

Q     And are all of the opinions that you have testified to today to a reasonable degree of neuropsychological and scientific

certainty?

A    That's correct.

Q    And if you had been contacted by trial counsel back in, say, 2003 to 2005, and they had provided you with a MRI of Mr. Fields' brain, do you have any -- could you have performed this sort of analysis and reached the same conclusions that you've reached today?

A    Well, we certainly would have been able to do all of the things that I've talked about today, that *American Journal of Neuroradiology* article, that research article that you referenced earlier, that's 1995.  So clearly all of that could have been done back then.

MS. NELSON-MAJOR:  Just a moment, Your Honor. May I confer with counsel?

THE COURT:  You may.

(PAUSE)

MS. NELSON-MAJOR:  All right.  I just have one, and I actually promise, just one question.

THE COURT:  You would be the first person to live up to it this week.

MS. NELSON-MAJOR:  We will see if I can do it, okay.

BY MS. NELSON-MAJOR:

Q    If trial counsel had asked you or a similarly qualified neuroradiologist to offer the sorts of opinions that you've

offered today based on a 2003 to 2005 MRI, would you have been able to have testified at Mr. Fields' trial to those opinions?

A    Sure.

MS. NELSON-MAJOR:  That's it.

THE COURT:  All right.  Thank you.  Any cross examination, Mr. Stewart?

MR. STEWART:  Yes.

THE COURT:  All right.  You may go ahead.

## CROSS EXAMINATION

**BY MR. STEWART**:

Q    Dr. Bigler, I noticed there were a few things that you reviewed, correct, in your report?

A    I am sorry, I'm having a little trouble hearing you there.

Q    Well, let me get closer to he microphone.  I'm sorry, I'm a little taller, so I might need to hunch.

There are several things that you reviewed in preparing your report, correct?

A    Correct.

Q    Was there anything that you reviewed in your report in which someone recommended physical scanning of the Defendant's brain?

A    I don't believe so.

Q    And you reviewed a report from Mr. Fields' CT scan in 1983?

A    That's correct.  I have it right here.

Q    And that report stemmed from a vehicle accident when he was a teenager?

A    Correct.

Q    And you mentioned that the scan, according to the report, came back normal.  Of course, we don't have the images.  Correct?

A    That is correct.

Q    Did you find any other traumatic head injuries in his history that occurred after the vehicle accident and before the crime?

A    So that wasn't my role, so I haven't reviewed the records from that standpoint.

Q    Now, you did review the district court's order denying the motion, correct?

A    Yes.

Q    And you are aware that this case is related to a motion that Mr. Fields' has filed to vacate his death sentence, correct?

A    I am generally familiar with, yeah, what's happening.

Q    And that initial motion was filed n 2010, correct?

A    I don't know the -- I don't know the actual date.

Q    Well, would it help to refresh your recollection with the order that you reviewed?

A    Well, I mean, that's fine.  I have them digitally here, but if you. . .

Q    Well, we can share it with you, Doctor.  I don't want to put

you on the spot.

MR. STEWART:  Tanner, can we put up document 125.

**BY MR. STEWART**:

Q     And this would be the order denying the motion that you reviewed.  It will be just a moment, Doctor.

A     Sure.

Q     And let's go to Page 3.  Scroll to the bottom, please. And you notice there in that last -- the beginning of the last paragraph on that page, it notes that there was a motion to vacate filed April of 2010?

A     Yes, I see that.

Q     Now, you reviewed Dr. Martel's two reports, correct?

A     Yes, I did.

Q     And one of them was dated in April of 2010?

A     Yes.

Q     And in that report he noted a catastrophic loss of brain function over the past five years, correct?

A     That is what he indicated, correct.

Q     And he thought the most likely explanation would involve the cerebral vasculature, including the possibility of atheros-clerosis and/or ischemic brain disease, correct?

A     Yes, that is in Dr. Martel's report, correct.

Q     And he also noted the possibility of a neoplastic brain disease, correct?

A    He did.

Q    Such as a tumor?

A    Yes.

Q    And he said a MRI was strongly indicated?

A    Yes.

Q    Now, are you aware that the Petitioner relied on Dr. Martel's report to request the 2011 MRI?

A    So I. . .I don't know the details, but I am familiar with Dr. Martel's report and that he recommended that that be done given his neuropsychological findings.

Q    And you did review Dr. --

MS. NELSON-MAJOR:  I would object to any further questions about the legal proceedings.  If he wants to ask the witness about the report that he reviewed. . .because he has no independent knowledge of the basis on which Mr. Fields' requested a MRI image.  It is just outside the scope of his knowledge.

THE COURT:  Well, I think he has indicated he at least reviewed that order, so overruled, but let's get to the point.

MR. STEWART:  Certainly, Your Honor.

BY MR. STEWART:

Q    And Doctor, you did review Dr. Koslow's report as well, correct?

A    Yes, the 2011 radiology report, sure.

Q    And she does note that it was a court ordered report, at least according to the patient?

A    Yeah, I believe so.  If you could put that back up there. . . we had it up there just a minute ago.  I think it would be in the header file.

Q    Let's go back to Document 125, and let's go to Page 4. As you can see there in that last paragraph, it says that an amended motion was filed in October of 2015, correct?

A    Yes.

Q    Do you happen to know if Mr. Fields presented any evidence of the 2011 brain scan in his amended petition?

         MS. NELSON-MAJOR:  Objection, Your Honor.  This is irrelevant to --

         THE COURT:  Sustained.  Let's get on with what this witness has testified to.

BY MR. STEWART:

Q    Let me ask you this, Doctor:  Do you see anything in this brain scan that would account for catastrophic loss of function over the last five years or from the time of the crime until 2011?

A    Well, there isn't a tumor, there isn't a stroke.  We don't -- this was a low field magnetic resonance scan that was a clinical scan, so there are few slices here.  It is not the kind of scan that would be done today, so it limits some of the inferences that you can make, but there was no major pathology like a tumor or a stroke or an old contusion or something along those

lines.

Q    And when were you retained in this case, again?

A    In 2022.

Q    Now, I think you mentioned earlier that there is nothing in the MRI that would – well, strike that.  Let me ask that a little more elegantly, or well maybe not elegantly but at least clearly.

You mentioned that even if it was a normal brain scan, a normal MRI, it would not rule out brain impairment, correct?

A    Correct.

Q    And you noted that it also wouldn't rule out brain damage, correct?

A    That's correct.

Q    And you mentioned that sometimes the terms are used a little interchangeably, correct?

A    That's correct.

Q    Now, what is organic brain damage?

A    So it is kind of an older term.  In fact, the origin of neuro-psychology was to identify individuals that had actual brain pathology or some kind of alteration in brain function, but the term really became problematic because this was in the error of not understanding major mental health conditions like schizophrenia.  So schizophrenia was considered to be a functional disorder, not organic, not related to the brain.  We, of course, now know that schizophrenia is a brain disease.

But in the traditional view, organic meant that there was some kind of psychological structural developmental anomaly, abnormalities, something that was wrong with the brain.

Q    So can you look at this scan and see any organic brain damage, as the term was used traditionally?

A    Well, that is -- this gets us back to the point I was trying to make at the end in clinical correlation. Just looking at a scan that doesn't have, like, a major stroke or a contusion or a tumor or a developmental anomaly that is a major anomaly in and of itself, you can't make conclusions just by looking at the scan.

Q    And so what you are saying essentially is that an abnormality, like you are identifying in the scan, doesn't tell us anything about the underlying pathology?

A    That's why you have a clinical correlation, correct.

MR. STEWART:  Just a moment, Your Honor. I am just trying to cut some stuff out for you.

THE COURT:  That's all right.

(PAUSE)

BY MR. STEWART:

Q    Now, you identified some factors that can affect ventricle size, correct?

A    Yes.

Q    And you mention abnormal development?

A    Correct.

Q   And an injury?

A   Correct, and aging.

Q   Obstruction of --

A   Various diseases.

Q   I'm sorry.  I didn't mean to interrupt you.  Go ahead, continue.

A   I just said diseases, various neurologic diseases.

Q   And you mention the obstruction of -- I think that is cerebral spinal fluid flow, correct?

A   Yes.

Q   And you also say, quote, "a variant of whatever reason that deviates from the normal."

What does that mean?

A   So that means often, like in this case, you have a scan at some point in time, but you don't have scans earlier in the individual's life, so you don't necessarily know the onset.  But in disorders, like, for example, major depression, bipolar disorder, schizophrenia, autism, there is a subset of individuals that have larger than normal ventricle size.  The assumption is that it occurred early in life, and it is something related to anomalous development in the way the brain developed.  So that's what I was referring to with that statement.

Q   So. . .I don't want to put words in your mouth.  I just want to clarify.  It basically means we see some kind of larger ventricles than we would expect, therefore something must

have happened to make it happen, correct?

A    Well, I. . .yes.  And I testified earlier that the brain is a very dynamic organ. It is changing.  And if there are changes that don't follow a normal trajectory, then these abnormalities show up.

Q    And in your report you used a -- I don't want to call it a control.  You used an image of what a -- what you called a neurotypical 44-year-old male brain, correct?

A    Yeah, it was my lab director.

Q    Why did you choose a male brain?

A    Well. . .so there are body size differences between males and females.  There are hat size differences between males and females.  So proportionately the brain is in relationship to the size of the head and the size of the skull.  So that's why – Mr. Fields' is a male and that's why I selected a male brain as a comparison.

Q    Now I want to talk about the OASIS images that you selected.  Do you know the background health history, medical histories of any of those individuals?

A    No.

Q    So you don't know if any of them are morbidly obese?

A    No,  I don't know anything more about the personal history of any one of the participants.

Q    Now if a person was morbidly obese, that could affect ventricle size, correct?

A    Yes, it can because there are associated disorders that are related to ventricle size, such as diabetes.

Q    Now, are you aware that Mr. Fields had diabetes and was considered morbidly obese?

A    I didn't know that he was morbidly obese, but the diabetes, yes.

Q    Did you also know that he had uncontrolled hypertension?

A    Yes, I knew about the hypertension because of the white matter hyperintensities.

Q    Now, are you aware that there was testimony at trial that he suffered a beating in the head in which he was nearly unconscious pretrial, but after the crime?

A    Again, that was not my role, to review those records from that standpoint.

Q    But would you consider that clinically relevant in reaching your opinion?

A    So that -- if that occurred, that can constitute traumatic brain injury.

Q    And so that could have affected ventricle size?

A    I already testified. . .in fact, one of the illustrations we looked at was an illustration from one of our TBI publications.

Q    And you mentioned the Analyze Software.  Now that is not FDA approved for clinical use, correct?

A    That's correct.

Q    Now, you say that enlarged ventricles and a thinning

corpus callosum would most likely be associated with the difference in processing speed, executive function, and memory.  You can't necessarily be definitive on that, correct?

A    So that's why it's called clinical association.

Q    In other words, someone could have the exact same scan as Mr. Fields and not have any of these dysfunctional issues?

A    Well, yes.  It may not be manifested.  It may not be impacting neuropsychological function and behavior.

Q    In other words, correlation does not equal causation?

A    That's the first statement in my research class.

Q    I won't be guest lecturing, don't worry.

A    Okay.

Q    Now, I want to ask you a little bit about Dr. Gelbort' testing.  Did you review his raw data?  Actually I know you reviewed his raw data.  Did you review it with an eye to whether he made any errors?

A    No.

Q    And so if there were errors in the scoring or missing data, you wouldn't know that?

A    Well, I retired in 2018.  I don't have access to test manuals, scoring protocols, so I am not in a position to look at that.

Q    But would that be relevant information as you do your clinical correlation?

A    It can be, but the thing is there are often some minor

scoring errors or recording errors.  I taught neuropsychological assessment for almost fifty years, and I've conducted major research studies.  So often we have two psychometrists administering tests and we look at how the test results line up and there is often some minor scoring errors, but it doesn't change the overall pattern.  It doesn't change the overall makeup of the test results in most cases.  And you can always quibble about a potential score.  Is it a one or is it a two or is it a zero.  So it is the overall pattern that becomes more important in my view.

Q    And what if there were entire missing parts of data that you could not then use to do your clinical correlation?

A    Well, you want to use all of the data that you possibly can.  I mean, missing data can't be analyzed, of course.

Q    Now, you discussed processing speed and its relationship to impulsivity and disinhibition, correct?

A    That's correct.

Q    And would you agree that a disinhibited and an impulsive person could be dangerous?

A    Yes.

Q    And you note in your report, do you not, that Dr. Gelbort thought those two characteristics were present in Mr. Fields, correct?

A    Correct.

Q    Can you treat enlarged ventricles?

A     Well. . .so there are certain conditions where there is a thing called normal pressure hydrocephalus where they actually put a shunt in and reduce the size of the ventricle.  So there are some things that can be done that way, but from a developmental standpoint if the brain was irregular to begin with and the ventricles is expanded to fill those developmental changes, then no.  But you can treat a variety of different behaviors, even those that are, and I am using your term, organic.

Q     So I just want to make sure I understand.  You also can't treat a thinning corpus callosum, correct?

A     Well, so. . .the brain is not a muscle but it does respond to cognitive challenges so to speak.  So the more passive that someone is interacting with their environment, the less healthy that is for the brain.  So for example, sitting and watching TV is not healthy.  But, you know, reading, doing parlor games, video games, things like that that challenge the brain and that require processing speed, yes, that is actually part of what we call cognitive neurorehabilitation.  That is actually what we do with some of our patients that have various neurologic and neuropsychiatric conditions.

Q     So. . .and I -- sorry, I don't mean to be sort of a lute out here, but I guess my question is can you make the thin corpus callosum thicker?

A     No.  I mean, you are – well, so there is some interesting

studies. Like, for example, learning to play the violin. If you take a naïve individual and you teach and train them, it doesn't necessarily make the corpus callosum thicker, but there is some other imaging tools that allow you to look at the integrity of the corpus callosum and it can become more efficient because you are actually challenging that part of the brain to do sort -- to sort of exercise.

Q    I think in your report you mentioned that a normal scan can not rule out pathology at a cellular level, correct?

A    Yes, because we are looking at cells that are at the nanometer level or the micro – or a millionth of a meter to a billionth of a meter depending on what part of the cell you want to look at. And everything from an MRI, that has been done in Mr. Fields, is at a millimeter to a half a centimeter level. So we are only looking at -- the way I like to describe this is we are looking at Los Angeles from a helicopter.

Q    And, Doctor, I mentioned a couple of things earlier and I wanted to circle back. I mentioned that Mr. Fields is morbidly obese, is diabetic, uncontrolled hypertension and had this attack, this pretrial attack. Considering those things can you say with a medical certainty that he would have had a similar brain scan in 2003 to 2005 as he did in 2011?

A    Well, I think I already gave the basis for that. So we don't see a major change in terms of overall ventricle size or corpus callosum size from 2011 to 2017. So that -- so even in

the presence of all of those problems that you just described, we are not seeing a massive change.  To me, I think that predicts that this was present during that time period that you mentioned.

Q    Well, let me follow up on that.  Do you know if Mr. Fields suffered another beating from 2011 to 2017?

A    No, I don't know that.

Q    I want to drill down on something because you say that brain damage can -- is basically kind of a capacious term. So in your mind -- well, strike that.

Is it your opinion that someone who has a TBI from getting hit in the head with a rock and someone who has brain atrophy because of twenty years of uncontrolled hypertension both have brain damage?

A    Correct.

Q    Now, you didn't diagnose Mr. Fields with any neurological disorder based on this brain scan, correct?

A    No.

Q    Or any disorder for that matter?

A    That was not my role, and I didn't see him either, as I already testified to.

Q    And you explain that there is correlations, but you cannot say that enlarged ventricles caused Mr. Fields' impairments?

A    So I. . I think I've said this multiple times.  This clinical correlation -- the size of the ventricles by itself is not necessarily clinically meaningful.  It is when you take the history, all of the

other factors compiled together in conjunction with

neuropsychological testing that the meaning and understanding

of what you are looking at from an imaging standpoint becomes

apparent.

Q    Now, brain imaging really doesn't do a great job of

identifying major mental illness, does it?

A    Major what?  I lost the last thing.  I couldn't hear -- major

what?

Q    Major mental illness.

A    Major mental. . .so, you know, we started off – in your

question you were asking me about organic – every -- so this

is the diagnostic and statistical manual of the American

Psychiatric Association that classifies the various mental

health disorders.  Every single disorder that is in that now has

been subjected to some form of imaging because the motto

in my lab was that every behavior has an anatomy.  So we

don't -- so behavior is never expressed.  Emotions aren't felt.

Senses aren't processed without the brain.  So the brain is

central to emotional health and mental health.  So there are

ways of getting at these different disorders and that's a big

part of what clinical research is right now.  It does come down

to the brain.

Q    Well, I want to touch on -- because it seems like you are

speaking from sort of a high level, so I want to kind of talk to

you about that.  Speaking of normal brain scans, someone

who would have a perfectly brain scan -- not a perfect brain but a normal brain scan, by your definition, could they have that normal brain scan and still commit murder?

A    Sure.

Q    Or have severe behavioral deficits?

A    Sure.

Q    Or even have significant impairments on neurological testing?

A    Yes.

Q    So -- and someone could have an abnormal brain scan like Mr. Fields and not murder anyone?

A    All correct.

Q    Or even be violent?

A    Correct.

Q    Or even have severe behavior deficits?

A    Correct.

Q    Or show impairments on neuropsychological tests?

A    Correct.

Q    Now, you -- I'm getting to the end here.  You say that your findings on the brain scan are consistent with Dr. Gelbort's findings, correct?

A    Correct.

Q    Would a finding of ventricles within a normal range be inconsistent with Dr. Gelbort's findings?

A    Not necessarily because there are -- none of the other

1206

advanced imaging analyses were done that we can do now that give us even more precise ways of looking at, for example, white matter, integrity and processing speed. But when we see the findings that are present in Mr. Fields' and then we see Dr. Gelbort's findings, that's where that clinical correlation comes in. Okay, this makes sense, this makes clinical sense as to why someone would have this neuropsychological profile. And that -- that's what is going on in the clinical world relating these imaging findings to behavior and neuro-psychological test results.

MR. STEWART: Your Honor, if I could have a minute, I might pull this off.

THE COURT: You are going to pull it off. (Laughter)

(PAUSE)

BY MR. STEWART:

Q    So, Doctor, are you saying that regardless of whether Mr. Fields' brain scan showed that he had smaller than normal ventricles, normal ventricles, or larger than normal ventricles, those would all be consistent with his test results?

A    Well, there are other factors that you are looking at. I mean, it is a complex array of data points. So it is not just one thing, but in Mr. Fields' case we have neuropsychological data and we have medical history and psychiatric diagnoses. So you bring that together and the enlarged ventricles, the corpus callosum, and the neuropsychological data tell us or tell

me that this is brain dysfunction, brain damage, and that it is present in Mr. Fields.

Q    Is it organic brain damage?

A    Well, yeah.  I mean, organic means that it is present in the brain.  If we can drill down enough into the cellular psychological level, something isn't working correctly.  That's organic.

MR. STEWART:  That's all, Your Honor.

THE COURT:  Any redirect?

MS. NELSON-MAJOR:  Just a few.

THE COURT:  Okay.

## REDIRECT EXAMINATION

**BY MS. NELSON-MAJOR**:

Q    Mr. Stewart asked you a number of questions about Dr. Martel's opinions.  Do any of those opinions you expressed today and in your reports rely on the findings of Dr. Martel?

A    No.  I focused on Dr. Gelbort.

Q    And if you had never been provided the report of Dr. Martel, would your opinions that you've given today and in your reports be the same?

A    Correct.

Q    And what entity or organization developed the Analyze software that you used?

A    Mayo Clinic.

Q    And Mr. Stewart asked you a number of questions about whether you can treat enlarged ventricles or a thinning

corpus callosum, but I want to ask you, can you treat the behaviors or impairments connected to executive dysfunction in any way?

A    Well, again there's cognitive neurorehabilitation that is a discipline within clinical neuropsychology and speech pathology and, yes, there are programs that you can work with but they are usually targeted to, like, a particular vocation or trying to get the person back into a job setting or something after a brain injury or after an onset of a particular neurologic condition.  You have to have a particular goal that you are searching for from the rehab standpoint.  You can't just, you know, do a treatment program to improve executive function in general.

Q    And would you expect that structured settings would have a positive impact on the behaviors of someone with the brain impairments that Mr. Fields has?

A    Oh yes.  I mean, that's classic in individuals with brain dysfunction.  You control the environment. You control the routine.  You control the setting and that eliminates some of that fluid aspect that we were talking about earlier that's most impaired in individuals that have brain dysfunction.  So, yes, a structured setting helps the brain damaged individual greatly.

MS. NELSON-MAJOR:  No further questions, Your Honor.

THE COURT:  All right.  Any recross?

MR. STEWART:  No, Your Honor.

THE COURT:  All right, very well.  Good.

All right.  Dr. Bigler, thank you for your time.  You are excused and dismissed.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  We will wrap up for today.  It is 5:00.

Let me -- let's go off the record.  There are a few things that I want to cover before we depart today.

(PROCEEDINGS RECESSED)


**C E R T I F I C A T E**

I, KARLA McWHORTER, Certified Shorthand Reporter and Registered Professional Reporter, do hereby certify that the foregoing Certified Transcript, as prepared, is a transcription of all requested matters contained on the recorded proceeding and has been done to the best of my skills, ability and  understanding.

I further certify that I am not employed by nor related to any party in this action, and that I am in no way interested in the outcome of this matter.

Certified this 8th day of November 2024.


s/Karla McWhorter

KARLA McWHORTER, CSR-RPR

United States Court Reporter

karla_mcwhorter@oked.uscourts.gov