IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )
                               )
vs.                            )     Case No.  03-CR-00073-RAW
                               )
EDWARD LEON FIELDS, JR.,       )
                               )
               Defendant.      )


TRANSCRIPT OF PROCEEDINGS

DECEMBER 6, 2024

BEFORE THE HONORABLE GERALD L. JACKSON

UNITED STATES MAGISTRATE JUDGE

EVIDENTIARY HEARING


APPEARANCES:


FOR THE PLAINTIFF:          CHRISTOPHER J. WILSON
                            United States Attorney
                            520 Denison Avenue
                            Muskogee, Oklahoma 74401

                            AARON J. STEWART
                            Capital Case Section
                            U.S. Department of Justice
                            1331 F Street, NW
                            Washington, D.C. 20530

(Appearances Continued)

REPORTED BY:                JOANNA SMITH, CSR, RPR
                            United States Court Reporter

**United States District Court**
**Eastern District of Oklahoma**

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          KATHERINE E. ENSLER
                           HAYDEN NELSON-MAJOR
                           KATHERINE C. THOMPSON
                           Federal Community Defender Office
                           Suite 545 West, The Curtis
                           601 West Walnut Street
                           Philadelphia, Pennsylvania 19106

                           HUNTER S. LABOVITZ
                           Federal Public Defender Office
                           Dean A. McGee Avenue, Suite 707
                           Oklahoma City, Oklahoma 73102

INDEX

PAGE

WITNESSES ON BEHALF OF THE DEFENDANT

JULIA O'CONNELL
  Direct Examination by Mr. Labovitz          4

**United States District Court**
**Eastern District of Oklahoma**

PROCEEDINGS

DECEMBER 6, 2024:

THE COURT: Good morning everyone. We are back on the record in Case Number CR-03-73-RAW, United States of America versus Edward Leon Fields, Jr.

For the record, counsel are all present, defendant is not. Just before we get started, anything we need to address before we get started this morning?

MR. WILSON: Not at this time, Your Honor.

MR. LABOVITZ: No, Your Honor.

THE COURT: All right. I just did want to make one quick announcement, and that is since we're getting started almost at 9:30, and today is the Court's holiday lunch, and I've already punished my folks up here enough by denying them over things, I'm not going to try to deny them that as well. So my goal is to go straight through to 11:30-ish, 11:45, without a break, if that's okay with everybody, and then we can break for lunch and do that, so ...

All right. With that, defendants ready to continue with their witness, Ms. O'Connell?

MR. LABOVITZ: Yes, Your Honor.

THE COURT: Okay. All right.

Ms. O'Connell, you may retake the stand. As always, I would simply remind you, you are still under oath.

MR. LABOVITZ:  One thing, Your Honor, I did heed the Court's advice and consulted with counsel last night and did truncate the remaining examination based upon some of yesterday's testimony.

THE COURT:  All right.  Very well.  Excellent.

MR. LABOVITZ:  My definition of truncate, of course, might be different from yours, but --

THE COURT:  We'll find out.  So we'll see.  That's fair enough.

MR. LABOVITZ:  But I did cut a lot.

JULIA O'CONNELL,

having first been duly sworn, was recalled as a witness and testified as follows:

DIRECT EXAMINATION

BY MR. LABOVITZ:

Q.    Good morning, Ms. O'Connell.

A.    Good morning.

Q.    We ended yesterday by talking about Defendant's Exhibit 184, so if we could pull that back up.  This is an email that you sent to David Freedman and Lisa Greenman back in June of 2005.

THE COURT:  What exhibit number are we on again?

MR. LABOVITZ:  184, Defendant's 184, Your Honor.

THE COURT:  Okay.  All right.  Thank you.

Q.    (By Mr. Labovitz)  And if -- you recall that you were

talking about a concern of the doctor for the government doing a variety of tests that would not show any impairment? Is that an accurate description of how we ended up yesterday?

A.   I don't know.

Q.   Okay.  Well, let me just ask you a question.  Take a look at Defendant's Exhibit 184.

A.   Okay.

Q.   And particularly in focusing at the bottom about different -- testing different areas of functioning other than what Dr. Gelbort tested.  All right.  Is it your position that if the government's pretrial neuropsychological testing showed that Mr. Fields was, as you say, "Overall, he's fine," then that would cancel out the frontal lobe impairment findings that Dr. Gelbort made in this case?

A.   No.

Q.   Okay.  Is it your position that if the neuropsychological testing by the government's expert covered many domains of brain functioning and only showed -- and also the testing by your expert.  So all the neuropsychological testing is done covering many domains of the brain, and it only showed impairments related to executive functioning and frontal lobe functioning, that you would not have wanted Mr. Fields' sentencing jury to hear that?

A.  I don't think I understand your question, if it only showed --

Q.  So if -- sort of taking this email here.  So if the -- if you had testing, whether from Dr. Gelbort -- neuropsychological testing from Dr. Gelbort or somebody else, that showed impairments in the frontal lobe and in executive functioning in that domain of the brain, but there was also testing showing that in other domains everything was fine, would you still have wanted to present the impaired functioning evidence to Mr. Fields' sentencing jury?

A.  Maybe.

Q.  And what would have been your -- why do you say maybe? What would have -- how would that have changed your decision-making?

A.  Well, I don't know that what you're asking me would change my decision making; it would be other factors, what other things the jury might hear.

Q.  Now, do you recall testifying yesterday that your understanding before the trial was that the frontal lobe of the brain controls actions such as a person's judgment?

A.  Judgment, yes.

Q.  Okay.  Do you know if the frontal lobe also controls things like a person's decision making?

A.  Yes.

Q.  Okay.  How about their ability to appreciate the

consequences of their actions?

A.    Sure.

Q.    How about their ability to reason clearly?

A.    Yes.

Q.    And is it your understanding -- well, was it your understanding, before trial, that issues about a person's judgment, reasoning, critical thinking, things like that, that those were issues that were of importance to capital mitigation?

A.    Yes.

Q.    Why is that?

A.    As I said yesterday, that's important to weigh into decisions for a jury or for other decision-makers whether or not the death penalty is appropriate in a case, given an individual's impairments.

Q.    And would those impairments that we were just talking about, in terms of decision making and reasoning and judgment, would those -- is it your understanding that those could help educate the jury as to why a client, such as Mr. Fields, acted as he did?

A.    Yes, it could.

Q.    Is it your position that if you had evidence that Mr. Fields was damaged in his frontal lobes -- well, let me ask you this.  If you had that evidence that Mr. Fields was damaged in the frontal lobes which affects his judgment, his

reasoning, his decision-making, would you present that to a sentencing jury, even if a government witness could testify that he did not have impairments that -- in other areas of his brain that had nothing to do with judgment, decision making, reasoning?

A.    I think it would depend.

        MR. WILSON:  Objection to form.  I think it's called -- it's calling for speculation.  I think counsel just needs to ask -- I think counsel just needs to ask the -- I think the appropriate question is why did you do what you did.  So I'm objecting to the form of the question.

        THE COURT:  Overruled.  She can -- the witness can answer it if she understands it.

A.    It would depend.

Q.    (By Mr. Labovitz)  What are some factors that it would depend on?

A.    It would depend on what other damaging evidence that witness might be able to get into.  That would be one -- one potential aspect.  Another aspect is just simply in being the lawyer and weighing the pros and cons of presenting different evidence, the risks of additional evidence coming in, what damage that might cause to the case, how it might detract from what one considers to be the most viable defense, things like that.

Q.    Now, we're talking about this email to Mr. Freedman

and Ms. Greenman.  This is in June of 2005.  And you testified yesterday that you had some concerns about -- in your view, of Dr. Gelbort's opinion was weakening when you talked to him at the conference in New Orleans.  Did you ever raise that concern with Mr. Greenman?  I'm sorry, Mr. Freedman.

A.    I don't know.  And, really, I'm not sure that weakening is the right word; softening might be a better word.

Q.    What do you distinguish as the difference between softening and weakening?

A.    Well, I don't really know at this point in time what Dr. Gelbort was thinking.  But from the beginning, from the first draft report, from the first reporting, actually, which was probably a phone call, of his results, to the end, it just lost its impact, the impact he was placing on it when he talked about it.

Q.    Did you -- and you said you consulted with Mr. Freedman and Ms. Greenman about some of the mental health issues in the case; correct?

A.    Yes.

Q.    Okay.  Did you consider asking them what they thought about whether Dr. Gelbort was softening his opinion?

A.    I don't remember.

Q.    If Ms. Greenman testified in these proceedings that

you did not provide her with Dr. Gelbort's final report, would you dispute that?

A.    I don't have any reason to.

Q.    Okay.  Do you know if you sought her impressions of Dr. Gelbort's final report?

A.    I don't know.

Q.    If Mr. Freedman testified that you did not provide him with Dr. Gelbort's final report, would you dispute that?

A.    No.

Q.    Do you know if -- do you recall if you sent him Dr. Gelbort's final report?

A.    I don't recall.

Q.    Would there have been a reason not to do that for Mr. Freedman or Ms. Greenman?

A.    Well, I don't -- from the start, there wasn't a reason to send any of them anything.  They -- they were people on the outside of the case.  They were not part of the defense team; they were people I was reaching out to for their expertise and for their assistance.  If I did not give them the final report, there could be any number of reasons why not, and, most likely, it was because, at that time, we were so busy doing other things that it wasn't necessary.  I felt at the time most likely that I had exhaustively discussed these issues and was making my own decisions as the trial attorney on how to proceed.  All of that stuff, I realize,

are decisions that are my responsibility.

Q.   Okay.  Now, I would like to ask you -- move on to another topic and ask if you recall getting a declaration from Dick Burr, B-U-R-R, as part of the Rule 12.2 continuance motions that we discussed yesterday?

A.   I don't specifically recall it, but I'm quite certain I did.

MR. LABOVITZ:  Can we pull up Defendant's Exhibit 146?

Q.   (By Mr. Labovitz)  Starting with page one, do you recognize this as one of the pleadings that we discussed yesterday?

A.   Yes, I still recognize it.

MR. LABOVITZ:  If we could go to page -- I think it's about 10 or 11.  Sorry.  Keep going.  Okay.

Q.   (By Mr. Labovitz)  Yeah, if you could -- I don't know if you want to scroll through this.  It's probably about 15 pages, but if you can just maybe look at page one, and if you need to look at more, just to see if this refreshes your recollection that someone on the defense team reached out to Richard Burr?

A.   Okay.

Q.   Does this look familiar now?

A.   It's a part of the pleading.

Q.   Okay.

A.    I don't deny that it's part of my pleading.

Q.    Do you know if you were the one that contacted Mr. Burr to obtain this declaration?

A.    Mostly likely, I was, yeah.

Q.    If you could look at page 20 of this exhibit, 2-0. And do you see at the top, it says "How Counsel for Mr. Fields Have Carried Out Their Duties in Conducting the Investigation of Mental-Health Based Issues."

A.    Yes.

Q.    And then there's paragraph 22 that says "Counsel for Mr. Fields have advised me of the following facts relevant to their investigation of potential mental health-based issues"?

A.    Yes.

Q.    Okay.  And now, if we could scroll to the next page. Do you see at the top there paragraph G?

A.    Yes.

Q.    It says "Following a review of Mr. Fields' biopsychosocial history, this expert conducted complete neuropsychological testing on August 10 and 11, 2004.  The results of the assessment, revealing serious brain dysfunction that had not been previously identified, were made available to counsel and their evaluating psychiatrist on August 26, 2004."

A.    I see that.

Q.   If Mr. Burr testified in these proceedings that he received this information about the results of Mr. Fields' neuropsychological testing by Dr. Gelbort from you and only you, would you dispute that?

A.   No.

Q.   Now, I would like to ask you some questions about Dr. Price.  And do you have an -- do you recall pretrial, if you thought, as a legal matter, that Dr. Price would only be permitted to testify if Dr. Gelbort, also a neuropsychologist, first testified?

A.   No, I don't think so.

Q.   Did you believe that -- what did you believe in terms of the legal relationship in testifying between you -- the defense calling Dr. Gelbort and the government responding with Dr. Price?

A.   I do not remember specifically, so if I answer, I am speculating in large degree.  Do you want me to do that?

Q.   No.  I'll ask you some additional questions in a minute.  All right.  Let me then turn to Defendant's Exhibit 120.  This is your declaration that we discussed yesterday.

A.   Right.

Q.   You do recognize that?

A.   I do.

Q.   Okay.  And I didn't write down the page number.  If we go to paragraph 17.  This is paragraph 17 on page 11.

A.    Yes.

Q.    And I would ask you to look at the fourth line of that paragraph, and do you see, it says "The evening before trial testimony was to begin, Dr. Gelbort notified me that he was going to be traveling and would not be available on the dates of trial that had been set"?

A.    Yes.

Q.    Is that a true statement?

A.    I believe so.  Like I said, at the time that I signed this, I had not reviewed my file.  I can't tell you exactly when he told me.  I can only tell you, you know, the circumstances as I -- as I remember them.  It was in trial.  It was -- I don't know if we were selecting the jury.  You know, I don't know exactly when it was that he and I had the conversation, but it was right upon trial.

Q.    Yesterday, you testified that you trusted Ms. Charpentier to provide a lot of the material for your declaration?

A.    Yes.

Q.    Do you know where Ms. Charpentier would have learned this fact without talking to you about it?

A.    Well, she did talk to me about it.  As we discussed yesterday, she talked to me a couple of different times.

Q.    Okay.

A.    But the exact time, again, I'm telling you, I can't

help you other than to say it was right up on trial, either while we were selecting the jury, or the night before it was time to present evidence, or something like that, when I had a conversation with him and he told me that he was in the airport on his way to France.

Q. And what -- if the defense presented their case starting on July 19th of 2005, when this declaration says the evening before trial testimony, are you referring to the defense trial testimony or the government's trial testimony?

A. I think it would have had -- necessarily be mine. I mean, necessarily be defense.

Q. And I know that you know -- well, we've discussed that I've reviewed your files, and I did not see any information about memorializing this phone call, so I would ask if there are any contemporaneous emails, notes, memos, that you would have prepared that memorialize Dr. Gelbort's calling you to say that he was traveling?

A. At the moment that it happened? Is that what you mean by contemporaneous?

Q. Yes.

A. I don't think I would have done that. We were in trial prep. We were working every night.

Q. Post-trial, did you make any recordings about or any memorializations of this conversation?

A. I might have griped in an email to someone about it,

but that's a might.  I do not know.

Q.    Do you know if -- well, do you recall discussing -- after you got this phone call from Dr. Gelbort, discussing that with anybody on the defense team?

A.    Yes.

Q.    Who was that?

A.    It would have been Ms. Shettles.  It would have been -- or likely Ms. Shettles.  I presume that she was there. Sometimes she was not with us during trial prep.  Mr. Gant knew.  Barry Derryberry was there that evening, he would know.  That was -- I think that's probably the extent of it.

Q.    Do you recall what their response was?

A.    No.

Q.    Okay.  Do you recall if they suggested that you do anything about this?

A.    No.  Nobody suggested that I do something about it.

Q.    Did you take any steps to notify the court that one of your experts would be traveling instead of attending the trial?

A.    No.

Q.    Why was that?

A.    Because I was not going to call him as a witness.

Q.    So if Dr. Gelbort, according to your declaration, didn't call you and say he was traveling, that wouldn't have mattered to your decision making?

A.   It could have potentially mattered to my decision making.  You know, when somebody is not coming, that sort of closes the door on trying to decide whether to call him or not.

Q.   Prior -- but are you saying that prior to his call, you had decided not to call Dr. Gelbort as a witness?

A.   Prior to his call, the position that I was well settled in, was that I wanted him there to hear Dr. Price testify.

Q.   And you were not yet -- well, is it accurate to say then that you were not yet well settled, that you wanted Dr. Gelbort to testify?  Well, I think yesterday you said you were well settled that -- sorry.  Was it well settled that you wanted Dr. Gelbort to testify in your case in chief?

A.   No.

Q.   And can you pinpoint the moment you made this decision to not present Dr. Gelbort in the case in chief?

MR. WILSON:  Objection.  It has been asked and answered, Your Honor.

THE COURT:  Sustained.

Q.   (By Mr. Labovitz)  Okay.  If I can show you Defense Exhibit 95.  I'm sorry, Defense Exhibit 195.  Have you had a chance to look that over?

A.   Yes.

Q.    And do you see that this is an email from Dr. Gelbort

to -- I believe it's kikntake@swbell.net; is that correct?

A.    Yes.

Q.    Do you know who that is?

A.    That's me.

Q.    Is that your private email account?

A.    Yes.

Q.    Okay.  And is this email dated July 11th, 2005?

A.    Yes.

Q.    Okay.  Is it -- in the email, does Dr. Gelbort tell you that "A reminder, I told you I would be leaving the country the evening of the 20th.  You had thought I could go on the 18th, that's preferable, but the 19th would work too.  Please let me know what you think"?

A.    Yes.

Q.    Do you recall receiving this email?

A.    No.

Q.    Why is that?

A.    So I'm quite certain on July 11th, I was busy working at the Airbnb in Muskogee and had no access to my personal email.

Q.    Okay.

        MR. LABOVITZ:  Court's indulgence.

    Your Honor, in light of this testimony, we have a new exhibit to offer, and we'll -- we have, right now, just hard

copies of that.

THE COURT: All right. Has the government seen this exhibit?

MR. LABOVITZ: I don't -- not yet, Your Honor.

MS. NELSON-MAJOR: May I approach?

THE COURT: Yes, you may.

MS. NELSON-MAJOR: There was an error on the Bates stamping on this exhibit. It should be Bates-stamped Defendant's Exhibit 281. I'll make sure that we replace it with a correct Bates-stamping on the break.

THE COURT: Mine is stamped Defendant's Exhibit 281.

MS. NELSON-MAJOR: Oh, we've already corrected then. I apologize.

THE COURT: No. You already fixed it. That's good. Actually, I have multiple copies here. Maybe I should give these back to you. I only need one. I guess we can give one to --

MR. LABOVITZ: May I proceed, Your Honor?

THE COURT: Has the government had a chance to review the exhibit?

MR. WILSON: Yes, Your Honor.

THE COURT: Okay. All right. You may proceed.

Q.   (By Mr. Labovitz) Ms. O'Connell, you testified that you did not have access to your personal email during trial?

A. I did not have access to my personal email when we were in Muskogee.

Q. Okay. Yes. So let me show you what has been marked as Defendant's Exhibit 281 and ask you to take a look at that one-page document.

A. Sure.

Q. Do you recognize this as email back and forth between yourself and Glori Shettles?

A. Yes.

Q. And on the top, is it dated July 11th, 2005?

A. It is.

Q. And is it from that same kikntake@swbell.net email that we just talked about?

A. Yes, it is, and it remains my personal email.

Q. And is this an email that you sent on July 11th to Glori Shettles from your personal email account?

A. It looks like it.

Q. Okay. And on July 11th of 2005, were you in Muskogee for trial?

A. I'm sure I was.

MR. LABOVITZ: Your Honor, at this time, I would move to admit Defendant's Exhibit 281.

MR. WILSON: No objection, Your Honor.

THE COURT: All right. Defendant's Exhibit 281 will be admitted.

Q.    (By Mr. Labovitz)  Did Dr. -- you talked a little bit yesterday about some structural imaging that Dr. Gelbort had mentioned?

A.    Yes.

Q.    Did he tell you that structural imaging of Mr. Fields' brain was necessary to his opinion?

A.    I don't believe so.

Q.    Okay.  Did you think that structural imaging was necessary before you could present the results of neuropsychological testing at trial?

A.    No.

Q.    Why didn't you obtain structural imaging of Mr. Fields' brain, such as an MRI?

A.    The main reason was because Dr. Woods -- Dr. Woods did not believe it was a good idea.

Q.    Okay.  If we could take a look at Defendant's Exhibit 80.  And I would direct your attention to paragraph 4. Well, first, I would ask you, do you recognize this as an email that you sent to Dr. Woods on -- well, do you recognize this as an email you sent to Dr. Woods?

A.    Yes.

Q.    Okay.  Looking at paragraph 4, do you see you ask "What about possible diagnostic imaging?  Is there any you are considering, and if so, what?"

A.    Yes.

Q.   Do you know if Dr. Woods responded to this email?

A.   I'm guessing he did.

Q.   Well -- and it's your position that when -- did he respond orally or by email, if you know?

A.   I do not know.

Q.   Okay.  But it's your position that at some point Dr. Woods told you not to do imaging?

A.   He told me not to do a PET scan.

Q.   Okay.  Did he tell you -- what did Dr. Woods tell you, if anything, about having Mr. Fields undergo an MRI of his brain?

A.   It would -- do you want me to speculate?

Q.   No, no.  Did he --

A.   Okay.  I can't tell you.

Q.   Okay.  Your recollection is that Dr. Woods was talking about a PET scan?

A.   It was a specific discussion about a PET scan.

Q.   Okay.  And if there are other kinds of scans of Mr. Fields' brain that were available in 2003, 2004, 2005, that would have showed structural damage to Mr. Fields' brain, would you have wanted to present that to Mr. Fields' sentencing jury?

A.   Yes, possibly.

Q.   Okay.  Would there be any -- well, what reason would there be not to do that, not to present it?

A.    If you had it.  I mean, like I -- well, I don't understand what you're asking --

Q.    No, I'm asking you in the hypothetical, of course.

THE COURT:  Please don't talk over each other.

A.    Okay.  So I asked the doctor what imaging he wanted. He's the physician.  If he had said he wanted an MRI or a PET scan or any other kind of physical testing, I would have done it.  I would have done what my doctor advised me to do. He was the expert.

Q.    (By Mr. Labovitz)  Did Dr. Woods ever tell you not to do an MRI?

A.    I don't know.

Q.    Is it your position that the expert decides what the defense should do in a case?

A.    No.

Q.    Did you consider -- let me change topics a little bit. Did you consider using Mr. Fields' Navy performance to support that he could do well in a structured setting if he received a sentence of life without parole?

A.    I don't remember.

Q.    Okay.  Would there have been any reason not to do that?

A.    I don't know.

Q.    Okay.  You were familiar with Mr. Fields' naval history, generally?

A.    Yes.

Q.    Did you contact any of his commanding officers who appear in the naval records?

A.    I did not.

Q.    Do you know if Ms. Shettles did?

A.    I don't recall.

Q.    If they had been available to testify on behalf of Mr. Fields about his performance in the Navy, would you have wanted the jury to hear from them?

A.    Possibly.

Q.    What would be the factors in your decision making there?

A.    I don't know.

Q.    Do you know if you -- well, do you recall asking anyone with expertise in a person's military service and performance to review his Navy records?

A.    No.

Q.    Why not?

A.    I don't know.

Q.    Did you have expertise yourself in reviewing and interpreting military records?

A.    No.

Q.    I want to show you -- I know -- just -- let me show you Defendant's Exhibit 21.

        MR. LABOVITZ:  Can we pull up two at a time or

not?  Okay.  21 and 22.

Q.    (By Mr. Labovitz)  And we'll start with 21, and just kind of scroll through that a little bit just to see if you recognize those records.  And then just also ask you -- or the same questions.  Could you just scroll through a little bit on Defendant's Exhibit 22 to see if you recognize those records.

A.    (Witness complies.)

Q.    Do you recognize Defense Exhibits 21 and 22 as military records related to Mr. Fields?

A.    I can see that's what they are.

Q.    Okay.  Do you recall -- whether it was these precise records or not, do you recall obtaining military records for Mr. Fields before trial?

A.    I don't have a specific recollection.  I'm sure we did.

Q.    Okay.  That would have been through Ms. Shettles?

A.    I think so, yes.

Q.    Do you recall whether you reviewed naval records regarding Mr. Fields prior to trial?

A.    No.

Q.    Okay.  What did you know about Mr. Fields' naval performance before trial began?

A.    Well, I can't tell you right now everything that I knew, okay, but I know he was honorably discharged.  I knew

that at the time. I knew that he spent maybe three years in the Navy, maybe four, and when he completed his service, he became a recruiter for a brief period of time. And then, you know, I know about his life while he was in the Navy, the birth of children and marriage and so on and so forth.

Q.   Did you know anything before the trial began about Mr. Fields' conduct, behavior, performance, while he was in the Navy?

A.   Well, I know he was honorably discharged.

Q.   Okay. And can you take a look on page 20 -- I'm sorry, page 41 of Defendant's Exhibit 22? Do you see at the bottom, there is a signature, "Edward Leon Fields"?

A.   Yes.

Q.   Okay. And above that, it states that "I volunteer to be frocked" -- F-R-O-C-K-E-D -- "to the rate of BM3"?

A.   Yes.

Q.   Do you know what a BM3 is?

A.   No.

Q.   Okay. Do you know what frocking is in the Navy?

A.   No.

Q.   Do you know what significance that holds, to be frocked?

A.   No.

Q.   Can you please look at page 69 of Defendant's Exhibit 22? I'm sorry. Let's go to page 68. That's too hard to

read.  That may be too hard too.

THE COURT:  Is that an improvement?

MR. LABOVITZ:  How about page -- let's try page 4.
Okay.  Let's stick with page 68 for a second then.  Do you
see in the middle, there is some text in all caps that has
been indented from the rest of the text?

A.    Yes.

Q.    Okay.  Do you see the second entry there?  It says --
well, can you make out that it says "Earned two COMNAVRES"
-- C-O-M-N-A-V-R-E-S -- for hard charger awards for October
and December?

A.    Yes.

Q.    Did you know -- well, do you know now what a hard
charger award is?

A.    No.

Q.    Did you know before trial?

A.    No.

Q.    Did you seek out any assistance from someone who might
understand what some of this naval terminology means?

A.    No.

Q.    Why not?

A.    I don't know.

Q.    Okay.  All right.  Now, I want to ask some questions
about Dr. Woods.  Did you consider asking Dr. Woods, as an
expert in mental health issues, as an expert in neurological

issues, to incorporate Dr. Gelbort's test results and final report into his opinion, and then testify about it at trial?

A.    I don't know.

Q.    Would there be a reason that Dr. Woods did not testify at trial about Mr. Fields' brain impairments in addition to the bipolar disorder and manic switch about which he did testify?

A.    There could be reasons.

Q.    Can you tell that?

A.    I can guess.

Q.    Well, in your decision-making pretrial, did you have any discussions with Dr. Woods about -- you know, about not -- about incorporating Dr. Gelbort's findings into his opinion?

A.    I don't have any specific recollection about that.

Q.    If Dr. Gelbort's neuropsychological of Mr. Fields showed that he had brain damage, and Dr. Woods could have explained that to the jury as part of his trial testimony, would you have had any reason not to have Dr. Woods do that at trial?

A.    I think so.

Q.    You think you would have had reasons?

A.    Yes.

Q.    Okay.  And what are those reasons?

A.    My reason would be to limit the amount of evidence and

discussion that we would have about brain damage with the government's experts.

Q.    Can you -- what do you mean by limit the amount of discussion?

A.    Like we were talking about yesterday, Dr. Price claimed to have considered a great number of things in reaching his opinion, pages and pages and pages of things. Much of it, we objected to, and I think Judge White's final -- I think -- again, I do not remember with specificity, but I think Judge White ruled that much of that evidence could not come in unless I opened the door.

Q.    The evidence of Dr. Price's testimony that Mr. Fields did not have brain damage?

A.    No.  No.  The background and history, hearsay, maybe some credible evidence, some not, but information that the government collected during its investigation relating to Mr. Fields' past, that I firmly believed and still believe was not an admissible -- was not admissible evidence of nonstatutory aggravating factor, but the government wanted it to be.  And so throughout trial, I was making an effort to ensure that the presentation of that information to the jury was limited.

Q.    And is it your position that if Dr. Woods or any other mental health expert who was qualified had discussed the neuropsychological findings regarding Mr. Fields from Dr. --

that Dr. Gelbort obtained, that that would have opened the door to this evidence that you're trying to preclude the jury from hearing?

A. Well, not 100 percent, no. I mean, I think it could have. It would just depend because then there would be cross-examination of them about their reliance on Dr. Gelbort and other information that the government might think would be relevant to relying on that evidence. I mean, it's possible that some of it would somehow eke its way into the trial.

Q. Were you concerned -- and when you talk about things from Mr. Fields' past, were you concerned about the jury hearing that, for example, Dr. Price thought he had sociopathic tendencies?

A. Yes.

Q. That he lacked a conscience?

A. Yes.

Q. Okay. Any other particular things you were concerned about the jury hearing?

A. He was narcissistic. He -- off the top of my head, I can't.

Q. Okay.

A. If I look at his report, I could probably list 20 things.

Q. Okay. What about that he discarded people? Would you

want the jury to hear that?

A.    I don't recollect that specific thing, but it doesn't sound like something I would want the jury to hear.

Q.    What about -- would you have wanted the jury -- well, at the time of trial, were you familiar with the diagnostic and statistic manual that was used by psychiatrists in making mental health diagnoses?

A.    Yes, I used it at trial.

Q.    Okay.  And would you -- are you familiar with one of the diagnoses in there being antisocial personality disorder?

A.    No.

Q.    What did you use to --

A.    I think maybe then, but I don't -- well --

Q.    What did you use the DSM for at trial?

A.    I think I had to use the DSM -- well, I don't remember specifically.  I know I used it because someone was wanting to -- and who, I don't even know who that was -- was wanting to opine -- of the government's experts.  Let me back up. One of the government's experts -- I don't remember which one -- was trying to opine about a diagnosis that was not supported by the DSM -- at the time, DSM-IV, I think -- that was not an accurate -- could not be an accurate diagnosis because one -- as I recall, for that particular disorder, whatever it was, for that diagnosis, one of the requirements

for the diagnosis to be given was that certain conduct had manifested itself prior to adolescence or prior to the age of 15 or something like that. And so my recollection is that I had to pull out the book and use it somehow, whether it was in cross-examination or in argument or something.

Q. And is it your recollection that there were descriptors in that diagnosis you're talking about, that also talk about adult conduct?

A. I presume so if it required manifestation prior to a certain age --

Q. Right.

A. -- that it, in all likelihood, is talking about an adult diagnosis.

Q. And was it your understanding those descriptors were meant to portray the person being diagnosed in a very negative light?

A. I would think so because I was combating it.

Q. Would that -- and were you combating it, to your recollection, in front of the jury or just in front of the judge?

A. I'm guessing in front of the jury, but I do not exactly remember.

Q. Was it your goal to try to limit the jury's exposure to harmful characteristics that they could hear about Mr. Fields?

A. With that -- with that --

Q. With that particular diagnosis?

A. I think what I would have -- they would have necessarily heard about it --

Q. Okay.

A. -- if I was cross-examining with it. So I was attempting to negate it or impeach the witness.

Q. Okay. And --

A. If that's the way it was happening.

Q. Would that have come out on the examination of Dr. Price?

A. I am guessing so.

Q. And do you know what the basis as a legal -- you know, what would be the basis for him to testify about that if you had not presented the evidence of brain damage that you said would have, you know, limited this discussion?

A. I don't know because I don't know specifically what you're talking about, so I don't know.

Q. You said that -- well, let me ask you this. Was there ever a time when you thought, pretrial, that a presentation of Mr. Fields' brain damage was inconsistent with the presentation that you also made at trial about bipolar disorder and a manic switch?

A. No, I never thought they were inconsistent.

Q. And if you told Mr. Freedman and Ms. Greenman that --

in an email, that the brain damage evidence complicates the client's ability to make it through his hypermanic state, does that sound like something you were thinking pretrial?

A.    Yes.

Q.    Okay.  Given that, did you ever ask Dr. Woods if he could testify to, what I think you said in another email to Mr. Gant was two phenomena, the brain damage and the manic switch?

A.    I don't recall.

Q.    Now, I want to ask you some questions about Dr. Grinage.  Do you recall, pretrial, you asked him for his opinion about several of the enumerated mitigating factors under the Federal Death Penalty Act?

A.    I don't recall.

Q.    If the record reflects that you had asked him for his opinion about three specific mitigating factors, would you have any reason to dispute that?

A.    No.

Q.    Okay.  And if one of those factors was -- are you familiar, at this point, with the mitigating factors under the Federal Death Penalty Act?

A.    No.

Q.    Okay.  Do you recall one being whether the defendant had an impaired capacity?  Does that sound familiar?

A.    It sounds right.

Q.   Okay.  Do you recall one being whether he was under a specific mental disturbance?

A.   Yes.

Q.   Okay.  And do you recall what is referred to sometimes in the case law as a catch-all factor, that, you know, any other factor about the defendant's character, record, nature of the offense?

A.   Yes.

Q.   When you retained Dr. Grinage, did you know that this case was his first case in which he was testifying for the defense in a capital case?

A.   I can't say for sure.  I think that would have been part of my interview process, but I don't have any specific recollection of that.

Q.   Do you recall any discussions with him, pretrial, about what kinds of mitigating evidence could support these mitigating factors that you had asked him to look into?

A.   I don't recall.

Q.   What was your understanding, pretrial, of whether evidence of Mr. Fields' brain damage could support these three mitigating factors under the law that we've just discussed?

A.   They could be helpful.

Q.   Do you know if you asked Dr. Grinage, as an expert in mental health issues, to incorporate the testing results and

36

findings of Dr. Gelbort into his opinion, and then testify about it at trial?

A.    I think we talked about this yesterday.  I asked him not to include it in his report to the extent that he didn't rely upon it in making his opinion.  That's all I can tell you about that.

Q.    Well, if Dr. Grinage could have included Dr. Gelbort's testing results in his report and then testified to it, would you have had a reason not to do that, not to ask him to do that?

A.    Yes.  As I said yesterday, yes.

Q.    Okay.  All right.  Now, I want to go back to some questions about Dr. Price.  After you received Dr. Price's report, what steps did you take to try to understand the results of his testing?

A.    Well, I know I shared his report with several people.  Who all, I can't say at this point.

Q.    After you shared the results with other people and you reviewed the results yourself, what was your understanding of what Dr. Price's testing of Mr. Fields showed as to whether or not Mr. Fields had brain damage?

A.    My understanding was that Dr. Price's report -- or Dr. Price's testing could be interpreted as showing deficiencies in frontal lobe functioning.

Q.    Do you know what that was based upon?

A.    What what was based upon?

Q.    Your understanding that it could show deficiencies?

A.    Well, first off, when you read it, it talks about functioning at the -- I will not say this right, but certain tests showed or had results at the low-average range or at the 18th percentile, for example, and that's just an example.  I don't know what the numbers were that were in the report.  But I could see the variables in the report, right, when I was reading about his results.  So that's one reason how I could know that.  But also, at some point in time, Dr. Gelbort told me the results aren't -- I think maybe what he said was aren't inconsistent, his testing results aren't inconsistent with Dr. Gelbort's testing results.  And then maybe some of the other people I was sharing results with, such as, for example, Lisa Greenman or the like, may have -- may have also discussed it, but at this point, I don't remember, with specificity, those.

Q.    Do you recall at trial that you elicited from Dr. Price, that on cross-examination, that Mr. Fields does not have much neuropsychological impairment?

A.    No.

Q.    Okay.  Can I show you your cross-examination from July 21st, 2005?  Do you recognize this as the transcript from Mr. Fields' trial on July 21st, 2005?

A.    That's what it says it is.

Q.    Okay.  And then if you can go to the second page.  Do you see at the top, it says "Witnesses, Jack Randall Price continued from 7/20/05"?

A.    Yes.

Q.    And it says, "Cross-examination by Ms. O'Connell" begins at page 3171?

A.    Yes.

Q.    So if we could go to page 3204.  It doesn't identify who is asking the question, but given what we just looked at in the table of contents, would you agree that this is your cross-examination of Dr. Price?

A.    If you tell me that, I believe it.

Q.    And so if we could look at -- starting at line 18 through the next page, line 4.

A.    Yes.

Q.    Do you know why you asked Dr. Price these questions designed to tell the jury that Mr. Fields did not have brain impairment?

A.    It looks to me like he already said it when I'm cross-examining him about it.  I said, "Yesterday, you said you didn't see much impairment in Mr. Fields; is that right?"

Q.    Do you see -- that's on page 3205, line 2, you asked him "The kind of impairment that comes from damage to the cells in the brain?"  And he answers, "Primarily, yes."

Right?  Do you know why you asked that specific question?

A.    No.

Q.    Okay.  Would there be a reason designed -- would you have had a reason that would further Mr. Fields' interest to ask that question?

A.    I would think so.

Q.    What would that be?

A.    I don't know.  I would have to read the entire cross-examination to tell you what I was doing.

Q.    How would it further Mr. Fields' interest to have the jury hear that he does not have damage to the cells in his brain?

A.    Sometimes when you're cross-examining a witness -- I'm sure you know this -- you have to commit them to what it is that they're saying, and then, at some point during the rest of your examination, you get to where you want to go to show that that might be faulty.  As my typical method of cross-examination, when what a witness has said is something that I disagree with or want to disprove, so I'm guessing that this is normal cross-examination of something that he testified to previously from looking at it.  And it is a guess.

Q.    Right.  So your normal practice, is it accurate to say you would lock in -- on cross-examination, you would lock in the witness to a certain line of testimony, and then you

would take steps to show that that testimony is not accurate?

A.    Yes, along those lines.

Q.    Do you recall if you asked Dr. Price if he did specific tests of Mr. Fields for executive functioning impairment?

A.    I don't recall.

Q.    Okay.  If the record reflects that, would you have any reason to dispute it?

A.    No.

Q.    Okay.  Do you know why you asked about whether Dr. Price tested Mr. Fields executive functioning?

A.    No.

Q.    Okay.  Do you recall, in response to that line of questioning, that Dr. Price said that the category test that he administered to Mr. Fields relates to executive functioning?

A.    No.

Q.    Okay.  And if I could show you the same transcript of July 21st, 2005, at page 3192, and I direct you to line 13. And do you see where it says:

    "QUESTION:  Executive functioning, you gave specific tests for that?

    ANSWER:  I did."

    And then you asked:

"QUESTION: How many?"

And then it says -- and then there's an answer, and on line 19, Dr. Price mentions the Booklet Category Test?

A. I see that.

Q. As being a test for executive functioning?

A. I see that.

Q. Okay. Do you know if -- or do you recall whether Dr. Gelbort administered the category test to Mr. Fields?

A. No.

Q. Do you see that, on line 20, Dr. Price responded that he -- "That the Trail Making Test, Part B, is also a test for executive functioning"?

A. Yes.

Q. Do you recall if Dr. Gelbort administered the Trail Making Test, Part B?

A. No.

Q. And do you see on lines 21 through 22, Dr. Price mentioned the controlled oral word association test as another test that he administered to Mr. Fields for executive functioning?

A. Yes.

Q. Do you see, on line 21, that Dr. Price said that the Stroop test, S-T-R-O-O-P, was another test he administered for executive functioning?

A. Yes.

Q.    Okay.  And then, finally, on line 23, do you see that Dr. Price said the Figural Fluency Test was another test he administered to Mr. Fields for executive functioning?

A.    Yes.

Q.    Okay.  Do you recall then asking Dr. Price specific questions about how Mr. Fields performed on these tests?

A.    Do I recall specifically?  No.  I imagine I did.

Q.    Okay.  Well, let's look at page 3194.  Direct you to line 23, and you asked, "How did Mr. Fields do in executive functioning?"

A.    Yes.

Q.    Do you -- why did you want to know from Dr. Price how Mr. Fields did in executive functioning?

A.    Do you want me to guess?

Q.    No.  Well, I mean -- well, you don't recall why you asked that question?

A.    I can guess why I did it.

Q.    Well, was executive functioning something that you were interested in discussing with your experts and possibly the government's experts?  You know, pretrial, I think you mentioned executive functioning was something that you wanted to probe as far as Mr. Fields' performance in that area?

A.    Yes, I said that.

Q.    Okay.  Would that -- so could have this question have

been related to trying to now get Dr. Price to talk about Mr. Fields' executive functioning?

MR. WILSON:  Objection, Your Honor.  The testimony has been is that counsel testified that she's responding to what Dr. Price had said in direct examination.  Counsel is trying to focus in on particular parts in cross without giving her the opportunity to review all of the testimony.  So I just -- I object to this line of testimony.

THE COURT:  I understand.  Well, it is, you know -- overruled, but it is of limited value if you don't understand the context in which any of the question is asked.

Q.    (By Mr. Labovitz)  Do you recall -- we talked about the tests that Dr. Price said were relevant to executive functioning.  Do you recall going through the specific results on those tests with Dr. Price?

A.    No.

Q.    Okay.  Did you have an opportunity to -- well, not an opportunity.  You said you reviewed materials prior to your testimony in these proceedings?

A.    Yes.

Q.    Did you review this transcript of your examination of Dr. Price?

A.    No.

Q.    How about the direct testimony of Dr. Price?

A.    I don't know if I did or not.  I believe I had that in my possession, but I'm not sure I got to it.

Q.    Well, let's look at page 3197 of your cross-examination.  Do you see that you're asking Dr. Price questions about the Figural Fluency Test?

A.    I do.

Q.    Okay.  Do you know what the Figural Fluency Test is?

A.    Not today.

Q.    Did you know back then?

A.    Yes.

Q.    Okay.  Did you know back then if it was a timed test?

A.    I'm sure I did.

Q.    And do you see on line 13, you asked Dr. Price if the score was at the first percentile, and he said yes?

A.    Yes, that's what it says.

Q.    Okay.  Did you ask Dr. Price if a score in the first percentile on the Figural Fluency Test was evidence of Mr. Fields having brain damage?

A.    I don't know.

Q.    And if there's no --

A.    On this page, I did not.

Q.    Okay.

A.    I don't know.

Q.    If I represent to you that I've reviewed the transcript and I don't see that particular question, would

**United States District Court**
**Eastern District of Oklahoma**

you accept that representation?

A.    If it's not in the transcript, I didn't do it.

Q.    Would there be a reason not to follow up and ask Dr. Price to explain what the first percentile is?

A.    I think I established that 99 percent of the people performed better than him.

Q.    And was that question part of your effort to show that Dr. Price's testimony that Mr. Fields did not have brain damage was faulty?

A.    What was faulty?

Q.    You said that -- you asked Dr. Price, originally, initially, if Mr. Fields had brain damage because you were trying to lock him into a position, and then, later, you would show that position as faulty?

A.    Okay.

Q.    Okay.  So is this one of the questions that you were asking Dr. Price to show that his assessment of Mr. Fields' brain impairment was faulty?

A.    Seems like it, yes.

Q.    If you didn't ask Dr. Price whether the Figural Fluency Test is sensitive to executive functioning problems, would there be a reason for that?

A.    I don't know.

Q.    If you did not argue to the jury that Mr. Fields' score in the first percentile of this, on which 99 percent

of people perform better than him, was evidence of brain damage, would there be a reason for that?

A. There could be.

Q. What could it be?

A. It could be I was focusing on something different, like the fact that all of Dr. Price's testimony was not credible. I don't know. I have no recollection.

Q. Sitting here today, do you recall why, generally, you wanted to go through the executive functioning test with Dr. Price and ask him about the various percentiles that Mr. Fields obtained?

A. I believe I did it to show that he performed much lower than most people.

Q. Now, on page 3196, lines 14 through 16 --

MR. LABOVITZ: Is that 3196? Oh, okay.

Q. (By Mr. Labovitz) Well, let me ask you this. If you asked Dr. Price about Mr. Fields' results on the Trail Making Test that he mentioned was a test for executive functioning, would that have been part and parcel of showing that Dr. Price was wrong?

A. I'm guessing.

Q. If Mr. Fields performed at the seventh percentile on the Trail Making Test that was administered by Dr. Price, would that be part of your reasoning?

A. I would think so, yes.

Q.   Now, if you asked Dr. Price about the Controlled Oral Word Association Test and whether Mr. Fields scored at the seventh percentile on that test, what would -- would that have been consistent with what we've been discussing as to your reasoning to try to get Dr. Price to show that his testing did reveal impairments on Mr. Fields' brain?

A.   I would guess so.

Q.   Do you know if that Controlled Oral Word Association Test is a time test?

A.   Not today.

Q.   Okay.  Did you know back then?

A.   I'm sure I did.

Q.   Do you know if the Trail Making Test, Part B, is a timed test?

A.   No.

Q.   Okay.  And back at the -- it's been over 20 years -- well, close to 20 years, but back at the time of trial, did you have any understanding of how these tests operated?

A.   Yes, I spent a great deal of time --

Q.   Right.

A.   -- on that, yes.

Q.   Okay.  Dr. Price said that the Stroop test was one of the tests for executive functioning.  Do you recall asking Dr. Price about Mr. Fields being at the 17th percentile on that test?

A.    No.

Q.    If the record shows that you did ask that question, what would have been the reason to ask that?

A.    Same.

Q.    Same.  And you said that there may have been a reason you wouldn't argue to the jury that Mr. Fields was in the bottom one percent on one of the tests for executive functioning.  We've now discussed five different tests that Dr. Price -- that you asked Dr. Price about.  Would there have been a reason not to then reference those scores in some manner in your closing argument?

A.    I don't know, maybe.

Q.    What might be the reason?

A.    I don't know.

Q.    Would there be a reason to -- strike that.  Okay.  Let me turn your attention to page 3198 of your cross-examination.  You asked a question on line 18 that says, "Now, a frontal lobe dysfunction is going to be something like we said earlier, a tumor, a hemorrhage, a lesion, a cyst?"  Do you see that?

A.    Yes.

Q.    Okay.  And then Dr. Price answered, starting on line 21, "Well, it could be due to an accident, it could be due to head trauma, it could be due to a disease process, it could be due to anything that affected part of the brain."

Do you see that?

A.     Yes.

Q.     And then going down to page 3199, at lines 1 through 3, he adds that "Damaged the cells of the brain in that part of the brain that has a resulting consequence in their behavior, thinking, emotion."  Do you see that?

A.     Yes.

Q.     If you didn't follow up to these answers by Dr. Price to ask him whether Mr. Fields' loss of oxygen during his birth could have damaged the cells of his brain, would there have been a reason for that?

A.     No, I can't think of one.

Q.     If you didn't follow up on Dr. Price's answers to ask him how Mr. Fields' truck accident, as a teenager, might have damaged the cells of his brain, would there be a reason for that?

A.     I have to go back to the other question too.  There may have been.

Q.     Okay.  What would that be?

A.     You know, I don't recall exactly what the judge told us about how certain things could come in or how they might come in, so that could have something to do with not touching on -- what the judge was, I think, referring to, sometimes as ancient history, right, talking about his birth, talking -- he seemed to be -- Judge White seemed to

be tying evidence of things in the past to the admissibility of some of the alleged behaviors that we were trying to keep from the jury.  So that may have been a reason.  I don't know if it was the reason, okay.

Q.   Is it your testimony that if Mr. Fields suffered brain damage during his birth, that that was something that you could not let his sentencing jury know about?

A.   No, I didn't say that at all.

Q.   Then what --

A.   You asked me if there might be a reason I did not ask Dr. Price whether or not deprivation of oxygen at birth, whether hypoxia could cause brain damage.

Q.   Right.  And you're saying there was concerns about the admissibility of ancient history?

A.   Yes.

Q.   So that's why I'm asking then, is it your position that evidence of Mr. Fields' birth, where he suffered trauma to his brain, was ancient history, that you could not inform the capital sentencing jury about?

A.   I already answered that, I think.  No, and that's not what I said.

Q.   Now, you've testified yesterday -- you testified yesterday as well as today that you were very concerned about ancient history, about adverse facts about Mr. Fields' personality coming out, and so that factored into some of

your decision making with regard to the brain damage evidence. Do you recall considering jettisoning the neuropsychological testimony altogether on the theory that the government would then not be able to call Dr. Price in rebuttal?

A.    Yeah, I think that was a discussion that I was having with some of the people that were helping me go through testing and reports.

Q.    Okay. Would one of the people you discussed this with be Lisa Greenman?

A.    Possibly.

Q.    Okay. Can I show you Defense Exhibit 141?

A.    Okay.

Q.    Was this one of the emails in which you discussed how to try to block Dr. Price from testifying altogether?

A.    To keep him from testifying altogether?

Q.    Or to -- well, to limit Dr. Price?

A.    Yes.

Q.    Okay.

A.    And I'm not necessarily saying it was just Dr. Price. It was that it -- what I was trying to limit was all those bad facts, what I consider to be bad facts, even though I also felt they shouldn't come in anyway, but it appeared they might.

Q.    Who would have testified to those bad facts other than

Dr. Price?

A.    An agent could testify to them, the agent who gathered those facts.

Q.    How would the agent who gathered those facts have firsthand knowledge that would allow the agent to testify?

A.    I think he would be able to testify as to what he gathered.  Dr. Price relied on that or at least reviewed all of that, so I think that's a possibility.  He reviewed all the reports, he reviewed videos, he reviewed interviews, at least he claimed he did.  Like I said, he had pages and pages and pages of information at the beginning of his report that he said he reviewed in making his opinion.

Q.    Okay.

      MR. LABOVITZ:  Can you scroll down to page 2 of this exhibit?

Q.    (By Mr. Labovitz)  I would say it's the fifth paragraph that begins by "Just by putting on."  Do you see that?

A.    Yes.

Q.    Okay.  And did you ask Ms. Greenman:

    "QUESTION:  Just by putting on my mental health defense, do I open the door to everything that could support the government's mental health experts' opinions?"

A.    Yes, I see that.

Q.    Okay.  What did you mean by "mental health defense"?

A.    I'm guessing I meant all of our defense.

Q.    Would mental health defense include Dr. Woods?

A.    Yes.

Q.    Would mental health defense include Dr. Grinage?

A.    Yes.

Q.    Okay.  Now, if you go back up to page 1, do you see that Ms. Greenman is responding to you?

A.    Yes.

Q.    And in line 2, she says, "It seems to me likely that if those anecdotes are the proper basis of a diagnosis that the government offers to counter your theory of diagnosis, then they probably come in."

A.    Yeah, I see that.

Q.    Okay.  How did that factor into your decision making?

A.    I don't know that it did.

Q.    Why not?

A.    This is me reaching out to someone to discuss my case and how I can work through it.  How I can present what I want and keep out what I want.  It's brainstorming facts and questions just like I would do in any kind of trial.  What the other person says may or may not affect my decision.  In the end, the decision is mine, and I recognize that.

Q.    Do you know if you agreed with Ms. Greenman's assessment that by presenting Dr. Woods and Dr. Grinage, that you would be -- it would be a proper basis for the

government to then respond with these anecdotes that you were trying to block?

A.    I don't think that's in context.

Q.    Okay.

A.    I mean, she's saying in this email, if I say my client is bipolar, the government says no, and he's actually antisocial and they have evidence to support it, then those facts come in unless I have some way to legitimately keep them out.  It's a conversation --

Q.    So --

A.    She didn't tell me what to do, okay, and I didn't necessarily take anything that she said to me as a direction.  It was guidance, it was assistance, it was very helpful.  That's all I can tell you about it.

Q.    And so then your -- was it your understanding before the trial began that if you presented evidence that Mr. Fields had bipolar disorder, the government, as a legal matter, was entitled to rebut that with their opinion that Mr. Fields did not have bipolar disorder, but was, in fact, antisocial?

A.    Yes.

Q.    Do you also recall discussing with David Freedman some of these ideas about limiting the evidence from the government's experts?

A.    I'm sure I did.

Q.    Now, I would like to show you Defendant's Exhibit 166. I just want to see if you recognize that as an email that Mr. Freedman sent to you and Ms. Greenman.

A.    I think you showed me this yesterday.

Q.    Yes.

A.    Yes.

Q.    Okay.  And if you could look at paragraph 3.  We didn't discuss that yesterday.  It says "In the alternative, you might consider not putting Gelbort on, sticking with the psychiatric evidence for penalty phase and the storytelling about his life, of course, and denying the opportunity to put Price on the stand.  If you want more feedback on this, I'd be happy to ask the rest of the project their thoughts too."  Did that -- I know you said you're the decision maker, but did that recommendation -- I mean, did that suggestion from Mr. Freedman factor into any of your decision making with regard to Dr. Gelbort and brain damage evidence?

A.    I don't know.

Q.    Do you recall knowing pretrial -- you mentioned a little bit about some of Judge White's rulings about this issue from, you know, the ancient history.  Do you recall Judge White ruling pretrial that he was inclined to allow broad rebuttal of any mental health evidence that the defense presented?

A.     I don't recall that specifically.

Q.     And if you could take a look at Defendant's Exhibit 194 to see if that refreshes your recollection?

A.     Okay.

Q.     Does that refresh your recollection as to say what Judge White had ruled pretrial about rebuttal of your mental health case?

A.     I guess.

Q.     Okay.  And what was your understanding of Judge White's ruling?

A.     Well, it sounds like my understanding was that Judge White was going to -- my impression was, from looking at this, that Judge White was going to allow whatever the doctors thought it was appropriate to consider in making their decisions, in rendering their opinions.

Q.     Did you -- based on these emails we've discussed just now, from Mr. Freedman and Ms. Greenman, did you ever think that, as a legal matter, you could totally preclude Dr. Price from testifying by not calling Dr. Gelbort?

A.     No, I never thought that.

Q.     Did you ever think that the government could rebut the defense case -- I'm sorry.  Did you ever think that if the government presented a psychiatrist in the defense case, that the government could only rebut that with a psychiatrist as opposed to a psychologist?

A.   No, I did not think that.

Q.   Ask a couple of questions about Dr. Gelbort.  Between -- do you recall that Dr. Gelbort did his testing of Mr. Fields in August of 2004?  We discussed that yesterday.

A.   If you say so.

Q.   Okay.  Well, between -- and we discussed that you asked Dr. Gelbort to consider doing more testing.  Do you remember those emails?  You sent Dr. Gelbort an email in June of 2005 asking if he was willing to do more testing.

A.   Did I?

Q.   Well, we discussed that yesterday, right, so the record --

A.   I know that -- what I recall is that Skip talked to him.

Q.   Okay.

A.   Mr. Gant talked to him about whether he could do more testing, and he reportedly said he was available to do more.

Q.   And do you recall that we discussed that Dr. Gelbort did not conduct any more testing of Mr. Fields after those original tests in August of 2004?

A.   Yes.

Q.   Okay.  Between August of 2004, when Dr. Gelbort met with Mr. Fields, and the trial in July of 2005, did you ask Dr. Gelbort to interview Mr. Fields again?

A.   I don't recall.

Q.    Okay.  Between August of 2004, when Dr. Gelbort did his testing of Mr. Fields and the trial, did you ask Dr. Gelbort to interview any collateral witnesses who might have information about Mr. Fields' life history?

A.    I don't recall.

Q.    Do you recall if, between Dr. Gelbort's testing of Mr. Fields in August of 2004 and trial, you provided him with any more records related to Mr. Fields' background?

A.    So are you saying anything additional, beyond what I gave him prior to his testing?

Q.    Correct.

A.    Okay.  I don't recall.

Q.    Do you recall if there was any new information that Dr. Gelbort received from the defense, between August of 2004, when he did his testing, and the trial in July of 2005?

A.    What do you mean by "new information"?

Q.    Interviews of witnesses, records, additional testing, anything that would have led him to think through further the information that he related to you in August of 2004 about the result of his testing.

A.    I know I gave him the government's reports from their experts.

Q.    Right.  And you just testified that those were something that he said was potentially, like, in sync with

what he had found?

A.    Something like that, yeah, for Dr. Price.  I don't recall if I gave him anything else.  I don't remember.

Q.    Now, yesterday we went through a lot of a number of what I would say are memorializations of Dr. Gelbort's findings and how you then related those to Mr. Gant, Ms. Shettles, to the consultants, to the Court; you know, how you presented those before the trial.  Do you agree we did that yesterday?

A.    We did what we did yesterday.

Q.    Okay.  Well, would you agree that we discussed multiple instances yesterday, where you were relating to other people that Mr. Gelbort -- that Dr. Gelbort's testing showed that Mr. Fields had brain damage and not potential brain damage?

A.    I guess.

Q.    And would you agree that if Ms. Charpentier reviewed those documents that we discussed yesterday, that were from your files, she would have been correct to frame your declaration as she did regarding Dr. Gelbort's finding of actual brain damage, not potential brain damage?

A.    Sure.

Q.    You said yesterday that you believed it would be important to tell a capital sentencing jury that your client has brain damage, at least in some -- well, you thought that

that's something important for the jury to hear; correct?

A.    Yes, it could be.

Q.    Okay.  And do you agree that in this capital case, even after trial had started, you still had not decided on whether you were going to present evidence of Mr. Fields' brain damage in the defense case in chief?

A.    I can't say with specificity when I made the choices I made.

Q.    Do you know if it was pretrial or during trial?

A.    I cannot say with specificity.

Q.    Now, is it -- I would ask you -- sorry.  If one of your client's neurocognitive abilities cannot be seen as normal, would you consider that client to have brain damage?

A.    Well, I think they could have, yes.

Q.    And why do you see could versus is?

A.    Can't be viewed as normal could mean many things. That's my opinion today.

Q.    Was that your opinion at time of trial?

A.    I don't recall.

Q.    What is your opinion today based upon?

A.    The words.

Q.    Just -- you're going off the plain language -- plain meaning, rather?  Sorry.

A.    Well, I think if an expert neuropsychologist is writing his opinion for me and his opinion is that the

client suffers from frontal lobe impairment and brain damage, that he would very clearly say so. That's one reason why I say what I say.

Q. Okay. And if the expert wrote that the individual's abilities -- neurocognitive abilities cannot be seen as normal, you would -- it's your position that that's not a clear indication of brain damage?

A. Yes.

Q. If a person's brain is not functioning the same as everyone else's, would you consider that person to have brain damage?

A. I don't know.

MR. LABOVITZ: May I have a moment to confer with counsel?

THE COURT: You may.

Q. (By Mr. Labovitz) If we could go back to Defendant's Exhibit 141. This was one of the email exchanges between you and Ms. Greenman about trying to limit Dr. Price's testimony. Do you see on line one of this email that she -- the first thing she says is "I guess one thing you are entitled to know is whether you want to" -- I'm sorry -- "is whether what you propose to put on will or will not open the door, so you may want to get very specific."

A. Yes.

Q. What did you interpret that to mean?

A.     I don't know.

Q.     Okay.  Well, based -- did you ever consider filing a motion in limine to set the parameters for what Dr. Price would be able to testify to if you presented Dr. Gelbort's testimony, whether through Dr. Gelbort or through another expert?

A.     I don't know.

Q.     You don't know if you considered it?

A.     I do not know if I considered it.

Q.     Given your -- the concerns that you've expressed about, you know, not having the jury hear all of this negative evidence, would there be a reason not to get a ruling pretrial about the parameters of Dr. Price's rebuttal if you presented brain damage evidence?

A.     I don't know.

          MR. LABOVITZ:  Those are all the questions I have at this time, Your Honor.  I would like to move to admit Defendant's Exhibit 120, which is Ms. O'Connell's declaration.  The government has made an objection to that as hearsay, and I believe it's not hearsay under Federal Rule of Evidence 801(d)(1)(A), which is for prior inconsistent statements.

          THE COURT:  In its entirety?

          MR. LABOVITZ:  Well, I'm happy to redact the parts that are consistent with her testimony, but certainly the

parts that talk about Dr. Gelbort saying that Mr. Fields had brain damage versus Ms. O'Connell's testimony about potential brain damage.  It is our position that those are -- that the declaration is inconsistent with her testimony from yesterday.

THE COURT:  Well -- Mr. Wilson, do you want to weigh in before I start talking?

MR. WILSON:  I'm sorry?

THE COURT:  You want to weigh in before I start talking?

MR. WILSON:  The government's position has not changed regarding the admissibility of this particular exhibit.  I think the evidence is very -- has been clear as to what the testimony was as to what Ms. O'Connell understood her position at the time versus what was in the affidavit, and so I don't believe it's appropriate to admit the affidavit.

THE COURT:  Well, my thought is -- I mean, look, you used it to cross-examine her with, and to the extent you impeached her with it, I'm not so sure there was any real clear inconsistencies.  It seemed to me they were fairly nuanced at best, but the record reflects your use of the declaration to cross-examine her or to question her.  It's technically not cross-examination, but to attempt to impeach her on those.  I think the record stands.  As we are now, we

don't need the declaration in. You've read the parts that you read to her, she -- but you had the discussion and asked the questions with her, so deny the -- Defendant's Exhibit Number 20 is denied as admitted. It's not admitted, so ...

MR. LABOVITZ: Your Honor, I understand the ruling. May I make a proffer for the record?

THE COURT: You may.

MR. LABOVITZ: Your Honor, Ms. O'Connell testified that the declaration was inaccurate because it did not say possible brain damage, possible. And under the case of *United States v. McGirt*, which is 71 F.4th 755, from the Tenth Circuit in 2023, when you fit into the exceptions to the hearsay rule for prior inconsistent statements, under 801(d)(1)(A), that statement is not simply impeachment; it now comes in as substantive evidence. And there's a question as to whether Ms. O'Connell's understanding of what Dr. Gelbort found was probable brain damage, which is not very mitigating, and this Court has to assess prejudice versus actual brain damage, which we know from case law is highly mitigating.

THE COURT: Well, I think the problem here, as I've sat and listened to this for a day and a half now, is one of timing. I mean, I think the evidence put in by documents and the testimony was that Dr. Gelbort conducted his testing in August 2004. It seems like there was a phone

call in which he relayed his findings to counsel. Counsel then relayed those findings to a lot of other people.

And I believe she said either -- whether they want to use weakening or softening -- over time, her perception of his opinion changed, and that whatever she thought in August of 2004 may not have been the same as what she thought in June or July of 2005. And so the fact that this declaration doesn't seem to make that clear, other than the fact it says in August 2004, she was notified of what her expert thought. It's through -- relating through someone else who drafted it.

I get we're having all this nuanced discussion about how she read it and what she did, I just -- I don't -- if you're telling me you think this is somehow a direct contradiction, I don't think that's what it is. I think it is a nuanced explanation of which there are different interpretations then and now. I don't see how that creates a situation in which this declaration needs to come in as evidence.

MR. LABOVITZ: Okay. And the final part of my proffer then, Your Honor, is at the status hearing this week, on Monday, December 2nd, 2024, the Court said that the issue before the Court is whether trial counsel could have obtained and presented evidence of Mr. Fields' brain damage.

Ms. O'Connell testified yesterday that she was told

initially by Dr. Gelbort that it was possible or probable brain damage, not actual. Her declaration that we went through yesterday says -- it doesn't use the word "actual," it just says "I was told initially that Mr. Fields had brain damage." I'm not talking about the weakening or the softening. I'm simply saying that as a matter -- when the Court is assessing whether Ms. O'Connell could have obtained or presented evidence of Mr. Fields' brain damage, she was told that he had brain damage, and that is in her declaration and her testimony is inconsistent with that.

THE COURT: All right. You know what? I'm going to let it in. It will just go into the giant pile of things we'll be looking at. So Defendant's Exhibit 120 can come in as evidence for whatever it's worth, whenever it's considered, at whatever time in the future. So with that, it's admitted.

All right. Ms. O'Connell, are you still good to go for another 30 minutes or so?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. All right. If not, let me know. We'll take a short break, even though I indicated I didn't want to, but we're here to help and accommodate you.

All right. Mr. Wilson, you may proceed with any cross-examination you have.

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Ms. O'Connell, you've been practicing law since 1999; is that correct?

A.   Yeah, something like that.

Q.   And you have handled hundreds of criminal cases in your career; is that correct?

A.   Yes.

Q.   But only one federal death penalty; correct?

A.   Yes.

Q.   And I believe you testified two state death penalty cases?

A.   Yes.

Q.   And you became the Federal Public Defender for the Northern and Eastern District sometime in -- what was the year -- 2009, roughly?

A.   I hate to say this.  I don't remember.  I'm on my fourth term, and I have four-year appointments.

Q.   Okay.  Fair enough.  And when you were appointed to this particular case, you were in the Northern/Eastern District Public Defender's Office, and Mr. Brunton selected you to handle this case; correct?

A.   Yes.

Q.   And I believe that in some email exchanges that have been provided in discovery, that Mr. Brunton characterized his office as having very able lawyers with lots of trial

motions and appeal experience in state death penalty cases.
Do you agree with that?

A.    Do I agree with --

MR. LABOVITZ:  Objection, Your Honor.  This is a
federal matter.

THE COURT:  He talked about state.  Overruled.

A.    I guess I didn't --

THE COURT:  You spent a lot of time on the state
cases, so overruled.

A.    I don't think I understood your question.  Are you
asking me if I agree that Mr. Brunton said that?

Q.    (By Mr. Wilson)  Yes.  Do you agree with that?

A.    Or do I agree with --

Q.    Do you agree with the substance of what Mr. Brunton
said, that his office contained several people with
experience in state death penalty cases?

A.    I don't necessarily agree with it.

Q.    Okay.  But you had experience?

A.    I had some experience, yes.

Q.    Okay.  Fair enough.  And, Ms. O'Connell, you've had
access to the petition that was filed in this case; correct?

A.    Yes.

Q.    As a matter of fact, you're still on the CM-ECF list;
correct?

A.    Yeah, I still get notices of filings, yes.

Q.    Okay.  And as part of that, you're aware of the initial petition, the amended petition, and all of the rulings that have come down in regard to those petitions; is that correct?

A.    No, that's not correct.  I have not followed the case like that.  I'm made aware when things are filed.  Sometimes I look at them, a lot of times I did not.

Q.    Okay.  Did you read Judge White's initial opinion?  Do you recall?

A.    I don't recall that I did.

Q.    Okay.  Do you recall reading the Tenth Circuit opinion?

A.    Yes.

Q.    And you are aware that post-conviction relief counsel has claimed that you were ineffective for failure to investigate and present evidence of brain -- organic brain damage; is that correct?

A.    Yes, I'm aware.

Q.    And there is a lot of discussion about the declaration that was prepared, Defendant's Exhibit Number 120.  And in that declaration, on page 11, there is a comment that says "I had no strategy or tactic for abandoning the specific factor of brain -- organic brain damage."  You've testified that there were a number of things that went into your decision as to whether or not to call Dr. Gelbort; is that

correct?

A.    Yes.

Q.    And we're going to focus on those in a minute, but was there a decision that was made to not present that evidence of Dr. Gelbort to the jury back in 2005?

A.    Yes.

Q.    And you made that decision; is that correct?

A.    Yes.

Q.    And did you contemplate the consequences -- strike that.  Did you contemplate the -- that at the time?

A.    Contemplate what at the time?

Q.    Did you contemplate whether or not to call him at the time?

A.    I contemplated whether or not to call him for a long time.

Q.    And did you discuss that with other people?

A.    Yes.

Q.    And would that include Mr. Gant?

A.    Yes.

Q.    For what that was worth?

A.    Yes.

Q.    Okay.  Did you discuss that with Mr. Derryberry?

A.    I'm not sure to what extent I would have discussed that with him.

Q.    But ultimately, the decision was made to not contact

-- or excuse me -- to not call Dr. Gelbort; correct?

A.    Yes.

Q.    All right.  You testified that there were a number of different people that you consulted as part of the representation, and what I'm going to try to do during my examination is kind of make a timeline from when this case started up until trial.  And so you agree with me that the crime took place in July of 2003; is that correct?

A.    I guess.

Q.    And if the records reflect that, you know, the complaint was filed in July of 2003, you don't have any reason to disagree with that?

A.    No.  I'm sure the record is what it is.

Q.    And that the Public Defender's Office was appointed, and then sometime later Mr. Gant entered an appearance; correct?

A.    Yes.

Q.    And Mr. Gant was part of what's been referred to as the Project; is that correct?

A.    Yes.

Q.    And the Project is the Capital Resource Project; correct?

A.    Yes.

Q.    And counsel, yesterday, during direct examination, went through a number of individuals that you may or may not

have been in contact with about this particular case; is that correct?

A.    Yes.

Q.    And that Judy Clarke was, I guess, the director, if you will --

A.    Yes.

Q.    -- or the person in charge of the Project?

A.    Yes.  I'm sorry.  I was speaking over you, yes.

Q.    And that in addition to Ms. Clark, that you may or may not have had conversations with David Bruck about the case.  Do you recall?

A.    Yes, I think we decided that I did, but I don't recall.

Q.    But all of these individuals that you contacted or had consultation with, why did you reach out to them at all?

A.    For help.

Q.    Why?

A.    Because I needed help.  I am not learned counsel.  In my opinion, I am not capable of defending a capital case all by myself.

Q.    And that's the purpose of having the Project; correct?

A.    Absolutely.

Q.    And the individuals that you spoke with -- specifically, there's been a lot of discussion about Mr. Freedman, David Freedman, and Lisa Greenman; correct?

A.    Yes.

Q.    You were aware back then that they were involved with the Project; correct?

A.    Yes, I was made aware.  I'm not sure that they were a part of the Project, such as employees of the Project if that makes sense, but they were certainly affiliated with it and did a lot of work on -- in the background on capital cases or federal capital cases around the country.

Q.    And based upon training, experience, that you had, even though limited in federal litigation, capital litigation, it was not uncommon to have a consultation with these individuals; correct?

A.    I'm not sure what you mean.  I would think not.

Q.    Okay.  And would it have been unreasonable to consult with these individuals?

A.    No, I think it was prudent.

Q.    And they provide advice; correct?

A.    Yes.

Q.    And ultimately -- and I believe you testified, it's ultimately your decision as trial counsel; correct?

A.    Absolutely.

Q.    As part of -- in addition to consulting with these individuals, you also hired experts; correct?

A.    Correct.

Q.    And the first one you hired was actually Dr. Grundy;

is that correct?

A.    Yes.

Q.    And that was the purpose of -- specifically for the issue of competency; correct?

A.    Correct.

Q.    And Dr. Grundy is local here in Oklahoma; correct?

A.    Yes.

Q.    And you had prior experience with Dr. Grundy?

A.    Yes.

Q.    And is Dr. Grundy a psychiatrist or a psychologist or do you recall?

A.    He is a forensic psychologist.

Q.    Now, as I review some of the records, and, particularly, there was some references in Defendant's Exhibit 146, about hiring of a psychiatrist in January of 2004.

A.    What is that exhibit?

Q.    Defendant's 146.

      MR. WILSON:  Can you put --

Q.    (By Mr. Wilson)  That would be one of the motions to extend the 12.2 notice.  If you will look at Defendant's 146, go to paragraph, I believe it's 7.  All right.  Do you see that on the screen?  "Prior to March 15."  Do you see that?

A.    I do.

Q.   Take a moment, and if you will just read through paragraph 7, if you don't mind.

A.   Okay.

Q.   Who was that?

A.   I don't know.  It might be George Woods.  I don't know.

Q.   We'll talk a little bit later, but George Woods wasn't hired until April of 2004.

A.   Okay.  I don't know.  I would have to look at procurement records to be able to tell you.

Q.   But you don't -- today, you don't have any independent recollection of who the psychiatrist was in January of 2004?

A.   I do not.

Q.   Because according to this document, that particular psychiatrist was to review the mitigation information that had been gathered at the time and to recommend additional areas of investigation.  Do you agree that that's what that says?

A.   Yes.

Q.   Do you recall today, whether or not that happened?

A.   If I said it happened, I'm pretty sure it happened.

Q.   Fair enough.  Okay.  All right.  So that was in -- crime in July of 2003, Dr. Grundy is hired in July of 2003 for competency issues; apparently, hire a psychiatrist in 2004, January of 2004.  You said -- you testified yesterday

that when their initial complaint was filed, that the charges contained in that complaint were death-eligible charges; is that correct?

A. Did I say that at the time, is that what you're asking me?

Q. Is it correct that the crimes that were in the original complaint were death-eligible crimes?

A. I think so.

Q. And as a result, that kick-started this need for potential learned counsel; correct?

A. Correct. I at least knew the facts of the case and knew it was death-eligible.

Q. Because the indictment actually didn't come down until August of 2003, the next month; correct? Or do you recall?

A. I don't recall.

Q. Okay. You had no reason to dispute that it was on August the 1st?

A. No.

Q. Okay. And that there was a document filed in March of 2004 called the "Notice of Intent to Seek the Death Penalty." In death penalty litigation, that's a significant document; correct?

A. Yes.

Q. And that's actually the formal notice that's filed as to the grounds upon which the government is going to seek

the death penalty; is that right?

A.     Yes, in part.

Q.     Between the time of the initial indictment, in August of 2003, up until the actual filing of the Notice of Intent, in March of 2004, March 15th of 2004, there's a whole lot of discussion going on between the defense and the government regarding the issue of seeking the death penalty.  Would you agree with that?

A.     I would.

Q.     There was some testimony yesterday about the death penalty protocol and making a trip to --

A.     D.C.

Q.     -- to the department to talk to the committee.  All that's going on between August of 2003 and March of 2004; correct?

A.     I presume so.

Q.     During his previous testimony in this case, Mr. Gant testified that one of his primary -- one of the primary focuses of defense counsel in a death penalty litigation is trying to avoid that case going to trial as a death penalty case.  Would you agree with that?

A.     With his testimony.

Q.     Would you agree that that's one of the primary roles, is to try to keep this case from being presented to a jury as a death penalty case?

A.    Yes.

Q.    And that's why you go through the whole protocol issue; correct?

A.    Yes.

Q.    That's why you do all the mitigation investigation; correct?

A.    Yes.

Q.    That's why you hire the Inquisitor, Inc., and Glori Shettles to collect all the records; correct?

A.    Correct.

Q.    That's why you hire experts to do evaluations, to render opinions to present not only to a judge or a jury at some point, but in advance to try to keep this case from becoming a case where there's a Notice of Intent to seek filed; correct?

A.    Yes.  I said that yesterday.

Q.    And that was your -- was that your mindset at the time, back in the fall of 2003, even before the Notice of Intent, was to try to keep this case from becoming a case presented to a jury for the death penalty?

A.    Absolutely.

Q.    After the Notice of Intent being filed in March of 2004, would you agree with me that Dr. Woods was then retained officially in May of 2005 -- excuse me.  I'm sorry, 2004.  Do you recall that?

A.    You know, I -- you're making the timeline.  I do not remember.

Q.    Let's look quickly at an exhibit.  Maybe it will help refresh your memory.  Look at Defense Exhibit Number 100, please.  Do you agree with me that this is an email from Mr. Gant to gloris@inquisitorinc.com and also cc'ing; is that right?  Or including you as well; correct?

A.    From Skip to Glori, including me.

Q.    And this appears to be a response to the email lower below -- or below in this same document, of an email about George Woods.  Do you agree with that?

A.    Yes.

Q.    And that's dated April the 15th of 2004?

A.    Yes.

Q.    Again, yesterday, there was references to Defendant's Exhibit Number 146, which again was that motion to continue.  And in there, if it indicates that Dr. Woods was hired in May of 2004, you wouldn't have any reason to disagree with that; is that correct?

A.    No, it looks like that might be right.

Q.    All right.  And I believe you testified -- well, let me ask you this.  Had you ever worked with Dr. Woods before?

A.    No.

Q.    Did not know him; correct?

A.    Correct.

Q.    But I believe you also testified, as a result of your interactions with Dr. Woods in this case, you had a very favorable opinion of him; correct?

A.    I did.

Q.    I believe you testified that he was immediately involved in the case; correct?

A.    I don't know if I testified to that or not, but he was.

Q.    He was very responsive?

A.    Yes.

Q.    He was available?

A.    Yes.

Q.    He came and actually visited with you multiple times; correct?

A.    Yes.

Q.    So you had a psychiatrist in January of '04, you hire Dr. Woods in May of '04.  The next expert that you hire is actually Dr. Michael Gelbort; is that correct?

A.    Probably.

Q.    I believe there was some testimony yesterday that -- something to the effect that he may have been referred to you by Susan Otto who was the public defender in the Western District at the time; is that correct?

A.    Yes.

Q.    But you had never had any previous experience with

Dr. Gelbort; is that correct?

A.    That's correct.

Q.    Now, we didn't talk about this with Dr. Woods, but when you -- and I think I heard testimony yesterday about it.  When you retain an expert, I believe you had some discussion with Mr. Labovitz about the fact that you will have some preliminary discussions with them, you will then prepare an engagement letter; correct?

A.    Correct.

Q.    And in that engagement letter, you actually set forth what your expectations are of this particular witness -- or excuse me -- expert including compensation and things like that; is that correct?

A.    Yes.

Q.    And then once that expert witness signs that engagement letter, then you will send that to your AO or your finance person, and they'll create a contract; correct?

A.    Correct.

Q.    Do you recall having a discussion with Dr. Gelbort regarding what your expectations were of him in reference to his work in this case?

A.    I don't recall it specifically.

Q.    Okay.  Do you recall creating an engagement letter?

A.    I don't recall it specifically, but I'm sure I did. It was a requirement.

Q.    All right.  Let me -- let me back up chronologic just for a moment.  You hired Dr. Woods.  I believe you said he was immediately involved in the case.  Did you have discussions with him about whether or not you should hire a neuropsychologist?

A.    I'm sure I did.

Q.    I believe you were shown an email yesterday about that particular issue.  Do you recall that?

A.    No.  I saw a lot of the emails yesterday.

Q.    I get it.  As a result of your discussions with him, ultimately, there was a decision to retain a neuropsych and then, ultimately, a decision to hire Dr. Gelbort; correct?

A.    Ultimately, a decision was made to hire Dr. Gelbort.

Q.    All right.  And I want to direct your attention to Defendant's Exhibit Number 74.

      MR. WILSON:  If you will enlarge that a little bit for me, please.

Q.    (By Mr. Wilson)  Do you see this document?

A.    Yes, I do.

Q.    Do you recognize that document?

A.    I do.

Q.    Okay.  And would this be an engagement letter?

A.    Yes.

Q.    And I believe it's dated July the 5th of 2004; correct?

A.   Correct.

Q.   And this would have been --

MR. WILSON:  And if you'll go to the second page, please, or the last page.

Q.   (By Mr. Wilson)  You see where that's actually signed by you; correct?

A.   Yes.

Q.   And do you see another signature down at the bottom?

A.   I do.

Q.   And do you recognize that signature?

A.   No.  It says it's Dr. Gelbort.

Q.   Fair enough.  Again, we're talking about something 20-plus years old.  But you don't have any -- you have no reason to doubt that that was Dr. Gelbort who signed that; correct?

A.   No.

Q.   And he signed it July the 18th of 2004; correct?

A.   That's what it says.

Q.   Okay.

MR. WILSON:  Let's move back up to the letter, please.

Q.   (By Mr. Wilson)  Okay.  On page 1, if you'll take a moment and just take a look -- and look at that and see if it includes any expectations that you had of what his role would be in this particular case?

A.    Yes.

Q.    And where do you find that?

A.    It's in the second paragraph.

Q.    And it appears that -- well, it just says "You will be required to review all pertinent records, which we will supply"?

A.    Yes.

Q.    Now, Ms. O'Connell, I take it, at this point, that Ms. Shettles and Mr. Lax from the Inquisitor had already begun to secure records; is that correct?

A.    Yes.

Q.    It goes on to say "and consult with the defense team and Dr. George Woods, the neuropsychiatrist retained in this case."  Is that correct?

A.    Yes, that's what it says.

Q.    All right.  And then it says "Thereafter, you will travel to meet with Mr. Woods in the Tulsa jail and administer appropriate psychological testing and evaluation."  And, parenthetically, it's added "To be determined by Dr. Woods in consultation with you.  And you also agree to prepare a report of your examination for the defense team."  Is that correct?

A.    Yes.  Well, except that it says that he will meet with Mr. Fields.  You said meet with Mr. Woods.

Q.    Sorry.  Thank you.  Now, you correct me if I'm wrong,

but it appears to me that your plan was that Dr. Gelbort was going to receive documents, records from you; correct?

A.    Correct.

Q.    That you were going to ask him to review those documents; correct?

A.    Correct.

Q.    That he was going to consult with Dr. Woods, who you had already retained as your neuropsychiatrist; correct?

A.    Correct.

Q.    And that they were going to discuss what tests should be presented to be administered to Mr. Fields as part of the neuropsychological evaluation; correct?

A.    Correct.

Q.    Did that happen?

A.    Some of it happened, yes.

Q.    And when you sent this engagement letter to Dr. Gelbort, and he signed it and sent it back, what did that indicate to you when he signed it and sent it back?

A.    Well, it indicated that we had an agreement.

Q.    And that that agreement would be based upon the engagement letter provisions?

A.    The entire letter.  For your part, you do this; for our part, we do that.

Q.    And we'll pay you the compensation that's set forth; correct?

A.    Correct.

Q.    Now, did Dr. Woods and Dr. Gelbort communicate before Dr. Gelbort committed -- or prepared his -- or performed his interview and examination?

        MR. LABOVITZ:  I would just object unless she has personal knowledge.  This is not a -- that would not be a conversation involving Ms. O'Connell.

        THE COURT:  Overruled.

A.    It did not happen.

Q.    (By Mr. Wilson)  Did Dr. Gelbort obtain from Dr. Woods his recommendation of what neuropsychological testing should be performed?

A.    I'm sorry, say that again.

Q.    Did Dr. Gelbort receive from Dr. Woods, Dr. Woods' recommendation as to what neuropsychological testing he thought should be performed?

        MR. LABOVITZ:  For the record, I would make the same objection.

        THE COURT:  Overruled.

A.    It was my understanding that Dr. Gelbort did not speak to Dr. Woods at all before coming and performing testing.

Q.    (By Mr. Wilson)  Do you know whether or not Dr. Gelbort reviewed any documentation before the -- before the interview and testing?

A.    That, I do not know.

Q.    Do you recall when it was that you found out that Dr. Woods and Dr. Gelbort had not talked at all before Dr. Gelbort performed his evaluation?

A.    I don't recall exactly.  It was sometime around completion of testing.

Q.    And when you found that out, what was your immediate reaction?  Do you recall?

A.    I was disappointed.

Q.    Why?

A.    Because I had expected him to consult with the neuropsychiatrist in tandem.  They would make a decision about what testing might be appropriate.

Q.    I'm going to jump out of chronological order just for a moment, then we'll come back.

          THE COURT:  Then I may make -- may make an inquiry.  Since I did promise everyone we would only go till about 11:30 without break, is it --

          MR. WILSON:  Judge, if you will just give me --

          THE COURT:  Just tell me when you're at a good breaking point.

          MR. WILSON:  A couple of minutes and we'll be ready.

          THE COURT:  All right.  That's fine.  Continue.

Q.    (By Mr. Wilson)  And I'm just going through the experts that were hired.  So we talked about the expert, but

you don't recall who it was in January; Dr. Woods,

Dr. Gelbort.  And you actually hired another expert, and

there's been some testimony about a Dr. Grinage; correct?

A.    Yes, I hired Dr. Grinage.

Q.    Okay.  And I believe that was in June prior to trial, June of 2005?

A.    If that's what the records reflect, yes.

Q.    Okay.

MR. WILSON:  Judge, I think this is an appropriate time for me to pause.

THE COURT:  Okay. That sounds good.  All right. Ladies and gentlemen, we're going to take our lunch break. As I said, I promised staff I wouldn't keep them from the holiday lunch today in the courthouse.  Why don't we take until 1:30.  That will give everybody plenty of time.  I know I have a couple of things, I think, I may have to address as well, to be back.  So we will be in recess for lunch until 1:30.

(Recess taken.)

THE COURT:  We are back on the record.  Anything we need to address before we commence?

MR. WILSON:  Not that I'm aware of, Your Honor.

MR. LABOVITZ:  No, Your Honor.

THE COURT:  All right.  Very well.  The witness is in the box.

Mr. Wilson, you may continue with your cross-examination.

MR. WILSON:  Thank you, Your Honor.

Q.    (By Mr. Wilson)  Ms. O'Connell, prior to the lunch break, we were talking about hiring of experts, and the last one we talked about is Dr. Grinage in the spring of 2005. I'm going to go back now to chronological order, if you will, to August of 2004.  And at that time you had retained, in July, Mr. -- or Dr. Gelbort to do neuropsychological evaluation and testing; correct?

A.    Yes.

Q.    And there has been some testimony that he actually performed that testimony in August -- excuse me -- that testing in 2004 of August.  Prior to that actually taking place, did you have an opportunity to go to the jail and talk with Mr. Fields about the upcoming testing?

A.    I'm sure I did, but --

Q.    Any recollection of that today?

A.    No.

Q.    But that would be typically what you would do when you would have a client that's going to be examined by an expert; is that correct?

A.    Yes.

Q.    And would you have discussed with your client the types of tests that they might be seeing?

A.    Well, yes, I would.

MR. LABOVITZ: I'd object that she doesn't have recollection of any discussion with Mr. Fields. So to talk about her general practice --

THE COURT: That's overruled.

A.    Yes.

Q.    (By Mr. Wilson) I know previously we talked about that in July, there had been some previous testing conducted by Dr. Grundy; is that correct?

A.    Yes, Dr. Grundy did previous testing.

Q.    And so that would have been about a month before; is that right?

A.    If that's what the record --

Q.    Actually, would have been about a year before.

A.    Okay. Thank you.

Q.    In July of 2003.

A.    Yes.

Q.    And do you know -- do you recall if you went to the jail and talked with Mr. Fields about the fact that he was going to be tested by Dr. Grundy?

A.    Yes.

Q.    Okay. Were you present during any of the interview of Mr. Fields by Dr. Gelbort or any part of the testing?

A.    I was not present for the interview or the testing. At most, with my clients, I would do an introduction, but I would not remain for testing by my own experts.

Q.    To your knowledge, was Dr. Woods involved or present during any of that testing?

A.    No, he was not.

Q.    And there's been previous testimony that a short time after the testing was conducted, that you received -- and I believe based on one of the documents -- a telephonic notice from Dr. Gelbort about his findings?

A.    Okay.  So about Dr. Gelbort's testing you're talking about?

Q.    Yes.

A.    I believe he called me first.

Q.    And I believe there was a reference to that in one of the motions to extend the 12.2 deadline, that you received a telephone call.  You don't have any reason to doubt that; is that correct?

A.    No, that's my recollection.

Q.    And as a result of that, I assume that you shared that information with Dr. Woods as well.  Would that be correct?

A.    I would have shared it with probably everyone I could on the defense team.

Q.    Okay.  Now, going back to chronologically, the next event is the notice -- the 12.2 notice.  And I believe there's some testimony that the 12.2 notice, under the Federal Rules of Criminal Procedure, is required so that you can call expert testimony either on the issue of guilt

and/or the issue of punishment in a capital case; is that correct?

A.    That's correct.

Q.    And the consequence for not submitting a 12.2 notice is that that evidence would be potentially not allowed, excluded?

A.    Yes, that could happen.

Q.    And you would agree with me that that's a very significant filing in a capital case?

A.    Yes.

Q.    And so as a result of the significance of that filing and the information you've had, you're now asking the Court to extend the deadline to give the formal 12.2 notice; correct?

A.    Correct.

Q.    And you do actually two filings, 145 and 146, Defense Exhibits Number 145 and 146.  Let's take, first, quickly, a look at 145, Defendant's 145.  And if you recall from testimony yesterday, this is the one that was filed with no signature on it.  Do you recall that?

A.    Yes.

Q.    And it appears, based upon some questioning that was elicited yesterday, that the handwritten notes that the counsel showed you yesterday, may have contributed to the drafting of this document; is that correct?

A.    Yes.

Q.    And I want to direct your attention specifically to page 3, and it's paragraph 5.  And about middle way down that paragraph, and it's actually line 7, there's a sentence which starts "The neuropsychiatrist," do you see that?

A.    Yes.

Q.    Could you just read that to yourself for a moment?

A.    Yes.

Q.    Okay.  And it appears to me that in this filing, you're informing the Court that the neuropsychiatrist, which would be Dr. Woods; correct?

A.    Yes.

Q.    He's reviewed the data that's been accumulated, the records so far; correct?

A.    That's what it looks like, yes.

Q.    And he's recommended particular neuropsychological services; is that correct?

A.    Yes.

Q.    And that would be in reference to what Dr. Gelbort was going to do; is that correct?

A.    I would think so.

Q.    Okay.  Neuropsychological services to be utilized to administer specific tests he deemed indicated; is that right?

A.    Yes.

Q.   And would you agree with me that that is consistent with the engagement letter that you sent to Dr. Gelbort?

A.   Yes.

Q.   But yet you find out later that didn't take place; is that correct?  That they did not meet?

A.   I don't think I understood your last question.  What it looks like I was trying to say here is that the neuropsychiatrist recommended that neuropsychological services be utilized to administer the tests that he thought were appropriate, and then I located, found the expert, who would be Dr. Gelbort, tests -- additional testing was performed, and the results indicated frontal lobe impairment.

Q.   Okay. All right.  So you provide that notice, and then a few days later, in September, September the 17th of 2004, there's Defendant's Exhibit Number 146, and we'll take a look at that very quickly.  You would agree with me that it's hard to read, but this looked like it was filed on September the 17th of 2004?

A.   Yes.

Q.   Do you recall why it was necessary to do an amended notice?

A.   Well, it's a supplemental notice.  I'd have to -- I'm not sure right now.

Q.   Okay.  Obviously, there has been some testimony that

you included the affidavit from Mr. Burr?

A.    Someone.

Q.    Okay.  And so counsel -- you made a determination that you needed to do a supplemental?

A.    Was that -- was the -- may I ask, was the declaration by that particular expert attached to this supplement?

Q.    Yes.  I can tell you the records will reflect that.

A.    All right.  That does make sense to me in some ways.

Q.    All right.  And, again, your purpose of doing that is so that the judge will stop the clock or expand the clock to allow you more time to actually do your 12.2 filing; correct?

A.    Yes.  May I explain?

Q.    Was this a significant situation at the time?

A.    It was a very significant situation.

Q.    So what was significant about it?

A.    Well, in order to be adequately prepared, we had to have appropriate time to conduct all this testing.  And Judge White was new to the bench, new to the case, obviously had never done a capital case, and it was -- at the time, it was quite challenging to practice in Judge White's court. He really had a great desire to move things forward, so he was reluctant to grant continuances.  One might even say he resisted granting continuances.  And so the motions to continue and the supplement to continue, my thought is that

I really had the need to explain to him in detail why this was so important, and he ought not deny the justified request for continuance.

Q.    And, again, the punishment if you don't do an adequate notice is you potentially could exclude -- that evidence could be excluded; correct?

A.    For a notice, yeah.

Q.    You mentioned the timing of -- well, strike that.  You mentioned that Judge White was wanting to move this litigation forward; correct?

A.    Yes.  All litigation, yes.

Q.    And had there been some movement of that 12.2 deadline --

A.    I don't recall.

Q.    -- in advance?

A.    I do not recall.

Q.    Okay.

THE COURT:  Mr. Wilson, you just sometimes -- get back closer to that microphone.

MR. WILSON:  Oh, sorry, Judge.

THE COURT:  It's not quite picking up as well as she might need.

MR. WILSON:  Okay.  I'll try to move my notes a little closer too.

THE COURT:  I know it's hard.

Q.    (By Mr. Wilson)  Let's look at Defendant's 153, and I'll try to move quickly on this.  Defendant's 153.  Do you see that document?

A.    I do.

Q.    Entitled "Fields, Working Points."  Do you recognize or recall that document?

A.    You know, someone has shown this to me recently, probably from the defense team.  I don't have any specific recollection of this.

Q.    Okay.  You don't know whether you're the one who created it or not?

A.    It seems -- it seems odd that I would create a typewritten list.  It's not my style, but that's all I can say.

Q.    Well -- and the reason I bring this up is, is about three-quarters of the way down, there's a reference to "Motion Filing/12.2 Deadline."  Do you see that?

A.    I do.

Q.    And it lists a couple of dates.  Is anything about that significant?

A.    Well, it says something was changed.  I'm fairly certain this is not my document.

Q.    Okay.  All right.  I appreciate that.  But needless to say, Judge White was willing to move this forward, and you wanted to get as much time as possible to do the notice?

98

A.    Yes.

Q.    Is that fair enough?

A.    That's fair enough.

Q.    Okay.  Now, you ultimately filed that notice on November the 1st of 2004.  Defendant's 122 is, in fact, that notice.  We'll look at that quickly, please.  I think counsel may have showed this to you earlier.  But in this notice, you're required to list what you anticipate that evidence is going to be, generally speaking; correct?

A.    Yes.

Q.    And as of November the 1st of 2004, you tell the Court and counsel that you intend to call a neuropsychiatrist, a neuropsychologist, and a pharmacologist?

A.    Right.

Q.    Why a pharmacologist?

A.    Well, so the initial thought was that maybe a pharmacologist could help us to explain the effects of Effexor on someone who is actually not needing that medication, right, but we found instead Dr. Grinage, who had some sort of -- some sort of specialization, I don't remember exactly what it was, in a pharmacology area.

Q.    All right.  So I take it from that, that as of November the 1st of 2004, in addition to the idea of brain impairment or brain injury, there was also a discussion about Effexor and the effects of Effexor on Mr. Fields; is

that correct?

A.    Yes.

Q.    Again, probably an unfair question, but I know that Dr. Woods got involved in this case back in April of 2004. Do you know if Dr. Woods had explored this idea of a manic switch or manic flip before Dr. Gelbort ever did any testing?

A.    I don't know.

Q.    Okay.  I said I was going to do a timeline, and I'm messing it up already.  This was November.  I need to go back in time just a little bit.  Let's look at Defendant's Exhibit Number 80.  Defendant's Exhibit 80.  And would you agree with me this appears to be an email from you to George Woods, Dr. Woods; correct?

A.    Correct.

Q.    Dated September 20th of 2004?

A.    Yes.

Q.    That would have been after the testing, but before the 12.2 notice was filed?

A.    Yes.

Q.    And I want to direct your attention specifically to paragraph 3, that you're talking to Woods about trying to get together to have a meeting.  Would you agree with that?

A.    Yes.

Q.    And hoping to get Woods, Gant, potentially

Dr. Gelbort, all together to talk about mental health issues; is that correct?

A.    Yes.

Q.    And also then in paragraph 4, you raise, again, the issue of imaging; is that correct?

A.    Yes.

Q.    So this would make the second time now that you have raised the issue.  You raised it back in April of 2004, and now again in September of 2004; is that correct?

A.    Maybe.  I'm sorry.

Q.    Okay.  We looked at some emails and we can look at them again, but would you have any reason to doubt that?

A.    No, if it's consistent.

Q.    And I believe your testimony was is that Dr. Woods said he didn't want to do a PET scan; is that correct?

A.    That's correct.

Q.    And to your knowledge, did he ever -- did Dr. Woods ever request any type of diagnostic imaging?

A.    No.  If he did, we would have done it.

Q.    Now, I want to direct your attention -- it's the same day.

        MR. WILSON:  And just for the record, Your Honor, Government's -- Defendant's Exhibit Number 80 is also Government's 55.  I just want the record clear.

        THE COURT:  Okay.

Q.     (By Mr. Wilson)  Okay.  Now, we're going to look at Defendant's Exhibit 240, which, for the record, is also Government's Exhibit 65.  We'll just pull up -- I'm just asking to pull up Defendant's Number 240.  Ms. O'Connell, this is an email.  It appears to be the same date, about an hour after the one we just looked at, and this one is to Skip Gant; is that correct?

A.     Yes.

Q.     And just so we're clear, Skip Gant is Mr. Gant who was learned counsel assigned in this case; correct?

A.     Yes.  His name is Isaiah; he goes by Skip.

Q.     Okay.  Isaiah Skip Gant.  I'm going to direct your attention to what you've numbered as paragraph 1, and it's actually six lines down.  The sentence actually begins on line 5, "I'd like you to be here as well."  Do you see that?

A.     Yes.

Q.     It appears that you're still talking about trying to get together.  Now, you're wanting -- inviting Mr. Gant to be a part of this meeting that you're wanting to have with Dr. Woods and potentially Dr. Gelbort; is that correct?

A.     Yes.  Yes.

Q.     All right.  Line 6 says "It seems we may have to work intensely with these two doctors to get them on the same page."  I'm reading that 20-plus years later, and I know you are too now.  But the impression I get from this email is

that there may have been some conflict, some issue going on between the two, to have them to agree or to get on the same page. Do you recall what might have been the motivation for you using that particular language?

A.   It wasn't that they disagreed with one another --

Q.   Okay.

A.   -- okay, to be clear. They did not disagree with one another. The issue was that -- it was my impression that Dr. Gelbort -- well, let me back up. I felt that Dr. Woods' results were the -- would be the major part of the defense storyline. I thought it was most impactful. That's the best way that I can say that. And so what I wanted Dr. Gelbort to do wasn't necessarily what Dr. Gelbort wanted to do. Clearly, he didn't want to -- he did not do some of what I asked him to do in terms of cooperating with or communicating with Dr. Woods. The impression that I got in the few conversations that I was able to have with Dr. Gelbort was that -- I felt he didn't want to play second fiddle.

Q.   And I don't want -- just for the record, when you say "play second fiddle," what do you mean by that?

A.   I mean not be the star of the show.

Q.   Do you recall if that meeting actually took place?

A.   I don't believe -- I don't believe Dr. Gelbort ever came to any meeting with -- I'm quite sure he didn't.

Q.     Do you recall a meeting in October of 2004, in your office, where Dr. Woods, Mr. Gant, yourself, Barry Derryberry, and potentially Dr. Gelbort, via telephone, occurred?

A.     Maybe in the conference room in my office.  I remember -- I think Glori Shettles may have been there too.  I remember having a meeting in my office with several people.

Q.     And Mr. Gant testified that -- what he said was, that was a meeting so that Dr. Woods could explain to him the manic switch or get him on board with manic switch.  Did you and Mr. Gant have any discussions about that, that you recall?

A.     That meeting was -- in my view, that meeting was for all of us to get together and talk about all of our possible mental health defenses, issues, results.

Q.     Knowing that your 12.2 deadline is coming up; correct?

A.     Yes.

Q.     There's reference in this same email, in paragraph 3, about firewall counsel.  Now, we all know what firewall counsel is, but for the record, what is firewall counsel?

A.     I don't even know if I can explain it now.  It's someone to stand sort of as protection between -- to protect the mental health -- well, to protect the second-stage evidence, really, from early disclosure to be held and be exchanged and reviewed.  I mean, firewall counsel can play

several roles, but I think mostly what I wanted to have firewall counsel for was for that.

Q. Because at this point, we're still preconviction; correct?

A. Yes.

Q. I mean, Mr. Fields doesn't plead guilty until just late in June or early July, correct, of 2005?

A. Sure.

Q. Okay. And so are you -- during this point, is there actually firewall counsel ultimately appointed in the case?

A. Well, ultimately, but not --

Q. Not at this stage?

A. Yeah, not here and now. Right.

Q. And we'll talk more about firewall counsel in a second. Okay. There was some testimony yesterday about the actual first draft of Dr. Gelbort's report. And I believe there was an email yesterday that Dr. Gelbort actually sent that to you in November, November the 10th of 2004, and that would have been, you know, just around -- just after the filing of the 12.2 notice, chronologically speaking. And when you got that report, I believe you testified that you shared that with co-counsel, with Mr. Gant; is that correct?

A. Sure. Yes.

Q. But you also shared it with some of the consultants, the people that you consulted with in this case; is that

correct?

A.    Right.

Q.    I want to direct your attention to Defendant's Exhibit Number 155.  And at the bottom of this exhibit appears to be where you're sending a report, a draft report, from Dr. Gelner -- Gelbort -- excuse me -- to Mr. Gant; is that correct?

A.    Yes.

Q.    And in the middle, there appears to be an email from Mr. Gant to you; is that correct?

A.    Yes.

Q.    Take a moment and just read through that if you don't mind, just to yourself.

A.    Okay.

Q.    Would you agree with me that Mr. Gant was not impressed with the draft report?

        MR. LABOVITZ:  Objection.  Ms. O'Connell can't know what is in Mr. Gant's mind.  He's certainly permitted to ask what was your impression of what Mr. Gant said.  I have no objection to that, but just saying --

        THE COURT:  Sustained.

        MR. LABOVITZ:  -- what did Mr. Gant know.

Q.    (By Mr. Wilson)  Based upon your reading of this email, what was your impression of Dr. Gant's feeling of Dr. Gelbort's draft report?

A.     Well, he says "I'm not the least at all impressed."

Q.     And does he talk about some specific issues in the report that he's concerned about?

A.     Yes.

Q.     And what are those?

A.     Well, I think the gist of what he's saying is that Dr. Gelbort is not incorporating historical information that we gave him about Ed Fields that might be relevant to brain damage, might be relevant to neuropsychological testing.

Q.     And that historical information would be the potential hypoxia at birth; is that correct?

A.     The hypoxia at birth, yes.

Q.     And when you read where he said he waved the back of his hand to the frontal lobe damage, what was your impression of that statement?

A.     What -- you mean, what do I take that statement to mean?

Q.     Yeah.  What was he telling you?  What was your impression of what he was trying to communicate to you in that comment?

A.     I think he was indicating that the doctor's report -- draft report didn't express a very strong opinion.

Q.     I want to direct your attention now to Defendant's 107, please.  Would you agree with me that this is an email from January of 2005?

A.    Yes.

Q.    And I want to start with the middle.  Again, this appears to be a different version of the email we talked about earlier, where you sent the report to Mr. Gant on January 3rd of 2005; is that correct?

A.    Yes.

Q.    At the top, the email that was sent from Skip to Lisa Greenman, freedman99, and to you; is that right?

A.    Yes.

Q.    Okay.  And we've talked about Lisa Greenman.  I assume that freedman99 is David Freedman; is that right?

A.    Yes.  I'm sorry.  Yes.

Q.    Okay.  And would you agree with me that this appears to be Mr. Gant sharing that draft report to those two consultants?

A.    That's what it says.

Q.    And you were on board with him sharing that with David and Lisa; is that correct?

A.    Yes.

Q.    And specifically, in that email to Lisa and David, Mr. Gant says "I've got an opinion, however, I am refraining from voicing it for fear of influencing how you may view the report."

A.    Yes.

Q.    When you read that, what impression did that language

make upon you about Mr. Gant's -- again, his thought about the report itself?

A.    It didn't.  It didn't make me think anything I don't think.

Q.    I'm sorry?

A.    My recollection is that it didn't make me think anything.

Q.    Okay.  Fair enough.  Now, let's go to Defendant's 136. Defendant's 136, which is also Government 31.  Again, another email.  This one, would you agree with me, appears to be dated January the 8th of 2005?

A.    Yes.

Q.    And would have been from Lisa to David and Skip, but also cc's you and Lisa's other email; is that correct?

A.    Yes.

Q.    And would you agree with me that she begins by saying that she's read the report and that she hates it?

A.    That's what it says.

Q.    Do you recall what, if any, impact that would have had on you at the time about Ms. Greenman's opinion of Mr. -- or Dr. Gelbort's report?

A.    Well, I'm sure I would have taken it into account, but what we're doing here is we're sharing all of this to exchange our opinions and try to see what might need to be tweaked or what we could do with the doctor, etcetera, to

make the report more understandable or conform with what he saying, but not writing, that kind of thing. And I was already concerned with a whole lot of what she was talking about, is -- I mean, I think I mentioned yesterday his report was not organized like any other expert psychological testing report I'd ever seen before. It wasn't -- it was just a narrative. So I already had concerns, and I think most of -- many of my concerns are probably echoed in these emails back and forth between everyone else.

Q. I direct your attention, still in that first paragraph, roughly seven lines down, where it says -- where it starts "It doesn't sound." Do you see that?

A. Yes.

Q. "It doesn't sound, at least initially, like you will be needing or wanting Gelbort to have to carry much of the storyline at trial."

A. Yes, I see that.

Q. Did you agree with Lisa?

A. Well, I don't know if I agreed with it at that point in time. I mean, I -- once Dr. Woods did his neuro examination and met with us and -- met with Skip and me and whoever else was there, and explained to us what he believed happened with a manic flip, I think I formed the opinion that was our main storyline in defense; that that was a compelling and strong argument, and it was accompanied by a

great deal of external corroboration.

Q.    Lisa goes on to say "The neuropsych data sounds to me far more likely to play a supporting role to testimony from an MD" or a medical doctor.  Is that right?

A.    Yes.

Q.    "Your client's underlying psychiatric problems, and the impact of the medications on his functioning, sound like much more significant storylines."

A.    That's what she says.

Q.    Does that coincide with what you just told me about your feeling about your discussions with Dr. Woods and his findings?

A.    Yes.

Q.    Also, in this email, would you agree with me that Ms. Greenman is critical of some of the language that Dr. Gelbort uses in his draft report, referring to a dose of the clap?

A.    Yes.

Q.    And that his suicide attempt was a shaving accident; is that correct?

A.    Yes.  I think -- my recollection is that Dr. Gelbort included those quotes indicating that that was the way that Mr. Fields explained those things in his humorous manner, when he was having -- you know, when he was doing the interview.  And rather than -- he just quoted him, rather

than writing it in a more palatable way.

Q.    And do you recall if Dr. Gelbort gave any explanation of why he wanted to use those particular quotes in his reports?

A.    No.  I believe that ultimately he cleaned it up.

Q.    In that same paragraph, references "The section on job history is related in a way that seems to be both misleading (it sounds like the client was employed more than unemployed) and fails to inquire into whether there is clinical significance to the client's movement from one job to another."  Did you agree with that assessment?

A.    I'm not sure that I did.  I thought my -- I'm not sure that I did.  I know that I was concerned at one point about Dr. Gelbort not getting the employment situation right.  I remember he said in one of his reports that Ed never held a steady job or something along those lines, when he'd had at least a six-year steady job at the correctional -- the prison that he worked at and then a couple of other jobs that didn't last as long as that one, but they -- you know, depending, I suppose, on what you call a steady job.  I mean, it just seemed as though to me that actually Dr. Gelbort just didn't have his brain wrapped around Ed's employment history.

Q.    Did that give you any concerns about the quality of Dr. Gelbort's evaluation and his opinion?

A.    Well, I remember it still.  I mean, it was a small piece of it, I think, but yeah.

Q.    And at the bottom of page 1 and the top of page 2, she references -- or she calls a niggling thing, that he referred to Effexor as a neuroleptic.  Did that give you any pause or any concern at that time?

A.    Well, of course.

Q.    And as counsel -- I think he showed you this email yesterday.  She does end the email by saying there's some good stuff there; is that correct?

A.    Yes.

Q.    Okay.  But yet he wasn't communicating that good stuff; is that correct?  That's her opinion?

A.    Right.  And I think -- yes.

Q.    Now, would you agree with me that not only Ms. Greenman was critical of the draft report, but also Mr. Freedman; is that correct?

A.    Yes.

Q.    I would direct your attention to Government's 90 -- or excuse me -- Defendant's 96, which is also Government 29 just for the record.  And do you agree with me that this appears to be an email from you to Mr. Gant, in which you're cc'd, dated January the 7th, same day, of 2005?

A.    Well, what I'm looking at looks like an email from David Freedman.

Q.    I'm sorry.  From David to Mr. Gant?

A.    Yes.

Q.    And would you agree with me that he has it broken up into answering what appears to be two questions, which Skip had asked or Mr. Gant had asked earlier; is that correct?

A.    That's what it looks like.

Q.    Okay.  And about midway down of this email, similar -- and this is my characterization -- similar to Ms. Greenman, that Mr. Freedman was critical of his description of Mr. Field's employment history; is that correct?  And I'm looking specifically at paragraph one, two, three, four, where it starts "classes he did not."  Do you see that? Second line, "Gelbort to express; also, he never kept a job."

A.    Yes.

Q.    Is that what you were referring to earlier about another email about not keeping a job or some report about not keeping a job?

A.    I think what I was talking about was I remember from his report, he was -- Dr. Gelbort said he didn't keep a job, when, in fact, he had.

Q.    Scanning down on this particular email, in paragraph 2, I think it appears that Mr. Freedman is also critical of the way it's structured, needs to be reorganized and restructured; is that right?

A.    Yes.

Q.    And that in this draft report, there's no connection of the testing that was performed and the results of that testing.  Would you agree that he's someone critical of that?  Specifically, that there's no reference to any specific testing that he conducted?

A.    I'm sorry.  I'm not sure what you're asking.

Q.    Look in paragraph 3.  I'm sorry.  "Since none of the summary information on scoring is tied to specific tests, this is much more difficult to interpret than it ought to be."

A.    Yes.

Q.    How did you -- how did you take that language or that criticism?

A.    Well, that criticism is really important in light of what follows.

Q.    Okay.

A.    Unless that was the point.

Q.    How so?

A.    Well, if you just -- I think the question was, is he being elusive because he doesn't have that much confidence in what he's saying out loud?  Is his report -- it's so difficult to read in relation to testing results because it's -- because it doesn't -- it's not as strong as he was saying out loud.

Q.    And I believe -- would that be consistent with what you testified yesterday, is his initial report to you was that he has brain damage, and now this report is not as definitive?  Is that what you're --

A.    No, I don't think that's the same thing, but -- no, I don't think it's the same.  I just think this is a different concern.

Q.    Okay.  Got to the next page.  Well, I'm sorry.  This spans page 1 and 2.  Starting at the bottom of page 1, "I view this as problematic -- potentially problematic, the variability and inconsistency reported on memory and learning will be made out by the prosecution to be malingering, especially in light of apparently normal attention testing."  What, if any, significance was that to you in Mr. Freedman's criticism of the report?

A.    I just thought it was an important note.

Q.    And moving on down on page number 2.

        MR. WILSON:  You can stop there.  Back down a little bit.  Thank you.

Q.    (By Mr. Wilson)  Paragraph 4, "The best potential evidence here is the 'higher functions' paragraph in which he says he is mildly impaired on impulsivity and processing speed and higher level reasoning, but he takes that away by saying it results from concentration and attention deficits, depending on the test on which he is basing this on, that

does not strike me as a likely explanation unless the impairments in these areas are minor or based solely on a single subset." Do you see that?

A.    Subtest, yes.

Q.    Or subtest. What, if any, concern did that language give you?

A.    And I can't -- I can't tell you that any of this specific language gave me a specific concern. This email is just an example of the many issues that the entire team was experiencing with Dr. Gelbort's report and testing.

Q.    And would you agree with me that, at this point, David Freedman nor Lisa Greenman had seen any of Dr. Gelbort's raw data or do you know that?

A.    I think that's true.

Q.    Okay. As a matter of fact, they actually request to see the raw data; isn't that right?

A.    Yes.

Q.    One more thing from this email, and then we'll move on. David Freedman is critical of the fact that Dr. Gelbort doesn't do any independent malingering tests, and that -- I think he used the expression that the government or the prosecution will eat him alive. Is that correct? You may have to pan down.

A.    Yes, I see it. Yes.

Q.    And were you aware that Dr. Gelbort did no independent

performance evaluation testing?

A.    I'm sorry.  Performance evaluation testing?

Q.    Performance -- I may be using the wrong terminology. Basically, malingering testing?

A.    So, yes, I was aware.

Q.    And it appears that Mr. Freedman is saying if he were to testify, based upon his testing, that the government is going to be critical of him in cross-examination?

A.    Sure.

Q.    And when you are assessing the strengths and weaknesses of testimony, of evidence to present, do you consider potential cross-examination and the damage of potential cross-examination?

A.    Yes.  When we're talking about presenting something to a jury or even to a judge sometimes, that's a strong consideration.

Q.    We mentioned -- or I mentioned the fact that both of them had requested the raw data.  Did you have any difficulties obtaining the raw data from Dr. Gelbort?

A.    I don't recall.  It -- I don't recall.

Q.    Well, let's look at Exhibit Number 208.  And for the record, that's also Government's 26.  Would you agree with me that this is also an email also on January the 7th, 2005?

A.    Yes.

Q.    And this one is from you to Lisa, David, Skip;

correct?

A.    Correct.

Q.    When you say "Apparently, I will have to jump on his head before he'll give them up" -- the first sentence you talk about the scores.  When you say the scores, you're talking about testing scores?

A.    Yes.

Q.    What do you mean "I may have to jump on his head before he'll give them up"?

A.    I meant that I might have to make him give them up, just get -- I don't know.  I can tell from the email, and as I recall, vaguely, my interactions or lack thereof with Dr. Gelbort, he was -- there came a point where he was very difficult to communicate with.  He didn't respond.  He didn't answer.  And as I'm saying in this email, I've asked him repeatedly for these things, then I email him again asking for it, so ...

Q.    There has been some testimony from Dr. Gelbort that he could not give that information to you, that he had to give it to a mental health professional.  Was that his explanation to you or do you recall?

A.    If that was his explanation, I would have said so in the email, but this is a circumstance of him when I'm writing this email.  This is him not saying anything to me. If he told me that, I would tell them that, and he may have

told me that at some point, in which case, I would have relayed it to the team.

Q.   Well, isn't it true that at some point later, you actually had to get Dr. Grundy to be the conduit to receive the raw data?

A.   That might be.

Q.   Well, just for timeline purposes, let's look at Government's Exhibit Number 4.  If you'll take a look at what appears to be an email dated March the 4th, which would have been two months after the January 7th email.  Just take a moment.  If you'll just look at that email for me, please.

A.   Okay.

Q.   And there was some testimony earlier about this, about some communication issues you had, and you actually had to go -- and I think the expression you used of sneak up on him at a conference?

A.   Yes.

Q.   And did you have the raw data yet?

A.   When?

Q.   By this March of 2004, if you know?

A.   At the time of the writing of this email?

Q.   Yes.

A.   No.  It looks to me like this phone conversation that I'm relating, where Mr. Gant and I spoke with Dr. Gelbort, that it was in that conversation that Dr. Gelbort told us

that he was uncomfortable giving data to anyone other than a psychologist. And so I'm asking them, are they -- can I give that to you or what do I do?

Q.    Okay. In which -- I believe that's when we talked about that Dr. Grundy may have been the conduit to get that; is that correct?

A.    Possibly, yes.

Q.    All right. Now, I want to direct your attention to another email, just for the timeline, to Defendant's Exhibit Number 157. It's also, for the record, Government's Exhibit 36. Would you agree with me this is an email from Skip to you dated January the 19th of 2005?

A.    It's from Skip to David Freedman, and I'm copied on it.

Q.    Right. I'm sorry. Yes, that's correct. Which appears to be -- again, the chain begins at the bottom of the page, on January the 14th; is that right?

A.    It appears to.

Q.    Just take a moment, and, if you will, just take a look at it and just characterize what the purpose of this chain was.

A.    Okay.

Q.    Okay. So what was the -- what was the purpose of that chain? What were you trying to express during those emails?

A.    I wasn't -- I'm just a recipient. I'm not expressing

anything.

Q.    Okay.  And would you agree with me that there's some discussion about trying to get together to talk about the mental health issues?

A.    To talk about -- I think -- I think it's about talking about Dr. Gelbort's report.

Q.    Okay.  Had you been having difficulty at this point having conversation with Dr. Gelbort?

A.    Yes, but this isn't about getting together with Dr. Gelbort, if that's what you're asking me.

Q.    All right.  Let's look quickly at Government's Exhibit Number 7 now.  Another email, this one January 27th, about a week later.  If you will take a moment and take a look at that email for a second.

A.    Okay.

Q.    Would you agree with me at the bottom -- and, again, we don't know exactly the date that you wrote this.  There's reference to asking a question about ever working with Gelbort before.  Do you see it at the bottom?

A.    Okay.  That's me asking.

Q.    Yes.

A.    Yes.

Q.    All right.  And then David responds in the middle of Government's 7, where it says "I had a hard time with him actually, he hadn't done all the testing that needed to be

done, and he basically just said he wouldn't go back and do more."  Do you see that?

A.    I do.

Q.    And that was an email that David had sent to you; is that correct?

A.    Yes.

Q.    And at the top of this same chain, I believe you were expressing to David about what you and I talked about early on, about Dr. Gelbort not conforming his actions to the engagement letter, in reference to communicating with Dr. Woods before the evaluation; is that right?

A.    That's what it's about, yes.

Q.    And you say "In the end, I find out Gelbort never talked with Woods and just went and did whatever testing he wanted."  Is that right?

A.    Yes.

Q.    And then you express an opinion about that draft report; is that correct?

A.    Yes.

Q.    And what was your opinion?

A.    It was a poor opinion.

Q.    Okay.  Specifically, you said it was the crappiest report you had ever seen; is that right?

A.    Yes.

Q.    Do you recall having a conversation with David

Freedman, in addition to the email we just looked about -- looked at, where he advised that he thought Gelbort was exceedingly difficult to work with and sloppy?

A.    I don't specifically remember that.

Q.    Would you agree or disagree with that opinion, if David expressed such an opinion?

A.    That he was exceedingly difficult to work with --

Q.    Difficult to work with and sloppy?

A.    -- and sloppy.  Well, I wouldn't necessarily disagree with it.  He was exceedingly difficult to work with.  As for why his report seemed to be done so poorly, I don't know if it's sloppiness or some other thing, so I can't say.

Q.    Okay.  Yesterday counsel asked you about a letter that you received from the United States Attorney's Office in February of 2005.  And, again, I'm trying to do the timeline.  So now we're in February of 2005.  And I believe you testified yesterday that this was Mr. Sperling's recitation back to you of communications that you had with him; is that correct?

A.    Yes.

Q.    And this is not a verbatim transcript of that discussion; is that correct?

A.    I'm not sure.  I guess -- I guess, Shelly, Mr. Sperling, was just trying to memorialize for some record somewhere that we had had these conversations, and that --

it's his words -- it's efforts at repeating the conversation that we'd had about the mitigation, that we thought was important in heading off, seeking the death penalty.

Q. And the document which was introduced, Defendant's Exhibit Number 168, or presented in this case, I think we talked about it yesterday, but it doesn't even have a signature on it, does it

A. No. What's 168?

Q. Defendant 168, that's the letter. We'll look at it real quick.

A. Oh, the letter from Mr. Sperling?

Q. Yeah.

MR. WILSON: If you'll go down to the end. If you'll scroll down to the end, please.

Q. (By Mr. Wilson) It doesn't appear to be signed.

A. No, it doesn't.

Q. Okay. But even though it's signed [sic], do you know if that's a letter that you received from Mr. Sperling?

A. I don't know where it came from. If it was in my file, I received it.

Q. Okay.

A. I don't have any specific recollection of this letter. I certainly have recollections of the things that are contained in the letter, so I don't have any reason to dispute that he wrote it to me.

Q.   And, again, I take it that this conversation would have been in the context of trying to get the U.S. Attorney's Office to not seek the death penalty?

A.   Yes.

Q.   And, again, that was post notice, but still asking for the government to potentially deauthorize the death penalty; correct?

A.   We had conversations all the way up to trial trying to avoid the death penalty.

Q.   I think you sent in some audio of some comments from family members as -- you tried everything you could --

A.   I think we made a video, yeah.

Q.   I asked about you being aware of Mr. Freedman's -- or recalling a conversation between you and Mr. Freedman, where he expressed concerns about Dr. Gelbort.  Were you aware that Dr. Woods had the same discussion with Mr. Freedman?

A.   I don't remember.

Q.   Okay.  You talked about trying to contact Dr. Gelbort and not being able to talk to him.  Did you ever -- did you try to email him and have him to get back with you by email?

A.   Yes.

Q.   Were you more successful via email than you were by telephone?

A.   I imagine so.  I really couldn't say that for certain. We had to call his office, and he had an assistant who took

messages. That's what I remember.

Q. Okay. Well, look at Government's Exhibit Number 61. And I know I've destroyed the timeline again, but we're back in January of 2005. This appears to be an email from you to Mr. Gant. And in all caps, you say "He has not answered my email yet." Is that correct?

A. Yes.

Q. And in the same month -- look at Government's Exhibit Number 7. We may have looked at this email earlier.

A. Yes, we did.

Q. But I believe you characterized or say that he's not a fan of yours at this point; is that correct?

A. That Dr. Gelbort is not a fan of mine?

Q. That he -- yeah, Gelbort is not one of your -- or you're not a fan of Dr. Gelbort.

A. Oh, okay. That's ...

Q. All right. Let's go to Government's Exhibit Number 9. Another email, this one now back into the month of February. And this would be after the draft report comes in. You still don't have the raw data at this point, and you send this email to David. Take a moment and look at that, please, or you may have already done it.

A. I did.

Q. Okay. Would you agree with me that you informed Mr. Freedman that you would not recommend Dr. Gelbort to

your worst enemy?

A.    Yes.

Q.    What motivated you to say that to David?

A.    Because he was very difficult to work -- Dr. Gelbort was very difficult to work with.

Q.    All right.  Yesterday counsel showed you three separate reports from Dr. Gelbort.

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    We've talked about one so far, the one that I believe you testified yesterday you wrote at the top of it "Draft"?

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    And that's the one where he used language like "dose of the clap" and "shaving accident"; is that correct?

A.    Yes.

Q.    Now, there's a two-page report that you were shown yesterday.

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Do you remember that report?

A.    Not -- not specifically, I do not.  I have an idea

what that is, but --

Q.   What's your idea of what that is?

A.   My idea is that's maybe what he sent me immediately after testing.  I saw in some of these emails that you showed me that he said -- where I'm saying, hey, here's his draft report to Freedman and Greenman.  And then, in parens, I think I said he's telling me the other that he sent was just to inform me of testing or immediately after testing. So maybe that's what that one was, but I don't have any independent recollection of that two-page report, frankly.

Q.   Do you find it odd that the draft report was four pages, and, then, allegedly, in March, a two-page one, and then a final back to four or five pages?

A.   Yes, I guess so.

Q.   Let's go now to the month of March.  I guess back to the month of March.  And we're going to look at --

A.   March of what?

Q.   Of 2005.

A.   Okay.

Q.   And we're going to look at specifically Defendant's Exhibit Number 179.  And for the record, that's also Government's Exhibit Number 20.  Do you agree with me that this is an email that you sent to David on March the 9th of '05?

A.   Yes.

Q.   And would you agree with me that it appears that you're still having difficulty having Dr. Gelbort to get back with you?

A.   Yes.

Q.   And I want to direct your attention to the second paragraph, and you start off by saying "I don't know how far I want the report to go, for several reasons."

A.   Yes.

Q.   What report are you referring to?

A.   I think it's Dr. Gelbort's report.

Q.   Okay.  And in the next sentence, you talk about the purpose of the report, that you might want to show it to the government for purposes of, again, trying to convince Mr. Sperling to not seek the death penalty; is that right?

A.   Yes.

Q.   I think you refer to that as "settlement purposes"; right?

A.   Yes.

Q.   And you said, "The other being that my claim to fame isn't brain damage, it's manic flip due to Effexor."  Now, I have in my own personal definition of what "claim to fame" is, but when you say that, what did you mean?

A.   It was not my main line of defense.

Q.   And would that be consistent with what you told us earlier about when you were discussing your impression of

what Dr. Woods had told you, and you believed that that was the most compelling evidence?

A.   Yes.

Q.   And when I say what Dr. Woods -- about the manic switch or manic flip?

A.   Yes.

Q.   And, again, you'd agree with me that you're expressing to David again the fact that Gelbort didn't contact Woods like he was supposed to; is that correct?

A.   Yes.

Q.   And that matter of fact, that Dr. Woods -- and I think the word you used was "dismayed" when he first heard about the test battery because it isn't standard protocol; is that right?

A.   Yes.

Q.   Now, it goes on to say, he -- you say that he emailed you and says he feels more comfortable now; is that right?

A.   Now that he's spoken with Dr. Gelbort, so I guess the doctors did finally speak.

Q.   When you typed this email, were you having any concerns about Dr. Gelbort and his performance?

A.   I don't know if at that moment I was or not.

Q.   Did this email reflect concerns that you may have formed at any point prior to drafting this email about Dr. Gelbort?

A.     Well, it reflects trouble that I was having with Dr. Gelbort, and, thus, I would think, concern.

Q.     Let's go to Defendant's Exhibit Number 180, which is also part of Government's Exhibit Number 20.  And would you agree with me that this is an email the same day, March the 9th of 2005; is that right?

A.     Yes.

Q.     And this one is to the other person you've been consulting with regularly, Lisa Greenman?

A.     Yes.

Q.     And I believe you start this email by saying "One thing to keep in mind is that I have George Woods, who is my real mental health expert."

A.     This -- yeah.

Q.     Expressing the same thoughts that you had expressed to David in the previous email; is that right?

A.     Yes.

Q.     And that you believed that his report is going to be much more comprehensive than Dr. Gelbort's; is that correct?

A.     Yes.

Q.     And you go on to say that, frankly, you'd rather rely upon him other -- rather than Gelbort; is that right?

A.     Yes.

Q.     And, actually, I think you say "Rather than this guy." And "this guy," that's Dr. Gelbort; right?

A.    Yeah.  I can tell by what I've said that I was disappointed with Dr. Gelbort at this point.

Q.    And I believe you may have talked with counsel during direct about this, this email, but you go on to say "The potential brain damage" -- and that's what you've used, the word "potential brain damage."  Is that correct?

A.    Yes.

Q.    "Potential brain damage has some value, but it's not a huge part of my mitigation.  It just enters the equation, complicating the client's ability to make it through his manic -- hyper-manic state."  Is that right?

A.    Yes.

Q.    Okay.  Again, probably an unfair question, but do you know why it was that in March of 2005, you were needing to express this opinion to Lisa?

A.    Well, this seems to be an email, like part of a chain, a back and forth, but I -- I can't say.  I don't know.

        THE COURT:  Whoever's phone is going off, will they silence it, please?

    (Discussion held off the record.)

Q.    (By Mr. Wilson)  At the bottom of this page, it referenced the fact that Dr. Gelbort has agreed to a dinner meeting; is that right?

A.    Yes.

Q.    Looks like you're actually wanting them potentially,

if possible, to join you for that meeting?

A.    Yes.

Q.    Okay.  And, again, in this same email -- this is the email I was talking about earlier -- in the third paragraph, "By the way, my psychologist friend has agreed to get the data from Gelbort."

A.    Yes.

Q.    Okay.  And under the heading of "Issues with having contact with Dr. Gelbort," I want to go back again to the meeting you tried to have.  You tried to have this dinner meeting.  Is this at the conference that you're referring to or do you remember?

A.    I think it was.  So -- may I explain?

Q.    Sure.

A.    Mr. Gant and I got on the phone, and somehow we managed to have a phone conversation with Dr. Gelbort.  And he told us he would be teaching at this conference, I believe, and then agreed that he would meet with me for dinner on both nights so that I could discuss the report with him, and he stood me up.

Q.    And I think, actually, you might express that opinion specifically in Defendant's Exhibit Number 182.  Would you agree with me that this is an email also from the month of March, now in March 24th, that you sent to David?

A.    Yes.

Q.   Saying he stood you up?

A.   He stood me up, and I had to go and sit in on one of his sessions and face-to-face confront him and set up a time when we could talk.

Q.   Now, you reference the fact that you had a pleasant conversation; right?

A.   Yes.

Q.   But you had very little -- you have very little knowledge after that conversation?

A.   Yes.

Q.   And after having that discussion with him, what was your impression of Dr. Gelbort?

A.   Well, it seems very negative.  I said, "I tell you, anyone asks you about him, tell them not to hire him.  He sucks.  Not because he's not smart or he doesn't know his field, but because he's too difficult to work with.  I think it's because he's smarter than all of us, if you know what I mean."  And what I meant was, he was arrogant.

Q.   And did that play into or was that consistent with Dr. Gelbort wanting to be -- I forget the expression you used, but like lead fiddle or --

A.   The star of the show.

Q.   -- whatever one --

A.   Yeah.  He didn't want to be second fiddle.

Q.   He didn't want to be second fiddle.

A.    Yes.  It's a number of things.  I mean, just even the dismissal of saying -- our suggestion, there might be additional testing, here is some additional testing, and then his response was, "No, I've done enough testing.  What I've done is sufficient for what we need."

Q.    Ms. O'Connell, we talked earlier about request for potential firewall counsel to be appointed.  We know that once the defense gives notice under 12.2, and then that the government has the right to have their own experts retained; is that correct?

A.    Yes, sort of.

Q.    Okay.  And had you had discussions with the United States Attorney's Office about the fact that they were going to be requesting Mr. Fields to be independently evaluated by government doctors?

A.    Yes.

Q.    And it's my understanding that there was an agreement that that take place at the jail?

A.    Eventually, there was an agreement, yes.

Q.    Okay.  But at some point, there was a request by the government to actually have Mr. Fields evaluated at the Bureau of Prisons?

A.    Correct.

Q.    What, if anything, was significant about that request in your mind?

A.    Well, I'm not really sure what you mean.  I resisted that request for several reasons.

Q.    Okay.  That's a perfect segue.  Why did you resist that request?

A.    Well, I want to say this the right way, so give me just a second, please.  There is a lot of potential trouble with sending the client in any case to the Bureau of Prisons for testing.  The client is away, doesn't have access to his attorney in the way that he would if testing was done locally.  So there's that.  You have zero control over -- or influence even -- over what happens once he gets there, who actually talks to him and what setting they conduct the testing in, what sort of observations they do, how much time they actually spend doing it, how much of it you can monitor.  It's not a preferable situation as far as -- as far as I'm concerned.  Testing by BOP takes forever.  It's not -- it's just a number of things.

Q.    In an email to Ms. Shettles, you refer to it as too risky.  Do you know why you would have characterized it as being too risky?

A.    Well, it takes the -- it takes the client away from me.  He's transported, guards can ask him questions.  I mean, there's just any number of things that could -- that could happen.

Q.    He potentially could have been tested diagnostically

at BOP; is that right?

A.    If you wanted to take him and do imaging, even if it wasn't ordered, they could potentially do it, might not be able to use it later, but they could do a number of things. It was just out of my control.

Q.    Did you have any concerns about whether or not he would be subjected to any physical scans or imaging while at BOP?

A.    I'm sorry, what did you -- what was the beginning?

Q.    Were you concerned about the fact that Mr. Fields might be subjected to a scan or some type of physical imaging while at BOP?

A.    Maybe, I don't know.  I don't remember what my specific concerns were.

Q.    I want to direct your attention to Government's Exhibit Number 11.  Do you recognize the handwriting in that?

A.    Yes.

Q.    Whose handwriting is that?

A.    That's Glori Shettles' handwriting.

Q.    And this, obviously, is a document that the government received in discovery.  But in this document, it refers to a call from you.  Did you see that?

A.    Yes.

Q.    Do you recall having a conversation with Ms. Shettles

about potential testing being conducted by BOP?

A.   It looks like I told her they're not going -- he's not going to BOP, is what it looks like.

Q.   When it says "To fight the order to take him to BOP. Saw firewall prosecutor, said they wanted to fight order to take him for MRI, other tests."  Do you recall the firewall counsel wanting to take Mr. Fields to BOP to conduct an MRI?

A.   I don't remember what they wanted to do.

Q.   Do you recall having this discussion about fighting firewall counsel, about having him -- sent for an MRI?

A.   I don't recall the exact discussion, no.

Q.   But Dr. Woods did not want a PET scan; is that correct?

A.   That is correct.  And I had done no imaging.  So if the government was going to try to do imaging, I believe I would naturally have opposed it because it was not in response to any testing I had done.

Q.   And, again, this is not your document, but it appears that this took place in April of 2004; is that correct?

A.   2005.

Q.   2005?

A.   Yes.

Q.   Okay.  So now we're into April.  I want to show you Defendant's Exhibit Number 147.

A.   Okay.

Q. Do you recognize that, ma'am?

A. Yes.

Q. And what is Defendant's 147?

A. This document is notice of intent to present aggravation.

Q. And it's my understanding that this is a document that's required by the government to inform the Court and counsel as to what they intend to present in aggravation; is that correct?

A. Right, what they intend to present to support imposition of the death penalty.

Q. And would you agree with me that this particular document contains multiple pages of allegations of conduct allegedly by your former client, Mr. Fields?

A. I remember it that way, yes.

Q. Now, there was a lot of discussion during direct examination about your concerns about particular pieces of evidence being presented to the jury, whether it would have been in guilt phase or in sentencing phase; is that right?

A. Yes.

Q. But, specifically, counsel was talking to you about mitigation and sentencing; is that right?

A. Right.

Q. And this particular filing, dated May the 26th of 2005, sets forth, I believe, some of that -- what was

characterized as "creepy evidence"; is that right?

A.    I think that's a good characterization.

Q.    When you received this document, did that give you any pause, any concern?

A.    Yes.

Q.    What?

A.    That the government wanted to present all sorts of evidence in aggravation that I didn't think was appropriate.

Q.    That it didn't follow under either a statutory aggravator or a non-statutory aggravator; is that correct?

A.    It was -- yeah, it definitely didn't -- didn't address statutory factors, okay.  I believe that it was Mr. Sperling's intent to try to introduce it in support of non-statutory aggravators, and it just simply was not the type of evidence that would justify imposition of the death penalty.

Q.    You would agree with me that it was your belief that the government, through the FBI and other investigators, had gone into Mr. Fields' hometown and tried to find every person they could to ask them about anything that Mr. Fields had ever done?

A.    Yes.

Q.    And as a result of that, you wanted -- is it correct that you wanted to make sure you could do whatever you could to limit that information to being presented to the jury,

either in guilt and/or mitigation and for punishment?

A.     Yes.  Aggravation.

Q.     I'm sorry?

A.     Aggravation.

Q.     I'm sorry, in aggravation.  I'm sorry.  Now, I'm not going to go through everything in there, but I think you testified yesterday -- I think it was yesterday, maybe this morning -- about allegations that Mr. Fields hung a cat or killed a cat as a child?

A.     Killed a cat as a child, maybe some other time too.

Q.     That he took a bomb to work?

A.     That -- yes.

Q.     That he had guns at every doorway in his house?

A.     Yes.

Q.     That he took a gun to work?

A.     Well -- yeah, well, I guess.  I mean, he took -- he had a gun in his truck in the parking lot at work.  But, yes, that was one of the pieces of evidence that Mr. Sperling thought could be used in support of imposition of the death penalty.

Q.     And that he was discharged, fired from his job for that; correct?

A.     Yes.

Q.     So now we're in May.

        THE COURT:  Mr. Wilson, let me --

Q.    (By Mr. Wilson)  The trial actually takes place --

THE COURT:  Mr. Wilson, let me just interrupt real quick.  Are we at a breaking or will be soon?  I want to take our midafternoon break, if we can.  How long do you anticipate your -- I'm not holding you to it, but a ballpark estimate of your remaining cross?

MR. WILSON:  I'm hoping to get done today, Judge.

THE COURT:  Okay.  Oh, well, all right.  There's a positive note.  All right.  We're going to take a 15-minute recess.  We'll be back at 3:30.

(Recess taken.)

MR. LABOVITZ:  Your Honor, one brief matter before we continue.

THE COURT:  Okay.

MR. LABOVITZ:  Ms. Nelson -- I'm sorry. Ms. Ensler, Ms. Thompson, and our paralegal, Ms. Yost, have to get back to Philadelphia for some family matters, so they will not be here for the remainder of this afternoon's session.

THE COURT:  Okay.  Very well.  You are excused. Safe travels.

All right.  Just a matter of housekeeping.  It's my understanding that Ms. O'Connell, if she needs to testify -- continue on Monday, which it looks highly likely that's going to happen -- needs to be out by -- is that 4:00 on

Monday?  Is that -- or today?

THE WITNESS:  I have to pick the children up from school.  I don't have anyone to do that.

THE COURT:  On Monday?

THE WITNESS:  On Monday.

THE COURT:  Not today.  Okay.  So we could go till five today?  That's what I just want to make sure.

THE WITNESS:  We could go till five or later today.

THE COURT:  All right.  Well, if you're still here at 4:00 Monday, I have failed miserably as a judge, so we will address that on Monday, but I don't think that's going to -- let me just say, that's not going to be a problem.  How's that?

Okay.  All right.  With that, you may continue your cross-examination.

Q.    (By Mr. Wilson)  Ms. O'Connell, I direct your attention to Government -- or excuse me -- Defendant's Exhibit 160, which is also Government's 25.  This is actually a two-page document.  And I want to begin on page 2.  We had been discussing earlier about raw data, that there were requests made for Dr. Gelbort's raw data?

A.    Yes.

Q.    And would you agree with me that it appears that about midway down -- actually, a little bit above midway down, you

144

write that you've -- informing David that you faxed him the raw data; is that right?

A.    Yes.

Q.    And on page 1 now of this email, appears to be an email that David sent to -- excuse me -- that David sent to you on May 31st of 2005.

A.    Yes.

Q.    The heading is actually an email from Mr. Freedman to Skip Gant.  I'm talking about the next one down, "Subject: Neuropsych data."  Do you see that?

A.    Yes, I do.

Q.    And, again, this appears to be an email.  And, Ms. O'Connell, would you agree with me that once the raw data was obtained, that you shared that with Mr. Freedman, asked him to review it, and give you -- give you his impressions of the data; is that correct?

A.    Yes.

Q.    And would you agree with me that he was critical of the test battery that Dr. Gelbort administered to Mr. Fields?

A.    Yes.

Q.    And in this email, he sets forth a number of different issues that he had with the testing; is that correct?

A.    Yes.

Q.    Beginning with -- and I'm not going to go through

every line -- but beginning with the fact that he only did a partial battery; is that correct?

A.   Yes.

Q.   And as a result, it makes it very difficult to get a sense of overall function -- functioning; is that correct?

A.   Yes.

Q.   That he criticized only using a portion of the Halstead-Reitan, in the bottom of that same paragraph; that it was difficult -- that it -- "I don't think there is a way to calculate any of the overall impairment indexes which would reflect overall brain functioning."  He also criticized the Trails testing, on paragraph -- under number three.  Trails and the Category.  And I believe there was some testimony earlier, counsel was asking you about the Category Test and the Trails Test.  Do you recall that?

A.   Yes.

Q.   And it's my understanding that those were two particular tests that measures executive functioning; is that correct?

A.   Yes.

Q.   But Mr. Freedman was expressing the fact that specifically the Category, that there's some debate whether poor performance actually reflects frontal damage or brain damage.  Do you see that?

A.   Yes.  I don't think that means between the two frontal

damage or brain damage.

Q.    Right.  And that the counter to Trails will be that it may measure things other than frontal functioning, attention, speed, motor ability, which he didn't test very well on; is that correct?

A.    Right.

Q.    Did that -- do you recall whether Mr. Freedman's criticism of the battery gave you any pause or any concern at that time?

A.    I don't recall specifically.

Q.    All right.  Fair enough.  Would you agree with me also that he criticized -- or actually made a comment about Mr. Fields' performance of the Trails Test, that it could be interpreted as successful strategy and adaptation; is that correct?

A.    Yes.

Q.    And then back on page 2, he summarizes it by saying "I guess, in the end, I'm not terribly impressed by him or his testing, and it is difficult to predict how much better the data would have been if he had done more work."  Again, do you have any specific recollection of whether that had any impact on you at the time you received it?

A.    I don't have any specific recollection.

Q.    Were you aware that Dr. Gelbort made errors in his scoring?

A.    I don't know that -- I'm not sure that I am aware of that.  I know that -- that he rescored some things.  That's what I remember.

Q.    If he testified in this hearing that -- under cross-examination by Mr. Stewart -- that he, in fact, made some errors, and that it was embarrassing, any reason to doubt that?

A.    No.

Q.    And if he made errors, he would be subject to cross-examination, should he be called to testify about errors that he made in his testing scoring; is that correct?

A.    Yes.

Q.    Who is Dennis Fries?

A.    He's the -- he's an assistant United States attorney. He's in the Northern District of Oklahoma now, but he was in the Eastern District, and he was second chair for the prosecution of Ed Fields.

Q.    And during the course of the trial prep and in days leading up to the trial, did you have discussions with Mr. Fries about the case?

A.    Yes.

Q.    Did you have discussion with Mr. Fries about Dr. Gelbort?

A.    Yes.

Q.    What, if anything, did Mr. Fries indicate to you about

Dr. Gelbort?

A.   Our -- what I remember of our discussions, you know, they weren't extended discussions.  It was -- what I remember is Dennis was tasked with cross-examining Dr. Gelbort, and he had some transcripts that he was going to use to cross-examine Dr. Gelbort.  He was asking me frequently if I was going to call Dr. Gelbort, are you still calling Dr. Gelbort, etcetera.

Q.   Did you ever give him any indication one way or the other as to whether or not you were going to be calling Dr. Gelbort?

A.   When I rested.

Q.   Did you say when you rested?

A.   Yes.

Q.   There's been some discussion -- testimony about additional testing, and it's my recollection that Dr. Gelbort wanted to actually do an MMPI test?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And you were opposed to that; is that correct?

A.   Yes.

Q.   And why were you opposed to that?

A.   Because it's personality testing, and if he did personality testing, then the government would surely do

personality testing, which can be interpreted in any number of ways, it's problematic, and, quite frankly, it's not that appropriate in a capital case.

Q.    As a matter of fact, the government's expert wanted to do personality testing; isn't that correct?

A.    Yes.

Q.    And when I say government's expert, Dr. Price?

A.    Dr. Price, yes.

Q.    He asked specifically about that; isn't that correct?

A.    Yes.  He had -- I think he proposed doing several personality tests.

Q.    One more issue regarding testing and additional testing.  Direct your attention to Defendant's Exhibit Number 168, Defendant 168.  And this is the letter that we've talked about earlier; is that correct?

A.    Yes.

Q.    Just about midway down the final page, the one that's on the screen, referencing Michael Gelbort is a psychologist from Chicago.

        MR. WILSON:  Thank you.

A.    Yes.

Q.    (By Mr. Wilson)  He traveled to Oklahoma to conduct several neuropsychological tests.  He told us that no PET scan was conducted because you had been told that such a test would cost $35,000, and the cost seemed too high at

this stage in the case.

A.    Yes, I see that.

Q.    Was that a correct recitation of what you told Mr. Sperling?

A.    That was part of our conversation, yes.  That wasn't the whole conversation, but yes.

Q.    So there was some cost concerns about the PET scan; is that right?

A.    I was not concerned about the cost of the PET scan.  There was money to do it.  It was one of the things I told Shelly in response to, well, what happened to the PET scan you said you might do.  One thing, it costs a lot of money.  It was -- there were many problems in the first place.  When I asked Dr. Woods about doing it, at that point, I had really struggled with finding someone who was willing -- a facility that was willing to do imaging for a prisoner.  And when we finally did find someone -- I think, actually, the cost that was quoted to me was maybe $33,000, but as I've already said, Dr. Woods told me I should not do it, so I did not.  And if I might.  I do not believe for one second I told him that he could do the testing if he wanted to absorb the cost.  That is not something I would have done, and as you can probably see from the record, I would have objected strenuously.

Q.    All right.  Thank you.  I believe early on, we talked

about the experts that you were hiring, and we talked about the third expert being -- actually, I guess the fourth. We don't know about the first one, but Dr. Grinage that was retained in June of 2005. And I believe you testified earlier that when you did your original 12.2 notice, you listed neuropsychiatrist, neuropsychologist, and a pharmacologist?

A.    Yes.

Q.    Okay. And that Dr. Grinage had some sort of expertise in the field of pharmacology; is that right?

A.    Yes.

Q.    Okay. And it's my understanding that you actually did an amended notice saying neuropsychiatrist, neuropsychologist, and psychiatrist?

A.    Yes.

Q.    Why did you change it from pharmacologist to psychiatrist?

A.    Because Dr. Grinage is not a pharmacologist. It would -- but I had to update it so that the government was properly informed of what type of witness I intended to call.

Q.    All right. You had a series of conversations with Dr. Grinage, obviously, in retaining him, discussing the case with him; is that correct?

A.    Yes.

Q.   And you've been shown some of that email traffic.  I want to focus on a couple of those.  Before I get to those, what was the purpose of calling another doctor?  You had -- you had Dr. Woods, who was a psychiatrist, neuropsychiatrist; right?

A.   Yes.

Q.   And he was going to testify about the effect of Effexor and the manic switch; is that correct?

A.   Yes.

Q.   Why did you think it was necessary to hire another psychiatrist to talk basically about the same thing?

A.   Well, what I was thinking it was essential to do was to hire a pharmacologist.  All right.  But then what I found was -- because that person would be able to help us to bolster our claim of manic flip because of the Effexor, because of the change in the dosage, but what I found was Dr. Grinage who had that subspecialty.  I'm not even sure what to call it, whether he was a board -- anyway, he had some claim to fame with pharmacology, but it made him -- it gave him some extra qualification to talk about the drugs and the interaction of the drugs.

Q.   And was it your understanding that that would help to bolster Dr. Woods and his -- his testimony that Mr. Fields was suffering from a manic switch from taking the Effexor?

A.   It would be a corroboration, yes.

Q.    As part of that interaction, did you provide Dr. Grinage social history, medical history, relevant history about Mr. Fields for him to make his evaluation?

A.    Yes.

Q.    Did you have a discussion with Dr. Grinage about Dr. Gelbort and the findings of Dr. Gelbort?

A.    I think we established we had at least an email exchange.

Q.    Okay.  Let's look at Defendant's Exhibit Number 170. Have you had an opportunity to look at that?

A.    I see it.

Q.    And you agree with me this appears to be sending to Dr. Grinage some excerpts of emails that you traded with Gelbort; is that right?

A.    That's what it says.

Q.    Do you know particularly what excerpts you sent to him?

A.    Excerpts from an email.  I don't.

Q.    Okay.  But it says that those are taken from his draft report and that he doesn't have a final report; is that correct?

A.    Yes.  And it tells the doctor that it covers what he wants to know, in my opinion.

Q.    Okay.  Now, let's move to Defendant's 171.

        MR. WILSON:  And for the record, Your Honor,

Defendant's 170 is also Government's 24.  Defendant's 171 is Government's 34.

Q.   (By Mr. Wilson)  If you don't mind, take a moment and look at that email.

A.   Yes.

Q.   And can you tell the Court what your -- the purpose of this email, why you're -- you know, what you're communicating to Dr. Grinage?

A.   It looks like I'm telling him Dr. Woods doesn't rely on Dr. Gelbort's testing, not purposefully, but because of the timing of events, which is that Dr. Gelbort, as we've already said, did testing first.

Q.   And why was it necessary for you to inform him of the fact that Dr. Woods didn't rely upon Dr. Gelbort?

A.   I couldn't say.  I don't know.

Q.   Was there a particular reason why you wanted to -- you wanted Dr. Grinage to limit his references to Dr. Gelbort in his report?

A.   What I wanted him to do was to not discuss Dr. Gelbort's testing unless he relied on it.  I didn't want him to be dishonest in his report.  So I think I was clear about that, unless you relied on it, but I didn't want him to make reference to it because I didn't want any of those evidentiary issues, concerns, that I've talked about, to become a problem as a result.  And I think, in all

likelihood, I may have serious doubts about Dr. Gelbort's testing after all these emails that we've looked at. Twenty years ago, I can't remember exactly what was in my head. Sorry.

Q. But you want him to be honest, but if he didn't rely upon Gelbort, you were asking him to not make any reference to it; is that correct?

A. Yes. I think I said limit, but maybe not.

MR. WILSON: Defendant's Number 148, please.

Q. (By Mr. Wilson) Do you see that, Ms. O'Connell?

A. Yes.

Q. And my understanding that this was a filing by the government again setting forth what they intended to present in aggravation; is that correct?

A. That's what it says.

Q. And I know you may not have read the whole thing, but would you agree with me that they were wanting to discuss issues which you were concerned about being presented to the jury?

A. Yes.

Q. Okay. Now, while this is all going on we talked about earlier that the government was wanting to get independent testing to have, one, Dr. Price to evaluate Dr. -- excuse me -- Mr. Fields, and also for Dr. Mitchell to evaluate Mr. Fields; is that correct?

A.   I think ultimately, yes.  There was -- Dr. Price was a last-minute jump-in.  Dr. Basso, B-A-S-S-O, was who Mr. Sperling told me for some time he was going to use as the psychologist in the case, but I don't know what happened with that.  All I know is at the last minute, it became J. Randall Price.

Q.   And you had some discussions with Dr. J. Randall Price about his desire to do testing and interview your client; is that correct?

A.   Yes.

Q.   As a matter of fact, he wanted to do two separate interviews; correct?

A.   Yes.

Q.   He wanted to do psychology testing; correct?

A.   Yes.

Q.   Did you have concerns about his requested battery of tests?

A.   Yes.

Q.   Did you attempt to limit those tests?

A.   Yes.

Q.   Including, as we talked about earlier, about personality testing; is that right?

A.   Yes.

Q.   And were you ultimately successful in getting those limitations put in place?

A. I don't recall how successful I was. I think I was fairly successful, but I don't recall. That may have become -- that may have been when it started to become extra concerning for me because it might be that the judge said they could conduct any testing they wanted. Sorry for answering you twice, but genuinely don't remember. I think the record would reflect whatever the facts are.

Q. Well, when the government filed its brief notifying you and the Court about his intent to introduce this evidence, there was ultimately an order issued about what could potentially be presented and what couldn't be presented. Do you recall that?

A. Vaguely.

Q. Look at Defendant's Exhibit Number 149. Would you agree with me that this is an order dated June of the 1st of 2005?

A. It appears to be.

Q. Okay.

A. June 17th, 2005.

Q. I'm sorry. June 17th, 2005, yes.

MR. WILSON: Tanner, if you'll scroll down, just give her an opportunity to take a look at it. All right. Move back up to the next -- to that point right there.

Q. (By Mr. Wilson) Ms. O'Connell, would you agree, the judge basically sets forth and starts listing some items

which he is going to exclude?

A.    Yes.

Q.    But that ultimately, on the final page of this order, says "Defendant's counsel will not be allowed to argue absence of prior unorthodox or criminal behavior without risking the Court's sua sponte reconsideration of this order"?

A.    Yes.

Q.    So you did get some relief from the Court, as you've testified earlier, about the judge limiting, potentially, the government getting into this information; correct?

A.    It looks like I did, yes.

Q.    And that the Court rules "If a witness for the defendant opened the door through some testimony, the government may argue for reconsideration outside the jury's earshot."  Is that what it says?

A.    Yes.

Q.    Was that the concern that we've been talking about, both in direct and cross-examination?

A.    The introduction of this evidence, yes.

Q.    Okay.  Now, I bring that up to transition back to Dr. Price.  Dr. Price did an evaluation -- actually, wanted to do a couple -- and presented a preliminary report and then a final report; is that right?

A.    Yes.

Q.   And when that report came out, it contained a significant amount of what you characterize as creepy evidence, potentially; is that right?

A.   Yes.

Q.   And did you share that report with David and with Lisa?

A.   I don't have a specific recollection.  I'm sure I did.

Q.   And if the records reflect that you did, would that be for the purpose of just getting their opinion and take on the report; is that correct or would that be correct?

A.   It would be for getting their input, yes, their reactions.

Q.   Dr. Price, in his report -- I think counsel asked you about this -- did he focus on the possibility that Mr. Fields had antisocial personality disorder?

A.   I'd have to look at it to tell you.  I mean, he focused on a number of things.  I'd have to look at his diagnoses again.  I mean, he focused on mild depression instead of bipolar disorder, and then he had other things that he -- that he said, like a personality disorder maybe, unspecified; maybe antisocial, narcissistic.

Q.   And it's my understanding that he also diagnosed Mr. Fields with -- and I never can pronounce it correctly -- dys -- I would say it's dysthymic.

A.   Dysthymia?

Q. Yeah, dysthymia.

A. Dysthymic disorder. Yes.

Q. Okay. And after you got that report -- you testified yesterday that you characterized that report as "whoredog awful"; is that right?

A. Yes, I did. Thank you.

Q. Okay. Well, it was too good. I had to -- I had to laugh.

THE COURT: Some things live in infamy, I guess.

THE WITNESS: Apparently, my emails.

Q. (By Mr. Wilson) Were you concerned that Dr. Price was going to be able -- or going to try, through the government, to present all of that creepy stuff in the government's case?

A. It seemed like a very real possibility, yes.

Q. I want to fast-forward -- and I know the Court is happy to hear that -- but I'm going to fast-forward to June of 2005, and I want to direct your attention to Defendant's Exhibit Number 172.

A. Okay.

Q. I think we talked a little bit about this a moment ago, but this is an email on Sunday, June 19th, that you sent to Dr. Grinage; correct?

A. Yes.

Q. And is this the email we were talking about, about

limiting references to Dr. Gelbort?

A.    Yes.

Q.    So you communicated that directly to him; is that right?

A.    Yes.

Q.    And in a previous email that counsel showed you -- well, actually, in this email, you reference the fact that you might jettison the neuro testimony; is that right?

A.    If I have to go to trial, yes.

Q.    And, again, is that based upon your concerns about Dr. Gelbort?

A.    It was based on several things.

Q.    What things do you recall it was based upon?

A.    Well, of course, there was Dr. Gelbort and all the problems that we had with him, and then the concerns about -- about raising the specter of clouding the trial with what you called "the creepy stuff."

Q.    And so I take it that you were actively involved in a thought process about whether or not you should actually call Dr. Gelbort; is that correct?

A.    Yes.

Q.    So, ultimately, at the time that you rested your case in chief, in mitigation, is it your testimony that you just simply forgot to call him?

A.    No.

Q.    There had been an actual decision made by you at some point, and I believe your testimony was you couldn't tie down exactly where that took place; is that right?

A.    Yes.

Q.    And was that decision based upon what you believe to be the best interest of Edward Fields?

A.    Yes.

Q.    And did you make that decision based upon your evaluation of the facts of the case?

A.    In part, yes.

Q.    Was it based in part upon consultation that you had with other individuals?

A.    In part.

Q.    Was it based upon discussions you had with Dr. Woods?

A.    Yes, in part.

Q.    I think counsel asked you yesterday or maybe today about emails that you had with Dr. Gelbort concerning Dr. Price's report.  Do you recall that?

A.    Yes.

Q.    And that Dr. Gelbort indicated that the testing that both of them did was somewhat consistent; is that correct?

A.    Yes, something like that.  Yes.

Q.    Okay.  And when you get his -- when you get Dr. Price's report -- I want to direct your attention to Defendant's Exhibit Number 164, which is also Government's

17. It appears to be an email dated June the 23rd, so we're talking a short -- you know, a matter of a few days before trial; correct?

A. Yes.

Q. Okay. And in this particular email chain, I believe you're informing David that doesn't look like this case is going to settle, we're going to trial; is that correct?

A. Correct.

Q. Okay. And what else are you trying to communicate to David in this email?

A. I am conveying that I think Dr. Price's conclusion that all that was going on with Ed was dysthymic disorder was baloney, and that it was most likely informed by all of the creepy stuff, and that it was a report that was not going to help me in the end. I'm telling him there are some parts in it that aren't terrible, but --

Q. Okay.

A. Just that -- like I said, it's off my chest. I vented about the report.

Q. And you were concerned that Dr. Price -- I think the expression you used, had been studying the prosecutor's how do you help me kill this guy; is that right?

A. Yeah, his pre-retainer packet. Yes.

Q. There's also some discussions about the Frontal Systems Behavior Scale. Do you remember what the context of

that was?

A.    Well, yes.  It was one of the tests that Dr. Price had administered that I wasn't familiar with, so I wanted to know more about it.  And I believe I ultimately reached out to the test author to ensure -- or actually to figure out whether or not it was used properly.

Q.    And you're doing all this, reaching out to the author of the person who originated the test.  Why are you doing that?

A.    I guess I was working hard.

Q.    Okay.

A.    I don't remember it.

Q.    Okay.  Did you request the tapes of the interview that Dr. Price conducted of Mr. Fields?

A.    Yes.

Q.    And not only the interview, but also the testing?

A.    Yes.

Q.    Did you do anything with those tapes?

A.    I listened to them, hours of tapes of Dr. Price's questioning of Mr. Fields.

Q.    Why did you do that?

A.    To determine how -- to determine what types of questions he asked, to see whether or not what he was reporting in his -- in his results actually happened.  So that I was prepared for his testimony in case he said that

Mr. Fields said or did something during testing that hurt us, I would know, in fact, whether or not it actually happened.

Q.    As a matter of fact, you --

A.    I was preparing for examination.

Q.    Okay.  As a matter of fact, you used that as part of the cross-examination; is that correct?

A.    Well, actually, I think I did use the tape in cross-examination because he said that Ed had -- like Ed just used other people, I think, basically was his inference, and he bragged about getting money on his books from his sister.  And I was familiar with that line of questioning because I had heard the tapes, and I played it for him and asked him to identify exactly where did Mr. Fields say that or anything like that.

Q.    I think you challenged Dr. Price on his administering part of the test by indicating with his pen the correct answer?

A.    Maybe, if that's what he -- if that's what I uncovered, that's what I would have done.  I don't have a specific recollection.

Q.    All right.  There's an email that is dated June the 27th.  It's Defendant's Exhibit Number 141.

DEPUTY COURT CLERK:  What was that?  I'm sorry.

MR. WILSON:  Defendant's 141.  Government 19, same

thing.

Q.     (By Mr. Wilson)  And I believe this is one of the exhibits that counsel showed you earlier, where you're having a discussion on June the 27th with Ms. Greenman, and where she's actually responding to you at the top; is that correct?

A.     Yes.

Q.     And, again, I don't want to belabor it, but as late as June the 27th, you're still concerned about opening the door to this creepy stuff; is that correct?

A.     Yes, I'm still batting around ways to avoid doing that.

Q.     And in this exchange, there's a suggestion that maybe one way to try to limit some exposure would be to not have your doctor do an Axis II diagnosis.  Do you recall that?

A.     I don't -- I don't specifically recall it.

Q.     Do you recall that Dr. Woods, in his final report, didn't give an Axis II diagnosis?

A.     I don't recall that either.

Q.     While you're doing this trial prep and hiring experts, are you still trying to keep this case from going to a jury?

A.     Yes.

Q.     We had some discussion early about between the time in which the complaint was filed in July of 2003 and the notice of intent in March of 2004, that there had been the whole

issue with going to the Department and trying to ask the Department to not allow the government to seek the death penalty; correct?

A.    Correct.

Q.    But you would agree with me that that process even continued up until literally the month before the trial; is that correct?

A.    I would say a week before the trial.  Yes, right up to trial.

Q.    And, in fact, there was another letter generated asking the Department of Justice again to not -- this time to deauthorize --

A.    Yes, that's true.

Q.    -- the death penalty; is that correct?

A.    Yes.

Q.    I direct your attention to Government's Exhibit Number 51.

        MR. WILSON:  And if you'll just kind of scroll down that for me, please.

Q.    (By Mr. Wilson)  All right.  I know that was kind of quick.

A.    Yeah.

Q.    But do you recall that letter?

A.    I do.

Q.    And it actually shows that it was under this --

written by Isaiah S., Skip, Gant; is that correct?

A.    That's what it says, yes.

Q.    And was that letter sent to the Department?

A.    Yes.

Q.    And what was the purpose of that letter?

A.    To try to -- to try to get the DOJ to deauthorize seeking death.

Q.    And I -- I gather that when you create a letter like that, you know, it's your last-ditch effort to ask the Department to deauthorize; correct?

A.    Well, it's about the last thing you can do with the Department, yes, with the DOJ.

Q.    And would you agree with me that this particular letter doesn't specifically reference any brain damage or brain injury?

A.    I don't know.  I would have to read it.

Q.    Just take a moment, if you will, and do that.  Just let us know when you need to change pages.

A.    Well, I'm on the last page now.

        MR. WILSON:  Yeah.  Go back to the top, please.

A.    If you tell me it doesn't, I'd -- you know, I take your word that it doesn't.

Q.    (By Mr. Wilson)  Well, let's look specifically at --

        MR. WILSON:  Go down to -- Tanner, go to page 3, I believe.  Page 4.

Q.    Okay.  Take a look at page 4.

A.    Okay.

      MR. WILSON:  Go to page 5, please.

Q.    (By Mr. Wilson)  That's the rest of that heading.

A.    I see it.

Q.    Did you see anything about brain injury?

A.    I didn't.

Q.    Who is Michael Burt?

A.    One of the many people who are associated with the Resource Project.

Q.    And I believe there was maybe some testimony yesterday about some consultation you may or may not have had with Mr. Burt; is that correct?

A.    Yes.

Q.    Okay.  And he -- I think you attempted to reach out to him, and he was pretty busy.  Do you recall that?

A.    No.

Q.    I want to direct your attention to Defendant's 191.

A.    Okay.  Yes, I do know this one.

Q.    Okay.  You're familiar with this email?

A.    Yes.

Q.    Okay.  And it's dated June the 28th; correct?

A.    Yes.

Q.    And I think jury selection started around July the 1st, roughly; is that correct?

A.    I tell him pretrial is Thursday and jury selection starts Tuesday.

Q.    Okay.  On page -- actually, it begins on page 1, right at the very bottom, just the heading, showing that you sent an email to him on June the 25th, three days before?

A.    Right, with a detailed -- or as best I could, a detailed description of my case.

Q.    Yeah, it's a three or four-page email; is that right?

A.    Yes.

Q.    What was the purpose of that email?

A.    Well, obviously, going to be asking him questions because I tell him that.  I say "Here's my case, my client, and my questions."  So --

Q.    And would you agree with me that as part of this email, you again say that "Most of my mitigation case is mental health evidence.  Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment"?

A.    Yes.

Q.    So that would be the same mindset that you had back in January when you were discussing that with Lisa and David; is that correct?

A.    That's consistent, yes.

Q.    And in this same email, you tell Michael that you had listened to all those interviews; is that correct?  You

Q.   listened to the government's -- the tapes?

A.   I don't -- if I did, I did.

Q.   Okay.  And that you say "I'm worried that, through mental health evidence, of it all" -- talking about the -- I think the words you used, "creepy-crawly stuff" -- "all of it will somehow come in, because the government's experts will say they reviewed it, it helped reach their conclusions, whatever."  Is that right?

A.   Yes.

Q.   And then you posed for him three questions.  "Can I keep it out?  Is there any way to attack the government's psychologist protocol based on his receipt and review of unreliable information?  And what other questions should I ask?"  Is that right?

A.   That's right.

Q.   To your knowledge, was Michael able to get back with you on that?

A.   Yeah, we did speak.  We talked -- we had a phone conversation.

Q.   Okay.  He didn't -- he didn't -- there wasn't an email chain about that other than this email; is that right?

A.   I couldn't say specifically.  I do remember we spoke on the phone.

Q.   Okay.  So let's talk about the telephone conversation. What, if anything, do you recall about it?

A.   I don't.  I'm sorry.

Q.   Okay.  But you do remember having a conversation with him?

A.   Yes.

Q.   And I assume that you would have shared the same information that you provided in the written email; is that correct?

A.   In the phone call?

Q.   Yes.

A.   Well, I sort of doubt it.  I went through it all in the email.

Q.   Well -- okay.  That you would have discussed some of the substance of the previous email?

A.   I presume he helped -- he tried to answer my questions, using the information I had given him.

Q.   And, again, the purpose is just to -- would you agree with me that you are in the process of still trying to evaluate how is it that I can try to limit exposure of this creepy-crawly evidence?

A.   Right.

Q.   I direct your attention now to Defendant's Exhibit 166.  And I think counsel showed this to you earlier, but this is an email now July the 4th of 2005.

A.   Okay.

Q.   And it's in reference to the report of Dr. Price; is

that correct?

A.    Yes.

Q.    And in there, he says "In the alternative, you might consider not putting Gelbort on, sticking with the psychiatric evidence for penalty phase and denying them the opportunity to put Price on the stand."  Is that right?

A.    Yes.

Q.    Did you consider that advice?

A.    Well, yeah, I considered that advice.  I didn't think it was -- rightly or wrongly, I didn't think it was possible to keep Price off the stand because he was opining about the bipolar issue as well, which was in direct response to our -- our case.

Q.    Knowing that likely you weren't going to be able to keep him completely off the stand, were you still concerned about presenting evidence in case in chief that might open the door for him to get into "creepy-crawly stuff"?

A.    Yes, in part, I was concerned about that.

Q.    But you had done all the -- looking at the reports that he provided, you had listened to all the tapes, you were preparing for cross-examination of Dr. Price; is that correct?

A.    Yes.

Q.    As a matter of fact, you were pretty confident that you were going to be successful in cross-examination; is

that correct?

A.    Well, I certainly hoped I would be.  I think I was.

Q.    Okay.  Defendant's 193.  This one is dated July the 4th, an email that you sent to David regarding Price?

A.    Yes.

Q.    Okay.  And you preface it by saying, you know, "I smell blood."  What did you mean by that?

A.    I believe I meant -- I meant that at that point in time, I had gathered enough information and had studied it enough to decide that I could effectively cross-examine him for a number of reasons.

Q.    All right.  And you characterize him as not a real doctor; is that right?

A.    Yes.

Q.    What did you mean by that?

A.    So the diagnosis of a bipolar disorder comes from a physician, an MD, or a DO; it doesn't come from a guy with a Ph.D.

Q.    As a matter of fact, during the trial, you asked Dr. Price, "Isn't it true that even the government's expert, Dr. Mitchell, agreed that Mr. Fields was experiencing auditory hallucinations?"

A.    Yeah, that was in regards to Dr. Price saying he felt that --  he concluded that Mr. Fields was essentially lying when he talked about having hallucinations, auditory

hallucinations, hearing voices, and the government's own medical expert found that claim to be credible. He testified -- he testified to that. And, yes, I cross-examined Dr. Price with that information.

Q. And that not only did Dr. Mitchell find it, but the other treating physicians at the jail all had found the same thing; is that correct?

A. Yes.

Q. And you cross-examined Dr. Price on that?

A. Yes.

Q. That they were all MDs, not Ph.D.s?

A. Yes.

Q. But I want to direct your attention to the next to the last paragraph where you tell David "This doesn't change the fact that I have a jury pool of 225 people, less than two dozen with college educations, and only a handful who don't exceedingly approve of the death penalty. And I recognize that experts can cancel each other out in jurors' minds. And many of them won't care about mental health." What were you thinking when you typed that?

A. Well, that's my experience speaking.

Q. There's an expression that sometimes we get into "battle of the experts"; is that correct?

A. Yes.

Q. Did you want to have -- was there any reason why you

didn't call a Ph.D., and you only called two MDs?

A.    No.  No, that wasn't it.  I didn't call Dr. Gelbort.

Q.    All right.  Defendant's 167.  Another email, this one also July the 5th, and this one from David.  And in this email, I believe he says "I think you might seriously consider just using your shrinks, George and the other guy, and objecting to Price as not proper rebuttal."

A.    Yes.

Q.    That forces the government to put on the shrink who basically agreed with the key problems."  Let us know when you need to scroll up.

A.    Oh, I'm sorry.  I was waiting for you.

Q.    Oh, I'm sorry.  Again, similar advice to what David had given earlier, but, at this point, you still didn't believe that you weren't going to be able to keep Price off the stand?

A.    Right.

Q.    Okay.  And at some point, you respond in an email, saying "It's a scary proposition.  The team will have to decide what to do."  Did the team decide?

A.    I don't recall.

Q.    But you made a decision; correct?

A.    I definitely made a decision, yes.

Q.    Okay.  Counsel asked you about this, about interaction with Dr. Gelbort.  You had sent the email to both -- to

Dr. Woods and Dr. Gelbort, saying I'm going to need you; correct? I think he showed you one, an email earlier, about going to need the both of you for trial. Do you recall that?

A. That he showed that to me, yes.

Q. Yes. You testified about getting prepared for actually presenting the defendant's case, the mitigation case. You were staying at the Airbnb; right?

A. Yes.

Q. Here in Muskogee?

A. Yes.

Q. You've got you and Mr. Gant, Ms. Shettles; is that right?

A. Yes.

Q. Are you working on other cases at that time?

A. I remember Barry had some appeals he had to work on. Yes, I did have some cases, and every once in a while, I would leave late at night and actually go home. My -- excuse me. I can't believe I did that. During that time, my mother-in-law ...

THE COURT: It's okay. Take your time.

A. I'm sorry. I mean, that's 20 years ago. I shouldn't be -- this shouldn't be happening. I'm sorry. My mother-in-law had a health incident and wound up in the hospital for an extended period of time, and she passed

away. Sometime at the beginning of the trial, whether it was during jury selection or the first few days -- I don't remember -- but that was happening, and I was having to also help to manage -- I would go home so my husband could go to the hospital, you know, things like that. And, of course, I wanted to spend time with her too as much as I could, but I had to also work on the case, and so I would. And I would go home because -- and I do think there was an impression that I may have left, that we never left the Airbnb. That's not true. I would certainly go home. I would go home on the weekends always, so ... that was weird.

Q. So the purpose of being here in town where you were close to the courthouse, you wouldn't have to -- eliminate some of the travel and times involved with that, but it was a central place where witnesses could come and prepare them for court; correct?

A. Yeah, it was an ideal situation. We had no real office here. We didn't have a real office space. And so to be able to have a place that we could have to ourselves, camp out, right, and work as much as possible together on the case. And, yes, witnesses came, witnesses stayed there. It saved me a lot of that icky kind of work, making arrangements for their travel and, you know, worrying about all that stuff. They could come; they could stay with us.

Q. You made arrangements to prepare Dr. Woods and

Dr. Grinage for testimony; correct?

A.    Yes.

Q.    You actually had them to come to the house; correct?

A.    Yes.

Q.    And I believe Dr. Woods testified he was there like a couple of nights?

A.    Yeah, Dr. Woods got the most preparation, yes.

Q.    Dr. Gelbort wasn't -- didn't come to the house?

A.    No, he did not.

Q.    You testified about a phone call that you got from him; is that correct?

A.    Yes.  It may have been me getting him on the phone. It was a phone call we had.

Q.    Okay.  And can you tell me again what the substance of that phone call was?

A.    Like, "when are you going to get here?  I need you. Here's, you know, what's going on."  And he said, "I'm in the airport I'm on my way to France.  I told you that."

Q.    Well, did you know that he actually testified in Pennsylvania on the 18th?

A.    Well, it doesn't surprise me, but I did not know that.

Q.    Did he tell you he was going to do that?

A.    I mean, I knew that before today, but at the time, no, I didn't know that.  That's not what he told me.  He told me he was on his way to France.

Q.     He lied to you?

A.     Apparently.

            MR. LABOVITZ:  Objection, Your Honor.

            THE COURT:  Overruled.

A.     If, in fact, he was not in an airport on his way to France, then what he told me was not the truth.

Q.     But at that point, I believe you testified that your plan was not to call him, but that, at a minimum, you wanted him there to be in the courtroom to potentially assist with Dr. Price; is that correct?

A.     Right, because -- because he insisted that his testing wasn't inconsistent with -- or that Dr. Price's testing wasn't inconsistent with his.  So I wanted him to help me if I needed it, as far as cross-examination went.

Q.     But he can't help you until actually the government -- as far as that, until the government presents its evidence; correct?

A.     Right.

Q.     Which is sometime after the 18th; correct?

A.     If you say so, yes.  I'm sorry.

Q.     Well, he says he's going to be gone, he's not going to be available; correct?

A.     Right.

Q.     So he's not going to be able to sit in the courtroom and listen to Dr. Price; is that correct?

A.    Right.

Q.    So there's no session with him because he's not available; correct?

A.    Correct.  Well, there's no session with him -- well, in part, because he's not coming, yeah.

Q.    But you had already decided sometime prior to that, you weren't going to call him as a witness; correct?

A.    Correct.

Q.    But you did have a prep session with Dr. Woods and a prep session with Dr. Grinage; correct?

A.    Yes.

Q.    And that took place there at the house.  And I believe -- did you testify about what Mr. Gant's involvement in that was?  I believe you said he just introduced himself or had some brief interaction; is that correct?

A.    Yeah, he had social interaction, is what I would call it, with Dr. Woods.

Q.    And Dr. Woods talked about the fact that he had prepared a PowerPoint.  Do you recall that?

A.    Yes.  Dr. Woods was -- I was quite impressed with his technological savvy because he came with a little, tiny -- must have cost a gazillion dollars -- a little, tiny laptop, and he had a wireless printer, and he was able to put his presentation together for us to review and change if we needed to.  But that PowerPoint was something that he was

able to put out with the things he carried in his suitcase.

Q. And did that reinforce your opinion about Dr. Woods, his preparation, his involvement, his willingness to go the extra mile?

A. Oh, I don't know that I would say that, but my opinion of him was well established by the time we were doing prep.

Q. Okay. Counsel showed you a document, which was a handwritten note or a list of witnesses. Do you recall that?

A. Yes.

Q. And that's -- I believe that's Government Number 23. And I'm not going to go through every one, but Dr. Distefano was the medical examiner; is that correct?

A. Yes.

Q. And his testimony was going to be limited to whether or not Mr. Fields had moved the body; is that correct?

A. I don't recall.

Q. Okay. And you estimated it was only going to be about five minutes; is that right?

A. Yes.

Q. You listed Jovonna Fields and Cherie Fields, Teresa Fields, all family members; is that right?

A. Cherie was his sister. Teresa is his ex-wife, mother of his children, or two of his children.

Q. You've got George Woods, and you estimate his time

being two hours; is that right?

A.    Yes.

Q.    And you got Dr. Grinage, an estimated time of an hour?

A.    Yes.

Q.    Okay.  At the time you generated this list, you had Dr. Gelbort, Ph.D., with 30 minutes; is that right?

A.    Yes.

Q.    Do you recall why it was that you set him at half of Dr. Grinage and much less than Dr. Woods?

          THE COURT:  Couldn't do the math quickly in your head, could you?

          MR. WILSON:  I'm sorry?

          THE COURT:  You couldn't do the math quickly in the head, could you?

          MR. WILSON:  I can't do it.  Don't even --

          THE COURT:  A quarter, I think, is what you're searching for.  It's the luxury of sitting up here.

          MR. WILSON:  Yeah.

          THE COURT:  It's late in the day.  I'm sorry.

          MR. WILSON:  It wouldn't matter if it was in the morning, Judge.

Q.    (By Mr. Wilson)  Do you know why you would have set that amount of time?

A.    It doesn't seem like I intended to spend a bunch of time on him.

Q.   Do you remember who Terry Hanna was?

A.   I really don't.  Maybe that was Ed's friend, maybe.

Q.   Well, we can come back to that.  But you estimated Dr. Gelbort would be the same as whatever test Terry Hanna was going to testify about?

A.   Yeah.  Maybe Terry Hanna was one of his treatment providers out in the wild.

Q.   We can talk about -- again, we'll talk about that in a second.  You had other handwritten notes in your files, and one that I believe we've talked about before was Government's Exhibit Number 33.  I'll just quickly show that to you.  Do you recognize the handwriting there?

A.   That's mine.

Q.   And, again, there's no date on this document; is that correct?

A.   Correct.

Q.   Do you have any independent recollection of when it might have been generated?

A.   As far as the date?  No.

Q.   Yeah.

A.   No.

Q.   Okay.  You'll notice at the bottom, it says "Gelbort is cumulative/lobe impairment."  Do you see that?

A.   Yes.

Q.   Do you recall why it was that you made that note?

A.    I could tell you what this looks like.

Q.    What does it look like?

A.    It looks like notes that I would have made during a phone conversation, especially because I'm doodling, and that's an unfortunate habit that I have when on a -- on a phone call with someone.  This looks like a phone conversation -- my notes from a phone conversation with George Woods.  One of the giveaways is "Clear genetic disorder."  He was -- one of the important factors in his conclusion was relating to the family history of apparent bipolar disorder, which is and can be, I guess, genetic.

Q.    But this idea of him -- that Gelbort is cumulative, again, do you know what the context of why you would have written that?

A.    Not exactly, no.

Q.    When you began the actual mitigation portion of the case, after the government rests, and you began to call witnesses, you called Dr. Grinage and you called Dr. Woods; is that correct?

A.    Yes.

Q.    And during the testimony of either Dr. Grinage or Dr. Woods, do you introduce information about the findings of Dr. Gelbort?

A.    I don't recall.

Q.    Okay.  Did you talk specifically with Dr. Woods or

Dr. Grinage about not referring to the findings of Dr. Gelbort, if you recall?

A.    I don't recall.  You're talking about in preparation for testimony; right?

Q.    Yes.

A.    Yeah, I don't recall.

THE COURT:  Mr. Wilson, I'll just inquire.  It is 5:00.  How much more do you anticipate you're going to have with this witness?

MR. WILSON:  I'm not going to make my estimate, Judge.

THE COURT:  Half an hour, an hour, undetermined?

MR. WILSON:  Probably 45 minutes to an hour, Judge.

THE COURT:  Okay.  Is now -- I mean, tell me -- it seems like you sort of shifted gears and a new topic.  I didn't -- I mean, that's my assessment, not -- you tell me if I'm wrong.

MR. WILSON:  This would be an appropriate time as any.

THE COURT:  Okay.  Well, since it's obvious -- and I assume, Mr. Labovitz, you're going to have some redirect?

MR. LABOVITZ:  Yes, Your Honor.

THE COURT:  And I'm just guessing.  I don't know why I would go there.  Took a chance.  Well, I think, then,

given it's Friday night, the courthouse on a skeleton crew already, that we're keeping them late, I think it would be a good appropriate time to --

I'm sorry, Ms. O'Connell, I was hoping to get you done today so you didn't have to come back on Monday, but I assure you, you will not be here at 4:00 on Monday.  I will guarantee that.  So with that, I think it's a good time to recess for the evening and for the weekend.

And did you need like 9:15 or 9:30 on Monday morning?

THE WITNESS:  I think I can get a friend to drop them off.  I can't --

THE COURT:  Well -- all right.  We'll anticipate starting at nine, but understand if you're not here until 9:15.

THE WITNESS:  Okay.

THE COURT:  And I actually had to schedule an 8:30 arraignment, so ...

THE WITNESS:  Okay.

THE COURT:  That's what we're doing.

All right.  With that, thank you everyone.  I guess my last admonition -- and I'm not picking on you, Mr. Labovitz, but it's probably more directed towards any redirect, is, as you may notice, there is no jury box in this room, there is no jury.  This is an evidentiary hearing.  You do not need to have the last word.  So I would hope any redirect is not

going to be repetitive of direct.  The record is what it is.

Obviously, you -- I'm assuming you want to, you know,

readdress some things, but I would hope you would be mindful

of not trying to replow ground that's already been plowed.

Again, it's a record -- this is building a record; this is

not convincing a jury, so ...

All right.  With those -- I'm not going to call them

words of wisdom -- those words, with that, everyone have a

good weekend.  I will see you Monday morning.  We are in

recess.

(PROCEEDINGS CONCLUDED.)

REPORTER'S CERTIFICATE

I, Joanna Smith, Registered Professional Reporter,

do hereby certify that the foregoing is a correct transcript

from the official proceedings in the above-entitled matter.

CERTIFIED:   /s/Joanna Smith
             Joanna Smith, CSR, RPR
             United States Court Reporter
             101 North 5th Street
             Muskogee, Oklahoma 74401