**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
                vs                 ) No. 03-CR-73-RAW
                                   )
EDWARD LEON FIELDS,                )
                                   )
                Defendant.         )
                                   )

TRANSCRIPT OF EVIDENTIARY HEARING
TESTIMONY OF JOSHUA S. SHIMONY, MD, PhD
BEFORE THE HONORABLE GERALD A. JACKSON
UNITED STATES MAGISTRATE JUDGE
DECEMBER 09, 2024

Shelley Ottwell, RPR, CSR
United States Stenographer
P.O. Box 607
Muskogee, Oklahoma 74402

**A P P E A R A N C E S**

ON BEHALF OF THE GOVERNMENT
Christopher Wilson, Esq.
United States Attorney's Office
520 Denison Ave.
Muskogee, Oklahoma 74401

Aaron J. Stewart, Esq.
United States Department of Justice - Capital Case
Section
1311 F. Street, NW, Room 656
Washington, D.C. 20530

ON BEHALF OF THE DEFENDANT
Hunter Labovitz, Esq.
Federal Public Defender Office - WDOK
215 Dean A. McGee Avenue, Suite 707
Oklahoma City, Oklahoma 73102

Hayden Nelson-Major, Esq.
Federal Community Defender Office for the Eastern
District of Pennsylvania
601 Walnut Street, Suite 545
Philadelphia, Pennsylvania 19106

**E X A M I N A T I O N**

JOSHUA SHIMONY

Direct Examination By Mr. Stewart            7
Cross-Examination By Ms. Nelson-Major       42
Redirect Examination by Mr. Stewart         79
Recross-Examination by Ms. Nelson-Major     82

Stenographer certification                  87

**P R O C E E D I N G S**

(ON THE RECORD AT 1:37 p.m.)

THE COURT:  All right.  We're back on the record after our lunch recess.

Anything we need to take up before the government starts putting on its evidence?

MR. STEWART:  Nothing from the government, Your Honor.

MR. LABOVITZ:  If your Honor wanted to address the length and timing of proposed findings and facts as well so we're prepared.

THE COURT:  This seems like a good time to do it before a witness is on the stand.

MR. LABOVITZ:  Yes, Your Honor.

We've consulted during the lunch and we would request 90 days to prepare our finding of facts and conclusions of law following the January hearing date. And the reason for the additional time, Your Honor, is that Dr. Seward has not yet testified.  He'll be testifying in January.  And I think given the issues before the Court, he's probably the most critical government witness at least from the defendant' perspective.  And I think it's important that we have his transcript and be certain to address any of his opinions thoroughly in our briefing.

And I can also address the page numbers, the page length.

THE COURT: Please, yes.

MR. LABOVITZ: So we would ask for a few more pages, up to 60 pages. And the reason for that, Your Honor, is that we looked over lunch at the Kenneth Barrett docket, which is the comparable 2255 case in this distinct. Their transcript was about 1100 pages in 2255 proceedings. And we're already at over 1200 pages from the October session, so it seems like we're averaging about 250 pages a day. So I fully expect we'll be over 2000 pages by the time that the hearing is completed. The Barrett proposal proposed findings of facts and conclusions of law was 91 pages from the defense. So in light of that, we would request 60 pages for our proposed findings of fact and conclusions of law.

MR. STEWART: The government does object to either of those.

THE COURT: Okay. I know the record is long and it's large. It will be larger.

And I don't -- I was not involved in the Barrett case, so I know there were issues there. So I don't have a way of comparing them. And while the transcript may be longer, I don't know if that has an impact on

what the proposed findings of facts and conclusions of law would be.

All right. What we'll do then is -- how long would it take, Shelley, on the January 22 hearing approximately, ballpark? If we had one day, how long would the transcript take?

STENOGRAPHER: Three days.

THE COURT: All right. We'll do the 90 days. I mean that, you know, I'll tell you any requested extension will be viewed highly disfavorably through the 90 days.

Let me put it at 60-pages for now. I mean, obviously, if you come in, you can ask for more. But you need to have an exact page request beyond 60. I mean, the purpose of this is not to recreate the entire record, the purpose is to condense the record to only those facts that you think are critically important for the issues at hand as to the proposal.

So if you need more you can ask, but you better have it drafted out when you ask so that you know what you need and exactly what you're asking for.

So all right, we'll do, what did I say, 60-pages? 90 days after the January 22nd hearing date and 60-pages on the limits of the proposed findings of facts and conclusions of law.

All right. Anything else before we -- you're back already? You spoke very quickly then?

MR. WILSON: I did.

THE COURT: So is this going to be the new thing that you can blame on me so you have to speak more quickly at all these things.

MR. WILSON: I'll put you on retainer, Judge. Thank you, Judge.

THE COURT: I'll do what I can to help out the people.

All right. Is the government ready to put on its first witness?

MR. STEWART: Yes, Your Honor. The government calls Dr. Joshua Shimony.

THE COURT: All right.

Just come up forward over here towards the witness box, and the clerk will place you under oath.

COURTROOM DEPUTY: Do you solemnly swear that the testimony that you will give before this honorable court will be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: All right. Doctor, if you'll just have a seat, you'll just need to kind of scoot up close to that microphone. It does not pick up very

well.

### JOSHUA SHIMONY

having been first duly sworn, testifies as follows:

### DIRECT EXAMINATION

**BY MR. STEWART:**

Q.    Please state your name and spell it for the record.

A.    Joshua Shimony.  S-H-I-M-O-N-Y.

Q.    What is your occupation?

A.    I am a neuroradiologist, that is a radiologist that specializes in the brain and the spine.

Q.    Where are you currently employed?

A.    I'm employed at the Washington University Medical School in St. Louis, Missouri.

Q.    And what do you do there?

A.    So half my time is clinical work.  I work mostly with residents and fellows.  Typically, they will review the films that we do.  I guess it's not films anymore.  Everything is on a computer, but they will review the examination first and then I typically will sit with them and do some teaching corrections until we file a final report.

That's -- so it's kind of a teaching and clinical role.  The other half of my time I do research.

Q.    So you work as both an educator and a

practitioner?

A.    Yes.

Q.    And you mentioned it briefly, but what is neuroradiology?

A.    So neuroradiology is the branch of radiology that specializes in the nervous system.  So we primarily look at the brain and the spine.  There's a few other smaller procedural type of things that we do, but that's the bulk of it.  The bulk of the work is CAT scans and MRI scans.

Q.    I'M going to show you Government's Exhibit Number 41.  It will come up on the screen there in front of you.

      Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It's my CV.

Q.    And I'm going to have Tanner scroll down.

      We'll go ahead and stop.  Is that the accurate up-to-date version of your CV as far as you know?

A.    It's slightly out of date, but the only changes would be some extra articles that have been published since.

Q.    I want to talk about your educational background.

      Where did you obtain your undergraduate degree?

A. I have a bit of an odd background. My parents were living in Israel at the time, and I did my undergrad degree in Israel.

Q. What was the subject of that degree?

A. Electrical engineering.

Q. And do you have any graduate degrees?

A. Yes. I returned to the United States at some point when I got married. And I went to the University of Tennessee, Knoxville, and I studied physics. And then I went to -- after that I went to medical school at the University of Illinois.

Q. Do you recall when you earned your M.D.?

A. 1995.

Q. Have you done any post-doctoral work?

A. So there's two aspects of that question.

I did some post-doctoral work after my physics degree but that was very brief. It was just to fill some time before I went to medical school. But I think you're referring to post-doctoral medical work, and so I did my residency in diagnostic radiology, that is, general radiology. This was between '95 and '99.

And then I stayed on for extra subspecialty training for two years, so that was between 1999 and 2001.

All of this training was done at Washington

University, and then I stayed on as staff in 2001, and I have been there ever since.

Q.   What was the specialty training that you mentioned?  What was it in?

A.   So residency is typically a more general training, and that was in general radiology, all aspects of radiology.

And then when you subspecialized, typically that's called a fellowship and that's two years.  Well, at the time it was in two years and that was in neuroradiology.

Q.   Are you licensed to practice medicine?

A.   Correct.

Q.   In what states?

A.   Missouri and Illinois.

Q.   How long have you been licensed to practice medicine?

A.   Well, going all the way back to probably the end of my residency, so 1999.

Q.   Do you have any additional certifications related to radiology or neuroradiology?

A.   Yes.  So the diagnostic, the general radiology training is a board certification, and then the neuroradiology subspecialty is called a certificate of adequate qualification.

Q.   Is that sort of equivalent to a board certification?

A.   Yes, exactly.  It's just a subspecialty board certification.

Q.   And how long have you been certified in diagnostic radiology?

A.   Again, approximately 1999 or so or maybe it was 2000.

Q.   Can you walk us through the positions that you held since completing your formal education?

A.   So since I have been at one place, you know, it's pretty straightforward.  I started as an instructor and I went through all the promotional steps.  At some point I became an assistant professor, then an associate professor and then a full professor.  Yeah, that's basically it.

Q.   So what are your typical duties as a professor?

A.   So, you know, we mentioned some of them already. You know, the bulk of my work is reading films with the residents, teaching the residents.  I give lectures.

Another big chunk of it is my research.  I have quite a few research projects going on.  And then, you know, I do have some administrative duties.  I run one of our research MR centers.  You know, I have some educational administrative issues.  But, yeah, mostly

that's a relatively small amount of my time.

Q.   And you also, I think your CV reflects, you're a director of imaging.

What does this entail?

A.   Where is that?  I'm sorry.

Q.   I believe that is -- if you can scroll down.

A.   That sounds like an incompetent sentence, like there's something after that or should be something.

Q.   Well, maybe it's -- at the very end where it says, 2020 to present, director East Building MRI Facility.

A.   So, yeah, I kind of mentioned that just a minute ago.

We have -- we actually have two research facilities that each have MRI scanners in them that are used just for research only.  I am in charge of running one of them.  It's in the east building.

We have three large MRI scanners there, and then there's two smaller -- no, also three, I'm sorry, smaller animal scanners for animals.  And, yeah, there's a lot of little administrative duties, scheduling, there's personnel I manage, there's safety issues that have to be addressed.  So I'm kind of in charge of all that.

Q.   Could you estimate how many scans you typically review in a week over the course of your duties?

A.   So like I said I'm only half-time.  Obviously, during my research time, I'm not reading scans.

But during, let's say a typical week, I would have two clinical days, work two-and-a-half clinical days. And on a typical day, you probably go through about, I'd say average, 60 exams.

Now, to be fair, a lot of the hard work is done by the residents.  I just have to review the scan and approve it.  So otherwise that would be very hard to do so, you know, like on average 60 a week, then you can multiply that by 50 weeks, et cetera, to get a feel.

Q.   And then you have been doing that for over 20 years?

A.   Correct.

Q.   Are you part of any professional organizations?

A.   Yes.  I belong to two or three of the major radiology organizations.  The RSNA, there's several, ASNR, ISMRM.  There's a few of these organizations that I belong to.

Q.   Could you repeat those, and maybe more slowly for the court reporter?

A.   I'm sorry, yes.

RSNA is the Radiological Society of North America. The ASNR is the American Society of Neuroradiology, and then ISMRM is the International Society of Magnetic

Residents in Medicine.

Q.   And are you involved in the production of any professional journals?

A.   I'm not on any editorial boards, but I review.  I review papers for, you know, multiple journals in my specialty.

Yeah, of course, I submit papers also.

Q.   Have you been qualified as an expert in neuroradiology in previous court cases?

A.   Yes.

Q.   Can you estimate how many?

A.   I've probably been in court -- I mean, I've been doing expert witness work for over 15 years, I would say so.  And I've probably been in court somewhere between 20 and 30 times, I would say.  But I've given, you know, hundreds of depositions.

Q.   Have you testified as an expert in both criminal and civil cases?

A.   Overwhelmingly civil.  I think I may have only been in court once for a criminal case.  I'm sorry.  Twice.

Q.   And do you recall in those two cases whether you were testifying for the defense or the prosecution?

A.   I think one for each side.  Since it's just two of them, it's easy to remember.

One was a -- well, they were actually both child abuse cases, not accidental crime. In one case I was on the defense side, and the other case I was testifying for the state of Illinois on the prosecution side.

MR. STEWART: Your Honor, at this time the government offers Dr. Shimony as an expert in neuroradiology.

MS. NELSON-MAJOR: No objection.

THE COURT: Dr. Shimony will be designated as an expert in neuroradiology.

Q. (BY MR. STEWART) Now, Dr. Shimony, what were you retained to do in this case?

A. You sent me films, or MRI scan, on Mr. Fields, and I was asked to look at that. And then you provided me with reports from Dr. Synder and Dr. Bigler, and you asked me to evaluate those reports.

Q. And were these materials, materials that you would routinely review and consider in your normal work, the types?

A. Well, the MRI scan certainly. You know, the reports would be very unique to legal cases.

Q. Now, you were paid for your work in this case, correct?

A. Yes.

Q.   You weren't asked to review any neuropsychological data, correct?

A.   Correct.

Q.   Do you recall the year of the MRI that you reviewed?

A.   2011 I believe.

Q.   I'm going to show you Government's Exhibit 40, and do you recognize this?  We can scroll down.

A.   Yes.

Q.   What is this?

A.   This is the initial report that I produced.

Q.   Doctor, we've heard testimony about ventricles and their relation to the brain, so you don't need to be exhaustive.  But could you just briefly explain what the ventricles are and how they relate to the rest of the brain?

A.   So just to be brief, the ventricles -- there's actually four of them but the main ones we're talking about are two large central structures in the brain that are full of fluid.  The fluid is called cerebrospinal fluid.  It's a very specific -- it's equivalent of plasma.  It's water with a lot of different proteins in it.  That fluid is produced in the ventricles themselves, and then flows out of the ventricle to surround the brain and the spine.  The

brain and spine are essentially floating in this fluid and this fluid is like a shock absorber. It's part of the protection system that the body has to protect the brain and spine. And the brain and spine are floating in this fluid.

Q. And could you explain also what the corpus callosum is?

A. So the brain, if you think of a brain as a computer, there's areas of the brain where things, information, gets processed and then there's a lot of wiring in the brain that connects the different parts of the brain to help in the processing.

So the wiring, in general, is called white matter. It's just because it looks white when you cut a brain up.

The corpus callosum is the largest bundle of white matter in the brain or communication fibers in the brain, it connects -- it's the major fiber that connects the left side of the brain to the right side of the brain, so it's obviously important for functioning.

Q. Now, how does ventricle size relate to psychiatric conditions?

A. Well, it really doesn't. I mean, the -- there's no strong connection between, you know, ventricle size

and psychiatric condition as a general statement.  I mean, there are certain psychiatric conditions in which you may tend to see larger ventricles on average.  You know, schizophrenia is an example of that but in general just because you see larger-than-average ventricles does not mean that the patient has a psychiatric condition.

Q.   And how does ventricle size relate to brain injury?

A.   Well, in cases of severe injury to the brain and it could be -- it does not have to be trauma.  It could be from any severe disease.  You can get -- and, again, I'm repeating myself in saying that.

In severe cases you can get loss of brain tissue, and that can happen, you know, from a stroke.  It can happen from MS.  It can happen from trauma.

If the injury is severe enough, you know, you may get some brain atrophy.  That is where the brain shrinks and the ventricles will tend to grow in size.

But I should add also our ventricles grow in size with average aging.  That is, on average a 60-year-old brain will have bigger ventricles than a 20-year-old brain.

Q.   Besides aging, what are some factors that might affect ventricle size?

A.   So, like I said, I think the aging is kind of the normal variation.  But I think, like I said before, there's many different diseases that -- but, again, it pretty much has been in their severe state.  You know, a mild trauma won't do that.  A mild version of MS won't do this.  But if you have severe conditions, such as a big stroke or dementia or a severe traumatic brain injury can do this or severe MS.  You know, you have a really bad cancer and you get a lot of chemotherapy, all of those things can cause an increase in the size of the ventricles.

There's another set of conditions where this fluid flow out of the ventricles is obstructed in some way and that can also increase the size of the ventricles.

Q.   Are there any lifestyle issues also that can affect that?

A.   Well, I think that that kind of ends up as part of the aging story.

So there's certain -- so if you don't take care of yourself, if you smoke, if you drink a lot, if you do drugs, if you don't eat well, then we do see on average, but it is a long-term process, that your brain can age faster and, therefore, if it ages -- part of the aging process is that the ventricles get bigger so that you could see bigger ventricles in somebody who

heavily smokes, for example.

Q.   Now, I believe that you list in your report, and actually it's right there in front of you near the bottom, some factors.  I believe you say -- yeah, you actually list a few there:  hypertension, obesity, depression, diabetes.

Do those all play into the aging factor that you're talking about?

A.   Well, not all of them, I guess.

I think high blood pressure will, obesity will. You know, depression is -- probably nobody knows why that does it.  Diabetes is certainly, you know, one of the medical conditions that can cause damage to the brain that's unrelated to aging.  And I mentioned schizophrenia before as a condition, which again for reasons that I don't think we know why you can see bigger ventricles.

Q.   Is there any established link between ventricle size and executive function?

A.   No.

Q.   Now, is it possible to determine whether someone has experienced a traumatic brain injury based on their ventricle size?

A.   No.

Q.   Why not?

A.   Well, I mean, as part of our discussion up until now we've mentioned so many different conditions that can cause enlarged ventricles.  So when you see big ventricles, you know, it's usually not very specific.  You can't -- without knowing more about the patient, I can't tell why this patient has big ventricles.  So you can't pinpoint it down.

Now, of course, as I mentioned earlier, if you have a severe enough version of traumatic brain injury, yeah, I mean, that can cause big ventricles.  But just generically saying "somebody has big ventricles" really doesn't tell you much because there's so many disease conditions that can lead to that.

Q.   Now, there's been a lot of discussion about brain damage in this case, and I want to ask you, as a neuroradiologist, when you're looking at an MRI scan, what are the tell-tell signs of brain damage that you would see on that kind of scan?

A.   So just generically?  Any kind of brain damage?

Q.   Yes.

A.   So there are -- there's two -- so an MRI scan will produce different types of pictures.  And we particularly program the MRI scanner to produce certain sets of pictures that give us specific information that we're interested in knowing.  So there's probably two

sets of images that I would look at first to determine if there's been brain damage.

One set of pictures is called the T two pictures or flairs. Another variation of that is a flair sequence. And in those pictures what I'm looking for is I'm looking for an abnormal signal. A lot of times it will be in the white matter that we mentioned earlier. And that abnormal, elevated signal, especially in an adult, is usually a marker of scar tissue in the brain. We call that -- the medical term is either "encephalomalacia" or "gliosis." But what those terms mean --

THE COURT: Can you just slow down and spell those for her just so we can make sure and get some record of that.

THE WITNESS: I'm sorry.

THE COURT: You're the expert. We're just trying to catch up.

THE WITNESS: Sure. Gliosis is G-L-I-O-S-I-S. You probably have that.

Encephalomalacia, so it's encephalo, E-N-C-E-P-H-A-L-O, and malacia M-A-L-A-C-I-A.

Sorry about that.

THE COURT: That's all right. You might want to slow down a little bit just so she can keep up, and

me for that matter.

MR. STEWART: I know you're trying to catch a flight, but we can slow down a little bit.

THE WITNESS: It's easier to just say that those can present as scar tissue in the brain. Obviously, if you have scar tissue, you had some kind of an injury.

The second set of pictures that I would look at is a set of pictures called again -- they, again, have multiple names. I'll use the shortest one, it's T2 is the short version of that. And those pictures are very sensitive to blood in the brain. That is blood that is outside of the blood vessels that's spilled out. Usually, it's due to some kind of an injury. It does not have to be trauma. It can be trauma but it could be from a brain tumor or, you know, a stroke or something like that.

So those are the two type -- those are the main ones that I've looked for.

Q.    (BY MR. STEWART) Now, we've had some discussions in previous testimony about the idea of normal versus abnormal brains.

Before we start talking about Mr. Fields specifically, I just want to ask what is meant in your field when a brain scan is said to be "abnormal"?

A.   Well, that's very over-encompassing, right, because that includes so many different things.  I mean, we obviously are going to look for -- I mean, you look -- I mean, the first thing I do when I look at the films I look just to make sure that things looked normal, that things are in place, that the structures are located where they're supposed to be located, that they generally have the correct signal intensity.

It also includes, you know, including other parts that are not brain.  You know, like the bones around the brain, the ears, the face, parts of the face that you see.  But I assume that you're wanting me to focus on the brain.

So, now, typically this can be difficult sometimes because there is a wide range of "normal."  Within the population there is a wide range of things that are normal and you have to know the age of the person that you're looking at also.  Because some things that would be normal for a 60 year old may not be normal for a teenager.  But there's a certain range for normal for each one of these items, so you're going to have to look for that.

Q.   Let me back up.  Let's say that you plot out the size of the ventricles on a bell curve.  Are the things at either end, like in the 95 percentile, would you

consider that abnormal?

A.   Right.  So, yeah.  As you pointed out, most medical measurements, and I think that's true about any scientific measurement, tend to be distributed on a bell curve.  And you kind of get a feel after looking at, you know, many thousands of scans, you get a feel for what's the mean in the population, or average.  And then what kind of spread is normal in the population, and you get a feel for those extremes.

Now, in the scientific literature, what you just said is correct.  You kind of typically take two standard deviations as normal and that puts you at 5 percent to 95 percentile range, and I think everybody is familiar that -- with those ranges.

You know, like those of us that have had children, we all know the pediatrician always puts our children on a growth chart, and you're kind of interested in where they land.  It's kind of the same thing with radiology, except, you know, it is more complicated.  Because in one brain, you have different parameters that kind of land on a bell curve like that and you kind of have to assess that, that range of normal.

Q.   Does an area of the brain being abnormal in a statistical sense mean that that individual has brain impairments?

A.   No.

Q.   Does it indicate any kind of pathology?

A.   I mean, not necessarily.  I mean, it can be, of course.  It's possible that they may have a pathology related to that but it doesn't necessarily mean that.

This is where, you know, you have to get some kind of history on what's going on with the patient, what are their symptoms.  So if, for example, they have a certain set of symptoms that kind of fits with what you think is abnormal, then, yeah, then you kind of can make that correlation.

But, you know, otherwise just because one thing is a little out of whack or outside of the realm of normal, you know, that doesn't necessarily mean that there's something wrong with that person overall or their behavior or anything like that.

Q.   So let's move to Mr. Fields' specific scan.

What were your impressions of that scan?

A.   Well, I agreed with Dr. Snyder and Dr. Bigler that the ventricles were predominant, mildly enlarged, above average, if you will.  I didn't think it was a severe situation.  I probably would have put that within the normal -- within the range of normal, you know, had I known nothing else.

I thought everything else was completely normal,

including the corpus callosum, of course.

Q. And I believe in your report you say it is a "normal study."

What do you mean by that?

A. Well, it's a study that at the end of the day -- the way I would have dictated that study is in the findings. I would have said something like you know, "mildly prominent ventricles" and then -- but when I say "mildly prominent" to me that indicates that it's within that two standard deviation of normal and, therefore, in the impression I would have felt very comfortable saying, "normal MRI scan."

Q. And how did you determine that it was just mildly prominent as opposed to perhaps markedly prominent?

A. Well, yeah, so like I said before, when you look at lots and lots of films over a career, you get a feel. It's part of learning your profession. And you get a feel for what's normal and what's not normal. And that is typically how we do it most of the time.

I mean, there are software programs nowadays that can do this automatically and measure volumes in the brain automatically. But we actually do not use those for much.

I think the only FDA-approved application of these types of software programs nowadays is for -- to help

diagnose dementia, like Alzheimer's dementia. But that's really the only application where it's sanctioned usage of that.

Q. Now, we talked earlier about some various factors that can affect ventricle size.

Are you aware of whether Mr. Fields had any of those factors present?

A. You know, I don't remember.

Q. Well, are you aware of whether he had struggled with hypertension?

A. You know, I'm sorry. I just don't remember that.

Q. Would taking a look at your report refresh your recollection?

A. Sure. Sure. Sure.

Oh, I see. Yes.

So the medical conditions that we talked about earlier, that you pointed out to me, are actually ones that Mr. Fields did have. So they're listed in my report as hypertension, obesity, depression, diabetes and schizo-affective disorder.

Q. Now, we talked about the ventricles.

What was your specific impression about the corpus callosum?

A. The corpus callosum was absolutely normal.

Q. Let's go to page three of Exhibit 40, Government's

Exhibit 40.

If you can zoom in on that figure.

Do you recognize this figure?

A.    Yes.  I produced that figure, yes.

Q.    Okay.  So can you kind of explain what you did here, what we're looking at?

A.    Sure.  So and, by the way, it was very clear to me visually that the corpus callosum looked normal.  So I wanted since -- especially in the report by Dr. Bigler there were quantitative measurements that were made, I felt like I had to support my view with more quantitative measurements.

So what I did was I -- the two sets of images on the right are sideway views of Mr. Fields' brain, and then you can see -- you can see I made different measurements on that brain and you can even probably make those measurements out even if you blew it up a bit more.  You don't have to.  I'm just pointing that out.  But I did those measurements in a very specific way to correspond to measurements in publications that talked about what is the normal size of the corpus callosum.  That data is on the left side of the figure.

So, you know, the top left plot is from one paper that looked at the total length of the corpus callosum, and it's producing a lot of -- all those points on that

plot are different individuals.  The different colors are those individuals who came from large publically available datasets of brain MRIs that you can access. And the lines are kind of lines that demonstrate the trend with age.  And that black star there is where Mr. Fields falls with that specific measurement of the callosal length, and you can see that he's right smack in the middle there.

And then the bottom plot is a different paper in which they made measurements of the width of the corpus callosum along its length.  And, again, the black stars are my addition on the figure and those are the measurements that I made on Mr. Fields' brain, and I put them, you know, on top of these group plots.

In this case, the horizontal axis is not age but it's the location along the length of the corpus callosum.

And, again, you can see that Mr. Fields falls quite nicely within the average of the population.

Q.   So you're saying that the -- I guess, is it the dotted yellow line that would be the average?

A.    Right.  So you can see -- in this paper they did two sets of measurements.  They did expert measurement, which would be just like me going in and measuring each brain, which is what I did.  That's the yellow line and

then the solid purple line is they had a software, a piece of software program that did this automatically, and that is the purple line. I think they wanted to show that their software program is really good, so it corresponds with the experts. And then, you know, I put my measurements on top of that just to show.

Q. And so your -- so you plotted the black star is where Mr. Fields' corpus callosum measurements fall.

A. Correct.

Q. Now, you mentioned the things that you look for specifically about brain damage and you mentioned scar tissue and bleeding, correct?

A. Correct.

Q. Did you see either of those on this MRI scan?

A. No.

Q. Did you see any evidence of brain damage?

A. No.

Q. Do you see any evidence of pathology?

A. No, other than the ventricles that we talked about.

Q. Now, do you see -- did you see anything in his scans that would be indicative of cognitive dysfunction?

A. No.

Q. Now, when you talked about the ventricles being

prominent, were they weighted towards any specific area of the brain?

A. I think again -- I mentioned that there are actually four ventricles. But I think in this specific case we were talking about the two lateral ventricles. And I felt like they were symmetrically distributed both left/right and anterior/posterior.

Q. Now, looking at the scans that you did, could you predict how Mr. Fields would perform on neuropsychological tests?

A. No, there's no way to do that.

Q. Why not?

A. Well, just measuring size in the brain is, you know, doesn't give you that kind of information. We don't know that much about the brain to make those kind of predictions. And even if we did, it wouldn't be correlated with a simple size measurement. You know, it would be in some futuristic time we're going to be able to do some more fancy stuff but a simple measurement with a ruler will certainly not predict anything neuropsychological.

Q. Now, I want to go to Dr. Snyder's report, which you mentioned that you reviewed, correct?

A. Yes.

Q. Let's go to Exhibit 7, Defendant's Exhibit 7, my

apologies.

As he's pulling this up, let me just ask you, how do you respond to his conclusion that the ventricles are "markedly prominent"?

A.   I would strongly disagree.

Q.   Why is that?

A.   Well, because at most they're mildly prominent. So there's a big step between mild and, you know, markedly.  That's -- I mean, those terms are not super well defined.  I will agree with that, but we still -- and I may some days in the reading room, I may argue with my resident, you know he may think that something is mild but I think it is moderate.  But it's super rare that we argue about one of us thinks something is mild and other one thinks it severe or markedly. That's a big gap to bridge, and it just doesn't look anything like that.

Q.   And you mentioned Dr. Snyder's report in your report, and you say that his comparison of Mr. Fields' scans to other scans is misleading.

Why do you say that that's misleading?

A.   Yeah.  Do you want to bring that up or should I just answer verbally?

It would be in his supplementary document.

MR. STEWART:  Yeah, let's go ahead and scroll

down, near the bottom actually.

Tanner, let's go to the bottom and then work our way up. And I can give you a page number here in a second.

A little further up.

THE WITNESS: Yeah, that's a good one. Yeah, that's a good one.

MR. STEWART: And rotate it.

THE WITNESS: So this is in an example --this figure is the one --

Q. (BY MR. STEWART) Hold on. Let me make sure we get the page number for the court reporter.

All right. So that is going to be page 75 of Defense Exhibit 7.

A. Yeah. So this is a good example of what I'm talking about. So we talked about the fact that things in the brain, measurements in the brain are distributed on a bell curve, and there's a distribution.

So when you're comparing something, you know, like the size of Mr. Fields' ventricles -- so Mr. Fields is the one on the far left. You know, you can't compare it to any one person. You have to compare it to a distribution of what's average and what is the standard deviation.

So what Mr. Snyder is doing here, he's picking,

you know, he's picking two brains. I'm not sure where he got them from. One he claims is from a 40-year-old and one he claims is from a 50-year-old. In my opinion those brains have very small ventricles. Like, that's the ventricle size I would typically expect on an average 20-year-old.

So to me it looks like he picked a 40-year-old with kind of small ventricles for a 40-year-old and he says it's normal. Of course, compared to that, you know, Mr. Fields looks really big, but it's really very misleading. It's a misleading comparison.

Q. Let's scroll down a few pages. Let's go to the third page from the end, which I believe would be page 81. Actually, let's stop right there. Yeah, that's page 81.

And this is about the corpus callosum. Does the same criticism apply to this?

A. Yes, but even in a worse way. Because I don't see any difference between Mr. Fields' corpus callosum and the other two.

In the previous example, you know, at least he picked -- he picked a 40 year old and 50 year old with small ventricles and so it looked different. But here to me this doesn't look -- I mean, within -- I mean, there's going to be some play there that, you know,

there's some variability, but, yeah, these all look kind of normal and okay to me.

Q. All right. I want to move on to Dr. Bigler's report. Dr. Bigler measured Mr. Fields' brain volume and ventricles.

Do you know how he did that?

A. Yes. So, I mean, he didn't tell us that in his initial report, but then in his addendum or supplement to his original report, he provided information.

You know, so he's basing his analysis on a paper that he was one of the co-authors on that was published in 1995. So this is -- we're a few days from being 30 years old on that paper.

And in that paper, even though overall he had, I think, 194. So this is a paper in which he made measurements on ventricles and he tried to produce, you know, normal values of ventricle size in the population. Even though he had 195, which is kind of a reasonable number even by today's standard, you know, he split it up into little groups of eight.

So he gave -- and you have to do this. He absolutely did the right thing because ventricle size increases with age, so it has to be by age. So he had a group of 20 to 30, 30 to 40, 40 to 50, 50 to 60, et cetera. So I don't remember all the groupings. But

basically in each group he had about 20 people, which is really not a lot by today's standard.

And, you know, he has the methods that he's applied there. But I just feel like -- I felt like when I first read that, that this looked to me like it was an outdated method and not -- really should not be applied in today's day and age.

In order to demonstrate that, I took a much more recent paper, which is this Bethlehem paper that was published within the last year or two in Nature. And, of course, you know that Nature is like -- that's like the top scientific journal in the world, and this paper was amazing because they looked at 100,000 people, and they measured the size of the ventricles in 100,000 people. And then I took Mr. Bigler's number and put it on that publication and again the results show that Mr. Bigler's work is not accurate.

Q. So let's actually look at the work that you did on that. Let's look at Government's Exhibit 40. And scroll down to the last page.

A. By the way, I did an even better job of this on my supplement, but this is fine. We can work with this.

Q. Well, we're going to go to that one.

A. Oh, we are? Okay, fine.

Q. So could you kind of explain what's going on here?

A.   So what I'm showing you are figures from this Nature paper, Bethlehem, that I just described.

Again, I find this paper amazing because they really sampled a massive number of people here.  And so what I'm showing you -- let's start on the left side first because I think that may be a good place to start.

And the curves that Bethlehem are showing us are the total volume of the brain.  Now, men are in blue and women are in red.  And you could see that on average just size-wise, you know, men are on average bigger than women, so the brain size -- you can see that the blue curve is a little bit higher than the red curve.  And the top curve is basically a bunch of points and you could see how the uncertainty gets much larger as we age.  And I'm not sure if every dot there is a person or maybe a study that they included.  But you can see that the black star is the mean value that Bigler cited of his population, and then the yellow star is Mr. Fields' value.

Now, what's more instructive is to look at the lower curve.  The lower curve are trajectories that were calculated based on the upper curve.  So those lines are kind of the mean of all those hundred thousand measurements on the top line.  Then you could

see -- let's just focus on the blue now because Mr. Fields is a man. So the blue number, the blue dots, are relevant to him. So you can see how the blue solid line is the average for men. And you know the bottom, the horizontal axis is by age. Of course, you can see that it's not a linear curve. It's logarithmic. You can see how there's a lot more difference at birth and the first two years of life, and then as we age it does not change as much. But what's really important is the dotted blue line. The dotted blue lines are kind of the 5 percent and the 95 percent standard deviation that we already talked about.

So you can see that even Mr. Bigler's average, his average that he produced in his report, is sitting above the 95 percent population line. That's what he claims is the average, and obviously that can't be right.

I mean, I think it's just because his methods are older. There's some flaws in his methods that I could get into, but really I don't want to waste everybody's time on this. But it's just an older method. He was working with older techniques, older MRI scans there. He got numbers that were a bit inflated, and you can see that. And you can see that Mr. Fields is even

above that, but basically that curve to me says it all. It just shows that his calculations are not accurate in my opinion.

Q.   So let's look at Government's Exhibit 74.

A.   Sure.

Q.   And this is going to be page two.  And I believe this is what you were just referring to.

A.   Right.

Q.   So what I did here -- this is after Mr. Bigler gave us an article that he was basing his work on. This article that's 30 years old now.

So what I did is I took out the numbers that he had for the different age groups in that paper, and I again went -- he separated men and women, and he had separate several different age groups.  You can see like the first group there is like probably 20 to 30, and 30 to 40, 40 to 50, 50 to 60, 60 to 70, something like that.  I think that's right.

Again, the blue are the value for men and the red are the value for women.  And, again, you could see how in his -- this is now in his article you could see how his numbers are, you know, inflated basically.  They're inflated.

Q.   So considering the charts and the things that you just discussed, what is your overall opinion about the

measurements that Dr. Bigler sets out in his report?

A.   I wouldn't take them seriously.

Q.   Dr. Bigler also discusses in his report associations between ventricle size and processing speed.

Did you review that?

A.   I did read his report.  He may have said that there was a relationship.  But, of course, I will add that Dr. Bigler is a neuropsychologist and he kind of goes into areas that are not my area of expertise.

Q.   Now, can you say with any certainty that if an MRI had been performed on Mr. Fields in 2003, 2004 or 2005, the results would have been the same or similar as the scan in 2011?

A.   I can't say for sure.

Q.   So it's possible that the ventricles could have grown between the time the crime was committed in 2003 to the time of the scan in 2011?

A.   Yes, that's possible.  But equally possible is that they were the same.  I just can't tell.

Q.   Is there any way of knowing?

A.   No.

Q.   Now, Dr. Shimony, what is your ultimate opinion as to whether Mr. Fields' MRI indicates that he has brain damage?

A.   I mean, I disagree with that assessment.

Q.   So are you saying that he doesn't have?

A.   Well, no, I can't say that.  I mean, the MRI is not a perfect exam.  You can have brain damage and have a normal MRI scan.  That's certainly true.  But based on the MRI scan alone, you cannot say that.

Q.   And are all the opinions expressed today in your testimony and in your report to a reasonable degree of medical and scientific certainty?

A.   Yes.

Q.   If an MRI had been performed after the crime but before the trial and produced results like the MRI in 2011, would you have been able to testify to the same opinions you did today?

A.   Yes.

          MR. STEWART:  Just a moment, Your Honor.

          THE COURT:  Okay.

          MR. STEWART:  That's all for direct, Your Honor.

          THE COURT:  All right.  Very well.  Any cross?

     Yes, you may go.  Sorry.

                    **CROSS-EXAMINATION**

**BY MS. NELSON-MAJOR:**

Q.   Dr. Shimony, not Shimony?

A. I accept either one.

Q. Okay. Well, good afternoon, Dr. Shimony.

Are all of the documents you reviewed in authoring your report listed on your two reports that you reviewed with the government?

A. I believe so. There was -- there was a document that had some medical information which I cite in my report, so I don't know if I listed -- I don't know if I list that officially, but I cited. That was that line in the text that I had forgotten about that I was reminded by Mr. Stewart. I got that from his -- some medical record that I looked at.

Q. Was that document an actual set of medical records or was it a summary of medical records?

A. I don't remember.

Q. And do you recall who prepared that document?

A. I do not think it was a summary. I do not think so. I don't know. I received that document as part of my file.

Q. And you also don't recall with any specificity the time period that that medical record review covered.

A. No.

Q. And in your initial report, you wrote that you will, quote, specifically address the MRI of the brain of Edward Fields dated November 3, 2011, and the report

from Imgen by Dr. Snyder, and the imaging aspects of the report by Dr. Bigler.

Were there other aspects, non-imaging aspects of Dr. Bigler's report, that you weren't going to review?

A.   Correct.

Q.   Was that the clinical correlation piece that doctor -- excuse me.  I just upgraded Mr. Stewart to Dr. Stewart -- that Mr. Stewart --

THE COURT:  Well, everybody here has practically been a doctor that we've heard from, so why not.

He's a doctor of law.  We'll count it.

Q.   (BY MS. NELSON-MAJOR) -- that Mr. Stewart asked you about on direct?

A.   Correct.

Q.   Okay.  That's because you're not a neuropsychologist?

A.   Correct.

Q.   And you testified that you reviewed the actual imaging files from the 2011 MRI.

A.   Correct.

Q.   Did you also review a report from a Dr. Susan Koslow?

A.   Yes.  I believe -- I believe she did the original radiology read on the 2011 scan if I'm not mistaken.

Q.   Are you aware that Dr. Koslow also authored a declaration giving some additional explanation context to her review of the 2011 MRI?

A.   I was not aware.

Q.   And you didn't have an opportunity to review that declaration from Dr. Koslow.

A.   Correct.

Q.   Are you aware that a second MRI was performed on Mr. Fields' brain in 2017?

A.   Yes.

Q.   And did you review the imaging files from the 2017 MRI?

A.   Yes.  However -- they were sent to me.  However, it was not the full study.  It was a very partial study.  It had one set of images called the T one images.  It did have that, but it did not have the full complement of pictures that we usually get.  I did not see any further images on that study.

Q.   So you did not see the T2 flair sequence that you mentioned on direct examination?

A.   Correct.

Q.   And that's the sequence that you explained that would show the presence of white matter changes in Mr. Fields' brain?

A.   Potentially, yes.  So I didn't -- not to confuse

everybody. I did not see those images.

Q. So you can't say whether or not those images, if they did exist, showed the presence of white matter changes or not in Mr. Fields' brain?

A. Correct.

Q. Did the 2011 MRI images that you reviewed include that T2 flair sequence that we were just talking about?

A. Yes.

Q. It did?

A. It did, and it did not show any abnormality.

Q. Did the government ask you to prepare a supplemental report regarding the 2017 MRI in your analysis of those images?

A. No.

Q. Did you ask the government if you should prepare a report on those images?

A. I believe we had a phone discussion about it and what I remember saying is that I thought -- again, I pointed out to them that they were missing a good chunk of the study. Based on the images that I saw, I did not see any difference, that is, the ventricles are actually something that you can assess pretty well on a T1. You don't need a T2 necessarily.

Q. I'm actually going to stop you there, Dr. Shimony, because I'm not asking what your opinion was, just

whether you were asked -- if you discussed giving a report as to those opinions.

A. So, like I said, I believe we talked about it in a phone conversation and I was not asked to produce an additional report.

Q. And did you have an opportunity to review the report from Dr. D.H. Berns, who reviewed and read that 2017 MRI study?

A. No.

Q. And are you aware that Dr. Berns, the radiologist who did review the 2017 study, observed white matter changes in Mr. Fields' brain?

A. I was not aware.

Q. And you testified on direct examination that the presence of white matter changes is one indicator of brain damage; is that right?

A. Correct.

Q. And are you aware that Dr. Berns also observed some prominence of Mr. Fields' lateral and third ventricles?

A. No. Again, I did not see his report.

Q. Okay. And bear with me for a moment, my computer locked me out again.

I'm going to show you what's been marked and admitted as Defendant's Exhibit 256. This is a

supplemental report that Dr. Bigler authored, which details his analysis of the 2017 MRI study of Mr. Fields' brain.

Have you seen this document before? I can scroll through it. It's not too long.

A. I don't think so. Let me just read it for a minute.

Q. I can zoom in if that makes it easier.

A. No, I did actually see this. Yes, I think I did receive this document.

Q. So the government provided you with this report?

A. I believe so, yes.

Q. And it's not listed on either of the reports that you prepared and signed as part of this case, right?

A. I guess so.

Q. And so far you've said that you've seen some of the 2017 images. You've seen Dr. Bigler's supplemental report. Are there any other documents that the government provided you and asked you to review that you haven't listed on either of your reports?

A. I don't think so, but you may prove me wrong. I don't think so.

Q. And so you have memory of seeing this 2017 report, but you haven't seen Dr. Bern's report, so you can't comment on the accuracy of Dr. Bern's assessment of the

2017 MRI; is that right?

A.   Correct.

Q.   Okay.  So I'd like to turn to the 2011 MRI.  And on direct examination you told Mr. Stewart that you found Mr. Fields' ventricles to be enlarged.

A.   Can I just add something to my previous answer? I'm sorry.

Q.   To the question about whether you have seen this report or not?

A.   No, to the documents provided to me.  It's possible that this document was provided to me after I wrote my report.  Therefore, it was not included.

Q.   Did the government ask you to offer an opinion as to the accuracy of Dr. Bigler's analysis regarding this, the 2017 MRI?

A.   No.

Q.   So getting back to the 2011 MRI, you explained to Mr. Stewart that you found Mr. Fields' ventricle to be enlarged, but mildly enlarged, and that the overall impression was that his brain was normal; is that right?

A.   Yes, correct.

Q.   And so in your opinion "mildly enlarged ventricles" are nonetheless normal?

A.   Well, they can fall within, yeah, the spectrum of

normal.

Q.   And at what point does ventricle enlargement become abnormal in your opinion?

A.   So I was trying to convey that point earlier a little bit but probably didn't convey it well.

It's -- there's no clean line there.  It's a bit of a judgment call, and I think once a scan verges into maybe the moderate area, I would have said, yeah, this is too big and I would call this abnormal.

But my feeling was that this was within the spectrum of a variation of normal.  But, again, I can't give you an exact line of demarcation.

Q.   And Mr. Stewart asked you about the bell curve and I think that you explained that something that's two standard deviations outside of the mean, that would be considered as abnormal; is that right?

A.   Yes.

Q.   And ventricle enlargement you explained exists on a continuum starting with, I guess, no enlargement preceding to mild; is that right?

A.   Yeah.  You would have -- you can even have small ventricles.  It's possible for people to have slit-like ventricles or very hard to see and then, yeah, it goes all way through average to then to above average.

Q.   Would you say after mild, and you said "marked" or

"moderate."

Are those two terms the same?

A.   No.   Typically in the wording that we use, but again it's a little bit vague in radiology, but, you know, there's, I would say, "normal."  You could use the word "minimally enlarged," "mildly enlarged."  Then you get "moderate."  And then "marked" and "severe" are probably in the same category as far as the terminology that I use.

Q.   And this is -- these differentiations between these categories, that's something that radiologists look at like on a clinical rating system; is that right?

A.   Yeah.  Again, it's not very accurate.  I think as a group, radiologists don't like to make measurements with a ruler.  So we -- a lot of it is eyeballing and just based on your experience.

Q.   And eyeballing to images that sort of -- the community views as fairly representative, on that continuum?

A.   Right.  So you -- I would say you build internally in your brain a continuum, you know, of what you expect to see, you know, by looking at many films.  Of course, it has to change and be very well based on the age of the patient in this case; but, yes.

Q.   In your practice, though, when you're looking at the scans of a patient's brain you're not pulling out, you know, a cheat-sheet, clinical rating system with pictures along it that show mild, moderate, severe dilation?

A.   No.

Q.   And so when you decided where Mr. Fields' ventricles fell on that continuum, I think you said you just kind of eyeball it and you use your experience.

Is that what you did in this case?

A.   Yes.

Q.   And in your report you wrote that Dr. Synder's assessment of Mr. Fields' ventricles are -- that his assessment that they were markedly prominent is a subjective opinion not based on objective criteria. And I think that's what doctor -- I am going to keep doing this to you, Mr. Stewart -- Mr. Stewart asked you about.

MR. STEWART:  I'll take it.

Q.   (BY MS. NELSON-MAJOR) And you looked at the normal controls that Dr. Snyder had included in his report; is that right?

A.   Correct.

Q.   Is that what you meant, that you had issue with the normal controls that Dr. Snyder used?

A.   Well, it's more my issue of comparing to a single individual.  Because comparing something to a single individual is not scientifically accurate because a single individual can be average or it can be below average or above average, and it's -- I gave an analogy in my report, which if you don't mind I will rephrase here.

If you put a 6'5" person next to Shaq O'Neil he's going to look short, you know, just because you're comparing him to a very tall person he's short in comparison.  But you really shouldn't be comparing to one person.  N equals 1, an experiment of N equals 1, is not scientifically valid.  You have to compare to a distribution.

And, therefore, Dr. Snyder by doing that, he's misleading.  You know, it's a misleading comparison in my opinion.

Q.   Did you compare Mr. Fields' ventricles to that greater population when you made your qualitative assessment?

A.   Well, yeah, I compared it to that greater population that's in my brain, yes.

Q.   And so unlike Dr. Snyder and Dr. Bigler, who included images of the normal controls that they compared Mr. Fields' brain to, you didn't include any

of the actual visual images of the normal controls that you compared Mr. Fields' brain to; is that correct?

A.   That's correct.

Q.   And so you explained previously that it's important to compare brains of similar ages because of this natural aging progression that happens with ventricle size; is that right?

A.   Yes.

Q.   So when you are using that population database in your head, are you able to specifically identify the range of normalcy main ventricle sizes for a certain population?

A.   To some degree, yes.  Yes.  I mean, I can't tell you -- I mean, it's hard to describe how I represent this in my brain and certainly I can't distinguish a 35-year-old from a 40-year-old, but I typically have, you know, blueprints of what a 60 and above looks like, what a middle-aged person looks like, what a young adult looks like, what a teenager.  And I believe Mr. Snyder does, too.  You know, I think every neuroradiologist that does this for a living gets these templates in their brain.

Q.   And your previous answer about Shaq O'Neil kind of brings up this question I wanted to ask you that you state in your report that neither Dr. Snyder nor

Dr. Bigler, in doing their qualitative analyses, considered whether Mr. Fields just happens to have a big head, that their qualitative analysis didn't factor that in.

Did you take into account Mr. Fields' overall head size when you concluded that his ventricles are mildly enlarged?

A. Well, it's typically not possible to do that for a radiologist just because there's no absolute measure of the scale that you're dealing with. Typically, what happens all the brains -- and by the way, the people that do this in the background are the radiation technologists, the people that run the scanner for us. And they will frame no matter what the brain is -- if it's a tiny baby brain or a huge brain of a giant man, they will frame the brain in such a way that it will fill most of your screen.

So you can't really tell what the absolute size of the brain is. You can only do a relative kind. I mean, I guess there is a ruler on the side and if you wanted to, you could measure it, but that's typically not our workflow.

Q. So when you made your qualitative assessment of Mr. Fields' ventricle size, you didn't take into account, because you're saying that you couldn't, his

overall brain size or his head size, excuse me?

A. Well, I did the way that I usually do it in the reading. I didn't attempt to, you know, make any measurements.

Q. Okay. I'm going to now show you what's been marked as Government's Exhibit 40.

Actually, we're going to soldier on. I'm just going to leave that up because we'll get back to it in a moment.

So I'd like you to turn to the quantitative analysis that Mr. Fields' brain ventricles were subject to in Dr. Bigler's report, and Dr. Bigler calculated the ventricle-to-brain ratio of Mr. Fields' head.

A. Yes.

Q. And he determined that Mr. Fields' ventricle-to-brain ratio was 6.18 percent.

A. Yes.

Q. And you believe that number is inaccurate.

A. Correct.

Q. But you haven't offered your own calculation, correct?

A. Correct.

Q. So you didn't calculate Mr. Fields' total brain volume yourself?

A. Correct. I used -- in my plots I used the numbers

that Mr. Bigler -- Dr. Bigler provided, yes.

THE COURT:  You demoted him.

MS. NELSON-MAJOR:  I don't know how we can promote "doctor." I think that is sort of the terminus for promotion levels.

Q.  (BY MS. NELSON-MAJOR) So you didn't also calculate independently yourself Mr. Fields' ventricle volume?

A.  Correct.

Q.  So you can't offer us an alternative number for Mr. Fields' ventricle-to-brain ratio, correct?

A.  Correct.

Q.  And I'd like to show you -- now, turn to the issues that you have with mister -- excuse me, doctor -- this is going to become endemic -- Dr. Bigler's calculations and you walked through on direct examination how you compared Dr. Bigler's numbers to some of those charts you got from an article published in Nature?

A.  Yes.

Q.  And I am going to pull up Defendant's Exhibit 260, and it's previously been admitted.

Is this the Nature article that you were discussing with Mr. Stewart on direct examination?  I can page through it.

A.  Yes, exactly.

Q.    And this is the article that forms the basis for your critique of Dr. Bigler's calculations.

A.    Correct.

Q.    And then you pulled some graphs from this article and included them in your initial and supplemental reports; is that right?

A.    Correct.

Q.    And then you compared Dr. Bigler's calculations of the ventricle volume of a normal brain, the neurotypical brain, to charts from that Nature article as well?

A.    Yes.

Q.    And based on that comparison, you concluded that the ventricle volume for a normal brain that Dr. Bigler calculated was accurate?

A.    No.  So we mostly talked about the -- we most likely talked about the -- in my initial part of my questioning by Mr. Stewart, we talked mostly about the brain volume.  We didn't talk about the ventricular volume so much.

Q.    Right.  So we're going to get to the ventricular volume, but I want to start with your analysis of the -- we're going to get to total brain volume, but I want to start with your analysis of the ventricular volume.

A.    Sure.

Q.    I can pull the chart, so we're all clear about what we're talking about.  So I'm now going to show you Government's Exhibit 40, which is your initial report.

A.    Right.

Q.    And now I'm going to turn to page four, and we're looking at Figure 2.

      On the right-hand side of this figure of the top right corner it says "ventricular volume."

A.    Yes.

Q.    And then the graph here is taken from that Nature article we just looked at.

A.    Yes.

Q.    And then you superimposed a black star, and that black star represents Dr. Bigler's value for what a normal ventricle size would be; is that correct?

A.    Yes.

Q.    And based on that, you determined that the normal ventricular volume that Dr. Bigler calculated was accurate; is that correct?

A.    Yes.  Well, I mean -- I'm sorry.  I shouldn't say "accurate."  At least falls within a reasonable range.

Q.    Okay.  And then the yellow star on that ventricular volume chart, that represents the figure that Dr. Bigler calculated for Mr. Fields' ventricle

volume; is that right?

A.    Correct.

Q.    Okay.  Now, I want to switch to the left-hand side of Figure 2, which are the graphs that you said were about total brain volume, and that is what Mr. Stewart was asking you about on direct examination.

A.    Correct.

Q.    And, again, those two charts, the one that says "Total cerebrum volume" and the one that says "Population trajectories" underneath it, were taken from that Nature article that we just looked at?

A.    Yes.

Q.    Okay.  When you copied those charts from the Nature article it had "Total cerebrum volume" written on top, correct?

A.    Yeah.  I think I left the title as was present in the article.  I believe so.

Q.    And we can go back to Defendant's Exhibit 260, which is the Nature article, and take a look at the graphs as they appear in the Nature article.  And I'm going to turn to page three of the Nature article, which is again Defendant's Exhibit 260.

     At the very top left-hand corner of page three is a series of graphs, but the very top left one says "Total cerebrum volume."  Is that right?

A.   Yes.

Q.   And that's the graph that you pulled out and included in your report.

A.   Yes.

Q.   And it says "Total cerebrum volume" because this graph is plotting that a number of studies, I think a hundred studies, calculated, right?

A.   Yes.

Q.   Does this cerebrum include all of the brain structures?

A.   No.

Q.   So it does not include the cerebellum?

A.   Correct.  It usually does not include the cerebellum, and the bottom part of the brain stem is probably not included also.

Q.   And on average what percentage of the brain's volume is cerebrum?

A.   Oh, gosh.  I don't know exactly.

Q.   And if I told you that Dr. Bigler testified that the cerebrum generally comprises on a neurotypical brain between 85 percent of a brain's total volume, would you have any reason to dispute that?

A.   That sounds about right.

Q.   So on average you would expect someone's cerebrum volume to be about 15 to 20 percent lower than their

total brain volume; is that right?

A.    Sure.

Q.    And are you aware that the total brain volumes in Dr. Bigler's report include the cerebrum, cerebellum, and the brain stem?

A.    I guess I was not aware of that.

Q.    Okay.  I'm going to show you now what has been marked as -- and admitted as Defendant's Exhibit 257.

And this is the article that you referred to as the Blatter paper in your supplemental report dated August 13 of 2024.

A.    Yes.

Q.    And this is the article that you and Mr. Stewart were talking about on direct examination.

A.    Yes.

Q.    Okay.  This article, it was published in the American Journal of Radiology 1995, as you pointed out. The lead author is Duane D. Blatter, but Dr. Bigler is one of the coauthors; is that right?

A.    Yes.

Q.    And Dr. Bigler referred you to this article as an explanation that the methodology he used to calculate Mr. Fields' total --

A.    Yes.

Q.    -- total brain volume, ventricle volume, and VBR,

or ventricle-to-brain volume ratio.

A.    Yes.

Q.    And you looked at this report and you compared the values for the normal brains that Dr. Bigler included in this report.  And you said that his methodology was unreliable because the figures in your opinion were off-the-charts inaccurate.  Is that right?

A.    Yes.

Q.    And, again, you reached that conclusion looking at those charts that we were just talking about from the Nature article.

A.    Yes.

Q.    Okay.  I'm now going to show you what's been marked as Government's Exhibit Number 74.  This is your supplemental report dated August 13 of 2024, and I just want to clarify something first.

So the text of the report references a Figure 1, and then this is listing the second page where there's a figure labeled Figure 2.

There weren't supposed to be two figures in this report, were there?

A.    No.  No.  That's an error on my part.

Q.    And then this being, we're looking at Figure 2, where it says "Population trajectories," this is an image that you took from that Nature article?

Q.

A. Correct.

Q. And it's doing population trajectories for the total cerebrum volume, again collected from the various studies in the Nature article; is that right?

A. Yes.

Q. And then you explained to Mr. Stewart that the stars you composed from that Blatter article and it represents the normal brain volumes that Dr. Bigler and coauthors plotted for various age groups; is that right?

A. Yes.

Q. Are you aware that these figures that you took from the Blatter article are again total brain volumes, not total cerebrum volumes?

A. I was not aware of that.

Q. So now that you are aware of that, are you surprised that the stars in Dr. Bigler's report and Dr. Bigler's article that we've been discussing are higher than the total cerebrum volumes on the Nature article in which you rely on?

A. Well, you certainly are pointing out a problem with my analysis. I guess my response to that would be that, yes, those -- including the cerebellum and a portion of the brain stem would raise those numbers.

Now, how much it would raise those numbers, I'm

not sure. I would have to recalculate that.

Q. I'm not asking you to do any math on the stand.

A. No, I understand. I understand.

Q. We discussed that you would expect on average that a total brain volume to be 15 to 20 percent higher than a total cerebrum volume in a normal brain?

A. Yeah, I would have to redo the calculation. I guess my estimate is that those numbers would still be too high; but, yeah, I can't say for sure.

Once we finish with this line of questioning though, there's another issue that I'd like to talk about.

Q. You'll have an opportunity to give any additional explanation that you might want to give for this confusion on redirect.

A. Sure.

Q. And a question about this graph, which appears on your supplemental report, Government's Exhibit 74, how did you physically put the stars on the graph?

Did you use a software program? Did you manually put them in? Did you use a ruler?

How does that work?

A. So within PowerPoint, there's a feature, a ruler feature, that you can set the parallel lines to the lines of the graph, and I used that to measure the

location.

Q.   Does that hold true as well as for stars that you plotted on your initial report, Government's Exhibit 40, you used the PowerPoint line feature as well?

A.   Yes.  Yes.

Q.   And I want to take a look at that Blatter article again.  Again, that's exhibit, Defendant's Exhibit 257. And I'm going to direct your attention to page seven.

And this is a graph summarizing the data that the authors of this article calculated for the volume of various structures in the brain.  And I'm going to direct you to the section of the graph that's titled total brain volume.

Do you see where I'm referring to?

A.   Yes.

Q.   And there's a column for "uncorrected mean" and a column for "corrected mean."

Which column did you use when you plotted these values, the graph that appears on your supplemental report, which is Government's Exhibit 74?

A.   I don't remember.  I would estimate that I used the corrected, but I'm not . . .

I think that if I remember correctly, that the difference was insignificant on the scale of that

graph. That is, you know, if you look at the first entry 16 to 25, the difference there is 1311 to 1354. So we're talking about a 40 numerical number of 40 difference over 1,300. So it's a two percent difference or so, or three percent.

On the scale of the plots that I created it would not have made much of a difference.

Q. And in your practice, be it clinical or your research practice, do you calculate ventricle-to-brain ratios from structural MRI studies?

A. No.

Q. And I'd like to ask you again about a statement that you made in your report where you say, "Mr. Fields has various medical conditions that can increase the risk for prominent ventricles." And, again, as support for this assertion you cite to this document that we've been talking about, which is, Fields medical and review part one.

A. Yes.

Q. And you don't have a clear recall of what that document is at this time.

A. Correct.

Q. And so you don't know whether that includes information about Mr. Fields' health conditions that predate the incident in this case.

A.   Correct.

MS. NELSON-MAJOR:  I would just note for the record that we've been unable to identify what this document is and I would ask the government to disclose to us at some point, so we can verify what information was provided.  I don't know if it was a medical record or some sort of summary but I am just putting that on the record.

MR. STEWART:  I'd be happy to address it, Your Honor.  It was just medical records.

MS. NELSON-MAJOR:  From what entity?

MR. STEWART:  From BOP.

MS. NELSON-MAJOR:  Oh, just from BOP.

MR. STEWART:  Yeah.

THE COURT:  Problem solved.  I'm good at that.

Q.   (BY MS. NELSON-MAJOR) So you suggest that these medical conditions can increase the risk for prominent ventricles; is that right?

A.   Yes.

Q.   But you're not offering an opinion as to what did, in fact, cause the ventricular enlargement in Mr. Fields' brain?

A.   No.  It could have been something that he's had from birth.  Yeah, I don't know.

What I stated is it could increase his risk for having large ventricles.

Q. And I want to ask you, I think on direct examination you said there isn't necessarily any relationship between ventricle enlargement and brain damage.

Is there a relationship between ventricle enlargement and frontal lobe damage?

A. Well, again, frontal lobe damage -- again let's say you bring to me a random patient and they have big ventricles. I can't tell just based on that why the ventricles are big.

But if you go in the other direction and tell me, oh, I have a patient with frontal lobe damage, is it more likely that he'll have big ventricles at least in the frontal area? I'll say, yeah, that is more likely. Because if somebody has frontal lobe damage that can increase the size of the ventricles in the frontal area.

But just stating that somebody has big ventricles, doesn't really -- it is just too nonspecific because that could be -- I see this all the time in children. We will incidentally find kids with -- completely healthy kids, completely normal, and we may scan their brains for something like a headache or something and

then, surprise, their ventricles are big.  And they're completely normal otherwise than having a headache.

So just by having big ventricles doesn't really mean much by itself.

Q.   So you would need to look at clinical history and neuropsychological testing to make any kind of determination about the significance of a finding of ventricle enlargement; is that right?

A.   Yes.

Q.   And you weren't asked to do that in this case.

A.   Correct.  It's not my specialty.

Q.   So I'd like to switch gears and talk about the corpus callosum for a bit.

In your opinion, of your initial report you again say that Dr. Bigler and Dr. Snyder's qualitative analysis of Mr. Fields' corpus callosum isn't based on any objective criteria; is that right?

A.   Correct.

Q.   And that's because in your opinion they just did a qualitative analysis?

A.   Yes.

Q.   And that's why you felt compelled to do a quantitative analysis here?

A.   Yes.

Q.   But you're also offering a qualitative assessment

of Mr. Fields' corpus callosum.  Because I think you said based on your experience you looked at it and you decided it was normal; is that right?

A.   Correct.

Q.   Now, what objective criteria did you rely on when making that qualitative assessment?

A.   Well, it was not objective.  It was my impression as a radiologist that the corpus callosum was normal.

Q.   In making qualitative assessments such as that where you compare, you'll get an image, you consult your experience, that's typically, I think you said, how it works in the clinical practice; is that right?

A.   Correct.

Q.   But I want to talk about the quantitative analysis that you did.  I'm going to pull up Government's Exhibit 40, which is your initial report.  I'd like to show you Figure 1, which appears on page three, and you looked at this with Mr. Stewart, on your direct examination.

     These graphs they're not from the Nature article, they're from a different article that's authored by Timothy Herron.

A.   Correct.

Q.   And that was published in 2012?

A.   Correct.

Q. And I want to ask the question about the graph that appears in the bottom left corner. And I think that you explained that this graph represents the measurements of thickness of the corpus callosum along different points of the tract; is that right?

A. Yes.

Q. The graph has peaks at the left and right-hand sides; is that right?

A. Yes.

Q. And that's because that the corpus callosum in a normal brain is thickest at the front and the back. I realize that's a layperson's way of putting it, but.

A. Yeah. Yeah. It tends with it to be a little bit thicker on the edges, correct.

Q. And that sort of front section, that's called -- that's sort of where the first peak is, would capture the thickness of, I think, what you radiologists refer to as the genu or the rostrum; is that right?

A. That's very good, yes.

Q. The genu is spelled G-E-N-U. The rostrum is R-O-S-T-R-U-M.

A. Yes.

Q. Okay. And then the peak on the right-hand side of the graph on the other side of the corpus callosum, that represents the splenium?

A. Correct.

Q. So in a normal corpus callosum you would expect the genu and the rostrum on one side and the splenium on the other to be thicker than the body of the corpus callosum itself. The "body" being the point between those two areas.

A. Correct.

Q. And you measured Mr. Fields' corpus callosum at four different points. You took five measurements but one is the full length of the corpus callosum.

A. Correct.

Q. And you measured his corpus callosum thickness at four different points I should say.

A. Correct.

Q. And the four spots that you chose to measure of Mr. Fields' corpus callosum are located in the middle of his corpus callosum, correct?

A. Correct.

Q. So you did not measure the thickness of his genu, rostrum, or splenium?

A. Correct.

Q. Why didn't you measure those areas?

A. No, it's a good question. I think in retrospect I probably should have.

I will point out, in my defense I'll point out,

that if you look carefully at the area of the genu, if you look at the purple curve -- well, on any of the dots that are of the genu, you can see -- do you see how the air bars on those dots are quite large?

Q. Yes, I see that.

A. And that indicates that the spread in the population of those measurements is quite wide, that is, there's a wide range of normal in the genu.

And so even though you may visually look at Mr. Fields' genu and rostrum and think, oh, they're not that much bigger in width than the rest of his corpus callosum, actually that still falls within normal. And you can see those because these air bars are typically a standard deviation.

So even if his -- the dark star measurement in the genu would fall below those curves it would still be well within normal.

Q. But you cannot offer us a quantitative answer to that question if they're normal or not?

A. No, not a quantitative.

Q. And even though that there's a range of error, there's a range error, albeit it's -- I'm just again eyeballing -- slightly smaller for the middle section of the corpus callosum. Nonetheless as a population matter, you would expect those two points, those two

points being the front and the back of the corpus
callosum, to be thicker than the middle in a normal
brain?

A.    Correct.  I would say that the splenium on
Mr. Fields, which you could --

Q.    I'm sorry, Dr. Shimony, I just want the answer to
that question.

A.    Okay.  Please repeat.

Q.    So even though you were talking about sort of
the -- I think that you called them air bars, or sort
of the range of values that you might expect to see at
the front and the back portion of the corpus callosum,
are somewhat larger than the range of values you might
see in the middle of the corpus callosum, as a
population matter overall you would nonetheless expect
to see the front and back of the corpus callosum to be
thicker than you would of the middle in a normal brain?

A.    Correct.

Q.    Okay.  And that's often, and again you'll have to
correct me if I get the terminology wrong, but sort of
the configuration of a normal corpus callosum tends to
be bulbous on the end and then slightly thinner, if not
more thin, middle section connecting with two ends?

A.    I mean, that's, yes, as a general rule, yes.  But
because of those wide air bars, what I'm pointing out

is that it doesn't have to be that much wider and still be normal.

Q. But based on the calculations you've done, we don't have a quantitative answer to that question?

A. We do not.

Q. And aren't the front and back of the corpus callosum, the genu and the rostrum on the one hand and the splenium on the other of particular importance to cognitive function?

A. No more so than any other part of the corpus callosum. I mean, they -- certainly the splenium is known to be most important in visual processing, not necessarily cognitive functioning. It's a large portion of the splenium is providing information on connecting the left and right visual fields and visual processing left to right side.

Now, you know, the genu and the rostrum, yes, they're in the frontal lobes. And our frontal lobes do a lot of stuff; so, yes, could be.

Q. So I'm showing you what's been marked as Defendant's Exhibit 261.

Is this the Herron article that we've been discussing?

A. Yes.

Q. And I'm going to turn to --

I lost my page number for a moment.  Forgive me while I find it.

I believe it's page 12.  I just for the record want to show you page eight.  In the graph at the top of this page, which is labeled Figure 4, this is the graph that you've taken and included in your supplemental report, right?

A.    Yes.

Q.    And so if in this article, I'm going to direct you to page 12 now into a section towards the bottom of the page, and I'll make it bigger so we can see it more clearly.

I want to ask you about the sentence that I highlighted, which discusses the significance of reductions in the anterior part of the corpus callosum and says -- and makes reference to recent reviews highlighting the cognitive importance of the anterior callosum.

You would agree with that statement, correct?

A.    Yes.

Q.    How did you actually come up with the measurements for the four spots in the middle of Mr. Fields' corpus callosum that you did measure?

Did you use an automated software?  Did you use, like, the ruler function on the MRI viewing software?

A.   Yes.  I had to use the ruler function on the viewing software.

Q.   And this Herron article that you're relying on it describes a fully automated process or technique using different software programs to calculate the thickness of the corpus callosum; isn't that right?

A.   Right.  But they had a -- if you go back to Figure 4 --

Q.   And you're going to have an opportunity to explain, but I just wanted to make sure --

          THE COURT:  I think he was trying to answer your question, though.

          THE WITNESS:  There was -- they did two measurements.  They did one that was fully automated and then they had an expert segmentation one.  I would consider my measurements to fall within that category.

Q.   (BY MS. NELSON-MAJOR) To be an expert segmentation.

A.   Yes.

Q.   And you certainly have been qualified today as an expert.

     The segmentation that you did was manual, though, correct?

A.   Correct.

Q.   And this article is primarily discussing an

automated technique for segmentation given some of the limitations that can occur when doing a manual segmentation process; is that right?

A.   Correct.

MS. NELSON-MAJOR:  May I have a moment to confer with counsel?

THE COURT:  You may.

MS. NELSON-MAJOR:  No further questions.

THE COURT:  All right.  Doctor, are you okay? How much redirect do you think you're going to have?

MR. STEWART:  Very briefly, Your Honor.

THE COURT:  Are you okay or do you need a break?

THE WITNESS:  No, no, let's go.

THE COURT:  You would rather finish?  That's why I give you the option.  I suspected as much.

All right.  Sir, you may do redirect.

**REDIRECT EXAMINATION**

**BY MR. STEWART:**

Q.   Doctor, just a few questions.  First of all, you did review T2 and flair data for the 2011 scan; is that correct?

A.   Correct.

Q.   Did you notice white matter changes in that scan?

A. No.

Q. So it's possible that any changes in the 2017 scan wouldn't have been present in 2011?

A. Correct.

Q. And I believe there was some discussion about your reports. Could we pull up Government's Exhibit 74?

Is it accurate that that was produced in August of 2024?

A. Yes.

Q. And let's pull up Defense Exhibit 256. And I believe that you were asked about this report.

Do you see the date on that?

A. September 9, 2024.

Q. Now there was some discussion about the measurements in the ventricles and the total brain volume and cerebrum volume you mentioned that there was something that you wanted to discuss there.

What were you wanting to point out?

A. Could you bring up, I think it was Exhibit 40, which is my original report.

Q. Sure. Let's go to Government's Exhibit 40. Let's scroll down. I am assuming that you wanted to talk about the figure.

A. Yeah, the next figure actually.

So it was correctly pointed out that I had an

error there in my analysis that potentially could affect the results on the left side of that plot. And, again, I still think those numbers come up high but probably not as high. But we didn't talk about the right side of that plot.

So I want to point out a flaw on that curve which, you know, I think also indicates that something is wrong with these measurements.

And as you can see on that curve the mean that Mr. Bigler evaluated for the ventricle volume fell, you know, within the range, within the correct range of the Bethlehem article, the Nature paper.

But you could see what the typical air bars are on these curves and you get a feel for that based on the dotted lines, and that's a 95 percentile line, so that's two standard deviations.

So if you look as to where the yellow star is compared to the mean we're talking -- again, I'm just eyeballing this. We're talking something like 8 to 10 standard deviations above the mean for the measurement for Mr. Fields.

Now statistically, that is not possible. That is, you know, when you look at a paper in the medical field that has an eight standard deviation, that's -- that's wrong. You know that that's an error in the

calculation.

MR. STEWART: I have no more questions, Your Honor.

MS. NELSON-MAJOR: Just very brief redirect. Recross. I don't know where we are at this point. We're somewhere.

THE COURT: Down is up; up is down.

MS. NELSON-MAJOR: Mr. Stewart is a doctor.

THE COURT: Yeah, I think we should all be considered doctors at this point.

**RECROSS-EXAMINATION**

**BY MS. NELSON-MAJOR:**

Q. So you testified that the 2011 MRI files that you reviewed included the T2 flair sequence. The MRI files are called DICOM files, that's right?

A. Correct, that it is the electronic format that they're placed into, yes.

Q. I'm going to show you what's been marked as Defendant's Exhibit 20. I don't believe that there was an objection to this exhibit. It's the actual MRI images of Mr. Fields' 2011 MRI brain study.

Here we go.

So what we're looking at on the screen is a software viewing program that collects all of those MRI images that were generated in the 2011 MRI; is that

right?

A. Yes.

Q. And on the left-hand side there's a series of smaller icons running vertically down the left-hand side of the screen?

A. Yes.

Q. And are each one of these icons a different sequence in the MRI study?

A. Yes.

Q. And I can scroll down but can you point out where the T2 flair sequence is?

A. Well, there's separate sequences. There's the T2. It says "T2 FSE," that one, and then the flair is right below it.

Q. So in your opinion, you were able to assess for the presence of white matter changes on these two sequences?

A. Yes.

Q. And bear with me a moment, and I'm going to show you again what has been marked as Government's Exhibit 40, which is your initial report, and I think just a moment ago you testified that the yellow star on the ventricular volume graph, which represents ventricular volume as Dr. Bigler calculated for Mr. Fields, in your opinion, is inaccurate because it's

several standard deviations above the norm; is that right?

A. Yeah. It's too high to be a realistic value.

Q. And I think you said that you thought it was between eight and ten standard?

A. Well, I mean, it could be six. I don't know. It's a lot. It's too high.

Q. And there are other ventricle volumes that are higher than the yellow star, Mr. Fields' ventricle, on this graph, right?

A. No.

Q. Not the blue or the red dots that are higher, larger, than Mr. Fields?

A. Well, in older populations.

Q. So let's look at the left, which are populations -- people that are younger than Mr. Fields at the time of the MRI study.

There are a number of blue triangles, which represent men, and several yellow circles that are equal to or higher than Mr. Fields' ventricle volume; is that correct?

A. Yeah, it's correct. They're probably outliers.

Q. Is it possible that Mr. Fields' ventricle volume is an outlier as well?

A. I think you're misunderstanding outlier. Outlier

means bad. It's a wrong measurement. It's an incorrect measurement.

Q. So you think everything over Mr. Fields' ventricular volume is inaccurate? It's not --

A. Correct.

Q. Wasn't the graph generated from hundreds of MRI studies that Nature collected to help figure out normative brain volumes of various structures?

A. Correct.

Q. And so it's your opinion that because Mr. Fields' ventricular volume is eight, maybe six, we're not exactly sure, we would have to look at Dr. Bigler's report, standard deviations above the norm, it has to be inaccurate?

A. Yes. What I'm trying to say is they took data from 100 studies. They didn't reprocess any of that data. Some of those studies could have wrong values in them.

But they're scientists and they present all their data, and so it's very clear to me that that pink circle that's pretty high there between 18 and 35 years old, that's a wrong measurement. That's a study that screwed it up but they still included it in their sample, so they put a dot there. You know, just because it's on there doesn't mean it's right.

If you see the bulk of the measurements, the bulk of the measurements in the study is hugging that very narrow 95 percent line, that's around the average.

And Mr. Fields' measurement is out of that range.

Q. And the dots that are hugging the line, that would represent -- the closer to the line the more close to normal. The dots cluster around what's considered normal at the bottom of the graph; is that right?

A. Correct.

MS. NELSON-MAJOR: Just a moment, Your Honor. No further questions.

THE COURT: Okay. All right. Thank you, Dr. Shimony. You are finished. You are excused. You may step down.

Do we have any more witnesses today?

MR. STEWART: No, Your Honor. Our last witness is Dr. Seward who will be here in January.

THE COURT: All right. Then the defendants still have Mr. Stanick, right, as your last witness?

MS. NELSON-MAJOR: That is correct.

THE COURT: Because we've now decided Ms. Koslow is no longer needed. We'll just rely on her declaration.

All right. Thank you all. We finished before time. What a treat.

Well, I think we're -- anything else before we adjourn? I know we've got our proposed findings of fact conclusions of law timing and page number set.

Anything else we need to address?

MS. NELSON-MAJOR: No, Your Honor.

MR. STEWART: Nothing from the government, Your Honor.

THE COURT: All right. Well, safe travels. I will see you all in January. Have happy holidays.

We are adjourned.

(Evening recess at 3:34 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: January 16, 2025


/S/ Shelley Ottwell, RPR
Shelley Ottwell, RPR, CSR
U.S. STENOGRAPHER

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT